UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>    Defendant. | Case No. 14-cr-00175-TEH-1<br><br>**ORDER DENYING DEFENDANT'S MOTION TO STRIKE SURPLUSAGE IN THE INDICTMENT** |

**INTRODUCTION**

In a Superseding Indictment (the "Indictment") filed on July 30, 2014, the United States charged Defendant Pacific Gas and Electric Company ("PG&E") with one count of obstructing a National Transportation Safety Board ("NTSB") investigation, and twenty-seven counts of violating the Natural Gas Pipeline Safety Act ("PSA"). (Docket No. 22). In the Indictment, the Government also sought an alternative fine under 18 U.S.C. § 3571(d). On August 8, 2014, Defendant Pacific Gas and Electric Company filed a motion to strike allegedly surplus language in the Indictment. (Docket No. 33). On September 22, 2014, the Court heard oral arguments on this matter. After carefully considering the parties' submissions and oral arguments, the Court now DENIES PG&E's motion to strike surplusage for the reasons set forth below.

**BACKGROUND**

On September 9, 2010, a gas line owned and operated by PG&E ruptured, causing a fire that killed eight people and injured fifty-eight others. Additionally, the fire damaged 108 homes, thirty-eight of which were completely destroyed. Ind. ¶ 5. In July of 2014, a Grand Jury returned a superseding indictment charging PG&E with twenty-seven counts of violating the Pipeline Safety Act, and one count of obstructing the Government's investigation of the explosion and PG&E's Integrity Management program.

1   The Indictment contains one paragraph (Paragraph 5 under "Introductory
2   Allegations") that explicitly describes the explosion:

> On September 9, 2010, at approximately 6:11 p.m., a portion of Line 132 (Segment 180) ruptured in a residential neighborhood of the City of San Bruno (the "San Bruno explosion"). Gas escaping from the rupture ignited, causing a fire that killed eight people and injured 58 others. The fire also damaged 108 homes, 38 of which were completely destroyed.

The remaining references to the San Bruno explosion in the Indictment refer to it in the context of PG&E's activities preceding the explosion and as the subject of a subsequent investigation that PG&E allegedly obstructed. Ind. ¶¶ 22, 34, 35, 43, 45, 50, 61.

The National Transportation Safety Board began an investigation the day after the explosion, which examined the cause of the explosion, the characteristics and history of the failed pipeline, the adequacy of PG&E's emergency response, and PG&E's operations. The investigation revealed a number of deficiencies in PG&E's record keeping, Integrity Management program, and maintenance practices as they related to various sections of the pipeline - including Line 132, the line that ruptured in San Bruno. Ind. ¶¶ 54-60. These alleged deficiencies form the basis of the criminal charges against PG&E for violating the Natural Gas Pipeline Safety Act.

Count One of the Indictment charges PG&E with obstructing the NTSB investigation into the San Bruno explosion, in violation of Title 18, United States Code § 1505. Counts Two through Twenty-Eight charge PG&E with various violations of the Natural Gas Pipeline Safety Act. For the purpose of determining the maximum alternative fine pursuant to Title 18, United States Code § 3571(d), the Indictment also alleged that PG&E derived gross gains from its misconduct in the amount of approximately $281 million, and that victims suffered losses of approximately $565 million. Ind. ¶ 76.

**LEGAL STANDARD**

An indictment must be a "plain, concise, and definite written statement of the essential facts constituting the offense charged . . . ." Fed. R. Crim. P. 7(c). "On the

defendant's motion, the court may strike surplusage from the indictment . . . ." *Id.* at 7(d). "The purpose of Rule 7(d) is to protect a defendant against prejudicial or inflammatory allegations that are neither relevant nor material to the charges." *United States v. Ramirez*, 710 F.2d 535, 544-45 (9th Cir. 1983); *see also* Fed. R. Crim. P. 7 advisory committee's note. The decision to strike surplusage is subject to the district court's discretion. *United States v. Laurienti*, 611 F.3d 530, 546 (9th Cir. 2010); *United States v. Terrigno*, 838 F.2d 371, 373 (9th Cir. 1988).

