MELINDA HAAG (CABN 132612)
United States Attorney

DAVID R. CALLAWAY (CABN 121782)
Chief, Criminal Division

KIM A. BERGER (NYBN 2481679)
HALLIE M. HOFFMAN (CABN 2100020)
OWEN MARTIKAN (CABN 177104)
Assistant United States Attorneys

MARK ROMLEY (CABN 240655)
Trial Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7232
    Fax: (415) 436-7234
    Kim.Berger@usdoj.gov
    Hallie.Hoffman@usdoj.gov
    Owen.Martikan@usdoj.gov
    Mark.Romley@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> PACIFIC GAS AND ELECTRIC COMPANY, <br><br> Defendant. | Case No. CR 14-00175 TEH <br><br> UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COUNTS 4, 5 AND 24-28 AS BARRED BY THE STATUTE OF LIMITATIONS <br><br> Hearing Date: September 21, 2015 <br> Hearing Time: 10:00 a.m. <br> Court: Hon. Thelton Henderson |

USA's Opposition to Defendant's Motion to Dismiss Counts 4, 5 and 24 – 28
as Barred by the Statute of Limitations
Case No. CR 14-00175 TEH

# I. INTRODUCTION

The defendant Pacific Gas and Electric Company ("PG&E") has moved to dismiss Counts 4 and 5 and Counts 24 through 28 of the Superseding Indictment ("Super. Ind.") as barred by the statute of limitations. The counts were charged within the limitations period, and the Court should deny PG&E's motion.

# II. BACKGROUND

## A. The Statute of Limitations

The relevant statute of limitations with respect to the charged crimes provides for an indictment to be returned within five years of the offense conduct. *See* 18 U.S.C. 3282(a). Because of the tolling agreement between the government and PG&E, the limitations period for the original indictment is approximately seven years, reaching back to April 17, 2007, and for charges in the superseding indictment, back to July 29, 2007. The Superseding Indictment was returned on July 29, 2014. The recordkeeping violations are continuing in nature. As such, the counts were timely charged.

## B. The Challenged Counts

The challenged counts relate to PG&E's record-keeping obligations under the Pipeline Safety Act ("PSA") with respect to its gas transmission pipelines. Counts Four and Five of the Superseding Indictment relate to PG&E's obligation to maintain repair records for the life of its pipelines, and Counts 24 through 28 relate to PG&E's obligation to conduct and thereafter retain pressure test records for the life of its pipelines. Counts Four and Five charge PG&E with knowingly and willfully violating Title 49, Code of Federal Regulations, Section 192.709(a) with respect to Lines 132 and 109. (Super. Ind. ¶¶ 64, 65). That section requires operators to maintain and retain records of the date, location, and description of each repair made to the pipe for as long as the pipe remains in service. These repair records are crucial to PG&E's ability to understand the history of its pipelines, evaluate threats, and to ensure the safety and integrity of its pipelines. (Super. Ind. ¶ 12). Both Counts Four and Five allege that the offense conduct began on a date unknown to the grand jury, and continued at least until on or about September 9, 2010, and allege a specific date of January 22, 2010, the date PG&E executed a Baseline Assessment Plan. (Super. Ind. ¶¶ 64, 65).

Counts 24 through 28 charge PG&E with knowingly and willfully failing to retain strength test pressure records for the useful life of transmission lines 132, 109, 153, 191-1, and DFM 1816-01 in violation of Title 49, Code of Federal Regulations, Section 192.517(a).  (Super. Ind. ¶¶ 74,75).  This provision of the regulations requires operators to pressure test the strength of certain pipelines newly installed or returned to service after 1970, and retain the records concerning the test for the "life of the pipeline," including the test medium used, the test pressure, the test duration, and any leaks and failures noted.  (Super. Ind. ¶¶ 20, 21).  These records are equally critical in that the pressure tests establish the maximum allowable operating pressure that PG&E may subsequently operate each tested pipeline.  Counts 24 through 28 charge that PG&E failed to retain pressure test records beginning in 1970, and continuing through the date of the Superseding Indictment, for transmission lines 132, 109, 153, 191-1, and DFM 1816-01.  (Super. Ind. ¶¶ 20-21, 74-75).

