UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>            Plaintiff,<br><br>    v.<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br>            Defendant. | Case No. 14-cr-00175-TEH<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS FOR MULTIPLICITY** |

This matter came before the Court on October 19, 2015 for a hearing on Defendant Pacific Gas & Electric ("PG&E")'s Motion to Dismiss for Multiplicity: Counts 3, 7, 8, 10-14, 16-18, and 20-23. After carefully considering the parties' written and oral arguments, the Court now GRANTS PG&E's motion, for the reasons set forth below.

**BACKGROUND**

On September 9, 2010, a gas line owned and operated by PG&E ruptured, causing a fire that killed 8 people and injured 58 others. Superseding Indictment ("SI") ¶ 5 (Docket No. 22). The fire damaged 108 homes, 38 of which were completely destroyed. *Id.* On July 30, 2014, a grand jury returned a superseding indictment ("Indictment") charging PG&E with 27 counts of violating the minimum federal safety standards for the transportation of natural gas by pipeline ("Pipeline Safety Act"), as set forth in 49 C.F.R. § 192 ("Section 192"). SI ¶¶ 62-75. "Knowing and willful" violations of these standards are criminalized under 49 U.S.C. § 60123 ("Section 60123").

Counts 2, 3, and 6-23 of the Indictment allege "knowing and willful" violations of Section 192's Subpart O, known as the Integrity Management ("IM") regulations. SI ¶¶ 62-63, 66-73. The IM regulations, set forth in 49 C.F.R. § 192.901 *et seq.*, were issued by the Department of Transportation in 2003 in response to a directive from Congress to "prescrib[e] standards to direct an operator's conduct of a risk analysis and adoption and

implementation of an integrity management program." H. R. 3609, at 18 (2002); 49

U.S.C. § 60109(c)(2)(A). The regulations detail minimum requirements for this integrity

management program. 49 C.F.R. § 192.901. The regulations apply to all "covered

pipeline segments," which are segments in densely populated areas where the risk of injury

or death from a gas leak or other pipeline failure is the highest. *Id.* § 192.903.

PG&E now moves to dismiss fifteen of the Indictment's IM regulation counts as

multiplicitous. These fifteen counts stem from five IM regulations – because the

Indictment charges for each regulation on a pipeline-by-pipeline basis – as follows:

- Counts 2-3 charge PG&E with violating 49 C.F.R. § 192.917(b) by "fail[ing] to gather and integrate existing data and information that could be relevant to identifying and evaluating all potential threats on covered segments," on two pipelines: Lines 132 and 109. SI ¶ 63.

- Counts 6-8 charge PG&E with violating 49 C.F.R. § 192.917(a) by "fail[ing] to identify and evaluate potential threats to covered segments," on three pipelines: Lines 132, 153, and DFM 1816-01. SI ¶ 67.

- Counts 9-14 charge PG&E with violating 49 C.F.R. § 192.919 by "fail[ing] to include in its annual baseline assessment plan all potential threats on a covered segment and fail[ing] to select the most suitable assessment method to assess all potential threats on covered segments," on six pipelines: Lines 132, 153, DFM 1816-01, 107, 191-1, and 109. SI ¶ 69.

- Counts 15-18 charge PG&E with violating 49 C.F.R. § 192.917(e)(3) by "fail[ing] to prioritize covered segments of lines as high risk segments for the baseline assessment or a subsequent reassessment, after changed circumstances rendered manufacturing threats on segments of the lines . . . unstable," on four pipelines: Lines 132, 153, DFM 1816-01, and 109. SI ¶ 71.

- Counts 19-23 charge PG&E with violating 49 C.F.R. § 192.917(e)(4) by "fail[ing] to prioritize covered segments of a line, as high risk segments for a baseline assessment plan or subsequent reassessment after a changed circumstance rendered manufacturing threats on those segments unstable, and fail[ing] to analyze covered segments to determine the risk of failure from such manufacturing threats," on five pipelines: Lines DFM 1816-01, 191-1, 109, 107, and 132. SI ¶ 73.

2

**DISCUSSION**

PG&E argues that the Indictment's pipeline-level charging is multiplicitous because "each course of conduct that is alleged to violate a regulation gives rise to one, single crime—no matter how many times that course of conduct is repeated—unless Congress provides otherwise in 'clear and definite' language." Def.'s Mot. to Dismiss for Multiplicity ("Mot.") at 1 (Docket No. 124). The Government argues that "each unique count differs because it requires the government to prove, for each segment, a separate act," and "where the separate counts charge separate acts but are part of a single scheme or purpose, the counts are not multiplicitous." Opp'n to Def.'s Mot. to Dismiss for Multiplicity ("Opp'n") at 2, 5-6 (Docket No. 148).

