1   LATHAM & WATKINS LLP
        Steven M. Bauer (Bar No. 135067)
2           steven.bauer@lw.com
        Margaret A. Tough (Bar No. 218056)
3           margaret.tough@lw.com
    505 Montgomery Street, Suite 2000
4   San Francisco, California  94111-6538
    Telephone:  +1.415.391.0600
5   Facsimile:  +1.415.395.8095

6   LATHAM & WATKINS LLP
        J. Scott Ballenger (*pro hac vice*)
7           scott.ballenger@lw.com
    555 11th Street, NW, Suite 1000
8   Washington, DC  20004-1304
    Telephone:  +1.202.637.2200
9   Facsimile:  +1.202.637.2201

10  CLARENCE DYER & COHEN LLP
        Kate Dyer (Bar No. 171891)
11          kdyer@clarencedyer.com
    899 Ellis Street
12  San Francisco, California  94109-7807
    Telephone:  +1.415.749.1800
13  Facsimile:  +1.415.749.1694

14  Attorneys for Defendant
    PACIFIC GAS AND ELECTRIC COMPANY

15

16              UNITED STATES DISTRICT COURT

17            NORTHERN DISTRICT OF CALIFORNIA
                  SAN FRANCISCO DIVISION

18

19
    UNITED STATES OF AMERICA,          CASE NO. CR-14-00175-TEH
20
              v.                       **DEFENDANT'S MOTIONS IN LIMINE**
21                                     **NOS. 1-10**
    PACIFIC GAS AND ELECTRIC
22  COMPANY,
                                       **Judge:   Hon. Thelton Henderson**
23            Defendant.              **Date:    Feb. 22, 2016**
                                       **Time:    2:30 p.m.**
24                                     **Place:   Courtroom 2, 17th Floor**

25

26          **REDACTED VERSION DOCUMENT SOUGHT TO BE SEALED**

27

28

1

## NOTICE OF MOTION AND MOTION

2

PLEASE TAKE NOTICE that on February 22, 2016, at 2:30 p.m., Defendant Pacific Gas

3

and Electric Company ("PG&E") will and hereby does move this Court for an order granting its

4

Motions *in Limine* Nos. 1 through 10.

5

***Evidence to Be Excluded.*** PG&E respectfully requests that this Court issue an order

6

excluding the following evidence and argument from the jury trial in this action:

7

Motion *in Limine* No. 1:  All evidence and argument relating to the San Bruno accident,

8

including:  (a) the accident itself and its causes; (b) PG&E's work clearance for the work done at

9

Milpitas Terminal on September 9, 2010, PG&E's pre-incident work clearance procedures, and

10

the work performed at Milpitas; and (c) PG&E's emergency response.

11

Motion *in Limine* No. 2:  All evidence and argument relating to the National

12

Transportation Safety Board ("NTSB") reports, opinions, conclusions, and recommendations

13

relating to the San Bruno accident, including:  (a) the NTSB final accident report, preliminary or

14

interim report, factual reports, or accident brief, or drafts of any such reports; and (b) any

15

conclusions, opinions, or recommendations contained in any of the above reports or briefs, or

16

draft reports or briefs.

17

Motion *in Limine* No. 3:  All evidence and argument relating to CPUC penalties and

18

fines, including:  (a) the $1.6 billion penalty imposed following Investigation 12-01-007 (the

19

"San Bruno OII"), Investigation 11-11-009 (the "Class Location OII"), and Investigation 11-02-

20

016 (the "Recordkeeping OII"), including the investigations and proceedings leading to the

21

penalty; and (b) PG&E's October 2012 discovery of misidentified pipeline features for Line 147

22

in San Carlos, its report of the inaccuracy to the CPUC, and the CPUC's December 2013

23

imposition of a fine for what it concluded was a misleading "errata" filing to correct the record.

24

Motion *in Limine* No. 4:  All financial evidence and argument unrelated to the charged

25

conduct, including:  (a) PG&E's profits, either as a whole or in connection with Gas

26

Transmission and Storage ("GT&S") services specifically; (b) PG&E's revenue, either as a

27

whole or in connection with the GT&S services specifically; (c) PG&E's budget-setting process;

28

1  (d) employee compensation; and (e) any uncharged conduct whose alleged relevance is based

2  solely on the theory that it evinces PG&E's profit motive.

3       Motion *in Limine* No. 5:  All evidence and argument relating to PG&E's safety

4  improvements after the San Bruno accident to imply that its prior work was illegal or improper,

5  including:  (a) restructuring its Gas Operations organization and leadership; (b) hiring several

6  hundred new employees at all levels of Gas Operations; (c) improving its Integrity Management

7  Program; (d) hydrotesting over 650 miles of pipeline; (e) installing additional automated and

8  automatic shutoff valves; (f) replacing over 100 miles of pipeline; (g) upgrading more than 200

9  miles of pipeline to accommodate inspection by in-line inspection tools; (h) scanning and

10  digitizing more than 3.8 million paper documents to meet the 2011 advisory that wherever

11  possible utilities rely on "traceable, verifiable, and complete" records; (i) validating the

12  maximum allowable operating pressure ("MAOP") of pipelines through hydrotesting or records

13  verification; (j) designing, building, and opening a new state-of-the-art Gas Control Center; and

14  (k) improving gas pipeline leak detection technology; and any PG&E statements of remorse and

15  empathy after the San Bruno accident, recognition of areas needing improvement, and

16  descriptions of the improvement measures.

17       Motion *in Limine* No. 6:  Certain recordkeeping evidence and argument, including:

18  (a) records (or lack thereof) of any repairs made prior to April 17, 2007, for which the

19  government cannot adduce evidence of a complete record that existed after April 17, 2007; and

20  (b) records (or lack thereof) of any pressure tests conducted prior to July 29, 2007, for which the

21  government cannot adduce evidence of a complete record that existed after July 29, 2007.

22       Motion *in Limine* No. 7:  All argument that actions before the integrity management

23  regulations became effective are relevant to establishing a violation, including overpressurization

24  events that occurred in 2003 or earlier.

25       Motion *in Limine* No. 8:  All evidence and argument relating to political and lobbying

26  activities, including (a) PG&E's participation in the drafting and revision of pipeline standards in

27  communications with public officials; (b) lobbying state and federal officials concerning the

28  content of such standards; (c) media reports or suggestions of official investigations concerning

lobbying public officials on an ex-parte basis; and (d) sanctions levied against PG&E for alleged lobbying rule violations.

Motion *in Limine* No. 9:  All evidence and argument relating to allegations of failure to cooperate with the NTSB investigation other than the data request response charged in Count One.

Motion *in Limine* No. 10:  All evidence and argument relating to the government's late-disclosed Rule 404(b) topic.

The Motion will be based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the declarations of Nicole C. Valco and Kala Sherman-Presser, the files and records of this case, and such other argument and evidence as the Court may consider.

1

# <u>TABLE OF CONTENTS</u>

2

3
<u>Page</u>

MOTION *IN LIMINE* NO. 1:  TO EXCLUDE ALL EVIDENCE AND
ARGUMENT RELATING TO THE SAN BRUNO ACCIDENT................................................. 1

MOTION *IN LIMINE* NO. 2:  TO EXCLUDE ALL EVIDENCE AND
ARGUMENT RELATING TO THE NTSB REPORTS, OPINIONS, AND
RECOMMENDATIONS FROM THE SAN BRUNO INVESTIGATION................................ 17

MOTION *IN LIMINE* NO. 3:  TO EXCLUDE ALL EVIDENCE AND
ARGUMENT RELATING TO CPUC PENALTIES AND FINES ........................................... 20

MOTION *IN LIMINE* NO. 4:  TO EXCLUDE ALL FINANCIAL EVIDENCE
AND ARGUMENT UNRELATED TO CHARGED CONDUCT ............................................. 28

MOTION *IN LIMINE* NO. 5:  TO EXCLUDE ALL EVIDENCE AND
ARGUMENT RELATING TO PG&E'S SAFETY IMPROVEMENTS AFTER
THE SAN BRUNO ACCIDENT......................................................................................... 31

MOTION *IN LIMINE* NO. 6:  TO EXCLUDE CERTAIN RECORDKEEPING
EVIDENCE AND ARGUMENT ....................................................................................... 36

MOTION *IN LIMINE* NO. 7:  TO EXCLUDE ALL ARGUMENT THAT
ACTIONS BEFORE THE INTEGRITY MANAGEMENT REGULATIONS
BECAME EFFECTIVE ARE RELEVANT TO ESTABLISHING A
VIOLATION.................................................................................................................... 38

MOTION *IN LIMINE* NO. 8:  TO EXCLUDE ALL EVIDENCE AND
ARGUMENT RELATING TO POLITICAL AND LOBBYING ACTIVITIES....................... 40

MOTION *IN LIMINE* NO. 9:  TO EXCLUDE ALL EVIDENCE AND
ARGUMENT RELATING TO ALLEGATIONS OF FAILURE TO
COOPERATE WITH THE NTSB INVESTIGATION.............................................................. 42

MOTION *IN LIMINE* NO. 10:  TO EXCLUDE ALL EVIDENCE AND
ARGUMENT RELATING TO THE GOVERNMENT'S LATE-DISCLOSED
RULE 404(B) TOPIC ...................................................................................................... 45

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**TABLE OF AUTHORITIES**</u>

<u>Page</u>

**CASES**

*Angelo v. Bacharach Instrument Co.*,
  555 F.2d 1164 (3d Cir. 1977)........................................................................ 24

*Becker v. ARCO Chemical Corp.*,
  207 F.3d 176 (3d Cir. 2000) ......................................................................... 25

*Cal. Dep't of Corr. v. Morales*,
  514 U.S. 499 (1995)....................................................................................... 38

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
  404 U.S. 508 (1972)....................................................................................... 41

*Cheek v. United States*,
  498 U.S. 192 (1991) ....................................................................................... 10

*Chiron Corp. v. NTSB*,
  198 F.3d 935 (D.C. Cir. 1999) ...................................................................... 17

*Curry v. Chevron, USA*,
  779 F.2d 272 (5th Cir. 1985) ........................................................................ 19

*Duran v. City of Maywood*,
  221 F.3d 1127 (9th Cir. 2000) ...................................................................... 13

*First Nat'l Bank of Boston v. Bellotti*,
  435 U.S. 765 (1978)........................................................................................ 41

*Fowler v. Firestone Tire & Rubber Co.*,
  92 F.R.D. 1 (N.D. Miss. 1980) ...................................................................... 24

*Hill v. Rolleri*,
  615 F.2d 886 (9th Cir. 1980) ................................................................... 20, 24

*In re Air Crash Disaster at Sioux City, Iowa on July 19, 1989*,
  1991 U.S. Dist. LEXIS 18638 (N.D. Ill. Dec. 26, 1991) ............................. 30

*In re Navy Chaplaincy*,
  738 F.3d 425 (D.C. Cir. 2013) ........................................................................ 9

*In re Petition of Cleveland Tankers, Inc.*,
  821 F. Supp. 463 (E.D. Mich. 1992) ............................................................. 20

*In re Related Asbestos Cases*,
  543 F. Supp. 1152 (N.D. Cal. 1982) ............................................................. 27

*John McShain, Inc. v. Cessna Aircraft Co.*,
  563 F.2d 632 (3d Cir. 1977)........................................................................... 19

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
    525 F. Supp. 2d 558 (S.D.N.Y. 2007)...................................................................9

*Major v. CSX Transp., Inc.*,
    278 F. Supp. 2d 597 (D. Md. 2003) ...................................................................20

*McClain v. Metabolife Int'l, Inc.*,
    401 F.3d 1233 (11th Cir. 2005) ...........................................................................9

*Old Chief v. United States*,
    519 U.S. 172 (1997).........................................................................8, 26, 38

*Paddack v. Dave Christensen, Inc.*,
    745 F.2d 1254 (9th Cir. 1984) .............................................................................19

*Protectus Alpha Navigation Co. Ltd. v. N. Pac. Grain Growers, Inc.*,
    767 F.2d 1379 (9th Cir. 1985) ......................................................................17, 20

*Rivers v. United States*,
    270 F.2d 435 (9th Cir. 1959) ...............................................................................14

*Rogers v. Tennessee*,
    532 U.S. 451 (2001)..............................................................................................38

*Senart v. Mobay Chemical Corp.*,
    597 F. Supp. 502 (D. Minn. 1984)......................................................................40

*Tagatz v. Marquette University*,
    861 F.2d 1040 (7th Cir. 1988) ...............................................................................9

*Tennison v. Circus Circus Enters., Inc.*,
    244 F.3d 684 (9th Cir. 2001) .......................................................................passim

*Turner v. Burlington N. Santa Fe R.R. Co.*,
    338 F.3d 1058 (9th Cir. 2003) .............................................................................19

*U.S. Football League v. Nat'l Football League*,
    634 F. Supp. 1155 (S.D.N.Y. 1986).....................................................................41

*United States v. Bensimon*,
    172 F.3d 1121 (9th Cir. 1999) ......................................................................29, 30

*United States v. Blackstone*,
    56 F.3d 1143 (9th Cir. 1995) .......................................................................26, 42

*United States v. BP Products North America Inc.*,
    610 F. Supp. 2d 655 (S.D. Tex. 2009) ................................................................35

*United States v. Bradley*,
    5 F.3d 1317 (9th Cir. 1993) .................................................................................25

*United States v. Commanche*,
    577 F.3d 1261 (10th Cir. 2009) ..........................................................................25

*United States v. DSD Shipping, A.S.*,
   No. 15-00102-CG-B, 2015 U.S. Dist. LEXIS 131003 (S.D. Ala. Sept. 29,
   2015) ............................................................................................................... 33

*United States v. Ellis*,
   147 F.3d 1131 (9th Cir. 1998) ...................................................................... 23

*United States v. Espinoza-Baza*,
   647 F.3d 1182 (9th Cir. 2011) ................................................................. 13, 38

*United States v. Eyster*,
   948 F.2d 1196 (11th Cir. 1991) .................................................................... 14

*United States v. Gomez*,
   763 F.3d 845 (7th Cir. 2014) ........................................................................ 25

*United States v. Gonzales-Flores*,
   418 F.3d 1093 (9th Cir. 2005) ......................................................... 8, 11, 16, 23

*United States v. Hitt*,
   981 F.2d 422 (9th Cir. 1992) ..................................................................... 8, 37

*United States v. Johnson*,
   No. 14-cr-00412-TEH, 2015 U.S. Dist. LEXIS 105518 (N.D. Cal. Aug. 11,
   2015) ......................................................................................................... 13, 24

*United States v. Martinez*,
   182 F.3d 1107 (9th Cir. 1999) ...................................................................... 25

