UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

PACIFIC GAS AND ELECTRIC COMPANY,

Defendant.

Case No. 14-cr-00175-TEH

**ORDER ON MOTIONS *IN LIMINE***

Defendant Pacific Gas and Electric Company ("PG&E") and the Government submitted simultaneous motions *in limine* on January 11, 2016.  Dkt. Nos. 236, 237.  Both parties timely opposed and replied in support of their respective motions.  Dkt. Nos. 277, 281, 300, 308.  The Court held limited oral argument on April 12, 2016.  After carefully considering the parties' written and oral arguments, the Court now GRANTS IN PART and DENIES IN PART the parties' motions *in limine*, as set forth below.

**BACKGROUND**

On September 9, 2010, a gas line owned and operated by PG&E ruptured, causing significant damage to a residential community in San Bruno, California.  Superseding Indictment ("SI") ¶ 5 (Dkt. No. 22).  PG&E stands charged with one count of obstructing the National Transportation Safety Board ("NTSB") investigation that followed the San Bruno explosion.  *Id.* ¶ 61.  PG&E is also charged with 12 counts of violating the minimum federal safety standards for the transportation of natural gas by pipeline ("Pipeline Safety Act"), as set forth in 49 C.F.R. pt. 192 ("Part 192").  *Id.* ¶¶ 62-75.  Congress criminalized "knowing and willful" violations of these minimum standards under 49 U.S.C. § 60123 ("Section 60123").

United States District Court
Northern District of California

## I.    Count 1: Obstruction

The NTSB began an investigation immediately after the San Bruno explosion, examining the cause of the explosion, the characteristics and history of the failed pipe, the adequacy of PG&E's emergency response, and PG&E's operations. SI ¶¶ 54-55.  The investigation revealed a number of deficiencies in PG&E's recordkeeping, integrity management program, and maintenance practices as they related to various sections of the pipeline, including the line that ruptured – Line 132.  *Id.*  The agency concluded that these deficiencies were a probable cause of the explosion.  *Id.*

As part of its investigation, "the NTSB sent PG&E a series of data requests concerning instances where PG&E's planned and unplanned pressure increases exceeded the 5-year MOPs and/or MAOPs of pipelines in HCAs."  *Id.* ¶ 56.  HCAs, or high consequence areas, are densely populated locales where a release of gas could pose a significant risk of injury or death, 49 C.F.R. § 192.903; the 5-year MOP is the "maximum operating pressure experienced during the preceding five years," 49 C.F.R. § 192.917(e)(3)(i); and the MAOP is the "maximum allowable operating pressure" for a pipeline segment, 49 C.F.R. § 192.903.

In response to the NTSB data requests, PG&E provided a copy of Risk Management Instruction-06 ("RMI-06"), an internal policy document that stated "PG&E would only consider a manufacturing threat as unstable if the pressure on the line exceeded the 5-year MOP by 10%."  SI ¶ 57.  The Pipeline Safety Act makes no such "10% or more" allowance.  *See* 49 C.F.R. § 192.917(e) ("If an operator identifies any of the following threats, the operator must . . . address the threat . . . [including] [o]perating pressure increases above the [MOP] experienced during the preceding five years.").

On April 6, 2011, PG&E sent a letter to the NTSB (1) explaining that the "10% or more" version of RMI-06 that had previously been disclosed was actually an "unapproved draft," and (2) attaching another version of RMI-06 that did not include the "10% or more" policy.  SI ¶ 59.  The Government alleges that what PG&E did not disclose in this letter is that its integrity management group had actually followed the "10% or more" policy set

forth in the original copy of RMI-06, whether or not that policy was formally approved and despite knowing that such a policy violated the Pipeline Safety Act.  *Id.* ¶ 60.

On the basis of this conduct, the indictment charges that PG&E "did corruptly influence, obstruct, and impede" the NTSB investigation.  *Id.* ¶ 61.

## II.   **Counts 2-13: Pipeline Safety Act Violations**

Counts 2-13[1] allege knowing and willful violations of the Pipeline Safety Act.

Counts 2 and 5-8 allege violations of Part 192's Subpart O, known as the Integrity Management ("IM") regulations.  *Id.* ¶¶ 62-63, 66-73.  Count 2 charges PG&E with violating 49 C.F.R. § 192.917(b), which states that "[t]o identify and evaluate the potential threats to a covered pipeline segment, an operator must gather and integrate existing data and information on the entire pipeline that could be relevant to the covered segment," on two pipelines: Lines 132 and 109.  *Id.* ¶ 63.  Count 5 charges PG&E with violating 49 C.F.R. § 192.917(a), which states that "[a]n operator must identify and evaluate all potential threats to each covered pipeline segment," on three pipelines: Lines 132, 153, and DFM 1816-01.  *Id.* ¶ 67.  Count 6 charges PG&E with violating 49 C.F.R. § 192.919, which states that "[a]n operator must include [certain] elements in its written baseline assessment plan," on six pipelines: Lines 132, 153, DFM 1816-01, 107, 191-1, and 109. *Id.* ¶ 69.  Count 7 charges PG&E with violating 49 C.F.R. § 192.917(e)(3), which states that "[i]f an operator identifies the threat of manufacturing and construction defects (including seam defects) in the covered segment, an operator must analyze the covered segment to determine the risk of failure from these defects," and if certain changes occur, that "an operator must prioritize the covered segment as a high risk segment for the baseline assessment or a subsequent reassessment," on four pipelines: Lines 132, 153,

---

[1]     The Counts had to be renumbered following the Court's Order Granting Defendant's Motion to Dismiss for Multiplicity ("Multiplicity Order").  Dkt. No. 217.  The Court has renumbered the Counts here to match the apparent agreement demonstrated by the parties' proposed verdict forms.  U.S.'s Proposed Verdict Form (Dkt. No. 295); Def.'s Proposed Special Verdict Form (Dkt. No. 306).

United States District Court
Northern District of California

1    DFM 1816-01, and 109.  *Id.* ¶ 71.  Count 8 charges PG&E with violating 49 C.F.R. §

2    192.917(e)(4), which states that "[i]f a covered pipeline segment contains [certain

3    characteristics], an operator must select an assessment technology or technologies with a

4    proven application capable of assessing seam integrity and seam corrosion anomalies,

5    [and] must prioritize the covered segment as a high risk segment for the baseline

6    assessment or a subsequent reassessment," on five pipelines: Lines DFM 1816-01, 191-1,

7    109, 107, and 132.  *Id.* ¶ 73.

8            Counts 3-4 and 9-13 allege that PG&E's recordkeeping practices fell below the

9    standards required of Part 192's recordkeeping provisions.  Counts 3-4 charge PG&E with

10   violating 49 C.F.R. § 192.709(a), which requires pipeline operators to maintain and retain

11   the "date, location, and description of each repair made to pipe . . . for as long as the pipe

12   remains in service."  *Id.* ¶ 65.  Counts 9-13 charge PG&E with violating 49 C.F.R. §

13   192.517(a), which requires that pipeline operators "make, and retain for the useful life of

14   the pipeline, a record of each [pressure] test performed" pursuant to certain other

15   provisions of Part 192.  *Id.* ¶ 75.

16

17   **LEGAL STANDARD**

18           Federal Rule of Evidence ("Rule") 401 states that evidence is relevant if it "has any

19   tendency to make a fact more or less probable" and "the fact is of consequence in

20   determining the action."  Fed. R. Evid. 401.  Rule 402 creates a general presumption that

21   relevant evidence is admissible unless otherwise prohibited.  Fed. R. Evid. 402.  Rule 403

22   allows the court to "exclude relevant evidence if its probative value is substantially

23   outweighed by a danger of one or more of the following: unfair prejudice, confusing the

24   issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative

25   evidence."  Fed. R. Evid. 403.

26           "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of

27   some concededly relevant evidence to lure the factfinder into declaring guilt on a ground

28   different from proof specific to the offense charged."  *Old Chief v. United States*, 519 U.S.

United States District Court
Northern District of California

172, 180 (1997).  That is, unfairly prejudicial evidence is evidence having "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.* (citation and internal quotation marks omitted).  In weighing unfair prejudice, "what counts as the Rule 403 'probative value' of an item of evidence, as distinct from its Rule 401 'relevance,' may be calculated by comparing evidentiary alternatives." *Id.* at 184.

"Rulings on admissibility of evidence normally should be deferred until trial, so that questions of foundation, relevancy, and potential prejudice may be resolved in proper context." *In re Air Crash Disaster at Sioux City, Iowa*, 1991 WL 279284, at *1 (N.D. Ill. Dec. 26, 1991).[2]

## PG&E'S MOTIONS *IN LIMINE*

### I.    PG&E's Motion *in Limine* No. 1

PG&E moves to exclude: "All evidence and argument relating to the San Bruno accident, including: (a) the accident itself and its causes; (b) PG&E's work clearance for the work done at Milpitas Terminal on September 9, 2010, PG&E's pre-incident work clearance procedures, and the work performed at Milpitas; and (c) PG&E's emergency response."  Def.'s Mots. *in Limine* Nos. 1-10 ("PG&E Mot.") at ii (Dkt. No. 273).[3]

The Government does not oppose PG&E's motion with respect to either PG&E's Milpitas work clearance and procedures (request (b)) or PG&E's emergency response to the explosion (request (c)).  U.S.'s Resp. to Def.'s Mots. *in Limine* ("Gov't Opp'n") at 1 (Docket No. 277).  Accordingly, PG&E's first motion *in limine* is hereby GRANTED with respect to these categories.

United States District Court
Northern District of California

---

[2]    The Court has determined that none of the motions described in Defendant's Brief Regarding Additional Motions *in Limine* (Dkt. No. 240) warrant pre-trial consideration.
[3]    PG&E's motion included duplicative page numbering: first, pages numbered 1-11 for the notice of motion, table of contents, and table of authorities; and second, pages numbered 1-48 for the memorandum of points and authorities.  To avoid confusion, the Court has renumbered the first pages 1-11 as pages i-xi, and will cite them accordingly.

United States District Court
Northern District of California

1       With respect to category (a), regarding the San Bruno explosion itself, PG&E

2   correctly argues that this Court previously ruled that the explosion is not an element of any

3   charged offense.  PG&E Mot. at 7.  But PG&E misreads the Court's prior order, to the

4   extent it reads the order as holding the explosion is not *relevant* to any charged offense.

5                   **a.  Evidence of the San Bruno explosion is relevant.**

6       The San Bruno explosion is unquestionably relevant to all thirteen counts that

7   remain to be tried in this case.  The Court has already concluded that the Superseding

8   Indictment's references to the explosion are relevant non-surplusage, as to both the

9   obstruction and Pipeline Safety Act counts.  Order Den. Def.'s Mot. to Strike Surplusage

10  ("Surplusage Order") at 3-9 (Dkt. No. 43).  These conclusions apply with equal, or perhaps

11  greater force in the context of trial.[4]

12      As to the obstruction count, the Court has previously held, and holds again now:

13              The relevance of identifying the subject of the investigation
                goes beyond merely providing context.  The specific intent
14              required for obstruction of justice under the applicable statute
                is that PG&E must have acted "corruptly," meaning that "the
15              act must be done with the purpose of obstructing justice."  *U.S.
                v. Laurins*, 857 F.2d 529, 536-37 (9th Cir. 1988).  Because the
16              Government must prove this criminal *purpose* beyond a
                reasonable doubt at trial, the subject and scope of the
17              investigation is directly relevant, regardless of the standard of
                relevance applied by the Court.  It would be exceedingly
18              difficult for a jury to determine the *mens rea* of PG&E's
                obstructive actions without knowing the nature of the
19              investigation and the potential consequences of an adverse
                finding by the NTSB, which would provide a strong motivation
20              for obstruction. . . .  [W]hile the subject of the NTSB
                investigation is not technically an element of the prima facie
21              case for obstruction, it is . . . necessary to prove PG&E's
                intent to obstruct the ongoing investigation.
22

23  Surplusage Order at 6-7 (emphasis in original).

24      As to the Pipeline Safety Act counts, the Court likewise affirms its prior holding

25  that the "explosion makes it at least somewhat more likely that the pipeline was improperly

26

27  ─────────────────────────────
    [4]   As PG&E argued in briefing its motion to strike surplusage, the relevance standard for
28  surplusage may be narrower than the relevance standard articulated by Rule 401.  Dkt. No.
    37 at 4 (citing *United States v. Cooper*, 384 F. Supp. 2d 958, 960 (W.D. Va. 2005)).

maintained," in violation of the Pipeline Safety Act. *Id.* at 7-8. To be clear, the Court does not commit the "logical fallacy" that PG&E cautions against. PG&E Mot. at 9. By holding that the explosion is relevant to the Pipeline Safety Act counts, the Court does not hold that the alleged Pipeline Safety Act violations must have *caused* the explosion. The Court merely recognizes that evidence of the explosion "has [a] tendency to make a fact" – the violation of regulations that are by definition in place to prevent the consequences of a pipeline explosion – "more [] probable than it would be without the evidence." Fed. R. Evid. 401(a); *see also* 49 U.S.C. § 60102(a)(1) ("The purpose of this chapter is to provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities by improving the regulatory and enforcement authority of the Secretary of Transportation.").

### b. Evidence of the San Bruno explosion is not per se unduly prejudicial.

While evidence of the San Bruno explosion is legally relevant, the admissibility inquiry does not end with relevance. PG&E also argues that the San Bruno evidence is unfairly prejudicial under Rule 403. PG&E Mot. at 8, 10, 12.

### i. The San Bruno evidence is highly probative.

PG&E is incorrect to argue that "[t]he probative value [of San Bruno evidence] is necessarily low as it does not go to any element of the charged conduct." *Id.* at 16 (citing *United States v. Gonzales-Flores*, 418 F.3d 1093, 1098 (9th Cir. 2005)). The San Bruno evidence does go to an element of the obstruction count; as discussed above, the explosion informs the "corrupt intent" that is required for that count.[5]

Moreover, the Government is not required to prove the obstruction count in a vacuum: "A jury is entitled to know the circumstances and background of a criminal

---

[5]   PG&E's argument that "this Court has already recognized" that "the explosion does not support any specific element of any of the counts," PG&E Reply at 6 n.6, is at best a misunderstanding of the Court's prior order and at worst a misstatement of that order. The Court's prior comments that "the subject of the NTSB investigation is not technically an element of the *prima facie* case for obstruction" and "the explosion itself is not an element of the [Pipeline Safety Act] violations," Surplusage Order at 7, were by no means conclusions that the explosion does not *support* any element of those counts.

United States District Court
Northern District of California

United States District Court
Northern District of California

charge.  It cannot be expected to make its decision in a void—without knowledge of the time, place, and circumstances of the acts which form the basis of the charge." *United States v. Daly*, 974 F.2d 1215, 1217 (9th Cir. 1992) (quoting *United States v. Moore*, 735 F.2d 289, 292 (8th Cir. 1984)).  The San Bruno explosion provides necessary context as to both the reasons for the NTSB investigation and PG&E's potential motives for obstructing it.  Though PG&E argues that it "could face no 'potential consequences' . . . because NTSB investigations do not determine 'the rights or liabilities of any person,' " Reply in Supp. of Def.'s Mots. *in Limine* Nos. 1-10 ("PG&E Reply") at 2 (Dkt. No. 308), the Court rejects the notion that a potential finding that PG&E's conduct was the "probable cause" of the accident was inconsequential to PG&E.

