UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Defendant. | Case No. 14-cr-00175-TEH-1<br><br>**ORDER REGARDING RECENTLY PRODUCED PHMSA AND NTSB MATERIALS** |

This matter came before the Court on a discovery dispute regarding whether the Court should recognize certain privileges claimed by the Pipeline and Hazardous Materials Safety Administration ("PHMSA") and National Transportation Safety Board ("NTSB"). Though no motion is currently pending, the Court has received ample briefing from the parties on this issue, Dkt. Nos. 532, 554, 585-1, and addresses the parties' arguments below.

**BACKGROUND**

On September 9, 2010, a gas line owned and operated by Defendant Pacific Gas and Electric Company ("PG&E") ruptured, causing significant damage to a residential community in San Bruno, California. Dkt. No. 22 (Superseding Indictment, "SI") ¶ 5. PG&E stands charged with one count of obstructing the NTSB investigation that followed the explosion. *Id.* ¶ 61. PG&E is also charged with 12 counts of violating the minimum federal safety standards for the transportation of natural gas by pipeline ("Pipeline Safety Act"). *Id.* ¶¶ 62-75.

PHMSA is the federal regulatory agency within the Department of Transportation that issued the Pipeline Safety Act regulations and is charged with their administration. *Id.* ¶ 9; 49 C.F.R. § 190.303 (providing that PHMSA administer the Pipeline Safety Act). PHMSA's mission is "to protect people and the environment by advancing the safe

transportation of energy and other hazardous materials." Dkt. No. 533 ("Gonsalves Decl.") ¶ 1.  NTSB is "an independent establishment of the United States Government," charged by Congress with "investigat[ing] and report[ing] on the safe transportation of hazardous material," including by pipeline.  49 U.S.C. §§ 1111(a), (g).  NTSB "makes public its actions and decisions through accident reports, safety studies, special investigation reports, safety recommendations, and statistical reviews." SI ¶ 53.  NTSB began an investigation immediately after the San Bruno explosion, examining the cause of the explosion, the characteristics and history of the failed pipe, the adequacy of PG&E's emergency response, and PG&E's operations.  *Id.* ¶¶ 54-55.  NTSB issued a report on the explosion on August 30, 2011.  *Id.* ¶ 54.

On June 29, 2015, this Court held that certain PHMSA and NTSB materials are relevant to PG&E's defense in this criminal prosecution, and ordered their production. Dkt. No. 103 ("June 29 Order").  Specifically, the Court held that (i) PHMSA and NTSB interpretations of the charged regulations, (ii) the agencies' statements regarding the charged regulations to other pipeline operators, and (iii) evidence of other operators' interpretations of these regulations, are all material to PG&E's defense that its own interpretations of the regulations were reasonable.  *Id.* at 8, 27.  PHMSA and NTSB collected the documents responsive to the June 29 Order, and produced them along with logs identifying any documents being withheld on the basis of privilege.  Dkt. No. 410.

On March 28, 2016, PG&E and the Government submitted a joint discovery dispute over whether the Court should compel the Government to produce the PHMSA and NTSB materials that were being withheld as privileged.  Dkt. Nos. 410, 412.  Because the Government "ha[d] not attempted to articulate why it believes the PHMSA or NTSB documents should remain privileged," Magistrate Judge Maria-Elena James ordered the Government to respond to PG&E's arguments on this topic by April 8, 2016.  Dkt. No. 420.  Instead, the Government offered that it would produce all of the previously withheld PHMSA and NTSB materials, pursuant only to a protective order.  Dkt. No. 444.  On April 11, 2016, Judge James entered a joint protective order signed by the parties, which states

1   "PHMSA and the NTSB do not waive any of the privileges asserted over these
2   documents."  Dkt. No. 430 ("Protective Order") at 1.  On the same day, the Government
3   disclosed to PG&E roughly 110,000 pages of previously withheld PHMSA and NTSB
4   materials.  Dkt. No. 436.

5   The Government indicated at an April 28, 2016 status conference that it still wished
6   to litigate whether PG&E may use these allegedly privileged materials at trial.  Dkt. No.
7   527.  On May 2, 2016, the Court therefore ordered the Government to respond to PG&E's
8   legal arguments on the legitimacy of PHMSA's and NTSB's claims of privilege, Dkt. No.
9   503, and the Government timely complied, Dkt. No. 532 ("Gov't Br.").  The Court also
10  permitted PG&E to submit an opposition to the Government's arguments, Dkt. No. 554
11  ("PG&E Opp'n"), and the Government to submit a reply in support of those arguments,
12  Dkt. No. 585-1 ("Gov't Reply").

