```
                                            Volume 17

                                     Pages 2426 - 2561

                     UNITED STATES DISTRICT COURT

                   NORTHERN DISTRICT OF CALIFORNIA

             BEFORE THE HONORABLE THELTON E. HENDERSON, JUDGE

UNITED STATES OF AMERICA,          )
                                   )
              Plaintiff,           )
                                   )
   VS.                             ) NO. C 14-175 TEH
                                   )
PACIFIC GAS AND ELECTRIC COMPANY,  )
                                   )   San Francisco, California
              Defendant.           )   Friday
                                   )   July 8, 2016
_____)   9:08 a.m.

                       TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:          BRIAN STRETCH
                        United States Attorney
                        450 Golden Gate Avenue
                        San Francisco, California  94102
                        HALLIE MITCHELL HOFFMAN
                   BY:  HARTLEY M.K. WEST
                        JEFFREY BENJAMIN SCHENK
                        Assistant United States Attorneys

For Defendant:          LATHAM & WATKINS, LLP
                        505 Montgomery Street
                        19th Floor
                        San Francisco, California  94111
                   BY:  MARGARET TOUGH, ESQ.
                        STEVEN MARK BAUER, ESQ.
                        NICOLE C. VALCO, ESQ.
                        ROBERT SIMS, ESQ.

Reported by:            BELLE BALL, CSR #8785, RDR, CRR
                        DEBRA L. PAS, CSR #11916, CRR, RMR
                        Official Reporters, U.S. District Court

(Appearances continued, next page)
```

**APPEARANCES, CONTINUED:**


**For Defendant:**          CLARENCE DYER & COHEN LLP
                           899 Ellis Street
                           San Francisco, California  94109
                     BY:  KATE DYER, ESQ.


**Also Present:**          JAMES HAGGARTY, San Bruno
                              Police Department
                           FBI SPECIAL AGENT SANDRA FLORES
                           MICHAEL J. SHEPARD, ESQ.

PROCEEDINGS                                    2428

```
 1   FRIDAY, JULY 8, 2016                            9:08 A.M.

 2                   P R O C E E D I N G S

 3        (The following proceedings were held outside of the

 4        presence of the Jury)

 5             THE CLERK:  Please remain seated and come to order.

 6             THE COURT:  Okay.  We've just issued the last of our

 7   serial orders on the objections to the exhibits.  So they're

 8   available for you to review.

 9        And I want the Government to make sure they read those

10   carefully, and understand the qualifications to those

11   admissions and the foundational requirements.

12        And I'll remind everyone that we're terminating early

13   today because of a medical appointment that I have this

14   afternoon.  So we'll be breaking around 12:00 today.

15        Okay?  Ready to go?

16             MS. DYER:  I have the briefest of housekeeping

17   matters.  If I could, just for the record, clarify an exhibit

18   that was offered during the Arnett examination.

19        The defense offered --

20             THE COURT:  What?

21             MS. DYER:  During the Todd Arnett examination there

22   was an exhibit --

23             THE COURT:  Last week?

24             MS. DYER:  Oh, I think it was more than that ago,

25   Your Honor.  It may have been actually --
```

 1                  THE COURT:  What are we doing now?

 2                  MS. DYER:  We're clarifying whether it was a defense

 3     exhibit or a Government Exhibit, simply for the record.

 4                  THE COURT:  Okay.

 5                  MS. DYER:  We offered, and the Court admitted

 6     Government's 716.

 7                  THE COURT:  Uh-huh.

 8                  MS. DYER:  I think I may have said "Defense," or

 9     somehow that was in the record.  Please be clear it was

10     Government's 716.

11                  THE COURT:  Okay.

12                  MS. DYER:  That's it, Your Honor.

13                  THE COURT:  The record will -- thank you for that

14     clarification.

15                  MS. DYER:  Thank you.

16          (Trial Exhibit 716 (Previously misidentified as D-716)

17     received in evidence)

18          (The following proceedings were held in the presence of

19          the Jury)

20                  THE CLERK:  Please be seated.

21                  THE COURT:  Okay.  Good morning, and welcome back.

22     I'll remind you that we're ending early today.  We're going to

23     end at 12:00 noon today, roughly.

24          Okay.  You may proceed.

25          You are still under oath, Mr. Manegold.

1          THE WITNESS:  Thank you.

2          THE COURT:  You may proceed.

3          MS. WEST:  Okay, thank you.

4                    WILLIAM MANEGOLD,

5   called as a witness for the Plaintiff herein, having been

6   previously sworn and testified, was examined and testified

7   further as follows:

8               DIRECT EXAMINATION RESUMED

9   BY MS. WEST:

10  Q   Mr. Manegold, the first exhibit we are going to look at

11  today is Exhibit 409, which you actually don't have in the

12  binder because it is electronic.

13         MS. WEST:  So we would like to be able to show it to

14  the witness, but not up on the screens (Indicating).

15         THE CLERK:  Okay.

16         MS. WEST:  Are we sure we have the screens turned

17  off?  Should I do something here?

18         THE CLERK:  I don't have control of the screens.  We

19  can actually physically turn them off.

20         MS. WEST:  Okay.  Then maybe we could -- with

21  Your Honor's permission, we would like to bring a laptop over

22  to Mr. Manegold so that he can individually look at something

23  on the screen.

24      This is Exhibit 409.  Do you want to see the laptop first?

25         MR. BAUER:  No, that's okay.  What we need to be sure

MANEGOLD - DIRECT EXAMINATION / WEST

 1  is we have a really clear record about what he's testifying

 2  about.  If we can keep our eye on that, that will be great.

 3          **MS. WEST:**  Yes, it's going to be a disk.  And we will

 4  have him initial it (Inaudible) if you would like to.  Yes?

 5          **MR. BAUER:**  No, I'm fine with the --

 6      (Off-the-Record discussion between counsel)

 7          **MR. BAUER:**  Your Honor, is it okay if I stand to see

 8  what he's looking at?

 9          **THE COURT:**  Absolutely.

10          **MR. BAUER:**  Thank you.

11      (Witness examines document)

12  **BY MS. WEST:**

13  **Q**   Okay, Mr. Manegold, I'm showing you what's been marked for

14  identification as Government Exhibit 409.  You can scroll back

15  and forth if you want.

16      I'm going to ask if you recognize this as a PG&E

17  spreadsheet.

18  **A**   Looks like it to me.

19  **Q**   All right.

20          **MS. WEST:**  The United States offers Exhibit 409.

21          **THE COURT:**  It will be admitted.

22          **THE WITNESS:**  You don't have a mouse for this thing,

23  do you?  Oh, you're done?  Okay, good.

24          **MS. WEST:**  That's it.

25          **THE WITNESS:**  All right.

1          (Trial Exhibit 409 received in evidence)

2               **MS. WEST:**  All right.  Now we can pull it up on the

3    screen, and everyone can take a look.

4    **BY MS. WEST:**

5    **Q**   Mr. Manegold, while we're pulling it up, we'll just look

6    at the front, the first --

7               **MS. WEST:**  Just the same as Mr. Manegold looked at,

8    please.

9          (Document displayed)

10              **MS. WEST:**  Thank you.

11   **BY MS. WEST:**

12   **Q**   Mr. Manegold, you said that this is a PG&E spreadsheet.

13   Is this the 2009 risk and threat spreadsheet?

14   **A**   That's what it says.

15   **Q**   And that's what you recognize it as.

16   **A**   Um, yeah.  I don't know if it's the final version, or a

17   revision, or what, but yeah, it is one.

18   **Q**   And it states at the top "Final"?

19   **A**   Even if we prepared it as -- I'm sure it is.  But even if

20   we prepared it as final, it could be that we edited it until --

21   the intent was to make it the final version.  And sometimes we

22   -- we have comments as we went through, and until it became

23   final it was -- it still had that header on it because that was

24   the intent, that it be that.  But there could be multiple

25   versions of it.

1  Q    There were various variations of this risk and threat

2  spreadsheet over a few years.  Is that right?

3  A    Not only a few years.  There's one every year.  But

4  there's also, within a year, we would -- it might be prepared,

5  people would review it, they would have comments, they would

6  say:  We need to change this, we need to add that, this is

7  missing, until it became the final version.

8  Q    And what is --

9  A    This -- this is probably it.  If you have it.

10 Q    You say this is probably what?

11 A    This is probably it.  This is probably the final version,

12 if you have it.

13 Q    How would you be able to tell if it was the final or not?

14 Would there be red lines in the draft?

15 A    No.  I would be probably be looking at the dates.

16 (Inaudible)

17     (Reporter Interruption)

18         THE WITNESS:  The change dates.

19 BY MS. WEST:

20 Q    It would be current as of whatever the most recent date

21 is?  Is that what you're saying?

22 A    Could you rephrase that?  Sorry.

23 Q    Can you please tell us how you would be able to tell if

24 this is the final version for 2009, as the title says?

25 A    I would look at the other versions that were available on

1  the server and -- and I would also look at the change dates on

2  those different revisions.  And I -- the latest one would be

3  the final version.

4  **Q**    All right.  In any event, whether there were different

5  iterations of a final version, would you agree that this was a

6  2009 risk and threat spreadsheet for PG&E?

7  **A**    Yes.

8  **Q**    All right.  And what was the purpose of this spreadsheet,

9  please?

10 **A**    This spreadsheet was prepared in -- to help calculate the

11 risk for our system and to prepare the BAP, which showed the

12 assessment dates and the threats each segment that was in an

13 HCA was to be assessed for.  Or had -- be calculated to have, a

14 threat that it had.

15 **Q**    And what kind of information does this spreadsheet

16 contain?

17 **A**    It has pipe data.  It has data about the area around the

18 pipes.  It has -- it will have soil data in it.

19      It'll have, um --

20 **Q**    Yes, if we can scroll down a little bit?

21 **A**    I think that's it.  Pipe data, soil data, consequence data

22 which would be related to information about stuff along the

23 pipeline.

24      It might have information in there too -- I don't

25 remember -- it might have information about land data that we

1   got from the state or information that we received about care

2   facilities.  I can't remember all what's in here.

3   **Q**    Mr. Manegold, would this also contain MOP data?

4   **A**    It would.

5   **Q**    Overpressure data?

6   **A**    Um, it would -- the intent was to gather that data.  But

7   in 2009 I don't think there is anything in there.

8   **Q**    Did it contain determinations as to whether threats

9   existed?

10  **A**    Yes.

11  **Q**    You said it contains pipe data as well.  What kinds of

12  pipe data?

13  **A**    We could look.  If you want to rely on my memory --

14  **Q**    Sure.  Which tab would we look at?

15  **A**    I believe -- scroll to the right, I think.  Or "Data," the

16  Data tab.  Look at the Data tab.

17       (Document displayed)

18  **Q**    Now, on the Data tab, do you see we have a route number?

19  **A**    Correct.

20  **Q**    Segment number?

21  **A**    Yes.

22  **Q**    And we have our mile points?

23  **A**    Uh-huh.

24  **Q**    Let's scroll over to the right more, please.

25       (Document displayed)

1          **MS. WEST:**  That's great, thank you.  Please stop.

2   **BY MS. WEST:**

3   **Q**    We have Joint Efficiency.  Do you see that?

4   **A**    Yes.

5   **Q**    The type of seam, which is Column P, do you see that?

6   **A**    Yes.

7   **Q**    Let's go over to -- can we expand the -- yeah, that's it.

8   Thank you.

9          (Document displayed)

10  **BY MS. WEST:**

11  **Q**    So there is a SMYS column, do you see that?

12  **A**    I do.

13  **Q**    All right.  And then if we go over to, I think it's T,

14  wall thickness, do I have that right?

15  **A**    You do.

16  **Q**    Outside diameter is the next column over, is that right?

17  **A**    That's correct.

18  **Q**    All right.  And then, the columns X and Z, do these relate

19  to pressure test?

20  **A**    They do.

21  **Q**    Okay.  And if there are zeroes, does that mean there

22  wasn't one?

23  **A**    A zero for the pressure test, it just means that we don't

24  have a record of it in GIS.  It may or may not have a pressure

25  test.

 1  Q    But that it was not maintained in GIS, if it's zero.

 2  A    That's correct.

 3  Q    Let's scroll over more, please.  We have Test Duration,

 4  that would be column AB.  And there in AD, do you see "MAOP"?

 5  A    Yes.

 6  Q    And the next column, over SMYS_MAOP?

 7  A    Correct.

 8  Q    And then we have the MOP and SMYS MOP, correct?

 9  A    Correct.

10  Q    We have the Allowable SMYS, that looks like column AH?

11  A    Correct.

12  Q    All right, let's scroll over more, please.

13       (Document displayed)

14  Q    And this is a very long spreadsheet, isn't it?  Many,

15  many, many columns?

16  A    Yes.

17  Q    Okay.  That's why we're looking at it electronically.  We

18  have Year of Install, which looks like AG, I think.  No, no,

19  AQ.

20       Do you see Year of Install?

21  A    Yes.

22  Q    Okay.  And so far, we talked about the importance of each

23  of these categories over the last couple of days.  Correct?

24  A    We've talked about a lot of them.  I don't know if we've

25  covered them all or not.

1    Q    Let's scroll to the right more, please.

2         (Document displayed)

3    Q    All right.  Let's stop there.  And do you see BL and BM

4    columns, Assessment Plan -- and again, those are the -- the E

5    is Direct Assessment, I is ILI?  Do you see that?

6    A    Correct.

7    Q    And the Last Assessment would have the letter indicating

8    the type of assessment and the year, correct?

9    A    Correct.

10   Q    All right.  And do you happen to know, Mr. Manegold,

11   whether that information from the spreadsheet we looked at

12   yesterday regarding SMYS was pulled from a risk spreadsheet

13   like this?

14   A    I don't think it was, but I don't know that.

15   Q    Okay.  All right.

16        MS. WEST:  Thank you.  We can take that down.

17        (Document taken off display)

18   BY MS. WEST:

19   Q    Now, do you still have that binder?

20   A    Yes.

21   Q    All right.  And I think in that binder, I think it goes up

22   so that you would have 508.  Is that -- can you verify we have

23   508 in that binder, please?

24        (Witness examines documents)

25   A    Okay.

1   Q    Okay.  Mr. Manegold, look at what is marked for

2   identification as Government Exhibit 508.  Do you recognize

3   that as a document that you were involved in preparing?

4   A    I do.

5         MS. WEST:  United States offers 508.

6         THE COURT:  It'll be admitted.

7         (Trial Exhibit 508 received in evidence)

8         MS. WEST:  Let's pull up Page 1 of Exhibit 508,

9   please.

10        (Document displayed)

11  BY MS. WEST:

12  Q    What is this document, if you could tell us, please?

13  A    It's a printout of a PowerPoint presentation that Calvin

14  Liu and I made to the Pipeline Engineering Group in 2010.

15  Q    What was the purpose of this presentation?

16  A    They had asked us to come and talk to them about the MOP

17  rule in Subpart O.

18  Q    Who is "they"?  Who asked you?

19  A    The pipeline engineers; I don't know if it was the manager

20  or if it was one of the senior engineers.

21  Q    And was it -- the Pipeline Engineering Group is the name

22  of a particular group at PG&E, or was, at the time?

23  A    Yes.

24  Q    Okay.  So they were the audience for this?

25  A    Correct.

1    Q    All right.  Let's take a look, please, at Page 4, if we

2    could pull up Page 4 of this PowerPoint.

3         (Document displayed)

4              **MS. WEST:**  Thank you.

5    **BY MS. WEST:**

6    Q    Mr. Manegold, what information is on Page 4, please?

7         (Witness examines document)

8    A    It looks like it's from Subpart O; it looks like it's

9    192.917(e)(4), I think.

10   Q    All right.  And that's the section that pertains to ERW

11   pipe, correct?

12   A    Correct.  ERW and other pipe that meets the criteria of

13   B31.8S.

14   Q    Let's look now, please, at Page 7.

15        (Document displayed)

16   **BY MS. WEST:**

17   Q    What is Page 7?

18   A    It's an FAQ.

19   Q    FAQ-221?

20   A    Yes.

21   Q    And, the question posed in this FAQ is (As read):

22             "Relative to the requirement of 192.917(e)(3),

23        how much pressure increase (above the maximum

24        experienced in the preceding five years of operation)

25        will trigger the requirement to treat the segment as

1      high risk for purposes of integrity assessments."

2      Did I read that right?

3   A  Yes, you did.

4   Q  What is the answer?

5   A  Is that a question?  I'm sorry.

6   Q  What is the answer on this page?

7   A  Oh, here.

8   Q  The answer --

9   A  I'm sorry; you want me to read that.  Do you want me to

10  read that?

11  Q  Yes, please.

12  A  (As read)

13          "The rule specifies that any pressure increase,

14      regardless of amount, will require that the segment

15      be prioritized as high risk for integrity

16      assessment."

17  Q  And you understand that to be the PHMSA guidance, correct?

18  A  That's correct.

19  Q  Let's take a look, please, at Page 8.

20     (Document displayed)

21  Q  What is Page 8?

22  A  Page 8 is another section of the federal rule for gas

23  lines.

24  Q  And this is the one that we talked about the other day,

25  correct?

1   **A**    It is.

2   **Q**    192.201?

3   **A**    Yes.

4   **Q**    And that section as, it says here, pertains to the

5   required capacity of pressure relieving or limiting stations?

6   **A**    It does.

7   **Q**    And this is where a 10 percent provision is contained,

8   correct?

9   **A**    That's correct.

10  **Q**    And as we discussed the other day, do you remember

11  testifying that you agree this is outside of the integrity

12  management regulations?

13  **A**    It's outside of Subpart O; that's what I agreed to, yes.

14  **Q**    Did you tell the pipeline engineers about a 10% percent

15  overpressure allowance?

16  **A**    Oh, uh --

17  **Q**    Let me ask it this way.

18  **A**    Yeah.

19  **Q**    Why did you include this section in this presentation?

