UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br>        v.<br>PACIFIC GAS AND ELECTRIC COMPANY,<br>    Defendant. | Case No. 14-cr-00175-TEH<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL UNDER RULE 29** |

Following a six-week trial and two weeks of deliberations, the jury in this case returned a guilty verdict as to Counts One, Two, Five, Six, Seven, and Eight, and a not guilty verdict as to all other counts. Pursuant to Federal Rule of Criminal Procedure 29, Defendant Pacific Gas and Electric Company ("PG&E") asks this Court to enter a judgment of acquittal on all six counts on which the jury found guilt. For the reasons discussed below, the Court DENIES PG&E's motion in its entirety.

**LEGAL STANDARD**

Rule 29 requires a court, on the defendant's motion, to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The "reviewing court may not ask whether a finder of fact could have construed the evidence produced at trial to support acquittal," nor may the court ask whether it would have found guilt beyond a reasonable doubt if it were the finder of fact. *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010). Instead, the court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In doing so, the court must draw all reasonable inferences – those "supported by a chain of logic, rather than . . . mere speculation" – in favor of the prosecution. *United States v. Navarrette-*

*Aguilar*, 813 F.3d 785, 793, 796 (9th Cir. 2015) (alteration in original) (quoting *Juan H. v. Allen*, 408 F.3d 1262, 1277 (9th Cir. 2005)).

## DISCUSSION

### I. Count One

Count One charged PG&E with obstructing a pending agency proceeding before the National Transportation Safety Board ("NTSB") in violation of 18 U.S.C. § 1505. As the jury was instructed, this charge "is based on a letter the defendant sent to the NTSB on April 6, 2011." Jury Instr. No. 19 (Dkt. No. 888 at 20). The April 6 letter purported to correct the version of PG&E's Risk Management Instruction No. RMI-06 that PG&E previously submitted to the NTSB. The letter noted that this version of RMI-06, referred to in the letter as "draft revision 1," stated that pipeline segments "will be prioritized as a high risk segment for the baseline assessment or reassessment if they have been operated over the maximum operating pressure (MOP) experienced during the preceding five years *plus 10 percent of the historical operating pressure*." Ex. D-402 at 1 (emphasis added). The letter further stated that draft revision 1 was never approved, and that the 10% provision was not included in either the version of RMI-06 in effect at the time of PG&E's original submission to the NTSB or the version in effect as of the date of the letter. Viewed in a light most favorable to the prosecution, the letter can reasonably be read as communicating that the 10% allowance was included only in a draft version of RMI-06 that was neither approved nor implemented by PG&E.

PG&E argues that its conviction on Count One must be overturned because the Government failed to prove the elements of materiality and corrupt intent.[1] The Court addresses each of these elements in turn.

---

[1] PG&E also argues in a footnote that the Court should enter a judgment of acquittal because the NTSB investigation was not a proceeding for the purposes of 18 U.S.C. § 1505. This Court already rejected that argument when it denied PG&E's motion to dismiss Count One, Dkt. No. 218 at 4-10, and finds no reason to revisit its pretrial ruling.

2

First, as to materiality:

> An act is "material" if it has a natural tendency to influence, or is capable of influencing, the investigation. The government must therefore prove beyond a reasonable doubt that the charged conduct was capable of influencing the investigation by, for example, causing the NTSB to cease its investigation, pursue different avenues of inquiry, or reach a different outcome.

Jury Instr. No. 23. While PG&E posits different theories as to why the April 6, 2011 letter was not material, the Court cannot say that a rational juror could not have reached a contrary conclusion. The jury heard ample testimony that the letter was responsive to an NTSB data request. The jury also heard evidence from the lead NTSB investigator that he placed the letter in the NTSB's public docket because it was pertinent to the investigation. The investigator also testified about why he would be concerned if PG&E had followed the 10% allowance contained in draft revision 1, and he explained that he accepted PG&E's letter at face value that the 10% allowance had not actually been put into effect. This evidence is sufficient to allow a rational juror to conclude beyond a reasonable doubt that the letter was capable of influencing the NTSB investigation and was therefore material.

