BRIAN J. STRETCH (CABN 163973)
United States Attorney

BARBARA J. VALLIERE (DCBN 439353)
Chief, Criminal Division

HALLIE MITCHELL HOFFMAN (CABN 210020)
HARTLEY M. K. WEST (CABN 191609)
JEFF SCHENK (CABN 234355)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    Fax: (415) 436-7234
    Hallie.Hoffman@usdoj.gov
    Hartley.West@usdoj.gov
    Jeffrey.B.Schenk@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 14-00175 TEH |
| Plaintiff, | UNITED STATES' SENTENCING MEMORANDUM |
| v. | |
| PACIFIC GAS AND ELECTRIC COMPANY, | Date: January 23, 2017<br>Time: 2:30 p.m.<br>Courtroom: G, 15th Floor |
| Defendant. | Judge: Hon. Thelton E. Henderson |

U.S. SENTENCING MEMORANDUM
CR 14-00175 TEH

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................................1

II.  DISCUSSION .....................................................................................................................2

     A.   Offense Conduct .......................................................................................................2

          1.   Count One .......................................................................................................2

          2.   Counts Two and Five Through Eight ..............................................................3

     B.   Relevant Conduct .....................................................................................................4

          1.   Obstruction ......................................................................................................4

          2.   Other Pipeline Safety Violations .....................................................................5

III. SENTENCING GUIDELINES CALCULATION .............................................................6

IV.  ARGUMENT ......................................................................................................................7

     A.   Fine ...........................................................................................................................7

     B.   Probation ..................................................................................................................8

          1.   Safety Program ................................................................................................8

          2.   Advertising Program .......................................................................................9

          3.   Monitor/Compliance and Ethics Program .......................................................9

          4.   Community Service .......................................................................................10

V.   CONCLUSION .................................................................................................................10

**TABLE OF AUTHORITIES**

CASES

*United States v. Danilow Pastry Co.*, 563 F. Supp. 1159 (S.D.N.Y. 1983) ............ 7

*United States v. Lowe*, 654 F.2d 562 (9th Cir. 1981) ............ 8

*United States v. Mitsubishi Int'l Corp.*, 677 F.2d 785 (9th Cir. 1982) ............ 7

STATUTES

18 U.S.C. § 3553 ............ 7, 8

18 U.S.C. § 3563 ............ 8, 9, 10

18 U.S.C. § 3572 ............ 7, 8

49 U.S.C. § 60123(a) ............ 3, 6

RULES

U.S.S.G. § 2Q1.2 ............ 6

U.S.S.G. § 4A1.3 ............ 6

U.S.S.G. § 5K2.3 ............ 6

U.S.S.G. § 8B1.3 ............ 10

U.S.S.G. § 8B2.1 ............ 9

U.S.S.G. § 8C2.1 ............ 6, 7

U.S.S.G. § 8D1.4(a) ............ 9

REGULATIONS

49 C.F.R. § 192.517(a) ............ 5

49 C.F.R. § 192.709(a) ............ 5

## I. INTRODUCTION

On September 9, 2010, a natural gas pipeline owned and operated by defendant Pacific Gas and Electric Company (PG&E) ruptured in a residential neighborhood in San Bruno, California. The rupture of Line 132 released approximately 47.6 million standard cubic feet of natural gas, created a crater approximately 72 feet by 26 feet wide, and launched a 180-foot long pipe weighing 3,000 pounds from several feet underground to rest about 100 feet away. The gas ignited, causing an explosion and fire that took 50 hours to extinguish. The fire killed 8 people and injured 58 others, several with severe burns over much of their bodies. It damaged 108 homes; 38 were completely destroyed.

The National Transportation and Safety Board (NTSB) immediately began an investigation into the cause of the explosion, as well as PG&E's pipeline integrity management program, which was supposed to ensure the safety of its system. The NTSB determined that PG&E's "gas transmission integrity management program was deficient and ineffective," and specifically that PG&E had inaccurate and incomplete records, failed to consider known longitudinal seam cracks in Line 132, chose a method to assess Line 132's integrity that it knew was inadequate to detect seam defects such as the one that led to the rupture, and improperly considered known manufacturing defects on Line 132 to be stable. Dkt. 672 at 4-6. The California Public Utilities Commission (CPUC) also conducted an investigation, concluding that PG&E's failure to comply with integrity management requirements, inadequate record keeping practices, and "systemic failure of PG&E's corporate culture to emphasize safety over profits," were causes of the San Bruno explosion. Dkt. 672 at 4-5.

