LATHAM & WATKINS LLP
  Steven M. Bauer (Bar No. 135067)
    steven.bauer@lw.com
  Margaret A. Tough (Bar No. 218056)
    margaret.tough@lw.com
  Robert E. Sims (Bar No. 116680)
    bob.sims@lw.com
505 Montgomery Street, Suite 2000
San Francisco, California  94111-6538
Telephone:  +1.415.391.0600
Facsimile:  +1.415.395.8095

LATHAM & WATKINS LLP
  Melissa Arbus Sherry (*pro hac vice*)
    melissa.sherry@lw.com
555 11th Street, NW, Suite 1000
Washington, DC  20004-1304
Telephone:  +1.202.637.2200
Facsimile:  +1.202.637.2201

CLARENCE DYER & COHEN LLP
  Kate Dyer (Bar No. 171891)
    kdyer@clarencedyer.com
899 Ellis Street
San Francisco, California  94109-7807
Telephone:  +1.415.749.1800
Facsimile:  +1.415.749.1694

Attorneys for Defendant
PACIFIC GAS AND ELECTRIC COMPANY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| UNITED STATES OF AMERICA | CASE NO. CR-14-00175-TEH |
|---|---|
| v. | **DEFENDANT'S SENTENCING MEMORANDUM** |
| PACIFIC GAS AND ELECTRIC COMPANY, | |
| Defendant. | **Judge:** **Hon. Thelton E. Henderson**<br>**Date:** **January 23, 2017**<br>**Time:** **2:30 P.M.**<br>**Place:** **Courtroom G, 15th Floor** |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................... 1

II. PG&E'S PROGRESS AS A COMPANY ..................................................... 2

    A.    Leadership Changes ............................................................................. 2

    B.    Gas Safety Improvements ................................................................... 2

    C.    Changes to Budgeting Practices .......................................................... 5

    D.    Compliance, Ethics, and Risk Management ........................................ 6

    E.    Corporate Citizenship ...................................................................... 10

III. AN APPROPRIATE SENTENCE ............................................................. 12

    A.    Governing Legal Standards ............................................................... 12

    B.    The Court Should Decline to Impose Additional Probation
            Conditions As Recommended by the Probation Office ..................... 14

          1.    The Analysis Underlying the PSR Recommendations Is
                 Flawed ...................................................................................... 14

          2.    Length of Probation Term ........................................................ 15

          3.    Proposed Condition 1 – "That the Defendant Not Commit
                 Another Federal, State, or Local Crime During the Term of
                 Probation" ................................................................................ 15

          4.    Proposed Condition 2 – Effective Compliance Plan .............. 15

          5.    Proposed Condition 3 – Bonus Compensation Program ........ 16

          6.    Proposed Condition 4 – Mandatory Advertising ................... 18

          7.    Proposed Conditions 5 (Monitorship) and 6 (Review of
                 Materials and Interviews of Employees) ................................ 19

          8.    Proposed Condition 7 – Community Service ......................... 20

          9.    Proposed Condition 8 – Material Changes in Finances or
                 Litigation ................................................................................. 20

          10.    Proposed Condition 9 – Periodic Payments ........................... 21

IV. ADDITIONAL OBJECTIONS TO THE PSR ............................................ 21

V. CONCLUSION ........................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Kimbrough v. United States*,
552 U.S. 85 (2007)..................................................................................12

*United States v. Atlantic Richfield Co.*,
465 F.2d 58 (7th Cir. 1972) ......................................................................13

*United States v. AU Optronics Corp.*,
No. 09-00110-10 (N.D. Cal. Oct. 2, 2012) ...............................................18

*United States v. Booker*,
543 U.S. 220 (2005)..................................................................................12

*United States v. Carter*,
219 F.3d 863 (9th Cir. 2000) ....................................................................13

*United States v. Chamness Technology, Inc.*,
No. 12-00149-001 (S.D. Iowa Jan. 23, 2013) ..........................................18

*United States v. CITGO Petroleum Corp.*,
No. C-06-563, 2012 U.S. Dist. LEXIS 133103 (S.D. Tex. Sept. 18, 2012) .................. 13, 14

*United States v. Doe*,
705 F.3d 1134 (9th Cir. 2013) ..................................................................13

*United States v. Duke Energy Business Services LLC*,
No. 15-CR-62, 67 and 68 (E.D.N.C. May 14, 2015) ................................18

*United States v. Fernandez-Angulo*,
897 F.2d 1514 (9th Cir. 1990) ..................................................................13

*United States v. Gall*,
552 U.S. 38 (2007)....................................................................................12

*United States v. Interstate Cigar Co.*,
801 F.2d 555 (1st Cir. 1986) .....................................................................13

*United States v. Mitsubishi International Corp.*,
677 F.2d 785 (9th Cir. 1982) ....................................................... 13, 14, 15, 19

*United States v. Partin*,
565 F. App'x 626 (9th Cir. 2014) ..............................................................13

*United States v. Southern Union*,
942 F. Supp. 2d 235 (D.R.I. 2013)....................................................... 13, 14, 19

*United States v. Vanderwerfhorst*,
576 F.3d 929 (9th Cir. 2009) ....................................................................13

1

# STATUTES

2    18 U.S.C. § 3553 ................................................................................................ 21, 22

3    18 U.S.C. § 3553(a) ........................................................................................... 12, 19

4    18 U.S.C. § 3561(c) ................................................................................................. 15

5    18 U.S.C. § 3563(a)(7) ............................................................................................ 21

6    18 U.S.C. § 3563(b) ................................................................................................ 12

7    18 U.S.C. § 3564(b) ................................................................................................ 15

8    18 U.S.C. § 3572 ............................................................................................... 21, 22

9    Cal. Pub. Util. Code § 451 ...................................................................................... 16

10

# OTHER AUTHORITIES

11   Decision Authorizing Pacific Gas & Electric Co.'s General Rate Case Revenue
      Requirement for 2014-2016, D. 14-08-032, 2014 Cal. PUC LEXIS 395 (Aug.
12     14, 2014) ............................................................................................................ 17

13   U.S. Dep't of Labor, Occupational Safety & Health Admin., Employer Safety
      Incentive and Disincentive Policies and Practices (Mar. 12, 2012),
14     https://www.osha.gov/as/opa/whistleblowermemo.html ................................... 17

15   U.S.S.G. § 82C.10 ................................................................................................... 12

16   U.S.S.G. § 82C1.2 ................................................................................................... 12

17   U.S.S.G. § 8A1.1 ..................................................................................................... 21

18   U.S.S.G. § 8A1.2, comment. (n.2) .......................................................................... 22

19   U.S.S.G. § 8A1.2, comment. (n.3(F)) ..................................................................... 23

20   U.S.S.G. § 8B2.1 ....................................................................................................... 6

21   U.S.S.G. § 8B2.1(6) .................................................................................................. 9

22   U.S.S.G. § 8B2.1(a) .................................................................................................. 6

23   U.S.S.G. § 8B2.1(b)(1) ............................................................................................. 9

24   U.S.S.G. § 8B2.1(b)(2) ............................................................................................. 6

25   U.S.S.G. § 8B2.1(b)(2)(A) ....................................................................................... 7

26   U.S.S.G. § 8B2.1(b)(2)(B) ....................................................................................... 8

27   U.S.S.G. § 8B2.1(b)(2)(C) ....................................................................................... 7

28   U.S.S.G. § 8B2.1(b)(4) ........................................................................................ 5, 10

