Pages 1 - 55

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE THELTON E. HENDERSON, JUDGE

```
UNITED STATES OF AMERICA,      )
                               )
               Plaintiff,      )
                               )
      v.                       ) Case No. 3:14-cr-00175-1 TEH
                               )
PACIFIC GAS AND ELECTRIC       )
COMPANY,                       )
                               )
               Defendant.      )
_____)
```

San Francisco, California
Monday, January 23, 2017

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:            BRIAN J. STRETCH
                          United States Attorney
                          For the Northern District of California
                          450 Golden Gate Avenue
                          San Francisco, California  94102
                    BY:   **HALLIE HOFFMAN**
                          **HARTLEY M. K. WEST**
                          **JEFFREY SCHENCK**
                          Assistant United States Attorneys




              (appearances continued on following page)




Reported By:              Leo T. Mankiewicz, CSR 5297, RMR, CRR
                          Pro Tem Reporter

```
APPEARANCES:   (cont.)


For Defendant:          LATHAM & WATKINS
                        505 Montgomery Street, Suite 1900
                        San Francisco, California  94111
                   BY:  STEVEN MARK BAUER, ESQ.
                        MARGARET TOUGH, ESQ.
                        SEAN PATRICK JAMES COYLE, ESQ.


                        Clarence Dyer & Cohen LLP
                        899 Ellis Street
                        San Francisco, Califorina  94109
                   BY:  KATE DYER, ESQ.


Also Present:  JILL SPITALERI, USPO

               JULIE KANE, Senior Vice President in charge of
               Compliance and Ethics, Pacific Gas and Electric
               Company

               (and other speakers, as noted in the transcript)
```

# I N D E X

|                                                              | **PAGE** |
|--------------------------------------------------------------|----------|
| Proceedings                                                  | 4        |
| Susan Bullis - Victim Statement                              | 8        |
| Dana Coffin - Victim Statement                               | 18       |
| Rene Morales - Victim Statement                              | 24       |
| Jim Ruane - Victim Statement                                 | 27       |
| Steven Klejst - Victim Statement                             | 31       |
| Statement by Defendant's Corporate Representative - Julie Kane | 35     |

---oOo---

1    <u>Monday, January 23, 2017</u>

2                                                    2:29 p.m.

3                   P R O C E E D I N G S

4         **THE CLERK:**  Calling criminal case number 14-175,

5    United States of America versus Pacific Gas & Electric Company.

6         Will counsel please step forward and state your

7    appearances for the record.

8         **MS. HOFFMAN:**  Good afternoon, your Honor.  Hallie

9    Hoffman, Hartley West and Jeff Schenck for the government.

10        **MS. WEST:**  Good afternoon.

11        **MR. BAUER:**  Good afternoon, your Honor.  Steve Bauer,

12   Katie Dyer, Margaret Tough and Sean Coyle on behalf of the

13   defendant.

14        **THE COURT:**  Good afternoon.  And Mr. Bauer, would you

15   introduce the corporate representative, please?

16        **MR. BAUER:**  Yes, the corporate representative is Julie

17   Kane.  She's a Senior Vice President in charge of Compliance

18   and Ethics.

19        Julie, could you just stand, so Judge Henderson can

20   say hello?

21        **THE COURT:**  Okay, thank you, ma'am.

22        **MR. BAUER:**  Thank you, Julie.

23                   (Pause in proceedings.)

24        **THE COURT:**  Okay, sorry about this crowd here.

25   I think that the longer I serve on this court, the smaller my

1   courtroom seems to get.

2          Okay, in advance of today's hearing, I've reviewed the

3   presentence investigation report and numerous victim impact

4   statements, and the parties' sentencing memoranda and replies,

5   as well as the government -- the parties' stipulation and

6   proposed order concerning monitoring.

7          Do counsel have any other documents that I should

8   consider before we proceed with sentencing today?

9          **MS. HOFFMAN:**  None from the government, your Honor.

10         **MR. BAUER:**  None from the defense, thank you.

11         **THE COURT:**  Okay.  Defense counsel, have you reviewed

12  the presentence report and any objections with your client?

13         **MR. BAUER:**  Yes, we have, your Honor.

14         **THE COURT:**  And is it Cage, C-A-G-E, the corporate --

15         **MR. BAUER:**  It is Kane.

16         **THE COURT:**  Kane, okay, thank you.

17         Ms. Kane, do you need any additional time to discuss

18  the presentence report and any objections to it or any other

19  matter with your attorneys before we proceed?

20         **MS. KANE:**  No, I do not, your Honor.

21         **THE COURT:**  Okay, thank you.  Okay, we'll proceed with

22  the sentencing.

23         I understand that the government has no objections to

24  the presentence report, is that correct?

25         **MS. HOFFMAN:**  That is correct, your Honor.

1    **THE COURT:**  And I've read PG&E's objections to the

2    presentence report, and the disputed issues will not affect

3    sentencing.  PG&E's objections are noted for the record, but

4    I'm not going to require the probation officer to make any

5    changes to the report.

6    However, I want to clarify that PG&E is correct that

7    this trial was not about the cause of the San Bruno explosion.

8    I cannot and do not conclude that the explosion was caused by

9    PG&E's obstruction of justice or the five specific violations

10   of the Pipeline Safety Act on which the jury found guilt, nor

11   is it necessary, in my view, for me to consider the prior

12   non-criminal incidents detailed in the presentence report.

13   That being said, the criminal conduct in this case was

14   quite serious.  I think no one disputes that.  And although the

15   evidence presented did not and was not asked to prove actual

16   causation of the San Bruno explosion, the purpose of the

17   Pipeline Safety Act regulations is, as the statute's name

18   implies, to promote safety.  Violation of those regulations

19   implicates the safety of the general public, putting lives and

20   property at risk of serious harm.

21   Indeed, PG&E began its sentencing memorandum by

22   observing that, quote, "Immediately," close quote, after the

23   San Bruno explosion, it, quote, "took significant action to

24   help those impacted and to make its pipeline system safer,"

25   close quote.  So that even PG&E seems to understand that there

1    is some link between the explosion and the overall safety of

2    its pipeline system.

3            So while I do not conclude that the criminal conduct

4    at issue in this case caused the San Bruno explosion, or any

5    other particular accident, I do find that the conduct makes

6    such incidents more likely.  That potential risk to the public

7    weighs heavily in my mind as I consider a necessary and

8    appropriate sentence.

9            I agree with the presentence report's calculation of

10   the advisory guidelines range.  The defendant's offense level

11   is 27.  There is no restitution.  The fine range is up to the

12   statutory maximum of $3 million, and the term of probation is

13   one to five years, with all terms of probation to run

14   concurrently.  The special assessment is $400 per count, for a

15   total of $2,400.  I do not intend to depart from the guidelines

16   range.

17           Are there any objections to what I've just said, for

18   the record?

19           **MS. HOFFMAN:**  None from the government, your Honor.

20           **MR. BAUER:**  No, your Honor.

21           **THE COURT:**  In determining an appropriate sentence,

22   I must consider the factors set out by Congress at 18 United

23   States Code Section 3553(a), and ensure that I impose a

24   sentence that is sufficient, but not greater than necessary, to

25   comply with the purposes of sentence as set forth in the

1   statute.

2         Before I decide what sentence to impose in this

3   matter, I want to ask, are there any victims present who wish

4   to make a statement in this case?

5        **MS. HOFFMAN:**  Your Honor, at this time, there are five

6   victims that are present.  There may be an additional victim

7   who we believe may join us during these statements.

8         The first victim that would like to speak is Sue

9   Bullis.

10       **THE COURT:**  Okay, would you step forward and speak

11   into the mic', ma'am.

12       **MS. HOFFMAN:**  Sorry, and Pastor Janet Bower.

13       **THE COURT:**  Okay.  Good afternoon.

14       **MS. BULLIS:**  Good afternoon.  Judge Henderson, thank

15   you for allowing me to speak today.

16        I lived in a house at 1690 Claremont Drive, which was

17   on the corner of Glenview and Claremont Drive.  I am here today

18   to not only represent myself, but also represent William,

19   Gregory, Lavonne and Lucky, who died.

20        Nearly six and a half years have passed since the PG&E

21   explosion and fire in San Bruno, and it seems like just

22   yesterday.  I lost my husband Greg, age 50, my son William, age

23   17, my mother-in-law Lavonne, age 82, my dog Lucky, my home,

24   and all my belongings.  Each member of my family has their own

25   story, but I'm going to tell you my story today.

