JENNER & BLOCK LLP
    Reid J. Schar (*pro hac vice*)
    RSchar@jenner.com
    353 N. Clark Street
    Chicago, IL 60654-3456
Telephone:   +1 312 222 9350
Facsimile:    +1 312 527 0484

CLARENCE DYER & COHEN LLP
    Kate Dyer (Bar No. 171891)
    kdyer@clarencedyer.com
    899 Ellis Street
    San Francisco, CA 94109-7807
Telephone:      +1 415 749 1800
Facsimile:       +1 415 749 1694

CRAVATH, SWAINE & MOORE LLP
    Kevin J. Orsini (*pro hac vice*)
    korsini@cravath.com
    825 8th Avenue
    New York, NY 10019
Telephone:      +1 212 474 1000
Facsimile:       +1 212 474 3700

Attorneys for Defendant PACIFIC GAS AND ELECTRIC COMPANY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                 Plaintiff,<br><br>   v.<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>                 Defendant. | Case No. 14-CR-00175-WHA<br><br>**MEMORANDUM RE 2019 WILDFIRE SAFETY PLAN IN RESPONSE TO COURT'S JANUARY 30, 2019 ORDER** |

Defendant Pacific Gas and Electric Company ("PG&E") respectfully submits this memorandum in connection with its filing of PG&E's Wildfire Safety Plan pursuant to the Court's Order dated January 30, 2019 (Dkt. 992). PG&E's Wildfire Safety Plan was provided to the California Public Utilities Commission ("CPUC") pursuant to Senate Bill 901 ("SB 901") earlier today.

PG&E agrees with the Court that the state of California is facing a critical public safety emergency. Wildfire risk is greater now than it has ever been in the past due to a confluence of climate conditions. A single spark can now spread into a catastrophic wildfire in a matter of minutes, as Northern California tragically experienced in October 2017 and November 2018. Given these conditions, it is imperative for public safety that all potential sources of wildfire ignition are addressed. PG&E recognizes that its electric system—with its more than 100,000 miles of overhead power lines—is a source of such potential ignitions. PG&E's goal is not mitigation of ignition risk; it is elimination of ignition risk to the greatest extent, and as fast as, possible. PG&E acknowledges that preventing wildfires outright might be impossible, but nevertheless PG&E is approaching the issue with the goal of doing all that it can to make sure its facilities do not create public safety risks.

Vegetation contact with power lines is the leading risk for electrically caused wildfires in the districts subject to the highest fire threats. And that is precisely why PG&E developed and implemented its Enhanced Vegetation Management Program. That Enhanced Vegetation Management Program, which further mitigates fire risk associated with PG&E's electric distribution lines, has three primary components: (1) clearing all overhanging limbs and limbs within four feet of electric distribution lines to further reduce the risk of tree contact with energized lines in High Fire Threat Districts ("HFTDs"); (2) targeted removal in HFTDs of the ten highest risk tree species, which together have accounted for more than 75 percent of all vegetation related ignitions in HFTDs since 2013; and (3) targeted defensible space clearing underneath power lines in HFTDs. PG&E must be cognizant of, and will not repeat here, the legal and environmental hurdles to completing this work. As part of the Wildfire Safety Plan process with the CPUC, PG&E is focused on addressing these legal and environmental hurdles to allow more effective and efficient vegetation management. PG&E is also continuing to explore all available options

to bring in additional trained tree crews, including exploring partnerships with the relevant unions and contractors to create new training programs so that more qualified workers can be deployed in the HFTDs as soon as possible. This vegetation work is described on pages 70–86 of the attached Wildfire Safety Plan.

Equipment failure is the second leading risk of electrically caused wildfires in HFTDs. PG&E also has an ambitious plan underway to address this issue. By May 31, 2019, PG&E intends to complete additional, enhanced inspections of its electric assets in HFTDs, including approximately 685,000 distribution poles, 50,000 transmission structures, and 200 substations. These enhanced inspections include ground inspections, drone and helicopter inspections where needed, and climbing inspections of every transmission tower. PG&E will take immediate action to address any issues identified as an imminent risk to public or workforce safety. PG&E is also working to harden its electric system for the future, including targeted use of undergrounding, insulated conductors and more durable and flame resistant power poles. PG&E's inspection, maintenance and hardening plans are described on pages 52–69 of the attached Wildfire Safety Plan.

