EXHIBIT F – 1

DRAFT FINAL

1       SUPERIOR COURT OF THE STATE OF CALIFORNIA

2            COUNTY OF SAN FRANCISCO

3

    ------------------------------

4  Coordination Proceeding,   ) Case No.

5  Special Title (Rule 3.550) ) JCCP No. 4955

6                        )

7  CALIFORNIA NORTH BAY FIRE  )

8  CASES                   )

9  ------------------------------)

10  AND RELATED CROSS-ACTIONS.  )

    ------------------------------)

11

12

13   VIDEOTAPED DEPOSITION OF PG&E THROUGH ITS PERSON

14      MOST QUALIFIED:  BRIAN JAMES BIANCARDI

15          San Francisco, California

16        Wednesday, January 16, 2019

17            Volume I

18

19

20  Reported by:

21  CATHERINE A. RYAN, RMR, CRR

22  CSR No. 8239

23  Job No. 3181431

24

25  PAGES 1 - 98

Page 1

DRAFT FINAL

```
1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                    COUNTY OF SAN FRANCISCO

3

4       _____

5     Coordination Proceeding,      ) Case No.

6     Special Title (Rule 3.550)    ) JCCP No. 4955

7                                   )

8     CALIFORNIA NORTH BAY FIRE     )

9     CASES                         )

10      _____)

11    AND RELATED CROSS-ACTIONS.     )

12      _____)

13

14

15

16              Videotaped deposition of BRIAN JAMES

17    BIANCARDI, Volume I, taken on behalf of Plaintiffs,

18    at Veritext Conference Center, 160 Pine Street,

19    Suite 710, San Francisco, California, beginning at

20    10:03 a.m. and ending at 11:40 a.m., on Wednesday,

21    January 16, 2019, before CATHERINE A. RYAN,

22    Certified Shorthand Reporter No. 8239.

23

24

25

                                            Page 2
```

DRAFT FINAL

```
 1   APPEARANCES:
 2
 3   For Subrogation Plaintiffs State Farm General
     Insurance Company, et al.:
 4       GROTEFELD, HOFFMANN, SCHLEITER, GORDON, OCHOA &
 5       EVINGER, LLP
         BY:  JORDAN EVERAKES
 6       Attorney at Law
 7       700 Larkspur Landing Circle, Suite 280
         Larkspur, CA  94939
 8       (415) 344-9670
         (415) 989-2802 Fax
 9       jeverakes@ghlaw-llp. com
10
     For Individual Plaintiffs Ellen Amador, et al., and
11   Philippe Langner, et al.:
12       DREYER BABICH BUCCOLA WOOD CAMPORA, LLP
         BY:  STEVEN M. CAMPORA
13       Attorney at Law
14       20 Bicentennial Circle
         Sacramento, California  95826
15       (916) 379-3500
         (916) 379-3599 Fax
16       scampora@dbbwc.com
17
18   For Individual Plaintiffs Willard Hay, et al.; Frank
     Jordan, et al.; Gregory Wilson, et al.:
19       COTCHETT PITRE & McCARTHY LLP
         BY:  FRANK M. PITRE
20       Attorney at Law
         840 Malcolm Road, Suite 200
21       Burlingame, California  94010
22       (650) 697-6000
         (650) 697-0577 Fax
23       fpitre@cpmlegal.com
24
25   //
```

Page  3

DRAFT FINAL

```
 1   APPEARANCES (Continued):

 2

 3   For Defendants Pacific Gas and Electric Company and
     PG&E Corporation and the Witness:

 4        CRAVATH, SWAINE & MOORE LLP
          BY:  JULIE A. NORTH

 5             BEATRIZ L. PATERNO
          Attorneys at Law

 6        Worldwide Plaza

 7        825 Eighth Avenue
          New York, New York  10019-7475

 8        (212) 474-1680 (Ms. Paterno)
          (212) 474-1752 (Ms. North)

 9        (212) 474-3700 Fax
          bpaterno@cravath.com

10        jnorth@cravath.com

11

12

13

14   TELEPHONIC APPEARANCES:

15

     For Subrogation Plaintiffs PURE Insurance Company,

16   California FAIR Plan Association, et al.:

17        BERGER KAHN
          BY: CRAIG S. SIMON

18        Attorney at Law
          1 Park Plaza, Suite 340

19        Irvine, California  92614
          (949) 474-1880

20        (949) 313-5029 Fax
          csimon@bergerkahn.com

21

22

23

24

25   //
```

Page 4

DRAFT FINAL

```
 1   TELEPHONIC APPEARANCES (Continued):
 2
 3   For Subrogation Plaintiffs:
 4        LAW OFFICES OF JANG & ASSOCIATES, LLP
          BY:  SALLY NOMA
 5        Attorney at Law
 6        1766 Lacassie Avenue, Suite 200
          Walnut Creek, California  94596
 7        (925) 937-1400
          (925) 937-1414 Fax
 8        snoma@janglit.com
 9
10   For Subrogation Plaintiffs:
11        DENENBERG TUFFLEY
          BY:  JARETT M. SMITH
12        Attorney at Law
          One Northwestern Plaza
13        28411 Northwestern Highway, Suite 600
          Southfield, Michigan  48034
14        (248) 979-9815 (Mr. Smith)
          (248) 593-5808 Fax
15        jsmith@dt-law.com
16
17   For Individual Plaintiffs Barbara Abbott, et al. and
     Nancy Batson, et al.:
18        JACKSON & PARKINSON
          BY:  ROBERT W. JACKSON
19        Attorney at Law
          205 West Alvarado Street, Suite 2
20        Fallbrook, California  92028
21        (760) 723-1295
          (760) 723-9561 Fax
22        robert@jacksontriallawyers.com
23
24
25   //
```

Page 5

DRAFT FINAL

```
 1    TELEPHONIC APPEARANCES (Continued):
 2
 3    For the County of Napa, County of Sonoma, County of
      Mendocino, City of Santa Rosa, and Individual
 4    Plaintiffs Bernard Krause, et al.; Demetrie Simmons,
      et al.; and Adrian John, et al.:
 5         BARON & BUDD, P.C.
           BY:  BRITT K. STROTTMAN
 6         Attorney at Law
           3102 Oak Lawn Avenue, Suite 1100
 7         Dallas, Texas  75219-4281
           (214) 521-3605
 8         (214) 520-1181 Fax
           bstrottman@baronbudd.com
 9
10         THORSNES BARTOLOTTA McGUIRE LLP
           BY:  JOHN "MICKEY" F. McGUIRE
11         Attorney at Law
           2550 Fifth Avenue, 11th Floor
12         San Diego, California  92103
           (619) 236-9363
13         (619) 236-9653 Fax
           mcguire@tbmlawyers.com
14
15
16
17
18    Also Present:
19         AMY CHAU, Paralegal, COTCHETT PITRE & McCARTHY LLP
20         SOUFOU LEE, Videographer
21
22
23
24
25
```

Page 6

DRAFT FINAL

```
 1                      INDEX
 2   WITNESS                              EXAMINATION
 3   BRIAN JAMES BIANCARDI                      PAGE
     Volume I
 4        BY MR. CAMPORA                          11
 5
 6
 7                    EXHIBITS
 8   NUMBER              DESCRIPTION          PAGES
 9   Exhibit 0070-001 "PLAINTIFFS' AMENDED NOTICE OF    25
10                    TAKING DEPOSITION OF PERSON MOST
11                    QUALIFIED AT PG&E AND REQUEST FOR
12                    PRODUCTION OF DOCUMENTS -- ALL
13                    FIRES" and "PROOF OF SERVICE"; 6
14                    pages
15
16   Exhibit 0070-002 Typed list of Bates numbers;     25
17                    1 page
18
19   Exhibit 0070-003 "PGE-CPUC_00005652 Metadata";    47
20                    Bates PGE-CPUC_00005652 -
21                    PGE-CPUC_00005660; 10 pages
22
23   Exhibit 0070-004 "ORDER TO SHOW CAUSE WHY PG&E'S   62
24                    CONDITIONS OF PROBATION SHOULD NOT
25                    BE MODIFIED"; 4 Pages
```

Page 7

DRAFT FINAL

```
 1                    EXHIBITS (Continued)
 2      NUMBER                DESCRIPTION            PAGES
 3      Exhibit 0070-005 "PGE-NBF-TAR-0000168677 Metadata";   66
 4                       Bates PGE-NBF-TAR-0000168677 -
 5                       PGE-NBF-TAR-0000168682; 7 pages
 6
 7      Exhibit 0070-006 "PGE-NBF-TAR-0000148890 Metadata";   72
 8                       Bates PGE-NBF-0000148890 -
 9                       PGE-NBF-0000148891; 3 pages
10
11      Exhibit 0070-007 Email series dated 10/3/2017,        87
12                       "Subject:  RE: Daily Reliability
13                       Scorecard - 02-Oct-2017"; Bates
14                       PGE-NBF-0000818792 -
15                       PGE-NBF-0000818802
16
17
18                   PREVIOUSLY MARKED EXHIBITS
19      NUMBER                DESCRIPTION            PAGES
20      Exhibit 0052-008 "Pacific Gas and Electric, Summary   60
21                       and Analysis of Vegetation-related
22                       Fire Incidents on PG&E Electric
23                       Powerlines, 2007-2012"; Bates
24                       PG&E_JCCP 136135 - PG&E_JCCP
25                       136145
```

Page 8

DRAFT FINAL

```
1    San Francisco, California; Wednesday, January 16, 2019

2                    10:03 a.m.

3

4          THE VIDEOGRAPHER:  Good morning.  We are

5    going on the record at 10:03 a.m. on Wednesday,          10:03:03

6    January 16th, 2019.

7          Please note that the microphones are

8    sensitive and may pick up whisperings, private

9    conversations, and cellular interference.

10          Please turn off all cell phones or place          10:03:16

11    them away from the microphones as they can interfere

12    with the deposition audio.

13          Audio and video recording will continue to

14    take place unless all parties agree to go off the

15    record.                                                 10:03:25

16          This is Media Unit 1 of the video-recorded

17    deposition of Brian Biancardi, taken for counsel by

18    Plaintiff, in the matter of California North Bay

19    Fire Cases and Related Cross-Actions, filed in the

20    Superior Court, State of California, County of          10:03:39

21    San Francisco, JCCP No. 4955.

22          This deposition is being held at Veritext

23    Conference Center, located at 160 Pine Street,

24    Suite 710, in San Francisco, California.

25          My name is Soufou Lee, from the firm              10:03:57
```

Page 9

DRAFT FINAL

| | |
|---|---|
| 1 | Veritext Legal Solutions, and I'm the videographer. | 10:03:59 |
| 2 | The court reporter is Catherine Ryan. |
| 3 | I am not related to any party in this |
| 4 | action, nor am I financially interested in the |
| 5 | outcome. | 10:04:08 |
| 6 | Counsel and all present in the room and |
| 7 | everyone attending remotely will now state your |
| 8 | appearances and affiliations for the record. |
| 9 | If there are any objections to proceeding, |
| 10 | please state them at the time of your appearance, | 10:04:17 |
| 11 | beginning with the noticing attorney. |
| 12 | MR. CAMPORA:  Good morning.  Steve Campora |
| 13 | for various individual plaintiffs. |
| 14 | MR. PITRE:  Buongiorno.  Frank Pitre for |
| 15 | the plaintiffs. | 10:04:27 |
| 16 | MR. EVERAKES:  Good morning.  Jordan |
| 17 | Everakes for various subrogating plaintiffs. |
| 18 | MS. NORTH:  Good morning.  Julie North, |
| 19 | Cravath, Swaine & Moore, for PG&E and the witness. |
| 20 | MS. PATERNO:  Beatriz Paterno, Cravath, | 10:04:39 |
| 21 | Swaine & Moore, on behalf of the witness and PG&E. |
| 22 | MR. CAMPORA:  On the phone we have Craig? |
| 23 | MR. SIMON:  Craig Simon, Berger Kahn, on |
| 24 | behalf of plaintiffs. |
| 25 | MR. CAMPORA:  Sally? | 10:04:50 |

