JENNER & BLOCK LLP
  Reid J. Schar (*pro hac vice*)
  RSchar@jenner.com
  353 N. Clark Street
  Chicago, IL 60654-3456
Telephone: +1 312 222 9350
Facsimile: +1 312 527 0484

CLARENCE DYER & COHEN LLP
  Kate Dyer (Bar No. 171891)
  kdyer@clarencedyer.com
  899 Ellis Street
  San Francisco, CA 94109-7807
Telephone: +1 415 749 1800
Facsimile: +1 415 749 1694

CRAVATH, SWAINE & MOORE LLP
  Kevin J. Orsini (*pro hac vice*)
  korsini@cravath.com
  825 8th Avenue
  New York, NY 10019
Telephone:    +1 212 474 1000
Facsimile:    +1 212 474 3700

Attorneys for Defendant PACIFIC GAS AND ELECTRIC COMPANY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>     v.<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>                    Defendant. | Case No. 14-CR-00175-WHA<br><br>**RESPONSE TO REQUEST FOR INFORMATION** |

Pacific Gas and Electric Company ("PG&E") respectfully submits this Response to the Court's Request for Information dated February 14, 2019. The following Response addresses the four questions posed by the Court. PG&E is filing a separate response to the Submission of Attorneys Pitre and Campora in Response to Order Dated January 30, 2019.

*   *   *

**Question 1: With respect to the written testimony of Janaize Markland cited on the first page of Attorneys Pitre and Campora's submission, please clarify whether Ms. Markland's reference to 17 tree-related outages per 1,000 miles should have been "< 2 percent of trees in contact," rather than "< 0.02 percent of trees in contact," an apparent error by a factor of 100.**

**Response:** In PG&E's Safety Model Assessment Proceeding testimony to the CPUC dated May 1, 2015, PG&E stated that "tree-related outages are in the neighborhood of 17 per 1,000 miles, < 0.02 percent of trees in contact". (Campora Decl. Exhibit A, Dkt. 1008-1 at 46.) The Court is correct that there is a math error.

PG&E's testimony inadvertently suggested that the ratio of tree-related outages per 1,000 miles correlated to the percentage of trees in contact with PG&E's power lines. This is not correct, as the ratio concerns line miles rather than an approximate number of trees per line mile. In other words, one cannot equate line miles with trees, as it is not a one to one ratio (*i.e.*, there is more than one tree per line mile).

Instead, PG&E estimates that there are more than 100,000,000 trees with the potential to contact its approximately 100,000 miles of overhead distribution and transmission lines.

Accordingly, PG&E estimates that there are:

- approximately 1,000 trees per line mile with the potential to contact the lines (100,000,000 trees / 100,000 overhead line miles = 1,000 trees), and thus
- approximately 1,000,000 trees per 1,000 line miles with the potential to contact the lines.

If in 2015 there were around 17 tree-related outages per 1,000 miles, the percentage of trees in contact with the lines causing outages was approximately 0.0017 percent of all trees with the potential to contact the lines (17 trees / 1,000,000 trees = 0.0017 percent). Thus, the percentage used in PG&E's testimony overstated the prevalence of tree contact outages.

As discussed in response to Plaintiffs' Paragraph 2, the way in which PG&E performed its risk assessment and allocated resources throughout its service territory in 2015 is vastly different from the way in which PG&E performs risk assessments and allocates resources today.  PG&E has significantly increased the financial and human resources expended to reduce vegetation-contact with power lines, and in turn decrease ignition risk, particularly in the areas classified as High Fire-Threat District areas in the High Fire-Threat District Map, adopted by the CPUC in January 2018.  (*See, e.g.*, Pacific Gas and Electric Company 2019 Wildfire Safety Plan ("WSP") dated Feb. 6, 2019, Dkt. 1004-1 at 70-80.)[1]

**Question 2:  What vegetation clearance requirements exist for PG&E power lines on federal lands?**

**Response:**  PG&E is generally required to maintain the same clearances between vegetation and power lines on federal lands that it must maintain elsewhere in California.  Vegetation clearance requirements adopted by the CPUC also apply on federal lands, including lands managed by the United States Forest Service ("USFS"), the Bureau of Land Management, and other federal entities, except to the extent they conflict with federal law.  CPUC General Order 95 Rule 35 sets vegetation clearance requirements that vary based on the voltage of the line.  PG&E is aware of no federal law that, as a general matter, conflicts with or otherwise preempts these requirements.

