1  JENNER & BLOCK LLP
    Reid J. Schar (*pro hac vice*)
2      RSchar@jenner.com
    353 N. Clark Street
3      Chicago, IL 60654-3456
4      Telephone: +1 312 222 9350
    Facsimile: +1 312 527 0484
5
6  CLARENCE DYER & COHEN LLP
    Kate Dyer (Bar No. 171891)
7      kdyer@clarencedyer.com
    899 Ellis Street
8      San Francisco, CA 94109-7807
    Telephone: +1 415 749 1800
9      Facsimile: +1 415 749 1694

10 CRAVATH, SWAINE & MOORE LLP
    Kevin J. Orsini (*pro hac vice*)
11     korsini@cravath.com
    825 8th Avenue
12     New York, NY 10019
13     Telephone: +1 212 474 1000
    Facsimile: +1 212 474 3700
14
15 Attorneys for Defendant PACIFIC GAS AND ELECTRIC COMPANY

16
17                     UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
18                         SAN FRANCISCO DIVISION

19
20 UNITED STATES OF AMERICA,      Case No. 14-CR-00175-WHA

21              Plaintiff,     **DECLARATION OF BRIAN J. BIANCARDI IN SUPPORT OF PACIFIC GAS AND**
22     v.     **ELECTRIC COMPANY'S RESPONSE TO REQUEST FOR INFORMATION**
23 PACIFIC GAS AND ELECTRIC COMPANY,

24              Defendant.

25
26
27
28

I, Brian J. Biancardi, declare:

1. I am a Manager for the Bay Region at Pacific Gas and Electric Company ("PG&E), where I oversee all vegetation management projects in the North Bay, East Bay, Mission, Diablo, San Francisco, Peninsula, San Jose and DeAnza Divisions of PG&E's service territory. I have personal knowledge of the following matters.

2. I hold a Bachelor's degree in Public Affairs from Indiana University and a Master's degree in Business Administration from Golden Gate University. I am a certified arborist and project manager. I received my certificate in arboriculture from the International Society for Arboriculture in 2006, and my certificate in project management from the Project Management Institute in 2009. As required by the International Society of Arboriculture, I complete continuing education credits and obtain recertification every three years.

3. In 2004, I began working as a pre-inspector with ACRT, Inc. ("ACRT"), a national vegetation management consulting firm. My first rotation with ACRT was with Florida Power & Light Company. In 2005, while still at ACRT, I began working as a contract pre-inspector for PG&E. As a pre-inspector, my job was to patrol overhead electrical lines and look for vegetation that could contact electric facilities and potentially impact public safety. In 2006, I became a supervisor at ACRT, at which point I began overseeing pre-inspectors working for PG&E in the East Bay.

4. In 2007, I was hired full-time by PG&E as a Forester, a position now known as Vegetation Program Manager ("VPM"), for the Yosemite Division in PG&E's Vegetation Management ("VM") Department.

5. In 2009, I began a rotation as a project manager for PG&E's pole test and treat program and pole stubbing program. In 2010, I began working in PG&E's customer care department in San Francisco.

6. In 2014, I returned to PG&E's VM Department. Since returning to this Department, I have held a number of positions, including as an auditor for the VM Quality Assurance Department, a

VPM for the Diablo and East Bay Divisions and a Supervising Vegetation Program Manager ("SVPM") for the North Coast. In or around 2016, I became SVPM for the North Bay.

7.   In November 2018, I became Manager of the Bay Region. I have 13 direct reports, including three SVPMs and ten VPMs.

8.   As stated above, I am responsible for overseeing all vegetation management projects in the North Bay, East Bay, Mission, Diablo, San Francisco, Peninsula, San Jose and DeAnza Divisions of PG&E's service territory. My duties include working with local VPMs and contractors to schedule all VM work in the Division, ensuring that each project is staffed appropriately, monitoring progress and ensuring that work is executed in a timely fashion.

9.   On January 16, 2019, I was deposed as the person most qualified at PG&E to discuss various topics related to facility protection trees ("FPTs") identified in five North Bay Vegetation Management Quality Assurance ("QA") Audits. A true and correct copy of my deposition transcript is attached hereto as Exhibit A.

10.   California Public Resource Code Section 4293 and CPUC General Order 95, Rule 35 require that all utilities trim or remove all dead or dying vegetation that has the potential to contact electric facilities in the event of failure. To ensure compliance with state law, PG&E performs numerous patrols to identify such trees, which PG&E refers to as "hazard" trees or FPTs. The term FPT is defined in PG&E's Distribution Routine Patrol Procedure ("DRPP"), Policy No. TD-7102P-01. A true and correct copy of the DRPP is attached hereto as Exhibit B.

