FRANK M. PITRE (SBN 100077)
fpitre@cpmlegal.com
ALISON E. CORDOVA (SBN 284942)
acordova@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

STEVEN M. CAMPORA (SBN 110909)
scampora@dbbwc.com
**DREYER BABICH BUCCOLA WOOD CAMPORA, LLP**
20 Bicentennial Circle
Sacramento, CA 95826
Telephone: (916) 379-3500
Facsimile: (916) 379-3599

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                 Plaintiff,<br><br>   vs.<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>                 Defendant | No.: 14-CR-00175-WHA<br><br>**PLAINTIFFS' RESPONSE TO COURT'S QUESTION CONCERNING PERCENTAGE OF CONTACT TREES**<br><br>**Judge:  Hon. William Alsup** |

Plaintiffs concur that Ms. Markland's testimony contained two separate measurements concerning the PG&E system.  The first measurement relates to outages per mile and is easily calculated by dividing 99,000 (81,000 miles of above ground distribution line, plus 18,000 miles of transmission line) by the number of tree related outages in any given year.

The second measurement is <0.02 of trees in contact.   The phrase "contract trees" has a specific meaning relative to PG&E's quality control.  It means trees that are either in contact or show evidence of contact with the line.   As measured by PG&E in Quality Assurance Audits, it does not include all compliance trees, i.e. those closer than 18 inches or 4 feet.  It also does not include any measurement of the number of FPT trees.  PG&E could have provided the Court with an actual percentage of contract trees, at any particular time, by reviewing the Quality Assurance Audits for a particular time frame.

However, PG&E instead has, without any evidence under oath, advised this Court that the percentage is 0.0017.   PG&E obtained this number by assuming there are 1,000 trees per mile with the potential to contact the lines and therefore assuming there are 100,000,000 trees with the potential to contact the line.   This usage of "contact" is not how PG&E uses "contact" in its vegetation management program.    In addition, these numbers are contrary to the testimony of PG&E's own employees.   During the course of discovery in the Butte Fire case, PG&E employees, specifically including Mr. Stephen Tankersley, who had been the head of the vegetation management program, testified that there are 5,000,000 trees with the potential to grow into the line and 50,000,000 trees, which were tall enough to reach the line. [1]

> Q. Now, sir, my question is this. You have said
> and others have said there are 55 million trees along
> PG&E's system as a whole. Am I correct in that?
> A. That is our estimate.
> Q. Okay. And you told me you came to that 12:09:31
> estimate by looking at the inventory that was done in
> about 1997, correct?
> A. Correct.

Deposition of Stephen Tankersley, May 3, 2017, page 107, lines 13-20, Exhibit A to the Campora

---

[1] This is based on a 1997 inventory.   PG&E claims to have removed millions of trees since that time.   Plaintiffs also assume other trees have grown tall enough to reach the line during that time frame.

2

Declaration.

> Q.      For every one tree inside the easement that if
> it fell that could reach the line, PG&E assumed there
> were 10 trees outside the easement that could fall into 12:14:45
> the line?
> MS. GOUGH: Vague.
> THE DEPONENT: Any tree that could conflict.
> So you narrowed it to trees that could fail.
> BY MR. CAMPORA:
> Q. Okay. So "conflict" just means either contact
> or fall into?
> A. Correct.
> Q. And the number you came up with was 55 million? 12:15:00
> A. Right.

Deposition of Stephen Tankersley, May 3, 2017, page 113, lines 3-13, Exhibit A to the Campora Declaration.

> Q. Well, your estimate is that there are 5 million
> trees that can grow into the line and 50 million trees
> that can fall into the line, right?
> A. That's my estimate.

Deposition of Stephen Tankersley, May 5, 2017, page 157, lines 9-12, Exhibit B to the Campora Declaration.

Using the only numbers provided under oath, and assuming 17 outages per 1000 miles of line, there were a total of 1700 tree related outages, meaning that 1700 trees out of 55,000,000 caused an outage (approximately 0.0033 percent.)  However, this does not tell us how many trees were actually in contact or a threat to the line.

