JENNER & BLOCK LLP
Reid J. Schar (*pro hac vice*)
RSchar@jenner.com
353 N. Clark Street
Chicago, IL 60654-3456
Telephone: +1 312 222 9350
Facsimile: +1 312 527 0484

CLARENCE DYER & COHEN LLP
Kate Dyer (Bar No. 171891)
kdyer@clarencedyer.com
899 Ellis Street
San Francisco, CA 94109-7807
Telephone: +1 415 749 1800
Facsimile: +1 415 749 1694

CRAVATH, SWAINE & MOORE LLP
Kevin J. Orsini (*pro hac vice*)
korsini@cravath.com
825 8th Avenue
New York, NY 10019
Telephone: +1 212 474 1000
Facsimile: +1 212 474 3700

Attorneys for Defendant PACIFIC GAS AND ELECTRIC COMPANY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

PACIFIC GAS AND ELECTRIC COMPANY,

Defendant.

Case No. 14-CR-00175-WHA

**RESPONSE TO SECOND ORDER TO SHOW CAUSE WHY PG&E'S CONDITIONS OF PROBATION SHOULD NOT BE MODIFIED**

## TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................................ 1

I. The First Proposed Condition Should At Least Be Clarified Given the Dynamic Characteristics of the Natural Environment And To Ensure That Regulators Are Determining PG&E's Compliance With The Law In The First Instance ................................. 4

II. The Second Proposed Condition Should Be Modified To Clarify That Compliance with the Wildfire Safety Plan Will Be Determined By The CPUC As Directed By California State Law ........................................................................................................ 9

III. PG&E Reserves Its Objection To The Fifth Proposed Condition Concerning Dividends ........................................................................................................................ 11

Defendant Pacific Gas and Electric Company ("PG&E") respectfully submits this memorandum in response to the Court's March 5, 2019, Second Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified ("Second OSC"). To the extent the Court proceeds with any modifications to the terms of PG&E's probation, PG&E requests that the Court eliminate or amend the first proposed condition and amend the second proposed condition for the reasons set forth below. PG&E reserves its objection to the portion of proposed condition 5 that would preclude PG&E from paying dividends.

**INTRODUCTION**

PG&E is committed to eliminating wildfire ignition risk as quickly and completely as possible. PG&E, in consultation with various experts, designed the Wildfire Safety Plan that it has submitted to this Court and the California Public Utilities Commission ("CPUC") to achieve precisely that goal. PG&E intends to work with CAL FIRE, the CPUC and other interested parties to determine whether there are ways to further enhance PG&E's Wildfire Safety Plan. Relatedly, PG&E welcomes the Court's proposals in conditions 3 and 4 that would direct the Monitor to take an even more active role in assessing PG&E's safety and records keeping efforts.[1]

With respect to proposed condition 1, PG&E understands that it has a fundamental obligation to comply with applicable state laws and regulations, including in particular the vegetation management requirements set forth in California Public Resources Code Sections 4292 and 4293 and CPUC General Order 95. PG&E of course has no objection to complying with these (and all other) laws and regulations. Instead, PG&E's concern with respect to proposed condition 1 is that

[1] To the best of PG&E's knowledge, the record keeping standard for PG&E's vegetation management efforts articulated in condition 4 ("traceable, verifiable, accurate and complete") has not been promulgated or defined by regulators in the electric industry. However, following guidance in 2011 from the Department of Transportation's Pipeline and Hazardous Materials Safety Administration (PHMSA), PG&E implemented "traceable, verifiable and complete" record-keeping standards related to certain aspects of its natural gas operations. *See* Department of Transportation, Pipeline and Hazardous Materials Safety Administration, Pipeline Safety: Establishing Maximum Allowable Operating Pressure or Maximum Operating Pressure Using Record Evidence, and Integrity Management Risk Identification, Assessment, Prevention, and Mitigation, 76 FR 1504, 1506 (Jan. 10, 2011). PG&E will use that prior experience and work cooperatively with the Monitor to align on the definitions necessary to comply with condition 4.

grafting these state *civil* regulatory requirements onto the terms of a federal *criminal* probation is inconsistent with the fundamental goal of probation, which is to facilitate rehabilitation and to prevent additional criminal conduct.

