1  AROCLES AGUILAR, SBN 94753
   CHRISTINE JUN HAMMOND, SBN 206768
2  CHRISTOFER NOLAN, SBN 229542
   California Public Utilities Commission
3  505 Van Ness Avenue
   San Francisco, CA 94102
4  Telephone: (415) 696-7303
   Facsimile: (415) 703-4592
5  Christofer.Nolan@cpuc.ca.gov
6
7  Attorneys for the California Public Utilities Commission and
   Michael Picker, Liane Randolph,
8  Martha Guzman Aceves, Clifford Rechtschaffen,
   and Genevieve Shiroma, in their official capacities as
9  Commissioners of the California Public Utilities Commission
10

**FILED**

MAR 22 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

11          **UNITED STATES DISTRICT COURT**

12      **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

13            **SAN FRANCISCO DIVISION**

14

15  UNITED STATES OF AMERICA,                    Case No. 14-CR-00175-WHA

16                    Plaintiff,                 **COMMENTS OF THE**
                                                 **CALIFORNIA PUBLIC UTILITIES**
17        vs.                                    **COMMISSION IN RESPONSE TO**
                                                 **SECOND ORDER TO SHOW CAUSE**
18  PACIFIC GAS AND ELECTRIC COMPANY,

19                    Defendant.                 Hearing Date: April 2, 2019
                                                 Time:          8:00 a.m.
20                                               Courtroom:    12, 19th Floor
                                                 Judge:        Hon. William H. Alsup
21

22

23

24

25

26

27

28

1    At the Court's invitation (Dkt. No. 1028), the California Public Utilities Commission

2  ("CPUC") hereby offers its comments on the Court's March 5, 2019 Second Order to Show

3  Cause Why PG&E's Conditions of Probation Should Not Be Modified (Dkt. No. 1027).

4    Before providing comments on the specific provisions of the Court's Second Order

5  to Show Cause, however, the CPUC would like to update the Court on the CPUC's own

6  wildfire-related proceedings, which are continuing apace in coordination with the public,

7  community organizations representing a range of interests, and the CPUC's sister agencies,

8  including CAL FIRE. [CPUC Comments In Response to Order to Show Cause (Dkt. No.

9  987)].

10    On October 25, 2018, the CPUC issued an Order Instituting Rulemaking to

11  Implement Electric Utility Wildfire Mitigation Plans Pursuant to Senate Bill 901 (2018)

12  (R.18-10-007).  On February 6, 2019, the first Wildfire Mitigation Plans ("WMPs") were

13  presented in the Rulemaking by eight electric utilities: Pacific Gas and Electric Company,

14  Southern California Edison Company, San Diego Gas & Electric Company, Bear Valley

15  Electric Service, Liberty Utilities (CalPeco Electric) LLC, PacifiCorp, NextEra Energy

16  Transmission West, LLC, and Trans Bay Cable LLC.

17    Thus far, at least 26 separate entities have offered comments on the Rulemaking or

18  on the proposed WMPs themselves.[1] At least 17 persons or entities have filed motions for

19  party status, which affords a party full rights of participation in CPUC proceedings and

20

21  [1] Those entities are: the CPUC's Office of the Safety Advocate, the Public Advocates Office
    at the California Public Utilities Commission, Small Business Utility Advocates, East Bay
22  Municipal Utility District, Southern California Edison Company, Pacific Gas and Electric
    Company,  San Diego Gas & Electric Company, The Utility Reform Network, Bear Valley
23  Electric Service, Liberty Utilities (CalPeco Electric) LLC, PacifiCorp, California Cable and
    Telecommunications Association, Pacific Bell Telephone Company (dba AT&T California,
24  AT&T Mobility, and AT&T Corp.), Green Power Institute, City of Laguna Beach,
    California Municipal Utilities Association, Zuma Beach FM Emergency and Community
25  Broadcasters Inc., Mussey Grade Road Alliance, Coalition of California Utility Employees,
    Office of the San Francisco City Attorney, NextEra Energy Transmission West, LLC,
26  Sunrun Inc., DATC Path 15, LLC, California Large Energy Consumers Association, Energy
    Producers and Users Coalition, California Farm Bureau Federation.

27

28

1  allows for potential statutory "intervenor compensation" to those who meaningfully

2  contribute towards a CPUC decision.[2]

3      The parties are in the process of reviewing the WMPs and the comments upon them,

4  and utilities are formulating reply comments, which the CPUC is required to consider per

5  California Public Utilities Code section 8386(d). The CPUC is slated to approve the utilities'

6  WMPs in May 2019, in compliance with the schedule mandated by California Public

7  Utilities Code section 8386(e).

8      The CPUC also has a companion Rulemaking on de-energization underway that was

9  begun in December 2018. The CPUC's Order Instituting Rulemaking to Examine Electric

10 Utility De-Energization of Power Lines in Dangerous Conditions (R.18-12-005) is ongoing,

11 but it is similarly active, with at least 61 persons and entities having already filed comments

12 or sought party status.[3] The purpose is to "undertake a thorough examination of de-

13 energization processes . . . and adopt best practices and a framework for utilities to ensure

14 orderly and safe de-energization (and re-energization) of power lines . . . ." See Assigned

15 _____

16 [2] Those persons and entities are: County of Inyo, City of Malibu, City of St. Helena, Ruth
   Henricks, California Environmental Justice Alliance, County of Napa, County of Sonoma,
17 County of Mendocino, Protect Our Communities Foundation, County of Santa Cruz,
   Citizens Sunrise Transmission LLC, William Bradley Abrams, Peninsula Clean Energy
18 Authority, County of Los Angeles, Contra Costa Water District, City of Santa Rosa, Rural
   County Representatives of California.

