Dario de Ghetaldi – Bar No. 126782
Amanda L. Riddle – Bar No. 215221
Steven M. Berki – Bar No. 245426
Sumble Manzoor – Bar No. 301704
**COREY, LUZAICH,
DE GHETALDI & RIDDLE LLP**
700 El Camino Real
P.O. Box 669
Millbrae, CA 94030-0669
Telephone: (650) 871-5666
Facsimile: (650) 871-4144
deg@coreylaw.com
alr@coreylaw.com
smb@coreylaw.com
sm@coreylaw.com

Attorneys for Victims of the
2015 Fresno Sheriff's Gun Range Explosion,
2015 Butte Fire, 2017 North Bay Fires, and the
2018 Camp Fire

RECEIVED

MAR 22 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>　　　　Defendant. | No. C 14-00175-WHA<br><br>**VICTIMS' RESPONSE TO SECOND ORDER TO SHOW CAUSE WHY PG&E'S CONDITIONS OF PROBATION SHOULD NOT BE MODIFIED (DOC. # 1027)**<br><br>**Date:  April 2, 2019**<br>**Time:  8:00 a.m.**<br>**Judge:  Hon. William H. Alsup** |

1

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................4

II.    STATEMENT OF FACTS AND ISSUES ...........................................................5

       A.    PG&E GAS OPERATIONS ......................................................................5

             1.    2015 Fresno Sheriff's Gun Range Explosion ................................5

             2.    2016 Appelbaum Whistleblower Complaint ..................................9

             3.    2012-2017 – Falsification of Pipeline Locate and Mark Records ...............11

             4.    February 2019 – Geary Boulevard Gas Explosion ......................13

             5.    July 2017 – Settlement of the Derivative Lawsuit Following the 2010
                   San Bruno Pipeline Explosion ....................................................14

       B.    PG&E'S DELIBERATE ENDANGERMENT OF PUBLIC SAFETY LED
             TO THE CAMP FIRE ..............................................................................15

             1.    The Camp Fire Could Have Been Avoided ..................................15

             2.    December 2012 – Collapse of Five Towers on the Caribou-Palermo
                   Line .............................................................................................15

             3.    February 2014 – Risk Informed Budget Allocation ("RIBA") Status
                   Report on the Caribou-Palermo Line ..........................................16

             4.    November 2016 – J-Hook Failure on the Caribou-Palermo Line...............16

             5.    November 2018 – Failure of a J-Hook Causes the Camp Fire ....................18

             6.    2012 – Bonneville Power Authority and New York State Asset
                   Management Strategies..............................................................21

III.   CONCLUSION....................................................................................................22

1

# TABLE OF AUTHORITIES

2

## *Cases*

3

*United States v. Luis*, 765 F.3d 1061 (9th Cir. 2014)     24

*United States v. Thomsen*, 830 F.3d 1049 (9th Cir. 2016)     24

4

5

6

## *Statutes*

7

18 U.S.C. § 3553(a)(1) ............................................................................................................ 4

18 U.S.C. § 3553(a)(2) ............................................................................................................ 4

18 U.S.C. § 3563(b)(12) ........................................................................................................ 23

18 U.S.C. § 3663A ................................................................................................................. 23

18 U.S.C. § 3663A(a)(1) ........................................................................................................ 23

18 U.S.C. § 3663A(a)(2) ........................................................................................................ 23

18 U.S.C. § 3663A(c)(1) ........................................................................................................ 23

49 C.F.R § 192.614 ............................................................................................................... 11

49 U.S.C. § 60123 ................................................................................................................. 12

California Government Code § 4216 ............................................................................ 9, 11, 12, 13

California Public Utilities Code § 451 .................................................................................... 13

8

9

10

11

12

13

14

15

16

17

18

19

20

## *Rules*

21

49 C.F.R. § 192, *et seq.* ....................................................................................................... 8, 9

49 C.F.R. § 192.327 ................................................................................................................ 4

49 C.F.R. § 192.605(a) ............................................................................................................ 9

49 C.F.R. § 192.705 ................................................................................................................ 5

22

23

24

25

26

## *Other Authorities*

27

Commission General Order 112-F ......................................................................................... 10

28

1  **I.     INTRODUCTION**

2          The Court has requested the parties comment on "the extent to which the offender's conditions

3  of probation should be modified to protect the public from further crimes and to help rehabilitate the

4  offender. 18 U.S.C. §§ 3553(a)(1), (a)(2)."

5          The following comments are made on behalf of the following Victims:

6          • approximately 1,454 victims of the 2018 Camp Fire, including the families of 15 people

7             who died in the fire;

8          • 292 victims of the 2017 North Bay Firestorm, including the family of one person who

9             died who died in the Cascade Fire;

10         • 261 victims of the 2015 Butte Fire, including the family of one person who died in the

11            fire; and

12         • a severely burned victim of the 2015 Fresno Sheriff's Gun Range Explosion.

13  (See Declaration of Dario de Ghetaldi ("de Ghetaldi Decl."), ¶ 2, Ex. 1, for a list of these Victims.)

14         These Victims fully support imposition of each of the further conditions the Court is

15  considering and greatly appreciate the Court affording them the opportunity to make their additional

16  views known. As more fully set forth below, these Victims wish to inform the Court of additional

17  serious problems in Defendants' gas operations that include errors in mapping transmission lines,

18  widespread falsification of "locate and mark" records, suppression of public safety concerns, and the

19  effect of Defendants' bankruptcy filings on the enforcement of corporate governance therapeutics and

20  gas operations therapeutics imposed by the San Mateo County Superior Court in a stipulated judgment.

