# EXHIBIT A

| | |
|---|---|
| STATE OF CALIFORNIA | EDMUND G. BROWN JR., *Governor* |

PUBLIC UTILITIES COMMISSION
505 VAN NESS AVENUE
SAN FRANCISCO, CA  94102-3298



March 15, 2018

<u>**Via Electronic Delivery**</u>

Kimberly D. Bose, Secretary
Federal Energy Regulatory Commission
888 First Street, N.E., Room 1A, East
Washington, D.C.  20002

Re:   *Pacific Gas and Electric Company*
      Docket No. ER16-2320-002

Dear Ms. Bose:

The California Public Utilities Commission ("CPUC") hereby submits for filing the attached "INITIAL BRIEF AND PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW OF THE CALIFORNIA PUBLIC UTILITIES COMMISSION."

Thank you for your cooperation in this matter, and please do not hesitate to contact me at (415) 703-2048 or tbo@cpuc.ca.gov if you have any questions or concerns regarding the foregoing.

Sincerely,

*/s/ Traci Bone*

Traci Bone
Staff Attorney

cc:   Hon. David H. Coffman, Presiding Administrative Law Judge
      Mr. Christopher Chaulk, Law Clerk
      Marshina Griffin, Legal Assistant
      Service List

PUBLIC VERSION – CUI/PRIV PORTIONS REDACTED

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| **Pacific Gas and Electric Company** ) | Docket Nos. | ER16-2320-000 |
| ) | | ER16-2320-002 |

INITIAL BRIEF AND PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW OF
THE CALIFORNIA PUBLIC UTILITIES COMMISSION

To: The Honorable David H. Coffman
    Presiding Administrative Law Judge

AROCLES AGUILAR
CHRISTINE J. HAMMOND
TRACI BONE
LEUWAM TESFAI

505 Van Ness Avenue
San Francisco, CA 94102
Phone: (415) 703-2048
Email: tbo@cpuc.ca.gov

Attorneys for the Public Utilities Commission
of the State of California

March 15, 2018

**PUBLIC VERSION – CUI/PRIV PORTIONS REDACTED**

**TABLE OF CONTENTS**

**Pages**

TABLE OF AUTHORITIES ...................................................................................v

STATEMENT OF THE CASE ................................................................................1

SUMMARY OF ARGUMENT ................................................................................1

I.   RATE OF RETURN ON EQUITY (ROE) ....................................................6
II.  COST OF LONG-TERM DEBT ...................................................................6
III. CAPITAL STRUCTURE ..............................................................................6
IV.  DEPRECIATION ..........................................................................................6
V.   CAPITAL ADDITIONS ................................................................................7
     A. Whether PG&E's Capital Additions Forecast Is Just And Reasonable .............................................................................................7
        1. The Evidence Shows That PG&E Builds To A Capital Additions Budget Rather Than Prioritizing The Right Projects To Be Built At The Right Time .............................................10
        2. PG&E's Unilateral "Advancement" Of Projects Not Identified In The Rate Case To Meet Its Capital Additions "Target" Is Not Just And Reasonable ..............................11
           a)  PG&E's Advancement Process Is Ad Hoc ..........................11
           b)  The Volume of Advanced Projects Is Not Just And Reasonable 12
     (1) The CPUC's Analysis ...................................................................12
     (2) PG&E's Testimony Minimizing The Volume Of Advanced Projects Is Wrong .....................................................................................................13
     (3) PG&E's Ad Hoc "Advancement" of Projects Demonstrates It Is Building To A Budget .................................................................................................18
        3. PG&E's Databases And Recordkeeping Practices Do Not Support Data-Driven Condition-Based Transmission Planning And Prioritization ........................................19
           a)  PG&E's Deficient Recordkeeping Practices Preclude The Development Of A Just And Reasonable Capital Additions Budget Or Forecast .......................................................................19
     (1) Overview of Internal PG&E Audits From 2012 to 2016 ..................20
        (a) 2012 Audit Of Underground Maintenance Processes And Controls 20

