RECEIVED

AUG – 5 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

FILED

AUG – 5 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  Michael J. Aguirre, Esq., SBN 060402
   Maria C. Severson, Esq., SBN 173967
2  AGUIRRE & SEVERSON, LLP
   501 West Broadway, Suite 1050
3  San Diego, CA 92101
   Telephone: (619) 876-5364
4  Facsimile: (619) 876-5368

5  Attorneys for Plaintiffs Alex Cannara
   and Gene A. Nelson in
6  Case No. 3:19-cv-04171-JCS

7

8              UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,          Case No. CR 14-00175 WHA

12                    Plaintiff,        **Related Case:**
                                        Case No. 3:19-cv-04171-JCS
13         v.

14  PACIFIC GAS AND ELECTRIC           **DECLARATION OF
    COMPANY,                           MICHAEL J. AGUIRRE IN SUPPORT
15                                      OF ADMINISTRATIVE MOTION
                      Defendant.        PURSUANT TO CIVIL L.R. 7-11 TO
16                                      CONSIDER WHETHER CASES
                                        SHOULD BE RELATED UNDER
17                                      CIVIL L.R. 3-12**

18

19

20

21

22

23

24

25

26

27

28

                                 1

1   I, Michael J. Aguirre, declare:

2       I am a partner at the law firm of Aguirre & Severson, LLP, counsel of record

3   for Plaintiffs in *Canarra et al. v. Nemeth et al.* ("Related Case"), Case No. 3:19-cv-

4   04171-JCS. I am an attorney duly licensed to practice before all the courts of the

5   State of California and before the United States District Court for the Northern

6   District of California. If called to testify as to the following, I could do so from my

7   own personal knowledge.

8       1.   Plaintiffs in the above-identified Related Case filed the Complaint

9   initiating the action on July 19, 2019. Attached as Exhibit 1 is a true and correct

10  copy of the Complaint initiating the action.

11      2.   The Clerk of the Northern District of California issued a Summons for

12  the case on July 19, 2019, on the same day the Complaint initiating the above-

13  identified Related Case designated Exhibit 1 was filed.

14      3.   Defendants/Respondents in the above-identified Related Case were

15  served with the Complaint and Summons on July 25, 2019.

16      4.   No Defendant/Respondent in that case has yet entered an appearance.

17      5.   Because the Defendants/Respondents in the above-identified Related

18  Case have not yet entered an appearance, a stipulation cannot be obtained from

19  them pursuant to Civil L.R. 7-12.

20      6.   On August 2, 2019, I accessed the California Secretary of State Cal-

21  Access Campaign Finance Database entry for Pacific Gas & Electric Corporation

22  (PG&E) for the 2017 to 2018 election cycle. PG&E's Cal-Access Campaign

23  Finance Database entry may be accessed at the following link: http://cal-

24  access.sos.ca.gov/Campaign/Committees/Detail.aspx?id=1007836&view=contribut

25  ions&session=2017.

26      7.   Attached as Exhibit 2 is a true and correct copy of the Cal-Access

27  database entry.

28                                  2

8.     On August 2, 2019, I accessed an article from the New York Times attributed to Thomas Fuller and Ivan Penn entitled, "The Political Playbook of a Bankrupt California Utility," dated February 23, 2019.  The New York Times article may be accessed at the following link:

https://www.nytimes.com/2019/02/23/us/pge-california-politics.html.

9.     Attached as Exhibit 3 is a true and correct copy of the New York Times article.

10.     On August 2, 2019, I accessed an article from ABC 10 attributed to Brandon Rittiman entitled, "FIRE – POWER – MONEY," dated July 10, 2019. The ABC 10 article also includes three videos detailing the subject of the article. The article and its three accompanying videos may be accessed at the following link: https://www.abc10.com/firepowermoney.

11.     Attached as Exhibit 4 is a true and correct copy of the webpage, which consists of the article and the three videos embedded therein.

12.     On July 3, 2019, pursuant to my inclusion in the service list for California Public Utilities Commission (CPUC) proceeding R.18-10-007, I was provided a copy of a letter from Meredith Allen, Senior Director of PG&E Regulatory Relations to Lee Palmer, Director of the CPUC Safety and Enforcement Division, entitled "Notice of Delayed Maintenance Work Past June 30 Deadline Set by Decision 17-12-024."  The letter is dated July 3, 2019.  The letter was since made available at PG&E's regulatory document archive at the following link: https://pgera.azurewebsites.net/Regulation/ValidateDocAccess?docID=569570

13.     Attached as Exhibit 5 is a true and correct copy of the July 3, 2019, letter from PG&E to the CPUC Safety and Enforcement Division.

14.     On August 2, 2019, I accessed an article in Curbed by Adam Brinklow entitled, "PG&E accused of falsifying safety records for five years," dated December 20, 2018.  The article can be accessed at the following link:

3

1  https://sf.curbed.com/2018/12/20/18149939/pg-e-falsifying-pipeline-records-cpuc-

2  investigation-san-bruno-expolosion

3      15.    Attached as Exhibit 6 is a true and correct copy of the December 20,

4  2018 article in Curbed. I declare under penalty of perjury that the foregoing is true

5  and correct to the best of my knowledge.

6      Executed this 2nd day of August 2019 at San Diego, California.

7

8                        AGUIRRE & SEVERSON, LLP

9

10  Dated: August 2, 2019         /s/  *Michael J. Aguirre*
                                Michael J. Aguirre, Esq.

11                                  Maria C. Severson, Esq.
                                Attorneys for Plaintiffs

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION IN SUPPORT OF ADMINISTRATIVE MOTION TO CONSIDER        CASE NO. CR 14-00175 WHA
WHETHER CASES SHOULD BE RELATED

# EXHIBIT 1

1   Michael J. Aguirre, Esq., SBN 060402
    Maria C. Severson, Esq., SBN 173967
2   AGUIRRE & SEVERSON, LLP
    501 West Broadway, Suite 1050
3   San Diego, CA 92101
    Telephone:  (619) 876-5364
4   Facsimile:  (619) 876-5368

5   Attorneys for Plaintiffs

6

7

8                   UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10
    ALEX CANNARA, an individual;          Case No.
11  GENE A. NELSON, an individual,

12                        Plaintiffs,     **COMPLAINT FOR
                                          DECLARATORY AND
13        v.                              INJUNCTIVE RELIEF FOR
                                          U.S. AND CALIFORNIA
14  CALIFORNIA DEPARTMENT OF              CONSTITUTIONAL VIOLATIONS
                                          OF:**
15  WATER RESOURCES DIRECTOR
    KARLA NEMETH; CALIFORNIA              **(1) DUE PROCESS,
16  PUBLIC UTILITIES COMMISSION           (2) TAKINGS CLAUSE,
    PRESIDENT MARYBEL BATJER;             (3) URGENCY CLAUSE
17  CALIFORNIA PUBLIC UTILITIES           (4) THE RIGHT TO ACCESS
                                          INFORMATION, AND
18  COMMISSIONER LIANE                    (5) GIFT OF PUBLIC FUNDS**
    RANDOLPH; CALIFORNIA
19  PUBLIC UTILITIES
20  COMMISSIONER MARTHA
    GUZMAN ACEVES; CALIFORNIA            **DEMAND FOR JURY TRIAL**
21  PUBLIC UTILITIES
22  COMMISSIONER CLIFFORD
    RECHTSCHAFFEN; CALIFORNIA
23  PUBLIC UTILITIES
24  COMMISSIONER GENEVIEVE
25  SHIROMA;  CALIFORNIA
    DEPARTMENT OF FINANCE
26  DIRECTOR KEELY BOSLER;
27  CALIFORNIA STATE
    CONTROLLER BETTY YEE;
28

| | |
|---|---|
| 1 | CALIFORNIA STATE TREASURER |
| 2 | FIONA MA; WILDFIRE FUND ADMINISTRATOR (DOE |
| 3 | DEFENDANT 1), all in their official |
| 4 | capacities; CALIFORNIA DEPARTMENT OF WATER |
| 5 | RESOURCES (DWR); CALIFORNIA PUBLIC UTILITIES COMMISSION |
| 6 | (CPUC); CALIFORNIA |
| 7 | DEPARTMENT OF FINANCE (DOF); and DOES 2 to 50, inclusive, |
| 8 | |
| 9 | Defendants. |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

# TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................. 1

II.  PARTIES ........................................................................................ 4

    A.   Plaintiffs ................................................................................. 4

    B.   Defendants .............................................................................. 5

III. JURISDICTION AND VENUE ....................................................... 6

IV. BACKGROUND .............................................................................. 7

    A.   California's Electric Utilities Have a Long
        History of Safety Violations Causing
        Catastrophic Wildfires ......................................................... 8

        (1)   SDG&E's Violations of State Electrical
              Power Line Safety Laws Caused the
              2007 San Diego County Wildfires ........................ 10

        (2)   SCE's Violations of General Order 95
              Were Found to Have Caused the
              2017 Thomas Fire and May Have
              Caused the 2018 Woolsey Fire ............................ 11

        (3)   PG&E Electric Power Line Safety
              Violations Caused the 2017 Northern
              California Wildfires and the 2018 Camp Fire ...... 14

        (4)   A Wall Street Journal Investigation
              Revealed Dysfunctional PG&E Safety
              Culture to Be Root Cause of 2017
              and 2018 Wildfires ............................................... 16

        (5)   PG&E, a Convicted Felon, Enters
              Bankruptcy to Escape Its Obligations
              to Make Wildfire Victims Whole .......................... 18

    B.   The Governor's Office Recognized the IOUs'
        Institutional Disregard for Safety, Yet Pushed
        Forth AB 1054 to Discourage Utility Customers
        from Preventing IOUs From Passing on Costs
        from Safety Violations .......................................................... 20

        (1)   AB 1054's Erosion of the Electric Utility
              Prudent Management Standard is the
              Product of Intense Lobbying and
              Regulatory Capture .............................................. 22

        (2)   AB 1054's Implementation of a
              Liquidity Fund Capitalized by Ratepayers
              is Also an Invention of the IOUs and
              Inserted into the Bill by Utility Lobbyists ............ 28

i

(3)     Convicted Felon PG&E Spent Millions
on Lobbying and Campaign Contributions
to Transfer Financial Liability for Wildfires
onto Utility Customers and Taxpayers ................................32

FIRST CLAIM FOR RELIEF ...........................................................39
Violation of Due Process under the
U.S. and California Constitutions

SECOND CLAIM FOR RELIEF ......................................................42
Violation of the Takings Clauses under the
U.S. and California Constitutions

THIRD CLAIM FOR RELIEF...........................................................45
Violation of the Urgency Clause of the California Constitution

FOURTH CLAIM FOR RELIEF ......................................................48
Violation of the Right to Access Information
Under the California Constitution

FIFTH CLAIM FOR RELIEF ...........................................................50
Violation of the Prohibition Against Unlawful Gifts of Public Funds

SIXTH CLAIM FOR RELIEF ..........................................................51
Declaratory Relief

PRAYER FOR RELIEF  ...................................................................52

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ii

## I.    INTRODUCTION

1.    This legal action is based on the fundamental premise that governors, legislators, commissioners, and department heads in California are required to conform their behavior to the United States and California Constitutions in carrying out their assigned governmental duties.

2.    Despite killing at least 100 people and inflicting billions in damage by causing disasters—wildfires which collectively destroyed tens of thousands of structures and burned millions of acres, a deadly gas pipeline explosion that leveled an entire neighborhood, and even the most severe gas blowout in U.S. history— California's investor-owned electric and gas utilities (IOUs) are wielding their immense political and financial resources to secure from the California Legislature undeserved reprieves from the past and future consequences of wildfires.

3.    Such a reprieve has already been granted in the form of Assembly Bill (AB) 1054, signed into law by Governor Gavin Newsom and chaptered thereafter as an urgency measure on 12 July 2019.  AB 1054 should have served as a last-chance warning against further utility disasters.  Instead, AB 1054 became a bailout of the IOUs, both financially and legally, from the consequences of their continued intransigence against prioritizing safety.

4.    Under AB 1054, electric utility customers and California taxpayers will continuously subsidize the IOUs' liabilities from causing catastrophic wildfires.  The statute authorizes the California Department of Water Resources (DWR) to issue as many bonds as necessary to capitalize a fund to pay IOU liabilities – an unlawful gift of public funds to the IOUs – while the California Public Utilities Commission (CPUC) is empowered to order any electricity rate increases necessary for the bonds to be paid off.

