JENNER & BLOCK LLP
    Reid J. Schar (*pro hac vice*)
    RSchar@jenner.com
    353 N. Clark Street
    Chicago, IL 60654-3456
Telephone: +1 312 222 9350
Facsimile: +1 312 527 0484

CLARENCE DYER & COHEN LLP
    Kate Dyer (Bar No. 171891)
    kdyer@clarencedyer.com
    899 Ellis Street
    San Francisco, CA 94109-7807
Telephone: +1 415 749 1800
Facsimile: +1 415 749 1694

CRAVATH, SWAINE & MOORE LLP
    Kevin J. Orsini (*pro hac vice*)
    korsini@cravath.com
    825 8th Avenue
    New York, NY 10019
Telephone:    +1 212 474 1000
Facsimile:    +1 212 474 3700

Attorneys for Defendant PACIFIC GAS AND ELECTRIC COMPANY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                       Plaintiff,<br><br>     v.<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>                       Defendant. | Case No. 14-CR-00175-WHA<br><br>**RESPONSE TO REQUEST FOR INFORMATION ON PSPS**<br><br>Judge:  Hon. William Alsup |

Defendant Pacific Gas and Electric Company ("PG&E") respectfully submits this response to the Court's October 14, 2019 request for information on the Public Safety Power Shutoff that occurred from October 9 to October 12, 2019 (the "October 9-12 PSPS").  Specifically, the

1

Court requested that PG&E indicate how many trees and limbs fell or blew onto the deenergized lines as well as the number of infrastructure failures identified during the post-PSPS patrols and, for each, how many of those tree or branch strikes or infrastructure failures likely would have caused arcing had the lines been energized.  PG&E provides that information below.

As an initial matter, PG&E wants to acknowledge the hardship that the October 9-12 PSPS as well as ongoing PSPS events have caused for the millions of people affected, and assures the Court that it intends to continue working with all key stakeholders to minimize, to the extent possible, the hardship caused by these PSPS events.  In addition, PG&E notes that the information provided herein was collected in connection with the patrols that PG&E conducted of the 25,000 line miles that were included in the October 9-12 PSPS.  These patrols were conducted to assess whether the lines were safe to re-energize, including whether line or equipment repairs were necessary before the lines could be re-energized.  PG&E also notes that its ability to provide the Court with information about how many line strikes (from trees, branches or infrastructure failures) would have caused arcing involves some amount of speculation and is based on PG&E's best view based on factors such as the vegetation's location and the damage the vegetation or infrastructure failure appears to have caused.

Against that background, with respect to the tree or limb strikes, PG&E identified 74 instances of vegetation damage that appear to have occurred during the October 9-12 PSPS (*e.g.*, a tree branch laying across a power line).[1]  PG&E's current information with respect to these 74 instances is that:

- 44 instances of vegetation damage likely would have caused arcing if the lines had been energized based on PG&E's assessment of whether the vegetation

---

[1] During the post-PSPS patrols, PG&E identified vegetation issues that may have pre-dated the October 9-12 PSPS (*e.g.*, vegetation that was within the applicable clearance zones).  These issues are not included as part of the 74 instances of vegetation damage discussed above.  PG&E addressed each of these issues prior to re-energizing its lines.  PG&E's information about these issues is preliminary, but it will provide additional information to the Court once it is available.  PG&E notes, however, that it may be delayed in doing so in view of the ongoing PSPS events, which require significant resources to ensure the timeliness of decision-making, the re-energization of power lines and that customers get the support they need before, during and after the shutdowns.

was contacting or had contacted the conductor (*e.g.*, a tree branch is laying on two phases of a conductor);

- 25 instances of vegetation damage likely would not have caused arcing (*e.g.*, the conductor was insulated); and
- with respect to 5 instances of vegetation damage, PG&E is unable to determine whether arcing likely would have occurred.

Each of the 44 locations where vegetation damage occurred that likely would have caused arcing is identified by county and coordinates on Exhibit A, attached herewith. Exhibit A also includes information regarding the date of the most recent vegetation management work at each of the locations where arcing likely would have occurred.

PG&E identified 41 instances of damage to its infrastructure that appear to have been caused by extreme wind and/or other fire conditions present during the October 9-12 PSPS (*e.g.*, a broken tie wire (the equipment connecting the insulator to the conductor)).[2] PG&E's current information with respect to these 41 instances is that:

- 12 instances of infrastructure damage likely would have caused arcing based on PG&E's assessment of the location of the damaged equipment (*e.g.*, two phases of conductor made contact);
- 26 instances of infrastructure damage likely would not have caused arcing (*e.g.*, the conductor was insulated) ; and

---

[2] During the post-PSPS patrols, PG&E identified equipment issues that may have pre-dated the October 9-12 PSPS (*e.g.*, a crack in a cross arm that may not have been caused by extreme wind). PG&E also identified two instances of damage to infrastructure that is owned and operated by third parties. These issues are not included as part of the 41 instances of infrastructure damage discussed above. PG&E addressed each of these issues prior to re-energizing its lines. PG&E's information about these issues is preliminary, but it will provide additional information to the Court once it is available. PG&E notes, however, that it may be delayed in doing so in view of the ongoing PSPS events, which require significant resources to ensure the timeliness of decision-making, the re-energization of power lines and that customers get the support they need before, during and after the shutdowns.

- with respect to 3 instances of infrastructure damage, PG&E is unable to determine whether arcing likely would have occurred.

Each of the 12 locations where infrastructure damage occurred that likely would have caused arcing is identified by county and coordinates on Exhibit B, attached herewith.  Exhibit B also includes information regarding the date of the most recent inspection or patrol of the equipment at each of the 12 locations where arcing likely would have occurred.[3]

Dated:  October 30, 2019

Respectfully Submitted,

JENNER & BLOCK LLP

By:   /s/ Reid J. Schar
Reid J. Schar (*pro hac vice*)

CRAVATH, SWAINE & MOORE LLP

By:   /s/ Kevin J. Orsini
Kevin J. Orsini (*pro hac vice*)

---

[3] A patrol is a simple, visual inspection of applicable overhead and underground facilities to identify obvious structural problems and hazards.  Distribution patrols must be performed annually in urban areas, and every other year in rural areas, unless the area has been inspected in that year. All transmission line facilities are patrolled annually, but a detailed inspection (described below) may supplant an annual patrol if performed that year.  A patrol of overhead lines may be performed by walking, driving or helicopter.

An inspection is a careful examination of individual components, structures and equipment through visual observation, and/or routine diagnostic tests in order to identify abnormal conditions that adversely impact safety or reliability.  PG&E performs inspections of distribution lines every five years. For transmission facilities, detailed inspection frequencies vary depending on voltage, structure type (wood or steel), and foundation location relative to Bay waters.

CLARENCE DYER & COHEN LLP


By:  /s/ Kate Dyer
       Kate Dyer (Bar No. 171891)


Attorneys for Defendant PACIFIC GAS
AND ELECTRIC COMPANY