JENNER & BLOCK LLP
      Reid J. Schar (*pro hac vice*)
      RSchar@jenner.com
      353 N. Clark Street
      Chicago, IL 60654-3456
Telephone: +1 312 222 9350
Facsimile: +1 312 527 0484

CLARENCE DYER & COHEN LLP
      Kate Dyer (Bar No. 171891)
      kdyer@clarencedyer.com
      899 Ellis Street
      San Francisco, CA 94109-7807
Telephone: +1 415 749 1800
Facsimile: +1 415 749 1694

CRAVATH, SWAINE & MOORE LLP
      Kevin J. Orsini (*pro hac vice*)
      korsini@cravath.com
      825 8th Avenue
      New York, NY 10019
Telephone:     +1 212 474 1000
Facsimile:     +1 212 474 3700

Attorneys for Defendant PACIFIC GAS AND ELECTRIC
COMPANY

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>          v.<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>                    Defendant. | Case No. 14-CR-00175-WHA<br><br>**RESPONSE TO QUESTIONS TO PG&E RE LATE OCTOBER PSPSs**<br><br>Judge:  Hon. William Alsup |

1    Defendant Pacific Gas and Electric Company ("PG&E") respectfully submits this

2  response to the Court's November 4, 2019 request for information on the Public Safety Power

3  Shutoffs ("PSPS") that occurred on October 23 (the "October 23 PSPS") and October 26-29 (the

4  "October 26-29 PSPSs").

5    **Question 1:**  With respect to the late October PSPSs, please supply all of the

6    same type of information already requested of PG&E, for the early October PSPS

7    (Dkt. Nos. 1100, 1106).

8  **PG&E Response:**

9    PG&E acknowledges the hardship that the October PSPS events have caused for

10  the millions of people affected.  PG&E reiterates its assurance that it continues to work with all

11  key stakeholders to minimize, to the extent possible, the hardship caused by these PSPS events.

12    The Court requested that PG&E indicate how many trees and limbs fell or blew

13  onto the de-energized lines as well as the number of infrastructure failures identified during the

14  post-PSPS patrols and, for each, how many of those tree or branch contacts or infrastructure

15  failures likely would have caused arcing had the lines been energized.  PG&E provides that

16  information below.[1]  PG&E notes that the data collected in connection with this response is

17  subject to interpretation given the nature of the collection of the data, the quality of the photos

18  depicting vegetation and infrastructure and the circumstances during patrols (*e.g.*, completing

19  documentation while power is being restored).  PG&E also notes that its ability to provide the

20  Court with information about how many line contacts (from trees, branches or infrastructure

21  failures) would have caused arcing involves some amount of speculation and is based on

22  PG&E's best view based on factors such as the vegetation's location and the damage the

23  vegetation or infrastructure failure appears to have caused.

24  _____

25    [1] After PG&E filed its October 30, 2019 response to the Court's Request for Information on
    PSPS, it came to PG&E's attention that an instance of vegetation damage that appears to have
26  occurred during the October 9-12 PSPS was inadvertently excluded from its response.  PG&E is
    unable to determine whether that vegetation damage likely would have caused arcing.
27

28

The information that PG&E provides herein was collected in connection with the patrols that PG&E conducted of (i) the approximately 7,800 miles included in the October 23 PSPS event, and (ii) all line miles[2] included in the October 26 and October 29 PSPS events.[3] These patrols were conducted to assess whether the lines were safe to re-energize, including whether line or equipment repairs were necessary before the lines could be re-energized.

### October 23 PSPS Event

PG&E identified approximately 19 instances of vegetation damage that appear to have occurred during the October 23 PSPS (*e.g.*, a tree branch laying across a power line.)[4] PG&E's current information with respect to these 19 instances is as follows:

- 15 instances of vegetation damage likely would have caused arcing if the lines had been energized based on PG&E's assessment of whether the

---

[2] At this time, PG&E does not have an approximate number of line miles that were patrolled as part of the October 26 and October 29 PSPS events.  A complete list of the more than 700 circuits that were patrolled can be found in the ESRB-8 report filed with the CPUC on November 18, 2019, *available at* https://www.pge.com/pge_global/common/pdfs/safety/emergency-preparedness/natural-disaster/wildfires/PSPS-Report-Letter-10.26.19.pdf.

[3] On October 26, 2019 and October 29, 2019, PG&E conducted two PSPS events in response to catastrophic wildfire risk presented by offshore wind events combined with low humidity levels and critically dry fuels.  The overlap of the two events resulted in approximately 12 hours of daylight restoration time available for patrols and restoration for the October 26 PSPS event.  The customers who were affected by both events experienced a cycle of either (1) being de-energized and restored for a short period of time before being de-energized again, or (2) being de-energized and remaining de-energized over the duration of both events.  Because PG&E is unable to determine in all circumstances whether the damage discussed herein occurred during the October 26 or October 29 PSPS events, the damage statistics for both events has been consolidated.

[4] During the post-PSPS patrols, PG&E identified vegetation issues that may have pre-dated the October 23 PSPS (*e.g.*, vegetation that was within the applicable clearance zones).  These issues are not included as part of the approximately 19 instances of vegetation damage discussed above.  PG&E also identified three instances of vegetation damage to service drops (*i.e.*, an overhead line from PG&E's distribution line to a point of attachment on the customer's residence).  Because it is the customer's responsibility to safely clear vegetation from service drops, these issues also are not included as part of the approximately 19 instances of vegetation damage discussed above.  PG&E addressed each of these issues prior to re-energizing its lines.

vegetation was contacting or had contacted the conductor (*e.g.*, a tree branch is laying on two phases of a conductor); and

- 4 instances of vegetation damage likely would not have caused arcing (*e.g.*, the conductor was covered).

Each of the 15 locations where vegetation damage occurred that likely would have caused arcing is identified by county and coordinates on Exhibit A, attached herewith. Exhibit A also includes information regarding the date of the most recent vegetation management work at each of the locations where arcing likely would have occurred.

