JENNER & BLOCK LLP
    Reid J. Schar (*pro hac vice*)
    RSchar@jenner.com
    353 N. Clark Street
    Chicago, IL 60654-3456
Telephone: +1 312 222 9350
Facsimile: +1 312 527 0484

CLARENCE DYER & COHEN LLP
    Kate Dyer (Bar No. 171891)
    kdyer@clarencedyer.com
    899 Ellis Street
    San Francisco, CA 94109-7807
Telephone: +1 415 749 1800
Facsimile: +1 415 749 1694

CRAVATH, SWAINE & MOORE LLP
    Kevin J. Orsini (*pro hac vice*)
    korsini@cravath.com
    825 Eighth Avenue
    New York, NY 10019
Telephone: +1 212 474 1000
Facsimile: +1 212 474 3700

Attorneys for Defendant PACIFIC GAS AND ELECTRIC
COMPANY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>      v.<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>                              Defendant. | Case No. 14-CR-00175-WHA<br><br>**RESPONSE TO ORDER TO SHOW CAUSE AND FURTHER ORDER TO SHOW CAUSE**<br><br>Judge:  Hon. William Alsup |

1

## TABLE OF CONTENTS

2    INTRODUCTION ................................................................................................................1

3    ARGUMENT .....................................................................................................................5

4    I.     THE COURT SHOULD NOT ADOPT THE HIRING CONDITION. ...........................5

5           A.     The Hiring Condition Is Unreasonable Because Current Resource Constraints
                   Are Not Affecting PG&E's Compliance with Vegetation Management Laws
6                  and Its Wildfire Safety Plan .........................................................................5

7           B.     Imposing the Hiring Condition to Increase the Pace of PG&E's EVM Program
                   Would Be Unreasonable. ...............................................................................9
8
                   1.     Labor Market Conditions Prevent PG&E From Completing Its
9                          Enhanced Vegetation Management Work Faster Than The CPUC-
                           Approved Timeline. .........................................................................10
10
                   2.     Requiring PG&E to Develop an Internal Workforce Would Simply
11                         Slow Down the Current Pace of Tree Work .......................................12

12          C.     The Hiring Condition Would Impermissibly Interfere with the CPUC's
                   Ongoing Regulatory Process...........................................................................18
13
            D.     The Hiring Condition Is Not Reasonably Related To The Underlying
14                 Conviction.....................................................................................................21

15   II.    THE COURT SHOULD NOT IMPOSE THE COMPENSATION CONDITION...........22

16          A.     The Compensation Condition Would Improperly Conflict With Recent
                   California Law Regulating Utility Incentive Compensation. ............................22
17
            B.     The Proposed Compensation Condition Would Undermine The Bankruptcy
18                 Court's Authority To Approve PG&E's Incentive Plans During The Chapter
                   11 Case...........................................................................................................26
19
            C.     The Compensation Condition Is Unreasonable Because It Is Not In The Public
20                 Interest............................................................................................................28

21

22

23

24

25

26

27

28

i

Defendant Pacific Gas and Electric Company ("PG&E") respectfully submits this response to the Court's January 16 and January 24, 2020 orders to show cause (1) why a further condition of probation should not be imposed "requiring PG&E to hire and train, as part of its own workforce, sufficient crews and equipment to inspect and to trim and remove all vegetation so as to come into compliance with the California Public Resources Code and PG&E's own wildfire mitigation plan" ("Hiring Condition"); and (2) why a further condition of probation should not be imposed requiring PG&E to "restrict all bonuses and other incentives for supervisors and above *exclusively* to achieving the PG&E Wildfire Mitigation Plan and other safety goals" ("Compensation Condition").

## INTRODUCTION

The Court should not impose the proposed probation conditions. "The test for validity of probation conditions . . . is whether the conditions are primarily designed to meet the ends of rehabilitation and protection of the public." *United States v. Terrigno*, 838 F.2d 371, 374 (9th Cir. 1988). The conditions must be "reasonably related to th[ose] purposes." *Id.* "If the impact is substantially greater than is necessary to carry out the purposes, the conditions are impermissible." *Higdon v. United States*, 627 F.2d 893, 897 (9th Cir. 1980). In addition, under principles of comity, "the federal government has no constitutional authority to interfere with a state's exercise of its police power," *United States v. Snyder*, 852 F.2d 471, 475 (9th Cir. 1988), and a "condition of probation may not circumvent another statutory scheme," *United States v. Abushaar*, 761 F.2d 954, 960 (3d Cir. 1985). The proposed probation conditions fail both these tests.

*Hiring Condition.* The Hiring Condition is unreasonable. It does not advance any rehabilitative or public interest purpose because it will not have the effect the Court suggests. The Court's proposed Hiring Condition is based on the mistaken premise that a lack of pre-inspector and tree trimming resources have kept PG&E from complying with state vegetation management laws and the targets in PG&E's Wildfire Safety Plan. That is incorrect. Any non-

RESPONSE TO ORDER TO SHOW AND FURTHER ORDER TO SHOW CAUSE
Case No. 14-CR-00175-WHA

compliance is not attributable to current resource constraints.  PG&E faced an unprecedented volume of tree work in 2019 that could not be fully executed until it had ramped up its contracted vegetation management workforce, which it did by more than tripling that workforce by the end of the year.  While the relatively small volume of compliance work that was outstanding at year-end 2019 was impacted by resource delays, much of the outstanding work consisted of trees that had only been recently identified for work; trees that were subject to environmental, permitting and customer refusal issues; or trees that were timely worked but the work is not yet reflected in PG&E's records due to lagging contractor invoicing.  With respect to PG&E's Wildfire Safety Plan, PG&E exceeded its Enhanced Vegetation Management ("EVM") program target.  The missed Catastrophic Event Memorandum Account ("CEMA")[1] inspection target was a result of scheduling issues that have already been addressed, not manpower issues.  The proposed Hiring Condition therefore will not advance PG&E's compliance with state laws concerning vegetation management.

The resource constraints that PG&E has cited in the past instead concern the pace at which PG&E can complete the full scope of the EVM work described in its Wildfire Safety Plan.  Specifically, the pool of qualified and experienced tree workers available to complete PG&E's EVM work is limited, and thus PG&E estimated that the full scope of its EVM work would take an estimated eight years to complete.  That fact was considered and addressed by the CPUC in its approval of PG&E's plan.

While PG&E appreciates the Court's desire to find ways to speed up the completion of that work, an order directing PG&E to hire tree trimmers as part of its own workforce would be counterproductive.  There is a critical statewide (indeed, nationwide) shortage of qualified and experienced tree workers that the Court's proposed Hiring Condition will not solve.  PG&E is working closely with its contractors to obtain additional resources for vegetation management—in fact, PG&E has worked with its contractors to add approximately

---

[1] CEMA comprises PG&E's drought emergency response vegetation management work.

4,700 pre-inspectors and tree trimmers throughout 2019. But additional qualified tree workers do not currently exist in California. If the Court were to force PG&E to develop an in-house tree worker team, PG&E would need to hire existing resources away from its own contractors, which would only shift who employs the resources performing work for PG&E, not add to them. Moreover, PG&E has not used internal tree workers for at least four decades. Instead, PG&E, like virtually all large utilities across the country, has contracted with experts in the vegetation management industry to conduct that work. Forcing PG&E to hire an internal workforce would therefore not address any near-term resource constraints because it would take PG&E many years and hundreds of millions of dollars to build the infrastructure, expertise, and management structures to develop the kind of vegetation management workforce that already exists at the vegetation management companies with which it contracts. The middle of California's wildfire emergency is not the time for PG&E to reverse course on the entire structure of its vegetation management work and spend significant time and resources that are better devoted to improving current arrangements and completing other important wildfire mitigation measures.

The Hiring Condition also would not help reduce the need for PG&E's Public Safety Power Shutoff ("PSPS") program. PG&E implemented its PSPS program in 2018 in response to a significantly changed wildfire risk, not because it had failed to comply with vegetation management regulations. While its EVM program is an integral part of an overall approach to wildfire mitigation, PG&E's ability to reduce the frequency and impact of PSPS events will depend in substantial part upon system enhancements, such as localized weather forecasts and real-time data, sectionalization of lines, and the use of microgrids. Even with perfect vegetation compliance, PG&E would still need to maintain a PSPS program to address extreme weather and fire danger conditions.

