JENNER & BLOCK LLP
    Reid J. Schar (*pro hac vice*)
    RSchar@jenner.com
    353 N. Clark Street
    Chicago, IL 60654-3456
Telephone: +1 312 222 9350
Facsimile: +1 312 527 0484

CLARENCE DYER & COHEN LLP
    Kate Dyer (Bar No. 171891)
    kdyer@clarencedyer.com
    899 Ellis Street
    San Francisco, CA 94109-7807
Telephone: +1 415 749 1800
Facsimile: +1 415 749 1694

CRAVATH, SWAINE & MOORE LLP
    Kevin J. Orsini (*pro hac vice*)
    korsini@cravath.com
    825 Eighth Avenue
    New York, NY 10019
Telephone: +1 212 474 1000
Facsimile: +1 212 474 3700

Attorneys for Defendant PACIFIC GAS AND ELECTRIC
COMPANY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br><br>    v.<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>               Defendant. | Case No. 14-CR-00175-WHA<br><br>**RESPONSE TO COURT REQUEST FOR AMENDED RESPONSES AND FURTHER QUESTIONS TO BE ANSWERED BY PG&E**<br><br>Judge: Hon. William Alsup |

1    Defendant Pacific Gas and Electric Company ("PG&E") respectfully submits this

2 response to the Court's February 4, 2020 Request for Amended Responses and Further Questions

3 to be Answered by PG&E.  (Dkt. 1136.)

4 **Follow-Up Questions to Docket No. 1111, Question 4**

5    **Question 1:**  Regarding the July 2019 "ground" inspection, who was the

6    inspector?  Give the name and contact information.  The name and contact

7    information may be filed under seal for now, if PG&E requests.  The Court,

8    however, may require him or her to testify.

9 **PG&E Response:**

10    PG&E understands this question to be referring to the detailed ground inspection

11 of Tower 001/006 on the Geysers #9-Lakeville 230 kV Transmission Line (the "Geysers #9

12 Line") that PG&E performed on July 18, 2019.  PG&E is filing under seal Exhibit A, which

13 includes the name of and contact information for the troubleman who performed that inspection.

14    **Question 2:**  As a ground inspection, how close to the jumper cable did the

15    inspector get?

16 **PG&E Response:**

17    PG&E understands that the PG&E troubleman who performed the July 18, 2019

18 ground inspection of Tower 001/006 stood at ground level and visually observed the tower

19 components from that vantage point, possibly using binoculars.  Based on Light Imaging and

20 Ranging ("LiDAR") data, PG&E estimates that the jumper cable on the topmost phase of the

21 Geysers #9 Line was approximately 80 feet above the ground.  As described in PG&E's

22 responses to Questions 3, 9, 11, 14 and 18 below, Tower 001/006 was also subject to separate

23 climbing and drone inspections in February and May 2019, respectively.

24

25

26

27

28

RESPONSE TO COURT REQUEST FOR AMENDED RESPONSES AND FURTHER QUESTIONS TO BE
ANSWERED BY PG&E
Case No. 14-CR-00175-WHA

**Question 3:** How could it be a "detailed" inspection if he or she stayed on the ground?

**PG&E Response:**

As defined in PG&E's Electric Transmission Preventive Maintenance ("ETPM") Manual in effect at the time of the July 18, 2019 ground inspection of Tower 001/006, a "detailed overhead inspection" is one during which "[i]ndividual elements and components are examined carefully through visual and/or routine diagnostic tests, and each abnormal condition is graded and/or recorded". That version of PG&E's ETPM Manual provides that a detailed inspection may take the form of a "ground, aerial, or climbing inspection". When done by ground, inspectors typically use binoculars. The ETPM Manual provides for detailed ground inspections of 230 kV transmission lines every five years. In years during which a detailed inspection was not performed, 230 kV transmission lines were patrolled, typically by helicopter.[1]

The July 18, 2019 ground inspection of Tower 001/006 was conducted pursuant to this schedule of ground inspections of 230 kV lines in PG&E's system every five years. In 2019, in addition to the routine inspections performed by PG&E employees, PG&E performed accelerated inspections of all transmission towers and poles in areas at higher risk of wildfire (as well as distribution facilities and substations in such areas) using enhanced technology and processes. Under that program, known as the Wildfire Safety Inspection Program ("WSIP"),

---

[1] Consistent with the Transmission Control Agreement ("TCA") between PG&E and the California Independent System Operator ("CAISO"), PG&E submits summaries of the inspection and patrol procedures set forth in its ETPM Manual to CAISO for its review and adoption. *See* TCA § 2.2 & Appendix C §§ 2.3, 5.2.1.1, 5.3; Transmission Maintenance Procedure No. 7 § 7.3.2. Those summaries are contained in PG&E's Transmission Owner Maintenance Practices document for Electrical Overhead Transmission Lines ("TOMP"). Since 1997, CAISO has reviewed and adopted successive versions of PG&E's TOMP.

In addition, CAISO may inspect PG&E facilities at any time on reasonable notice to verify inspection and maintenance performance. *See* TCA § 18.3; Transmission Maintenance Procedure No. 4 § 4.1.1. In a report on PG&E's maintenance practices, issued on October 23, 2018, CAISO reported that "site visits of overhead transmission lines indicated the lines were generally well maintained and largely reflected PG&E's maintenance records."

1   PG&E hired contractors to perform climbing inspections (during which inspectors climb towers)

2   and drone inspections (involving drones and helicopters equipped with high-resolution cameras

3   that fly around the structure) of all transmission towers in Tier 2 and Tier 3 High Fire-Threat

4   District ("HFTD") areas prior to the 2019 fire season.  Based on its location in a Tier 3 HFTD

5   area, the Geysers #9 Line was one of the more than 500 lines within the scope of PG&E's WSIP

6   and, as a result, Tower 001/006 was subject to separate climbing and drone inspections in

7   February and May 2019, respectively.  Those enhanced inspections were in addition to the

8   routine ground inspection of Tower 001/006 that PG&E performed on July 18, 2019, in

9   accordance with its existing practice of inspecting 230 kV lines from the ground every five years

10  and patrolling by helicopter in other years.