An indictment is sufficient if it: (1) contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend; and (2) contains sufficient facts to allow a defendant to raise a double jeopardy bar to subsequent prosecutions arising from the same actions. *United States v. Lazarenko*, 564 F.3d 1026, 1033 (9th Cir. 2009). Under the Alternative Fines Act ("AFA"), the government must prove to a jury beyond a reasonable doubt any facts used to establish a fine greater than the statutory maximum. *See Southern Union Co. v. United States*, 132 S.Ct. 2344, 2348-49 (2012).

**DISCUSSION**

**1. The Indictment's References to the Explosion are Relevant**

PG&E contends that references to the explosion are irrelevant to the charges returned by the Grand Jury and will serve only to prejudice the trial. Mot. at 4 (Docket No. 33). Federal Rule of Criminal Procedure 7(d) provides a trial court with the discretion to strike surplusage from an indictment in order "to protect a defendant against prejudicial or inflammatory allegations that are neither relevant nor material to the charges." *Terrigno*, 838 F.2d at 373 (quotation marks omitted); Fed. R. Crim. P. 7(d) advisory committee's note. Therefore, language in an indictment that is relevant to the charges is not surplusage, and a court need not balance relevance against prejudice in deciding a motion to strike. *See United States v. Laurienti*, 611 F.3d 530, 546-47 (9th Cir. 2010) ("Even if the use of the word "unlawful" could be considered prejudicial, we hold that the

3

district court nevertheless did not abuse its discretion because the allegation was relevant."); *United States v. Graves*, 5 F.3d 1546, 1550 (5th Cir. 1993) ("For language to be struck from an indictment, it must be irrelevant, inflammatory, and prejudicial.").

Although the Ninth Circuit has not fully articulated the applicable relevance standard in the context of surplusage, it has implied that "relevance" for indictment purposes is a fairly broad standard, repeatedly affirming district courts' decisions not to strike surplusage on relevance grounds. In *Laurienti*, a case about securities fraud, the Ninth Circuit upheld the use of the adjective "unlawful" in an indictment to describe certain sales practices, even though the conduct was not unlawful per se, because the government intended to prove unlawfulness at trial. 611 F.3d at 547 ("The characterization . . . was relevant, because the government sought to prove that . . . the practices were indeed unlawful.").

In *Terrigno*, the Ninth Circuit upheld an indictment's description of embezzled funds as "destined for the 'poor and homeless,'" along with other somewhat prejudicial details, because such facts were "essential" to proving intent and conversion. 838 F.2d at 373. Although the court described these facts as "essential," this does not seem quite accurate – the government needed to prove that the defendant converted the funds from some other purpose, not that the funds were specifically destined for the especially sympathetic "poor and homeless." Rather, the court's holding is best understood as applying a broad and permissible definition of relevance at the grand jury stage.

The Ninth Circuit has also stated in dicta that "surplusage" includes the "language of an indictment [that] goes beyond alleging elements of the crime," and that the inclusion of such surplusage "must not be allowed to prejudice a defendant in the context of his case." *United States v. Jenkins*, 785 F.2d 1387, 1392 (9th Cir. 1986). The court in *Jenkins*, however, was not addressing a motion to strike surplus language, but was rather addressing the separate question of whether surplus language in an indictment *must be proven at trial*. *Id.* At no point does *Jenkins*, or the cases upon which it relies, refer to Federal Rule of Criminal Procedure 7, the rule at issue here. In fact, it is obvious that

4

*Jenkins* is talking about a different kind of surplusage than that which is described in Rule 7. The surplusage described in *Jenkins* requires only that the language go "beyond alleging elements of the crime," without respect to whether it is prejudicial. Accordingly, the court in *Jenkins* determined that because the government's allegation was not an element of the charged offense, it was therefore surplusage, even though it was *not* prejudicial. *See id.* at 1392 ("[A]ppellants here make no claim that the indictment failed to inform them fully of the charges against them or that they were otherwise prejudiced by the allegations of government insurance. Nor could they, on these facts. . . . [T]he language was surplusage that did not have to be proved at trial. Its inclusion was harmless."). Given that the purpose of striking surplusage under Rule 7(d) is to protect a defendant against irrelevant allegations that may be *prejudicial*, *Jenkins*' dicta should not be interpreted as laying out the standard for relevance under Rule 7(d).