The federal regulations also required pipeline operators to prepare a Baseline Assessment Plan by December 17, 2004, that identified known or potential threats for every relevant segment in its transmission system in high consequence areas, and decide how it was going to address threats to those segments.  (Super. Ind. ¶ 13).  In selecting an appropriate method to address any threats, PG&E was required to conduct an exhaustive search of their records, including any repair records and strength test pressure records, in making its integrity management decisions.  (Super. Ind. ¶ 13).  For pipelines with unstable manufacturing threats, PG&E was required to select an assessment method capable of evaluating manufacturing threats, such as a hydrotest.  External Corrosion Direct Assessment ("ECDA"), which tests the outside of the pipeline for external corrosion and third party damage, cannot be used because ECDA does not assess manufacturing defects.  (Super. Ind. ¶¶ 14, 17).  The Superseding Indictment further charges that PG&E's failure to maintain repair records required by the regulations allowed PG&E to select assessments methods for Lines 132 and 109 that could not identify active manufacturing threats on the lines, like the one that ruptured at San Bruno.  (Super. Ind. ¶¶ 28, 29).  After December 2004, PG&E was required to prepare a Baseline Assessment Plan on an annual basis.  Each annual Plan required PG&E to undertake an exhaustive search of its records for any information relevant to the integrity management decisions of its pipelines.

1    In addition to the Baseline Assessment Plans, PG&E prepared Long Term Integrity Management Plans ("LTIMPs") for Lines 132 and 109.  Each LTIMP was a detailed integrity management plan for the relevant segments of pipeline covered in the Baseline Assessment Plans.  In the LTIMP for Line 132, signed on April 26, 2010, PG&E declared there were no long seam failures or "leaks referencing material or manufacturing failure that had occurred since this pipeline was installed." *See* Exhibit A to the Declaration of Detective James Haggarty (the "Haggarty Decl").  In fact, Line 132 experienced a leak on a long seam that was repaired in 1988.  (Super. Ind. ¶¶ 28, 29).  Further, there were over 30 leaks of unknown causes on Line 132 before the line exploded in 2010.  PG&E's LTIMP for Line 109, signed on August 31, 2010, also claimed there were no long seam failures or leaks on covered segments on Line 109.  *See* Exhibit B to the Haggarty Decl. at ¶ 4.  In fact, Line 109 experienced a leak on a long seam in 1977 that was repaired in 1978.  According to the federal regulations, where pipeline operators experience leaks on the long seams on their gas transmission pipelines, they must assess similar segments throughout their system for like threats.

During the proceedings conducted by the California Public Utilities Commission ("CPUC") in the wake of the San Bruno explosion, PG&E admitted that it could not locate pressure test records for over 23,700 sections of its gas transmission pipelines covering over 430 miles of pipeline.  For sections that were put into service or replaced post-1970, PG&E was missing records for over 8680 sections of its system, representing over 50 miles of pipeline.  *See* Haggarty Decl. at ¶ 5.  PG&E was only able to produce approximately 47 full pressure test records for the post-1970 pipe sections during the investigation leading to the Superseding Indictment.  *See* Haggarty Decl. at ¶ 6.  As noted above, those pressure tests are critical to the safe operation of PG&E's gas transmission system given that the pressure tests set the maximum allowable operating pressure at which PG&E may thereafter operate each tested pipeline.

## III.    DISCUSSION

### A. The Record-Keeping Charges are Continuing Offenses

Consistent with the Supreme Court's decision in *Toussie v. United States*, 397 U.S. 112 (1970), and Ninth Circuit precedent, the Court should find that the record-keeping offenses charged in Counts 4

and 5 and Counts 24 through 28 are continuing offenses. Under the Supreme Court's test in *Toussie,* an offense is considered a continuing offense if the statute's language compels the conclusion that the offense is continuing, or if the nature of the crime is such that "Congress must assuredly have intended that it be treated as a continuing one." 397 U.S. at 115. In this case, the statute criminalizing regulatory violations under the Pipeline Safety Act, 49 U.S.C. § 60123(a), uses general language and does not specify whether any particular violation is continuing. But the nature of a record-keeping violation is such that by criminalizing it, Congress must have intended that it be treated as a continuing violation.