## I.   Multiplicity of Counts

### a.   The Proper Inquiry Is What Congress Has Made the Allowable "Unit of Prosecution"

Where, as here, a defendant is charged with multiple violations of the same provision of law, the Supreme Court has stated that the proper inquiry is "[w]hat Congress has made the allowable *unit of prosecution*." *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221 (1952) (emphasis added).[1] In other words, courts must

---

[1] The Government argues that a different test applies: that "[t]o determine whether two counts of an indictment are multiplicitous, the Supreme Court set forth the test of 'whether each [count] requires proof of an additional fact which the other does not.' " Opp'n at 1 (quoting *Blockburger v. United States*, 284 U.S. 299, 304 (1932)). To support this argument, the Government cites a line of Ninth Circuit cases that have applied this "proof of facts" test to determine whether multiple counts charged under the same provision of law were multiplicitous. *See, e.g.*, *United States v. Kennedy*, 726 F.2d 546, 548 (9th Cir. 1984). The Government therefore concludes that it was proper to charge by "pipeline" because the proof will be different for each pipeline. Opp'n at 3-6.

Accepting fully the Ninth Circuit's ruling in *Kennedy*, this order applies the test set forth by the Supreme Court in *C.I.T.* The Ninth Circuit did not distinguish or even consider the applicability of *C.I.T.* in *Kennedy*, and therefore did not provide a basis for setting it aside in favor of the *Blockburger* analysis. The Ninth Circuit cases that have actually considered *C.I.T.*, however, have explicitly rejected the approach the Government now requests, because "[t]he *Blockburger* test . . . is generally applicable when 'the same act or transaction constitutes a violation of two distinct statutory provisions,' " but is inapplicable when the "same act . . . constitutes a violation of only one statutory provision." *United States v. Keen*, 104 F.3d 1111, 1118 n.12 (9th Cir. 1996).

United States District Court
Northern District of California

determine whether Congress meant to punish each instance of a violation as a separate crime, or punish once per violation of a single provision of law.  The Supreme Court has also indicated that when such "choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is *clear and definite*."  *Id.* at 221-22 (emphasis added).

The Ninth Circuit has affirmed that the rule of lenity animates this inquiry: "A court may not impose consecutive sentences for a single transaction that violates more than one statutory provision or purpose unless Congress has *clearly expressed its intent* to make each violation within that single transaction a separate offense subject to separate punishment."  *Brown v. United States*, 623 F.2d 54, 57 (9th Cir. 1980) (emphasis added).  Courts must therefore limit their search for what Congress has deemed the "unit of prosecution" to materials that directly inform congressional intent: "Unless we can find from the face of the Act or from its legislative history a clear indication that Congress intended to authorize multiple punishments for a single transaction, we are obliged to construe the Act against the harsher penalties that result from cumulative punishments."  *Id.* at 57 (quoting *United States v. Clements*, 471 F.2d 1253, 1254 (9th Cir. 1972)).

In *C.I.T.*, the leading case on this issue, the Supreme Court considered whether the Fair Labor Standards Act ("FLSA") minimum-wage, overtime, and recordkeeping provisions called for criminal penalties on an employee-by-employee, week-by-week basis.  344 U.S. at 219-20.  There, the corporate defendant had been charged with 32 counts of violating the three FLSA provisions – 6 counts for failure to pay minimum wages, 20 counts for violation of the overtime provisions, and 6 counts for failure to comply with record-keeping requirements.[2]

---

[2]     The minimum wage violations were charged for "six separate weeks, one per week, but only as to one employee in any one week and only as to three employees in all"; the overtime violations were charged for "twenty separate weeks, one per week, [with a] total of eleven employees [] involved, two violations having been charged as to each of nine employees"; and the record-keeping violations were charged for "four employees, two violations as to each of two employees."  *C.I.T.*, 344 U.S. at 219-20.