*United States v. Mayans*,
   17 F.3d 1174 (9th Cir. 1994) ........................................................................ 25

*United States v. Mitchell*,
   172 F.3d 1104 (9th Cir. 1999) ............................................................ 28, 29, 30

*United States v. Mix*,
   Crim. No. 12-171, 2013 U.S. Dist. LEXIS 64919 (E.D. La. May 7, 2013) ................. 14, 15

*United States v. Moccia*,
   681 F.2d 61 (1st Cir. 1982).......................................................................... 44

*United States v. Reyes*,
   660 F. 3d 454 (9th Cir. 2011) ....................................................................... 30

*United States v. Rrapi*,
   175 F.3d 742 (9th Cir. 1999) ................................................................... 15, 23

*United States v. Sanford Ltd.*,
   878 F. Supp. 2d 137 (D.D.C. 2012) ......................................................... 30, 35

*United States v. Smith*,
   534 F.3d 1211 (10th Cir. 2008) .................................................................... 14

*United States v. Stahl*,
   616 F.2d 30 (2d Cir. 1980)........................................................................... 30

*United States v. Vega,*
    188 F.3d 1150 (9th Cir. 1999) ........................................................................ 47

*United States v. Vizcarra-Martinez,*
    66 F.3d 1006 (9th Cir. 1995) ................................................................. 16, 23

*United States v. Wiggan,*
    700 F.3d 1204 (9th Cir. 2012) ........................................................................ 15

*United States v. Yazzie,*
    59 F.3d 807 (9th Cir. 1995) ............................................................................. 9

*Weit v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi.,*
    641 F.2d 457 (7th Cir. 1981), *cert. denied,* 455 U.S. 988 (1982)........................ 42

**STATUTES**

49 U.S.C. § 1154(b) ........................................................................................ 17, 18

Cal. Pub. Util. Code § 315 ..................................................................................... 27

**OTHER AUTHORITIES**

Decision Determining Maximum Allowable Operating Pressure Methodology, D.
    11-06-017, 2011 Cal. PUC LEXIS 324 (Jun. 9, 2011) .......................................... 32

Decision Different of President Picker on Fines and Remedies to Be Imposed on
    PG&E, D.15-04-024, 2015 Cal. PUC LEXIS 230 (Apr. 9, 2015)................... 21, 23

Decision Establishing Maximum Operating Pressure for Lines 101, 132A, and
    147, D.11-12-048, 2011 Cal. PUC LEXIS 570 (Dec. 15, 2011) .................... 21, 22

Final Decision Imposing Sanctions for Violation of Rule 1.1 of the Commission's
    Rules of Practice and Procedure, D.13-12-053, 2013 Cal. PUC LEXIS 749
    (Dec. 19, 2013) ........................................................................................ 22, 23

Order Instituting Investigation into Operations and Practices of PG&E, etc.,
    2015 Cal. PUC LEXIS 229 (Apr. 9, 2015) ......................................................... 29

Peter E. Quint, *Toward First Amendment Limitations on the Introduction of
    Evidence: The Problem of United States v. Rosenberg,* 86 Yale L.J. 1622
    (1977)........................................................................................................ 41

**RULES**

Fed. R. Evid. § 1101(b).......................................................................................... 33

Fed. R. Evid. § 401 ........................................................................................... 17, 37

Fed. R. Evid. § 402 ........................................................................................... 17, 37

Fed. R. Evid. § 403 ....................................................................................... 26, 37, 45

| | |
|---|---|
| Fed. R. Evid. § 404(b) | 25 |
| Fed. R. Evid. § 404(b)(1) | 26, 44 |
| Fed. R. Evid. § 407 | 33, 36 |
| Fed. R. Evid. § 701 | 19 |
| Fed. R. Evid. § 702 | 19 |
| Fed. R. Evid. § 801 | 19 |
| Fed. R. Evid. § 803(8) | 19 |
| Fed. R. Evid. § 803(8)(A)(iii) | 19 |

**REGULATIONS**

| | |
|---|---|
| 35 Fed. Reg. § 13248 | 6 |
| 49 C.F.R § 192.917(e)(3) | 39 |
| 49 C.F.R. § 192.13(c) | 15 |
| 49 C.F.R. § 192.605 | 15 |
| 49 C.F.R. § 192.616 | 15 |
| 49 C.F.R. § 192.619 | 6 |
| 49 C.F.R. § 192.619(c) | 6, 32 |
| 49 C.F.R. § 192.625 | 15 |
| 49 C.F.R. § 192.917(e)(3) | 11 |
| 49 C.F.R. § 800.3 | 17 |
| 49 C.F.R. § 831.4 | 17, 20 |
| 49 C.F.R. § 835.1 | 17 |
| 49 C.F.R. § 835.10(c) | 18 |
| 49 C.F.R. § 835.2 | 17 |
| 49 C.F.R. § 835.3 | 17, 18 |
| 49 C.F.R. § 835.3(b) | 18 |
| 49 C.F.R. § 835.3(c) | 18 |
| 49 C.F.R. § 845.40 | 17 |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEF.'S MOTS. IN LIMINE NOS. 1-10
CASE NO. 14-CR-00175-TEH

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

49 C.F.R. § 845.41 ............................................................................................................ 20

68 Fed. Reg. 69788 ............................................................................................................ 6

69 Fed. Reg. 2307-01 ......................................................................................................... 39

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2  In reviewing the prosecution's pretrial arguments, the defense is concerned that there is a

3 significant disconnect between the specific allegations at issue and the evidence the government

4 intends to present.  This trial should only address whether any PG&E employee intentionally

5 violated specific pipeline regulations, within the statute of limitations.  The government,

6 however, apparently envisions a lengthy trial about the San Bruno accident and a collection of

7 alleged inadequacies stretching over decades.  The government heightened our concern when it

8 refused to agree to any of the defense's proposed motions *in limine* without a court order.  The

9 defense respectfully submits that it is important that this disconnect be addressed, so that the jury

10 is not overwhelmed with legally irrelevant allegations, lacking any context in the complicated

11 world of pipeline engineering, in the opening statement and throughout the trial.

12

## Motion *in Limine* No. 1:  To Exclude All Evidence and<br>Argument Relating to the San Bruno Accident

13

14  The San Bruno explosion was an awful, tragic accident.  On September 9, 2010, a 23-foot

15 long section of PG&E's 50,000 miles of underground natural gas pipelines, after operating safely

16 since its installation in 1956, suddenly and catastrophically failed.  The cause of the tragedy is

17 now well-established:  Unknown to anyone, this short section was installed missing one-half of a

18 weld running along its seam.  Natural gas pipelines are operated with such wide margins of

19 safety that this section functioned perfectly well for 54 years until it suddenly failed.

20  Following the accident, PG&E committed over $100 million to the San Bruno

21 community.  It also conceded negligence in the 1956 pipe installation, paving the way for

22 complete civil settlements with those impacted by the accident, amounting to more than

23 $500 million.  It did not appeal a $1.6 billion penalty imposed by its regulator.  After seeing that

24 this kind of sudden catastrophic failure is possible, PG&E (and many other pipeline operators)

25 made significant changes to its pipeline safety program.  And it has brought into question among

26 regulatory authorities the longstanding premise of their most basic regulations, including the

27 Grandfather Clause through which operators and regulators assume that aging pipelines will

28 continue to operate safely at pressures at or below the past pressures experienced.

1    The explosion, however, is not the result of any knowing and willful illegal act by a

2    PG&E employee.  This is why PG&E has pleaded not guilty, and is contesting these allegations

3    while simultaneously striving to become the safest utility in the country.

4    The San Bruno accident may be why federal prosecutors brought this indictment, but the

5    explosion itself is not relevant to the actual charges, which are an assortment of alleged

6    regulatory violations throughout PG&E's network and stretching back decades.  As the Court has

7    stated, the explosion is not an element of any alleged crime.  It is not relevant to any existing

8    damages or fines theory, now that the Court has dismissed the Alternative Fine Act loss

9    allegations.  And as we will show in this motion, testimony about the accident will not help the

10   jury assess the evidence concerning any Count in the superseding indictment.

11   Two things are certain, though, if the government is permitted to pursue its plan to

12   introduce the accident into this pipeline regulatory case.  First, that evidence will be enormously

13   prejudicial to PG&E.  As the Court previously recognized, it is "common sense" that "the deaths,

14   injuries, and property damage that resulted from the explosion . . . might prejudice a jury."

15   Dkt. 43 at 8.  Second, in order to combat that prejudice, the defense will challenge any

16   suggestion that the accident is linked scientifically or in any other way to any alleged regulatory

17   violation.  This will require days and days of engineering testimony and exhibits to help the jury

18   understand that this indictment is not about the San Bruno accident.  We respectfully request that

19   the Court exclude all evidence and argument concerning the San Bruno explosion, its causes, and

20   its aftermath under Rules 401 and 403.

21       **A.    Background**

22            1.    Procedural Background

23   Earlier, PG&E moved to strike references to the accident from the indictment, arguing

24   that the grand jury does not allege any causal connection between the alleged regulatory

25   violations and the accident itself.  The Court denied our motion, holding (broadly speaking) that

26   the indictment implicitly asserts a connection between the case and the accident, putting the

27   defense on notice.  The Court specifically noted:  "the Court anticipates that there will be an

28   extensive process of conducting voir dire, litigating motions *in limine*, and carefully crafting jury

1   instructions as this case moves to trial.  Through this process, the Court can adequately limit any

2   prejudicial effect of the references in the Indictment at trial."  Dkt. 43 at 8-9.

3                    2.        The Cause of the San Bruno Accident

4          In order for the Court to decide this motion and determine what a jury will hear, we

5   believe it will have to understand what is known about the San Bruno explosion.  While the facts

6   and metallurgy are complex, we submit that the ultimate result is quite straightforward:  there is

7   no evidence that a knowing and willful regulatory offense led to the accident.  The segment that

8   ruptured operated safely and without incident for more than five decades, and everyone agrees

9   that the weld defect remained undetected until the tragic accident in 2010.  It is not possible to

10  know today why those missing welds were not detected in 1956.  This terrible pipeline accident

11  was just that—an accident.  It was the product of negligence and human error, not "evil motive"

12  or any deliberate wrongdoing.  There is no evidence that any PG&E employee ever knew that the

13  pipe was defective.  PG&E made extensive good-faith efforts over the decades to promote safety

14  and avoid accidents, while managing 50,000 miles of underground natural gas pipe throughout

15  California.

16         PG&E originally built Line 132 in the 1940s, and the line generally runs for about

17  50 miles from the Milpitas Terminal, up the Peninsula, north to San Francisco.  There are more

18  than 300 different segments of Line 132.  Segment 180 is a 1,742 foot section in the San Bruno

19  area.  It was relocated in 1956.  PG&E's engineering records indicated that most of Segment 180

20  consisted of "DSAW" pipe—that is, API 5LX Grade X52 Double Submerged Arc Welded Pipe.

21  DSAW pipe is manufactured using a flat sheet of steel that is rolled into pipe and then welded

22  along the seam from both the outside and inside.  It is so widely considered safe and reliable that

23  the regulations state that the DSAW weld is as strong as seamless steel pipe (which has no weld

24  at all).  Properly made DSAW pipe of this specification can withstand upwards of 1,300 pounds

25

26

27

28

per square inch gauge ("psig") of pressure.  But a sequence of improbable events led Segment 180 to fail in September 2010 at one location at less than 400 psig.[1]

The rupture occurred in a section of Segment 180—approximately 23 out of 1,742 feet—that caused the San Bruno explosion.  That section of pipe contained six shorter sections of pipe colloquially called "pups."  PG&E engineers were unaware that three of the pups were missing an interior weld that is found in properly manufactured DSAW pipe.  Those missing welds were not detected by the pipe manufacturer or during the installation process, and no historical records identified a problem for future generations of PG&E engineers.  After the accident, the PG&E employee who crawled through the pipe during the 1956 installation explained that he had not noticed the missing welds.  Thus, there is no question at all that no one at PG&E ever knew about the defective pipe until it failed.

What caused these pups suddenly to fail?  Microscopic analysis after the fact showed that the missing interior seam weld on the pipe developed a crack known as a "ductile tear," which slowly grew over the years due to "fatigue crack growth."  The following diagram shows the unwelded region on the bottom, the ductile tear (colored in yellow), and the fatigue crack growth (colored in green):



The dominant theory to explain this engineering mystery is that the ductile tear was created during a post-installation hydrotest at 500 psig (at 1.25 times Line 132's maximum

---

[1]   The accompanying Caliguiri Declaration describes much of the fact presentation here.  *See* Decl. of Nicole C. Valco in Support of Def.'s Mots. *in Limine* Nos. 1, 5, and 8 ("Valco Decl.") Ex. 1.

1    allowable operating pressure ("MAOP") of 400 psig) and propagated by fatigue crack growth,

2    which may have resulted in the 2010 failure of Segment 180.  (Although hydrotests at

3    installation were not yet required by law in 1956, PG&E had started doing them at that point.

4    PG&E has not located a record of this possible 1950s era pressure test, but the evidence suggests

5    that it may have occurred.)  Using a method known as the Effective Area Method under

6    American Society of Mechanical Engineers ("ASME") industry standard B31G, the calculated

7    pipe burst pressure was more than 525 psig, so a standard 500 psig hydrotest was stressful

8    enough to cause ductile tearing, but not enough to make the pipe fail.

9         In the decades between PG&E's installation of Segment 180 in 1956 and the tragic

10   accident in 2010, Segment 180 operated safely and without significant incident.  Throughout this

11   period, PG&E took important steps to enhance the safety of its pipelines, both with respect to

12   Line 132 and more broadly.[2]  PG&E repaired or replaced various sections on all its gas

13   transmission pipelines as needed.  In the mid-1980s, PG&E became one of the first companies to

14   implement—voluntarily—a Gas Pipeline Replacement Program ("GPRP") to phase out older

15   pipelines that met certain criteria, which included those segments of transmission lines that used

16   outdated welding techniques (such as oxyacetylene welds, bell-bell chill ring welds, and bell and

17   spigot welds) and were located in areas with a greater risk to public safety in the event of an

18   incident.  This project was undertaken with considerable assistance from a global engineering

19   firm.

20        PG&E also surveyed and made replacements along transmission lines to account for

21   liquefaction and took precautions in the event of earthquakes.  Following the Loma Prieta

22   Earthquake in 1989, PG&E and outside contractors it hired conducted additional seismic surveys

23   to ensure the safety of its transmission pipelines during a future earthquake.  As a result of these

24   efforts, PG&E replaced numerous sections of pipe near certain fault areas.