Finally, though PG&E has offered to "stipulate to the existence, subject and scope of the NTSB investigation into a pipe failure," the Government "is entitled to prove its case by evidence of its own choice, or, more exactly, [] a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it." *Old Chief*, 519 U.S. at 186-87.  And again, the probative value of the San Bruno evidence extends beyond the NTSB's investigation into a "pipe failure" to include at least the fact that the investigation followed a deadly explosion.

### ii.  The probative value of the San Bruno evidence is not per se outweighed by unfair prejudice.

None of the cases cited by PG&E suggest that the San Bruno evidence's probative value is per se substantially outweighed by a risk of unfair prejudice.  The chief case PG&E relies on is *United States v. Gonzales-Florez*, 418 F.3d 1093 (9th Cir. 2005).  There, the defendant was convicted on one count of bringing illegal aliens to the United States.  418 F.3d at 1095.  The Ninth Circuit held that evidence that two young women had been injured in the process was inadmissible under Rule 403:

> As a logical matter, the fact that two girls in Gonzalez's group suffered heat stroke *does not affect the probability* (1) that Gonzalez brought aliens into the United States other than at a recognized port of entry, (2) that Gonzalez knew they were aliens, or (3) that Gonzalez intended to violate U.S.

immigration law by bringing them in.   The heat stroke is *a mere detail in the story* of the offense.

*Id.* at 1098 (emphasis added).

Unlike *Gonzales-Flores*, however, the San Bruno explosion does affect the probability, both that PG&E obstructed the NTSB investigation and that PG&E violated the relevant Part 192 regulations.  Though PG&E argues that "the fact that an explosion is possible does not affect the probability that PG&E intended to violate the charged regulations," PG&E Mot. at 10, this characterization misses the point.  It is not the fact that an explosion *is possible* that matters, it is the fact that an explosion *actually happened*.  Evidence of the explosion is likewise not a "mere detail" in either the obstruction or Pipeline Safety Act counts, for all of the reasons set forth above.

A closer case on these facts is *United States v. Mix*, Crim. No. 12-171, 2013 U.S. Dist. LEXIS 64919 (E.D. La. May 7, 2013).  In *Mix*, the defendant was charged with obstructing the grand jury investigation into the Deepwater Horizon explosion and oil spill.  Defendant moved to exclude any reference to the eleven deaths that resulted, the size of the spill, and the flow rate during efforts to stop the spill.  2013 U.S. Dist. LEXIS 64919, at *2-3.  In excluding evidence of the deaths and size of the spill, the court noted that "the fact of the explosion and the duration of the spill" was "relevant to the foreseeability of the grand jury investigation and defendant's motive."  *Id.* at *4.  The court also permitted references to the flow rate because they "provide[d] needed context for attempting to discern Mix's motive and intent as well as specific evidence relevant to the critical issues of defendant's motive and intent."  *Id.* at 6.  As in *Mix*, some San Bruno evidence is relevant to PG&E's motive and intent.

Moreover, the Supreme Court explained in *Old Chief* that, as the party with the burden of proof, the prosecution has a "need for evidentiary richness and narrative integrity in presenting a case."  519 U.S. at 183.  This remains true even when the evidence may produce an emotional response.  *See United States v. Ganoe*, 538 F.3d 1117, 1124 (9th Cir. 2008) ("The court is not required to scrub the trial clean of all evidence that may have an emotional impact.").  And this is especially true where the challenged evidence

United States District Court
Northern District of California

goes to the law's very foundation: "[T]he evidentiary account of what a defendant has thought and done can accomplish what no set of abstract statements ever could, not just to prove a fact but to establish its human significance, and so to implicate the law's moral underpinnings and a juror's obligation to sit in judgment."  *Old Chief*, 519 U.S. at 187-88. As PG&E knows well, avoiding accidents like the San Bruno explosion is the very purpose of the Pipeline Safety Act.  49 U.S.C. § 60102(a)(1).

### iii.  The evidence must be considered on a case-by-case basis.

The Court recognizes, however, that the Government cannot "structure a trial in whatever way would produce the maximum unfair prejudice consistent with relevance." *Old Chief*, 519 U.S. at 183.  Accordingly, the Court must consider the Government's proffered San Bruno evidence on a case-by-case basis to guarantee that each item's probative value is not substantially outweighed by a risk of unfair prejudice.  To that end, the Court identifies and balances below each item of San Bruno evidence that has come up in the parties' briefing on their respective motions *in limine*.  Though this discussion is non-exhaustive, the parties are invited to use it as a guide as they prepare evidence and consider objections for trial.

The probative value of the following items is substantially outweighed by the risk of unfair prejudice, and these items are therefore inadmissible: "[i]mages of the explosion site, testimony about the fire, and statistics regarding the number of deaths, injuries, and houses damaged and destroyed," Gov't Opp'n at 4;[6] "a brief video clip as well as a few photographs of the explosion scene," *id.* at 5; "video footage or photographs depicting the deceased or people engulfed in flames; graphic descriptions of the burns victims suffered; testimony about the deaths of loved ones by their children, parents, or spouses; or recordings of panic-stricken 9-1-1 calls," *id.*; "witness firefighter Scott Waldvogel, a first responder who will describe the fire and his challenges getting water to combat it because

---

[6]     PG&E has offered to stipulate that the portion of Line 132 that exploded, Segment 180, was located in an HCA, which undercuts the probative value of this highly prejudicial evidence.  PG&E Reply at 4.  The Court will hold PG&E to this offer.

United States District Court
Northern District of California

the explosion damaged the entire grid from which nearby hydrants drew water," *id.*; and a jury viewing of the portion of Line 132, on Segment 180, that exploded, *see infra* § XI (denying the Government's first motion *in limine*). Moreover, the probative value of testimony that PG&E's substandard recordkeeping or Integrity Management Program caused the San Bruno explosion is substantially outweighed by a risk of confusing the issues, as the jury is not tasked with determining the cause of the explosion. The following evidence and testimony is therefore inadmissible: that "PG&E's intentional pressure spikes did in fact cause the crack [in Segment 180] to grow," *id.* at 3; that "hydrotesting . . . would have caused the pipe to burst," *id.*; and testimony that if "PG&E properly kept its records and tested Line 132, the San Bruno explosion never would have occurred," *id.*

The probative value of the following items is not substantially outweighed by the risk of unfair prejudice, and these items are therefore admissible: the fact of the deadly explosion; "a map of the explosion site, denoting the houses that were damaged," *id.* at 5;[7] "witnesses from the NTSB and other government entities involved in investigating the explosion," *id.*, (within the boundaries discussed above); and NTSB reports, *see infra* § II (discussing the limitations on such reports).

### c.  This limited introduction of San Bruno evidence will not confuse the issues, mislead the jury, or waste time.

PG&E also argues that San Bruno evidence should be excluded under Rule 403 because it "would involve an extended trial on the metallurgical cause of the accident, the investigation into the cause of the accident, and ultimately risk confusing the jury and wasting time." PG&E Mot. at 13. As discussed above, however, the Government is not permitted to argue that PG&E's recordkeeping or maintenance caused the explosion, so PG&E's concerns are unwarranted. Moreover, PG&E need not prove or disprove the metallurgical cause of the San Bruno explosion just to counter the Government's limited introduction of evidence. Indeed, PG&E sufficiently explained the uncertainty

---

[7]  This map may not denote the houses that were "completely destroyed" as opposed to just "damaged," and may not denote the houses where fatalities occurred.

United States District Court
Northern District of California

surrounding the cause of the explosion in just four pages of briefing before this Court.  *Id.* at 3-6.  Accordingly, the Court rejects PG&E's argument that the parties will need to "try" the San Bruno Explosion case in a way that would confuse the issues, mislead the jury, or waste time.  *Id.* at 13-14.

## II.   PG&E's Motion *in Limine* No. 2

PG&E moves to exclude: "All evidence and argument relating to the [NTSB] reports, opinions, conclusions, and recommendations relating to the San Bruno accident, including: (a) the NTSB final accident report, preliminary or interim report, factual reports, or accident brief, or drafts of any such reports; and (b) any conclusions, opinions, or recommendations contained in any of the above reports or briefs, or draft reports or briefs."  *Id.* at ii.  PG&E also moves to "limit the testimony of NTSB witnesses to their firsthand factual observations."  *Id.* at 18.

### a.  Portions of NTSB reports may be admissible.

PG&E correctly argues that "NTSB Accident Reports are inadmissible in suits or actions for damages arising from matters under investigation."  *Id.* at 17; *see also* 49 U.S.C. § 1154(b) ("No part of a report of the Board . . . may be admitted into evidence or used in a civil action for damages resulting from a matter mentioned in the report.").  But this is not a suit or action for damages, it is a criminal prosecution.  And the regulations governing the use of NTSB accident reports in criminal prosecutions – "Part 835" – limit only the *testimony* of NTSB employees.  Indeed, the stated purpose of those regulations is to "prescribe[] policies and procedures *regarding the testimony of employees* of the [NTSB] in suits or actions for damages and criminal proceedings arising out of transportation accidents . . . ."  49 C.F.R. § 835.1 (emphasis added).[8]

Though Part 835 mentions the prohibition of NTSB accident reports from certain civil litigation, it is only by reference to the statutory prohibition contained in the

---

[8]   *See infra* § II(b) (discussing the limitations on NTSB employee witness testimony).

12

United States District Court
Northern District of California

1    Independent Safety Board Act of 1974 (49 U.S.C. 1154(b)), which as discussed above,

2    limits only suits or actions for damages.  And PG&E cites nothing – not structural context,

3    not legislative history, not even case law – to suggest that the Court should expand the

4    scope of the Safety Board Act beyond its plain language.  *See United States v. Carter*, 421

5    F.3d 909, 911 (9th Cir. 2005) ("It is well settled that, in a statutory construction case,

6    analysis must begin with the language of the statute itself; when the statute is clear, judicial

7    inquiry into its meaning, in all but the most extraordinary circumstance, is finished.")

8    (internal quotation marks and alterations omitted).[9]  PG&E is therefore incorrect that any

9    and all NTSB accident reports must be excluded from criminal trials as a matter of law.[10]

10         PG&E also argues, however, that the NTSB reports are inadmissible hearsay.

11   PG&E Mot. at 19.  The Government does not contest that the NTSB reports are hearsay

12   not subject to any exception.  *See* Gov't Opp'n at 8 ("The government does not contest that

13   the NTSB reports contain out of court statements.").[11]  Instead, the Government argues that

14   it intends to use the reports for non-hearsay purposes.  *Id.*  But the Government offers only

15   one example: it "intends to elicit evidence concerning the NTSB's urgent safety

16   recommendations that . . . directed PG&E to '[a]ggressively and diligently search' for all

17   records related to the [MAOP] of its oldest pipelines."  *Id.*  The Government argues that

18   these urgent recommendations would be offered not for their truth, but to show PG&E's

19   state of mind for the obstruction count, and in particular, to establish that because PG&E

20   was "[a]ware of the NTSB's particular interest in this issue, PG&E sought to conceal its

21   policy of exceeding the MAOP up to 10% . . . by saying the document reflecting such

22   policy was an 'unapproved draft.' "  *Id.*[12]

23

---

24   [9]   Even the regulatory history PG&E cites is testimony-specific.  55 Fed. Reg. 30941.
     [10]  To the extent the Government intends to rely on *factual* accident reports, rather than
25   *Board* accident reports, this is permitted of even civil litigants.  *See* 49 C.F.R. § 835.2
     ("The Board does not object to, and there is no statutory bar to, admission in litigation of
26   factual accident reports.").
     [11]  The Court likewise does not hold that NTSB reports are hearsay not subject to any
27   exception.
     [12]  The Government mistakenly states here that RMI-06 was PG&E's "policy of
28   exceeding the MAOP up to 10%."  Gov't Opp'n at 8.  As the Government knows well,
     RMI-06 concerns MOP.  SI ¶ 57.

United States District Court
Northern District of California

1    Though PG&E argues the urgent recommendations are irrelevant to the obstruction

2  count because they pertained to MAOP, while the policy at issue in the obstruction count

3  (RMI-06) concerned MOP, this argument is unavailing.  PG&E Reply at 8-9.  The Court

4  has reviewed the NTSB data request that prompted the disclosure of RMI-06, and that

5  request also concerned MAOP.[13]  Yet PG&E responded to that request in part by providing

6  a copy of RMI-06, which PG&E admits concerned collection of MOP data.  *Id.*  For

7  PG&E to now argue that the MAOP and MOP measures are completely unrelated is to

8  contradict its own responses to NTSB data requests.  The Court therefore agrees with the

9  Government that the NTSB's "particular interest" in PG&E's maximum pressure practices,

10  as expressed by the urgent recommendations, is relevant to PG&E's state of mind in

11  answering NTSB data requests on those practices.  Accordingly, PG&E's second motion *in*

12  *limine* is DENIED as to the fact that the NTSB made urgent recommendations regarding

13  PG&E's MAOP records, as this fact represents relevant and permissible non-hearsay.[14]

14    The Court cannot, however, make a hearsay determination as to any other

15  statements – contained in NTSB accident reports or elsewhere – for the simple reason that

16  the Government has not provided any other examples.  Accordingly, PG&E's second

17  motion *in limine* is DENIED WITHOUT PREJUDICE to renewal at trial, if and when the

18  Government attempts to admit other NTSB out-of-court statements.[15]

19    **b.  The NTSB's conclusions are inadmissible.**

20    Hearsay determinations aside, PG&E also argues that "[e]vidence of the NTSB's

21  conclusions and opinions, and its recommendations to promote safety, would lead to jury

22

23  ──────────────

[13]    The Court previously had occasion to review USA_NTSB-035772 *et seq.*, which
24  contains PG&E's response to the NTSB data request at issue and includes the text of the
request itself.
25  [14]    Even if the statutory prohibition on the use of NTSB accident reports did apply in
criminal cases, it is not clear that these "urgent" safety recommendations were included in
26  any such report.
[15]    The court will also make a document-by-document determination of whether any out-
27  of-court statements by the NTSB are admissible as "adopted statements."  Gov't Opp'n at
8.  This is necessary because the Government has not detailed any "adopted statements"
28  with sufficient specificity for the Court to determine whether Rule 801(d)(2)(B) applies to
render them admissible.