13  PHMSA and NTSB assert that both the deliberative process privilege and the
14  attorney-client privilege protect the 110,000 pages at issue.  Gov't Br. at 1.  The Court
15  considered the parties' briefing, and expressed a concern that the "twelve examples offered
16  in the parties' briefing represent only a fraction of the 110,000 pages of PHMSA and
17  NTSB material that PG&E is still in the process of reviewing," and that "[a]bsent a broader
18  resolution of the parties' privilege arguments, the Court is therefore concerned that
19  disagreements about whether the privileges apply to specific documents will delay and
20  prolong this already complex criminal prosecution."  Dkt. No. 602 at 2.  The Court
21  therefore invited the parties to adopt a scheme that "would guarantee that the PHMSA and
22  NTSB materials are not broadly disseminated . . . while also permitting PG&E to put on a
23  full and fair defense."  *Id.*  The parties refused.  Dkt. No. 622.

24

25  **LEGAL STANDARDS**
26  "The burden is on the party asserting the privilege to establish all the elements of
27  the privilege."  *United States v. Martin*, 278 F.3d 988, 999-1000 (9th Cir. 2002).
28

### I. Deliberative Process Privilege

The deliberative process privilege "permits the government to withhold documents that reflect advisory opinions, recommendations and deliberations comprising part of a process by which government decisions and policies are formulated." *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984). The privilege is designed to "promote frank and independent discussion among those responsible for making governmental decisions," *id.*, and above all else, aims to "prevent injury to the quality of agency decisions." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975).[1]

To be protected by the deliberative process privilege, a document must be both "predecisional" and "deliberative." *Nat'l Wildlife Fed'n v. U.S. Forest Serv.*, 861 F.2d 1114, 1117 (9th Cir. 1988). Predecisional means that the document was "antecedent to the adoption of agency policy," *id.* (internal quotation marks omitted), and the Supreme Court has made clear that "communications made after the decision and *designed to explain it*" are not predecisional (and therefore not privileged), *Sears*, 421 U.S. at 152 (emphasis added). Deliberative means that the document "must actually be related to the process by which policies are formulated." *Nat'l Wildlife Fed'n*, 861 F.2d at 1117 (internal quotation marks omitted). "Purely factual material that does not reflect deliberative processes is not protected," unless "the factual material . . . is so interwoven with the deliberative material that it is not severable." *Warner Commc'ns*, 742 F.2d at 1161. Because the deliberative process is "so dependent upon the individual document and the role it plays in the administrative process," the agency must "establish what deliberative process is involved, and the role played by the documents in issue in the course of that process." *Elec. Frontier Found. v. CIA*, No. C 09-3351 SBA, 2013 WL 5443048, at *12 (N.D. Cal. Sept. 30, 2013) (internal quotation marks and citations omitted).

---

[1] Much of the deliberative process privilege case law is born of litigation under the Freedom of Information Act ("FOIA"), but the privilege also applies in the criminal context. *See United States v. Fernandez*, 231 F.3d 1240, 1246 (9th Cir. 2000) (holding that U.S. Attorney's Office death penalty evaluation form and related prosecution memorandum were protected under the deliberative process privilege).

The deliberative process privilege may be overcome if a litigant's "need for the materials and the need for accurate fact-finding override the government's interest in non-disclosure." *Warner Commc'ns*, 742 F.2d at 1161. Courts have identified several factors – the "*Warner* factors" – to guide the decision whether to override a valid claim of privilege: "1) the relevance of the evidence; 2) the availability of other evidence; 3) the government's role in the litigation; and 4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions." *Id.*

## II.   Attorney-Client Privilege

The purpose of the attorney-client privilege is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). To achieve this purpose, "[c]lients must be able to consult their lawyers candidly, and the lawyers in turn must be able to provide candid legal advice." *United States v. Christensen*, 801 F.3d 970, 1007 (9th Cir. 2015). The privilege therefore protects not only the lawyer's provision of legal advice, "but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn*, 449 U.S. at 390. "[I]t is clear that an agency can be a 'client' and agency lawyers can function as 'attorneys' within the relationship contemplated by the privilege." *Coastal States Gas Corp. v Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980).

However, the fact "[t]hat a person is a lawyer does not, *ipso facto*, make all communications with that person privileged." *United States v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996). Rather, courts must examine the content and context of a communication to determine whether the attorney-client privilege applies. An eight-part test governs this inquiry:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.