20  **A**    I don't remember exactly, but I know we were thinking that

21  10 percent overpressure allowance would be something that we

22  would be looking at for the five-year maximum that we were

23  trying to measure.  We hadn't decided what we were going to do,

24  and we would have talked to them about this.

25  **Q**    And what would you have told them about it, if you

1  remember?

2  **A**    I don't remember exactly what I told them.

3  **Q**    But you told them that this 201 provision exists?

4  **A**    Yeah.  And they were aware it existed, too.

5  **Q**    Excuse me?

6  **A**    They are aware that it existed as well; but yes, we talked

7  about it.

8  **Q**    And, were you aware, Mr. Manegold, at the time, that

9  importing this 10% provision from 201 into the Subpart O

10  regulations was directly contrary to the FAQ-221?

11  **A**    I was -- I was aware that any overpressure amount was

12  directly contrary to that FAQ.

13  **Q**    And I think we talked about this also in the last day or

14  two.  But, do you agree that there is no cushion or amount

15  specified over that is allowed under the federal rule that you

16  cite here on Page 4, regarding ERW pipe?

17  **A**    I would say that on the federal rule it doesn't say one

18  way or the other.

19  **Q**    And it says (As read):

20       "Operating pressure on the covered segment has

21       increased over the maximum operating pressure."

22       Correct?

23  **A**    Correct.

24  **Q**    And is .0001 over?

25  **A**    Where did you measure it?

1   **Q**    You're saying that over could be ambiguous.  Is that

2   right?

3   **A**    That's correct.  It could take -- there are other FAQs

4   that address tool tolerance, for instance, and the FAQ -- and

5   the rule might have considered that tool tolerance.

6   **Q**    Okay.  And, the integrity management regulations in

7   Subpart O say if it's over, it must be prioritized as a

8   high-risk segment.  Correct?

9   **A**    Yes.

10         **MS. WEST:**  Let's look at Page 1.

11      (Document displayed)

12  **BY MS. WEST:**

13  **Q**    And I would like you to read Page 9 to us, sir.

14  **A**    (As read)

15         "PG&E efforts.

16         "Box one:  When rule implemented PG&E identified

17      lines that would be affected and raised the pressure

18      accordingly.

19         "Box 2:  Since then, wrote and implemented

20      'RMI-06.'

21         "Box 3:  Monitoring MOP's yearly to ensure MOP

22      retention.

23         "Box 4:  As new HCAs are identified, other

24      segments may be affected."

25         **MS. WEST:**  And let's look, please, at Page 13.

1          (Document displayed)

2    **BY MS. WEST:**

3    **Q**    What is the purpose of this slide?

4              **THE COURT:**   Read that a little slower, if you would,

5    sir.

6    **BY MS. WEST:**

7    **Q**    Before you read it, what is the purpose of this slide?

8    **A**    Can I read it, so then I can --

9    **Q**    Yes, of course.

10   **A**    Read it first.

11         (Witness examines document)

12   **A**    It was to describe the role that the pipeline engineers

13   had in this effort.

14   **Q**    And now, if you could please read it, and a little more

15   slowly.

16   **A**    (As read)

17             "How you can help.

18             "Box 1:  Only applies to transmission pipe in

19        HCAs that do not have a valid Subpart J pressure

20        test.

21             "Box 2:  If assumed properties can be confirmed

22        as better than what is assumed, it may drop out of

23        manufacturing threat program.

24             "Box 3:  If valid pressure test done, it can

25        drop out."

MANEGOLD - DIRECT EXAMINATION / WEST

1  **Q**    Thank you.

2       I'm going to ask you to turn to -- I think it is the next

3  in your binder, should be Exhibit 533.

4       Mr. Manegold, do you recognize Exhibit 533 as an email

5  chain -- at the top it would be from Calvin Liu, correct?

6  **A**    Yes.

7  **Q**    Who reported to you at this time in 2010?

8  **A**    He did.

9  **Q**    And you're included on the email chain lower down.

10 Correct?

11 **A**    Yes.

12 **Q**    Actually, I believe this exhibit has already been

13 admitted.   533.

14          **THE CLERK:**  It has.

15          **MS. WEST:**  It was admitted July --

16          **THE COURT:**  It has been, yes.

17          **MR. BAUER:**  I have an email from you, saying it was

18 withdrawn.

19          **MS. WEST:**  533?

20          **MR. BAUER:**  Yeah, 533.  But I'll tell you what --

21          **MS. WEST:**  It's already admitted in evidence.

22          **MR. BAUER:**  I'm fine with your questioning on it.

23          **MS. WEST:**  Let's pull up Page 1 of 533, please.

24       (Document displayed)

25          **MS. WEST:**  And let's go about -- the bottom half,

MANEGOLD - DIRECT EXAMINATION / WEST                2447

```
 1   that email right there, right.  That's fine.  Thank you.

 2        (Document displayed)

 3   BY MS. WEST:

 4   Q    Okay.  Mr. Manegold, let's look at the email.  And you see

 5   yourself on the To line here?

 6   A    I do.

 7   Q    This is from Calvin Liu?

 8   A    Yes, it is.

 9   Q    All right.  And it says (As read):

10        "Pipeline engineers,

11        "As presented in last week's PLE meeting, a

12        number of pipe segments that have a potential

13        manufacturing threat may lose their published MOP due

14        to depression in operating pressure that exceeds 5

15        years."

16   Do you see that?

17   A    I do.

18   Q    And do you know if this is referring to -- "Last week's

19   PLE meeting" is referring to the slide that we just looked at?

20   A    I believe it is.

21   Q    (As read)

22        "Please review the attached spreadsheet of

23        segments affected in your area and take notice of the

24        upcoming dates."

25   What is the purpose of taking note of the upcoming dates?
```

1  A     The pipeline engineers are responsible for making sure

2  that the pressures are raised or lowered -- or raised if it can

3  be raised.

4        So the purpose of Calvin's data gathering was to find out

5  those segments that might lose their ability to operate at a

6  five-year maximum if the pressure wasn't raised to that amount.

7  And he was notifying the engineers to say:  This is that

8  maximum.  If you don't meet that date, we will lose the ability

9  to operate at that pressure without activating a manufacturing

10 threat.

11 Q     Thank you.  The email continues:

12           "Note that this spreadsheet will contain

13        additional or removed segments from the original and

14        will continue to be updated yearly."

15     And finally, it says:

16           "Please direct all questions regarding this

17        project to me..."

18     "Me" being Calvin Liu, correct?

19 A     That's correct.

20 Q     (As read)...

21           "...as I have taken over this project from Gene

22        Muse."

23     Now I think that you mentioned yesterday, I believe, that

24 you had originally asked Gene Muse to take care of this

25 tracking project?

1    **A**    That's correct.

2    **Q**    And then at some point it sounds like Calvin Liu took over

3    that project from Mr. Muse.

4    **A**    Calvin joined our group in January, and he took over the

5    work at that time.

6    **Q**    January of 2010.

7    **A**    Correct.

8    **Q**    And below, do you see embedded here one of the

9    spreadsheets -- well, there's "MOP control.PowerPoint" and then

10   there's "MOP tracking dates 2010 to 2015," and that being an

11   Excel document.

12        Do you see that?

13   **A**    I do.

14   **Q**    Let's look at the email that's above this, if we could,

15   please.

16        (Document displayed)

17   **BY MS. WEST:**

18   **Q**    All right.  This is an email from a Rick Brown.  Is that

19   correct?

20   **A**    Yes.

21   **Q**    Who is Rick Brown?

22   **A**    I believe his title was Manager of Gas Transmission

23   Planning at this time.

24   **Q**    And he writes --

25   **A**    Could have been Distribution as well.

 1  Q    And he writes to Mr. Liu (As read):

 2          "Calvin –

 3          "Is the date in column B the date that pressure

 4      must be raised by to avoid a drop in MOP?  Do we have

 5      to raise the pressure to exactly the MOP in order to

 6      retain the MOP (usually regs are set a few PSI below

 7      MOP)?"

 8       So, a couple of questions here, Mr. Manegold.  First of

 9  all, these are talking about planned pressure increases, right?

10  To retain that five-year MOP?

11  A    Right.

12          MR. BAUER:  Objection, calls for speculation.  He's

13  not on this part of the email, Your Honor.

14          THE COURT:  Do you know the answer to that question,

15  sir?

16          THE WITNESS:  Could you repeat it again?

17          MS. WEST:  Could we read that back, please?

18      (Pending question read back by the Reporter)

19          THE WITNESS:  That's correct.

20  BY MS. WEST:

21  Q    And were there also unplanned --

22          MR. BAUER:  I'm sorry; I need a ruling on the

23  objection, please.

24          THE COURT:  Pardon?

25          MR. BAUER:  I don't think you -- I might not have

 1   heard you, Your Honor.  I objected for lack of foundation

 2   because he is not on the email, and I'm not sure I heard a

 3   ruling, but then the witness answered.

 4           **THE COURT:**  Your objection wasn't for lack of

 5   foundation, Counsel.

 6           **MR. BAUER:**  He -- he is not on -- he is not on the

 7   email, so it's lack of foundation, speculation -- he doesn't

 8   have personal knowledge that --

 9           **THE COURT:**  Okay.

10           **MR. BAUER:**  Just that basic objection.

11           **THE COURT:**  Okay.  Okay.  I gotcha.  And it's

12   preserved for the record.  And I should say that all previously

13   written and spoken objections are preserved for the record, so

14   that you don't have to continue making them.  But this is a new

15   one.  I understand.

16           **MR. BAUER:**  Okay.  Thank you.

17           **THE COURT:**  Okay.

18   **BY MS. WEST:**

19   **Q**    Mr. Manegold, you understood from the email that you are

20   on, as well as Rick's response to Calvin, that these pertain to

21   planned pressure increases.  Correct?

22   **A**    I do understand that, yes.

23   **Q**    Were there occasions where the five-year maximum operating

24   pressure was exceeded during planned pressure increases?

25   **A**    Are you asking me if I knew that at this time?  Or are you

MANEGOLD - DIRECT EXAMINATION / WEST 2452

1   asking me if I know that today?

2   **Q**    Let's do it one at a time.

3   **A**    Okay.

4   **Q**    Do you know that today?

5   **A**    And do I know that they exceeded the target pressure?  Is

6   that the question?

7   **Q**    The question is:  Are you aware of there being any

8   exceedance over the five-year MOP as a result of planned

9   pressure increases?

10  **A**    On an HCA segment?

11  **Q**    Yes.

12  **A**    No, I'm not aware of that.

13  **Q**    You are not aware of that.

14  **A**    No.

15  **Q**    Are you aware of there having been any exceedances over a

16  five-year MOP that resulted from an unplanned pressure

17  increase?

18  **A**    On an HCA segment?

19  **Q**    On an HCA segment.

20  **A**    I don't know.

21  **Q**    And I take it if you say you don't know that now, that you

22  would not have known that before, either?

23  **A**    That's correct.

24  **Q**    Let's look at Calvin's response here.  Says (As read):

25          "Rick, you are correct.  The date in column B is

1          the five-year anniversary date in which MOP was last

2          reached.  In order to maintain this MOP, the pressure

3          must be raised to exactly the MOP."

4          Do you see that?

5     A    I do.

6          (Document displayed)

7     Q    And what does Calvin say after that?

8     A    "...but no more than 10 percent over."

9     Q    Mr. Manegold, this email chain, it goes through March of

10    2010.  Right?

11    A    Yes.

12    Q    Do you recall at this time that there was an upcoming

13    audit?

14    A    Yes.

15    Q    Who was that audit with, if you remember?

16    A    The CPUC.

17    Q    And did you have any role in preparing for that audit?

18    A    I did.

19    Q    Did you participate in that audit?

20    A    I did.

21    Q    Why don't you tell the jury, please, what the purpose of

22    an audit is, particularly with the CPUC.

23    A    Well, the CPUC audit in this case was to review our

24    Integrity Management Program.  And for them to determine

25    whether we were in compliance with the rules.

1          They use a series of protocols that they have developed,

2   and they ask us a series of questions, and we answer them.

3   They look at documents that -- they ask for documents, and we

4   provide them.  And at the end, they issue a report that tells

5   us whether we were in compliance or not.

6   Q    Do you recall whether the topic of potential overpressures

7   was an issue that PG&E was considering leading up to this

8   audit?

9   A    Yes.

10  Q    And was it in particular a topic that was on your mind

11  leading up to this audit?

12  A    It was.

13  Q    Were you involved in writing something referred to as a

14  "white paper" about that particular issue?

15  A    I was.

16       (Document taken off display)

17  Q    What was your -- well, let me ask you this way.  How did

18  you come to be involved in a white paper about the overpressure

19  issue?

20  A    If I'm going too far back, you can cut me off.  But in the

21  fall of 2009, we knew that there was an audit coming up with

22  the CPUC.

23       And I went and talked to my supervisor and let her know

24  that I thought we were unprepared for the audit, and I thought

25  we didn't have enough resources to address the issues that

1   would come up in the course of that audit.

2   **Q**    When you say you talked to your supervisor, who was that?

3   **A**    Sara Burke.

4   **Q**    Okay.

5   **A**    And Sara agreed, and she sought outside help to help us

6   prepare for that audit.  She let a contract with Mears Group,

7   and hired Chris Warner who had been the previous manager of

8   System Integrity to help us prepare for that audit.

9       Chris met with us, I think it was first in probably

10  December.  And he asked each group to come up with a list of

11  items that they were most concerned about for the audit that

12  was coming.  And --

13  **Q**    Let me pause you again.

14  **A**    Sure.

15  **Q**    Was the white paper your idea?

16  **A**    I don't remember.

17  **Q**    I'm going to direct you to the same grand jury transcript

18  that we looked at yesterday.

19          **MS. WEST:**  This is February 12, 2013.  And we're

20  looking at Page 150, beginning, Line 12.

21          **THE WITNESS:**  Line 12?

22  **BY MS. WEST:**

23  **Q**    Yes.  Line 12.

24      Here, you're talking about -- actually, let's back it up

25  to Line 10.

1      Do you see, you testified in the grand jury (As read):

2           "Prior to the audit in 2010 that we had -- that

3      we talked about preparing for 2009, I thought this

4      might be an issue that would come up."

5      And you are referring to --

6  A   So I did -- so I was the one that thought about it.

7  Q   And you are referring to the overpressurization issue,

8  correct?

9  A   Yes.

10         MR. BAUER:  Objection.  We should do this question

11 and answer through the transcript, not just pulling little

12 lines out of the middle of answers.  So I don't know what you

13 call that objection, but that's --

14         THE COURT:  Okay.  Completeness, let's have

15 completeness.

16         MS. WEST:  Okay.

17 BY MS. WEST:

18 Q   "And what was" -- now same page, Line 1:

19         "And what was -- did you talk about it with Sara

20      Peralta?"

21         "ANSWER:  I did."

22      Mr. Manegold, are you talking about the overpressurization

23 issue?

24 A   Yes.

25 Q   Okay.

1          "**QUESTION:**  And what was her response?"

2      Why don't you say your answer, please?

3   **A**   Which line are we on?

4   **Q**   Line 5.

5   **A**   Line 5.

6          "**ANSWER:**  The first time I talked to her

7          about it she had been -- just been supervisor

8          four or five days.  She took a lot of notes.

9          She listened but I don't remember any

10          particular response.  Then we discussed it in

11          subsequent meetings and I -- sitting here

12          now, I don't remember, other than prior to

13          the audit in 2010, that we had -- that we

14          talked about preparing for 2009.  I thought

15          this might be an issue that would come up and

16          I wanted to prepare a memo describing how we

17          had treated lines that had some amount of

18          overpressurization."

19  **Q**   And the rest of that?

20  **A**   (As read)

21          "She commented on it but her comments were she

22      didn't understand the issue."

23  **Q**   Okay.  Mr. Manegold, let's look at that phrase, just

24  before that last sentence.  You said you wanted to prepare a

25  memo describing how we -- and is "we" PG&E?

1    **A**    Correct.

2    **Q**    How PG&E had treated lines that had some amount of

3    overpressurization.  Correct?

4    **A**    That's correct.

5    **Q**    So at that time you knew that there had been

6    overpressurization on lines.  Correct?

7    **A**    Yes.

8    **Q**    And your white paper that you wrote had to do with HCA

9    segments.  Correct?

10   **A**    Right.  I just don't know if the HCA segments were

11   overpressurized.  We measure --

12   **Q**    You are saying that you knew lines were overpressurized;

13   you just didn't look at whether it pertained to particular

14   segments?  Is that your testimony?

15   **A**    We only measure pressure at a single point, at a station.

16   And most of the segments that we're concerned about are

17   downstream of that, and we don't have pressure measuring points

18   there.  So we don't know exactly what the pressure is

19   downstream.

20        So we don't know for sure whether it's overpressurized or

21   not.  And so -- unless we have another pressure monitoring

22   points downstream.

23   **Q**    Mr. Manegold, is the pressure measured at the same place

24   for both the five-year MOP and to assess the highest pressure?

25            **MR. BAUER:**  Objection, vague and compound.  Which --

1   **BY MS. WEST:**

2   **Q**    Do you understand my question?

3            **THE COURT:**  Vague?

4            **THE WITNESS:**  I'm not sure.

5            **MR. BAUER:**  Vague and compound, which location.

6   Asking about hundreds of locations in one question.

7            **THE COURT:**  Rephrase.

8   **BY MS. WEST:**

9   **Q**    Mr. Manegold, is there -- what is the place called where

10  one measures the five-year MOP for a line?

11           **MR. BAUER:**  Same objection.

12  **BY MS. WEST:**

13  **Q**    Is it called a regulator?

14  **A**    We -- we use a -- a pressure transmitter which is

15  installed near the regulator, as a proxy for pressure on the

16  rest of the line.

17  **Q**    Is that where the SCADA data comes from?

18  **A**    That's correct.