As to corrupt intent, "'corruptly' means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information." Jury Instr. No. 21.

> Because a corporation can act only through its employees, the government must prove beyond a reasonable doubt that one or more employees of the defendant corruptly committed the acts charged in Count One. However, the employee who possesses the corrupt intent need not be the same employee who carries out the act effectuating that corrupt intent.

Jury Instr. No. 22. Again, PG&E asserts several theories that, if believed, could have led the jury to conclude that the Government failed to prove corrupt intent. However, the record contains sufficient evidence to allow a rational juror to find corrupt intent beyond a reasonable doubt. As the Government correctly observes in its opposition – although it suggested to the contrary in its closing argument – the jury could have disbelieved the

3

testimony of William Hayes, the signatory to the letter, that he was not involved in drafting the letter and had no knowledge of whether PG&E actually put into practice the supposedly unapproved 10% policy.  *See United States v. Kenny*, 645 F.2d 1323, 1346 (9th Cir. 1981) ("When the defendant elects to testify, he runs the risk that if disbelieved, the trier of fact may conclude that the opposite of his testimony is the truth.").  Moreover, the jury heard evidence that PG&E's integrity management employees only began to track down communications regarding RMI-06 one month prior to the April 6 letter, after being told that the Pipeline and Hazardous Materials Safety Administration ("PHMSA") party representative to the NTSB investigation did not believe that federal regulations permitted a 10% allowance.  The jury also heard evidence that PG&E employees, including those at high levels, applied the 10% allowance or believed the 10% allowance to be the company's practice, as well as evidence that several of these same employees understood that federal regulations did not permit such an allowance.  Viewing the evidence in a light most favorable to the prosecution, it is a reasonable inference, and not mere speculation, that one or more PG&E employees must have intended to conceal the 10% practice in the April 6, 2011 letter.  This is sufficient to support the jury's finding of corrupt intent.

Accordingly, the Court DENIES PG&E's motion for a judgment of acquittal on Count One.

## II.   Count Two

Count Two charged PG&E with knowingly and willfully violating 49 C.F.R. § 192.917(b) as to Lines 109 and 132.  PG&E argues that its conviction on this count must be overturned because the Government failed to prove that PG&E "knowingly and willfully failed to, for the purpose of identifying and evaluating the potential threats to a covered pipeline segment, gather and integrate existing data and information on the entire pipeline that could be relevant to the covered segment."  Jury Instr. No. 29.

The Government argues that the evidence supports a guilty verdict as to two leaks: a 1977 leak on Line 109 and a 1988 leak on Line 132.  The jury received ample evidence

4

1 from which it could have concluded that PG&E knew that information as to these two
2 leaks was missing from certain of the company's records, including the geographic
3 information system ("GIS") into which, by company policy, data was to be integrated.
4 The jury also received evidence that PG&E knew it had to gather and integrate data to
5 comply with federal regulations.  Although willfulness is a closer question, the Court
6 cannot say that no rational juror could have found willfulness beyond a reasonable doubt.
7 The jury could have reasonably concluded, for example, that PG&E took steps to integrate
8 other pieces of data, so its failure to do so as to these two leaks must have been intentional.
9 The jury could also have believed that PG&E employees were motivated to cut corners by
10 saving money, despite the dangers involved, perhaps because they were directed to
11 maximize profits or because the company's financial results factored into employee
12 compensation.  In any case, the Court finds sufficient evidence to support a finding of guilt
13 beyond a reasonable doubt and therefore DENIES PG&E's motion for a judgment of
14 acquittal on Count Two.

## III. <u>Count Five</u>

Count Five charged PG&E with knowingly and willfully violating 49 C.F.R. § 192.917(a) as to DFM 1816-01 and Lines 132 and 153.  PG&E argues that its conviction on this count must be overturned because the Government failed to prove that PG&E "knowingly and willfully failed to identify and evaluate all potential threats to each covered pipeline segment."  Jury Instr. No. 31.