PG&E was charged with violating the very same pipeline safety regulations that underlay the NTSB's and CPUC's findings. On August 9, 2016, after an eight-week jury trial, PG&E was convicted on five felony counts of knowingly and willfully violating minimum safety standards under the Natural Gas Pipeline Safety Act. The jury also convicted PG&E of obstructing the NTSB proceedings, finding that it intentionally and corruptly provided investigators with misleading information concerning its integrity management practices.

PG&E's pattern of deliberate and methodical violations of safety regulations, motivated by profit and resulting in mass death and destruction, warrants the most serious sentence this Court can impose. The United States fully supports the comprehensive sentencing recommendation of the United States

1  Probation Office, including a five-year probation term, extensive monitoring program, 10,000 hours of
2  community service by executive management and other employees, revamping of the company's
3  compensation structure to reward safety over profits, and media acknowledgement of its violations and
4  convictions, as well as the maximum statutory fine.  The Court should order that these costs not borne
5  by the ratepayers.  Such a sentence is not only appropriate, it is the minimum necessary to reflect the
6  seriousness of PG&E's conduct, promote respect for the law, provide just punishment, protect the public
7  from further crimes by this recidivist defendant, and adequately deter other natural gas operators across
8  the country.

## II.   DISCUSSION

**A.   Offense Conduct**

The Presentence Report (PSR) accurately summarizes the proof at trial regarding PG&E's offense conduct.

### 1.   Count One

The evidence proved that PG&E intentionally and corruptly endeavored to obstruct, influence, or impede the NTSB's investigation.  Among the issues that the NTSB specifically investigated was PG&E's practice of intentionally raising the pressure every five years in many of its oldest gas transmission pipelines in high consequence areas (HCAs), including Line 132.  PG&E engaged in this practice in an effort to maintain the pipelines' five-year maximum operating pressure ("5-year MOP") at the maximum allowable operating pressure (MAOP).  These planned pressure increases (PPIs) often resulted in pipelines experiencing pressures that exceeded their 5-year MOP.  According to the pipeline safety regulations, once the pressure on these lines exceeded the 5-year MOP, manufacturing threats on the pipelines became unstable, requiring the operator to replace or properly assess the integrity of the pipeline either by a hydrotest or an acceptable form of in-line inspection (ILI).

After learning that PG&E was intentionally increasing pressure on its transmission lines as a strategy to preserve its 5-year MOPs, the NTSB sent PG&E data requests seeking more information.  In February 2011, PG&E responded to the NTSB's requests with a copy of its Risk Management Instruction ("RMI-06"), which set forth PG&E's PPI policy, including that PG&E considered a manufacturing threat unstable only if the pressure exceeded the 5-year MOP by 10% (RMI-06 +10%

version). On March 9, 2011, an inspector with the Pipeline and Hazardous Materials Safety Administration (PHMSA), who was also a party member to the NTSB investigation, advised PG&E management that its +10% allowance was not allowed. The NTSB followed up with a data request asking how PG&E determined the stability of manufacturing threats on its high-risk pipelines.

After a flurry of emails amongst PG&E employees, PG&E emailed a letter to the NTSB on April 6, 2011, advising there was "no indication that [the +10% allowance version of RMI-06] was ever approved," and that the RMI-06 versions in effect did not include "the 10% provision found in the unapproved version." PG&E did not disclose that its integrity management group had actually followed the +10% version of RMI-06 and, as a result, did not treat approximately 84 miles (443 segments) of its gas transmission lines as having unstable manufacturing threats. The letter also failed to disclose to the NTSB that senior members of PG&E's integrity management group who implemented this policy knew the +10% version violated the pipeline safety regulations and PHMSA guidance regarding those regulations. The lead NTSB investigator posted this letter on the NTSB's docket, which he testified signified its importance to the investigation.