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

DEF.'S SENTENCING MEM.
CASE NO. CR-14-00175-TEH

1  U.S.S.G. § 8B2.1(b)(5) ......................................................................................... 8

2  U.S.S.G. § 8B2.1, comment. (n.1) ......................................................................... 6

3  U.S.S.G. § 8C2.1 ................................................................................................. 21

4  U.S.S.G. § 8C2.1, comment. (backg'd) ............................................................... 22

5  U.S.S.G. § 8C2.10 ............................................................................................... 22

6  U.S.S.G. § 8C2.2 ................................................................................................. 21

7  U.S.S.G. § 8C2.9 ................................................................................................. 21

8  U.S.S.G. § 8D1.4, comment. (n.1) ......................................................................... 6

9  Working With Diverse Suppliers, PG&E, https://www.pge.com/en_US/for-our-
   business-partners/purchasing-program/suppliers/supply-chain-
10  responsibility/supply-chain-responsibility.page. ............................................... 11

11  **RULES**

12  Fed. R. Crim P. 32(i)(3)(B) ................................................................................. 13

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.     INTRODUCTION

The 2010 natural gas explosion in San Bruno was a terrible, tragic event.  Immediately afterwards, and years before this case, PG&E took significant action to help those impacted and to make its pipeline system safer.  For example, and as the Court knows, PG&E stipulated to liability in the civil cases, and then began settling with each and every victim of the accident.  PG&E also granted millions of dollars to the San Bruno community, with no conditions or requirements as to how the funds should be spent.  The trial court presiding over the San Bruno civil case recognized PG&E's efforts to be a responsible institution and corporate citizen:

> [A]t the very beginning of this journey, PG&E accepted responsibility for what happened.  That was a critical first step.  Also, the decision was made to essentially pay the City of San Bruno $70 million without any legal obligation to do so.  That was an incredible gesture to essentially heal the rift that had been caused by the events of September 9, 2010.

Exhibit 1 at 21:1-8.[1]

After the explosion, PG&E also undertook a massive program to update one of the largest pipeline systems in the country.  As the Court knows, PG&E has strength tested or verified the pipeline strength of hundreds of miles of pipeline, replaced or upgraded hundreds of other miles to accommodate in-line inspection tools, and reviewed, scanned, and uploaded more than 3.8 million paper documents into electronic form.  To advise on these and other efforts, PG&E hired the former head of the National Transportation Safety Board ("NTSB") itself, who has observed that PG&E's "Gas Operations leadership team has demonstrated a commitment to safety that permeates throughout the organization."

PG&E exercised its right to trial on the 28 counts because PG&E believed that no employee intended to commit a crime.  The jury returned a guilty verdict on several counts which, of course, the Company accepts.

Both since the accident in San Bruno and since the criminal trial, PG&E has taken steps to move beyond the legal disputes and focus its energies on becoming the safest public utility in

---

[1]     All "Exhibit" references are to the Declaration of Sean P.J. Coyle, filed concurrently herewith.

1   the country.  After the jury returned its verdict, PG&E made the unilateral public announcement

2   that it would not appeal the convictions on the five integrity management counts.  In addition,

3   should the Court impose it, PG&E will pay the maximum statutory fine in this case ($3 million)

4   promptly.  These actions, we submit, demonstrate PG&E's desire to focus its efforts on the

5   safety of its customers and its community, without distraction or diversion.

6        Below, we will describe in further detail the facts behind this summary.  After that, we

7   will explain why several of the sentencing recommendations of the Probation Office are

8   inappropriate and contrary to federal law.

9   **II.    PG&E'S PROGRESS AS A COMPANY**

10       In the years since the events described in the superseding indictment, PG&E has pursued

11  an ambitious program of gas safety improvements in response to the explosion and its aftermath.

12  In addition, the Company has implemented significant enhancements to its compliance and

13  ethics programs, across all aspects of its service to customers.

14       **A.    Leadership Changes**

15       After the San Bruno tragedy, change at PG&E started at the top.  PG&E's parent, PG&E

16  Corporation, appointed Anthony Earley as Chairman, CEO, and President in August 2011 – the

17  first in PG&E Corporation's history to come from outside the Company.  Exhibit 2.  PG&E's

18  current President, Gas (Nickolas Stavropoulos) and its Senior Vice President, Gas Operations

19  (Jesus Soto) also joined the Company from leadership positions in the industry.  Exhibit 3.  The

20  Company has added several Board members with extensive experience in the industry and with

21  safety issues.  Exhibit 4.  And PG&E has reorganized itself, separating out the gas and electric

22  functions in order to maximize visibility into each organization's operations.  Exhibit 5.[2]

23       **B.    Gas Safety Improvements**

24       Since 2010, PG&E has spent more than $2.1 billion in shareholder funds on gas pipeline

25

26  ---

    [2]    In November, PG&E Corporation announced that, effective March 1, 2017, as part of its
27  leadership succession, Geisha Williams, PG&E's current President, Electric, will become the
    CEO and President of PG&E Corporation.  At that time, Mr. Earley will become the Executive
28  Chair of the PG&E Corporation Board of Directors and Mr. Stavropoulos will become the
    President and Chief Operating Officer of PG&E.

1   safety improvements.  It has completed 11 of the NTSB's 12 recommendations related to its

2   review of the accident in San Bruno, with the last recommendation in "open acceptable" status.

3   Exhibit 6.  Working with respected integrity management experts, PG&E reviewed and revised

4   its Transmission Integrity Management related procedures, including modifying the weighting of

5   the risk factors and incorporating additional historical leak records identified through its records

6   review and consolidation process.  PG&E's risk assessments for stress corrosion cracking,

7   internal corrosion, and incorrect operation threats have been strengthened as well.

8           Through its Pipeline Safety Enhancement Plan, overseen by the California Public

9   Utilities Commission ("CPUC"), PG&E has strength tested or verified the pipeline strength of

10  hundreds of miles of pipeline (Exhibit 7 at 27) and replaced or upgraded hundreds of other miles

11  to accommodate better inspection methods – also referred to as making the pipes "piggable," so

12  that they can accommodate an inspection tool called a smart pig.  *Id*. at 4, 28-29.  And PG&E

13  reviewed, scanned, and uploaded more than 3.8 million paper documents into an electronic

14  database associated with its natural gas transmission pipeline system.  Exhibit 8 at 23.

15          Between 2010 and 2015, PG&E:

16      •   Replaced more than 155 miles of transmission pipeline.

17      •   Hydrotested more than 750 miles of transmission pipeline.

18      •   Made piggable more than 415 miles of transmission pipeline.

19      •   Installed 235 additional Automated Valves.

20      •   Conducted a GPS survey for 100% of its accessible transmission pipeline system
            using highly precise mapping tools.

21      •   Replaced more than 310 miles of gas distribution main, resulting in all known
22          remaining cast-iron pipe being decommissioned in 2014.

23  Exhibit 7 at 1-2.

24          PG&E has also built a state-of-the-art, integrated gas transmission and distribution

25  control and dispatch center that gives the Company real-time data and improved control over the

26  thousands of miles of pipeline in both its gas distribution and transmission systems.  Exhibit 7 at

27  42-43.  And the Company has revised its compensation program so that 50% of eligible

28

1  employees' short-term incentive compensation is based on safety metrics – twice as much as is

2  based on the Company's financial performance.  *Id*. at 4.