1    My daughter Janine, who had just at the time turned

2    24, and I were not home at the time of the explosion.  Janine

3    had just returned to our home from work, and was ready to go to

4    celebrate her birthday with her friends.  Her friends sat her

5    down to watch what was on the television:  There was a terrible

6    fire in the neighborhood where we live.

7    Janine tried to call her dad, to no avail.  She tried

8    to call her grandmother, again, to no avail.  She tried to --

9    then she called me.  I was at a meeting the a local hotel, and

10   she sounded very frantic and worried, and told me that there

11   was a fire in the neighborhood.

12   I got up, left the meeting that I was in, and hurried

13   out of the room that I was in.  I quickly exited -- my friends

14   that were there were worried, but I went anyway.  I told Janine

15   I would try to call her father and get right back to her.

16   I tried to call Greg and William both, and they still,

17   to no avail, the phones weren't working.  I called Janine back

18   and told her that, and she told me that the fire was on the TV.

19   I ran into a bar that was at the hotel and asked the

20   bartender if he would turn on the TV, and told him that there

21   was a fire in my neighborhood where I lived.  I believe he

22   turned on Channel 5.  There, right on the screen, was an

23   inferno.  The view was from the helicopter, and I could

24   actually see where our house was and the cars on fire.

25   I ran back into the meeting, grabbed my purse and ran

1    out.  This time, some colleagues followed me.  They had me sit

2    down and tell them what was going on.  They told me I could not

3    drive, so somebody else would have to drive me home.

4         The ride from Sunnyvale where I was to San Bruno was

5    torturous.  People were calling my friend Patty who was

6    driving, people were calling me, the radio was on, the

7    announcer was trying to give explanations as to why the fire

8    was so big.  The first report said there was a plane crash, the

9    second was a gas station blew up.  My head started swirling.

10        We had to take a different route home, because the

11   road was blocked, and there was a lot of traffic on 280.  We

12   arrived at the corner of San Bruno Avenue and Glenview, where

13   we found the fire barricade.  I went up to the barricade

14   wanting to go down into the fire.  I was stopped by somebody.

15   Then I noticed a TV camera being turned on my face.  Somebody

16   asked me, "Do you have anybody in the fire?"  I ran away to the

17   car.  I just couldn't handle it.

18        We headed -- we were directed down to the Bayhill

19   Shopping Center, where the command center was.  Things really

20   start to blur at that point.  I know all of my family was

21   calling me to ask if anybody survived.  I did not know, but

22   I had a sinking feeling in my gut.

23        I called my daughter and my niece Megan and told them

24   to come to the command center.  I started calling people I knew

25   who worked in hospitals to see if anybody had any news.  We

decided to go to Peninsula and Seton medical centers, but to no
avail.  There was nobody from the -- even though they were
ready and willing to take victims from the fire, there was
nobody that had come in from the fire.  But I remember vividly
that the -- the TVs were on and kind of blaring, and they were
saying that nobody could have survived the explosion and fire.
Nobody.  So I kind of knew at that point we weren't going to
find them, and it was beyond words.  It was a horrible
experience for me.

We went back to the command center.  I met up with
neighbors and they told me that they had seen Greg come home
from work, do some work in his garage, and then close the
garage door behind him, and then they noticed -- never saw him
again.

The loss -- on September 9, 2010, my life changed
forever in a split second.  I vividly remember what they did
that day, what I said to each of the family members, and how
I felt.  The loss of my loved ones, personal belongings, my
neighborhood, my life, occurred due to the negligence of a
greedy company which put profit ahead of the public safety.
PG&E caused eight people to die.

The next two weeks were a blur.  My friends and
families called hospitals, burn units, hoping that my family
was there.  We were told that the coroners were working
continually daylight hours searching for DNA.  They worked all

night in a crime lab, investigating samples.  They slept in

their cars when they could.  They wanted answers for us, too.

The confirmation did not take days, but weeks.  Even

when the deputy coroner came to the house where I was staying

at, she said that they were desperately trying to find DNA at

the house.  She asked my sister-in-law to draw up a floor plan

and asked me to point where my family members would be in the

house at that point in time.

She also said that the fire was such a high

temperature, unlike a house fire, that it was extremely

difficult to find DNA.  She burst into tears right in front of

us and said she had not done this before, and we said we had

never done this before either.  The coroner asked us to swab

our mouths, so we did, although I wasn't able to do it, my

hands were shaking too much.

A few days later, the deputy coroner came again.  The

cadaver dog found Lucky first, my dog.  The investigators were

able to find my husband Greg and my mother-in-law Lavonne's

remains.  They could never find my son William.  I would never

have the opportunity to lay my Will's remains to rest.

For days, weeks, and months after the explosion, I was

in a state of shock and disbelief.  Then the gravity of all of

what had happened hit.  I wanted to join my beloved deceased

family.  I truly did not want to live.  The pain was just too

much.

1          With a lot of intense therapy, I can say I no longer

2    feel that way.  That's not to say that I don't still have

3    depression, anxiety, PTSD from that horrific night.  I do.

4    I continue my intensive therapy six years later.  I regularly

5    meet with my psychiatrist, my psychologist and my pastoral

6    counselor on a weekly basis.  I go to a support group for

7    grieving widows and widowers.  It is likely I will continue

8    this therapy the rest of my life.

9          Formerly, I was a social person.  Since the explosion,

10   I've been more withdrawn.  I can no longer participate at the

11   church at which I spent most of my life, Bethany Presbyterian

12   Church, the church that I was raised in, the church that I met

13   my husband in, that I got married in, the church that

14   I baptized my children in and raised them.  I would be sitting

15   in the sanctuary and see my family in the front of the church.

16   It was too traumatizing for me and I'd break down and cry every

17   single time I went to church.  So I left my beloved church

18   family of Bethany and went to another church.

19         After the explosion, I was a Registered Nurse in --

20   I was a Registered Nurse and a Director of Nursing at a skilled

21   nursing facility, and then after the explosion, I had to take a

22   leave of absence.  It was too hard to work.  I couldn't

23   concentrate.  You know, I had spent my career taking care of

24   seniors, and it was very difficult to work as a nurse and take

25   care of people when I, you know, I had suffered such a loss.

1        I found -- I found, however, I was no longer

2   functioning as a Registered Nurse or administrator.  I had

3   difficulty concentrating and focusing.  I had at least daily

4   anxiety attacks.  So I resigned the career I loved so much and

5   that gave me purpose.

6        Coming from a family of nurses, including my

7   mother-in-law Lavonne and my husband Greg, it was a huge void

8   in my life.  I've been a longtime resident in San Bruno, spent

9   most my young life there, going to church and youth clubs, and

10  I didn't really feel after the explosion I really wanted to

11  leave.  So I moved to an apartment building near Tanforan,

12  across the street from a Marine base where Greg had served at;

13  and even that became very, very hard for me, especially to hear

14  the taps every afternoon, it was very difficult.  So when I was

15  able to, I moved away to Burlingame, because living in San

16  Bruno was too traumatizing for me.

17       Although I was once very social, today I find myself

18  being -- that being with others can be an overwhelming

19  challenge.  Too much activities, loud conversations or

20  gatherings with others bring up memories that can cause me to

21  be isolated and feel lonely even in the midst of crowds.

22       I watch and listen more than converse.  My family

23  lifestyle has changed drastically.  My daughter and I go to

24  family reunions, we feel the loss of our family members who are

25  no longer present.  It's a somber tone.

1      There's a sense of the family going through all the

2 litigation processes through the court prior to this trial was

3 overwhelming to all family members, and the aftermath is like

4 the elephant in the room.  So even though Janine and I, my

5 daughter, are overcomers, it still is very, very, very hard to

6 deal with what we needed to deal with as far as the explosion

7 and loss to our family.

8      The most painful shift in how I relate to people was

9 the change in relationship with my daughter.  We both traveled

10 our own individuals paths of loss, grieving and healing.  She

11 withdrew from me and rarely spoke to me following the

12 explosion.  Perhaps my grief was overwhelming to her.  During

13 the memorials and community remembrances, my daughter separated

14 herself from me and stood in the back by herself.  My daughter

15 chose to spend time with friends and other family members.  It

16 seemed as though it was too painful for her to be with me.  She

17 immersed herself into nursing school and hospital service.