To be clear, PG&E has not waited for the Wildfire Safety Plan process to begin the work described above. That work could not wait. PG&E is also, however, cognizant of the fact that not all of the wildfire risk can be completely eliminated through vegetation management, system inspection and system hardening. That is precisely why PG&E has developed—and continues to refine—a proactive de-energization program that will be in place for this upcoming wildfire season (and was initially deployed last year). As noted at the hearing on January 30, the California utility with the most experience running a de-energization program is San Diego Gas & Electric ("SDG&E"). When PG&E set out to develop its own program, it specifically did so based on SDG&E's experience and practices, including SDG&E's framework concerning when proactive de-energization should be initiated. PG&E met with SDG&E on numerous occasions and spent time learning from its key team members involved in the wildfire risk reduction effort. One key aspect that became clear was the importance of SDG&E's extensive network of weather stations and cameras that permit it (and state or local fire officials) to monitor its

approximately 5,500 miles of overhead power lines (as compared to the more than 100,000 miles in PG&E's system) in real time.  PG&E immediately embarked upon a program to install similar capabilities as quickly as practical and that work is underway.  Learning from SDG&E's experience and CPUC guidance, PG&E also has developed (and continues to refine) advance warning systems for potentially impacted customers, first responders and customers that provide critical services.[1]  PG&E continues to recognize the safety risks associated with de-energization and believes those risks must be accounted for.  But at the same time, PG&E fully expects that as it enters the 2019 wildfire season, there likely will be multiple de-energization events in PG&E's service territory.  PG&E's de-energization plan is described on pages 94–109 of the attached Wildfire Safety Plan.

In addition to addressing these critical issues of vegetation management, equipment inspection and maintenance and de-energization, SB 901 also contains specific requirements for the topics that must be addressed in a wildfire safety plan.  (Pub. Util. Code § 8386(c).)  Based on those requirements, PG&E and other California utilities proposed an outline of issues to be addressed in the CPUC Wildfire Safety Plan proceedings and provided that outline to the CPUC.  In a decision dated January 17, 2019, a CPUC Administrative Law Judge ruled on the proposed plan template and added additional information that the utilities must address in their wildfire safety plans.  *Available at* http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M259/K972/259972066.PDF.  As set forth in those documents, other required issues that the Court will see addressed in the Wildfire Safety Plan filed with this memorandum include climate change risks, post-incident recovery, restoration and remediation measures and detailed discussions of the way in which PG&E has identified and classified wildfire risks in its service territory.

---

[1] PG&E's de-energization plan includes advance warning systems for potentially impacted customers where feasible.  Because forecasted weather conditions can change quickly, advance notification (particularly more than 24-48 hours) is not always possible.  SDG&E, for example, provided notification to impacted customers one day ahead of its de-energization event on September 21, 2017.  (San Diego Gas & Electric Company Report on De-Energization of Circuit 221 on September 21-22, 2017 at 3, *available at* http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/Electric_Safety_and_Reliability/SDGE%20De-Energization%20Report%20-%20Sept%2021-22.pdf.)

PG&E looks forward to receiving public comments to its Wildfire Safety Plan both as part of this proceeding and the CPUC process.  Wildfire risk is only increasing with continuing climate change and development of the portions of California that are most susceptible to wildfire events.  While PG&E has devoted a great deal of time and expertise, including external consultants, to evaluating the best means to address wildfire risk as quickly and as safely as possible, PG&E hopes that others—including, among others, members of the community, wildfire experts, technology consultants, and tree contractors—will take advantage of these opportunities to comment.  To the extent there are other solutions that PG&E has not identified, PG&E wants to hear about them as soon as possible.

Dated:  February 6, 2019

Respectfully Submitted,

JENNER & BLOCK LLP

By:   /s/ Reid J. Schar
      Reid J. Schar (*pro hac vice*)

CRAVATH, SWAINE & MOORE LLP

By:   /s/ Kevin J. Orsini
      Kevin J. Orsini (*pro hac vice*)

CLARENCE DYER & COHEN LLP
Kate Dyer (Bar No. 171891)

By:   /s/ Kate Dyer
      Kate Dyer (Bar No. 171891)

Attorneys for Defendant PACIFIC GAS AND ELECTRIC COMPANY