Page 10

DRAFT FINAL

| | | |
|---|---|---|
| 1 | MS. NOMA:  Sally Noma, subrogating | 10:04:52 |
| 2 | plaintiffs. | |
| 3 | MR. CAMPORA:  Robert? | |
| 4 | MR. JACKSON:  Robert Jackson on behalf of | |
| 5 | individual plaintiffs. | 10:04:58 |
| 6 | MR. CAMPORA:  Mickey?  Mickey McGuire, are | |
| 7 | you still on the phone? | |
| 8 | MR. McGUIRE:  I'm sorry.  I had my mute | |
| 9 | on.  Mickey McGuire on behalf of individual | |
| 10 | plaintiffs. | 10:05:15 |
| 11 | MR. CAMPORA:  Britt? | |
| 12 | MS. STROTTMAN:  Britt Strottman, Baron & | |
| 13 | Budd, for public entity plaintiffs. | |
| 14 | MR. CAMPORA:  Anybody else on the phone? | |
| 15 | (No response.) | 10:05:26 |
| 16 | THE VIDEOGRAPHER:  Thank you. | |
| 17 | Would the court reporter please swear in | |
| 18 | the witness. | |
| 19 | BRIAN JAMES BIANCARDI, | |
| 20 | having been administered an oath, was examined and | 10:05:39 |
| 21 | testified as follows: | |
| 22 | EXAMINATION | |
| 23 | BY MR. CAMPORA: | |
| 24 | Q    Could you state your full name for the | |
| 25 | record, please, sir. | 10:05:42 |

Page 11

DRAFT FINAL

```
 1        A    Yes.  Brian James Biancardi.              10:05:43

 2        Q    Mr. Biancardi, my name is Steve Campora.

 3   We were just introduced off the record.

 4             We're here today for your deposition, but

 5   it's your deposition as the person most qualified    10:05:55

 6   from Pacific Gas & Electric Company.

 7             Do you understand that?

 8        A    I do.

 9        Q    And do you understand that you'll be

10   testifying today just as if the corporation were     10:06:02

11   speaking?

12        A    I do.

13        Q    So the answers that you give are as if

14   PG&E was answering the question.

15             Do you understand that?                    10:06:09

16        A    I do understand that.

17        Q    Okay.  Have you ever given a deposition

18   before?

19        A    I have not.

20        Q    This is your first time?                   10:06:14

21        A    It is.

22        Q    Well, I'm going to cover some ground rules

23   just to make sure you and I are on the same page.

24             Have you had -- first of all, have you had

25   an opportunity to discuss with your attorney what a  10:06:23
```

Page 12

DRAFT FINAL

```
 1    deposition is?                                    10:06:25

 2        A    We've discussed it, yes.

 3        Q    Okay.  During the course of this

 4    deposition, if you see where I'm going with a

 5    question and you answer before I'm done, your answer   10:06:31

 6    will break up the question and the record, and we

 7    don't want that to happen.  So if you wait until I

 8    finish the questions, I'll wait until you finish the

 9    answers, okay?

10        A    Agreed.                                   10:06:41

11        Q    The oath you just took is the same oath

12    you would take if you were testifying in court.

13             Do you understand that?

14        A    I do.

15        Q    The same penalties of perjury apply as if   10:06:47

16    you're testifying in court.

17             Do you understand that?

18        A    I do.

19        Q    During the course of the deposition, if

20    you don't know the answer to a question because you   10:06:52

21    don't -- you don't have the information, tell me you

22    don't have the answer.  Don't guess and don't

23    speculate.  But if you do have an answer based on

24    the facts that you have and a best estimate, I'm

25    entitled to that.                                 10:07:05
```

Page 13

DRAFT FINAL

```
1              Do you understand?                        10:07:05

2        A    I do.

3        Q    Do you know the difference between a guess

4    and an estimate?

5        A    Yes.                                        10:07:09

6        Q    Good.  Okay.

7              It's not an endurance contest.  If you

8    want to take a break today, just say you want to

9    take a break, but if there's a question pending, I'm

10   going to ask you to answer that question before we    10:07:20

11   break, okay?

12       A    Understood.

13       Q    All right.  During the course of the

14   deposition, if you don't understand my question, you

15   need to stop me and tell me you don't understand the  10:07:27

16   question, because if you answer it, I'm going to

17   assume you understood it.  The record may reflect

18   you understood it.  But if you have to go back later

19   and change that answer and tell us you didn't

20   understand the question, then we're going to comment  10:07:37

21   on that and perhaps -- perhaps affect your

22   credibility.

23             Do you understand that?

24       A    I do.

25       Q    Okay.  When the deposition is over, it's    10:07:42
```

Page 14

DRAFT FINAL

1    typed into a booklet form.  You get a chance to read          10:07:45

2    and review your testimony, make any changes to that

3    testimony you think are appropriate.  You can't

4    change the questions, but you can change your

5    answers.  But if you make a change, I can comment          10:07:53

6    it -- on it or any other attorney in this room can

7    comment on it and perhaps suggest you're being less

8    than honest.

9              Do you understand that?

10       A    I do.                                              10:08:01

11       Q    Okay.  Any reason why you can't go forward

12   and give us your best testimony?

13       A    No.

14       Q    You're not sick?  You haven't taken any

15   narcotics?  You're good to go?                             10:08:10

16       A    That's correct.

17       Q    Okay.  What's your educational background?

18       A    BS in public affairs, Indiana University,

19   2000; MBA, Golden Gate University, 2010; certified

20   arborist since 2006; certified project manager.           10:08:35

21       Q    What did you do in order to obtain your

22   certificate as a certified arborist?

23       A    The International Society for

24   Arboriculture has a exam, which I sat for and

25   passed.                                                    10:09:03

DRAFT FINAL

| | | |
|---|---|---|
| 1 | Q    Did you take any classes before taking the | 10:09:04 |
| 2 | exam? | |
| 3 | A    No, on-the-job training. | |
| 4 | Q    So you didn't attend any seminars?  You | |
| 5 | didn't have any text, notebooks, anything like | 10:09:12 |
| 6 | that? | |
| 7 | A    There were texts.  There were notebooks. | |
| 8 | There's a study manual that is issued by the ICA | |
| 9 | (sic), the International Society for Arboriculture. | |
| 10 | Q    Did you have any in-field training before | 10:09:25 |
| 11 | you took your test as a certified arborist? | |
| 12 | A    On-the-job training, yes. | |
| 13 | Q    Who provided -- who was your supervisor | |
| 14 | when you got on -- on-the-job training to become a | |
| 15 | certified arborist? | 10:09:38 |
| 16 | A    Bob -- or Robert Urban. | |
| 17 | Q    Is that when you worked for ACRT? | |
| 18 | A    It was, yes. | |
| 19 | Q    Are you a certified utility arborist or | |
| 20 | just a certified arborist? | 10:09:55 |
| 21 | A    I'm no longer a certified utility | |
| 22 | specialist; however, I was.  I did not -- did not | |
| 23 | renew that certification. | |
| 24 | Q    Okay.  When -- during what years were you | |
| 25 | a certified utility arborist? | 10:10:04 |

Page 16

DRAFT FINAL

```
 1        A    2006 or '7 to 2011 or '12.  I don't have          10:10:15

 2   the exact dates.

 3        Q    You also said you were a certified project

 4   manager --

 5        A    That's correct.                                    10:10:30

 6        Q    -- is that right?

 7             Who was that certificate issued by?

 8        A    Through the Project Management Institute,

 9   PMI.

10        Q    When did you obtain that certificate?             10:10:37

11        A    In 2009.

12        Q    Any other certificates that you hold?

13        A    No.

14        Q    Other than a driver's license, have you

15   held any licenses in the state of California?               10:10:50

16        A    Not to my knowledge.

17        Q    When you got your degree in public affairs

18   at Indiana, did you take any classes in

19   arboriculture?

20        A    I did not.                                         10:11:04

21        Q    And I take it, when you got an MBA at

22   Golden Gate, you didn't take any classes in

23   arboriculture?

24        A    That's correct.

25        Q    Is it correct, sitting here today, that           10:11:12
```

Page 17

DRAFT FINAL

| | | |
|---|---|---|
| 1 | you haven't had any training or education regarding | 10:11:15 |
| 2 | arboriculture, other than on-the-job training at | |
| 3 | either ACRT or PG&E? | |
| 4 | A    That's -- that's correct.  I did have a | |
| 5 | course -- week-long course with ACRT in Ohio in | 10:11:25 |
| 6 | 2005. | |
| 7 | Q    Is that the course that you took before | |
| 8 | you became -- they sent you to the field? | |
| 9 | A    That was classroom time and -- and field | |
| 10 | time, yes. | 10:11:42 |
| 11 | Q    At the beginning of your job? | |
| 12 | A    No, in the -- in the middle of my job, | |
| 13 | 2005, with -- with ACRT. | |
| 14 | Q    Okay.  And that lasted how many days? | |
| 15 | A    That was a week-long course. | 10:11:51 |
| 16 | Q    And was there an ACRT training manual? | |
| 17 | A    There was. | |
| 18 | Q    You still have it? | |
| 19 | A    I don't believe so. | |
| 20 | Q    That's okay.  I have one. | 10:12:04 |
| 21 |      Give me your employment history since | |
| 22 | college. | |
| 23 | A    After graduating college, I worked for | |
| 24 | Enterprise Rent-a-Car in Washington State.  After | |
| 25 | that, I worked for Climax Climbing Gear in Portland, | 10:12:25 |

Page 18

DRAFT FINAL

| | | |
|---|---|---|
| 1 | Oregon.  After that, I spent two years working -- | 10:12:32 |
| 2 | volunteering with the Peace Corps in Nepal.  After | |
| 3 | that, I worked at a bicycle shop in Seattle for a | |
| 4 | few months before being hired on to ACRT. | |
| 5 | Q    I take it, at Enterprise, you didn't gain | 10:12:56 |
| 6 | any experience with regard to arbor- -- | |
| 7 | arboriculture, did you? | |
| 8 | A    No. | |
| 9 | Q    And with Climax, you didn't gain any | |
| 10 | experience or training with regard to arboriculture, | 10:13:06 |
| 11 | did you? | |
| 12 | A    A lot of the climbing training that | |
| 13 | happens in rock climbing is transferable over to | |
| 14 | tree climbing. | |
| 15 | Q    Okay.  Well, so did you -- were you -- | 10:13:17 |
| 16 | anything in your work at Climax help you identify | |
| 17 | facility-protect trees? | |
| 18 | A    No. | |
| 19 | Q    What about when you were in the Peace | |
| 20 | Corps; anything there transfer as -- with regard to | 10:13:30 |
| 21 | experience in arboriculture? | |
| 22 | A    Yes.  I was a environmental awareness | |
| 23 | volunteer, working on various forestry projects. | |
| 24 | Q    Tell me what you did. | |
| 25 | A    I worked with a local school, taught | 10:13:49 |

Page 19

DRAFT FINAL

```
 1    substitute science for eighth grade in Nepal, worked        10:13:52

 2    with a local small conservation and forestry

 3    department with the local district of -- of Rasuwa

 4    in -- in the mountains of Nepal and formed a nature

 5    club where we built a tree nursery and used that            10:14:11

 6    tree nursery to stabilize landslides.

 7         Q    Okay.  Are the trees in Nepal similar to

 8    the trees in California?

 9         A    Similar species.

10         Q    Similar species?                                  10:14:29

11         A    Similar species, yes.

12         Q    Okay.  So Ponderosa Pine, for example?

13         A    A pine tree.

14         Q    Okay.  Gray Pine?

15         A    No.                                               10:14:34

16         Q    Valley Oak?  Valley Oak?

17         A    No.

18         Q    Blue Oak?

19         A    No.

20         Q    Live Oak?                                         10:14:40

21         A    No.

22              Species, not -- not genus.  Sorry.

23         Q    I understand.

24              How about when you worked for the bicycle

25    shop; I take it no experience there relating to             10:14:51
```