The Pacific Southwest Region of the USFS, which covers National Forests within PG&E's service territory, also requires that PG&E comply with California Public Resources Code Sections 4292 and 4293 on National Forest land or inside the National Forest Boundary.  *See* Ronald Stewart, Pacific Southwest Region of the United States Forest Service, Order No. 91-1, *Fire Restrictions* (Jul. 24, 1991), *available at* https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5155192.pdf.  These provisions would otherwise apply only in state responsibility areas.

Pursuant to Public Resources Code § 4292, utilities must maintain at least 10 feet of clearance at ground level around each of their utility poles during the designated fire season by removing all

---

[1] The page numbers referenced in all citations to the WSP throughout PG&E's Response refer to the Wildfire Safety Plan's internal pagination, not the ECF page numbers.

1  flammable materials, including dead or dry vegetation, from the circumference of any pole that has
2  equipment, as designated by the California Department of Forestry and Fire Protection ("CAL FIRE"),
3  that may generate electrical arcs, sparks or hot material during normal operation.  Pursuant to Public
4  Resources Code § 4293, during the designated fire season utilities must maintain around their
5  conductors a radial clearance that varies based on the voltage of the line.  In addition, Public Resources
6  Code § 4293 requires utilities to remove "[d]ead trees, old decadent or rotten trees, trees weakened by
7  decay or disease and trees or portions thereof that are leaning toward the line which may contact the
8  line from the side or may fall on the line".

9  NERC Reliability Standard FAC-003-4, Transmission Vegetation Management, also regulates
10 PG&E's transmission-related vegetation management practices throughout California with respect to
11 lines 200 kV and above (as well as a small number of lines below 200 kV), including on federal land.
12 FAC-003-4 imposes minimum vegetation clearance distances that depend on the type of current
13 (alternating or direct), the nominal and maximum system voltages and the altitude of the conductor
14 above sea level.  FAC-003-4 also imposes other requirements on owners and operators of transmission
15 facilities, including but not limited to annual inspections, annual completion of necessary work, timely
16 notification and correction of urgent conditions and documentation of vegetation management
17 practices.

18 As a matter of policy, PG&E applies the same vegetation management standards to vegetation
19 management inspections and patrols on federal land that it applies elsewhere in its service territory.
20 Pre-inspectors and tree crews are instructed to maintain the same clearances, remove or trim dead or
21 dying trees and clear poles in the same manner.

22 In complying with clearance regulations and standards on federal land, PG&E must navigate
23 various regulatory requirements, including requirements that apply elsewhere in California.  *See*
24 *California Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 594 (1987) (holding that California
25 environmental regulation was not preempted and applied on federal land).  For example, California
26 law requires that any entity seeking to take an action that substantially diverts or obstructs the natural
27 flow or substantially changes or uses material from the bed, channel or bank of any river, stream or
28

lake, or uses material from a streambed, must first notify the California Department of Fish & Wildlife ("CDFW").  Cal. Fish & Game Code §§ 1600 *et seq.*  Entities must provide CDFW with written notification of the project, including details regarding dates, cost, methods of construction, types of equipment to be used, anticipated impact on vegetation and fish and wildlife resources and pre- and post-project site conditions.  CDFW then reviews the notification and determines whether the project will have a substantial adverse impact on fish and wildlife resources.  If so, it issues a Streambed Alteration Agreement for the work that imposes restrictions designed to protect the potentially impacted fish or wildlife resource.  Cal. Fish & Game Code § 1602(a).