11.   As stated in Exhibit B, PG&E defines FPTs as all "[t]rees that are dead, show signs of disease, decay or ground or root disturbance, which may fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle". Green and healthy trees with no signs of ground or root disturbance are not FPTs. Although FPTs are sometimes referred to as "hazard" trees, not all FPTs pose a risk of potentially igniting a wildfire.

12.   In my experience, whether an FPT poses a risk of wildfire depends upon the particular conditions of the tree, including the location of the tree, its proximity to high voltage lines and the

conditions on the ground. For example, an FPT located near a secondary conductor generally poses a lower fire risk because secondary lines operate at a lower voltage than primary distribution or transmission lines.

13. PG&E schedules vegetation management work according to the urgency of the risk posed by a particular tree. PG&E's policies clearly dictate the procedures pre-inspectors must follow when assessing risk.

14. If a tree presents an immediate or urgent threat, pre-inspectors must follow PG&E's T&D Vegetation Management Hazard Notification Procedure, Policy No. TD-7103P-09 ("Hazard Notification Procedure"). A true and correct copy of this procedure is attached hereto as Exhibit C.

15. The Hazard Notification Procedure provides that if a tree poses an imminent threat and requires immediate action, the pre-inspector or first responder who identified the issue must contact the SVPM or VPM and remain on site until a tree crew arrives to trim or remove the tree. (Exhibit C at PGE-CPUC 00005996.)

16. If a tree or vegetation condition "requires urgent mitigation but does not pose an imminent threat," the location is identified as a hazard notification ("HN") location. The person who identified the HN location must contact the SVPM or VPM to provide them with notice of the hazard, and may not leave the site until he or she has received affirmative confirmation from either the SVPM or VPM that the notice was received. The SVPM or VPM is responsible for confirming that appropriate work is scheduled to address the issue giving rise to the notification. (*Id.* at PGE-CPUC 00005994-96.)

17. PG&E's DRPP explains how a pre-inspector should assign priority work codes to each tree identified during a patrol. Pursuant to the DRPP, if a pre-inspector believes that a tree is unlikely to remain in compliance with regulations before the next scheduled cycle of tree work, that pre-inspector should assign an "Accelerate" priority code to ensure that the work assignment is issued out early. (Exhibit B at PGE-CPUC 00005474.) If a pre-inspector identifies a "fast growing tree[] that may not hold compliance for a full cycle," he or she should consult with a supervisor to consider potential alternatives prescribed by PG&E policy, including increasing the clearance prescription or seeking

removal, among other options. (*Id.* at PGE-CPUC 00005476, PGE-CPUC 00005487-88.) If "no other alternatives are available," the pre-inspector should assign a "Bi-annual" cycle code, which triggers another inspection within the next six months. (*Id.* at PGE-CPUC 00005476.)

18. If a tree requires pruning or removal but the pre-inspector believes that it will remain in compliance until the next scheduled cycle of tree work, the pre-inspector should assign a "Routine" priority code. If a pre-inspector identifies a trees near secondary conductors, they should assign a "Routine" priority code. (*Id.* at PGE-CPUC 00005474.)

19. As Manager for the Bay Region, I am responsible for monitoring that all vegetation management work is timely executed in my Divisions. This includes, among other things, tracking all pending tree work.

20. I receive a "pending report" from the office of our Senior Manager on a weekly or biweekly basis that summarizes all outstanding FPT work in each Division of PG&E's service territory.

21. In addition, I have access to a "Tree Summary Report" through our Vegetation Management Database. PG&E's Vegetation Management Database houses all vegetation management inspection records and work requests. The inspection records that are maintained in this database are generally created by a pre-inspector using a handheld device at the time of inspection. The work requests maintained in this database, which document completed work, are marked as complete when the contractor submits an invoice and appropriate documentation to PG&E for billing purposes—not when the work is actually completed. The Vegetation Management Database therefore does not register work as "complete" until the contractor has submitted all the required invoicing paperwork.

22. Because the Vegetation Management Database does not track completed work in real time, I also maintain my own spreadsheet to track all carryover trees, which are trees marked for inspection in the prior year that have yet to be worked, in my Divisions.