In the 2016 aggregate audit results, PG&E identified a total of 241 trees, out of a sample of 102,502, which were not in compliance.  (See Exhibit 52-006 to the Oldford Deposition, Exhibit C to the Campora Declaration.)  If we extrapolate that total using the 5,000,000 trees, which could grow into the line, the total number of trees in violation of Section 4293, in 2016, was 11,756.

The more important figure, based on PG&E's own research, is the number of trees along its lines, which were tall enough to reach a line and which for some reason were at risk for falling into the line, Facility Protect Trees.

As previously cited by Plaintiffs, Mr. Filmer's study clearly stated that trees which fall into the line (FPT) cause 90% of the vegetation related fires and only 2% of the vegetation related fires are caused by trees growing into the line (contact trees).   (See Filmer Study, Exhibit D, to the Campora Declaration.)  We know, based on PG&E's own Quality Assurance Audits, that in 2016,

3

1  *after its pre-inspectors and tree trimmer had completed their work*, there were 3,603 Facility

2  Protect Trees discovered in a sample of 102,502 trees.    If that number is extrapolated, based on a

3  total of 55,000,000 trees within reach of the lines, *after PG&E pre- inspectors and tree trimmers*

4  *had performed their work*, 1,925,000 trees were at risk for falling into PG&E's lines.

5        Plaintiffs are aware that PG&E now claims that the Quality Assurance audits are not

6  performed after the pre-inspectors and tree trimmers have performed their work.   This makes little

7  sense, since according to Mr. Oldford, one purpose of the QA audits is to evaluate the performance

8  of the inspectors and the tree trimmers.  (See Oldford Deposition, page 113:24-114:5, Exhibit C to

9  Campora Declaration.)   Mr. Oldford, the person in charge of the Quality Assurance Audits, testified

10  as follows:

11        Q Okay. So don't they have to inspect it
        first before you can find out if they missed it?
12        A Yes.
        Q Okay. So when we look at these sheets --
13        and, for example, on page -9431, it's page --
        labeled page 2 and its Bates numbers ends with
14        -9431.
        Are you with me?
15        A Yes.
        Q All right. So when it goes through this
16        compliance assessment results, they're assessing the
        trees that are in compliance to see whether or not
17        the pre-inspector or the tree trimmers have missed
        trees that were not in compliance, true?
18        A True.
        Q Okay. So, for example, there are 12 FPT
19        trees here.
        A Yes.
20        Q Those are FPT trees that existed after the
        pre-inspector and the tree trimmers have done their
21        work, true?
        MS. NORTH: Objection. Vague.
22        THE WITNESS: True.

23  Deposition of Eric Oldford, page 114, lines 3-25, Exhibit C to the Campora Declaration.

24        It is possible to actually calculate the number of trees in violation of the code, based on

25  PG&E's audits.   As of November 30, 2018, PG&E's Quality Assurance audit process had not

26  changed since the Butte Fire. (See Oldford Deposition, pages 97-99, Exhibit C to the Campora

27  Declaration.)   Following the Butte Fire, Plaintiffs retained a statistical expert, Dr. Nicholas

28  Jewell.   A true and correct copy of his declaration is attached to the Declaration of Steven M.

Campora as Exhibit D.   Using the data from the 2014 audit, for the Stockton Division, the site of the Butte Fire, Dr. Jewell was able to calculate the potential number of contract trees and FPT trees.  (See paragraphs 36, 37, 38, 39, 40 and 41 of the Declaration of Dr. Nicholas Jewell, Exhibit D to the Campora Declaration.)   Using current audits, the number of trees in violation of the code could be calculated for the Court.

Dated:  March 1, 2019

DREYER BABICH BUCCOLA WOOD
CAMPORA, LLP

By: _____
Steven M. Campora

PLAINTIFFS' RESPONSE TO COURT'S QUESTION CONCERNING PERCENTAGE OF CONTACT TREES
No.: 14-CR-00175-WHA