PG&E's service territory includes tens of millions of trees that could come in contact with its lines. PG&E has developed an extensive program of inspection and maintenance to identify which of those trees need to be removed or trimmed based on the governing regulatory requirements. But that program—*as with any other vegetation management program*—does not include constant surveillance of all trees within striking distance of the utility's lines. The natural environment through which PG&E's lines traverse is dynamic; conditions can and do change in an instant. A tree that was compliant at the time of a prior inspection might become a non-compliant hazard tree one day later when it is damaged by a natural or man-made event or three months later after a bark beetle infestation has taken hold. Because PG&E cannot monitor every tree at every moment of every day, PG&E cannot know of each such condition the instant it arises. A constant state of perfect compliance could therefore only be achieved by engaging in extensive clear-cutting that is not required by state law, is not legally, financially or practically possible and is not required by the Court's revised conditions. Requiring perfect compliance with state civil regulations as a condition of probation against this backdrop will likely result in probation violations.

Moreover, as CAL FIRE has explained, "[w]hether a healthy tree or limb may contact the line from the side or fall on the line, and thus whether the tree or limb is a hazard, depends on the factual circumstances specific to that tree or limb." (Supplemental Response of the California Department of Forestry and Fire Protection Following January 30, 2019 Hearing on Order to Show Cause, dated February 6, 2019 ("CAL FIRE Feb. 6 Br.") (Dkt. 1012) at 1.) As a result, "inspectors must use their professional judgment" and CAL FIRE evaluates the "specific circumstances" to decide "on a case-by-case basis" whether a violation of state law has occurred. (*Id.*) General Order 95 Rule 35, enforced by the CPUC, "is similar to, and complements, Section 4293." (*Id.* at 3.) In this case, compliance will involve assessment of millions of trees over PG&E's vast service territory. PG&E submits that the Court should leave the case-by-case assessment of compliance with state

regulations to the state law enforcement and regulatory experts equipped to exercise the necessary professional judgment, especially on this scale. The most effective and appropriate way to do this would be to omit the first proposed condition from any probation modification. Alternatively, and at a minimum, the Court should revise the first proposed condition to clarify that the Court will only find a violation of probation if PG&E's regulators (CAL FIRE or the CPUC) have in the first instance found PG&E to have violated the relevant regulatory requirements. A federal probation court should not take on the prerogative of finding civil violations of state regulatory laws when the state regulator itself has not made any findings of violation. Doing so would improperly supplant the authority of expert regulators and risk inconsistent determinations.

With respect to proposed condition 2, PG&E has no objection to the Court's proposal to make compliance with PG&E's Wildfire Safety Plan a condition of its probation.[2] However, as a number of participants to the ongoing CPUC wildfire safety plan process have noted, PG&E must have the ability to work with the CPUC to update its plan to address advancements in technology and enhanced understanding of how to best eliminate wildfire risk. Some discretion to adapt to changing circumstances is critical, and the California State Legislature has appropriately exercised the powers left to it under the Federal system to vest the CPUC with the responsibility and authority to monitor compliance with each utility's wildfire safety plan. Accordingly, PG&E requests that the Court modify condition 2 to establish that a finding by the CPUC that PG&E has failed to comply with its Wildfire Safety Plan will be a predicate for a finding of a violation of this proposed condition.

Finally, PG&E reserves its objection to the Court's fifth condition, which bars the issuance of "any dividends until [PG&E] is in compliance with all applicable vegetation management requirements as set forth above." (Second OSC (Dkt. 1027) at 6.) PG&E has already suspended dividends and will not pay any dividends at least until it emerges from bankruptcy. However, in the ordinary course of business, PG&E must raise significant amounts of capital to finance

[2] To the extent the CPUC modifies the Wildfire Safety Plan filed with this Court, PG&E will promptly file the revised plan with this Court and identify any such modifications with specificity.

3

RESPONSE TO SECOND ORDER TO SHOW CAUSE WHY PG&E'S CONDITIONS OF PROBATION SHOULD NOT BE MODIFIED
**Case No**. 14-CR-00175-WHA

improvements and investments needed to provide safe and reliable service. PG&E consistently spends more cash than it generates through its operations and cannot fund all its infrastructure investments without external financing from the debt and equity markets. Payment of a dividend is a key way to induce equity investment. If PG&E were prohibited from paying a dividend, its ability to raise equity capital would be substantially constrained, which in turn would impair its ability to make the investments and improvements needed to carry out its duty to provide safe and reliable service and reorganize in a way that benefits all Californians.