19 [3] These include: San Diego Gas & Electric Company, Pacific Gas and Electric Company,
   the Public Advocates Office at the California Public Utilities Commission, the CPUC's
20 Office of the Safety Advocate, Department of Community Services and Development,
   William B Abrams, Small Business Utility Advocates, Coalition of California Utility
21 Employees, California Farm Bureau Federation, Sunrun Inc., UCAN - Utility Consumers'
   Action Network, County of Mendocino, County of Napa, County of Sonoma, California
22 Energy Storage Alliance, Direct Access Customer Coalition, Energy Users Forum, Protect
   Our Communities Foundation, Southern California Edison Company, Northern California
23 Power Agency, California Water Association, Liberty Utilities (CalPeco Electric) LLC, Bear
   Valley Electric Service, PacifiCorp, East Bay Municipal Utility District, Municipal Water
24 District of Orange County, California Municipal Utilities Association, City and County of
   San Francisco, The Utility Reform Network, Local Government Sustainable Energy
25 Coalition, Mussey Grade Road Alliance, The Energy Producers and Users Coalition,
   NextEra Energy Transmission West, LLC, Center for Accessible Technology, California
26 State Association of Counties, Rural County Representatives of California, and a collection
   of approximately 25 telecommunications companies filing joint comments.

27

28

1    Commissioner's Scoping Memo and Ruling (Phase 1) at p.1, attached hereto as **Exhibit 1**.

2    This Rulemaking is providing access to those most affected by wildfires and the use of de-

3    energization as a fire-prevention tool, allowing for robust debate among the parties and the

4    communities they represent. The ongoing first phase of the Rulemaking is designed "to

5    ensure that the Commission has adopted de-energization parameters and protocols in

6    anticipation of the upcoming 2019 wildfire season," and a proposed decision is expected in

7    late April 2019. Id. at pp. 3, 6.

8         With regard to **the Court's first proposed condition**, the CPUC takes no issue with

9    PG&E having to comply with applicable vegetation-management rules, as PG&E is already

10   required to do so under CPUC regulation.

11        As for **the Court's second proposed condition** in which the Court contemplates

12   ordering PG&E to "fully comply with the specific targets and metrics set forth in its

13   amended 2019 wildfire mitigation plan, the CPUC notes for the Court that PG&E's

14   amended WMP (Dkt. No. 1014-2) is not yet a final document for the CPUC's purposes, and

15   has not been approved by the CPUC, as required by statute.  The CPUC is required to

16   receive comments on filed WMPs, consult with CAL FIRE, and "may require modifications

17   of [WMPs]" based on comments and consultation with CAL FIRE.  *See* Cal. Pub. Util. Code

18   §§ 8386(b)&(d).  Reply comments are forthcoming, and the record of the WMP proceeding

19   remains open.  The CPUC is scheduled to approve the WMPs in May 2019.[4]

20        Were the Court to order full compliance with PG&E's amended WMP now, there is

21   a risk of dual WMPs:  PG&E's *proposed* amended WMP and the WMP *actually approved*

22   by the CPUC (and future WMPs approved by the CPUC), with potential confusion over

23   compliance, enforcement, and cost-recovery from ratepayers.  The CPUC submits that it

24

25   _____

26   [4] The CPUC additionally notes for the Court that the WMPs filed in February 2019 are only
     the first set; thereafter, the WMPs are to be updated and submitted annually for CPUC
27   approval.  Cal. Pub. Util. Code § 8386(b).

28

1   would be prudential for the Court to forbear on this issue, at least at the present time, as

2   PG&E's amended WMP, as filed with this Court, has not been approved by the CPUC.

3        The **third condition proposed by the Court** only raises a potential issue of

4   duplication, as California Public Utilities Code section 8386 (as amended by SB 901) now

5   requires that PG&E engage an independent evaluator from a list mutually compiled by the

6   CPUC and CAL FIRE. The independent evaluator is "to review and assess the electrical

7   corporation's compliance with its [wildfire mitigation] plan." Cal. Pub. Util. Code §

8   8386(h)(2)(B)(i). The independent evaluator is required to consult with and operate under

9   the direction of the CPUC's Safety and Enforcement Division and issue a report each year

10  addressing PG&E's compliance with its WMP, including whether or not PG&E failed to

11  fund any activities included in the plan. Id. The CPUC is required to consider the

12  independent evaluator's findings and apply penalties to PG&E for failure to comply with the

13  plan. A Court-appointed Monitor may duplicate efforts of the independent evaluator, with

14  ratepayers potentially responsible for paying for redundancies.