21  Additionally, evidence developed in the Camp Fire cases shows that as early as 2014 PG&E knew that

22  the towers on the Caribou-Palermo 115 kV transmission line – the line responsible for starting the

23  November 2018 Camp Fire – had a "high" likelihood of failure, and as early as 2016 PG&E knew that

24  the "J-hooks" on the Caribou were subject to corrosion and subject to failure where only 20% of the

25  hook had been compromised. Finally, despite PG&E's claims of being a "world-class" operation, it

26  lacks a program like those implemented in 2012 by the Bonneville Power Authority and the State of

27  New York that inventories the components of its electric system, assigns a useful life to those

28  components, and schedules replacement of those components as they near the end of their useful lives.

1    Finally, these Victims will respectfully offer suggestions for additional conditions of probation
2  for the Court to consider imposing.

3  **II.     STATEMENT OF FACTS AND ISSUES**

4       **A.     PG&E GAS OPERATIONS**

5            **1.     2015 Fresno Sheriff's Gun Range Explosion**

6       PG&E's Line 118B ("Line 118B" or the "Pipeline") is a highly pressurized 12-inch natural gas
7  transmission line that supplies gas to an electricity generation plant in Chowchilla, and travels through
8  the Fresno County Sheriff's gun firing range located just east of Highway 99 and just south of the San
9  Joaquin River (the "Gun Range"). The Gun Range has occupied the property for over 50 years, with
10 over 30 law enforcement agencies using the facility regularly, and, until recent years, was open to
11 public use.

12      Line 118B was installed in 1962, with the Gun Range being constructed shortly thereafter. The
13 Pipeline runs east to west along the high bluff bordering the south end of the Gun Range, before taking
14 a 90 degree turn at the west end to travel north down the slope of the bluff toward and then directly
15 along the western side of the western-most shooting range on the property.

16      The Gun Range has six corridors or ranges separated by cinder block walls running from north
17 to south. When Sheriff's officers and other law enforcement officers use the Gun Range, they fire
18 their weapons in these ranges toward a sand-covered berm that runs east to west along the south end
19 of the range at the foot of the bluff. There is an access bench road that runs along the top of the berm
20 that is used to place additional sand on the berm as needed. Over the years, soil and other debris
21 sloughed off the high bluff down onto the bench road, limiting its use and almost blocking the access
22 ramp at the west end of the road.

23      On April 17, 2015, Ismael Arreazola was performing work in his capacity as a heavy
24 equipment operator for the County of Fresno Public Works and Planning Department. As directed by
25 his supervisor in Public Works, Mr. Arreazola was operating a front loader to scrape dirt off the access
26 road. A front loader is similar to a backhoe but has no arm for digging holes. Unlike a backhoe, a
27 front loader's bucket cannot dig more than 3-4 inches below the level of its wheels.

28

1    Line 118B exploded when the blade of the front loader struck the pipe that was buried mere
2  inches below the surface of the road.  The initial explosion propelled dirt and debris at the front loader,
3  shattering its windshield, and propelling it off the ground to where it landed several feet away as shown
4  in the following photograph.



20    A second explosion occurred with the ignition of the gas in the line, resulting in a fireball.  Mr.
21  Arreazola narrowly escaped the front-loader, but not without suffering serious burns to 40% of his
22  body.  At the time, inmates from the Fresno County Jail were detailed to pick up brass casings from
23  spent bullets at the range.  One of the inmates was killed by the explosions and twelve others were
24  injured.  The explosion and fire generated heat that was so intense that it warped the tracks of the
25  Union Pacific Railroad line that runs between Highway 99 and the western border of the gun range.[1]

27  _____
   [1]  Lawsuits filed by Mr. Arreazola, the inmates, and Union Pacific against the County and PG&E were
28  stayed while the California Workers Compensation Board determined whether the inmates were
   statutory employees of Fresno County at the time of the explosion.  At the time PG&E filed for

At the time of the explosion, Line 118B was pressurized at a minimum level of 370 pounds per square inch ("psi.") It took PG&E almost one hour to shut off the flow of gas that was feeding the flames, inhibiting with first responders' ability to control and extinguish the fire. Even though 49 C.F.R. § 192.327 required a minimum of 30-36 inches of cover over Line 118B, it had virtually no cover where it passed under the south side of the bench road at the point where it exploded under Plaintiff's work vehicle. Under the supervision of the CPUC, PG&E's retained engineering expert examined the site and the pipe and determined that Line 118B had "minimal depth of cover" at the point of failure. The following photograph looking westward along the bench road gives a good perspective on how shallow the cover over the pipeline was as it passed under the bench road.



In the early 1960's, PG&E helped construct the Gun Range and knew for over 50 years that the property under which Line 118B ran operated as a highly populated gun range. PG&E knew that the Pipeline runs immediately adjacent to the Union Pacific Railroad company tracks, on which passenger and freight trains travel many times a day, and also runs adjacent to Highway 99, an active

bankruptcy protection the Workers Compensation Appeals Board still had that issue under consideration.

7

1   freeway.  PG&E was further aware that the California High Speed Rail Authority was in the process

2   of planning the installation of high-speed rail tracks in between the Union Pacific tracks and the Gun

3   Range.  In addition, PG&E knew that Line 118B ran along the top of the bluff – in some places just at

4   its edge – that was subject to erosion and was improperly secured at the top and bottom of the bluff.