    (b)   2014 Audit Of Inspection And Maintenance Of Overhead Lines ....22
    (c)   2013 Audit of Non-Major Capital Projects .....................................25
    (d)   2016 Audit Of Substation Maintenance ..........................................30
    (e)   2016 Audits of As-Built Process and Records For Substations And Electric Transmission Lines ...............................................................................34
(2)     PG&E's Records Management Processes Have Not Significantly Improved – As Of August 2017 PG&E Had Not Set A Date For Compliance With Its Own Records Management Corporation Standard................................................36
(3)     PG&E's 2017 Asset "Strategies" Identify The Need For Data Management And Missing Asset Data ........................................................................................39
(4)     PG&E Testimony Supports The Evidence That PG&E's Prioritization Methodologies Were Ad Hoc .......................................................................45
(5)     PG&E's Systems of Record Include Deficiencies Consistent With The Audit Findings ..........................................................................................................46
   4.   Progress On Database Management Has Been Minimal Despite Spending ..................................................................................47
   5.   Where Prioritization Frameworks Existed, They Were Inadequate And Applied *Ad Hoc* ......................................................48
   6.   RIBA Did Not Inform Prioritization Of The TO18 Projects.................................................................................................54
   7.   The Evidence Shows That Operative Dates For The Forecasted Projects Are Not Relevant To PG&E..............................56
   8.   PG&E Arguments Defending Its Capital Additions Forecast Are Unpersuasive ..............................................................58
       a)   Most Of PG&E'S Reliability Improvements Are Due To Spending On PG&E's Distribution System....................................................58
       b)   Given The Absence Of Capacity Additions, PG&E's Increased TRR Is Not Justified ......................................................................59
   9.   Proposed Findings Of Fact And Conclusions Of Law Regarding PG&E's Capital Additions Forecast ..............................60
B. Whether PG&E Has Included Any Imprudent Capital Costs In The TO18 Transmission Revenue Requirement ....................................60
   1. Legal Standards Regarding Prudency...............................................65
   2. A TRR Disallowance of $73 Million Is Appropriate To Address PG&E's Unjust And Unreasonable Practice Of Self-Approving More Than 60% Of Its Capital Additions.................................................................................................68
       a)   Order 890 and the PJM Order.............................................68

      b) PG&E Has No Order 890-Compliant Planning Procedures In Place For Projects Comprising More Than Half Of Its Annual Capital Additions Costs ... 70

      c) PG&E's Claims That It Is Compliant With Order 890 Are After-The-Fact Rationalizations That Cannot Be Sustained ...................... 75

      d) PG&E's Order 890 Violations Have Resulted In A Bloated Rate Base Justifying A Significant Disallowance .................................... 77

      e) A Disallowance For PG&E's Bloated Rate Base Resulting From Its Order 890 Violations Is Appropriate ................................................ 78

   3. PG&E Has Exceeded The CPUC-Approved Maximum Just And Reasonable Cost For The Embarcadero-Potrero Project By $91.3 Million – Justifying A TRR Disallowance Of $14.8 Million And A Rate Base Reduction Of $91.3 Million As Depreciated Going Forward ........................................................................ 79

      a) CPUC Proceeding Background .......................................... 79

      b) PG&E Has Not Shown That The Embarcadero-Potrero Cost Overruns Were Prudently Incurred .................................................... 82

(1) The Evidence Shows That The CPUC-Approved Estimate Was Well-Defined And The AACE Guidelines Do Not Support PG&E's Argument . 82
(2) PG&E Fails To Provide Specific Evidence To Demonstrate The Prudency Of The Cost Overruns ................................................................... 88
(3) PG&E's "Lessons Learned" On Embarcadero-Potrero Show Extensive Project Mismanagement ................................................................. 89
(4) An PG&E Audit Performed At The Time The Project Was Being Developed Found That PG&E Was Unable To Align Project Funding With Job Estimates 91

   4. PG&E's Policy Arguments Against The CPUC's Proposed Disallowances Have No Merit .......................................... 92

   5. The CPUC's Proposed Disallowances For The Embarcadero-Potrero Cost Overruns Are Appropriate ..................... 94

   6. Proposed Findings of Fact and Conclusions of Law Regarding Prudency ........................................................... 94

 C. Other Capital Additions Issues ............................................... 94

VI. COMMON, GENERAL AND INTANGIBLE ("CGI") PLANT ............... 98

VII. OPERATION AND MAINTENANCE (O&M) EXPENSES ..................... 98

 A. WHETHER PG&E'S O&M EXPENSE FORECAST IS JUST AND REASONABLE ............................................................. 98

VIII. ADMINISTRATIVE AND GENERAL (A&G) EXPENSES ..................... 98
IX. MATERIALS AND SUPPLIES (M&S) ESCALATION RATE ................ 98
X. ALLOCATORS ............................................................................................ 98
XI. SALES FORECAST ................................................................................... 98
XII. OTHER ........................................................................................................ 99