5.    In other words, IOU customers can now be made responsible for paying back potentially limitless IOU wildfire liabilities without due process, while IOUs continue to reap a guaranteed profit for their shareholders and investors.  The

1

1  utilities have placed the burden of their wildfires squarely on the backs of poor and

2  working-class families through increased electricity rates and taxes.

3      6.    Worse, AB 1054 redefined both the burden of proof and the legal

4  standard by which an electric utility could be found imprudent. Utility customers

5  are now required to make a showing of IOU imprudence in the first instance.

6  Meanwhile, a utility can now show it acted prudently by comparing its actions

7  against those of other electric utilities, even if it violated objective standards of

8  utility behavior, such as California's wildfire safety rules. As a practical matter, it

9  is now nearly impossible for utility customers to prevent an IOU from passing

10  uninsured wildfire liabilities onto them.

11      7.    The Legislature chose to dismantle long-standing legal incentives

12  against utility imprudence, despite both federal and state investigations revealing

13  the IOUs' cavalier attitudes towards safety to be the root cause of many devastating

14  wildfires. Indeed, the California Department of Forestry and Fire Protection (Cal

15  Fire) has found IOU electric equipment to have caused many of the state's most

16  destructive wildfires – at least *fifteen* such fires since 2007.

17      8.    One of California's largest IOUs—Pacific Gas & Electric Company

18  (PG&E)—is in fact a *convicted felon* for its criminally negligent maintenance of its

19  gas pipelines which led to a gas pipeline explosion in San Bruno. PG&E declared

20  bankruptcy six months ago because of its many billions in wildfire-related

21  liabilities, yet exhaustive investigations of PG&E's wildfire-related activities by at

22  least two separate media outlets have revealed PG&E spent millions lobbying the

23  California Legislature in the last year. PG&E also issued billions in dividends to its

24  shareholders over the past few years instead of overhauling electric power lines the

25  company *knew in advance* were defective and likely to cause a fire.

26      9.    AB 1054 justified its anti-consumer burden-shifting by requiring

27  electrical utilities to receive safety certifications and file wildfire mitigation plans.

28  These requirements are merely window dressing: they do not address whether the

2

1   IOUs *in fact* acted safely and followed their mitigation plans in relation to a given

2   wildfire. Given the IOUs' recent history of disaster after disaster caused by

3   violations of safety rules, AB 1054's built-in presumption of safe electric utility

4   operation does little more than assist IOUs in passing on costs in the form of unjust

5   and unreasonable rates onto their customers.

6       10.   Meanwhile, California's IOU regulatory agency, the CPUC, has been

7   ineffectual at forcing the IOUs into compliance with California's well-developed

8   utility safety rules.[1]  The CPUC has recently admitted its regulation of the IOUs has

9   been *reactive*, not *proactive*.[2]  With no meaningful regulatory incentives to change

10  their behavior, the IOUs have caused disaster after disaster.

11      11.   To induce the Legislature into passing a 57-page utility bailout plan in

12  the span of two weeks, the IOUs and their institutional investors threatened IOU

13  credit downgrades. They even threatened the IOUs could go bankrupt and thereby

14  cease electric services altogether.  AB 1054's authors perpetuated those fears at

15  committee meetings to manufacture an imperative for the bill to be passed as an

16  urgency measure.

17      12.   Such threats resemble the tactics used by electric power providers

18  during the California Energy Crisis: Power plant operators would threaten to

19  withhold energy and even turn off their power plants unless the Legislature

20  approved immediate and unprecedented action to authorize purchases of artificially

21  overpriced electricity.  Those actions cost the people of California billions which,

22  after almost two decades, Californian taxpayers are *still* paying off.

23

24  [1] *See e.g.* Taryn Luna, "California utility equipment sparked more than 2,000 fires
    in over three years," Los Angeles Times (Jan. 28, 2019),
25  https://www.latimes.com/politics/la-pol-ca-california-utilities-wildfires-regulators-
    20190128-story.html ("Picker told lawmakers the agency had neither the
26  technology nor manpower to ensure safety compliance on its own.")
    [2] *See e.g.* "FIRE – POWER – MONEY, Ep. 2 of 3," ABC 10 (July 12, 2019), at
27  timestamp 24:45 – 26:20 (explaining CPUC standard practice of trusting IOU
    internal safety controls – "The assumption was, they don't need to be watched all
28  that closely, because they're going to do the right thing.").

13.    If implemented, AB 1054 would be a permanent burden to California taxpayers.  AB 1054 thus violates the due process rights of electric utility customers, would impose unjust and unreasonable rates upon them amounting to an unconstitutional taking, was improperly designated as an urgency measure, and would violate the right of the public to access records pertaining to the public's business.  Plaintiffs hereby bring this action to invalidate AB 1054 as violative of the U.S. and California Constitutions, receive a declaration of the bill's invalidity, and enjoin any state officer and agency from implementing the bill's various provisions.

## II.    PARTIES

### A.    Plaintiffs

14.    Plaintiff Gene A. Nelson, an individual, is a resident of the Northern District of California with a deep background in the sciences.  He is a graduate of Harvey Mudd College with a Bachelor of Science in Biophysics and holds a Ph.D in Radiation Biophysics from SUNY Buffalo.  He has been employed by NASA's Jet Propulsion Laboratory, Technicon, CIBA-Corning Diagnostics, Cuyahoga Community College, Microsoft, Collin County College, Genuity, U.S. Census Bureau, California Polytechnic State University, and Cuesta College.  He has also worked as a freelance investigative journalist, a computer consultant. and is currently employed as an independent IT contractor.

15.    Plaintiff Alex Cannara, an individual, is a resident of the Northern District of California with a deep background in environmental and energy issues. He is a graduate of Lehigh University where he earned a bachelor's degree in electrical engineering. He is also a graduate of Stanford University where he earned two master's degrees, one in electrical engineer and degree of engineer and another in statistics, as well as a Ph.D. in mathematical methods in educational research. Dr. Cannara has also taught at several universities including Golden Gate University,

4

1   Santa Clara University and the University of San Francisco.

2       16.    Plaintiffs are electric and gas ratepayers of Pacific Gas & Electric

3   Company and would therefore be required under the complained-of law to

4   subsidize the electric utility companies through payment of increased rates and

5   moreover, would have their rights under the U.S. and California Constitutions, such

6   as their due process rights and rights to be free from an unlawful government

7   taking, violated by enforcement of the complained-of act of the Legislature.

8   **B.**    **Defendants**

9       17.    The defendants are:

10   (1)    California Department of Water Resources Director Karla Nemeth;

11   (2)    California Public Utilities Commission President Marybel Batjer;

12   (3)    California Public Utilities Commissioner Liane Randolph;

13   (4)    California Public Utilities Commissioner Martha Guzman Aceves;

14   (5)    California Public Utilities Commissioner Clifford Rechtschaffen,

15   (6)    California Public Utilities Commissioner Genevieve Shiroma,

16   (7)    California Department of Finance Director Keely Bosler,

17   (8)    California State Controller Betty Yee,

18   (9)    California State Treasurer Fiona Ma;

19   (10)    California Department of Water Resources (DWR);

20   (11)    California Public Utilities Commission (CPUC);

21   (12)    California Department of Finance (DOF); and

22   (13)    Wildfire Fund Administrator (sued as Doe Defendant 1).

23       18.    Each of the individually named Defendants are charged with

24   implementing the urgency measure at issue in this suit and are named in their

25   official capacity.

26       19.    Each of the state agencies named as Defendants in this suit are also

27   charged with implementing the urgency measure at issue in this suit.

28

20.     Upon further information and belief, Plaintiffs will amend this complaint to include the true names of other individuals and state agencies charged with implementing the urgency measure at issue in this suit.

21.     The true names and capacities of those Defendants sued herein as DOES 1 through 50, inclusive, whether individual, governmental, corporate or otherwise, are unknown to Plaintiffs, who sue those Defendants by such fictitious names. When the DOE parties' true names and capacities and their actual involvement in the matters alleged herein are ascertained, Plaintiffs will amend this complaint to accurately reflect the same.

22.     Plaintiffs are informed and believe, and thereon allege, that each of the fictitiously named defendants designated hereunder as a DOE is responsible in some manner for the occurrences alleged herein, and that Plaintiffs' damages as herein alleged were proximately caused or contributed to by their conduct.

23.     Plaintiffs are informed and believe, and thereon allege, that at all relevant times herein, each of the Defendants was the agent, employee, alter ego, and/or co-conspirator of one or more of the remaining Defendants and in doing the acts alleged herein, was acting within the purpose, course and scope of such agency, employment joint venture or conspiracy, and with the consent, permission or ratification of one or more remaining Defendants.

## III.    JURISDICTION AND VENUE

24.     This Court has jurisdiction under 28 U.S.C. § 1331 because the action arises from alleged violations of the U.S. Constitution and thereby depends on resolution of substantial questions of federal law.  This Court also has jurisdiction under 28 U.S.C. § 1343(3) and (4) because this action seeks to redress a deprivation, under color of law, of a right, privilege or immunity secured by the United States Constitution, and seeks to recover equitable and other relief under 42 U.S.C. § 1983, an Act of Congress providing for the protection of civil rights.

6

25.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367 for any California state law claims that arise under the same transactions and/or occurrences.

26.     Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b)(1) because the defendants are located in and do business in this District, including business related to the claims in this Complaint.  Venue is also proper under 28 U.S.C. § 1391(b)(2) because the events giving rise to Plaintiffs' claims occurred in this District.

**IV.    BACKGROUND**

27.     Fifteen days after its introduction via the gut-and-amend legislative technique on 27 June 2019, and merely six days after substantial revisions made on 5 July 2019, the California Legislature passed Assembly Bill (AB) 1054 to relieve California's investor-owned utilities (IOUs) of financial responsibility for causing future catastrophic wildfires, despite imprudently causing at least twelve such wildfires from 2015 to 2018.

28.     The California State Legislature Glossary of Legislative Terms explains a "gut and amend" occurs "[w]hen amendments to a bill remove the current contents in their entirety and replace them with different provisions."  A bill introduced through such a procedure avoids the rigors of the legislative process by not being heard in full committees during the regular scheduled legislative session.

29.     AB 1054 should have received two or three more months of legislative discussion and if truly urgent, implementation of the bill's provisions could have still occurred this year. A legislative proposal as significant and with such high stakes deserved more consideration.

30.     Instead, AB 1054 was gutted and amended to provide for a scheme by which the people of California will continuously subsidize the IOUs' catastrophic wildfires liabilities.  The legislative process used for AB 1054 was chosen to

7

1  significantly limit the full participation by affected citizens and consumer advocacy
2  groups.

3      31.    Worse, AB 1054 made sweeping changes to the law of electric utility
4  cost recovery as applied to wildfires. The changes are disproportionately favorable
5  to utilities, such that utility customers will be hard-pressed to prevent the utilities
6  from passing on more of their wildfire costs.

7      32.    Meanwhile, the Legislature made no specific provisions for proactive
8  wildfire safety enforcement, including aggressive and regular inspection of
9  overhead electric supply lines in high fire-risk areas, to ensure no future wildfire
10  liabilities are incurred in the first instance.  In short, the underlying problems
11  remain, while electric utility customers are in a worse position.

12      33.    AB 1054 is not the result of sudden collective Legislative inspiration
13  to prop up the electric utilities at the expense of utility customers.  As detailed
14  below, its myriad provisions against consumers are the product of a persistent and
15  aggressive campaign of legislative lobbying, legal maneuvering, and regulatory
16  capture of the State of California's most powerful regulatory body.

17  **A.    California's Electric Utilities Have a Long History of Safety**
18  **       Violations Causing Catastrophic Wildfires**

19      34.    The California Public Utilities Commission (CPUC) has promulgated
20  minimum standards for the construction, maintenance, and replacement of overhead
21  electrical supply lines since 1941 in the form of General Order (GO) 95.  Rules 31,
22  35 and 38 are most relevant to the question of electric utility fault as to a given
23  wildfire.  Rule 31 requires electric utilities to actively inspect and maintain their
24  overhead facilities to ensure safe operation.  Rule 35 of GO 95 imposes minimum
25  requirements for vegetation management to ensure trees do not strike power lines,
26  while Rule 38 requires wires have minimum clearances from other wires to prevent
27  them striking each other in windy conditions.  Taken together, compliance with GO
28  95 should result in electric utility equipment not causing wildfires.