PG&E identified approximately four instances of damage to its infrastructure that appear to have been caused by extreme wind and/or other fire conditions present during the October 23 PSPS (*e.g.*, a broken tie wire (the equipment connecting the insulator to the conductor)).[5] PG&E's current information with respect to these four instances is that all four instances of infrastructure damage likely would have caused arcing based on PG&E's assessment of the location of the damaged equipment (*e.g.*, two phases of conductor made contact). Each of these four locations is identified by county and coordinates on Exhibit B, attached herewith. Exhibit B also includes information regarding the date of the most recent inspection or patrol of the equipment at each of the approximately four locations where arcing likely would have occurred.[6]

_____

[5] During the post-PSPS patrols, PG&E identified equipment issues that may have pre-dated the October 23 PSPS (*e.g.*, a crack in a cross arm that may not have been caused by extreme wind). These issues are not included as part of the approximately four instances of infrastructure damage discussed above. PG&E addressed each of these issues prior to re-energizing its lines.

[6] A patrol is a simple, visual inspection of applicable overhead and underground facilities to identify obvious structural problems and hazards. Distribution patrols must be performed annually in urban areas, and every other year in rural areas, unless the area has been inspected in that year. All transmission line facilities are patrolled annually, but a detailed inspection (described below) may supplant an annual patrol if performed that year. A patrol of overhead lines may be performed by walking, driving or helicopter.

An inspection is a careful examination of individual components, structures and equipment through visual observation, and/or routine diagnostic tests in order to identify abnormal

RESPONSE TO QUESTIONS TO PG&E RE LATE OCTOBER PSPSs
Case No. 14-CR-00175-WHA

1

**October 26 and October 29 PSPS Events**

2        PG&E identified approximately 241 instances of vegetation damage that appear to

3  have occurred during the October 26 and 29 PSPSs.[7]  PG&E's current information with respect

4  to these 241 instances is as follows:

5        • 175 instances of vegetation damage likely would have caused arcing if the

6          lines had been energized based on PG&E's assessment of whether the

7          vegetation was contacting or had contacted the conductor (*e.g.*, a tree

8          branch is laying on two phases of a conductor);

9        • 52 instances of vegetation damage likely would not have caused arcing

10         (*e.g.*, the conductor was covered); and

11       • with respect to 14 instances of vegetation damage, PG&E is unable to

12         determine whether arcing likely would have occurred.

13  Each of the 175 locations where vegetation damage occurred that likely would have caused

14  arcing is identified by county and coordinates on Exhibit C, attached herewith.  Exhibit C also

15  includes information regarding the date of the most recent vegetation management work at each

16  of the locations where arcing likely would have occurred.

17

18

19  conditions that adversely impact safety or reliability.  PG&E performs inspections of distribution

20  lines every five years.  For transmission facilities, detailed inspection frequencies vary depending
    on voltage, structure type (wood or steel), and foundation location relative to Bay waters.

21       [7] During the post-PSPS patrols, PG&E identified vegetation issues that may have pre-dated

22  the October 26 and October 29 PSPSs.  These issues are not included as part of the
    approximately 241 instances of vegetation damage discussed above.  PG&E also identified 39

23  instances of vegetation damage to service drops (*i.e.*, an overhead line from PG&E's distribution
    line to a point of attachment on the customer's residence).  Because it is the customer's

24  responsibility to safely clear vegetation from service drops, these issues are also not included.
    Finally, PG&E also identified four instances of vegetation damage to infrastructure owned and

25  operated by third parties, and these issues are not included as part of the approximately 241

26  instances of vegetation damage discussed above.  PG&E addressed each of these issues prior to
    re-energizing its lines.

27

28

RESPONSE TO QUESTIONS TO PG&E RE LATE OCTOBER PSPSs
Case No. 14-CR-00175-WHA

PG&E identified approximately 44 instances of damage to its infrastructure that appear to have been caused by extreme wind and/or other fire conditions present during the October 26 and October 29 PSPSs.[8]  PG&E's current information with respect to these 44 instances is as follows:

- 24 instances of infrastructure damage likely would have caused arcing based on PG&E's assessment of the location of the damaged equipment;
- 19 instances of infrastructure damage likely would not have caused arcing; and
- with respect to one instance of infrastructure damage, PG&E is unable to determine whether arcing likely would have occurred.

Each of the 24 locations where infrastructure damage occurred that likely would have caused arcing is identified by county and coordinates on Exhibit D, attached herewith.  Exhibit D also includes information regarding the date of the most recent inspection or patrol of the equipment at each of the 24 locations where arcing likely would have occurred.

**Question 2:**  If a jumper cable separates and falls away from an energized *transmission* line, will any arcing or sparking plausibly occur, even briefly, between the energized line as it falls away?  If a jumper cable becomes disconnected from an energized line, what other scenarios could plausibly produce sparking or arcing?

**PG&E Response:**

Arcing refers to an event during which electricity moves through the air to the nearest conducting surface.  The nearest conducting surface could be the other end of a severed conductor, a conductor on another phase or a grounded object such as a tower leg.  The

---

[8] During the post-PSPS patrols, PG&E identified equipment issues that may have pre-dated the October 26 and October 29 PSPS events.  These issues are not included as part of the approximately 44 instances of infrastructure damage discussed above.  PG&E addressed each of these issues prior to re-energizing its lines.

separation of an energized jumper cable from an energized transmission line may result in arcing between the jumper and a nearby grounded object.  Where a jumper is connected to a single conductor, arcing can also occur between the two ends of the disconnected jumper at the point of separation as it falls away.  By contrast, where a jumper is connected to bundled conductor (*i.e.*, where a jumper is connected to two conductors for the same phase that run parallel to each other), arcing typically would not occur between the two ends of the disconnected jumper as the parallel conductor would provide an alternate path through which the current would run.  In either jumper/conductor configuration, arcing could still occur between the energized jumper and a nearby grounded object.  PG&E cannot speculate whether arcing or sparking can occur under such circumstances given the host of variables that determine the probability of arcing or sparking.  Such variables include, among others, the proximity of grounded objects to the detached jumper cable and line voltage, which could affect whether the air becomes ionized (a predicate for arcing).