Finally, the Hiring Condition is also unlawful because it interferes with the expert judgment exercised by other politically accountable actors. The California Legislature and the CPUC have comprehensive regulatory authority over vegetation management compliance and California utilities' wildfire mitigation plans. The CPUC has approved the targets for PG&E's

1    2019 EVM and has full authority to address any non-compliance—it also has the expertise to

2    determine how best to increase the vegetation management resources available to PG&E and its

3    contractors.  The CPUC considered resource constraints in its review of PG&E's 2019 Wildfire

4    Safety Plan and its investigation of the 2017 Northern California Wildfires and 2018 Camp Fire.

5    As a result of those proceedings and PG&E's independent efforts, PG&E is in the process of

6    implementing multiple measures designed to expand the vegetation management labor pool and

7    better utilize existing vegetation management resources, which are discussed in detail below.

8            *Compensation Condition.*  The Compensation Condition is also unlawful and

9    conflicts with determinations to be made by the CPUC and with compensation matters that may

10   be brought before the Bankruptcy Court.  California recently passed major legislation, AB 1054,

11   that regulates PG&E's executive compensation and that expressly permits that compensation to

12   be determined by a mix of safety and financial considerations.   That decision reflects

13   California's judgment, amply supported by the legislative record, that PG&E cannot safely

14   provide power unless it is financially stable.  The CPUC will hold hearings on February 19 on

15   PG&E's proposed 2020 executive compensation plan pursuant to that legislation, and PG&E has

16   submitted written testimony to the CPUC describing in detail the complex set of considerations

17   that underlie the proposals, and why the proposals meet AB 1054's standards.  *See* "Pacific Gas

18   and Electric Company Plan of Reorganization OII 2019, Prepared Testimony, Volume 1:

19   Chapter 7, Executive Compensation," at 7-3 to 7-23 (Jan. 31, 2020), attached as Ex. A to the

20   Declaration of Kate Dyer In Support of PG&E's Response to Order to Show Cause and Further

21   Order to Show Cause ("Dyer Decl.") [hereinafter "CPUC Testimony"].  It would be

22   inappropriate for this Court to override those state determinations via a probation condition.  The

23   Bankruptcy Court has also previously addressed PG&E's incentive plans.  In particular, the

24   Bankruptcy Court approved PG&E's 2019 short-term incentive plan, which included safety

25   (65%), financial (25%) and customer (10%)-related goals, as a sound exercise of business

26   judgment,  "justified by the facts and circumstances," and "in the best interests of  [PG&E], its

27   estate[], creditors, shareholders and all parties in interest."  Order Pursuant to 11 U.S.C.

28

§§ 105(a), 363, and 503(c) (I) Approving Short-Term Incentive Plan and (II) Granting Related Relief, at 1, *In re PG&E Corp.*, No. 19-30088 (Bankr. N.D. Cal. Apr. 29, 2019), ECF No. 1751 [hereinafter, the "STIP Order"].  Judge Montali should have the ability to assess any incentive compensation plan proposed for 2020 that may seek to similarly balance safety goals with other important goals of the company without the constraints of the proposed condition.  The Court should not interfere with the ongoing efforts of these other authorities or upset the balance they have struck.

Moreover, PG&E's incentive plans already weigh safety far more heavily than its peer utilities' plans do.  PG&E is a leader in the industry in weighting safety in its incentive plans, and there is no evidentiary or other basis for concluding that safety outcomes would be better if incentive compensation were tied exclusively, rather than predominantly, to safety.  To the contrary, PG&E must balance three major pillars of its overall mission in serving Californians: it must *reliably* provide customers with clean energy sufficient to meet their needs; it must provide that energy *safely*; and it must remain financially healthy so that it can continue to provide those services *affordably*, which is a point of particular concern as PG&E seeks to emerge from bankruptcy.  Thus, while safety is indisputably paramount, this Court should not limit PG&E to compensating its many supervisors based on only one of these factors.

**ARGUMENT**

The proposed conditions "violate[] the principle that any deprivation of liberty must be reasonably necessary to a proper sentencing objective."  *United States v. Lorenzini*, 71 F.3d 1489, 1493-94 (9th Cir. 1995).

**I.      THE COURT SHOULD NOT ADOPT THE HIRING CONDITION.**

**A.      <u>The Hiring Condition Is Unreasonable Because Current Resource Constraints Are Not Affecting PG&E's Compliance with Vegetation Management Laws and Its Wildfire Safety Plan</u>**

The Court's January 16 Order to Show Cause states that the intended reason for this new condition is for PG&E "to come into compliance with the California Public Resources

1    Code and PG&E's own wildfire mitigation plan."  Order to Show Cause at 2, *United States v.*

2    *Pac. Gas & Elec. Co.,* No. 14-cr-175 (N.D. Cal. Jan. 16, 2020), ECF No. 1133.  Respectfully, the

3    premise of the Court's Order is mistaken.  PG&E would like to clarify the record so that there is

4    no misunderstanding about its current compliance status.  PG&E faced resource constraints in

5    2019 as it sought to complete an unprecedented volume of tree work in its routine, CEMA and

6    EVM programs at the same time California faced a critical shortage of qualified and experienced

7    tree workers.  Working with its contractors, PG&E responded by more than tripling its pre-

8    inspector and tree trimmer workforce, largely with new pre-inspector hires and by recruiting tree

9    trimmers from out of state.  The time to complete this ramp up, along with other external factors

10   (*e.g.,* winter storms) and scheduling changes to prioritize work in the highest fire-threat areas,

11   had the effect of pushing a large volume of PG&E's tree work toward the end of 2019.  Despite

12   these obstacles, PG&E finished 2019 in substantial compliance with state vegetation

13   management laws and the targets in the Wildfire Safety Plan as set forth below.  To the extent

14   PG&E has fallen short of perfect compliance, current resource constraints are not the cause.

15   Accordingly, the Hiring Condition serves no rehabilitative or public purpose.

16          *First*, PG&E is already in substantial compliance with vegetation management

17   laws and the vegetation management targets in its Wildfire Safety Plan.  PG&E worked over a

18   million trees in 2019, and had not completed work on only 22,000 trees that represent

19   compliance issues because they have been identified as hazard trees or trees with vegetation

20   within the four-foot radial clearance area by year end.  (Declaration Regarding Vegetation

21   Management in Support of Response to Order to Show Cause and Further Order to Show Cause,

22   February 12, 2020, ("VM Decl.") ¶ 3)  As explained in its January 15 submission, many of these

23   trees are recently identified trees that have been or will be completed in PG&E's standard work

24   completion timeframes, while others have been delayed due to environmental and permitting

25

26

27

28

RESPONSE TO ORDER TO SHOW AND FURTHER ORDER TO SHOW CAUSE
Case No. 14-CR-00175-WHA

1 requirements and customer refusals.[2]  (PG&E's Response to Request for Information at 5,

2 *United States v. Pac. Gas & Elec. Co.,* No. 14-cr-175 (N.D. Cal. Jan. 15, 2020), ECF No. 1132

3 ("January 15 submission"); *see also* VM Decl. ¶ 4)  For the remaining trees that do not fall into

4 any of these categories, delays were the result of planning and prioritization issues as PG&E

5 completed an unprecedented volume of tree work in the closing months of 2019.  (VM Decl. ¶ 5)

6 PG&E acknowledges that such issues are unacceptable, but they are better addressed by PG&E's

7 continuing efforts to mature its expanded vegetation management operations and improve

8 oversight and management of PG&E's current contractor workforce rather than by forcing

9 PG&E to build an internal tree inspection and trimming workforce from scratch.  In 2020, PG&E

10 has improved its regional Vegetation Management ("VM") managers' ability to track

11 outstanding compliance work and is developing additional checkpoints with contractors as it

12 prioritizes timely completion of this work.  (*Id.*)

13            With respect to PG&E's Wildfire Safety Plan, PG&E completed work on

14 approximately 2,500 EVM line miles, thereby *exceeding* its 2019 target of 2,450 miles.  (*Id.* ¶ 9)

15 While PG&E missed its target of 100% completion of its planned CEMA second patrols of

16 certain line miles for dead, dying or diseased trees[3], that was the result of delays in routine

17 inspections in the first half of the year as PG&E ramped up its pre-inspector workforce, as well

18 as changes to the schedule for routine inspections to prioritize work in the highest fire-threat

19 areas.  (*Id.* ¶¶ 10-11)  PG&E completed virtually all routine inspections by year end, but these

20 scheduling changes had the cascading effect of pushing a number of CEMA second patrols,

21 which are typically scheduled to take place approximately six months after a routine inspection,

22

23            [2] As set forth in PG&E's January 15 submission, because there is a lag between the time tree
24 work is completed and the time PG&E contractors submit paperwork confirming completion,
    PG&E's records may not yet reflect completion of work for many of the trees recently identified
25 for work.  PG&E expects that the work on most of those trees was timely completed.