11          PG&E's plan for inspections in 2020 and beyond is described in its latest Wildfire

12  Mitigation Plan that was recently submitted to the CPUC for review.  As described in that Plan,

13  PG&E's inspection program for transmission lines is moving from a prescriptive time cycle

14  frequency to an approach driven by risk, with the highest-risk assets requiring more frequent

15  inspections than lower-risk assets.  In addition, the detailed inspection checklist for electric

16  transmission lines and equipment has been updated to incorporate WSIP-identified fire risk

17  considerations as well as baseline compliance guidelines.  Detailed ground or climbing

18  inspections of electric transmission lines will be coupled with aerial inspection methods to

19  provide the additional aloft vantage points for each structure assessed during a given cycle.

20          **Question 4:**  Did the inspector take photographs of the jumper cable?  If so,

21          provide them.

22  **PG&E Response:**

23          The PG&E troubleman who performed the July 18, 2019 ground inspection of

24  Tower 001/006 did not take any photographs of the jumper cable.

25

26

27

28

RESPONSE TO COURT REQUEST FOR AMENDED RESPONSES AND FURTHER QUESTIONS TO BE
ANSWERED BY PG&E
Case No. 14-CR-00175-WHA

**Question 5:**  What specifically did the inspector do to ascertain whether the jumper cable remained secure, as opposed to on the verge of detaching?

**PG&E Response:**

The PG&E troubleman who performed the July 18, 2019 ground inspection of Tower 001/006 stood on the ground and, from that vantage point, visually examined the structure and its individual components (possibly using binoculars) for any abnormalities as defined in PG&E's ETPM Manual, such as signs of arcing on the jumper, broken strands, rust, cracks, gunshot damage, corrosion, twisting, loose or broken connectors, damaged or missing dampers, and insufficient clearance from the tower or other components.  The troubleman recorded no such findings.

**Questions 6 and 7:**  Did the checklist used by the inspector specifically inquire into the conditions of the jumper cable?  And, if so, what specifically was the inspector supposed to check?

**PG&E Response:**

The inspection form used by the PG&E troubleman who performed the July 18, 2019 ground inspection of Tower 001/006 did not specifically inquire into the conditions of jumper cables on the tower.  PG&E notes that the electronic checklists that inspection personnel used to record WSIP enhanced climbing and drone inspections of Tower 001/006 in February and May 2019, respectively, did specifically inquire into the condition of individual transmission line components and hardware, including jumper cables.  Those inspections are described in PG&E's responses to Questions 9, 11, 14, 15, 16 and 18 below.

**Question 8:**  Explain the specific causes of the detachment in October, and why those conditions weren't identified in the July inspection.

**PG&E Response:**

PG&E does not currently know what caused the detachment.  CAL FIRE has collected the jumper, and PG&E understands that CAL FIRE's investigation is ongoing.  PG&E does have access to certain photographs that were taken prior to the removal of the potential

RESPONSE TO COURT REQUEST FOR AMENDED RESPONSES AND FURTHER QUESTIONS TO BE ANSWERED BY PG&E
Case No. 14-CR-00175-WHA

1  evidence by CAL FIRE, but review of those photographs is insufficient to establish the cause of

2  the separation.[2]

3      **Question 9:**  Regarding the February 2019 "climbing" inspection, who was the

4      inspector?  Again, the name and contact information may be filed under seal for

5      now if PG&E requests.

6  **PG&E Response:**

7      PG&E understands this question to be referring to the climbing inspection of

8  Tower 001/006 on the Geysers #9 Line that a three-person PG&E contractor crew performed on

9  February 6, 2019, in connection with PG&E's Wildfire Safety Inspection Program.  PG&E

10 understands that two of the crew members climbed Tower 001/006 while the other remained on

11 the ground to inspect the tower from that vantage point and to record inspection findings on an

12 electronic checklist.  PG&E is filing under seal Exhibit A, which lists the names of and contact

13 information for the three crew members.[3]

14     **Question 10:**  What contractor was hired for the job?

15 **PG&E Response:**

16     The three-person contract inspection crew that performed the February 6, 2019

17 climbing inspection of Tower 001/006 was affiliated with Quanta Energy Services, LLC.

18

19     [2] On October 26, 2019, PG&E employees and contractors took drone and other photographs

20 and video of Tower 001/006 to obtain footage of the condition of the tower, including the
   detached jumper.  After the drone footage was taken, CAL FIRE personnel directed the PG&E

21 personnel and contractors to provide the drone footage to CAL FIRE.  The PG&E personnel and
   contractors did so.  PG&E subsequently learned from its contractor that images from the drone

22 footage of Tower 001/006 were cached on a computer and promptly informed CAL FIRE.  CAL
   FIRE has requested that PG&E not utilize or disseminate, outside of PG&E, the drone footage

23 of Tower 001/006, and PG&E has complied with that instruction.  Further, the CPUC has
   provided PG&E information about its observations of the collected equipment, but this

24 information also does not permit PG&E to establish the cause of the separation.

25     [3] PG&E understands that, in addition to the three members of the climbing inspection crew

26 who are identified on the climbing inspection form and are listed in Exhibit A, two contractor
   groundmen were also present for the inspection, but that these groundmen did not climb the

27 tower.

28

RESPONSE TO COURT REQUEST FOR AMENDED RESPONSES AND FURTHER QUESTIONS TO BE
ANSWERED BY PG&E
Case No. 14-CR-00175-WHA

**Question 11:**  As a "climbing" inspection, how close to the jumper cable did the inspector climb?

**PG&E Response:**

The two members of the contract inspection crew who climbed Tower 001/006 on February 6, 2019 would have used a ladder built into the steel lattice to ascend the tower and observe individual components more closely than they could from the ground.  While PG&E does not have records that note how close the inspectors climbed to the jumper, the ladder allowed the climbers to reach a point on the tower that is approximately 20 feet from the jumper cable that failed, as determined from LiDAR data.

**Question 12:**  Was the line energized?

**PG&E Response:**

Yes, the Geysers #9 Line was energized at the time of the February 6, 2019 climbing inspection.

**Question 13:**  Did the inspector touch and/or tug on the jumper cable?

**PG&E Response:**

No, the inspectors who performed the February 6, 2019 climbing inspection did not touch or tug on the jumper cable.