Courts in other circuits have "strictly construed [this standard] against striking surplusage," and such motions are rarely granted. *United States v. Jordan*, 626 F.2d 928, 930 n.1 (D.C. Cir. 1980); *see also United States v. Eisenberg*, 773 F. Supp. 662, 700 (D.N.J. 1991) ("It is an exacting standard which is met only in rare cases."). On the other hand, when considering whether to strike potentially surplus language, the district court should be mindful that the prosecution "may not use the indictment as a vehicle to persuade the jury that the crime alleged has great and hidden implications." *United States v. Brighton Bldg. & Maint. Co*, 435 F. Supp. 222, 230-31 (N.D. Ill. 1977).

PG&E identifies a district court case from Virginia that found the relevance standard for surplusage to be narrower than the evidentiary standard of relevance articulated by Federal Rule of Evidence 401. Mot. at 5; Reply at 4 (Docket No. 37) (citing *United States v. Cooper*, 384 F. Supp. 2d 958, 960 (W.D. Va. 2005)). PG&E contends that language is irrelevant under Rule 7 where it is "unnecessary in making out a *prima facie* pleading of the violation." Mot. at 5 (quoting *Cooper*, 384 F. Supp. 2d at 960) (internal quotation marks omitted). In *Cooper*, the district court explained that because the standard

5

of relevance for purposes of surplusage is narrower than the evidentiary standard, some facts that might be relevant at trial might be "irrelevant" surplusage in an indictment. *Id.*

The appropriate standard of relevance is discussed in the context of each of the charges below.

**a. References to the explosion in the context of the obstruction charge**

A criminal obstruction charge under 18 U.S.C. § 1505 has three elements: (1) there must be a proceeding pending before a department or agency of the United States; (2) the defendant must be aware of the pending proceeding; and (3) the defendant must have "intentionally endeavored corruptly to influence, obstruct or impede the pending proceeding." *United States v. Price*, 951 F.2d 1028, 1030-31 (9th Cir. 1991).

In previous obstruction cases, courts have declined to strike allegedly surplus background information where it provided context for the defendant's conduct. *See, e.g.*, *United States v. Poindexter*, 725 F. Supp. 13, 35-37 (D.D.C. 1989) (declining to strike background paragraphs about the relationship between the U.S. and Iran, the fact that hostages were held in Lebanon, and the seizure of the American embassy, as it "would be difficult, if not impossible, for the jury to understand defendant's allegedly false statements and obstruction without that background").

The relevance of identifying the subject of the investigation goes beyond merely providing context. The specific intent required for obstruction of justice under the applicable statute is that PG&E must have acted "corruptly," meaning that "the act must be done with the purpose of obstructing justice." *U.S. v. Laurins*, 857 F.2d 529, 536-37 (9th Cir. 1988). Because the Government must prove this criminal *purpose* beyond a reasonable doubt at trial, the subject and scope of the investigation is directly relevant, regardless of the standard of relevance applied by the Court. It would be exceedingly difficult for a jury to determine the *mens rea* of PG&E's obstructive actions without knowing the nature of the investigation and the potential consequences of an adverse finding by the NTSB, which would provide a strong motivation for obstruction.

6

PG&E argues that the subject of the NTSB investigation is unnecessary, and therefore irrelevant under the *Cooper* standard, because the Government need only prove that there was an ongoing investigation. Mot. at 9. The Ninth Circuit's decision in *Terrigno* reveals that this cannot be right. As previously described, the appellate court in that case found the indictment's explanation that the converted money was originally "destined for the 'poor and homeless'" was both "material" and "relevant," despite the fact that the originally intended use of the funds was not technically an element of the *prima facie* case for embezzlement. *Terrigno*, 838 F.2d at 373. The court reasoned that this detail was nonetheless "necessary" to prove the defendant's intent to convert the stolen funds. *Id.* Here, while the subject of the NTSB investigation is not technically an element of the *prima facie* case for obstruction, it is similarly necessary to prove PG&E's intent to obstruct the ongoing investigation. Absent a compelling reason to do otherwise, this Court applies the Ninth Circuit's reasoning in *Terrigno* and denies PG&E's motion to strike references to the explosion in the context of the obstruction charge.

**b. References to the explosion in the context of the PSA violations**

It is a federal crime to "knowingly and willfully" violate the regulatory requirements of the Natural Gas Pipeline Safety Act (PSA). 49 U.S.C. § 60123. Counts two through twenty-eight of the Indictment allege that PG&E knowingly and willfully failed to properly test and keep records for its pipelines as required by the PSA. Ind. ¶¶ 62-75.