Under 49 C.F.R. § 192.709(a), pipeline operators must maintain records showing the "date, location, and description of each repair made to pipe . . . for as long as the pipe remains in service." That same section requires operators to retain records of repairs made to the pipeline system, other than repairs to pipe, for five years. 49 C.F.R. §§ 192.709(b). The regulations further require that pipeline operators pressure test the strength of certain pipelines newly installed or returned to service after 1970, and then "retain for the useful life of the pipeline, a record of each test performed…." 49 C.F.R. §§ 192.503, 192.517(a). A knowing and willful violation of these regulations is a crime. 49 U.S.C. § 60123(a).

The Ninth Circuit has held that possessory offenses are by their nature continuing offenses because the essence of the offense is possession. *United States v. Krstic*, 558 F.3d 1010, 1017 (9th Cir. 2009). Thus, possessing an illegal alien registration receipt card is an offense for as long as the defendant knowingly possessed it. *Id*. at 1018. The Ninth Circuit distinguished *Toussie*, which held that the crime of failure to register for the draft (as it was then written) was not a continuing offense, because a possessory offense assumes a continuous violation, while the failure to register is an instantaneous act. *Id*. at 1018.

Another Ninth Circuit decision with particular application here is *Big Bear Super Market No. 3 v. INS*, 913 F.2d 754, 757 (9th Cir. 1990). There, the Ninth Circuit held that INS regulations requiring an employer to maintain its employees' Forms I-9 so that they were available for INS inspection imposed a continuing duty on the employer to prepare and maintain those records. *Id*. The fact that an employer was cited once by the INS for failing to prepare and maintain the forms did not insulate it from

USA'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COUNTS 4, 5 AND 24 – 28
AS BARRED BY THE STATUTE OF LIMITATIONS
CASE NO. CR 14-00175 TEH                5

1  further violations if it continued to fail to maintain them. *Id*. The Ninth Circuit's understanding of the
2  continuing nature of record-keeping violations is consistent with the way it has defined the word
3  "maintain" —with reference to numerous dictionaries — as "to keep in a state of repair, efficiency, or
4  validity" and to "preserve from failure or decline." *Russell Country Sportsmen v. U.S. Forest Service*,
5  668 F.3d 1037 (9th Cir. 2011). The ordinary meaning of "maintain," in the Ninth Circuit's view,
6  communicates the idea of preservation against decline, or sometimes to hold something in a constant
7  state. *Id*. at 1042 n.6.

8  Other Circuit Courts have reached the same conclusion. The Fourth Circuit, in *United States v.*
9  *Blizzard*, 27 F.3d 100, 102 (4th Cir. 1994), held that Congress must have intended the offense of
10 concealing and retaining stolen property to be a continuing offense because to retain stolen property
11 means to keep it for a period of time, and the passage of time does not give the defendant license to
12 possess it. Similarly, the Fifth Circuit recently held in *United States v. Tavarez-Levario*, 788 F.3d 433,
13 439 (5th Cir. 2015), that an offense "that prohibit[s] an individual from remaining in an unlawful
14 condition or status" is by its nature a continuing offense, because "the perpetration of the offense
15 naturally continues for so long as the unlawful condition is maintained." A district court in the Eastern
16 District of Washington held that the nature of a defendant's crime of knowingly storing hazardous waste
17 without a permit continued for as long as the storage took place. *United States v. White*, 766 F.Supp.
18 873, 887 (E.D. Wash. 1991).

19 **B.  Counts Four and Five were Timely Charged**

20 The regulation charged in Counts Four and Five requires that pipeline operators keep and update
21 repair records for pipes "for as long as the pipe remains in service." Given that these pipelines remain in
22 service for many years, as PG&E concedes in its motion, the regulation's purpose is not to preserve
23 records from the date the pipeline was first placed in service, but to maintain a repair history for the
24 pipeline that is updated over time. 49 C.F.R. § 192.709. A complete record of what pipeline segments
25 failed, the cause of such failures, and what repairs were made, is critical to PG&E's ability to operate its
26 transmission system safely. It would make no sense to start the limitations period on the operator's first
27 failure to retain a repair record, or first destruction of a repair record, if the operator continually fails to
28

maintain an updated repair history over time.  The purpose of the regulation is to ensure that operators have a full and accurate record of the failures and subsequent repairs to its lines.  As the Ninth Circuit held, the essence of "maintaining" something is "to keep [it] in a state of repair, efficiency, or validity" and to preserve it from decline.  *Russell Country Sportsmen*, 668 F.3d at 1042.  By its nature, the offense of failing to maintain repair records presumes a continuing violation.