United States District Court
Northern District of California

United States District Court
Northern District of California

After reviewing the FLSA's text and legislative history, the Court concluded that Congress was not "decisively clear" in defining a smaller unit of prosecution, and therefore that the "offense made punishable under the [FLSA] is a *course of conduct*." *Id.* at 224 (emphasis added). Thus, the Court would treat "as one offense all violations that arise from that singleness of thought, purpose or action." *Id.* For example, "a wholly unjustifiable managerial decision that a certain activity was not work and therefore did not require compensation under [the FLSA] cannot be turned into a multiplicity of offenses by considering each underpayment in a single week or to a single employee as a separate offense." *Id.* Because the information did precisely that, the Court affirmed the district court's dismissal of all but one count for each FLSA provision, "without prejudice to amendment of the information." *Id.* at 224-26.

### b. Congress Did Not Define a "Unit of Prosecution" for Criminal Violations of the Pipeline Safety Act

The question before the Court is therefore whether Congress intended for violations of the IM regulations on separate pipelines to constitute separate "units of prosecution" under Section 60123, such that they may be charged as separate crimes.

This is a question of statutory construction. Accordingly, the Court must look to the wording of the statutory provision at issue, the overall statutory scheme, and the legislative history to determine whether Congress defined a unit of prosecution "in language that is clear and definite." *C.I.T.*, 344 U.S. at 222.

### i. The Statutory Text Does Not Define a "Unit of Prosecution"

Section 60123(a), the statute that criminalizes violations of the IM regulations, provides only that:

> A person knowingly and willfully violating . . . a regulation prescribed or order issued under this chapter shall be fined under title 18, imprisoned for not more than 5 years, or both.

These words contain no mention of a unit of prosecution, let alone a clear indication that the proper unit of prosecution is the "pipeline." Indeed, by criminalizing regulatory

5

United States District Court
Northern District of California

1    violations at a general level, Section 60123 does not even define the conduct it outlaws.

2    The Government fares no better when the Court analyzes Section 60109, the

3    provision of the Pipeline Safety Act through which Congress called for the IM regulations.

4    That section states in relevant part:

> [T]he Secretary shall issue regulations prescribing standards
> to direct an operator's conduct of a risk analysis and adoption
> and implementation of an integrity management program
> under this subsection. The regulations shall require an
> operator to conduct a risk analysis and adopt an integrity
> management program within a time period prescribed by the
> Secretary . . . .

10   49 U.S.C. § 60109(c)(2)(a).  The statute speaks only of a single integrity management

11   program, and gives no indication of what Congress deemed the proper unit of prosecution

12   for a violation of the as yet unwritten regulations that would bring this program to life.

13   The Government argues that the Court should look to the IM regulations for the

14   "unit of prosecution," rather than Sections 60123 or 60109, because it is the regulations

15   that actually define PG&E's unlawful conduct.  Opp'n at 2.  And the IM regulations, the

16   Government argues, "mandate minimal standards that a pipeline operator must maintain on

17   *each covered segment of pipeline*," indicating that "the unit of prosecution is not the course

18   of conduct, but how an operator treats threats on a pipeline."  *Id.* (emphasis added).  The

19   IM regulation underlying Counts 6-8, for example, requires that "[a]n operator must

20   identify and evaluate all potential threats to *each covered pipeline segment*."  49 C.F.R. §

21   192.917(a) (emphasis added).

22   Though the Government's argument has logical appeal – as Congress cannot have

23   defined a "unit of prosecution" in a criminal statute that does not even define the unlawful

24   conduct – it is ultimately unpersuasive.  First, it is not clear that by requiring action on

25   "each" covered segment, Congress (speaking through the Department of Transportation)

26   intended to create a separate punishment for each covered segment.  Indeed, the minimum

27   wage statute at issue in *C.I.T.* likewise required that "[e]very employer shall pay to *each* of

28   his employees who is engaged in commerce or in the production of goods for commerce

United States District Court
Northern District of California

1    not less than 75 cents an hour." *C.I.T.*, 344 U.S. at 219 n.1 (emphasis added).  And the

2    Supreme Court nevertheless declined to punish employers on an employee-by-employee

3    basis for failure to pay "each" employee the minimum wage.  *Id.* at 224.[3]

4          Second, the IM regulations are of uncertain value in gleaning Congress' "clearly

5    expressed [] intent" (*Brown*, 623 F.2d at 57), given that Congress did not actually author

6    them.  Indeed, the regulations were not issued until 2003, nearly a quarter-century after

7    Congress added criminal penalties to the Pipeline Safety Act in 1979,[4] making it difficult

8    to even conclude that Congress impliedly intended to adopt the unit of prosecution defined

9    in the regulations, whatever that may be.  With later-enacted regulations as the only source

10   of the congressionally defined "unit of prosecution" for Section 60123, it is therefore

11   "difficult to ascribe any specific intent on this issue to Congress at all."  *United States v.*

12   *Pers. Fin. Co.*, 174 F. Supp. 871, 875 (S.D.N.Y. 1959).