25

26   _____

27   [2]   For trial, the complete discussion of the history of PG&E's pipeline safety programs may not
     be relevant unless the government is permitted to introduce evidence of the accident.  Several of
28   the motions that follow move to exclude some of this very evidence.

1    In the early 2000s, PG&E became an early adopter of the risk management approach to

2    maintaining the safety and reliability of its pipelines, a precursor to the integrity management

3    regulations that were eventually enacted.  The risk management approach allowed PG&E to

4    evaluate a multitude of threats to its pipelines and represented a significant advance from its

5    earlier GPRP program.  Instead of focusing on a singular threat to certain types of pipelines,

6    PG&E created risk algorithms that factored in the relative risk faced by all of its pipelines.

7    Likewise, PG&E's efforts related to Line 132 were also extensive and thorough.  PG&E

8    replaced and relocated portions of Line 132 in every decade from the 1950s until September

9    2010.  Replacement work was done as part of the GPRP and the evaluation of seismic risks.

10   PG&E set the MAOP for Line 132 at 400 psig pursuant to what is known as the "Grandfather

11   Clause."  *See* 49 C.F.R. § 192.619.  The regulations required hydrostatic testing for newly

12   constructed pipelines, but the "Grandfather Clause" provides that operators of pipelines

13   constructed before 1970 may utilize the highest known operating pressure obtained in the five-

14   year period preceding July 1, 1970.  49 C.F.R. § 192.619(c).  That regulation was based on the

15   sensible premise that manufacturing defects usually reveal themselves in operation, and if a

16   pipeline had been successfully operated at a certain pressure for a substantial period of time there

17   is every reason to believe that it can be operated at that pressure going forward.[3]  Before 1970,

18   Line 132 had attained a pressure high of 400 psig on October 16, 1968.

19   In 2002, Congress passed the Pipeline Safety Improvement Act, which is the basis for the

20   integrity management charges here.  PG&E conducted assessments on Line 132 pursuant to that

21   statute and its implementing regulations.

22   In sum, despite PG&E's good-faith efforts to monitor and enhance the safety of Line 132

23   over the years, the underlying weld defects in the pups located on the 23-foot stretch of Segment

24

---

25   [3]   *See* 68 Fed. Reg. 69788, 69791 (Dec. 15, 2003); 35 Fed. Reg. 13248, 13255 (Aug. 19, 1970).
     In fact, as a result of the San Bruno accident, the NTSB recommended that PHMSA revoke the
26   Grandfather Clause altogether and require that all gas transmission pipelines constructed before
     1970 be subjected to a hydrostatic pressure test, but PHMSA has not done so.  *See*
27   http://opsweb.phmsa.dot.gov/pipeline_replacement/by_decade_installation.asp (noting that over
     50% of onshore transmission pipe in the country was installed before 1970).

28

180 never came to light.  From 1956 up until the time of the accident, PG&E monitored and maintained Line 132, as it monitors and maintains the rest of its transmission pipeline network, and addressed defects that it discovered.  But as far as PG&E was aware, Segment 180 was a reliable pipe that had operated safely for more than half a century.

### 3.    The Day of the Accident

On the day of the San Bruno rupture, PG&E was performing electrical work at Milpitas Terminal, the origin of Line 132.  During the work, a power failure caused malfunctions in various pressure regulation valves, leading to a pressure increase on Line 132.  Although the pressure on Segment 180 did not exceed its MAOP, the pups failed.  Following the explosion, PG&E personnel worked frantically to stop the flow of gas to the rupture site, to assist emergency responders, and to control the gas distribution system in the area.  In its standard post-accident investigation, the NTSB concluded that there were errors in the electrical work at the Milpitas Terminal and in the work clearance there.  The NTSB also pointed out deficiencies in the emergency response to the failure.  The NTSB, however, did not conclude that these errors actually caused either the power failure or the explosion.

This was an abbreviated summary to give the Court a sense of the substantial evidence the jury would have to hear if testimony about the San Bruno explosion is admitted.  Next, we will turn to discussing how tangential this testimony is to the charges in this case.

### B.    The San Bruno Explosion Is Not an Element of Any Charge

The fact of the San Bruno pipe failure, its resulting damage, or what caused it are not elements of any of the charged regulatory offenses—as this Court has already recognized. Dkt. 43 at 7 ("[T]he explosion itself is not an element of the PSA violations."), 10 ("PG&E can prepare its defense to those charges without addressing causation.").  Similarly, it is also not an element of the charged obstruction offense.  Dkt. 43 at 7.  The pipe failure also is not relevant to the Alternative Fine Act claims, as this Court has dismissed the government's loss allegation. *See generally* Dkt. 201.

**C.     The San Bruno Pipe Failure Should Not Be Admitted To Show A Consequence Of The Alleged Crimes**

   1.     Highly Prejudicial Evidence Showing Alleged Consequences Is Disfavored

Since the pipe failure is not an element of any charge, the prosecution's proposed evidence can at best seek to show a consequence of an alleged completed violation.  To begin with, this theory for admitting evidence is disfavored—especially so when the evidence is prejudicial and its probative value slight or absent.  "Where the evidence is of very slight (if any) probative value, it's an abuse of discretion to admit it if there's even a modest likelihood of unfair prejudice or a small risk of misleading the jury."  *United States v. Hitt*, 981 F.2d 422, 424 (9th Cir. 1992).  Unfair prejudice is "the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."  *Old Chief v. United States*, 519 U.S. 172, 180 (1997) (citation omitted).

A roughly analogous situation arose in *United States v. Gonzales-Flores*.  418 F.3d 1093 (9th Cir. 2005).  There, the defendant was charged with knowingly and intentionally bringing aliens into the United States at a location other than at a recognized port of entry.  *Id.* at 1098. The government had sought to introduce the fact that two girls suffered a heat stroke while being transported by the defendant at trial.  *Id.*  The Ninth Circuit held that the evidence of injury was not admissible because it did not affect the probability that the defendant had committed any element of the crime.  *Id.*  The court held that the dramatic story of the injuries was precisely the kind of emotional evidence that could cause unfair prejudice while having little probative value. *Id.* at 1099.[4]

Here, the explosion and any argument about its cause is precisely the type of evidence that "provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant *wholly apart from its judgment as to his guilt or innocence*."

---

[4]     Likewise, in *United States v. Cooper*, 591 F.3d 582, 589 (7th Cir. 2010), the court excluded evidence of the effects on users of the charged drug sales.  As the court explained, "[e]vidence of what happened to Cooper's customers after they bought heroin from him had nothing to do with the charges."  *Id.*

1    *United States v. Yazzie*, 59 F.3d 807, 811 (9th Cir. 1995) (citation and internal quotation marks

2    omitted).  To avoid this kind of error, there would have to be a very clear probative value to

3    testimony about the explosion.  As we discuss below, we believe there is none.

4                    2.      The Government's Relevance Theories Are Insufficient

5            Thus far, the government has offered four arguments that the pipeline failure may be

6    relevant to the actual charges in the case.  None is sufficient for opening the door to the evidence

7    about the accident.

8                        a.      *Subsequent Events to Prove Prior Acts*

9            First, the government claims that the explosion "may be relevant . . . as a subsequent

10   pipeline explosion makes it at least somewhat more likely that the pipeline was improperly

11   maintained."  Dkt. 43 at 7-8 (citing Gov.'s Opp. to Mot. to Strike at 15).  Stated this broadly, the

12   argument must fail because any one or combination of a hundred factors could cause a pipeline

13   failure.  This kind of backward proof—seeking to prove a prior act by a subsequent event—does

14   not work when any number of prior events could have caused the subsequent event.  This theory

15   suffers from the basic logical fallacy that "[c]orrelation is not causation."  *Tagatz v. Marquette*

16   *Univ.*, 861 F.2d 1040, 1044 (7th Cir. 1988).  Essentially, the government's theory is "based on

17   the false inference that a temporal relationship proves a causal relationship."  *McClain v.*

18   *Metabolife Int'l, Inc.*, 401 F.3d 1233, 1243 (11th Cir. 2005).  The fact that an explosion occurred

19   does not imply a causal relationship to the alleged earlier violation of the regulation because the

20   subsequent event could have resulted from "random chance" or other causes, especially when

21   there are "potential confounding factors."  *In re Navy Chaplaincy*, 738 F.3d 425, 429 (D.C. Cir.

22   2013); *see also Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 677

23   n.350 (S.D.N.Y. 2007) (citing David H. Kaye & David A. Freedman, Reference Guide on

24   Statistics, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 2d at 138 (Federal Judicial

25   Center 2000) (explaining why correlation is not equivalent to causation: "For an easy example,

26   among schoolchildren, there is an association between shoe size and vocabulary.  However,

27   learning more words does not cause feet to get bigger, and swollen feet do not make children

28   more articulate.")).

1    Looking at the problem more specifically, which knowing and willful regulatory

2  violation does the prosecution contend caused the accident?  (As we noted earlier, the grand jury

3  did not make this finding or state this allegation.)  The negligent manufacture of the pups with a

4  missing weld surely was one cause of the accident.  Another would be the long-ago negligent

5  pipe installation.  Perhaps a 50-year old hydrotest caused a ductile tear.  These are all possible

6  confounding causes that make the prosecution's first argument untenable.

7                    b.       *Proving the Obvious with Unduly Prejudicial Evidence*

8            The government's second theory of relevance is that the explosion "is relevant to

9  showing the danger that running highly pressurized gas, through a pipeline . . . may present in

10  determining the degree of care that should have been exercised in assessing whether PG&E

11  willfully disregarded the regulations."  Dkt. 36 at 15.  As an initial matter, we certainly can agree

12  that high pressure gas pipelines are dangerous and require extreme caution.  And if this

13  proposition was somehow in doubt, there are many less prejudicial ways to establish it than

14  evidence of an explosion.  Further, if the government's "degree of care" language is central to

15  this argument, the government is misleadingly inserting the language of negligence into this

16  knowing and willful trial.  The mental state required in this case is not knowledge that an

17  explosion may result from poor maintenance.  Rather, the mental state required is knowledge of

18  the regulations and a willful intent to violate them.  *See* Dkt. 103 at 7 n.1 ("willfulness does not

19  include recklessness as applied to PG&E's criminal prosecution"); *see Cheek v. United States*,

20  498 U.S. 192, 201 (1991) (the "standard for the statutory willfulness requirement is the

21  'voluntary, intentional violation of a known legal duty'").  *Gonzales-Flores* is on point here as

22  well.  As explained by the Ninth Circuit, "[a]s a logical matter, the fact that two girls in

23  Gonzalez's group suffered heat stroke does not affect the probability . . . that Gonzalez intended

24  to violate U.S. immigration law by bringing them in."  418 F.3d at 1098.  Similarly, here, the fact

25  that an explosion is possible does not affect the probability that PG&E intended to violate the

26  charged regulations.

27

28

c.    *Speculating That a Series of Events Would Have Led to a Hydrotest of Segment 180*

At one hearing, the government stated a third theory, which is quite complicated and involved, but equally meritless.  To simplify, the government has argued that PG&E was required to hydrotest Segment 180 by some previous events, and that a hydrotest would have had to occur before the date of the accident.[5]  This theory is meritless at each step of the way:

First, the government's third theory starts with the assertion that PG&E elevated the internal gas pressure on Line 132 above its MAOP of 400 psig in 2003, and that this led to some regulatory obligations.  This opening assertion is completely wrong, as a matter of law.  If the evidence shows that there was a brief period in 2003 when the pressure on Line 132 was measured at 402.7 psig (slightly above the 400 MAOP), that would not trigger any regulatory obligation—since the regulations were not effective until February 14, 2004.[6]

Second, the 2008 pressure reading of 400.7 psig (less than 0.25 of 1% above MAOP) was too insignificant to raise any engineering concern.  Moreover, there is not even a hyper-technical regulatory argument available for the prosecution, since that pressure was less than the 402.7 pressure the line experienced in the five years preceding the regulations.  Additional obligations only arise if a covered segment in a pipeline is operated above the maximum operating pressure experienced "during the five years preceding identification of the high consequence area."  49 C.F.R. § 192.917(e)(3).  It is undisputed that the pressure experienced in 2003 was higher than in 2008, and within five years—so the regulation was clearly not triggered by the pressure increase in 2008.

Third, if all of this were not so, and if the prosecution had law and evidence backing the first two legs of its argument, the results would not be a required hydrotest before September 2010.  Rather, even under the government's theory, the result would only be a requirement that

---

[5]   Before diving into showing how flawed this argument is, we should first note that this remains, like the previous arguments, an effort to show the alleged consequences of a completed violation, failing the *Gonzales-Flores* analysis.

[6]   This is addressed more in depth in Motion *in Limine* No. 7.

1    the segment be "prioritized" as high risk; not by a specific time before September 2010, and

2    certainly not for an assessment by a hydrotest by any specific date.[7]

3         In sum, this circuitous theory to present highly prejudicial evidence to the jury fails at

4    each step on the regulations themselves, and then depends on pure speculation concerning if and

5    when a hydrotest would have occurred.

6              d.      The Explosion as Prejudicial and Unnecessary Background for an
                       NTSB Investigation
7

8         The government's final relevance argument is that evidence of the explosion is necessary

9    to explain why the NTSB was conducting an investigation.  This theory fails for three reasons:

10        First, the data request charged in Count One was unrelated to the cause of the accident.

11   Recall that the NTSB's investigation had one objective:  determining the probable cause of the

12   accident.  Whether or not the particular policy at issue in Count One was an approved integrity

13   management policy had nothing to do with the cause of the accident.  The jury need not hear

14   highly prejudicial evidence to understand why the NTSB had made this discovery request.

15        Second, for the same reason, there is no basis for the government's assertion that because

16   this was an investigation of a terrible accident, PG&E somehow had an incentive to obstruct it.

17   The severity of an accident does not affect a company's obligation to respond accurately to

18   investigation inquiries.  Moreover, this discovery request was one of 550 similar requests and,

19   importantly, this one did not have anything to do with the root cause of the accident.  And, as we

20   explained in our motion to dismiss, the NTSB's findings are not an adjudication of any rights

21   and are not binding.[8]  Dkt. 125 at 5-6.

22        Third, having established that the government's first three relevance theories (which

23   concern the Pipeline Safety Act ("PSA") counts) do not support the probative value of the

24   accident, it would be especially problematic to admit the accident just for general background to

25

26   [7]   This admittedly abbreviated discussion of the regulations sets aside for the moment several
      other problems with the government's theory.

27   [8]   As mentioned above, the NTSB recommended to PHMSA that it amend the code of federal
28    regulations to delete the Grandfather Clause, but, to date, it has not done so.

1    the NTSB investigation in Count One.  No limiting instruction could effectively prevent the jury

2    from considering the accident as substantive evidence concerning the pipeline allegations.