United States District Court
Northern District of California

confusion between the very different evidentiary and legal standards presented in an NTSB accident investigation as compared to a criminal enforcement action."  PG&E Mot. at 20. The Court agrees.  The probative value of the NTSB's conclusions, including that "PG&E's Integrity Management program was both deficient and ineffective, and was a probable cause of the accident," SI ¶ 54, is limited because the ultimate issue of the NTSB investigation – the cause of the San Bruno explosion – is not at issue in this case. Meanwhile, admitting the NTSB's conclusions invites the jury to improperly substitute the NTSB's findings – under a different standard and for a different purpose – for its own findings about PG&E's alleged regulatory violations.  *See Protectus Alpha Nav. Co. Ltd. v. N. Pac. Grain Growers, Inc.*, 767 F.2d 1379, 1385 (9th Cir. 1985) ("[T]he excluded [NTSB] report was merely another trier of fact's conclusion as to what transpired on that fatal evening.").  Moreover, there is a substantial risk that the jury would "punish" PG&E on the basis of the NTSB's conclusion that PG&E's program was a probable cause of the explosion, which is precisely the sort of improper basis that renders evidence unfairly prejudicial.  *Old Chief*, 519 U.S. at 180 (1997).

Accordingly, PG&E's second motion *in limine* is hereby GRANTED as to the conclusions and opinions contained in any NTSB reports.

### c.  NTSB witnesses may testify only about their firsthand observations.

PG&E also moves to "limit the testimony of NTSB witnesses to their firsthand factual observations."  PG&E Mot. at 18.  The Government concedes that it "does not intend to call NTSB witnesses to render expert opinions," Gov't Opp'n at 9, and the Court will hold the Government to this concession.

While addressing NTSB employee testimony, it is worth clarifying that because Part 835 limits testimony in both civil and criminal cases, NTSB employee-witnesses will not be permitted to rely upon NTSB accident reports during their testimony in this case. *See* 49 C.F.R. § 835.4(b) ("Consistent with section 701(e) of the FA Act and section 304(c) of the Safety Act, a Board employee may not use the Board's accident report for any purpose during his testimony.").

1    Finally, PG&E argues that "[t]he Court should preclude [the Government's] experts

2    from offering any opinions based on the NTSB Accident Report or from testifying that

3    they have relied on it."  PG&E Mot. at 20.  The Government concedes that it "does not

4    intend to . . . elicit other expert testimony that relies on the NTSB reports," Gov't Opp'n at

5    9, and the Court will hold the Government to this concession.

6

7    **III.    PG&E's Motion *in Limine* No. 3**

8        PG&E moves to exclude: "All evidence relating to [California Public Utilities

9    Commission ('CPUC')] penalties and fines, including: (a) the $1.6 billion penalty imposed

10   following Investigation 12-01-007 (the 'San Bruno OII'), Investigation 11-11-009 (the

11   'Class Location OII'), and Investigation 11-02-016 (the 'Recordkeeping OII'), including

12   the investigations and proceedings leading to the penalty; and (b) PG&E's October 2012

13   discovery of misidentified pipeline features for Line 147 in San Carlos, its report of the

14   inaccuracy to the CPUC, and the CPUC's December 2013 imposition of a fine for what it

15   concluded was a misleading 'errata' filing to correct the record."  PG&E Mot. at ii.

16       **a.   The Government concedes that the CPUC penalties should be excluded,**
17            **and the same reasoning holds for remedial measures.**

18       The Government agrees "not to offer evidence of the amount of the fine, including

19   orders and reports establishing the fine . . . ."  Gov't Opp'n at 10.  Accordingly, PG&E's

20   second motion *in limine* is hereby GRANTED as to category (a).

21       In opposition to this motion *in limine*, however, the Government set forth other

22   CPUC OII evidence, not the subject of the motion, that it intends to offer at trial.  *Id.*  First,

23   the Government seeks to include "admissions PG&E made to the CPUC during the OIIs,

24   such as in the form of data responses."  *Id.*  As such "statements of a party opponent" are

25   the subject of the Government's Motion *in Limine* No. 4, the Court discusses their

26   admissibility there.  Second, the Government seeks to include the remedial measures the

27   CPUC imposed upon PG&E following the OIIs.  *Id.*  The Government argues that "[t]hese

28   remedial measures are direct evidence of PG&E's poor record keeping practices, lack of

United States District Court
Northern District of California

16

1    hydrotesting, lack of verifications of MAOPs on old pipelines, etc. before the San Bruno

2    explosion, and thus highly probative of PG&E's violations of the charged regulations."  *Id.*

3        However, PG&E's argument that the CPUC *penalties* should be excluded under

4    Rule 403 – that "the CPUC's conclusions . . . would unfairly encourage the jury to

5    abdicate its critical role as fact-finder," PG&E Mot. at 24 – applies with equal force to the

6    CPUC *remedial measures*.  Though any remedial measures aimed at charged Pipeline

7    Safety Act regulations would be highly probative of PG&E's alleged violations of those

8    regulations, there is a substantial risk that "[t]he jury may assume that if the CPUC, an

9    authoritative government agency, imposed [remedial measures] on PG&E, then PG&E is

10   deserving of punishment . . . ."  *Id.*  And this risk substantially outweighs the probative

11   value of the CPUC remedial measures.  *See Angelo v. Bacharach Instrument Co.*, 555 F.2d

12   1164, 1176 (3d Cir. 1977) (holding that it was within the discretion of the trial judge to

13   exclude an Equal Employment Opportunity Commission ("EEOC") determination letter

14   because the probative value of the letter "was substantially outweighed by the dangers of

15   unfair prejudice and misleading the jury inherent in an . . . EEOC evaluation of the

16   ultimate factual issue in the case.").

17       Accordingly, though CPUC remedial measures were not initially the subject of this

18   motion *in limine*, the Court now GRANTS PG&E's motion to exclude evidence of the

19   remedial measures the CPUC imposed upon PG&E following the OIIs.

20       **b.  The Line 147 evidence is the subject of the Government's Motion *in***

21           ***Limine* No. 5.**

22       PG&E's motion to exclude the Line 147 evidence – category (b) – is the subject of

23   the Government's Motion *in Limine* No. 5, and the Court discusses its admissibility there.

24

25   **IV.    PG&E's Motion *in Limine* No. 4**

26       PG&E seeks to exclude: "All financial evidence and argument unrelated to the

27   charged conduct, including: (a) PG&E's profits, either as a whole or in connection with

28   Gas Transmission and Storage ('GT&S') services specifically; (b) PG&E's revenue, either

United States District Court
Northern District of California

17

1   as a whole or in connection with the GT&S services specifically; (c) PG&E's budget-

2   setting process; (d) employee compensation; and (e) any uncharged conduct whose alleged

3   relevance is based solely on the theory that it evinces PG&E's profit motive."  PG&E Mot.

4   at ii-iii.  The Government submits that evidence of PG&E's profit motives is probative of

5   PG&E's willfulness in violating the Pipeline Safety Act regulations.  Gov't Opp'n at 11.

6   PG&E counters that evidence of a defendant's financial condition and profit incentives is

7   generally inadmissible under Rule 403.  PG&E Mot. at 29-30.

8        PG&E is correct that "[p]roof of [greed], without more, is likely to amount to a

9   great deal of unfair prejudice with little probative value."  *United States v. Mitchell*, 172

10  F.3d 1104, 1109 (9th Cir. 1999).  The Ninth Circuit therefore requires that "something

11  more" accompany evidence of poverty or greed for such evidence to be admissible.

12  *United States v. Bensimon*, 172 F.3d 1121, 1129 (9th Cir. 1999).  This issue typically

13  presents when the government seeks to introduce evidence of poverty to prove motive in

14  theft crimes.  In that context, the Ninth Circuit has held, for example, that this "something

15  more" can include an "unexplained, abrupt change in circumstances," *id.*, or the fact that a

16  "defendant is living beyond his means," *Mitchell*, 172 F.3d at 1108.

17       Here, the Government has offered "something more" than just greed.  The

18  Government alleges that PG&E's profit motives drove "cost-cutting" decisions that

19  actually meant "safety-cutting" decisions, including that "PG&E knew that updating all of

20  its records and hydrotesting its old pipelines in highly populated areas would have been

21  expensive [and] . . . chose to spend money elsewhere."  Gov't Opp'n at 11.  If true, such

22  evidence presents more than "[a] mere interest, unconnected with inclination," *Mitchell*,

23  172 F.3d at 1109; it suggests that PG&E's inclination to make money actually informed its

24  decision-making in a way that informs its mental stated on the charged regulatory crimes.[16]

25

26  ───────────────

    [16]    PG&E's other argument, that "this evidence will unnecessarily prolong and
27  complicate the case . . . [b]ecause . . . cost savings do not necessarily generate future
    profits," PG&E Mot. at 30, lacks merit.  The Government need not prove *how much* PG&E
28  profited for such evidence to be admissible; it need only demonstrate that PG&E intended
    to profit from specific safety-based cost-cutting measures.

United States District Court
Northern District of California

United States District Court
Northern District of California

Though this may be true in the abstract, it does not mean all evidence regarding PG&E's financial condition would survive a Rule 403 balancing.  For example, the fact that "PG&E reported its income for the second quarter of 2010 as $333 million," Gov't Opp'n at 12, is a presentation of wealth unnecessary to any argument that PG&E's profit motives drove regulatory violations, and it is therefore inadmissible.  But in opposition to this motion, the Government did not provide specific examples of financial evidence it seeks to admit.  The Government did not explain how it will prove that "PG&E knew that updating all of its records and hydrotesting its old pipelines . . . would have been expensive" and therefore elected not to do it.  *Id.* at 11.  Instead, the Government argues only that it "intends to call an expert who will testify that PG&E's practices focused on financial gains at the expense of safety." *Id.*  A hearing on whether this witness's expert testimony meets the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) is set for April 20, 2016.  Dkt. No. 435.  In the meantime, the Court holds only that evidence that PG&E's profit motives drove its compliance (or non-compliance) with the charged regulations is not substantially outweighed by the risk of unfair prejudice, as such would be direct evidence of the required mental state for the regulatory counts.  This remains true regardless of whether the evidence falls within one of the five categories PG&E identified for exclusion.

Accordingly, PG&E's fourth motion *in limine* is hereby DENIED WITHOUT PREJUDICE to renewal at trial, when it becomes clear precisely how the Government intends to prove that PG&E's alleged regulatory violations were motivated by a desire to maximize profits.

## V.    PG&E's Motion *in Limine* No. 5

PG&E moves to exclude eleven categories of "evidence and argument relating to PG&E's safety improvements after the San Bruno accident" and "any PG&E statements of remorse and empathy after the San Bruno accident, recognition of areas needing improvement, and descriptions of the improvement measures."  PG&E Mot. at iii.

### a. Rule 407 applies but does not bar any of PG&E's remedial measures.

PG&E argues that it has accepted responsibility for the San Bruno explosion by implementing many broad safety improvements, and that this "important work should not be used against it." *Id.* at 31. PG&E relies on Rule 407 to support this argument, which states: "When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove . . . culpable conduct." Fed. R. Evid. 407. The Government argues that Rule 407 is a civil rule of evidence with no application in this criminal prosecution. Gov't Opp'n at 14-16.

Though the Rules of Evidence apply in both "civil cases and proceedings" and "criminal cases and proceedings," Fed. R. Evid. 1101(b), the Government finds some support for its argument. *See, e.g.*, *United States v. Wittig*, 425 F. Supp. 2d 1196, 1233 (D. Kan. 2006), *rev'd on other grounds*, 472 F.3d 1247 (10th Cir. 2007) ("Defendants' reliance on Rule 407 of the Federal Rules of Evidence is misplaced, for it applies only to civil cases."); *United States v. Gallagher*, No. 89-00272-03, 1990 WL 52722, at *1 (E.D. Pa. 1990) ("The court concludes that Rule 407 does not apply to criminal cases, and that even if it did, it would not apply to the facts of this case.").

The Court is aware of no binding authority, however, to definitively address whether Rule 407 applies in criminal cases. Without any such authority, the Court agrees with PG&E that the purpose of Rule 407 – "to encourage tortfeasors to remedy hazardous conditions without fear that subsequent measures will be used as evidence against them," *Gauthier v. AMF, Inc.*, 788 F.2d 634, 637 (9th Cir. 1986) – applies with equal force to civil and criminal cases. Though this harm-reduction objective may more often find application in civil cases, "neither harm nor injury are exclusively civil matters." *United States v. DSD Shipping, A.S.*, No. 15-00102-CG-B, 2015 WL 5722805, at *1 (S.D. Ala. Sept. 29, 2015). And this is certainly a criminal case where harm-reduction can and should be a goal, as indicated by the Pipeline Safety Act itself. 49 U.S.C. § 60102(a)(1); *see also DSD Shipping*, 2015 WL 5722805, at *2 ("[W]here, as here, subsequent remedial measures are possible in a criminal case, Rule 407 does not state that the case is excluded from its

20

1    application.").  The Court therefore finds that Rule 407's bar of subsequent remedial

2    measures can apply to criminal cases and may apply to this one.

3          Rule 407, however, is not without its limitations.  First, the Rule only prohibits

4    evidence of "measures . . . that would have made an earlier injury or harm less likely to

5    occur."  Fed. R. Evid. 407.  Rule 407 likewise does not apply to involuntary remedial

6    measures.  *See In re: Air Crash in Bali, Indonesia*, 871 F.2d 812, 816-17 (9th Cir. 1989)

7    ("The purpose of Rule 407 is not implicated in cases involving subsequent measures in

8    which the defendant did not voluntarily participate.").  With these principles in mind, the

9    Court now addresses the eleven categories of remedial measures, numbered (a) through

10   (k), that PG&E seeks to exclude, considering also whether each category is admissible

11   under Rules 401 and 403.

12         As an initial matter, when asked at the April 12, 2016 oral argument to explain the

13   relevance of categories (a), (b), (e), (i), (j), and (k), the Government responded that only

14   one of these categories – category (i) – is relevant to proving the charged regulatory

15   violations.  *See* Apr. 12, 2016 Tr. ("4/12/16 Tr.") at 3 (Dkt. No. 436) ("[T]he Court is

16   wondering which of these [six categories] is relevant for the charged regulations.  Your

17   Honor, one of them is.  And that is the fourth one down.  It has the (i) in front of it.").

18   Because the Government concedes that categories (a), (b), (e), (j), and (k) are irrelevant,

19   these categories are inadmissible under Rule 401, regardless of whether they would be

20   admissible under Rule 407.  Accordingly, PG&E's fifth motion *in limine* is hereby

21   GRANTED as to these five categories.

22         Category (c), PG&E "improving its Integrity Management Program," PG&E Mot.

23   at iii, is too broad for a Rule 407 determination.  The Court therefore asked at the April 12,

24   2016 oral argument which specific measures PG&E seeks to exclude, and received the

25   following:

26              PG&E . . . implemented a revised program that includes: a
             revised risk model; a revised consideration of defect and leak
27           data for the life of each pipeline; a revised risk assessment
             methodology; and an improved self-assessment process.
             PG&E . . . update[d] the threat identification processes for
28           manufacturing and construction threats, cyclic fatigue, and

United States District Court
Northern District of California

1

2

3

4

> interactive threats . . . updated eleven of its risk management procedures including its Integrity Management Program (RMP-6) and added four new procedures . . . revised its risk analysis methodology to ensure assessment methods are selected for each pipeline segment, specifically focusing on design, material, and construction threats . . . [and] documented these changes to the existing integrity management procedures through a change form process.