5

1   *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009) (citing *In re Grand Jury*
2   *Investigation*, 974 F.2d 1068, 1071 n.2 (9th Cir. 1992)). In the agency-as-client context,
3   "[t]he privilege does not allow an agency to withhold a document or portions thereof
4   merely because it is a communication between the agency and its lawyers." *Elec. Frontier*
5   *Found.*, 2013 WL 5443048, at *16. Rather, the agency bears the burden of demonstrating
6   that the above factors are present, i.e., that "it supplied information to its lawyers with the
7   expectation of secrecy and the information was not known by or disclosed to any third
8   party." *Id.*
9         "Like all privileges, however, the attorney-client privilege is narrowly construed
10  and is limited to those situations in which its purposes will be served." *Coastal States*, 617
11  F.2d at 862. In the agency-as-client context, a communication will only be protected if the
12  agency is "dealing with its attorneys as would any private party seeking advice to protect
13  personal interests," *id.* at 863. The privilege therefore does not protect "neutral, objective
14  analyses of agency regulations" resembling "question and answer guidelines which might
15  be found in an agency manual," *id.*, but does protect "legal advice and recommendations
16  regarding agency action," *Am. Immigration Council v. U.S. Dep't of Homeland Sec.*, 21 F.
17  Supp. 3d 60, 80 (D.D.C. 2014). *See also Elec. Frontier Found. v. Dep't of Def.*, No. C 09-
18  05640 SI, 2012 WL 4364532, at *13 (N.D. Cal. Sept. 24, 2012) (holding that the attorney-
19  client privilege applied to agency communications regarding "whether certain policies
20  apply to new situations, impressions, corrections and changes to prior guidance, tentative
21  guidance, seeking input regarding future issues, and otherwise seeking legal advice that is
22  not a neutral application of established policies").

24  **DISCUSSION**
25        The 110,000 pages of PHMSA and NTSB materials are discoverable, as PHMSA
26  and NTSB identified this set of documents as responsive to the June 29 Order. The
27  question, then, is whether PHMSA and NTSB have met their burden of demonstrating the
28  privileges – either deliberative process or attorney-client – that they assert.

6

It remains true that the Court cannot possibly determine whether PHMSA and NTSB have met their burden with respect to all 110,000 pages. Accordingly, the Court will address the twelve examples provided in the parties' briefing, and otherwise invites the parties to use these findings as they prepare evidence and consider objections for trial. *See* Decl. of Nicholas Y. Lin in Supp. of Def.'s Reply ("Lin Decl."), Exs. A-L (filed under seal).[2]

First, though, the Court addresses a threshold argument PG&E makes with respect to PHMSA's and NTSB's assertions of privilege: that any claim of privilege has been waived "multiple times." PG&E Opp'n at 2-6.

### I. PHMSA and NTSB did not waive all claims of privilege.

PG&E makes three waiver arguments: first, that the Government never supported any privilege assertion during the discovery period; second, that the Government waived privilege arguments before Judge James; and third, that the Government waived privilege by voluntarily disclosing the documents to PG&E. *Id.* All three arguments are unavailing.

First, it is not fair to suggest that PHMSA and NTSB never supported any privilege claim during the discovery period. The Court ordered that the agencies produce privilege logs, June 29 Order at 29, and the agencies complied, *see, e.g.*, Gonsalves Decl. Ex. 1 (attaching privilege logs from June 16, 2015, December 31, 2015, and February 2, 2016). The Government was not ordered to provide legal support for these logs until April 4, 2016 (with briefing due four days later), and the parties *agreed* that the agencies would instead produce the previously withheld materials pursuant to a protective order. *See* Protective

---

[2] This Order is not intended to cover the few documents that PHMSA argues were "inadvertently produced" and that PG&E concedes it will not use at trial. *See* Gonsalves Decl. ¶ 7; Lin Decl. ¶ 11. However, PHMSA and PG&E disagree about whether another inadvertently produced document – a performance appraisal of one of the Government's witnesses – should be returned. *Id.* The Court agrees with PG&E that the appraisal's notation that this witness "created a document identifying possible changes to pipeline safety regulations after the San Bruno rupture . . . is highly material evidence to the defense." Lin Decl. ¶ 11. PG&E may therefore use the appraisal for this limited purpose, but the Court declines to rule on any broader use of the appraisal that may implicate the witness' private information.

7

1  Order at 1 ("The parties in the above-captioned case jointly submit this application for a
2  Protective Order regarding the documents produced on April 8, 2016."). While it is
3  certainly frustrating that the parties are litigating the privilege issue so late in this
4  prosecution, PG&E cites no authority for its assertion that the delay (caused at least in part
5  by its own willingness to sign the protective order) calls for complete waiver. The Court
6  therefore declines to take such a drastic approach.