19  **Q**    Okay.  Is it possible for PG&E to install these

20  transmitter -- is that what you call them, "transmitters"?

21  **A**    Yes.

22  **Q**    Is it possible for PG&E to install transmitters along

23  every segment of a pipeline?  I'm asking:  Possible.

24  **A**    Physically possible?

25  **Q**    Physically possible.

1   **A**    Um, it can be put into the line.  I don't know if you can

2   get the space necessary to put in the telemetering equipment

3   necessary to transmit what you have found.

4   **Q**    How much space does one of those pieces of equipment take

5   up?

6   **A**    Well, you need to -- they don't take much.  But you need

7   the communications equipment to go with it.  Because it's got

8   to be able to transmit it.

9   **Q**    Okay.  How much space does that require?

10  **A**    Space for a cabinet.  So maybe as big as this desk here

11  (Indicating).

12  **Q**    So you approximated about maybe two and a half to three

13  feet?

14  **A**    Yeah.  As deep as this.  That's as much space as you need.

15  **Q**    Is there anything that physically prevented PG&E from

16  putting these monitors every two and a half to three feet on

17  its pipelines?

18  **A**    Well, they're in the middle of city streets, and there's

19  sewer lines.  So yeah, there would be physical interferences

20  with other utilities.  And so, yeah, there are some physical

21  interferences.  There are some reasons you can't do that.

22  **Q**    Is it physically impossible?

23  **A**    I don't know, because --

24  **Q**    Would it be costly?

25  **A**    Yes.

1   Q    And PG&E chose not to do that, correct?

2   A    That's correct.

3   Q    And where did PG&E choose to put its transmitters?

4   A    At regulator stations where they could be maintained.  And

5   at -- and at -- and where they were concerned about the highest

6   pressure on the pipeline being.

7   Q    Okay.  And where it was concerned about that highest

8   pressure, that's where the transmitter went, and that's where a

9   measurement was taken.  A SCADA measurement.  Correct?

10  A    Right.  There's other -- there's other SCADA points in a

11  system, and it's not always at the regulator station as the

12  only spot.  It depends on how important the line is, depends on

13  a bunch of other issues.  But --

14  Q    Who chose where to put the SCADA transmitter points?

15  A    I don't know.

16  Q    Was it PG&E?

17  A    Yes.

18  Q    Okay.  Now, you mentioned that this issue, being the

19  potential overpressurization, was something that was on your

20  mind as the audit approached.  Correct?

21  A    It was.

22  Q    Was it an important issue to you?

23  A    It was.  I would say it's probably the most important

24  issue.  Certainly, at the time of the audit, it was the most

25  important issue, I thought.  Leading up to the audit, it was

1    still probably most important.

2    **Q**    Would you agree that it was your number-one concern?

3    **A**    It was.

4    **Q**    Did you think that PG&E had a good enough response to that

5    issue?

6    **A**    No, I did not.

7    **Q**    Would you agree that your solution was to write a white

8    paper?

9    **A**    Um --

10   **Q**    Let me rephrase that.  That PG&E's solution was for a

11   white paper --

12   **A**    That is what we decided to do, yes, to address it.

13   **Q**    Did you think that that was a good solution?

14   **A**    Writing a white paper -- yes, I thought a white paper was

15   a good solution.

16   **Q**    You did?

17   **A**    I didn't think me writing a white paper was a good

18   solution.

19   **Q**    Why not?

20   **A**    Well, because I'd been wrestling with this problem for

21   some time, and I didn't know what to do.

22        A white paper is a technical review and -- a complete

23   review of a topic to figure out what you should -- how you

24   should deal with a particular problem.  And I didn't have the

25   answer.

1   **Q**    Mr. Manegold, I would like to have you look, please, at

2   Page 159 of the same transcript you have in front of you.

3        (Request complied with by the Witness)

4   **Q**    And before we get to that, you mentioned that Mears came

5   to be involved in preparing for the audit.  Correct?

6   **A**    They did.

7   **Q**    And in particular, a Chris Warner?

8   **A**    That's correct.

9   **Q**    And did Chris Warner have any thoughts that he imparted to

10  you about a white paper?

11  **A**    Um, he -- ultimately, yes, he provided comments to me on

12  -- when we talked, and he provided comments when I wrote the

13  paper that I wrote.

14  **Q**    Who instructed you to write the white paper?

15  **A**    Chris made the assignments.  I could have turned it down.

16  But Chris made the assignments.

17  **Q**    Okay.  And you said that you thought it was a good idea to

18  write the white paper, but not for you to write it.  Correct?

19  **A**    Correct.

20  **Q**    Did you think it was a terrible idea for you to write it?

21  **A**    I did.

22  **Q**    Did you think that it was probably the best that PG&E had,

23  short of saying you were going to assess all those lines?

24            **MR. BAUER:**  Objection, vague.

25            **THE COURT:**  I'm going to sustain that because I don't

1    -- vague to me.  So rephrase, if you would, Counsel.

2    **BY MS. WEST:**

3    **Q**    Mr. Manegold, did you think that you writing the white

4    paper was the best solution that PG&E had, short of assessing

5    all overpressured lines?

6    **A**    I did.

7    **Q**    Let's take a look, please, at Exhibit 549.  Do you know

8    what this is?

9    **A**    Yes, I do.

10   **Q**    What is it?

11   **A**    It's the -- it's a version of the memo that we were just

12   talking about, but it's written by Calvin Liu.

13              **MS. WEST:**  The United States offers Exhibit 549.

14              **THE COURT:**  It will be admitted.

15        (Trial Exhibit 549 received in evidence)

16              **MS. WEST:**  Can we please pull up the top half of the

17   first page.

18        (Document displayed)

19   **BY MS. WEST:**

20   **Q**    Let's take a look at Exhibit 549, Mr. Manegold.  As you

21   said, this was a version written by Calvin Liu, correct?

22   **A**    That's correct.

23   **Q**    Do you see the date on here?

24   **A**    Yes.

25   **Q**    April 12, 2010?

MANEGOLD - DIRECT EXAMINATION / WEST                    2465

```
 1   A     Yes.

 2   Q     Was that before the audit?

 3   A     It was.

 4   Q     And the Subject line here?

 5   A     "MOP + 10% Allowance."

 6   Q     And then it says:

 7               "MEMO TO FILE."

 8         Correct?

 9   A     It does.

10   Q     Do you know why this was a memo to file?

11   A     As opposed to --

12   Q     A memo to an individual.

13   A     Oh.  A memo to file would be what we often used to

14   document program steps or -- or actions or information about

15   the program that didn't fit in the procedures, or didn't fit in

16   another kind of a document that we would make.

17   Q     Thank you.

18               MS. WEST:  Let's look at the first paragraph.

19   BY MS. WEST:

20               "This memo to file documents that the operating

21         pressure in a pipeline with a manufacturing seam

22         threat, that has previously not been pressure tested,

23         will not activate unless the historical maximum

24         operating pressure (MOP) plus 10 percent is

25         exceeded."
```

MANEGOLD - DIRECT EXAMINATION / WEST                    2466

```
 1        Do you see that?
 2   A    I do.
 3   Q    And then it lists the PG&E usage of MOP versus MAOP.
 4   Correct?
 5   A    Yes.
 6   Q    And then it states (As read):
 7             "The historical MOP is obtained based on the
 8        hourly averages in SCADA for the highest operating
 9        pressure for five years preceding December 17, 2004,
10        the date at which the baseline assessment plan was
11        signed/determined."
12        Do you see that?
13   A    I do.
14   Q    (As read)
15             "The highest historical operating pressures in
16        the five years from December 17, 1999 to December 17,
17        2004 were then established as the new MOP for
18        pipelines with manufacturing seam threats."
19        Did I read that correctly?
20   A    Yes, you did.
21   Q    The white paper continues:
22             "Currently..."
23        And it refers to Section 192.917(e)(3), correct?
24   A    Correct.
25   Q    (As read)
```

1          "...does not specify any allowance past MOP for

2      ERW pipe."

3      Correct?

4  **A**   Correct.

5  **Q**   And there it underlines the language that we looked at

6  previously, where it says:

7          "increased over the maximum operating

8      pressure..."

9      Correct.

10 **A**   Correct.

11 **Q**   Below that indented language it states:

12         "Similarly, ASME B31.8S, at A..."

13     -- that's Appendix, right?

14 **A**   That's correct.

15 **Q**   (As read):

16         "...Appendix 4.4, integrity assessment does not

17     specify an allowance either."

18     Correct?

19 **A**   Correct.

20 **Q**   And then it quotes some language from ASME.  Correct?

21 **A**   Yes.

22 **Q**   And below that, it quotes FAQ-221 from PHMSA.  Correct?

23 **A**   Correct.

24 **Q**   In particular, the answer that you read to us a few

25 minutes ago (As read):

1          "The rule specifies that any pressure increase,

2      regardless of amount, will require that the segment

3      be prioritized as high risk."

4      Correct?

5  A   Correct.

6  Q   The white paper continues that (As read)

7          "This, the Code, Part 192, and ASME B31.8S do

8      not state any allowance (over or above) MOP, nor do

9      they indicate the amount..."

10     I'm sorry, I've gone to Page 2.

11     (Document displayed)

12         **MS. WEST:**  There we go.  Thank you.

13  **BY MS. WEST:**

14  Q   (As read):

15         "...nor do they indicate the amount over MOP for

16     pipelines with manufacturing seam threats to activate

17     and thus require assessments."

18     Am I reading correctly so far?

19  A   That's what the memo says.

20  Q   (As read)

21         "Although PHMSA FAQs further state that any

22     pressure increase regardless of amount will require

23     assessment, PG&E will interpret that an allowance of

24     MOP + 10% is suitable before the pipeline with a

25     manufacturing seam threat must be assessed."

1       Correct?

2  **A**    It does say that.

3  **Q**    Okay.  Let's go down, there, then it says, the Code -- it

4  talks about the Code 192.201's 10 percent, correct?

5  **A**    Yes.

6  **Q**    And below that, it says:

7           "PG&E interprets this section of the Code..."

8           That being 201, right?

9  **A**    Yes.

10 **Q**    (As read)

11          "...to also apply to transmission lines.  Once

12          the operating pressure exceeds the MOP (historical

13          operating pressure) by greater than 10%, the affected

14          pipe shall then be subject to hydrotest or other

15          approved assessment technology."

16          Did I read that correctly?

17 **A**    Yes, you did.

18 **Q**    All right.  Let's look now at Exhibit 553.

19          Mr. Manegold, is Exhibit 553 an email chain between a

20 Chih-Hung Lee and Calvin Liu?

21 **A**    Yes, it is.

22 **Q**    And did Mr. Lee report to you at this time as well?

23 **A**    Yes.

24              **MS. WEST:**  The United States offers Exhibit 553.

25              **THE COURT:**  It will be admitted.

 1       (Trial Exhibit 553 received in evidence)

 2           **MS. WEST:**  Let's start, please, with the bottom half

 3   of Page 1.  Actually, the bottom quarter of Page 1 is fine.

 4       I take it back, let's do the whole bottom half first.

 5   Thank you.

 6       (Document displayed)

 7   **BY MS. WEST:**

 8   **Q**   Okay.  And now we're looking at Calvin Liu's email to

 9   Chih-Hung Lee.  Correct?

10   **A**   Correct.

11   **Q**   April 21st, 2010?

12   **A**   Yes.

13   **Q**   All right.  And, Mr. Lui writes (As read):

14           "Chih-Hung,

15           "Please use this as the reference for LF ERW

16       pipe..."

17       That's low frequency ERW, correct?

18   **A**   That's correct.

19   **Q**   (As read)

20           "...that I'm tracking, it is the most up to date

21       list that I maintain weekly."

22       And there is embedded a spreadsheet, right?

23   **A**   That's correct.

24   **Q**   He states:

25           "I am aware and tracking Line 153..."

1

2    **A**    All right.  Small point.

3    **Q**    Yes.

4    **A**    Probably doesn't make any difference, but the

5    spreadsheet's  -- that's just a pointer to the spreadsheet.

6    The spreadsheet's not embedded.

7    **Q**    It's not a link?

8    **A**    It's a link.  It's not the -- it's not an embedded

9    document.

10   **Q**    It's a hyper link, correct?

11   **A**    Yeah.

12   **Q**    And below that chart it states (As read)

13          "If you have time, can you also look at the

14          white paper I am drafting regarding the 10% MOP

15          allowance?"

16          Do you see that?

17   **A**    I do.

18   **Q**    And there is a link to that document.  Correct?

19   **A**    Correct.

20   **Q**    Below that, it says:

21          "FYI – we have about 187 miles with this

22          threat."

23          Do you see that?

24   **A**    I do.

25   **Q**    All right.  And, then Mr. Lee, if we look at the top of

1   Page 1, responds to Mr. Lui that his comments are in the

2   attached file.  Do you see that?

3        (Witness examines document)

4   **A**    Yes.  Yes, yes.  I'm sorry.

5   **Q**    Top of Page 1.

6   **A**    Yes.

7   **Q**    Okay.

8            **MS. WEST:**  And can we look, please, at Page 2 of this

9   document.

10       (Document displayed)

11           **MS. WEST:**  All right.  If we could enlarge the bottom

12  part where we see some highlighting.

13       (Document displayed)

14  **BY MS. WEST:**

15  **Q**    And it appears that he's highlighted the word "over"?

16  **A**    Yes.

17  **Q**    And let's look at Page 3, please.

18       (Document displayed)

19           **MS. WEST:**  And if we could enlarge the top half where

20  we have the highlighting as well.

21       (Document displayed)

22           **MS. WEST:**  Thank you.

23  **BY MS. WEST:**

24  **Q**    He's highlighted the word "above," correct?

25  **A**    Yes.

1   Q    And, under FAQ-221, that "any pressure increase,

2   regardless of amount" has also been highlighted.  Correct?

3   A    Correct.

4   Q    Let's look, please, at Exhibit 560.  Do you recognize this

5   as an email chain including yourself?

6   A    Yes.

7   Q    In April of 2010?

8   A    Yes.

9        MS. WEST:  The United States offers Exhibit 560.

10       THE COURT:  It will be admitted.

11       (Trial Exhibit 560 received in evidence)

12       (Document displayed)

13  BY MS. WEST:

14  Q    And I would like to start, please, at the bottom of

15  Page 1.

16       (Document displayed)

17       MS. WEST:  Thank you.

18  BY MS. WEST:

19  Q    The bottom of Page 1 is an email from Calvin Lui to

20  yourself and Frank Dauby, is that right?

21  A    Yes.

22  Q    And this is a few days later, still April of 2010?

23  A    Yeah.

24  Q    The email states (As read):

25       "Bill & Frank,

1           "Using the preceding 5-years to determine

2      maximum historical operating pressure (as defined

3      below), there are approximately 84 miles or 443

4      segments of pipeline with a manufacturing threat that

5      has exceeded MOP."

6      Do you see that?

7  A    I do.

8  Q    And there, here's a link, or rather, a file: "Exceeding

9  MOP"?

10 A    That is the name of the file, yes.

11 Q    It says:

12           "Other notes:

13           "None of the segments have exceeded MOP plus

14     10%."

15     Do you see that?

16 A    I do.

17 Q    And below that:

18           "55 segments have pressure test data (as

19     indicated in GIS) and could possibly be removed if

20     STPRs are found."

21     Do you see that?

22 A    I do.

23 Q    Can you please tell us the distinction between having

24 pressure test data and having STPRs?

25 A    If the line has been pressure tested, the five-year --

MANEGOLD - DIRECT EXAMINATION / WEST

1  through the FAQs, the five-year MOP rule doesn't apply.  The

2  strength test qualifies the line to operate at the MAOP,

3  whether it's seen that pressure in the last five years or not.

4  Q    Is that true, only if strength test pressure reports

5  meeting the provisions in the Code exist?

6  A    For -- for lines that have the -- that are subject to the

7  manufacturing threat, yes.  It doesn't apply to DSAW lines;

8  doesn't apply to lines with a joint efficiency of 1.

9  Q    And what if there are -- if there is some data, but not

10 complete strength test pressure reports meeting all the Code

11 requirements?

12 A    The Code says it has to meet the requirements of

13 Subpart J.  And that would include all those record

14 requirements that you just alluded to.

15 Q    And is that why, if you know, Mr. Lui is saying that the

16 55 segments that appear to have some pressure test data as

17 indicated in GIS could be possibly removed if the STPRs are

18 found?

19         MR. BAUER:  Objection; calls for speculation.

20         THE COURT:  Do you know the answer to that?

21         THE WITNESS:  Is that -- he's mentioning it because

22 -- say that again?

23 BY MS. WEST:

24 Q    Do you understand Mr. Lui to be drawing a distinction

25 between the existence of some pressure test data in GIS and

1    actually finding STPRs?

2    **A**    Um --

3    **Q**    Let me ask you --

4    **A**    Yes.  Yes.

5    **Q**    Okay.  And let me ask it this way:  Is it sufficient under

6    the Code for there to be some information in GIS?  Does that

7    count as a qualified pressure test?

8    **A**    Um, it depends what the information in GIS is.

9    **Q**    The Code requires an STPR.  Correct?

10   **A**    It doesn't call it that.  I think there's like seven or

11   eight things that have to be retained for the life of the

12   facility on the test.  And PG&E stores them on that strength

13   test pressure report.

14   **Q**    Okay.  Thank you for that clarification.  You said seven

15   or eight things that the Code requires for it to be complete.

16   Correct?

17   **A**    Yes.

18   **Q**    And if some of those are missing, is it a complete and

19   valid pressure test record?

20            **MR. BAUER:**  Objection; calls for a legal conclusion.

21            **THE COURT:**  You may answer.

22            **THE WITNESS:**  That's what I believe.  If it doesn't

23   have the requirements of the Code for a complete test, it's not

24   a complete test.