The jury received evidence that PG&E selected the external corrosion direct assessment ("ECDA") method to assess some of the identified threats, including manufacturing threats, and that it knew that federal regulations required it to identify and evaluate such threats.  The jury also heard consistent testimony that it was impossible to evaluate manufacturing threats using ECDA.  In addition, the jury heard evidence that ECDA was more expensive than other testing methods, and that PG&E employees considered cost when making decisions.

1    PG&E does not contest that the jury could have reached these conclusions, but it
2    argues that this is insufficient to support a conviction on Count Five because – unlike a
3    different, uncharged regulation – the charged regulation does not require selection of the
4    method "best suited" to address the identified threats.  *Compare* 49 C.F.R. § 192.917(a)
5    (regulation charged in Count Five) *with* 49 C.F.R. § 192.921(a) (uncharged regulation
6    requiring that "[a]n operator must select the method or methods best suited to address the
7    threats identified to the covered segment").  Although PG&E is correct that the charged
8    regulation does not require the "best suited" method of assessment, the regulation does
9    require that PG&E "evaluate" all potential threats.  Based on the evidence presented at
10   trial, including evidence that PG&E chose ECDA to assess manufacturing threats that it
11   knew ECDA could not actually evaluate, it would be reasonable to conclude beyond a
12   reasonable doubt that PG&E knowingly and willfully failed to evaluate such threats.  Thus,
13   the Court DENIES PG&E's motion for a judgment of acquittal on Count Five.

## IV.    Count Six

Count Six charged PG&E with knowingly and willfully violating 49 C.F.R. § 192.919 as to Lines 109, 132, and 153.  PG&E argues that its conviction on this count must be dismissed because the Government failed to prove that PG&E "knowingly and willfully failed to include in a Baseline Assessment Plan [("BAP")]. . . the methods selected to assess all potential threats on covered segments."[2]  Jury Instr. No. 32.

PG&E's argument as to Count Six mirrors its argument as to Count Five: that "all the *charged* regulation requires is that PG&E document *an* assessment method" in the BAP, Dkt. No. 898 at 21, not that the method be "best suited to address the threats" as required by § 192.921(a).  This argument is as unpersuasive as to Count Six as it is to

---

[2] PG&E also argues that Count Six should have been limited to Revision 5 of the BAP, approved on January 22, 2010.  The Court does not address this argument, including whether challenges to jury instructions are properly raised in a Rule 29 motion, because, as discussed below, sufficient evidence from the January 22, 2010 BAP supports a conviction.

Count Five. Viewing the evidence in a light most favorable to the prosecution, a rational juror could have concluded that the January 22, 2010 BAP identified ECDA as the purported assessment method for potential threats on charged lines that could not possibly have been assessed by ECDA, and that the BAP therefore failed to include *any* assessment method at all for these threats. It would be as if PG&E said it would assess a potential leak on a pipe by measuring the pipe's diameter or the temperature of the gas inside; a jury could have found ECDA to be no different from these nonsensical methods of "assessment" and determined that ECDA was not a "method . . . to assess" the potential threats. A rational juror could have further concluded that PG&E knew of the impossibility of assessing some of the potential threats using ECDA but chose that method anyway, perhaps to reduce costs, and that PG&E therefore knowingly and willfully violated § 192.919 beyond a reasonable doubt. Consequently, the Court DENIES PG&E's motion for a judgment of acquittal on Count Six.