### 2. Counts Two and Five Through Eight

PG&E was also convicted on Counts Two and Five through Eight, which charged knowing and willful violations of Minimum Federal Safety Standard regulations for natural gas pipelines, in violation of the Natural Gas Pipeline Safety Act, 49 U.S.C. § 60123(a). As to Count Two, the evidence showed that PG&E knowingly and willfully failed to gather and integrate data and information relevant to identifying and evaluating potential threats to pipeline segments in HCAs. Specifically, PG&E integrity management documents falsely stated that there were no failures or leaks on the long seams of particular pipelines, and that potential threats had been reviewed and addressed. Meanwhile, PG&E admitted in its data responses to the NTSB that its leak records were "not fully integrated," and that it could not find records pertaining to one particular leak. PG&E nonetheless consistently chose an integrity assessment method (external corrosion direct assessment, or "ECDA") that, while cheap, was not designed for nor capable of testing for long seam leaks and failures.

As to Count Five, the evidence proved that PG&E knowingly and willfully failed to identify and evaluate not only the leaks identified in Count Two, but also manufacturing threats to certain pipeline

U.S. SENTENCING MEMORANDUM
CR 14-00175 TEH                    3

segments in HCAs. Numerous PG&E records, including its Integrity Management Plans, Baseline Assessment Plans (BAPs), and risk assessment spreadsheets, documented the existence of potential manufacturing threats, yet all identified ECDA as the only past and future assessment method despite knowing it was unsuitable for assessing manufacturing threats.

Regarding Count Six, the evidence proved that PG&E knowingly and willfully failed to include in its BAPs information supporting identification of potential manufacturing threats on HCA segments, and methods selected to assess those threats. While the BAPs recognized the existence of potential manufacturing threats on HCA segments that had experienced overpressures, they showed that PG&E had again selected the cheaper and utterly ineffectual ECDA to assess the threats. The evidence demonstrated such violations on eleven HCA segments on Line 132, and fourteen HCA segments on other Bay Area pipelines.

In Count Seven, the jury found that PG&E knowingly and willfully failed to prioritize as high risk HCA segments with manufacturing threats, after they had experienced overpressures. Evidence from PG&E's own BAPs, Integrity Management Plans, and risk spreadsheets proved that PG&E identified manufacturing defects, recognized overpressures, and nonetheless planned only to use ECDA (knowing that it was incapable of assessing manufacturing threats) on well over 100 HCA segments, including the exploded segment of Line 132.

Finally, in convicting on Count Eight, the jury found that PG&E knowingly and willfully failed to prioritize as high risk certain HCA segments – those containing low-frequency ERW pipe or pipe with a joint efficiency factor less than 1.0 – that had experienced overpressures. PG&E's own integrity management records show its repeated choice of the entirely unsuitable ECDA on more than 70 overpressured HCA segments.

**B.     Relevant Conduct**

In addition to the offenses of conviction, the evidence at trial demonstrated a larger pattern of obstructive conduct by PG&E, as well as other violations of the pipeline safety regulations.

1.     Obstruction

PG&E's submission of the misleading April 6 letter was not its only effort at obstruction. Trial testimony established that, throughout the NTSB's investigation, PG&E failed to provide accurate or

complete information, hindered investigators' ability to gather information during interviews, misled investigators about the amount of overpressures on the lines, and withheld information about the number and types of leaks on lines, including on Line 132. Indeed, PG&E's party participation was so abysmal that the NTSB took the rare step of removing its party representative.

PG&E also elicited false trial testimony from employee Calvin Lui, who denied PG&E's 10% practice. The evidence, however, showed that he was specifically trained on the 10% practice and that he carried out the 10% practice through his instructions to engineers. The jury's finding of guilt on the obstruction charge implicitly reflects their finding that Lui lied in saying no 10% practice existed.

And PG&E's obstructive conduct went beyond that heard by the jury. PG&E management instructed employees to copy an attorney on any emails concerning the San Bruno explosion in an effort to shield them from discovery. PG&E also withheld material evidence called for by subpoena during the government's investigation, including the April 6 letter concerning the 10% practice. (The government charged PG&E with the obstruction count after discovering the April 6 letter on the NTSB's website.)