3      Throughout, PG&E has sought third-party, independent input, reviews, and certifications

4  of its key safety processes.  In the area of asset and risk management, PG&E's Gas Operations

5  organization achieved "PAS 55" and the similar ISO 55001 certifications in 2014, becoming one

6  of the first gas utilities in the world to hold both certifications.  Exhibit 9.  PAS 55 is a standard

7  developed by the British Standards Institution that requires, among other things, a proactive and

8  systematic approach to identifying threats and the resulting risks, and ISO 55001 is a similar

9  international standard.  The certifications were granted by Lloyd's Register Quality Assurance, a

10  global accrediting organization, after more than 150 interviews and extensive audits of numerous

11  critical areas of asset management.  There are ongoing surveillance visits and a full

12  recertification process every three years, in a process that is internationally recognized as best-in-

13  class.  *Id*.  As the CPUC's Safety and Enforcement Division Risk Assessment Section concluded

14  in a 2016 report, PG&E's risk management practices, while continuing to evolve, make the

15  Company "clearly a utility industry leader."

16      PG&E Gas Operations also received a certificate of compliance from an independent

17  third-party auditor on American Petroleum Institute Recommended Practice (RP) 1173 in 2015,

18  becoming one of the first gas utilities in the U.S. to earn that distinction.  Exhibit 10.  And PG&E

19  became the first gas utility in the U.S. to achieve Responsible Care and International Standards

20  Organization 14001 certification in 2016, demonstrating a process safety management system in

21  which safety processes have multiple layers of protection so that incidents can be prevented even

22  when a layer of protection fails.  Exhibit 11.  Each of these certifications reflects PG&E's

23  commitment to assess and address the risk that safety incidents may occur due to the nature of its

24  business.

25      PG&E has also sought additional outside perspectives for advice and assessments.  For

26  example, in 2011 PG&E engaged Hall and Associates, led by former NTSB chair Jim Hall, to

27  perform continuing assessments of PG&E's gas management activities and make

28  recommendations on the identification and implementation of best practices.  Exhibit 12.

In 2012, PG&E became the first gas utility in the world to employ the vehicle-mounted Picarro Surveyor instruments which are nearly 1,000 times more sensitive than traditional commercially available gas pipeline leak detection equipment.  Exhibit 13.  This technology has enabled PG&E to conduct leak surveys of its system more quickly and to detect more leaks than would be found using traditional tools.  Exhibit 7 at 32-34.

PG&E encourages employees and contractors to report issues when they arise, and implemented the Corrective Action Program ("CAP") to offer employees a simple method to report potential issues related to gas assets and processes. The types of issues submitted in the Corrective Action Program entries include employee concerns or suggestions, operational events, audit findings, or issues with facilities or tools, records, training and safety. The CAP ensures that issues are categorized, assessed for risk and assigned to an owner to implement effective corrective actions that will help prevent recurrence.  *Id*. at 6.  By 2018, PG&E will have implemented CAP on a Company-wide basis.

PG&E also has made a number of improvements to the PG&E Academy – a centralized organization responsible for training, development, and delivery – in the areas of both curriculum development and training delivery.  The Company is building a state-of-the-art training center, scheduled to open this year, which will provide cutting edge, hands-on training in a variety of gas work activities, including leak detection, construction methods (including welding), and how to operate and maintain instrumentation and regulation equipment.  Exhibit 14; *see also* United States Sentencing Commission, *Guidelines Manual*, § 8B2.1(b)(4) (Nov. 2016) (hereinafter "U.S.S.G.") ("The organization shall take reasonable steps to communicate periodically and in a practical manner its standards and procedures" such as "by conducting effective training programs and otherwise disseminating information" that takes into account the appropriateness of the information to individuals' respective roles and responsibilities.).

## C.    Changes to Budgeting Practices

Following the accident in San Bruno, PG&E also initiated development of a framework through which it could enhance its budget, strategy, and execution planning processes.  The Company benchmarked the processes of leading companies in a variety of industries, and

1  developed its Integrated Planning Process – a multi-year planning cycle in which risk and

2  compliance inform its annual planning process.  Exhibit 15.  The Integrated Planning Process

3  imposes a systematic and disciplined approach by which PG&E establishes its operating plan

4  and budget, and makes and implements its strategic decisions – by looking first to safety and

5  other risk and compliance considerations, as well as resource and system constraints.  Across the

6  Company in all lines of business, including in its core lines of business (gas, electric, and

7  generation), safety, risk and compliance are key considerations in decision-making.  Exhibit 16.

8        **D.**     **Compliance, Ethics, and Risk Management**

9       PG&E has overhauled the standards and procedures[3] that make up its enterprise-wide

10  compliance and ethics program.  *See* U.S.S.G. § 8B2.1.  The Guidelines recommend that a

11  compliance and ethics program "be reasonably designed, implemented, and enforced so that the

12  program is generally effective in preventing and detecting criminal conduct" and recognize that

13  the "failure to prevent or detect the instant offense does not necessarily mean that the program is

14  not generally effective in preventing and detecting criminal conduct."  U.S.S.G. § 8B2.1(a); *see*

15  *also* U.S.S.G. § 8D1.4, comment. (n.1) (recommending that a program be deemed sufficient "as

16  long as it is consistent with § 8B2.1, and any applicable statutory and regulatory requirements.").

17  We submit that the standards and procedures, improvement measures, and compliance efforts

18  discussed herein exceed the Guidelines' recommendations and promote an organizational culture

19  that encourages ethical conduct and compliance with the law.  *See* U.S.S.G. § 8B2.1.

20       To start, PG&E has substantially increased senior-level oversight of its compliance and

21  ethics program, and has significantly expanded its compliance and ethics team.  These measures

22  are consistent with the Guidelines' recommendation that the organization's governing authorities

23  have knowledge and oversight of the content and implementation of the program, that high-level

24  personnel of the organization ensure its effectiveness, and that specific individuals are delegated

25  day-to-day responsibilities for its operation.  *See* U.S.S.G. § 8B2.1(b)(2).

26

27  [3]  The Guidelines define "standards and procedures" of effective compliance and ethics
   programs as "standards of conduct and internal controls that are reasonably capable of reducing

28  the likelihood of criminal conduct."  U.S.S.G. § 8B2.1, comment. (n.1).

1    In March 2015, PG&E created a new Senior Vice President position, the Chief Ethics and

2    Compliance Officer (CECO), who centrally coordinates its compliance and ethics program.

3    Exhibits 17, 18.  The CECO, Julie Kane, reports directly to PG&E Corporation's Chairman and

4    CEO, and is accountable to PG&E Corporation's and PG&E's Boards of Directors, with

5    additional reporting responsibility to the Compliance and Public Policy Committee of PG&E

6    Corporation's Board and the Audit Committees of PG&E Corporation's and PG&E's Boards.[4]

7    Ms. Kane is responsible for overseeing the Company-wide compliance and ethics program,

8    including compliance management, risk-mitigation and reporting; overseeing employee-

9    investigatory processes; and reinforcing PG&E's ethics and compliance culture, among many

10   other compliance and ethics program elements.  *See* U.S.S.G. § 8B2.1(b)(2)(C).