18 This estrangement lasted two excruciating years.

19      We both did our best to heal, but it was horrible.

20 Today we have a healthy, close relationship.  However, it has

21 taken much effort and energy to restore our bond.  To this day,

22 we cannot talk about the explosion together.

23      Since the explosion, I'm no longer naïve or trusting

24 of large corporations.  I no longer have the confidence that my

25 own community is safe.  I doubt the efficacy of the justice

1   system, and the oversight and accountability that the State was

2   supposed to provide PG&E through the CPUC.

3        PG&E acted negligently about upkeep and recordkeeping

4   of their pipelines.  This negligence resulted in the lives --

5   loss of lives and homes, immense suffering and destruction of

6   neighborhoods.

7        PG&E attorneys were cruel and insensitive in San Bruno

8   to the victims.  They tried to prove I had not experienced

9   trauma because I was not there during the explosion, but I was

10  there at that fire.  The PG&E attorneys attempted to prove my

11  emotional instability had existed before the explosion.  During

12  the trial, I felt personally attacked and terrified, which

13  caused me trauma -- re-traumatization.  The deposition and

14  trial had been beyond anxiety-producing.  It was hard to fight

15  back the tears and anxiety.

16       PG&E covered up their findings and were not

17  transparent or apologetic.  I still have anxiety and PTSD when

18  I see PG&E trucks, logos, commercials, fires, handles and

19  smoke.  I am unable to enjoy a calm fire or the warmth of a

20  fireplace.

21       I resent the fact that the opening statements of the

22  trial via PG&E attorneys matter-of-factly stated that the leaks

23  happened, that they can't always find the source, that odor

24  from pipelines is like a perfume, and that over-pressurized

25  pipelines are like driving a car over the speed limit, when

cars are designed to run at speeds over one hundred.

If PG&E continues its negligent practices and standards, then all of California will be at risk for death, injury and loss of homes and belongings. If we use the school grading system, I believe that the standards PG&E used are at a D level at best. PG&E needs to perform at an A level.

Your Honor, your sentencing will have a big impact on this company and other utility companies across the country. I am hopeful that with an independent monitor with no time limits, changes in the management of PG&E can and will be made. There can no longer be back room politics between PG&E and CPUC. A major overhaul in standards and procedures needs to take place. It should not take 90 minutes for PG&E to turn off the gas to stop a gas leak like the one that killed my family in San Bruno.

No court decision will bring back my family or former life. It is my hope, however, with the proper checks and balances for PG&E, this tragedy will never, ever happen again.

Thank you, your Honor, for allowing me to make my statement today in remembrance of my family, Greg, William, Lavonne and Lucky. My prayers remain with you, and all who have been affected. Thank you.

**THE COURT:** Thank you, ma'am.

**MS. HOFFMAN:** Your Honor, a victim, Mr. Dana Coffin.

**THE COURT:** Good afternoon.

1          **MR. COFFIN:**  Good afternoon, your Honor.  My name is

2    Dana Coffin, and I'm here to speak on my behalf as well as my

3    father Alto Coffin.  We were both living in the house in the

4    disaster area.

5          Now, I wasn't physically affected by the disaster, and

6    my father wasn't physically affected, but we were emotionally

7    traumatized, and it continued for several years.

8          The events of the night were that my father, who was

9    in a wheelchair, was home by himself, and I was away from the

10   house, and at the time we didn't have cell phones.  So on my

11   return home that night, I found out that I couldn't get to the

12   neighborhood because the streets were blocked and the power was

13   off, and it wasn't until more than an hour after I had arrived

14   in Rollingwood, San Bruno that I realized there was a fire

15   going on.

16         And I had to park my car up near Portola Heights in

17   San Bruno and run to my neighborhood to find out what was going

18   on; and only when I came to Sneath Lane and saw the multitude

19   of fires that were going on in my neighborhood, and the sky

20   lights and the fire engines, I had never been traumatized more

21   than that moment in time, to think that my neighborhood was not

22   only destroyed, but my father and everything that we have

23   was -- would be gone.

24         I managed to break through security, because I went

25   through the Crestmore Canyon and I went into my neighborhood,

1    and I got to the top of my street, where policemen apprehended

2    me and prevented me from going down on my street, which was a

3    smart move on their behalf.

4            At the time I told them that my father was probably

5    still in the house, and did anyone know where he was.  They

6    went down, checked on the house, and he was not there, which

7    meant that somebody had rescued him.

8            So now I was left to find out where my father was, and

9    also remember where my car was.  I managed to get to my car,

10   and I had heard that there was a center set up at Bayhill

11   Shopping parking lot.  I went there to find out which rescue

12   squad got my father and where they put him.  Nobody had any

13   record.

14           I went to Red Cross.  I formerly worked for Red Cross

15   and FEMA, so I know some things about disaster relief.  I went

16   to Red Cross.  They had no record of a search party getting my

17   father.

18           Lucky for me that I was on the sidewalk and a national

19   news team overheard me, and asked me if I would volunteer to go

20   on air and make an announcement, if anyone knew where my father

21   was.  I did that, and within 10 minutes a shout came from the

22   parking lot, from some stranger, that my father was in Kaiser

23   Hospital.  They didn't tell me which one.  Took a while,

24   figured out it was in South City Kaiser.

25           And stranger than that was a friend that I haven't

1    seen in 40 years, who was watching TV with his family in South

2    San Francisco, and his family told him to come and find me, to

3    help me find my father.  He finds me in the parking lot.  We go

4    to Kaiser, I go there to get my father.  Kaiser won't release

5    my information to me.  Even though I had a power of attorney,

6    they wouldn't release it.  And I almost broke the windows in

7    the emergency room.  I went ballistic.

8            Luckily, there was a nurse inside who overheard it,

9    knew of the situation, gave me a clue that my father had been

10   taken to my uncle's house.  My uncle's house is in South San

11   Francisco.  I determined that it was safer for him to be there

12   in his wheelchair than to be with me trying to find out where

13   we're going to stay.

14           So I left them there, and the first night I went and

15   stayed in the San Bruno shelter that was set up in the

16   gymnasium.  I may have been the only person that stayed in the

17   shelter.  All night long I was shaking, and I had to rack my

18   brain on how I was going to resolve the thing and make amends

19   to whatever happened.

20           I met with my father, determined that he needs to be

21   in a board and care facility, because I cannot take care of him

22   the same way that I did.  Before the explosion, I was taking

23   care of my father at home, but I was also taking care of my

24   mother, who was temporarily in a board and care facility, and

25   she was supposed to come home.  So now this whole thing put it

1    on -- put that on the back burner.

2              So I had to find a place for my father, where he would

3    be taken care of, and I know the board and care facilities are

4    very iffy.

5              So I have my father's life in my hands, had to resolve

6    the situation with the house, couldn't get to the house for

7    over a week, had contacted the insurance company at the San

8    Bruno shelter, one of the first ones to apply, and our

9    insurance company turned us down.  So I was left with PG&E.

10              The PG&E social workers that eventually picked up the

11    case, they used local representatives first, but then they flew

12    out a group of people who came out of New Jersey, and this

13    group of people couldn't have been more incompetent as far as

14    case work goes.  Myself working in social services, I've never

15    seen such incompetent people handling claims of people who had

16    lost -- in many cases lost everything they had.  The

17    unprofessionalism was every moment that I dealt with them.

18              So I'm in a situation where my insurance company won't

19    help me, PG&E is dogging this thing on, but I still have to

20    take care of my father.  I have to find a place to stay, I have

21    to get the house taken care of, because we cannot live in the

22    house.  I found housing, and I found housing in a place

23    across -- in San Bruno, across from Tanforan, probably the same

24    place as the previous person who spoke.

25              I move there, and I'm thinking I can move my father in

1   with me.  The first week I'm in there, there are fire alarms

2   going off inside the apartment complex.  There are fire alarms

3   going off every other day, because there are kids pulling them

4   or they're smoke fires going in the kitchens.