Page 20

DRAFT FINAL

| | | | |
|---|---|---|---|
| 1 | | arboriculture, true? | 10:14:53 |
| 2 | A | No. | |
| 3 | Q | That's correct? | |
| 4 | A | That's correct. | |
| 5 | Q | And then you went to work for ACRT in what | 10:14:57 |
| 6 | year? | | |
| 7 | A | In 2004. | |
| 8 | Q | In what capacity? | |
| 9 | A | As an inspector. | |
| 10 | Q | So PI? | 10:15:07 |
| 11 | A | I started with a contract with Florida | |
| 12 | Power & Light, so the terminology was different. | | |
| 13 | Q | Is it the equivalent of a PI? | |
| 14 | A | Yes. | |
| 15 | Q | And when I say "PI," you understand I'm | 10:15:17 |
| 16 | talking about what PG&E calls a "pre-inspector"? | | |
| 17 | A | Yes. | |
| 18 | Q | So your job duties would have been to go | |
| 19 | out and inspect lines and looking for vegetation | | |
| 20 | issues? | | 10:15:28 |
| 21 | A | Yes. | |
| 22 | Q | How long did you do that? | |
| 23 | A | I was employed with ACRT from December of | |
| 24 | 2004 until March 27th of 2007. | | |
| 25 | Q | And at all times when you worked for ACRT, | 10:15:39 |

Page 21

DRAFT FINAL

| | | |
|---|---|---|
| 1 | were you a -- the equivalent of a preliminary -- or | 10:15:41 |
| 2 | a pre-inspector? | |
| 3 | A    No. | |
| 4 | Q    Okay.  So what was your job after | |
| 5 | pre-inspection? | 10:15:48 |
| 6 | A    Supervisor. | |
| 7 | Q    And you supervised pre-inspectors? | |
| 8 | A    I supervised pre-inspectors, correct. | |
| 9 | Q    When did you become a supervisor? | |
| 10 | A    I had a few rotational positions in 2005, | 10:15:55 |
| 11 | and I officially became a supervisor in 2006. | |
| 12 | Q    Where were you working when you became a | |
| 13 | supervisor? | |
| 14 | A    In the East Bay. | |
| 15 | Q    And what -- was ACRT doing work for PG&E | 10:16:10 |
| 16 | at that time? | |
| 17 | A    They were. | |
| 18 | Q    So in 2006, were you promoted from | |
| 19 | supervisor? | |
| 20 | A    In 2006, I was promoted to a supervisor. | 10:16:19 |
| 21 | In 2007, I was promoted to -- hired on to PG&E. | |
| 22 | Q    Okay.  So the two jobs -- two job -- job | |
| 23 | categories you had at ACRT were -- number one is | |
| 24 | a -- what we call a "pre-inspector" -- what PG&E | |
| 25 | calls a "pre-inspector"? | 10:16:38 |

Page 22

DRAFT FINAL

```
 1        A    Correct.                                  10:16:40

 2        Q    And number two is a supervisor of

 3   pre-inspectors?

 4        A    Yes.

 5        Q    And you didn't hold any other jobs at     10:16:43

 6   ACRT?

 7        A    No.

 8        Q    And other than the class you told me about

 9   that lasted for a week in 2005, did you receive any

10   other classroom training from ACRT?                 10:16:51

11        A    No.

12        Q    So when you first went to work as a

13   pre-inspector in 2004, you had no classroom training

14   before going out into the field?

15        A    No.                                        10:17:04

16        Q    That's correct?

17        A    That's correct.

18        Q    That was in Florida?

19        A    That was in Florida, correct.

20        Q    And, to your knowledge, is the training   10:17:13

21   the same here in California; that ACRT hires people

22   and puts them in the field without any additional

23   training?

24             MS. NORTH:  Objection.  Argumentative.

25   //
```

Page 23

DRAFT FINAL

| | | |
|---|---|---|
| 1 | BY MR. CAMPORA: | 10:17:22 |
| 2 | Q   If you know? | |
| 3 | A   I'm unsure of their exact training | |
| 4 | practices. | |
| 5 | Q   Okay.  Did you receive -- when you worked | 10:17:28 |
| 6 | for ACRT, did you receive any training from any PG&E | |
| 7 | employees? | |
| 8 | A   I worked with PG&E employees as a | |
| 9 | pre-inspector and as a supervisor with ACRT. | |
| 10 | Q   Yeah, but my question is different. | 10:17:55 |
| 11 | My question is:  Did any PG&E employees | |
| 12 | provide you with any training while you worked at | |
| 13 | ACRT? | |
| 14 | A   I -- I believe so. | |
| 15 | Q   Who? | 10:18:06 |
| 16 | A   At the time, the local supervisor was Doug | |
| 17 | McPherson, and the local vegetation program | |
| 18 | manager -- or they called them at the time | |
| 19 | "foresters" -- was Dee McDonough. | |
| 20 | Q   What training did Mr. McPherson give you? | 10:18:28 |
| 21 | A   And the PG&E staff at the time would -- | |
| 22 | would routinely review procedures with local staff. | |
| 23 | Q   What procedures did Doug McPherson review | |
| 24 | with you? | |
| 25 | A   I can't recall which exact procedure. | 10:18:42 |

Page 24

DRAFT FINAL

```
 1        Q    What about Mr. -- is that Mr. McDonough or        10:18:44

 2   Ms. McDonough?

 3        A    Ms.

 4        Q    What training did Ms. McDonough give you?

 5        A    Equivalent procedures.                            10:18:54

 6        Q    Equivalent to what?

 7        A    Equivalent to what Mr. McPherson ...

 8        Q    The ones you can't remember?

 9        A    Exactly.

10        Q    Any other PG&E employees give you any            10:19:02

11   other training, to your knowledge?

12        A    Not to my knowledge.

13             MS. NORTH:  I should have objected to that

14   as vague.

15             MR. CAMPORA:  I probably should mark both        10:19:34

16   of those in that order.

17             (Exhibit 0070-001 and Exhibit 0070-002

18             were marked for identification by the

19             court reporter.)

20             MS. NORTH:  Thank you.                           10:19:38

21             MR. CAMPORA:  This witness is Witness 70,

22   and we have just marked Exhibits 1 and Exhibit 2 to

23   this deposition, so it's Exhibit 70-001 and

24   Exhibit 70-002.

25        Q    I've put in front of you, sir, a                 10:19:59
```

Page 25

DRAFT FINAL

| | | | |
|---|---|---|---|
| 1 | | deposition notice which has now been marked as | 10:20:01 |
| 2 | | Exhibit 70-001. | |
| 3 | | Have you seen this notice before? | |
| 4 | A | I have. | |
| 5 | Q | When did you first see it? | 10:20:07 |
| 6 | A | Monday. | |
| 7 | Q | Monday, January the -- | |
| 8 | A | Fourteenth. | |
| 9 | Q | -- 14th? | |
| 10 | A | That's correct. | 10:20:20 |
| 11 | Q | Did you see that this notice required the | |
| 12 | | production of various documents -- | |
| 13 | A | I did. | |
| 14 | Q | -- starting on page 4? | |
| 15 | | Did you review those document requests? | 10:20:31 |
| 16 | A | Can you repeat the question? | |
| 17 | Q | Sure. | |
| 18 | | If you look at page 4, there's a document | |
| 19 | | request on this -- in this notice, and they're | |
| 20 | | Document Requests 1 through 7. | 10:20:48 |
| 21 | | Did you see those document requests? | |
| 22 | A | I did see this document request, yes. | |
| 23 | Q | Did you review the document request? | |
| 24 | A | I did review the document request. | |
| 25 | Q | What did you do, if anything, to make sure | 10:21:02 |

Page 26

DRAFT FINAL

```
 1    the documents responsive to these requests were          10:21:04

 2    produced?

 3         A    For this, I verified with counsel.

 4         Q    So what did you do?  Did you go back and

 5    look on the computer or in any databases that you       10:21:25

 6    have to see whether all documents responsive to

 7    these requests were produced?

 8         A    I did not.

 9         Q    Did you check to see if there were

10    documents that were responsive to these requests on     10:21:33

11    your database?

12         A    I did not.

13         Q    Okay.  So you did nothing with regard to

14    finding documents to produce here today; is that

15    true?                                                    10:21:41

16              MS. NORTH:  Objection.  Argumentative.

17              THE WITNESS:  I was told that these

18    documents were produced.

19    BY MR. CAMPORA:

20         Q    Okay.  My question, sir, is:  Did you do       10:21:46

21    anything to verify that yourself, since you're the

22    one here testifying under penalty of perjury?

23         A    No.

24              MS. NORTH:  Objection.  Argumentative.

25    //
```

Page 27

DRAFT FINAL

```
 1   BY MR. CAMPORA:                                      10:21:54

 2       Q    Okay.  So sitting here today, you don't

 3   know, of your own knowledge, whether these documents

 4   were produced or not, true?

 5            MS. NORTH:  Objection.  Argumentative.      10:22:00

 6            THE WITNESS:  Not necessarily.

 7   BY MR. CAMPORA:

 8       Q    Okay.  Well, so tell me which documents

 9   that you know that respond to these seven requests

10   were produced.                                       10:22:08

11       A    Again, it is my understanding that I've

12   been assured through my employer that these were

13   produced.

14       Q    I'm not asking you what somebody else told

15   you.  I'm asking you what you did.                   10:22:17

16            Sitting here today, you have no personal

17   knowledge that any of these documents were produced,

18   do you?

19            MS. NORTH:  Objection.  Asked and

20   answered.                                            10:22:25

21   BY MR. CAMPORA:

22       Q    Correct?

23       A    Again, not necessarily.

24       Q    Okay.  Well, tell me what personal

25   knowledge you have that any one document was         10:22:32
```

Page 28

DRAFT FINAL

```
 1    produced.                                               10:22:35

 2         A     May I ask how you expect me to exemplify

 3    that?

 4         Q     Do you know what "personal knowledge" is?

 5         A     I do.                                        10:22:47

 6         Q     Okay.  It means that you either saw it

 7    being produced, confirmed it was produced, saw the

 8    list of documents that was produced.

 9              So do you have personal knowledge that any

10    document responsive to these requests was produced?    10:22:55

11         A     Yes.  Again --

12         Q     Which ones?

13         A     -- I was ...

14         Q     Okay.  Being told doesn't count as

15    personal knowledge.                                    10:23:05

16              MS. NORTH:  Objection.  You're being

17    argumentative.

18              MR. CAMPORA:  No, I'm not.

19              MS. NORTH:  Yes, you are.

20    BY MR. CAMPORA:                                         10:23:09

21         Q     Who told you -- who told you all the

22    documents were produced?

23         A     Counsel told me.

24         Q     Okay.  So all you know is what counsel

25    told you, right?                                        10:23:14
```

Page 29

DRAFT FINAL

```
 1        A    That's correct.                              10:23:15

 2        Q    So you have no personal knowledge, right?

 3             MS. NORTH:  Objection.  Asked and

 4    answered.  Argumentative.  Please move on.

 5             MR. CAMPORA:  No.                             10:23:20

 6        Q    You can answer the question.

 7             MS. NORTH:  Again --

 8             MR. CAMPORA:  He hasn't answered it yet.

 9             MS. NORTH:  Yes, he has.

10    BY MR. CAMPORA:                                       10:23:25

11        Q    You have -- all you know is what your

12    lawyer told you, right?

13        A    That's correct.

14        Q    Category number one, beginning on page 2

15    -- category number one is:  "The location of each     10:23:47

16    FPT tree located as part of the following audits,"

17    and then there are five audits listed.

18             Do you see that?

19        A    I do.

20        Q    Are you the person most qualified to         10:23:57

21    testify here today as to the location of each FPT

22    tree that was identified in those audits?

23        A    I am.

24        Q    What did you do to prepare yourself to

25    answer those questions?                               10:24:07
```