In addition, tree-trimming and removal on federal land may also implicate the Federal Endangered Species Act ("FESA"), 16 U.S.C. §§ 1531 *et seq.*, and the California Endangered Species Act ("CESA"), Cal. Fish & Game Code §§ 2050 *et seq.*, both of which are generally applicable on federal land.  FESA and CESA prohibit the "take" of listed species, as defined by each statute.  *See* 16 U.S.C. § 1538; 50 C.F.R. § 17.3(c); Cal. Fish & Game Code §§ 2080 *et seq.*  As part of its environmental evaluation process, PG&E assesses vegetation management work for endangered species concerns and implements a variety of avoidance and minimization measures developed by biologists as necessary to avoid the take of listed species, including scheduling of work outside of nesting or breeding seasons when possible.

To the extent that PG&E cannot avoid the "take" of listed threatened or endangered species, it must apply for and obtain an incidental take permit.  16 U.S.C. § 1539; Cal. Fish & Game Code §§ 2080.1, 2081.  The permit application generally must include a conservation plan that specifies the likely impact of the activities, as well as minimization and mitigation strategies.  16 U.S.C. § 1539(a)(2)(A).  At both the state and federal level, this can be an extremely time-consuming process and add significant time to the work schedule.

The requirement to obtain a permit under any of the above statutes may also trigger environmental review under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and/or the California Environmental Quality Act ("CEQA"), Cal. Pub. Res. Code §§ 21000 *et seq.*  Environmental review under NEPA and CEQA is triggered when PG&E seeks a discretionary

permit from a federal agency or state agency, respectively. Projects for which PG&E requires both federal and state discretionary permits triggers environmental review under both statutes. The extent of such review under NEPA and/or CEQA depends on the magnitude of the project's impact on the environment. For projects that may have significant impacts on the environment, NEPA requires that the federal agency prepare an Environmental Impact Statement ("EIS") that analyzes potentially significant impacts, identifies potential mitigation measures, and potential alternatives to the project. 42 U.S.C. § 4332. CEQA requires the state or local agency to prepare an Environmental Impact Report ("EIR") that contains a similar scope and level of analysis for projects that may have significant impacts on the environment, except that CEQA requires that all feasible mitigation measures must be implemented unless the agency determines that economic, social or other conditions make doing so infeasible. Cal. Pub. Res. Code §§ 21002, 21002.1. The approval process can impose substantial delays, which generally extend to the range of 6 to 24 months if the proposed action does not qualify for a statutory or categorical exemption from review under the relevant statute or implementing regulations.

In complying with clearance regulations and standards on federal land, PG&E must not only comply with generally applicable regulations, but also requirements of the federal agency administering the land. Additional requirements may include advance notice and approval, as well as time, place and manner restrictions. Requirements may vary between federal lands depending on which federal entity acts as the administrator. For example, not only does the USFS impose requirements different from the National Park Service, but the requirements may vary even within a department, between field offices or national parks. Further, federal land administrators may communicate guidance informally. Navigating complex, informal and non-standardized guidance makes expedited completion of prescribed work more challenging.

PG&E undertook a multi-year effort to streamline this process within the National Forest system. PG&E and USFS negotiated master permits and easements and a Master Operations and Maintenance Plan to cover the 11 national forests in PG&E's service territory. The Master Operations and Maintenance Plan standardizes application and notice procedures and imposes required practices

to minimize impacts to soil and waterways and to protect sensitive species and habitat areas. Even with this agreement, however, PG&E still must obtain approval or provide notice regarding the general type of work, the location and the schedule of routine vegetation management activities. Moreover, when PG&E's compliance work requires more significant activities, including removal of hazard trees or other work which may leave woody material on-site, PG&E must provide additional notice and information, including information about the equipment to be used, the extent to which a ground disturbance is anticipated, the number, location, size and species of trees to be cut and best management practices and avoidance and minimization measures that are to be followed.