23. At the beginning of each year, I review the pending report and my own spreadsheet to determine the number of carryover trees in my Divisions. I schedule weekly or biweekly meetings with VPMs and tree crew supervisors to go over a list of carryover trees in my Divisions and discuss an

appropriate work schedule. The tree crew supervisors then go into the field to determine the status of each of the trees discussed and report back to me. In some cases, contractors have informed me that work was completed but not yet submitted for billing. In other cases, contractors have identified external issues, such as a customer refusal, terrain issues or environmental concerns, that delay work. In those situations, I have worked with those contractors to resolve the issue as quickly as possible. Depending on the volume of carryover trees, I have previously required contractors to attend meetings multiple times a week. I conduct these regular meetings until all the carryover trees have been worked.

24. In addition to working directly with contractors, I hold monthly meetings with the SVPMs and VPMs in my Divisions. During these meetings, I regularly check in on the status of carryover tree work in their local areas.

25. Throughout the year, PG&E conducts annual Quality Assurance ("QA") audits for State Responsibility Areas ("SRA") and Local Responsibility Areas ("LRA") in each of its Divisions. These QA audits are designed to determine whether the conditions in its service territory are consistent with PG&E's legal obligations. A true and correct copy of the 2016 SRA QA audit for the North Bay Division is attached hereto as Exhibit D.

26. During my deposition, Mr. Campora marked as Exhibit 007-006 a June 6, 2017 email from Corey Peters noting that over 6,000 FPTs identified for work in 2016 were still outstanding. (*See* Campora Decl. Exhibit F-2, Dkt. 1008-7 at 54-55.) The email includes a screenshot taken from PG&E's Vegetation Management Database. As described above, the Vegetation Management Database does not register work as "complete" until the tree contractor has submitted all required invoicing paperwork. (*See supra* ¶ 21.) In my experience, and as I stated during my deposition, it is common practice among contractors to submit the required invoicing paperwork several months after the work was completed. (*See* Exhibit A at 70:22-71:8.)

27. After Messrs. Pitre and Campora filed their February 6, 2019 submission, I asked my staff to determine how many of the approximately 6,000 FPTs identified in Exhibit 007-006 were actually

outstanding on June 6, 2017. PG&E's records indicate that by June 6, 2017, there were 3,962 carryover FPTs that remained pending.

28. I also asked my staff to determine how many of the approximately 6,000 FPTs identified in Plaintiffs' submission were still outstanding by October 8, 2017, when certain of the October 2017 North Bay Wildfires ignited. PG&E's records indicate that by October 8, 2017, 131 carryover FPTs remained pending, and of these, 50 were in divisions affected by the October 2017 North Bay Wildfires.

29. During my deposition, Mr. Campora also marked as Exhibit 007-007 an October 3, 2017 email exchange between Tony Walls and me regarding outstanding tree work in the North Bay. (*See* Campora Decl. Exhibit F-2, Dkt. 1008-7 at 56.) After Messrs. Pitre and Campora filed their February 6, 2019 submission, I reviewed PG&E's records to determine the cause of delays referenced in Exhibit 007-007. PG&E's records indicate that the tree at issue in this email was inspected and prescribed for work in 2016, but upon arrival at the site, the crew members who were to perform the work found that the job required de-energization of the line. The contractor was unable to perform the work during this initial visit, but put in a request with the local VPM to schedule a date when the line could be de-energized. Because de-energization requires coordination among numerous departments, the job was scheduled for October 2, 2017. The job was rescheduled due to a wind storm on October 2, 2017 and was ultimately completed on December 29, 2017.

30. The tree at issue in Exhibit 007-007 (which was located several miles away from any of the October 2017 North Bay Wildfire fire perimeters) presented a low potential for wildfire ignition because it was in the vicinity of a secondary conductor, which operates at a lower voltage than primary distribution or transmission lines and therefore poses a lower risk of ignition if contact occurs. Further, the tree was located in a Tier 1 area, which presents a lower fire risk than Tier 2 or Tier 3.

31. On March 30, 2018, PG&E submitted its amended response to the CPUC's November 21, 2017 Data Request, Question 69. That response stated that there are no records of pending tree work at any of the incident locations associated with the October 2017 North Bay Wildfires. Attached hereto as Exhibit E is a true and correct copy of PG&E's Response to Question 69.

I declare under penalty of perjury that the foregoing is true and correct of my own personal knowledge. Executed this 22nd day of February, 2019 in Oakland, California.

_____
Brian J. Biancardi