## I. The First Proposed Condition Should At Least Be Clarified Given The Dynamic Characteristics Of The Natural Environment And To Ensure That Regulators Are Determining PG&E's Compliance With The Law In The First Instance

The first proposed condition states that PG&E "must fully comply with all applicable laws concerning vegetation management and clearance requirements, including Sections 4292 and 4293 of the California Public Resources Code, CPUC General Order 95, and FERC FAC-003-4." (Second OSC (Dkt. 1027) at 5.) The Court states that compliance with Section 4293 will be measured against the interpretation of the provision that CAL FIRE submitted to the Court on February 6, 2019.

As noted, PG&E understands and agrees that it is obligated to comply with vegetation management requirements. PG&E's vegetation management program was designed with that obligation in mind. (*See* PG&E's Response to Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified, dated January 23, 2019 (Dkt. 976) at 33.) To control vegetation and maintain compliance with the relevant statutes and regulations, PG&E's program comprises a combination of routine, specialized and targeted vegetation management initiatives, as set forth in detail in PG&E's January 23 (Dkt. 976 at 34-36) and February 22 (Dkt. 1016 at 10-12) submissions. Further, to respond to external factors, such as environmental changes, PG&E continuously reviews and enhances its vegetation management program to further effectuate this goal (*e.g.*, implementing the Drought and Tree Mortality Response Program in 2014, establishing additional patrols in certain areas to further abate potentially hazardous trees).

However, the requirement of perfect compliance imposed by proposed condition 1 means

4

RESPONSE TO SECOND ORDER TO SHOW CAUSE WHY PG&E'S CONDITIONS OF PROBATION SHOULD NOT BE MODIFIED
**Case No**. 14-CR-00175-WHA

that unforeseeable changes in the natural, dynamic environment would result in violations of PG&E's probation. If, for example, a tree was trimmed in accordance with clearance requirements, but shortly thereafter became damaged to the extent that it then presents a hazard and should be removed, PG&E would be in violation of its probation until that tree is removed. However, PG&E would typically be unaware that the tree needs to be removed until the next inspection occurs (the timing of which varies based on the wildfire risk at that particular location) and the pre-inspector identifies the tree for removal. PG&E obviously does not and cannot have eyes on every tree and limb in its service territory at all times. For example, if, the day after it had been inspected, a tree near a line was struck by lightning, hit by a car, weakened due to a disturbance on the ground as a result of construction, irrigation, farming or a mudslide (to name just a few possibilities), PG&E would then be out of technical compliance—and, in accordance with the Court's proposed probation conditions, in violation of its probation—until the next patrol of that area allows for identification and removal. To be sure, complying with applicable vegetation management regulations includes identifying trees or limbs that could eventually grow into and contact PG&E's lines and cutting them before that growth can occur. But that is merely a part of the overall compliance effort. Although PG&E cannot predict with certainty which trees will be impacted by the changing environment, it is highly likely that, as a result of unforeseen events or even just the natural progression of tree health, some trees will likely at some point in time be out of compliance for some period of time until PG&E can reassess and work them.

PG&E will continue to implement processes designed to identify and complete all necessary tree work promptly and take the necessary steps to maintain compliance. For example, during routine distribution patrols, pre-inspectors are required not only to identify trees that are currently not in compliance with legal requirements or company standards at the time of the inspection, but also to identify trees that may not maintain compliance in the coming year and to prescribe work that will achieve a minimum of year-long compliance. Pre-inspectors may also designate fast-growing trees as requiring inspections twice per year. Moreover, to identify and abate dead or dying trees, and further reduce the risk of vegetation contacting power lines, PG&E performs inspections of

5

RESPONSE TO SECOND ORDER TO SHOW CAUSE WHY PG&E'S CONDITIONS OF PROBATION SHOULD NOT BE MODIFIED
**Case No**. 14-CR-00175-WHA

certain locations at least twice a year and as often as four times a year. Such inspections are designed to mitigate the types of compliance issues raised in the examples above, including the historic rates of tree mortality that PG&E has observed in recent years. Further, PG&E has implemented checks on its contractors' vegetation management work as another way to monitor compliance. (*See* PG&E's Response to Request for Information, dated February 22, 2019 (Dkt. 1016) at 11-12.) But given the fact that PG&E must prioritize certain areas of its territory and is constrained by the number of qualified pre-inspectors and tree workers available for employment, short of clear cutting, PG&E simply cannot guarantee that every tree within its territory is in compliance at all times across its approximately 100,000 miles of overhead lines. Moreover, PG&E's wildfire prevention efforts and its vegetation management efforts are the subject of proceedings before California regulators. The California Legislature has adopted comprehensive legislation to address wildfire risks, and regulators are overseeing a process in which all stakeholders and experts on all aspects of those risks are participating. The challenges of remaining in perfect compliance are compounded by the inherent subjectivity in the legal standard, as applied by CAL FIRE.