15       The CPUC takes no issue with **the fourth condition proposed by the Court**, that

16  PG&E maintain accurate and verifiable records of its vegetation management efforts, as

17  PG&E is already required to do this under CPUC regulation.

18       As for **the fifth and final proposed condition**, the CPUC will determine PG&E's

19  ability to recover expenses to implement its WMP through rates in PG&E's general rate

20  case, as required by California Public Utilities Code sections 314.5 and 8386(g), where the

21  CPUC will evaluate the reasonableness of PG&E's expenses.  Therefore, the CPUC cannot

22  prejudge the outcome of that proceeding

23       Finally, the Court has indicated that it has temporarily postponed **the issue of de-**

24  **energization**. The CPUC has made its position on de-energization clear and will not repeat

25  it.  The CPUC would only note that it has received many comments in its ongoing Order

26  Instituting Rulemaking to Examine Electric Utility De-Energization of Power Lines in

27  Dangerous Conditions (R.18-12-005) that show the intense public interest in this issue and

28

1  highlight the significant concerns raised by numerous parties about the costs, safety and

2  reliability impacts, and notification challenges associated with de-energization and the need

3  for it to be carried out in a careful and deliberate manner.[5]  The CPUC has dedicated a page

4  of its website to the issue of de-energization to promote public participation on this issue,

5  which can be found here: http://www.cpuc.ca.gov/deenergization/. Finally, the CPUC

6  attaches as **Exhibit 2** its "CPUC Actions on SB 901 & Wildfires," which provides a timeline

7  of the CPUC's recent engagement with the California Legislature and the public on the

8  issues of wildfires and de-energization.

9

10                                              Respectfully submitted,

11

12                                    By:    /s/     _Christofer Nolan_
   March 22, 2019                            AROCLES AGUILAR

13                                            CHRISTINE JUN HAMMOND
                                             CHRISTOFER NOLAN

14
                                             Attorneys for the CALIFORNIA PUBLIC
15                                           UTILITIES COMMISSION

16

17

18

19

20

21

22

23

24  _____

25  [5] The party comments can be found at the following web address:
    https://apps.cpuc.ca.gov/apex/f?p=401:57:0::NO
26

27

28

# EXHIBIT 1

MP6/rp4  3/8/2019



**FILED**
03/08/19
03:11 PM

## BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA

| | |
|---|---|
| Order Instituting Rulemaking to Examine Electric Utility De-Energization of Power Lines in Dangerous Conditions. | Rulemaking 18-12-005 |

## ASSIGNED COMMISSIONER'S SCOPING MEMO AND RULING (PHASE 1)

This scoping memo and ruling sets forth the category, issues to be addressed, and schedule of the proceeding pursuant to Public Utilities (Pub. Util.) Code § 1701.1 and Article 7 of the Commission's Rules of Practice and Procedure.

### 1. Procedural Background

The Commission opened this proceeding via Order Instituting Rulemaking (OIR) adopted on December 13, 2018 and issued on December 19, 2018. The intent of the OIR is to examine its rules allowing electric utilities under the Commission's jurisdiction to de-energize power lines in case of dangerous conditions that threaten life or property in California. Through this proceeding, the Commission will undertake a thorough examination of de-energization processes (also named Public Safety Power Shutoff by various utilities) and adopt best practices and a framework for utilities to ensure orderly and safe de-energization (and re-energization) of power lines and identify the need for review of these practices and framework in future proceedings.

The Commission also opened Rulemaking (R.) 18-10-007 on October 25, 2018 to provide guidance on the form and content of initial wildfire mitigation plans developed pursuant to Senate Bill (SB) 901.[1] The electric utilities' wildfire mitigation plans,

---

[1] Stats. 2018, Ch 626.

R.18-12-005 COM/MP6/rp4

filed February 6, 2019, contain specific information on de-energization practices and protocols for each utility based upon the provisions contained in Resolution ESRB-8,[2] which currently governs utility de-energization practices, and in accordance with Pub. Util. Code Section 8386(c)(6).  Unless stated otherwise, protocols adopted in this OIR will go into effect immediately (as soon as they can be practicably adopted by the utilities), and the utilities' future de-energization plans must comply with newly adopted protocols.

The OIR named the following electric utilities as respondents:  Pacific Gas and Electric Company (PG&E), Southern California Edison Company (SCE), San Diego Gas & Electric Company (SDG&E), Liberty Utilities/CalPeco Electric (Liberty), Bear Valley Electric Service, a division of Golden State Water Company (Bear Valley), and Pacific Power, a division of PacifiCorp (PacifiCorp).  Each of these utilities filed comments on the OIR, some jointly or in combination.