5        The map of Line 118B appearing on PG&E's website still – even four years later – does not

6   accurately depict the location of the Pipeline, incorrectly showing it running only part way across the

7   bluff, then down the bluff, and then angling through the center of the gun range approximately 200

8   feet to the east of its actual location.  The following map is an enlargement from PG&E's 2019 website

9   showing PG&E's mapping of Line 118B in blue, the line's actual location in red, and the explosion

10  site as a yellow star:



27       PG&E had numerous opportunities and public safety reasons – as well as a clear obligation

28  under 49 C.F.R. § 192.705 – to patrol Line 118B at the Gun Range "for indications of leaks,

1  construction activity, and other factors affecting safety and operation" at least once every calendar
2  year. Had PG&E done so it would or should have known that the pipe was not buried to the appropriate
3  depth, or even close to the same.

### 2.   2016 Appelbaum Whistleblower Complaint

5       In February 2013, PG&E hired David Appelbaum as Manager of Damage Prevention and
6  Pipeline Integrity in its Gas Operations Division. In April 2015, Mr. Appelbaum's team was assigned
7  to investigate the explosion at the Gun Range. PG&E terminated Mr. Appelbaum effective September
8  17, 2015, after intense disagreements between him and his superiors over:  (1) Appelbaum's
9  expressions of PG&E's culpability in the Gun Range explosion; (2) his insistence that PG&E mitigate
10 threats posed by gas transmission lines running under four other gun ranges; (3) his disclosure of
11 internal PG&E materials to the CPUC during an audit relating to inaccuracies in "mis-mark" and late
12 ticket data; and (4) his having informed PG&E's regulatory group in September 2015 that he was
13 prepared to testify before the CPUC that he agreed with the CPUC's assertion that PG&E was not a
14 safe company.[2]

15      On September 8, 2016, Appelbaum filed a whistleblower complaint for wrongful termination
16 against PG&E.[3]  In his complaint, Appelbaum alleged the following:

17  - In In 2014, he and his immediate supervisor were asked to work with California State
18    Senator Jerry Hill on Senate Bill 119, which was introduced to improve excavation safety
      by amending several sections of California Government Code § 4216 to include an
19    enforcement mechanism.

20  - "Dig-ins" are damages to underground pipelines resulting from excavation.  In 2014 and
      2015, Appelbaum developed a Dig- in Reduction Team ("DiRT") to reduce the number of
21    dig-ins in PG&E's system and provide competent investigations on dig-ins that occur.
      When a dig-in occurs the cause of it is almost always one of two entities: the excavator
22    doing the digging or the utility which owns and is responsible for locating the underground
      pipeline. When it is the fault of the excavators the root cause typically includes not making
23    an 811 call, digging outside the delineated area, or using mechanized equipment too close
      to the pipeline. When it is the fault of the utility, reasons often include: mismarking the
24    location of the pipeline, not marking the location of the pipeline, maps containing
      incomplete or incorrect data, or not responding to an 811 call on time. When DiRT was
25    created it was organized to be independent of any of PG&E groups that could be

26 [2]  "Mis-marks" are location marks made by PG&E personnel that are more than 24 inches from a
27 pipe's actual location.  "Late tickets" are pipe locates completed more than 2 work days from
   generation.  Both are violations of California Government Code § 4216.
28 [3]  *Appelbaum v. Pacific Gas and Electric Company*, San Francisco County Superior Court case no.
   CGC-16-554142.  (de Ghetaldi Decl., ¶3, Ex. 2.)

responsible for utility at fault at dig-ins. This independence gave DiRT credibility with contractors and excavators.

- Soon after the Gun Range Explosion and as instructed, Applebaum's DiRT team started assembling the documentation necessary to support a lawsuit against Fresno County.

- Appelbaum had a conversation with John Higgins, Senior Director of Gas Operations Field Delivery for PG&E, and pointed out that although Fresno County did not have an 811 ticket, PG&E may want to be careful going on the offensive. Plaintiff reminded Higgins that the gas transmission line that was hit sat in a berm that was part of a gun range. In addition, the gun range had a downrange berm that catches bullets. This berm also contained a PG&E high-pressure natural gas line. During this conversation, Appelbaum mentioned that he heard there were four other gun ranges in their service territory that contain PG&E gas assets. Appelbaum asked Higgins if PG&E was going to take steps to mitigate those threats. Higgins said there was no threat. Appelbaum replied, "John when I started here you told me my job was to 'make us do it right.' I think the right answer is to evaluate the condition of these other gun ranges." Higgins replied, "what else you got?"

- Appelbaum went on to tell him that Government Code § 4216.2 (a)(1) requires an 811 call if the dig site is known, or reasonably known, to contain a sub-surface installation. Higgins replied, "so." Appelbaum responded that most people including himself would not reasonably assume a gas company would install a transmission gas pipeline, above grade in a berm, which apparent sole purpose is to catch gunfire.

- In addition, Appelbaum told Higgins that although there was a pipe line marker in the area of the explosion, it was riddled with bullet holes. PG&E markers do not look like the majority of the Country's markers for gas and oil pipelines, so if a reasonable person would not assume there exists a subsurface installation, the 811 call would not be required. Higgins asked Appelbaum if he had this conversation with anyone else. Appelbaum replied no. Higgins told Appelbaum that Nick Stavropoulos, executive VP, "wants to sue Fresno County and you need to keep your mouth shut."

- In early June 2015, senior PG&E leadership had discussions about where to re-organize Appelbaum's DiRT team. Appelbaum stated his position that his team should be aligned under Integrity Management to eliminate any perceived conflict of interest by not working in a group that could attempt to exert influence on an investigation.