ACRONYM APPENDIX

# TABLE OF AUTHORITIES

**PAGES**

**FEDERAL COURT DECISIONS**

*Anaheim, Riverside, Banning, Colton, & Azusa, Cal. v. FERC*,
  669 F.2d 799 (D.C. Cir. 1981) ................................................................. 61-63, 85

*West Ohio Gas Co. v. Public Utilities Comm.,* 294 U.S. 63 ...................................61

**FERC DECISIONS**

*Iroquois Gas Transmission System, L.P.*, Order on Remand and Establishing
  Hearing, 87 FERC ¶ 61,295 (1999), 1999 WL 396473 .................................. 61-63

*Minnesota Power & Light Co.*, Opinion No. 86, Opinion and Order
  on Rate Increase Filing, 11 FERC ¶ 61312 (June 24, 1980),
  1980 WL 100840 ........................................................................................ 61-62

*Monongahela Power Co.*, 156 FERC ¶ 61,134 (2016), *reh'g dismissed*,
  157 FERC ¶ 61,178 (2016) ("PJM Order to Show Cause") ...........................65, 73

*Monongahela Power Co., et al.*, 162 FERC ¶ 61,129 (2018)
  ("PJM Order") .......................................................................................65, 66, 68, 69

*Preventing Undue Discrimination and Preference in Transmission Service*,
   Order 890, 72 Fed. Reg. 12,266, (Mar. 15, 2007), FERC Stats. & Regs.
  ¶ 31,241 (2007) ("Order 890") .................................................................. *passim*

*Preventing Undue Discrimination and Preference in Transmission Service*,
  *on reh'g and clarification*, Order No. 890-A, 73 Fed. Reg. 2984
  (Jan. 16, 2008), FERC Stats. & Regs. ¶ 31,261 (2007) ("Order 890-A") ............64

*Preventing Undue Discrimination and Preference in Transmission Service*,
  *on reh'g*, Order No. 890-B, 73 Fed. Reg. 39,092 (July 8, 2008),
  123 FERC ¶ 61,299 (2008) ................................................................................64

*Preventing Undue Discrimination and Preference in Transmission Service*, *on reh'g
  and clarification*, Order No. 890-C, 74 Fed. Reg. 12,540 (Mar. 25, 2009),
  126 FERC ¶ 61,228 (2009) ................................................................................64

# TABLE OF AUTHORITIES
## (Con't)

**PAGES**

*Preventing Undue Discrimination and Preference in Transmission Service*,
  *clarified*, Order No. 890-D, 74 Fed. Reg. 61,511 (Nov. 25, 2009),
  129 FERC ¶ 61,126 (2009) ................................................................................64

*Southern Cal. Edison Co.,* 8 FERC P 61,198 (1979), 1979 WL 31572 .................63

## CPUC DECISIONS

CPUC Decision 08-12-058 at 293, Ordering Paragraph 6, *In the Matter of the
Application of San Diego Gas & Elec. Co. (U 902 e) for A Certificate of Pub.
Convenience & Necessity for the Sunrise Powerlink Transmission Project,*
A.06-08-010, 2008 WL 5426908 (Dec. 18, 2008)..................................................59

CPUC Decision 14-01-005, *In the Matter of the Application of S. California
Edison Co. (U338e) for A Certificate of Pub. Convenience & Necessity
Concerning the Tehachapi Renewable Transmission Project
(Segments 4 Through 11)*, A.07-06-031, 2014 WL 316650 (Jan.16, 2014) ...........59

CPUC Decision 14-01-007, *Decision Granting Certificate of Public Convenience and
Necessity Authorizing Construction of the Embarcadero-Potrero 230 kV Transmission
Project,* 2014 WL 316621 (January 16, 2014) ......................................................78

CPUC Decision 15-04-021*, Modified Presiding Officer's Decision Regarding
Allegations Of Violations Regarding Pacific Gas And Electric Company's
Operations And Practices With Respect To Facilities Records For Its
Natural Gas Transmission System Pipelines*
2015 WL 1687668 (April 9, 2015).................................................................4, 30

## CALIFORNIA STATUTES

Cal. Pub. Util. Code § 381.2 ......................................................................................9
Cal. Pub. Util. Code § 399.11 ....................................................................................9
Cal. Pub. Util. Code § 399.13 ....................................................................................9
Cal. Pub. Util. Code § 740.12 ....................................................................................9