8

35.    As shown in the below table summarizing the most destructive utility-caused catastrophic wildfires since 2007, the IOUs have a long history of causing devastating wildfires and violating various safety rules required to prevent wildfires:

| Date | Fire | Cause // GO 95 Rule Implicated | Utility | Damage |
|------|------|-------------------------------|---------|--------|
| 10/22/07 | Witch | Power lines contacted each other; damaged lines left energized for 6 hours. Rule 38 (clearance). | SDG&E | 2 deaths; 40 injured; 1,141 homes lost |
| 10/22/07 | Guejito | Wire owned by third party contacted incorrectly placed power line. Rule 38 (clearance). | SDG&E | Merged with Witch Fire |
| 10/22/07 | Rice | Tree limb fell onto power line. Rule 35 (vegetation). | SDG&E | 206 homes |
| 9/9/15 | Butte | Tree limb fell onto power line. Rule 35 (vegetation). | PG&E | 2 deaths, 965 structures |
| 10/8/17 | Redwood | Trees fell in two separate locations onto same power line.[3] Rule 35 (vegetation). | PG&E | 9 deaths; 546 structures |
| 10/8/17 | Sulphur | Wind knocked down power pole, power lines contacted ground. Rule 31.1 (maintenance). | PG&E | 162 structures |

---

[3] The fires dated October 8, 2017, were collectively referred to by news outlets as the Northern California Fire Siege. *See* Cal Fire, "CAL FIRE Investigators Determine Causes of 12 Wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake, and Napa Counties," press release dated June 8, 2018, https://fire.ca.gov/media/5100/2017_wildfiresiege_cause.pdf

| 10/8/17 | Norrbon Adobe Partrick Pythian Nuns | Trees fell onto five power lines in one evening; the fires merged. PG&E caused one fire by reenergizing a downed line. Rules 31.1 (maintenance) and 35 (vegetation). | PG&E | 3 deaths, 1,355 structures |
|---|---|---|---|---|
| 10/8/17 | Atlas | Two trees in two locations fell onto the same power line. Rules 35 (vegetation), 38 (clearance). | PG&E | 6 deaths, 783 structures |
| 12/4/17 | Thomas | Power lines contacted each other due to high winds.[4] Rule 38 (clearance). | SCE | 2 deaths, 1063 structures |
| 11/8/18 | Woolsey | Under investigation by Cal Fire, but SCE "believes" one of its power lines started the fire. Likely GO 95 violations. | SCE | 1,643 structures |
| 11/8/18 | Camp | PG&E lines blown by high winds into nearby vegetation at two separate points.[5] Rules 35 (vegetation), 38 (clearance). | PG&E | 85 deaths, 13,972 structures |

(1)   **SDG&E's Violations of State Electrical Power Line Safety Laws Caused the 2007 San Diego County Wildfires**

36.   On Sunday, 21 October 2007, San Diego Gas & Electric (SDG&E) equipment ignited the Witch Fire at approximately 12:35 p.m. in the rural area of Witch Creek, east of Ramona in San Diego County.  By the next day, SDG&E

---

[4] Ventura County Fire Department. "VCFD Determines Cause of the Thomas Fire," press release, https://vcfd.org/news/335-vcfd-determines-cause-of-the-thomas-fire
[5] Cal Fire, "CAL FIRE Investigators Determine Cause of the Camp Fire," press release dated May 15, 2019, https://fire.ca.gov/media/5038/campfire_cause.pdf

10

1  equipment had also ignited the Rice and Guejito Fires.

2      37.    Cal Fire's investigation reports revealed SDG&E, in causing the three

3  fires, violated multiple safety regulations codified in the Public Resources Code.

4  Substantially similar safety rules exist in the CPUC's General Order 95, including

5  Rule 31.1 (maintenance of transmission lines), Rule 35 (vegetation management)

6  and Rule 38 (clearance).

7      38.    The Witch Fire led to the destruction of 1,141 homes, 509 outbuildings

8  and 239 vehicles. Once combined with the Guejito Fire, the Witch Fire burned a

9  total of 197,990 acres. The Rice Fire burned 9,472 acres, destroyed 206 homes, two

10  commercial properties and 40 other buildings before being contained.

11      **(2)**    **SCE's Violations of General Order 95 Were Found to Have**

12              **Caused the 2017 Thomas Fire and May Have Caused the 2018**
            **Woolsey Fire**

13      39.    On 4 December 2017, SCE power lines ignited two separate fires that

14  later merged and collectively became the Thomas Fire. Both fires started on the

15  same electrical circuit. The same day, a single energized conductor separated near

16  an insulator on an SCE power pole and caused the Koenigstein Fire. The energized

17  conductor fell to the ground along with molten metal particles and ignited the dry

18  vegetation below. The Koenigstein Fire started 3.5 miles northwest in Upper Ojai,

19  approximately one hour after the initial start of the Thomas Fire.

20      40.    Only hours later, the Koenigstein Fire merged with the Thomas Fire,

21  coming perilously close to Ventura County's most populous areas.

22

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

11



**Thomas fire**
As of 6:59 p.m. 12/11/17

8 MILES

SANTA BARBARA COUNTY                    VENTURA COUNTY

33

Santa Barbara

Ojai

Carpinteria                    Fillmore

**Fire perimeter**                    126   Santa Paula

**Evacuations**
▦ Mandatory
☐ Voluntary                    Ventura   101   23

Source: InciWeb, Cal Fire, OpenStreetMap, Mapzen          @latimesgraphics

41.   The Ventura County Fire Department and Cal Fire joint investigation revealed the SCE power lines which caused the Thomas Fire struck each other during high winds, creating an electrical arc which spilled molten material onto flammable material below.  The investigation report found SCE violated General Order 95, Rule 31.1, which requires "electrical supply and communications systems shall be of suitable design and construction for their intended use, regard being given to the conditions under which they are to be operated."[6]

42.   Less than a year later, on 8 November 2018, SCE equipment ignited the Woolsey Fire in Ventura County.  The Woolsey Fire spread to both Ventura and Los Angeles Counties, burned almost 100,000 acres, destroyed an estimated 1,643 structures, damaged another 364 structures, and caused at least three fatalities.

/ / /

/ / /

/ / /

/ / /

---

[6] Page 3 of the Thomas Fire Investigation Report, dated March 14, 2019:
https://vcfd.org/news/335-vcfd-determines-cause-of-the-thomas-fire

12

Case 3:14-cr-00175-WHA   Document 1079   Filed 08/05/19   Page 22 of 61



43.     After the fires burned vegetation and structures, rains in January 2018 ran through the burned areas with such force that it caused deadly mudslides, killing 21 and damages hundreds more homes that previously escaped the fires. This second catastrophe was the result of the fires caused by SCE equipment.

44.     The cause of the Thomas Fire is under investigation by Cal Fire, but SCE disclosed in a regulatory filing with the U.S. Securities and Exchange Commission that it "believes its equipment could be found to have been associated with the ignition" of the fire."[7]  Indeed, as of 31 March 2019, SCE reported $4.669 billion in wildfire claims liabilities from the Thomas and Woolsey Fires.[8]

///

///

[7] Jeff Daniels, "LA County sues Edison utility to recover over $100 million in costs from Woolsey Fire," CNBC (Apr. 25. 2019), https://www.cnbc.com/2019/04/26/la-county-sues-edison-utility-to-recover-costs-from-woolsey-fire.html
[8] Business Wire, "Edison International Reports First Quarter 2019 Results" (Apr. 30, 2019), https://www.businesswire.com/news/home/20190430006188/en/Edison-International-Reports-Quarter-2019-Results.

13

   (3)   **PG&E Electric Power Line Safety Violations Caused the 2017 Northern California Wildfires and the 2018 Camp Fire**

45.   In April 2016, a Cal Fire investigation found Pacific Gas & Electric (PG&E) responsible for the 2015 Butte Fire, one of the most destructive wildfires in state history. The investigative report determined that the fire was sparked by a PG&E power line that struck a tree, resulting in a wildfire that spread to more than 70,000 acres in Amador and Calaveras counties, killed two people and burned more than 900 structures.

46.   In October 2017, a series of wildfires – over 170 in total – ripped through several Northern California counties, burning at least 245,000 acres and causing over $14 billion in damage.

47.   Cal Fire announced on June 8, 2018 that PG&E equipment was connected to 12 such wildfires – mostly from nearby vegetation coming into contact with PG&E power lines. In one instance, PG&E reenergized a downed power line. Cal Fire referred its investigations to the District Attorneys of the fires' respective counties due to evidence of violations of state law.

48.   On the morning of 8 November 2018, the same day as the Woolsey Fire, the Camp Fire in Butte County burned a total of 153,336 acres, destroying 18,804 structures and resulting in 85 civilian fatalities and several firefighter injuries. The Camp Fire is the deadliest and most destructive fire in California history.

49.   Cal Fire determined the Camp Fire was caused by two separate ignitions from electrical transmission lines owned and operated by PG&E. The cause of the second ignition was determined to be vegetation colliding into electrical distribution lines owned and operated by PG&E.

50.   Cal Fire forwarded its Camp Fire investigative report to the Butte County District Attorney for a separate investigation into whether PG&E violated

14

1 state wildfire safety laws.[9] As depicted in the below diagram, PG&E had advance

2 warning of the need for decisive action in response to worsening weather

3 conditions, but ultimately did nothing.



**ABORTED POWER-SHUTDOWN PLAN**
In the days before the Camp Fire, with dangerous fire weather expected, PG&E warned that it might cut power to about 26,500 customers in portions of Butte County on Nov. 8, the day the fire started. But the utility kept the power running, and now state officials are investigating PG&E's possible role in the deadly blaze.

Sources: PG&E and Cal Fire

BAY AREA NEWS GROUP

20      51.    As of 31 March 2019, PG&E's wildfire liabilities subject to

21 compromise were $14.2 billion.[10] Wildfire-related claims include amounts

22 associated with the 2018 Camp Fire, the 2017 Northern California wildfires, and

23 the 2015 Butte fire.

---

[9] Tony Bizjak, Ryan Sabalow, "Will PG&E face criminal charges for California's Camp Fire?," The Sacramento Bee (May 19, 2019), https://www.sacbee.com/news/state/california/article230480424.html

[10] Jeff St. John, "PG&E Under Investigation by SEC Over Wildfire Losses" Greentech Media (May 06, 2019), https://www.greentechmedia.com/articles/read/pges-q1-reveals-sec-investigation-into-public-disclosures-accounting-of-wil#gs.q34tnx

15

(4) **A Wall Street Journal Investigation Revealed Dysfunctional PG&E Safety Culture to Be Root Cause of 2017 and 2018 Wildfires**

52.     Recent investigatory reports have revealed the true extent of PG&E's dysfunctional safety culture which, in turn, led to the Camp Fire. On 11 July 2019, the Wall Street Journal (WSJ) published a report based on records obtained from the U.S. Department of Forestry under a Freedom of Information Act request showing PG&E knew about defects in its power lines for many years and failed to take corrective action.[11] The article explained:

> PG&E Corp. knew for years that hundreds of miles of high-voltage power lines could fail and spark fires, yet it repeatedly failed to perform the necessary upgrades.
>
> ***
>
> The failure last year of a century-old transmission line that sparked a wildfire, killed 85 people and destroyed the town of Paradise wasn't an aberration, the documents show. A year earlier, PG&E executives conceded to a state lawyer that the company needed to process many projects, all at once, to prevent system failures—a problem they said could be likened to a "pig in the python."

53.     The WSJ article explained many of PG&E's transmission towers are past their life expectancy. Worse, PG&E had such poor record keeping that it was unaware of exactly how old most of its transmission lines and towers were:

> Even before November's deadly fire, the documents show, the company knew that 49 of the steel towers that carry the electrical line that failed needed to be replaced entirely. In a 2017 internal presentation, the large San Francisco-based utility estimated that its transmission towers were an average of 68 years old. Their mean life expectancy was 65 years.
>
> The oldest steel towers were 108 years old.
>
> ***

[11] Katherine Blunt, Russell Gold, "PG&E Knew for Years Its Lines Could Spark Wildfires, and Didn't Fix Them." Wall Street Journal (July 10, 2019), https://www.wsj.com/articles/pg-e-knew-for-years-its-lines-could-spark-wildfires-and-didnt-fix-them-11562768885

16

Documents show that PG&E is unaware of the exact age of many of its transmission towers and wires. In 2010, PG&E commissioned consulting firm Quanta Technology, a subsidiary of Quanta Services Inc., to assess the age and condition of transmission structures throughout its 70,000-square-mile service area.