> **Question 3:**  What scenarios could plausibly cause a jumper cable to separate from a transmission line during a windstorm?

**PG&E Response:**

During a windstorm, a jumper cable on a transmission line can become separated from its connection point in a variety of ways, regardless of whether the jumper had a pre-existing condition.  For example, high winds can result in the mechanical failure of a jumper cable in good working condition or exacerbate a pre-existing condition on the jumper (such as corrosion or metal fatigue).  Another potential scenario is that during a particularly severe wind event, debris carried by the wind could strike the jumper cable and cause it to sever.

> **Question 4:**  For the Burned Mountain Tower in question, when, how and by whom was the jumper cable in question last inspected?

**PG&E Response:**

PG&E understands this question as referring to the detached jumper cable on Tower 001/006 on the Geysers #9-Lakeville 230 kV Transmission Line (the "Geysers #9 Line"),

referenced in PG&E's Electric Incident Report filed with the California Public Utilities

Commission on October 24, 2019.  Based on PG&E's records, the jumper cables on

Tower 001/006 were last inspected on July 18, 2019 by a PG&E troubleman during a routine

detailed ground inspection of the Geysers #9 Line, in accordance with the schedule for routine

inspections set forth in PG&E's Electric Transmission Preventive Maintenance ("ETPM")

Manual.  The ETPM Manual instructs inspectors to visually examine all transmission line

components to determine their overall condition and identify for correction any abnormalities,

including, for conductors, rust, cracks, gunshot damage, corrosion, twisting, loose connectors,

damaged or missing dampers, and insufficient clearance from the tower or other components.

No new conditions on Tower 001/006 were identified as a result of the July 18, 2019 detailed

inspection.[9]

　　　　　Based on PG&E's records, earlier in 2019, Tower 001/006 was subject to

enhanced inspections as part of PG&E's Wildfire Safety Inspection Program ("WSIP").  On

February 6, 2019, a PG&E contractor crew assigned to WSIP performed a climbing inspection of

Tower 001/006.  On the electronic checklist used to document the climbing inspection, the

personnel performing the inspection answered "No" in response to the prompt, "Jumpers in poor

condition".  On May 11, 2019, PG&E collected aerial drone photographs of Tower 001/006, and

on May 23, 2019, PG&E's Drone Inspection Review Team ("DIRT") performed a drone

inspection of the tower by reviewing the drone photographs.  During that review, the DIRT team

used the incorrect form (one for non-steel instead of steel structures) to document the inspection.

---

[9] At the time of the inspection, the tower had three open notifications resulting from the
February 2019 Wildfire Safety Inspection Program climbing inspection (discussed in text).  One
of these notifications required repainting of the structure.  That notification remained open as of
October 23, 2019.  Another one of these notifications, related to a missing danger sign, was
addressed in September 2019.  The final notification open as of the inspection was for rusted
bolts and was determined on July 30, 2019 not to require corrective action because the condition
observed was determined to be surface rust only.

1   Both forms included the same question about the condition of jumpers.  The DIRT team

2   answered "N/A" in response to the prompt, "Jumpers in poor condition".[10]

3        Tower 001/006 is a double-circuit tower that supports two transmission lines in

4   the Geysers area in Sonoma County, California:  the Geysers #12-Fulton 230 kV Transmission

5   Line (the "Geysers #12 Line") and the Geysers #9 Line.  Based on PG&E's records, in addition

6   to the inspection of the jumper cables on Tower 001/006 that occurred on July 18, 2019 in

7   connection with the routine detailed inspection of the Geysers #9 Line, described above,

8   Tower 001/006 was also inspected by a PG&E troubleman on July 11, 2019 in connection with a

9   routine detailed ground inspection of the Geysers #12 Line.  No new conditions on

10  Tower 001/006 were identified as a result of the July 11, 2019 detailed inspection of the tower.

11       **Question 5:**  Should we now be worried that other jumper cables inspected in the

12       same manner have potential failures that have gone undetected?

13  **PG&E Response:**

14       As part of its WSIP, PG&E recently completed enhanced inspections of the vast

15  majority of its transmission, distribution and substation assets in High Fire-Threat District

16  ("HFTD") areas, including approximately 700,000 distribution structures across more than

17  25,200 line miles, approximately 50,000 transmission structures across more than 5,500 line

18  miles and 222 substation facilities.  Inspection findings were documented through high-

19  resolution images and reviewed by dedicated teams with experience in system maintenance,

20  engineering and maintenance planning to evaluate identified conditions.  The electronic

21  checklists used to perform these enhanced climbing and drone inspections of transmission

22  structures specifically asked inspectors to look for and document any abnormalities with respect

23  to transmission line components and hardware, including jumper cables.  As of August 31, 2019,

24  

25  [10] In June 2019, the DIRT team re-reviewed the drone photographs of Tower 001/006 in
connection with a routine review of drone inspection forms on which no conditions were

26  reported.  The only condition identified as a result of that re-review was a missing danger sign on
the structure; no conditions relating to jumper cables on Tower 001/006 were identified through

27  that re-review.

28  

RESPONSE TO QUESTIONS TO PG&E RE LATE OCTOBER PSPSs
Case No. 14-CR-00175-WHA

PG&E had repaired or made safe all of the highest-priority conditions found during WSIP inspections of its transmission, distribution and substation assets.  In particular, as a result of its WSIP, PG&E identified two Priority Code "A" conditions relating to jumper cables on transmission structures, both of which were timely repaired and made safe.  PG&E is incorporating the lessons learned from WSIP into its ongoing regularly scheduled inspections and maintenance of electric infrastructure.

PG&E is also actively investigating the cause of the failure of the jumper cable on Tower 001/006 on the Geysers #9 Line.[11]  As one aspect of its investigation, PG&E is seeking to determine whether the configuration of the jumper cable on Tower 001/006 contributed to its failure and, in addition, whether there are similarly configured jumper cables in PG&E's system.  PG&E is also seeking more generally to determine whether there may be jumper cables that may be susceptible to failure for any reason in PG&E's system.  PG&E is not currently aware of information suggesting that there are jumper cables on other transmission structures in its system that are susceptible to potential failures.  In the event PG&E becomes aware of any condition affecting a jumper cable that could lead to failure or otherwise presents a public safety risk, it will take corrective action.