26            [3] PG&E's routine patrols inspect the lines for dead, dying or diseased trees.  PG&E's CEMA
27 is therefore a "second patrol" for these same issues that is completed on lines in high fire-threat
    areas.

28

RESPONSE TO ORDER TO SHOW AND FURTHER ORDER TO SHOW CAUSE
Case No. 14-CR-00175-WHA

into 2020.  (*Id.*)  Those issues have been addressed for 2020.  (*Id.* ¶ 11)  While the failure to meet the CEMA second patrols target is not acceptable, it was the result of scheduling changes, not the availability of pre-inspectors to conduct the patrols.  (*Id.*)

Contrary to the apparent premise of the Court's Order, it is also incorrect that PG&E's PSPS program resulted from any failure by PG&E to comply with California law. PG&E implemented a PSPS program in 2018 in response to dramatically increased wildfire risk due in large part to climate change, which has led to more extreme weather events across a longer and drier fire season.  (Declaration Regarding PSPS in Support of Response to Order to Show Cause and Further Order to Show Cause ("PSPS Decl.") ¶ 2)  While the EVM program is an integral part of its overall approach to wildfire mitigation, the primary means of reducing the frequency and impact of PSPS events are the availability of more localized weather forecasts and real-time data, sectionalization of lines to allow de-energization of smaller sections of line, the use of microgrids to power safe-to-energize areas, and targeted system hardening in high fire-risk areas.  (*Id.* ¶ 3)  Even with these changes, there will remain a risk of vegetation-caused fires in circumstances involving high winds and dry brush—and thus a need for a PSPS program—no matter how much EVM work is completed.  (*Id.* ¶ 5)  The comments by PG&E's CEO William Johnson cited by the Court in its order do not concern vegetation management, but instead relate to the amount of time it will take to upgrade the system to allow for more targeted, precise and informed PSPS events.  PG&E has already made significant strides in that area and will continue to do so in the coming years.  (*Id.* ¶ 4)  But again, the need for and challenges associated with PSPS have nothing to do with tree worker availability.  (*Id.* ¶ 2)

*Second*, to the extent the Court's Order is focused on PG&E's failure to certify that it is in perfect compliance with vegetation management requirements, PG&E has been candid in its submissions that it will never be in a position to certify perfect compliance.  PG&E provides electricity across 70,000 square miles of territory spanning a range of terrains.  (VM Decl. ¶ 6)  The natural environment in which it operates is dynamic: any number of weather events, animal activities, or human interventions can transform trees from compliant to non-

compliant on a daily basis. (*Id.*) Certification of perfect compliance with state-law standards would require technologically infeasible, round-the-clock surveillance of tens of millions of trees. (*See* January 15 submission at 3-4; VM Decl. ¶ 6) But as PG&E has previously informed the Court, it has made extensive efforts to ensure that it is getting as close to that standard as practicable. It has made, and will continue to make, workforce and process improvements to enhance the speed, effectiveness, and safety of its wildfire mitigation work. (*See* January 15 submission at 4-8; VM Decl. ¶ 6)

### B. Imposing the Hiring Condition to Increase the Pace of PG&E's EVM Program Would Be Unreasonable.

To the extent the Court seeks to increase the pace at which PG&E will complete its EVM work—in other words, to the extent the Court's concern is with PG&E's CPUC-approved annual targets themselves, rather than with PG&E's compliance with the annual targets—imposing the Hiring Condition would still be unreasonable.[4] That is so for at least two reasons. *First*, the well-recognized shortage of qualified pre-inspectors and line clearance tree trimmers in California will prevent PG&E from completing its work on a faster timeline. Imposing the Hiring Condition will not change these underlying labor market conditions, and in fact could pose an obstacle to PG&E's compliance, as described below. *Second*, the 2019 targets have been reviewed and approved by the CPUC, the expert body with authority to impose and enforce the Wildfire Safety Plan. This Court should not interfere with the CPUC's determinations.

---

[4] As part of its continual assessment of its wildfire mitigation programs, PG&E plans to conduct EVM on 1,800 distribution line miles in 2020 and beyond based on insights gained from the 2019 effort. PG&E will refocus some of its resources in 2020 to expand Rights-of-Way and remove incompatible species around lower voltage transmission lines in order to reduce wildfire risk and reduce the footprint of future PSPS events by allowing some transmission lines to remain energized. (PG&E 2020 Wildfire Mitigation Plan, submitted on February 7, 2020, at Executive Summary-6, *available at* https://www.pge.com/pge_global/common/pdfs/safety/emergency-preparedness/natural-disaster/wildfires/wildfire-mitigation-plan/2020-Wildfire-Safety-Plan.pdf.)

1          1.     <u>Labor Market Conditions Prevent PG&E From Completing Its Enhanced Vegetation Management Work Faster Than The CPUC-Approved Timeline.</u>

The Bureau of Labor Statistics' most recent data on the entire "Tree Trimmers and Pruners" occupation (from May 2018) shows nationwide employment of 42,440 and California-wide employment of 6,840.[5]  But only a small subset of these tree workers have the necessary experience and certification to work as "line clearance" tree trimmers adjacent to energized power lines.  (VM Decl. ¶ 13)  In AB 1054, the California Legislature specifically found that "[t]here is a nationwide shortage of the qualified utility line workers and qualified line clearance tree trimmers needed to prevent and respond to wildfires, storms, and other major events.  Because this work is performed on and near high voltage lines and other energized electrical equipment, these jobs require substantial training and are highly dangerous.  Current efforts to hire enough qualified people to perform these functions have fallen short even though exceptional compensation packages are being offered."  (2019 Cal. Legis. Serv. ch. 79, § 12(7) ("A.B. 1054") (law filed July 12, 2019)).[6]  PG&E's own experience casting a wide net and offering substantial financial incentives to hire additional tree personnel in the fall of 2018 identified a maximum of approximately 3,000 qualified tree workers to perform vegetation management activities around utility lines at that time.  (PG&E Amended 2019 Wildfire Safety Plan, submitted on February 14, 2019 ("WSP") at 80-81, *available at* https://www.pge.com/pge_global/common/pdfs/safety/emergency-preparedness/natural-disaster/wildfires/Wildfire-Safety-Plan.pdf ; (VM Decl. ¶ 19)).

---

[5] U.S. Bureau of Labor Statistics, Occupational Employment and Wages, May 2018, 37-3013 Tree Trimmers and Pruners, available at https://www.bls.gov/oes/2018/may/oes373013.htm.

[6] In Senate Bill 247, which was passed three months after AB 1054, the legislature mandated that qualified line clearance tree workers be paid no less than apprentice electrical utility linemen. 2019 Cal. Legis. Serv. ch. 406, § 2(b) (law filed Oct. 2, 2019).

1    It is also important to understand that using qualified tree workers from outside

2    California is extremely difficult.  In 2016, in an effort to understand what level of workforce

3    expansion might be possible, PG&E contracted with a vegetation management consultant to

4    perform a market analysis concerning the potential to bring additional qualified personnel into

5    California.  (WSP at 83; (VM Decl. ¶ 20))  The few vendors who showed interest in working in

6    California expressed, in aggregate, an ability to mobilize possibly a few hundred qualified

7    personnel to California and generally expressed an interest in only emergency/short-term work,

8    not a willingness to commit long-term to developing a workforce in California (or moving their

9    existing workforce).  (*Id.*)  In sum, while there are many more tree trimmers and pruners

10    throughout the United States, as of the time PG&E submitted its 2019 Wildfire Safety Plan,

11    third-party and PG&E research had identified no solution for enticing significant numbers of

12    utility-qualified workers to California for a long-term engagement.