**Question 14:**  Did the inspector take photographs of the jumper cable?  If so, please provide them.

**PG&E Response:**

The inspectors who performed the February 6, 2019 climbing inspection took multiple photographs of Tower 001/006 while aloft the tower, including of the ends of the insulator strings on the tower.  Two photographs in the completed inspection form show sections of the jumper cable at issue.  PG&E is attaching those photographs as Exhibit B to this

submission.[4]  One of the two photographs (the first in Exhibit B) captures the section of conductor that later separated.

        **Questions 15 and 16:**  What did the inspector do to ascertain whether the jumper cable remained secure, as opposed to on the verge of detaching?  What specifically was the inspector supposed to check to ensure that the jumper cable was not in poor condition?

**PG&E Response:**

        Consistent with the ETPM Manual in effect at the time of the inspection, PG&E understands that the inspection crew would have examined the jumper cable for any abnormalities as defined in the ETPM Manual, including signs of arcing, broken strands, rust, cracks, gunshot damage, corrosion, twisting, loose or broken connectors, damaged or missing dampers, and insufficient clearance from the tower or other components.  In addition, the inspectors were required by prompts in the electronic checklist used to record the inspection to specifically consider whether the jumpers were "in poor condition" or had a "clearance issue".  The inspectors answered "no" in response to each of these prompts.

        **Question 17:**  Explain why the February inspection did not discover the defects that led to the separation in October.

**PG&E Response:**

        As explained in PG&E's response to Question 8 above, at this time, PG&E has not determined the specific cause or causes of the jumper detachment on Tower 001/006 that was observed in October 2019.

---

[4] The crew members took other photographs of the structure as a whole, some of which also capture the jumper cable, but from a farther distance.

RESPONSE TO COURT REQUEST FOR AMENDED RESPONSES AND FURTHER QUESTIONS TO BE ANSWERED BY PG&E
Case No. 14-CR-00175-WHA

**Question 18:**  With respect to the May drone inspection, from the provided photographs the tower appears far enough away that it would be impossible to detect all but the most obvious problems, such as a jumper cable that has already been well separated.  Explain the purpose of the drone inspection, and how that could have possibly been expected to reveal the defects that led to the October detachment.

**PG&E Response:**

PG&E has not previously provided photographs of the May 2019 drone inspection to the Court and is not aware of the particular photographs to which the Court is referring.  The drones that PG&E used to perform WSIP inspections of transmission towers are equipped with cameras that take high-resolution photographs.  The drones are able to reach proximities and viewing angles that ground inspectors cannot, and inspectors examining the photographs are able to zoom in on specific components to better observe their condition.  During the May 11, 2019 drone flight of Tower 001/006, the drone operator took 67 high-resolution photographs of the tower from multiple vantage points, including a number of photographs that capture the jumper cable and surrounding components.  Attached as Exhibit C to this submission are two photographs that show the jumper cable at issue, as well as two blown-up portions of those same photographs that show the area of separation.

As explained in PG&E's response to Question 3, drone inspections were one component of PG&E's enhanced inspections for 2019 of transmission towers in areas at higher wildfire risk.  In 2019, PG&E used drones with high-definition cameras to take photographs of transmission towers in Tier 2 and Tier 3 HFTD areas from multiple vantage points.  Those photographs were then reviewed by an inspector on PG&E's Drone Inspection Review Team ("DIRT").  As further explained above, PG&E's drone inspections are able to photograph tower components, and those photographs can be reviewed for conditions requiring maintenance, such as signs of arcing, broken strands, rust, cracks, gunshot damage, corrosion, twisting, loose or

RESPONSE TO COURT REQUEST FOR AMENDED RESPONSES AND FURTHER QUESTIONS TO BE
ANSWERED BY PG&E
Case No. 14-CR-00175-WHA

broken connectors, damaged or missing dampers, and insufficient clearance from the tower or other components.

As explained in PG&E's responses above, PG&E does not currently know the cause of the jumper detachment observed in October 2019.  PG&E notes that photographs of the jumper cable taken during the May 11, 2019 drone inspection, attached as Exhibit C to this submission, show the jumper cable to be intact.

**Question 19:**  Explain why the inspectors used the incorrect form.

**PG&E Response:**

PG&E understands that the DIRT inspector used an incorrect form to document the May 2019 drone inspection of Tower 001/006 (one for non-steel rather than steel structures) because of human error.  As noted in PG&E's prior filing, both forms included the same prompt requiring DIRT to evaluate the condition of jumper cables on Tower 001/006.

**Follow-Up Questions to Docket No. 1111, Question 5:**

**Question 1:**  PGE did not fully answer Question 5.  Shouldn't we be concerned that the inspections conducted by PG&E failed to detect the potential detachment on the tower in question, and shouldn't we be concerned that other inspections of other towers using the same protocol have also failed to catch jumper cables on the verge of detachment?

**PG&E Response:**

It is certainly a matter of significant concern to PG&E that the jumper cable on Tower 001/006 separated.  That separation occurred after Tower 001/006 was inspected three times in 2019 by different personnel using three different inspection methods.  As noted, PG&E does not currently know why or when the jumper detached, and PG&E understands that CAL FIRE, which has possession of the relevant equipment, is continuing its investigation.  Once the cause of the detachment is determined, PG&E expects that will help PG&E ascertain what concerns, if any, that may raise for other towers and the actions, if any, that are needed to address those concerns.

1      **Question 2:**  What good are inspections that don't find problems?

2  **PG&E Response:**

3      Inspections, including the enhanced inspections that PG&E implemented after the

4  2018 Camp Fire, are designed to detect existing and emergent problems.  Since the

5  implementation of WSIP in December 2018, PG&E has completed enhanced inspections of

6  approximately 700,000 distribution structures across 25,000 miles and approximately 50,000

7  transmission structures over more than 5,500 miles.  As of October 31, 2019, PG&E identified

8  approximately 8,900 high-priority conditions (*i.e.*, conditions requiring repair immediately or

9  within three months) on distribution lines and approximately 8,500 high-priority conditions on

10  transmission lines, in addition to approximately 180,400 lower-priority conditions on distribution

11  lines and approximately 92,400 lower-priority conditions on transmission lines.