Whether the Indictment's references to the explosion are relevant (non-surplusage) or irrelevant (potential surplusage) to the alleged PSA violations depends on the applicable standard of "relevance." Under the narrow *Cooper* standard identified by PG&E, references to the explosion would be irrelevant, and therefore potentially surplus, because the explosion itself is not an element of the PSA violations. Conversely, under the broader evidentiary standard of relevance, the explosion may be relevant non-surplusage, as a subsequent pipeline explosion makes it at least somewhat more likely that the pipeline was

7

improperly maintained, especially because explosions such as the one in San Bruno are the very consequence of poor maintenance and monitoring contemplated by the institution of the Pipeline Safety Act.[1]  *See* Opp'n at 15; 49 U.S.C. § 60102 ("The purpose of this chapter is to provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities by improving the regulatory and enforcement authority of the Secretary of Transportation.").  Moreover, given the stakes at issue in gas pipeline maintenance, the fact of an explosion may be relevant in addressing PG&E's mental state regarding its maintenance program and pipeline safety precautions.  Further, despite PGE's allegations to the contrary, the PSA section of the Indictment fairly implies a causal relationship between the PSA violations and the San Bruno explosion.  For example, the Indictment states, "At no time between installation of [Segment 180] and the San Bruno explosion did PG&E check or confirm whether its records accurately reflected the data relevant to assessing the integrity of Segment 180, even though PG&E knew that GIS contained incomplete and inaccurate data."  Ind. ¶46.

The Court declines to follow *Cooper's* narrow standard of relevance for surplusage purposes.  As discussed above, the approach in the Ninth Circuit has been to use a broader standard than the one articulated by the out-of-circuit court in *Cooper*.  Because the Court finds that the Indictment's references to the San Bruno explosion are relevant to the PSA allegations, it therefore declines to strike them from those portions of the Indictment.

The Court nonetheless recognizes the potential for prejudice in such references if improperly presented at trial.  Given the deaths, injuries, and property damage that resulted from the explosion, and were reported by the media, it is common sense that these references might prejudice a jury.  Discussion of the explosion may confuse the issues at trial, resulting in a conviction of PG&E not for the PSA violations or obstruction charge, but for the subsequent explosion instead.  For this reason, the Court anticipates that there will be an extensive process of conducting voir dire, litigating motions *in limine*, and

---

[1] This is not an order on a motion *in limine*, and the discussion herein should not be taken as an evidentiary ruling in any way.

carefully crafting jury instructions as this case moves to trial.  Through this process, the Court can adequately limit any prejudicial effect of the references in the Indictment at trial.

In addition to the prejudice the references to the explosion will create at trial, PG&E objects to the prejudicial effect of the Indictment through pre-trial media reports.  PG&E contends that allowing references to the explosion to remain in the Indictment facilitates the media's coverage of this case as a prosecution primarily for PG&E's role in the explosion, as opposed to a pipeline maintenance violation and obstruction charge.  PG&E argues that surplusage in the Indictment "operates much like an extrajudicial statement in its likely impact and potential prejudice" because "indictments are public documents that . . . often are widely reported through the media."  Mot. at 17 (citing *Cooper*, 384 F. Supp. 2d at 961).  However, it is unreasonable to believe that striking references to the explosion from the PSA allegations, in part or in whole, will change the way the media reports on the impending trial – the press has already made the connection between the explosion and this prosecution.  Striking such references from the entire Indictment would be detrimental to an understanding of the other criminal allegations, and striking these references from the PSA section alone would do little to alleviate this alleged pre-trial prejudice.

### 2.  The Indictment is Legally Sufficient

Federal Rule of Criminal Procedure 7(c)(1) requires that an indictment "be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  "An indictment is sufficient if it: (1) contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend; and (2) enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  *United States v. Lazarenko*, 564 F.3d 1026, 1033 (9th Cir. 2009) (internal quotations omitted).  Further, it is generally sufficient for the indictment to set forth the charged offense in the words of the statute itself.  *United States v. Johnson*, 804 F.2d 1078, 1084 (9th Cir. 1986).  The government is not required to disclose the theory of its case or

9

the entirety of the supporting evidence in the indictment, only the essential facts necessary to put the defendant on notice of the nature of the charges. *United States v. Buckley*, 689 F.2d 893, 897 (9th Cir. 1982).