PG&E argues that the Pipeline Safety Act, by providing that certain civil penalties accrue with each day that a violation occurs, shows that Congress intended only its civil penalties to be continuing violations.  (Mot. at 10.)  This argument fails on its own terms, however, because the civil penalty is not a continuing violation; it merely provides that a new violation takes place every day.  49 U.S.C. § 60122(a)(1).  The purpose for this language is apparent: to allow regulators to accumulate fines for persistent violations.  *Id*.  That is the opposite of a continuing violation, which is a violation that extends over time.  *Krstic*, 558 F.3d at 1017-18 (noting that a continuing possessory offense begins when the possession begins and ends when the possessor parts with the item).

PG&E also argues, citing *Toussie*, that a regulatory violation cannot be a continuing violation unless the statute itself creates a continuing offense.  (Mot. at 11.)  This is a misapplication of *Toussie*, where the Supreme Court held that it would not defer to a regulation's interpretation of an offense as continuing when the statute itself did not state a continuing offense.  397 U.S. at 120.  The situation here is different: the statute does not state a discrete or particular act constituting an offense; rather, it criminalizes knowing and willful regulatory violations.  49 U.S.C. § 60123(a).  Thus, the nature of the regulation by necessity determines whether the offense is continuing.  PG&E would have the Court find that because the statute criminalizes conduct by reference to regulations rather than specifying the crime itself, no criminal violation of the regulations could ever be continuing.  (Mot. at 11.)  This interpretation contravenes what Congress must have known when it passed the statute: that it was criminalizing knowing and willful violations of a broad range of regulations, some of which might be continuing offenses, and some of which might not be, depending upon the nature of the offense.  This is made clear by the fact that Congress only required operators to maintain repair records to the pipeline

system, other than repairs to pipe, for five years, whereas Congress expressly required pipe repair records to be maintained for "as long as the pipe remains in service." 49 C.F.R. § 192.709(b).

### C. Counts 24 through 28 Were Timely Charged

Like the record-keeping offenses charged in Counts Four and Five, the offenses charged in Counts 24 through 28 are also continuing offenses, and thus not time barred.  Under 49 C.F.R. § 192.517(a), pipeline operators must conduct a pressure test for certain pipelines, and then retain records for each pressure test conducted for the useful life of the pipeline.  Like the repair records, a knowing and willful violation of this regulation is a crime.  49 U.S.C. § 60123(a).  The Indictment charges that PG&E violated this regulation starting in or about August 1970 and continuing through the date of the Superseding Indictment.  (Super. Ind. ¶ 75).

PG&E's argument that this crime is completed when a PG&E employee failed to maintain or destroyed a pressure test record is at odds with *Toussie* and the Ninth Circuit's decision in *Big Bear Super Market No. 3*, where the Ninth Circuit held that INS regulations requiring an employer to maintain certain forms imposed a continuing duty on the employer to prepare and maintain those records, and did not preclude further violations even if it was cited for failing to maintain the forms in the past.  913 F.2d at 757.

The same conclusion should apply here.  This regulation called for PG&E to conduct and then retain pressure test records for the life of the pipeline.  That PG&E could fail to retain or destroy a record five years ago and face no consequence is at odds with the regulatory scheme, which clearly called for criminal sanctions for willfully failing to retain pressure test records.

IV.  **CONCLUSION**

Counts 4 and 5 and 24 through 28 of the Superseding Indictment were timely charged.  As such, PG&E's motion should be denied.

Dated:  August 10, 2015

Respectfully Submitted:

MELINDA HAAG
United States Attorney

/s/
_____

KIM. A. BERGER
HALLIE M. HOFFMAN
OWEN MARTIKAN
Assistant United States Attorneys

MARK ROMLEY
Trial Attorney