13         Finally, even if the Court were to look to the regulations written and issued by the

14   Department of Transportation for a "clear and definite" statement from Congress, and were

15   to determine that the regulations define "each covered pipeline segment" as the unit of

16   prosecution, this would still not save the multiple counts of the Indictment because the

17   Indictment does not charge on a segment-by-segment basis.  Though the Government

18   argues that it plans to prove each count with segment-specific evidence (*see* Opp'n at 3-6),

19   the Indictment actually *charges* on a pipeline-by-pipeline basis.

20                    **ii.  The Legislative History Does Not Define a "Unit of**

21                            **Prosecution"**

22         Given that the statutory text does not provide a "clear and definite" statement from

---

[3]    The Supreme Court also relied heavily on the FLSA's legislative history in reaching this conclusion, as the legislative history indicated that Congress had considered and rejected employee-level and week-level units of prosecution.  *C.I.T.*, 344 U.S. at 222-23.  But this further illustrates why the inclusion of "each" does not clearly indicate a congressional intent that the "unit of prosecution" be the noun modified by "each," as Congress required conduct as to "each employee" in the FLSA even after almost expressly rejecting an employee-level unit of prosecution.

[4]    *Compare* 93 Stat. 989, 992 (Nov. 30 1979) (enacting predecessor to Section 60123), *with* 68 Fed. Reg. 69778 (Dec. 15, 2003) (adopting the IM regulations at issue).

1   Congress about the allowable unit of prosecution, the Court may consider whether the

2   legislative history of the Pipeline Safety Act provides any insight.  *Brown*, 623 F.2d at 57.

3           To that end, the Court granted the Government's request at the October 19, 2015

4   hearing to provide "supplemental briefing on the question whether anything in the

5   legislative history of [Section] 60123 suggests that Congress either intended or did not

6   intend to defer to the language of the underlying regulations to answer questions like the

7   proper 'unit of prosecution' for each crime."  Docket No. 188.

8           PG&E submitted supplemental briefing explaining that the legislative history for

9   Section 60123 is "surprisingly thin," and that "neither the committee report nor the

10  hearings concerning that bill address the proper 'unit of prosecution' under the provision,

11  or anything else."  Def.'s Supplemental Br. Regarding Multiplicity at 1, 2 (Docket No.

12  191).  The Government submitted supplemental briefing to say only that it had "found

13  nothing in the history of [Section] 60123 that answers [the Court's] question."  United

14  States' Supplemental Br. Regarding Multiplicity at 1-2 (Docket No. 193).

15          The legislative history therefore does nothing to inform whether Congress intended

16  that the unit of prosecution for violations of the IM regulations be the segment, the

17  pipeline, or anything else.

18                          **iii.   The Pipeline Safety Act Criminalizes a "Course of**

19                                          **Conduct"**

20          Having reviewed the language of Sections 60123 and 60109 and the relevant

21  legislative history, the Court cannot say that Congress *clearly expressed* an intent to

22  impose cumulative punishments upon PG&E for each pipeline that violated the IM

23  regulations.  All relevant materials are silent on the subjects of cumulative punishments

24  and unit of prosecution, and this silence compels the Court to adopt the more lenient

25  reading of the unit of prosecution.  *See United States v. Keen*, 104 F.3d 1111, 1119 (9th

26  Cir. 1996) ("[W]e are compelled by the rule of lenity to hold that imposition of

27  consecutive sentences . . . was error.") (citation omitted).  Accordingly, the Court holds

28  that the Pipeline Safety Act criminalizes a "course of conduct."  *C.I.T.*, 344 U.S. at 224.

United States District Court
Northern District of California

8

United States District Court
Northern District of California

### c.   The Indictment Alleges Only One "Course of Conduct" for Each of the Five IM Regulations at Issue

Charging PG&E with a separate crime for each pipeline that violated the IM regulations would therefore be inappropriate unless the violation on each pipeline stemmed from a separate "course of conduct."  Indeed, *C.I.T.* expressly left open the possibility that multiple counts for violating the same provision of law would be appropriate where the indictment alleges multiple courses of conduct.  *See C.I.T.*, 344 U.S. at 225 ("However, a wholly distinct managerial decision that piece workers should be paid less than the statutory requirement in terms of hourly rates involves a different course of conduct, and so would constitute a different offense.") (citation omitted).  To uphold all twenty IM regulation counts in the Indictment, the Government would therefore need to prove that the failure to follow the IM regulations constituted a different "managerial decision" on each separate pipeline, rather than a single "course of conduct."  *Id.*