3          **D.**     **Trying the San Bruno Explosion Case Would Confuse the Issues, Mislead the Jury, and Waste Time**

4

5         As we hope is clear from the short summary of the evidence concerning the accident and

6    the refutation of the government's evidence theories, evidence presentation about the accident

7    would consume a great deal of time.  It would involve substantial technical evidence about

8    metallurgical causes of the accident and the history of that particular pipeline segment.  And

9    there is no fair way to abbreviate this evidence because, if the government is permitted to argue

10    that the San Bruno accident is somehow relevant to these charges, the defendant will have to

11    contest that allegation thoroughly.  The highly prejudicial nature of the allegation means that a

12    defense priority must be to show that the allegation is incorrect.

13         Evidence that confuses the issues and can mislead the jury should be excluded because

14    the evidence "might [cause] the jury to base its verdict on highly speculative evidence" rather

15    than a defendant's "guilt or innocence."  *United States v. Espinoza-Baza*, 647 F.3d 1182, 1190

16    (9th Cir. 2011) (citing *Old Chief*, 519 U.S. at 180).  Furthermore, evidence that could require a

17    "full-blown trial within th[e] trial," including lay and expert witness testimony, would waste time

18    and should be excluded.  *Duran v. City of Maywood*, 221 F.3d 1127, 1133 (9th Cir. 2000); *see*

19    *also Tennison v. Circus Circus Enters., Inc.*, 244 F.3d 684, 690 (9th Cir. 2001) (excluding

20    evidence that would have required a "mini trial").  This Court has recognized that evidence that

21    could lead to a mini-trial on a side issue should be excluded.  In *United States v. Johnson*, the

22    Court excluded evidence of a burglary from a felon in possession of a firearm trial where the

23    same firearm was purportedly used in both crimes.  No. 14-cr-00412-TEH, 2015 U.S. Dist.

24    LEXIS 105518, at *8 (N.D. Cal. Aug. 11, 2015).  The evidence "would likely result in a mini-

25    trial about the burglary investigation . . . [and] ultimately risks confusing the jury, as Defendant

26    is on trial for possession of a firearm, not for burglary."  *Id.* at *9.  Similar to *Johnson*, this case

27    would involve an extended trial on the metallurgical cause of the accident, the investigation into

28    the cause of the accident, and ultimately risk confusing the jury and wasting time.  PG&E is on

1   trial for allegedly violating the Pipeline Safety Act regulations and obstructing the NTSB

2   investigation, not for causing the explosion.

3       **E.    Evidence of the Consequences of the San Bruno Explosion Should be
             Excluded**
4

5       Finally, the Court should also preclude the government from referencing or introducing

6   evidence of the awful consequences of the San Bruno explosion—including the resulting fire,

7   deaths, injuries, and property damage.  Such evidence would have no probative value, and the

8   government has no reason, other than to prejudice PG&E, to make any references at trial to the

9   consequences of the explosion.  *See Rivers v. United States*, 270 F.2d 435, 437 (9th Cir. 1959)

10  (holding that "photographs should be excluded where their principal effect would be to inflame

11  the jurors against the defendant because of the horror of the crime"); *United States v. Smith*, 534

12  F.3d 1211, 1219 (10th Cir. 2008) (ruling that graphic photographs were substantially more

13  prejudicial than probative because they were likely to "provoke a substantial emotional

14  response" by the jury); *United States v. Eyster*, 948 F.2d 1196, 1212-13 (11th Cir. 1991)

15  (excluding photographs showing gruesome details of the crime scene because they had no

16  tendency to make the existence of any fact or element of the charged offense more or less

17  probable and "the manner of death of the body was not an issue for the jury to resolve").

18      This case is similar to *United States v. Mix*, Crim. No. 12-171, 2013 U.S. Dist. LEXIS

19  64919 (E.D. La. May 7, 2013).  In *Mix*, the defendant was charged with obstructing an

20  investigation into the Deepwater Horizon explosion by a variety of federal agencies.  The court

21  granted the defendant's motion *in limine* to preclude the government from referencing the eleven

22  deaths and size of the oil spill resulting from the explosion, explaining:

23          Evidence concerning the eleven (11) deaths and the size of the oil spill may
            constitute relevant evidence, but the unfair prejudice resulting from the admission
24          of such evidence substantially outweighs the probative value of that evidence.
            Even absent that evidence, there is abundant evidence available to the United
25          States which would be relevant to the foreseeability of the grand jury
            investigation and defendant's motive, e.g. the fact of the explosion and the
26          duration of the spill.
27
28

1   *Id.* at *4-5.  The same is true here.  Should the Court find some relevance in the explosion as

2   evidence for the obstruction or PSA charges, then the consequences of the explosion have almost

3   no additional probative value.  *See also United States v. Wiggan*, 700 F.3d 1204, 1213 (9th Cir.

4   2012) ("[A] decision regarding probative value must be influenced by the availability of other

5   sources of evidence on the point in question.").

6   ### F.   Evidence of the Work Clearance and Emergency Response Should be Excluded

7

8        The government has indicated it intends to introduce evidence regarding the alleged

9   deficiencies in PG&E's work clearance for electrical work done on the day of the San Bruno

10  accident and in its emergency response, as determined by the NTSB, under the theory that they

11  are "inextricably intertwined" with the charged conduct.  Valco Decl. ¶ 3.  This evidence is

12  inadmissible both because it is not inextricably intertwined and under Rule 403.[9]

13  #### 1.   The Proposed Evidence Is Not Inextricably Intertwined and Is Inadmissible

14

15       Evidently recognizing that this evidence is inadmissible under Rule 404(b), the

16  government withdrew it as a 404(b) topic and instead proposes to introduce it as "inextricably

17  intertwined."  Evidence is inextricably intertwined if it (1) constitutes part of the transaction that

18  is the basis for the criminal charge, or (2) is necessary for the prosecutor to offer a coherent story

19  regarding the crime.  *United States v. Rrapi*, 175 F.3d 742, 748-49 (9th Cir. 1999) (citations and

20  internal quotation marks omitted).

21       Here, PG&E's electrical work clearance and its emergency response are not part of the

22  "transaction" or conduct that is the basis for the criminal charges, nor is it necessary for the

23  government to offer a coherent story.  None of the integrity management or recordkeeping

24  charges includes conduct related to the work clearance or emergency response procedures.

25  Indeed, work clearance procedures and emergency response are governed by wholly separate

26  subsections of the regulations.  *See* 49 C.F.R. §§ 192.13(c), 192.605, 192.625, 192.616.  There

27  [9]   Whether the NTSB Report and its findings are admissible is the subject of Motion *in Limine*

28  No. 2.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2 Case 3:14-cr-00175-TEH   Document 237   Filed 01/11/16   Page 27 of 59

1   are no allegations that any of the individuals involved in the work clearance or emergency

2   response were involved in the charged integrity management or recordkeeping conduct.

3          In short, PG&E's work clearance and emergency response have no bearing on PG&E's

4   knowledge of the charged recordkeeping and integrity management regulations or its alleged

5   willful violation of them. *See United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1012-13 (9th

6   Cir. 1995) (holding that to be inextricably intertwined, "[t]here must be a sufficient contextual or

7   substantive connection between the proffered evidence and the alleged crime").  On the

8   obstruction charge, the allegedly obstructive conduct at issue was submitting a letter months after

9   the explosion involving a draft of an integrity management policy, which had nothing to do with

10  the work clearance or the emergency response.  Superseding Indictment ("SI") ¶¶ 53-61.  When

11  "it is clear that the prosecution would encounter little difficulty in presenting the evidence

12  relevant to its case" without the purportedly inextricably intertwined evidence, that evidence

13  should be excluded. *Vizcarra-Martinez*, 66 F.3d at 1013.

14          2.      Any Probative Value of the Evidence Is Substantially Outweighed by the
                    Confusion and Waste of Time It Would Cause

15

16          The evidence should also be excluded under Rule 403.  The probative value is necessarily

17  low as it does not go to any element of the charged conduct. *See Gonzales-Flores*, 418 F.3d at

18  1098.  As discussed above, evidence of the San Bruno explosion is unduly prejudicial.  The

19  evidence would also waste time and cause jury confusion.  Both parties will have to present

20  expert and lay testimony on PG&E's work clearance procedures and the complicated electrical

21  work performed at Milpitas Terminal.  Similarly, the parties would have to present expert and

22  lay testimony on the adequacy of actions taken by PG&E personnel on the night of the rupture.

23  Introducing this evidence would require a significant mini-trial.  The jury would also be misled

24  about whether this is a trial about PG&E's work clearance and emergency response instead of

25  the charged conduct.  The evidence should be excluded.

26

27

28

1    **Motion *in Limine* No. 2:  To Exclude All Evidence and Argument Relating to the NTSB**
2    **Reports, Opinions, and Recommendations from the San Bruno Investigation**

3         This motion concerns evidence relating to the NTSB investigation of the probable cause

4    of the San Bruno accident.  The NTSB drafted various investigative reports, culminating in a

5    final accident report reflecting the Board's conclusions, opinions, and safety recommendations.

6    *See* SI ¶ 54.  The Court should exclude all evidence and argument relating to any NTSB reports,

7    and limit the testimony of NTSB witnesses to their firsthand factual observations.[10]

8         **A.    NTSB Accident Reports Are Inadmissible as a Matter of Law**

9         NTSB accident investigations result in a narrative report of the facts, conditions, and

10   circumstances, and the Board's determination of the probable causes ("NTSB Accident Report").

11   49 C.F.R. §§ 800.3, 831.4, 845.40.  It is well-settled that NTSB Accident Reports are

12   inadmissible in suits or actions for damages arising from matters under investigation.  49 U.S.C.

13   § 1154(b); 49 C.F.R. §§ 835.2, 835.3; *Protectus Alpha Nav. Co. Ltd. v. N. Pac. Grain Growers,*

14   *Inc.*, 767 F.2d 1379, 1384-85 (9th Cir. 1985).  "To ensure that Safety Board investigations focus

15   only on improving transportation safety, the Board's analysis of factual information and its

16   determination of probable cause cannot be entered as evidence in a court of law."[11]  *See also*

17   49 C.F.R. § 835.3 (explaining the rule reflects Congress's "strong desire to keep the Board free

18   of the entanglement of such suits"); *Chiron Corp. v. NTSB*, 198 F.3d 935, 940-41 (D.C. Cir.

19   1999).

20        The reasons that NTSB Accident Reports cannot be used to establish civil liability apply

21   equally to criminal liability.  49 C.F.R. § 835.1 ("This part prescribes policies and procedures

22   regarding the testimony of employees of the [NTSB] in suits or actions for damages *and criminal*

23   *proceedings* arising out of transportation accidents when such testimony is in an official capacity

24   and arises out of or is related to accident investigation.") (emphasis added).  As in a civil case,

25

26   [10]    As described above in Motion *in Limine* No. 1, the San Bruno accident and related
     circumstances, including the Milpitas clearance process and PG&E's emergency response, are
27   not relevant to proving any of the charges.  If the Court grants Motion *in Limine* No. 1, it should
     also exclude the NTSB reports detailing these circumstances.  Fed. R. Evid. 401, 402.

28   [11]    http://www.ntsb.gov/investigations/process/pages/default.aspx (last visited Jan. 10, 2016).

the Board ought to be free of the entanglements of having its work and reports be made a part of criminal proceedings.  *Id.*  The NTSB's unique organization and investigative process were designed to provide the NTSB the independence necessary to thoroughly investigate accidents and candidly make findings and recommendations to promote safety in transportation, without concern that its Accident Reports would later be used to the benefit of another party in a different forum, whether that forum be civil or criminal.  *See id.*[12]  The Court should exclude the NTSB Accident Report from this case.

### B. NTSB Employees Cannot Testify About the Board's Conclusions, Opinions, or Recommendations

The government cannot bypass the prohibition on use of NTSB Accident Reports by offering testimony from NTSB employees about the Board's conclusions, opinions, or recommendations.  49 C.F.R. §§ 835.3 ("The purposes of these sections [including 49 U.S.C. § 1154(b)] would be defeated if expert opinion testimony of Board employees, which may be reflected in the views of the Board expressed in its reports, were admitted in evidence or used in litigation arising out of an accident."), 835.4.  Although the NTSB regulations allow employees to give factual testimony based on "firsthand information they obtained during an investigation that is not reasonably available elsewhere, including observations recorded in their own factual accident reports," they are not permitted to "give any expert or opinion testimony" or to testify about other employees' reports or other types of documents, including "safety recommendations, safety studies, safety proposals, safety accomplishments, reports labeled studies, and analysis reports."  49 C.F.R. §§ 835.3(b) & (c), 835.10(c).  If the government plans to call any NTSB witnesses, their testimony must be limited to their firsthand observations of actual facts during the investigation, not any results or opinions or recommendations.

---

[12]  *See also* NTSB, https://app.ntsb.gov/about/history.html (last visited Jan. 10, 2016) ("In 1974, Congress reestablished the NTSB as a completely separate entity, outside the DOT, reasoning that '. . . No federal agency can properly perform such (investigatory) functions unless it is totally separate and independent from any other . . . agency of the United States.' . . . The NTSB, which has no authority to regulate, fund, or be directly involved in the operation of any mode of transportation, conducts investigations and makes recommendations from an objective viewpoint.").

1

### C.    NTSB Reports Are Inadmissible Expert Opinion Hearsay

2          All of the various NTSB reports, including drafts, are independently inadmissible as

3   hearsay (often multiple layers) to which no exception applies.  Fed. R. Evid. 801.  Although

4   courts have found that the public records and reports hearsay exception in Federal Rule of

5   Evidence 803(8) in some circumstances can apply to portions of NTSB factual reports, *see, e.g.,*

6   *John McShain, Inc. v. Cessna Aircraft Co.*, 563 F.2d 632, 635-36 (3d Cir. 1977), the exception

7   for factual findings from a legally authorized investigation is only available in a civil case or

8   *against* the government in a criminal case.  Fed. R. Evid. § 803(8)(A)(iii).  The government

9   cannot exploit this exception here.

10          Moreover, these reports contain what Rule 702 would define as expert opinion regarding

11   potential issues in the case.  NTSB reports are compiled by a team of investigators determining

12   the factual circumstances and probable causes of a complex organizational accident.  This

13   process is based on "scientific, technical or other specialized knowledge" and may only be

14   offered by an expert, but, as explained above, none of the people involved in its creation are

15   permitted to testify about their conclusions.  Fed. R. Evid. 701, 702.  Rule 703 does not allow for

16   "admission of [] reports to establish the truth of what they assert" in support of an expert opinion.