5   Def.'s Suppl. Resp. Regarding Def.'s Motion *in Limine* No. 5 ("4/12/16 Resp.") at 1 (Dkt.

6   No. 438).  The Government concedes such improvements would have made the San Bruno

7   explosion less likely to occur, Gov't Opp'n at 16-17, and the Court agrees.  The Court does

8   not agree, however, with PG&E's argument that these measures were voluntary.

9         "An exception to Rule 407 is recognized for evidence of remedial action mandated

10   by superior governmental authority . . . because the policy goal of encouraging remediation

11   would not necessarily be furthered by exclusion of such evidence."  *O'Dell v. Hercules,*

12   *Inc.*, 904 F.2d 1194, 1204 (8th Cir. 1990).  Though PG&E argues that it "voluntarily

13   commenced [these] improvements to its Integrity Management Program shortly after the

14   accident," and only "later coordinated with various regulatory recommendations and

15   directives," 4/12/16 Resp. at 1, it is evident that the CPUC was heavily involved in

16   requiring such improvements in the days and months following the San Bruno explosion.

17   First, the CPUC passed a resolution within two weeks of the explosion, ordering PG&E to

18   take immediate measures to improve and evaluate the safety of its pipeline system.  CPUC

19   Resolution No. L-403, at 3 (Sep. 23, 2010).[17]  For example, the CPUC ordered that PG&E

20   immediately "conduct[] an integrity assessment of all gas facilities in the impacted area,"

21   "[c]onduct an accelerated leak survey of all transmission lines in PG&E's service

22   territory," "[e]valuate records of customer leak-complaint response times and response

23   effectiveness system-wide," "[p]repare a plan for a complete safety inspection of PG&E's

24   entire natural gas transmission pipeline system," and "[r]eview the classification of natural

25   gas transmission lines."  *Id.* at 3-4.  Several months later, the CPUC issued yet another

26   "rule[] for near-term implementation," which would require pipeline operators to "identify

27

28   [17]    Available at http://docs.cpuc.ca.gov/word_pdf/AGENDA_RESOLUTION/ 123786.pdf.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    threats along their pipelines and come up with a plan to mitigate the threats, including

2    research and development."  Order Instituting Rulemaking, at 7, Attach. B at 5 (Feb. 25,

3    2011).[18]  Moreover, PG&E concedes that its Pipeline Safety Enhancement Plan was "part

4    of PG&E's work to meet CPUC directives."  PG&E Reply at 16.  It is therefore readily

5    apparent that the improvements to PG&E's Integrity Management Program identified

6    above were anything but voluntary, and therefore fall outside the scope of Rule 407.

7          Meanwhile, improvements PG&E made to its Integrity Management Program are

8    relevant and highly probative, as this is the program at issue in Counts 2 and 5-8.  For

9    example, the fact that PG&E "update[d] the threat identification processes for

10   manufacturing and construction threats," 4/12/16 Resp. at 1, is directly related to the

11   counts brought under 49 C.F.R. § 192.917, which requires pipeline operators to "identify

12   and evaluate all potential threats to each covered pipeline segment," including

13   "[m]anufacturing and construction defects."  The improvements are therefore also

14   admissible under Rules 401 and 403.  Accordingly, PG&E's fifth motion *in limine* is

15   hereby DENIED as to category (c).

16         Category (d), PG&E "hydrotesting over 650 miles of pipeline," PG&E Mot. at iii,

17   falls within the Government's argument that "post-accident tests . . . rarely qualify as

18   subsequent remedial measures, because they are investigative rather than remedial."  Gov't

19   Opp'n at 17; *see also Fasanaro v. Mooney Aircraft Corp.*, 687 F. Supp. 482, 487 (N.D.

20   Cal. 1988) ("Post-event tests will not, in themselves, result in added safety. . . .  By its

21   terms Rule 407 includes only the actual remedial measures themselves and not the initial

22   steps toward ascertaining whether any remedial measures are called for.").  PG&E did not

23   contest the Government's argument regarding post-accident testing, so the Court agrees

24   that admission of such evidence is not barred by Rule 407.  The probative value of

25   hydrotesting evidence is high because one of the charged IM regulations, 49 C.F.R. §

26   192.919, requires operators to list "[t]he methods selected to assess the integrity of the []

27

28   ───────────────
     [18]    Available at http://docs.cpuc.ca.gov/PublishedDocs/Word_PDF/FINAL_DECISION/
     131324.PDF.

1   pipe, including an explanation of why the assessment method was selected to address the

2   identified threats to each covered segment," and one available method is "[p]ressure test

3   conducted in accordance with subpart J of this part," *id.* § 192.921(a)(2), also known as a

4   hydrotest, SI ¶ 14.  The IM regulations also require pipeline operators to identify threats on

5   segments operated in HCAs, *id.* § 192.917(a); once certain threats are identified, the

6   regulations further require operators to "select an assessment technology . . . with a proven

7   application capable of assessing" those threats, *id.* § 192.917(e)(4).  The Government

8   claims "[t]he evidence will show that the only workable test for Line 132 was

9   hydrotesting," Gov't Opp'n at 3.  The fact that PG&E later began hydrotesting is therefore

10  probative of whether hydrotesting was required by the IM regulations.  Meanwhile, PG&E

11  has not provided any reason why the probative value of this evidence is substantially

12  outweighed by a risk of unfair prejudice.  Accordingly, PG&E's fifth motion *in limine* is

13  hereby DENIED as to category (d).

14      Category (f), PG&E "replacing over 100 miles of pipeline," PG&E Mot. at iii,

15  suffers from the same Rule 407 defect as category (c); namely, that PG&E has not

16  demonstrated that the measure was voluntary, even if it would have prevented the San

17  Bruno explosion.  Indeed, PG&E conceded that "PG&E's pipeline replacement . . . w[as]

18  incorporated into the CPUC's Order Instituting Rulemaking," 4/12/16 Resp. at 2, which is

19  one of the same orders discussed under category (c).  However, this evidence carries little

20  probative value, as it is not directly related to a charged regulation in the same manner as

21  the category (c) evidence.  Meanwhile, there is a substantial risk that the evidence would

22  produce an emotional response from the jury, as the jury may conclude that PG&E could

23  have easily prevented the tragic explosion by simply replacing the pipeline sooner.

24  Because the risk of this emotional response substantially outweighs the slim probative

25  value of the evidence, this evidence is inadmissible under Rule 403.  Accordingly, PG&E's

26  fifth motion *in limine* is hereby GRANTED as to category (f).

27      Category (g), PG&E "upgrading more than 200 miles of pipeline to accommodate

28  inspection by in-line inspection tools," PG&E Mot. at iii, likewise falls outside the scope

United States District Court
Northern District of California

24

1    of Rule 407 because PG&E has not demonstrated that the measure was voluntary; another

2    of the CPUC's "rules for near-term implementation" was the "[r]etrofitting of transmission

3    lines to allow inline inspections."  Order Instituting Rulemaking, Attach. B at 1.  Here, on

4    the other hand, the probative value of this evidence is high because one of the charged

5    regulations, 49 C.F.R. § 192.919, requires operators to list "[t]he methods selected to

6    assess the integrity of the [] pipe, including an explanation of why the assessment method

7    was selected to address the identified threats to each covered segment," and one available

8    method is "[i]nternal inspection tools," 49 C.F.R. § 192.921(a)(1).  That PG&E later

9    updated to accommodate this method is therefore probative of the Government's argument

10   that the methods PG&E selected before the San Bruno explosion were insufficient.  And

11   PG&E has not provided any reason why the probative value of this evidence is

12   substantially outweighed by a risk of unfair prejudice.  Accordingly, PG&E's fifth motion

13   *in limine* is hereby DENIED as to category (g).

14        Category (h), PG&E "scanning and digitizing more than 3.8 million paper

15   documents to meet the 2011 advisory that wherever possible utilities rely on 'traceable,

16   verifiable, and complete' records," PG&E Mot. at iii, was involuntary by PG&E's own

17   admission.  *See* PG&E Reply at 16 ("[E]fforts like the 2011 records review . . . were part

18   of PG&E's work to meet CPUC directives . . . .").  However, while such admission limits

19   the application of Rule 407, it also serves to undercut the Government's theory of

20   relevance for this evidence, because an involuntary measure, no matter how large the scale,

21   does little to demonstrate PG&E's state of mind.  *See* Gov't Opp'n at 18 ("PG&E's

22   massive effort to fix its recordkeeping problems[] is relevant to show PG&E's knowledge

23   of its recordkeeping deficiencies.  A jury may properly conclude that if it was necessary

24   for PG&E to rent the Cow Palace in order to properly review its records . . . then its

25   deficiencies were so widespread that its employees must have known about the problem

26   pre-San Bruno.").  The probative value of this evidence is therefore relatively low.

27   Meanwhile, there is a substantial risk that the jury would confuse the portion of records

28   review prompted by the CPUC directive (and therefore unrelated to the charged conduct)

United States District Court
Northern District of California

1   with the portion aimed at compliance with Part 192 (if any).  Rule 403 therefore applies to

2   bar admission of this evidence.  Accordingly, PG&E's fifth motion *in limine* is hereby

3   GRANTED as to category (h).

4          Category (i), PG&E "validating the [MAOP] of pipelines through hydrotesting or

5   records verification," PG&E Mot. at iii, is another for which PG&E concedes the CPUC

6   was the driving force.  *See id.* at 32 ("Another new requirement arose in June 2011, when

7   the CPUC . . . disallowed gas pipeline operators from establishing pipeline MAOPs based

8   solely on historical operating pressure.").  The probative value of this evidence is high for

9   the same reasons as category (d); namely, PG&E's pressure testing practices are directly at

10  issue in this case.  And PG&E has not provided any reason why the probative value of this

11  evidence is substantially outweighed by a risk of unfair prejudice.  Accordingly, PG&E's

12  fifth motion *in limine* is hereby DENIED as to category (i).

13          **b.  PG&E's statements of remorse and empathy are excluded.**

14          PG&E argues that its statements of remorse and empathy following the San Bruno

15  explosion should be excluded because they are irrelevant and "the jury could confuse

16  PG&E's public expressions of remorse for the accident as admissions of culpability for the

17  regulatory violations charged."  *Id.* at 36.

18          The Government did not oppose this argument.  The Court is therefore left without

19  any explanation of how the probative value of PG&E's public apologies stacks against the

20  unfair prejudice that PG&E has identified.  Accordingly, the Court hereby GRANTS as

21  unopposed PG&E's motion to exclude "any PG&E statements of remorse and empathy

22  after the San Bruno accident, recognition of areas needing improvement, and descriptions

23  of the improvement measures."  *Id.* at iii.[19]

24  //

25  //

26

27  _____
    [19]   The Court will address PG&E's argument that post-accident improvements cannot be
28  used to prove the Government's Alternative Fines Act allegation, PG&E Mot. at 34, in
    connection with the second phase of trial, should that become necessary.

United States District Court
Northern District of California

## VI.     PG&E's Motion *in Limine* No. 6

PG&E moves to exclude: "Certain recordkeeping evidence and argument, including: (a) records (or lack thereof) of any repairs made prior to April 17, 2007, for which the government cannot adduce evidence of a complete record that existed after April 17, 2007; and (b) records (or lack thereof) of any pressure tests conducted prior to July 29, 2007, for which the government cannot adduce evidence of a complete record that existed after July 29, 2007." *Id.*

PG&E argues that "there is a substantial risk that this evidence would mislead the jury into believing that simply *not having* a record during the limitations period is itself a federal crime," *id.* at 38, while the Government argues that this Court previously "ruled that the government need only prove PG&E failed to create and *retain* pressure test records in the limitation period," Gov't Opp'n at 20.  These arguments indicate a mutual misunderstanding of this Court's prior Order Denying Defendant's Motion to Dismiss Counts 4, 5 and 24-28 as Barred by the Statute of Limitations ("Limitations Order").  Dkt. No. 215.  In the Limitations Order, the Court had occasion to consider but explicitly did not decide whether Part 192's recordkeeping provisions create continuing offenses.  *See* Limitations Order at 12 ("The Court therefore need not address whether the alleged recordkeeping violations constitute continuing offenses, as no exception to the statute of limitations is required to address PG&E's arguments that the challenged counts are untimely.").  Now that evidentiary considerations require clarity, however, the Court finds occasion to decide this issue.[20]

### a.  Section 192's recordkeeping provisions create continuing offenses.

The doctrine of continuing offenses operates as an exception to the general rule that the statute of limitations begins to run once a crime is complete.  *Toussie v. United States*, 397 U.S. 112, 114 (1970).  The doctrine effectively extends the statute of limitations[21] in

---

[20]     As the doctrine of continuing offenses was thoroughly briefed by the parties in connection with PG&E's prior motion to dismiss, further briefing is not required to decide this issue in connection with PG&E's motion *in limine*.

[21]     The recordkeeping offenses for which PG&E is charged do not specify a statutory

1    cases where the "offense is one which is not complete upon the first act, but instead

2    continues to be perpetrated over time."  *United States v. De La Mata*, 266 F.3d 1275, 1288

3    (11th Cir. 2001).  Should a court find that a statute creates a continuing offense, then "the

4    statute of limitations does not begin to run when all elements of the crime are first

5    satisfied, but rather when the ongoing commission of the crime comes to an end."  *United*

6    *States v. Tavarez-Levario*, 788 F.3d 433, 437 (5th Cir. 2015).

7          In *Toussie*, however, the Supreme Court made clear that the doctrine "should be

8    applied in only [two] limited circumstances . . . [when] the *explicit language* of the

9    substantive criminal statute compels such a conclusion, or the *nature of the crime* involved

10   is such that Congress must assuredly have intended that it be treated as a continuing one."

11   397 U.S. at 115 (emphasis added).  With respect to the nature of a crime, "[t]he hallmark

12   of the continuing offense is that it perdures beyond the initial illegal act, and that each day

13   brings a renewed threat of the evil Congress sought to prevent even after the elements

14   necessary to establish the crime have occurred."  *United States v. Yashar*, 166 F.3d 873,

15   875 (7th Cir. 1999) (citation and internal quotation marks omitted).

16         In determining whether a statute creates a continuing offense, courts are typically

17   limited to the language of the statute itself: "[S]ince questions of limitations are

18   fundamentally matters of legislative not administrative decision, we think [a] regulation

19   should not be relied upon . . . to stretch a . . . statute of limitations . . . unless the statute

20   itself, apart from the regulation, justifies that conclusion."  *Toussie*, 397 U.S. at 121.  The

21   Pipeline Safety Act presents an unusual case, however, because Section 60123 defines

22   criminal conduct only by reference to underlying regulations:

23             A person knowingly and willfully violating . . . a regulation
              prescribed . . . under this chapter shall be fined under title 18,
24            imprisoned for not more than 5 years, or both.

25

26   _____

27   limitations period, 49 U.S.C. § 60123(a), so the general five-year limitations period
     applies, 18 U.S.C. § 3282.  The parties have agreed, however, on a limitations period
28   closer to seven years, reaching back to April 17, 2007 for charges in the original
     indictment (including Counts 3-4), and back to July 29, 2007 for charges in the
     Superseding Indictment (including Counts 9-13).  Dkt. No. 113 at 2, 8; Dkt. No. 119 at 2.