7  Second, PG&E's argument that "[t]he government waived any privilege claims by
8  flouting two briefing deadlines set by Magistrate Judge James," PG&E Opp'n at 1, is
9  inaccurate. The Government did not simply ignore the briefing deadline set by Judge
10  James; rather, as discussed above, the Government and PG&E *agreed* (before the
11  Government's briefing deadline) that the withheld documents would instead be produced
12  pursuant to a protective order. This protective order expressly stated that in producing
13  these materials "PHMSA and the NTSB [did] not waive any of the privileges asserted over
14  them," and, it bears repeating, PG&E *agreed* to these terms. Protective Order at 1. The
15  cases PG&E cites for the proposition that "failure to respond to an argument is a waiver or
16  abandonment of the argument" are therefore inapposite. *See* PG&E Opp'n at 3 (citing
17  *Ramirez v. Ghilotti Bros.*, 941 F. Supp. 2d 1197, 1210 n.7 (N.D. Cal. 2013); *In re Online*
18  *DVD Rental Antitrust Litig.*, No. 09-2029 PJH, 2011 WL 5883772, at *12 (N.D. Cal. Nov.
19  23, 2011)). The Government did not fail to respond to Judge James's order or PG&E's
20  arguments, it simply responded in a way that did not please PG&E (despite PG&E's
21  apparent agreement).

22  Third, and similarly unavailing, is PG&E's argument that the Government waived
23  any privilege claims "by choosing to disclose all of the documents to the defendant."
24  PG&E Opp'n at 1. PG&E relies on *In re Pacific Pictures Corp.*, where the Ninth Circuit
25  noted that "[v]oluntarily disclosing privileged documents to third parties will *generally*
26  destroy the privilege." 679 F.3d 1121, 1126-27 (9th Cir. 2012) (emphasis added). But the
27  precedential value of *In re Pacific Pictures* is limited by the fact that it did not involve or
28  discuss the impact of a protective order (expressly retaining claims of privilege) on the

8

1  question of waiver; rather, the case considered the issue of "selective waiver" in the
2  context of civil litigation. *Id.* at 1127-28. However, the Ninth Circuit has considered this
3  issue in the context of Rule 16(a)(2)'s work product protections, and held that where the
4  government "consistent[ly] and systematic[ally] [retained] control" over protected
5  material, it did not waive its right to withhold the material simply by "permitting
6  Defendants access to the substantive information contained within" the material. *United*
7  *States v. Fort*, 472 F.3d 1106, 1120-21 (9th Cir. 2007). *See also United States v. Mann*, 61
8  F.3d 326, 332 (5th Cir. 1995) (holding that the government did not waive its Rule 16(a)(2)
9  protection by allowing the defendants to have conditional access to the protected
10 documents). In light of this authority, the Court declines to allow PG&E to sign a
11 stipulation agreeing that PHMSA and NTSB would retain their asserted privileges upon
12 production, only to argue waiver at the moment of production.

**II.  PHMSA and NTSB's claims of privilege must be considered on a document-by-document basis.**

For each of the twelve documents identified in the parties' briefing, the Court determines first whether the asserted privilege applies, and second whether any valid claim of privilege nevertheless gives way to PG&E's need for the document.[3] With respect to the latter analysis, it is worth noting that the circumstances of this criminal prosecution may make for an unusually high need for privileged materials. By charging PG&E with (1) obstructing a deliberative process and (2) knowingly and willfully violating regulations often subject to a deliberative process, the Government put protected materials directly at issue. PG&E's need for such materials is therefore likely to be greater than the typical criminal defendant; as PG&E argues, such materials may be necessary to "show[] that the

---

[3] Though the twelve documents were filed under seal to protect any privileged material while this issue was pending, the Court finds no need to redact its analysis of these documents. For many of the documents, a valid claim of privilege is simply overridden by PG&E's need for the materials; for others, the document is either not privileged or privileged but the Court's analysis does not unnecessarily reveal privileged material to an extent that implicates the concerns underlying the stated privilege.

9

1    pipeline regulations are unclear to the regulators themselves, and that the April 6 letter had

2    no impact on the NTSB investigation." PG&E Opp'n at 1. The Court does, of course,

3    consider each stated privilege on a document-by-document basis, but this reality animates

4    the analysis.

### a. Ex. A: USA_NTSB-354126 (D-179)

NTSB claims the deliberative process privilege over this document. Dkt. No. 534 ("Tochen Decl.") ¶¶ 6-7. The document is a July 12, 2011 email offering suggested language for inclusion in the final investigative report that NTSB would issue the following month; specifically, language concerning PG&E's pressure increases on Line 132.[4] Lin Decl., Ex. A. The document is both pre-decisional (as it relates to the final investigative report but was authored before such report) and deliberative (as it offers "suggested text" for the final report). The document is therefore protected by the privilege unless PG&E's "need for the materials and the need for accurate fact-finding override the government's interest in non-disclosure." *Warner Commc'ns*, 742 F.2d at 1161.