25

1    **BY MS. WEST:**

2    **Q**    And were you familiar in the course of your job for -- I

3    can't remember, I think it was three decades at PG&E -- with

4    the requirements under the Code for strength test pressure

5    reports?

6    **A**    I don't know if I was at this time, but I was at different

7    times.

8    **Q**    Are you now?

9    **A**    No, I would have to get that book back.

10   **Q**    Okay.  You remember there being seven or eight

11   requirements?

12   **A**    Yes, yes.

13   **Q**    Correct?

14   **A**    Yes.

15   **Q**    And you know enough to know that if they were not all

16   maintained, that it was not a complete record, under the Code.

17          **MR. BAUER:**  Same objection, Your Honor.

18          **THE COURT:**  Same ruling.

19          **THE WITNESS:**  I didn't consider it a complete record.

20   **BY MS. WEST:**

21   **Q**    Let's look at Page 2.  The very bottom, please.

22          (Document displayed)

23          **MS. WEST:**  Thank you.

24   **BY MS. WEST:**

25   **Q**    At the end of his email, Mr. Lui refers again to FAQ-221.

1   Correct?

2   **A**    He does.

3   **Q**    And in particular:

4           "The rule specifies that any pressure increase,

5           regardless of amount, will require that the segment

6           be prioritized as high risk for integrity

7           assessment."

8           Do you see that?

9   **A**    I do.

10  **Q**    Let's look back at Page 1, the middle of the page.  And

11  this is Frank Dauby's response to Mr. Lui and to yourself.

12  Correct?

13          (Document displayed)

14  **A**    Yes.

15  **Q**    Mr. Dauby writes (As read):

16          "How did you calculate the 84 miles as I only

17          get 44.12 miles when I added up the footages in

18          column AQ?  Also, are all of these miles in HCA?

19          Seems like there are a lot of assumed values in the

20          pipe specification values that would likely be..."

21          I think he means "our" --

22          "...our first way to address these.  I'm

23          confused as to what happened to all the work that

24          Gene did on this issue."

25          Do you see that?

1    **A**    I do.

2    **Q**    And he's referring to Gene Muse?

3    **A**    Yes.

4    **Q**    And Mr. Lui responds, if we look at the very top of

5    Page 1.

6         (Document displayed)

7    **Q**    He says (As read):

8              "My apologies I sent out the excel file with the

9         filter on column S set to 'LOSS MOP.'  Please set

10        that filter to 'ALL'.  Then all rows for the

11        spreadsheet will show up and the footages will sum to

12        84 miles."

13   **A**    That's correct.

14   **Q**    He continues:

15             "Yes – all these segments are in HCA and greater

16        than 20% SMYS MOP."

17        Do you understand the significance of it being over 20

18   percent SMYS MOP?

19   **A**    I don't know why he mentioned that.

20   **Q**    Is that one of the definitions for transmission pipe?

21   **A**    It's one of the criteria.  But if it's an HCA, it's in

22   transmission.  We don't have HCAs in non-transmission.  So I

23   don't know why he would mention that it was over 20 percent.

24   **Q**    Thank you.  He continues:

25             "I understand that there are a lot of assumed

1          values and I'm currently working to address this, as

2          Gene had, when he was working on this project."

3          He then says:

4               "Much of Gene's work has been incorporated into

5          GIS..."

6          Correct?

7    A     Correct.

8    Q     (As read)

9               "...and this spreadsheet however there is still

10         a lot more to address since this threat is prevalent

11         throughout the system – approximately 189 miles."

12         Do you see that?

13   A     I do.

14   Q     Okay.  I would like to look now at Exhibit 558.

15         Is this an email from Calvin Lui to yourself,

16   Mr. Manegold?

17   A     Yes, it is.

18              MS. WEST:  Okay.  The Government offers Exhibit 558.

19              THE COURT:  558 is admitted.

20         (Trial Exhibit 558 received in evidence)

21              MS. WEST:  Thank you.  Let's pull up Page 1 of

22   Exhibit 558, please.

23         (Document displayed)

24              MS. WEST:  Let's just look at the top quarter.

25         (Document displayed)

1    **BY MS. WEST:**

2    **Q**    Okay, Mr. Manegold, this is actually the bottom of the

3    chain that we just read from Exhibit 560, correct?

4    **A**    Let me look.  Sorry.

5         (Witness examines document)

6    **A**    Yes.

7    **Q**    Okay.  And this one actually has an attachment which is

8    that spreadsheet, "Exceeding MOP"?  Do you see that in the

9    header?

10   **A**    Yes.

11   **Q**    I would like us to take a look at that spreadsheet that is

12   attached.

13        If we could please pull up the spreadsheet.  And, as we

14   saw in Exhibit 560 with Mr. Liu's instructions, if we could

15   open column S and select "ALL."

16        (Document displayed)

17            **MS. WEST:**  Thank you.

18   **BY MS. WEST:**

19   **Q**    Now, did you understand that this spreadsheet was

20   something that could be filtered by line?

21   **A**    Um --

22   **Q**    Did you ever look at the spreadsheet that Mr. Lui sent

23   you?

24   **A**    I don't know if I did or not.

25   **Q**    You don't remember?

1   **A**    It looks like -- well, when he sent it to me, it's the

2   time when I just came back from vacation.  So I probably did,

3   but I just don't remember it.

4   **Q**    All right.  Let's please filter the spreadsheet for Lines

5   153, 132, and 191-1.

6       (Document displayed)

7   **Q**    Do you see those on the screen in front of you,

8   Mr. Manegold?

9   **A**    I do.

10  **Q**    All right.  And let's take a look at, first -- column C is

11  where it lists the line.  Correct?

12  **A**    Yes.

13  **Q**    All right.  And then we have got our mile points.  Is that

14  right?

15  **A**    Yes.

16  **Q**    Okay.  And then column F, "Segment Active" and these all

17  have a "Y."  Presumably -- is that yes?

18  **A**    Yes.

19  **Q**    Okay.  Then we see our "5-Year High MOP."

20      Do you see that?

21  **A**    Yes.

22  **Q**    Column G.  And then we have the date that that five-year

23  high was established in column H, is that correct?

24  **A**    Correct.

25  **Q**    And then the column I is "5-Year Exceeded," correct?

1   **A**    Correct.

2   **Q**    And all of those say "Yes."

3   **A**    That's correct.

4   **Q**    And then we also have a column for whether the MOP has

5   exceeded MAOP.  Is that column J?

6   **A**    Yes.

7   **Q**    And it says:

8          "Yes!  Yes!  Yes!  Yes!  Yes!"

9          Do you see that?

10  **A**    Yes.

11  **Q**    And I would like to go down -- let's look at L and M.  The

12  L is the "5-Year Exceeded MOP," correct?

13  **A**    That's what it says, yes.

14  **Q**    And M says "5-Year Exceed Date (Post 2005)," correct?

15  **A**    Correct.

16  **Q**    Let's look at, please -- you've got to go down a little

17  ways -- to AU and AV.

18          (Document displayed)

19          **MS. WEST:**  There we go.  And this highlighting is in

20  the original.

21  **BY MS. WEST:**

22  **Q**    Do you see there, Column AU is "HCA ID"?

23  **A**    I do.

24  **Q**    Do you understand what that means?

25  **A**    Yes.

1   **Q**    What is it?

2   **A**    It's telling you whether it's an HCA or not.  And if it's

3   an I, or an A or a B is the prefix, then it's a HCA.

4   **Q**    And is there something in particular that the I means?

5   **A**    I means that -- in the original review for HCAs that we

6   did back in 2004, the letters were to try to identify which

7   HCAs were HCAs by virtue of there being an identified site

8   within the potential impact circle.

9        A meant it was -- it was an HCA because there were 20 or

10  more structures within the impact circle.  And B, if it was the

11  prefix, meant that it is an HCA because it had both an

12  identified site and more than 20 buildings.

13       We didn't always maintain those letters.  It was a lot of

14  work, and it wasn't required.  But that's what the initial

15  assignments were about.

16  **Q**    And here we do see I's preceding numbers, correct?

17  **A**    Correct.

18  **Q**    And can you give us an example of an identified site that

19  would give it an I denotation?

20  **A**    A school.

21  **Q**    And how about the numbers after the I's?  1, 5, 9?

22  **A**    Those are the reviewers.  The person that did the review

23  that identified it as an HCA, 1 would have been Chris Warner.

24  5, I think, was Dan Curtis.  9 would have been Thach Ha.

25  **Q**    Okay.  And then column AV, do you see "MANUF" -- can we

1    expand AV, please?

2        (Document displayed)

3            **MS. WEST:**   Thank you.

4    **BY MS. WEST:**

5    **Q**    Do you understand that to mean manufacturing threat?

6    **A**    I do.

7    **Q**    Okay.  And again, "Yes, Yes, Yes," all the way down.

8    Correct?

9    **A**    Right.

10   **Q**    So according to this chart, there is a manufacturing

11   threat on each of these HCA segments, correct?

12   **A**    Yes, although I don't know -- I think we talked the other

13   day, there's two criteria within B31.8S, Appendix A, that

14   identifies manufacturing issues.  One is a threat that requires

15   assessment.  One is a situation that needs to be monitored, and

16   preventative measures taken --

17   **Q**    Let me ask my question again, Mr. Manegold.

18   **A**    And I don't -- okay.

19   **Q**    My question was, according to this chart, there is a

20   manufacturing threat on each of these HCA segments.  Correct?

21   **A**    So, the answer is:  I don't know.

22   **Q**    You don't know if this chart says "Yes, Yes, Yes, Yes"?

23   **A**    I know the chart says it.  I thought you asked me if it

24   had the threat.  I'm sorry.

25   **Q**    No, my question is:  According to this chart --

1   **A**    Yes, you're right.  Yes.

2   **Q**    And according to this chart, based on the columns we

3   already looked at, the five-year MOP was exceeded for each of

4   these.  Correct?

5   **A**    Yes.

6   **Q**    Let's look at Exhibit 565, please.  Do you recognize

7   Exhibit 565 as an email from Mr. Lui to you?

8   **A**    Yes.

9            **MS. WEST:**  United States offers Exhibit 565.

10           **THE COURT:**  565 will be admitted.

11       (Trial Exhibit 565 received in evidence)

12           **THE COURT:**  And without rushing yourself, give some

13   thought to when we'll take our first and only recess today.

14           **MS. WEST:**  Yes, Your Honor.

15       (Document displayed)

16           **MS. WEST:**  Can we expand, please?

17       (Document displayed)

18           **MS. WEST:**  Thank you.

19   **BY MS. WEST:**

20   **Q**    Mr. Manegold, this email from Calvin Lui to you is

21   May 3rd, 2010.  Correct?

22   **A**    That's correct.

23   **Q**    Okay.  So, just a few days after the last email we looked

24   at.  Yes?

25   **A**    Yes.

1  Q    The subject is "MOP + 10% Allowance for Manufacturing Seam

2  Threat."  Correct?

3  A    Correct.

4  Q    And Mr. Lui writes:

5         "Bill,

6         "Please take a look, and after let's discuss

7     since it seems to be a big issue with the audit

8     looming."

9     And there is a document attached.  Correct?

10 A    Yes.

11 Q    Or it appears that it's maybe a link to it?

12 A    Yes, yes.

13 Q    Okay.  And is that link to a document where part of the

14 title is "Weld" -- appears to be:

15        "Weld Construction Material Threats\MOP

16     SeamIssues\Documents\MOP10%allowance.doc"?

17 A    Yes.  The file name is the MOP part.  The other part are

18 just folders.

19 Q    Okay.  And do you know whether this document was the white

20 paper that Mr. Lui wrote?

21 A    It's not attached, so I can't tell.  But I assume it was.

22 Q    Let's look back, and we don't need to change the screen,

23 but Mr. Manegold, if you wouldn't mind looking back at

24 Exhibit 553, please.

25     And in particular, the bottom of Page 1, where Mr. Lui

1    sends his draft white paper to Chih-Hung Lee.

2        Do you recognize that as the same file path document "MOP

3    10% allowance"?

4    **A**    It appears to be, yes.

5    **Q**    All right.

6            **MS. WEST:**   Now would be a fine time for a break,

7    Your Honor.

8            **THE COURT:**   Okay.   Thank you, Counsel.

9        Okay.   Court's in recess for 15 minutes.

10       (Jury excused)

11       (Recess taken from 10:19 a.m. to 10:39 a.m.)

12           **THE COURT:**   Okay.   Let's call out the jury.

13       (Jury enters the courtroom at 10:39 a.m.)

14           **THE COURT:**   You may begin when you're ready, counsel.

15           **MS. WEST:**   Thank you.

16   **BY MS. WEST:**

17   **Q**    Mr. Manegold, I placed in front of you a second Grand Jury

18   transcript, so if you could just keep those at hand.   You

19   testified in the Grand Jury more than once, correct?

20   **A**    I did.

21   **Q**    Three times?

22   **A**    That's correct.

23   **Q**    Okay.   So now you have in front of you your October -- it

24   should be an October transcript.   That's the one that we have

25   been looking at -- I'm sorry, February.   February 2013, that's

1    the first one.  Do you see that?

2    **A**    Correct, correct.

3    **Q**    And then there is also a May 2013 transcript, correct?

4    **A**    Yes, there is.

5    **Q**    Okay, great.

6         Mr. Manegold, before we go on to the next exhibit, I want

7    to ask you if you agree that the issue of lines exceeding

8    historical MOP was a problem at PG&E?

9    **A**    Yes.

10   **Q**    And would you agree that the 84 miles that we saw in

11   Mr. Lui's email where he says:

12              "84 miles with a manufacturing threat

13         that has exceeded MOP."

14        Then he clarifies that all those segments are in HCAs.

15   Would you agree that that is significant?

16              **MR. BAUER:**    Objection.  Compound and vague.

17              **THE COURT:**    I will allow that testimony.

18   **A**    Yes.

19   **BY MS. WEST:**

20   **Q**    Yes, you agree it is significant?

21   **A**    I do.

22   **Q**    Let's look at Exhibit 572.  Now, Mr. Manegold, I think you

23   already testified that at some point you actually wrote the

24   white paper, correct?

25   **A**    Yes.  Do I need to have 572?

 1  Q     Looks like we're into the next binder.

 2        (Whereupon exhibit binder was tendered to the witness.)

 3  Q     And do you now have 572 in front of you?

 4  A     I do.

 5  Q     This is an email from you?

 6  A     Yes.

 7          MS. WEST:  United States offers Exhibit 572.

 8          THE COURT:  It will be admitted.

 9        (Trial Exhibit 572 received in evidence.)

10          MS. WEST:  If we could please pull up Page 1 and

11  enlarge so we can see?  Thank you.

12        (Document displayed)

13  BY MS. WEST:

14  Q     Mr. Manegold, this email from you is dated May 17, 2010,

15  correct?

16  A     Yes, it is.

17  Q     The subject is "Seam Weld Threat."  Do you see that?

18  A     I do.

19  Q     There is an attachment "MOP 10 Percent Allowance R1,"

20  correct?

21  A     Correct.

22  Q     Is that Revision 1?

23  A     That's what I believe, yes.

24  Q     Well, you titled it, correct?

25  A     I titled it, yes.

1  Q   And you sent it to Sara Burke, Calvin Lui, Thach Ha,

2  Chi-Hung Lee, Chris Warner, Daniel Curtis and Frank Dauby,

3  correct?

4  A   Correct.

5  Q   Why did you send it to these people?

6  A   I wanted their comments.

7  Q   Okay.  And your text in this email is:

8           "My interpretation of what activates the

9        manufacturing threat for seam weld pipe.

10        Comments?"

11     Correct?

12  A   Correct.

13  Q   All right.  Let's take a look at your attachment.  And

14  this is your version of the white paper, correct?

15  A   It's a memo to file.  I wouldn't -- it was -- we

16  originally planned to write a white paper.  I wouldn't exactly

17  call this a white paper, but it's a memo to file.

18  Q   A memo to file?

19  A   Yes.

20  Q   Have you referred to it in the past as a white paper?

21  A   It was the goal to make it a white paper, yes.

22  Q   Okay.

23       **MS. WEST:**  Let's expand, if we could, please, the

24  text of this memo to file.

25  Q   And the date, incidentally, is May 17, 2010?

1   **A**    Correct.

2   **Q**    In the header I'm looking at, it says:  "To:  File.  From:

3   William Manegold"?

4   **A**    Yes.

5   **Q**    (As read)

6            "Memo to File:  This memo to file documents that

7        the operating pressure in a pipeline within a high

8        consequence area that has an identified manufacturing

9        seam threat and that has previously not been pressure

10       tested in accordance with Subpart J will not activate

11       nor require assessment as a high risk segment unless

12       the historical maximum operating pressure is exceeded

13       or unless there is a seam weld failure."

14       So far, so good?

15  **A**    Yes.

16  **Q**    Okay.  So one is exceedance and two is seam weld failure,

17  right?

18  **A**    Correct.

19  **Q**    Okay.  Then you say similar to what Mr. Lui said in his

20  directive:

21            "That the historical MOP is obtained

22        based on hourly averages in SCADA."

23       Correct?

24  **A**    Correct.

25  **Q**    (As read)

MANEGOLD - DIRECT EXAMINATION / WEST       2493

```
 1              "For the highest operating pressure for
 2          five years."
 3      Correct?
 4  A   Correct.
 5  Q   Okay.  Then let's look at the third paragraph:
 6              "Currently PG&E uses a five year rolling
 7      historical maximum to define the MOP limits that
 8      define the activation of the seam weld threat."
 9      Correct?
10  A   That's correct.
11  Q   Okay.  And is that the five year MOP that we've seen in a
12  few spreadsheets now?
13  A   I believe so.
14  Q   (As read)
15              "Additionally, as new HCAs are identified that
16      have a seam weld threat, the threshold five year MOP
17      necessary to trigger a seam evaluation is based on
18      the date the new HCA was identified."
19      Correct?
20  A   That's correct.
21  Q   Okay.  Let's look at the next paragraph.
22          MS. WEST:  And if we could highlight the next
23  paragraph, please?
24      (Document highlighted.)
25          MS. WEST:  Thank you.
```

1    BY MS. WEST:

2    Q    (As read)

3              "While the limits against increasing the

4         maximum operating pressure for HCA piping

5         with a seam threat are absolute."