## V. Counts Seven and Eight

Counts Seven and Eight both concern prioritization of pipeline segments that have particular threats. Count Seven charged PG&E with knowingly and willfully violating 49 C.F.R. § 192.917(e)(3) as to DFM 1816-01 and Lines 109, 132, and 153. To comply with this regulation, a pipeline operator who has "identified the threat of manufacturing defects in a covered segment" on which "a 'changed circumstance' occurred" must "prioritize the covered segment for the baseline assessment or a subsequent reassessment." Jury Instr. No. 33. A "changed circumstance" includes "operating pressure increased above the maximum operating pressure experienced during the preceding five years." *Id.*

Count Eight charged PG&E with knowingly and willfully violating 49 C.F.R. § 192.917(e)(4) as to DFM 1816-01 and Lines 107, 109, 132, and 191-1. To comply with this regulation, if "a covered pipeline segment contained low frequency electric resistance welded pipe (ERW), lap welded pipe or other pipe that satisfies the conditions specified in ASME/ANSI B31.8S, Appendices A4.3 and A4.4," and "any covered or noncovered

7

1   segment in the pipeline system with such pipe has experienced seam failure" or "operating
2   pressure on the covered segment has increased over the maximum operating pressure
3   experienced during the preceding five years," then a pipeline operator must "prioritize the
4   covered segment as a high risk segment for the baseline assessment or a subsequent
5   reassessment."  Jury Instr. No. 34.

6   PG&E raises a number of challenges to its convictions on these counts, but a rational juror could have followed the evidence outlined by the Government during its closing arguments and found sufficient evidence of guilt beyond a reasonable doubt. For instance, PG&E argues that the regulations are ambiguous as to whether prioritization is required with *any* increase in operating pressure over the maximum operating pressure experienced in the last five years, even if that increase was of short duration, but the jury could well have concluded that these arguments were post-hoc attempts to rationalize the company's failures. Indeed, PG&E's motion cites no evidence that any PG&E employee ever believed that temporary pressure increases need not be considered as increases in operating pressure under federal regulations, and the jury could have concluded that the plain language of the statute refers to any overpressure, however temporary, and that PG&E knew that. PG&E did present testimony that it only considered increases over 10% to be an issue, but a rational juror could have concluded beyond a reasonable doubt that PG&E knew that such an allowance was not permissible under the regulations.

PG&E also argues that there was no proof of any actual increases beyond maximum operating pressures because the Government relied solely on PG&E's own records, which PG&E employees testified did not accurately report actual operating pressures. The jury could have simply disbelieved the self-serving testimony of PG&E's employees, but even if it believed that there was some margin of error in PG&E's data, it could nonetheless have found an overpressure in at least some of the instances identified by the Government.

Finally, even if there might be some ambiguity as to the outer bounds of what it means to "prioritize" under these regulations, a rational juror could have concluded that PG&E violated any reasonable interpretation of the term. For example, the jury heard

substantial evidence concerning ECDA, its unsuitability to evaluate some of the risks for which PG&E used it, and its low cost relative to more appropriate testing methods. A rational juror could have concluded that PG&E chose ECDA to cut costs even though it knew that ECDA was incapable of assessing certain risks, thereby essentially ignoring those risks, and that it knew that this was not permitted under the regulations. PG&E repeatedly argued to the jury about "good engineering judgment," but the jury could have determined that it was not good judgment to use an assessment method that was technically incapable of assessing the identified risks. Thus, the jury could have concluded beyond a reasonable doubt that PG&E knowingly and willfully chose to do nothing to address segments where overpressures occurred and prioritization was required, and that any reasonable interpretation of "prioritize" would not allow this.

For all of the above reasons, the Court DENIES PG&E's motion for a judgment of acquittal on Counts Seven and Eight.

**CONCLUSION**

On all six counts on which it was convicted, PG&E argues to the Court, as it previously argued to the jury, that the Government failed to prove its case. The jury rejected PG&E's theories, and the Court cannot say that no rational juror, viewing the evidence in a light most favorable to the prosecution, could have found guilt beyond a reasonable doubt. Accordingly, the Court DENIES PG&E's motion for a judgment of acquittal in its entirety.

**IT IS SO ORDERED.**

Dated: 11/17/16

THELTON E. HENDERSON
United States District Judge