2.     Other Pipeline Safety Violations

The evidence also showed, by at least a preponderance of the evidence and notwithstanding the jury's acquittal on Counts 3-4 and 9-12, that PG&E failed to maintain leak repair records and to retain strength test pressure records (STPRs), as required under 49 C.F.R. §§ 192.709(a) and 192.517(a).

PG&E's data responses, integrity management documents, and other communications demonstrated that PG&E created leak repair records but could not locate them for years. As a result, PG&E failed to take the leaks into consideration when making integrity management decisions such as proper assessment methods.

That PG&E failed to retain STPRs as required was proved by Defense Exhibit 218A. The federal regulations required PG&E to strength test each piece of pipe after installation and before using it to transport natural gas. Defense Exhibit 218A purported to account for each STPR that PG&E had not produced to the government prior to the Superseding Indictment – the basis for the STPR charges. Instead, it shows pressure tests conducted after PG&E was charged with lacking such records; tests prior to pipe installation; and reports that simply lack the documentation mandated under the regulation.

### III.  SENTENCING GUIDELINES CALCULATION

The government concurs with the sentencing guidelines calculation set forth in the revised PSR. Because there is no guideline assigned for 49 U.S.C. § 60123(a), the Court should apply the most analogous guideline. USSG § 2Q1.2 is the guideline for Mishandling of Hazardous or Toxic Substances or Pesticides; Recordkeeping, Tampering, and Falsification; Unlawfully Transporting Hazardous Materials in Commerce. It is most analogous for an offense involving transportation of explosive materials such as natural gas. Under § 2Q1.2, the government concurs that PGE's offense level is 27:

| | |
|---|---|
| Base Offense Level, USSG § 2Q1.2: | 8 |
| Specific Offense Characteristics: | |
| Ongoing discharge of hazardous material, USSG § 2Q1.2(a) | +6 |
| Substantial risk likelihood of death or serious bodily injury, USSG § 2Q1.2(b)(2) | +9 |
| Disruption of utilities and evacuation of community, USSG § 2Q1.2(b)(3) | +4 |
| Adjusted Offense Level: | 27 |

In addition to these guidelines calculations, there are two applicable guidelines-based grounds for upward departure. First, an upward departure is appropriate where the defendant's criminal history is inadequately represented. USSG § 2Q1.2, App. N. 6 and 9(A); USSG § 4A1.3. Here, PG&E has an extensive history of violating the Pipeline Safety Act, as recounted in the PSR. A list of PG&E's prior violations, pertaining to both its natural gas and electric lines of business, is attached to this Sentencing Memorandum as Exhibit 1.

Second, an upward departure may be appropriate where an offense has caused extreme psychological injury. USSG § 2Q1.2, App. N. 9(B); USSG § 5K2.3. PG&E's actions killed 8 people and injured 58 others. They destroyed 38 homes and damaged another 70. There is no question that the survivors of the explosion – those critically injured, the family and friends of those killed and injured, those whose homes were destroyed, and those who witnessed the death and destruction – suffered extreme psychological injury such as would warrant an upward departure.

USSG § 8C2.1 governs the applicability of fine guidelines for defendant PG&E. Because PG&E's guideline offense level is determined under USSG § 2Q1.2, which is not listed in USSG

§ 8C2.1(a) or (b), USSG § 8C2.10 applies.  USSG § 8C2.10 requires the Court to determine an appropriate fine under 18 U.S.C. §§ 3553 and 3572, which allow a maximum fine of $3,000,000.

### IV.   ARGUMENT

When it comes to sentencing, "[c]orporate criminal defendants present a special problem because they cannot be incarcerated." *United States v. Mitsubishi Int'l Corp.*, 677 F.2d 785, 788 (9th Cir. 1982) (upholding sentence requiring corporations to loan executives for one year to a community organization and to make a contribution of $10,000 for each violation to said organization).  Monetary penalties offer insufficient deterrence as "large corporate defendants," like PG&E, can "just write a check and walk away."  *Id.*  For this reason, courts frequently are "require[d] . . . to adopt 'unique and creative' sentences."  *United States v. Danilow Pastry Co.*, 563 F. Supp. 1159, 1166 (S.D.N.Y. 1983) (quoting *Mitsubishi*, 677 F.2d at 788).