11   In 2015, the PG&E Corporation Board of Directors also reconstituted its Public Policy

12   Committee into the Compliance and Public Policy Committee, which is accountable for

13   overseeing the compliance and ethics program through reports from the CECO, as well as

14   outside compliance reports and external audits.  Exhibit 18; *see also* U.S.S.G. § 8B2.1(b)(2)(A).

15   Further, PG&E developed a senior officer Compliance & Ethics Committee, which generally

16   meets monthly to enable regular senior-level discussions of critical compliance and ethics

17   matters.  The Compliance & Ethics Committee is a collaborative partner to the CECO, providing

18   business insight and feedback to the CECO to support establishing and implementing the

19   compliance and ethics program, as well as support in promoting compliance and ethics

20   throughout the Company.

21   PG&E has in place a rigorous internal risk and compliance program.  Every year,

22   PG&E's senior executives from each line of business – including Gas Operations, Electric

23   Operations, and Generation – convene a two-day discussion to review and assess the Company's

24   risks and compliance obligations, how the Company has performed in the past year, and its plans

25   to mitigate any open issues identified in this planning process.  This annual two-day meeting

26

27   [4]   Ms. Kane joined PG&E from Avon Products, Inc., where she served as Vice President,
     General Counsel & Compliance Officer, North America & Corporate Functions.  Prior to her
     role with Avon, she held a number of senior roles with Novartis Corporation and its affiliates
28   over a 25-year period, culminating in her role as Vice President, Ethics and Compliance.

1   represents the culmination of several months of work by each line of business to analyze and

2   assess its risk and compliance issues, identify gaps, and develop mitigation plans.  The CECO

3   and Vice President of Enterprise and Operational Risk Management lead this meeting of the

4   Company's senior executives, including the PG&E Corporation Chairman and CEO.

5          In addition, each line of business (e.g., Electric Operations, Gas Operations, and

6   Customer Care) within PG&E has its own risk and compliance committee, which regularly

7   reviews that business's most-significant risks and compliance requirements, including the status

8   of associated mitigations.  The risk and compliance committee meetings generally are led by

9   officers from the specific line of business for the express purpose of creating a forum to address

10  its significant risks and compliance requirements.

11         PG&E encourages employees to speak up and report concerns whenever they arise.  In

12  2011, PG&E Corporation created the Chairman's Ethics Council, a forum where management

13  and front line employees engage in an open dialogue about ethical issues facing PG&E,

14  providing another venue for management to receive feedback on how to continue to strengthen

15  training and other ethics and compliance initiatives.  The Council, which includes representatives

16  from across PG&E Corporation and PG&E, meets five times a year, including an annual meeting

17  that is open to all employees.  Exhibit 18.  *See* U.S.S.G. §§ 8B2.1(b)(2)(B); 8B2.1(b)(5)(a)-(b)

18  ("The organization shall take reasonable steps . . . to ensure that the organization's compliance

19  and ethics program is followed, including monitoring and auditing to detect criminal conduct"

20  and "to evaluate periodically the effectiveness of the organization's compliance and ethics

21  program.").

22         PG&E also maintains a 24-hour Compliance and Ethics Helpline available to everyone at

23  the Company, including contractors, consultants, and suppliers, to assist in the responsible

24  execution of the collective compliance and ethics duties.  Exhibit 7 at 7.  "Helpline calls are

25  handled confidentially to the extent permitted by law, and can be submitted anonymously

26  without fear of retaliation."  Exhibit 19 at 7.  *See* U.S.S.G. § 8B2.1(b)(5)(c) ("The organization

27  shall take reasonable steps . . . to have and publicize a system, which may include mechanisms

28  that allow for anonymity or confidentiality, whereby the organization's employees and agents

1   may report or seek guidance regarding potential or actual criminal conduct without fear of

2   retaliation.").

3         PG&E's Employee Code of Conduct (the "Code") describes its ethical values and

4   policies, sets forth the Company's conduct and conflict of interest standards, and highlights key

5   compliance topics.[5]  Exhibit 19; *see also* U.S.S.G. § 8B2.1(b)(1) ("The organization shall

6   establish standards and procedures to prevent and detect criminal conduct.").  The Code states

7   that employees shall "[n]ever knowingly violate laws, regulations, policies, standards, or

8   procedures, even if [the employee] [thought] doing so would lower costs, increase earnings, or

9   satisfy a customer."  *Id*. at 3.  PG&E "does not grant waivers to its conduct, conflict of interest

10  and compliance standards" and the "[f]ailure to comply with [the] Code or Company guidance

11  documents may result in disciplinary action or termination."  *Id*. at 5.  The Code encourages

12  employees to "deal with people and issues openly, directly, and respectfully"; to "take actions

13  that are consistent with words"; to "do the right thing even if unpopular"; and to "foster a climate

14  of trust and openness between people."  *Id.* at 1; *see also* U.S.S.G. § 8B2.1(6) ("The

15  organization's compliance and ethics program shall be promoted and enforced consistently

16  throughout the organization through . . . appropriate disciplinary measures for engaging in

17  criminal conduct[.]").

18        The Code also describes PG&E's strong non-retaliation policy.  The Company regularly

19  promotes the importance of a "speak up" culture, and consistent with that, expects and regularly

20  reaffirms that all employees should communicate honestly and openly with supervisors and

21  others in leadership positions and raise concerns, including those about safety, possible

22  misconduct, and violations of laws, regulations, or internal requirements.  PG&E expressly

23  prohibits retaliation against anyone who raises concerns or is involved in an investigation.  The

24  Code states:  "Adversely changing an employee's condition of employment for a non-business

25  reason (i.e., 'retaliating') is not acceptable.  Employees in supervisory and other leadership

26

27  _____

    [5]    PG&E also maintains a Code of Business Conduct and Ethics for Directors (Exhibit 20) and

28  a Supplier Code of Conduct (Exhibit 21).

1  positions may not retaliate, tolerate retaliation by others, or threaten retaliation." *Id.* at 6. The

2  Company's policy is to investigate all reports of retaliation and take appropriate action.

3      PG&E conducts annual compliance and ethics training, and also requires management

4  employees to complete training related to the Code. Exhibit 18; *see also* U.S.S.G. § 8B2.1(b)(4)

5  ("The organization shall take reasonable steps to communicate periodically and in a practical

6  manner its standards and procedures, and other aspects of the compliance and ethics program,"

7  such as "by conducting effective training programs and otherwise disseminating information" to

8  management, employees, and the organization's agents.). PG&E also conducts new-hire training

9  that includes a specific discussion about the tragic accident in San Bruno and the actions that the

10  Company has taken following the accident.

11      Finally, the Internal Audit Department also plays a critical role in monitoring the

12  effectiveness of PG&E's compliance program. Internal Audit provides an assessment of the

13  adequacy of processes and controls to manage business and compliance risks and provides

14  control advisory services. Each year Internal Audit submits its annual audit plan to the Audit

15  Committees of the Boards for approval. Consistent with PG&E's emphasis on ethics and

16  compliance, Internal Audit has a keen focus on auditing compliance processes, including the

17  processes and controls for managing, monitoring, and reporting on the lines of business

18  compliance risks identified at the annual two-day risk and compliance meeting led by senior

19  executives.

20      **E.    Corporate Citizenship**

21      PG&E has a strong corporate tradition of a deep commitment to social and environmental

22  responsibility, and to being a force for positive change. The Company recently was named to the

23  100 Best Corporate Citizens list by *Corporate Responsibility Magazine*, earning the No. 2

24  position among utilities and No. 39 overall. Exhibits 22, 23.