5           So from the moment the first fire alarm hit, I went

6   into a panic mode, because I realized I could not bring my

7   father back here without having to find somebody else to stay

8   with him 24 hours while I'm out dealing with the insurance

9   company, with contractors, with PG&E, as well as continue with

10  work that I was doing representing my father in a lawsuit

11  against Kaiser Hospital.

12          And this, the fire alarms went off more than a month.

13  So I was on edge morning to night, constantly on edge, and to

14  this day, your Honor, I have not had a good night's sleep.  No

15  matter what I try, whether it's medication or it's therapy or

16  physical exertion, I cannot sleep a full night.

17          I'm back in the house in my neighborhood, and I'd

18  lived in that neighborhood since 1968.  I do not feel

19  comfortable living in that neighborhood, but it's the house

20  that belongs to my family and it belongs to me now.  My father

21  passed away in July of last year.

22          What lingers is, for a very long time, I could not

23  trust anyone.  I could not trust social workers, I could not

24  trust contractors, I couldn't even trust the banking business.

25  When we were all homeless and I was paying bills for my dad and

1    myself and we had no money coming in, I risked going bankrupt,

2    and I even tried to get bank loans to cover us for a period of

3    time, and that didn't help.  That didn't happen.  And

4    unfortunately, no friends or family would help.  And in fact,

5    what this did was it opened us up to people thinking that we

6    won the lottery and that they should benefit from our loss; and

7    this was family and friends.

8        And the negligence from PG&E continued even when

9    I moved back into the house and found out that the power line

10   that goes to our house, goes to the masthead of our house, the

11   power pole had caught on fire and it burnt the wires, but this

12   particular power line was never replaced.  And it wasn't until

13   a year later -- this would be about 2014 -- that PG&E finally

14   took the line down and found out that my ground wire had been

15   disabled since the fire, and I'd been using electricity in my

16   house without ground, without being grounded.  That continues

17   to unnerve me to this day, of the potential that that could

18   cause harm to the house.

19       I have used whatever strength I gained from my mother

20   and father to keep moving forward, to stay ahead of this thing

21   and don't let it get me down, because there were periods of

22   time when I was in the apartment complex by myself, when

23   I contemplating ending it, because I found no way out of it to

24   resolve it.  Fortunately for me, I didn't take that position.

25       As far as your sentencing goes towards PG&E, your

1   Honor, I'll leave to the attorneys to weigh on you about that.

2   As far as the emotional effect of this goes, it still affects

3   me, and even though this was six and a half years ago, it can

4   feel like it was a week ago, and that's still lingers with me

5   every day, and I just have to keep it on the back of my

6   shoulder and distract myself doing other things.

7           Thank you for your time, your Honor.

8           **THE COURT:**  Thank you, Mr. Coffin.

9           **MS. HOFFMAN:**  Your Honor, the next victim that would

10  like to speak is Ms. Rene Morales.

11          **MS. MORALES:**  Good afternoon, your Honor.

12          **THE COURT:**  Good afternoon.

13          **MS. MORALES:**  Thank you for allowing me to speak

14  today.  The people versus Pacific Gas & Electric have won a

15  small victory today as PG&E now will be labeled the full

16  criminals that they have been in recent years and recently in

17  the San Bruno explosion.

18          Thank you for all the work you have done, the hard

19  work to convict PG&E.  It's well deserved to be able to say

20  those words, convicted criminals.  PG&E, convicted criminal on

21  four counts of violating the safety standards and one count of

22  obstructing the investigation.

23          My name is Rene Morales, and I am the mother of

24  Jessica Morales.  She was the first known victim, and the face

25  of the San Bruno explosion.  I honestly didn't know what I was

1  going to say today, as you can see from my crumbled-up papers,

2  but I am filled with my emotions.  I'm absolutely filled with

3  regret, and I wonder if the CEOs and the executives of PG&E

4  Corp. have any regret.

5       There's not a day that goes by without thoughts

6  turning to that day of the explosion, September 9th.  I often

7  relive that day, conversations Jessica and I had throughout the

8  day, text messages back and forth.  My ultimate regret is that

9  I didn't stop her at the door.

10       Jessica and I were best friends.  We were sisters at

11  heart.  We were mother and daughter by bond, and the last words

12  I heard, she said, "Don't worry, Mom, I promise I'll be back by

13  nine, before you leave to work at the hospital."  She reassured

14  me, "I'll take care of the kids and clean the kitchen and wash

15  the dishes."  Those words ring in my mind every day.  I relive

16  that day.  I wish I could turn back that time.  I would hold

17  her and not let her out that door.

18       My youngest son didn't want to let her go either, for

19  some reason.  He offered to give her the TV, which Spongebob

20  was an often hit in the evening.  But he said, "Stay, you can

21  watch the TV here, Jessica."  That would forever haunt him.  He

22  couldn't save his sister.  A ten-year old little boy filled

23  with guilt.  I did try to call her at 5:00 p.m. to invite her

24  to the mall, but she had left her phone at home.

25       I just wonder today if PG&E has any regret, and

1    I understand that labeling them as a convicted felon,

2    unfortunately, not one of the CEOs will see the inside of a

3    jail cell, which I'm not a vindictive person.  I just hope that

4    this bears weight with them, that every day that they try to do

5    something, to change, and look back.  My family has been

6    forever changed.

7         I was the only victim that had young children

8    that I needed to nurture through this.  I had to be strong, and

9    it was hard for me.

10        I don't want your sympathy, because I will get through

11   this, as I always do.  I just would like you to emphasize to

12   PG&E, to make them understand that it's important what they do.

13   I feel PG&E, a public utility, bear a huge responsibility.

14   They didn't take the public safety first.

15        And I don't agree with this independent monitor.

16   I believe that there should be a separate, nonprofit

17   organization that should be established, somebody who's not

18   going to hold the hands of PG&E or be withinside the working

19   walls of PUC.  I believe that PG&E should have some type of

20   fund set up for an independent, nonprofit organization to move

21   forward to monitor them, based on integrity and morals, so that

22   this doesn't happen again.  Everybody deserves to know what's

23   going on, and concealing evidence and hiding the truth is not

24   what we need to do.

25        Thank you, your Honor.

1          **THE COURT:**  Thank you.

2          **MS. HOFFMAN:**  Your Honor, the Mayor of San Bruno, Jim

3     Ruane is next.

4          **MR. RUANE:**  Good afternoon, honorable Judge Henderson.

5     Thank you for this opportunity to address the Court today.

6          **THE COURT:**  You're welcome.

7          **MR. RUANE:**  I'm Jim Ruane, the very proud Mayor of the

8     wonderful City of San Bruno.

9          We in San Bruno waited a very long time for this final

10    chapter in our quest to see that PG&E is held fully accountable

11    for their violations of federal pipeline safety regulations and

12    for their negligent operation of their gas utility system.

13    That negligence led to devastation in our community that has

14    changed our lives forever and has profoundly eroded the very

15    basic trust and confidence in our state's public utility system

16    upon which we and all Californians should be able to rely.

17         The Court has heard a great deal about the technical

18    metrics of the federal regulations and gas system operations.

19    You heard about gas pipeline pressures, tolerances and

20    inspection practices, about record keeping and reporting, and

21    about financial priorities.

22         The specifics of the trial were not about what

23    happened in San Bruno that terrible evening of September 9th,

24    2010, but the residents of San Bruno believe that in a very

25    real sense, that is exactly what this trial was all about.

1    PG&E's failure to adhere to even the most basic pipeline safety

2    regulations, their failure to properly record, monitor and

3    inspect what they had in the ground, and their practice of

4    prioritizing financial gain over safety have been proven in

5    this courtroom beyond a reasonable doubt.  These same failures

6    and negligence led directly to the explosion of Line 132 in our

7    community.

8            Today it is our chance to express the humanity of what

9    happened in San Bruno on September 9th, 2010.  As residents of

10   the Crestmoor neighborhood gathered in their living rooms to

11   watch the opening game of the NFL season, or as they sat down

12   for dinner, PG&E's Line 132, that had laid quietly under the

13   street for over 50 years, exploded suddenly and without

14   warning.  The explosion set off a loud boom that was heard

15   throughout San Bruno, and it threw a section of 30-inch steel

16   pipe over 100 feet away.  Gas spewing from the broken pipe

17   almost immediately burst into flames that leapt over 600 feet

18   into the air and could be seen from miles away.