Page 30

DRAFT FINAL

```
 1        A    I have reviewed with counsel these audits.      10:24:11

 2        Q    Okay.  So when you review the audit, the

 3   audit doesn't say where the FPT tree is, does it?

 4        A    The audit report does not say where the

 5   FPT tree is.                                              10:24:28

 6        Q    Okay.  So what did you do to identify the

 7   location of each FPT tree identified in those

 8   audits?

 9        A    We reviewed a number of them -- of the

10   locations using the work request and the field data      10:24:37

11   sheets.

12        Q    When you say "we," you mean you and your

13   lawyer?

14        A    The two counsel sitting next to me.

15        Q    Okay.  Did you review it with any other       10:24:48

16   employees of PG&E?

17             MS. NORTH:  Objection.  Vague.

18   BY MR. CAMPORA:

19        Q    Do you understand my question?

20        A    There were other folks that I've spoken to     10:24:59

21   in prep- -- in preparation for this.

22        Q    Okay.  So for this category, what

23   employees, if any, from PG&E did you speak with?

24        A    For this category, I spoke with Eric

25   Oldford.                                                  10:25:13
```

Page 31

DRAFT FINAL

```
 1        Q     Anyone else?                              10:25:19

 2        A     No.

 3        Q     Did Mr. Oldford give you the location of

 4   any FPT tree that was identified in any of those

 5   audits?                                              10:25:33

 6        A     The locations were provided in the field

 7   data sheets.

 8        Q     Who gave you the field data sheets to

 9   review?

10        A     Counsel.                                  10:25:52

11        Q     Do you not know where the field data

12   sheets are at PG&E?

13        A     I do not have -- yes, I do know where they

14   are.

15        Q     Okay.  But you relied on your lawyer to    10:26:00

16   give you the documents?

17        A     Yes.

18             MS. NORTH:  Objection.  Argumentative.

19   BY MR. CAMPORA:

20        Q     So other than talking to your lawyer and   10:26:07

21   looking at documents given to you by your lawyer and

22   talking to Mr. Oldford, did you do anything else to

23   prepare to answer the questions in category 1?

24        A     No.

25        Q     Category 2 is:  "The nature of the WORK,   10:26:20
```

Page 32

DRAFT FINAL

```
1    if any, prescribed for each FPT tree identified in        10:26:22

2    the following audits," and, again, it lists the one,

3    two -- five audits.

4            Do you see that?

5       A    I do.                                              10:26:32

6       Q    And it says that "WORK" means cutting,

7    trimming, removal, or inspection of the subject

8    tree.

9            Did you understand that when you read it?

10      A    I do.                                              10:26:39

11      Q    Okay.  What did you do to prepare to

12   testify in this category?

13      A    To understand the nature of the work, you

14   need to understand the trim code assigned by the

15   inspector, and those are available on the work        10:26:51

16   requests.

17      Q    Okay.  So what documents did you review to

18   prepare to testify?

19      A    The work request associated with the field

20   data sheets that list the locations and trees for     10:27:06

21   these audits.

22      Q    Okay.  And where did you get the documents

23   to review?

24      A    From counsel.

25      Q    Were those documents not available to you     10:27:15
```

Page 33

DRAFT FINAL

| | | |
|---|---|---|
| 1 | at PG&E? | 10:27:16 |
| 2 | MS. NORTH:  Objection.  Argumentative. | |
| 3 | THE WITNESS:  Those documents are | |
| 4 | available to me. | |
| 5 | BY MR. CAMPORA: | 10:27:21 |
| 6 | Q    Okay.  But the only documents you looked | |
| 7 | at were the ones given to you by counsel; is that | |
| 8 | true? | |
| 9 | A    That's correct. | |
| 10 | Q    Did you review PG&E database to see if | 10:27:29 |
| 11 | there were any other documents available? | |
| 12 | MS. NORTH:  Objection.  Vague. | |
| 13 | BY MR. CAMPORA: | |
| 14 | Q    Do you understand my question? | |
| 15 | A    Yes, I do. | 10:27:40 |
| 16 | Q    Okay.  Did you review the PG&E database to | |
| 17 | see if there were any other documents available to | |
| 18 | provide information on this topic? | |
| 19 | A    Yes.  There -- | |
| 20 | MS. NORTH:  Objection.  Vague. | 10:27:49 |
| 21 | Go ahead. | |
| 22 | THE WITNESS:  There was one location where | |
| 23 | I did search the database. | |
| 24 | BY MR. CAMPORA: | |
| 25 | Q    Okay.  What database did you search? | 10:27:55 |

Page 34

DRAFT FINAL

| | | |
|---|---|---|
| 1 | A    The Vegetation Management Database, or | 10:27:57 |
| 2 | VMD. | |
| 3 | Q    Okay.  Which location did you search the | |
| 4 | database for? | |
| 5 | A    I do not recall. | 10:28:04 |
| 6 | Q    Did you do that search with -- with | |
| 7 | counsel or by yourself? | |
| 8 | A    With counsel in the room. | |
| 9 | Q    Okay.  So in order to prepare for this, | |
| 10 | you reviewed documents provided to you by counsel, | 10:28:15 |
| 11 | with the exception of one location, which you looked | |
| 12 | at on the database? | |
| 13 | A    That's correct. | |
| 14 | MS. NORTH:  Objection.  Vague. | |
| 15 | Go ahead. | 10:28:22 |
| 16 | BY MR. CAMPORA: | |
| 17 | Q    Did you speak with any employees of | |
| 18 | PG&E -- | |
| 19 | MS. NORTH:  Vague.  Objection. | |
| 20 | BY MR. CAMPORA: | 10:28:26 |
| 21 | Q    -- in preparing for this category? | |
| 22 | MS. NORTH:  "This category" being | |
| 23 | category 2? | |
| 24 | MR. CAMPORA:  Right. | |
| 25 | THE WITNESS:  No. | 10:28:37 |

Page 35

DRAFT FINAL

```
 1   BY MR. CAMPORA:                                     10:28:37

 2       Q    So the -- the entirety of the information

 3   you have to respond to this cat- -- category comes

 4   from documents given to you by counsel, with the

 5   exception of one location, true?                    10:28:44

 6       A    That's correct.

 7       Q    Number 3:  "The date and time when WORK,

 8   if any, was performed on each FPT tree, identified

 9   in the following audits," and, again, there are five

10   audits listed.                                      10:28:57

11           Do you see that?

12       A    I do.

13       Q    What did you do to prepare to answer

14   questions on category 3?

15       A    The date and time for work in --           10:29:07

16   associated with these audits is, again, on the work

17   requests, which were, again, provided by counsel.

18       Q    Did you review any documents on the PG&E

19   database yourself to determine -- to obtain

20   information to answer questions regarding           10:29:24

21   category 3?

22       A    None except for the location I stated

23   earlier.

24       Q    Okay.  So the sum -- did you talk to any

25   employees to get information regarding category 3?  10:29:35
```

Page 36

DRAFT FINAL

```
 1        A    I did not.                                    10:29:37

 2        Q    So the sum and substance of your basis of

 3   information is documents given to you by counsel

 4   with the exception of your review of one location on

 5   the PG&E database, true?                               10:29:46

 6             MS. NORTH:  Objection.

 7             THE WITNESS:  That's correct.

 8   BY MR. CAMPORA:

 9        Q    Number 4:  "The date and time when WORK,

10   if any, was performed on each FPT tree, identified     10:29:55

11   in the following audits."

12             And just so we have a clear record,

13   category 3 was work performed after the subject

14   audit.  Category 4 was work performed before the

15   subject audit.                                         10:30:09

16             Did you understand that when you were

17   preparing?

18        A    I do understand that, yes.

19        Q    Okay.  What information -- what documents

20   did you review in preparing to testify here today as   10:30:15

21   to category number 4?

22        A    Again, to understand if work was performed

23   and the date and time, you need to look at the work

24   requests, which were provided by counsel.

25        Q    And did you look at any part of PG&E's       10:30:29
```

Page 37

DRAFT FINAL

1    database independent of counsel?                      10:30:33

2            MS. NORTH:  Objection.  Vague.

3    BY MR. CAMPORA:

4        Q    Do you know what "independent of counsel"

5    means?                                                10:30:39

6        A    I do.

7        Q    Okay.

8        A    And the answer is "No."

9        Q    So, again, the sum and sub- -- oh, strike

10   that.                                                 10:30:45

11           Did you speak with any PG&E employees in

12   order to obtain information regarding category

13   number 4?

14       A    No.

15       Q    So the sum and substance of your            10:30:52

16   information here today, as the person most qualified

17   from PG&E, is documents given to you by your lawyer,

18   right?

19           MS. NORTH:  Objection.  Argumentative.

20           THE WITNESS:  That's correct.                10:31:03

21   BY MR. CAMPORA:

22       Q    Number 5:  "The segments of each circuit

23   which were inspected as... part of" any "of the

24   following audits," and there are, again, five audits

25   listed.                                               10:31:15

Page 38

DRAFT FINAL

1          Do you see that?                                    10:31:16

2     A    I do.

3     Q    Okay.  What did you do to prepare yourself

4  to testify as to category number 5?

5     A    I reviewed the segments of each circuit            10:31:28

6  which were inspected or audited as part of these

7  quality assurance audits.

8     Q    Okay.  So when you say "the segments,"

9  you're talking about the source-side device

10  segments?                                                  10:31:43

11    A    That's correct, the source-side device

12  segments, the protection zones.

13    Q    So is it your understanding that the audit

14  is done by selecting, randomly, source-side devices?

15         MS. NORTH:  Objection.  Outside the scope.         10:31:54

16  BY MR. CAMPORA:

17    Q    Do you understand my question?

18    A    I do understand your question.

19    Q    Is that -- is that what happens?

20    A    That -- that is correct.                           10:31:58

21         MS. NORTH:  Objection.  Outside the scope.

22  BY MR. CAMPORA:

23    Q    Okay.  And so the segments that are

24  inspected are the randomly selected source-side

25  device, assuming it's aboveground, right?                 10:32:04

DRAFT FINAL

| 1 | MS. NORTH:  Objection.  Outside the scope. | 10:32:07 |

2      THE WITNESS:  That's correct.

3  BY MR. CAMPORA:

4      Q    And you -- an inspection takes place from

5  that source-side device to either the next               10:32:12

6  source-side device or to the end of the line, true?

7      MS. NORTH:  Objection.  Outside the scope.

8      THE WITNESS:  Correct.

9  BY MR. CAMPORA:

10     Q    Okay.  And did you understand that when          10:32:20

11  you were preparing to talk about each segment -- or

12  the segment of each circuit which was inspected as

13  part of the following audits?

14     MS. NORTH:  Objection.  Vague.

15  BY MR. CAMPORA:                                          10:32:30

16     Q    Do you understand my question?

17     A    I do.

18     Q    Okay.

19     A    Yes.

20     Q    Okay.  So did you familiarize yourself           10:32:33

21  with the source-side device segments that were

22  inspected?