On other federal lands, such as those managed by the National Park Service ("NPS") and the Bureau of Land Management ("BLM"), where PG&E has not established similar streamlined processes for conducting operations and maintenance work, including vegetation management, coordination with the agency on vegetation management activities is generally on a project-by-project basis.[2] This creates uncertainty and variability in the length of time it takes for the agency to authorize PG&E to proceed with the work.

**Question 3:   With respect to the enhanced vegetation management work proposed in PG&E's wildfire mitigation plan, it appears that if the proposed rate of vegetation clearance were followed, it would take more than ten years for PG&E to complete its work on the lines located within the High Fire Threat Districts alone. Is this correct?**

**Response:** In its Wildfire Safety Plan, PG&E discussed the various enhanced vegetation management ("EVM") programs it is implementing to further reduce the likelihood of vegetation contact with power lines and the potential for wildfire ignition. In late 2018, PG&E began performing EVM work in Tier 2 and Tier 3 High Fire Threat District ("HFTD") areas, in addition to its ongoing,

---

[2] PG&E is working to streamline the agency review and approval process for operations and maintenance work on lands managed by NPS and BLM. In December 2018, PG&E obtained a five-year permit from the NPS that streamlined operations and maintenance work in the Golden Gate National Recreation Area. However, PG&E's service territory includes several other NPS-administered parks, such as Point Reyes National Seashore, Yosemite National Park and Whiskeytown National Recreation Area, and PG&E must coordinate with NPS on a case-by-case basis to perform work in those parks.

1  routine and drought and tree mortality response vegetation management programs. The EVM
2  programs include (1) overhang clearing, (2) targeted tree species work and (3) targeted fuel reduction.
3  The scale, scope and complexity of this work is such that PG&E currently expects the EVM work will
4  take approximately eight years to complete.

5        PG&E is proactively addressing the challenges associated with completing the EVM program
6  work. As discussed in its January 23 Submission and its Wildfire Safety Plan, the most significant
7  challenge to the program schedule is the limited availability of a qualified work force, in particular,
8  limited qualified tree workers, which in turn limits the maximum pace of work. (Jan. 23 Br. at 47;
9  WSP at 80-83.)

10        The estimated pace of PG&E's multi-year EVM program is based on maintaining the
11  maximum-available resource of qualified tree workers who could be hired to perform vegetation
12  management activities. After accounting for the number of workers already needed to complete
13  PG&E's annual routine vegetation management, PG&E estimates that its EVM program will take
14  approximately eight years to complete (*i.e.*, from 2019 to approximately 2026).[3] PG&E hopes to
15  accelerate that schedule, but that will require identifying a sustainable increase in the volume of
16  trained, safe, qualified, line clearance certified tree workers.[4]

17        PG&E is exploring approaches to increase the population of qualified tree workers who could
18  perform this work. For example, PG&E is considering partnering with its Tree Work Vendors and the

---

[3] In its Wildfire Safety Plan, PG&E stated that with respect to its overhang clearing and targeted tree species programs, it intends to complete approximately 2,450 circuit miles in 2019, out of approximately 25,200 circuit miles. (WSP at 74.) Although this may suggest that the program would take approximately ten years to complete, PG&E intends to increase its pace of work after 2019. (*See id.*) PG&E has estimated that there are approximately 3,000 qualified tree workers who could be hired to perform vegetation management activities. (*Id.* at 80-83.) PG&E anticipates, however, that it will take some time in early 2019 to reach the necessary staffing levels for the EVM programs, which is why PG&E estimates that it may complete fewer circuit miles in 2019 than in subsequent years.

[4] With respect to the overhang clearing program in particular, in addition to the initial work, PG&E will need to perform annual, follow-up vegetation maintenance work on the sections of the line cleared of overhangs, to keep branches above power line height from growing back into an overhanging position. As the line miles cleared of overhangs increases, the annual maintenance and upkeep effort will also grow.