As currently framed, proposed condition 1 should therefore at least be clarified for the reasons set forth below.

*First*, a core purpose of probation is to promote rehabilitation and prevent additional criminal conduct. The Ninth Circuit and other appellate courts have accordingly recognized that it is improper to impose a probation condition that the defendant cannot satisfy. *E.g., Higdon v. United States*, 627 F.2d 893, 899 (9th Cir. 1980) (explaining that an "important feature" of a legitimate sentencing regime is that "defendant will be able to meet payments"); *United States v. Spencer*, 640 F.3d 513, 521 (2d Cir. 2011) ("A releasee cannot be imprisoned for failing to comply with an impossible condition."); *United States v. Poulin*, 809 F.3d 924, 932 (7th Cir. 2016) (vacating probation condition requiring defendant to support his family and requiring district court to take "defendant's ability to pay" into account). PG&E will do everything it can to comply with its legal obligations, but because the dynamic characteristics of the natural environment make it highly likely

that there will be some tree out of compliance at some point in time, the condition is improper as currently framed.

*Second*, condition 1 would have the Court making determinations about whether a particular tree constituted a regulatory violation in the first instance, rather than allowing the state experts to make those determinations. Under Section 4293 as construed by CAL FIRE, PG&E is required to trim any tree "regardless of its health" that is a hazard. (CAL FIRE Feb. 6 Br. (Dkt. 1012) at 3.) But, CAL FIRE also emphasized that "[t]his does not mean that Section 4293 requires trimming or removing every healthy limb that hangs over a powerline. Whether a tree or limb may contact the line from the side or fall on the line, and thus whether the tree or limb is a hazard, depends on the factual circumstances specific to that tree or limb." (*Id*. at 4 (emphasis added).) In other words, professional and regulatory judgment are required to assess whether a particular healthy tree poses a hazard within the meaning of Section 4293.

The CPUC, which is the agency charged under California law with determining PG&E's compliance with California's civil regulatory framework, also explained in its prior submission that "ratemaking and safety regulations counsels an emphasis on a well-ordered and thorough vegetation management program." (Comments of the California Public Utilities Commission in Response to Order to Show Cause, dated January 28, 2019 (Dkt. 987) at 17.) And the CPUC has observed that "the complexity and magnitude of responsible vegetation management requires a carefully considered plan that reflects safety standards, environmental protection, and local concerns." (*Id*. at 20.) Those expert regulating entities—including the CPUC, CAL FIRE, and FERC—have comprehensive programs for enforcing the vegetation management regulations and are well-positioned to assess compliance, and CPUC and CAL FIRE have explained in detail to the Court their regulatory frameworks, and the complex balance of interests they take into account.

If the Court were to take upon itself the task of finding regulatory violations where the regulators or CAL FIRE have not, it would improperly intrude on the state's regulatory and law enforcement framework. The decision whether to enforce, and how to enforce, state law enforcement and regulatory standards is a key hallmark of regulatory power that is generally not

suited to judicial oversight. *Heckler v. Chaney*, 470 U.S. 821, 831 (1985) ("An agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."). That is because such decisions

> often involve[] [the] complicated balancing of a number of factors which are peculiarly within [the agency's] expertise. Thus, the agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, [and] whether the particular enforcement action requested best fits the agency's overall policies.

*Id.* Thus, the judgment as to whether PG&E is in compliance with its regulatory obligations is a judgment that in the first instance should be left to the regulators and CAL FIRE, all of whom are responsible to the people of California for the decisions they make.

As the Ninth Circuit has explained, "the federal government has no constitutional authority to interfere with a State's exercise of its police power except to the extent the State's action intrudes on any of the spheres in which the federal government itself enjoys the power to regulate." *United States v. Snyder*, 852 F.2d 471, 475 (9th Cir. 1988). This Court should not adopt a condition of probation that "touch[es] on the province" of state and federal regulators. (United States's Response to Court's Order to Show Cause and Request for Comment, dated January 23, 2019 (Dkt. 975) at 5.) As PG&E noted in its prior filings with the Court, federal courts ought to be especially wary of encroaching on the province of state regulators managing a regulatory framework when those regulators are currently devoting intense scrutiny to determining the best path forward.