The following additional parties filed comments:  The City and County of San Francisco (CCSF), The Utility Reform Network (TURN), The Commission's Public Advocates Office (Cal Advocates), The Commission's Office of the Safety Advocate (OSA), California Municipal Utilities Association (CMUA), East Bay Municipal Water District (EBMUD), Municipal Water District of Orange County (MWDOC), California Water Association, Northern California Power Agency, Protect Our Communities Foundation (POC), Direct Access Customer Coalition and Energy Users Forum (jointly), California Energy Storage Alliance, Counties of Mendocino, Napa and Sonoma (jointly), Utility Consumer's Action Network (UCAN), Sunrun, Inc., California Farm Bureau Federation, Coalition of California Utility Employees, Small Business Utility Advocates, Local Government Sustainability Energy Coalition, William B. Abrams, and the Joint Parties (the entities collectively known as AT&T,

---

[2]  Resolution Extending De-Energization Reasonableness, Notification, Mitigation and Reporting Requirements in Decision 12-04-024 to All Electric Investor Owned Utilities (July 16, 2018), available at http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M218/K186/218186823.PDF.

R.18-12-005 COM/MP6/rp4

California Cable and Telecommunications Association, Verizon Wireless, the entities collectively known as Frontier, Comcast Phone of California, Consolidated Communications of California Company and the Small LECs (Local Exchange Carriers), and the entities collectively known as Sprint.[3]

A Prehearing Conference (PHC) was held on February 19, 2019 to discuss the issues and to address the procedures and schedule for this proceeding. The assigned Administrative Law Judge (ALJ) granted party status to the following entities: The Energy Producers and Users Coalition, the City of Malibu, Center for Accessible Technology, CTIA (representing the wireless communications industry), and the California Large Energy Consumers Association.

## 2. Issues

This proceeding will be divided into two phases. This scoping memo addresses only Phase 1 issues. Phase 2 issues will be set forth in a subsequent scoping memo that will be forthcoming. Attached to this Scoping Memo is a high-level Phase 1 staff proposal (Staff Proposal). Parties can provide feedback on the Staff Proposal pursuant to the direction set forth in Section 2.1.

The goal of the first phase of this proceeding is to ensure that the Commission has adopted de-energization parameters and protocols in anticipation of the upcoming 2019 wildfire season. Due to regional variability in topography, weather, and other factors, there is no one-size-fits-all approach for utility de-energization. However, the first phase of this proceeding will necessarily be rapid and will seek to build upon and/or modify the provisions the Commission adopted in Resolution ESRB-8 to provide protocols and a framework under which utilities may de-energize. As explained at the PHC, Resolution ESRB-8 remains in effect unless and until it is superseded or amended by a decision in this proceeding. Phase 1 will focus on notice and communication issues.

---

[3] The County of San Diego Office of Emergency Services served a letter to the service list of R.18-12-005 on February 8, 2019. Party status has not yet been resolved for County of San Diego.

R.18-12-005 COM/MP6/rp4

Phase 2 will take a more comprehensive look at de-energization practices and protocols, including mitigation measures, additional coordination across agencies, overarching policies to ensure that de-energization is used as a last resort measure to protect the public safety, and re-energization protocols, among other issues.

The following issues are in scope of Phase 1:

1. Updates to Resolution ESRB-8;

   a. What, if any, updates or modifications should be made to Resolution ESRB-8 to ensure that, should de-energization become necessary during the 2019 wildfire season, de-energization is undertaken as efficiently and safely[4] as possible?

2. Notification and communication to the public (including vulnerable populations), local governments, critical facilities, and emergency/first responders;

   a. What are the best ways to notify the aforementioned parties of a planned de-energization event and when power will be restored in the event of de-energization?

      i. How far in advance (and in what order of priority) should the aforementioned parties be notified of an upcoming de-energization event?

      ii. What information should be conveyed about an upcoming de-energization event?

      iii. Who should be responsible for notifying affected customers/populations? Should the utilities be solely responsible, or should other parties such as local governments have a responsibility in communicating these events?

      iv. What systems should be used for notification of customers (for example, the Standardized Emergency Management System framework, reverse 9-1-1, *etc.*)?

   b. How should 'vulnerable populations' be defined and identified?

---

[4] Parties may provide comment on what constitutes "efficient" and "safe" de-energization.

     i.  Is a list of Medical Baseline customers sufficient, and if not, how should the utilities identify vulnerable populations?

  c.  How should critical facilities be defined and identified?

  d.  How should first responders/emergency responders be defined and identified?

     i.  Should water utilities and communication companies be defined as first responders?

3.  What structures and practices should be in place to maximize coordination between utilities and first responders/local governments?

  a.  Should the utilities be required to embed liaison officers (who are empowered to make decisions on behalf of the utility) in emergency operations centers carried out under state and local plans consistent with SEMs?

4.  What information should be provided to the Commission after a de-energization event to show that de-energization was used as a method of last resort and that it was in compliance with Commission rules?

What additional provisions or protocols are necessary if de-energization of transmission lines become necessary?

## 2.1 Staff Proposal

Attached to this Scoping Memo is a Phase 1 Staff Proposal. The Staff Proposal contains Safety and Enforcement Division's recommendations, set forth as responses to each of the scoping questions above. Parties are requested to respond to the Staff Proposal when providing comments, according to the schedule in Section 4 below.

## 3. Need for Evidentiary Hearing

Both in comments and at the PHC, there was discussion regarding the need for evidentiary hearings in this proceeding. Most parties stated that hearings would not be necessary or desirable; however, several parties felt hearings may be necessary depending on the specific scope adopted and the outcome of various steps of the proceeding.