- Instead, the DiRT team was placed under Joel Dickson, Director of Gas Compliance, which had responsibility for the Locate and Mark group that was responsible for timely responding to 811 calls, and properly locating and marking underground PG&E assets among other things. Within a couple of weeks of this realignment DiRT investigators who reported to Appelbaum started complaining that personnel from Locate and Mark were trying to influence their investigations. Appelbaum brought these concerns to the attention of John Higgins and Joel Dickson. Dickson told Appelbaum that the DiRT team members are not neutral investigators, they are PG&E contractors and PG&E pays for them. Plaintiff responded that this discredits his entire DiRT team. Dickson pointed at Appelbaum and said, "remember which team you play for."

- In June 2015 the CPUC conducted a weeklong damage prevention audit of PG&E. Appelbaum was present to represent the pro-active efforts PG&E was making to mitigate dig-ins. During the audit and in direct response to a request, Plaintiff presented a draft of the monthly Keys report, a monthly report to senior leadership on the state of health in Gas Operations. Among other things the report had data on the Locate and Mark group that identified mis-mark data and late tickets.

1     •   Shortly thereafter Appelbaum received a call from Dickson who was upset that Appelbaum
2         shared the Keys report with the CPUC, specifically the information indicating data on
        Locate and Mark which was Dickson's area of accountability. Appelbaum replied that this
        information is a matter of public concern and that to his knowledge PG&E wanted to be
3         more transparent with the sharing of information. Dickson replied "let them ask for it,
        don't volunteer it." Dickson then told Appelbaum, "Just keep your mouth shut."

4 (de Ghetaldi Decl., ¶ 3, Ex. 2, at ¶¶ 20-30.)

5       The Appelbaum case settled in late 2018 and on December 21, 2018, the Superior Court

6 granted PG&E's motion to seal records relating to the settlement agreement. (de Ghetaldi Decl., ¶ 4

7 Ex. 3.) Counsel for Mr. Arreazola was in the process of investigating the allegations of Mr.

8 Appelbaum's complaint against PG&E and the December 27, 2018, SED Report (see § II.A.3 below)

9 when PG&E filed for bankruptcy protection under Chapter 11.

10           **3.    2012-2017 – Falsification of Pipeline Locate and Mark Records**

11       Beginning in 2016, the Safety & Enforcement Division ("SED") of the CPUC learned that

12 PG&E had possibly falsified its records related to its compliance with the Damage Prevention Program

13 required under 49 CFR § 192.614, and the SED initiated a preliminary investigation into the

14 Operations and Practices of PG&E's Damage Prevention and Locate and Mark Programs. On

15 December 14, 2018, the SED issued an "Investigative Report on Operations and Practices of PG&E's

16 Damage Prevention and Locate and Mark Programs" ("SED Report")[4] in which it concluded:

17           "In conclusion, SED believes that between 2009 and 2017, PG&E has
18       committed numerous and serious violations of 49 CFR §§ 192 *et seq*., California
      Government Code § 4216, and PG&E's own procedures adopted in compliance with
      the federal and state regulations. As illustrated in Sections VI through X the practice
19       of falsifying its safety records to conceal violations of the excavation law was evident.
      It resulted in complete breakdown in PG&E's compliance with damage prevention
20       regulations and procedures. SED's preliminary investigation has demonstrated;

21       •   "instances of falsification of safety records,

22       •   "certain leaders' knowledge about PG&E's falsification of safety records,

23       •   "failure to eliminate the practice of falsification even though it was reported
24          repeatedly since 2009,

25       •   "instances of under-reporting the number of violations of the excavation
         requirement internally and to SED.

26       "All of this collectively resulted in over tens of thousands separate and distinct
27       violations of the excavation law and damage prevention regulations.

28   

---

[4] ftp://ftp.cpuc.ca.gov/Safety/news/I1812007SEDInvestigativeReport.pdf

1

2        "A. Results of Preliminary Investigation

3        "SED found PG&E's act of falsifying safety records to conceal violation of the
         excavation requirements (California Government Code § 4216) to be evident. This
         resulted in a prolonged period of PG&E undercounting its late tickets. SED's earliest
4        inquiry of late tickets data was made on June 8, 2016. PG&E notified SED, on August
         4, 2017, that it was identifying an independent third-party firm to conduct an
5        investigation on under-counting late tickets issue. [Footnote omitted.] PG&E provided
         SED, on May 2, 2018, with the result of Guidepost's investigation and new late tickets
6        count by Bates White.

7        "B. SED Recommendations

8        "SED recommends that the Commission view PG&E's damage prevention
         problem regarding its locating and marking as serious and unacceptable. The problems
9        presented significant risks to the public and went unreported for many years even
         though PG&E was aware that its system did not properly record late tickets at least as
10       early as 2009 and continued to report to its leaders repeatedly about this issue.

11       "In his Examination Under Oath, [redacted], repeated a number of times that
         his focus is on dig-in rate when SED sought information about PG&E's late tickets.
12       [Footnote omitted.] He was informed about the late tickets issue directly by [redacted]
         Quality Assurance staffs, and he was also provided with examples of late tickets that
13       were improperly recorded as on-time. He asked [redacted], to meet with the Quality
         Assurance staffs. However, he did not follow up with the [redacted] about the late
14       tickets issue. [Footnote omitted.] [redacted] was [redacted].