PUBLIC VERSION – CUI/PRIV PORTIONS REDACTED

INITIAL BRIEF AND PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW
OF THE CALIFORNIA PUBLIC UTILITIES COMMISSION

To: **The Honorable David H. Coffman**
**Presiding Administrative Law Judge**

Pursuant to Rule 706 of the Commission's Rules of Practice and Procedure, and the March 31, 2017 Order Establishing Procedural Schedule in this case, the California Public Utilities Commission ("CPUC") submits this Initial Brief and Proposed Findings of Fact and Conclusions of Law.[1]

## STATEMENT OF THE CASE

The CPUC incorporates and accepts the Joint Statement of Procedural History and Joint Statement of Stipulated Facts previously submitted in this proceeding. The CPUC presents the testimony of one witness: Geneva Looker, Ex. PUC-0001. The CPUC testimony and Initial brief demonstrate that PG&E's capital additions forecast in not just and reasonable and that PG&E has incurred over $500 million inimprudent capital additions expenses which justify disallowances to reach a just and reasonable transmission revenue requirement.

## SUMMARY OF ARGUMENT

Over 1½ years ago, on July 29, 2016, Pacific Gas and Electric Company ("PG&E") filed its eighteenth Transmission Owner rate case ("TO18") with this

---

[1] The CPUC reserves the right to address in its Reply Brief any issue that it does not address in this Initial Brief.

**PUBLIC VERSION – CUI/PRIV PORTIONS REDACTED**

Commission seeking a $1.718 billion retail transmission revenue requirement ("TRR") to be effective on October 1, 2016, with a nominal suspension period.[2]

This TO18 rate case is unprecedented in several ways.  PG&E has one of the largest TRRs of any investor-owned public utility in the United States, representing one of the largest TO rate cases reviewed by FERC.  In addition, PG&E's TO18 filing seeks a $387 million increase over its settled TRR in its TO17 case.  In other words, PG&E's seeks a 29% increase in its 2017 TRR over its 2016 TRR.

That this case went to hearing is also unprecedented.  While litigation occurred to resolve discrete issues in PG&E's TO rate cases before 2000, the parties – many of the same ones here – have settled more than a dozen TRR requests since that time.

**PG&E's growing revenue requirement, with no significant capacity additions, and no end in sight,[3] have driven PG&E's largest transmission customers to advocate together for a significant readjustment to PG&E's revenue requirement.** PG&E's retail TRR (as settled in TO17) has increased 356% since the $292 million TRR settled in its first TO case.[4]  While significant TRR increases are expected when a utility is constructing large new transmission lines that expand the capacity of its system – this does not explain PG&E's TRR increases.  It appears that the bulk of PG&E's capital

---

[2] PG&E TO18 Application, FERC Docket No. ER16-2320, Ex. PGE-0001 at 2.

[3] Ex. PGE-0038 at 7:7-8, Gabbard Rebuttal ("PG&E expect that replacement-related capital work will continue to grow as PG&E's assets continue to age."); and *id.* at 7:16-18 ("capital investment will shift significantly, from capacity increase-related projects, to lifecycle replacement projects.").

[4] Ex. PUC-0001 at 9, Table C, Looker Direct.

additions investments have been made to repair or replace existing assets.[5]  Given the significant amounts being invested in this work – more than $802 and $696 million in capital expenditures for 2016 and 2017 respectively[6] – it is appropriate to ask whether the work is truly needed, or whether it unjustly and unreasonably burdens ratepayers with unnecessary costs.

This question is nearly impossible to answer because nearly all of this investment has been made without any review of those projects by any third party – not FERC, not the CAISO, and not the CPUC.[7]  PG&E's "self-approved" projects comprise $831.5 million (or 63%) of the capital additions proposed to be ratebased in 2016 and $612 million (or 81%) in 2017.  In comparison, the capital additions for CAISO-approved projects – which are capacity projects by definition – represent $493 million (or 37%) of the capital additions proposed to be ratebased in 2016 and $147 million (or 19%) in 2017.[8]

PG&E's lack of new capacity and the amount spent on its "self-approved" repair and replacement activities have led the CPUC to question PG&E's electric transmission repair and replacement practices.  This review has been informed by the CPUC's investigations into the root causes of the 2010 San Bruno explosion of a PG&E high

---

[5] Ex. PUC-0001 a 36, Table K, Looker Direct.