The firm was unable to determine the age of about 6,900 towers in the 115-kilovolt system. It found that nearly 30% of the remaining towers in that system, more than 3,500, were installed in the 1900s and 1910s. About 60% of the structures in the 230-kilovolt system were built between 1920 and 1950.

54. PG&E was further aware its failure to better manage its aging transmission lines would likely result in its equipment igniting wildfires. Nevertheless, PG&E repeatedly delayed upgrades of its old transmission lines because they were "low-risk projects," and instead spent billions elsewhere:

The danger posed by PG&E's neglect of its transmission lines increased around 2013, when a historic drought dried up much of California, creating extraordinary fire conditions. In its 2017 internal presentation, the company said it needed a plan to replace towers and better manage lines to prevent "structure failure resulting [in] conductor on ground causing fire." Nevertheless, PG&E repeatedly delayed upgrades of some of its oldest transmission lines, ranking them as low-risk projects, while it spent billions of dollars on other work it considered higher priority, such as substation upgrades, according to federal regulatory filings.

55. Yet, California's utility regulators "paid little attention to the condition of PG&E's transmission system and have largely left it up to the company to decide what to upgrade and when." The WSJ article further revealed PG&E delayed performing safety work on the Camp Fire-causing transmission line:

PG&E delayed safety work on the Caribou-Palermo line for more than five years, the Journal reported in February. The company needed to replace 49 steel towers "due to age," and hardware and aluminum line on 57 towers "due to age and integrity," according to memos PG&E officials sent in 2017 and early 2018 to the U.S. Forest Service, whose territory the line crosses.

56.   Perhaps most egregious of all, PG&E failed to implement a hired safety consultant's recommendation to physically climb a sample of transmission towers every three to five years; utility leadership felt it was "doing enough" already.  Moreover, when the WSJ reported a year earlier that PG&E had delayed planned upgrades to the line, PG&E released a statement saying the work was "not maintenance-related (i.e., work related to identifying and fixing broken or worn parts."  However, the Journal explained PG&E internally characterized the work as in fact being "maintenance-related."

57.   The WSJ report also indicates other PG&E transmission lines, at least as old as the Caribou-Palermo transmission line, still remain in service. PG&E continues to delay the same type of safety-related maintenance needed for other similar aging lines in high fire risk areas:

> The company also has delayed upgrades to several 115-kilovolt lines passing through national forests that have become California's highest-risk fire areas, the filings indicate. A line partly in the Plumas National Forest was slated for work this year but was delayed and now is on hold because of the Camp Fire investigation.

**(5)   PG&E, a Convicted Felon, Enters Bankruptcy to Escape Its Obligations to Make Wildfire Victims Whole**

58.   The misconduct revealed by the WSJ report is not wholly surprising: PG&E is a convicted felon from its handling of the San Bruno pipeline explosion that killed 8, injured 58 others, and destroyed 38 homes in a densely populated residential area.  PG&E was convicted of *six* felonies: five violations of federal gas pipeline safety standards and one violation of obstruction of justice for lying to federal investigators about the records PG&E relied on to assess the pipeline that exploded.

59.   PG&E was placed on five years' probation, during which it caused the 2017 Northern California Fire Siege and the 2018 Camp Fire.  On 19 January 2019, a United States District Court Judge for the Northern District of California, the

18

1  Honorable William Alsup, who is overseeing PG&E's probation, issued an order

2  requiring PG&E to show cause why its probation conditions should not be

3  modified, which proposed PG&E's probation be expanded to require:

4      In light of PG&E's history of falsification of inspection reports,
PG&E shall, between now and the 2019 Wildfire Season, re-inspect
5  all of its electrical grid and remove or trim all trees... shall identify
and fix all conductors that might swing together and arc due to slack
6  and/or other circumstances under high-wind conditions; shall identify
and fix damaged or weakened poles, transformers, fuses and other
7  connectors; and shall identify and fix any other condition anywhere in
its grid similar to any condition that contributed to any previous
8  wildfires.

9

10      ***

11  Reliability is important but safety must come first. Profits are
important but safety must come first. *Only* safe operation will be
12  allowed.

13      ***

14  This will likely mean having to interrupt service during high-wind
events (and possibly at other times) but that inconvenience, irritating
15  as it will be, will pale by comparison to the death and destruction that
otherwise might result from PG&E-inflicted wildfires.

16

17      60.    On 29 January 2019, PG&E filed for Chapter 11 bankruptcy.  PG&E

18  listed $30 billion in liabilities, most of it for damages it caused by starting both the

19  2017 Northern California Wildfire Siege and the 2018 Camp Fire.  Governor

20  Newsom declared his administration's handling of PG&E's bankruptcy was "a top

21  priority for this administration... This is not being pushed back in the file."  The

22  Governor stated that PG&E's service would not be interrupted by the bankruptcy:

23  "This is not 2001. There is no energy crisis."[12]

24

25

26  [12] Joe Garofoli, "California Gov. Gavin Newsom gets no honeymoon as PG&E bankruptcy, LA

27  school strike hit," San Francisco Chronicle (Jan. 15, 2019),
https://www.sfchronicle.com/politics/article/California-Gov-Gavin-Newsom-has-two-crises-after-
28  13536637.php

**B.    The Governor's Office Recognized the IOUs' Institutional Disregard for Safety, Yet Pushed Forth AB 1054 to Discourage Utility Customers from Preventing IOUs From Passing on Costs from Safety Violations**

61.    On 12 February 2019, Governor Newsom announced in his State of the State address that he had convened a group of bankruptcy attorneys and financial experts that would work as a "strike team" to address PG&E's bankruptcy and the threat of utility-caused wildfires.[13]  On 12 April 2019, Gov. Newsom's wildfire strike force issued a report entitled "Wildfires and Climate Change: California's Energy Future."

62.    In it, the strike force recognized the need for proactive application of the safety rules – such as General Order 95 – by the CPUC, recommending the CPUC "increase enforcement authority, including delegating more enforcement authority to the Commission's safety division staff."  The strike force also recognized the CPUC needed to conduct "meaningful review" of electric utility wildfire mitigation plans, an effort which would require "organizational changes, budget increases, and a concerted effort to hire… the expertise needed."[14]

63.    Further, the strike force recognized: "PG&E's decision to voluntarily seek the protection of a chapter 11 bankruptcy court punctuates more than two decades of mismanagement, misconduct, and failed efforts to improve its safety culture."  The report also noted PG&E's felony convictions "for safety violations in connection with the San Bruno gas explosion in 2010."  The report went so far as to list all PG&E-caused fires and explosions within the last 25 years, concluding

---

[13] Julia Pyper, "Governor Newsom Convenes 'Strike Team' to Release PG&E Strategy Within 60 Days." Greentech Media (Feb. 12, 2019).
https://www.greentechmedia.com/articles/read/newsom-pge-strike-team-60-days
[14] Office of Governor Gavin Newsom. "Wildfires and Climate Change: California's Energy Future," April 12, 2019, pp. 43-44.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  thereafter: "PG&E has failed to implement the fundamental management and
2  cultural reforms to prioritize safety and reliable service."[15]

3      64.   Despite the well-documented history of IOU safety malfeasance and
4  his strike force's recognition of the same, Governor Newsom's favored changes in
5  utility law, as memorialized in the strike force report and beyond, included
6  changing the utility customer-protecting prudent manager standard to be more
7  lenient as applied to wildfire costs.

8      65.   The prudent manager standard is a long-held CPUC administrative
9  case law doctrine which required utilities, when applying to recover costs from its
10  customers, to affirmatively show its actions relating to those costs were prudent.
11  Absent a determination that its activity was prudent, an IOU would be unable to
12  raise its energy rates to pay for such costs because its increased rates would not be
13  "just and reasonable" under Cal. Pub. Util. Code § 451.

14      66.   The prudent manager standard was codified on 1 January 2019 in
15  Section 451.1 of the Public Utilities Code in 2018, following passage of Senate Bill
16  (SB) 901 on 21 September 2018.  Before its codification, the prudent manager
17  standard was a creature of CPUC administrative case law.[16]

18      67.   SB 901's codification of the prudent manager standard included a
19  twelve-factor test specific to circumstances relating to a wildfire ignition by which
20  the CPUC would determine if an electric utility had acted prudently.  By placing the
21  burden of proof onto the utilities to show their behavior conformed to these factors,
22  the SB 901 prudent manager standard for wildfire costs reflected a long-standing
23  principle of CPUC case law that it would be "unconscionable" for utility customers
24  to bear the consequences of imprudent utility behavior.[17]

25  _____
   [15] *Id.* at 45-46.
26  [16] *See e.g.* 2018 Cal. PUC LEXIS 314, *3-4 (explaining prudent manager standard rule originated
   in CPUC case law as a function of the CPUC's duty to ensure rates imposed on utility customers
27  are "just and reasonable.").
   [17] 1984 Cal. PUC LEXIS 1044, *107 ("It would be unconscionable from a regulatory perspective
28  to reward such imprudent activity by passing the resultant costs through to ratepayers.").

68.    AB 1054 removed all twelve factors, lowered the showing needed for utility prudence, *and* shifted the initial burden of proof onto the utility customers, who must now show the *utilities* had acted imprudently, despite the well-documented history of critical safety violations by the IOUs which have caused many lost lives and billions in damage.  As explained below, AB 1054's fundamental restructuring of electric utility law is the product of a persistent and aggressive campaign of legislative lobbying, legal maneuvering, and regulatory capture.

> **(1)    AB 1054's Erosion of the Electric Utility Prudent Management Standard is the Product of Intense Lobbying and Regulatory Capture.**

69.    On 26 January 2019, the Governor appointed five individuals to serve on the Commission on Catastrophic Wildfire Cost and Recovery (Wildfire Commission), who were charged with issuing a report recommending changes to public utility law to "ensure equitable distribution of costs among affected parties."[18]

70.    The IOUs filed comments to the Wildfire Commission demanding a shift of the burden of proof in determining electric utility wildfire prudence.  San Diego Gas & Electric said as much to the Commission in a presentation in Redding, California on 13 March 2019 entitled "EXISTING WILDFIRE LEGAL LIABILITY REGIME:"

> The issue of inverse condemnation vs. utility cost recovery is the heart of the matter. Either the State needs to reform inverse condemnation, or it needs to establish a clear path for utilities to recover liability costs when they are prudent operators.
>
> The determination of a prudent operator needs to be established in statute and approved by the PUC up-front. A utility should be deemed

---

[18] Ashley Zavala, "New commission on wildfire recovery set withi five members, KRON (Jan. 26, 2019), https://www.kron4.com/news/california/new-commission-on-wildfire-recovery-set-with-five-members/.

1   prudent if it is in substantial compliance with its Wildfire Management
2   Plans.

3      71.    On 1 April 2019, Southern California Edison likewise argued for a
4   presumption of utility prudence:

5          In order to restore the market's confidence in California's regulatory
6          framework with IOUs, the State needs durable and objective standards
           that define utility prudency and a timely process for completing
7          prudency review.

8          We believe this can best be accomplished by mandating that if an IOU
9          has complied with its approved wildfire mitigation plan (WMP), the
           CPUC should deem the company a prudent operator for cost recovery
10         purposes.

11     72.    The Wildfire Commission thereafter recommended in its final report to
12   the Legislature dated 1 July 2019:
13

14         **Cost Recovery Option 1**: Burden shifting. In order to increase the
           certainty that prudently incurred costs will be allowed in rates, CPUC
15         process could be modified to allow for a presumption of prudence for a
16         utility wildfire expense given a prima facie showing but still allow for
           a challenger to attempt to prove, by a preponderance of the evidence,
17         that an expense was imprudently incurred.[19]

18
       73.    After several rounds of public comments and meetings, the Wildfire
19   Commission chose to regurgitate the input of the IOUs and their institutional
20
     investors by recommending changes to the law to assist IOUs in recovering their
21
     wildfire liabilities from utility customers.  Such utility-favored changes were
22
     recommended by the Wildfire Commission under the guise of providing "clarity"
23
     and "certainty" to the process.[20]
24

25
     ───────────────────────
26   [19] *Id.* at page 8.
     [20] Governor's Office of Planning and Research, "Final Report of the Commission on Catastrophic
27   Wildfire Cost and Recovery," dated June 17, 2019, pp. 7-8,
     http://www.opr.ca.gov/docs/20190618-
28   Commission_on_Catastrophic_Wildfire_Report_FINAL_for_transmittal.pdf

                                        23

74. Unsurprisingly, public records requests to this Wildfire Commission forced disclosure of records revealing ex parte meetings and communications between two Commissioners, including the Commission chair, and representatives of the IOUs, to discuss utility-favored changes to the law. A lawsuit relating to the disclosure of further such communications is pending before the Sacramento Superior Court.