**Question 6:**  How many structures have been lost and how many lives have been lost by wildfires arguably caused by PG&E *distribution* lines in 2019?  The Court is inclined to expect that the answer for 2019 thus far will be many fewer than for prior years, thanks to the PSPS interruptions, but the Court (and the public) would appreciate a more precise answer.  Please answer as of NOVEMBER 29.

**PG&E Response:**

In 2019, there have been no fatalities and no structures destroyed in any wildfire that may have been caused by PG&E distribution lines.  PG&E reiterates its commitment to

---

[11] PG&E assisted CAL FIRE with its November 1, 2019 collection of potential evidence from Tower 001/006, including its collection of the jumper cable that failed.  To PG&E's knowledge, this potential evidence remains in the possession of CAL FIRE.

1   continue to work aggressively to further strengthen its programs and infrastructure to maximize

2   safety and mitigate wildfire risk.

3   In preparing this response, PG&E reviewed available data associated with fires of

4   ten acres or greater to which PG&E's distribution lines may have contributed that potentially

5   involved vegetation contact or equipment failure in 2019.[12]  PG&E's response does not include

6   data pertaining to ignitions that may have been caused by third-party contact with PG&E's

7   equipment (*e.g.*, animal or vehicle contact) or ignitions for which the cause is unknown.  PG&E

8   relied on data that it compiled in the ordinary course of business about incidents in its service

9   territory through November 29, 2019.  This analysis represents PG&E's current understanding of

10  the circumstances.

11  **Question 7:**  A local television station has suggested that the PSPS process itself

12  has sparked wildfires.  Has there been any such instance, even arguably?

13  **PG&E Response:**

14  PG&E is not familiar with the television story referenced by the Court, or a

15  wildfire being sparked by the PSPS events.  Prior to initiating a PSPS, PG&E proactively reaches

16  out to customers using multiple methods, including interactive voice response (IVR) calls, text

17  messaging, email and personal phones calls, to alert its customers that a PSPS may occur.  This

18  is because, among other reasons, there are public safety risks associated with turning off power,

19  including impacts to first responders, critical medical care and the provision of water, sewer, and

20  other essential services, including street lights and signals and communications systems.  PG&E

21  advises its customers that in taking steps to minimize the safety risks and inconvenience caused

22  by a power outage, customers should avoid using candles due to the risk of fire.  In the event

23  candles must be used, PG&E further advises its customers to exercise extreme caution.  PG&E

24  also urges its customers to turn off heat-producing appliances such as ovens, stovetops and irons

25

26  [12] These figures do not include three structures that were destroyed in three separate fires

27  that may have involved PG&E distribution lines, each of which was no more than one acre in
    size and none of which involved any fatalities.

28

during an outage, because this practice helps to eliminate fire hazards that may occur when power is restored.  Finally, PG&E advises its customers to avoid using permanent or portable generators unless they were installed safely and can be operated properly.  Improperly installed or operated generators pose a risk of damage to property and may endanger the lives of customers.

Respectfully Submitted,

Dated:  November 29, 2019

JENNER & BLOCK LLP

By:   /s/ Reid J. Schar
      Reid J. Schar (*pro hac vice*)

CRAVATH, SWAINE & MOORE LLP

By:   /s/ Kevin J. Orsini
      Kevin J. Orsini (*pro hac vice*)

CLARENCE DYER & COHEN LLP

By:   /s/ Kate Dyer
      Kate Dyer (Bar No. 171891)

Attorneys for Defendant PACIFIC GAS AND ELECTRIC COMPANY

RESPONSE TO QUESTIONS TO PG&E RE LATE OCTOBER PSPSs
Case No. 14-CR-00175-WHA

# EXHIBIT A

**Exhibit A**

| No. | County | Latitude | Longitude | Date of Last Routine Inspection | Date of Last Drought and Tree Mortality Response ("CEMA") Inspection |
|-----|--------|----------|-----------|--------------------------------|---------------------------------------------------------------------|
| 1 | Amador | 38.39061 | -120.64143 | 6/8/2019 | 8/16/2019 |
| 2 | Amador | 38.3956 | -120.64284 | 6/8/2019 | 8/16/2019 |
| 3 | Amador | 38.440518 | -120.552185 | 6/15/2019 | 3/14/2019 |
| 4 | Lake | 38.681511 | -122.593837 | 5/15/2019 | 9/19/2019 |
| 5 | Placer | 39.00374656 | -120.9954162 | 10/23/2018 | 5/29/2019 |
| 6 | Plumas | 39.6817 | -120.9851 | 5/21/2019 | 9/18/2018 |
| 7 | San Mateo | 37.419454 | -122.332157 | 4/19/2019 | 2/9/2018 |
| 8 | San Mateo | 37.415794 | -122.331923 | 4/29/2019 | 2/9/2018 |
| 9 | Sonoma | 38.63782 | -122.68032 | 7/17/2019 | 1/9/2019 |
| 10 | Sonoma | 38.435825 | -122.548608 | 7/18/2019 | 10/1/2019 |
| 11 | Sonoma | 38.4419 | -122.5979 | 7/16/2019 | 2/27/2019 |
| 12 | Sonoma | 38.30116 | -122.4415794 | 6/14/2019 | 8/17/2019 |
| 13 | Sonoma | 38.75669 | -122.90353 | 7/2/2019 | 6/20/2019 |
| 14 | Yuba | 39.470911 | -121.214932 | 6/7/2019 | N/A[13] |
| 15 | Yuba | 39.3997 | -121.2242 | 10/1/2019 | 5/15/2018 |

[13] The location where the vegetation damage occurred is outside the scope of the CEMA program.