13    Despite these limitations, PG&E in 2019 was able to increase its total contracted

14    pre-inspector workforce from 580 to 1,375, largely by onboarding and training new pre-

15    inspectors in cooperation with its contractors.[7]  (VM Decl. ¶ 23)  PG&E also expanded its total

16    contracted tree trimmer workforce from 1,400 to 5,437, by working with contractors to identify

17    additional trimmers, largely by recruiting trimmers from outside of California.[8]  (*Id.* ¶ 29)  At the

18    CPUC's direction, PG&E is also working with local governments and agencies to explore

19    partnerships to access additional existing vegetation management resources.  (*Id.* ¶ 35)  PG&E

20

21    _____

      [7] *See infra* at Part I.B.2.b. for a discussion of PG&E's pre-inspector training program.

22
      [8] The September 2019 online newsletter of the International Brotherhood of Electric
23    Workers ("IBEW") 1245, PG&E's primary union, reported that in Northern California:  "There
      is absolutely no shortage of work out there right now. All companies are hiring as many people
24    as possible and they need more. There are some yards with fully stocked, brand new trucks just
      sitting because there are not enough employees to run them. We are constantly receiving phone
25    calls asking if we know anybody that needs a job."  Available at
26    https://ibew1245.com/2019/10/15/influx-of-new-line-clearance-tree-trimmer-contractors-could-
      lead-to-interesting-negotiations-la-afluencia-de-nuevos-contratistas-de-poda-de-arboles-para-el-
27    despeje-de-lineas-puede-resultar-en-negoci/.

28

1    believes that the key to addressing California's vegetation management resource constraints and

2    expanding the pool of qualified, in-state workers is through wage incentives and expanded

3    training and certification opportunities.  That does not require those workers to become

4    employees of PG&E.

5              2.     Requiring PG&E to Develop an Internal Workforce Would Simply Slow
                      Down the Current Pace of Tree Work
6

7              Requiring PG&E to develop its own internal workforce of pre-inspectors and tree

8    trimmers would not help PG&E accelerate its EVM work; it would slow it down.  That is so for

9    at least two reasons.  *First*, the trimming and removal of trees near energized power lines is a

10   highly specialized and dangerous line of work in which PG&E's contractors have accrued

11   decades of experience and invested heavily to develop the requisite infrastructure and training

12   and management capabilities.  It would take years and hundreds of millions of ratepayer dollars

13   (if not more) for PG&E to develop the infrastructure, workforce and training programs that

14   PG&E's contractors already have in place and have refined over time.[9]  The proposed condition

15

16         [9] In an effort to respond to the Court's questions regarding an era in which PG&E may have
     used in-house crews to perform vegetation removal and tree trimming work, PG&E reviewed
17   relevant historical records and interviewed retired employees who worked on its electric
     distribution system in the 1960s, 1970s and 1980s.  These inquiries confirmed that, while PG&E
18   crews might possibly have done some tree trimming work in the post-war period, PG&E has
     used contractors to perform this work since at least 1976 and most likely since the 1960s.  To the
19   extent PG&E may have used in-house crews for vegetation management work before 1960, the
     company does not have information about how many people were on such crews, if they existed,
20   or the type of equipment they may have used.

21
           At least two filings in California Public Utility Commission (CPUC) proceedings reference
22   PG&E's longstanding use of contractors:  In 1976, the CPUC issued a General Rate Case
     decision which noted that PG&E's "[t]ree trimming is usually let out on a contract."  (CPUC
23   Decision 86821 at p. 45, August 24, 1976, attached as Ex. B to Dyer Decl.); and in testimony
     filed in a 1998 CPUC investigation, a witness provided a history of PG&E's vegetation
24   management program, noting that PG&E transitioned to grid-based trimming in the early 1980s -
     - and that all such work was completed by contractors.  (Testimony of Robert R. Novembri,
25   PG&E's Response to OII 98-09-007, Chapter 3 at p. 3-32 to 3-33, February, 1999, attached as
     Ex. C to Dyer Decl.)  In addition, three retired employees reported that PG&E relied exclusively
26   on contractors for tree trimming and removal work during the 1960s and a fourth recalled that

27

28

1   is therefore not a solution that would alleviate resource constraints in the near term.  Moreover,

2   even if such a massive and costly undertaking were successful, most new hires would necessarily

3   come from the existing pool of contract workers who already perform work on PG&E lines.  The

4   end result in the near term would thus be a change in the composition of, but not a material

5   increase in, the overall resource pool.  *Second*, PG&E's efforts to address the shortage of tree

6   workers are best focused on its ongoing support and funding of programs to train new tree

7   trimmers and pre-inspectors in cooperation with its contractors, outside stakeholders like

8   community colleges, labor unions and local governments and agencies, as well as its pre-existing

9   pilot program to hire a limited internal pre-inspector workforce to evaluate whether those

10  supplemental personnel can improve quality and efficiency.

11              a.      Tree Work Is a Dangerous, Highly Specialized and Resource-
                        Intensive Field that PG&E's Contractors Are Better Positioned
12                      than PG&E to Handle

13              The upfront investments required to train, equip and deploy a workforce of tree

14  trimmers large enough to cover PG&E's service area are significant and lengthy.  (VM Decl. ¶

15  32)  Tree work—which generally involves tree pruning, tree removal and brush removal—is a

16  highly dangerous line of work that requires extensive training and on-the-job experience to

17  perform properly and safely, even without the threats posed by energized powerlines.  (*Id.* ¶ 14)

18  To minimize these risks, federal and California law prescribe comprehensive safety, training and

19  knowledge requirements for tree workers generally, as well as specific requirements for tree

20  workers performing work around energized lines, including requirements to possess and know

21  how to use specialized equipment, to adhere to specific safety procedures and to maintain

22  minimum approach distances from energized lines.  *See* 8 CCR §§ 2940.2, 2950-2951,

23  3420-3428; 29 C.F.R. §§ 1910.269(a)(2)-(r).  Particular kinds of removal and trimming

24

25

26  ─────────────────────────

27  her husband worked for a third-party contractor performing tree trimming for PG&E in the
    1950s.

28

                                                13

operations that involve climbing trees or the use of cranes may require additional levels of training and experience.  *See, e.g.*, 8 CCR 3427(a)(1)(B).

For decades, PG&E's contractors have expended significant resources to identify, train, manage, equip and deploy appropriately qualified personnel who can perform tree work safely and meet the line clearance needs of PG&E and other electric utilities.  (VM Decl. ¶ 30)  Unlike PG&E—which devotes significant resources every year to the ongoing operation and maintenance of electric and gas infrastructure for 16 million Californians—these companies focus almost exclusively on vegetation management.  (*Id.*)  To comply with the proposed condition, PG&E would have to establish from the ground up what would essentially be a full-service vegetation management business within an electric and gas utility, complete with the infrastructure and specialized equipment required to run that operation—all while simultaneously attending to the many other duties associated with providing safe, reliable and affordable power to millions of customers.  (*Id.* ¶ 32)  Far from providing additional value or improving safety, that new business-within-a-business would largely duplicate an infrastructure and workforce that PG&E's vegetation management contractors have spent decades and hundreds of millions of dollars to develop.  (*Id.* ¶¶ 30, 33)  It is unrealistic to think that PG&E, as a newcomer to the industry, would be able from day one to perform tree work as safely and efficiently as companies that have been performing such work as their core business activity for decades.  (*Id.* ¶ 30)

PG&E is not unusual in its choice to rely on contractors for this work.  As observed in a report commissioned by the Federal Energy Reliability Commission, "[t]he vast majority of work in this multi-billion-dollar-a-year industry is not performed by utility personnel, but rather outsourced to specialized tree and vegetation management contractors".  (CN Utility Consulting, LLC, *Utility Vegetation Management Final Report Commissioned to Support the Federal Investigation of the August 14, 2003 Northeast Blackout* (March 2004) at 1, *available at* https://www.ferc.gov/industries/electric/indus-act/reliability/blackout/uvm-final- report.pdf; *see also* National Rural Electric Cooperative Association Research Network, *Vegetation Management, Project 98-08, Section 7 (The Line Clearance Work Force)* (2000) at 45, *available*

*at* https://www.tnelectric.org/wp-content/uploads/2016/08/ECI-Veg-Mgt-CRN.pdf ("Most of the electric utility vegetation management work completed in North America is done on a contract basis").)  The proposed condition would ignore industry best practices and require PG&E to do something that virtually no other major electric utility does, on a compressed timeframe, and on a scale that is unrivaled in the industry.  (*Id.* ¶¶ 30-32)