12  <u>**Follow-Up Question to Docket No. 1125**</u>

13      **Question 1:**  With respect to the Camp Fire, PG&E was asked what is possible,

14      not what they believe.  Please explain plausible scenarios in which the failure of

15      the hold-down anchor contributed to the failure of the C-hook, taking into

16      consideration how the listed components and others (the insulator, jumper cables,

17      links, etc.) all affected each other as a system.

18  **PG&E Response:**

19      PG&E is not aware of any plausible scenarios in which the failure of the hold-

20  down anchor at Tower :27/221 on the Caribou-Palermo 115 kV Transmission Line (the

21  "Caribou-Palermo Line") contributed in a non-negligible way to the failure of the C-hook on

22  Tower :27/222.

23      **Question 2:**  Did the C-hook that failed in any way interrelate with the anchor?

24  **PG&E Response:**

25      Yes, the C-hook that failed interrelated in some way with the hold-down anchor,

26  but only in a highly attenuated way.  The hold-down anchor held down a suspension insulator on

27  the right phase of Tower :27/221.  That suspension insulator, in turn, supported the tensioned

28

RESPONSE TO COURT REQUEST FOR AMENDED RESPONSES AND FURTHER QUESTIONS TO BE
ANSWERED BY PG&E
Case No. 14-CR-00175-WHA

C-phase conductor on the Caribou-Palermo Line, which extended approximately 850 feet to Tower :27/222. At Tower :27/222, the C-phase conductor terminated at a clamp on the hot end of two "dead-end" insulators. From the other end of that clamp, the C-phase conductor was transposed to the left-phase position on the other side of Tower :27/222 by means of a transposition jumper, a physically distinct piece of conductor. The transposition jumper that joined the two conductors was supported by two suspension insulators attached to the runner arms of Tower :27/222. The C-hook that failed held up the suspension insulator on the left-phase runner arm—*i.e.*, the arm that was farthest away from the C-phase conductor extending from Tower :27/221.

> **Question 3:** Did the C-hook on Tower :27/222 and the hold-down anchor on Tower :27/221 share the same conductor line?

**PG&E Response:**

No, the C-hook on Tower :27/222 and the hold-down anchor on Tower :27/221 did not share the same conductor line. The C-hook on Tower :27/222 that failed held up a suspension insulator that supported a non-tensioned transposition jumper. That transposition jumper was used to transpose the C-phase conductor that ran between :27/221 and :27/222 (a physically distinct piece of conductor from the jumper) from the right-phase position on the span between Tower :27/221 and Tower :27/222 to the left-phase position on the span between Tower :27/222 and Tower :27/223. The hold-down anchor at Tower :27/221 held down an insulator that supported the C-phase conductor.

> **Question 4:** Provide a diagram that shows the hold-down anchor, the C-hook that failed, and other relevant components.

**PG&E Response:**

Attached as Exhibit D is an annotated diagram showing the hold-down anchor on Tower :27/221, the C-hook on Tower :27/222 that failed, and other relevant components.

**Follow-Up Question to Docket No. 1125, Question 10:**

**Question 1:**  PGE did not fully answer Question 10, specifically the extent to which they knew about C-hook wear prior to the Camp Fire.  With respect to how "PG&E personnel noted that metal-on-metal rubbing caused or exacerbated by wind conditions could result in wear of C-hooks and hanger plates," what form did this notation take?  Please provide them.

**PG&E Response:**

PG&E's statement that "PG&E personnel noted that metal-on-metal rubbing caused or exacerbated by wind conditions could result in wear of C-hooks and hanger plates" was based on the 12 instances cataloged for the Court in PG&E's December 19, 2019 Response to Follow-up Questions Regarding CPUC Report on Camp Fire, Further Questions to be Answered by PG&E by December 19 and Supplemental Question 6a (the "December 19, 2019 Responses").  For each of the 12 instances described in that submission, PG&E is providing in Exhibit E one document, such as a testing report, maintenance notification or email, in which PG&E personnel noted or discussed the C-hook or hanger plate wear at issue.  There is typically more than one report, notification or email relating to each instance, and PG&E can provide those additional documents upon request.  As stated in PG&E's December 19, 2019 Responses, PG&E believes that prior to the Camp Fire, the occasions on which PG&E records noted wear on C-hooks or working eyes were limited in the context of the overall number of such components in PG&E's system, and PG&E followed up on identified issues.  (Dkt. 1128 at 10-11.)

**Question 2:**  Were these notes taken prior to the Camp Fire?

**PG&E Response:**

Yes.

**Question 3:**  The Exponent report concludes that "factors such as design (link connectors and relatively large number of non-tensioned insulated connectors), long duration exposure to higher winds, age, and historical inspection methodologies likely contributed to these [increased rates of] cold end hardware

issues" (Exponent Report on PG&E Caribou-Palermo Asset Condition Investigation, vi).  PG&E must clarify what it knew with respect to these various factors prior to the Camp Fire.  Regarding component design, was PG&E aware that Caribou-Palermo towers used significantly lower weight conductors than non-adjacent comparison lines (Exponent Report, 61)?

**PG&E Response:**

PG&E was aware prior to the Camp Fire that different sections of the Caribou-Palermo Line used different types of conductors, and that some of those conductor types were of significantly lower weight than those used on other transmission lines in PG&E's system.  In particular, PG&E was aware that most of the Caribou-Palermo Line (36.8 miles) used 452.3 kcmil aluminum conductor steel-reinforced ("ACSR"), that a large section on the southern end of the line (13.2 miles) used 167.8 kcmil copper conductor, that two short sections of the line (2.2 miles and 1.5 miles) used 397.5 kcmil or 715.5 kcmil all-aluminum conductor ("AAC"), and that two short line sections (0.9 miles and 0.6 miles) used 397.5 kcmil ACSR or 795 kcmil ACSR. The 452.3 kcmil ACSR conductor used on most of the Caribou-Palermo Line, including the spans on either side of Tower :27/222, is neither the heaviest nor the lightest type of conductor in use in PG&E's system.

**Question 4:**  Was PG&E aware that lower span weights might increase susceptibility to wind-induced conductor sway, and thus wear?