As discussed below, the Indictment here is sufficient for both the charged offenses and the alternative fine penalty.

**a. The Indictment is sufficient for the PSA and obstruction charges**

PG&E argues that the Indictment here is insufficient because it fails "to facilitate the proper preparation of a defense and to ensure that the defendants [will be] prosecuted on facts presented to the Grand Jury." Mot. at 3 (citing *United States v. Cecil*, 608 F.2d 1294, 1296-97 (9th Cir. 1979)). This argument is unconvincing. Over the course of sixteen pages, the Indictment goes into great detail about PG&E's PSA obligations and alleged failure to properly monitor and maintain its pipeline, including the segment that ruptured in San Bruno, as well as PG&E's obstruction of the subsequent investigation. *See* Ind. ¶¶ 3-60. These details comprise the "essential facts" underlying the charges brought by the Government. No additional facts are needed for PG&E to respond to the PSA and obstruction charges, as the explosion itself is not an element of those offenses.

Also, it is difficult to see how the description of the explosion in the Indictment could make it difficult for PG&E to prepare a defense to the obstruction and PSA charges, as PG&E is likely better informed than anyone regarding the facts of the explosion. PG&E argues that it needs to know whether or not to defend against causation arguments at trial. However, as already noted, the explosion is not an essential element of the obstruction or PSA charges, so PG&E can prepare its defense to those charges without addressing causation. Moreover, under *Buckley*, PG&E does not have a right to know exactly how the Government will prove its case.[2] The Court finds that the Indictment fairly informs PG&E

---

[2] Even so, PG&E already knows that the Government will make causation arguments for the Alternative Fines Act penalty, as discussed below. The Government has made clear its intention to prove causation, both in its opposition and in open court.

10

of the obstruction and PSA charges against it by sufficiently alleging all of the essential elements of those offenses.

Additionally, while the full extent of the Grand Jury's exposure to facts relating to the explosion is unknown, it is clear from the Indictment that the Grand Jury was presented with and considered such facts in arriving at the present charges. The Indictment includes the description of the explosion previously quoted from the Introductory Allegations, and the date of the explosion, September 9, 2010, is referenced throughout the Indictment as the end-date for the alleged criminal activities. *See, e.g.*, Ind. at ¶¶ 5, 54, 63, 65. Further, the Alternative Fines Act penalty is clearly predicated on the damage resulting from the explosion, as it specifies an amount of damages incurred by victims. Ind. ¶ 76.

PG&E relies on *Russell v. United States*, 369 U.S. 749 (1962), to argue that the Indictment did not plead sufficient facts under the Fifth and Sixth Amendment guarantees of grand jury review. Mot. at 5. This reliance is misplaced. *Russell* was a McCarthy-era case wherein members of the press refused to answer vague questions at a congressional hearing, and the government subsequently failed to allege that the questions were pertinent to the subject matter of the hearing – an *essential element* of the offense. 369 U.S. at 755. The Court reversed the defendants' convictions, because the government's failure to convince a grand jury of this essential element resulted in an indictment that was insufficient under the Fifth Amendment, and also failed to inform the defendant of the nature of the charges against him as required by the Sixth Amendment. *Id.* at 760, 764-68. For the reasons already discussed, the Indictment in this case shows that the Grand Jury adequately alleged the essential facts of the relevant offenses.

### b. The Indictment is sufficient for the Government's alternative fine

In order to obtain a fine greater than the statutory maximum for a particular offense, the government must prove to a jury at trial, beyond a reasonable doubt, facts establishing the appropriateness of the fine. *See Southern Union Co. v. United States*, 132 S.Ct. 2344, 2348-49 (2012).

11

PG&E argues that the Alternative Fines Act penalty sought in the Indictment is legally insufficient because it: (1) fails to allege the essential facts justifying an alternative fine; (2) does not provide a basis for the calculation of the requested fine amount; and (3) does not provide a proximate causal connection between the charges in the Indictment and the damages alleged. Mot. at 12. The Court finds that the essential facts are sufficiently alleged, the basis for the calculation is easily inferred, and there is no proximate cause requirement at the Indictment stage.