To that end, the Government argues "each unique count differs because it requires the government to prove, for each segment, a separate act."  Opp'n at 5-6.  For example, on counts 6-8 – which charge that PG&E "failed to identify and evaluate potential threats to covered segments" (SI ¶ 67) – the Government explained that it "is not simply going to prove a course of willful conduct to fail to identify threats, but rather prove how PG&E willfully failed to do so with regard to a specific pipeline" (Opp'n at 4).  The Government also argues that because it "has carefully charged only certain exceedances on particular dates of particular lines," these must be different counts.  *Id.* at 5.

While different facts would be necessary to prove the pipeline-level counts in the Indictment, this does not direct the conclusion that each count stemmed from a different course of conduct or managerial decision.  If different evidence were the standard, then the Supreme Court would not have rejected the employee-level counts in *C.I.T.*, as proving each employee-level count there would have required employee-specific evidence.  The varied degree of charging across IM regulations – with the various regulations charged on as many as six and as few as two pipelines – likewise does not direct the conclusion that

1   each count stemmed from a different course of conduct. *C.I.T.* is again instructive; the fact

2   that the government brought counts only for the employees who had actually been

3   underpaid, overworked, or under-reported and only in the weeks they had actually been

4   underpaid, overworked, or under-reported (and this number varied across the three FLSA

5   provisions) did not mean the government had alleged separate counts. Here, as there, the

6   Government cannot create multiple courses of conduct simply by identifying the specifics

7   of the allegedly unlawful conduct.

8          Ultimately, the Government does not contest that the IM regulation counts all stem

9   from the fact that "PG&E adopted two unlawful practices and created one allegedly

10  incomplete report." Mot. at 1. Indeed, the Government admits that it "has set forth an

11  *overall scheme* in its [] Indictment." Opp'n at 1 (emphasis added). The Government ties

12  every count in this scheme to a single date, January 22, 2010, the date the Baseline

13  Assessment Plan was due in 2010. SI ¶¶ 63, 67, 69. 71, 73. And all twenty counts of this

14  scheme allege a "failure" by PG&E to follow one of five IM regulations, which together

15  "set[] forth how a pipeline operator identifies threats to a pipeline and uses the threat

16  identification in its integrity program, and . . . regulate[] what needs to be in the baseline

17  assessment plan for a pipeline." Opp'n at 1. PG&E's failure to follow these regulations,

18  even many times over, no more directs the conclusion that multiple counts per regulation

19  are appropriate than the *C.I.T.* defendant's failure to pay minimum wage, follow overtime

20  provisions, or comply with recordkeeping requirements.

21         The Indictment therefore alleges only a single course of conduct for each of the five

22  relevant IM regulations, and this is enough to sustain only five counts.[5] This conclusion

23  does not diminish how serious PG&E's alleged failure to heed the IM regulations was, or

24  how dangerous it was for PG&E to fail so many times over. As the Supreme Court has

25  explained:

---

27  [5]    PG&E concedes that at least five counts are sufficiently alleged. *See* Reply in
Supp. of Def.'s Mot. to Dismiss for Multiplicity ("Reply") at 9 (Docket No. 177) ("The
28  five different regulations that the government contends PG&E violated may allow it to
legitimately charge that conduct in five different counts.").

United States District Court
Northern District of California

United States District Court
Northern District of California

> [T]his [is] not out of any sentimental consideration, or for want of sympathy with the purpose of Congress in proscribing evil or anti-social conduct. It may fairly be said to be a presupposition of our law to resolve doubts in the enforcement of a penal code against the imposition of a harsher punishment.

*Bell v. United States*, 349 U.S. 81, 83 (1955).  Here, Congress has not stated in "language that is clear and definite" that PG&E should face separate criminal penalties for each pipeline that violated the IM regulations, so the Court has no choice but to limit the Indictment to one count per IM regulation.  *C.I.T.*, 344 U.S. at 222.

### d.  Eliminating All but a Single Count per IM Regulation Introduces Neither Duplicity Nor Proof Problems into the Indictment

The Government argues that "if all the acts on all of the numerous pipelines were combined in a single charge, there would be a duplicity issue."  Opp'n at 1.  *See also id.* at 2 ("Conversely, it is improper to charge more than one offense in a single count.") (citing *United States v. Yarbrough*, 852 F.2d 1522, 1530 (9th Cir. 1988)).