17   *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1262 (9th Cir. 1984) (affirming exclusion of

18   audit reports relied upon by expert and offered to prove the truth of the underlying matter); *see*

19   *also Turner v. Burlington N. Santa Fe R.R. Co.*, 338 F.3d 1058, 1062 (9th Cir. 2003) (excluding

20   a report offered not as "data upon which an expert in his field would reasonably rely in forming

21   an opinion," but as "substantive evidence of his ultimate conclusions").

22          ### D.    The Government's Experts May Not Rely on the NTSB Reports or Opinions

23          The government also cannot use its expert witnesses to inject the substance of these

24   hearsay expert opinions and recommendations into the case.  The statutory prohibition on "use"

25   of an NTSB report in litigation means that an expert cannot testify that he or she relied on the

26   NTSB's conclusions in reaching an opinion.  *Curry v. Chevron, USA*, 779 F.2d 272, 274 (5th

27   Cir. 1985) (affirming exclusion of expert witness testimony that he relied on the probable cause

28   conclusions or opinions of the NTSB report in reaching his opinion about the cause); *Major v.*

1  *CSX Transp., Inc.*, 278 F. Supp. 2d 597, 604 (D. Md. 2003) (rejecting attempt to introduce NTSB

2  opinions and conclusions "to bolster the credibility of experts and their opinions").

3          The government has stated that three of its potential experts may base their testimony on

4  the NTSB investigation and report.  The Court should preclude these experts from offering any

5  opinions based on the NTSB Accident Report or from testifying that they have relied on it.

6       **E.      The NTSB Reports Would Create Jury Confusion, Unfair Prejudice, and
                Undue Delay**

7

8          Evidence of the NTSB's conclusions and opinions, and its recommendations to promote

9  safety, would lead to jury confusion between the very different evidentiary and legal standards

10  presented in an NTSB accident investigation as compared to a criminal enforcement action.  Fed.

11  R. Evid. 403.  Far from making determinations beyond a reasonable doubt, the NTSB's Accident

12  Reports contain the Board's opinions about the "probable" causes of an accident based on non-

13  adversarial investigations, and they cannot be appealed.  49 C.F.R. §§ 831.4, 845.40, 845.41.

14  Admission of the NTSB reports would supplant the jury's role as factfinder with the opinions of

15  a board of political appointees.  *See id.*; *Protectus Alpha Nav. Co. Ltd.*, 767 F.2d at 1385 ("[T]he

16  excluded [NTSB] report was merely another trier of fact's conclusion as to what transpired on

17  that fatal evening."); *In re Petition of Cleveland Tankers, Inc.*, 821 F. Supp. 463, 466 (E.D.

18  Mich. 1992).  It would be unfairly prejudicial for a jury to rely on non-judicial determinations of

19  law or fact by witnesses not subject to cross-examination.  *Hill v. Rolleri*, 615 F.2d 886, 890 (9th

20  Cir. 1980).  Moreover, the defense would need to dispute and litigate some of the NTSB's

21  conclusions and findings, creating unnecessary delay and mini-trials.

22       **Motion *in Limine* No. 3:  To Exclude All Evidence and
             Argument Relating to CPUC Penalties and Fines**

23

24          PG&E moves to exclude all evidence and argument concerning proceedings, penalties,

25  and fines of the California Public Utilities Commission ("CPUC").  Specifically, the government

26  stated it intends to introduce evidence of the $1.6 billion penalty imposed by the CPUC on

27  April 9, 2015, at the culmination of several investigative proceedings ("CPUC OII evidence") as

28  "inextricably intertwined" with the charged conduct.  *Id.*  Additionally, the government has

1    stated it intends to introduce under Rule 404(b) evidence of PG&E's October 2012 discovery of

2    misidentified pipeline features for Line 147 in San Carlos, its alleged delay in reporting the

3    inaccuracy to the CPUC, and the CPUC's December 2013 imposition of a fine for what it

4    concluded was a misleading "errata" filing to correct the record (collectively, the "Line 147

5    evidence").

6        **A.    Background**

7            1.    CPUC OII Evidence

8            Following the rupture of Line 132 in San Bruno, the CPUC issued orders instituting three

9    investigations ("OIIs").  They pertained to (1) PG&E's recordkeeping practices; (2) PG&E's

10   operation of transmission lines in high population density areas; and (3) the San Bruno accident.

11   In the three OIIs, the CPUC investigated PG&E for potential violation of dozens of regulations.

12   Decision Different of President Picker on Fines and Remedies to Be Imposed on PG&E, D.15-

13   04-024, 2015 Cal. PUC LEXIS 230 (Apr. 9, 2015) ("CPUC Decision Different"), at *13-32.

14   Following a penalty proceeding and the issuance of decisions, on April 9, 2015, the CPUC

15   imposed a penalty of $1.6 billion on PG&E, which penalty PG&E did not contest.  *Id.* at 2.  The

16   government has stated that it intends to introduce evidence of the CPUC penalty, but not

17   evidence regarding the regulations and CPUC findings upon which the penalty was based.

18            2.    Line 147 Evidence

19           After the accident, the CPUC also ordered PG&E to reduce its operating pressure on

20   Line 132 and, at the same time, PG&E voluntarily reduced the allowable pressure on Line 147 (a

21   short "cross-tie" line connecting Line 132 to Line 101) from 375 psig to 300 psig.  Decision

22   Establishing Maximum Operating Pressure for Lines 101, 132A, and 147, D.11-12-048, 2011

23   Cal. PUC LEXIS 570, at *1-3 (Dec. 15, 2011).  Anticipating increased winter demand, PG&E

24   provided the CPUC with information to support increasing pressure on Line 147 to 365 psig in

25   the fall of 2011.  The CPUC held a hearing on November 22, 2011, which included PG&E's

26   testimony confirming it had validated the line's engineering and construction through a review of

27   records and performed hydrostatic pressure testing on specified segments for which a prior

28

1    pressure test result was not available.  *Id.* at *6-7.  The CPUC authorized PG&E to raise the

2    pressure on Line 147 to 365 psig on December 15, 2011.  *Id.* at *14-15.

3              Some ten months later, in mid-October 2012, PG&E discovered a leak on Line 147.

4    After a crew exposed the pipe, an engineer visually inspected it and noticed that the long-seam

5    weld appeared to be single-submerged arc welded ("SSAW"), though it was listed as double-

6    submerged arc welded ("DSAW") on the pipeline features list.  (The line was repaired a week

7    later, and the cause of the leak was determined to be external corrosion unrelated to the pipe's

8    seam.)  Based on operational needs, the line had been operating below 300 psig since May and

9    the engineer calculated that, with an SSAW seam, it was safe to continue to operate at that

10   pressure.  On November 14, 2012, the engineer notified various PG&E departments of the

11   discrepancy on the pipeline features list.  PG&E commenced a review of all specifications for

12   Line 147 and, in the course of doing so, discovered three additional SSAW segments that had

13   been misidentified.  After completing this review, PG&E participated in a conference call with

14   CPUC Safety and Enforcement Division staff in March 2013 and informed them of the

15   misidentified pipe.[13]

16            PG&E formally advised the Commission itself that erroneous information had been

17   entered in the earlier proceeding on July 3, 2013, when it filed a document entitled "Errata to

18   Pacific Gas and Electric Company's Supporting Information for Lifting Operating Pressure

19   Restrictions on Lines 101 and 147."  Final Decision Imposing Sanctions for Violation of

20   Rule 1.1 of the Commission's Rules of Practice and Procedure, D.13-12-053, 2013 Cal. PUC

21   LEXIS 749, at *1 (Dec. 19, 2013).  This document stated that PG&E had identified errors in

22   some of the information filed in the prior proceeding related to Line 147.  *Id.*  In August 2013,

23   the Commission rejected the errata and issued an Order to Show Cause why PG&E should not be

24   sanctioned for violating its Rules of Practice and Procedure.  After a hearing, the CPUC fined

25

26   ─────────────────

27   [13]  *See generally* Verified Statement of PG&E's Vice President of Gas Transmission
      Maintenance and Construction in Response to Ruling of Assigned Commissioner and Assigned
28   Administrative Law Judge, available at http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/
      M076/K386/76386737.PDF (accessed Jan. 11, 2016).

1   PG&E $14.35 million for not more promptly correcting what it perceived to be a material

2   misstatement of fact, and for characterizing the July 3, 2013 filing as an "errata." *Id.* at *3.

3         **B.**      **The Court Should Exclude the CPUC OII Evidence**

4            **1.**    <u>Evidence Concerning the 2015 CPUC Penalty of PG&E Is Not</u>
    <u>Inextricably Intertwined with the Charged Conduct</u>

5

6         Evidence of the 2015 CPUC-imposed penalty for the OIIs is not inextricably intertwined

7   with the charged conduct and is subject to Rule 404(b)'s prohibitions against use of other act

8   evidence. *Rrapi*, 175 F.3d at 748-49.  Evidence is inextricably intertwined with the charged

9   crime if it (1) constitutes part of transaction that is the basis for the criminal charge, or (2) is

10  necessary for the prosecutor to tell a coherent and comprehensible story regarding the crime. *Id.*

11        The CPUC penalty is not part of the transaction that forms the basis of the criminal

12  charge.  First, the disclosed evidence is confined to the penalty itself.  The CPUC's *post hoc*

13  conclusions regarding an appropriate penalty are not part of the same transaction as the alleged

14  PSA violations and obstruction charged here.  Second, while the CPUC investigated in the OIIs

15  dozens of potential violations across PG&E's entire system, the government's charges here are

16  far narrower. *See* CPUC Decision Different at *7-31.  Whether PG&E complied with uncharged

17  regulations does not form the basis of the criminal charge.

18        Likewise, to present a comprehensible story, the prosecution need not discuss the

19  conclusions of a regulatory agency regarding both charged and uncharged conduct reached years

20  after the charged conduct allegedly occurred. *See Vizcarra-Martinez*, 66 F.3d at 1012-13.

21           **2.**    <u>Any Probative Value of the CPUC OII Evidence Is Substantially</u>
    <u>Outweighed By Its Potential to Prejudice, Confuse, and Waste Time</u>

22

23        When the evidence does not go to an element of the charge, as here, any probative value

24  is necessarily low. *Gonzales-Flores*, 418 F.3d at 1098 (citing *United States v. Ellis*, 147 F.3d

25  1131, 1135 (9th Cir. 1998)).  This low probative value is again outweighed by the danger of

26  unfair prejudice, confusing the issues, and wasting time.

27

28

1          a.       *Unfair Prejudice*

2          Evidence of the CPUC OIIs and determinations of uncharged regulatory violations would

3   enhance the risk that the jury would be drawn to convict PG&E based on something other than

4   evidence of the offenses charged.  And to the extent that some portion of the 2015 penalty relates

5   to regulations that were charged in the indictment, the CPUC's conclusions—reached in a

6   proceeding with very different evidentiary and legal standards and intent requirements than a

7   criminal enforcement action—would unfairly encourage the jury to abdicate its critical role as

8   fact-finder and rely on non-judicial determinations of law or fact by witnesses not subject to

9   cross-examination.  *See Hill*, 615 F.2d at 890.

10          b.       *Jury Confusion*

11          Jurors would likely also confuse the potential regulatory violations explored by the

12   CPUC OII with the various knowing and willful violations charged as to the indicted pipelines.

13   The jury may assume that if the CPUC, an authoritative government agency, imposed a penalty

14   on PG&E, then PG&E is deserving of punishment, regardless of the evidence pertaining to the

15   charged conduct.  *See Angelo v. Bacharach Instrument Co.*, 555 F.2d 1164, 1176 (3d Cir. 1977)

16   (excluding EEOC letter with reasonable cause determination as likely to mislead jury to suppose

17   that the agency had determined the ultimate issue in the case); *Fowler v. Firestone Tire &*

18   *Rubber Co.*, 92 F.R.D. 1, 2 (N.D. Miss. 1980) (excluding government agency reports on defects

19   in defendant's tires because their official nature would likely confuse the jury).

20          c.       *Waste of Time*

21          To adjudicate this issue properly, both parties would need to introduce evidence about the

22   CPUC and its highly technical investigations, and PG&E would vigorously contest the

23   government's characterization of the CPUC's conclusions.  Even more, the government intends

24   to introduce a bald statement that the CPUC ordered a $1.6 billion penalty, without any

25   explanation that it was based largely on uncharged conduct and thus has little to no probative

26   value.  This would mislead the jury to believe that the $1.6 billion value is proportionally related

27   to the charged conduct, and would require the defense to waste a significant amount of the

28

1   Court's and jury's time to address that misconception.  *See Tennison*, 244 F.3d at 690; *Johnson*,

2   2015 U.S. Dist. LEXIS 105518, at *8.

3       **C.      The Court Should Exclude the Line 147 Evidence**

4           1.      The Line 147 Evidence Is Inadmissible Under Rule 404(b)

5           The government has identified the Line 147 evidence as "other act" evidence, and seeks

6   to admit it under Rule 404(b).  Evidence of other acts may be admissible under Rule 404(b)

7   "only when offered for purposes other than 'to prove the character of a person in order to show

8   action in conformity therewith.'"  *United States v. Bradley*, 5 F.3d 1317, 1319 (9th Cir. 1993)

9   (quoting Fed. R. Evid. 404(b)).  "[T]he question in a prior bad acts case is whether the proffered

10  evidence really does tend to prove something material by a means other than bad character."

11  *United States v. Martinez*, 182 F.3d 1107, 1111 (9th Cir. 1999).  The rule specifies that other act

12  evidence may be offered "for another purpose, such as proving motive, opportunity, intent,

13  preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed R.

14  Evid. 404(b).  As the proponent, the government "bears the burden of proving a logical

15  connection between [the defendant's] purported involvement in the [other act] and a material fact

16  at issue in the crime with which he was charged."  *United States v. Mayans*, 17 F.3d 1174, 1183

17  (9th Cir. 1994).

18          However, the government's "incantation of the proper uses of [Rule 404(b) evidence] . . .

19  does not magically transform inadmissible evidence into admissible evidence."  *Becker v. ARCO*

20  *Chemical Corp.*, 207 F.3d 176, 191 (3d Cir. 2000) (citation omitted).  The Court should

21  scrutinize the government's offer of proof to ensure that the permitted use of the evidence is not

22  based on the impermissible inference of conduct in conformity:

23          [I]t's not enough for the proponent of the other-act evidence simply to point to a
            purpose in the 'permitted' list and assert that the other-act evidence is relevant to
24          it. Rule 404(b) is not just concerned with the ultimate conclusion, but also with the
            chain of reasoning that supports the non-propensity purpose for admitting the
25          evidence. . . . [T]he rule allows the use of other-act evidence only when its
            admission is supported by some propensity-free chain of reasoning.
26

27  *United States v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014); *see also United States v.*

28  *Commanche*, 577 F.3d 1261, 1267 (10th Cir. 2009).