United States District Court
Northern District of California

United States District Court
Northern District of California

49 U.S.C. § 60123(a).  This case is therefore unlike the seminal analysis in *Toussie*, because there the statute contained the elements of the criminal offense.[22]  Here, there exists no crime without the regulations.

When asked at the September 21, 2016 motion hearing whether any court had considered the continuing offense doctrine in circumstances like this, PG&E cited (and subsequently submitting briefing on) *United States v. Del Percio*, 870 F.2d 1090 (6th Cir. 1989).  Def.'s Suppl. Brief (Dkt. No. 171).  There, the Sixth Circuit considered whether the violation of regulations promulgated under the Atomic Energy Act constituted continuing offenses.  870 F.2d at 1094-98.  Relying on *Toussie*, the Court looked first to the *explicit language* of the criminal statute alone, because the "search for explicit continuing offense language is limited to the statutes under which the defendants are charged."  *Id.* at 1095.  The court turned next to the *nature of the charged offenses*, and in so doing, to the text of the regulations: "Given the sparse language of the statutory provisions under which the defendants are charged . . . [the] regulations provide the substantive bases for the charged offenses and define the 'nature' of those offenses."  *Id.* at 1097.  The court found no continuing offense, as neither the explicit language of the statute nor the nature of the conduct proscribed by the regulations dictated otherwise.

With *Del Percio* as a guide, the Court now applies the principles of *Toussie* to the Pipeline Safety Act.  First, it is beyond dispute that Section 60123 contains no explicit continuing offense language, as the statue only broadly prohibits violations of Pipeline Safety Act regulations, including Part 192.  49 U.S.C. § 60123(a).  Second, as in *Del Percio*, the "sparse language" of Section 60123 requires that the Court look to the regulations contained in Part 192 to determine whether the "nature of the offenses charged

---

[22]    In *Toussie*, the statute at issue required men between the ages of 18 and 26 to "submit to registration at such time or times and place or places, and in such manner, as shall be determined by . . . rules and regulations prescribed hereunder."  *Toussie*, 397 U.S. at 113.  A regulation promulgated under that statute further specified that "[t]he duty of every person subject to registration . . . shall continue at all times," and that "if for any reason any such person is not registered . . . he shall immediately present himself for and submit to registration."  *Id.* at 116.

United States District Court
Northern District of California

1    is such that Congress must assuredly have intended that they be treated as continuing

2    ones." *Toussie*, 397 U.S. at 115.

3           49 C.F.R. § 192.709(a), at issue in Counts 3-4, states that:

4                  Each operator shall maintain the following records for
                   transmission lines for the periods specified: (a) The date,
5                  location, and description of each repair made to pipe (including
                   pipe-to-pipe connections) must be retained for as long as the
6                  pipe remains in service.

7           49 C.F.R. § 192.517(a), at issue in Counts 9-13, states that:

8                  Each operator shall make, and retain for the useful life of the
                   pipeline, a record of each test performed under §§ 192.505 and
9                  192.507.

10          Upon examination of these regulations, it is clear that their requirements are

11   continuing in nature.  Each regulation contains durational language – "as long as the pipe

12   remains in service" and "for the useful life of the pipeline" – that extends beyond the event

13   that triggers the required record.  Moreover, the verbs employed – maintain and retain –

14   comprehend continuing conduct.  *See* Webster's New World Dictionary 815 (3d ed. 1991)

15   (defining "maintain" as "to keep or keep up; continue in or with; carry on"); *id.* at 1145

16   (defining "retain" as "to continue to practice, use, etc.").  And there is good reason for the

17   recordkeeping requirements to be indefinite; pipeline operators must continually consider

18   records to satisfy the minimum safety standards set forth by the IM regulations.  *See, e.g.*,

19   49 C.F.R. § 192.917(b) ("At a minimum, an operator must . . . consider both . . . past

20   incident history . . . [and] maintenance history . . . .").  By failing to "maintain" and

21   "retain" the proper records, a pipeline operator therefore frustrates the very purpose of the

22   IM regulations, which is to "protect[] against risks to life and property."  49 U.S.C. §

23   60102.  And each day an operator so fails "brings a renewed threat of the evil Congress

24   sought to prevent."  *Yashar*, 166 F.3d at 875.  Given this overwhelming evidence, the

25   Court is satisfied that in criminalizing violations of these regulations[23] Congress intended

26   that any violations would be treated as continuing offenses.  *Toussie*, 397 U.S. at 115.[24,25]

27

28   _____

[23]    When Congress amended the Pipeline Safety Act in 1979 to criminalize violations of
these regulations, S. Rep. No. 96-182 (1979), the regulations contained substantially

30

United States District Court
Northern District of California

1    Accordingly, the statute of limitations on the recordkeeping charges "does not begin

2 to run when all elements of the crime are first satisfied, but rather when the ongoing

3 commission of the crime comes to an end." *Tavarez-Levario*, 788 F.3d at 437.  The

4 Government may therefore introduce evidence of: (i) repairs made or pressure tests

5 conducted within the limitations period for which PG&E knowingly and willfully failed to

6 create and maintain or retain the required record; or (ii) repairs made or pressure tests

7 conducted before the limitations period for which PG&E knowingly and willfully failed to

8 create and maintain or retain the required record, provided that knowing and willful failure

9 was not corrected before the limitations period.

10    PG&E has expressed concerns that this latter category would create absurd results:

> [W]hat if the records that they couldn't find that they talked
> about were because of a fire? Or an earthquake that happened
> 20 years ago? . . . Did you commit a knowing and willful
> felony to not maintain that record after it was destroyed 40
> years ago in an earthquake?  I mean, that's an absurd result.

14 Sep. 21, 2015 Tr. ("9/21/15 Tr.") at 34 (Dkt. No. 154).  In so arguing, PG&E seems to

15 forget that the Pipeline Safety Act criminalizes only *knowing and willful* failures, which

16 means PG&E would not be criminally liable for failure to maintain and retain required

---

18    similar language as they do today.  *See* 35 Fed. Reg. 13270 (Aug. 19, 1970) ("Each
operator shall make, and retain for the useful life of the pipeline, a record of each test
19    performed under §§ 192.505 and 192.507."); *id.* at 13273 ("Each operator shall keep
records covering each . . . repair made . . . for as long as the segment of transmission line
20    involved remains in service.").
[24]    The cases cited by PG&E do not compel a different result.  In *United States v.
21    Dunne*, 324 F.3d 1158 (10th Cir. 2003), the court held that making a false statement on a
certified audit report is not a continuing offense.  324 F.3d at 1165.  But the statute at issue
22    there "contemplate[d] a single act," the falsification of a record, whereas the regulations at
issue here contemplate continued maintenance and retention of records for the life of a
23    pipeline.  And in *United States v. Sloan*, 389 F. Supp. 526 (S.D.N.Y. 1975), the court held
that making false entries in brokerage firm books is not a continuing offense.  389 F. Supp.
24    at 528-29.  But there the court failed to even consider the "nature" of the charged conduct,
and therefore ignored an entire half of the *Toussie* analysis.
[25]    The rule of lenity does not prohibit this conclusion.  It is certainly true that "when
25    choice has to be made between two readings of what conduct Congress has made a crime,
it is appropriate, before we choose the harsher alternative, to require that Congress should
26    have spoken in language that is clear and definite." *Toussie*, 397 U.S. at 122.  But the only
ambiguity here surrounded which language to consider.  Having decided that it is
27    permissible to rely upon the language contained in the regulations, which Congress
adopted by criminalizing their violation, it is abundantly clear that the nature of the
28    recordkeeping crimes defined therein is continuous.

records if that failure was caused by a natural disaster.  For the same reason, the Government would not prove a crime if it merely proved that PG&E could not produce a required record, either before or during the limitations period; the Government must also prove that PG&E *knowingly and willfully* failed to maintain or retain that record during the limitations period.  Therefore, to use another of PG&E's analogies, the engineer who opens a drawer and realizes, for the first time, that required records are missing is not instantly a felon.  9/21/15 Tr. at 7-9.  And if the engineer takes steps to address this mistake – by, for example, notifying all impacted parties that relevant records are missing for a period of time, thereby ensuring against incorrect reliance on the *absence* of those records, or by working to prevent the same mistake from happening again – then she certainly has not *knowingly and willfully* failed with respect to those missing records.

### b.  The evidence at issue is relevant and not unduly prejudicial.

Because the doctrine of continuing offenses applies, PG&E's Rule 401 and 403 arguments for the pre-2007 recordkeeping evidence lack merit.  PG&E Mot. at 37-38.  As the Government correctly argues, "[e]vidence of PG&E's deficient recordkeeping practices, along with testimony and exhibits proving that this deficiency was open and notorious at PG&E, is probative of PG&E['s] intent to violate recordkeeping regulations, allowing a jury to fairly conclude that poor recordkeeping was not an accident, but rather an intentional decision not to correct the problem."  Gov't Opp'n at 21.  Any risk that the Government will only "circumstantially prove PG&E's intent with respect to (at best) a handful of recent records," PG&E Reply at 20, does not substantially outweigh the probative value of this evidence.

Accordingly, PG&E's sixth motion *in limine* is hereby DENIED.

### VII.    PG&E's Motion *in Limine* No. 7

PG&E moves to exclude: "All argument that actions before the integrity management regulations became effective are relevant to establishing a violation, including overpressurization events that occurred in 2003 or earlier."  PG&E Mot. at iii.

32

United States District Court
Northern District of California

1    The parties agree that the *Ex Post Facto* Clause forbids prosecution of PG&E for

2    violations of the IM regulations before they became effective.  *Id.* at 38; Gov't Opp'n at

3    21.  The parties also agree that PG&E's pre-effective date conduct may be relevant to

4    establishing its post-effective date obligations under the IM regulations, PG&E Reply at

5    20, because "PG&E's obligations on the day [a] regulation became effective were

6    determined by its past use of the pipeline," Gov't Opp'n at 22.  PG&E therefore modified

7    its request, and now seeks only an "order prohibiting any argument that pre-effective date

8    conduct was part of a *continuing course of conduct* that violated the regulations or that it is

9    in any way probative of a violation except to the limited extent mentioned above."  PG&E

10   Reply at 21.

11   The Court agrees with PG&E that allowing a "course of conduct" argument that

12   reaches conduct before the IM regulations were effective risks that the jury will punish

13   PG&E for conduct that was lawful when it occurred.  Accordingly, the Court hereby

14   ORDERS the Government not to argue that pre-effective date actions were part of a

15   continuing course of conduct that violated the IM regulations.  This order does not limit

16   the Government's use of pre-effective date conduct, including overpressurization events

17   that occurred in 2003 or earlier, to establish PG&E's post-effective date obligations.

18   PG&E's seventh motion *in limine* is otherwise DENIED.

19

20   **VIII.    PG&E's Motion *in Limine* No. 8**

21   PG&E moves to exclude: "All evidence and argument relating to political and

22   lobbying activities, including (a) PG&E's participation in the drafting and revision of

23   pipeline standards in communications with public officials; (b) lobbying state and federal

24   officials concerning the content of such standards; (c) media reports or suggestions of

25   official investigations concerning lobbying public officials on an ex-parte basis; and (d)

26   sanctions levied against PG&E for alleged lobbying rule violations."  PG&E Mot. at iii-iv.

27   The Government agrees not to introduce evidence of PG&E's ex-parte or otherwise

28   improper lobbying activities and any resulting sanctions (categories (c) and (d)), "unless

33

1    PG&E opens the door by arguing that state regulators failed to regulate it effectively."

2    Gov't Opp'n at 24.  PG&E's eighth motion *in limine* is therefore GRANTED as to these

3    two categories, but the Court will reconsider the parties' arguments if PG&E attempts to

4    argue at trial that state regulators failed to regulate it effectively.

5        As to categories (a) and (b), PG&E argues that regulation-drafting and lobbying

6    evidence is both irrelevant and inadmissible under Rule 403, given the risk that the jury

7    will punish PG&E for this First Amendment-protected activity.  PG&E Mot. at 41-42.  The

8    Government responds that this evidence will undercut PG&E's argument that it could not

9    have "knowingly and willfully" violated the IM regulations because the regulations are

10   complex and confusing.  Gov't Opp'n at 23.  Specifically, "[t]he government intends to

11   show that PG&E understood the charged regulations very well, as demonstrated by its

12   personal participation in their development."  *Id.*

13       That PG&E participated in the drafting of the IM regulations and lobbied

14   concerning their content is certainly relevant to PG&E's understanding of those

15   regulations.  How *probative* this evidence is depends on which regulations PG&E

16   commented and what those comments were, but the Government has not offered any

17   specific examples for the Court to assess.  Even in the abstract, however, the probative

18   value of evidence of PG&E's familiarity (and perhaps irritation) with the IM regulations is

19   not substantially outweighed by the risk that PG&E's First Amendment rights will be

20   unfairly prejudiced.  PG&E has offered no explanation of why the jury would punish

21   drafting or lobbying activity, especially given that the Department of Transportation

22   invited such involvement.  PG&E Reply at 22 n.22.  Finally, the Court is not concerned

23   that this evidence will either confuse the jury or unduly prolong these proceedings.  PG&E

24   Mot. at 42.

25       Accordingly, PG&E's eighth motion *in limine* is hereby DENIED as to categories

26   (a) and (b).

27   //

28   **//**

United States District Court
Northern District of California

34

IX.    **PG&E's Motion** *in Limine* **No. 9**

PG&E moves to exclude: "All evidence and argument relating to allegations of failure to cooperate with the NTSB investigation other than the data request response charged in Count One." *Id.* at iv.  PG&E argues that such evidence is irrelevant, unfairly prejudicial, and unnoticed Rule 404(b) evidence.  *Id*. at 43-45.

First, the Government's proffered evidence – that "PG&E was providing incomplete and tardy responses to the agency's requests for information," was "repeatedly violating the NTSB's ground rules for party representatives to be forthcoming," and "met with witnesses before the NTSB interviews, violating another ground rule required [] for a party to participate in the NTSB investigation," Gov't Opp'n at 26 – is relevant to show the specific intent required for the obstruction count, namely, that PG&E acted "with the purpose of obstructing justice." *Laurins*, 857 F.2d at 537.  The fact that PG&E continuously withheld information or violated NTSB rules certainly has a tendency to make less probable PG&E's argument that the alleged shortcomings with the April 6, 2011 letter were innocent mistakes.  And the probative value of this evidence is not substantially outweighed by the risk that the jury will convict simply because "PG&E must have done something improper with respect to the NTSB investigation."  PG&E Mot. at 45.