To that end, PG&E argues that "[o]ne of the critical issues for Count One is whether PG&E's allegedly obstructive letter was material to the NTSB's investigation." Lin Decl. ¶ 2. The letter at issue in the obstruction count was sent in response to "NTSB . . . data requests concerning instances where PG&E's planned and unplanned pressure increases exceeded the 5-year MOPs and/or MAOPs of pipelines in HCAs," SI ¶ 56; in other words, both the allegedly obstructive letter and the Ex. A email concerned PG&E's pressure

---

[4] NTSB explains that "[t]he official 'decision' of the NTSB is embodied in the facts, circumstances, probable cause and contributing causes of the incident, and recommendations found in the final investigative report." Tochen Decl. ¶ 3. PG&E seems to contest the notion that "any deliberative process privilege applies to NTSB materials." PG&E Opp'n at 8. But PG&E cites no authority for the proposition that the privilege does not extend to items like NTSB investigative reports. Without such authority, it seems apparent to the Court that as "an independent establishment of the United States Government" charged by Congress with "investigat[ing] and report[ing] on the safe transportation of hazardous material," 49 U.S.C. §§ 1111(a), (g), the NTSB's decision making is implicated by a privilege "rest[ed] . . . on the policy of protecting the decision making processes of government agencies," *Sears*, 421 U.S. at 150 (internal quotation marks omitted). *See also Lahr v. NTSB*, 569 F.3d 964, 983 (9th Cir. 2009) (holding that a Central Intelligence Agency document concerning radar tracking of airliner downed by mid-air explosion, prepared for NTSB, was covered by deliberative process privilege).

10

1   increases, and the email offers language excluding "PG&E's practice of increasing the
2   pressure . . . as contributory to the accident." Lin Decl. Ex. A.  PG&E argues this
3   "[e]vidence regarding what the NTSB considered or excluded as the cause of the accident
4   is directly relevant to whether the letter was material." *Id.* ¶ 2.  The Government provided
5   no argument against this assertion of relevance in its reply briefing.

   The *Warner* factors favor overriding NTSB's claim of deliberative process privilege over this document: first, the email is relevant because it sheds light on the materiality of PG&E's pressure increases to the NTSB investigation of the San Bruno explosion; second, PG&E cannot obtain such evidence elsewhere because evidence about what NTSB did and did not consider to be material to its investigation is by definition located in its internal documents about and preceding the investigative report; third, the NTSB plays a central role in this prosecution, as the obstruction charge is predicated upon PG&E's alleged obstruction of the NTSB's San Bruno investigation; and fourth, though disclosure of this email may hinder frank and independent discussion regarding draft language in NTSB investigation reports, this factor is overridden by the other three factors in the context of a prosecution that calls into question what was material to the NTSB investigators (as discussed above).  Accordingly, the Court now finds that PG&E's need for this email overrides NTSB's interest in non-disclosure.

### b. Ex. B: USDOJ-1084976-77 (D-241)

PHMSA claims the attorney-client privilege over this document.  Gonsalves Decl. ¶ 10.  The document is a March 2006 email thread between a PHMSA attorney and two PHMSA employees, through which one of the employees seeks guidance (from both the attorney and the other employee) on the meaning of "pipeline" in 49 C.F.R § 192.917(b) (one of the charged regulations).  Lin Decl., Ex. B; Gonsalves Decl. ¶ 10.  Though PHMSA argues the email "includes a request for legal advice and provides subjective legal analysis," Gonsalves Decl. ¶ 10, the email more closely resembles the "neutral, objective analyses of agency regulations" that are not protected by the privilege, *Coastal States*, 617 F.2d at 863.  The employee does not seek guidance for use in a specific agency action;

1 rather, he offered a hypothetical scenario involving "Pipeline A" and "Pipeline B" that
2 seems to be precisely the sort of "question and answer guidelines which might be found in
3 an agency manual" that are not protected by the privilege. *Id.* Accordingly, the Court now
4 finds that Exhibit B is not protected by the attorney-client privilege.

### c. Ex. C: USDOJ-1082776-86

PHMSA claims the deliberative process privilege over this document. Gonsalves Decl. ¶ 4(a). The document is a September 2013 email thread among PHMSA employees discussing a draft "action memorandum" from a PHMSA engineer; the attached memorandum concerns a potential amendment to the Pipeline Safety Act regulations. Lin Decl., Ex. C at USDOJ-1082776-79. The document is both pre-decisional (as it details "recommended changes" to the regulations) and deliberative (as it was circulated for the express purpose of obtaining pre-implementation feedback). *Id.* The document is therefore protected by the privilege unless PG&E's "need for the materials and the need for accurate fact-finding override the government's interest in non-disclosure." *Warner Commc'ns*, 742 F.2d at 1161.