6    Did I read that right?

7    A    You did.

8    Q    (As read)

9         "45 CFR 192.201 recognizes some drift in

10   pressure control equipment setpoints is inevitable

11   between maintenance periods."

12   Correct?

13   A    Correct.

14   Q    (As read)

15        "For HCA pipe with a seam weld threat, operating

16   pressure excursions about these CFR established

17   limits will trigger the activation of the seam weld

18   threat."

19   Correct?

20   A    Correct.

21   Q    Okay.  So here you're saying if it goes more than

22   10 percent over the five year MOP, PG&E will treat it as an

23   activated threat, correct?

24   A    That's correct.

25             MS. WEST:  The last paragraph, could we highlight

1    that, please?

2         (Document highlighted)

3    **BY MS. WEST:**

4    **Q**    (As read)

5              "Should such an event occur, PG&E will

6         consider the pipe to be high risk piping and

7         will schedule an assessment in accordance

8         with the requirements of RMP-06."

9         Did I read that right?

10   **A**    You did.

11   **Q**    And just to confirm, Mr. Manegold, do you agree that this

12   is directly contradictory to FAQ 221, correct?

13   **A**    I agree it contradicts 221, yes.

14   **Q**    Let's take a look at 573.

15        (Document displayed)

16   **Q**    Is 573 a forward of your -- sorry, a reply from Sara

17   Burke, then Peralta, to your email with your draft white paper?

18   **A**    Yes.

19             **MS. WEST:**  The United States offers Exhibit 573.

20             **THE COURT:**  573 is admitted.

21        (Trial Exhibit 573 received in evidence.)

22             **MS. WEST:**  Can we expand the top part of this,

23   please?

24        (Document displayed.)

25             **MS. WEST:**  That's great.  Thank you.

1  **BY MS. WEST:**

2  **Q**    Your supervisor -- she's your supervisor at the time,

3  right?

4  **A**    That's correct.

5  **Q**    She responds to you that she does not have a whole lot of

6  background on the issue.  The interpretation seems logical, and

7  she has two minor comments, correct?

8  **A**    Correct.

9  **Q**    Okay.  Let's take a look at her comments.

10          **MS. WEST:**  If we could go to the next page?  Thank

11  you.  And if we could expand just the very bottom.  Let's

12  see -- no, the three paragraphs up.  There you go.  That's

13  great.  And then through the bottom.  There you go.  Thank you.

14      (Document displayed.)

15  **BY MS. WEST:**

16  **Q**    Okay.  This looks like a red lined version, correct, with

17  a mark on the side?

18  **A**    I think so.

19  **Q**    Okay.  And her comments, as she says, there are two.  Do

20  you see the first?  It says, where you had:

21              "For HCA pipe with a seam weld threat

22              operating pressure excursions about the CFR

23              established limits will trigger the

24              activation of the seam weld threat."

25      Her comment was, she suggested a different word instead of

1    the word "about."  Do you see that?

2    **A**    Yes, I do.

3    **Q**    All right.  And let's look at the very bottom edit, her

4    other comment.  She says:

5                   "The memo is titled MOP 10 Percent

6              Allowance, but we do not explicitly mention?"

7         Do you see that?

8    **A**    I do.

9    **Q**    Now, it appears that you did not email your memo to file

10   to Bob Fassett, is that right?

11   **A**    That's correct.

12   **Q**    At this time was he your direct supervisor?

13   **A**    No, he wasn't.

14   **Q**    He was your supervisor's supervisor, correct?

15   **A**    That's correct.

16   **Q**    Did you discuss your draft white paper that you were

17   working on with Mr. Fassett?

18   **A**    I discussed this issue.  I don't remember if I discussed

19   this white paper or not.  I discussed the issue, but I don't

20   remember if this paper was something that Bob and I talked

21   about.

22   **Q**    And when you say you discussed --

23   **A**    I don't think so, but I don't know.

24   **Q**    When you say you discussed this issue, you mean this

25   10 percent overpressure allowance, correct?

1  A    Well, that and the issue of just pipes exceeding their

2  MOP.

3  Q    You discussed both of those with him, correct?

4  A    Yes.

5  Q    Did -- do you remember when you discussed it with him?

6  A    Sometime in the first half of the year, but I don't

7  remember explicitly, no.

8  Q    Do you remember discussing with him the same day that he

9  took on his job as supervising in that section?

10 A    10 percent, no.  When -- when he took that job on, what I

11 talked to him about was the issue in general of monitoring the

12 MOPs.  He had -- we just started to develop a program and I

13 talked to him about what we were going to do.

14 Q    And what did you tell him you were going to do?

15 A    I told him we were going to monitor the five year MOP;

16 that I went through with him what each employee in my group was

17 doing and I told him that I had assigned this task to Gene.

18 Q    Do you know if he was aware of the issue of the 10 percent

19 over MAOP?

20 A    I believe he was.

21 Q    Why do you believe that?

22 A    Because I think I talked to him about it.

23 Q    Do you think so or you know so?

24 A    I can't remember the explicit conversation, so I can't say

25 I know it.

1  Q    Would you agree that you apprised him of it on a number of

2  occasions?

3  A    I believe I did.

4  Q    But you don't remember a particular response?

5  A    No.

6  Q    Do you agree that he did not object to -- well, let me

7  back up.

8      While you're working on this memo to file and Mr. Lui

9  worked on the draft white paper as well, did PG&E hydrotest any

10 of the HCA segments that had been identified as having an

11 overpressure exceeding the five year MOP?

12           MR. BAUER:   Objection.   Assumes facts not in

13 evidence.

14           THE COURT:   Rephrase, counsel.

15 BY MS. WEST:

16 Q    Do you remember looking at twice, because it was contained

17 in two exhibits, the email and attached spreadsheet from Calvin

18 Lui identifying 84 miles of HCA segments with pressures that

19 exceeded the five year MOP?

20 A    I remember looking at the -- I remember that I looked at

21 that spreadsheet that Calvin produced, the one that we looked

22 at earlier.

23 Q    And do you know whether PG&E hydrotested any of those

24 segments before the CPUC audit?

25 A    To my knowledge, no, we did not.

1  Q    Was there a decision to just wait?

2  A    Yes.

3  Q    Did you talk to Mr. Fassett about the decision to wait?

4  A    I don't know when I last talked to him, so what we're

5  talking about is the time period between when Calvin made the

6  spreadsheet and the audit in May.  So I --

7  Q    Let me stop you.

8  A    Yeah.

9  Q    Would you agree that Mr. Fassett did not object that PG&E

10 had not taken action on those segments?

11 A    One more time?

12 Q    Would you agree that Mr. Fassett did not object that PG&E

13 had not taken action on those segments?

14 A    I would agree with that.

15 Q    You do agree with that?

16 A    Yes.

17 Q    And, in fact, Mr. Fassett made it very clear to you when

18 he disapproved of something you were doing, correct?

19 A    That's correct.

20 Q    Let's take a look at Exhibit 575, please.

21      (Witness complied.)

22 Q    This is an email response to your draft white paper from

23 Daniel Curtis?

24 A    Yes, it is.

25         **MS. WEST:**  United States offers Exhibit 575.

1          **THE COURT:**  575 is admitted.

2       (Trial Exhibit 575 received in evidence.)

3          **MS. WEST:**  Can we please pull up Page 1?  And the top

4    part just, so we can read it.  Thank you.

5       (Document displayed)

6    **BY MS. WEST:**

7    **Q**    And Mr. Curtis just says here, Mr. Manegold:

8          "Bill, comments within attached document.  Good

9          luck in the audit."

10       Correct?

11   **A**    Correct.

12   **Q**    If we could now look at the attached comments?  And, in

13   particular, if we could look at Page 3.

14          **MS. WEST:**  And the bottom red part would be fine.

15   Thank you.  Thank you.

16       (Document displayed)

17   **BY MS. WEST:**

18   **Q**    Okay.  Mr. Manegold, you have the context in front of you

19   in the document.  I have it expanded, a certain part of it, on

20   the screen.

21       But the red comments that we have on the screen are just

22   below your paragraph where you cite to 49 CFR 192.201, correct?

23   **A**    Correct.

24   **Q**    And let's look at the comment that you received from

25   Mr. Curtis.  Would you mind reading that to us, please?

1   A      (As read)

2              "You know, of course, that FAQ 221 addresses

3          this issue.  FAQ 221 is as follows."

4   Q      Let me stop you there.  He then puts in FAQ 221, correct?

5   A      Correct.

6   Q      Including:

7              "The rule specifies that any pressure increase,

8          regardless of amount, will require that the segment

9          be prioritized as high risk for integrity

10         assessment."

11         Correct?

12  A      That's correct.

13  Q      And what was Mr. Curtis' relationship to you at the

14  company at the time?

15  A      Mr. Curtis was a contractor for Mears that was -- that was

16  working for me.

17  Q      And he was somebody that you had solicited his comments?

18  A      Yes.

19  Q      So if you can remember back to Mr. Lui's draft, Mr. Lui

20  had FAQ 221 in it, correct?

21  A      It did.

22  Q      And you took it out, correct?

23  A      Yes.

24  Q      And Mr. Curtis puts it back in, correct?

25  A      That's his comment, yes.

1  Q    All right.  Let's look now, please, at -- we're going to

2  turn to 578, but before we get there, let's talk about the

3  audit for a moment.

4       You said you were involved in preparing for it, correct?

5  A    Yes.

6  Q    And you actually participated in it?

7  A    Yes, I did.

8  Q    What was your role participating in the audit?

9  A    I helped respond to various questions that the CPUC had

10 about the HCA identification, risk analysis and threat analysis

11 that we did.

12 Q    You said this was -- do I have it right, that this was to

13 be an audit of PG&E's integrity management practices?

14 A    Program.

15 Q    Program?

16 A    Yes.

17 Q    Okay.  You testified that this overpressure issue had

18 been a -- that -- I think you said the number one issue for you

19 leading up to the audit?

20 A    Yes.

21 Q    Did you discuss this during the audit with CPUC?

22 A    No.

23 Q    Did you raise the issue?

24 A    I did not.

25 Q    Were you instructed not to raise the issue?

1  **A**     No.

2  **Q**     Did anyone instruct -- nobody instructed you not to raise

3  this?

4  **A**     No.

5  **Q**     Were you instructed -- given an instruction more broadly

6  not to raise issues that CPUC did not ask?

7  **A**     I was asked to answer the questions that I was asked and

8  to not answer questions that weren't asked.

9  **Q**     Is there any reason that you can think of that the CPUC

10  would have thought to ask whether you were not following the

11  Code and its FAQ for overpressures?

12          **MR. BAUER:**  Objection.  Argumentative and calls for

13  speculation of CPUC's thought process.

14          **THE COURT:**  I will sustain that.

15  **BY MS. WEST:**

16  **Q**     Did you personally put the CPUC on notice that PG&E had

17  overpressures on its lines in HCA segments?

18  **A**     I did not.

19  **Q**     Are you aware whether at the time of the audit PG&E,

20  anyone from PG&E, had told the CPUC that it had overpressures

21  on segments in HCAs?

22          **MR. BAUER:**  Objection.  Assumes facts not in

23  evidence.

24          **THE COURT:**  Overruled.

25  **A**     I'm not aware.

1    BY MS. WEST:

2    Q    Did you end up finalizing your white paper?

3    A    Yes.

4    Q    Did you provide it to the CPUC?

5    A    I did not.

6    Q    What did you do with it?

7    A    When the audit was over, I shredded it.

8    Q    You shredded it?

9    A    I did.

10   Q    Why did you shred it?

11   A    Because I didn't like it.  I didn't think it was -- the

12   intent of the memo was to be a white paper, and it was hardly

13   that.  It wasn't -- and it didn't address, I didn't think,

14   satisfactorily the issues that needed to be addressed.

15   Q    Did you feel comfortable with the language that you had

16   written in that white paper?

17   A    No.

18   Q    Did you think PG&E should stand by it?

19   A    No.

20   Q    So you got rid of it?

21   A    Yes.

22   Q    What was the date of the audit, if you remember?

23   A    I believe it started on the date that that memo was dated.

24   I believe it was May 17.

25   Q    All right.  Let's look at 578 now.  Is this an email chain

1    from you at the top?

2    **A**     Yes.

3              **MS. WEST:**  Government offers Exhibit 578.

4              **THE COURT:**  578 is admitted.

5         (Trial Exhibit 578 received in evidence.)

6         (Document displayed)

7              **MS. WEST:**  Thank you.

8    **BY MS. WEST:**

9    **Q**     So the bottom of this email chain, Mr. Manegold, is your

10   interpretation of what activates manufacturing threats for seam

11   weld pipe, correct?

12   **A**     That's correct.

13   **Q**     With a document MOP 10 Percent Allowance?

14   **A**     Yes.

15   **Q**     And the response from Mr. Dauby is:

16              "Bill, sounds reasonable and defendable."

17         Correct?

18   **A**     Yes.

19   **Q**     And what is your response to Mr. Dauby?

20   **A**     (As read)

21                   "That's what Custer told the lieutenant

22              who said, 'Let's stop here.'"

23   **Q**     What did you mean by that?

24   **A**     I mean, I thought the same thing that happened to Custer

25   was going to happen to us.  We had a very -- we thought we were

1    in a good position, or Frank did, and I didn't.  I think we

2    were -- I thought he was underestimating the problem.

3        I thought we were going to get -- like Custer, I thought

4    we were going to get killed in the audit.  I thought we were

5    going to get slaughtered.

6    Q    And would you agree that you thought the PUC would not

7    approve that 10 percent practice?

8    A    I did agree.  Yeah, I do agree with that.

9    Q    Would you agree that you thought PG&E would have been

10   required to assess for manufacturing threats?

11   A    Without a better justification than what I provided in

12   that memo, yes.

13   Q    Let's turn to Exhibit 582, please.

14       (Witness complied.)

15   Q    I'm looking in particular at the bottom part of 582, Mr.

16   Manegold.  Is that an email from Calvin Lui to -- well, this

17   whole exhibit is an email chain that you were copied on,

18   correct?

19   A    Yes.

20            MS. WEST:  United States offers Exhibit 582.

21            THE COURT:  3582 is admitted.

22       (Trial Exhibit 582 received in evidence.)

23            MS. WEST:  If we can please pull up the bottom half

24   of 582, Page 1?

25       (Document displayed)

1          **MS. WEST:**  Thank you.

2   **BY MS. WEST:**

3   **Q**    Mr. Manegold, in this email Calvin Lui writes -- and here

4   you're copied, correct?

5   **A**    Yes.

6   **Q**    And he states:

7          "In preparation for next week's CPUC IMP audit."

8          And that's Integrity Management Program?

9   **A**    That's correct?

10  **Q**    (As read)

11         "A review of overpressure events in the system

12         was conducted with a focus for MOP exceeding

13         10 percent on lines with a manufacturing seam

14         threat."

15         Do you see that?

16  **A**    I do.

17  **Q**    (As read)

18         "(While it is not clear if the CPUC will even

19         allow exceedance one pound above MOP, an exceedance

20         beyond 10 percent will definitely not be accepted)."

21         Do you see that?

22  **A**    I do.

23  **Q**    Okay.  So then it looks like as of this email, May 13th,

24  he's saying the audit begins the next week, right?

25  **A**    It -- yeah.

1  Q    Okay.  So is that consistent with your memory, that it --

2  A    Yeah.

3  Q    -- began around May 17th?

4  A    Yes.

5  Q    All right.  Let's look, please, at Exhibit 591.

6       (Witness complied.)

7  Q    Is this an email from Calvin Lui to others copying you?

8  A    Yes.

9          MS. WEST:  United States offers Exhibit 591.

10         THE COURT:  591 is admitted.

11      (Trial Exhibit 591 received in evidence.)

12         MS. WEST:  If we can please pull up and expand the

13 text of 591?

14      (Document displayed)

15         MS. WEST:  Thank you.

16 BY MS. WEST:

17 Q    Is the audit over by now, by the way, Mr. Manegold?  We're

18 in August of 2010.

19 A    Yes, yes.

20 Q    This email is to a Gary Grelli and a Kevin Wong.  Who are

21 they?

22 A    Kevin Wong worked, I believe, in the Operations

23 Department.  Gary Grelli was a pipeline engineer.  That's my

24 recollection.

25 Q    Okay.  And Mr. Lui writes:

1              "The link below is the spreadsheet that I

2         maintain to track the MOP of pipeline segments that

3         have a low frequency ERW seam threat."

4         Correct?

5    **A**    That's correct.

6    **Q**    Okay.  And you see there there is the link to the Excel

7    spreadsheet?

8    **A**    Yes.

9    **Q**    MOP Retention PVID Summary?

10   **A**    Yes.

11   **Q**    Do you know what PVID stands for?

12   **A**    I know what it is, but I don't know what the individual

13   letters stand for.

14   **Q**    What is it?

15   **A**    It's a list of -- of -- I think it comes from Gas

16   Historian.  It's a list of the pressure reads on the pipeline

17   that are -- the PVID refers to individual pressure measurement

18   points.

19   **Q**    Okay.  Then he says:

20              "If the link does not work, please see

21         the attached spreadsheet."

22         Correct?

23   **A**    Yes.

24   **Q**    All right.  Let's take a look now at Exhibit 615.

25         (Witness complied.)

1  Q    Is this an email to you from Calvin Lui?

2  A    It is.

3         MS. WEST:  The United States offers 615.

4         THE COURT:  It's admitted.

5    (Trial Exhibit 615 received in evidence.)

6         MS. WEST:  Can we please put that on the screen and

7  expand the text?