Such is this case.  PG&E's pattern of deliberately violating federal regulations designed to ensure the safety of its natural gas pipelines – absent which the San Bruno explosion and devastation could not have occurred – together with its obstruction of the ensuing investigation, mandate a creative and comprehensive sentencing strategy.

Title 18, United States Code, Section 3553(a) requires courts to "impose a sentence sufficient, but not greater than necessary . . . to reflect the seriousness of the offense," "promote respect for the law," "provide just punishment," "afford adequate deterrence," and "protect the public from further crimes of the defendant."  In fashioning the sentence, courts must also consider "the nature and circumstances of the offense and the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  The sentencing proposal formulated by U.S. Probation creatively and comprehensively meets these goals.  The United States supports the proposal recommended by U.S. Probation, with a few modifications as set forth below, and urges the Court to adopt it.  The government asks the Court to order that none of the fine nor costs of performing the conditions of probation be passed on, in any form, to PG&E's customers.

**A.    Fine**

The United States shares Probation's concerns that the statutory maximum fine of $3 million will be a "drop in the bucket" for PG&E, and will do little to deter it from continuing to prioritize profits

U.S. SENTENCING MEMORANDUM
CR 14-00175 TEH                     7

over complying with safety regulations. PSR Sentencing Recommendation at 2. This is all the more true given that:

  1. PG&E boasted an income of $333 million in the second quarter of 2010, just before the explosion.[1] *See* 18 U.S.C. § 3572(a)(1) (defendant's income a factor in setting fine).

  2. PG&E has acted as a bad corporate citizen for decades. Beyond the criminal activity supporting the counts of conviction and relevant conduct – its further obstructive acts and its failure to maintain critical leak and strength test records – PG&E has a long history of other, similar regulatory violations. The Probation Office catalogued these in Part B of the PSR, and we incorporate this list of prior misconduct here as Exhibit 1.

  3. PG&E held the trusted position of operating as a monopoly, with a guaranteed rate of return and customer base.

Particularly given these circumstances, the expansive terms of the proposed probation program are necessary to meet the purposes of § 3553(a).

**B. Probation**

Courts have "broad discretion in setting probation conditions," *United States v. Lowe*, 654 F.2d 562, 567 (9th Cir. 1981), so long as they "are reasonably related to the factors" identified above, 18 U.S.C. § 3563(b). All of the conditions identified in the PSR are reasonably related, and in fact necessary, to address the § 3553(a) factors. The United States wishes to comment on a few of these suggested conditions.

  1. <u>Safety Program</u>

The United States strongly supports requiring PG&E to restructure its employee bonus formula so that the safety record is paramount. As a regulated monopoly, PG&E has a guaranteed rate of return, such that it should not be prioritizing profits. That PG&E pipes have continued to rupture even after the San Bruno explosion (e.g., March 2014 explosion of residence in Carmel during PG&E work on gas pipeline, due to inaccurate records) demonstrates that its management has not taken safety seriously enough. When employees are rewarded based on meeting budgets or earnings per share goals, it is

---

[1] *See* PG&E's Press Release dated August 4, 2010, "PG&E Corporation Reports Second Quarter Earnings: Reaffirms Guidance."

U.S. SENTENCING MEMORANDUM
CR 14-00175 TEH        8

inevitable that such factors will affect decisionmaking.

### 2. Advertising Program

The government supports the condition requiring PG&E to notify the public of its criminal and neglectful behavior, what it was convicted of, and the changes made within the organization to reduce the likelihood of future criminal conduct and negligence. *See* U.S.S.G § 8D1.4(a) ("The court may order the organization, at its expense and in the format and media specified by the court, to publicize the nature of the offense committed, the fact of conviction, the nature of the punishment imposed, and the steps that will be taken to prevent the recurrence of similar offenses.").