25      Diversity and inclusion are pillars of PG&E's culture. For the eighth consecutive year,

26  PG&E was named one of the top five utilities in the U.S. for diversity by *DiversityInc*, a leading

27  publication focused on issues of diversity and inclusion in the workplace. Exhibit 24. The utility

28  also has one of the nation's top diversity supply chains, due in large part to its Supply Chain

Responsibility program,[6] and spent a record $2.5 billion with diverse suppliers in 2015, or 44% of its total procurement.  *Id.*; Exhibit 25.

PG&E's diversity and workforce commendations also include:

- *Black Enterprise* magazine—One of the top 40 best companies for diversity
- Disability Equality Index—A perfect score of 100 percent
- *DiversityBusiness.com*—One of the top 50 organizations for multicultural business opportunities
- Electric Power Conference—Faraday Award given to PG&E's PowerPathway program for employment of veterans
- *G.I. Jobs* magazine—Top 100 Military Friendly Employer®
- Human Rights Campaign—100 percent rating on the Corporate Equality Index
- LATINA Style magazine—One of the LATINA Style 50
- Cal Poly Society of Hispanic Professional Engineers—Company of the Year

Exhibit 26.

In the area of environmental leadership and sustainability, PG&E was named to the S&P Climate Disclosure Leadership Index by CDP, the only global disclosure system for companies, cities, states and regions to measure and manage their environmental impacts.  Exhibit 27. PG&E earned a perfect 100 score from the organization and was one of only four utilities in the U.S. to make the list in 2015.  *Id.*  In October 2016, CDP selected PG&E as a member of its "Climate A List."  Exhibit 28.  And in June 2016, *Newsweek* ranked PG&E first among electric and natural gas utilities in the nation, and No. 15 overall, in its "2016 Green Rankings" of the 500 largest publicly traded companies in the U.S., moving up from the 3rd and 42nd spots the previous year.  Exhibit 29.

PG&E's environmental leadership commendations also include:

- National Hydropower Association—Outstanding Stewards of America's Waters Award

---

[6]   Working With Diverse Suppliers, PG&E, https://www.pge.com/en_US/for-our-business-partners/purchasing-program/suppliers/supply-chain-responsibility/supply-chain-responsibility.page.

- Solar Electric Power Association Utility Solar Rankings—Top utility in the U.S. (Solar Megawatts)

Exhibit 26.

PG&E made these substantial, meaningful, system-wide improvements and created many of these programs long before the prosecution of this case. Many of these improvements have been implemented, reviewed, or vetted by third-party experts. We submit that this is a meaningful display of corporate responsibility and an appropriate response to the tragedy in San Bruno.

## III.   AN APPROPRIATE SENTENCE

PG&E is prepared to submit the maximum statutory fine ($3,000,000). In addition, as further noted below, PG&E is not opposed to the imposition of a properly scoped monitorship and is working with the Government on a joint proposal which, if agreement is reached, will be submitted to the Court ahead of sentencing.

### A.   Governing Legal Standards

Congress requires that in assessing a "just" punishment, district courts "shall impose a sentence sufficient, but not greater than necessary." 18 U.S.C. § 3553(a). The Court, then, has the power and the duty to impose a sentence that reflects balance and due proportion. Under *United States v. Booker*, 543 U.S. 220 (2005), *United States v. Gall*, 552 U.S. 38 (2007), and *Kimbrough v. United States*, 552 U.S. 85 (2007), the Guidelines are merely advisory and should not be afforded greater weight than the other factors under 18 U.S.C. § 3553(a). Courts may not presume that a sentence or a condition of probation recommended by the Guidelines is reasonable. *Gall*, 552 U.S. at 50. This is particularly appropriate where, as here, the corporate fine Guidelines do not apply at all to the counts of conviction. *See* U.S.S.G. § 82C1.2, 82C.10.

Discretionary conditions of probation must be "reasonably related to the factors set forth in section 3553(a)(1) and (a)(2) and to the extent that such conditions involve only such deprivations of liberty or property as are reasonably necessary for the purposes indicated in section 3553(a)(2)[.]" 18 U.S.C. § 3563(b). The conditions are further "limited by . . . the recognition that the statutorily prescribed maximum sentence cannot be increased by the terms of

probation." *United States v. Mitsubishi Int'l Corp.*, 677 F.2d 785, 788 (9th Cir. 1982) (citing *United States v. Atlantic Richfield Co.*, 465 F.2d 58, 61 (7th Cir. 1972)).  Courts therefore "have consistently held that the combination of the fine imposed under the statute setting forth the offense and any conditions of probation cannot exceed the statutory maximum penalty." *United States v. Southern Union*, 942 F. Supp. 2d 235, 241-42 (D.R.I. 2013) (citing *United States v. Interstate Cigar Co.*, 801 F.2d 555, 556 (1st Cir. 1986); *Fiore v. United States*, 696 F.2d 205, 209-10 (2d Cir. 1982); *Mitsubishi*, 677 F.2d at 788; *Atlantic Richfield*, 465 F.2d at 61; *United States v. CITGO Petrol. Corp.*, No. C-06-563, 2012 U.S. Dist. LEXIS 133103 (S.D. Tex. Sept. 18, 2012)); *see also CITGO*, 2012 U.S. Dist. LEXIS 133103, at *13 ("[A]ny imposition of a sentence of probation that requires CITGO to pay the equivalent of a monetary penalty in excess of the maximum monetary penalty prescribed for its convictions is illegal.").

A sentencing court "must – for any disputed portion of the presentence report or other controverted matter – rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing[.]"  Fed. R. Crim P. 32(i)(3)(B); *United States v. Carter*, 219 F.3d 863, 867 (9th Cir. 2000).  "Strict compliance with the Rule is required," *United States v. Fernandez-Angulo*, 897 F.2d 1514, 1516 (9th Cir. 1990), and "the rulings must be 'express' or 'explicit,'" *United States v. Doe*, 705 F.3d 1134, 1153 (9th Cir. 2013).  *See also United States v. Partin*, 565 F. App'x 626, 627 (9th Cir. 2014) ("The district court did not strictly comply with Fed. R. Crim. P. 32 because it referenced disputed facts at sentencing without resolving the dispute.").  Thus, "when the defendant challenges the factual accuracy of any matters contained in the presentence report, the district court must, at the time of sentencing, make the findings or determinations required by Rule 32." *Id.*  The sentencing court need not resolve a factual dispute, however, if it makes clear that it will not rely on the disputed fact for sentencing.  *Carter*, 219 F.3d at 868.  And while "the district court may consider a wide variety of information at sentencing," a district court abuses its discretion if it relies on information that is false or unreliable as any basis for the sentence imposed.  *United States v. Vanderwerfhorst*, 576 F.3d 929, 935-36 (9th Cir. 2009).  Information considered at sentencing must have indicia of reliability "beyond mere allegation." *Id.*

**B.     The Court Should Decline to Impose Additional Probation Conditions As Recommended by the Probation Office**

Probation conditions that functionally increase the punishment above the statutory maximum are unconstitutional.  *Southern Union*, 942 F. Supp. 2d at 241-42; *CITGO*, 2012 U.S. Dist. LEXIS 133103 at *13.  PG&E therefore reserves the right to object to the imposition of probation to the extent it would violate this principle, or the terms are otherwise unlawful or unreasonable.  *See, e.g.*, *Mitsubishi*, 677 F.2d at 788.  But with that said, PG&E is eager to move forward and has made clear that it welcomes a monitor and reasonable terms of probation that take account of (1) the extensive regulatory oversight of PG&E's operations by various state and federal agencies, including the CPUC, PHMSA, and the Federal Energy Regulatory Commission; (2) PG&E's substantial gas safety, compliance, and ethics improvements in the years since the conduct described in the superseding indictment; and (3) the other mitigating factors described here.  Critically, the conditions should be structured in a manner that does not interfere with the primary regulatory responsibilities of the CPUC, which is charged by the people of California with regulating PG&E's operations, including its safety practices, budget, and compensation structures, and which, under federal law, has exclusive jurisdiction to enforce safety standards unless and until the Secretary of Transportation revokes that authority.