19           Hundreds of our desperate residents faced searing heat

20   and a wall of fire as they fled their homes, fearing for their

21   lives.  For over 90 long minutes, as the gas continued to spew

22   unabated from the broken pipeline, our firefighters were pushed

23   back by the relentless fire consuming the neighborhood.

24           The horror of that night remains firmly etched in our

25   minds.  A tight-knit neighborhood was literally ripped apart.

Thirty-eight family homes were burned to the ground, leaving those families not only without shelter, but shattering their lives, and in some cases, their health and their livelihoods.

Over 60 people were injured, some so seriously that over six years later, they still face long and difficult recovery.  Most tragically, eight innocent people were killed.

You have heard Rene Morales and you've heard Sue Bullis and their powerful and deeply moving statements about their experiences, experiences that no one should have to endure.  The enormity of their loss is virtually unimaginable.

Rebuilding the physical damage to our Crestmoor neighborhood has been accomplished and it will be completed, but whether the psychological damages to scores of our residents will ever be healed is far less certain.

Children who became anxious at the sound of sirens or the sight of the flames from a barbecue, adults who lost all of their possessions, who have struggled to put their lives back together and who still do not feel safe in their own homes or competent in their ability to protect their families, parents who have lost their children forever, these are the residents of our community today; all of them strong, resilient people, who are still working to recover from the entirely preventible manmade tragedy that they experienced at the hands of PG&E.

For their part, PG&E has publicly stated that they are sorry, but they have yet to accept full accountability for

their failure to operate the gas pipeline system in a safe and responsible manner. Instead, they have adopted a practice of blaming others; first, the City of San Bruno, then the victims themselves have been so badly harmed, and even the prosecutors who so diligently researched and presented the evidence that conclusively proved their guilt.

Their advertising campaign portraying the company as community and safety-minded rings hollow, as did their arguments at trial that the federal regulations are ambiguous and confusing. The jury did not believe that PG&E, with all of its attorneys actively working to deflect blame, could be confused about its safety obligations. Instead, the jury found that PG&E obstructed the independent NTSB investigation, whose sole mission was to find the truth about what really happened.

As I stand before you today, I am joined by the eight angels that sit on my shoulders and in whose memory we in San Bruno have fought so long for reform of a broken utility system, to make sure that what happened in our community never happens again, anywhere.

I urge the Court to impose the strongest possible sentence on PG&E, a sentence that is intended to finally correct PG&E's negligent practices, install a culture of safety over profits, and to finally bring justice for those angels we have lost and who we will never forget, Greg Bullis, Lavonne Bullis, William Bullis, James Franco, Jacqueline Gray, Janessa

1   gray, Jessica Morales and Elizabeth Torres.

2           Thank you, your Honor.

3           **THE COURT:**  Thank you, Mr. Mayor.

4           **MS. HOFFMAN:**  Your Honor, I have been told there is

5   one additional victim that had wanted to speak today.  His name

6   is Joseph Gomez.  He was the boyfriend of Rene Morales'

7   daughter.  He actually is in his, I believe it's now fifth

8   surgery following the explosion, and this surgery is on his

9   feet, because he ran out of the home while it was on fire.

10          The last victim that is going to speak, your Honor, is

11  from the federal agency that was corruptly obstructed by PG&E,

12  the National Transportation and Safety Board, your Honor.  It

13  is Deputy Managing Director Steven Klejst.

14          **MR. KLEJST:**  Good afternoon, your Honor.

15          **THE COURT:**  Good afternoon.

16          **MR. KLEJST:**  Your Honor, thank you for the opportunity

17  to speak to you today about the impact of PG&E's obstruction of

18  the National Transportation Safety Board's investigation into

19  the tragic San Bruno explosion.

20          As you may remember from the trial, my name is Steven

21  Klejst and I'm the Deputy Managing Director of the NTSB, and at

22  the time of the accident investigation, I was the Director of

23  the office of Railroad, Pipeline and Hazardous Materials

24  Investigations, the group that led the investigation at San

25  Bruno.

1          On behalf of the entire NTSB, we would like to extend

2     our condolences to the victims, their loved ones and all of the

3     lives that were forever altered by this preventible disaster.

4          The NTSB is not a typical federal investigative

5     agency.  It is not our mission to find blame or fault.  Our

6     powers are quite limited.  We do not carry guns, we do not

7     arrest anyone, and we do not have hundreds of investigators

8     available to conduct interviews and sort through reams of

9     documents.

10         For nearly 50 years, we rely on the honesty and

11    cooperation of the people and entities we've made parties to

12    our investigation.  This non-adversarial system works

13    remarkably well and has helped to save countless lives by

14    making transportation safer.

15         From early in our investigation of the San Bruno

16    explosion, PG&E engaged a course of conduct designed to thwart

17    our efforts at nearly every turn.  During the investigation,

18    you heard the effect of PG&E's actions in the San Bruno

19    investigation.  PG&E's actions and our experience in overcoming

20    them has also changed how NTSB has conducted its investigations

21    since then.

22         During the San Bruno investigation, the NTSB spent

23    countless of additional hours unraveling a web of obfuscation

24    and outright deceptions spun by PG&E.  Our investigators and

25    other staff had to fight to receive information.  We had to

1   sort through many boxes filled with irrelevant and unnecessary

2   documents grudgingly provided by PG&E and search for answers to

3   simple questions which PG&E could easily have answered much

4   earlier in our investigation.

5          This additional work cost the NTSB hundreds of

6   thousands of dollars in salaries and other expenses, as the

7   investigation was unnecessarily prolonged in search of the

8   truth.

9          In the years since the San Bruno investigation, our

10   pipeline investigators have noticed a shift in the level of

11   cooperation we receive from many pipeline operators involved in

12   our other investigations.  We believe many in the industry that

13   saw PG&E and how PG&E was able to obstruct our investigation in

14   the San Bruno matter without sanction or consequence; since the

15   verdict in this case, we have seen improvements in the level of

16   cooperation from the parties to our investigations.  We hope

17   that this trend will certainly continue and accelerate after

18   the sentencing.

19          The NTSB has implemented new procedures since the San

20   Bruno investigation to ensure we'd receive the honesty and

21   cooperation we rely upon to do our work.  We now frequently

22   launch attorneys with our go-teams so that we have legal

23   representation at the accident scene to deal with uncooperative

24   parties and their attorneys directly and immediately.  We now

25   issue hundreds of subpoenas each year for documents and

1    information, where before we relied on the cooperation of the

2    parties.

3           For significant accidents, the Chairman of the NTSB

4    often has a personal phone call with the chief executive

5    officer of whatever entities are involved in the accident to

6    clearly establish our expectations and authorities from the

7    onset.

8           All of these efforts obviously cost money.  For

9    example, the cost of sending attorneys to accident scenes is

10   thousands of dollars per accident above and beyond their

11   salaries.

12          To be clear, the sentencing in this case is not about

13   the NTSB recovering its costs.  It is about punishing the

14   defendant and sending a clear message to the people and

15   companies who we will be involved with in the future in NTSB

16   investigations and their cooperation and truthfulness is

17   necessary, and that they cannot obstruct federal investigations

18   without severe consequences.

19          Thank you, your Honor.

20          **THE COURT:**  Thank you, sir.

21          **MS. HOFFMAN:**  Your Honor, it is my understanding that

22   is all the victims that would like to speak.  Many have

23   submitted victim impact statements to the Court.

24          **THE COURT:**  Right, I've read those.  Okay, thank you.

25   And thank those who have just spoken.

1          Before I hear from counsel in the case, I want to

2    inquire whether Ms. Kane, as PG&E's corporate representative,

3    would like to make a statement.  You don't have to, but you

4    may.

5          **MS. KANE:**  Yes, your Honor.

6          **MR. BAUER:**  Your Honor, may I introduce Ms. Kane to

7    you?

8          **THE COURT:**  You may do so.

9          **MR. BAUER:**  This is Julie Kane.  She is the Senior

10   Vice President and Chief Ethics and Compliance Officer of PG&E.

11   She joined PG&E in 2015 as part of a company-wide ethics

12   program, compliance program, to improve what was happening at

13   PG&E.  She reports directly to the CEO and to the appropriate

14   committees of the Board of Directors, and so thank you for

15   allowing her to speak.