23     MS. NORTH:  Objection.  Vague.

24     THE WITNESS:  Yes.  We were provided with

25  a list of source-side devices.                           10:32:49

Page 40

DRAFT FINAL

```
 1    BY MR. CAMPORA:                                        10:32:52

 2         Q    When you say "we were provided with a

 3    list," who gave you the list?

 4         A    Counsel.

 5         Q    Was it given to you on a PG&E document or    10:32:58

 6    a document prepared by counsel, if you know?

 7         A    I believe it was a PG&E-prepared document.

 8         Q    Who gave it to you?

 9         A    Counsel.

10         Q    Did you look on any PG&E databases,          10:33:12

11    independent of counsel, to determine any of the

12    information you are relying upon to testify here

13    today?

14              MS. NORTH:  Objection.

15              THE WITNESS:  I did not.                     10:33:23

16    BY MR. CAMPORA:

17         Q    Okay.  So all the information that you're

18    basing your testimony on today was contained in

19    documents provided to you by your lawyer; is that

20    right?                                                 10:33:28

21         A    That's correct.

22              MS. NORTH:  Objection.  Argumentative.

23    BY MR. CAMPORA:

24         Q    In part of paragraph -- of category 5, it

25    says:  Plaintiff under- -- "Plaintiffs understand     10:33:39
```

                                                   Page 41

DRAFT FINAL

| | | |
|---|---|---|
| 1 | that the audits involved inspections of portions of | 10:33:41 |
| 2 | a circuit from an SSD to the next SSD or from an SSD | |
| 3 | to the end of the line." | |
| 4 | Did you read that part of the notice? | |
| 5 | A    I did. | 10:33:52 |
| 6 | Q    Then it says:  "The witness should be | |
| 7 | prepared to identify SSDs used in the audit by | |
| 8 | number or other specific means of identification." | |
| 9 | Did you see that part of the notice? | |
| 10 | A    I did. | 10:34:04 |
| 11 | Q    Did you prepare yourself to be able to | |
| 12 | identify the SSDs used in the audit by number or by | |
| 13 | other specific means of identification? | |
| 14 | A    I did. | |
| 15 | Q    For example, do you know which circuits | 10:34:12 |
| 16 | they were on? | |
| 17 | A    Yes. | |
| 18 | Q    Category 6 is:  "The definition of an" | |
| 19 | F- -- "FPT tree, used by Pacific Gas & Electric | |
| 20 | Company, in its Quality Assurance Program, from | 10:34:29 |
| 21 | January 1, 2015 to the present." | |
| 22 | Did you read that definition -- or that | |
| 23 | category, sir? | |
| 24 | A    I did. | |
| 25 | Q    What did you do to prepare yourself to | 10:34:40 |

DRAFT FINAL

```
1    testify here today as to the definition of an FF --        10:34:41

2    FPT tree used by Pacific Gas & Electric Company from

3    January 1, 2015, to present?

4        A    Yes.  I reviewed procedures that list the

5    definition of a facility-protect tree.  In addition,       10:34:54

6    I reviewed GO 95/Rule 35 language and Public

7    Resource Code 4293 language around hazard trees.

8        Q    Did you know the definition before you

9    reviewed those items in preparation to testify here

10   today?                                                     10:35:19

11       A    I did.

12       Q    How did you know it?

13       A    Experience.

14       Q    Okay.  So tell me, in your own words,

15   based on your experience, what the definition of an        10:35:28

16   "FPT tree" is.

17       A    Sure.

18            A facility-protect tree is a tree that has

19   the ability to strike our facilities and is either

20   dead, diseased, decayed or decadent or portions            10:35:44

21   thereof the tree.

22       Q    Dead, diseased?

23       A    Dead, diseased, decadent or decaying, or

24   portions thereof that are diseased, dead, decadent,

25   or decaying.                                               10:36:07
```

Page 43

DRAFT FINAL

| | | | |
|---|---|---|---|
| 1 | Q | Do you know whether or not a green, | 10:36:12 |
| 2 | healthy tree can be an FPT tree? | | |
| 3 | A | No. | |
| 4 | Q | "No," you don't know or "No," it's not? | |
| 5 | A | No, a green, healthy tree cannot be an | 10:36:22 |
| 6 | FPT. | | |
| 7 | Q | Do you know who Steve Tankersley is? | |
| 8 | A | I do. | |
| 9 | Q | Have you ever spoken with Mr. Tankersley | |
| 10 | about what the definition of an FPT tree is? | | 10:36:31 |
| 11 | A | I have not. | |
| 12 | Q | Mr. Tankersley ever tell you that a green, | |
| 13 | healthy tree can be an FPT tree? | | |
| 14 | A | I have not had that conversation with | |
| 15 | Steve. | | 10:36:40 |
| 16 | Q | Does the definition of "FPT tree" | |
| 17 | intrude -- include trees with structural issues; | | |
| 18 | that is, for example, a tree that has maybe a 5-inch | | |
| 19 | diameter at breast height but is 44 feet tall? | | |
| 20 | A | A tree that is -- can you repeat the | 10:36:55 |
| 21 | question? | | |
| 22 | Q | Sure. | |
| 23 | | I'm asking whether F- -- the definition of | |
| 24 | "FPT trees" would include trees with structural | | |
| 25 | issues; that is, the diameter at breast height, for | | 10:37:04 |

Page 44

DRAFT FINAL

1    example, would be 4 or 5 inches, but it might be                 10:37:08

2    44 feet tall so that -- such that the structure

3    causes an issue.

4              MS. NORTH:  Objection.  Hypothetical.

5              THE WITNESS:  It is my understanding that             10:37:16

6    if a tree has structural issues, then it can no

7    longer be healthy.

8    BY MR. CAMPORA:

9        Q    Okay.  So under your education and

10   training, you think a tree with structural issues is          10:37:23

11   not a healthy tree?

12       A    That's correct.

13       Q    Have you been told that by people at PG&E?

14             MS. NORTH:  Objection.  Outside the scope.

15             THE WITNESS:  That's my understanding.               10:37:32

16   BY MR. CAMPORA:

17       Q    Okay.  So your definition of "FPT trees,"

18   where it says -- you said dead, diseased, decadent,

19   decay, or portions thereof.  You didn't use the word

20   "healthy."                                                     10:37:47

21             So what I'm -- I'm asking you:  In your

22   definition that you gave me, does a tree with

23   structural issues fall within that definition?

24       A    You asked for our definition --

25       Q    Right.                                                10:37:58

Page 45

DRAFT FINAL

| 1 | A    -- for an "FPT tree," and that is what I | 10:37:58 |

gave you.

| 3 | Q    Okay. |

| 4 | A    It doesn't include the word "healthy" in |

| 5 | that definition. | 10:38:05 |

| 6 | Q    Okay.  Nor does it saying anything about |

| 7 | structure. |

| 8 | You said:  Dead, diseased, decadent, or |

| 9 | decay, or portions thereof, right? |

| 10 | A    That's correct. | 10:38:12 |

| 11 | Q    Okay.  So does -- do FPT trees include |

| 12 | trees with structural issues? |

| 13 | A    Yes. |

| 14 | Q    Okay.  So how does that fit in the |

| 15 | definition? | 10:38:21 |

| 16 | A    I believe it also states that if there is |

| 17 | ground or root disturbance, which would fall under |

| 18 | the category of a structural issue. |

| 19 | Q    Okay.  What's "ground disturbance"? |

| 20 | A    If a tree is uprooting, for instance, if | 10:38:34 |

| 21 | the root ball is coming out, that would be |

| 22 | considered a structural issue. |

| 23 | Q    Okay.  So you -- you said "ground or root |

| 24 | disturbance." |

| 25 | That's basically the same thing, right? | 10:38:46 |

Page 46

DRAFT FINAL

| | | |
|---|---|---|
| 1 | A      Yes. | 10:38:48 |
| 2 | Q      Okay.  So the -- the example I gave you, | |
| 3 | where the tree has a structural issue, had nothing | |
| 4 | to do with the root or the root ball, right? | |
| 5 | A      That's correct. | 10:38:55 |
| 6 | Q      Okay.  So if a tree has a structural | |
| 7 | issue -- that is, it appears to be too tall and thin | |
| 8 | to support itself -- that's a structural defect, as | |
| 9 | you understand it? | |
| 10 | A      That is a structural defect. | 10:39:05 |
| 11 | Q      Okay.  Where does that fall in the FPT | |
| 12 | definition? | |
| 13 | MS. NORTH:  Objection.  Vague. | |
| 14 | BY MR. CAMPORA: | |
| 15 | Q      If it doesn't, just tell me it doesn't. | 10:39:11 |
| 16 | A      It does not fall under the definition. | |
| 17 | Q      Okay.  So trees with structural issues | |
| 18 | that don't involve the root don't fall within the | |
| 19 | FPT definition; is that true? | |
| 20 | MS. NORTH:  Objection.  Sorry.  Objection. | 10:39:24 |
| 21 | Vague. | |
| 22 | THE WITNESS:  That's correct. | |
| 23 | MR. CAMPORA:  Okay.  Mark that as next, | |
| 24 | please. | |
| 25 | (Exhibit 0070-003 was marked for | 10:39:51 |

Veritext Legal Solutions
866 299-5127

DRAFT FINAL

```
 1              identification by the court reporter.)        10:39:51

 2              MS. NORTH:  Thank you.

 3              THE WITNESS:  Let me refine that last

 4    answer.  You said a tree with a structural issue

 5    does not fall into the definition.                      10:39:59

 6              A ground or root disturbance is a type of

 7    structural issue, and that -- that is in the

 8    definition.

 9    BY MR. CAMPORA:

10         Q    Sir, actually, what I said was, if it         10:40:07

11    doesn't involve the root or the root ball but it has

12    a structural issue aboveground, it doesn't fall

13    within your definition, and you said that was

14    correct.

15         A    That is correct.                              10:40:16

16         Q    Are you changing that answer?

17              MS. NORTH:  Objection.  Argumentative.

18              THE WITNESS:  I'm defining that answer.

19    BY MR. CAMPORA:

20         Q    Right.  Your -- but your definition          10:40:20

21    includes problems with the root or the root ball.

22         A    That is the definition on the procedures

23    that I reviewed.

24         Q    Okay.  So is anybody, to your knowledge,

25    in doing the audits, looking for trees that have       10:40:29
```

DRAFT FINAL

1    structural issues above the root or the root ball?          10:40:32

2              MS. NORTH:  Objection.  Outside the scope.

3    Vague.

4              THE WITNESS:  We hold our contractors to

5    the procedures.                                             10:40:42

6    BY MR. CAMPORA:

7         Q    Okay.  That's a fine answer, but it

8    doesn't answer my question.

9              My question specifically was -- to you,

10   was:  In the categories of audits, is there anybody         10:40:50

11   looking for trees that have structural issues above

12   the root ball?

13             MS. NORTH:  Objection.  Outside the scope.

14             THE WITNESS:  There is -- we have a

15   reliability program that focuses on removing trees          10:41:00

16   that have a likelihood.  Those -- that reliability

17   program is a separate scope from our compliance

18   program and is based off of years of data collected

19   through outage investigations.  So what we do is we

20   look at outages, once they happen, based on tree            10:41:24

21   failure, look at tree failure patterns based on

22   species, and then we go and look at removal of areas

23   that have high outage counts -- source-side devices

24   that have high outage counts and look at removing

25   trees based on that scope.                                  10:41:41

DRAFT FINAL

1           MR. CAMPORA:   Move to strike as                    10:41:45

2     nonresponsive.

3        Q      Sir, we're going to get done faster here

4     today if you listen to my question and answer what

5     I've asked you, okay?                                      10:41:51

6              MS. NORTH:   I --

7     BY MR. CAMPORA:

8        Q      So my question to you is:   Sitting here

9     today, are you aware of any inspector --

10    pre-inspector who's looking for structural -- not          10:41:57

11    dead, diseased -- I'm not talking about those parts.

12    I'm talking about structural defects above the root

13    ball.

14             Are you aware of any pre-inspector looking

15    for structural defects?                                    10:42:11

16             MS. NORTH:   Objection.   Outside the scope.

17    His prior answer was completely responsive.

18             You can go ahead and answer that question

19    again.

20             THE WITNESS:   My understanding is that our       10:42:19

21    inspectors follow the procedures given to them.

22    BY MR. CAMPORA:

23       Q      Okay.   Well, they're given definitions of

24    "FPT trees," right?