8
RESPONSE TO REQUEST FOR INFORMATION
Case No. 14-CR-00175-WHA

International Brotherhood of Electrical Workers to potentially implement a tree worker apprenticeship program that is intended to create a pool of new qualified personnel.

Another challenge to completing EVM work on schedule is the numerous legal requirements that must be navigated, including the need to secure permission to access land, local permit requirements, environmental requirements and other state or federal requirements.  These issues may involve concerned landowners and communities, local governments and state or federal agencies, and can cause significant delays in performing vegetation management work.  PG&E discussed these issues in more detail in its January 23 Submission and its Wildfire Safety Plan.  (Jan. 23 Br. at 28-32; WSP at 83-85.)

**Question 4:  Is PG&E in full compliance with Section 4293 of the California Public Resources Code? State the reliability of the sources used to answer. If the answer is anything other than an unqualified yes, state all reasons for noncompliance.**

**Response:**  The areas through which overhead power lines traverse are often densely forested, highly dynamic, living environments, in which conditions can rapidly change.  Neither PG&E nor any other utility that operates tens of thousands of line miles in such environments can verify on any one day that no tree in its service territory encroaches within the minimum clearance distances established by Public Resources Code § 4293 or that no tree is dead or dying such that Section 4293 requires it to be trimmed or removed.  Given the dynamic conditions of vegetation, it is impossible for a utility to achieve perfect compliance or to represent that it is in full compliance at all times.  Nevertheless, utilities, including PG&E, implement a number of procedures to (1) appropriately identify and remove or prune vegetation that grows within the required clearances before the next inspection, and (2) assess compliance after the work is completed and take action to implement corrective actions as necessary.  PG&E's procedures are described below.

To maintain compliance with Section 4293 during the designated fire season, PG&E operates a comprehensive, multi-pronged vegetation management program designed to be responsive to the changing natural environment.  In order to control vegetation and maintain compliance with the

relevant statutes and regulations, PG&E's vegetation management program comprises a combination of routine, specialized and targeted vegetation management initiatives. These initiatives include the routine distribution program and drought and tree mortality response program, which are, among other things, designed to maintain compliance with Section 4293, and are discussed in detail in PG&E's January 23 Submission. (Jan. 23 Br. at 34-36.)

During routine distribution patrols, pre-inspectors are required not only to identify trees that are currently not in compliance with legal requirements or company standards at the time of the inspection, but also to identify trees that may not maintain compliance in the coming year and to prescribe work that will achieve a minimum of yearlong compliance. After completion of the pre-inspection, trimming of trees exhibiting no near-term risk factors is expected to be completed within a 60-90 day range. Trees that may not maintain compliance are addressed more quickly, and if any trees are identified as an "immediate" risk, PG&E's policy is those trees be addressed immediately (*i.e.*, the same day).

In order to achieve compliance regardless of the standard cadence of inspections and tree work, PG&E policies require pre-inspectors to assign trees identified during patrols with work codes that differ depending on urgency. For example, PG&E's Distribution Routine Patrol Procedure provides that if a pre-inspector believes that a tree is unlikely to remain in compliance with regulations before the next scheduled cycle of tree work, the pre-inspector should assign an "Accelerate" priority code, which gives that work a higher priority than other routine work.[5] (Biancardi Decl. Exhibit B, at PGE-CPUC-00005474.) Similarly, after consulting with a supervisor, pre-inspectors may assign a "Bi-annual" code for "fast growing trees that may not hold compliance for a full cycle", which triggers another inspection within the next six months. (*Id.* at PGE-CPUC-00005476-5477.) If a tree requires

---

[5] Once the "Accelerate" code is assigned, the pre-inspector consults with the local Vegetation Management Program Manager ("VPM") to create the work tag and schedule the work. (*Id.*)

pruning or removal but will likely remain in compliance until the next scheduled cycle of tree work, the pre-inspector should assign a "Routine" priority code.[6] (*Id.* at PGE-CPUC-00005474.)