Accordingly, the Court should remove proposed condition 1 from any modification of probation conditions. At a minimum, the Court should modify proposed condition 1 to make clear that the Court will not find a violation of probation absent a prior finding of violation by the relevant regulator, be it CAL FIRE, CPUC, or FERC.[3]

---

[3] Such a condition could require that "PG&E fully comply with all applicable laws concerning vegetation management and clearance requirements, including Sections 4292 and 4293 of the California Public Resources Code, CPUC General Order 95, and FERC FAC-003-4, with any non-compliance to be determined in the first instance by the relevant regulating entity charged with enforcement of those laws."

## II. The Second Proposed Condition Should Be Modified To Clarify That Compliance With The Wildfire Safety Plan Will Be Determined By The CPUC As Directed By California State Law

The Court's proposed condition 2 would require that PG&E "fully comply with the specific targets and metrics set forth in its amended 2019 wildfire mitigation plan." (Second OSC (Dkt. 1027) at 6.) While PG&E has every intention of implementing and complying with its plan, PG&E believes that it is critical that it have the ability, working with the CPUC, to modify the plan in appropriate circumstances, including where additional learning would allow PG&E to improve the plan, changed conditions warrant a reprioritization of work or external factors prevent PG&E from meeting a target. As a result, PG&E respectfully submits that the Court should modify condition 2 to provide that the CPUC will, consistent with state law, be the entity to determine whether PG&E has substantially complied with its Wildfire Safety Plan.

As the Court is aware, the requirement to submit a wildfire safety plan was recently created as part of Senate Bill ("SB") 901. Cal. Pub. Util. Code § 8386. In creating this obligation, the California legislature explicitly stated that compliance monitoring under SB 901 is squarely the role of the CPUC. Cal. Pub. Util. Code § 8386(b). While electrical corporations are required to engage an independent evaluator to review and assess compliance with their wildfire mitigation plan, the independent evaluator's findings are not binding on the CPUC, and the CPUC must conduct its own compliance review. *Id.* Notably, SB 901 provides that the CPUC shall assess penalties for non-compliance only on "an electrical corporation that fails to *substantially comply* with its plan." Cal. Pub. Util. Code § 8386.1 (emphasis added). Thus, as with condition 1, if the Court were to impose its own interpretation of PG&E's compliance requirements under SB 901, it would interfere with the legal jurisdiction that the legislature has given to the CPUC and would improperly supplant the state's regulatory framework governing wildfire mitigation plans. *See Heckler*, 470 U.S. at 831 (finding that an agency's decision to enforce a regulation is committed to its absolute discretion).

Moreover, the CPUC is still in the process of reviewing wildfire mitigation plans and has been asked to address the level of discretion electrical corporations will have to deviate from their plans. Later today, PG&E and other electrical corporations are filing their responses to comments

regarding the plans that were submitted to the CPUC by interested parties ("intervenors"). Two of these intervenors, the Office of the Safety Advocate (OSA) and the Energy Producers and Users Coalition (EPUC), raised concerns that strict adherence to CPUC-approved wildfire mitigation plans would discourage electrical corporations from making modifications that could increase safety based on new information. As PG&E will state in its reply, PG&E agrees with the intervenors that some measure of flexibility is important to address changed conditions and allow continuous improvement, especially in the early years of the plans. (PG&E's Reply Comments on the Wildfire Mitigation Plan of Pacific Gas and Electric Company (U 39 E), Rulemaking 18-10-007 (Mar. 22, 2019) at 5.)[4] For example, PG&E may learn as it implements its plan that there is a more efficient method to achieve a wildfire risk reduction than the one set forth in the Wildfire Safety Plan. Similarly, execution risks outside of PG&E's control may prevent it from meeting the targets included in PG&E's plan or changed conditions may alter the risk assumptions PG&E made in developing the plan. As the regulator charged by the elected state legislature with the responsibility for approving and monitoring wildfire mitigation plans, the CPUC should be permitted to determine the extent to which PG&E and other electrical corporations may deviate from the written terms of their plans in appropriate circumstances. A condition of probation that requires strict adherence with the version of the Wildfire Safety Plan originally submitted by PG&E to this Court would displace that regulatory function and interfere with the determinations of the California Legislative Branch.

      For these reasons, PG&E respectfully submits that the Court should modify and clarify condition 2 to remove the requirement that PG&E "fully comply" with the specific targets and metrics in its 2019 Wildfire Safety Plan and instead require that PG&E comply with the 2019 Wildfire Safety Plan, as approved by the CPUC, with such compliance to be determined by the CPUC.

---

[4] Once submitted, PG&E's Reply will be available on the CPUC website (http://www.cpuc.ca.gov). PG&E also will provide the Court with a courtesy copy of the Reply as soon as it is available.