R.18-12-005  COM/MP6/rp4

Phase 1 of this proceeding will involve development of overarching policies and protocols based upon the feedback of parties and the already adopted protocols in Resolution ESRB-8. Evidentiary hearings will not be needed to resolve Phase 1, and the preliminary determination that hearings are not needed remains unchanged. At the time of issuance of a Phase 2 scoping memo, the issue of evidentiary hearings may be revisited; however, it is anticipated the entire proceeding can be resolved without the need for evidentiary hearings.

## 4. Schedule

The phase 1 schedule is:

| | |
|---|---|
| Opening comments/briefs on Phase 1 issues filed and served | March 25, 2019 |
| Reply comments/briefs on Phase 1 issues filed and served | April 2, 2019 |
| Phase 1 proposed decision | Late April 2019 |

Based on this schedule, the proceeding will be resolved within 18 months as required by Pub. Util. Code § 1701.5. The Phase 1 schedule may be modified by the ALJ as required to promote the efficient and fair resolution of the rulemaking.

## 5. Category of Proceeding/*Ex Parte* Restrictions

Most parties supported a quasi-legislative categorization for this proceeding and the associated *ex parte* rules. However, Public Advocates Office stated that if this proceeding examines cost responsibility for de-energization on affected communities, even though only from a policy perspective, this proceeding would better be classified as ratesetting.[5] TURN similarly suggested that if this proceeding addresses the cost/benefit analysis of de-energization, than a ratesetting categorization would be most appropriate.[6] Direct Access Customer Coalition and Sunrun, Inc. both suggest that mitigation measures after a de-energization event is called must be examined, including cost responsibility.

---

[5] Transcript, PHC at 26-27.

[6] *Id* at 27-28.

Therefore, both argue that a ratesetting designation is appropriate.[7]  Finally, Protect Our
Communities argued that this is the appropriate proceeding to address costs related to
de-energization; therefore, the categorization should be changed to ratesetting.[8]

This ruling confirms the Commission's preliminary determination that this is a
quasi-legislative proceeding.  The purpose of this rulemaking is to take a comprehensive
and holistic look at de-energization across utility territories and to adopt protocols to
promote effective and safe de-energization practices.  If Phase 2 examines cost
responsibility, it will be from a policy perspective; rather than examining any one
utility's specific costs.  Pursuant to SB 901, costs of implementing utility
wildfire mitigation plans, which include de-energization plans, must be considered in
each utility's general rate case.[9]  Therefore, the quasi-legislative categorization is
appropriate.

*Ex parte* communications are permitted as set forth in Article 8 of the
Commission's Rules of Practice and Procedure.  Although Direct Access Customer
Coalition[10] requested that ratesetting *ex parte* rules be in effect, even if this proceeding is
designated as quasi-legislative, in this case, the free flow of information and discussion
outweighs such a change.

### 6.  Public Outreach

Pursuant to Pub. Util. Code § 1711(a), the Commission sought the participation of
those likely to be affected by this matter as follows:

The Commission noticed (on the Commission's Daily Calendar) and facilitated
(led by Commission staff) two workshops to gather input from first responders, affected
communities, and other stakeholders.  The Commission held the first workshop on

---

[7] *Id* beginning at 28.

[8] *Id* at 31-32.

[9] Pub. Util. Code Section 8386 (C)(20)(g).

[10] *Id* at 31.

- 7 -

R.18-12-005 COM/MP6/rp4

December 14, 2018 in Santa Rosa, California and the second on January 9, 2019 in Calabasas, California. Remote access via telephone and WebEx was also made available.

The Commission shared a new release to media organizations across the entire state.[11] The Commission also included information on the OIR in the January 2019 "Working for California" newsletter.[12]

The Commission created and will continue to update regularly a webpage for this proceeding, located at http://cpuc.ca.gov/deenergization/.

In addition, the Commission served the OIR on the respondent investor-owned utilities and on the service lists for the following proceedings: R.18-10-007, R.18-03-011, R.15-05-006, R.15-06-009, Application (A.) 15-09-010, A.17-07-011, A.18-04-001, A.18-09-002, and A.08-12-021.

Further, the Commission served the OIR on the following agencies and organizations: State Board of Forestry and Fire Protection (CAL FIRE), California Energy Commission, State Air Resources Control Board, California Governor's Office of Emergency Services, California Department of Fish and Wildlife, California Infrastructure and Economic Development Bank, California Office of Planning and Research, California Department of Parks and Recreation, California State Association of Counties, League of California Cities, California Native American Heritage Commission, California Municipal Utilities Association, California State Sheriffs' Association, California Fire Chiefs' Association, State Association of Counties, and the League of California Cities.

---

[11] http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M250/K559/250559067.PDF

[12] The Working for California newsletter is distributed statewide to elected (mayors and county BOS) and appointed (city/county managers) officials, most local public works and county-level emergency services directors, as well as anyone else who requests a copy. Additionally, it is posted on the CPUC's outreach website at www.cpuc.ca.gov/newsletter/

R.18-12-005  COM/MP6/rp4

## 7. Intervenor Compensation

Pursuant to Pub. Util. Code § 1804(a)(1), a customer who intends to seek an award of compensation must file and serve a notice of intent to claim compensation no later than 30 days after the PHC.