15       "Further SED notes that tens of thousands of late tickets were identified by a
         consultant hired by PG&E in each year from 2012 to 2016. Each late ticket is a
16       violation of the California Government Code § 4216 as well as PG&E's own damage
         prevention procedure, which PG&E is required to follow under 49 CFR Section
17       192.605(a). PG&E undercounted its late ticket in each of these years on the order of
         tens of thousands."

18  (SED Report, pp. 176-177; see de Ghetaldi Decl, ¶ 5.)

19       In particular, the SED's conclusion that PG&E committed "numerous and serious violations

20  of 49 CFR §§ 192 *et seq.*" would, if found to be true, support a conclusion that PG&E had violated

21  minimum federal safety standards under 49 C.F.R. § 192, *et seq.* If any such violation was found to

22  be knowing and willful, it would be a crime under 49 U.S.C. § 60123, and therefore a violation of

23  PG&E's first special condition of probation that states, "While on probation, PG&E shall not commit

24  another Federal, State, or local crime."

25       In his Examination Under Oath, Appelbaum testified consistently with the allegations in his

26  complaint.   (See Attachments to CPUC Mark and Locate Report, 12/27/2018 ("SED Report

27  Attachments"), Attachment 32, pp. SED-00502 – SED-00609; see de Ghetaldi Decl., ¶ 6.)[5] Note that

28  ────────────────
    [5] ftp://ftp.cpuc.ca.gov/Safety/news/I1812007Attachments1-67.pdf

although the currently available online version of the Attachments has names redacted, Mr. Appelbaum's testimony can be identified by its consistency with the allegations in his complaint in the San Francisco Superior Court. (See de Ghetaldi Decl., ¶ 3, Ex. 2.)

PG&E submitted two reports to the SED: (1) a report prepared by Guidepost Solutions LLC, a global compliance and investigative firm that PG&E asked to investigate locate and mark late ticket under-reporting issues and prepare an independent, non-privileged report on the causes of the under-reporting; and (2) a report prepared by Bates White LLC, an economic consulting firm that PG&E asked to determine, to the greatest extent possible based on the data available in the electronic database that PG&E uses to track its responses to USA tickets, which tickets should be properly categorized as late during the period of January 1, 2012 – February 28, 2017. (SED Report Attachments, Attachment 4, pp. SED-00048 – SED-00102.) These reports support some of the substance of the SED report if not the scope of the SED's conclusions.

Additionally, the SED briefed the monitor team at Kirkland & Ellis, LLP, on the investigation on a weekly basis, and the monitor team attended most of the interviews the SED conducted. The monitor team attended daily briefings at the end of all six interview days as well as a final briefing on March 14, 2018.

On December 14, 2018, the CPUC issued an Order Instituting Investigation ("OII") in which it stated it will investigate whether PG&E violated 49 C.F.R. §§ 192.13(c), 601-603, and 1007(c), California Public Utilities Code § 451, California Government Code § 4216, and Commission General Order 112-F. (de Ghetaldi Decl., ¶ 7, Ex. 4.) PG&E's response to the OII in which it must "identify all reasons of law and fact known to PG&E to support the possibility that the company has committed no violation of law with respect to locate and mark practices" is due on March 14, 2019. (de Ghetaldi Decl., ¶ 7, Ex. 4.) As of the date of this submission, PG&E's response is not available on line.

### 4.   February 2019 – Geary Boulevard Gas Explosion

At approximately 1:15 p.m. on February 6, 2019, a PG&E gas distribution line at the intersection of Geary Boulevard and Parker Avenue in San Francisco's Inner Richmond District exploded when struck by a crew working for Verizon. Flames shot 40 feet into the air and five buildings were damaged, but luckily nobody was injured. It took PG&E crews until 3:35 p.m. to shut

off six valves on the gas feeding the flames, or 45 minutes longer than it took to shut off the gas line feeding the 2010 San Bruno pipeline explosion. (See de Ghetaldi Decl., ¶¶ 8-9, Exs. 5 and 6.)

The distribution line could not be remotely shut down and there are conflicting accounts to explain the extraordinarily long time it took to shut off the gas. On February 6, PG&E Spokesman Blair Jones explained that PG&E workers had to painstakingly use shovels to hand-dig through asphalt paving to reach the shut-off valves buried under the street. (de Ghetaldi Decl., ¶ 8, Ex. 5.) On February 9, federal investigators said that the six valves were located at street level and were not paved over. (de Ghetaldi Decl., ¶ 9, Ex. 6.)

There are additional unanswered questions about whether PG&E properly located and marked the distribution line or whether the Verizon contractor was at fault. The NTSB investigation is focused on the length of time it took to shut off the gas. (de Ghetaldi Decl., ¶ 10, Ex. 7.)

### 5.   July 2017 – Settlement of the Derivative Lawsuit Following the 2010 San Bruno Pipeline Explosion

While the coordinated tort cases in the *PG&E "San Bruno Fires" Cases*, JCCP No. 4648, were pending several related derivative cases were filed in state and federal courts. While the tort cases were pending, the derivative cases were coordinated in *PG&E San Bruno Fires Derivative Cases*, JCCP No. 4648-C. By the end of 2013, virtually all of the tort cases had settled and challenges to the pleadings in the derivative cases began.

In March 2017, the parties in the derivative cases entered into a "Stipulation of Settlement" ("Stipulation") in which PG&E agreed to adopt extensive corporate governance therapeutics and gas operations therapeutics:

> "In consideration of the Settlement, PG&E Corporation and the Utility will implement certain corporate governance therapeutics, which the parties agree will provide substantial value to both companies and their shareholders. Both companies will work with diligence to implement these therapeutics after the Effective Date through the adoption or amendment of relevant Board committee charters, and the amendment of corporate governance guidelines, shareholder communication policies, codes of conduct and ethics, and management compensation plans, programs, and policies, as necessary and appropriate. The companies' progress in implementing and completing the therapeutics outlined in this Stipulation shall be disclosed annually in PG&E Corporation's Corporate Responsibility and Sustainability Report or another suitable report. The obligations set forth in this Stipulation shall be in effect for five years after the Effective Date."