[6] Ex. PGE-0009, Table PGE-9-1, Totals less MWCs 60, 61 and 82.

[7] See Section V.B.2 below and *CPUC, et al. v. PG&E,* FERC Docket No. EL17-45 for information regarding PG&E's "self-approval" process.

[8] Ex. PGE-0028 at 61-75.

pressure gas transmission line. The CPUC found in those investigations, among other things, that PG&E mismanaged the repair and replacement of its gas transmission system for decades by engaging in poor recordkeeping practices that prevented it from properly identifying the assets that most needed the work.[9]

The ratepayers represented by the CPUC in this case will pay approximately 90% of the total TRR approved by FERC in this proceeding – which totals $1.546 billion of PG&E's current request. As outlined in Section V.A below, the evidence in this case shows similar mismanagement of PG&E's electric transmission assets. This evidence demonstrates that PG&E does not, and cannot, engage in a functional data-driven condition-based methodology to identify, rank, and pursue the most needed electric transmission projects for repair and replacement.

In addition, PG&E's own testimony explains that PG&E now engages in a practice of "advancing" projects not forecasted to go into ratebase in order to ensure PG&E meets its annual capital additions budget target.[10] As described in Section V.A.2 below,, advanced projects in this rate case total over $303 million in capital additions in this rate case, with $265 million of those capital additions not even identified in the TO18 application.

---

[9] See e.g., CPUC Decision 15-04-021, *Modified Presiding Officer's Decision Regarding Allegations Of Violations Regarding Pacific Gas And Electric Company's Operations And Practices With Respect To Facilities Records For Its Natural Gas Transmission System Pipelines* (April 9, 2015) I.11-02-016, 2015 WL 1687668.

[10] Ex. PGE-0043 at 5:13-22, Vijayraghavan Rebuttal.

The CPUC is also challenging the prudency of two aspects of PG&E's expenditures which contribute significantly to ratebase in this case. Those include over $90 million in cost-overruns associated with the Embarcadero-Potrero transmission project and PG&E's historic and on-going investment in self-approved transmission projects in violation of this Commission's Order 890.

All of the evidence shows that for PG&E, it doesn't really matter what transmission capital investments get made, whether capital projects are prudently identified, ranked and pursued, or whether ratepayers will be paying only just and reasonable rates for safe and reliable electric service. PG&E's only concern in that money gets spent and assets are placed in rate base in a predictable manner to ensure its cash flow and return to shareholders.

For all of these reasons, and others set forth below, PG&E's capital additions forecast was not reasonable when made because it is based on proposed projects that cannot be shown to be needed and PG&E's TRR is not just and reasonable because it reflects the impact of more than $500 million in imprudent investments. A significant adjustment is necessary to force PG&E to determine capital additions priorities and track its progress in meeting those priorities in a meaningful and cost effective manner so the most necessary projects are pursued in the right priority and at the right price.

The CPUC proposes the following specific adjustments herein:

- A $73 million reduction to PG&E's proposed 2017 TRR to address PG&E's unjust and unreasonable practice of self-approving more than 60% of its capital additions;

- A $475 million reduction in PG&E's ratebase as depreciated going forward to address PG&E's unjust and unreasonable practice of self-approving more than 60% of its capital additions;

- A $14.8 million reduction in PG&E's 2017 TRR to address PG&E's imprudently incurred cost overruns on the Embarcadero-Potrero project; and

- A $91.3 million reduction in PG&E's ratebase as depreciated going forward to address PG&E's imprudently incurred cost overruns on the Embarcadero-Potrero project.[11]

## ARGUMENT

**I.   RATE OF RETURN ON EQUITY (ROE)**

The CPUC elects not to address this issue at this time.

**II.   COST OF LONG-TERM DEBT**

The CPUC elects not to address this issue at this time.

**III.   CAPITAL STRUCTURE**

The CPUC elects not to address this issue at this time.

**IV.   DEPRECIATION**

The CPUC elects not to address this issue at this time.

---

[11] Ex. PUC-0001 at 28:25-29:8, Looker Direct.

## V.   CAPITAL ADDITIONS

### A.   Whether PG&E's Capital Additions Forecast Is Just And Reasonable

PG&E's capital additions forecast is not just and reasonable because, as described in Sections V.A.1 and V.A.8 below, it is expressly designed to result in spending more on capital additions than is reasonably necessary to maintain the reliability and safety of the system. This spending is reflected in PG&E's TRR, which is growing at a rapid rate. The cost of capital additions (in return on equity) comprises approximately 32% of PG&E's requested TRR in this rate case.