75. One could reasonably infer the IOU representatives supplied the Wildfire Commissioners with the IOU party line talking points regurgitated in the Commission's final report. Indeed, one of the emails disclosed is a written record from the Commission chair to himself of what talking points the IOU representatives fed him: "Discuss SDGE operations, situation hardening, wildfire catastrophe funding… inability of insurance to cover multi-billion losses, how to spread cost of fund."

76. The Wildfire Commission's recommendations carried over to AB 1054. After the bill was first gutted and replaced on 27 June 2019 to be the vehicle for the Governor's wildfire bailout package, Section 8 of the bill, amending Cal. Pub. Util. Code § 451.1, read in relevant part:

> If the electrical corporation has received a valid safety certification for the time period in which the covered wildfire ignited, an electrical corporation's conduct shall be deemed to have been reasonable pursuant to subdivision (b) unless a party to the proceeding demonstrates, based on a preponderance of the evidence, that the electrical corporation's conduct was not reasonable.

77. AB 1054's authors introduced amendments to the bill on 5 July 2019 under the guise of responding to concerns raised by various interested parties. One such change was to amend the wildfire-specific prudent manager standard, which was now Section 6 of the bill, as depicted below:

///

Costs and expenses arising from a covered wildfire are just and reasonable if the conduct of the electrical corporation *related to the ignition* was consistent with actions that a reasonable utility would have undertaken in good faith under similar circumstances, at the relevant point in time, and based on the information available at that *to the electrical corporation at the relevant point of* time.

Reasonable conduct is not limited to the optimum practice, method, or act to the exclusion of others, but rather encompasses a spectrum of possible practices, methods, or acts consistent with utility system needs, the interest of the ratepayers, and the requirements of governmental agencies of competent jurisdiction. Costs and expenses in the application may be allocated for cost recovery in full or in part taking into account factors *both within and beyond the utility's control* that may have exacerbated the costs and expenses. *expenses, including humidity, temperature, and winds.*

...

If the electrical corporation has received a valid safety certification for the time period in which the covered wildfire ignited, an electrical corporation's conduct shall be deemed to have been reasonable pursuant to subdivision (b) unless a party to the proceeding demonstrates, based on a preponderance of the evidence, that the electrical corporation's conduct was not *creates a serious doubt as to the reasonableness of the electrical corporation's conduct. Once serious doubt has been raised, the electrical corporation has the burden of dispelling that doubt and proving the conduct to have been reasonable.*
(emphasis original)

78.    As admitted by the Governor's office staff during hearings before committees in both houses of the Legislature, the "serious doubt" requirement in the final version of AB 1054 is imported from the Federal Energy Regulatory Commission (FERC) standard for utility prudency.

79.    The "serious doubt" requirement in AB 1054 strongly resembled that articulated by the IOUs in related cases and administrative proceedings. Indeed, the IOUs' persistent lobbying of those Commissioners to support legislative

25

1  dismantling of the customer-protecting prudent manager standard is but one
2  instance of such behavior to force a change in law through any available means to
3  provide the IOUs an escape from wildfire liabilities caused by their own safety
4  violations.

5      80.    By way of example, SDG&E has filed a petition for a writ of certiorari
6  to the U.S. Supreme Court in response to rejections by both the California Supreme
7  Court and the Court of Appeal of its wildfire cost arguments.  To wit, SDG&E and
8  its sister utilities (through amicus curiae briefs) have taken the position that the state
9  law doctrine of inverse condemnation results in an unlawful government taking
10  against the IOUs when they are denied cost recovery from their customers for
11  utility-caused wildfires, *even when the CPUC has found the IOUs to have caused*
12  *the fires due to utility imprudence*.

13      81.    Moreover, SDG&E and its brethren IOUs argued the CPUC was
14  incorrect to have found SDG&E imprudent because FERC did not also find
15  SDG&E imprudent when SDG&E applied with FERC to pass on $24 million of
16  uninsured wildfire liabilities from the 2007 San Diego wildfires.  SDG&E stated
17  "FERC held that recovery was warranted without regard to the prudence of
18  SDG&E maintenance operations" because of the doctrine of inverse
19  condemnation.[21]

20      82.    The FERC decision cited by SDG&E actually goes a step further.
21  FERC held SDG&E to have been prudent *even if SDG&E was found to have*
22  *violated General Order 95 and other overhead electric supply line safety rules*:

23      However, such alleged violation (or indeed, even a violation) does not
24      create a presumption of imprudence.  GO-95 is a set of rules developed
         for the design, construction, and maintenance of overhead electrical
25      supply and communication facilities that come within the jurisdiction
26      of CPUC, prescribed and enforced by the CPUC.

27  _____
[21] *San Diego Gas & Elec. Co. v. Pub. Util. Comm'n of the State of Cal.*, U.S. Supreme Court
28  Docket No. 18-1368, Petition for a Writ of Certiorari, dated April 30, 2019, page 8.

As discussed below, even if SDG&E had been found to have violated GO-95, that alone is insufficient to cast serious doubt on the prudence of the Wildfire Costs.

In fact, one violation by a utility does not necessarily constitute imprudence, as utilities are not expected to be infallible. Instead, the Commission looks to things like standard utility practice to determine whether the utility's conduct was that of a reasonable, prudent utility, as set forth in *New England Power Company*: "[T]he appropriate test to be used is whether they are costs which a reasonable utility management (or that of another jurisdictional entity) would have made, in good faith, under the same circumstances, and at the relevant point in time."

83.     In other words, all three IOUs have recently argued to the U.S. Supreme Court that their tens of billions in wildfire liabilities should be paid for by utility customers, even though Cal Fire has repeatedly found electric utility safety violations to be the cause of the wildfires which led to the tens of billions in liabilities.

84.     The Supreme Court case's administrative proceeding history before the CPUC is also another example of regulatory capture by the IOUs to force a change in the prudent manager standard. The doctrine of inverse condemnation should not be considered by the U.S. Supreme Court, let alone the California Court of Appeal, in the first instance, but for procedurally improper actions taken by the CPUC to preserve the issue for appeal after CPUC decisionmakers held numerous ex parte meetings with the IOUs.

85.     In August 2017, the CPUC disallowed SDG&E recovery from utility customers the $379 million in uninsured wildfire costs from three wildfires SDG&E caused in October 2007, finding SDG&E acted imprudently in causing the fires because of repeated violations of General Order 95. Before the CPUC issued its final administrative decision in that proceeding, however, the CPUC granted party status to two intervenors: PG&E and SCE, for the specific purpose of arguing

27

1  whether California's inverse condemnation laws prevented the CPUC from denying

2  SDG&E its request for $379 million from its customers.  By that point in the

3  proceeding, *both* the evidentiary hearing and briefing phases were already

4  complete.

5       86.    Prior to granting party status to the two IOUs, SDG&E's own attempts

6  at raising the issue of inverse condemnation were rejected by the presiding

7  administrative law judge as being outside the scope of the proceeding.  Yet,

8  immediately prior to the grant of party status to those utilities, CPUC

9  decisionmakers engaged in numerous ex parte meetings with IOU representatives

10  on the topic of inverse condemnation law.  The CPUC thus allowed the IOUs

11  preserve the issue of inverse condemnation for appeal, thus making the issue of

12  SDG&E's uninsured wildfire costs a vehicle to invalidate the prudent manager

13  standard.

14       87.    In short, AB 1054 is the culmination of years of maneuvering by the

15  IOUs to force a change in the prudent manager standard so that utility customers

16  would subsidize IOU safety violations.  The bill's fundamental reworking of the

17  prudent manager standard, a fundamental precept of California public utility law,

18  however, is only half the bailout.

19    **(2) AB 1054's Implementation of a Liquidity Fund Capitalized by**
       **Ratepayers is Also an Invention of the IOUs and Inserted into the Bill by**
20     **Utility Lobbyists**

21       88.    The other half of the bailout is AB 1054's utility customer-capitalized

22  wildfire liability liquidity fund.  That concept also dates back many years, at least

23  since 31 August 2009, when SDG&E proposed a Wildfire Expense Balancing

24  Account to secure automatic recovery for all uninsured wildfire liabilities through

25  increased electricity rates:

26       Applicants therefore request prompt Commission action authorizing
27       recovery through retail rates of the costs arising from wildfires for
         which they are at risk due to the limited availability of liability
28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

insurance.

Rather than attempt to accumulate reserves in advance for future payouts, Applicants propose to finance uninsured costs as they are incurred and subsequently recover the costs in rates.[22]

89. The CPUC administrative law judge initially found the proposal defective for three reasons, which became the basis for the judge's proposed decision denying SDG&E's proposal:

1. The limitless potential for ratepayers to fund third-party claims, including fire suppression and environmental damage, all but invite governmental entities and everyone else to submit claims to utilities;

2. Utilities have no incentive to defend against third-party claims, and ratepayers are without a practical means to protect their interests; and

3. The presumption of recovery of third-party claims undermines financial incentives for prudent risk management and safety regulation compliance.[23]

90. All five CPUC Commissioners voted to agree with the judge and reject SDG&E's proposed liquidity fund, recognizing it would "provide for unlimited potential for uninsured wildfire costs to ratepayers," and would "not create incentives to reduce the risk of wildfires."[24]

91. Yet, on April 12, 2019, pages 36-37 of the Governor's Strike Force Report included the SDG&E liquidity fund concept, premised upon ratepayer contributions to cover uninsured wildfire costs:

This concept would create a fund to provide bridge financing for utilities to pay wildfire liability claims pending the CPUC's decision on cost recovery under a modified standard.

...

The liquidity-only fund could be capitalized by utility investors and ratepayers, potentially through a continuation and securitization of the

---

[22] Joint Application of SDG&E, SCE, and So. Cal. Gas Co., proceeding A.09-08-020 (August 31, 2009), pp. 5-8.
[23] Decision Denying Application, D.12-12-029. proceeding A.09-08-020 (December 20, 2012), p. 2.
[24] *Id.* at 18.

29

1    Department of Water Resources (DWR) charge implemented during
2    the power crisis in 2001 and expected to be fully repaid before the end
     of 2020… The fund would then be available to provide funds for
3    utilities to pay claims after a determination of cause and before a
4    determination of cost recovery.

5    …
     This concept does not shield utility customers from uncapped liability
6    for wildfire damages. In fact, if cost recovery changes increase the
7    certainty that utilities can recover damages from their customers,
8    ratepayers will pay more.

9        92.    The IOUs supplied the wildfire fund concepts to the Governor's office
10   through their ex parte meetings with the California Commission on Catastrophic
11   Wildfire Cost and Recovery and through the IOUs' comments and public
12   presentations.
13       93.    On 11 March 2019, for example, SCE wrote the following to the
14   Commission in a letter entitled "March 13th Meeting of the Commission on
15   Catastrophic Wildfire Cost and Recovery":
16       While wildfires can cause damage into the tens of billions of dollars,
17       the commercial insurance and reinsurance markets by all accounts will
         only cover up to approximately $1.5B.
18
19       For damage above commercial insurance, there is a critical need for an
         alternative risk financing vehicle, such as a catastrophic wildfire
20       recovery fund that would be capitalized both pre- and post-loss through
21       utility rates charged to customers.
22       94.    Likewise, SDG&E's presentation to the Commission on March 13,
23   2019, in Redding, California, included:
24       A statewide wildfire insurance fund should be established to socialize the
         costs of wildfire liability broadly. Such a fund should include investor owned
25       utilities and municipal utilities. The fund should operate on top of a utility's
26       insurance coverage. Utilities should contribute to the fund based on their
         relative risk profile, factoring in their service territory size and fire risk, as
27       well as the investment and programs they have initiated to mitigate
28       catastrophic wildfires.

                                        30

Utilities should be able to access the wildfire fund or securitize their liabilities through a dedicated rate component prior to an after-the-fact reasonableness review. This is essential to avoid future liquidity crisis that could lead to bankruptcy.