RESPONSE TO QUESTIONS TO PG&E RE LATE OCTOBER PSPSs
Case No. 14-CR-00175-WHA

# EXHIBIT B

**Exhibit B**

| No. | County | Latitude | Longitude | Date of Last Patrol | Date of Last Inspection |
|---|---|---|---|---|---|
| 1 | Calaveras | 38.414834 | -120.134649 | 7/30/2019 | 5/31/2019 |
| 2 | El Dorado | 38.66490976 | -120.7868313 | 7/13/2019 | 4/5/2019 |
| 3 | Plumas | 39.685274 | -120.993788 | 6/26/2019 | 5/22/2019 |
| 4 | Sonoma | 38.43707 | -122.54692 | 8/20/2018 | 10/15/2019 |

RESPONSE TO QUESTIONS TO PG&E RE LATE OCTOBER PSPSs
Case No. 14-CR-00175-WHA

# EXHIBIT C

1
2
3
4
5

**Exhibit C**

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

| No. | County | Latitude | Longitude | Date of Last Routine Inspection | Date of Last Drought and Tree Mortality Response ("CEMA") Inspection[14] |
|---|---|---|---|---|---|
| 1 | Alameda | 37.7603439 | -122.1454128 | 1/4/2019 | 8/26/2019 |
| 2 | Alameda | 37.82095768 | -122.2010525 | 9/19/2019 | 10/3/2019 |
| 3 | Alameda | 37.775556 | -122.15862 | 1/4/2019 | 8/26/2019 |
| 4 | Alameda | 37.8385 | -122.231 | 9/17/2019 | 10/22/2019 |
| 5 | Alameda | 37.705501 | -122.020264 | 5/31/2019 | 2/1/2019 |
| 6 | Alameda | 37.8331 | -122.2006 | 6/4/2019 | 8/1/2019 |
| 7 | Amador | 38.4349 | -120.5862 | 7/20/2019 | 3/7/2019 |
| 8 | Butte | 39.512385 | -121.357103 | 5/5/2019 | 7/10/2018 |
| 9 | Butte | 39.85805 | -121.605199 | 5/20/2019 | 11/8/2018 |
| 10 | Butte | 39.4509675 | -121.542707 | 7/25/2019 | 6/18/2019 |
| 11 | Calaveras | 38.3802167 | -120.5576683 | 2/19/2019 | 9/14/2019 |
| 12 | Calaveras | 38.237543 | -120.351522 | 10/15/2019 | 2/28/2018 |
| 13 | Calaveras | 38.377866 | -120.56514 | 4/23/2019 | 9/14/2019 |
| 14 | Calaveras | 38.32937 | -120.546037 | 4/5/2019 | 9/14/2019 |
| 15 | Calaveras | 38.405104 | -120.164262 | 11/16/2019 | 2/1/2019 |
| 16 | Contra Costa | 37.792893 | -122.014834 | 4/9/2019 | 2/12/2019 |
| 17 | Contra Costa | 37.87087143 | -121.7399879 | 10/14/2019 | 6/18/2019 |
| 18 | Contra Costa | 37.9214 | -122.026 | 7/9/2019 | 9/18/2019 |
| 19 | Contra Costa | 37.923987 | -122.015118 | 7/8/2019 | 9/18/2019 |
| 20 | Contra Costa | 37.84190908 | -122.0314809 | 12/18/2018 | 7/30/2019 |
| 21 | El Dorado | 38.903126 | -120.863236 | 7/26/2019 | 11/9/2018 |
| 22 | El Dorado | 38.905485 | -121.0056536 | 7/9/2019 | 11/9/2018 |
| 23 | El Dorado | 38.867651 | -120.849093 | 9/18/2019 | 4/11/2019 |
| 24 | El Dorado | 38.86441599 | -120.8361437 | 6/4/2019 | 4/11/2019 |
| 25 | Humboldt | 40.16233787 | -123.6555889 | 10/7/2019 | 8/1/2019 |
| 26 | Humboldt | 40.894111 | -123.770828 | 5/9/2019 | 10/18/2019 |
| 27 | Humboldt | 40.285565 | -123.81725 | 2/16/2019 | N/A |
| 28 | Lake | 38.85095197 | -122.7320008 | 8/13/2019 | 3/29/2019 |
| 29 | Lake | 38.9088198 | -122.5908602 | 3/5/2019 | 8/16/2019 |
| 30 | Lake | 38.9276 | -122.6179 | 6/10/2019 | 5/8/2019 |
| 31 | Lake | 38.85761 | -122.722172 | 8/20/2019 | 3/29/2019 |
| 32 | Lake | 39.02764123 | -122.6676858 | 8/20/2019 | 4/24/2019 |
| 33 | Lake | 38.93935 | -122.62475 | 3/5/2019 | 8/16/2019 |
| 34 | Lake | 39.024636 | -122.880637 | 9/27/2019 | 5/14/2019 |

27

[14] N/A refers to locations where the vegetation damage occurred outside the scope of the CEMA program.