In addition, the costs of establishing a full-scale tree trimming service within PG&E would be prohibitive and far outweigh whatever efficiencies might be realized over time. Among other things, PG&E would have to fund training, salaries, benefits, travel expenses and statutorily-required overtime for a workforce of at least 5,000 tree trimmers, plus mechanics to maintain equipment and management, security, administrative and support staff; procure a large fleet of trucks and specialized equipment and tools; secure office space for administrative staff and information technology resources to support their operations; and establish, staff and maintain multiple wood management yards for the storage and disposal of vegetative material. (*Id.* ¶ 32)  All of the equipment required for day-to-day operations would immediately begin to depreciate and require ongoing maintenance and replacement, and the anticipated rate of turnover would add to yearly costs.  (*Id.*)  PG&E conservatively estimates that these costs would run into the hundreds of millions of dollars and could exceed $1 billion.  (*Id.*)  It is likely that PG&E's customers would bear a significant portion of this expense.  (*Id.*)

Using a contractor-based workforce also provides significant advantages with regard to flexibility and other efficiencies.  The use of a contractor workforce that collectively covers all parts of Northern California allows PG&E to quickly and efficiently deploy tree trimmers across its vast service territory, and gives PG&E the flexibility to terminate relationships with contractors whose work does not meet PG&E's high standards.  (*Id.* ¶ 31)  The competition among contractors that vie for PG&E's business also spurs innovation and improvements in efficiency and work quality, to the ultimate benefit of ratepayers.  (*Id.*) Industry research has identified these and numerous other benefits to using contractors instead of in-house crews, including greater flexibility in the selection and deployment of crews, stricter

control over quality and performance standards, and ready access to specialized services, technical expertise and equipment.  (*See* National Rural Electric Cooperative Association Research Network,  *Vegetation Management ,Project 98-08: Section 7 (The Line Clearance Work Force)* (2000) at 45, *available at* https://www.tnelectric.org/wp-content/uploads/2016/08/ECI-Veg-Mgt-CRN.pdf.)

          b.      PG&E's Efforts Are Best Focused on Working to Expand the Underlying Resource Pool and Improving the Quality of Current Workers

PG&E already is engaged in a variety of programs designed to increase the underlying labor pool and improve the quality and efficiency of its vegetation management work. These programs have been developed in a careful, considered manner in cooperation with other stakeholders and experts in the industry, as well as with CPUC guidance.  The proposed Hiring Condition would interfere with these beneficial efforts.

Partnerships with Local Governments and Agencies

In response to the vegetation management resource constraints PG&E identified in its Wildfire Safety Plan, the CPUC directed PG&E to investigate partnerships with state and local governments to identify additional skilled labor available in the near-term and explore other possibilities such as local training programs to increase the skilled labor pool in the longer-term. (*See* Decision on Pacific Gas and Electric Company's 2019 Wildfire Mitigation Plan Pursuant to Senate Bill 901, Rulemaking 18-10-007, dated June 4, 2019, at 26, 64.)  To date, PG&E has conducted outreach to local agencies in 23 priority jurisdictions.  (VM Decl. ¶ 35)  While none has identified vegetation management resources that would provide a meaningful increase to PG&E's current contracted workforce, several have expressed interest in continued conversations about potential joint efforts.  (*Id.*)  In addition to continuing conversations with those local agencies, PG&E is expanding its outreach to additional local agencies in 2020.  (*Id.*)

Tree Trimmer and Pre-Inspector Training and Certificate Programs

The CPUC's Safety and Enforcement Division ("SED") in 2019 also evaluated

RESPONSE TO ORDER TO SHOW AND FURTHER ORDER TO SHOW CAUSE
Case No. 14-CR-00175-WHA

1   the quality and availability of vegetation management workers as part of its Order Initiating

2   Investigation concerning the North Bay Fires and Camp Fire ("Wildfires OII").  (*Id.* ¶ 36)  As

3   memorialized in its resolution of the Wildfires OII with the SED and other stakeholders, PG&E

4   is collaborating with community colleges, vegetation management contractors, the line clearance

5   trimmer labor union, and other California utilities to establish a Tree Trimmer Training and

6   Certificate Program and a Pre-Inspector Training and Certificate Program to train tree crew

7   workers and pre-inspectors in local communities where the need for such workers is greatest.[10]

8   PG&E expects the tree crew program to support a total capacity of up to approximately 2,800

9   individuals across PG&E's service territory between program launch and mid-2021 in an effort

10  to address the current shortage of qualified in-state tree workers.  (*Id.* ¶¶ 36-39)

11                PG&E Pre-Inspector Training Programs

12                In 2019, PG&E launched a day-long instructor-led training in safety, patrol

13  procedures and PG&E standards and rating systems, for all contract pre-inspectors to supplement

14  training provided by vegetation management companies, and a three-day training program for all

15  new pre-inspectors performing EVM work.  PG&E onboarded and trained approximately 1,700

16  new vegetation management pre-inspectors hired by its vegetation management contractors

17  under these programs.  (*Id.* ¶¶ 24-26)  PG&E is also in the process of developing an eight-

18  course, comprehensive pre-inspector training program that include web-based training, scenario-

19  based skills assessments, on-the-job training, and mentoring relationships with experienced pre-

20  inspectors.  (*Id.* ¶ 27)  These training programs not only help PG&E address near-term EVM

21  resource constraints, but also expand the pool of skilled and experienced pre-inspectors available

22  to PG&E and other California utilities in the future.

23                Pre-inspector Pilot Program

24  _____

25      [10] *See* Joint Motion of Pacific Gas and Electric Company (U 39 E), the Safety and
    Enforcement Division of the California Public Utilities Commission, Coalition of California
26  Utility Employees, and the Office of the Safety Advocate for Approval of Settlement Agreement,
    dated December 17, 2019, at 16-17.  The Administrative Law Judge presiding over the Wildfire
27  OII is currently reviewing the parties' settlement agreement for approval.

28

RESPONSE TO ORDER TO SHOW AND FURTHER ORDER TO SHOW CAUSE
Case No. 14-CR-00175-WHA

Finally, PG&E has recently reached an agreement with its primary union, IBEW, to conduct a pilot program to evaluate the use of an internal, PG&E pre-inspector workforce. (*Id.* ¶ 28)  The purpose of the pilot program is to evaluate whether bringing a portion of the current, contracted pre-inspector workforce in-house will provide for improved long-term retention of pre-inspectors and build efficiencies.  (*Id.*)  The program is not contemplated to replace PG&E's large contracted pre-inspector workforce, but, if successful, would allow PG&E to build a skilled, internal pre-inspector workforce to conduct EVM work verification, support regional pre-inspection for all of PG&E's vegetation management programs, mobilize for emergency and storm response, and be reassigned, as needed, to cover other vegetation management resource needs across PG&E's service area.  (*Id.*)  The Court should allow PG&E to evaluate the real-world impacts of an internal pre-inspector workforce through this pilot program rather than forcing it to create a full blown, internal pre-inspector workforce now (and abandon the many benefits of a contracted workforce discussed above) without due consideration of its effect on the quality and economics of PG&E's vegetation management work.

## C.     The Hiring Condition Would Impermissibly Interfere with the CPUC's Ongoing Regulatory Process

The proposed Hiring Condition is also unreasonable because it intrudes into a sphere more appropriately left to a publicly accountable and expert state agency. When adopting probation conditions, "the federal government has no constitutional authority to interfere with a state's exercise of its police power except to the extent the state's action intrudes on any of the spheres in which the federal government itself enjoys the power to regulate."  *Snyder,* 852 F.2d at 475.  The Hiring Condition substitutes the Court's view of what is needed for safe operation with the expert state agency's view—an agency that has been singularly focused on this issue for years and that has exercised the state's police power in an area of core state concern.

As explained above, the CPUC considered resource constraints in its review of PG&E's 2019 Wildfire Safety Plan and its investigation of the 2017 Northern California Wildfires and 2018 Camp Fire.  As a result of those proceedings and PG&E's own, independent

1    efforts, PG&E is in the process of implementing multiple measures designed to expand the

2    underlying vegetation management pool and better utilize existing vegetation management

3    resources.  These measures are reviewed, approved, supervised, and enforced by the CPUC.

4    This Court should not impose a condition that interferes with that expert exercise of the state's

5    police power.