**PG&E Response:**

Prior to the Camp Fire, PG&E engineers understood that lower span weight could increase susceptibility to wind-induced conductor sway, and thus wear.  At this time, PG&E has not identified information establishing that it was aware prior to the Camp Fire that lower conductor weight was a significant contributor to wear on cold-end insulator attachment hardware.

**Question 5:** Was PG&E aware of the high correlation between non-tensioned insulated jumpers and cold-end hardware wear (Exponent Report, 75)?

**PG&E Response:**

Prior to the Camp Fire, PG&E engineers understood that non-tensioned insulated jumpers were more prone to wind sway, and thus wear, than conductors under tension. At this time, PG&E has not identified information establishing that prior to the Exponent Report it had analyzed the correlation, if any, between the presence of non-tensioned insulated jumpers and wear on cold-end insulator attachment hardware.

**Questions 6 and 7:** Regarding wind conditions, was PG&E aware that the Caribou-Palermo line experienced higher than average Aeolian conditions (low, sustained wind speeds)? Was PG&E aware that these conditions were known to cause hardware fatigue or wear damage over time in towers? (Exponent Report, 57)?

**PG&E Response:**

Prior to the Camp Fire, PG&E was aware that the sustained effects of wind could cause wear on tower hardware over time. (*See, e.g.*, Exhibit F (August 2009 email chain among PG&E engineers and transmission line personnel that includes discussion of the influence of Aeolian vibration, galloping, insulator and conductor movement, and wind more generally on transmission line components).) At this time, PG&E has not identified information establishing that prior to the Exponent Report it was aware that the Caribou-Palermo Line experienced higher-than-average Aeolian conditions as compared with the other lines analyzed by Exponent.

**Questions 8-9:** Was PG&E aware that the Caribou-Palermo line experienced double the amount of galloping winds of next closest lines (relatively high wind

1    speeds)?  Was PG&E aware that these higher sustained winds were more likely to

2    cause motion in non-tensioned lines and hardware (Exponent Report, 57)?

3  **PG&E Response:**

4        At this time, PG&E has not identified information establishing that it was aware

5  prior to the Camp Fire that the Caribou-Palermo Line experienced double the amount of

6  galloping winds as compared with the Bucks Creek-Rock Creek-Cresta and Pit #4 Tap lines.

7  Prior to the Camp Fire, PG&E was aware that high windspeeds could cause wear on tower

8  hardware over time and motion in non-tensioned lines and hardware.

9        **Question 10:**  Regarding the age of components, how old were the C-hooks on

10       the Caribou-Palermo line?

11  **PG&E Response:**

12        PG&E does not know the ages of the large number of C-hooks on the hundreds of

13  structures that make up the Caribou-Palermo Line.  For any of the numerous individual C-hooks

14  on the Caribou-Palermo Line, PG&E can attempt to deduce the date that particular C-hook was

15  installed by referencing any physical markings on the C-hook, historical design drawings,

16  manufacturer catalogs and work orders.  For various reasons, however, the available information

17  for each individual C-hook may be inconclusive or insufficient to allow PG&E to determine the

18  installation date of that hook.  For example, work orders relating to the replacement of

19  attachment hardware on the Caribou-Palermo Line that occurred several decades ago may be

20  archived in hard copy or no longer be available, consistent with applicable record retention

21  periods.  *See* CPUC General Order 95, Section I, Rule 18(A)(1) (requiring that "corrective

22  action" records "be preserved by the company for at least ten (10) years and . . . be made

23  available to Commission staff upon 30 days notice"); 18 C.F.R. §§ 125.1-125.3 (regulations

24  promulgated by the Federal Energy Regulatory Commission ("FERC") prescribing a five-year

25  retention period for "maintenance work orders and job orders" for transmission and distribution

26  facilities owned by public utilities subject to FERC's jurisdiction).

27

28

**Question 11:**  PG&E previously stated that the non-routine climbing investigation of Caribou-Palermo the month of the Camp Fire was related to the age of the line (CAMP-0676).  Did PG&E know that older towers might be more at risk of cold-end hardware wear?

**PG&E Response:**

 PG&E was aware before the Camp Fire that cold-end hardware, like many transmission line components, wears at least to some degree with age.  PG&E was also aware that age is but one of a number of factors that influence wear and the overall condition of cold-end hardware and other tower components.

**Question 12:**  Was that the primary factor in selecting Caribou-Palermo for a non-routine climbing investigation?

**PG&E Response:**

PG&E's records do not enumerate the factors that led to the selection of multiple lines in the North Valley region, including the Caribou-Palermo Line, for non-routine climbing inspections in 2018.  Based on its investigation, PG&E believes that age was one of the factors that led to selection of the Caribou-Palermo Line for non-routine climbing, but has been unable to determine the primacy or relative importance of that factor.

**Questions 13-14:**  Further questions shall be answered about the nature of the non-routine climbing inspection that occurred just before the Camp Fire, from September 19, 2018 to November 5, 2018.  There was an inspection of the Caribou-Palermo line the month of the fire.  It is obvious from the nature of the C-hook gouging that this issue would have been visible to any inspector who got close enough to see the condition of the C-hook.  No high-priority tags associated with cold-end hardware wear were found from January 2001 to October 2018 (Exponent Report, 68).  The November 2018 non-routine inspection caught 141 issues along the Caribou-Palermo lines, but found zero cold-end hardware issues (Exponent Report, 67).  A post-fire inspection from November 8, 2018, to June

19, 2019, using new inspection procedures, caught 32 issues of high-priority wear on cold-end hardware (Exponent Report, 40).  What accounts for the fact that there were 32 incidents of high-priority cold-end hardware wear discovered after the disaster?  Why were they not caught earlier?  What were the new inspection procedures?

**PG&E Response:**

The discovery of 32 instances of high-priority cold-end hardware wear on the Caribou-Palermo Line was the result of PG&E's inspection efforts following the Camp Fire. Those efforts included enhanced and accelerated inspections performed as part of PG&E's Wildfire Safety Inspection Program.  The new inspection procedures applicable to WSIP are described in PG&E's response to Question 18.  Prior to WSIP and as an immediate response to the Camp Fire, PG&E performed expedited climbing inspections of structures on the Caribou-Palermo Line in the days and weeks following the fire.