In relevant part, the Indictment states:

> With respect to the charges in this Superseding Indictment, for the purposes of determining the maximum alternative fine, pursuant to Title 18, United States Code, Section 3751(d), the defendant, PACIFIC GAS AND ELECTRIC COMPANY, derived gross gains of approximately $281 million, and the victims suffered losses of approximately $565 million.

Ind. ¶ 76. Although the essential facts relating to the AFA allegation are scattered among the earlier sections of the Indictment, they are present, and provide sufficient notice to PG&E of the nature of the allegation. Paragraph 76 of the Indictment describes the origin of the "derived gross gains" and the losses that the "victims suffered" by providing that these were consequences "[w]ith respect to the charges in [the] Superseding Indictment." The derivation of the gross losses suffered by the victims is clear - Paragraph 5 explains that the San Bruno explosion caused a fire resulting in the death of eight people and the injury of fifty-eight others, as well as causing damage to 108 homes, thirty-eight of which were complete destroyed.

Additionally, the figure of "$281 million in gains" alleged in Paragraph 76 was apparently taken from PG&E's submissions to the California Public Utilities Commission as the amount the company plans to spend to bring the pipeline system into compliance with federal regulations. Opp'n at 19. Consequently, this must be a reasonable calculation of the amount saved by PG&E's alleged failure to comply with the PSA as charged in the Indictment. Because avoided costs of compliance can be used to form the basis of a gross gain for purposes of the AFA, this number is sufficiently supported by the alleged PSA

12

violations, which the Indictment repeatedly identifies as being motivated by economic considerations. *See United States v. BP Products North America Inc.*, 610 F. Supp. 2d 655, 695-96, 728 (S.D. Tex. 2009) (accepting a plea agreement, over the objection of victims, where the government and defendant agreed on an alternative fine that was equal to twice the defendant's avoided costs of compliance).

PG&E also attempts to create a requirement that AFA allegations explicitly allege proximate cause, relying heavily on *United States v. Sanford Ltd.*, 878 F. Supp. 2d 137 (D.D.C. 2012). However, *Sanford* does not supply the support PG&E needs. First, that decision concerned a motion *in limine*, not a motion to strike surplusage; the court in that case had previously denied defendants' motion to strike, and it did not disturb that decision. *Id.* at 141-43. In fact, the AFA language of the indictment upheld by the court in *Sanford* generally tracks the language of the statute, much like the language of the Indictment in this case. *See id.* at 141. The court rejected defendants' revived "insufficient indictment" argument in the motion *in limine*, denying that motion to the extent the government would use financial data to prove a motive for the offense and financial gain under the AFA. *Id.* at 153-54. Moreover, the *Sanford* court discussed the government's need to prove proximate cause *to the jury at trial*, not to the grand jury in the indictment. *See id.* at 147, 152. *Sanford* simply does not stand for the heightened indictment standard that PG&E claims. It certainly does not require the Grand Jury or the Government to use the magic words "proximate cause" when charging an Alternative Fines Act penalty.

Finally, the Court notes that PG&E's arguments are mutually exclusive. PG&E simultaneously complains that the factual allegations for the increased fine are too vague, while also complaining that even minimal references to the San Bruno explosion in the Indictment are irrelevant and prejudicial. Consequently, PG&E's position demands further reference to the explosion, while PG&E implores the Court to remove all references to the explosion. PG&E cannot have it both ways. Because the existing references to the explosion are essential to the obstruction charge and AFA allegations, striking them from

the Indictment is untenable despite any argument made about their "surplus" nature in relation to the alleged PSA violations.  The explosion must be referenced in some portions of the Indictment, and it would provide only *de minimis* mitigation of prejudice to unjustifiably remove it from others.  PG&E may be right that after allowing such references the Court cannot "un-ring" the "bell" of associating the charged conduct with the explosion.  *See* Mot. at 11.  Unfortunately for PG&E, that fact cuts both ways.

**CONCLUSION**

Because the Indictment's references to the San Bruno explosion are relevant to the obstruction, PSA, and AFA allegations that the Government intends to prove at trial, the references are not surplusage, and the Court declines to strike them.  Furthermore, the Court finds that the Indictment sufficiently alleges all charges, as well as the basis for any penalty under the Alternative Fines Act.  Accordingly, PG&E's motion to strike surplusage is DENIED.

**IT IS SO ORDERED.**

Dated:   09/29/2014

_____
THELTON E. HENDERSON
United States District Judge