The Government's argument assumes what it attempts to prove – that each pipeline for which PG&E violated the IM regulations must be charged as a separate crime.  It is certainly true that "[a] duplicitous indictment compromises a defendant's Sixth Amendment right to know the charges against him, as well as his Fifth Amendment protection against double jeopardy."  *United States v. King*, 200 F.3d 1207, 1212 (9th Cir. 1999).  But duplicity analysis considers whether acts that *may* constitute separate offenses *must* be brought as separate offenses.  *See id.* at 1213 (answering in the negative whether "an act which can be viewed as an independent execution of a scheme must be charged in a separate count").  And as discussed above, the IM regulations criminalize a "course of conduct" – the course being PG&E's failure to follow each IM regulation – meaning PG&E's failure on each pipeline *may not* be brought as separate counts.  The Indictment would therefore not be charging more than one offense in each charge if all acts on each pipeline were combined into a single charge.

The Government likewise argues that "[i]f no pipeline is alleged or proven, but

United States District Court
Northern District of California

1  rather merely a course of conduct, the government would not prove that PG&E willfully

2  failed to" follow the IM regulations because the regulations criminalize on a pipeline-by-

3  pipeline basis.  Opp'n at 4.  But as discussed above, the IM regulations criminalize a

4  "course of conduct," and the Government will be free to introduce pipeline-specific and

5  segment-specific evidence to prove the "course of conduct" required by each IM

6  regulation.

7

8      **II.    Remedy for Multiplicitous Counts**

9          PG&E has requested that if the Court finds the IM regulation counts to be

10  multiplicitous – which it has – then the Court should "either dismiss Counts 3, 7, 8, 10

11  through 14, 16 through 18, and 20 through 23, or order the government to elect one count

12  under each charged provision of the integrity management regulations on which to

13  proceed."  Reply at 10.

14          The Court agrees with PG&E that since the Indictment alleges only five distinct

15  crimes, "allowing the government to proceed to trial on [twenty crimes] would unfairly

16  prejudice PG&E in the eyes of the jury" (Reply at 9), and the Court therefore also agrees

17  that dismissal of all but one count per regulation is the appropriate remedy.  This finding is

18  consistent with how other courts have handled multiplicitous counts.  *See, e.g.*, *C.I.T.*, 344

19  U.S. at 226 (affirming dismissal of all but one count per FLSA provision, "[w]ithout

20  prejudice to amendment of the information before trial if the evidence to be offered

21  warrants it").

22          Consistent with the discussion in this order, each count will be based on PG&E's

23  alleged course of conduct, rather than PG&E's actions as to particular pipelines.  Thus, it is

24  irrelevant which of the multiplicitous counts are dismissed, as the Government will be free

25  to present evidence on all alleged pipelines – within the confines of the Federal Rules of

26  Evidence – to prove that PG&E violated the five IM regulations at issue in this motion.

27  For example, Counts 2 and 3 allege violations of 49 C.F.R. § 192.917(b), with Count 2

28  focusing on Line 132 and Count 3 on Line 109.  Regardless of which count survives, the

United States District Court
Northern District of California

1    Government may offer evidence as to both lines to prove that PG&E knowingly and

2    willfully violated the regulation through the single course of conduct alleged in the

3    Indictment.  Because it does not matter which of the multiplicitous counts are dismissed,

4    the Court will grant PG&E's motion to retain only the first listed count for each alleged

5    regulatory violation.

6          Accordingly, the Court hereby GRANTS WITHOUT PREJUDICE PG&E's motion

7    to dismiss Counts 3, 7, 8, 10-14, 16-18, and 20-23 of the Indictment.  The parties shall

8    meet and confer on whether it is necessary for the Government to amend the Indictment,

9    and if so, a schedule for amendment.  The parties shall file, on or before **January 19,**

10   **2016**, either a joint stipulation detailing the outcome of this meet and confer or a joint

11   statement detailing their positions on any topics of disagreement.

12

13   **CONCLUSION**

14         For the reasons set forth above, PG&E's motion is GRANTED WITHOUT

15   PREJUDICE.  The parties shall meet and confer and provide notice to the Court, as

16   directed above, on or before **January 19, 2016**.

17

18   **IT IS SO ORDERED.**

19

20   Dated:   12/23/15

21                                                    THELTON E. HENDERSON
                                                      United States District Judge
22

23

24

25

26

27

28