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEF.'S MOTS. IN LIMINE NOS. 1-10
CASE NO. 14-CR-00175-TEH

1    Here, the government has not made any offer of proof, nor has it identified any

2    permissible purpose to admit Line 147 evidence under Rule 404(b)—and none applies.  To the

3    extent the government argues that the later discovery of misidentified pipeline specifications on

4    Line 147 bolsters its allegation that the charged prior conduct occurred, it would run afoul of

5    Rule 404(b)(1), which generally bars other-act evidence to prove conduct in conformity.

6           2.    Any Probative Value of the Line 147 Evidence Is Substantially
                  Outweighed By Its Potential to Prejudice, Confuse, and Waste Time
7

8    As with the evidence relating to the CPUC OIIs,  the Line 147 "other act" evidence

9    should be independently excluded under Rule 403 because any (dubious) probative value is

10   substantially outweighed by the danger of unfair prejudice, confusing the issues, and wasting

11   time.

12          a.    Unfair Prejudice

13   "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some

14   concededly relevant evidence to lure the factfinder into declaring guilt on a ground different

15   from proof specific to the offense charged."  *Old Chief*, 519 U.S. at 180.  Evidence is "unfairly

16   prejudicial" when it has "an undue tendency to suggest decision on an improper basis,

17   commonly, though not necessarily, an emotional one."  Fed. R. Evid. 403, adv. comm. note.

18   "Evidence is prejudicial if it appeals to the jury's sympathies, arouses its sense of horror,

19   provokes its instincts to punish, or triggers other mainsprings of human action."  *United States v.*

20   *Blackstone*, 56 F.3d 1143, 1146 (9th Cir. 1995) (citation and internal quotation marks omitted).

21   Here, evidence of a 2012 gas leak and misidentified pipe specifications on Line 147 would

22   enhance the serious risk that the jury would be drawn to convict PG&E based on something other

23   than evidence of the crimes charged.  Moreover, evidence regarding the CPUC administrative

24   sanction for the errata filing might tempt jurors to punish PG&E for that conduct or suggest that

25   it might be not trustworthy in this proceeding, again inviting conviction on an improper basis.

26          b.    Jury Confusion

27   Jurors would likely confuse the 2012 Line 147 leak and/or misidentified features with the

28   various knowing and willful violations charged as to the indicted pipelines.  Furthermore, jurors

1   could view with special deference any evidence or argument concerning the CPUC sanction.

2   The "official" nature of that sanction could mislead and confuse the jury, especially when it was

3   decided under standards and procedures entirely different than those governing this proceeding.

4   *See Angelo*, 555 F.2d at 1176; *Fowler*, 92 F.R.D. at 2.

5              *c.      Waste of Time*

6              Introduction of the Line 147 evidence would waste time and prolong these proceedings.

7   PG&E would vigorously contest the government's characterization of the leak, the

8   misidentification of pipeline specifications, the manner in which it occurred, the impact of either

9   the leak or the misidentified specifications, PG&E's ensuing investigation, the manner in which

10  the errors were disclosed to the CPUC (both to the staff and the Commission), and the ultimate

11  sanctions imposed by the Commission.  This would be accomplished through substantial

12  testimony and other evidence to provide the jury with the necessary context and would be a huge

13  and unwarranted distraction that would needlessly prolong this proceeding.  *See Tennison*, 244

14  F.3d at 690 (excluding testimony of prior conduct because it would have "resulted in a 'mini

15  trial,' considering that much of their testimony was disputed"); *In re Related Asbestos Cases*,

16  543 F. Supp. 1152, 1156 (N.D. Cal. 1982) (excluding agency records under Rule 403 in part

17  because they presented innumerable collateral issues that defendants would undoubtedly pursue,

18  in detail, on cross examination).

19          **D.      The CPUC Documents Are Inadmissible**

20              Finally, the government may not use the relevant CPUC orders and reports to prove the

21  CPUC fines or any of the uncharged conduct upon which the fines are based.  First, the CPUC

22  orders and reports are hearsay that do not fit under any exception.  Fed R. Evid. 801.

23  Additionally, the law is clear that CPUC orders and reports are inadmissible evidence in civil

24  cases.  Cal. Pub. Util. Code § 315; *see also Re San Diego Gas & Elec. Co*. (Cal.P.U.C., May 7,

25  1993, Application No. 93-02-025).  The OII documents should not be admissible here either, in a

26  criminal case with a higher standard of proof.  And of course, evidence of the fine itself is

27  hearsay, not subject to any exception.

28

**Motion *in Limine* No. 4:  To Exclude All Financial Evidence
and Argument Unrelated to Charged Conduct**

This motion concerns evidence relating to PG&E's finances and budgeting.  The Ninth

Circuit prohibits admission of evidence related to a criminal defendant's financial circumstances

when offered to establish profit motive.  *See United States v. Mitchell*, 172 F.3d 1104, 1110 (9th

Cir. 1999).  The government, however, plans to introduce inadmissible evidence of PG&E's

financial condition and budgetary practices far beyond the specific allegations in the superseding

indictment to show that it is motivated by profit and to suggest that this is evidence of

impropriety.

**A.     Background**

The government has stated that it will "offer evidence in its case-in-chief that PG&E's

regulatory violations, which directly led to the San Bruno explosion, were motivated by the

desire to maximize profits."  Dkt. 201 at 5 (quoting Dkt. 147 at 3).  But based on the

government's disclosures to date, its financial evidence will not focus on profits derived from the

crimes charged, or even from the pipelines identified in the superseding indictment.  Instead, it

will offer evidence of PG&E's financial practices generally, and evidence that PG&E considered

the financial implications of business decisions—including those not alleged to have violated the

regulations at all.

For example, based on the government's incomplete expert disclosures and its grand jury

presentations, it will apparently present evidence, including expert testimony, about the

budgeting processes and financial performance in PG&E's entire Gas Transmission & Storage

("GT&S") department for more than 10 years prior to the San Bruno accident.  Through complex

analyses of the spending amounts implied by PG&E's rate cases over that period of time, it will

contend that PG&E earned more revenue and spent less on maintenance than supposedly

contemplated by the CPUC.  (We believe this is factually wrong.)

This evidence will greatly expand the scope and complexity of the evidence presented at

trial, yet the government will be unable to tie it to the charged offenses.  Indeed, in the regulatory

investigations stemming from the San Bruno accident, the CPUC considered the same GT&S

1   rate and budgeting comparison the government wants to offer here—and even hired the same

2   expert consulting firm to conduct an analysis.[14]   Despite a lower standard of proof and a much

3   broader scope of relevance, the CPUC concluded:  "We do not find that the methodologies . . .

4   support any determination of whether PG&E underspent or overspent on gas transmission safety

5   [operations and maintenance] and capital expenditures relative to amounts adopted by the

6   Commission in setting rates."  Order Instituting Investigation into Operations and Practices of

7   PG&E, etc., D.15-04-023, 2015 Cal. PUC LEXIS 229, at *312 (Apr. 9, 2015).  Moreover, the

8   government's expert consulting firm determined in the CPUC proceedings that, with respect to

9   GT&S spending practices, PG&E "focused its efforts on integrity management regulatory

10  compliance"—the opposite of what the government has alleged.

11       The government has also said that it considers the financial effects of uncharged business

12  practices relevant.  It will seek, for example, to show that PG&E "cut costs" when, in 2000, it

13  began a gas transmission pipeline Risk Management Program in place of its earlier Gas Pipeline

14  Replacement Program.  The government's position is that this evidence is "inextricably

15  intertwined with the charged conduct," but this change in PG&E's approach predates the

16  enactment of the integrity management regulations in 2004.  Moreover, those regulations

17  ultimately *required* operators to create an integrity management program, which is a form of risk

18  management.

19       **B.      The Court Should Exclude General Financial Evidence**

20       Evidence of a defendant's financial condition and profit incentives is generally

21  inadmissible.  *Mitchell*, 172 F.3d at 1110; *United States v. Bensimon*, 172 F.3d 1121, 1129-30

22  (9th Cir. 1999) (noting the "limited probative value" and "likely prejudicial effect" of evidence

23  of the defendant's bankruptcy for the purpose of showing financial incentive to commit a crime).

24  Thus, for the government to admit financial evidence, it must show something more than a desire

25  to earn to profit.  Typically, this something more is a direct connection to the crime charged—for

26  _____

27  [14]   The government has disclosed its expert, but not his opinions.  Based on the opinions of the
    expert's firm before the CPUC, PG&E anticipates filing a *Daubert* motion concerning the expert,

28  as explained in PG&E's concurrently filed brief regarding additional motions *in limine*.

1   example, evidence of the proceeds of the offenses.  *United States v. Reyes*, 660 F. 3d 454, 463-64

2   (9th Cir. 2011) (upholding admission of evidence of the proceeds of the charged stock option

3   backdating scheme); *United States v. Sanford Ltd.*, 878 F. Supp. 2d 137, 140-146 (D.D.C. 2012)

4   (holding that but for Alternative Fines Act gains allegations, "some evidence" of the alleged

5   "monetary proceeds" "derive[d] . . . from the offense" would be admissible) (alterations

6   original).  Since the government's financial evidence is not tied it to the charged violations, it is

7   inadmissible under *Mitchell*.  172 F.3d at 1110; *Bensimon*, 172 F.3d at 1129-30.[15]

8        Moreover, it would inherently invite prejudice by the jury, which is "improper" and has

9   "no place in a court room."  *United States v. Stahl*, 616 F.2d 30, 32-33 (2d Cir. 1980); *see also In*

10  *re Air Crash Disaster at Sioux City, Iowa on July 19, 1989*, No. 1:89-cv-08082, 1991 U.S. Dist.

11  LEXIS 18638, at *5 (N.D. Ill. Dec. 26, 1991) ("Motive, as used in the context of Rule 404(b),

12  typically refers to a more specific reason explaining a defendant's challenged conduct than a

13  simple desire for pecuniary gain, which would presumably exist in all commercially related

14  crimes.").  Railing against for-profit corporations is easy political rhetoric, but it has no place in

15  a criminal trial.

16       Finally, admitting this evidence will unnecessarily prolong and complicate the case.

17  Because PG&E is a regulated entity, cost savings do not necessarily generate future profits.  The

18  CPUC sets PG&E's rates through rate cases at a level that considers the company's operating

19  costs, and that gives PG&E the opportunity to earn a return on its system investments.[16]  If these

20  expenditures decrease, the CPUC may decide that PG&E's rates—and net income—should as

21  well.[17]  But determining what costs may be recovered through rates is a complex process, one

---

22  [15]  The only clear attempt to connect PG&E's finances to the charged offenses is the AFA
23  allegation—which the Court will consider separately after additional briefing.  But even there,
     the Court has expressed concern with "broad-based measures."  Dkt. 201 at 6.

24  [16]  *See* CPUC's "Electric and Gas Utility Cost Report: Public Utilities Code Section 747 Report
25  to the Governor and Legislature," April 2015 at 8 (explaining that "utilities earn a rate of return
     or profit" on "costs that are utility-owned and capitalized (e.g. assets and equipment)"), *available*
26  *at* http://www.cpuc.ca.gov/WorkArea/DownloadAsset.aspx?id=5650.

27  [17]  *See supra* n.16 at 9 ("Other things being equal, a larger ratebase results in higher net income
     for the utilities.  Depreciation causes the utilities' ratebase for existing assets to decline over
28  time, while building new plants or making capital improvements to existing plants causes their
     ratebase to increase.").

1    which can take even the CPUC months or years to resolve.  Asking jurors to make this

2    determination—*i.e.*, deciding what revenue or expenses the CPUC approved in a given rate

3    settlement, or the level of recovery PG&E may have experienced based on any alleged cost

4    savings—would entail highly-technical financial testimony and a great deal of speculation.  The

5    parties would need to conduct side-trials much like the multi-year rate cases before the CPUC.

6
        **Motion *in Limine* No. 5:  To Exclude All Evidence and Argument Relating to**
        **PG&E's Safety Improvements After the San Bruno Accident**
7

8            The tragic accident in San Bruno on September 9, 2010 greatly affected the community,

9    PG&E, its employees, and the gas industry as a whole.  PG&E accepted responsibility for the

10   accident and has since implemented many broad safety and maintenance improvements.

11   PG&E's important work should not be used against it.  The Federal Rules of Evidence prevent a

12   party's subsequent remedial measures from being used to prove its culpability.  Moreover, many

13   of PG&E's improvement efforts are either not mandated by any specific set of regulatory

14   requirements or relate to requirements that have been enacted since the accident.  PG&E's post-

15   accident improvement efforts, and its statements apologizing for the accident and describing its

16   plans for improvements, are not probative of the charged integrity management and

17   recordkeeping failings, and would confuse the issues, waste time, and prejudice the defendant.

18           We believe that the evidence shows that PG&E (along with many others in the industry)

19   responded significantly and effectively to the unprecedented San Bruno accident.  The

20   government should not be permitted to use that response against a criminal defendant.  Broadly

21   summarized, these include PG&E's efforts to:  (1) restructure its Gas Operations organization

22   and leadership; (2) hire several hundreds of new employees at all levels of Gas Operations;

23   (3) improve its Integrity Management Program; (4) hydrotest over 650 miles of pipeline;

24   (5) install additional automated and automatic shutoff valves; (6) replace over 100 miles of

25   pipeline; (7) upgrade more than 200 miles of pipeline to accommodate inspection by in-line

26   inspection tools; (8) scan and digitize more than 3.8 million paper documents to meet the 2011

27   advisory bulletin that wherever possible utilities rely on "traceable, verifiable, and complete"

28   records; (9) validate the MAOP of pipelines through hydrotesting or records verification;

1   (10) design, build, and open a new state-of-the-art Gas Control Center; and (11) improve gas

2   pipeline leak detection technology.  *See generally* Valco Decl. Exs. 2, 3.  Likewise, settlement

3   payments, and statements of remorse, contrition, or sympathy may not be used by the

4   government as an attempt to establish knowing and willful criminal behavior by unidentified

5   employees.

6   **A.     Background**

7   Since the tragic San Bruno accident, PG&E has worked to improve the safety and

8   maintenance of its gas system.  These broad improvements have spanned nearly all aspects of

9   that system, including organizational structure, human resources, integrity management,

10  transmission and distribution pipeline records, records and leak detection technology, and

11  physical pipeline upgrades.