Second, such evidence is not unnoticed Rule 404(b) evidence.  Rule 404(b) – which bars evidence of a "crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character" – is "inapplicable . . . where the evidence the government seeks to introduce is directly related to, or inextricably intertwined with, the crime charged in the indictment." *United States v. Rizk*, 660 F.3d 1125, 1131 (9th Cir. 2011) (quoting *United States v. Lillard*, 354 F.3d 850, 854 (9th Cir. 2003)).  "Evidence is 'inextricably intertwined' if it 'constitutes a part of the transaction that serves as a basis for the criminal charge,' or 'was necessary to . . . permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime.' " *United States v. Rrapi*, 175 F.3d 742, 748-49 (9th Cir. 1999) (quoting *United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1012-13 (9th Cir. 1995)).  Here, PG&E's other

35

1     alleged misconduct before the NTSB is inextricably intertwined with the April 6, 2011

2     letter because it is evidence that PG&E possessed the "corrupt intent" that is required for

3     that count throughout the entire "transaction that serves as a basis" for the count, namely,

4     throughout the NTSB investigation.  *See United States v. Senffner*, 280 F.3d 755, 765-66

5     (7th Cir. 2002) (holding that other bad acts were admissible in a prosecution for

6     obstructing a Securities and Exchange Commission proceeding).

7            Accordingly, PG&E's ninth motion *in limine* is hereby DENIED.

8

9        **X.    PG&E's Motion *in Limine* No. 10**

10           PG&E moves to exclude: "All evidence and argument relating to the government's

11     late-disclosed Rule 404(b) topic."  PG&E Mot. at iv.

12           On June 29, 2015, this Court ordered the Government to disclose any Rule 404(b)

13     evidence by September 18, 2015 in accordance with the Rule's "reasonable notice"

14     requirement.  Order Granting in Part and Denying in Part Def.'s Disc. Mots. ("Discovery

15     Order") at 27 (Dkt. No. 103); Fed. R. Evid. 404(b)(2)(A).  The Government disclosed one

16     of its potential 404(b) topics,[26] three days after this deadline.  PG&E Mot. at 46.

17           The Ninth Circuit has held that a "court in its discretion may, under the facts, decide

18     that the particular request or notice was not reasonable, either because of the lack of

19     timeliness or completeness."  *United States v. Vega*, 188 F.3d 1150, 1153 (9th Cir. 1999)

20     (quoting Fed. R. Evid. 404(b), adv. comm. note, 1991 amend.).  Though the Government's

21     disclosure was three days late, PG&E received notice of the topic over three months before

22     motions *in limine* were due and over five months before the then-scheduled trial date.  This

23     is adequately "reasonable notice," and the Court declines to take the extreme measure of

24     excluding the evidence for being only three days late so many months before trial.

25           Accordingly, PG&E's tenth motion *in limine* is hereby DENIED.[27]

26     _____

27     [26]    The Court does not here decide whether this topic actually represents Rule 404(b)
       evidence.  The Court decides only whether, if it does, the evidence should be excluded as a
28     threshold matter for being untimely.
       [27]    PG&E also requested that if the Court allows this untimely topic, PG&E be permitted

United States District Court
Northern District of California

**GOVERNMENT'S MOTIONS *IN LIMINE***

## XI.   Government's Motion *in Limine* No. 1

The Government moves to allow the jury to view the portion of Line 132, on Segment 180, that "exploded out of the ground and flew 100 feet in the air," which is 28 feet long, 30 inches in diameter, and weighs approximately 3,000 pounds.  U.S.'s Mots. *in Limine* ("Gov't Mot.") at 1 (Dkt. No. 236).  Given the size of this pipe segment, the Government "proposes to bring the pipe on a flatbed truck to a street near the Courthouse, so that the viewing will be controlled, will not cause a significant delay in the trial, and will minimize the inconvenience to the Court and jurors."  *Id.*

In deciding whether to admit evidence of this nature, courts consider both logistical difficulty and whether other available evidence achieves the same purpose.  *See United States v. Bernal*, 533 Fed. Appx. 795, 795-96 (9th Cir. 2013) (finding that district court did not abuse its discretion in denying request that jury view the site of a depredation of property).  As with all evidence, it is also subject to Rules 401 and 403.

The Government argues that showing the pipe will demonstrate "the difference between the actual pipe characteristics and those stated in PG&E's records," including that the pipe is welded rather than seamless.  Gov't Mot. at 1.  But PG&E concedes that there were "errors in historical records concerning some of the pipe's characteristics."  Def.'s Opp'n to Gov't's Mots. *in Limine* ("PG&E Opp'n") at 3 (Dkt. No. 281).  It is therefore unnecessary to remove the jury from the courtroom to "see for themselves" that the pipe's characteristics at the time of the explosion differed from PG&E's records.  U.S.'s Reply in Supp. of Mots. *in Limine* ("Gov't Reply") at 1 (Dkt. No. 300).  This renders the probative value of a pipe viewing very low.

Meanwhile, this is not a trial about the San Bruno explosion, and as discussed in PG&E's Motion *in Limine* No. 1, the Court must ensure that it does not become one.

---

to move *in limine* to exclude the topic under Rules 401, 402, 403, and 404(b).  PG&E Mot. at 48.  Because this topic is already at issue in the Government's Motion *in Limine* No. 6, and PG&E's arguments were more than adequately briefed there, the Court declines PG&E's request.

United States District Court
Northern District of California

1    Inviting the jury to examine the enormous, damaged pipe risks an emotional response that

2    is completely untethered from the pipe's relevance.  The low probative value of a pipe

3    viewing is therefore substantially outweighed by the risk of unfair prejudice.  If, however,

4    PG&E refuses to concede any fact that would be proven by a viewing of the pipe, then the

5    Government will be permitted to admit a photograph of the pipe to establish that fact.  If

6    not, the probative value of even a photograph of the damaged pipe would be outweighed

7    by the same risk of unfair prejudice.

8            Accordingly, the Government's first motion *in limine* is hereby DENIED.

9

10   **XII.     Government's Motion *in Limine* No. 2**

11           The Government moves to exclude all expert testimony and affirmative defenses

12   that PG&E has not yet disclosed.  Gov't Mot. at 2-3.  The Government has since

13   withdrawn its request to exclude affirmative defenses.  Gov't Reply at 4.

14           With respect to PG&E's expert disclosures, the Court learned at the April 12, 2016

15   oral argument that PG&E provided the Government with a letter on February 22, 2016,

16   which included the names of its possible expert witnesses and the area in which those

17   witnesses may testify.  *See* 4/12/16 Tr. at 11 ("[W]e sent them the names . . . and the titles

18   of the people that we would hire. . . .  And [said] if you're going to put on testimony about

19   . . . the measurements on the pipeline . . . here is our person that will testify about that.

20   And if the Court permits you to put in any evidence about San Bruno, we sent a declaration

21   from our metallurgist, saying . . . this is . . . what . . . Dr. Caligiuri[] will testify about.").

22   The Court was not asked to determine through this motion whether such production fulfills

23   PG&E's discovery obligations, and it will not.  But this much is clear: the Government

24   was to make expert disclosures as recently as March 29, 2016, Dkt. No. 403 at 1, and April

25   8, 2016, Dkt. No. 419 at 11, and even further expert disclosures are due from the

26   Government by April 18, 2016, Dkt. No. 443 at 2.  The Court therefore declines to take the

27   extreme measure of excluding PG&E's entire expert case for what may or may not be

28

United States District Court
Northern District of California

1    insufficient expert disclosures, when it is entirely unclear that either party has met their

2    discovery obligations throughout this case, expert or otherwise.

3            Accordingly, the Government's second motion *in limine* is hereby DENIED.  If the

4    Government believes further expert productions from PG&E are warranted, it should seek

5    them through the appropriate discovery channels.

6

7    **XIII.        Government's Motion *in Limine* No. 3**

8            The Government moves to restrict PG&E's use of Pipeline and Hazardous

9    Materials Safety Administration ("PHMSA") and NTSB discovery to support PG&E's

10   defense that its interpretations of the IM regulations were reasonable.  Gov't Mot. at 4.

11           This Court previously held that "evidence of how other operators interpreted the

12   regulations" and "[c]ommunications from PHMSA to other operators regarding the

13   regulations at issue" are relevant to PG&E's defense that its own interpretations of the

14   regulations were reasonable.  Discovery Order at 8.  The Court therefore ordered the

15   Government to produce discovery on these topics.  *Id.*  Though the Government now seeks

16   to limit PG&E's use of this very same evidence, the Court's position on its relevance has

17   not changed.  Evidence that PHMSA or another pipeline operator had the same

18   interpretation of a regulation as PG&E supports PG&E's defense that such interpretation

19   was objectively reasonable and therefore not a willful violation of the law.  *Id.* at 7 n.1

20   (citing *Safeco Insurance Co. v. Burr*, 551 U.S. 47 (2007)).

21           The Government's argument that PG&E's description of such evidence is

22   inaccurate, Gov't Reply at 6, goes to the weight of the evidence, not its admissibility.  And

23   though it may be true that offering this evidence requires PG&E to put on several

24   witnesses to testify about another pipeline operator's policies and practices, this would not

25   be a waste of time, *id.* at 7, because such testimony cuts to the heart of PG&E's defense.

26           Accordingly, the Government's third motion *in limine* is hereby DENIED.

27   *//*

28   *//*

United States District Court
Northern District of California

39

United States District Court
Northern District of California

1    **XIV.    Government's Motion *in Limine* No. 4**

2        The Government moves to admit prior statements made by or on behalf of PG&E as

3    non-hearsay statements of a party-opponent.  Gov't Mot. at 4.

4        Rule 801(d)(2) permits a statement as non-hearsay if the statement is offered against

5    an opposing party and: "(A) was made by the party in an individual or representative

6    capacity; (B) is one the party manifested that it adopted or believed to be true; (C) was

7    made by a person whom the party authorized to make a statement on the subject; (D) was

8    made by the party's agent or employee on a matter within the scope of that relationship

9    and while it existed; or (E) was made by the party's coconspirator during and in

10   furtherance of the conspiracy."  Fed. R. Evid. 801(d)(2).

11       Here, however, the Government moves to admit broad categories of unspecified

12   statements.  The Court cannot assess in the abstract whether the Government has proven,

13   by a preponderance of the evidence, the "preliminary facts" necessary to apply Rule

14   801(d)(2) to these categories.  *Bourjaily v. United States*, 483 U.S. 171, 176 (1987).  It is

15   certainly possible that a statement falling into any one of the eight categories the

16   Government has identified, Gov't Mot. at 5-6, *could be* a non-hearsay statement of a party-

17   opponent.  But without specific statements to examine, the Court cannot determine either

18   whether Rule 801(d)(2) applies or whether the statements are independently inadmissible

19   under Rules 401 and 403.

20       In Reply, the Government did identify the face pages of two documents, both

21   bearing PG&E's logo, that it argues should fall within Rule 801(d)(2).  Gov't Reply at 8;

22   Decl. of Hartley M. K. West in Supp. of Gov't Reply ("West Decl.") Ex. 1 at USA-

23   157880, PGE_DOJ_0045106 (Dkt. No. 302).  Such documents, if otherwise admissible,

24   would fall within Rule 801(d)(2) as statements of a party-opponent.  *See Metro-Goldwyn-*

25   *Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 974 (C.D. Cal. 2006)

26   ("Documents that bear StreamCast's trade names, logos, and trademarks are statements by

27   StreamCast itself, and are admissible as admissions by a party-opponent under Rule

28   801(d)(2) . . . .  These include, but are not limited to, PowerPoint presentations and

40

business plans.") (citations omitted).  The Government also included several emails for which either the email address or signature block indicate the author is a PG&E employee,[28] and the emails do all appear to concern matters within the scope of the author's employment.  Such documents, if otherwise admissible, would also fall within Rule 801(d)(2) as statements of a party-opponent.  *See Sea-Land Serv., Inc. v. Lozen Int'l, LLC.*, 285 F.3d 808, 821 (9th Cir. 2002) (holding that emails closing with electronic signature manifesting employment, and forwarded emails manifesting adoption of content, are admissible under Rule 801(d)(2)).

But the Government made relevance arguments for neither the documents underlying the face pages nor the emails.  So the Court holds only that, subject to Rule 401 and 403 objections by PG&E, such evidence is non-hearsay under Rule 801(d)(2).  The Government's fourth motion *in limine* is otherwise DENIED WITHOUT PREJUDICE to renewal at a trial, where the Government will presumably be prepared to make the adequate factual showing to apply Rule 801(d)(2) to any other statements.[29]

## XV.    Government's Motion *in Limine* No. 5

The Government moves to admit "evidence that PG&E delayed reporting its deficient records . . . for Line 147."  Gov't Mot. at 7.  The Government argues that

---

[28]    The sole exceptions are an email authored by Chris Warner of Mears Group, Inc., West Decl., Ex. 2 at PGE_DOJ_0335216, and another authored by PMP consultant Loretta Corzo, *id.* at PGE_DOJ_11384547-48.

[29]    If and when certain party-opponent statements are admitted under Rule 801(d)(2), the Government is incorrect that the Rule of Completeness is categorically inapplicable.  The Rule of Completeness allows defendants to introduce excerpts of a statement where necessary to correct misleading proffers by the Government.  Fed. R. Evid. 106; *see also United States v. Wilde*, 2015 U.S. Dist. LEXIS 4594, at *9 (N.D. Cal. Jan. 13, 2015) ("Although the Rule of Completeness cannot serve as an end run around the prohibition on inadmissible hearsay, this principle does not allow the Government to offer abridged portions of statements that distort the meaning of a statement.").  The Rule of Completeness likewise "allows the admission of statements in their entirety when the Government introduces only a portion of *inextricably intertwined* statements."  *Id.* (citation and quotation marks omitted) (emphasis in original).  The cases cited by the Government are inapposite because they did not involve misleading, misrepresentative, or inextricably intertwined statements.  *E.g.*, *United States v. Collicott*, 92 F.3d 973, 983 (9th Cir. 1996) (noting that there was no concern that "a misleadingly-tailored snippet" was introduced).

United States District Court
Northern District of California

"PG&E's delayed reporting . . . [and] faulty records concerning Line 147, is probative of PG&E's knowledge of its recordkeeping deficiencies, and its willfulness in failing to address them."  *Id.* at 9.

PG&E's Motion *in Limine* No. 3, which seeks to exclude this same evidence, summarizes the underlying facts.  In response to the San Bruno explosion, the CPUC ordered PG&E to reduce its operating pressure on Line 132 and PG&E also voluntarily reduced the pressure on Line 147.  When PG&E sought to re-increase the pressure on Line 147 in late 2011, it "provided the CPUC with information to support increasing pressure on Line 147."  PG&E Mot. at 21.  After a hearing, "which included PG&E's testimony confirming it had validated the line's engineering and construction through a review of records," the CPUC authorized PG&E to raise the pressure on Line 147 in December 2011.  *Id.*  Then in mid-October 2012, while investigating a leak on Line 147, a PG&E engineer discovered that its Line 147 records contained faulty information about the pipe segment, such as the wrong seam type, which rendered incorrect a "features list" it had previously submitted to the CPUC.  *Id.* at 22.  But PG&E waited until March 2013 to inform the CPUC staff of this discrepancy, and until July 2013 to formally inform the CPUC through an "errata."  *Id.*  In August 2013, the CPUC "rejected the errata and issued an Order to Show Cause why PG&E should not be sanctioned for violating its Rules of Practice and Procedure."  *Id.*  The CPUC subsequently fined PG&E $14.35 million for not more promptly correcting what it perceived to be a material misstatement of fact, and for characterizing the July filing as an "errata."  *Id.* at 23.