To that end, PG&E argues the document is material to its defense because the document supports PG&E's assertion that the Pipeline Safety Act lacks a definition of "seam failure." Lin Decl. ¶ 4. Count 8 charges PG&E with violating 49 C.F.R. § 192.917(e)(4), which is triggered if, among other things, the relevant "pipe has experienced seam failure." PG&E's proposed instruction for this count includes the statement "the term 'experienced seam failure' is not defined. There is no provision in the regulations stating that 'seam failure' could be anything less than a total failure and rupture of the seam." Dkt. No. 304 at 48. PG&E highlights portions of the Ex. C document that arguably equate failure with rupture and concede that there is no definition for failure/rupture. *See, e.g.*, Lin Decl., Ex. C at USDOJ-1082782 (proposing "[a] definition of failure/rupture"); *id.* at USDOJ-1082779 (noting the "team is not aware of such a definition, so is initiating a proposal for the definition of a large release failure/rupture").

1   The Government provided no argument against this assertion of materiality in its reply
2   briefing.
3         The *Warner* factors favor overriding PHMSA's claim of deliberative process
4   privilege over this document: first, the document is relevant because it supports PG&E's
5   defense to Count 8 that the meaning of the triggering term "seam failure" was unclear;
6   second, PG&E cannot obtain such evidence elsewhere because there is no better source for
7   the meaning, or lack of clear meaning, of the Pipeline Safety Act regulations than analysis
8   by the agency charged with writing those regulations; third, as the agency charged with
9   creating and interpreting the charged regulations, PHMSA plays a central role in this
10  prosecution; and fourth, though disclosure of a draft "action memorandum" may hinder
11  frank and independent discussion regarding contemplated changes to the Pipeline Safety
12  Act regulations, this factor is overridden by the first three, especially in the context of a
13  criminal prosecution about the very meaning of those regulations (as discussed above).
14  Accordingly, the Court now finds that PG&E's need for this document overrides
15  PHMSA's interest in non-disclosure.[5]

### d. Ex. D: USDOJ-1159756-60238; Ex. E: USDOJ-1127926-8635; Ex. F: USDOJ-406607-7063; and Ex. G: USDOJ-346523-885

18        PHMSA claims the deliberative process privilege over the documents in Exhibits D
19  and E.  Gonsalves Decl. ¶¶ 4(b), (c).  Exhibits D and E are emails attaching drafts of, and
20  comments on, a PHMSA Notice of Proposed Rulemaking ("NPRM") that ultimately issued
21  on April 8, 2016.  Lin Decl. ¶ 5, Ex. D at USDOJ-1159756, Ex. E at USDOJ-1127927.
22  Exhibits F and G contain excerpts of drafts of that NPRM, which "proposes revisions to a
23  number of the charged regulations." *Id.* ¶ 5; *see also id.* Exs. F-G.  The draft NPRMs are
24  both pre-decisional (as they predate the final NPRM) and deliberative (as they were
25  circulated for the express purpose of obtaining comment).  The draft NPRMs are therefore

---

[5] It is unclear whether PG&E seeks to use only the underlying "action memorandum" at trial, or also the emails transmitting this memorandum, but the Court notes that PG&E's expressed need is so far limited to the memorandum itself.

13

protected by the privilege unless PG&E's "need for the materials and the need for accurate fact-finding override the government's interest in non-disclosure." *Warner Commc'ns*, 742 F.2d at 1161.

To that end, PG&E argues the draft NPRMs are material to its defense because they undercut the Government's allegation that PG&E failed to gather and integrate certain types of data, including "wall thickness, diameter, seam type, manufacturer, and date of manufacture," in violation of 49 C.F.R. § 192.917(b). Lin Decl. ¶ 5; SI ¶ 28. PG&E argues that "[d]rafts of the NPRM . . . reveal substantial confusion among PHMSA employees regarding [whether] 49 C.F.R. § 192.917 previously required" this data. Lin Decl. ¶ 5. For example, the excerpt contained in Exhibit G proposed "[p]ipe diameter, wall thickness, grade, and seam type" as "minimum" requirements under 49 C.F.R. § 192.917(b), *id.* Ex. G at USDOJ-346857, but elsewhere stated that "[t]he proposed requirements *expand* the minimum list of required data an operator must collect," *id.* Ex. G at USDOJ-346640 (emphasis added). Exhibit F contains similar examples. *See id.* Ex. F at USDOJ-406783 (an unknown employing commenting "Are you sure about that?" to a line in the NPRM stating the "expanded rule language does not impose new requirements or more prescriptive requirements"). The draft NPRMs were transmitted after the Government alleges PG&E violated 49 C.F.R. § 192.917(b) by not including such data. *Id.* Ex. G. at USDOJ-346523; SI ¶¶ 28, 63. The Government provided no argument against this assertion of materiality in its reply briefing.