8    (Document displayed)

9  BY MS. WEST:

10  Q    Mr. Manegold, this appears to be a forward from Calvin Lui

11  to you of your email about your interpretation of what

12  activates the manufacturing threat, correct?

13  A    That's correct.

14  Q    Do you know why Mr. Lui is forwarding this to you

15  September 15th, 2010 after you sent it May 17, 2010?

16  A    My guess is I was asking him for it.  I couldn't find it.

17  But I'm not sure.

18  Q    Okay.  If you could look, please, at Page 2 of this

19  document, that's your memo to file, correct?

20  A    Yes.  This was the draft I think that I had sent out to

21  everybody.

22  Q    All right.  Let's look now at 622.

23    (Witness complied.)

24  Q    Do you recognize this as an email from Brian Daubin to

25  you, as well as somebody else?

1  A    Yes.

2           MS. WEST:  United States offers 622.

3           THE COURT:  622 is admitted.

4       (Trial Exhibit 622 received in evidence.)

5           MS. WEST:  If we could expand the text, please?

6  Including the subject line?  Great.  Thank you.

7       (Document displayed)

8  BY MS. WEST:

9  Q    Okay.  And the subject line of this email dated

10 September 28, 2010, Mr. Manegold, is:

11          "Source Document Verification for Line 101, Line

12      109 and Line 132."

13      Is that right?

14 A    That's right.

15 Q    Okay.  And who is Mr. Daubin?

16 A    Brian, I believe, was the -- was a manager in our

17 Engineering Department, and the Gas Mapping Group supervised by

18 Luano Nomellini reported to him.

19 Q    And does Mr. Daubin tell you in this email that he is in

20 need of verifying all GIS source documentation for the Lines

21 101, 109 and 132?

22 A    Yes.

23 Q    He says:

24          "We will essentially need to rebuild the

25      data in GIS for these three lines.  The

1                    timing for this effort is key as the

2                    estimators are currently building PFLs for

3                    these three lines."

4          Do you see that?

5    **A**    I do.

6    **Q**    And then he asked to get together at your earliest

7    convenience, and he says today; correct?

8    **A**    Okay.  Yes.

9    **Q**    Okay.  Can you tell us, please, what PFL refers to?

10   **A**    It means a pipeline features list.

11   **Q**    What is that?

12   **A**    It's a list of all the features along the pipeline; not

13   just the pipe, but any appurtenances, all the fittings,

14   everything that's on that pipeline.

15   **Q**    Do you know why Mr. Daubin writes that they essentially

16   need to rebuild the data in GIS for these lines?

17   **A**    Specifically, I don't know why he wrote that.

18   **Q**    Do you have an understanding -- what did --

19   **A**    I could guess.

20   **Q**    I don't want you to guess.  What did you understand he

21   meant?

22   **A**    Sitting here now, I can't tell you.  Oh, what he did mean?

23   Meaning -- what did he mean about -- he wanted to have a

24   meeting.  That's what he meant.

25   **Q**    What did you interpret "rebuilding the data in GIS for

1    these three lines" to mean?

2    **A**    That would have meant revalidating all the data that was

3    in GIS for those three lines.

4    **Q**    Was there a reason to do that?

5    **A**    I don't remember the timing of events.  There was a

6    determination that some of the data was wrong in GIS and I

7    assume this was after that time.

8    **Q**    Was it some data?

9    **A**    I don't know.  I wasn't involved in that decision.  Brian

10   is telling us what he's -- he's going to have the meeting

11   because he's got some sort of direction to do something.

12   **Q**    But he's asking for a meeting with you, correct?

13   **A**    Correct.

14   **Q**    Okay.  And he's telling you that they need to rebuild the

15   data in GIS for Lines 101, 109 and 132, correct?

16   **A**    Right.

17   **Q**    Okay.  And he says that the timing is key?

18   **A**    That's what he says, yes.

19   **Q**    Okay.  And you said that PFL refers to a pipeline features

20   list, which is all the pipe data?

21   **A**    Correct.

22   **Q**    And they say that they are currently building it, correct?

23   **A**    That's what it says.

24   **Q**    And are you aware whether the pipeline features list was,

25   in fact, built?

MANEGOLD - DIRECT EXAMINATION / WEST                2515

```
 1   A    I believe it was.

 2   Q    Did you have any involvement in it at all?

 3   A    I don't believe so.

 4   Q    Did you ever look at that pipeline features list?

 5   A    I looked at some of the work that was going on.  They set

 6   up a big room to do the work and I looked at some of it, but I

 7   don't think I -- I don't know if I saw the completed product or

 8   not.

 9   Q    Are you aware, one way or another, whether that built

10   pipeline features list recognized numerous errors in GIS?

11   A    Since I didn't see the final list, I don't know that.

12   Q    You don't know that?

13   A    It wouldn't surprise me, but I -- I didn't see the

14   features list, so I can't tell you.

15   Q    Why wouldn't it surprise you?

16   A    Why what?

17   Q    Why --

18             MR. BAUER:  Objection.  Argumentative.  Calls for

19   speculation.

20             THE COURT:  I will allow it.

21             MS. WEST:  He said it wouldn't surprise him.

22   BY MS. WEST:

23   Q    Why would it not surprise you that there were numerous

24   errors?

25   A    Because there were a lot of assumed values in GIS.
```

1  Q    Would you consider that an error?

2  A    For purposes of your question I did.

3  Q    Please turn to Exhibit 642.

4       (Witness complied.)

5  Q    Mr. Manegold, you testified previously, correct, that

6  assumed values were intended to be conservative, is that right?

7  A    They were.

8  Q    All right.  Let's look at 642.

9       (Witness complied.)

10 Q    And if you could tell me, please, if this is an email that

11 you're on?

12 A    I am.

13          MS. WEST:  Government offers 642.

14          THE COURT:  642 is admitted.

15      (Trial Exhibit 642 received in evidence.)

16          MS. WEST:  Please pull up the bottom half of this

17 email chain?

18      (Document displayed.)

19 BY MS. WEST:

20 Q    The top half, incidentally, Mr. Manegold, the recipient

21 just says "Thanks," right -- I'm sorry.  You say "Thanks."

22 A    Thanks to Scott, yes.

23 Q    Okay.  So let's look now what we have on the screen and

24 see somewhat Scott told you.  Who is Scott?

25 A    Scott Shield was a manager in our Mapping Department.  He

 1  worked for Luano Nomellini.

 2  **Q**    Did the Mapping Department have any role in the pipeline

 3  features list, if you know?

 4  **A**    I think they did.  When they were building this, it was a

 5  big team effort, but I don't know who was all on the team.

 6  **Q**    Okay.  The subject much Mr. Shield's email to you in

 7  October of 2010 is "PFL WT Decrease."  Do you see that?

 8  **A**    I do.

 9  **Q**    Do you understand "WT" to refer to wall thickness?

10  **A**    Yes.

11  **Q**    The email he sends to you is:

12          "Bill, here are the decreases in wall thickness

13      that I found from a quick scan of Line 132 PFL."

14      Do you see that?

15  **A**    I do.

16  **Q**    I believe you told us in the last day or two, but if you

17  could remind us, please, whether, and if so why, wall thickness

18  is important?

19  **A**    Wall thickness is used to calculate the percent SMYS,

20  which is the operating stress on the pipeline.

21  **Q**    And is there any relation between that and MOP?

22  **A**    Not the actual operating pressure, but the allowable

23  limits on operating pressure, yes.

24  **Q**    Now, this pertains to Line 132, but there is a list of

25  segments here, correct?

1   **A**    Yes.

2   **Q**    Okay.  And a few of those are, second row down, 105.6,

3   correct?

4   **A**    Yes.

5   **Q**    And for 105.6 it says GIS wall thickness, which is the old

6   one, was .344.  Do you see that?

7   **A**    I do.

8   **Q**    Okay.  And it says that the new wall thickness is .3125.

9   Do you see that?

10  **A**    Yes.

11  **Q**    And a few rows down do you see Segment 171.1?

12  **A**    Yes.

13  **Q**    The GIS -- the old wall thickness was .375.  Do you see

14  that?

15  **A**    Yes.

16  **Q**    And then the PFL wall thickness is .3125?

17  **A**    Yes.

18  **Q**    Segment 181, the GIS wall thickness was .375 again?

19  **A**    Yes.

20  **Q**    And the PFL wall thickness was .2815, correct?

21  **A**    Correct.

22  **Q**    Would these differences in wall thickness -- if you

23  substituted the PFL one -- would that change, as you said, the

24  percent of SMYS?

25  **A**    The calculated percent of SMYS, yes, it would.  It would

1   increase it.

2   Q    It would increase it?

3   A    Yeah.  The operating stress would go up with a thinner

4   wall pipe.

5   Q    And what does that mean, for the operating stress to go

6   up.

7   A    It means it goes up.  I'm not sure what --

8   Q    What effect might -- would that have an effect on the

9   maximum operating pressure?

10  A    It doesn't change what the operating pressure is.  It

11  might change what's allowed.  It depends on how much it goes

12  up.

13  Q    Okay.  And can you tell from looking at this, sitting here

14  now, whether it would change the operating pressure that's

15  allowed?

16  A    No.

17  Q    You can't tell or it would not?

18  A    I can't tell.

19  Q    What would you need to do to be able to tell?

20  A    You need know what the diameter of the line is.  You need

21  to know what the class location is for the area.  You need to

22  know if the line had been tested or not.

23  Q    Pressure tested?

24  A    Yes.

25  Q    Let's look at Exhibit 647, please.

1           (Witness complied.)

2    **Q**    Is this another email chain including yourself?

3    **A**    Yes, it is.

4              **MS. WEST:**  Government offers Exhibit 647.

5              **THE COURT:**  647 is admitted.

6           (Trial Exhibit 647 received in evidence.)

7              **MS. WEST:**  I'd like to start at the bottom of Page 1,

8    please.

9           (Document displayed)

10   **BY MS. WEST:**

11   **Q**    Mr. Manegold, this is October 21st, 2010, an email from

12   yourself to a Wayne -- why don't you pronounce that last name

13   for me, please?

14   **A**    Ciardella.

15   **Q**    Okay.  Who was that?

16   **A**    A friend of mine that worked in the Safety, Health and

17   Claims Department.  We had been friends.  We worked together in

18   the Mechanical and Nuclear Engineering Department back in the

19   80's and he had worked at Diablo Canyon as well.

20   **Q**    A PG&E friend of yours?

21   **A**    Yes.

22   **Q**    All right.  And you advise Mr. Ciardella in this email:

23              "I sent this to Dan Curtis."

24           Correct?

25   **A**    That's correct.

MANEGOLD - DIRECT EXAMINATION / WEST                    2521

1  Q    And please remind us your relationship, work relationship

2  with Mr. Curtis at this time?

3  A    Mr. Curtis was a contractor that worked for us.  He worked

4  for Mears Corporation.

5  Q    Okay.  And you say -- you refer to a Glen.  Who is Glen?

6  A    Glen Carter was the senior director of the Gas Department.

7  Director or senior director.  I don't remember what his exact

8  title was at this point, but he was the head of the Gas

9  Engineering Department.

10 Q    And in your chain of command?

11 A    Yes.  He worked -- Bob Fassett worked for home.

12 Q    (As read)

13             "Glen brought Chris Johns to different

14          offices today."

15     And please remind us who Chris Johns was at this time?

16 A    The president of PG&E Company.

17 Q    And you say, in parentheses:

18          "(Thach was in the DIMP meeting, but I'm stuck

19          writing explanations on why something went up or down

20          from one year to the next in the top 100."

21     Do you see that?

22 A    I do.

23 Q    What does the top 100 refer to?

24 A    The top 100 was -- it's something of a misnomer, but it's

25 the list of pipeline segments that we calculated at each year

1  as having the highest risk in the system and, therefore, would

2  be good targets for pipeline remediation, usually by

3  replacement.

4  **Q**    And was this list anything, if you know, that was

5  communicated to the CPUC for rate setting process?

6  **A**    It would -- not the list itself, but projects that we

7  would suggest that we wanted to do might come from this list.

8  **Q**    Okay.

9  **A**    And those projects might be listed in a CPUC rate

10  application.

11  **Q**    And tell us, please, what a rate application is?

12  **A**    It's an application to the CPUC to increase gas and

13  electric rates, or electric rates.

14  **Q**    To increase them for whom?

15  **A**    Customers.

16  **Q**    Now, you continue:

17         "Fortunately, it is for someone else to explain

18       why we never did anything with any of them."

19       What did you mean by that?

20  **A**    Each year we came up with that list and on the -- on the

21  segments that were -- where the suggested remediation was

22  replacement.  I thought at the time I wrote this that we hadn't

23  replaced any of the segments that we called for as being within

24  that list.  And we made a new list each year.

25  **Q**    Let's look at the bottom paragraph of this email where you

```
 1    say:

 2               "But, of course, they are going to spend" --

 3         Well, actually, I didn't want to skip ahead.  Let's go

 4    down a little.  Go through it a little more methodically.

 5               "And when they stopped by" --

 6         And "they" is referring to Glen and Chris Johns?

 7    A    Correct.

 8    Q    (As read)

 9               "...Glen said I could say what I thought."

10         Do you see that?

11    A    I do.

12    Q    (As read)

13               "This was after an explanation by Chris that

14         'we' were looking at all our processes.  I said our

15         problem wasn't our processes, that we had a lot of

16         well maintained, but old pipe.  We should spend more

17         to replace it and add people to manage that spending.

18         That a well maintained 1956 Cadillac is not as safe

19         as a new car."

20         Correct?

21    A    Correct.

22    Q    And you finish:

23               "But, of course, they are going to spend more

24         dough anyway, so it was a wasted opportunity.  What I

25         should have said was, in this review process don't
```

1          assume that the people working on this stuff now are

2          idiots that should be ignored (as it seems to me has

3          been done)."

4          Do you see that?

5     A    I do.

6     Q    Let's look at Mr. Ciardella's response to you, please.

7              MS. WEST:  If we could pull up the top half?

8          (Document displayed)

9     BY MS. WEST:

10    Q    I would like you to look at the middle of this paragraph.

11    Do you see where it says "Money that engineers"?

12    A    Yes.

13    Q    He writes:

14             "Money that engineers would have used to add

15         safety margins, replacements, et cetera, over all the

16         these years and, yes, maybe not meeting the

17         authorized rate of return.  This problem is across

18         gas and electric.  I only thought about electric and

19         thought it was just there, but now we see the gas

20         side, too, the piping and valves and design."

21         And then he compares it to the old 56 Cadillac, correct?

22    A    Yes.

23    Q    He says:

24             "The old 56 Cadillac that runs like a top, but

25         is not up to current standards and safety criteria."

1          Correct?

2     A    Correct.

3     Q    And then he continues:

4                    "This is the (near criminal) fault of

5                all the financial people running the show

6                since the 1980's and Peter and Chris

7                continued that same philosophy and,

8                therefore, are not free from fault.  The

9                truth needs to be fully aired out to the

10               state and federal authorities."

11         Did I read that correctly?

12    A    You did.

13    Q    Who is "Peter" referring to, if you know?

14    A    Peter Darbee.

15    Q    Who was that?

16    A    He was -- I think the title is right.  I think he was CEO

17    of PG&E Corporation.  Chairman of the board and CEO, I think.

18    Q    Can I have you turn next please to Exhibit 649?

19         (Witness complied.)

20    Q    Do you have that in front you?

21    A    Yes.

22    Q    Mr. Manegold, is this an email chain, the top of which is

23    from you?

24    A    Yes.

25              MS. WEST:  The Government offers Exhibit 649.

 1              **THE COURT:**  649 is admitted.

 2          (Trial Exhibit 649 received in evidence.)

 3              **MS. WEST:**  Okay.  Let's go, please, to the very

 4    bottom of Page 2 and the top of Page 3.

 5    **BY MS. WEST:**

 6    **Q**    And, Mr. Manegold, the bottom of Page 2 is the beginning

 7    of this email chain, right?

 8    **A**    That's correct.

 9    **Q**    It's an email from Robert Fassett?

10    **A**    Yes.

11    **Q**    To Sara Peralta?

12    **A**    Yes.

13    **Q**    And I'm -- there we go.

14          (Document displayed)

15    **Q**    Okay.  It says:

16                  "Sara, I will be meeting with Ed Salas

17              next Wednesday to catch up on a few things."

18          Is that right?

19    **A**    Yes.

20    **Q**    Who is Ed Salas?

21    **A**    Ed Salas, I believe, was the executive vice-president of

22    the Gas Department.  Gas Engineering and Operations, I think.

23    **Q**    Would that put him in your chain of command as well?

24    **A**    Yes.  I think -- Bob Howard reported to him.

25    **Q**    Bob Howard reported to Ed Salas?

1    **A**    Correct.

2    **Q**    How high up was Ed Salas?  Who did he report to?

3    **A**    I don't know.

4    **Q**    All right.  And tell us his title again?

5    **A**    I believe it was Executive Vice-President of Engineering

6    and Operations.  Not Gas Engineering, but Engineering and

7    Operations.  I think, but I'm not sure.

8    **Q**    Okay.  Do you know roughly how many tiers down from the

9    president of PG&E he was?

10   **A**    He could have reported directly to Chris Johns.  I just --

11   I don't know.  Or he could have reported to the chief operating

12   officer.  I'm just not sure.

13   **Q**    Okay.  In any event, Mr. Fassett is writing that he will

14   be meeting with Ed Salas Wednesday, the 28th, is that right?

15   **A**    Yes.

16   **Q**    Okay.  And let's look at the second paragraph there, where

17   it says:

18           "Also, previously you mentioned you'd check with

19           Bill to find the reference in the Code and/or B31.8S

20           and where in our procedures we address the concept of

21           stable/unstable threat."

22           Did I read that right?

23   **A**    You did.

24   **Q**    And then this gets sent to Sara Peralta, right?

25   **A**    Yes.