The government recommends that all of the terms specified in the PSR be adopted except that (a) PG&E be required to use the same television networks and same or comparable airing times as it used during its advertising campaign in January through August 2016 (the months before and during trial); (b) PG&E be required to post advertisements in the San Francisco Chronicle and the Wall Street Journal containing the delineated information; and (c) PG&E include a hotline number for the public to report safety concerns and incidents involving PG&E. The first modification is designed to ensure that PG&E reaches the same audience it intended to reach with its ramped-up advertising campaign preceding and during trial. The second is designed to reach the non-television viewing audience, as well as potential investors who may be located elsewhere in the nation. That investors be able to evaluate PG&E's conduct and vote with their pocketbooks is particularly significant when consumers cannot due to PG&E's monopoly status. The third modification will help protect the public.

### 3. Monitor/Compliance and Ethics Program

The United States regards establishment of a corporate compliance and ethics monitorship as an indispensable component of PG&E's probationary sentence. Both 18 U.S.C. § 3563(b)(22) and U.S.S.G. § 8B2.1 authorize and encourage this Court to require felonious corporations to establish standards and procedures to prevent and deter future criminal conduct. PG&E's history of noncompliance with its regulatory obligations demonstrates that it cannot be trusted to prevent criminal conduct on its own. Instead, this Court should impose a corporate monitor on PG&E to achieve some measure of confidence that PG&E will comply with Pipeline Safety Act regulations to prevent future tragedies, such as the deadly pipeline explosion in San Bruno.

The government and the defense are attempting to reach an agreement regarding the terms of this monitorship. Whether or not an agreement has been reached, the government will submit to the Court a Proposed Order regarding this monitorship. The government anticipates asking this Court to order PG&E to retain a monitor of the government's choosing. The Monitor will serve for a period of years and oversee PG&E's efforts to safely supply natural gas throughout Northern California. Among his or her duties, the monitor will review and report on PG&E's level of compliance with governing regulations, including the federal Pipeline Safety Act.

### 4. Community Service

The government adopts Probation's recommendation of 10,000 hours of community service, 2,000 of which needs be performed by high level personnel, and that this community service be performed to repair communities impacted by PG&E's offense conduct. *See* U.S.S.G § 8B1.3 ("Community service may be ordered as a condition of probation where such community service is reasonably designed to repair the harm of the offense."); U.S.S.G. § 3563(b)(12). This condition of probation uniquely conveys the seriousness of PG&E's offense conduct and has the capacity to help rebuild the community's trust in a corporation whose deliberate choices put their safety at risk. Moreover, it deters PG&E from making choices simply based on the cost – PG&E cannot simply pay its way out but actually has to spend its time and energy repairing the communities it harmed and put at risk by its criminal conduct.

## V.   CONCLUSION

PG&E violated the sacred trust placed in it by every person living in or merely passing through Northern California to follow minimum standards of safety in operating its natural gas pipelines – pipes that transport highly explosive material under the public's homes, freeways, and businesses. Its deliberate and repeated choices not to do so were motivated by the desire to maximize profits instead of safety – in other words, greed. The San Bruno explosion was not an "accident"; it was a matter of time. And PG&E's efforts to corruptly mislead the federal investigation of the explosion highlight its status as a bad corporate citizen.

PG&E's crimes compel a serious sentence that will alter its culture for good. Only through the comprehensive probationary scheme laid out in the PSR, as modified in the government's proposal and

U.S. SENTENCING MEMORANDUM
CR 14-00175 TEH                    10

together with the maximum fine allowed by statute, will the sentence reflect the seriousness of PG&E's crimes, promote respect for the law, justly punish PG&E, and protect the public from further crimes by PG&E, and adequately deter future such crimes.

Finally, the United States anticipates that several victims of PG&E's crimes, including representatives from San Bruno and the NTSB, may seek to be heard at sentencing regarding the impacts of PG&E's crimes. The government will make every effort to advise the Court of the number of individuals who wish to speak prior to commencement of the sentencing proceedings.

Dated: January 9, 2017                    Respectfully submitted,

                                          BRIAN J. STRETCH
                                          United States Attorney

                                              /s/
                                          _____
                                          HALLIE MITCHELL HOFFMAN
                                          JEFFREY B. SCHENK
                                          HARTLEY M. K. WEST
                                          Assistant United States Attorneys