Consistent with those principles, PG&E objects in particular to the following aspects of the Probation Office's recommendations.

**1.     The Analysis Underlying the PSR Recommendations Is Flawed**

In its revised presentence report ("PSR"), the Probation Office has recommended several probationary requirements that are based on faulty conclusions or a misunderstanding of the law. And the conditions recommended by the Probation Office appear to stem largely from the report's incorrect conclusion that the conduct underlying the regulatory violations found by the jury caused the explosion in San Bruno.  PSR at 43.  The government did not allege and the jury did not find that the regulatory violations charged in this case caused the tragic accident in San Bruno.  As the Court repeatedly instructed, "there is no allegation in this case and there has been no evidence in this case that any alleged regulatory violation caused the San Bruno explosion.

1  Such evidence had no place in this criminal prosecution because this case is not about the cause

2  of the San Bruno explosion[.]"  Dkt. 888 (Instr. No. 37); *see also* Dkt. 751 (Trial Tr. Vol. 19) at

3  2642:10-16 ("[T]here is no allegation in this case and there will be no evidence in this case that

4  any alleged regulatory violation caused the San Bruno explosion. . . . [T]his case is not about the

5  cause of the San Bruno explosion[.]"); Dkt 839 (Trial Tr. Vol. 28) at 4422:6-13 (same); Dkt. 708

6  (Trial Tr. Vol. 10) at 1343:25-1344:3 (Court instructing the jury that "[a]s I instructed you earlier

7  in this trial, this case is not about the cause of the San Bruno explosion and you will not be

8  tasked with determining what did or did not cause the explosion").  There is no justification for

9  conditions based on this erroneous premise.

10       Moreover, the Probation Office openly recommends these conditions as a way to

11  circumvent the $3 million statutory maximum fine in the case.  PSR at 43 ("Since the fine is

12  capped at $3,000,000, the probation officer's concern is that there appears to be no real

13  deterrence[.]").  It is improper to use probationary conditions in this way.  *Mitsubishi*, 677 F.2d

14  at 788.

15  **2.     Length of Probation Term**

16       PG&E agrees with the Probation Office's conclusion that the maximum term of probation

17  in this case is five years.  PSR ¶¶ 155-56.  The "authorized terms of probation are . . . for a

18  felony, not less than one nor more than five years," and "[m]ultiple terms of probation, whether

19  imposed at the same time or at different times, run concurrently with each other."  18 U.S.C.

20  §§ 3561(c), 3564(b).

21  **3.     Proposed Condition 1 – "That the Defendant Not Commit Another**

22  **Federal, State, or Local Crime During the Term of Probation"**

23  PG&E does not object to this term.

24  **4.     Proposed Condition 2 – Effective Compliance Plan**

25       PG&E does not object to this term.  As described in some detail in Section II above,

26  PG&E is fully committed to maintaining an effective compliance program, and has dedicated

27  significant time and resources to enhancing its Compliance and Ethics Program in recent years.

28

**5.      Proposed Condition 3 – Bonus Compensation Program**

The Probation Office has recommended that the Court order PG&E to "develop and submit to the court an effective safety program directly related to all potential bonuses" that "shall limit or allow bonuses based on the number of dangerous/hazardous incidents incurred over the prior year due to negligence," and require that "[n]o bonuses shall be given based on remaining within a fiscal budget nor based on the amount of profit one created."  PSR at 45. PG&E's compensation programs – which place a significant emphasis on safety – are devised in consultation with industry experts based on assessments of peer and other exemplar companies, are reviewed by the CPUC, and are described in PG&E's public disclosures.  PG&E can provide to the Court more information about these programs, if the Court would like.  Imposing the strictures contemplated by the Probation Office's proposal, however, would undermine, rather than further safety goals, and is not reasonably necessary to advance the objectives of sentencing.

In recent years, PG&E has placed increased emphasis on safety in its incentive programs. PG&E's annual short-term variable pay program, the Short-Term Incentive Program (or "STIP") has as its chief metric public and employee safety, which at 50 percent weighting is considerably greater than the industry norm.  Of that 50 percent, public safety accounts for 34 percent, and employee safety accounts for the remaining 16 percent.   Customer satisfaction metrics, including electric reliability, make up 25 percent of the STIP.  Earnings From Operations ("EFO"), which ties to the company's affordability goals and ability to raise capital for critical infrastructure projects, accounts for the remaining 25 percent of the STIP.[7]  These carefully considered programs are designed to further the Company's goals of providing safe, reliable, clean and affordable energy, consistent with the requirements of all California public utilities. *See* Cal. Pub. Util. Code § 451.

The Probation Office's recommendation would undermine safety goals in several important ways.  First, incentive programs – common among PG&E's peers in a highly

---

[7]   PG&E's non-annual Long-Term Incentive Program ("LTIP") is also tied to safety, which is a critical piece of PG&E's long-term performance as a company.  For example, following the accident in San Bruno, performance shares granted under the LTIP had zero payout from 2012 to 2014.

1   competitive labor market – play a critical role in the Company's efforts to attract and retain

2   talented and dedicated employees to safely and efficiently operate its system and run its business.

3   As part of its improvement efforts, PG&E has hired gas industry leaders from across the country

4   and other companies to improve its gas operations.  The Probation Office's proposal poses a

5   serious threat of undermining PG&E's ability to hire and keep the people necessary to run a safe

6   system.

7         Second, the proposal would incentivize employees based only on past safety-related

8   events – a lagging indicator of safety performance – which could unintentionally encourage

9   employees to underreport safety incidents.  OSHA, in fact, has cautioned against incentive

10  programs structured this way.[8]

11        Third, the recommendation ignores the reality that responsible financial management is

12  critical to PG&E's ability to safely operate its system in the long term – including attracting

13  capital investment for significant system improvements.  Fiscal responsibility is vital to the

14  company's ability to sustain reliable and safe operations.

15        Finally, the Probation Office's recommendation would interfere with the CPUC's

16  ongoing oversight of these precise issues – oversight that prioritizes safety.  PG&E's

17  compensation structure and incentive programs are reviewed by the CPUC in the Company's

18  General Rate Cases.[9]  The CPUC has ordered that at least 40% of short-term incentive

19  compensation for eligible gas operations employees be based on safety targets (a requirement

20  that PG&E exceeds with its 50% safety weighting), and the CPUC's Safety and Enforcement

21  Division is evaluating PG&E's compensation structures.

22  _____

23  [8]   Indeed, OSHA has explained in guidance:  "[S]ome employers establish programs that
     unintentionally or intentionally provide employees an incentive to not report injuries."  U.S.