16         **THE COURT:**  Okay, thank you.

17         Ms. Kane?

18         **MS. KANE:**  Good afternoon, your Honor.

19         **THE COURT:**  Good afternoon.

20         **MS. KANE:**  On behalf of PG&E, we sincerely apologize

21   to the families and friends of those who lost their lives or

22   were injured in this tragic explosion, and we want them to know

23   our mission and our commitment to safety will never stop.  We

24   will remain forever committed to taking action to meet the high

25   safety standards our customers and we demand and expect.  We

1   are profoundly sorry.

2              **THE COURT:**  Thank you, Ms. Kane.

3              **MS. KANE:**  Thank you, your Honor.

4              **THE COURT:**  At this point, I'll now hear from counsel,

5   but I want to focus our discussion on the conditions of

6   probation.  As both parties' sentencing memoranda contemplate,

7   I intend to impose the maximum statutory fine as well as the

8   maximum term of five years of probation.

9              The only questions concern some of the probation

10  conditions proposed by the probation officer, and I want to

11  give my thinking before I hear from counsel for both sides.

12             First, PG&E does not object to conditions 1, 2 or 9,

13  and the parties have reached a monitoring agreement on

14  condition 5, and so I don't think we need to discuss these any

15  further.  I'm prepared to sign the parties' stipulated

16  monitoring agreement at the time of sentencing.

17             I'm inclined not to impose condition 3, concerning

18  employee bonuses.  PG&E has already given safety more of a

19  priority in its bonus compensation program, which is now up to

20  50 percent, and the CPUC also provides regular oversight of the

21  bonus program.  In addition, I agree that although fiscal

22  management can never be allowed to take precedence over safety,

23  it's nonetheless relevant and important.

24             Finally, and the most significantly for purposes of

25  sentencing, it appears that the other terms of probation, such

1    as the compliance and ethics program, as well as the monitoring

2    plan, are sufficient, or will be sufficient, to ensure that

3    PG&E prioritizes safety over finances.

4            On condition 4, concerning advertising, I think some

5    type of condition would be appropriate, but I'm not inclined to

6    order development of an entirely new advertising campaign.

7    Instead, I'd like to hear your thoughts on a condition that any

8    advertisements touting PG&E's safety must include a statement

9    of the criminal convictions in this case.

10           I agree that the case has gotten widespread publicity,

11   no question about that, but it also seems an appropriate

12   punishment and deterrent for PG&E not to be able to publicize a

13   commitment to safety without also mentioning that it was found

14   liable for knowingly and willfully violating safety regulations

15   in this case.

16           On condition 6, I'm inclined to find that the broad

17   language about reviewing business records and interviewing

18   employees is appropriate, especially given the obstruction

19   conviction, but I'd like to hear from the parties on whether

20   this term is necessary in light of the agreement on a

21   monitoring arrangement.  It appears to me that the parties'

22   agreement gives the monitor the powers contemplated by

23   condition 6.  So this separate condition may not be necessary.

24           As for condition 7, PG&E does not object to some form

25   of community service.  The 10,000 hours recommended by

Probation appears to me to be appropriate, as does the

requirement that at least 2,000 hours be performed by high

level personnel.  However, I'm inclined to rely on the

definition of "high level personnel" in the guidelines rather

than limiting it to only employees with the words "president,"

"vice president" or "chief" in their title.

I'm also inclined to remove the condition that the

service be separate and unique from existing community

relations programs and activities.  I agree that such tracing

might be unduly cumbersome or impossible.  However, the intent

of this condition is for PG&E to do new community service, and

I would like the probation officer to keep that in mind as she

considers what service projects to approve.  Requiring

community service would have no deterrent effect whatsoever if

PG&E simply did what it was already planning to do.

On condition 8, I'm inclined to follow the probation

officer's recommendation.  PG&E is correct that the language is

broader than the standard condition, but it is the language

recommended in the sentencing guidelines for probation of an

organization, and it appears appropriate in this situation.

So that is what I am thinking, and I'll now give

counsel a chance to respond.  And let me add that I'm not

opposed to continuing this hearing if you wanted time to meet

and confer to see if you can agree on language or proposed

conditions.

1          I'll hear from you on that, in light of the thoughts

2     that I've just given you.  You may proceed.

3          **MS. WEST:**  Thank you, your Honor.

4          Hartley West for the United States.  The United States

5     does not need nor request a continuance.

6          **THE COURT:**  Okay.

7          **MS. WEST:**  I would like to address a couple of

8     particular conditions, and then my colleagues from the U.S.

9     Attorney's office will address the other conditions that the

10    Court has flagged.

11         The first one that I would like to address is proposed

12    condition number 3, dealing with compensation; and I understand

13    the Court's comments and I also understand the arguments --

14    I believe that I do -- raised by PG&E, but PG&E says in its

15    reply, or its response to the government's sentencing

16    memorandum, that since the time of the San Bruno explosion,

17    safety has been the most heavily weighted.

18         Your Honor, the government believes that that's not

19    working, and part of our evidence for that not working is in

20    2014, less than three years ago, March of 2014, there was an

21    explosion in a residence in Carmel that was the direct result

22    of PG&E having improper records such that when they were

23    performing work on a pipeline underlying that house, they did

24    not know what that pipe consisted of, and the result was

25    complete destruction of the home.  Fortunately, nobody was

1    home, and so nobody perished in that explosion.

2         But that is after, obviously, the time of the San

3    Bruno explosion, and so the continued emphasis on meeting

4    budget and profits for a regulated monopoly that already has a

5    rate of return provided by the CPUC, even though it may be less

6    than it was preceding the San Bruno explosion, it appears still

7    not to be enough to persuade PG&E executives to prioritize

8    compliance with the regulations and safety.

9         The government believes that the only way of properly

10   doing that is to make sure that the executives themselves do

11   not get the bonuses that they would otherwise get, they do not

12   receive the compensation they would otherwise get if there are

13   these same kinds of safety regulation violations.

14        And so we do urge the Court to adopt the third

15   recommended condition.

16        I also wanted to address briefly the condition

17   pertaining to advertising, and that is number 4.  I think what

18   the Court is proposing is pretty close to something that the

19   government thinks is right.

20        The Court, however, recommended, or said that it was

21   considering, any advertisement that is touting PG&E's safety

22   must include a statement of its convictions, and I think that

23   if that were different so that it was any PG&E advertisement

24   they are putting on, if that has to address the factors set

25   forth in the sentencing guideline, that is, the nature of the

1    offense committed, the fact of conviction, the nature of the

2    punishment imposed, and the steps to be taken to prevent

3    recurrence, in addition to what the government suggests of a

4    hotline number to call if they are -- if somebody seeing this

5    advertisement is aware of some dangerous condition that they

6    want to report, then that will address the government's

7    concerns.

8         But I think it should be -- I would hate to see some

9    very carefully worded advertisements by PG&E, so that they

10   don't use the word "safety," and therefore, evade this

11   condition.  I think if they choose to advertise, then those

12   advertisements should include these kinds of statements.

13        The other point, and I -- I think the Court had

14   intended to -- I don't want to put words in the Court's mouth,

15   but the Court mentioned that the convictions it would need to

16   include in that advertisement would be the knowing and willful

17   violations of the Pipeline Safety Act regulations.  The

18   government believes that they should also be required to state

19   that they were found to have corruptly obstructed a federal

20   investigation or a federal proceeding.

21        Thank you, your Honor.

22        **THE COURT:**  Thank you, counsel.

23        **MR. SCHENK:**  Good afternoon, your Honor.

24        **THE COURT:**  Good afternoon.

25        **MR. SCHENK:**  I'm going to talk just briefly about

1    condition number 6.  The Court had a question about that, and

2    in particular, the Court was wondering whether the examination

3    of corporate books that's discussed in number 6 would overlap

4    with the monitor agreement, and the answer is yes.  The monitor

5    would have the ability to examine the books, just as is

6    described in 6.  There's still wisdom, though, in giving

7    Probation that ability.

8            I think that the Court is right to be concerned about

9    overlap, but the focus should be when the overlap would trade

10   off with the success of the monitor, and the government and at

11   least counsel -- new counsel for the defendant, that the

12   government has spoken with, the government believes is focused

13   on successful monitorship.