25             MS. NORTH:   Objection.   This is outside         10:42:27

Page 50

DRAFT FINAL

| | | | | |
|---|---|---|---|---|
| 1 | | the scope. | | 10:42:28 |
| 2 | | BY MR. CAMPORA: | | |
| 3 | Q | Correct? | | |
| 4 | A | They are. | | |
| 5 | Q | They are given "contact" definitions? | | 10:42:30 |
| 6 | | MS. NORTH:  Same objection. | | |
| 7 | | BY MR. CAMPORA: | | |
| 8 | Q | Correct? | | |
| 9 | A | They are given def- -- the definition -- | | |
| 10 | | the same definition that I gave you. | | 10:42:36 |
| 11 | Q | No.  Listen to my question. | | |
| 12 | | They're given the definition for "FPT," | | |
| 13 | | true? | | |
| 14 | | MS. NORTH:  Objection.  Outside the scope. | | |
| 15 | | BY MR. CAMPORA: | | 10:42:43 |
| 16 | Q | Yes? | | |
| 17 | A | They're given a definition for an FPT, | | |
| 18 | | true. | | |
| 19 | Q | They're given training on what a "contact | | |
| 20 | | tree" is, right? | | 10:42:49 |
| 21 | | MS. NORTH:  Outside the scope. | | |
| 22 | | THE WITNESS:  Can you define a "contact | | |
| 23 | | tree" for me? | | |
| 24 | | MR. CAMPORA:  Sure. | | |
| 25 | Q | Do you not know what a "contract tree" is? | | 10:42:54 |

Page 51

DRAFT FINAL

| | | | |
|---|---|---|---|
| 1 | A | I'm wondering what your definition is. | 10:42:55 |
| 2 | Q | My definition is a tree that either is in | |
| 3 | | contact with the line or shows evidence of being in | |
| 4 | | contact with a line. | |
| 5 | A | Yes. | 10:43:02 |
| 6 | Q | Is that your definition? | |
| 7 | A | I -- I am -- the word "contact" is used | |
| 8 | | in -- in various places in our program, and so I'm | |
| 9 | | wondering what your definition was.  And, yes, I | |
| 10 | | understand that a tree in contact can be called a | 10:43:12 |
| 11 | | "contact tree." | |
| 12 | Q | Okay.  Well, either in contact or that | |
| 13 | | shows evidence of contact, right? | |
| 14 | A | Yes. | |
| 15 | | MS. NORTH:  Objection.  Outside the scope. | 10:43:19 |
| 16 | BY MR. CAMPORA: | | |
| 17 | Q | Okay.  That's what pre-inspectors look | |
| 18 | | for, right? | |
| 19 | | MS. NORTH:  Objection.  Outside the scope. | |
| 20 | | THE WITNESS:  That -- that is one of the | 10:43:23 |
| 21 | | things that the pre-inspectors look for -- | |
| 22 | | MR. CAMPORA:  Right. | |
| 23 | | THE WITNESS:  -- yes. | |
| 24 | // | | |
| 25 | // | | |

DRAFT FINAL

```
1    BY MR. CAMPORA:                                      10:43:26
2         Q     They look for trees that are closer than
3    18 inches, right?
4         A     Depending on the area of where they're
5    looking, yes.                                        10:43:31
6         Q     Sure.
7               MS. NORTH:   Please give me a chance to
8    object.
9               Outside the scope.
10   BY MR. CAMPORA:                                      10:43:34
11        Q     They look for trees less than 4 feet,
12   right?
13              MS. NORTH:   Outside the scope.
14              THE WITNESS:   Yes.
15   BY MR. CAMPORA:                                      10:43:37
16        Q     They look for trees that won't hold for 90
17   days, right?
18              MS. NORTH:   Same objection.
19              THE WITNESS:   The inspectors or the
20   auditors, sir?                                       10:43:43
21              MR. CAMPORA:   Both.
22              THE WITNESS:   The --
23              MS. NORTH:   Objection.   Outside the scope.
24              THE WITNESS:   Part of the scope of the
25   auditors are to look for trees that won't hold for   10:43:50
```

Page 53

DRAFT FINAL

```
 1    90 days.                                                10:43:52

 2    BY MR. CAMPORA:

 3          Q     Okay.  They look for multiple woody stems,

 4    right?

 5               MS. NORTH:  Objection.  Outside the scope.   10:43:56

 6    Vague.

 7               THE WITNESS:  You're asking if the

 8    inspectors or the auditors are looking for major

 9    woody stems?

10               MR. CAMPORA:  Okay.  Yes.                    10:44:08

11          Q     Do they look for those?

12               MS. NORTH:  Objection.  Outside the scope.

13               THE WITNESS:  The -- yes.

14               MR. CAMPORA:  Okay.

15               THE WITNESS:  Major woody stem is an         10:44:15

16    exemption given by Cal Fire for trees that have

17    major wood within the compliance zone.

18    BY MR. CAMPORA:

19          Q     So which category includes trees with

20    structural defects above the root ball?                10:44:26

21               MS. NORTH:  Objection.  Outside the scope.

22               THE WITNESS:  Which category out of major

23    woody stem, contacts --

24    BY MR. CAMPORA:

25          Q     Out of all the -- out of the four -- of     10:44:35
```

Veritext Legal Solutions
866 299-5127

DRAFT FINAL

```
 1    the categories we just went through that inspectors        10:44:36
 2    and auditors look for, I want to know which category
 3    a tree with a structural defect above the root ball
 4    would fall in.
 5              MS. NORTH:  Objection.  Outside the scope.        10:44:49
 6              THE WITNESS:  None of those.
 7    BY MR. CAMPORA:
 8        Q    Now --
 9        A    Nor is the --
10        Q    -- let's look at Exhibit --                       10:44:58
11              MS. NORTH:  You're not finished with your
12    answer.
13              Steve, you're interrupting him.
14              If you have something to add, please do.
15              THE WITNESS:  Nor does the law talk about         10:45:06
16    structural defects.
17              MR. CAMPORA:  Yeah.
18        Q    We don't want to kill people, right?
19              MS. NORTH:  Objection.  Argumentative.
20    BY MR. CAMPORA:                                             10:45:12
21        Q    True?  We're trying not to kill people,
22    right?
23        A    Yes, I'm trying not to kill people; that
24    is correct.
25        Q    All right.  So let's look at                      10:45:17
```

Page 55

DRAFT FINAL

| | | |
|---|---|---|
| 1 | Exhibit 70-003, page 7 of 9, Bates No. -5658. | 10:45:19 |
| 2 | Well, first of all, do you know what this | |
| 3 | document is that I've handed to you? | |
| 4 | MS. NORTH:  Does your copy have Bates | |
| 5 | numbers on the bottom of it, because mine -- | 10:45:40 |
| 6 | THE WITNESS:  It does, yes. | |
| 7 | MS. NORTH:  Okay.  It just got cut off in | |
| 8 | the copying. | |
| 9 | THE WITNESS:  But you're not looking for | |
| 10 | the Bates number.  You're looking for the -- | 10:45:48 |
| 11 | MR. CAMPORA:  I gave you both, actually. | |
| 12 | So, first, just look at the document itself. | |
| 13 | Let's just take a break for a minute. | |
| 14 | Take a -- go ahead and take a look at that document, | |
| 15 | and if you want to get up and stretch your legs, | 10:45:58 |
| 16 | that's fine. | |
| 17 | THE VIDEOGRAPHER:  The time is 10:45 a.m. | |
| 18 | We're off the record. | |
| 19 | (Recess.) | |
| 20 | THE VIDEOGRAPHER:  The time is 10:50 a.m. | 10:50:57 |
| 21 | We're back on the record. | |
| 22 | BY MR. CAMPORA: | |
| 23 | Q    So we have a clear record, this is | |
| 24 | Exhibit -- Witness 70 - Exhibit 3, and the metadata | |
| 25 | sheet on here just says where the document -- which | 10:51:08 |

Page 56

DRAFT FINAL

```
 1    custodian it came from on the front, and it has          10:51:11

 2    the -- the Bates number, and then the second page is

 3    the actual document.

 4            Do you see that, sir?

 5      A    I do.                                             10:51:18

 6      Q    Okay.  So this is a Facility Protect and

 7    Work Difficulty Classification Procedure.  It's

 8    identified as Utility Procedure TD-7102P, like

 9    "Paul," dash, 08.

10            Do you see that?                                 10:51:34

11      A    I do.

12      Q    And the publication date here is

13    April 1st, 2015.

14            Do you see that?

15      A    I do.                                             10:51:38

16      Q    And it's Revision 5.

17      A    Yes.

18      Q    Okay.  And you've seen this document

19    before?

20      A    I have.                                           10:51:43

21      Q    In fact, I -- unless I'm incorrect, you

22    are the document owner, are you not?

23      A    Of this version, I am.

24      Q    Okay.  And above it, for document

25    approver, was Steve Tankersley, right?                   10:51:56
```

Page 57

DRAFT FINAL

| | | |
|---|---|---|
| 1 | A    That is correct. | 10:51:58 |
| 2 | Q    Mr. Tankersley, at the time, was the | |
| 3 | vegetation management senior operations manager, | |
| 4 | true? | |
| 5 | A    That's correct. | 10:52:03 |
| 6 | Q    Okay.  I have seen emails with -- that you | |
| 7 | sent or were sent to you regarding some question | |
| 8 | about whether or not the definition, which is on | |
| 9 | page 7 of 9, applied to guy wires. | |
| 10 | Do you remember that conversation? | 10:52:22 |
| 11 | MS. NORTH:  Objection.  I'm just going to | |
| 12 | impose the objection that I think we've agreed that | |
| 13 | emails are not going to be the subject of these | |
| 14 | depositions. | |
| 15 | MR. CAMPORA:  No -- | 10:52:33 |
| 16 | MS. NORTH:  Go ahead. | |
| 17 | MR. CAMPORA:  -- we agreed you didn't have | |
| 18 | to produce the emails.  We didn't agree I wasn't | |
| 19 | going to ask him about it if it's part of the topic. | |
| 20 | Q    Was there -- was there a dispute -- or was | 10:52:40 |
| 21 | there a conversation between people at PG&E about | |
| 22 | whether or not guy wires for poles was included in | |
| 23 | this definition? | |
| 24 | MS. NORTH:  Objection for the same reason | |
| 25 | that I stated. | 10:52:50 |

Page 58

DRAFT FINAL

```
 1            THE WITNESS:  I do not recall.              10:52:52

 2   BY MR. CAMPORA:

 3       Q    Okay.  So the -- the highlighted language

 4   on page 7 of 9 says:  "Facility Protection is work

 5   performed to address tree failure, not tree growth."   10:53:04

 6            That's a correct statement?

 7       A    That is correct.

 8       Q    Okay.  It says:  "It targets any tree or

 9   portions of" that "tree that has the potential to"

10   fall "and come" in "contact with... high voltage       10:53:16

11   conductors before the next scheduled patrol/trim

12   cycle."

13            Did I read that correctly?

14       A    You did.

15       Q    Is that a definition of facility-protect      10:53:24

16   tree?

17            MS. NORTH:  Objection.

18            THE WITNESS:  There's more to it than

19   this.

20   BY MR. CAMPORA:                                        10:53:31

21       Q    Okay.  Where -- where is it in writing

22   more than this?

23       A    I believe if you look at -- excuse me

24   while I find the page -- page 2 of 9, Bates number

25   ending in -5653 under "Procedural Steps 1.1," you'll   10:53:48
```

Page 59

DRAFT FINAL

| | | |
|---|---|---|
| 1 | find it says:   PI and tree -- "... PI and TC," or | 10:53:55 |
| 2 | tree contractor, "will REMOVE or Facility Protect | |
| 3 | Prune all trees that are dead, show signs of | |
| 4 | disease, decay or ground/root disturbance that may | |
| 5 | fall into or otherwise impact the primary conductors | 10:54:12 |
| 6 | or secondary stand-alone." | |
| 7 |      Q    Okay.  So that is the specific definition | |
| 8 | of a "facility-protect tree"? | |
| 9 |           MS. NORTH:  Objection.  Vague. | |
| 10 | BY MR. CAMPORA: | 10:54:21 |
| 11 |      Q    Is that your understanding? | |
| 12 |      A    That's my understanding, yes. | |
| 13 |      Q    So in section 1.3 where it refers to | |
| 14 | "overhangs," are overhangs part of a | |
| 15 | facility-protect tree but only if they show -- are | 10:54:42 |
| 16 | dead, diseased, decayed -- is that correct? | |
| 17 |      A    That's correct. | |
| 18 |      Q    You said earlier that PG&E does | |
| 19 | investigation based on outages and, previously, some | |
| 20 | fires and does studies of tree species, true? | 10:54:59 |
| 21 |           MS. NORTH:  Objection.  Outside the scope. | |
| 22 |           THE WITNESS:  We investigate outages that | |
| 23 | are caused by tree failure. | |
| 24 |           MS. NORTH:  Thank you. | |
| 25 |           (Exhibit 0052-008 was introduced.) | 10:55:20 |