Because of external factors, such as customer refusals or certain environmental restrictions, required work is sometimes delayed. In 2016, for example, there were more than 40,000 instances in which work was delayed because a customer refused to permit PG&E to conduct necessary vegetation management work, and more than 1,200 instances in which work was delayed because a protected bird's nest was found in a tree prescribed for work. Where such conditions exist, PG&E may be required to obtain permits, research land rights or discontinue electric service until the issue is resolved. Depending on the length of time it takes to resolve the issue, some trees may begin to encroach within the minimum clearance distance provided by Section 4293, which raises a compliance issue.

Some of these delays may be mitigated by Public Resources Code § 4295.5, which the California State Legislature recently enacted to permit owners of electrical transmission and distribution lines to enter private property to inspect their lines and prune trees that encroach within the clearances prescribed by Section 4293 or that are otherwise hazardous. However, because Section 4295.5 is newly enacted, it has not yet been judicially tested, and its impact remains uncertain.

PG&E has also implemented checks on its contractors' vegetation management work as another way to monitor compliance. For example, PG&E conducts audits and reviews of its vegetation management program to assess the quality of contractors' work and compliance with PG&E's standards and legal requirements, including Public Resource Code § 4293. PG&E's audit and review process consists primarily of two programs, Quality Control ("QC") and Quality Assurance ("QA"). PG&E's Quality Control ("QC") reviews are designed to assess whether the vegetation management contractors are performing according to PG&E's expectations, including whether they are complying with the applicable regulations. The QC reviews assess whether pre-inspection contractors identify

---

[6] Because Public Resource Code § 4293 permits contact between vegetation and power lines below a certain voltage, trees that require work near such low-voltage conductors are always assigned a Routine priority code.

and prescribe the proper work, as well as whether the tree workers' performance is consistent with contractual requirements (*e.g.*, completing work prescribed by pre-inspectors).  To the extent that issues are identified, corrective actions are assigned and documented by local Vegetation Management Program Managers ("VPM"), who are responsible for tracking whether any necessary corrective actions are fully implemented.[7]

PG&E's QA audits are designed to obtain a "real-time" assessment of PG&E's vegetation management program and whether the conditions in its service territory are consistent with PG&E's legal obligations.  To ascertain a true "real-time" condition of the program, audits are performed throughout the year.  Unlike QC audits, QA audits are not scheduled to follow inspections and tree trimming/removal work, but are instead scheduled independently.  The audits indicate whether any identified issues pose compliance violations or potential violations (*e.g.*, potential violation may occur within 90 days).  The auditors perform an analysis of any actual or potential compliance issues, identify trends and report the results to the VM-Operations Managers and the VPM for the area.  The VPM is responsible for taking action to correct identified deficiencies and for communicating any required corrective actions to the contractors.  If an auditor identifies a recurring or systemic issue, the VM Operations group, working in conjunction with the QA Specialists, develops long-term action plans to reduce or prevent the issue from recurring.

---

[7] Depending on the significance and frequency of issues identified, corrective actions may range from a renewed order to complete the work, training, reduction of assignments, restricting contractors from working on the PG&E contract or other actions as determined by the local VPM.

|   |   |
|---|---|
|   | Respectfully Submitted, |
| Dated:  February 22, 2019 | JENNER & BLOCK LLP |
|   | By:   /s/ Reid J. Schar |
|   |      Reid J. Schar (*pro hac vice*) |
|   | CRAVATH, SWAINE & MOORE LLP |
|   | By:   /s/ Kevin J. Orsini |
|   |      Kevin J. Orsini (*pro hac vice*) |
|   | CLARENCE DYER & COHEN LLP |
|   | By:   /s/ Kate Dyer |
|   |      Kate Dyer (Bar No. 171891) |
|   | Attorneys for Defendant PACIFIC GAS AND ELECTRIC COMPANY |