## III. PG&E Reserves Its Objection To The Fifth Proposed Condition Concerning Dividends

The Court's fifth proposed probation condition provides, in part, that in order to ensure that "sufficient financial resources are available [to achieve compliance with proposed conditions one to four, among other things] PG&E may not issue any dividends until it is in compliance with all applicable vegetation management requirements as set forth above." (Second OSC (Dkt. 1027) at 6.) As noted, PG&E has not paid any dividends since the beginning of the fourth quarter of 2017 due to potential liability related to the October 2017 North Bay Wildfires. Because PG&E will not resume paying dividends during the course of the Chapter 11 proceedings, it is not seeking any relief from the Court with respect to proposed condition 5 at this time. However, because PG&E believes that the proposed limitation on PG&E's discretion to issue dividends could have significant negative long-term effects on PG&E's ability to reorganize and continue to make necessary capital improvements upon emergence from Chapter 11, PG&E reserves its right to raise this issue later.

In the ordinary course of business, PG&E must raise significant amounts of capital to finance investments needed to provide safe and reliable gas and electric service to its customers. PG&E is historically cash flow negative, meaning that it spends more cash than it generates through its operations and cannot, therefore, fund all of its infrastructure investments without external financing.[5] PG&E also cannot finance investments with debt alone, both because its debt capacity is limited and because the CPUC requires PG&E to maintain a capital structure that is balanced between debt and equity.[6] Equity funding is therefore crucial to supporting capital improvement projects. To incent sufficient equity investment, PG&E must offer investors the opportunity to earn

---

[5] *See* Pacific Gas And Electric Company, Annual Report (Form 10-K) at 57, (Feb. 16, 2017) ("FY2016 10-K"), https://www.sec.gov/Archives/edgar/data/75488/000100498017000006/form10k.htm. While not strictly necessary for the purposes of this motion, it is appropriate for the Court to take judicial notice of "reported stock price history and other publicly available financial documents," including form 10-Ks and other SEC filings. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008).

[6] (*See* FY2016 10-K at 11, 55-56.) It also should be noted that regulating investor-owned utilities' debt and equity balance, including PG&E's, is a part of the CPUC's ratemaking function. *See Ponderosa Tel. Co. v. Pub. Utilities Com.*, 197 Cal. App. 4th 48, 51-52 (2011) (in determining a utility's "authorized rate of return," the CPUC first "adopts a reasonable capital structure, *i.e.*, the proportion of debt to equity that a utility company should use to finance its capital needs").

a reasonable rate of return. The expectation of a stable dividend is one of the top reasons investors purchase utility stocks. Payment of a dividend goes hand-in-hand with the restoration of investor confidence that is both a signal and requisite element of financial health. In fact, certain institutional investors cannot or will not invest in equity without a dividend. Accordingly, in the utility industry, except for extremely unusual circumstances in which the utility experiences financial distress, dividends are regularly paid to shareholders.[7]

PG&E's ability to raise equity capital upon emergence from Chapter 11 (or perhaps to facilitate such an emergence) will be crucial. By limiting PG&E's ability to issue dividends, the Court's proposed condition 5 would make it more difficult for PG&E to raise that equity capital, reorganize successfully and continue to make the investments necessary to meet its duties to the public to provide safe and reliable gas and electric service. PG&E accordingly reserves its objection on this issue.

7 That is precisely why, in calculating the penalty that it required PG&E to pay after the San Bruno gas explosion, the CPUC calibrated the penalty specifically to avoid impairing PG&E's ability to continue paying a dividend. CPUC Decision No. 15-04-024 (Apr. 9, 2015) at 65, *available at* http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M150/K990/150990886.PDF.

Respectfully Submitted,

Dated: March 22, 2019

JENNER & BLOCK LLP

By: /s/ Reid J. Schar
Reid J. Schar (*pro hac vice*)

CRAVATH, SWAINE & MOORE LLP

By: /s/ Kevin J. Orsini
Kevin J. Orsini (*pro hac vice*)

CLARENCE DYER & COHEN LLP

By: /s/ Kate Dyer
Kate Dyer (Bar No. 171891)

Attorneys for Defendant PACIFIC GAS AND ELECTRIC COMPANY

13

RESPONSE TO SECOND ORDER TO SHOW CAUSE WHY PG&E'S CONDITIONS OF PROBATION SHOULD NOT BE MODIFIED
**Case No**. 14-CR-00175-WHA