## 8. Public Advisor

Any person interested in participating in this proceeding who is unfamiliar with the Commission's procedures or has questions about the electronic filing procedures is encouraged to obtain more information at http://consumers.cpuc.ca.gov/pao/ or contact the Commission's Public Advisor at 866-849-8390 or 415-703-2074 or 866-836-7825 (TYY), or send an e-mail to public.advisor@cpuc.ca.gov.

## 9. Service of Documents on Commissioners and Their Personal Advisors

Rule 1.10 requires only electronic service on any person on the official service list, other than the ALJ.

When serving documents on Commissioners or their personal advisors, whether or not they are on the official service list, parties must only provide electronic service. Parties must NOT send hard copies of documents to Commissioners or their personal advisors unless specifically instructed to do so.

## 10. Assignment of Proceeding

Michael Picker is the assigned Commissioner and Melissa K. Semcer is the assigned ALJ.

**IT IS RULED** that:

1. The scope of this proceeding is described above.

2. The schedule of this proceeding is as set forth above.

3. Evidentiary hearings are not needed in Phase 1.

4. The category of the proceeding is quasi-legislative. *Ex parte* communications are permitted.

R.18-12-005  COM/MP6/rp4

5. Notices of intent to claim intervenor compensation must be filed within 30 days of the February 19, 2019 prehearing conference.

Dated March 8, 2019, at San Francisco, California.


/s/ MICHAEL PICKER
Michael Picker
Assigned Commissioner

R.18-12-005  COM/MP6/rp4

# Appendix A

# *Rulemaking 18-12-005*
# *Phase 1 Staff Proposal*

March 7, 2019

R.18-12-005  COM/MP6/rp4

Rulemaking 18-12-005 Phase 1 Staff Proposal
March 7, 2019

The following provides staff-proposed high-level responses to each of the issues in scope of Phase 1. Parties are encouraged to respond to Staff's responses and to expand upon the answers provided as parties see fit.

1. Updates to Resolution ESRB-8:
a.      What, if any, updates or modifications should be made to Resolution ESRB-8 to ensure that, should de-energization become necessary during the 2019 wildfire season, de-energization is undertaken as efficiently and safely as possible?

Resolution ESRB mandates that investor-owned utilities (IOUs) must reasonably believe that there is an imminent and significant risk that strong winds will topple power lines onto tinder dry vegetation or will cause major vegetation-related impacts on its facilities during periods of extreme fire hazard. In order to facilitate situational awareness across public safety partners throughout California, IOUs must clearly articulate their threshold for strong wind events, as well as the conditions (humidity, fuel dryness, temperature) that define "an extreme hazard" to allow public safety partners to conduct parallel planning for potential de-energization events. Additionally, IOUs will be responsible for publishing a GIS REST service articulating the geographic boundaries of the areas subject to de-energization to public safety partners concurrent with their notifications of de-energization events. IOUs should ensure their de-energization plans provide the means for pre-designated first responders with statutory responsibility for impacted jurisdictions to request a temporary delay in de-energization events in exigent circumstances.

2.      Notification and communication to the public (including vulnerable populations), local governments, critical facilities, and emergency/first responders;
a.      What are the best ways to notify the aforementioned parties of a planned de-energization event and when power will be restored in the event of de-energization?

Consistent with the principles of the Standardized Emergency Response System (SEMS), IOUs will be responsible for contacting local public safety officials in impacted jurisdictions prior to a de-energization event and must utilize all available means to communicate a de-energization event. At a minimum, these contacts should include local and County public safety notification points whose jurisdictions include de-energized areas. These contacts must include primary 24-hour contact points, secondary contacts, and tertiary contacts.
To ensure the accuracy of these lists, IOUs will be required to update these lists annually and conduct a communication exercise prior to fire season to confirm their ability to rapidly disseminate information.  Additionally, all notifications related to de-energization events will be concurrently sent to the California Governor's Office of Emergency Services, the California Public Utilities Commission, and CALFIRE. These notifications

- 1 -

R.18-12-005 COM/MP6/rp4

should include anticipated de-energization events, de-energization events, and estimated restoration timelines.

i.     How far in advance (and in what order of priority) should the aforementioned parties be notified of an upcoming de-energization event?

Every effort must be made by the IOUs to provide notice of potential de-energization events as early as possible. At a minimum, notifications to Public Safety officials and critical infrastructure owners/operators should occur when a utility Emergency Operations Center activates (stands-up) in anticipation of a public safety power shutoff (PSPS) Response Protocol taking place, when the PSPS Response Protocol is initiated, when re-energization begins, and when re-energization is completed within a jurisdiction. Instead of creating a multi-layer notification tiering system, it is recommended that notifications be provided to public safety partners and critical infrastructure partners prior to initial customer notifications; however, the completion of these notifications should not be an impediment to providing notification to impacted populations. To the extent practical, communities disproportionately impacted by de-energization events should include additional notification streams (up to and including in person notification) in lieu of staggered alerting timelines.