1   (de Ghetaldi Decl., ¶ 11, Ex. 8, pp. AA0407-408.)[6]

2        In April 2017, the Coordination Trial Judge approved a preliminary settlement and in July

3   2017 entered a judgment requiring PG&E to comply with the terms of the Stipulation relating to

4   corporate governance and gas operations therapeutics for a period of five years.  (de Ghetaldi Decl.,

5   ¶¶ 12-13, Exs. 9 and 10.)  Among the specific terms is the requirement that PG&E submit quarterly

6   reports to the Superior Court and the City of San Bruno.  While those reports show that PG&E is in

7   substantial compliance with many of the terms, there are significant items that have not been

8   completed or are ongoing in nature.  (See de Ghetaldi Decl., ¶ 14, Ex. 11.)

9        PG&E's bankruptcy filings stay the Superior Court's authority to oversee and compel PG&E's

10   compliance with the terms of the stipulated judgment, an authority that was to last until 2022.

11   **B.   PG&E'S DELIBERATE ENDANGERMENT OF PUBLIC SAFETY LED TO**

12   **THE CAMP FIRE**

13        **1.   The Camp Fire Could Have Been Avoided**

14        Newly discovered evidence shows that PG&E deliberately endangered public safety by

15   intentionally failing to maintain the out dated Caribou-Palermo transmission circuit and cure safety

16   risks with the structures and J-hooks that were known for years before the Camp Fire.  Simply put, in

17   2014 PG&E knew that the towers on the Caribou-Palermo line were subject to failure that could lead

18   to a fire but chose to do nothing to repair those towers even knowing that lives and property were

19   endangered.  Compounding that failure is the fact that in 2016 PG&E knew that the J-hooks used on

20   the Caribou-Palermo line were subject to corrosion and failure but chose to do nothing to inspect and

21   replace those J-hooks as necessary.  The Camp Fire could have been avoided had PG&E inspected the

22   towers and J-hooks on the Caribou-Palermo line and replaced the J-hook that failed on Tower :27/222.

23        **2.   December 2012 – Collapse of Five Towers on the Caribou-Palermo Line**

24        In December 2012, five steel lattice transmission towers on the Caribou-Palermo line collapsed

25   like a group of dominos.  The towers were located up slope and west of Highway 70, spanning the

26   Plumas-Butte County border and approximately 5 miles northeast of Tower :27/222.  PG&E moved

27

28   [6] The full description of the therapeutics is set forth in de Ghetaldi Decl., ¶ 11, Ex. 8, at pp.
AA0408-414.)

1  the collapsed towers and "temporarily" supported the transmission lines on wood poles in early 2013

2  until they were eventually replaced with steel towers in 2016.  (de Ghetaldi Decl., ¶ 15, Ex. 12.)

3          **3.**      **February 2014 – Risk Informed Budget Allocation ("RIBA") Status**

4                    **Report on the Caribou-Palermo Line**

5        In an internal PG&E email dated February 26, 2014, attendees of an upcoming "EO RIBA" or

6  "Electric Operations Risk Informed Budget Allocation" meeting received a status update and findings

7  in advance of the meeting scheduled for the next day that included the following:

8         "Caribou Palermo: <200 score because there is no likely large environmental event (if
9         structures fail, it will be likely due to heavy rain and no wildfires are possible then).
       Also no likely public safety issue with live wires down because it is in a remote area.
       Reliability score is not that high because although the likelihood of failed structures
10         happening is high, the affected customers are likely in the order of >1K [sic]."

11  (de Ghetaldi Decl., ¶ 16, Ex. 13.)

12        Translated, the email is saying that the Caribou-Palermo line has been given a low score for

13  risk to the environment of "<200" because if it failed, it "will be likely due to heavy rain and no

14  wildfires are possible then."  "Reliability" is the measure PG&E uses to evaluate the potential of

15  equipment to cause outages and associated complaints by customers.  The email is saying that even

16  though the "likelihood of failed structures happening is high," the reliability score is "not that high"

17  (i.e., it is relatively good) because the line does not service many customers and therefore relatively

18  few complaints would ensue even if it did fail.

19        This brief paragraph shows how tragically PG&E underestimated the risk posed by the

20  Caribou-Palermo line to human life and property.

21          **4.**      **November 2016 – J-Hook Failure on the Caribou-Palermo Line**

22        According to PG&E's December 13, 2018, responses to this Court's questions, "the three-bolt

23  connector replacement work on Tower :27/222 was completed in June 2016 by the transmission

24  division of PG&E's GC group."  (Doc. # 956-1, pp. 7, 11, and 14-15.)  Those responses do not indicate

25  that the June 2016 connector replacement work on Tower :27/222 raised any red flags.  That, however,

26  changed a few months later but again PG&E failed to understand the risk that stared them in the face.

27        "J-hooks" (or "C-hooks" as they are called by some) are hangers from which insulator strings

28  or other components are hung from transmission towers.  The following photograph shows a J-hook

supporting an insulator string on the tower immediately adjacent to Tower :27/222 (the "Adjoining Tower") that is similar to the one that failed and led to the ignition of the Camp Fire.