"At the onset of the CAISO's formation in 1997, PG&E's wholesale TRR was set at $292 million. Twenty years later, PG&E is requesting a wholesale TRR of $1.706 billion."[12] PG&E has been investing heavily in transmission assets, but "has little to show in the way of new transmission assets that provide additional capacity for the over $11.5 billion … paid by its customers during the last twenty years."[13]

FERC Form 1 filings between 2007 and 2016 show $6.2 billion invested in transmission capital additions over the last ten years. However, during that time, PG&E has built no new transmission substations,[14] and since 2012, PG&E's total miles of

---

[12] Ex. PUC-0001 at 6:12-14 and 7:1-2, Looker Direct.

[13] Ex. PUC-0001 at 10:13-17 and 9:1-2, Looker Direct.

[14] Ex. PUC-0008 at 1, Answer (a), CPUC-PGE-157, 6/1/17.

transmission lines have decreased by approximately 300 miles.[15]  This lack of capacity additions is not surprising, as the loads in PG&E's territory have been trending downward, particularly in the last few years.[16]

It appears that much of PG&E's new investment is to replace or upgrade facilities.[17]  While the CPUC recognizes that repair and replacement are necessary components of a utility's operation, the amount that PG&E has been spending on what appears primarily to be replacement of transmission facilities is staggering and potentially unjustified.  Further, the identification and development of these projects is done exclusively by PG&E – there is no regulatory or other third party reviewing PG&E's determination that these projects are needed.[18]  Thus, there is reason to be concerned that PG&E is "gold plating" the system.

Also concerning is that there is no end in sight.  PG&E's future forecasts show that the rapid rise in TRR is likely to continue unless PG&E is held to account for the choices it is making in its capital additions.  PG&E forecasts more than ▇▇▇▇▇▇ on transmission capital expenditures from 2018 to 2021.[19]

---

[15] Ex. PUC-0001 at 17:16-17, Looker Direct.

[16] Ex. PUC-0001 at 17:10-12, Looker Direct.

[17] Ex. PUC-0001 at 20:6-7, Looker Direct.

[18] Ex. PUC-0001 at 20:9-14, Looker Direct.

[19] Ex. TNC-0185 (PRIV) at 36 and 53, Electric T&D S2 Executive Discussion, 11/3-4/2016, CPUC-PGE179Atch05PRIV .

The TRR increases from such investments, compounded by declining loads, cannot be sustained in light California's other legislatively mandated energy priorities, including its Renewables Portfolio Standard ("RPS"),[20] energy efficiency,[21] and electrification of transportation[22] - all of which include costs recoverable from ratepayers. All of these programs emphasize the need for cost-effective solutions and require CPUC oversight to ensure reasonableness.[23]  For example, the RPS statute requires "[a] process that provides criteria for the rank ordering and selection of least-cost and best-fit eligible renewable energy resources to comply with the California Renewables Portfolio Standard Program obligations on a total cost and best-fit basis."[24]  The transportation electrification statute similarly requires that "[p]rograms proposed by electrical corporations shall seek to minimize overall costs and maximize overall benefits."[25]

It is time for PG&E's transmission investment to be held to a similar standard, and for PG&E to be accountable for the imprudent expenditures it has incurred and the unjust and unreasonable transmission planning practices it has employed for at least a decade.

---

[20] Cal. Pub. Util. Code § 399.11 (requiring an RPS of 33% by 2020 and 50% by 2030).

[21] Cal. Pub. Util. Code § 381.2 (energy efficiency).

[22] Cal. Pub. Util. Code § 740.12 (transportation electrification).

[23] Cal. Pub. Util. Code § 399.11(e)(1) ("the commission shall ensure rates are just and reasonable, and are not significantly affected by the procurement requirements of this article."); Cal. Pub. Util. Code § 381.2(b) ("Electrical corporations and gas corporations shall be permitted to recover in rates the reasonable costs of these programs."); and Cal. Pub. Util. Code § 740.12(b) ("The commission shall approve, or modify and approve, programs and investments in transportation electrification, including those that deploy charging infrastructure, via a reasonable cost recovery mechanism.").

[24] Cal. Pub. Util. Code § 399.13(a)(4)(A) (renewable energy procurement).

[25] Cal. Pub. Util. Code § 740.12(c) (transportation electrification).