95.     All the above-described liquidity fund elements have been made into law by AB 1054. For example, Section 16 of the bill, adding Cal. Pub. Util. Code § 3280 *et. seq.,* establishes a wildfire fund which is continuously appropriated for the IOUs' use whenever they cause a fire. $10.5 billion in taxpayer funds from the Surplus Money Investment Fund is to be transferred to the fund as an initial contribution to be paid back by utility customers.

96.     Section 22 of the bill, adding Cal. Wat. Code § 80500 *et. seq.,* provides the taxpayer funds to capitalize the wildfire fund be paid back through the issuance of bonds by the Department of Water Resources. In turn, the DWR's bonds are paid off by revenue from utility customers in the form of a charge to monthly bills originally imposed during the California Energy Crisis.

97.     Section 22 provides for the charge to be extended to 2035, 13 years after its intended expiration date of 2022. Funds from the DWR charge are deposited in their own fund but transferred thereafter to the wildfire fund. Annually, the DWR is to propose, and the CPUC is to approve, a revenue requirement for the DWR charge fund to ensure the bonds are paid back by 2035.

98.     In short, AB 1054 provides for an endless amount of bonds to be issued and an endless amount of rate increases to meet the revenue requirement of the DWR charge fund so that the bonds to capitalize the wildfire fund are paid off, which in turn pays for whatever wildfire liabilities are incurred by the IOUs.

99.     Through a targeted and intensive lobbying campaign, the IOUs have created SDG&E's limitless wildfire liability fund concept from 2007, a concept so odious to utility customers that the CPUC rejected it outright, yet passed through

31

Case 3:14-cr-00175-WHA   Document 1079   Filed 08/05/19   Page 41 of 61

1    the Legislature only fifteen days from its introduction as a gutted-and-amended bill.

2

3    **(3) Convicted Felon PG&E Spent Millions on Lobbying and Campaign
     Contributions to Transfer Financial Liability for Wildfires onto
     Utility Customers and Taxpayers**

4

5    100.   The IOUs persuaded the Governor and members of the Legislature to

6    include legal and financial bailout provisions into AB 1054 by making massive

7    campaign contributions to nearly every politician with the power to vote on the bill.

8    101.   On 27 June 2019, AB 1054 was gutted and replaced, after which it was

9    rushed through committees and through Senate and Assembly floor votes, despite

10   its 57-page length:

| Date | Action |
|---|---|
| 07/12/19 | Chaptered by Secretary of State - Chapter 79, Statutes of 2019. |
| 07/12/19 | Approved by the Governor. |
| 07/11/19 | Enrolled and presented to the Governor at 12 p.m. |
| 07/11/19 | Urgency clause adopted. Senate amendments concurred in. To Engrossing and Enrolling. |
| 07/11/19 | Assembly Rule 77 suspended. |
| 07/10/19 | From committee: That the Senate amendments be concurred in. (Ayes 11. Noes 1.) (July 10). |
| 07/09/19 | Re-referred to Com. on U. & E. pursuant to Assembly Rule 77.2. |
| 07/09/19 | In Assembly. Concurrence in Senate amendments pending. May be considered on or after July 11 pursuant to Assembly Rule 77. |
| 07/08/19 | Read third time. Urgency clause adopted. Passed. Ordered to the Assembly. |
| 07/08/19 | Ordered to third reading. |
| 07/08/19 | From committee: Do pass. (Ayes 5. Noes 1.) (July 8). |
| 07/08/19 | From committee: Do pass and re-refer to Com. on APPR. (Ayes 9. Noes 2.) (July 8). Re-referred to Com. on APPR. |
| 07/05/19 | From committee chair, with author's amendments: Amend, and re-refer to committee. Read second time, amended, and re-referred to Com. on E., U. & C. |
| 07/05/19 | In committee: Hearing postponed by committee. |
| 07/05/19 | Joint Rule 62(a) suspended. |
| 06/27/19 | From committee chair, with author's amendments: Amend, and re-refer to committee. Read second time, amended, and re-referred to Com. on E., U. & C. |

32

102. PG&E made massive campaign contributions to nearly every member of the Legislature and to Governor Newsom to secure passage of AB 1054. Indeed, Brandon Rittiman of Sacramento's ABC Channel 10 reported ninety-eight (reduced to 93 after his report) sitting members of the California legislature took campaign contributions from PG&E, despite the company's recent convictions of six federal felonies.

103. Both Democrat and Republican lawmakers alike accepted PG&E's money. Collectively, the recipients of PG&E's campaign contributions make up a supermajority of the Legislature: 8 out of every 10 sitting lawmakers took the felon's money.

104. PG&E was convicted in August 2016 and sentenced in January 2017, yet it went on to spend millions to influence California politics. After its felony conviction, PG&E donated $208,400 to help elect Gov. Gavin Newsom and sent more than $550,000 to both the state Republican and Democratic parties.

105. According to Rittiman, "In all, state lawmakers received more than $548,005 from PG&E in the last election cycle." Those who accepted PG&E's campaign contributions strongly correlate with those who voted for AB 1054. Of the 31 Senators who voted for AB 1054, 64% (20 Senators) accepted PG&E's campaign contributions.

106. In total, PG&E contributed approximately $97,417 to the 20 Senators. On average, PG&E contributed around $4,871 per Senator:

| NAME | PG&E's CONTRIBUTION |
|---|---|
| Benjamin Allen | $2,000 |
| Patricia Bates | $8,800 |
| Andreas Borgeas | $8,800 |
| Steven Bradford | $4,758 |
| Anna Caballero | $4,400 |

33

| Brian Dahle | $8,800 |
|---|---|
| Bill Dodd | $2,258.82 |
| Elena Durazo | $3,400 |
| Robert Hertzberg | $8,800 |
| Ben Hueso | $8,800 |
| Connie Leyva | $1,000 |
| Mike McGuire | $1,000 |
| John M.W. Moorlach | $1,000 |
| Jim Nielsen | $6,400 |
| Richard Pan | $8,800 |
| Richard Roth | $3,000 |
| Susan Rubio | $5,000 |
| Nancy Skinner | $1,000 |
| Henry Stern | $3,000 |
| Bob Wieckowski | $6,400 |

107.   Of the 65 Assemblymembers who voted for AB 1054, 85% (or 55 Assemblymembers) accepted PG&E's campaign contributions *after* PG&E was convicted of 5 felony safety violations in August 2016.

108.   In total, PG&E contributed approximately $323,640 to the 55 Assemblymembers.  On average, PG&E contributed around $5,884 per Assemblymember:

| NAME | PG&E'S CONTRIBUTION |
|---|---|
| Cecilia M. Aguiar-Curry | $8,800 |
| Joaquin Arambula | $4,000 |
| Frank Bigelow | $8,800 |

34

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

| | |
|---|---|
| Richard Bloom | $2,000 |
| Tasha Boerner Horvath | $4,400 |
| Rob Bonta | $8,800 |
| William Brough | $5,400 |
| Autumn Burk | $8,800 |
| Ian Calderon | $8,800 |
| Wendy Carrillo | $3,400 |
| Steven Choi | $2,000 |
| Kansen Chu | $2,500 |
| Ken Cooley | $6,400 |
| Jim Cooper | $8,800 |
| Jordan Cunningham | $8,800 |
| Tom Daly | $8,800 |
| Tyler Diep | $4,400 |
| Susan Talmantes Eggman | $4,440 |
| Health Flor | $8,800 |
| Jim Frazier | $8,800 |
| Laura Friedman | $1,300 |
| Jesse Gabriel | $4,400 |
| James Gallagher | $8,400 |
| Eduardo Garcia | $8,400 |
| Mike Gipson | $5,900 |
| Todd Gloria | $5,000 |
| Lorena Gonzalez | $8,800 |
| Chris Holden | $8,800 |
| Jacqui Irwin | $4,500 |
| Reginald Bryon Jones-Sawyer, Sr | $8,800 |

35

| | |
|---|---|
| Sydney Kamlager-Dove | $2,000 |
| Monique Limon | $1,300 |
| Evan Low | $13,500 |
| Brian Maienschein | $4,000 |
| Chad Mayes | $8,800 |
| Kevin McCarty | $3,000 |
| Jose Medina | $4,000 |
| Al Muratsuchi | $7,400 |
| Adrin Nazarian | $2,000 |
| Jay Obernolte | $3,000 |
| Patrick O'Donnell | $8,800 |
| Jim Patterson | $8,800 |
| Bill Quirk | $8,800 |
| Sharon Quirk-Silva | $6,400 |
| James Ramos | $4,400 |
| Anthony Rendon | $8,800 |
| Eloise Gomez Reyes | $2,000 |
| Freddie Rodriguez | $8,800 |
| Blanca Rubio | $8,800 |
| Miguel Santiago | $8,800 |
| Mark Stone | $1,000 |
| Randy Voepel | $2,000 |
| Marie Waldron | $3,000 |
| Shirley Weber | $1,000 |
| Jim Wood | $2,000 |

36

109.   Campaign contributions weren't the only form in which a bankrupt PG&E spent its cash to influence legislators.  On 23 February 2019, the New York Times reported, "Filings with the California secretary of state show that PG&E, which serves 16 million customers, spent $10 million on lobbying last year."[25]

110.   In fact, PG&E spent roughly six times more than PG&E had spent lobbying in previous legislative sessions.  As the San Francisco Chronicle reported on 30 January 2019: "Pacific Gas & Electric Co.'s lobbying expenses have soared as the utility giant struggles to deal with a Legislature determined to avoid a repeat of the deadly wildfires that have ravaged California."  To wit, the Chronicle examined PG&E's filings with the California Secretary of State and found a dramatic increase in lobbying expenses after the 2017 Northern California wildfires:

| Year | Amount PG&E Expended in State Lobbying |
|------|----------------------------------------|
| 2018 | $8.35 million |
| 2017 | $1.61 million |
| 2016 | $1.11 million |
| 2015 | $1.42 million |
| 2014 | $1.85 million |
| 2013 | $1.34 million |
| 2012 | $1.42 million |
| 2011 | $1.24 million |
| 2010 | $1.53 million |
| 2009 | $1.25 million |
| 2008 | $1.33 million |
| 2007 | $1.05 million |

[25] https://www.nytimes.com/2019/02/23/us/pge-california-politics.html

37

111. On 12 April 2019, in response to questions from Rittman, Governor Newsom revealed he'd already granted PG&E access to him. Newsom stated he spoke privately with the PG&E's new board members and president about the utility's path out from bankruptcy: "Maybe it's an enlightened board, it's the right board, it's going to meet the moment and their president is the right person, he's going to meet the moment. By the way, he's privately said the right things to us, he really did—it's almost too good. He's said all the right things, maybe — maybe they'll follow through on it. Maybe, maybe so we've got to give these folks a chance."[26]

112. PG&E's campaign contributions induced the Governor and the Legislature to act without regards to climate change. The dryer weather and more aggressive winds caused by climate change make it imperative for utilities to operate their systems in strict compliance with fire safety rules. Yet, the legislature lowered the fire safety standards with the passage of AB 1054 by adopting the prudency standard used by FERC.

113. Violations of fire safety standards such as General Order 95 are insufficient under the FERC standard to establish the serious doubt needed to defeat a presumption of utility prudence because "utilities are not expected to be infallible." The new FERC rules instead "permits considerable latitude."[27] While the prudent manager standard at the CPUC was developed to protect the public from "unconscionable" rate increases,[28] the FERC version of the standard developed to streamline utility requests for rate increases.[29]

114. California's formulation of the prudent manager standard dovetails with the state's ambitious climate change policies, while the FERC standard does

---

[26] California Office of Emergency Services, "LIVE from the Headquarters of Cal OES!," streamed live on April 12, 2019, https://www.youtube.com/watch?v=gncpih-XfrE, timestamp 50:05 to 51:15.
[27] 146 FERC ¶ 63,017, p. 14.
[28] 1984 Cal. PUC LEXIS 1044, *107
[29] 153 FERC ¶ 61,233, p. 9 ("However, in order to ensure that rate cases are manageable, a presumption of prudence applies…").

38

1  not. The Governor and the Legislature's break from their fundamental climate

2  change policies shows how influential PG&E's millions in campaign contributions

3  were to the formulation and rapid passage of AB 1054.

## FIRST CLAIM FOR RELIEF
### Violation of Due Process under the U.S. and California Constitutions
### (Against All Defendants)

6      115.  Plaintiffs re-allege and incorporate the allegations of all prior

7  paragraphs of the complaint, as though fully set forth herein.