28

RESPONSE TO QUESTIONS TO PG&E RE LATE OCTOBER PSPSs
Case No. 14-CR-00175-WHA

| No. | County | Latitude | Longitude | Date of Last Routine Inspection | Date of Last Drought and Tree Mortality Response ("CEMA") Inspection[14] |
|-----|--------|----------|-----------|--------------------------------|--------------------------------------------------------------------------|
| 35 | Lake | 39.040863 | -122.586604 | 9/4/2019 | 4/12/2019 |
| 36 | Lake | 39.0217 | -122.678 | 8/23/2019 | 4/24/2019 |
| 37 | Madera | 37.19387 | -119.49639 | 1/1/2019 | 6/1/2019 |
| 38 | Marin | 37.90858 | -122.527317 | 4/23/2019 | 9/30/2019 |
| 39 | Marin | 37.97988 | -122.591686 | 1/21/2019 | 7/8/2019 |
| 40 | Marin | 37.945987 | -122.56257 | 10/8/2019 | 6/7/2018 |
| 41 | Marin | 37.960387 | -122.545014 | 6/26/2019 | 6/7/2018 |
| 42 | Marin | 38.00806 | -122.64567 | 7/16/2019 | 12/28/2018 |
| 43 | Marin | 37.90368 | -122.55355 | 5/28/2019 | 10/24/2019 |
| 44 | Marin | 37.9540483 | -122.5536417 | 3/21/2019 | 7/8/2019 |
| 45 | Marin | 37.89089 | -122.50541 | 5/15/2019 | 9/14/2019 |
| 46 | Marin | 37.985868 | -122.600086 | 1/30/2019 | 6/24/2019 |
| 47 | Mendocino | 39.79066 | -123.19807 | 9/18/2019 | 10/22/2019 |
| 48 | Mendocino | 39.262353 | -123.112601 | 7/23/2019 | 10/16/2019 |
| 49 | Mendocino | 38.7853 | -123.50076 | 7/30/2019 | 6/11/2019 |
| 50 | Mendocino | 39.835941 | -123.676355 | 10/8/2019 | 9/11/2019 |
| 51 | Mendocino | 39.35946 | -123.6473 | 4/24/2019 | 9/23/2019 |
| 52 | Napa | 38.569992 | -122.583697 | 6/5/2019 | 1/9/2019 |
| 53 | Napa | 38.570619 | -122.583958 | 6/5/2019 | 1/9/2019 |
| 54 | Napa | 38.571188 | -122.584761 | 6/5/2019 | 1/9/2019 |
| 55 | Napa | 38.4878 | -122.4641 | 4/10/2019 | 8/30/2019 |
| 56 | Napa | 38.56141279 | -122.5816536 | 7/25/2019 | 11/2/2018 |
| 57 | Napa | 38.65695613 | -122.6027459 | 2/26/2019 | 1/9/2019 |
| 58 | Napa | 38.5652283 | -122.43928 | 5/8/2019 | 10/26/2018 |
| 59 | Napa | 38.575955 | -122.57749 | 7/1/2019 | 11/2/2018 |
| 60 | Napa | 38.554331 | -122.536025 | 11/28/2018 | 11/2/2018 |
| 61 | Napa | 38.54638 | -122.48961 | 4/26/2019 | 9/30/2019 |
| 62 | Napa | 38.5356 | -122.47017 | 4/26/2019 | 10/26/2018 |
| 63 | Napa | 38.559989 | -122.547034 | 6/26/2019 | 11/2/2018 |
| 64 | Napa | 38.565 | -122.4639 | 5/1/2019 | 10/26/2018 |
| 65 | Napa | 38.60143 | -122.62712 | 7/12/2019 | 1/9/2019 |
| 66 | Napa | 38.56775 | -122.54206 | 6/19/2019 | 11/2/2018 |
| 67 | Napa | 38.35503 | -122.36594 | 8/5/2019 | 1/28/2019 |
| 68 | Napa | 38.51827 | -122.4234 | 4/4/2019 | 7/2/2018 |
| 69 | Napa | 38.588781 | -122.607214 | 8/6/2019 | 1/9/2019 |
| 70 | Napa | 38.589055 | -122.606693 | 7/15/2019 | 1/9/2019 |
| 71 | Napa | 38.34554 | -122.40071 | 9/20/2019 | 1/28/2019 |
| 72 | Napa | 38.54844885 | -122.5652616 | 3/4/2019 | 1/9/2019 |
| 73 | Napa | 38.3652 | -122.4144 | 8/13/2019 | 1/28/2019 |

RESPONSE TO QUESTIONS TO PG&E RE LATE OCTOBER PSPSs
Case No. 14-CR-00175-WHA

| No. | County | Latitude | Longitude | Date of Last Routine Inspection | Date of Last Drought and Tree Mortality Response ("CEMA") Inspection[14] |
|---|---|---|---|---|---|
| 74 | Nevada | 39.146137 | -121.143905 | 8/28/2019 | 11/8/2018 |
| 75 | Nevada | 39.163738 | -121.045957 | 9/26/2019 | 1/14/2019 |
| 76 | Nevada | 39.3709933 | -121.0571226 | 5/21/2019 | 11/8/2018 |
| 77 | Nevada | 39.2088104 | -121.070202 | 8/15/2019 | 3/25/2019 |
| 78 | Nevada | 39.222346 | -121.063828 | 8/14/2019 | 2/18/2019 |
| 79 | Nevada | 39.07742163 | -121.056044 | 9/12/2019 | 3/25/2019 |
| 80 | Nevada | 39.3163 | -121.11 | 6/12/2019 | 10/8/2019 |
| 81 | Nevada | 39.320661 | -121.128089 | 5/23/2019 | 10/4/2019 |
| 82 | Nevada | 39.26291 | -120.8185781 | 5/7/2019 | N/A |
| 83 | Placer | 39.039128 | -120.967797 | 11/12/2018 | 5/14/2019 |
| 84 | Placer | 39.20820956 | -120.8004096 | 8/9/2018 | 4/26/2018 |
| 85 | Placer | 39.20501842 | -120.7994337 | 8/14/2018 | 4/26/2018 |
| 86 | Placer | 39.20992701 | -120.8013657 | 8/14/2018 | 4/26/2018 |
| 87 | Placer | 39.20762633 | -120.8000847 | 8/9/2018 | 4/26/2018 |
| 88 | Placer | 39.20937457 | -120.8010581 | 8/14/2018 | 4/26/2018 |
| 89 | Placer | 39.20587977 | -120.799436 | 8/14/2018 | 4/26/2018 |
| 90 | San Mateo | 37.572956 | -122.363254 | 9/10/2019 | N/A |
| 91 | San Mateo | 37.314025 | -122.294819 | 6/28/2019 | 5/9/2019 |
| 92 | San Mateo | 37.62180766 | -122.4348659 | 10/24/2019 | 6/14/2019 |
| 93 | San Mateo | 37.62521 | -122.432483 | 10/23/2019 | 6/14/2019 |
| 94 | San Mateo | 37.552362 | -122.339913 | 10/21/2019 | 12/13/2018 |
| 95 | San Mateo | 37.634752 | -122.44324 | 8/12/2019 | 2/15/2019 |
| 96 | San Mateo | 37.61730201 | -122.4341958 | 9/14/2018 | 6/14/2019 |
| 97 | San Mateo | 37.639027 | -122.440475 | 8/9/2019 | 2/15/2019 |
| 98 | San Mateo | 37.433062 | -122.321972 | 5/9/2019 | 2/9/2018 |
| 99 | San Mateo | 37.59004024 | -122.4739712 | 10/16/2019 | 5/24/2019 |
| 100 | San Mateo | 37.408051 | -122.33265 | 4/29/2019 | 2/9/2018 |
| 101 | San Mateo | 37.404266 | -122.334644 | 4/29/2019 | 2/9/2018 |
| 102 | San Mateo | 37.407143 | -122.332749 | 4/29/2019 | 2/9/2018 |
| 103 | San Mateo | 37.405951 | -122.333058 | 4/29/2019 | 2/9/2018 |
| 104 | San Mateo | 37.289689 | -122.215498 | 9/27/2019 | 2/26/2019 |
| 105 | San Mateo | 37.634978 | -122.445914 | 8/9/2019 | 2/15/2019 |
| 106 | San Mateo | 37.634881 | -122.452168 | 8/13/2019 | 6/13/2019 |
| 107 | San Mateo | 37.2994 | -122.2656 | 11/8/2019 | 2/26/2019 |
| 108 | Santa Clara | 37.455616 | -121.851195 | 6/14/2019 | 5/9/2018 |
| 109 | Santa Clara | 37.198662 | -122.030359 | 5/20/2019 | 3/8/2019 |
| 110 | Santa Clara | 37.25075433 | -122.0946811 | 7/19/2019 | 10/16/2019 |
| 111 | Santa Clara | 37.0356 | -121.7468 | 12/21/2018 | 9/20/2019 |
| 112 | Santa Cruz | 37.0883 | -122.2038 | 8/12/2019 | 6/18/2019 |