6             As courts have repeatedly held, "[a] condition of probation may not circumvent

7    another statutory scheme."  *Abushaar*, 761 F.2d at 960; *see also United States v. Jalilian*, 896

8    F.2d 447, 449 (10th Cir. 1990) (vacating condition of probation requiring non-citizen to depart

9    the country because order interfered with "the comprehensive scheme for admission and

10   deportation of aliens in 8 U.S.C. sections 1101-1362" and Congress's delegation of "primary

11   jurisdiction to the Attorney General"); *United States v. Mercedes-Mercedes*, 851 F.2d 529, 531

12   (1st Cir. 1988) (invalidating probation condition requiring non-citizen to obtain consent of

13   Probation Officer to reenter the country, because such condition "leaves open the theoretical

14   possibility that the probation officer would overrule the immigration authorities" and thereby

15   created a "potential conflict with the immigration laws"); *cf. United States v.Castillo-Burgos,*

16   501 F.2d 217, 220 (9th Cir. 1974) (vacating sentence that mandated deportation at conclusion of

17   the prison term since "[n]owhere in this detailed statutory scheme is there a provision for a court

18   to deport aliens sua sponte"), *abrogated on other grounds by United States v. Rubio-Villareal,*

19   967 F.2d 294 (9th Cir. 1992).

20            These problems compound when the statutory scheme reflects an exercise of the

21   state's core police powers, as is the case here.  *See Queenside Hills Realty Co. v. Saxl*, 328

22   U.S. 80, 82-83 (1946) ("Protection of the safety of persons is one of the traditional uses of the

23   police power of the States. . . .  It is for the legislature to decide what regulations are needed to

24   reduce fire hazards to the minimum."); *Comms. Telesystems Int'l v. California Pub. Util.*

25   *Comm'n*, 196 F.3d 1011, 1017 (9th Cir. 1999) ("[T]he regulation of utilities is one of the most

26   important of the functions traditionally associated with the police power of the States." (quoting

27   *Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm.*, 461 U.S. 375, 377 (1983)); *Sable*

28

*Comms. of California Inc. v. Pac. Tel. & Tel. Co.*, 890 F.2d 184, 189 n.9 (9th Cir. 1989) ("The CPUC was created by the California Constitution Art. XII, § 22, and California's police power over public utilities has been vested in it.").  Appellate courts have thus counseled district courts not to impose probation conditions that intrude on a state's administration of its comprehensive regulatory schemes.  *E.g.*, *Snyder,* 852 F.2d at 475 (holding that "federal courts are constitutionally barred from unilaterally ordering suspensions of state drivers' licenses"); *United States v. Sterber*, 846 F.2d 842, 844 (2d Cir. 1988) (holding that a probation condition revoking a pharmacy license "implicates important notions of federalism," and "question[ing] whether a federal district judge, 'unguided by Congress except in the most general terms,' can require a defendant to give up a state-granted professional license, particularly where the state provides a comprehensive regulatory system to handle the professional misconduct of those it licenses" (citation omitted)), *superseded by statute on other grounds*, 18 U.S.C. § 853(a), *as recognized in United States v. Singh*, 390 F.3d 168 (2d Cir. 2004); *United States v. Pastore*, 537 F.2d 675, 683 (2d Cir. 1976) (rejecting probation condition requiring defendant to resign from state bar because "expulsion from the state bar is a sanction precisely governed by statute and regulation," and "it would seem preferable not to impose that sanction except by the procedure and for the reasons there prescribed"), *superseded by statute on other grounds as recognized by United States v. Singh*, 390 F.3d 168 (2d Cir. 2004); *see also Thomas v. Kadish,* 748 F.2d 276, 278 (5th Cir. 1984) (rejecting a plaintiff's effort to challenge state bar proceedings in district court "in the light of the weight given by the Court to the values . . . that arise out of federal-state comity considerations and the 'strength of the state interest in regulating the state bar'" (citation omitted)).[11]  The proposed Hiring Condition—by interfering with and displacing the CPUC's own regulatory framework—would do exactly what these cases forbid.

---

[11] This deference to state expertise is hardly limited to the probation context.  For example, the *Burford* absention doctrine counsels deference to state regulatory regimes even when doing so would require courts to forego their own jurisdiction.  As the Supreme Court held in the namesake case, "it 'is in the public interest that federal courts . . . should exercise their

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**D.    <u>The Hiring Condition Is Not Reasonably Related To The Underlying Conviction.</u>**

A discretionary condition of probation "must involve only such deprivations of liberty or property as are *reasonably necessary* to accomplish the purposes of sentencing.  If a condition of probation does not meet these requirements, it is invalid."  *Lorenzini,* 71 F.3d at 1492 (emphasis added) (citation omitted).  As noted in previous filings, PG&E was convicted of obstructing an NTSB investigation and of five violations of the federal Pipeline Safety Act concerning data gathering and integration and integrity management concerning natural gas transmission pipelines.  *See United States v. Pac. Gas & Elec. Co.,* No. 14-cr-175 (N.D. Cal. Jan. 31, 2017); *see* Response to Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified at 49, *United States v. Pac. Gas & Elec. Co.*, No. 14-cr-175 (N.D. Cal. Jan. 23, 2019), ECF No. 976.  Those convictions concerned PG&E's natural gas transmission business.  None of them involved any aspect of PG&E's electric grid operations.  In passing the probation statute, "Congress intended that there be some connection between the proscription to be ordered by the court and the nature of the crime or the degree of punishment."  *Lorenzini*, 71 F.3d at 1493.  Here, there is no reasonable relation between PG&E's original offenses and probation conditions relating to its electric distribution business.  PG&E recognizes that the Court has previously imposed conditions related to electricity distribution, despite PG&E's arguments on this score, and reiterates it for preservation purposes.

---

discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy."  *Burford v. Sun Oil Co.*, 319 U.S. 315, 318 (1943).  This deference is warranted despite the "virtually unflagging obligation" of federal courts to exercise their jurisdiction.  *Mata v. Lynch*, 135 S. Ct. 2150, 2156 (2015) (citation omitted).  If deference to state agencies is warranted in that context, it is even more warranted in the context of probation conditions that are a matter of discretion.

Likewise, under the doctrine of primary jurisdiction, courts refer questions to an expert agency whenever the enforcement of a claim subject to a specific regulatory scheme requires resolution of issues that are 'within the special competence of an administrative body.'"  *Davel Commc'ns, Inc. v. Qwest Corp.*, 460 F.3d 1075, 1086 (9th Cir. 2006).

1

## II.        THE COURT SHOULD NOT IMPOSE THE COMPENSATION CONDITION.

2

3
          The Compensation Condition is equally impermissible and unwarranted.  That

4
requirement would require PG&E to "restrict all bonuses and other incentives for supervisors

5
and above *exclusively* to achieving the PG&E Wildfire Mitigation Plan and other safety goals."

6
As with the hiring condition, the subject of compensation has been and continues to be the focus

7
of state regulatory efforts, including high-profile legislation, and it is a subject that has been and

8
will continue to be adjudicated in CPUC proceedings.  In fact, the CPUC has approved–and

9
indeed in some cases required–a hybrid approach to incentives that gives predominant weight to

10
safety, but that also takes into account financial performance.  This Court should not impose

11
conditions that conflict with the considered regulatory decisions of the California legislature and

12
undermine the authority of the Bankruptcy Court to approve an incentive compensation plan it

would otherwise deem appropriate.

13
          Moreover, PG&E's incentive metrics are already weighted significantly further in

14
favor of safety compared to the metrics of its peer utilities.  PG&E's recently revised executive

15
compensation structure leads the industry in this regard.  Nor is there any evidence suggesting

16
that safety outcomes would improve by making safety the sole criterion for the incentive

17
program, especially given that PG&E already weights safety considerations so heavily.  To the

18
contrary, the hybrid approach previously approved by both California and the Bankruptcy Court

19
reflects the reality that a financially stable PG&E is better positioned to safely provide power.

20
### A.        The Compensation Condition Would Improperly Conflict With Recent California Law Regulating Utility Incentive Compensation.