Before the Camp Fire, the Caribou-Palermo Line was last subject to a detailed inspection in 2014, and certain towers were subject to non-routine climbing inspections in the three months preceding the Camp Fire.  PG&E cannot be certain why the 32 conditions that were identified through inspections that occurred after the Camp Fire were not caught earlier.  There are numerous possible reasons.  For example, certain conditions may have arisen or become easier to identify since the last inspection, the inspection methods employed after the Camp Fire may have provided a better vantage point for detecting the condition, or inspectors might have scrutinized cold-end insulator hardware more closely in light of the cold-end hardware failure at the origin of the Camp Fire.

**Question 16:**  What accounts for the change in inspection procedures?

**PG&E Response:**

As a result of the Camp Fire and growing wildfire risk in its service territory, PG&E implemented a number of new initiatives to further reduce wildfire risk in late 2018 and 2019.

1   **Question 17:**  Why did the September 2018 revision of the detailed climbing

2   inspection form for non-500kV structures inquire into the condition of cold-end

3   hardware, whereas the older form did not (CAMP-0636; compared with CAMP-

4   0641)?

5   **PG&E Response:**

6   Both the September 2018 revision of the form designated TD-1001M-F04, Steel

7   Structure Detailed Climbing Inspection Form (Non-500 kV Structures), and the earlier revision

8   of that same form, designated TD-1001M-FXX and dated March 2016, inquired into the

9   condition of cold-end insulator attachment hardware.  The second page of the revision dated

10  March 2016 prompts the inspector completing the form to check for the following condition:

11  "Working eyes and shackles free of wear."  The only material difference between the two forms

12  is that the September 2018 revision uses different language for the corresponding prompt, which

13  reads:  "Working eyes and shackles show significant wear."  Blank copies of the March 2016

14  and September 2018 forms are attached to this submission as Exhibit G.

15  **Question 18:**  What do new "enhanced" inspection procedures, including CIRT

16  and DIRT, require of inspectors to check for cold-end hardware wear?

17  **PG&E Response:**

18  PG&E's enhanced WSIP inspections differed from its prior routine inspections in

19  various ways, including, for transmission towers in elevated and extreme high fire-threat areas,

20  the use of climbing and drones equipped with high-resolution cameras; inspection forms that

21  specifically required inspectors to check for certain potential failure modes (including worn cold-

22  end hardware) and document the condition of various components (including cold-end

23  hardware), regardless of whether they required repair; review of drone photographs by members

24  of the Drone Inspection Review Team; and review and prioritization of inspection findings by

25  CIRT, composed of personnel with collective experience in engineering, inspections and

26  maintenance.  Of note, WSIP inspections were informed by a Failure Modes and Effects

27  Analysis ("FMEA") that PG&E conducted after the Camp Fire.  The FMEA identified multiple

28

1   potential points of failure on transmission assets that could cause ignitions, including wear on

2   C-hooks and other insulator attachment hardware, and the failure points capable of visual

3   observation were incorporated into WSIP inspection forms.

4           PG&E's WSIP inspections use electronic inspection forms, called "Pronto

5   Forms", that require field and drone inspectors to respond to specific prompts regarding the

6   condition of tower components, including cold-end insulator attachment hardware.  Specifically,

7   field inspectors performing climbing inspections must answer "Yes" or "No" to the following

8   prompts that are intended to identify conditions on cold-end insulator attachment hardware:

9   "Suspension/Dead-end conductor hardware cold-end in poor condition (*e.g.*, C-hook)",

10  "Insulator hanger (eye) plate in poor condition?", and "Working eyes and shackles show

11  significant wear".  In the event that an inspector answers "Yes" to any one of these prompts, a

12  preliminary notification recording the condition is required to be created and is subject to further

13  review by CIRT to assign the condition an appropriate priority level for repair in accordance

14  with PG&E's ETPM Manual.

15          **Question 19:**  What are the names and contact information of the inspectors who

16                  conducted the post-fire inspection?  PG&E may request to keep the names under

17                  seal.

18  **PG&E Response:**

19          PG&E understands "the post-fire inspection" to mean climbing and drone

20  inspections of Tower :27/222 on the Caribou-Palermo Line that were performed as part of the

21  Wildfire Safety Inspection Program.  The Caribou-Palermo Line has approximately 450

22  structures, almost all of which were subject to both climbing and drone inspections in 2019 by

23  various PG&E contract inspectors assigned to WSIP.  PG&E is filing under seal Exhibit A,

24  which identifies the names of and contact information for the PG&E contractors who performed

25  the WSIP climbing and drone inspections of Tower :27/222 on January 22, 2019, and

26  January 29, 2019, respectively.  By the time these WSIP inspections took place, CAL FIRE had

27  already collected evidence from Tower :27/222, including the two C-hooks and suspension

28

1   insulators previously attached to the runner arms and the transposition jumper that they

2   supported.  Exhibit A does not include names of or contact information for the personnel who

3   operated the drones that took photographs of Tower :27/222 but played no other role in the

4   inspection process, the PG&E employees who performed non-WSIP inspections of the Caribou-

5   Palermo Line in the days and weeks following the Camp Fire, or the members of the Centralized

6   Inspection Review Team who reviewed findings by the primary WSIP inspectors.

7          **Question 20:**  Were they contractors?

8   **PG&E Response:**

9          All accelerated and enhanced inspections conducted after the Camp Fire pursuant

10  to WSIP, including the WSIP inspections of the Caribou-Palermo Line, were performed by

11  contractors.  Non-WSIP inspections of structures on the Caribou-Palermo Line in the days and

12  weeks following the Camp Fire were performed by PG&E employees.

13         **Question 21:**  Was the line de-energized?

14  **PG&E Response:**

15         The Caribou-Palermo Line was de-energized at the time of the post-Camp Fire

16  inspections and has been de-energized since December 2018.  For additional information

17  regarding the de-energization of the Caribou-Palermo Line, PG&E refers the Court to PG&E's

18  Supplemental Response to Request for Information dated August 16, 2019.  (Dkt. 1090.)

19         **Questions 22-25:**  What specifically did the inspectors do to ascertain whether the

20         C-hooks remained in good condition?  Did the post-fire climbing inspection form

21         inquire into the condition of cold-end hardware?  If no, why not?  And, if so, what

22         specifically was the inspector supposed to check?