12  Many of PG&E's improvement efforts involve new standards that have arisen since

13  2010.  For example, in January 2011, the NTSB issued safety recommendation P-10-2, in which

14  it suggested that PG&E search for records and that those records should be "traceable, verifiable,

15  and complete" wherever possible.  This new recordkeeping guidance was later issued and further

16  defined by the CPUC and PHMSA.  Another new requirement arose in June 2011, when the

17  CPUC issued Decision 11-06-017 that disallowed gas pipeline operators from establishing

18  pipeline MAOPs based solely on historical operating pressure as permitted under the Grandfather

19  Clause (49 C.F.R. § 192.619(c)).  *See* Decision Determining Maximum Allowable Operating

20  Pressure Methodology, D. 11-06-017, 2011 Cal. PUC LEXIS 324, at *30 (Jun. 9, 2011).  Several

21  of PG&E's post-accident safety and maintenance efforts have in part addressed new guidance

22  and standards such as these.

23  The government has discussed PG&E's post-accident improvements with witnesses and

24  has produced many documents that describe them, including press releases about PG&E's

25  maintenance and operational improvements; screenshots from PG&E's website showing its

26  safety progress; job opening announcements for gas safety positions; and SEC and CPUC filings

27  regarding the costs of safety improvements.  *See, e.g.*, Valco Decl. Ex. 4-6.  Further, the

28

1    government has indicated that it will attempt to have an expert witness testify about PG&E's

2    post-accident improvements.

3         Many of the same documents described above about improvement efforts also expressed

4    remorse for the San Bruno accident or recognized needed improvements.  For example, PG&E or

5    its executives have stated that the accident was a tragedy and it is "deeply sorry that [its] pipeline

6    was the cause," and the company has recognized that "it is evident that [the company] must

7    make major improvements."  Valco Decl. Exs. 5, 6.

8    **B.      Rule 407 Excludes Evidence of PG&E's Post-Accident Improvements**

9         Evidence and argument about PG&E's post-accident safety improvements, including the

10   eleven categories of improvements listed above, should be excluded as evidence of subsequent

11   remedial measures.  "When measures are taken that would have made an earlier injury or harm

12   less likely to occur, evidence of the subsequent measures is not admissible to prove . . . culpable

13   conduct."  Fed. R. Evid. 407.[18]  The purpose of the rule is to encourage parties to improve safety

14   "conditions without fear that subsequent measures will be used as evidence against them."

15   *Gauthier v. AMF, Inc.*, 788 F.2d 634, 637 (9th Cir. 1986) (Henderson, J.).  "The courts have

16   applied this principle to exclude evidence of subsequent repairs, installation of safety devices,

17   changes in company rules, and discharge of employees."  Fed. R. Evid. 407 adv. comm. notes

18   1972.

19        Under Rule 407, the government cannot use this evidence to argue that PG&E is culpable

20   for not taking similar measures before the accident, or ask witnesses whether those are projects

21   the company should have performed to comply with the charged regulations before September 9,

22   2010.  Additionally, the government cannot circumvent Rule 407 by arguing that it does not

23   exclude evidence of subsequent improvements that were not voluntary.  PG&E's work to follow

24   recommendations by the NTSB or the CPUC should not be admitted, when those

25

26

27   [18]   Rule 407 applies to criminal cases, even though issues regarding subsequent measures most
     often arise in civil cases.  *See United States v. DSD Shipping, A.S.*, No. 15-00102-CG-B, 2015
28   U.S. Dist. LEXIS 131003, at *5-6 (S.D. Ala. Sept. 29, 2015); *see also* Fed. R. Evid. 1101(b).

recommendations were not part of the charged regulations before the accident and most of

PG&E's improvement efforts involved close cooperation with regulators and industry experts.

### C.     The Court Should Also Exclude Evidence of Post-Accident Improvements as Irrelevant, Confusing the Issues, a Waste of Time, and Unduly Prejudicial

The Court should also exclude post-accident improvement measures and statements

under Rules 401, 402, and 403.  The accident was a major event in the gas industry, and the

broad steps PG&E or other utilities took to improve after the accident are not relevant to proving

whether PG&E was in compliance with the charged regulations before the accident and what

PG&E's engineers knew about the company's compliance.

The post-accident improvement evidence would also confuse the issues because none of

the projects can be cleanly described as addressing any set of preexisting regulatory

requirements—let alone the four specific gas safety regulations PG&E allegedly violated.  Most

of the improvement efforts were broad efforts that were informed by preexisting standards and

requirements, as well as new guidance.  It would confuse the issues for the jury to try to untangle

the improvement measures that the government may argue were to address preexisting

requirements from broader efforts aimed to implement new thinking, recommendations, and

requirements.  Moreover, admission of this evidence would waste time because it would require

PG&E to respond and separate out which parts of these broad efforts are unrelated to the charged

conduct.  Finally, evidence of PG&E's safety improvements would be unduly prejudicial

because it would emphasize the San Bruno accident (which should be excluded entirely) and the

major changes that took place after it.

### D.     Evidence of PG&E's Post-Accident Improvements Cannot Be Used to Prove the Government's Alternative Fines Act Gains-Based Allegations

The Court is considering whether the gains-based Alternative Fines Act sentencing

allegations should be dismissed because they will unduly complicate the trial.  *See* Dkt. 201.  If

the gains issues remain in the case, however, the government may attempt to prove those gains

through evidence of PG&E's safety and maintenance improvements after the San Bruno

accident.  The government has stated that it based its gains allegations on what "PG&E plans to

1    spend to bring its pipeline system in compliance with the federal regulations."  Dkt. 36 at 19.

2    There are several problems with this.  For one, Rule 407 excludes evidence of costs of post-

3    accident improvements from trial.  For another, the government cannot use evidence of broad

4    measures of post-accident improvements to prove those gains, which are defined as any

5    additional before-tax profits earned by the defendant as a proximate result of the specific charged

6    offenses.  *See Sanford Ltd.*, 878 F. Supp. 2d at 153.

7           This issue was addressed in *United States v. BP Products North America Inc.*, 610 F.

8    Supp. 2d 655, 700-02 (S.D. Tex. 2009).  The court was considering whether to accept the plea

9    agreement that based the stipulated Alternative Fines Act fine amount on twice the amount it had

10   cost BP Products after the accident to implement new safety measures.  *See id.* at 701.  The

11   government and the defendant argued that the court should accept the plea agreement because a

12   trial involving the gains allegations would implicate the Alternative Fines Act's undue

13   complication provision.  The parties asserted "that the basis used to compute the stipulated fine

14   could not be used in litigation if the plea agreement were rejected" because those improvement

15   efforts were post-accident remedial measures.  *Id.*  The court found that, for purposes of the plea

16   agreement, it could accept the stipulated fine without determining whether its factual basis

17   "could feasibly be proven and calculated at trial."  *Id.* at 702.  Moreover, the court found that, if

18   the government was unable to rely on the cost of post-accident improvements at trial to prove the

19   alleged gains, it would have to rely on alternative methods of proof, each of which would

20   implicate the undue complication provision.  *See id.*  Like in *BP Products*, the Court should find

21   that the government cannot rely on evidence of the cost of post-accident improvements to prove

22   gains under the Alternative Fines Act.

23          **E.    The Court Should Exclude Post-Accident Evidence of PG&E's Statements of**
                   **Remorse or Recognition of Areas Needing Improvement**
24

25          PG&E has apologized to the community, its customers, and all those affected by the

26   tragic San Bruno accident, and recognized that it needed to improve areas of its gas system.  (It

27   has also paid millions in civil settlements and in voluntary grants to the City of San Bruno.)

28   Those statements of remorse and descriptions of improvement are directly tied to PG&E's

1   improvement efforts, and the government should not be permitted to introduce them in an

2   attempt to prove PG&E's culpability.  *See* Fed. R. Evid. 407.  Moreover, such statements should

3   be excluded under Rules 401, 402, and 403, because they are irrelevant to proving whether—

4   before the accident—PG&E complied with the regulations and its engineers' knowledge of such

5   compliance.  Additionally, these statements would prejudice PG&E by emphasizing the accident,

6   which is unrelated to the charged conduct.  Further, the jury could confuse PG&E's public

7   expressions of remorse for the accident as admissions of culpability for the regulatory violations

8   charged.  The Court should exclude evidence of PG&E's expressions of remorse and statements

9   of intention to improve its gas system safety.

10   **Motion *in Limine* No. 6:  To Exclude Certain Recordkeeping Evidence and Argument**

11   This motion concerns evidence PG&E anticipates the government will seek to introduce

12   in support of Counts 4, 5, and 24 through 28.  SI ¶¶ 65, 75.  The government appears ready to

13   introduce evidence of alleged recordkeeping deficiencies dating back to the 1970s.  The Court

14   should exclude all evidence and argument related to: (1) records (or lack thereof) of any repairs

15   made prior to April 17, 2007, for which the government cannot adduce evidence of a complete

16   record that existed after April 17, 2007; and (2) records (or lack thereof) of any pressure tests

17   conducted prior to July 29, 2007, for which the government cannot adduce evidence of a

18   complete record that existed after July 29, 2007.

19   **A.    Background**

20   Counts 4, 5, and 24 through 28 charge PG&E with knowingly and willfully violating two

21   regulations about how operators should handle repair and pressure-test records concerning their

22   underground pipelines.  *See* SI ¶¶ 65, 75.  Although the superseding indictment alleges that these

23   violations began "on a date unknown" and "in or about August 1970," respectively, the statute of

24   limitations for all of these counts is approximately seven years (because PG&E voluntarily

25   extended it beyond the statutory five years).  Dkt. 215 at 3.  On December 23, 2015, this Court

26   denied PG&E's motion to dismiss these counts as time-barred.  The Court held that the

27   allegations in the indictment were sufficient to put PG&E on notice that it "must come prepared

28   to rebut the Government's evidence that it failed to create and maintain any record for any repair

1    made or relevant pressure test conducted during the seven-year statute of limitations." *Id.* at 9.

2    The Court's order was based in part on the government's courtroom assurance that it "intends to

3    prove at trial that the defendant knowingly and willfully did not maintain [repair] records . . . on

4    line 132 and line 109 . . . and knowingly and intentionally did not retain [pressure test] records

5    *within* the statute of limitations." *Id.* at 4 (emphasis added).

6         **B.**    **Recordkeeping Evidence Unconnected to Any Knowing and Willful Violation**
     **within the Limitations Period Is Irrelevant**

7

8            Notwithstanding the government's assurance, to date, it has not identified a single

9    pressure test or repair that was performed during the limitations period but not recorded, or a

10   single record that was created but subsequently lost, discarded, or destroyed during the relevant

11   limitations period.  Before the grand jury and in the evidence it has produced to date, the

12   government has relied instead on evidence of records that must have been missing well before

13   the relevant limitations period and evidence of missing records for which there is no indication

14   that a record existed within the limitations period.

15           Evidence concerning repairs made or pressure tests conducted *outside* the limitations

16   period cannot prove a crime that the government can still prosecute unless a record of that repair

17   or pressure test with all the required information existed *within* the limitations period.  Either

18   such a record—*i.e.*, containing all the required information—was never made of such a repair or

19   pressure test or, if such a record was made, it was apparently lost, discarded, or destroyed outside

20   the limitations period.  In either case, prosecution of any knowing and willful failure to make and

21   retain *that* record is barred by the statute of limitations.  So far, the government has not explained

22   why evidence of such recordkeeping deficiencies—reaching back decades—is nevertheless

23   relevant to alleged crimes within the limitations period, and no relevance is apparent.  For that

24   reason alone, it should be excluded.  Fed. R. Evid. 401, 402.

25        **C.**    **The Court Should Also Exclude Such Evidence as Unfairly Prejudicial,**
     **Confusing, and a Waste of Time**

26

27           Such evidence should also be excluded because it would be unfairly prejudicial and

28   confusing, and would result in undue delay and a waste of time.  Fed. R. Evid. 403; *see Hitt*, 981

1    F.2d at 424.  For example, given the government's arguments to date, there is a substantial risk

2    that this evidence would mislead the jury into believing that simply *not having* a record during

3    the limitations period is itself a federal crime.  *See* Dkt. 154 at 30:13-15 ("One fails to maintain

4    or retain the record every day when it is not readily accessible to use in making decisions

5    concerning the integrity of the pipeline.").  It would invite the jury to base its verdict on "pure

6    speculation" of any knowing and willful conduct within limitations period, *Espinoza-Baza*, 647

7    F.3d at 1190, or, worse yet, convict on a conclusion that "missing" records indicate that PG&E

8    must have done *something* wrong, *see Old Chief*, 519 U.S. at 180.  That is particularly true

9    where, as here, evidence of relevant conduct within the limitations period is either non-existent

10   or exceedingly minimal relative to the purported evidence of wrongful conduct outside the

11   limitations period.

12          Finally, admitting this evidence would expand the scope of the trial enormously,

13   encapsulating more than 40 years of repairs, tests, and records.  It would shift the burden to

14   PG&E to explain various facts in its defense, including what records or information were not

15   required under the federal regulations, and the circumstances under which records could have

16   gone missing over the course of several decades.  The resulting mini-trials are independent

17   grounds for exclusion under Rule 403.  *See Tennison*, 244 F.3d at 690.

18   **Motion *in Limine* No. 7:  To Exclude All Argument That Actions Before the Integrity
     Management Regulations Became Effective Are Relevant to Establishing a Violation**
19

20          PG&E seeks to exclude all argument that conduct that was complete before the effective

21   date of the integrity management regulations—most notably any alleged overpressurization

22   events in 2003—can constitute a violation of those regulations.

23          The *Ex Post Facto* Clause forbids the application of laws that "retroactively alter the

24   definition of crimes or increase the punishment for criminal acts."  *Cal. Dep't of Corr. v.*

25   *Morales*, 514 U.S. 499, 504 (1995) (citations and quotation marks omitted).  The Clause

26   specifically forbids "[e]very law that makes an action done before the passing of the law, and

27   which was innocent when done, criminal; and punishes such action."  *Rogers v. Tennessee*, 532

28   U.S. 451, 456 (2001) (citation and quotation marks omitted).

1    The government contends that PG&E violated portions of the integrity management

2    regulations, in part, by actions performed before February 14, 2004—the effective date of the

3    integrity management regulations.  *See* 69 Fed. Reg. 2307-01 (Jan. 15, 2004).  The retroactive

4    application of the 2004 regulations to conduct that was complete before their effective date

5    would violate the Constitution's *Ex Post Facto* Clause; therefore, any evidence or argument

6    related to pre-enactment conduct is irrelevant to the integrity management charges in this case.

7    The Court should issue an order prohibiting the government from arguing or implying that

8    PG&E's pre-enactment actions violated or evinced an intent to violate the integrity management

9    regulations.