The Government argues that this entire transaction – from the error in PG&E's records to the delay in reporting that error – is admissible either as "inextricably intertwined" with the charged conduct or as "other act" evidence to prove PG&E's intent, which is permissible under Rule 404(b).  Gov't Mot. at 8.

First, the Line 147 evidence is not "inextricably intertwined" with the charged conduct.  Evidence is "inextricably intertwined" if it is (1) part of the same criminal transaction or (2) necessary to tell a coherent story about the charged conduct.  *Vizcarra-*

United States District Court
Northern District of California

1   *Martinez*, 66 F.3d at 1012-13.  On the former basis, the Government argues that

2   misidentified pipeline features on Line 147 are "part of the same criminal episode as

3   PG&E's other record-keeping violations."  Gov't Mot. at 8.  This argument is unavailing,

4   because the faulty recordkeeping on Line 147 would not violate either of the charged

5   recordkeeping regulations, which themselves criminalize different "courses of conduct."

6   *See* Multiplicity Order at 9-11 (holding that the Superseding Indictment alleges a separate

7   "course of conduct," and therefore separate criminal transaction, for each alleged

8   regulatory violation).  On the latter basis, the Government will not be hampered in telling a

9   coherent story about the charged recordkeeping violations without evidence of Line 147,

10   because the SI does not even mention Line 147.  The Line 147 evidence is therefore "other

11   act" evidence within the meaning of Rule 404(b).

12          Because the Court has concluded that the Line 147 evidence is "other act" evidence,

13   it must apply the Ninth Circuit's four-part test to determine whether the evidence is

14   nevertheless admissible under Rule 404(b):

15              Evidence of prior criminal conduct may be admitted if (1) the
16              evidence tends to prove a material point; (2) the prior act is not
                too remote in time; (3) the evidence is sufficient to support a
17              finding that the defendant committed the other act; and (4) (in
                cases where knowledge and intent are at issue) the act is
18              similar to the offense charged.

19   *Vizcarra-Martinez*, 66 F.3d at 1013 (quoting *United States v. Mayans*, 17 F.3d 1174, 1181

20   (9th Cir. 1994)).  In applying this test, the Ninth Circuit has made clear that Rule 404(b)

21   should operate as a "rule of inclusion," and that "[e]vidence of other crimes or acts is

22   admissible under Rule 404(b), except where it tends to prove *only* criminal disposition."

23   *United States v. Ayers*, 924 F.2d 1468, 1472-73 (9th Cir. 1991) (internal quotations marks

24   omitted) (emphasis in original).

25          Here, there is no doubt that PG&E committed the other act (satisfying element 3),

26   and because the other act occurred within either two years of the charged recordkeeping

27   violations (for Counts 3-4) or during the charged recordkeeping violations (for Counts 9-

28   13), it is not too remote in time (satisfying element 2).  The Line 147 evidence tends to

United States District Court
Northern District of California

1    prove a material point (satisfying element 1), because the Government must prove PG&E

2    possessed the requisite intent for the charged recordkeeping violations; PG&E's

3    subsequent acts on Line 147 are relevant to PG&E's state of mind for those violations

4    because in both instances PG&E allegedly demonstrated both knowledge of recordkeeping

5    deficiencies and a willingness to let those deficiencies stand uncorrected.  *See id.* at 1473

6    (holding that "subsequent acts of concealing large amounts of cash are highly probative of

7    an intent to defraud the United States in the collection of income taxes").  Finally, the Line

8    147 evidence is sufficiently similar to the charged conduct (satisfying element 4) because

9    having and failing to report faulty records on one pipeline is sufficiently similar to having

10   and failing to correct faulty records on another, even if the faults are not identical.  *See id.*

11   at 1473 (holding that purchasing cashiers checks in amounts less than $10,000 and

12   submitting false customs declarations are sufficiently similar because both are "acts which

13   conceal the ownership of cash from the government").  The Line 147 evidence is therefore

14   admissible under Rule 404(b).

15           However, the Line 147 evidence must still survive a Rule 403 balancing to be

16   admissible.  Though this evidence is highly probative, certain aspects of the evidence

17   increase the risk of unfair prejudice.  First, evidence of a gas leak so close in time to the

18   San Bruno explosion creates a serious risk that the jury would be drawn to convict PG&E

19   based on some perceived and repeated danger to the public, rather than for the alleged

20   recordkeeping violations.  Second, evidence regarding the CPUC penalty for the errata

21   filing might tempt jurors to punish PG&E for that conduct, rather than the recordkeeping

22   violations.  Evidence of (1) why PG&E uncovered the faulty records on Line 147 (i.e., the

23   gas leak), and (2) the CPUC penalty for the errata filing, are therefore inadmissible under

24   Rule 403.  The rest of the Line 147 survives, however, because the Court is not concerned

25   that any "mini-trial" would result from the introduction of this limited Line 147 evidence.

26   PG&E Mot. at 27.

27           Accordingly, the Government's fifth motion *in limine* is GRANTED IN PART and

28   DENIED IN PART.  The Government may admit evidence that PG&E had incorrect

1  records on Line 147 and that it waited five months to correct this deficiency with the

2  CPUC.  The Government may not admit evidence that PG&E realized the record

3  deficiency through a leak on Line 147, or that the CPUC subsequently penalized PG&E for

4  its late disclosure of the records error.[30]

5

6  **XVI.   Government's Motion *in Limine* No. 6**

7       The Government moves to admit evidence concerning a former PG&E employee,

8  Leslie McNiece.  PG&E challenges the admissibility of four topics of Ms. McNiece's

9  testimony.

10       **a.   Testimony regarding the purpose of Ms. McNiece's hire is admissible.**

11       First, the Government moves to admit evidence that Ms. McNiece was hired in

12  2012 "for the purpose of building a department to address PG&E's recordkeeping

13  deficiencies identified after the San Bruno explosion."  Gov't Mot. at 9-10.  The

14  Government argues that this testimony, "along with her personal observations regarding

15  the state of PG&E's recordkeeping, are relevant, direct evidence of PG&E's knowledge

16  regarding the inadequate state of its pipeline records," and therefore "inextricably

17  intertwined" with the charged conduct.  *Id.* at 10.

18       Evidence is "inextricably intertwined" if it is (1) part of the same criminal

19  transaction or (2) necessary to tell a coherent story about the charged conduct.  *Vizcarra-*

20  *Martinez*, 66 F.3d at 1012-13.  On the first basis, PG&E argues that "[v]ague allusions to

21  'recordkeeping deficiencies' . . . on a company-wide basis do not satisfy the government's

22  burden to show that this other act evidence constitutes 'part of the transaction' that forms

23  the basis of the criminal charge."  PG&E Opp'n at 23-24.[31]  The Court disagrees.

24  _____

25  [30]    This evidence implicates no uncharged regulations, because PG&E admitted to the
error on its CPUC "features list" and the list was not required by any Pipeline Safety Act

26  regulation.  PG&E Mot. at 21-23.  PG&E therefore need not examine PHMSA or "other
operator" interpretations of any uncharged regulations to defend against this evidence.  *See*

27  Dkt. Nos. 419, 424, 425, 428.
[31]    PG&E also argues that this evidence is inadmissible under Rule 407 as a "subsequent

28  remedial measure."  PG&E Opp'n at 23 n.14.  But as discussed under PG&E's Motion *in*
*Limine* No. 5, *see supra* § V, Rule 407 only bars evidence of measures that "would have

United States District Court
Northern District of California

1    Evidence that PG&E hired Ms. McNiece to address recordkeeping deficiencies is

2    probative of both the deficiencies themselves and PG&E's mental state with respect to

3    those deficiencies.  And the Government has assured the Court that the deficiencies are

4    tied to charged conduct:

> Other witnesses will testify that [Ms. McNiece's testimony on
> PG&E's recordkeeping deficiencies] constitute[s] relevant
> repair and strength test pressure records under 49 C.F.R. §
> 192.709(a) and § 192.517(a), and are necessary to identify and
> evaluate all potential threats on covered segments under §
> 192.917(a) and (b).  Witnesses will further testify . . . that
> failure to maintain and integrate such records impacts a
> utility's ability to include potential threats in its Baseline
> Assessment Plan and select the most suitable assessment
> method under § 192.919, and to prioritize covered segments
> under § 192.917(e)(3) and (e)(4).

11   Gov't Reply at 12.

12        Because Ms. McNiece's hire occurred during the relevant period for five of the

13   counts,[32] the purpose of her hire and the recordkeeping deficiencies she experienced on the

14   job are direct evidence of charged conduct during the relevant period for those counts.  As

15   to the remaining counts, this evidence does not become "other acts" simply because it was

16   not charged.  *See United States v. Williams*, 989 F.2d 1061, 1070 (9th Cir. 1993) ("The

17   policies underlying rule 404(b) are inapplicable when offenses committed as part of a

18   'single criminal episode' become other acts simply because the defendant 'is indicted for

19   less than all of his actions.' ") (quoting *United States v. Soliman*, 813 F.2d 277, 279 (9th

20   Cir. 1987)).  The Court therefore finds that testimony about the purpose of Ms. McNiece's

21   hire and her experiences on the job is inextricably intertwined with PG&E's alleged

22   regulatory violations, because "[e]vidence of PG&E's failure to maintain, gather, and

23   integrate repair and strength test records at the time of Ms. McNiece's employment is

24

25

26   ───────────────────────────
     made [the San Bruno explosion] less likely to occur," Fed. R. Evid. 407.  As PG&E has
27   not argued that hiring Ms. McNiece would have made the explosion less likely to occur,
     Rule 407 does not apply to bar this evidence.
28   [32]   Counts 9-13 (the alleged pressure testing record violations) were not completed until
     well after Ms. McNiece's hire.  SI ¶ 75.

United States District Court
Northern District of California

1    inextricably intertwined with – and direct evidence of – its failure to maintain, gather, and

2    integrate such records at the time of the charged conduct."  Gov't Reply at 15.

3         Moreover, evidence of Ms. McNiece's hire would be admissible even if it were an

4    "other act," because (1) it tends to prove a material point (at a minimum, PG&E's mental

5    state with respect to charged recordkeeping or IM regulations), (2) it is not too remote in

6    time (as discussed above Ms. McNiece was hired either during or immediately following

7    the charged conduct), (3) it is plainly PG&E conduct, and (4) it is sufficiently similar to the

8    charged offenses (as Ms. McNiece will testify about one (or all) of the following:

9    violations of 49 C.F.R. §§ 192.709(a) and 192.517(a); recordkeeping deficiencies that

10   impacted PG&E's ability to comport with other charged IM regulations; or recordkeeping

11   deficiencies that inform PG&E's mental state with respect to charged conduct).  *Vizcarra-*

12   *Martinez*, 66 F.3d at 1013; *Ayers*, 924 F.2d at 1473.

13        PG&E also argues that Ms. McNiece's testimony should be excluded under Rule

14   403.  PG&E Opp'n at 27.  For the same reasons that Ms. McNiece's testimony is either

15   inextricably intertwined or admissible evidence of intent under Rule 404(b), the testimony

16   has high probative value.  Meanwhile, PG&E merely states that this evidence is "highly

17   prejudicial" because it paints PG&E as a "bad company."  *Id*.  But to the extent that Ms.

18   McNiece's testimony reveals violations of the charged regulations, there is nothing

19   "unfair" about this prejudicial evidence.  *See United States v. Guzman-Montanez*, 756 F.3d

20   1, 7 (1st Cir. 2014) ("[T]he law shields a defendant against unfair prejudice, not against all

21   prejudice.") (alteration and citation omitted).  And as discussed below, PG&E's objections

22   to Ms. McNiece's testimony largely focus on its argument that the Government's

23   characterization of the testimony is "misleading."  PG&E Opp'n at 21-23.  To the extent

24   this is true, PG&E can therefore substantially minimalize any perceived unfair prejudice

25   through cross-examination of Ms. McNiece.

26        Accordingly, the Government's sixth motion *in limine* is hereby GRANTED as to

27   the purpose of Ms. McNiece's hire and her personal observations regarding the state of

28   PG&E's recordkeeping while on the job.

United States District Court
Northern District of California

47

**b.  Testimony regarding the "pushback" Ms. McNiece received at PG&E is admissible, but she may not testify about "destroyed copies."**

Second, the Government moves to admit Ms. McNiece's testimony about "the pushback she received throughout her tenure at PG&E," including "the opposition she faced when she tried to remedy PG&E's recordkeeping deficiencies, instances when she received specific instructions to destroy documents . . . and the financially-motived pushback she received when she attempted to organize PG&E records or move them from a storage facility called Iron Mountain."  Gov't Mot. at 10-11.

The Government argues that this "pushback" evidence is "direct evidence of PG&E violations of recordkeeping regulations, and explains how PG&E did not genuinely attempt to address its known recordkeeping deficiencies."  *Id.* at 11.  PG&E objects again that "the government does not contend that the documents in question are gas transmission records, let alone related to the charged conduct in this case."  PG&E Opp'n at 24.  But as discussed above, the Government does contend that Ms. McNiece's work at PG&E fell within the purview of the charged regulations, and this would necessarily include pushback she received for that work.  Gov't Reply at 12.  And for the reasons discussed above, this evidence is either inextricably intertwined or otherwise admissible evidence of intent under Rule 404(b).

PG&E also argues, however, that the "pushback" evidence is misleading because PG&E did ultimately adopt the policies Ms. McNiece proposed, and because any documents she was told to destroy were merely copies.  PG&E Opp'n at 21-22.  With respect to the policy adoption, this objection is proper fodder for cross-examination, at which point PG&E can minimize any risk of unfair prejudice through correcting this mischaracterization.  With respect to the destroyed copies, on the other hand, such evidence has "an undue tendency to suggest decision on an improper basis," *Old Chief*, 519 U.S. at 180; namely, that "document destruction" is clearly "bad conduct."  Indeed, this much is evident from the press coverage the Government's Motion *in Limine* No. 6 received the day after it was filed, including a *San Francisco Chronicle* article titled,

48

"PG&E management allegedly ordered papers destroyed after blast."[33]  And because the Government conceded at the April 12, 2016 oral argument that the destroyed copies were not required by any charged regulation, 4/12/16 Tr. at 7, the probative value of their destruction is both low and outweighed by this risk of unfair prejudice.

Accordingly, the Government's sixth motion *in limine* is hereby GRANTED IN PART and DENIED IN PART as to the "pushback" Ms. McNiece received while on the job.  Ms. McNiece may testify about the pushback she received, but she may not testify that she was told to destroy any documents.

### c.  Testimony regarding the documents Ms. McNiece found in a dumpster is inadmissible.

Third, the Government moves to admit Ms. McNiece's testimony about her "discovery of original pipeline survey sheets of Line 132, containing handwritten notes, in a dumpster," including "Line 132 discarded survey sheets [with the notation]: 'leak info not in GIS' . . . dated 12/8/2003."  Gov't Mot. at 11.

The Government argues that "[t]his map and the accompanying notation are probative of several relevant facts: that PG&E's GIS system was deficient, that PG&E was aware of this deficiency, and that by discarding this original map, PG&E was failing to maintain records, as required, for the life of a pipe."  *Id.*  PG&E argues again that this characterization is misleading because the "dumpster documents" had already been electronically scanned by the time Ms. McNiece found them, so the files were indeed being "maintained" pursuant to the charged regulations.  PG&E Opp'n at 22.