The *Warner* factors favor overriding PHMSA's claim of deliberative process privilege over the draft NPRMs: first, the documents are relevant because they support PG&E's contention that the requirements of the charged regulations were unclear; second, PG&E cannot obtain such evidence elsewhere because there is no better source for the meaning, or lack of clear meaning, of the Pipeline Safety Act regulations than analysis by the agency charged with writing those regulations; third, PHMSA plays a central role in this prosecution (as discussed above); and fourth, though disclosure of draft NPRMs may hinder frank and independent discussion regarding contemplated changes to the Pipeline

14

1  Safety Act regulations, this factor is overridden by the first three, especially in the context
2  of a criminal prosecution about the very meaning of those regulations (as discussed above).
3  Accordingly, the Court now finds that PG&E's need for the draft NPRMs overrides
4  PHMSA's interest in non-disclosure.[6]

### e. Ex. H: USDOJ-1156391-402

PHMSA claims the deliberative process privilege over this document. Gonsalves Decl. ¶ 4(d). The document is a July 2015 email transmitting a chart that lists issues related to the NPRM discussed above. Lin Decl., Ex. E. The chart is both pre-decisional (as it predates the final NPRM) and deliberative (as it was circulated while still in the process of being completed and commented upon). *Id.* The chart is therefore protected by the privilege unless PG&E's "need for the materials and the need for accurate fact-finding override the government's interest in non-disclosure." *Warner Commc'ns*, 742 F.2d at 1161.

To that end, PG&E argues the chart is relevant to challenge the Government's assertion that "PG&E's regulatory violations . . . were motivated by the desire to maximize profits." Lin Decl. ¶ 6 (quoting Dkt. 147 at 3). Specifically, PG&E argues that the chart contains PHMSA "cost and benefit" analysis, *see, e.g.*, *id.*, Ex. H at USDOJ-1156391-93, and "[t]he fact that the government must take cost and benefit to the industry into account in proposing regulations is relevant to what an operator like PG&E may consider when it decides how to devote resources to its pipeline system," *id.* ¶ 6. The Government provided no argument against this assertion of relevance in its reply briefing.

The *Warner* factors counsel against overriding PHMSA's claim of deliberative process privilege over this chart. First, the chart is minimally relevant. Unlike the draft NPRMs themselves, the chart does not concern the meaning of Pipeline Safety Act regulations that PG&E is charged with knowingly and willfully violating. Rather, the

---

[6] *See supra* n.5 (limiting the Court's analysis to the specific materials over which PG&E has expressed a need). The Court also notes that the draft NPRMs appear to be very long; the Court's holding pertains only to the excerpts for which PG&E has sufficiently expressed a need.

15

1   chart concerns an area of the Pipeline Safety Act – consequence areas – that is not
2   contested in this criminal prosecution.  *See* Dkt. No. 460 at 10 n.6 (noting PG&E's offer to
3   stipulate that the San Bruno explosion occurred in a High Consequence Area).  Second,
4   PG&E has not explained why it cannot obtain other evidence to combat the Government's
5   "motive" argument, and the Court is not convinced that there are no avenues other than
6   internal deliberative materials to demonstrate that a federal agency takes costs into
7   consideration while planning.  The third factor is the only of the three favoring PG&E, as
8   PHMSA plays a central role in this prosecution (as discussed above).  And fourth,
9   disclosure of a chart designed to further the NPRM process may hinder frank and
10  independent discussion regarding that process.  Accordingly, the Court now finds that
11  PG&E's need for the chart does not override PHMSA's interest in non-disclosure.

### f. Ex. I: USDOJ-1082884-86

PHMSA claims the deliberative process privilege over this document.  Gonsalves Decl. ¶ 4(e).  The document is a draft correspondence from PHMSA to a United States Congresswoman in response to an inquiry about the use of federal grant funds and encroachments.  Lin Decl., Ex. I.  Though PHMSA argues this "confidential draft was an intermediate step, and thus pre-decisional to the final response [letter]," Gonsalves Decl. ¶ 4(e), this argument assumes such letters qualify as "the adoption of agency policy" for the purposes of the privilege.  *Nat'l Wildlife Fed'n*, 861 F.2d at 1117.  But the Supreme Court has made clear that "communications made after the decision and *designed to explain it*" are not predecisional (and therefore not privileged).  *Sears*, 421 U.S. at 152.  The Exhibit I letter appears to do just that; the author merely explains that "PHMSA administers its financial assistance programs in accordance with" a preexisting federal regulatory framework, and explains the interplay between PHMSA and the California Public Utilities Commission ("CPUC") with respect to the encroachment question.  Lin Decl., Ex. I at

16

1   USDOJ-1082884-86.  Accordingly, the Court finds that Exhibit I is not protected by the

2   deliberative process privilege.[7]

### g.  Ex. J: USDOJ-1104117-20

PHMSA claims the attorney-client privilege over this document.  Gonsalves Decl., Ex. 1 at 14.  The document is an April 2013 email thread between a PHMSA accident coordinator and PHMSA attorneys, in which the accident coordinator inquires about the history of a former PHMSA enforcement action against another pipeline operator.  Lin Decl., Ex. J.  PG&E correctly argues that "[t]hough the thread includes PHMSA attorneys, nothing beyond boilerplate warnings indicates that the document is privileged," and more importantly, "[n]o one on the thread is seeking legal advice and no legal advice or attorney work product is offered or discussed."  *Id.* ¶ 8.  Rather, the email is just a factual inquiry that happens to have been made to attorneys.  Accordingly, the Court finds that Exhibit J is not protected by the attorney-client privilege.