1   Q     All right.  So now let's look at the middle of Page 2 and

2   see what Sara does with this email.

3       And while we're pulling that up, Mr. Manegold, would you

4   agree that she forwards it to you?

5   A     Yes.

6       (Document displayed)

7   Q     And it says:

8           "Bill, can you provide the following per Bob's

9       request."

10      And the second bullet point she writes is:

11          "I have several emails (and the brief draft

12      white paper) discussing the activation of a seam

13      threat.  In terms of our own procedures, is there

14      anywhere else we discuss how we deal with this

15      outside of RMI-06?  In terms of code/industry

16      documents, is there anywhere outside of Subpart O and

17      FAQ 221 (like ASME B31.8S) where this topic is

18      addressed?"

19      Is that right?

20  A     That's right.

21  Q     And then if we go to Page 1, we see you responded to the

22  other bullet point, but she reminds you to address the second

23  bullet point regarding internal/external references to seam

24  threat?

25  A     Yes.

1    Q    And then the final email, the top email of this chain --

2              **MS. WEST:**  And that's what I would like to expand,

3    please, on Page 1.

4         (Document displayed)

5    **BY MS. WEST:**

6    Q    -- is your response to Ms. Peralta, correct?

7    A    Correct.

8    Q    October 22nd, 2010 is our date, right?

9    A    That's right.

10   Q    Okay.  And you say:

11            "Sorry about that.  The issue is also addressed

12       in B31.8S, Appendix A4 and our RMI-06 (this is the

13       latest signed off copy I have)."

14       Correct?

15   A    That's correct.

16   Q    Okay.  And that's actually attached here, RMI-06 Rev-01?

17   A    Yes.

18   Q    (As read)

19            "As previously discussed, I have asked Calvin

20       not to request any lines that have their pressure

21       raised to maintain their five year operating pressure

22       until the issue is discussed and agreed on at a level

23       beyond my group."

24       Is that right?

25   A    That's correct.

1  Q    Okay.  Let's take a look, please, at the attachment,

2  RMI-06 Rev-01.

3         MS. WEST:  Can we, please -- I want to go to Page 5

4  of this document.  Thank you.  And the middle part of the page

5  under the bold underline.

6       (Document displayed)

7         MS. WEST:  Thank you.  That's great.

8  BY MS. WEST:

9  Q    All right.  Mr. Manegold, this section of the RMI-06 that

10  you attached to your supervisor contains language that -- well,

11  let's just read it:

12         "In the situations where pipeline segments with

13         a potential manufacturing threat, as described in

14         917(e)(4) ERW pipe, will be prioritized as a high

15         risk segment for the baseline assessment or

16         reassessment if they have operated over the maximum

17         operating pressure experienced during the preceding

18         five years plus 10 percent of the historical

19         operating pressure."

20         Did I read that right?

21  A    You did.

22  Q    And then you continue:

23         "To keep from continually losing operating

24         pressure on pipelines that have a potential long seam

25         manufacturing threat, PG&E has made a decision to

1            only reprioritize those pipeline segments that exceed

2            the historic five year MOP plus 10 percent of the

3            historic five year MOP.  The 10 percent portion was

4            taken from 49 CFR 192.201(a)(2)(i).

5            Correct?

6    **A**    That's what it says.  I didn't write this, I think you

7    said.  "You continue."

8    **Q**    And you testified that you -- what was your role at this

9    time?

10   **A**    I was the supervisor of the -- I was the program manager

11   for Integrity Management and I was the supervising engineer for

12   Integrity Management.

13   **Q**    And as the program manager, it was your responsibility for

14   Risk Management Instructions like 06, correct?

15   **A**    As long as it didn't continue across departments.  If it

16   did, then I wasn't authorized to sign it.

17   **Q**    Okay.  And you testified that this one, RMI-06, did stop

18   with you, correct?

19   **A**    No, I didn't testify to that.  That goes across

20   departments.

21   **Q**    Okay.  It says:

22            "The additional" --

23            At the bottom of that section:

24            "The additional 10 percent is from the historic

25            five year MOP instead of the MOP stated in 49 CFR" --

```
 1              THE COURT:  MAOP.

 2              MS. WEST:  Oh, thank you.

 3   BY MS. WEST:

 4   Q    (As read)

 5              "...MAOP stated in 49 CFR 192.201."

 6        Is that right?

 7   A    That's correct.

 8   Q    And you forwarded this to Sara Peralta?

 9   A    Yes.

10   Q    And she has told you she's forwarding it to Bob Fassett?

11   A    Is that what I said?

12   Q    Well, we just looked at the email that she forwarded to

13   you from Bob Fassett that's at the bottom of this chain.

14   A    Right.

15   Q    Okay.  Let's look at 648.

16        (Witness complied.)

17   Q    Is 648 Ms. Peralta's response to you?

18   A    Yes.

19              MS. WEST:  The Government offers 648 in evidence.

20              THE COURT:  648 is admitted.

21        (Trial Exhibit 648 received in evidence.)

22   BY MS. WEST:

23   Q    I'm not sure we even need to pull this up.  It's so fast,

24   Mr. Manegold.

25        Ms. Peralta says:
```

1              "Exactly what I needed.  Thank you.  I

2         believe  Bob will be discussing this issue

3         with Ed Salas next week and I will be

4         providing him the background info on the

5         issue."

6    Correct?

7    A    Correct.

8    Q    And are you aware of -- actually, I think we already did

9    that.

10        Let's look at 651.

11        (Witness complied.)

12   Q    Is 651 an email from Sara Peralta to Bob Fassett?

13   A    That's what it says.

14   Q    And it attaches the RMI-06 Rev-01 that you sent to Sara?

15   A    I assume that.  That's what it says.

16        MS. WEST:  The Government offers Exhibit 651.

17        THE COURT:  Admitted.

18        (Trial Exhibit 651 received in evidence.)

19        MS. WEST:  If we could please pull up Page 1, the top

20   half?

21        (Document displayed.)

22        MS. WEST:  Thank you.

23   BY MS. WEST:

24   Q    I'd like to direct your attention, Mr. Manegold, to the

25   portion that says "long seam threat."  Do you see that?

1   **A**    Yes.

2   **Q**    And Ms. Peralta advises Mr. Fassett:

3            "This issue is addressed internally primarily in

4       RMI-06 (attached).  Externally this issue is also

5       addressed in ASME B31.8S, Appendix A4."

6       Right?

7   **A**    That's correct.

8   **Q**    And she's forwarding the information that you gave her?

9   **A**    That's what it appears, yes.

10  **Q**    She says:

11           "I talked with Bill about your question from

12      yesterday."

13      Did you understand that to be you?

14  **A**    Yes.

15  **Q**    Okay.  And let's look at the document that she attaches.

16           **MS. WEST:**  Let's go to Page 4 of this exhibit,

17  please?

18      (Document displayed)

19  **BY MS. WEST:**

20  **Q**    If you could just take a look at it, Mr. Manegold.  This

21  is -- if you can tell from Page 4, does this appear to be the

22  same document that you forwarded to her?

23  **A**    Yes, it does.

24  **Q**    The RMI-06 that discusses 10 percent?

25  **A**    Yes.

1  Q     Let's look at Exhibit 663, please.

2            MR. BAUER:  I'm sorry.  I missed the number.  653?

3            MS. WEST:  663.

BY MS. WEST:

5  Q     This an email from you?

6  A     Yes, it is.

7            MS. WEST:  The Government offers 663.

8            THE COURT:  Admitted.

9        (Trial Exhibit 663 received in evidence)

10           MS. WEST:  If we could please pull up Page 1?

11       (Document displayed)

12           MS. WEST:  Thank you.

BY MS. WEST:

14  Q     Mr. Manegold, this is an email November 17, 2010 to a

15  Sumeet Singh copying Sara Peralta, is that right?

16  A     That's correct.

17  Q     Can you tell me who Sumeet Singh is?

18  A     I don't know what his job title was at the time, but he

19  was someone within PG&E who was, I think from this email, doing

20  a program review of the Integrity Management Program, or

21  leading one anyway.  Maybe coordinating it?

22  Q     At some point, do you know, did he become the senior

23  vice-president of Integrity Management?

24  A     I think that's his current title.

25  Q     Okay.  And do you know, was he in that position at this

1  time or not yet?

2  **A**    No, he was not.

3  **Q**    All right.  And you email Mr. Singh:

4              "Sumeet, besides the RMPs, I think a

5           program review should look at RMI-06.  Bill."

6       Is that right?

7  **A**    That's correct.

8  **Q**    Why did you tell him that?

9  **A**    Because I was concerned about the language that's shown

10  here.

11  **Q**    Okay.  When you say "shown here," let's take a look at

12  Page 3 and let's see what you are sending him.

13           **MS. WEST:**  If we could enlarge the overpressurization

14  section again?

15       (Document enlarged.)

16  **BY MS. WEST:**

17  **Q**    You are sending him RMI-06 with the 10 percent language

18  again, correct?

19  **A**    Yes.

20  **Q**    Let's look at 674, please.

21       (Witness complied.)

22  **Q**    Is 674 an email chain that you are included on?

23  **A**    Yes, it is.

24           **MS. WEST:**  The Government offers 674.

25           **THE COURT:**  674 is admitted.

1           (Trial Exhibit 674 received in evidence.)

2                MS. WEST:  Start at the bottom of Page 1, please.

3       (Document displayed)

4  BY MS. WEST:

5  Q    Okay.  Mr. Manegold, this is an email from Calvin Lui to

6  Sumeet Singh copying you, is that right?

7  A    That's correct.

8  Q    And you're still supervising Calvin Lui at this time?

9  A    Yes, I am.

10 Q    The subject is "MOP Plus 10 Exceededss."

11 A    "10 Percent Exceededss," yes.

12 Q    Okay.  And he says:

13           "Sumeet, I have compiled a list of segments with

14      a long seam threat."

15      And he cites to 917(e)(4), is that right?

16 A    That's correct.

17 Q    (As read)

18               "...that have exceeded MOP plus

19           10 percent.  Some of the values may need to

20           be verified due to SCADA error, updated pipe

21           specs, et cetera."

22      And then it looks like there is embedded the Excel

23 spreadsheet "MOP Plus 10 Percent"?

24 A    Yes.

25 Q    It says:

1              "I can also provide segments that have been

2         overpressured past MOP.  However, this list is much

3         more extensive and will require some time.  Please

4         let me know if you want me to do this."

5         Do you see that?

6    A    I do.

7    Q    Okay.  He also says:

8                  "Also, I track overpressure events with

9              respect to seem threats."

10        And then he attaches "Gas Events Overpressure Log."

11   Do you know what that is

12   A    I think I do.  I think I do.

13   Q    What do you think it is?

14   A    I think it's a list that comes off of our -- primarily

15   from our Gas Event Log that lists all the gas events that

16   involve overpressurization, failure of regulating equipment.  I

17   think that's what it is.

18   Q    Is it limited just to failure of regulating equipment?

19   A    I don't know.  I'd have to see the list.  And that might

20   not tell me either, but I don't know.

21   Q    Mr. Singh responds to Calvin, again copying you, is that

22   right?

23   A    Yes.

24   Q    Okay.

25             MS. WEST:  Let's look at his response, the next email

1    up, please.

2         (Document displayed)

3    **BY MS. WEST:**

4    **Q**    He says:

5              "Calvin.  Thank you for providing these details.

6         However, please develop a summary chart that shows

7         the number of incidents by year where

8         overpressurization has occurred.  Also, my

9         understanding is that the Subpart O requirement

10        states that there is an issue where MOP is exceeded

11        (and not MOP plus 10 percent).  Hence, this

12        information is what I would need for my analysis.

13        Thank you."

14        All right.  Do you know what analysis Mr. Singh was doing

15   that he's referring to?

16   **A**    Sitting here right now?  No.

17   **Q**    Do you have a memory whether you responded to this email

18   chain?

19   **A**    I don't remember, no.

20   **Q**    All right.

21             **MS. WEST:**  Let's look at the top email, please.

22        (Document displayed)

23   **BY MS. WEST:**

24   **Q**    Okay.  And this is Mr. Lui's response to Mr. Singh, right?

25   **A**    Yes.

1    Q    Okay.  He says "Sumeet."  And then it looks like we have

2    maybe a little bit of a formatting problem here, but he appears

3    to list the years 2005 through 2009, correct?

4    A    That's correct.

5    Q    And then "Overpressure Events" and it says 9, 10, 5, 3,

6    14; is that right?

7    A    That's correct.

8    Q    (As read)

9                    "The chart above summarizes the number

10               of overpressure events established by the

11               five year high MOP."

12        Do you see that?

13   A    I do.

14   Q    Okay.  Let's take a look at 714, please.

15        (Witness complied.)

16   Q    Is Exhibit 714 an email from Sumeet Singh to Sara Peralta

17   forwarding an email from a David Harrison?

18   A    Yes.

19   Q    And who is David Harrison?

20   A    He was a contract employee that worked for PG&E.

21   Q    Did he report to you?

22   A    At this time -- he had, but I don't think he was reporting

23   to me at this time.

24   Q    At this time he was working for PG&E as a contractor?

25   A    As a contractor, yes.

1           **MS. WEST:**  Government offers Exhibit 714.

2           **THE COURT:**  Admitted.

3      (Trial Exhibit 714 received in evidence.)

4           **MS. WEST:**  If we can, please, pull up the text here?

5   Thank you.

6      (Document displayed.)

7   **BY MS. WEST:**

8   **Q**   Mr. Harrison advises Mr. Singh in this email -- now we're

9   looking at January, 2011, is that right?

10  **A**   Yes.

11  **Q**   And he says:

12          "Sumeet.  Attached is the spreadsheet.  I'm

13      afraid that I really did not accomplish anything.

14      Everything that we filled in says no STPR."

15      Is that Strength Test Pressure Report?

16  **A**   Yes.

17  **Q**   (As read)

18          "Also, I was just comparing to make sure I

19      wasn't missing anything and you realized most of

20      these don't show a strength test in GIS.  If the

21      existing GIS does not show an STPR, the chances of us

22      finding one are pretty close to zero."

23      Do you see that?

24  **A**   I do.

25  **Q**   Okay.  And then he finishes:

1          "We will continue to work on this, but the STPR

2      data is not any better."

3  A    Yes.

4  Q    Okay.  And then do you see that attached to this email, if

5  we look up at the top is, it says "P-increase verification."

6  A    Yes.

7  Q    And it seems to be a spreadsheet.  "xls," do you see that?

8  A    Yes.

9  Q    Do you know whether you've ever looked at that

10 spreadsheet?

11 A    Again, sitting here now, no, I can't tell you that.

12 Q    Let's look at Exhibit 717.

13     (Witness complied.)

14 Q    Is 717 a PG&E email from a Steve Whelan to Ed Salas, who

15 you mentioned?

16 A    Yes.

17         **MS. WEST:**  Government offers 717.

18         **THE COURT:**  717 is admitted.

19     (Trial Exhibit 717 received in evidence.)

20         **MS. WEST:**  Pull up Page 1, please.

21     (Document displayed)

22         **MS. WEST:**  Thank you.

23 **BY MS. WEST:**

24 Q    Who is Steve Whelan at this time, do you know?

25 A    So if I could amend my earlier testimony when I said that

1  Glen Carter reported to Bob Howard.  He did up until, I

2  think -- I think Bob Howard retired in, I want to say June of

3  2010 and I believe Steve Whelan was appointed as the interim

4  vice-president.  That's my recollection.

5       So Steve Whelan filled the slot in the organization that I

6  think had been previously occupied by Bob Howard prior to his

7  retirement.

8  Q    Do you know what the work relationship was between Steve

9  Whelan and Ed Salas?

10 A    So Steve would have reported to Ed.

11 Q    Ed is above Steve?

12 A    That's correct.

13 Q    And there is a Kirk Johnson on here.  Who is that, please?

14 A    At this point I don't know what Kirk's position was.

15 Q    The subject is "Overpressure."  Do you see that?

16 A    Yes.

17 Q    And it states:

18          "Engineering is working on the official response

19      to your question about the lines involved in

20      overpressuration.  It is taking longer than expected,

21      so I put together the attached Excel spreadsheet from

22      the information that I have."

23      And it says:

24          "The PDF is a copy of the Data Response given to

25      the CPUC in December and the PowerPoint presentation

1          was prepared yesterday and walks through the

2          intentional lines."

3          Were you aware of PG&E providing Data Responses to the

4     CPUC?

5     **A**     Yes.

6     **Q**     Did you have any role in preparing any Data Responses?

7     **A**     Yes.

8               **MS. WEST:**  Let's look, please, at Page 2 of this

9     exhibit.

10         (Document displayed)

11    **BY MS. WEST:**

12    **Q**     All right.  Page 2 says:

13                   "Phase 1 - Analysis for intentional

14              overpressure events."

15         Do you see that?

16    **A**     I do.

17              **MS. WEST:**  And let's look now at Page 3.

18         (Document displayed)

19    **BY MS. WEST:**

20    **Q**     I want to look at the ""Background" section.  There under

21    "Background" it says:

22              "Conduct analysis to answer questions to the

23              CPUC in which PG&E raised the pressure above MAOP on

24              any segment of pipe."

25                   "Phase 1" --

1        Which is what we just looked at on the prior page, right?

2   A    Yes.

3   Q    (As read)

4            "PG&E intentionally raised the pressure to

5        maintain a given level of MAOP.

6            "Phase 2:  Confirmed instance where PG&E

7        unintentionally exceeded the MAOP."

8        Let's look at Page 4.

9            MS. WEST:  Can we expand the top half of this,

10  please?  Thank you.

11       (Document displayed)

12  BY MS. WEST:

13  Q    This page is entitled "Approach," right?

14  A    Yes.

15  Q    It says.

16           "Pipeline Segment Identification:  GIS used to

17       identify segments with manufacturing seam threat

18       consisting of."