24  Dep't of Labor, Occupational Safety & Health Admin., Employer Safety Incentive and
     Disincentive Policies and Practices (Mar. 12, 2012),

25  https://www.osha.gov/as/opa/whistleblowermemo.html.  PG&E has carefully considered these
     incentives and created safety metrics that are designed to encourage safe practices, and not

26  simply rely on results.

     [9]   *See* Decision Authorizing Pacific Gas & Electric Co.'s General Rate Case Revenue
27  Requirement for 2014-2016, D. 14-08-032, 2014 Cal. PUC LEXIS 395, at *755 (Aug. 14, 2014)
     at 520 (approving ratepayer expense funding of $89 million of the STIP program for 2014); *id.* at

28  *763 (approving $8.734 million to fund PG&E's R&R program).

**6.      Proposed Condition 4 – Mandatory Advertising**

The Probation Office recommends that, within 90 days of judgment, PG&E "create an advertising program on national cable television . . . using at least 25% of its annual television advertising budget from the 2016 calendar year to run for a year," to "notify the public and customers" of PG&E's conviction and its gas safety, compliance, and ethics improvements.  PSR at 45.  This condition is unnecessary, however, because these events and issues have been well-publicized by the local and national media – indeed, by media around the world – and by PG&E itself.  For example, in addition to PG&E's own press release, the jury's guilty verdict was covered by the *San Francisco Chronicle*, the *San Jose Mercury News*, the Associated Press, Bloomberg, Reuters, the *Wall Street Journal*, and the *New York Times*, among others, including news sources in Europe, the Middle East, and Canada.  Indeed, between May and September 2016, there were more than 500 stories about the criminal trial in local and national media outlets.  PG&E has also publicized its improvements in recent years, and many of these, too, have been covered extensively by the media.  No further publicity is required to alert the public to the circumstances of this case.

If the Court is inclined to order that PG&E further publicize its conviction, however, the proposal by the Probation Office is overbroad and inconsistent with other instances in which courts have imposed this sort of condition.  In a recent case in this district that received substantially less media attention, for example, Judge Illston ordered AU Optronics to "acknowledge the fact of conviction, the nature of the punishment imposed, and the steps that will be taken to prevent the recurrence of similar offenses, in *three major trade publications* in both the United States and Taiwan."  Judgment at 3, *United States v. AU Optronics Corp.*, No. 09-00110-10 (N.D. Cal. Oct. 2, 2012), ECF No. 976 (emphasis added); *see also* Judgment at 2, *United States v. Chamness Tech., Inc.*, No. 12-00149-001 (S.D. Iowa Jan. 23, 2013), ECF No. 22 ("The defendant shall publish a public apology consisting of an advertisement the size of at least one-eighth of a page with content agreed upon by the parties on two separate publications each in the Ottumwa Courier and Oskaloosa Herrold."); Judgment at 4, *United States v. Duke Energy Business Servs. LLC*, No. 15-CR-62, 67 and 68 (E.D.N.C. May 14, 2015), ECF No. 66 (ordering

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   the defendant to "place a full-page (132 column inches) public apology in at least two national

2   newspapers and a major newspaper in each of Raleigh, Greensboro, and Charlotte, North

3   Carolina").[10]  We are aware of no case in which such a condition has approached the scope of the

4   one proposed by the Probation Office here.

5          Moreover, the proposed condition would be improper for several reasons.  It would run

6   afoul of the principle that the costs of probation conditions cannot exceed the statutory maximum

7   sentence.  *Mitsubishi*, 677 F.2d at 788; *see also Southern Union Co.*, 942 F. Supp. 2d at 243

8   ("Because the combination of a fine and the conditions of probation may not exceed the statutory

9   maximum penalty, *Apprendi* limits the monetary value of a community service obligation to the

10  amount that can be supported by the jury's verdict.").  No matter how spending levels are

11  determined, a year-long national television advertising campaign runs the risk of resulting in a

12  total financial penalty that exceeds the statutory maximum.  And the expansive requirement that

13  PG&E create and publicize content at the Probation Officer's discretion over such a long period

14  of time is not, as the law requires, "reasonably necessary" to effectuate the goals of § 3553(a)(2).

15          **7.      Proposed Conditions 5 (Monitorship) and 6 (Review of Materials and
16                    Interviews of Employees)**

17         The Probation Office has recommended imposition of a monitor in this case (Condition

18  5) as well as access to PG&E materials and employees (Condition 6).  PG&E is not opposed to

19  the imposition of a properly scoped monitorship, which would include the monitor having access

20  to materials and employees.  PG&E and the Government are currently working towards

21  agreement on the scope and terms of a monitorship designed to support and ensure a strong

22  safety culture without compromising the role of PG&E's state and federal regulators.  PG&E

23  hopes that agreement on the monitorship can be reached and a proposal submitted to the Court

24  ahead of sentencing.  As to the recommendations proposed in Conditions 5 and 6, PG&E objects

25  to these Conditions as currently proposed because they do not provide sufficient consideration of

26  the specific gas pipeline transmission safety issues that are the foundation of this matter.

27  _____

28  [10]    In June 2011, PG&E published an apology for the explosion in San Bruno, which ran in more
    than 50 publications.  *See* Exhibit 30.

8.      **Proposed Condition 7 – Community Service**

For its proposed Condition 7, the Probation Office has recommended that the Court impose various community service requirements on PG&E and its personnel.  PSR at 46.  PG&E has a longstanding and deep commitment to community service.  In 2016, PG&E was named one of America's 50 most community-minded companies by the National Conference on Citizenship's annual Civic 50 list, which identifies the top 50 S&P 500 corporations in the U.S. in terms of time, talent and resources used to improve the quality of life in their communities.  Exhibit 31.  This is the fourth year that PG&E has been recognized as a leader in civic engagement.  PG&E has also had an employee volunteer program since 2005.  Every year the Company's employees donate tens of thousands of hours of time to a wide range of community service initiatives, including 87,000 volunteer hours from employees in 2015, and more than 96,000 hours in 2016.  These efforts benefit a wide range of interests, including over 1,750 community organizations and schools in 2016, with missions focused on education, environmental issues, emergency preparedness, and others.

If the Court is so inclined, PG&E would not object to some form of community service as a condition of probation, within the penalty limits recognized by the Ninth Circuit.  The condition as recommended by the Probation Office, however, would be impossible to implement as currently crafted.  For example, the proposed condition requires that all service donated be "separate and unique from existing" programs and activities.  But PG&E's ongoing community service programs are so varied and expansive that confirming that each hour expended under this condition be for a program completely new to the company would be impossible to define and calculate.  Similarly, it would be impossible for PG&E to ensure that each hour expended was incrementally more than what would have been done absent the condition, because, while the Company encourages and tracks service by its employees, it does not require any minimum number of hours per year.

9.      **Proposed Condition 8 – Material Changes in Finances or Litigation**

The Probation Office recommends that PG&E "notify the Court or probation officer immediately upon learning of (A) any material adverse change in its business or financial

1   condition or prospects, or (B) the commencement of any bankruptcy proceeding, major civil

2   litigation, criminal prosecution, or administrative proceeding against the organization, or any

3   investigation or formal inquiry by governmental authorities regarding the organization."  PSR at

4   46.  This proposed condition is substantially broader than the standard condition under 18 U.S.C.