14           The examination of the books by Probation, though,

15   doesn't run that risk.  I don't think that there's a concern

16   that the monitor's effectiveness will be jeopardized if

17   Probation has the ability to inquire into areas of concern by

18   Probation.

19           The wisdom of the monitorship is, Probation has a very

20   large caseload.  This is a corporation that needs some serious

21   oversight.  What they need is essentially a probation officer

22   with one case, and that's what the monitor is.

23           If the Probation Office, though, has the experience,

24   the willingness, the time to also examine the books, as is

25   requested in 6, and Probation has asked the Court for that

1  power, I think we should support that, because I don't believe

2  that this condition runs the risk of trading off with the

3  successfulness or the effectiveness of the monitorship.

4  Without that concern, I think the Court should still impose

5  that condition.  Thank you.

6  **THE COURT:**  Okay, thank you.

7  **MS. WEST:**  Sorry, your Honor, I said that I was done,

8  but I realized there was one additional point on the publicity

9  provision of the probation program, and that is, we spoke about

10  television advertising.

11  The United States does think that it is important to

12  require some statement that will go out more nationally than

13  the advertising previously that we believe was more local, and

14  that is particularly the Wall Street Journal, because that is a

15  mechanism for reaching the investing public.

16  And the customers, as the Court knows, really don't

17  have a choice about whether to use PG&E.  For this reason

18  particularly, we believe it is critical for the investing

19  public to receive these statements as provided in the

20  Sentencing Guidelines, acknowledging PG&E's offense conduct,

21  its convictions, and the steps that are being taken to make

22  improvements, so that the investing public can make the

23  decision and vote with their pocketbooks.  Thank you.

24  **THE COURT:**  Okay, thank you, counsel.

25  **MS. HOFFMAN:**  Good afternoon, your Honor.  Hallie

1    Hoffman again for the government.

2           Since this is basically the last time the government

3    is going to have an opportunity to speak to you before sentence

4    is imposed, the government would like to say a few words.

5           This case involved not just a corporation, but a

6    monopoly, a monopoly that is entrusted with providing service

7    to the residents of the Bay Area.  That monopoly decided to

8    undertake a pattern of intentional violations of safety

9    regulations, motivated by profit, and resulting, or at least

10   making more likely, death and destruction.

11          This case involved the monopoly's corrupt obstruction

12   of an investigation into that death and destruction, in order

13   to cover up the monopoly's intentional and illegal practices.

14          A case such as this, with a defendant such as this,

15   warrants a most serious sentence by the Court.  The government

16   fully supports Probation's recommendations.

17          As we've already discussed many of these conditions of

18   probation, we would note that what we propose the sentence

19   would do is, under 3553(a), reflect the seriousness of the

20   offense, provide a just punishment, afford adequate deterrence

21   and most importantly, protect the public from future crimes of

22   this defendant.

23          Your Honor, the government appreciates the comment of

24   the PG&E representative earlier and understands that PG&E is

25   sorry that this horrible event happened.  We all agree the San

1   Bruno explosion was a horrible, horrible event.  But that it

2   could have been avoided is frankly heinous, your Honor.

3          Turning to the probation conditions that haven't yet

4   been addressed, and your Honor has made comments about the

5   hours of community service, believing that the 10,000 hours of

6   community service is appropriate, 2,000 hours to be served by

7   high-level personnel, it seems acceptable that that would

8   follow the guideline advisement of what constitutes high-level

9   personnel.

10         Some of your Honor's comments, I believe, would ensure

11   that this is new community service, and that is very important

12   to the government.  There are two cases discussed in the United

13   States' briefing that the government would just like to again

14   discuss, because of what comes out of the cases.

15         In one of the cases actually cited by the defense, the

16   *Citgo* case, the court recognizes when community service would

17   be appropriate, and the court says,

18              "Such sentence is required that the defendant

19              become personally involved, devoting both time and

20              energy in a project that serves the public interest,

21              and thereby inculcate in the defendant a sense of

22              social responsibility."

23         That is exactly what the government is asking for.  A

24   monopoly willing to play Russian roulette with a pipeline

25   running underneath a neighborhood needs to get personally

```
 1    involved.  They need to devote their time and energy, and
 2    thereby inculcate the defendant with a sense of social
 3    responsibility.
 4           What else is the purpose of this community service?
 5    Your Honor, the government believes that it will provide a
 6    specific deterrence for this company.  Here, where there were
 7    decades of ignoring safety standards and a culture of
 8    obstructing what they were doing, your Honor has seen e-mails
 9    being sent by management while the fires of San Bruno were
10    still smoldering, demands that employees face what the company
11    has done, and we hope that by doing this community service, the
12    corporation will -- corporation's culture will begin to change
13    and something like San Bruno will not happen again.
14           Your Honor, we also feel that this is an important
15    condition for general deterrence.  We hope that other utility
16    monopolies will not -- will think twice before choosing profit
17    over safety if senior executives are required to spend 2,000
18    hours affecting the communities.
19           And finally, your Honor, we feel like this condition
20    is important because PG&E, as your Honor saw throughout trial,
21    is a company that felt it was above the reach of the law and it
22    did not need to follow minimum safety rules.  Over and over,
23    PG&E's definition of good engineering judgment during the
24    trial, that it knew more than PHMSA or the NTSB, included it
25    being okay to ignore activated manufacturing threats in heavily
```

populated areas and included intentionally making decisions

based on information it knew was full of errors.  PG&E's good

engineering judgment was that decisions were made for

financial, not technical reasons.

PG&E needs to work to regain the trust of communities

that are forced to use their services, meanwhile living in fear

that PG&E is still a threat to their safety.

Therefore, that is why, your Honor, the government

feels that the community service condition is necessary in

order to achieve what is contemplated under 3553(a) factors.

For the same reasons just articulated, the government

agrees with condition number 8, where there is a more extensive

notification requirement on PG&E, given the track record that

PG&E has chosen to ignore regulations that are imposed against

it.

Thank you, your Honor.

**THE COURT:**  Thank you, counsel.

**MR. BAUER:**  Thank you, your Honor, for the opportunity

to speak with you.

Following the Court's Rule 29 rulings, the company

made an effort to reach agreement with the government on as

many sentencing issues as they could, as you are aware, and

that began with the company unilaterally announcing to the

public markets that it would not appeal the five integrity

management counts of conviction as a showing of trying to move

1    forward after the trial.

2            They've since agreed to the terms of the monitorship,

3    and of course, have agreed to pay the full statutory fine, and

4    as the Court has seen in our submissions, the company has been

5    involved in an extensive program of corporate reforms and

6    safety improvements and modernization of the system, with the

7    effort to become the safest utility in the country and to make

8    sure this kind of accident does not happen again.

9            As the Court is also aware, you know, you hear these

10   horrible stories from the victims, as it was pointed out, the

11   civil judge who was presiding over the case complimented PG&E

12   and said from the very beginning PG&E accepted responsibility,

13   conceded negligence, settled with the victims, and then

14   included, which the judge thought was an incredible gesture,

15   gave $70 million to San Bruno with no strings attached, in

16   order to help heal the rift, and Judge Dylina pointed that out.

17   The company has also, you know, provided another 50 million for

18   capital improvements and other millions to the actual -- to

19   rebuild actual places in the damaged area.

20           So with that as a backdrop, I think there's only a few

21   issues that I need to discuss, and they're the ones that you

22   raised.

23           So first of all, with respect to items 1, 2, 5 and 9,

24   you know, we of course agree with you, and the intent was to

25   have all of those covered by the monitorship, and I think the

1   Court understood that, and I think we may be on the same page

2   with that.  And I will take you through the other ones now.

3        With regard to community service, knowing PG&E quite

4   well, PG&E has a culture of community service and volunteering

5   time, and because of that, they have no objection to the

6   requirement of 10,000 hours, and with 2,000 of it being

7   high-level persons, under the guidelines.

8        And if Probation wants to monitor that or if the

9   monitor wants to monitor it, either is fine, and certainly

10  understand the intent of the Court to say it's something new in

11  addition to what they are currently doing.  We have no

12  objection to that at all.

13       **THE COURT:**  Okay.