DRAFT FINAL

```
 1              MR. CAMPORA:  It's marked already.          10:55:25

 2        Q    Have you ever seen this document before,

 3   sir?

 4              MS. NORTH:  I'm just going to state an

 5   objection to any questions about it because it        10:55:38

 6   appears to be outside the scope.

 7              THE WITNESS:  I am not familiar with this

 8   document.

 9   BY MR. CAMPORA:

10        Q    Okay.  Look at page 10 of 11, Bates          10:56:08

11   No. JCCP 136144.  It has previously been marked as

12   Exhibit 52-008.  In the middle of that page, there's

13   a paragraph that starts with:  "Above-average."

14              Do you see that paragraph?

15        A    I do.                                        10:56:40

16        Q    Take a moment and read that paragraph to

17   yourself.

18              (Pause.)

19        A    Okay.

20        Q    Have you seen that paragraph before today?   10:57:18

21        A    I have not.

22        Q    Have you ever been told the information in

23   that paragraph before today?

24        A    I --

25              MS. NORTH:  Objection.  Outside the scope.  10:57:24
```

DRAFT FINAL

```
1              THE WITNESS:  I have not.                    10:57:25

2    BY MR. CAMPORA:

3       Q    Okay.  It says:  "Above-average

4    percentages of blue oak, valley oak, and blue gum"

5    trees -- of "blue gum tree failures occur during      10:57:31

6    May," slash, "October," and then it says, paren,

7    "Table 9," comma, "column 1," closed paren.

8              Did I read that accurately?

9       A    You did.

10      Q    It says:  "As the failure profile of these     10:57:42

11   three species is mostly branch failures, it could be

12   cost effective fire" reduction -- "fire-risk

13   reduction work to remove overhanging branches of

14   these species in high-risk areas."

15             Did I read that accurately?                  10:57:58

16      A    You did.

17      Q    Okay.  In your understanding of a

18   definition of a "facility-protect tree," would a

19   Valley Oak with a overhaving (sic) bra- --

20   overhanging branch that wasn't diseased, dead, or     10:58:08

21   dying be a facility-protect tree?

22      A    It would not.

23             (Exhibit 0070-004 was marked for

24             identification by the court reporter.)

25             MR. CAMPORA:  There's an extra copy,         10:58:54
```

Page 62

DRAFT FINAL

| | | |
|---|---|---|
| 1 | Frank? | 10:58:55 |
| 2 | MR. PITRE:  Yeah. | |
| 3 | BY MR. CAMPORA: | |
| 4 | Q    I'm handing you what's been marked as | |
| 5 | Exhibit 70-004.  This is a copy of an Order to Show | 10:58:59 |
| 6 | Cause Why PG&E's Conditions of Probation Should Not | |
| 7 | be Modified. | |
| 8 | Have you ever seen this document before, | |
| 9 | sir? | |
| 10 | MS. NORTH:  Objection.  Outside the scope. | 10:59:12 |
| 11 | THE WITNESS:  I have not seen this | |
| 12 | document. | |
| 13 | BY MR. CAMPORA: | |
| 14 | Q    If you go to page 2 of the document, | |
| 15 | paragraph 1, it says:  "In light of PG&E's history | 10:59:25 |
| 16 | of falsification of inspection reports, PG&E shall, | |
| 17 | between now and the 2019 Wildfire Season, re-inspect | |
| 18 | all of its electrical grid" -- and the part I'm | |
| 19 | interested in now says:  "and remove or trim all | |
| 20 | trees that could fall" into "its power lines, poles | 10:59:44 |
| 21 | or equipment in high-wind conditions, branches that | |
| 22 | might bend in high wind" or "hit power lines, poles | |
| 23 | or equipment and branches that could break off in | |
| 24 | high wind and fall onto power lines, poles or | |
| 25 | equipment ..." | 10:59:57 |

Page 63

DRAFT FINAL

1           Did I read that accurately?                    10:59:59

2      A    You did.

3      Q    So PG&E's definition of "facility-protect

4  tree" would not include all trees that could fall

5  onto its power lines, poles or equipment in          11:00:08

6  high-wind conditions, true?

7           MS. NORTH:  Objection.  Vague.

8           THE WITNESS:  Can you repeat the question?

9           MR. CAMPORA:  Sure.

10     Q    Un- -- unless the tree was dead, diseased,   11:00:19

11  or decadent, PG&E's definition of "facility-protect

12  trees" would not include all trees that could fall

13  onto its power lines, poles or equipment in

14  high-wind conditions, true?

15          MS. NORTH:  Objection.  Vague.              11:00:34

16          THE WITNESS:  That's correct.

17  BY MR. CAMPORA:

18     Q    Okay.  The next one says:  "... branches

19  that might bend in high wind and hit power lines,

20  poles or equipment ..."                              11:00:42

21          PG&E's deposition of -- deposition --

22  testing one, two.

23          PG&E's definition of "facility-protect

24  trees" would not include trees whose branches might

25  bend in high wind and hit power lines, poles or      11:00:54

DRAFT FINAL

| | | |
|---|---|---|
| 1 | equipment unless the tree was dead, diseased, or | 11:00:56 |
| 2 | decadent, true? | |
| 3 | MS. NORTH:  Objection.  Vague. | |
| 4 | THE WITNESS:  My understanding of this, in | |
| 5 | reading it for the first time, is that they're | 11:01:06 |
| 6 | asking for any tree with the possibility to fall in | |
| 7 | high winds, and what I will say is that is | |
| 8 | impossible to determine which tree will be the next | |
| 9 | tree that falls into the line, and the only way to | |
| 10 | do that would be to remove all the trees. | 11:01:29 |
| 11 | MR. CAMPORA:  That's another fine answer | |
| 12 | to a question that wasn't asked. | |
| 13 | Q    So my question to you, sir, is:  The | |
| 14 | "facility-protect" definition that you've given me | |
| 15 | would not include trees with branches that might | 11:01:39 |
| 16 | bend in high wind and hit power lines unless that | |
| 17 | tree was dead, diseased, or decadent, true? | |
| 18 | MS. NORTH:  Objection.  Vague.  Asked and | |
| 19 | answered. | |
| 20 | THE WITNESS:  That's correct. | 11:01:52 |
| 21 | BY MR. CAMPORA: | |
| 22 | Q    Okay.  The next one says:  "... branches | |
| 23 | that could break off in high wind and fall onto | |
| 24 | power lines, poles or equipment ..." | |
| 25 | Same issue:  Unless the tree was | 11:02:02 |

DRAFT FINAL

```
 1   identified as being dead, diseased, or decadent,          11:02:04

 2   that category would not fall within PG&E's

 3   definition of "facility-protect," would it?

 4           MS. NORTH:  Objection.  Vague.

 5           THE WITNESS:  That's correct.                      11:02:15

 6   BY MR. CAMPORA:

 7       Q    It would not, true?

 8       A    It's correct, again.  You would need to

 9   remove all the trees that have the ability to

10   strike.                                                   11:02:21

11           MR. CAMPORA:  Move to strike everything

12   after that's "correct."

13           MS. NORTH:  He can give a full answer if

14   he wants.

15           MR. CAMPORA:  If it's responsive.               11:02:26

16           MS. NORTH:  He's allowed to put his answer

17   into context.

18           (Exhibit 0070-005 was marked for

19           identification by the court reporter.)

20           MR. CAMPORA:  70-005?                           11:03:13

21           MS. NORTH:  Six.

22           MR. PITRE:  Five.

23           MS. NORTH:  Oh, really?  What was the --

24           MR. CAMPORA:  Four, I think.  That's what

25   I wrote on it.                                          11:03:21
```

Page 66

DRAFT FINAL

```
1           MR. PITRE:  No, it's the last one.        11:03:23

2           MS. NORTH:  No, we're behind one.

3           MR. PITRE:  All right.

4           (Simultaneously speaking.)

5           MR. CAMPORA:  Let's go through this.      11:03:27

6           MR. PITRE:  Hang on.  Let's -- let's --

7   let's take a break.

8           MR. CAMPORA:  Yeah.

9           MR. PITRE:  Let's go through the exhibits

10  and make sure they're all straight, so let's go off   11:03:32

11  the record.

12          THE VIDEOGRAPHER:  The time is 11:03 a.m.

13  We're off the record.

14          (Discussion Off the Record.)

15          THE VIDEOGRAPHER:  The time is 11:04 a.m.   11:04:38

16  We're back on the record.

17          MR. PITRE:  Do you want to square the

18  record, Steve?

19          MR. CAMPORA:  I will.

20          So we went off the record to make sure we   11:04:45

21  had correct numbering of exhibits, and the exhibit

22  we're now looking at is Exhibit -- it's correctly

23  Exhibit 70-005.

24          The issue we had was that there was a

25  prior document which had previously been marked as    11:04:56
```

Page 67

DRAFT FINAL

| | | |
|---|---|---|
| 1 | an exhibit. | 11:04:58 |
| 2 | MR. PITRE:  And the Bates numbers, please. | |
| 3 | MR. CAMPORA:  The Bates number on this -- | |
| 4 | it starts -- it's PG&E-NBF-TAR-0000168677, and it's | |
| 5 | a series of emails. | 11:05:11 |
| 6 | Q    Have you ever seen this document before, | |
| 7 | sir? | |
| 8 | A    I have not. | |
| 9 | Q    Okay.  It wasn't provided to you by | |
| 10 | counsel in preparation for today? | 11:05:24 |
| 11 | A    It was not. | |
| 12 | Q    And I want to ask you some questions about | |
| 13 | the location of FPT trees, and I want to make sure | |
| 14 | that I understand where they were. | |
| 15 | This document says at the beginning -- | 11:05:35 |
| 16 | there's an email on the front page from Laurel | |
| 17 | Reimann. | |
| 18 | Do you know who Laurel Reimann is? | |
| 19 | A    I do. | |
| 20 | Q    Who is Laurel Reimann? | 11:05:43 |
| 21 | A    Laurel Reimann is a vegetation management | |
| 22 | specialist in our government -- in our support | |
| 23 | organization within vegetation management. | |
| 24 | Q    Okay.  And the email is to Kamran Rasheed | |
| 25 | and Erin Parks. | 11:05:57 |

Page 68

DRAFT FINAL

```
 1              Who is Kamran Rasheed?                    11:05:59

 2       A     Kamran Rasheed is a senior manager on the

 3   operations side of our vegetation management

 4   department.

 5       Q     And then there's Erin Parks.              11:06:07

 6              Who is she?

 7       A     Erin Parks is a supervisor in our support

 8   organization, currently on rotation as a manager in

 9   our operations organization.

10       Q     And then, finally, April Kennedy.         11:06:21

11              Who is April Kennedy?

12       A     April Kennedy is a supervisor within our

13   vegetation management department, currently on

14   rotation as a manager in our operations department.

15       Q     And the subject of this email is "Carry-in   11:06:37

16   FPs ..."

17              Do you see that?

18       A     I do.

19       Q     And an "FP" refers to a facility-protect

20   tree, correct?                                      11:06:46

21       A     It does.

22       Q     Okay.  So here it says:  "For the next go

23   around of FP forecasting, we'll need to take into

24   account the number of FPs from 2015 that will hit

25   the 2016 Rtn" -- which is "routine," right?         11:06:58
```