Additionally, to be consistent with the California Public Alert and Warning System (CalPAWS) Plan, the following definitions will be utilized to discuss de-energization communications:

- Alert - A communication intended to draw the attention of recipients to some previously unexpected or unknown condition or event.
- Warning – A communication that encourages recipients to take immediate protective actions appropriate to some emergent hazard or threat.
- Notification – A communication intended to inform recipients of a condition or event for which contingency plans are in place.

ii.    What information should be conveyed about an upcoming de-energization event?

In order to ensure shared situational awareness, IOUs will need to provide public safety partners with the following information: total customer outages within a jurisdiction's boundaries, total number of impacted medical baseline customers within a jurisdiction's boundaries, the event triggering the de-energization, and the estimated length of the de-energization event. IOUs will be responsible for publishing a GIS REST service articulating the geographic boundaries of the areas subject to de-energization to public safety partners concurrent with their notifications of de-energization events.

iii.   Who should be responsible for notifying affected customers/populations? Should the utilities be solely responsible, or should other parties such as local governments have a responsibility in communicating these events and for notifying affected customers/populations? If not, who should be responsible for notification?

R.18-12-005 COM/MP6/rp4

The IOUs should retain the responsibility for notifying impacted jurisdictions of de-energization events; however, the California Public Alert and Warning System (CalPAWS) states that:

"People rarely act on a single warning message alone. To be effective, warnings should be delivered in various formats via various media, both to increase reliability of warning delivery and to provide a sense of corroboration that will encourage recipients to take protective actions"

In order to ensure time sensitive notifications are sent to populations potentially impacted by de-energization events, IOUs should pre-script messages templates in advance in a format that allows public safety agencies to use their official public alerting channels to amplify the message if they choose to do so. Consistent with existing best practices articulated in CalPAWS, warning messages should answer five (5) key recipient questions:

    a. Why are we at risk?
    b. Do you really mean me? (Does this affect my location or situation?)
    c. How long do I have to act?
    d. What should I do?
    e. Who says so?

iv.    What systems should be used for notification of customers (for example, the Standardized Emergency Management System framework (SEMS), reverse 9-1-1, etc.)? In order to be effective, warnings should be delivered in multiple formats across several media channels, both to increase the potential a message successfully reaches an impacted population and to provide a sense of corroboration that will encourage individuals to take protective actions. These customer notifications should include, but are not limited to, telephonic notification, text message notification, social media advisories, emails, and messages to agencies that service disadvantaged communities within an impacted area to allow them to amplify any pertinent warnings. Although mandating public safety partners provide notifications to impacted jurisdictions in advance of a de-energization event is outside the scope of this proceeding, IOUs should develop messages that allow public safety partners to utilize their official notification tools at their discretion.

b.    How should 'vulnerable populations' be defined and identified?

For the purposes of de-energization, "vulnerable populations" should address those individuals who are or have:
- Physical, developmental or intellectual disabilities
- Chronic conditions or injuries
- Limited English proficiency
- Elderly
- Children

R.18-12-005 COM/MP6/rp4

- Low income, homeless and/or transportation disadvantaged (i.e., dependent on
- public transit)
- Pregnant women

i.      Is a list of Medical Baseline customers sufficient, and if not, how should the
utilities identify vulnerable populations?

Although medical baseline customers do not represent the breadth and scope of those
who represented by vulnerable populations, the use of this population is the best available
proxy prior for the 2019 fire season. To augment the limitations on this methodology,
IOUs should reach out to organizations with the ability to reach out to these communities,
including (but not limited to): local Independent Living Centers, Regional Centers,
paratransit providers, and other resource providers. Additionally, potential augmentation
efforts to more fully address methods to identify and alert vulnerable populations should
be addressed in Phase II of this rulemaking.

c.      How should critical facilities be defined and identified?

For the purposes of de-energization events, critical facilities should include the following:
- Police Stations
- Fire Stations,
- Emergency Operations Centers
- Medical facilities, including hospitals, skilled nursing facilities, nursing homes,
  blood banks, and health care facilities
- Schools and day care centers
- Public and private utility facilities vital to maintaining or restoring normal services
- Drinking water and wastewater treatment plants
- Communication carrier infrastructure including selective routers, central offices,
  head ends, cellular switches, remote terminals, and cell sites.

d.      How should first responders/emergency responders be defined and identified?
The term "first responder" refers to those individuals who in the early stages of an
incident are responsible for the protection and preservation of life, property, evidence,
and the environment, including emergency response providers. The term "emergency
response providers" includes federal, state, and local governmental and nongovernmental
public safety, fire, law enforcement, emergency response, emergency medical services
providers (including hospital emergency facilities), and related personnel, agencies, and
authorities.

i.      Should water utilities and communication companies be defined as first
responders?

R.18-12-005  COM/MP6/rp4

Public Utilities Code Section 8386 (c) (6) states that Communications infrastructure providers should receive priority notification of planned de-energization events.
[1] For purposes of notification, water and communication companies should be prioritized; however, this should not include designation as first responders.

3.      What structures and practices should be in place to maximize coordination between utilities and first responders/local governments?