The following photograph shows another J-hook on the Adjoining Tower. Note the corrosion, the coating that is scraped away exposing the bare metal, and the wear on the ring from which the hook is hanging.



In November 2016, PG&E's "Weekly Near Hit Report" disclosed the fact that J-hooks used on the Caribou-Palermo line towers were compromised and subject to break easily:

> "Contractor Employee was working on lattice tower 011/099 on the Caribou-Palermo 115kV line executing work of recoating tower. From working position, he reached to reposition himself grasping a piece of flat cross bracing when the 'J' hook hardward [sic] used to secure the flat bracing to the tower leg failed and broke at the 'J' part of the 'J' hook hardware. It appears as though about 20% of the thickness of the bolt had been compromised through corrosion (see attached)."

(de Ghetaldi Decl., ¶ 17, Ex. 14.)

PG&E's "Lesson Learned" from this "Field Near Hit" was not to immediately begin inspecting all J-hooks on the Caribou-Palermo line for similar signs of corrosion and wear.  Instead, it was this:

> "Crews working on these towers need to use caution when working on or near towers containing the 'J' hook hardware.  Special care to inspect the condition of the hardware prior to applying force."

(de Ghetaldi Decl., ¶ 17, Ex. 14.)

Absent from this "Lesson Learned" is any suggestion that defective J-hooks should be inspected or replaced or any concern about the public safety risk the failure of a J-hook would.

### 5.    November 2018 – Failure of a J-Hook Causes the Camp Fire

The Camp Fire started when the J-hook attaching one of the suspension insulators on Tower :27/222's jumper extension broke and allowed the uninsulated transposition jumper to dangle free and contact the jumper arm extension, causing arcing and ejecting hot pieces of metal onto the dry tinder on the ground below the tower.

Tower :27/222 is a "transposition tower" where the relative positioning of the conductors is switched from one side of the tower to the other.  The purpose of changing the relative position of the conductors is to reduce power loss across lines that can be 100 km to 150km long.  The following photograph shows the Adjoining Tower, a transposition tower of a type similar to the damaged Tower :27/222 observed by PG&E's aerial patrol.  Note how the wedge-shaped jumper arm extension on the lower left side of the tower holds a "transposition jumper" away from the tower and leads the conductor indicated by the red diamond from one side of the tower to the other, transposing the position of the "red" conductor relative to the "blue" and "yellow" conductors.



The following photo shows the upper part of Tower :27/222 on November 18, 2018.  The red arrows point to cut ends of the transposition jumper after Cal Fire removed the section that failed and took it into custody as evidence.  The orange arrows point to where the jumper arm extension was attached to Tower :27/222 before Cal Fire removed it and took it into custody as evidence.



The following photograph of the Adjacent Tower shows where the attachment of the suspension insulator to the jumper arm extension failed on Tower :27/222.



The steel lattice towers on the Caribou-Palermo 115kV line are close to 100 years old. There were clear warnings that the towers and components on the line were at the end of their useful life. Five towers similar to Tower :27/222 fell over like a string of dominos in December 2012. A February 2014 risk assessment of the Caribou-Palermo line accurately rated the "likelihood of failed structures happening" as "high" but grossly underestimated the risk of such a failure causing a wildfire and the number of people it could affect. A June 2016 project to replace "three-bolt" conductor connectors on Tower :27/222 failed to recognize any damage to the J-hooks supporting the transposition jumpers. The November 2016 "Near Hit" report showed the aged J-hooks on the Caribou-Palermo transmission towers were prone to failure.

Other than suggesting that contractors who climb the towers be cautioned not to put weight on tower components supported by a J-hook, PG&E deliberately failed to take any action to reduce the risks presented by the aging infrastructure on the Caribou-Palermo line. That failure cost 86 people their lives and thousands of people their homes.

1
2

      **6.**    **2012 – Bonneville Power Authority and New York State Asset**
               **Management Strategies**

3         After the 2010 San Bruno Gas Pipeline Explosion and Fire, Plaintiffs' counsel learned that

4   PG&E had no documents showing plans for the construction of the gas transmission line, no as-built

5   drawings, no photographs, and no invoices or material orders except for one receipt for the purchase

6   of bar soap.  Plaintiffs' counsel also learned that PG&E's system-wide gas pipeline inventory listed

7   the pipeline as "seamless" and made from stainless steel, neither of which was true.

8         History seems to have repeated itself with the Camp Fire.  Even though PG&E touts its "world

9   class" operation, it has not adopted a program to inventory the components of its electric transmission

10   infrastructure, identify the useful life of those components, and systematically replace all components

11   that have reached the end of their useful life.

12        Other electric utilities recognize the need for such a program.  For example, the Bonneville

13   Power Authority ("Bonneville" or "BPA") in Oregon and the Niagara Mohawk Power Company

14   ("Niagara") began implementing such programs years ago. (de Ghetaldi Decl., ¶¶ 18-19.)

15        Bonneville's "Steel Lines Sustain Program Asset Management Strategy" was adopted in early

16   2012. (de Ghetaldi Decl., ¶ 18, Ex. 15.)  In assessing the need for its program, Bonneville noted the

17   following in terms that would apply equally to PG&E's transmission system:

18
19
    "• Sixty percent of BPA's 10,660 circuit miles of steel lines are 40 years or older and
    many still have the original hardware in place.

20
    "• Theoretical life expectancy of the most critical active components is 40 years.

21
    "• In the period between 2005 and 2011, BPA experienced 41 outages in excess of 240
    minutes that were due to material failure.