8      116.  The Fourteenth Amendment to the U.S. Constitution states: "No state

9  shall make or enforce any law which shall abridge the privileges or immunities of

10  citizens of the United States; nor shall any state deprive any person of life, liberty,

11  or property, without due process of law..."

12      117.  Section 7(a) of the California Constitution likewise states: "A person

13  may not be deprived of life, liberty, or property without due process of law..."

14      118.  Both constitutional due process guarantees require a fair proceeding

15  whenever an individual is to be deprived of life, liberty or property. A fair

16  proceeding requires notice and a meaningful opportunity to be heard.

17      119.  Due process prohibits the Legislature from enacting statutes that

18  unfairly shift the burden of proof. Due process also prohibits the Legislature from

19  declaring that proof of a fact or group of facts shall constitute evidence of an

20  ultimate fact in issue if those facts have no rational connection between what is

21  proved and what is to be inferred.

22      120.  A statute creating a presumption that is arbitrary, or that operates to

23  deny a fair opportunity to repel it, thus violates the due process clause of the

24  Fourteenth Amendment of the U.S. Constitution. Legislative fiat may not take the

25  place of fact in the judicial determinations of issues involving life, liberty or

26  property.

27  / / /

28

1    121.   AB 1054 violates Plaintiffs' due process rights in two ways. First, it

2   impermissibly shifts the burden to ratepayers to show prudency by the utilities

3   when their operations cause wildfires. Second, it violated due process by continuing

4   a surcharge for an additional 15 years and the issuance of bonds that was originally

5   established in and around 2001 and was set to end in 2021. Enactment of AB 1054

6   denied Plaintiffs due process as they were not provided a forum to challenge the

7   extended surcharge in a CPUC proceeding.

8    122.   By enacting AB 1054, the Legislature improperly created a

9   presumption that disproportionately favors IOUs by assuming they acted

10  reasonably in starting a wildfire. AB 1054's annual safety certification does not

11  constitute evidence of whether an IOU was acting reasonable at the time a given

12  fire was ignited. An IOU's annual safety certification does not allow an

13  adjudicative body to infer whether that utility was reasonable in the context of

14  starting a wildfire.

15   123.   By shifting the initial burden of proof, utility customers now have the

16  affirmative duty to provide evidence showing serious doubt as to whether the utility

17  acted reasonably. IOUs which apply to draw from the wildfire fund have no

18  incentive to candidly provide the CPUC and members of the public relevant

19  information by which to determine utility prudence. Indeed, IOUs are

20  *disincentivized* from being forthcoming with testimony and internal data, making it

21  all but impossible for utility customers to demonstrate serious doubt.

22   124.   Utility customers already have a severe disadvantage in CPUC

23  proceedings in comparison to the IOUs, as the standard is dependent upon internal

24  data showing what the utility knew or did not know at the time of the fire, what

25  tools a utility had available to address the fire and how it used those tools, and so

26  on. Compounding these procedural disadvantages, utilities have millions upon

27  millions to spend on lobbyists, attorneys, public relations experts, and so on to

28  make their affirmative case to raise rates.

40

1    125.   Combined with AB 1054's lowering of the prudent manager standard

2  away from objective determinations of fault based upon violations of well-

3  established safety standards under California law such as General Order 95, AB

4  1054 operates to deny a fair opportunity for utility customers to repel the

5  presumption of utility prudence.  As such, AB 1054 violates the due process rights

6  of utility customers under the U.S. and California Constitutions.

7    126.   Second, Plaintiffs' due process rights are violated because AB 1054

8  proposed wildfire funding mechanisms are premised upon limitless subsidies from

9  utility customers. The CPUC rejected such a fund when originally proposed by

10  SDG&E because of the potential for limitless utility customer subsidies without any

11  incentives for utilities to act prudently because all their uninsured costs would be

12  passed onto ratepayers.

13    127.   In violation of due process, the California Department of Water

14  Resources (DWR) defendant intends and will issue long term bonds over the next

15  15 years to pay for past and future uninsured wildfire costs the utilities have

16  incurred.  The DWR intends to make continuous appropriations of taxpayer and

17  utility customer funds to pay the bonds in amounts as much as $200 billion over the

18  next 15 years.

19    128.   AB 1054 provides for such a fund and as such, fails again to balance

20  the interests of utility customers against those of the utilities.  Utility customers

21  have an interest in being free from exploitation, yet AB 1054 would subject utility

22  customers to potentially limitless exposure for the IOUs' wildfire claims.  Worse,

23  by passing on uninsured wildfire costs onto ratepayers and then applying a

24  weakened prudent manager standard, AB 1054 allows utility customers to be

25  exploited and forced to subsidize IOUs for the wildfires they cause without any just

26  compensation.

27    129.   Under Section 16 of AB 1054, the defendants intend to finance the

28  wildfire fund in part by extending the surcharge rate imposed upon ratepayers under

1   a rate agreement between the CPUC and the DWR and bond proceeds issued by the

2   DWR to pay the utilities' uninsured wildfire cost bills. The DWR bonds were

3   originally enacted to address California's energy crises and were set to expire in

4   2021.

5        130.   AB 1054 extended these bonds to charge utility customers for another

6   15 years. AB 1054 extended the bonds for another 15 years without any proceeding

7   where utility customers had either notice or a meaningfully opportunity to oppose

8   such an extension. AB 1054 also extends these bonds for another 15 years for a

9   reason unrelated to why the bonds were initially issued.

10       131.   The wildfire fund's reliance on revenue from electricity rate increases

11  paid by utility customers therefore results in a deprivation of property without due

12  process, in violation of both the U.S. and California Constitutions.

13                          **SECOND CLAIM FOR RELIEF**

14  **Violation of the Takings Clauses under the U.S. and California Constitutions
    (Against All Defendants)**

15       132.   Plaintiffs re-allege and incorporate the allegations of all prior

16  paragraphs of the complaint, as though fully set forth herein.

17       133.   The Takings Clause to the Fifth Amendment to the U.S. Constitution is

18  the last phrase therein: "…nor shall private property be taken for public use,

19  without just compensation."

20       134.   Likewise, the Takings Clause of the California Constitution, Art. 1 §

21  19, states: "Private property may be taken or damaged for a public use and only

22  when just compensation, ascertained by a jury unless waived, has first been paid to,

23  or into court for, the owner."

24       135.   The Takings Clauses of both constitutions require that rates imposed

25  upon utility customers be just and reasonable.  The just and reasonableness of rates

26  is determined not only in light of the utility's interest in financial integrity but also

27  by utility customers' legitimate interest in freedom from exploitation.  In balancing

28

                                          42

1  those interests for a just and reasonable rate, the law is concerned with a broad zone

2  of reasonableness and not with any particular point therein.

3    136.  Moreover, the utility's interest in financial integrity describes an

4  interest the utility may pursue and not a right that it can *demand*.  Such an interest is

5  only one of many variables in the constitutional calculus of reasonableness.  Under

6  both federal and California utility law, a regulated firm in fact has no constitutional

7  right to a profit, even if compelled to operate at a loss.

8    137.  The prudent manager standard of California law is meant to answer the

9  question of whether it would be just and reasonable for an IOU to pass on its costs

10  onto their customers.  By way of example, in finding that SDG&E was not a

11  prudent manager in causing the 2007 San Diego wildfires, the CPUC relied upon its

12  own safety rules and regulations for overhead electric supply lines which have been

13  in effect since 1911 – General Order 95.[30]

14    138.  Section 6 of AB 1054 created a new prudent manager standard for

15  wildfire costs, codified in Cal. Pub. Util. Code § 451.1, which allows passing such

16  costs onto utility customers *despite* proven violations of safety standards, including

17  General Order 95.  As described above, § 451.1(c) requires utility customers make

18  a showing of "serious doubt" to challenge IOU applications to pass on wildfire

19  costs onto their customer base.  FERC has already held that violations of General

20  Order 95 do not constitute a requisite showing of serious doubt to challenge the

21  passing on of wildfire costs, yet AB 1054 adopts FERC's serious doubt standard in

22  the same context.[31]

23    139.  AB 1054's adoption of the "serious doubt" standard is doubly

24  problematic in view of the bill's change to Cal. Pub. Util. Code § 451.1(b) to allow

25  an IOU to show prudence through comparison to actions taken by other IOUs.

26  [30] 2018 Cal. PUC LEXIS 314, *supra*, *13 ("The issue is that SDG&E knew it had an obligation to
   maintain its facilities in compliance with established equipment clearance requirements under
27  General Order 95."), *14 ("Here, the GO violation... demonstrated a failure to reasonably and
   prudently operate and maintain overhead electric lines... Compliance is not discretionary.").
28  [31] *See* 146 FERC ¶ 63,017, pp. 14-16.

43

1   Because the "serious doubt" standard rejects the existence of safety violations as

2   *per se* proof of IOU imprudence, AB 1054 would allow IOUs to pass on their

3   wildfire costs onto ratepayers by arguing that their lack of objective safety

4   precautions – such as compliance with General Order 95 – is excused by the failure

5   of other electric utilities to be in compliance with relevant safety rules.

6       140.   AB 1054's changes to Cal. Pub. Util. Code § 451.1(b) also allows

7   IOUs to justify the passage on its costs onto customers by arguing "factors both

8   within and beyond the utility's control that may have exacerbated the costs and

9   expenses, including humidity, temperature, and winds." AB 1054 does not explain

10   to what extent an IOU's liability for a given wildfire could be affected by factors

11   beyond the IOU's control. Nor does AB 1054 explain how the extent to which an

12   IOU's liability was in fact exacerbated by such factors be determined.

13       141.   The totality of these changes to the prudent manager standard results

14   in the imposition of unjust and unreasonable rates because they do not properly

15   balance the interests of utility customers against those of the utilities. By separating

16   the prudent manager standard in the context of wildfires from IOU compliance with

17   General Order 95 and other applicable wildfire safety rules, AB 1054 created a

18   prudent manager standard that allows for decisions to be made outside the zone of

19   reasonableness required by the Takings Clauses of both the U.S. and California

20   Constitutions. Indeed, AB 1054's formulation of the prudent manager standard

21   appears to be designed to facilitate IOUs passing wildfire costs onto their

22   customers, despite IOUs lacking any Takings Clause entitlement to a guaranteed

23   profit, let alone cost recovery.

24       142.   As such, AB 1054 imposes an unlawful government taking without

25   just compensation against utility customers, in violation of both the U.S. and

26   California Constitutions.

27       143.   A second way in which the takings clause is violated is that it provides

28   for limitless subsidies from utility customers, such as the wildfire fund created by

44

1    AB 1054, since at least 2009.  The CPUC rejected such a fund when originally

2    proposed by SDG&E because of the potential for limitless utility customer

3    subsidies without any incentives for utilities to act prudently because all their

4    uninsured costs would be passed onto ratepayers.

5         144.  AB 1054 provides for such a fund with bonding and as such, fails

6    again to balance the interests of utility customers against those of the utilities.

7    Utility customers have an interest in being free from exploitation, yet AB 1054

8    would subject utility customers to potentially limitless exposure for the IOUs'

9    wildfire claims.  Worse, by passing on uninsured wildfire costs onto ratepayers and

10   then applying a weakened prudent manager standard, AB 1054 provides virtually

11   no incentives for IOUs to act prudently to prevent wildfires in the first instance.

12        145.  The wildfire fund's reliance on revenue from electricity rate increases

13   paid by utility customers therefore results in unjust and unreasonable rates, in

14   violation of both the U.S. and California Constitutions.

15                    **THIRD CLAIM FOR RELIEF**
         **Violation of the Urgency Clause of the California Constitution**
16                     **(Against All Defendants)**

17        146.  Plaintiffs re-allege and incorporate the allegations of all prior

18   paragraphs of the complaint, as though fully set forth herein.

19        147.  Article IV, Section 8(d) of the California Constitution states an

20   urgency statute "may not create or abolish any office or change the salary, term, or

21   duties of any office, or grant any franchise or special privilege, or create any vested

22   right or interest."

23        148.  Section 4 of AB 1054 "hereby established the California Wildfire

24   Safety Advisory Board."  Section 4 provides for the Board to "consist of seven

25   members," of which five "shall be appointed by the Governor," one "shall be

26   appointed by the Speaker of the Assembly," and the final member "shall be

27   appointed by the Senate Committee on Rules."  Further, AB 1054 establishes an

28

                                   45

1   administrator for the Wildfire Fund.  Put simply, AB 1054 creates eight offices that

2   did not exist before, in violation of the Constitution's prohibition of the same

3   against urgency statutes.