| No. | County | Latitude | Longitude | Date of Last Routine Inspection | Date of Last Drought and Tree Mortality Response ("CEMA") Inspection[14] |
|---|---|---|---|---|---|
| 113 | Santa Cruz | 37.11982 | -121.99152 | 5/3/2019 | 2/2/2019 |
| 114 | Santa Cruz | 36.95198 | -121.84287 | 4/26/2019 | 4/26/2018 |
| 115 | Santa Cruz | 37.13896 | -122.09077 | 7/18/2019 | 1/25/2018 |
| 116 | Santa Cruz | 37.05866646 | -121.8221006 | 4/12/2019 | 12/21/2018 |
| 117 | Santa Cruz | 37.107088 | -121.947074 | 9/23/2019 | 3/1/2019 |
| 118 | Santa Cruz | 37.166012 | -122.042466 | 5/20/2019 | 3/8/2019 |
| 119 | Santa Cruz | 37.119719 | -121.951974 | 5/15/2019 | 11/15/2018 |
| 120 | Santa Cruz | 37.09919 | -122.05306 | 10/10/2018 | 5/28/2019 |
| 121 | Santa Cruz | 37.105841 | -121.948772 | 9/30/2019 | 12/17/2018 |
| 122 | Santa Cruz | 37.02094 | -121.82773 | 4/9/2019 | 12/21/2018 |
| 123 | Santa Cruz | 37.05377 | -121.81684 | 4/10/2019 | 12/21/2018 |
| 124 | Santa Cruz | 36.9881 | -121.93946 | 2/25/2019 | 8/6/2019 |
| 125 | Santa Cruz | 37.06793965 | -122.01398 | 5/6/2019 | 2/2/2019 |
| 126 | Santa Cruz | 37.02155 | -121.82654 | 4/9/2019 | 12/21/2018 |
| 127 | Santa Cruz | 37.16832781 | -122.1744458 | 5/13/2019 | 11/7/2018 |
| 128 | Santa Cruz | 37.16039 | -122.08652 | 7/22/2019 | 1/25/2018 |
| 129 | Santa Cruz | 37.02608 | -121.77497 | 2/4/2019 | 9/20/2019 |
| 130 | Santa Cruz | 37.17961 | -122.21531 | 1/14/2019 | 10/29/2018 |
| 131 | Santa Cruz | 37.12748 | -122.11733 | 7/1/2019 | 1/25/2018 |
| 132 | Santa Cruz | 37.0289 | -121.9963 | 11/15/2018 | 4/19/2019 |
| 133 | Santa Cruz | 36.9994 | -122.0371 | 10/25/2019 | 4/19/2019 |
| 134 | Santa Cruz | 37.0242013 | -121.7779 | 4/18/2019 | 4/26/2018 |
| 135 | Santa Cruz | 37.16287 | -122.16854 | 3/21/2019 | 11/7/2018 |
| 136 | Shasta | 40.622288 | -122.234833 | 4/25/2019 | 1/12/2019 |
| 137 | Shasta | 40.393239 | -122.3501295 | 6/11/2019 | 1/31/2019 |
| 138 | Shasta | 40.5926 | -122.2288 | 5/4/2019 | 1/12/2019 |
| 139 | Shasta | 40.5699 | -122.2402 | 4/25/2019 | 1/22/2019 |
| 140 | Shasta | 40.5571299 | -121.716849 | 4/11/2019 | 10/21/2019 |
| 141 | Shasta | 40.519089 | -122.2385433 | 4/19/2019 | 1/22/2019 |
| 142 | Shasta | 40.47726 | -122.4943545 | 7/31/2019 | 6/6/2018 |
| 143 | Shasta | 40.5666 | -122.207325 | 5/6/2019 | 1/29/2019 |
| 144 | Shasta | 40.519078 | -122.237914 | 4/19/2019 | 1/22/2019 |
| 145 | Sonoma | 38.46157 | -122.93668 | 7/19/2019 | 4/16/2019 |
| 146 | Sonoma | 38.32323758 | -122.433251 | 6/5/2019 | 9/17/2019 |
| 147 | Sonoma | 38.27905 | -122.41557 | 10/16/2019 | 8/30/2019 |
| 148 | Sonoma | 38.27376 | -122.45314 | 10/16/2019 | N/A |
| 149 | Sonoma | 38.31211 | -122.68422 | 3/20/2019 | N/A |
| 150 | Sonoma | 38.610101 | -122.661047 | 7/19/2019 | 1/9/2019 |
| 151 | Sonoma | 38.42567 | -122.83287 | 9/30/2019 | N/A |