21

22
          As explained above, probation conditions are unlawful to the extent they interfere

23
with valid state regulatory regimes.  *See supra* Part I.C.  As the Ninth Circuit has held, "where a

24
state has in place a comprehensive procedure for resolution of the condition probation imposes, it

25
makes good sense to defer to that established procedure.'"  *United States v. Lakatos*, 241 F.3d

26
690, 695 (9th Cir. 2001) (quoting *United States v. A-Abras Inc.*, 185 F.3d 26, 35 (2d Cir. 1999)).

27

28

1   The Court's proposed Compensation Condition runs contrary to California's chosen method of

2   regulating PG&E's incentive plans.

3            Last year, California enacted AB 1054.  This bill began as a narrow proposal in

4   the California Assembly in February 2019 to appoint an internal auditor for the CPUC.  *See* 2019

5   Cal. A.B. 1054 (introduced Feb. 21, 2019).  But, over the course of the spring and summer,

6   legislators came together, compromised, and, after multiple amendments, transformed AB 1054

7   into a comprehensive response to "[t]he increased risk of catastrophic wildfires" in the state.

8   2019 Cal. Legis. Serv. ch. 79, § 1(a)(1) (law filed July 12, 2019).  As part of this comprehensive

9   reform, AB 1054 specifically addresses the issue of electrical utility compensation.  *Id.* § 21

10  (codified as amended at Cal. Pub. Util. Code § 8389).  It also delegates to the CPUC the power

11  to approve executive incentive plans, within the guided discretion provided by statutory

12  standards.  *Id.* § 21(e)(4).  Such approval is required for the CPUC to issue a safety certification,

13  without which an electric utility will have difficulty recovering costs from the State when

14  wildfires occur.  *Id.* §§ 6(c), 21(e)(4).  The proposed incentives condition conflicts with that

15  legislation in two ways.

16           *First*, AB 1054 requires a utility's executive compensation structure to promote

17  both safety *and* financial stability.  The law provides that to obtain a safety certification, a utility

18  must show, among other things, that it has "established an executive compensation structure

19  approved by the [Wildfire] [D]ivision [that is] structured to promote safety as a priority and to

20  ensure public safety *and utility financial stability* . . . ."  Cal. Pub. Util. Code § 8389(e)(4)

21  (emphasis added).  It also requires that electric utilities "establish[] a compensation structure for

22  any new or amended contracts for executive officers."  *Id.* § 8389(e)(6)(A).  The "primary

23  portion" of that structure must be "based on achievement of objective performance metrics," but

24  the law also requires that the structure "provide[] a significant portion of compensation . . . based

25  on the electrical corporation's long-term performance *and value*," while minimizing indirect

26  compensation "that is not aligned with *shareholder and taxpayer interest* in the electrical

27  corporation."  *Id.* § 8389(e)(6)(A)(i)(I), (iii)-(iv) (emphases added).  As part of the CPUC's

28

oversight authority, the law does give the CPUC discretion to approve a 100% safety-related overlay that denies all incentive compensation in the event of a significant safety issue such as a catastrophic wildfire. *Id.* § 8389(e)(4) (stating that incentive structure "may include tying 100 percent of incentive compensation to safety performance and denying all compensation in the event the electrical corporation causes a catastrophic wildfire that results in one or more fatalities"). But the balance of the statute makes clear that financial performance cannot be ignored entirely.

AB 1054's hybrid criteria thus reflect the judgment, supported by the legislative record, that PG&E is best-positioned to provide safe and reliable power if it is financially stable itself. *See, e.g.,* 2019 Cal. Legis. Serv. ch. 79, § 2(c) ("The state has a substantial interest that its electrical corporations are operating in a safe and reliable manner and have access to capital at reasonable cost to make safety investments."); *Wildfires and Climate Change: California's Energy Future: A Report from Governor Newsom's Strike Force* at 3 (Apr. 12, 2019) [hereinafter "Strike Force Report"] ("Utilities rely on credit to finance ongoing infrastructure investments, including fire mitigation. As utilities' credit ratings deteriorate, their borrowing costs increase and those costs for capital necessary to make essential safety improvements are passed directly to customers. These downgrades, and the prospect of additional utility bankruptcy filings, directly impact Californians' access to safe, reliable and affordable electricity."); *id.* at 28 ("California residents and businesses require a safe and reliable electrical system, the achievement of which requires ongoing investment in new equipment, systems, and workforce.").

The Court's proposed condition, by contrast, would require tying 100% of incentive compensation to safety metrics and would bar any reliance on the financial performance metrics that California law expressly contemplates. The Compensation Condition would effectively enact an earlier, rejected version of AB 1054, which required "an executive incentive compensation plan linked to safety performance metrics" with no mention of financial stability, 2019 Cal. A.B. 1054, § 25(e)(5) (as amended June 27, 2019), rather than the final law's

1    dual focus on safety and financial health.  The proposed Compensation Condition thus conflicts

2    with California law and upsets the bargain struck by California's legislature.

3              *Second*, the Compensation Condition would go substantially further than AB

4    1054 by mandating an incentive structure for all supervisors below the executive level.  Between

5    the Senate-amended version of the bill on June 27 and the final bill signed into law in mid-July,

6    the Legislature changed the focus of, and elaborated in great detail on, the incentive requirements

7    for executives that would be required to obtain a safety certification.  *Compare* 2019 Cal. A.B.

8    1054, § 25(e)(5) (as amended June 27, 2019), *with* 2019 Cal. Legis. Serv. ch. 79, § 21(e)(4),

9    (e)(6).  Throughout those amendments, however, California left decisions about non-executives

10   to the discretion of the utilities— and, in PG&E's case, that of the bankruptcy court with respect

11   to pre-emergence incentive plans.  The Compensation Condition, which would fix the incentive

12   criteria for thousands of PG&E supervisors, conflicts with that legislative judgment.

13             Nor, for that matter, has California finished regulating in this area.  PG&E has

14   been participating in ongoing negotiations with the CPUC and the Governor's Office regarding

15   incentive plans, and the CPUC will begin hearing testimony regarding PG&E's 2020 executive

16   compensation plan on February 19.  PG&E has already submitted written testimony explaining

17   its proposed incentive plans and the decision-making that underlay the proposals.  *See* CPUC

18   Testimony at 7-3 to 7-19 (explaining that "PG&E's performance-based compensation structure

19   aligns with customer welfare overall—including safety as its most critical element—but the

20   structure does so without sacrificing reliability and affordability").  The Bankruptcy Code and

21   AB 1054 provide room for the CPUC (as well as the Bankruptcy Court, discussed immediately

22   below) to engage in any necessary iterative process to ensure that PG&E's incentive plans follow

23   the best interests of the interested bankruptcy parties and satisfy the strictures of California law,

24   and applicable bankruptcy law.  The proposed Compensation Condition would replace this

25   system of guided discretion to consider costs and benefits with a rigid "safety-only" rule.  This

26   Court should not preempt the expert and accountable state decisions-makers to which California

27   has chosen to delegate the responsibility of approving PG&E's incentive compensation plans.

28

1
2

**B.**     **The Proposed Compensation Condition Would Undermine The Bankruptcy Court's Authority To Approve PG&E's Incentive Plans During The Chapter 11 Case.**

3

In addition to conflicting with California's legislative determinations, the

4

proposed Compensation Condition would undermine the Bankruptcy Court's discretion to

5

approve pre-emergence incentive plans.  *See Abushaar*, 761 F.2d at 960 (probation conditions

6

should not conflict with other federal prerogatives).  As the January 24 Order to Show Cause

7

recounts, Judge Montali has previously addressed the issue of incentive compensation in

8

PG&E's chapter 11 case.  He has issued orders approving (or disapproving) employee incentive

9

plans and has assessed whether those plans represent a reasonable exercise of PG&E's business

10

judgment.

11

As background, the Bankruptcy Court has addressed PG&E's 2019 employee

12

incentive plans over the course of last year.  As the Bankruptcy Court noted, PG&E "face[s]

13

suffocating pressures from [its] creditor committees, regulatory agencies, various other creditor

14

groups, the general public, and governmental agencies to" meet two separate but intertwined

15

goals: to "improve substantially [its] safety practices and [to] successfully reorganize."  Order

16

Denying Motion to Approve KEIP at 6, *In re PG&E Corp.*, No. 19-30088 (Bankr. N.D. Cal.

17

Aug. 30, 2019), ECF No. 3773 [hereinafter "Order on KEIP"].  Those political and financial

18

pressures are compounded by time pressure—the California Legislature is pushing PG&E "to

19

exit bankruptcy by June 30, 2020."  *Id.*

20

Against this backdrop, the Bankruptcy Court approved, "in the best interests of . .