23  **PG&E Response:**

24         Beginning in January 2019, PG&E commenced WSIP climbing and drone

25  inspections of the Caribou-Palermo Line, which remained de-energized.  As noted above, all

26  transmission lines in elevated and extreme high fire-threat areas were within the WSIP scope for

27  2019.  PG&E's response to Question 18 above describes the guidance given to the field

28

RESPONSE TO COURT REQUEST FOR AMENDED RESPONSES AND FURTHER QUESTIONS TO BE
ANSWERED BY PG&E
Case No. 14-CR-00175-WHA

inspectors who performed these enhanced inspections and the electronic forms they used to record findings.  As noted, those forms specifically inquired into the condition of cold-end insulator attachment hardware, including C-hooks.

Non-WSIP inspections of structures on the Caribou-Palermo Line were performed in the days and weeks following the Camp Fire.  These were climbing inspections, findings from which were recorded on form TD-1001M-FXX, Steel Structure Detailed Climbing Inspection Form (Non-500 kV Structures).  That form prompts the inspector completing the form to check for the following condition:  "Working eyes and shackles free of wear."

**Question 26:**  There were three times more cold-end insulator high-priority incident tags along the Caribou-Palermo line caught post-fire than the next highest line (Exponent Report, 75).  What accounts for this high incident rate?

**PG&E Response:**

In early 2019, the CPUC's Safety and Enforcement Division directed PG&E to engage Exponent, an independent third-party engineering firm, to analyze why the Caribou-Palermo Line had a greater number of high-priority conditions than other transmission lines with similar characteristics.  In its final report dated November 1, 2019, Exponent stated that "Caribou-Palermo and other North Fork Feather River Canyon lines appear to have a unique set of factors that contributed to increased rates of high-priority cold-end hardware tags relative to other comparison lines" and that "[f]actors such as design (link connectors and a relatively large number of non-tensioned insulated conductors), long-duration exposure to higher winds, age, and historical inspection methodologies likely all contributed to these cold-end hardware wear issues."  (Exponent Report at 76.)  PG&E refers to the report for Exponent's full findings.

**Question 27:**  Append to your response the ten most pertinent emails, memos, text messages or other documents (including electronic documents) that show the true extent to which PG&E knew before the Camp Fire that C-hook wear was a

1   safety problem.  Do NOT refer to large swaths of documents.  PG&E must find

2   and append the ten (and only ten) most pertinent documents.

3   **PG&E Response:**

4   Question 27 asks about PG&E's knowledge prior to the Camp Fire, unbounded by

5   any date range, seniority level or area of responsibility of personnel, or other dimension.  PG&E

6   is a large corporation with over 100 years of history.  It has tens of thousands of employees and a

7   similarly large number of former employees, many of whom have passed away or relocated, as

8   well as an immense volume of corporate documents and records.  In addition, PG&E's

9   knowledge does not reside with any one person but is distributed among many different

10   individuals with different roles and responsibilities.  The answers in this submission about

11   PG&E's knowledge are given against that background and are based on a reasonable

12   investigation of the available information.  PG&E further notes that there are no objective

13   criteria for identifying the 10 documents "most pertinent" to PG&E's knowledge of C-hook wear

14   before the Camp Fire.  Identifying those documents requires a judgment call on which different

15   people could reasonably make different judgments.

16   Defining pertinency by reference to PG&E's awareness prior to the Camp Fire of

17   past instances of C-hook or hanger plate wear, PG&E refers the Court to the documents that are

18   already being provided in response to Question 1 above, attached as Exhibit E to this submission.

19   For the avoidance of doubt, PG&E is not representing that the documents being provided in

20   Exhibit E constitute all documents relating to its knowledge before the Camp Fire of C-hook or

21   hanger plate wear.  Nor can PG&E represent that a different person would not identify a different

22   set of documents as the "most pertinent" documents.

23   **Follow-Up Question to Docket No. 1129, Question 1:**

24   **Questions 1-3:**  Please provide more details on the extent that PG&E has fallen

25   short.  Please explain why PG&E is now following a new patrol strategy that is

26

27

28

RESPONSE TO COURT REQUEST FOR AMENDED RESPONSES AND FURTHER QUESTIONS TO BE
ANSWERED BY PG&E
Case No. 14-CR-00175-WHA

1  not approved by the CPUC.  Please explain how this strategy differs from the

2  CPUC-approved strategy.

3  **PG&E Response:**

4  The CPUC considered and approved PG&E's Amended Wildfire Safety Plan (the

5  "Amended WSP"), submitted to the CPUC on February 14, 2019.  On April 25, 2019, PG&E

6  filed with the CPUC a Second Amended Wildfire Safety Plan (the "Second Amended WSP")

7  notifying the CPUC of proposed changes to, among other things, its patrol strategy for re-

8  energization of lines de-energized as a result of Public Safety Power Shutoff ("PSPS") events.

9  The Amended WSP approved by the CPUC stated that, after a PSPS event, "[c]rews will patrol

10  all facilities de-energized during a PSPS event to identify any damage that needs to be repaired

11  before re-energizing."  (Pacific Gas and Electric Company Amended Wildfire Safety Plan,

12  February 6, 2019, at 109.)  The Second Amended WSP updated this language to explain that

13  PG&E would "[r]e-energize only when confirmed safe to do so and only after lines *within areas*

14  *triggering the PSPS decision* are patrolled and clear of defects or damage."  (Second

15  Amendment to Pacific Gas and Electric Company's Wildfire Mitigation Plan, R.18-10-007,

16  April 25, 2019, at 20-21 (emphasis added).)  PG&E followed the re-energization strategy set

17  forth in its Second Amended WSP for PSPS events in 2019.