10    PG&E's concern that the government will argue that pre-2004 conduct violated the

11    integrity management regulations is not hypothetical; the government has shown it intends to

12    introduce such evidence.  *See, e.g.*, SI ¶¶ 34, 35, 47, 50, 51, 63.  For example, the government

13    has repeatedly—and inaccurately—argued that pressure increases in 2003 violated 49 C.F.R

14    §192.917(e)(3) or (e)(4), which are integrity management regulations.  The indictment, for

15    example, states that the defendant "adopted a practice in 2003 called 'planned pressure increases'

16    ("PPIs")," and that, having exceeded the 5-Year MOPs of the lines, "PG&E failed to review the

17    history of the pipelines or verify the accuracy of its data prior to executing the PPIs to determine

18    whether intentionally increasing the pressure on these older pipelines would affect the integrity

19    of the pipeline."  SI ¶ 34.  But the regulatory requirement to gather and integrate data was not

20    actually in effect in 2003 at the time of those pressure increases.

21    Later, at the hearing on PG&E's Motion to Strike, the government argued:  "In 2003 and

22    again in 2008, PG&E raised the pressure on line 132 well above its normal operating pressure

23    and exceeded its maximum allowable pressure.  At that point, the law required very specific

24    things of PG&E . . . [i]t could hydrotest[] . . . the relevant segments on the line or replac[e]

25    them."  9/22/14 Hr'g Tr. (Dkt. 42) 21:22-22:25.  But, again, "at that point" (*i.e.*, in 2003), the law

26    *did not* require PG&E to do what the government asserted; any legal obligation arising from the

27    integrity management regulations would not become effective until the next year.  The pressure

28    increases in 2003 and any other pre-effective date conduct are not relevant to proving violations

1    of regulations that were not in effect until 2004.  The Court should issue an order excluding

2    evidence and argument suggesting that the pre-enactment conduct was indicative of the

3    defendant's violation of, or intent to violate, a law not yet in effect.[19]

4            **Motion *in Limine* No. 8:  To Exclude All Evidence and Argument**
             **Relating to Political and Lobbying Activities**

5

6            PG&E moves under Rules 402 and 403 to exclude all evidence and argument regarding

7    its lobbying activity, including (a) participation in the drafting and revision of pipeline

8    standards in communications with public officials; (b) lobbying state and federal officials

9    concerning the content of such standards; (c) media reports or suggestions of official

10   investigations concerning lobbying public officials on an ex-parte basis; and (d) sanctions

11   levied against defendant by any regulatory authority for alleged lobbying rule violations.  This

12   evidence is irrelevant to the charged conduct, and the only reason for its admission would be to

13   unfairly prejudice PG&E by influencing the jury to infer guilt on the basis of the defendant's

14   exercise of its constitutional rights.

15       **A.     Background**

16           PG&E's lobbying efforts with state or federal officials regarding the development and

17   drafting of regulations is speech protected by the First Amendment.  *See Senart v. Mobay*

18   *Chemical Corp*., 597 F. Supp. 502, 506 (D. Minn. 1984) ("[Defendants'] particular view in a

19   scientific debate and for trying to retain a regulatory standard which defendants preferred . . .

20   [do] not constitute torts[;] they are protected by the first amendment.").  The discovery

21   suggests that the government intends to introduce evidence of PG&E's lobbying activities

22   relating to the development and promulgation of the integrity management regulations.  Valco

23   Decl. ¶ 9.  We also have reason to believe that the government intends to introduce evidence of

24   lobbying activities by PG&E employees related to CPUC proceedings that are irrelevant to the

25   issues in this case.  Valco Decl. ¶ 10.  The only conceivable purpose for the introduction of this

26
27
28

---

[19]    Furthermore, planned pressure increases do not "violate" the integrity management regulations.  The integrity management regulations contain nothing prohibiting or otherwise discouraging an operator from raising a pipeline's operating pressure up to its maximum allowable operating pressure for any reason, including to maintain its capacity.

1    evidence would be to unfairly prejudice PG&E by inviting the jury to infer the guilt of the

2    defendant, in part, on the basis of its constitutionally protected activities—a danger sufficient

3    to warrant exclusion under Rule 403.  *See* Peter E. Quint, *Toward First Amendment*

4    *Limitations on the Introduction of Evidence: The Problem of United States v. Rosenberg*, 86

5    Yale L.J. 1622, 1641 (1977) ("When the government introduces evidence of speech or

6    association protected by the First Amendment to prove a non-speech offense, it creates the

7    danger that . . . the jury may convict the defendant, not because it is convinced that he is guilty

8    of the offense charged, but to retaliate against him for his protected speech or association . . .").

9    The Court should exclude this type of evidence.

10       **B.      PG&E's Lobbying Activities Are Irrelevant**

11       Evidence of PG&E's pre-enactment lobbying activities with respect to the charged

12   integrity management regulations is irrelevant because it tells the jury nothing about whether

13   PG&E violated those regulations.  Further, the CPUC lobbying activities the government has

14   referenced in discovery are all part of unrelated state proceedings and bear no probative value

15   with regard to the charged conduct.  Valco Decl. ¶ 10.  These categories of evidence would not

16   aid the jury in resolving any fact of consequence in this case.  The Court should exclude them.

17       **C.      Evidence of Defendant's Lobbying Activities Is Further Inadmissible Under
                   Rule 403 Because Lobbying Activities Are Protected by the First Amendment**
18

19       Lobbying activities are core speech protected by the First Amendment, which guarantees

20   the right to petition the Government.  The First Amendment extends to corporate entities such as

21   defendant, *see First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 784-86 (1978), and protects

22   speech directed to "all departments of Government," including both federal and state

23   administrative agencies, *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510-11

24   (1972).

25       Given the protected nature of lobbying activities, courts have excluded evidence of such

26   activity under Rule 403.  *See U.S. Football League v. Nat'l Football League*, 634 F. Supp. 1155,

27   1171 (S.D.N.Y. 1986) (excluding evidence of NFL's lobbying efforts under Rule 403).  If the

28   government suggests that PG&E somehow had an improper role in helping craft pipeline

1    regulations, jurors could punish PG&E for engaging in protected First Amendment activities

2    rather than for the conduct charged.  *See Quint*, 86 Yale L.J. at 1641; *Blackstone*, 56 F.3d at 1146

3    ("Evidence is prejudicial if it appeals to the jury's sympathies, arouses its sense of horror,

4    provokes its instincts to punish, or triggers other mainsprings of human action.") (citation and

5    internal quotation marks omitted).

6            Evidence of PG&E's lobbying activities would also confuse the jury about its fact-

7    finding mission.  *See Weit v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi.*, 641 F.2d 457, 466-67

8    (7th Cir. 1981) (finding evidence of defendants' lobbying posed a serious problem of confusion

9    of issues for the jury to justify its exclusion and tended to encroach too closely on First

10   Amendment rights), *cert. denied*, 455 U.S. 988 (1982).  Moreover, jurors might give special

11   deference to evidence of administrative sanctions for defendant's self-disclosed ex-parte contacts

12   with the CPUC, even though those sanctions were imposed under entirely different legal

13   standards and in an entirely separate proceeding.  *See Fowler*, 92 F.R.D. at 2 (excluding

14   government agency reports on defects in defendant's tires as likely to confuse or mislead jury

15   because of their official nature).

16           Finally, evidence of defendant's lobbying activities would unduly prolong these

17   proceedings with a slew of unnecessary mini-trials.  *See Tennison*, 244 F.3d at 690 (excluding

18   testimony of prior conduct because it would have "resulted in a 'mini trial,' considering that

19   much of their testimony was disputed").  Defendant would contest the prejudicial inferences the

20   government would draw from this evidence, which would require, at a minimum, offering:

21   (1) details about the particular regulatory proceeding at issue; (2) explanations of the governing

22   agency rules in effect at the time; and (3) evidence of the prior course of dealing between the

23   parties involved (both the regulators and the regulated entities).  The Court should exclude this

24   evidence under Rule 403.

25                 **Motion *in Limine* No. 9:  To Exclude All Evidence and Argument Relating to**
                  **Allegations of Failure to Cooperate With the NTSB Investigation**

26

27           As this Court has recognized, the heart of the obstruction charge in Count One is a

28   "specific letter" that PG&E sent to the NTSB on April 6, 2011, which contained "specific

1    statements . . . that were allegedly false or misleading."  *See* Dkt. 228 at 3; Dkt. 218 at 2.  This

2    letter related to a draft of an internal instruction document called RMI-06.  SI ¶ 59.  The

3    indictment alleges that, in the letter, "PG&E did not disclose that, from in or about 2009 through

4    in or about April 2011, its Integrity Management group followed the practice set forth in the 10%

5    Version" and also "failed to disclose that PG&E knew the 10% Version was in violation of" the

6    regulations.  *Id.* ¶ 60.  The government's evidence relating to the NTSB investigation must be

7    limited to evidence that is probative of the charge that someone at PG&E committed obstruction

8    through that letter.

9            **A.      Background**

10           Despite the narrow scope of this charge, the government has repeatedly elicited

11   characterizations relating to individuals and events involved in the NTSB investigation that have

12   nothing to do with the allegedly obstructive April 2011 letter or PG&E's practices with respect

13   to RMI-06.  For example, the government has elicited broad opinions from NTSB investigators

14   about their perception of the general demeanor and responsiveness of some PG&E employees

15   during NTSB interviews in January and February of 2011, which was presented to the grand jury

16   on the day the government superseded to add the obstruction count.  The government has also

17   repeatedly elicited comments about PG&E's replacement of its party representative to the NTSB

18   investigation based on issues related to the 1956 installation of the segment that ruptured.  This

19   evidence was also presented to the grand jury on the day the superseding indictment issued.

20   Such evidence is wholly irrelevant to the alleged obstruction charged in Count One and should

21   be excluded.

22           **B.      The Evidence Is Irrelevant**

23           Evidence unrelated to PG&E's practices with respect to the version of RMI-06 that the

24   indictment alleges was used in practice or the April 6, 2011 letter is irrelevant to the allegation

25   that the letter obstructed the NTSB investigation.  As this Court has recognized, this conduct is

26   the only allegedly obstructive conduct charged in the indictment.  Dkt. 218 at 2; Dkt. 228 at 3.

27   Consequently, characterizations of the generalized demeanor of some employees during NTSB

28   interviews in early 2011 and PG&E's decision to replace its party representative—months before

1    the alleged obstruction—cannot be probative of that charge.  These employees' actions—let

2    alone opinions and comments about them—have nothing to do with the allegedly obstructive

3    letter, nor do they go to the "nature of the investigation and the potential consequences of an

4    adverse finding by the NTSB," Dkt. 43 at 6, evidence of which the Court has deemed relevant to

5    whether an individual at PG&E had the requisite specific intent to obstruct the NTSB

6    investigation, *id.* at 7.  Accordingly, this evidence must be excluded as irrelevant under Rule 402.

7        **C.    The Evidence Is Unnoticed "Other Acts" Evidence And Must Be Excluded
              Under Rule 404(b)**

8

9        The proffered evidence that the government presented to the grand jury—concerning

10   other PG&E employees and other issues in the NTSB investigation unrelated to the charged

11   letter and RMI-06—is essentially "other acts" evidence covered by Rule 404(b).  The

12   government did not provide pretrial notice of its intent to offer such evidence, as required under

13   Rules 404(b)(2)(A) and (B) and this Court's order.  Dkt. 103 at 27.  Absent such notice, the

14   evidence must be excluded.

15       In any event, this evidence is inadmissible alleged character evidence.  Fed. R. Evid.

16   404(b)(1).  Based on the government's grand jury presentation, it will apparently seek to

17   convince the jury that, because some investigators may criticize other PG&E employees (with

18   no connection to the April 6, 2011 letter) for their purported actions during the NTSB

19   investigation, the yet-unidentified alleged corrupt actor must have intended to obstruct the

20   investigation by sending the letter.  Courts routinely exclude such propensity evidence because

21   "the risk that a jury will convict for crimes other than those charged—or that, uncertain of guilt,

22   it will convict anyway because a bad person deserves punishment—creates a prejudicial effect

23   that outweighs ordinary relevance." *United States v. Moccia*, 681 F.2d 61, 63 (1st Cir. 1982).

24   The proffered evidence does not bear on any PG&E employee's motive or intent in sending that

25   letter, and does not demonstrate any knowledge or plan relating to the subject matter of its

26   contents.

27

28

1

### D.    Any Minimal Probative Value Is Substantially Outweighed by the Danger of Undue Delay, Waste of Time, Confusion, and Prejudice

2

3    In addition, the potential for undue delay, jury confusion, waste of time, and prejudice all

4    warrant exclusion.  Fed. R. Evid. 403.  If the Court were to permit the government to offer this

5    kind of evidence about conduct that is not charged in the indictment and has no relation to the

6    charged conduct, it would greatly expand the scope of the trial, requiring PG&E to put on

7    evidence in its defense about the circumstances and propriety of each instance of alleged lack of

8    cooperation.  These inevitable mini-trials are independent grounds for exclusion under Rule 403.

9    *See Tennison*, 244 F.3d at 690.

10    Further, there would be a risk that a jury might conclude that these acts, although

11    uncharged, were an indication that PG&E must have done something improper with respect to

12    the NTSB investigation, even though there is no nexus to the alleged obstruction charge.  The

13    evidence creates a serious risk that a jury could, either from confusion or undue prejudice,

14    convict PG&E for conduct for which the government has not established a corrupt intent, that did

15    not cause any obstruction of the investigation, or concerned information immaterial to the

16    investigation.

17

### Motion *in Limine* No. 10:  To Exclude All Evidence and Argument Relating to the Government's Late-Disclosed Rule 404(b) Topic

18

19 ████████████████████████████████████████████████████████████

20 ██████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████████████

22 ██████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████████████

24 ████████████████████████████████

25 ██    ████████████

26 ████████████████████████████████████████████

27 ██████████████████████████████████████████████████████████

28 ████████████████████████████████████████████████████████████

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEF.'S MOTS. IN LIMINE NOS. 1-10
CASE NO. 14-CR-00175-TEH



LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEF.'S MOTS. IN LIMINE NOS. 1-10
CASE NO. 14-CR-00175-TEH



LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEF.'S MOTS. IN LIMINE NOS. 1-10
CASE NO. 14-CR-00175-TEH

1

2

3

4

5

6

7

8

9

10

11

12

13

14   Dated:  January 11, 2016                    Respectfully submitted,

15                                          By _____/s/_____

16                                             Steven M. Bauer
                                              Margaret A. Tough
17                                            LATHAM & WATKINS LLP

18                                            Kate Dyer
                                              CLARENCE DYER & COHEN LLP

19                                            *Attorneys for Defendant*

20                                            *Pacific Gas and Electric Company*

21

22

23

24

25

26

27

28