The Government conceded at the April 12, 2016 oral argument that it had indeed received scanned copies of these documents from PG&E.  4/12/16 Tr. at 7.  And the Government merely reiterated an argument from its Reply briefing that the "relevance of the scanning is linked to the time," *id.*, despite the fact that the Court specifically

---

[33]  Jaxon Van Derbeken, *PG&E management allegedly ordered papers destroyed after blast*, San Francisco Chronicle, Jan. 12, 2016, available at http://www.sfgate.com/crime/article/PG-E-management-allegedly-ordered-papers-6754580.php.

49

United States District Court
Northern District of California

1    referenced this argument in asking the Government why the scanned copies are not just as

2    probative of PG&E's failure to integrate the records and properly assess potential threats

3    as the original copies that were found in the dumpster.  The probative value of both the

4    documents themselves and any notations they contain is therefore questionable at best.

5    But again, this evidence has "an undue tendency to suggest decision on an improper basis,"

6    *Old Chief*, 519 U.S. at 180; this time, that throwing documents away is clearly "bad

7    conduct."  And again, such prejudice is apparent from the *San Francisco Chronicle* article

8    that followed the Government's filing of this motion, which included the heading, "Map in

9    trash bin."[34]  The slim probative value of this evidence is therefore substantially

10   outweighed by the risk of unfair prejudice presented by the evidence.

11         Accordingly, the Government's sixth motion *in limine* is hereby DENIED as to the

12   documents Ms. McNiece found in the dumpster.

13              **d.   Testimony regarding the box of documents Ms. McNiece found outside**

14                   **her office is inadmissible.**

15         Finally, the Government moves to admit testimony that "in or about May 2013,

16   [Ms. McNiece] found outside of her office door a box of original pipeline records,

17   including for Line 132, with a Post-It note [with] words to the effect of, 'I'd rather give

18   this to you than Gas Ops.' "  Gov't Mot. at 10.

19         The Government argues that "[t]his 'other act' evidence is relevant to show that

20   PG&E acted with the specific intent to violate the charged pipeline regulations," because it

21   "tends to show that PG&E engaged in a pattern of poor recordkeeping conduct, so much so

22   that an employee only 'trusted' giving McNiece the records."  *Id.* at 11.  Rather than

23   arguing that this evidence is inextricably intertwined with the charged conduct, the

24   Government argues that evidence "disproving mistake or accident and instead proving a

25   pattern of conduct is proper 404(b) evidence in the context of a corporate defendant."  *Id.*

26

27

28   _____

[34]   *See supra* n.33.

50

1   PG&E accurately describes the attenuated nature of the Government's argument for

2   this evidence: "The government appears to contend that the unknown author's act of

3   leaving the box and note is evidence that some other unknown person intentionally

4   engaged in some unidentified bad recordkeeping conduct." PG&E Opp'n at 26.  It is

5   entirely unclear how this implied, ambiguous, second-hand allegation of "bad behavior" is

6   probative of PG&E's specific intent to violate any of the charged regulations.  Rather, it

7   appears the Government would like the jury to reason along the lines specifically

8   prohibited by Rule 404(b), by inviting them to assume that if an unknown PG&E

9   employee engaged in some unidentified bad behavior at some unspecified time in the past,

10  PG&E must have also acted knowingly and willfully in violating the charged regulations.

11      Accordingly, the Government's sixth motion *in limine* is hereby DENIED as to the

12  box of documents Ms. McNiece found outside her office.

13

14  **XVII.    Government's Motion *in Limine* No. 7**

15      The Government moves to admit seven categories of evidence that it argues are

16  inextricably intertwined with the charged conduct.  Evidence is "inextricably intertwined,"

17  and outside the scriptures of Rule 404(b), if it is (1) part of the same criminal transaction or

18  (2) necessary to tell a coherent story about the charged conduct.  *Vizcarra-Martinez*, 66

19  F.3d at 1012-13.

20          **a.  Evidence on unindicted lines is admissible.**

21      The Government moves to admit evidence that "PG&E failed to incorporate . . .

22  pipe specifications, class location data, strength test pressure records, 'as-builts,' and

23  manufacturing records" on unindicted lines, Gov't Mot. at 12, as inextricably intertwined

24  with Count 2, which charges PG&E with violating 49 C.F.R. § 192.917(b) by "fail[ing] to

25  gather and integrate existing data and information that could be relevant to identifying and

26  evaluating all potential threats on covered segments," on Lines 132 and 109, SI ¶ 63.

27      PG&E previously and successfully argued that the Pipeline Safety Act criminalizes

28  a "course of conduct," which prevented the Government from charging for violations of

51

United States District Court
Northern District of California

1   the IM regulations on a pipeline-by-pipeline basis.  Multiplicity Order at 9-11.  PG&E's

2   "criminal transaction" on each charged IM regulation therefore necessarily includes every

3   pipeline for which PG&E violated the regulation during the relevant period.  And evidence

4   that PG&E violated 49 C.F.R. § 192.917(b) on uncharged lines does not become "other

5   acts" simply by virtue of not being charged.  *See Williams*, 989 F.2d at 1070 ("The policies

6   underlying rule 404(b) are inapplicable when offenses committed as part of a 'single

7   criminal episode' become other acts simply because the defendant 'is indicted for less than

8   all of his actions.' ").  The Court therefore agrees with the Government that evidence of

9   relevant but unintegrated data on Lines other than 132 and 109 is part of the same criminal

10  violation of 49 C.F.R. § 192.917(b) as those charged lines, and is therefore inextricably

11  intertwined with Count 2.

12        PG&E is nevertheless correct that evidence outside the scriptures of Rule 404(b)

13  must still survive a Rule 403 balancing to be admissible.  PG&E Opp'n at 29.  Because the

14  Government has not specified how many unindicted lines it seeks to introduce, the Court

15  cannot assess PG&E's argument that this evidence will "create protracted mini-trials

16  relating to all of the allegedly unincorporated data."  *Id.*  This determination is therefore

17  better left for trial, when the Court can assess in context whether the presentation of this

18  evidence is cumulative or otherwise a waste of time.

19        Accordingly, the Government's motion *in limine* to admit evidence that PG&E

20  failed to incorporate pipe specification data on unindicted lines is hereby GRANTED.  But

21  PG&E may re-raise its Rule 403 objection at trial, if the Government's presentation of this

22  evidence becomes cumulative or begins to waste time.

23        **b.  PG&E's transition from the Gas Pipeline Replacement Program to the**

24        **Risk Management Program is admissible.**

25        The Government moves to admit evidence that PG&E transferred 212 miles of pipe

26  from its Gas Pipeline Replacement Program ("GPRP"), where it had been designated for

27  replacement due to its age, to its Risk Management Program ("RMP"), where it was never

28  replaced.  Gov't Mot. at 12.  The Government argues that this evidence demonstrates both

1    that PG&E knew the age of the charged pipelines – which, it argues, is a factor in

2    identifying and evaluating potential threats under the IM regulations – and that PG&E

3    prioritized profits over safety.  Reply at 17.  PG&E argues only that the probative value of

4    this evidence is low because the age of the pipelines is undisputed, while the evidence

5    would "be unfairly prejudicial, confuse the jury, and create a long mini-trial" about these

6    decades-old programs.  PG&E Opp'n at 30.

7           As an initial matter, the Court is not convinced that this is the sort of "other act"

8    evidence that requires Rule 404(b) treatment.  The Ninth Circuit has explained that

9    "[e]vidence of other crimes or acts is admissible under Rule 404(b), except where it tends

10   to prove *only* criminal disposition."  *Ayers*, 924 F.2d at 1472-73 (emphasis in original).

11   PG&E has provided no explanation of what improper propensity reasoning the transition

12   evidence invites, and it is otherwise unclear what "criminal disposition" the jury would

13   glean from such evidence.  Nevertheless, evidence of PG&E's decision to transition and

14   ultimately not replace portions of the charged pipelines would be inextricably intertwined

15   with the charged conduct because it is direct evidence of both PG&E's mental state with

16   respect to the safety and maintenance of the charged pipelines and its obligations on those

17   lines, all during the relevant period.  As the Government explained at the April 12, 2016

18   oral argument, "in the [Baseline Assessment Plan], a utility is required each year to

19   evaluate threats[;] [a]nd this evidence, while dating back many years . . . [t]he age of the

20   pipes and the characteristics or specifications of the pipes . . . that knowledge is something

21   that PG&E is, under the regulations, required to be aware of and incorporate into their

22   decisions . . . [s]o it remains relevant over the years."  4/12/16 Tr. at 8-9.

23          Meanwhile, PG&E has not contested that the age of the pipeline is relevant to the

24   counts brought under 49 C.F.R § 192.917.  And though PG&E argues that the age of the

25   pipeline is undisputed, the Government "is entitled to prove its case by evidence of its own

26   choice, or, more exactly, [] a criminal defendant may not stipulate or admit his way out of

27   the full evidentiary force of the case as the Government chooses to present it."  *Old Chief*,

28   519 U.S. at 186-87.  Finally, a determination of whether this evidence invites "a long mini-

United States District Court
Northern District of California

United States District Court
Northern District of California

1    trial" is better left for trial, when the Court can assess in context whether the presentation

2    of GPRP and RMP evidence is cumulative or otherwise a waste of time.  But presently,

3    PG&E has offered no explanation as to why the presentation of such evidence would

4    require testimony "about the development, purposes, and achievements of the fifteen-year

5    transmission GPRP and the transition to a new system-wide RMP."  PG&E Opp'n at 30.

6          Accordingly, the Government's motion *in limine* to admit evidence of PG&E's

7    transition of charged pipelines from GPRP to RMP is hereby GRANTED.

8          **c.  Evidence of planned pressure increases on unindicted lines is admissible.**

9          The Government moves to admit "evidence [on] other pipelines, beyond those

10   charged in the Superseding Indictment, where PG&E increased the pressure over the

11   maximum allowable pressure of the pipelines."  Gov't Mot. at 13.  The Government argues

12   that because "PG&E's planned pressure increase program is the very reason that threats on

13   many of the charged segments were activated," this evidence is inextricably intertwined

14   with the alleged violations of 49 C.F.R. §§ 192.917(e)(3), (e)(4), and 192.919.  Gov't

15   Reply at 18.

16         PG&E argues that there is no need to offer evidence of alleged increases on lines

17   other than those charged by the grand jury.  PG&E Opp'n at 30.[35]  But as discussed above,

18   because the Pipeline Safety Act criminalizes a "course of conduct," PG&E's "criminal

19   transaction" on each charged IM regulation necessarily includes the same conduct on

20   uncharged lines.  And evidence on uncharged lines does not become "other acts" simply

21   by virtue of being uncharged.  *Williams*, 989 F.2d at 1070.  The Court therefore agrees

22   with the Government that evidence of planned pressure increases on uncharged lines is

23   part of the same criminal transaction as the lines charged under 49 C.F.R. §§

24   192.917(e)(3), (e)(4), and 192.919, and is therefore inextricably intertwined with the

25

26   ---

[35]     PG&E also argues that intentional pressure increases are not illegal.  PG&E Opp'n at
27   30.  As the Government explains, however, the thrust of this evidence is that PG&E
     unintentionally *exceeded* its maximum operating pressure through these (otherwise lawful)
28   planned pressure increases, and these exceedances are relevant to proving PG&E's failures
     under 49 C.F.R. §§ 192.917(e)(3), (e)(4), and 192.919.

United States District Court
Northern District of California

1   charged conduct.  Because the Government seeks to admit evidence on only four

2   additional lines – Lines 50A, 118A, 142S, and 114, Gov't Mot. at 13 – the Court is not

3   concerned that this evidence will be unnecessarily cumulative or otherwise waste time.

4        Accordingly, the Government's motion *in limine* to admit evidence of planned

5   pressure increases on uncharged lines is hereby GRANTED.

6             **d.  Evidence of unplanned pressure increases on unindicted lines is**

7                   **admissible.**

8        The Government also moves to admit evidence of *unplanned* pressure increases on

9   uncharged pipelines.  Gov't Mot. at 13.

10       PG&E argues that because these increases were unintentional, they are "even less

11  probative of any alleged knowing violation in the charged conduct" than the planned

12  pressure increases discussed above.  PG&E Opp'n at 31.  But PG&E misunderstands the

13  Government's theory of relevance for this evidence; the Government argues "[w]hether

14  planned or unplanned, PG&E was aware that over pressurizations activated manufacturing

15  threats, was aware that activated manufacturing threats required it to perform pipeline

16  assessments, and intentionally selected improper assessment methods."  Gov't Mot. at 13.

17  Evidence of *unplanned* pressure increases that caused the pressure exceedances on

18  uncharged lines is therefore inextricably intertwined with the charged conduct for the same

19  reasons as the *planned* pressure increases, as discussed above.

20       Accordingly, the Government's motion *in limine* to admit evidence of unplanned

21  pressure increases on uncharged lines is hereby GRANTED.

22            **e.  Evidence of the San Bruno OIIs is inadmissible or governed by**

23                  **Government's Motion *in Limine* No. 4.**

24       The Government originally moved to admit "evidence that the CPUC assessed

25  PG&E with a $1.6 billion penalty."  *Id.* at 13.  The Government has since withdrawn this

26  request.  Gov't Reply at 18-19.  In Reply, the Government then asserted that it "moved to

27  admit PG&E's admissions to the CPUC as part of [OIIs] . . . as admissions of a party

28  opponent."  *Id.* at 18.  As this was already the subject of the Government's Motion *in*

1   *Limine* No. 4, the Court will not repeat its analysis here.  The Government's motion *in*

2   *limine* to admit OII evidence is otherwise DENIED.

3         **f.   The Government has withdrawn evidence of the NTSB's conclusions**

4             **about PG&E's emergency response.**

5   The Government has withdrawn this request.  *Id.* at 19.

6         **g.   The Government has withdrawn evidence of deficiencies in PG&E's**

7             **work clearance at the Milpitas terminal.**

8   The Government has withdrawn this request.  *Id.*

9

10   **XVIII.   Government's Motion *in Limine* No. 8**

11        The Government moved the Court to "declare certain government witnesses as

12   hostile, and therefore permit the government to cross examine its own witnesses."  Gov't

13   Mot. at 14.  The Government has since withdrawn this motion, as it is "not yet ripe."

14   Gov't Reply at 19.  The Court will therefore make determinations regarding hostile

15   witnesses in the proper context at trial.

16

17   **CONCLUSION**

18        For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART

19   the parties' motions *in limine*.  Because these rulings impact the parties' previously filed

20   witness and exhibit lists, the parties are hereby ORDERED to refile witness and exhibit

21   lists that conform to the evidentiary rulings contained in this order, by **12:00 p.m. on**

22   **April 25, 2016**.

23

24   **IT IS SO ORDERED.**

25

26   Dated:   04/18/16

27   THELTON E. HENDERSON
    United States District Judge

28

United States District Court
Northern District of California