### h.  Ex. K: USDOJ-1053517-20[8]

PHMSA claims the attorney-client privilege over this document.  Gonsalves Decl., Ex. 1 at 30.  The document is a June 2011 email thread between PHMSA employees and attorneys, concerning how to respond to various press inquiries.  The thread appears to seek legal advice (how to respond to a media request about an ongoing investigation) from legal counsel (Chief Counsel for PHMSA) in a confidential manner (the thread is shared only among the PHMSA and DOT personnel who had relevant insight).  *Id.*; Lin Decl. Ex. K.  It therefore appears that PHMSA (as agency-client) is "dealing with its attorneys as would any private party seeking advice to protect personal interests."  *Coastal States*, 617

---

[7] This holding does not mean that the letter is relevant and admissible as an evidentiary matter.  Though PG&E argues that "[t]his document also is relevant to PG&E's defenses [because it] is relevant to the relationship between the CPUC and PHMSA," Lin Decl. ¶ 4, it is not immediately apparent why this letter's information about the CPUC-PHMSA relationship is relevant to PG&E's defense that it did not violate the Pipeline Safety Act.

[8] Exhibit K also includes USDOJ-1053521-27, but PG&E does not address these additional pages anywhere in its briefing or declaration.  *See* Lin Decl. ¶ 9.  As these pages appear to have been included inadvertently, the Court considers them no further.

1   F.2d at 863.  Accordingly, the Court finds that Exhibit K is protected by the attorney-client
2   privilege.
3       Though PG&E argues the email thread is related to Count 1, this is based on the
4   mere assertion that the press inquiries concerned the documentation of "joint audits of
5   PG&E by PHMSA and the CPUC, including a 2010 audit that occurred around the same
6   time as the conduct alleged in Count 1."  Lin Decl. ¶ 8.  PG&E fails to explain why an
7   inquiry about documentation for an event near in time to the NTSB investigation at issue
8   in Count 1 "lies at the heart of this litigation."  PG&E Opp'n at 7 (quoting *Cal. State
9   Foster Parent Ass'n v. Wagner*, No. C 07-05086, 2008 WL 2872775, at *5 (N.D. Cal. July
10  23, 2008)).  Exhibit K is unlike Exhibit A in this respect; it was proper to override the
11  deliberative process privilege asserted over Exhibit A because it represented "internal
12  NTSB discussions about the investigation," PG&E Opp'n at 6, which PG&E urged would
13  uniquely shed light on what was material to that investigation.  Exhibit K contains no such
14  information.  Accordingly, the Court now finds that Exhibit K remains protected by the
15  attorney-client privilege.

### i. Ex. L: USDOJ-1082185-87

PHMSA claims the attorney-client privilege over this document.  Gonsalves Decl., Ex. 1 at 60.  The document contains additional emails in the same June 2011 email thread discussed above under Exhibit K.  Exhibit L is protected by the attorney-client privilege for the same reasons discussed above, and this privilege stands for the same reasons discussed above.

**CONCLUSION**

For the reasons set forth above:

    a. Exhibit A is protected by the deliberative process privilege, but that privilege is overridden;

    b. Exhibit B is not protected by the attorney-client privilege;

18

1     c. Exhibit C is protected by the deliberative process privilege, but that privilege
2        is overridden;
3     d. Exhibit D is protected by the deliberative process privilege, but that privilege
4        is overridden;
5     e. Exhibit E is protected by the deliberative process privilege, but that privilege
6        is overridden;
7     f. Exhibit F is protected by the deliberative process privilege, but that privilege
8        is overridden;
9     g. Exhibit G is protected by the deliberative process privilege, but that privilege
10       is overridden;
11    h. Exhibit H is protected by the deliberative process privilege, and that
12       privilege is not overridden;
13    i. Exhibit I is not protected by the deliberative process privilege;
14    j. Exhibit J is not protected by the attorney-client privilege;
15    k. Exhibit K is protected by the attorney-client privilege, and that privilege
16       stands; and
17    l. Exhibit L is protected by the attorney-client privilege, and that privilege
18       stands.
19
20 **IT IS SO ORDERED.**
21
22 Dated: 06/14/16       _____
23       THELTON E. HENDERSON
      United States District Judge
24
25
26
27
28