19       And then there is two things listed, right?

20  A    That's correct.

21  Q    Pre-1970 ERW pipe?

22  A    Yes.

23  Q    And pipe with joint efficiency less than one?

24  A    Yes.

25  Q    All right.  And let's go to the bottom half of this page

1   where it says "Event Identification."  Do you see that?

2   **A**     I do.

3   **Q**     (As read

4            "For identified pipeline segments with

5       manufacturing seam threat, referenced integrity

6       management database for instances of intentional

7       pressure increase."

8   **A**     Yes.

9   **Q**     All right.  And then the first dash there talks about:

10           "Initiated tracking of instances in 2003 to

11      comply with the requirements of Subpart O."

12      Yes?

13  **A**     49 CFR 192 Subpart O, yes.

14  **Q**     Okay.  And then the second dash says:

15           "Annual comparison of SCADA Gas Historian data."

16      And it has a little Footnote 1, which refers to the bottom

17  there.  It says:

18                "Based on hourly pressure average data."

19      Do you see that?

20  **A**     Yes.

21  **Q**     And do you know whether SCADA maintained data in

22  increments less than one hour?

23  **A**     It depends on the time period, but the more recent data,

24  yes.  Older data, I don't think so, but I'm not sure.

25  **Q**     Do you know what -- when that changed?

1    **A**   I used to, but I don't know now.

2    **Q**   Okay.  And did it end up maintaining at some point at

3    twenty second increments?

4    **A**   It could have.  I just don't remember what the minimum --

5    **Q**   Fair enough.

6    **A**   -- sampling was.

7    **Q**   So it says:

8                "Data performed for dates of pressure

9            exercise increase with:

10               "1.  Highest operating pressure

11           experienced in a five year window when a

12           segment is identified in an HCA beginning in

13           2003.

14           "2.  System MOP based on the weakest link of the

15           respective pipeline segment."

16           Is that right?

17   **A**   That's correct.

18   **Q**   Okay.  And then:

19               "Highest SCADA pressure reading used for all

20           segments for the identified pipelines."

21   **A**   Yes.

22   **Q**   Let's look at Page 5.

23           (Document displayed)

24   **Q**   And the top of Page 5 is the "Number of Events."  And we

25   have got a footnote which refers to the "hourly pressure

1   average data."  Do you see that?

2   **A**    Okay.  Yep.

3   **Q**    And it says 16 is the total number of events?

4   **A**    Yes.

5   **Q**    And then the second bullet point talks about the number of

6   pipelines involved.  It's got 12.  Do you see that?

7   **A**    Yes.

8   **Q**    Among those Line 107, 109 and 132?

9   **A**    Yes.

10  **Q**    And then the third bullet point is number of miles, and

11  the total there is 46.5.  And it says "HCA Miles," is that

12  right?

13  **A**    Yes.

14  **Q**    Let's look at the next page, if you would.

15       (Document displayed)

16  **Q**    There's "Additional Analysis."  If we look at the bottom

17  two bullet points, it says:

18            "Conducted records review to verify seam type

19       and MAOP data in GIS."

20       And it says it excluded segments with DSAW seam.  Do you

21  know why that is or why that would be?

22  **A**    I assume they are interested in just the segments that are

23  subject to the requirements of the Appendix A in B31.8S, which

24  doesn't include DSAW pipe.

25  **Q**    Okay.  And are you thinking -- do you have (e)(4) in mind

1   with ERW?

2   **A**     Yes.

3   **Q**     The last bullet point says:

4              "Pipeline engineering performed review of

5         segments to identify uprate or replacement work

6         performed that may not have been reflected in GIS."

7         Do you see that?

8   **A**  Yes.

9   **Q**     Let's look at the next page, please.

10        (Document displayed)

11  **Q**     It's "Records Review Results."  Do you see that?

12  **A**  Yes.

13  **Q**     Okay.  And we've got two charts here "Seam Type" and

14  "MAOP"?

15  **A**  Yes.

16  **Q**     All right.  And I'm interested in the "Total" column at

17  the bottom.  It lists different seams along the left column,

18  right?

19  **A**  Yes.

20  **Q**     Long seam type?

21  **A**  Yes.

22  **Q**     Okay.  And then the total in the second column says --

23  "HCA Miles" is the title of that second column?

24  **A**  Yes.

25  **Q**     And the total is the 46.5 that we saw a moment ago?

1   **A**    Yes.

2   **Q**    Okay.  And then look at the last column over on the right

3   where it says "Unconfirmed."  And there is a footnote.  Do you

4   see that Footnote 1?  It says:

5            "Job files could not" --

6            **MS. WEST:**  Could we expand that footnote there at the

7   bottom, please?

8        (Document enlarged.)

9            **MS. WEST:**  Thank you.  I'm not sure that helps,

10  but...

11  **BY MS. WEST:**

12  **Q**    (As read)

13            "Job files could not readily be located and

14        require additional research or job files did not

15        definitively confirm GIS data."

16        Do you see that?

17  **A**    I do.

18  **Q**    Okay.  And the number of unconfirmed miles is 34.4?

19  **A**    Yes.

20  **Q**    All right.  So the number of confirmed HCA miles here,

21  which is the third column, is 11.9, right?

22  **A**    Correct.

23  **Q**    All right.  So the balance is unconfirmed, yes?

24  **A**    Yeah.

25  **Q**    I want to take a look at one of the attachments here.

1          **MS. WEST:**  If we could pull up the attachment that is

2     the consolidated sheet.  Do you see that?

3          I think we may need to go back to Page 1 to get the

4     consolidated sheet.  Let's see.

5          **THE COURT:**  While they are doing that, let's start

6     winding this down.  I am on a very tight schedule.

7          **MS. WEST:**  Yes.

8          (Brief pause.)

9          **MS. WEST:**  I'm looking for the consolidated sheet on

10    717.

11         (Document displayed.)

12         **MS. WEST:**  Thank you.

13    **BY MS. WEST:**

14    **Q**   Do you -- do you see this in front of you?  It's also --

15    **A**   Do you want me to find it here or just here (indicating)?

16    **Q**   You can look at it on Pages --

17    **A**   Okay.  I'll look at it on the screen.

18    **Q**   Okay.  It's also on Pages 18, 19 and 20 in front of you.

19    **A**   That's fine.

20    **Q**   Okay.  Mr. Manegold, do you see that it says at the top

21    there:

22              "This list below only includes

23         transmission lines."

24    **A**   Yes.

25    **Q**   All right.  So do you see that this is a list of

1   exceedances on transmission lines?

2   **A**   I see that it says "exceed five year MOP."

3   **Q**   Well, many of them say that.  Some say other things, is

4   that right, if you want to look through?

5   **A**   Okay.  Well, so what page is it on?  I can only see what's

6   on the screen there and I only see "exceed five year MOP."

7   **Q**   Why don't you look at the pages in front you, 18, 19 and

8   20 of this exhibit.

9       (Witness complied.)

10  **A**   17 pages.  18, 19 and 20...  I'm on the wrong exhibit, I

11  guess.  Is it -- what's the --

12  **Q**   717.

13  **A**   Okay.

14  **Q**   Pages 18, 19 and 20.

15  **A**   It looks like mine stops at 13.  Am I reading the wrong

16  thing?

17  **Q**   That's all right.  Do you know why this data was being

18  gathered?

19  **A**   No.

20  **Q**   Have you heard of something called a critical or --

21  something called CIMT?

22  **A**   Right now that -- those letters don't mean anything to me.

23  **Q**   All right.  Let's take a look at 725, please.

24  **A**   725?

25

1  Q    Yes.

2  A    I don't think I have that in the book.

3  Q    You do not?

4  A    I have 722 and 728.

5  Q    All right.

6          MR. BAUER:  I'm missing that as well.

7          MS. WEST:  Okay.

8  BY MS. WEST:

9  Q    Let's go to 756.

10  A    Okay.

11  Q    Is this an email, originally from you, that gets

12  forwarded?

13  A    Yes.

14          MS. WEST:  Government offers 756.

15          THE COURT:   756 is admitted.

16      (Trial Exhibit 756 received in evidence.)

17          MS. WEST:  Can we please pull up Page 1?

18      (Document displayed)

19  BY MS. WEST:

20  Q    Now, the bottom email here, Mr. Manegold, is again your

21  interpretation of what activates the manufacturing threat,

22  correct?

23  A    It was the draft memo that I wrote, correct.

24  Q    All right.  And you had sent this -- you had sent to it

25  Sara Burke, Calvin Lui, et cetera?

1  **A**     Right.  For comment, right.

2  **Q**     Here, if we look at the top of this chain, it says it's

3  from Calvin Lui to a Justin Aragon?

4  **A**     Yes.

5  **Q**     Do you know who that is?

6  **A**     I believe Justin was an attorney contracted to PG&E.  He

7  worked for Orrick.

8  **Q**     And you're copied on this email?

9  **A**     Yes.

10 **Q**     And the date is February 18, 2011?

11 **A**     Yes.

12 **Q**     And it appears to be forwarding your "10 percent

13 allowance" document, correct?

14 **A**     That draft memo, right.

15 **Q**     Do you know why this was forwarded?

16 **A**     No.

17 **Q**     You don't know why it was forwarded to a contract

18 attorney?

19 **A**     No.

20         **MS. WEST:**  Could we have a couple more minutes, your

21 Honor?  I can get probably through two more exhibits in a

22 couple minutes.

23         **THE COURT:**  Okay.

24 **BY MS. WEST:**

25 **Q**     Let's look at 767, please.

 1          (Witness complied.)

 2   **Q**    767 is an email from a Peter Katchmar to Bob Fassett?

 3   **A**    Yes.

 4   **Q**    Do you know who Peter Katchmar is?

 5   **A**    I think so.

 6   **Q**    Is he a PHMSA --

 7   **A**    He's a PHMSA inspector who was a member of the NTSB

 8   investigation board and he was also a member of the audit team

 9   that -- that audited PG&E in April of 2011.

10          **MS. WEST:**  The Government offers Exhibit 767.

11          **MR. BAUER:**  Objection.  This one was withdrawn also.

12          **MS. WEST:**  The Government --

13          **THE COURT:**  I'm sorry.  This one was what?

14          **MR. BAUER:**  The Government withdrew this exhibit,

15   too, your Honor.

16          **MS. WEST:**  Your Honor, the Government had withdrawn

17   it and then advised PG&E a couple of days ago that it intended

18   to offer it again.

19          **THE COURT:**  Well, we don't -- let's take this up next

20   week.  I'm not going to -- be ready to argue it and we'll start

21   there.

22          **MS. WEST:**  All right.  Now would be a good time to

23   break then.

24          **THE COURT:**  Okay.  We're in recess in a moment until

25   9:00 o'clock next Tuesday.  Have a good weekend.

1        Very briefly, I'll remind you of your admonitions.  Do not

2   talk about this case among yourselves or with others.  Don't do

3   any independent research of any kind over the weekend or during

4   this trial, in fact.  And do not let any third person discuss

5   this case to you or in your presence.  And if anyone does, I

6   ask that you let me know immediately.

7        Court is adjourned.  Have a good weekend.

8        (Jury exits courtroom at 11:56 a.m.)

9        **THE COURT:**  Okay, we're in recess.

10       Monday I'd like you to update your estimate of how long

11   your case will take.  I believe we started off estimating that

12   it would end mid next week.  Let me know how far off that was

13   to the best of your ability.  Okay?

14       **MS. WEST:**  Yes.

15       **MR. BAUER:**  I haven't had a chance to talk to my team

16   about this, but as I'm looking at these documents coming in, I

17   think I'd like permission to file a short brief for you to read

18   on Monday, as I -- as I try to be clear on what I can ask and

19   what I can't ask related to San Bruno.  I don't want to -- I

20   know if I ask a question, the Government is going to say:

21   You've opened the door.  And so I don't want to have that fight

22   from a position of weakness.

23       **THE COURT:**  Nor do I.

24       **MR. BAUER:**  But many of these, the explanation for

25   why people are doing program reviews, of course, is because

1  they were looking at the program afterwards.  So I just want to

2  be careful about that.

3           **THE COURT:**  Okay.  When do you want to do that?

4           **MR. BAUER:**  If I could just file something?  If I

5  file something on Monday, Monday morning or something, just so

6  you have a chance to see it and think about it.

7           **THE COURT:**  Okay.  When will you file that?

8           **MR. BAUER:**  I can do it before 9:00 o'clock Monday

9  morning.  How is that?

10          **THE COURT:**  Okay, that's fine.

11      How does our Monday afternoon look, Tracy?  That's usually

12  better.

13      (Discussion held off the record between the Court and the

14      Courtroom Deputy.)

15          **THE COURT:**  We're going to have to do it fairly late.

16  4:00 o'clock Monday, how will that work for everyone?

17          **MR. BAUER:**  I think I will still be awake by then,

18  your Honor.

19          **THE COURT:**  Okay.  Let's plan to discuss this

20  thoroughly at 4:00 o'clock Monday.

21          **MS. WEST:**  Will the Court want a written response

22  from the Government?  I fear if so, I need to ask for more than

23  two hours this time.

24          **THE COURT:**  I will leave that to you.  You can argue

25  it orally, but if you want to have a written response, I'll

1  need it before 4:00 o'clock.

2          MS. WEST:  Well, that's why I wonder if the Court

3  would like a written response, if perhaps the defense could

4  file by Sunday, then we could provide that to the Court Monday

5  morning.

6          THE COURT:  Is that doable?

7          MR. BAUER:  If -- end of the day Sunday or something,

8  right?  I'm not sure I can think this through in one day.

9          THE COURT:  That's fine.  Let's do that.

10         MS. WEST:  Perhaps --

11         THE COURT:  We need to be explicit.  End of the day

12  Sunday is what time?

13         MR. BAUER:  Oh, for us?  I mean, we're -- I'm in the

14  saddle until 11:00 o'clock every night, your Honor.

15         THE COURT:  We notice.  Okay.

16         MS. WEST:  So then can the Government have until noon

17  on Monday, your Honor, to respond?  If they file at midnight, I

18  wouldn't be able to respond.

19         THE COURT:  You can have until noon --

20         MS. WEST:  Thank you.

21         THE COURT:  -- Monday.

22         MS. WEST:  Thank you.

23         THE COURT:  So we're all set.  Okay.  Court is --

24         MS. HOFFMAN:  Your Honor, I know you're rushing off

25  to a medical appointment and I hate to do this, but I know

 1  we're also supposed to bring matters right away to the Court.

 2       We were handed this morning a new defense exhibit that

 3  we've never been provided before.  It's over 300 pages.  It's

 4  the additional STPRs.

 5       And I know I brought this up previously when we were

 6  saddled with over 3,000, but that was before trial.  Now we're

 7  a month into trial.

 8       If your Honor is going to allow this sort of late

 9  production, we would ask to be given a detailed index of these

10  300-plus documents; what line they pertain to, what mile post

11  they pertain to.  Because there is no way we can incorporate

12  this.  They gave it to us today for a witness who is the next

13  witness intending to testify.

14            **THE COURT:**  Who is that next witness?

15            **MS. HOFFMAN:**  Todd Hogenson.

16            **THE COURT:**  Well, you may -- because I'm getting

17  really tired of this crap.  You can tell by that word that I am

18  really getting tired of it.  You may want to consider whether

19  you're even going to show this -- present this person until I

20  iron this out.  I'm tired of staying up late at night, and she

21  stays up later because of this game playing you're doing.

22       So we'll talk about it, but we're not going to cram this

23  down my throat.  We'll solve this in due time and if you have

24  to call this person out of order, that's what we'll do.  Am I

25  clear?

1          **MS. DYER:**  Yes, your Honor.  We would be happy to

2    address it on Monday afternoon if that's convenient.

3          **THE COURT:**  We will do that.

4          **THE CLERK:**  Court is in recess.

5       (Whereupon at 12:02 p.m. further proceedings

6        in the above-entitled cause was adjourned until

7        until Monday, July 13, 2016 at 4:00 p.m.)

8                           -   -   -   -

## INDEX

**PLAINTIFF'S WITNESSES**                                    **PAGE**   **VOL.**

**MANEGOLD, WILLIAM**
(RECALLED)                                                   2430      17
Direct Examination Resumed by Ms. West                       2430      17

## EXHIBITS

|      | IDEN | VOL. | EVID | VOL. |
|------|------|------|------|------|
| 409  |      |      | 2432 | 17   |
| 508  |      |      | 2439 | 17   |
| 549  |      |      | 2464 | 17   |
| 553  |      |      | 2470 | 17   |
| 558  |      |      | 2480 | 17   |
| 560  |      |      | 2473 | 17   |
| 565  |      |      | 2486 | 17   |
| 572  |      |      | 2490 | 17   |
| 573  |      |      | 2495 | 17   |
| 575  |      |      | 2501 | 17   |
| 578  |      |      | 2506 | 17   |
| 582  |      |      | 2507 | 17   |
| 591  |      |      | 2509 | 17   |
| 615  |      |      | 2511 | 17   |
| 622  |      |      | 2512 | 17   |
| 642  |      |      | 2516 | 17   |
| 647  |      |      | 2520 | 17   |
| 648  |      |      | 2532 | 17   |
| 649  |      |      | 2526 | 17   |
| 651  |      |      | 2533 | 17   |
| 663  |      |      | 2535 | 17   |
| 674  |      |      | 2537 | 17   |
| 714  |      |      | 2541 | 17   |
| 716 (Previously misidentified as D-716) |  |  | 2429 | 17 |
| 717  |      |      | 2542 | 17   |
| 756  |      |      | 2553 | 17   |

1

2                    **CERTIFICATE OF REPORTER**

3

4

5        We certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.

7

8        _____/s/_____

9

10       Debra L. Pas, CSR 11916, CRR, RMR, RPR

11       _____/s/_____

12        Belle Ball, CSR 8785, CRR, RMR, RPR

13

14

15                    Friday, July 8, 2016

16

17

18

19

20

21

22

23

24

25