5   § 3563(a)(7), which directs the Court to order that PG&E "notify the court of any material

6   change in the defendant's economic circumstances that might affect the defendant's ability to

7   pay . . . fines, or special assessments[.]"  PG&E respectfully recommends that the Court follow

8   the standard and mandatory language contemplated by the statute.  As a publicly traded

9   company, PG&E's financial condition is a matter of public concern, and it makes regular reports

10  to its shareholders and the investing public through SEC forms 10-K, 10-Q, and 8-K, among

11  others.  PG&E is happy to provide copies of those reports to the Probation Officer or the Court.

12              **10.    Proposed Condition 9 – Periodic Payments**

13          PG&E will pay the maximum statutory fine, if imposed.

14  **IV.    ADDITIONAL OBJECTIONS TO THE PSR**[11]

15          PG&E respectfully submits that the PSR has incorrectly applied Guidelines provisions,

16  and this part of the report's analysis must be rejected.

17          The guidelines and policy statements in Chapter Eight of the Guidelines apply in this

18  case.  U.S.S.G. § 8A1.1.  With respect to the fine, Section 8C2.1 directs the Court to apply either

19  the specific provisions set forth in Sections 8C2.2 through 8C2.9 for certain enumerated

20  offenses, or to apply Section 8C2.10, which directs the Court to determine the fine according to

21  18 U.S.C. §§ 3553 and 3572.  PG&E agrees with PSR's conclusion that Section 8C2.10 applies

22  to all of the counts of conviction in this case.  PSR at ¶ 138.

23          The PSR, however, runs through a Chapter Two analysis anyway, contrary to the

24  instructions in the Guidelines.  Section 8A1.2(b) makes clear that Chapter Two calculations

25  should only be done in the case of a crime that is covered by Sections 8C2.2 through 8C2.9.

26

27

28  [11]   PG&E submitted other objections to the Probation Office, which are noted in the PSR.

Because these sections do not apply[12], the Court should proceed straight to analyzing the appropriate fine under the relevant statutory provisions in 18 U.S.C. §§ 3553 and 3572.  U.S.S.G. § 8C2.10.[13]

The PSR also lists two factors that may warrant an upward departure, to which PG&E objects for the same reasons:  Sections 8C2.2 through 8C2.9 do not apply.   Specifically, the PSR characterizes several incidents as prior similar misconduct, which it says may warrant an upward departure pursuant to the "most analogous" guideline provision, 2Q1.2, and a provision from Chapter Four, Section 4A1.3.  PSR ¶ 158.  Neither authorizes an upward departure here.  Because Section 8C2.10 applies, the Court should not conduct a 2Q1.2 analysis.  See U.S.S.G. § 8C2.1, comment. (backg'd)  Moreover, Section 4A1.3 does not apply to an organizational defendant because Chapter Eight makes clear that "[g]uidelines and policy statements not referenced in this chapter, directly or indirectly, do not apply when the defendant is an organization[.]"  U.S.S.G. § 8A1.2, comment. (n.2).

Finally, the PSR identifies 68 incidents of what it describes as "prior similar misconduct."  PSR ¶¶ 42-109.  PG&E respectfully submits that, under the plain terms of the Guidelines, it is improper to consider these events as "prior similar misconduct."   First, the PSR describes these events as part of PG&E's purported "criminal history."  PSR ¶ 41.  But only one of the events – described in Paragraph 45 – involves a criminal case, which is decades old and did not concern PG&E's gas system, let alone transmission Integrity Management practices.  Second, as discussed above, the Guidelines on which the PSR relies do not apply.  *See* U.S.S.G.

---

[12]   "[T]he provisions of §§ 8C2.2 through 8C2.9 do not apply to counts for which the applicable guideline offense level is determined under Chapter Two, Part Q (Offenses Involving the Environment).  For such cases, § 8C2.10 (Determining the Fine for Other Counts) is applicable."  U.S.S.G. § 8C2.1, comment. (backg'd); *see also* Office of the General Counsel, U.S. Sentencing Comm'n, "The Commission has not promulgated guidelines for determining the fines for counts not included in §8C2.1, such as environmental pollution offenses" and "[f]or such counts, the court should determine an appropriate fine by applying the provisions of 18 U.S.C. §§ 3553 and 3572.").

[13]   In addition, Section 2Q1.2 is not sufficiently analogous with respect to the Integrity Management counts to which the report applies it.

1  § 8C2.1.  As such, "prior similar misconduct" under Section 8C2.5(c) is not an appropriate

2  consideration.

3     Moreover, the conduct described is not "similar in nature" to the conduct underlying the

4  convictions.  *See* U.S.S.G. § 8A1.2, comment. (n.3(F)).  As the PSR's own summaries make

5  clear, the listed events do not involve criminal obstruction of an agency proceeding or the kinds

6  of Integrity Management issues as this case.    Indeed, several of the events (*e.g.*, ¶¶ 43, 48, 49,

7  52, 53, 55, 57-59, 60, 62-64, 67) relate to PG&E's gas distribution system, as opposed to the

8  transmission system at issue in this case, and involve different infrastructure and are subject to

9  different rules and regulations.[14]  Other events do not involve PG&E's gas operations at all (*e.g.*,

10  ¶¶ 45, 47, 50, 54, 70-79, 81-109) and are even more dissimilar.  With one exception, the

11  remaining listed events do not involve similar transmission Integrity Management or criminal

12  obstruction issues and are not otherwise "similar in nature," as contemplated by the Guidelines.

13     Finally, as PG&E noted in its objections to the draft PSR, a number of the descriptions of

14  these events are inaccurate or lack critical context.  And each one would require a mini-trial – or

15  at a minimum a review of voluminous evidence – to provide the Court with information

16  sufficient to make a fair assessment.  The listed events are not akin to the prior criminal history

17  the Court sees in a typical criminal case, where there are charging documents and a guilty plea or

18  verdict to give minimal assurances concerning the nature of the underlying conduct.  Since

19  nearly all the events do not involve criminal issues at all, let alone "similar" conduct, their

20  probative value is minimal, at best.  PG&E respectfully submits that the events listed in the PSR

21  should not be considered by the Court in fashioning a sentence, and certainly not as "prior

22  similar misconduct" as contemplated by the Guidelines.

23  //

24  //

25

26  _____

27  [14]  The Court recognized this critical distinction during trial when it excluded evidence pertaining to PG&E's distribution system. Dkt. 698 (Trial Tr. Vol. 9) at 1250:5-7 ("I simply

28  can't find that PG&E's compliance with distribution regulations is sufficiently similar to PG&E's compliance with transmission regulations.").

1    **V.       CONCLUSION**

2           PG&E respectfully asks that the Court impose a sentence consistent with the principles

3    discussed here.

4

5    Dated:  January 9, 2017                              Respectfully submitted,

6                                                   By _____/s/_____
                                                        Steven M. Bauer
7                                                       Margaret A. Tough
                                                        Robert E. Sims
8                                                       Sean P.J. Coyle
                                                        LATHAM & WATKINS LLP
9
                                                        Kate Dyer
10                                                      CLARENCE, DYER & COHEN LLP

11                                                      *Attorneys for Defendant*
                                                        *Pacific Gas and Electric Company*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28