14       **MR. BAUER:**  With regard to the advertising, I think

15  the Court is correct to note that this was a very widely

16  publicized trial, and I guess our request regarding the

17  imposition of court-ordered advertising is two:

18       One is that there be some period of time that is tied

19  to that, whether it's, you know, a number of months or a year

20  or something, that it isn't a five-year program.

21       And the reason I ask that has to do with the second

22  point, and that is, we think that the advertising should be

23  designed to help improve the safety of the community.  It

24  should be geared toward informing the community how to partner

25  with PG&E to try to make things safe, and the Court, you're

1    aware of many of these announcements and the advertisements

2    that PG&E makes, but to tell people about how to respond to an

3    emergency or what if they smell gas or storm safety or lighting

4    pilots or, you know, digging, those kinds of things.

5         So the company doesn't object to having a requirement

6    that, you know, somewhere in those advertisements they talk

7    about the conviction, but we'd like the Court's instruction to

8    be that we could make those geared toward improving the safety

9    as opposed to a punitive measure.

10        The Ninth Circuit has questioned whether compelled

11   advertisements or compelled statements really fits the terms of

12   probation and the goals of probation, and I think here we have

13   an opportunity to tie them together, because what we're really

14   talking about is safety.  We're all trying to get to the same

15   place, there.

16        Of course, there's also the question of the amount and

17   how that compares to the statutory maximum, but as I say, if we

18   have a time limit and we can find a way to tie it to safety, so

19   it's just not reporting that the people don't know what to do

20   with, I think the company would be fine with that, and I think

21   it could actually be helpful to informing the public.

22        We, of course, think the Court is correct on the

23   compensation question.  As you pointed out, right now PG&E has

24   a higher percentage of its compensation program tied to safety

25   than even the CPUC recommended, and I'm not sure that the

1    government or you or I or Probation is really qualified to talk

2    about how a compensation program should be structured.  I think

3    that if we -- if we as a company exceed what the CPUC requires

4    and have a 50 percent safety factor in the compensation

5    structure that the CPUC has said is okay, that would be enough.

6          The problem is, if you start tinkering too much with

7    the safety, you then start making it difficult to retain

8    employees and recruit employees and, you know, we have to, as a

9    company, have to be competitive and make sure we get good

10   people to make things safe.  And so I would urge you to stick

11   with your instincts on that one, your Honor.

12         Regarding the financial disclosure factor, which I'll

13   call as shorthand for item 8, you know, the company is, you

14   know, under at least two different disclosure obligations and

15   review obligations, right, and that is the CPUC reviews much of

16   what they do and there are also SEC requirements.

17         So I question whether it makes sense to put a third

18   one, and a very kind of general one, on top of those, because,

19   you know, things are disclosed to the CPUC and they are

20   disclosed to the SEC.

21         Now, if the Court were to make that a term of

22   probation, we would urge the Court to make that disclosure go

23   to the monitor as opposed to to the Court or to the U.S.

24   Probation, because the monitor will be someone that PG&E will

25   be working with regularly, and will be able to -- and will be a

1   qualified person that the government has agreed to, or will

2   have agreed to, when that's worked out, as opposed to sending

3   things to the Court or bringing Probation into an area that the

4   monitor really is more qualified to cover.

5           And I think we may not have any disagreement now about

6   condition 6, as I understand the prosecutor.  Our intent was

7   that the items that were listed in the probation

8   recommendation 6 would fall under the monitorship, because once

9   again, that's to the point of the monitor as having an informed

10  person there working with the company, keeping track of things.

11          And so when the government says that that would not

12  hinder what the monitor does, I would say that if you have two

13  parallel requirements to two different people, it is not really

14  fitting probation terms to make the monitorship effective, and

15  so if we're going to have that as a term, we should either

16  assign to it Probation or to the monitorship rather than

17  running the risk of having two, you know, different reviewers.

18          And once again, I would suggest that the monitor is

19  the person that is going to be there, is going to be qualified,

20  will have enough experts to help him or her, and that we could

21  just take condition 6 and push it into the monitorship.

22          So your Honor, if you have any further questions of

23  me, I'm happy to answer them.  Otherwise, I will submit on the

24  statements and the objections in our sentencing briefs.

25          **THE COURT:**  All right, I don't have any further

1    questions.

2              **MR. BAUER:**  All right, thank you.

3              **MS. WEST:**  Your Honor, if I might take another minute

4    or so, I wanted to respond to just two points made by

5    Mr. Bauer.

6              The first is with regard to community service.  The

7    government would ask that Probation be in charge of overseeing

8    the community service and not the monitor.  It is right down

9    the middle of what Probation is generally asked to do in

10   criminal cases after a conviction, is to monitor community

11   service, and this case should be no different.

12             With regard to advertisements, Mr. Bauer asked that

13   he -- the advertisements be limited to discussions about safety

14   and suggested that to do otherwise might be improper.  I think

15   that's quite wrong.  The purpose of the provision in the

16   sentencing guidelines is not limited to safety.  Certainly that

17   is something that the government thinks is entirely

18   appropriate, and that's why we have suggested this hotline

19   number.

20             However, there are other factors under 3553(a), as the

21   Court is fully aware.  Those are to reflect the seriousness of

22   the offense, to promote respect for the law, provide just

23   punishment and afford adequate deterrence, and all of those are

24   critically served by having this publication relating to the

25   convictions of the defendant and not simply saying, we're here

1    to preserve safety, so make sure you check for the smell of

2    gas.

3         I think that the Court might consider also -- I don't

4    know if Probation wants to take this on, but the language that

5    they intend to use in these advertisements, perhaps, to make

6    sure that it is achieving the goals of deterrence, promoting

7    respect for the law and the others that are enumerated in

8    Section 3553(a), perhaps the Court might consider ordering that

9    those be approved, at least in the generic, by Probation.

10        Thank you.

11   **THE COURT:**  Okay.  Thank you, counsel.

12        What I am going to do now, and I apologize in advance,

13   rather than give us full resolution right here and now, I'm

14   going to continue this hearing to give me time consider the

15   comments you've made.  I want to give them further thought.

16   There are merits on both sides.

17        I'm available as early as tomorrow afternoon, or any

18   time after that.  So I want to ask counsel to give us some

19   dates -- meet and confer -- of times that would work for your

20   schedule, and I'll ask Tracy here to let us know which of those

21   dates and times will work for the Court.

22   **MR. BAUER:**  Would you like me to do that now or do it

23   on the side with Tracy?  I could do it right now.

24   **THE COURT:**  Let's do it now.  I think maybe those --

25   there are those here who would want to come back, maybe.

1    **MR. BAUER:**  How about sometime tomorrow?

2    **MS. HOFFMAN:**  Your Honor, the government is available

3 tomorrow afternoon, but we've just been told by Probation that

4 Probation is not available in the afternoon.  So I don't know

5 if there's availability on Thursday?  The Probation said there

6 is availability on Thursday.

7    **MR. BAUER:**  May I have just a moment, your Honor?

8    **THE COURT:**  Yes, take your time.

9    **MR. BAUER:**  Thursday's fine with me, your Honor.

10    **THE COURT:**  Thursday?

11    **MS. HOFFMAN:**  Yes, your Honor.

12    **THE COURT:**  Okay.

13    **THE CLERK:**  Your Honor, how about morning, like 11:00?

14    **THE COURT:**  Okay, let's do that in the morning, at

15 10:00 o'clock.

16    **THE CLERK:**  10:00 o'clock?

17    **MS. HOFFMAN:**  Yes, your Honor.

18    **THE COURT:**  Thursday at 10 clock?  Okay.  We're in

19 recess, and we will meet this Thursday at 10:00 o'clock, to

20 complete the sentencing.

21    **THE CLERK:**  Court is in recess.

22                  <u>4:06 p.m.</u>

23

24

25

**CERTIFICATE OF REPORTER**

      I, LEO T. MANKIEWICZ, a pro tem reporter in the United States Court, Northern District of California, and Certified Shorthand Reporter duly licensed in the State of California, hereby certify that the foregoing proceedings in Case No. 3:14-cr-00175-1 TEH,  United States of America v. Pacific Gas & Electric Company, were reported by me, and were thereafter transcribed under my direction into typewriting; that the foregoing is a true record of said proceedings as bound by me at the time of filing.

      The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_____

Leo T. Mankiewicz, CSR 5297, RMR, CRR

Tuesday, January 31, 2017