Page 69

DRAFT FINAL

```
 1        A    That's correct.                              11:07:03

 2        Q    -- "budget."

 3             Do you see that?

 4        A    I do.

 5        Q    Okay.  And is it correct -- did you have     11:07:07

 6   an understanding that facility-protect trees that

 7   had been identified in 2015 had not been corrected

 8   and were carried forward into 2016?

 9             MS. NORTH:  Objection.  Outside the scope.

10             THE WITNESS:  I believe what they're         11:07:20

11   speaking here is billing and invoicing.

12             MR. CAMPORA:  Right.

13        Q    But the invoice happens after the tree is

14   fixed, right?  After it's worked?

15        A    The invoicing happens after the -- the FP    11:07:29

16   is -- is mitigated; that's correct.

17        Q    Okay.  So did you learn, as part of your

18   job -- because I have got some emails from you --

19   that there was trees, in 2015, that were FPT trees

20   that were not finished and were carried into 2016?    11:07:44

21             MS. NORTH:  Objection.  Outside the scope.

22             THE WITNESS:  It's a possibility, but this

23   email doesn't seem to be looking at whether work is

24   carried over.  It seems to be discussing that

25   invoicing and budgeting is carrying over.             11:07:58
```

Page 70

DRAFT FINAL

```
 1    BY MR. CAMPORA:                                    11:07:59

 2         Q    Can you think of a reason, sir, that a --

 3    either a PI inspector or a tree-trimming contractor

 4    wouldn't bill for work done in 2015 in 2015?

 5              MS. NORTH:  Objection.  Outside the scope.  11:08:11

 6              THE WITNESS:  Yes, I can't speculate as to

 7    the reasoning, but I can tell you that that is

 8    something that happens regularly.

 9    BY MR. CAMPORA:

10         Q    Okay.  Did you, as part of identifying the  11:08:23

11    location of FPT trees in the audits, determine

12    whether or not any of the trees that were identified

13    as FPT trees in the audits had been carried over

14    from one year to the next?

15         A    Are we talking --                           11:08:36

16              MS. NORTH:  Objection.  Vague.

17              Go ahead.

18    BY MR. CAMPORA:

19         Q    Do you understand my question?

20         A    I do not know, no.                          11:08:41

21         Q    Okay.  What I'm asking you is:  Assuming

22    trees were carried from 2015 to 2016, did you

23    determine whether or not any of those trees were

24    identified in the audits as facility-protect trees?

25              MS. NORTH:  Objection.  Vague.              11:08:52
```

DRAFT FINAL

```
 1              THE WITNESS:  I actually need           11:08:54

 2    clarification here.  I'm -- I'm having trouble

 3    understanding whether you're speaking about budget

 4    and carryover or whether you're speaking about

 5    whether a tree was not mitigated in that year.     11:09:03

 6              MR. CAMPORA:  All right.  Well, sir, let's

 7    do this one, since you're -- apparently you're

 8    confused.

 9              Mark that as next, please.

10              (Exhibit 0070-006 was marked for          11:09:20

11              identification by the court reporter.)

12              MR. CAMPORA:  This would be Exhibit --

13              MS. NORTH:  Do you have an extra copy?

14              MR. CAMPORA:  Oh, I'm sorry.

15              MS. NORTH:  It's all right.  Thank you.   11:09:29

16              THE WITNESS:  I was handed two copies.

17              MS. NORTH:  Oh, there you go.

18              MR. CAMPORA:  Give one to your lawyer.

19       Q    This is Exhibit 70-006.  It starts with

20    Bates No. PG&E-NBF-TAR-0000148890.  And the email   11:09:45

21    I'm interested in is from Corey Peters.

22              Who is Corey Peters?

23       A    Corey Peters is a supervisor in our

24    operations.

25       Q    Okay.  This email was sent June 6th, 2017.  11:10:02
```

DRAFT FINAL

| | | |
|---|---|---|
| 1 | | Do you see that? | 11:10:06 |
| 2 | A | I do. |
| 3 | Q | It was copied to you. |
| 4 | | Do you see that? |
| 5 | A | I do see that. | 11:10:11 |
| 6 | Q | Okay.  And it says:  "Team:  The 2016 work |

6  Q    Okay.  And it says:  "Team:  The 2016 work

7  is still not done and I wanted to bring it to your

8  attention."

9          Did I read that accurately?

10     A    You did.                                11:10:24

11     Q    Okay.  So we're not talking about

12  budgeting now; we're talking now about work not

13  being done, right?

14     A    Yes.

15          MS. NORTH:  Objection.  Vague.          11:10:30

16          THE WITNESS:  That's very clear.

17  BY MR. CAMPORA:

18     Q    Okay.  It says --

19          MS. NORTH:  Outside the scope.

20  BY MR. CAMPORA:                                 11:10:33

21     Q    -- "There are still over" 6,000

22  "outstanding 1st patrol FPTs from 2016."

23          Did I read that accurately?

24     A    You did.

25     Q    Any reason to believe that's not true?   11:10:42

Page 73

DRAFT FINAL

1      A     No.                                              11:10:43

2      Q     Okay.  And you -- is this a copy of an

3  email you received in June of 2017?

4      A     It appears so.

5      Q     So in June of 2017, there were still 6,000        11:10:48

6  outstanding first patrol FPT trees that hadn't been

7  done that were identified in 2016; is that true?

8          MS. NORTH:  Objection.  I think you

9  misstated the year in your question, so it's outside

10  the scope.                                               11:11:04

11          MR. CAMPORA:  Let me make sure I got it

12  right.

13      Q     Is it correct, sir, that as of June 6th,

14  2017, there were still over 6,000 outstanding first

15  patrol FPT trees from 2016?                              11:11:13

16      A     It's possible.  I'm going to take Corey's

17  word for it, but I will say that this appears to be

18  systemwide and not specific to my division of

19  responsibility.

20      Q     Okay.  Well, did you send back an email         11:11:31

21  that said, "Hey, in our -- we got all ours done"?

22          MS. NORTH:  Objection.  This is outside

23  the scope.

24          THE WITNESS:  I'm unsure.

25  //

                                                       Page 74

DRAFT FINAL

```
 1    BY MR. CAMPORA:                                        11:11:42

 2         Q    Okay.  Well, you can look at the breakdown

 3    of the -- on the next page, it has a breakdown of

 4    each division where the FPTs are, doesn't it?

 5         A    It does.                                     11:11:58

 6         Q    Okay.  Which area was yours?

 7              MS. NORTH:  Objection.  Again, this is

 8    outside the scope.

 9              THE WITNESS:  June of 2017, my

10    responsibility --                                      11:12:12

11    BY MR. CAMPORA:

12         Q    Yes, the email is June of 2017.

13         A     -- my responsibility divisions were

14    North Bay, East Bay, and Diablo.  So out of this

15    6477, my responsibility was the 20 in Diablo, the 26   11:12:27

16    in East Bay, and the 24 in North Bay.

17         Q    Where do you see 24 in North Bay?

18         A    Six trees that are still pending, and 18

19    trees that are assigned.

20         Q    And in East Bay, there would be 28, true?    11:12:58

21         A    Yes.  Thank you.

22         Q    And Diablo there were 20?

23         A    Correct.

24         Q    Okay.  So there were -- in your area,

25    there were 20, plus 28, plus 24, right?                11:13:12
```

Page 75

DRAFT FINAL

```
 1        A     Correct.                                11:13:19

 2        Q     So 72 trees from 2016 still hadn't been

 3   done in June of 2017, true?

 4              MS. NORTH:  Objection.  Vague.  Outside

 5   the scope.                                          11:13:31

 6              THE WITNESS:  It appears to be correct.

 7   BY MR. CAMPORA:

 8        Q     And these are -- those are

 9   facility-protect trees, true?

10              MS. NORTH:  Objection.  Outside the scope.  11:13:36

11              THE WITNESS:  Yes.

12   BY MR. CAMPORA:

13        Q     Trees that pose a risk to the line, true?

14        A     According to the definition, that's

15   correct, yes.                                       11:13:41

16        Q     Okay.  Now, one of the categories that

17   we're here about today is the danger that PG&E

18   understood was posed to the public by a

19   facility-protect tree.

20              Did you read that in the notice?          11:13:55

21        A     You're speaking of 070 - Exhibit 1?

22        Q     I am.

23        A     Yes.

24        Q     Category number 7.

25        A     Yes.                                      11:14:07
```

Page 76

DRAFT FINAL

1        Q      Okay.  What is category 7?  You can read

2     it into the record?                                      11:14:08

3        A      Category 7 states that "Pacific Gas &

4     Electric Company's understanding, at" the "time

5     between January 1st, 2015 to the present, of the          11:14:15

6     danger, if any, posed to the public by an FPT ..."

7        Q      Okay.  So as Pacific Gas & Electric

8     Company here today, tell me what you understood the

9     danger was to the public posed by an FPT tree.

10       A      There's multiple danger that can be posed       11:14:38

11    to the public through an FPT tree.  It varies based

12    on the location, the conditions on the ground, the

13    weather at the time, and the location.

14       Q      Okay.  Well, let's talk about the dan- --

15    various dangers.                                          11:14:53

16              One is the tree -- the FPT tree could fall

17    on the line and we could have a wire down and

18    somebody could get electrocuted and killed, right?

19       A      That's a possibility of a danger, yes.

20       Q      Okay.  And in June, when this email            11:15:05

21    happens, that's during fire season, right?

22       A      I'm -- possibly.

23       Q      So are you telling me, sir, as the person

24    most qualified from PG&E, you don't know that June

25    is part of fire season?                                   11:15:17

DRAFT FINAL

| | | |
|---|---|---|
| 1 | MS. NORTH:  Objection.  Argumentative. | 11:15:18 |
| 2 | THE WITNESS:  Each county declares fire | |
| 3 | season separately, and I can't say specifically | |
| 4 | whether Alameda County or Napa County or | |
| 5 | Marin County had declared fire season. | 11:15:30 |
| 6 | BY MR. CAMPORA: | |
| 7 | Q    Okay.  But a concern would be that if a | |
| 8 | tree fell into a line -- and it could either lay on | |
| 9 | the line and cause a fire or it could bring the line | |
| 10 | down and cause a fire, true?  Isn't that a danger? | 11:15:44 |
| 11 | A    Possibly, yes, but not necessarily.  It | |
| 12 | depends on, again, the condition, the weather. | |
| 13 | Q    Okay.  Well, let's talk about October of | |
| 14 | 2017. | |
| 15 | Do you understand what the weather | 11:16:03 |
| 16 | conditions were then, sir? | |
| 17 | MS. NORTH:  Objection.  Outside the scope. | |
| 18 | BY MR. CAMPORA: | |
| 19 | Q    If you don't know, just tell me you don't | |
| 20 | know. | 11:16:08 |
| 21 | MS. NORTH:  Objection.  You're being | |
| 22 | argumentative. | |
| 23 | THE WITNESS:  Is there -- | |
| 24 | MR. CAMPORA:  No, I'm not. | |
| 25 | MS. NORTH:  Yes, you are. | 11:16:11 |

Page 78

DRAFT FINAL

1           THE WITNESS:  Are you referring to                11:16:11
2   October 8th?
3           MR. CAMPORA:  I'm talking about October --
4   the month of October 2017 and those conditions.
5      Q    Do you know what I'm talking about?              11:16:20
6           MS. NORTH:  Objection.
7           THE WITNESS:  Yes.  Do I understand the
8   conditions of October 8th and the lead-up?  Yes, I
9   do.
10  BY MR. CAMPORA:                                          11:16:27
11     Q    Okay.  And you're aware that a danger
12  posed by an FPT tree could be that if a tree fell
13  into the line, it could lay on the line and cause a
14  fire, right?
15     A    Yes.  That is one of the possibilities          11:16:36
16  of -- one of the dangers that we understand posed to
17  the public by an FPT tree.
18     Q    Okay.  Or it could bring the line down,
19  and that could cause a fire, right?
20          MS. NORTH:  Objection.  Vague.                   11:16:49
21          THE WITNESS:  Possibility, yes.
22  BY MR. CAMPORA:
23     Q    Okay.  And so knowing that's a danger,
24  PG&E understands that if a fire starts, an FPT tree
25  poses the risk of death to people, true?              11:16:58

Page 79