In order to ensure situational awareness in a format compatible with state-of-the-art public safety systems, IOUs should provide geospatial REST services in a format that can be readily accessed and that provides a near real time overview. Additionally, IOUs should provide Shapefiles/KMZ files to public safety partners  and critical infrastructure providers that geospatially represent historic de-energization boundaries and any available probabilistic models of de-energization events.

a.      Should the utilities be required to embed representatives (who are empowered to make decisions on behalf of the utility) in emergency response team operations centers carried out under state and local plans consistent with SEMS?

Yes; in order to ensure that public safety partners are able to address the full range of impacts that may stem from a de-energization event, IOUs who have initiated a de-energization plan should assign a liaison officer to the Emergency Operations Center (EOC) that has been activated to respond to a de-energization event. These liaison officers must be enabled to provide rapid and accurate information from the IOUs and should be in frequent communication with an IOU's operational center.

4.      What information should be provided to the Commission after a de-energization event to show that de-energization was used as a method of last resort?

In the reporting required by ESRB-8 following power restoration, the IOUs should provide information including, but not limited to, an event timeline, decision criteria leading to a de-energization (including an evaluation of alternative actions), all notifications and timing, impacted area, and lessons learned. In addition, the IOUs should explain how the public benefit of the de-energization event outweighed any potential public safety risks.

5.      What additional provisions or protocols are necessary if de-energization of transmission lines becomes necessary?

---

[1] Joint Party Comments on OIR, pp. 3-4.

R.18-12-005  COM/MP6/rp4

As opposed to providing provisions or protocols that differ based on impacted
infrastructure (transmission versus distribution), it is recommend that the IOUs shape
their protocols based on the impacts to populations across impacted jurisdictions. In the
case of transmission line de-energization events, this may require additional coordination
with CalOES's State Operations Center.

# EXHIBIT 2






# CPUC ACTIONS ON SB901 & WILDFIRES

**Dec. 2017** – Updated line inspection and vegetation management requirements; new statewide fire maps.

**Jul. 12, 2018** – Stronger utility public notice requirements for de-energization.

**Oct. 25, 2018** – Expedited proceeding on electric utility Wildfire Mitigation Plans.

**Nov. 29, 2018** – CPUC orders PG&E to implement all safety recommendations of CPUC staff as outlined in report by independent third-party.

**Dec. 13, 2018** – New proceeding to examine conditions for de-energization and to ensure that electric utilities coordinate with state and local first responders. Proceeding also seeks to mitigate de-energization impacts on vulnerable populations.

**Dec. 21, 2018** - New phase of PG&E Safety Culture proceeding to examine the utility's corporate governance, management, and structure.

**Jan. 10, 2019** - Rulemaking to address cost recovery for wildfire-related expenses by formulating "stress test" that can be applied to electric utilities.

**Jan. 10, 2019** - CPUC authorizes Southern California Edison to track wildfire prevention costs for 2018 and until CPUC decision on the utility's Grid Safety and Resiliency Program application is final later in 2019.

**Jan. 10, 2019** - Rulemaking requiring electric utilities to identify equipment that may need special protection and measures to reduce identified risks and threats.

**Jan. 30, 2019** – CPUC approves hiring an independent evaluator to review Wildfire Mitigation Plans, overall compliance with legislation and all other rules, orders and decisions on wildfire risks.

**Feb. 6, 2019** – Utility Wildfire Mitigation Plans filed and posted to CPUC website.

**Feb. 13, 2019** – Public workshop on utilities' Wildfire Mitigation Plans.

**Feb. 26-27, 2019** – Public technical workshops on Wildfire Mitigation Plans.

**Mar. 20-21, 2019** - CPUC co-hosts Wildfire Technology Innovation Summit in Sacramento.

**May 2019** - Target for CPUC approval of Wildfire Mitigation Plans, with ongoing review to ensure compliance.

# CPUC ACTIONS ON SB901 & WILDFIRES

## 2018

### July
**Public notice requirements for de-energization**

Resolution ESRB 8

### October
**Expedited proceeding on Wildfire Mitigation Plans**

SB901 Sec. 38/8386 PUC

### November
**CPUC orders PG&E to adopt safety culture recommendations; other utilities added later**

I-15-08-019 & SB901 Sec. 40/8386.2

### December
**De-energization workshops**

### December
**Rulemaking on PG&E governance, management, and structure; utility "stress tests"**

SB901 Sec. 40/8386.2 & Sec. 27/PUC 451.2

## 2019

### January
**Independent evaluator for Wildfire Mitigation Plans**

SB901 Sec. 40/8386.2

### February 6
**Wildfire Mitigation Plans filed and posted on CPUC website**

SB901 Sec. 38/8386

### February 13
**Public workshop on Wildfire Mitigation Plans**

SB901 Sec. 38/8386

### February 26 & 27
**Technical workshops on Wildfire Mitigation Plans**

SB901 Sec. 38/8386

### March 20 & 21
**CPUC & OES host statewide Wildfire Technology Innovation Summit**

### May
**Target for CPUC approval of Wildfire Mitigation Plans, with penalties for non-compliance**

SB901 Sec. 39/8386.1