22
23
    "• The advanced age of components is assumed to increase their likelihood of failure
    during severe weather.

24
25
    "• BPA is experiencing material failures that indicate that active components
    (connectors, insulators, dampers, spacers, airway warnings) have a finite lifespan and
    are approaching that limit; reliability and availability of the operating line will decrease
    as a result.

26
27
    "• Failing components could result in extended line outages and possibly a multiple
    line outage if a span crossing over other lines fails.

28
    "• BPA needs to be proactive in addressing these aging assets and avoid being in a
    reactive mode with regard to transmission line material failure.

1       "• Maintenance costs to repair or replace failing components in a piece meal fashion
2       will be less cost effective than a proactive and methodical component replacement
      approach."

3  (de Ghetaldi Decl., ¶ 18, Ex. 15, p. 2.)

4       Bonneville's "Sustain" program focuses on the following questions: (1) What equipment and

5  facilities are covered?; (2) What performance objectives, measures and targets should be set?; (3) What

6  is the health of the assets, and what risks must be managed?; (4) What strategies should Bonneville

7  undertake?; and (5) What will it cost?  (de Ghetaldi Decl., ¶ 18, Ex. 15, p. 3.)

8       With respect to Bonneville's 115kV lines, BPA sets the "average estimated life span" of its

9  towers at 100 years and its "insulator assemblies & associated" at 50 years.  Bonneville classifies the

10  component health of towers between 80 and 100 years old as "impaired" and the component health of

11  "insulator assemblies & associated" that are over 60 years old as "poor."  (de Ghetaldi Decl., ¶ 18, Ex.

12  15, p. 27.)  Bonneville rates the risk or "line impact" of towers and insulator assemblies as "high"

13  whatever the age.  (de Ghetaldi Decl., ¶ 18, Ex. 15, p. 26.)

14       Beginning in 2007, Niagara makes yearly reports to the State of New York Public Service

15  Commission on the condition and physical elements of its transmission and distribution systems.

16  Those reports detail how Niagara systematically sets inspection schedules, rates the conditions of its

17  infrastructure, and sets refurbishment programs and remedial actions based on those ratings.   (de

18  Ghetaldi Decl., ¶ 19, see 2012 Niagara Report at pp. 1-130.)[7]

19       There is a critical need for PG&E to undertake a comprehensive inventory of its electric system

20  infrastructure, adopt a systematic evaluation strategy, and implement a replacement program similar

21  to those employed by Bonneville and Niagara.

22 **III.   CONCLUSION**

23       From the 2010 San Bruno Gas Explosion to the 2015 Butte Fire to the 2017 North Bay Fires

24  to the 2018 Camp Fire, PG&E continues to leave a trail of devastation.  Causes of that devastation are

25  many and range from ineptitude, unnecessarily high risk tolerance, failure to properly implement well-

26  intentioned programs, recordkeeping and inventory failures, outright fraud, indifferent vegetation

27

---

28  [7] http://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId={AF7F1E52-0453-448E-A65D-556180A3CDA0}

management practices, poor training, pure arrogance, simple ignorance, missed opportunities, and repeatedly continuing to place profits before public safety.

For all of the foregoing reasons, the Victims respectfully request that the Court consider the following additional conditions of probation:

A. Require PG&E to comply with the CPUC's determination and orders relating to the December 14, 2018, OII;

B. Require PG&E to comply with the terms of the parties' Settlement and the San Mateo County Superior Court's Judgment in *PG&E "San Bruno Fires" Cases*, JCCP No. 4648;

C. Require PG&E to institute a program to inventory, assess, and replace components of its electric transmission and distribution systems that are defective or at the end of their useful life;

D. Extend the Monitor's authority to include review and recommendations relating to PG&E's electric operations;

E. Require the Monitor to attend to all Board of Directors meetings and present an oral report to the Boards;

F. Require the Monitor to make all reports submitted to PG&E's Board of Directors, the Justice Department, the Probation Office, or the Court publicly available;

G. Make all past reports of the Monitor publicly available;

H. Require additional community service under 18 U.S.C. § 3563(b)(12)  of 50 hours annually for each corporate director and officer, each member of the Safety and Nuclear Oversight Committees, the Chief Safety Officer/s, and the Chief Ethics and Compliance Officer/s to be performed in areas where PG&E equipment has caused a fire or explosion since 2015; and

I. Extend the term of probation an additional three years.

The Victims also request that the Court consider imposition of a restitution order pursuant to 18 U.S.C. § 3663A following any new conviction as provided by the Mandatory Victim Restitution Act ("MVRA") where the conviction involves (1) "an offense against property [under Title 18], including any offense committed by fraud or deceit," and (2) when there is "an identifiable victim or victims [who] suffered ... pecuniary loss." (18 U.S.C. § 3663A(a)(1)-(2), (c)(1); *United States v.*

1  *Thomsen*, 830 F.3d 1049, 1065 (9th Cir. 2016); *United States v. Luis*, 765 F.3d 1061, 1065-1066 (9th

2  Cir. 2014).  [Physical damage is not required.].)

3  DATED: March 22, 2019                          Respectfully submitted,

4                                                 COREY, LUZAICH, DE GHETALDI & RIDDLE LLP

5

6                                          By:    _____

7                                                 Dario de Ghetaldi
                                                  Attorneys for Fire Victims in the
8                                                 2015 Fresno Gas Pipeline Explosion and Fire
                                                  Cases, the 2015 Butte Fire Cases, the 2017 North
9                                                 Bay Fire Cases, and the 2018 Camp Fire Cases

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28