4       149.   Further, Art. IV, Sec. 8(d) of the California Constitution defines an

5   urgency statute as that "necessary for immediate preservation of the public peace,

6   health, or safety."  An urgency statute must include one section with "a statement of

7   facts constituting the necessity" of the bill. *Id*.

8       150.   Section 27 of AB 1054 justifies the bill's status as an urgency measure

9   with one sentence: "In order to address wildfire safety and wildfire liability of

10   electrical utilities and ensure that the claims of wildfire victims may be paid

11   expeditiously, it is necessary for this act to take effect immediately."

12      151.   AB 1054, by its own terms, does not make factual findings to justify

13   how the increase of electric utility rates to capitalize a wildfire liability fund is

14   necessary for the "immediate preservation" of either "public peace, health, or

15   safety" as required by Art. IV Sec. 8(d) of the California Constitution.

16      152.   Section 27's lone statement does not show a rational relationship

17   between the establishment of the liability fund (meant to address the "wildfire

18   liability of electrical utilities") and the bill's provision for $10.5 billion in bonds to

19   be taken out, which ratepayers must pay for in the form of increased rates.  In other

20   words, the statement of facts in Section 27 affirmatively shows there is no public

21   necessity which requires *ratepayers* in particular to contribute to a continuous

22   bailout of electric utility companies from hypothetical wildfire damages.

23      153.   Section 27's lone statement also does not show a rational relationship

24   between the provision of a ratepayer-funded bailout of electrical utility companies

25   and the Legislature's declaration of intent for "the claims of wildfire victims be

26   paid expeditiously."  Critically, PG&E declared bankruptcy in January 2019,

27   several months *before* AB 1054 was gutted-and-replaced to serve as the vehicle for

28   the Governor's ratepayer-funded electric utility bailout.  Meanwhile, AB 1054's

46

1  wildfire liability fund will cover the payment of claims for *future*, not past,

2  wildfires.

3       154.   For claims of wildfire victims to in fact be paid expeditiously as

4  Section 27 of AB 1054 contemplates, PG&E would have to emerge from

5  bankruptcy with a plan to raise capital to pay over $30 billion in wildfire damage

6  claims from the 2017 Northern California Fire Siege and the 2018 Camp Fire.  AB

7  1054 does *not* provide PG&E with funds to pay claims arising from these fires.

8  Nor does AB 1054 provide PG&E a mechanism to obtain funding to pay such

9  claims.

10      155.   In other words, there is nothing in AB 1054 which would result in

11  *existing* wildfire claims being paid out expeditiously.  The bill only provides for

12  *future* hypothetical wildfire claims.  The statement of facts in Section 27 thus

13  affirmatively show no public necessity relating to payment of wildfire claims.

14      156.   Finally, with respect to AB 1054 addressing the "wildfire liability of

15  electrical utilities," there are no circumstances requiring the immediate passage, let

16  alone enactment, of the bill other than those created by its supporters, the IOUs, and

17  their institutional investors.

18      157.   Gov. Newsom claimed securities analysts threatened the Governor's

19  office and the Legislature with downgrades of creditworthiness of SCE and

20  SDG&E to junk bond status if the Governor's office and the Legislature could not

21  get AB 1054 passed by 12 July 2019.[32]  While S&P Global and Moody's did call

22  for further utility credit downgrades if no action was taken to address the upcoming

23  wildfire season, it was Governor Newsom who in fact set the July 12th deadline at a

24  press conference on 12 April 2019 in which he outlined the contents of his strike

25  force's report.[33]

26  ――――――――――
    [32] Taryn Luna, "California needs a big pot of money for wildfires. But how big? And who pays?,"
27  Los Angeles Times (June 17, 2019), https://www.latimes.com/politics/la-pol-ca-wildfire-money-
    fund-20190617-story.html
28  [33] Mark Chediak, Romy Varghese, and Michael B. Marois. "PG&E Caps Best Day Since Going

47

158.   Likewise, at the Senate Energy, Utilities, and Communications Committee hearing of 8 July 2019, the bill's principal author, Assemblymember Chris Holden, declared: "One [of our utilities] went to junk bond status and then bankruptcy. Another faces the same plight this summer if we do nothing. Other utilities, public and private, may be close behind as the market actions have a cascading effect."[34]

159.   Assemblymember Holden's statement was both misleading and materially false.  The utility that went into junk bond status and then into bankruptcy was PG&E, saddled with $30 billion in liabilities from causing two of the most damaging wildfires in California history within a two-year period.  PG&E's descent into bankruptcy was a given after the Camp Fire.  The other utility referenced by the Assemblymember is SCE, which is not at risk for either junk bond status or bankruptcy.  In summary, there were no circumstances showing a need for immediate preservation of the public peace, health, or safety, other than those manufactured by the bill's proponents.

160.   By its very terms, AB 1054 is not an urgency statute.  AB 1054 took action forbidden by the California Constitution of urgency statutes and made findings of fact which lacked a rational relationship to the bill's provisions.

### FOURTH CLAIM FOR RELIEF
### Violation of the Right to Access Information
### Under the California Constitution
### (Against all Defendants)

161.   Plaintiffs re-allege and incorporate the allegations of all prior paragraphs of the complaint, as though fully set forth herein.

Bankrupt as California Offers Help." Bloomberg (April 12, 2019), https://www.bloomberg.com/news/articles/2019-04-12/california-s-newsom-signals-pg-e-edison-will-get-wildfire-help
[34] California Senate Energy, Utilities, and Communications Committee meeting, (July 8, 2019), timestamp 00:11:10, calchannel.granicus.com/MediaPlayer.php?view_id=7&clip_id=6447

48

1       162.   Article I, Section 3 of the California Constitution requires statutes that

2  limit the public's right to access information "shall be adopted with findings

3  demonstrating the interest protected by the limitation and the need for protecting

4  the interest."

5       163.   AB 1054 Section 4 enacted Section 326.1, which established the

6  California Wildfire Safety Advisory Board. The board's mission is to advise on

7  ways and means to reduce wildfires.  Section 326.1 allows the CPUC or the board

8  to "assert the deliberative process privilege for a communication between the board

9  and the commission that satisfies the criteria for privilege as a deliberative process

10  communication."  Accordingly, AB 1054 limits the public's right to access public

11  records and communications between two public entities regarding how they are

12  dealing with California's wildfires.

13       164.   The deliberative process privilege provides a limited exemption to the

14  right of public access.  However, it does not apply to discussions between members

15  of two different public agencies.  The privilege is also limited and may be

16  overridden if the public interest in disclosure outweighs the interest in concealment.

17  The public has a substantial interest in the communications between two public

18  agencies discussing recommendations on ways and means for utilities to reduce

19  catastrophic wildfires.

20       165.   Since AB 1054 limits the public's right to access communications

21  between two public entities through the deliberative process privilege, AB 1054

22  was required to be adopted with findings demonstrating the interest protected by the

23  bill's limitation and the need for protecting the interest in accordance with

24  California's Constitution Article 1, Section 3.

25       166.   The legislative findings of AB 1054, listed in Sections 1 and 2 of the

26  same, do not identify the interest protected by preventing the public from obtaining

27  communications between the two public entities.  Nor does the bill explain why the

28

1  deliberative process privilege should be automatically applied to communications

2  between members of the two public entities.

3      167.  Because the requisite legislative findings to support a limitation of the

4  constitutional right of access to information comprising the public's business are

5  not made, AB 1054 violates Article I, Section 3 of the California Constitution.

6  **FIFTH CLAIM FOR RELIEF**

7  **Violation of the Prohibition Against Unlawful Gifts of Public Funds**
   **(Against all Defendants)**

8      168.  Plaintiffs re-allege and incorporate the allegations of all prior

9  paragraphs of the complaint, as though fully set forth herein.

10      169.  Art. XVI, Sec. 6 of the California Constitution provides the Legislature

11  shall have no power to make any gift or authorize the making of any gift, of any

12  public money or thing of value to any individual, municipal, or other corporation.

13      170.  Gifts of public funds are government expenditures that primarily serve

14  a private purpose.  The gift the Legislature is prohibited from making is not limited

15  to a mere voluntary transfer of personal property without consideration but includes

16  all appropriations of public money for which there is no authority or enforceable

17  claim, even if there is a moral or equitable obligation.  Indeed, the restrictions

18  against gifts of public funds is in place to ensure accountability to constituents and

19  to prevent misuse of public money.

20      171.  AB 1054 was enacted to serve the primary private purpose of bailing

21  out IOUs from the billions of dollars in damages from catastrophic wildfires they

22  imprudently caused.  Indeed, the IOUs have proposed wildfire funding mechanisms

23  premised upon limitless subsidies from utility customers, such as the wildfire fund

24  created by AB 1054, since at least 2009.

25      172.  The CPUC rejected such a fund when originally proposed by SDG&E

26  because of the potential for limitless utility customer subsidies without any

27  incentives for utilities to act prudently because all their uninsured costs would be

28

50

1    passed onto ratepayers. AB 1054's gifts of public funds to the IOUs therefore lack
2    accountability, as there are no longer meaningful incentives to avoid imprudent
3    behavior and thus misuse of the billions of public funds to be allocated by AB 1054
4    on behalf of the IOUs.

5        173.   Under Section 25 of AB 1054, the Department of Finance defendant,
6    the State Treasurer defendant, and the State Controller defendant intend to make an
7    unlawful gift of nine million dollars ($9,000,000) of taxpayer money in the General
8    Fund to cover the Department of Water Resources' initial costs associated with the
9    newly extended bonds. AB 1054 also allows utilities to receive a two billion-dollar
10   ($2,000,000,000) loan from the Surplus Money Investment Fund (SMIF) and
11   authority for up to $8.5 billion in additional SMIF loans if there is no ratepayer
12   charge.

13       174.   Under Section 16 of AB 1054, the defendants intend to fund a wildfire
14   fund with a two billion dollar ($2,000,000,000) loan from taxpayers' funds held in
15   the California state's Surplus Money Investment Fund (SMIF) and an additional
16   eight billion five hundred million dollar ($8,500,000,000) loan if there is no
17   ratepayer charge. The defendants intend to finance the wildfire fund in part by
18   extending the surcharge rate imposed upon ratepayers under a rate agreement
19   between the CPUC and the Department of Water Resources, along with bond
20   proceeds issued by the DWR, to pay the utilities' uninsured wildfire cost bills.

21       175.   Each of these are unlawful gifts of public funds, in violation of Art.
22   XVI, Sec. 6 of the California Constitution.

23                        **SIXTH CLAIM FOR RELIEF**
                              **Declaratory Relief**
24                         **(Against all Defendants)**
25       176.   Plaintiffs re-allege and incorporate the allegations of all prior
26   paragraphs of the complaint, as though fully set forth herein.
27

28

                                    51

177.   A case of actual controversy exists regarding whether the Defendants will violate Plaintiffs' constitutional rights as alleged in this operative complaint if AB 1054 is in fact implemented.  The facts and circumstances alleged establish that a substantial controversy exists between the adverse parties of sufficient immediacy and reality as to warrant a declaratory judgment in Plaintiffs' favor.

178.   Plaintiffs thereby seek a declaration from this Court confirming AB 1054 is invalid as violative of the U.S. and California Constitutions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray judgment as follows:

1.   For a judgment that AB 1054 and its various provisions are invalid as violative of the U.S. and California Constitutions;

2.   For a declaration under any relevant statutes that AB 1054 and its various provisions violate the U.S. and California Constitutions, as alleged in this Complaint;

3.   For injunctive relief, under 42 U.S.C. § 3613(c), Cal. Gov. Code § 12929.2 and any other relevant statute, enjoining Defendants from enforcing or implementing any provisions of AB 1054;

4.   An award of litigation expenses, attorney fees, and costs pursuant to 42 U.S.C. § 3612(p); 42 U.S.C. § 1988; Cal. Code of Civil Procedure § 1021.5 and Cal. Gov. Code § 12989.2, as well as any other relevant statutes the Court deems proper; and

5.   For all other relief the Court determines is proper.

AGUIRRE & SEVERSON, LLP

Dated:  July 19, 2019

/s/ Michael J. Aguirre
Michael J. Aguirre
Attorneys for Plaintiffs

52