RESPONSE TO QUESTIONS TO PG&E RE LATE OCTOBER PSPSs
Case No. 14-CR-00175-WHA

| No. | County | Latitude | Longitude | Date of Last Routine Inspection | Date of Last Drought and Tree Mortality Response ("CEMA") Inspection[14] |
|---|---|---|---|---|---|
| 152 | Sonoma | 38.4655 | -122.69384 | 2/20/2019 | 9/9/2019 |
| 153 | Sonoma | 38.219115 | -122.681516 | 12/12/2018 | 8/15/2019 |
| 154 | Sonoma | 38.35318 | -122.60589 | 3/25/2019 | 6/3/2019 |
| 155 | Sonoma | 38.42087 | -122.83461 | 7/25/2019 | N/A |
| 156 | Sonoma | 38.46221 | -122.68547 | 6/6/2019 | 7/22/2019 |
| 157 | Sonoma | 38.40944 | -122.5534 | 7/16/2019 | 10/1/2019 |
| 158 | Sonoma | 38.365233 | -122.778347 | 3/13/2019 | N/A |
| 159 | Sonoma | 38.35807 | -122.76869 | 6/4/2019 | N/A |
| 160 | Sonoma | 38.40385 | -122.82873 | 7/26/2019 | N/A |
| 161 | Sonoma | 38.3887 | -122.48708 | 8/8/2019 | 6/14/2019 |
| 162 | Sonoma | 38.40052 | -122.51287 | 7/16/2019 | 10/1/2019 |
| 163 | Sonoma | 38.319251 | -122.500503 | 7/24/2019 | 6/28/2019 |
| 164 | Sonoma | 38.62934 | -122.83388 | 5/7/2019 | 10/15/2019 |
| 165 | Sonoma | 38.436102 | -122.55041 | 7/18/2019 | 10/1/2019 |
| 166 | Sonoma | 38.48254 | -122.93874 | 5/7/2019 | 10/15/2019 |
| 167 | Sonoma | 38.45881 | -122.84309 | 9/13/2019 | N/A |
| 168 | Sonoma | 38.27495 | -122.72401 | 7/10/2019 | 8/15/2019 |
| 169 | Sonoma | 38.3930338 | -122.6207504 | 3/4/2019 | 10/19/2019 |
| 170 | Sonoma | 38.293254 | -122.702317 | 3/20/2019 | 9/17/2019 |
| 171 | Tehama | 40.18024 | -122.32753 | 7/30/2019 | 2/20/2019 |
| 172 | Trinity | 40.204203 | -123.479129 | 9/16/2019 | 8/1/2019 |
| 173 | Tuolumne | 37.8365 | -120.2286 | 1/2/2019 | 6/1/2019 |
| 174 | Tuolumne | 38.174855 | -120.035421 | 6/20/2019 | 12/1/2018 |
| 175 | Yuba | 39.441747 | -121.265136 | 4/23/2019 | 7/2/2019 |

RESPONSE TO QUESTIONS TO PG&E RE LATE OCTOBER PSPSs
Case No. 14-CR-00175-WHA

# EXHIBIT D

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Exhibit D**

| No. | County | Latitude | Longitude | Date of Last Patrol | Date of Last Inspection |
|---|---|---|---|---|---|
| 1 | Alameda | 37.7557 | -122.1247 | 2/27/2019 | 3/17/2019 |
| 2 | Alameda | 37.832278 | -122.186688 | 3/14/2018 | 5/4/2019 |
| 3 | Alameda | 37.76671 | -122.138019 | 3/2/2019 | 3/13/2019 |
| 4 | Amador | 38.4349 | -120.5862 | 5/3/2019 | 4/1/2019 |
| 5 | Calaveras | 37.9144 | -120.6129 | 2/20/2018 | 5/9/2019 |
| 6 | Calaveras | 38.21484165 | -120.3610502 | 7/12/2019 | 4/11/2019 |
| 7 | Contra Costa | 37.8017 | -121.8577 | 5/23/2018 | 4/17/2019 |
| 8 | Contra Costa | 37.9244 | -122.015 | 5/23/2018 | 4/17/2019 |
| 9 | Lake | 39.024861 | -122.667202 | 6/14/2019 | 7/13/2016 |
| 10 | Lake | 39.065647 | -122.622435 | 8/29/2019 | 4/2/2019 |
| 11 | Madera | 37.2526 | -119.5066 | 5/11/2019 | 5/17/2019 |
| 12 | Mendocino | 39.79081076 | -123.1981318 | 11/14/2018 | 9/21/2016 |
| 13 | Napa | 38.47144 | -122.39927 | 7/27/2019 | 9/28/2015 |
| 14 | Napa | 38.36648 | -122.40959 | 7/2/2019 | 3/18/2019 |
| 15 | Napa | 38.40769 | -122.31969 | 6/20/2019 | 9/12/2016 |
| 16 | Placer | 39.21015759 | -120.8014944 | 5/18/2019 | 4/2/2019 |
| 17 | San Mateo | 37.29513 | -122.26676 | 8/13/2019 | 3/21/2019 |
| 18 | Santa Clara | 37.2515 | -122.06398 | 6/18/2018 | 4/3/2019 |
| 19 | Santa Clara | 37.190013 | -122.012607 | 5/16/2019 | 3/29/2019 |
| 20 | Shasta | 40.523967 | -122.559842 | 8/1/2019 | 3/25/2019 |
| 21 | Shasta | 40.984668 | -121.970685 | 8/21/2019 | 4/4/2019 |
| 22 | Sonoma | 38.328696 | -122.503399 | 9/26/2019 | 5/3/2016 |
| 23 | Sonoma | 38.40028 | -122.954 | 8/7/2019 | 4/14/2019 |
| 24 | Sonoma | 38.22128 | -122.64316 | 3/5/2019 | 4/20/2019 |

RESPONSE TO QUESTIONS TO PG&E RE LATE OCTOBER PSPSs
Case No. 14-CR-00175-WHA