21

. all parties in interest," an incentive plan for a significant portion of the company's employees

22

that took into account safety, financial and customer performance criteria.  *See* STIP Order at 1-

23

2.  In so doing, Judge Montali ultimately approved metrics that were more focused on safety and

24

less focused on financial performance compared to those in an earlier proposed plan, but that

25

were also not 100% focused on safety, as some participants in the proceeding had urged.  *See id.*

26

at 1.  Specifically, the STIP Order approved an incentive plan for non-executives that

27
28

RESPONSE TO ORDER TO SHOW AND FURTHER ORDER TO SHOW CAUSE
Case No. 14-CR-00175-WHA

1  "increase[ed] the weighting for the safety metrics … from 50% to 65% (with a corresponding

2  15% reduction in the Financial Performance weighting, from 40% to 25%)").  *Id.* at 2.

3  Conversely, Judge Montali later rejected an incentive proposal for a limited group

4  of PG&E's most senior executives that would have provided from $5.5-16.4 million in

5  compensation, also based on metrics weighted at 65% safety, 10% customer satisfaction, and

6  25% financial performance.  *See* Mot. of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and

7  503(c) for Entry of an Order (I) Approving Debtors' Incentive Program for Certain Key

8  Employees and (II) Granting Related Relief at 12-13, *In re PG&E Corp.*, No. 19-30088 (Bankr.

9  N.D. Cal. June 19, 2019), ECF No. 2664; Order on KEIP at 6 (denying proposed incentive plan

10  for certain of PG&E's most senior executives because they should be focused on "improving

11  Debtors' safety record" without needing additional financial incentives).  Judge Montali

12  suggested that an incentive plan based entirely on safety metrics might be appropriate with

13  respect to this limited group, Order on KEIP at 6-7, thereby demonstrating the Bankruptcy Court

14  is well-positioned to consider such a plan where circumstances so warrant.

15  By requiring the exclusion of all non-safety metrics, the Court's Compensation

16  Condition usurps the discretion of the Bankruptcy Court.  Judge Montali has applied a nuanced

17  approach in his consideration of PG&E's 2019 plans.  Rather than constrain Judge Montali in the

18  event he is called upon to assess PG&E's compensation plans for 2020, this Court should allow

19  the Bankruptcy Court to pass judgment on PG&E's plans with the benefit of submissions from

20  all interested estate stakeholders.  *In re Gruntz*, 202 F.3d 1074, 1080 (9th Cir. 2000) (en banc)

21  ("Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they

22  might deal efficiently and expeditiously with all matters connected with the bankruptcy estate."

23  (quoting *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995)).

24  Accordingly, this Court should not impose a condition that conflicts with or

25  constrains the Bankruptcy Court's review of PG&E's employee compensation arrangements.

26

27

28

C.   **The Compensation Condition Is Unreasonable Because It Is Not In The Public Interest.**

Even apart from the findings of state and federal actors, the Compensation Condition is not reasonably necessary. *Lorenzini,* 71 F.3d at 1492.  PG&E already weighs safety more heavily in its incentive program than its peer utilities do, and for good reason.  *See* CPUC Testimony, at 7-9 ("The STIP's emphasis on customer and workforce welfare (especially public safety) tied to outcome-based metrics represents industry leadership: Based on our analysis of 19 other utilities, only 20 percent use customer/public safety metrics, and only one uses such a metric that is outcome-based."); Reply Mem. of Points and Authorities in Further Support of Corrected Mot. of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363, and 503(c) for Entry of an Order (I) Approving Short-Term Incentive Plan and (II) Granting Related Relief at 19, *In re PG&E Corp.*, No. 19-30088 (Bankr. N.D. Cal. Apr. 3, 2019), ECF No. 1226 (noting that PG&E's proposed safety weighting "is considerably higher than typical of the utility industry" (quoting Assessment of Pacific Gas and Electric Corporation and Pacific Gas and Electric Company's Safety Culture ("NorthStar Report") at I-6, VII-12)); Transcript of April 9, 2019 Proceedings Before the Hon. Dennis Montali at 88, *In re PG&E Corp.*, No. 19-30088 (Bankr. N.D. Cal. Apr. 10, 2019), ECF No. 1325 (statement of Mr. Bray, Unsecured Creditors Committee) ("If you look at the peer groups for this industry and this company, they have similar structures.  [PG&E's] safety metric is much higher than theirs are, if the Court approves the stipulation . . . .").

There is no evidence suggesting that making safety performance the *exclusive* criterion rather than the *most important* criterion (as PG&E does) improves safety outcomes. Moreover, PG&E is unaware of any utility that gives no weight to financial performance in its incentive calculations.  *See* Corrected Decl. of Douglas J. Friske in Support of Mot. of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363, and 503(c) for Entry of an Order (I) Approving Short-Term Incentive Plan and (II) Granting Related Relief at 8, *In re PG&E Corp.*, No. 19-30088

(Bankr. N.D. Cal. Mar. 8, 2019), ECF No. 807 ("Financial performance measures were used at 100% of the Debtors' peer companies.").

Indeed, as explained above, PG&E's ability to safely provide power is in large part predicated on its financial stability, particularly in the context of the company's bankruptcy. As PG&E has explained in its CPUC testimony on this subject, including a financial metric "promotes safety, . . . in that strong public safety performance is essential to financial stability (as evidenced by the current Chapter 11 proceedings and the substantial decline in the price of PG&E Corporation common stock since the 2017 and 2018 wildfires)." CPUC Testimony at 7-14. In this way, "tying 100 percent of incentive compensation to safety metrics would not adequately align with PG&E's *overall* mission of providing safe, reliable, affordable, and clean energy to its customers." *Id.* at 7-21. In fact, an exclusive focus on safety may even *harm* PG&E's mission to provide safe and reliable electricity to Californians. *See id.* at 7-9 ("[W]ith an overly narrow or exclusive focus on safety, PSPS could be routinely implemented—and although that might ensure wildfire safety, it could cause hardships to PG&E's customers, especially its most vulnerable customers.").[12]

This Court should not impose conditions that lack an evidentiary foundation in the record, and that are potentially counter-productive. Probation conditions "must involve only such deprivations of liberty or property as are reasonably necessary to accomplish the purposes of sentencing." *Lorenzini*, 71 F.3d at 1492. Conditions that "unnecessarily restrict otherwise lawful activities . . . are impermissible." *Terrigno*, 838 F.2d at 374. No record before the Court justifies limiting all supervisors to "safety-only" incentive plans. Indeed, quite the opposite. Judge Montali's words in approving the 2019 STIP and its hybrid criteria are just as relevant to this Court's proposed condition:

> [W]e're talking about people that work at the nuclear power plant, people working in the corporate offices, people dealing with customer complaints, people that are fixing lines in Berkeley and in San Francisco and in many other parts of

---

[12] The Compensation Condition is also not reasonably related to the underlying conviction for the reasons explained *supra*. *See* Part I.D.

northern California that are not at all fire hazard areas, hopefully.  And so to suddenly decide, because of a tragedy of such magnitude, therefore thousands of employees should not have the kind of compensation arrangement that has been a consistent pattern in this company seems to be the wrong way to deal with the problem.

Transcript of Arp. 23, 2019 Proceedings Before the Hon. Dennis Montali at 75, *In re PG&E Corp.*, No. 19-30088 (Bankr. N.D. Cal. Apr. 24, 2019), ECF No. 1663.

RESPONSE TO ORDER TO SHOW AND FURTHER ORDER TO SHOW CAUSE
Case No. 14-CR-00175-WHA

Dated:  February 12, 2020

Respectfully Submitted,

JENNER & BLOCK LLP


By:   /s/ Reid J. Schar
      Reid J. Schar (*pro hac vice*)

CRAVATH, SWAINE & MOORE LLP


By:   /s/ Kevin J. Orsini
      Kevin J. Orsini (*pro hac vice*)


CLARENCE DYER & COHEN LLP


By:   /s/ Kate Dyer
      Kate Dyer (Bar No. 171891)


Attorneys for Defendant PACIFIC GAS
AND ELECTRIC COMPANY

RESPONSE TO ORDER TO SHOW AND FURTHER ORDER TO SHOW CAUSE
Case No. 14-CR-00175-WHA