18  Under the CPUC-approved strategy set forth in the Amended WSP and explained

19  above, PG&E would have been required to patrol all lines de-energized as a result of a PSPS

20  event, including lines in areas that did not experience PSPS-triggering conditions (collectively,

21  the "PSPS footprint") but were nonetheless de-energized as a consequence of the decision to de-

22  energize upstream transmission lines on which they rely for power.  Under the updated strategy

23  that PG&E submitted for CPUC approval in advance of the 2019 fire season, PG&E explained

24  that it would exercise "operational judgment" in determining whether to patrol distribution lines

25  in areas that did not experience the PSPS-triggering conditions but were interrupted only because

26  of the de-energization of other lines that did experience such conditions.

27

28

1    PG&E refined its patrol strategy in this manner to account for the expanded scope

2    of the PSPS program for 2019.  As PG&E explained to the CPUC in its Second Amended WSP,

3    the original language calling for patrol of all de-energized lines prior to re-energization was

4    based on PG&E's PSPS program as implemented in 2018.  At that time, the PSPS scope did not

5    include high-voltage transmission lines.  Following the Camp Fire, PG&E expanded the scope of

6    the PSPS program to include such lines.  Because the electrical grid is interconnected, the

7    de-energization of high-voltage transmission lines can have a cascading effect that causes other

8    transmission and distribution lines—potentially far from the original fire-risk areas—to be de-

9    energized.  Thus, distribution lines far outside the high fire-risk areas that triggered the PSPS

10   event, but that rely on the de-energized lines for power, such as lines in cities like San Francisco

11   or San Jose, could be de-energized.  Patrol of these lines that are outside the PSPS footprint and

12   do not otherwise pose a high risk of wildfire would exacerbate the hardship caused by PSPS

13   events by delaying restoration of power to large numbers of customers.

14       **Question 4:**  Please explain in more detail how PG&E exercises "operational

15       judgement" to determine whether to re-energize patrol lines.

16   **PG&E Response:**

17   The Second Amended WSP clarified that PG&E would "exercise operational

18   judgment" in determining whether to patrol distribution lines in areas outside the PSPS footprint.

19   For PSPS events in 2019, PG&E determined that it would patrol (i) all transmission lines that

20   were de-energized because they traversed the PSPS footprint and were identified as meeting the

21   criteria for proactive de-energization of transmission lines for the PSPS event; and (ii) all

22   distribution lines in Tier 2 and Tier 3 HFTD areas that were de-energized during the event and

23   fell within the PSPS footprint.  Prior to re-energizing, PG&E did not patrol (i) segments of

24   distribution lines not in Tier 2 or Tier 3 HFTD areas, whether within or outside the PSPS

25   footprint; or (ii) distribution lines outside the PSPS footprint, regardless of HFTD area, that were

26

27

28

RESPONSE TO COURT REQUEST FOR AMENDED RESPONSES AND FURTHER QUESTIONS TO BE
ANSWERED BY PG&E
Case No. 14-CR-00175-WHA

de-energized only as a consequence of de-energizing upstream transmission lines.[5]  In addition, following PSPS events in 2019, PG&E did not patrol transmission lines within the PSPS footprint that did not meet the standard for proactive de-energization and therefore remained energized during the PSPS event.

PG&E exercised its operational judgment in this way to reduce hardship to customers who were not in areas that experienced PSPS-triggering conditions but lost power because of the downstream effects of de-energizing other lines within the PSPS footprint. Distribution lines that fall outside the PSPS footprint do not share the same wind or fuel conditions as those within it, and wind-related damage is thus both less likely to occur and less likely to cause a wildfire where it does occur.  Similarly, distribution lines that are not in Tier 2 or Tier 3 HFTD areas but happen to fall within the PSPS footprint do not present a heightened wildfire risk.  Given the lower wildfire risk posed by lines outside the PSPS footprint and lines within the footprint but not in Tier 2 or Tier 3 HFTD areas, PG&E determined that patrolling these lines prior to re-energizing was not required for safety and would delay restoration of power to the affected customers.  As a result, PG&E excluded these lines from its post-event patrol strategy.

---

[5] Following PSPS events in 2019, PG&E patrolled every mile of transmission lines that were proactively de-energized (including line sections beyond the PSPS footprint) because the additional time required to patrol such lines was minimal as compared with the time required to patrol only the section traversing the PSPS footprint.

1  **Follow-Up Question to Docket No. 1135, Amended Response to Questions to PG&E re Late**

2  **October PSPS:**

3          **Question 1:**  With respect to your January 29 amended response, please explain

4          by way of examples your use of the term "infrastructure damage," giving

5          examples as to both distribution lines and transmission lines.

6  **PG&E Response:**

7          In PG&E's January 29, 2020 and February 7, 2020 responses to the Court

8  regarding the October 26 and October 29 PSPS events, PG&E reported that it identified

9  approximately 102 instances of damage to its infrastructure that appear to have been caused by

10  extreme wind and/or other fire conditions present during the October 26 and October 29 PSPS

11  events.  (Dkt. 1135; Dkt. 1139.)  PG&E identified infrastructure damage only to distribution

12  lines during its patrols of the lines included in the October 26 and October 29 PSPS events.

13          PG&E is providing in Exhibit H photos of four instances of infrastructure damage

14  to its distribution lines that it identified during the October 26 and October 29 PSPS events.

15  Those photographs depict a pole in Contra Costa County that broke and fell over due to winds; a

16  down guy wire in Calaveras County that snapped due to stress on the pole from winds; a broken

17  tie wire in Santa Clara County that fastened a conductor to an insulator and appears to have

18  broken due to winds; and a crossarm in Nevada County that split down the middle due to stress

19  from winds.

20

21

22

23

24

25

26

27

28

1  Dated:  February 18, 2020                          Respectfully Submitted,

2                                                     JENNER & BLOCK LLP

3

4                                                     By:   /s/ Reid J. Schar
5                                                            Reid J. Schar (*pro hac vice*)

6                                                     CRAVATH, SWAINE & MOORE LLP

7

8
                                                      By:   /s/ Kevin J. Orsini
9                                                            Kevin J. Orsini (*pro hac vice*)

10

11                                                    CLARENCE DYER & COHEN LLP

12
                                                      By:   /s/ Kate Dyer
13                                                           Kate Dyer (Bar No. 171891)

14

15                                                    Attorneys for Defendant PACIFIC GAS
                                                      AND ELECTRIC COMPANY
16

17

18

19

20

21

22

23

24

25

26

27

28