JENNER & BLOCK LLP
    Reid J. Schar (*pro hac vice*)
    RSchar@jenner.com
    353 N. Clark Street
    Chicago, IL 60654-3456
Telephone: +1 312 222 9350
Facsimile: +1 312 527 0484

CLARENCE DYER & COHEN LLP
    Kate Dyer (Bar No. 171891)
    kdyer@clarencedyer.com
    899 Ellis Street
    San Francisco, CA 94109-7807
Telephone: +1 415 749 1800
Facsimile: +1 415 749 1694

CRAVATH, SWAINE & MOORE LLP
    Kevin J. Orsini (*pro hac vice*)
    korsini@cravath.com
    825 Eighth Avenue
    New York, NY 10019
Telephone: +1 212 474 1000
Facsimile: +1 212 474 3700

Attorneys for Defendant PACIFIC GAS AND ELECTRIC COMPANY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                     Plaintiff,<br><br>       v.<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>                     Defendant. | Case No. 14-CR-00175-WHA<br><br>**MOTION FOR STAY PENDING RECONSIDERATION AND APPEAL**<br><br>Judge:  Hon. William Alsup |

**TABLE OF CONTENTS**

**INTRODUCTION**..........................................................................................................................1

**ARGUMENT**................................................................................................................................2

I.     PG&E Is Likely to Prevail on the Merits of Its Reconsideration Motion and Appeal. ........2

        A.     The Court Erred by Imposing Conditions Without Notice or a Hearing.................3

        B.     The Court's Conditions Are Substantively Unreasonable. .....................................3

              1.     The Order Is Based on Erroneous Factual Premises...................................4

              2.     The Conditions Interfere With California's Existing Regulatory Regime ..6

              3.     The Conditions Are Substantively Unreasonable Because They Do Not Serve the Purposes of Probation ..................................................................8

II.    PG&E Will Suffer Irreparable Harm Absent A Stay. ........................................................12

III.   The Balance of the Equities And The Public Interest Favor A Stay. ...............................14

**CONCLUSION** ..........................................................................................................................15

**INTRODUCTION**

Pacific Gas and Electric Company ("PG&E") is committed to working with its regulators to provide safe and reliable power to the people of California. It shares the goal of all Californians, and this Court, to improve wildfire safety. Because of that commitment, PG&E submits this motion to stay the new probation conditions imposed by the Court's April 29, 2020 Order ("Order") (Dkt. 1186) while PG&E's motion to reconsider those conditions and its appeal of the Order are pending. The Court imposed four new conditions: one requiring PG&E to "employ its own cadre of pre- and post- inspectors" for vegetation management (the "Hiring Condition"); one requiring PG&E to identify the "age of every item of equipment on every transmission tower and line" (the "Age Identification Condition"); one requiring PG&E to "design a new inspection system for assessing every item of equipment on all transmission towers" (the "Inspection Condition"); and one requiring its inspection contractors "to carry insurance sufficient to cover losses suffered by the public should their inspections be deficient and thereby start a wildfire" (the "Insurance Condition").

A stay is warranted because the Order is both procedurally and substantively unlawful, will cause PG&E irreparable harm, and threatens public safety. The new conditions are more likely to undermine wildfire safety than they are to promote it.

PG&E is likely to succeed on the merits of its challenge to the conditions. As a threshold matter, the Court imposed the new probation conditions without notice or the hearing that Federal Rule of Criminal Procedure 32.1 expressly requires. As a consequence, PG&E had no opportunity to present its objections and mitigating evidence. As the affidavits attached to this motion demonstrate, and as PG&E further elaborates in its motion to reconsider, the Court's premises for imposing new conditions are contrary to fact; the new conditions are neither reasonable nor necessary (and, as to some conditions, impossible to satisfy); and the new conditions interfere with the efforts of the California legislature and its regulators to address the same subject matter.

As the attached affidavits further explain, the failure to stay the conditions will

1  result in irreparable harm—both to PG&E and the public because PG&E will be forced to divert
2  significant resources from its CPUC-approved Wildfire Safety Plan to satisfy the Court's
3  conditions, with no evidence that those conditions will enhance safety and a risk that they may
4  well decrease it.

5  For these reasons and the others given herein and in the attached material, the
6  Court should stay the Order pending reconsideration and appeal.

## ARGUMENT

8  Pursuant to Fed. Crim. R. 38(d), PG&E respectfully requests a stay of the Order
9  pending reconsideration and any appeal.  A motion for stay of probation conditions under Rule 38
10 is governed by the traditional stay factors.  *See, e.g.*, *United States v. Catlett,* No. 2:13-CR-00208,
11 2013 WL 6797482, at *1 (E.D. Cal. Dec. 19, 2013).  Those factors are: (1) the movant's likelihood
12 of success; (2) the movant's irreparable harm absent a stay; (3) the balance of the equities; and (4)
13 the public interest.  *See Lair v. Bullock*, 697 F.3d 1200, 1203 (9th Cir. 2012).

14 "The first two factors of the traditional standard are the most critical." *Nken v.*
15 *Holder*, 556 U.S. 418, 434 (2009).  The Ninth Circuit uses a sliding-scale to evaluate these factors:
16 Where the movant makes a strong showing of irreparable harm, it may satisfy its burden by
17 demonstrating only that it "raised serious questions going to the merits." *All. for the Wild Rockies*
18 *v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (citation omitted) (preliminary injunction); *see*
19 *Leiva-Perez v. Holder*, 640 F.3d 962, 966–68 (9th Cir. 2011) (applying *Cottrell* to stay context).
20 PG&E meets the test for a stay pending reconsideration and any appeal.

21 **I.     PG&E Is Likely to Prevail on the Merits of Its Reconsideration Motion and
             Appeal.**

23 PG&E not only raises serious questions going to the merits of its reconsideration
24 motion and appeal, but is also likely to prevail on the merits.  PG&E argues that this Court erred
25 by, *inter alia*: imposing probation conditions without the required notice or hearing; setting
26 conditions based on faulty premises; interfering with California's regulatory regime; and designing
27 probation conditions that do not meet the statutory sentencing requirements and are unsupported

2

by the record.

A.     **The Court Erred by Imposing Conditions Without Notice or a Hearing**

The plain language of Federal Rule of Criminal Procedure 32.1(c) requires that "[b]efore modifying the conditions of probation . . . the court must hold a hearing . . . at which the person has the right to counsel and opportunity to make a statement and present any information in mitigation." Rule 32.1(c)'s hearing requirement is mandatory. *See United States v. Inzunza*, 108 F.3d 1387, 1997 WL 119508, at *1 (9th Cir. 1997) (unpublished table decision) ("A defendant *is entitled* to a hearing and assistance of counsel prior to the modification of the terms . . . of his probation . . . ." (emphasis added)). And when a court seeks to impose a condition not listed in the U.S. Code or sentencing guidelines, "notice is required before it is imposed, so that counsel and the defendant will have the opportunity to address personally its appropriateness." *United States v. Wise*, 391 F.3d 1027, 1033 (9th Cir. 2004) (vacating condition of supervised release); *see United States v. Zambrano-Ruiz*, 768 F. App'x 615, 618 (9th Cir.) (same), *cert. denied*, 140 S. Ct. 311 (2019).

This Court did not provide the required notice or hearing before adopting the new conditions. The Court provided notice and a hearing as to two *different* proposed conditions; but the four conditions in the Order were never mentioned or explored during the Court's prior probation hearings. (Dkt. 1133; Dkt. 1134.). Had PG&E been provided notice and a hearing, it would have presented mitigating information, detailed below and in the accompanying affidavits, and further elaborated in the Motion to Reconsider. The Court's procedural errors alone establish a likelihood of success on the merits. *See, e.g.*, *United States v. Colson*, 675 F. App'x 624, 627 (7th Cir. 2017) (overturning district court's "add[ition] [of] several of its own modifications" "on its own initiative" "without giving [defendant] a chance to be heard").

B.     **The Court's Conditions Are Substantively Unreasonable.**

Discretionary conditions of probation may be imposed only "to the extent that such conditions" serve the purposes laid out in 18 U.S.C. § 3553(a)(1)-(2). *United States v. Lorenzini*, 71 F.3d 1489, 1492 (9th Cir. 1995). Those conditions, as relevant here, are: (A) "to reflect the

3

1  seriousness of the offense, to promote respect for the law, and to provide just punishment for the
2  offense"; (B) "to afford adequate deterrence to criminal conduct"; and (C) "to protect the public
3  from further crimes of the defendant." *Id.* (quoting 18 U.S.C. § 3553(a)(2)). "A discretionary
4  condition *must* be reasonably related to one or more of these goals and *must* involve *only such*
5  *deprivations of liberty or property as are reasonably necessary* to accomplish the purposes of
6  sentencing." *Id.* (emphases added). As a result, when a district court "impose[s] a special
7  condition, [it] must" determine, *inter alia*, "whether an adequate record can be developed to
8  support it." *United States v. Myers*, 426 F.3d 117, 130 (2d Cir. 2005) (Sotomayor, J.).

9  Here, the Court substantively erred in three respects. First, the Court's conclusion
10 that additional conditions are necessary is based on numerous factual errors. In fact, the new
11 conditions are not necessary. Second, the new conditions are substantively unreasonable because
12 they interfere with California's preexisting regulatory regime. Third, the conditions are
13 substantively unreasonable because there is no evidence that the conditions advance PG&E's
14 ongoing efforts to mitigate wildfire risk. Instead, the conditions are counterproductive,
15 impractical, dangerous or impossible to satisfy.

16         1.    <u>The Order Is Based on Erroneous Factual Premises.</u>

17 As an initial matter, the Order is premised on numerous factual errors.

18 For example, the Court based the Hiring Condition in large part on its belief that
19 PG&E is "years away" from compliance with state law. Order at 6. But this confuses PG&E's
20 enhanced vegetation management efforts ("EVM") with regulatory clearance requirements.
21 (Goodfellow Decl. ¶ 28; Ritter Decl. ¶ 39.) The Court also incorrectly asserted that a "backlog"
22 of tree work led to the 2017 North Bay Wildfires, when not one of the trees that allegedly ignited
23 those fires was a tree that had been identified for work in the most recent pre-fire inspection.
24 (Ritter. Decl. ¶ 41.) The Court's suggestion that PG&E's vegetation management efforts must
25 be inadequate because trees and branches were blown into lines during Public Safety Power
26 Shutoff ("PSPS") events is also incorrect. (Order at 6.) PG&E implemented its PSPS program
27
28

in 2018 in response to a dramatically increased wildfire risk due in large part to years of drought and climate change causing a longer and drier fire season and more extreme weather events. (Dkt. 1140 at 3.)  A large part of what makes PSPS events necessary is that healthy and compliant trees and limbs can fail and fly into lines in extreme winds.  (Dkt. 1140 at 3; Wright Decl. ¶ 4; Goodfellow Decl. ¶ 40.)  Indeed, the CPUC recognizes that public safety power shutoffs need to take place to guard against the risk of utility fires in extreme conditions even when a utility is in compliance with regulations.  CPUC Decision No. 12-04-024 (Apr. 19, 2012) at 32 (finding that equipment could still be at risk of starting fires even if it was in compliance with regulations).

The Court based its Inspection, Insurance, and Age Identification Conditions on the mistaken belief that PG&E's existing inspection regime for its transmission lines "failed to spot dangerous conditions."  Order at 10.  In particular, the Court focused on two incidents:  the observation of worn equipment on one tower on the Cresta-Rio Oso 230 kV Transmission Line (the "Cresta-Rio Oso Line"), and the separation of a jumper cable on a tower of interest in the 2019 Kincade Fire.  As to the former, the Court's conclusion rested on testimony of Thomas Hylton, a witness introduced by the Tort Claimants Committee.  But Mr. Hylton, who is not an engineer or metallurgical expert, provided no scientific or engineering basis for his opinion and misstates the risk posed by the equipment.  (James Decl. ¶ 16.)  To the contrary, experts have concluded that the worn hooks and hanger plates removed from the Cresta-Rio Oso Line were *not* at imminent risk of failure; indeed, they would not have required repair or replacement for at least 15 to 20 years more, and more likely for another 75 to 100 years or more, depending on certain assumptions.  (James Decl. ¶¶ 5-14.)  David DeCampli, a former utility executive with years of experience in transmission maintenance and asset management, is not aware of any utility whose policies would require immediate emergency replacement of C-hooks or hanger plates in the same condition as those removed from Tower 009/081.  (DeCampli Decl. ¶¶ 37-38.)  As for the Kincade Fire, the record does not support any finding that inspectors missed an indication that the jumper that caused the fire was at risk of failure.  As demonstrated by the high-resolution drone

1  photographs taken in May 2019 that were previously provided to the Court, and as confirmed by
2  Mr. DeCampli, there were *no* visible signs when the tower was inspected that the jumper cable
3  was at imminent risk of failure.  (DeCampli Decl. ¶ 40.)

4  In short, the Court's criticism of PG&E's Vegetation Management Program has no
5  basis in the record; nor does its criticism of PG&E's current inspection program.  The premises of
6  its decision to impose new probation conditions are factually unsound.  Thus, the Court erred in
7  concluding that new conditions were "reasonably necessary" to accomplish that goals of
8  sentencing.  *Lorenzini*, 71 F.3d at 1492.

9  2. <u>The Conditions Interfere With California's Existing Regulatory Regime</u>

10  The new conditions are also unreasonable, because they unlawfully impinge on
11  state regulatory authority.  "[W]here a state has in place a comprehensive procedure for resolution
12  of the condition probation imposes, it makes good sense to defer to that established procedure."
13  *United States v. Lakatos*, 241 F.3d 690, 695 (9th Cir. 2001) (vacating probation condition and
14  citing relevant authority).

15  Perhaps no subject has received greater regulatory and legislative attention in
16  California in recent years than wildfire safety.  In 2019, the state imposed comprehensive new
17  requirements on PG&E and other electric utilities and created a new regulatory body, the Wildfire
18  Safety Division ("WSD"), to "[o]versee and enforce electrical corporations' compliance with
19  wildfire safety."  Cal. Pub. Util. Code § 326(a)(1).  Electric utilities must annually submit detailed
20  Wildfire Mitigation Plans ("WMPs") to the WSD, and the WSD must review and may approve or
21  reject these plans.  *See* Cal. Pub. Util. Code § 8386(b) (vesting the agency with responsibility for
22  "review and approval" of each utility's WMP).  The submitted plans *must* include, and the CPUC's
23  WSD *must* review, as relevant here, "[p]lans for vegetation management" and "[p]lans for
24  inspections of the electrical corporation's electrical infrastructure," Cal. Pub. Util. Code
25  § 8386(c)—in other words, the very same subjects covered by the Court's new proposed
26  conditions.

Consistent with California's regime, the WSD is currently reviewing PG&E's vegetation management and inspection plans for 2020 as part of the WMP approval process. The CPUC has worked with PG&E and other utilities to continue to develop and improve upon proposed WMPs, including through workshops and regulatory data requests aimed at better understanding and identifying areas for improvement in each utility's wildfire mitigation efforts. (Allen Decl. ¶¶ 7-15.) The WSD has also conducted extensive fact-finding and discovery into PG&E's WMP for 2020, including its vegetation management plan and equipment inspection programs. (Allen Decl. ¶ 14.) On May 7, 2020, the WSD recommended that the CPUC conditionally approve PG&E's WMP for 2020, subject to dozens of conditions requiring modifications to the plan or PG&E's approach to assessing the most effective and efficient risk-mitigation strategies. *See* WSD Draft Guidance Resolution on 2020 Wildfire Mitigation Plans Pursuant to Public Utilities Code Section 8386 ("Resolution WSD-002"); Draft Resolution Ratifying Action of the Wildfire Safety Division on Pacific Gas and Electric Company's 2020 Wildfire Mitigation Plan Pursuant to Public Utilities Code Section 8386 ("Resolution WSD-003", and, collectively with Resolution WSD-002, the "May 7 Draft Resolutions"). The CPUC will review and vote on these draft resolutions.

By bypassing state law and replacing regulators' expert judgment with the views of a non-expert federal court, the Order violates the principle, rooted in federalism and comity, that a "condition of probation may not circumvent another statutory scheme." *United States v. Abushaar*, 761 F.2d 954, 960 (3d Cir. 1985). Probation conditions are not an appropriate method for setting regulatory policy in a complex and developing field that has been occupied by the state. A court exercising probation powers lacks both the technical expertise and the legislative mandate to enact sweeping changes to a utility's operations.

Moreover, the conditions conflict in multiple ways with the substantive requirements of California law. *Compare, e.g.*, Order at 11 (applying new transmission record-keeping condition to "every transmission tower and line" and transmission inspection condition to "all transmission towers"), *with* May 7 Draft Resolutions at 4 (directing PG&E to engage in

7

"strategic prioritization of initiatives geographically and by ignition driver to target the highest risk elements of PG&E's grid" so that PG&E's plan can "be most effective with its finite resources"). Because California "has in place a comprehensive procedure for resolution of the condition probation imposes," it is likely that PG&E will prevail in arguing that probation conditions should "defer to that established procedure." *Lakatos*, 241 F.3d at 695.

### 3. The Conditions Are Substantively Unreasonable Because They Do Not Serve the Purposes of Probation

Moreover, the Order's conditions are impracticable or impossible to meet, and (as discussed below and demonstrated by the supporting declarations) are unsupported by record evidence. Thus, they violate the rule that a "discretionary [probation] condition must be reasonably related to one or more of the[] goals" of sentencing laid out in 18 U.S.C. § 3553(a)(1)-(2), "and must involve only such deprivations of liberty or property as are *reasonably necessary* to accomplish the purposes of sentencing." *Lorenzini*, 71 F.3d at 1492 (emphasis added). The Order's new conditions are not "reasonably necessary to a proper sentencing objective" and are unsupported by the record; they therefore cannot be sustained. *Id.* at 1493-94; *see Myers*, 426 F.3d at 130 (Sotomayor, J.).[1]

***Hiring Condition.*** The Hiring Condition requires PG&E to "employ its own cadre of pre- and post- inspectors" for vegetation management. But the record does not establish that hiring in-house inspectors would enhance safety.

As described in the attached Declarations of John Goodfellow and David DeCampli—both industry experts with significant experience advising or leading utilities around

---

[1] As noted in previous filings, PG&E was convicted of obstructing an NTSB investigation and of five violations of the federal Pipeline Safety Act concerning data gathering and integration and integrity management concerning natural gas transmission pipelines. *See* Judgment, *United States v. Pac. Gas & Elec. Co.*, No. 3:14-cr-00175 (N.D. Cal. Jan. 31, 2017), Dkt. 922; *see* Response to Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified at 49, *United States v. Pac. Gas & Elec. Co.*, No. 3:14-cr-00175 (N.D. Cal. Jan. 23, 2019), Dkt. 976. Those convictions concerned PG&E's natural gas transmission business. None involved any aspect of PG&E's electric grid operations. In passing the probation statute, "Congress intended that there be some connection between the proscription to be ordered by the court and the nature of the crime or the degree of punishment." *Lorenzini,* 71 F.3d at 1493. Here, there is no reasonable relation between PG&E's original offenses and the imposed probation conditions relating to its electric distribution and transmission businesses. That is another reason, in addition to those set forth below, why the Court should consider these new conditions.

the country—using specialized vegetation management contractors for inspections and tree work is common throughout the electric utility industry. (Goodfellow Decl. ¶ 29; DeCampli Decl. ¶¶ 10-11.) And for good reason. PG&E's vegetation management contractors are highly specialized and have expended significant resources to identify, train, manage, equip and deploy qualified personnel who can perform tree work safely and meet the line clearance needs of PG&E and other utilities. (Ritter Decl. ¶ 28; Goodfellow Decl. ¶¶ 30-31, 35; DeCampli Decl. ¶¶ 10-11.) The Hiring Condition would discard these benefits, despite the lack of any evidence that simply changing who employs the inspectors would have *any* impact on safety.

The Hiring Condition would involve great cost and disruption. Nearly all of PG&E's new hires would need to come from the *existing pool* of contract workers, because there is no other pool of workers with the relevant skills and experience. (Ritter Decl. ¶31; Goodfellow Decl. ¶ 36.) This means the Hiring Condition would change little, if anything, in terms of who is doing the inspecting and how they are doing it. But it would substantially detract from PG&E's important initiatives. For example, the Hiring Condition would directly interfere with PG&E's new "Defined Scope" model, under which PG&E's vegetation management contractors will be assigned entire circuits and be responsible for both the pre-inspection ("PI") and tree-trimming ("TT") work performed on that circuit. (Ritter Dec. ¶¶ 20-26.) In light of these facts, there is no basis to conclude that the Hiring Condition is "reasonably necessary to a proper sentencing objective," as the probation statute requires. *Lorenzini*, 71 F.3d at 1492.

***Inspection Condition.*** The Inspection Condition requires PG&E "to design a new inspection system for assessing every item of equipment on all transmission towers" (the "Inspection Condition"). There is no evidence that the Inspection Condition (or any of the other transmission-related conditions) will enhance safety; instead, it will interfere with PG&E's more effective inspection process.

In response to the devastating Camp Fire of 2018, PG&E brought together internal and external subject-matter experts to fundamentally enhance asset inspections in high fire-threat areas, ultimately spending over $800 million for the transmission portion of the

9

program alone.  (Hvistendahl Decl. ¶ 14.)  The program those experts collectively developed, known as the Wildfire Safety Inspection Program ("WSIP"), adopted an entirely new, risk-based approach that improved on PG&E's prior routine inspections in numerous ways and allowed for a top-to-bottom assessment of each structure.  WSIP inspections were a critical component of PG&E's 2019 Wildfire Mitigation Plan, which the CPUC reviewed and approved.  (Allen Decl. ¶ 5.)

PG&E is applying lessons learned from the 2019 WSIP to further enhance its inspections this year.  The Company's inspection plan for 2020 is detailed in its WMP, which last week the WSD recommended that the CPUC conditionally approve.  (Allen Decl. ¶ 15.)  The plan builds on the 2019 WSIP and prioritizes the highest-risk transmission structures for more frequent and in-depth inspections.  (Hvistendahl Decl. ¶ 15.)

WSIP and PG&E's new 2020 inspection program are effective programs for wildfire risk reduction—particularly with respect to identifying high-priority conditions on PG&E's lines requiring repair.  (Brown Decl. ¶ 16; DeCampli Decl. ¶¶ 26-29.)  By interposing new and different requirements—just weeks before wildfire season, no less—the Inspection Condition will upend evidence-based plans without any basis for concluding that, once implemented, outcomes will be improved.

The Inspection Condition also requires PG&E inspectors to record video of inspections and tug on transmission wires.  Neither of these mandates serves the purposes of probation.  Inspectors are already required to take date- and time-stamped photographs of equipment subject to inspection (including the physical field markers on the assets being inspected), and electronic forms use GPS data to record the physical location of the inspector at the time of the inspection.  (Hvistendahl Decl. ¶ 23.)  There is no evidence video will add anything of value.  For post-inspection review purposes, the high-quality still images that PG&E takes by drone are far more useful than lower-resolution video.  (Hvistendahl Decl. ¶ 24; DeCampli Decl. ¶ 34).  Touching or tugging on parts, meanwhile, either pose significant safety risks to inspectors or require frequent, year-round de-energization of lines overseen by the California Independent

System Operator (CAISO). The many outages required for PG&E to tug on electrical equipment during its thousands of tower inspections would beget disruption to customers and the CAISO for no tangible benefit. (Hvistendahl Decl. ¶¶ 27-30; DeCampli Decl. ¶¶ 32-33.) There is no evidence in the record from any expert, regulator or industry participant that this requirement is advisable.

*Age Identification Condition.* The Age Identification Condition requires PG&E to identify the "age of every item of equipment on every transmission tower and line" (the "Age Identification Condition"). That directive imposes an enormous burden on PG&E without any measurable benefit, in violation of Section 3553(a)'s requirements.

The condition incorrectly assumes that age is a predominant or critical factor in asset-replacement and repair decisions, but the key determinant here is asset *condition*. (Ly Decl. ¶¶ 3-4; Brown Decl. ¶ 13; DeCampli Decl. ¶ 21.) A condition-based methodology requires consideration of inspection and maintenance history, the physical environment in which an asset operates, and the stress equipment experiences in service, among other factors. (Ly Decl. ¶ 2.) Asset age is one relevant data point, but it is not always a reliable guide to asset condition. (*Id.* ¶ 3; DeCampli Decl. ¶ 21.) The granular, component-level data that the Age Identification Condition requires PG&E to compile across the system would have no material impact on its risk assessments. (DeCampli Decl. ¶ 16; *id* ¶¶ 16-18;. Ly Decl. ¶¶ 9-11; Brown Decl. ¶¶ 11-12; .)

On the other hand, the condition would require PG&E to divert significant time and resources from more effective safety initiatives to attempt to determine the age of millions of pieces of equipment—including those that are not in poor condition, and that are located in areas posing little fire risk. For a variety of reasons, many of the records do not exist. (Ly Decl. ¶ 11.) The Age Identification condition therefore would not further public safety or PG&E's rehabilitation and compliance with state laws.

*Insurance Condition.* The Insurance Condition forces PG&E to require all contractors performing inspections "to carry insurance sufficient to cover losses suffered by the public should their inspections be deficient and thereby start a wildfire" (the "Insurance Condition"). The Insurance Condition does not comply with the purposes of probation because it

11

is impossible to meet. The market does not offer the tens of billions of dollars' worth of insurance the Order would necessitate. For the 2019 fire season, PG&E sought to procure at least $630 million of new coverage for wildfire liability, in addition to coverage it had from prior multi-year policies. (Cairns Decl. ¶ 4.) After approaching more than 65 markets and widely marketing its insurance program to traditional insurance carriers, reinsurance providers and capital markets, PG&E managed to obtain only $50 million in additional wildfire liability coverage and $140 million in non-wildfire coverage—and even this coverage carried a heavy premium cost of $48 million. (*Id.*) Insurance "sufficient" to cover wildfire risks is also unavailable to PG&E's contractors. (Coleman Decl. ¶¶ 2-3; Ball Decl. ¶ 9; Ex. 13 (Cochran Letter).) California has recognized that traditional insurance is no longer a viable solution for insuring wildfire liability; as a result, it set up a non-market-based Wildfire Fund to provide compensation for victims of wildfires caused by igniting transmission lines. *See* Senate Committee on Appropriations, Comm. Report on Assembly Bill No. 1054, 2019–20 Reg. Sess., at 4 (Cal. July 8, 2019). State law thus addresses the policy concern at the heart of the Insurance Condition.

**II.      PG&E Will Suffer Irreparable Harm Absent A Stay.**

"Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). Absent a stay, the Order will irreparably injure PG&E, as well as the State of California, because attempting compliance will exacerbate the risk of wildfires.

First, the conditions demand that PG&E divert attention and finite resources away from ongoing safety work being conducted under the oversight of its regulators, potentially increasing the risk of wildfires and causing PG&E further harm from potential liability and loss of goodwill. *See Am. Trucking Ass'n v. City of L.A.*, 559 F.3d 1046, 1058 (9th Cir. 2009). For instance, the Hiring Condition requires PG&E to hire an internal workforce to conduct all pre-inspection and post-inspection work. While PG&E has not had the opportunity fully to assess the costs, a preliminary projection shows that it could cost at least $140 million in start-up costs (and perhaps much more), with an additional $70 million required over the first five years. (Ritter Decl.

12

MOTION FOR STAY PENDING RECONSIDERATION AND APPEAL
Case No. 14-CR-00175-WHA

¶ 30.) The Inspection Condition, too, would require a massive diversion of resources. (Hvistendahl Decl. ¶ 25.) Depending on how the condition is implemented, it would either tax finite resources by necessitating an additional inspector on each crew to film the inspection, or else require significant expenditures on body cameras for hundreds of inspectors and additional personnel to capture, store, and watch 32,000 hours of video footage each inspection cycle. (*Id.*) The Age Identification Condition, similarly, is enormously expensive and time-consuming. The approximately 150,000 transmission structures in PG&E's system, comprising steel towers, steel poles and wood poles, consist of many individual components. (Lyl Decl. ¶ 7; DeCampli Decl. ¶ 17.) Extrapolating to all 150,000 transmission structures, the condition would require PG&E to attempt to research the vintage of *millions* of pieces of equipment. (Lyl Decl. ¶ 7; DeCampli Decl. ¶¶ 17-19.) And the Insurance Condition, were it possible to comply with, would shift huge costs onto PG&E's contractors, which would in turn pass additional costs onto PG&E or else leave PG&E without contractors entirely. (Ex. 13 (Cochran Letter.)).

Attempting compliance with the conditions will also compromise PG&E's ability to comply with state law. For example, because the Insurance Condition is impossible to comply with, PG&E would be left with the Hobson's choice of violating its probation or failing to complete necessary wildfire safety work that must be done using contractors. (*See id.*; Coleman Decl. ¶¶ 2-3; Ball Decl. ¶ 9.) The other conditions, too, likewise create tension with state law and thus expose PG&E to potential enforcement by the CPUC, as well as other penalties. The Age Identification Condition would require PG&E to abandon risk-based prioritization in order to implement the Court's conditions on every tower. *See supra* at 7-8 (describing conflict with state law). In fact, the conditions *all* interfere with PG&E's existing plans as vetted by and determined with its state regulators, and thus further expose PG&E to liability for noncompliance. If the WSD determines that a utility is not complying with its WMP, it may refer the company for an enforcement action or, as discussed above, deny approvals. Cal. Pub. Util. Code § 8389(g); *see id.* §§ 8386.1, 8389(e)(2) (penalties). Attempting compliance with the Order's conditions may give rise to further liability: State law prohibits any diversion of resources from a utility's Wildfire Safety Plan. Cal.

Pub. Util. Code § 8386.3(d). The risk of government enforcement if PG&E departs or diverts funds from its own Wildfire Mitigation Plan to comply with the Court's Order warrants relief. *See Cal. Trucking Ass'n v. Becerra*, No. 3:18-CV-02458, 2020 WL 248993, at *10 (S.D. Cal. Jan. 16, 2020), *appeal docketed*, No. 20-55107 (9th Cir. Jan. 30, 2020).

### III.   The Balance of the Equities And The Public Interest Favor A Stay.

The balance of the equities and the public interest, too, favor a stay.

A stay pending reconsideration and any appeal serves the public interest because, without it, the additional conditions, as explained above, may force violations of state law and may also lead to increased risk of wildfires by diverting focus and attention from ongoing safety efforts overseen by regulators to compliance with the Court's conditions. The Inspection Condition also would potentially place inspectors in mortal danger, including through electrocution, by requiring them to "tug" on transmission wires, (Hvistendahl Decl. ¶ 27; DeCampli Decl. ¶ 32.); *see* 29 C.F.R. § 1910.269(*l*), (*l*)(3)(iii); Cal. Code Regs. tit. 8, § 2940.2 (federal and state regulations requiring minimum approach distances from energized components), unless the lines are first de-energized—a disruptive process that likely cannot be sustained for extended periods.

By contrast, there is no public interest in the immediate implementation of these conditions. The Court's conclusions that the new conditions further public safety are premised on incorrect assumptions, including about PG&E's compliance with relevant state laws. (James Decl. ¶¶ 5-16 (refuting testimony of Thomas Hylton regarding Cresta-Rio Oso Line tower); Ritter Decl. ¶¶ 34-41 (explaining PG&E's compliance with state law and industry standards, as well as the differences between PG&E's regulatory requirements and its EVM work.)) Thus, even if these conditions were ultimately deemed lawful, the record does not establish a public interest in their immediate enforcement.

The equities, too, favor a stay. A stay would serve only to preserve the status quo pending reconsideration and any appeal. There is no evidence that a temporary stay of these additional conditions will burden third parties. To the contrary, third parties and the public at large will benefit from not immediately imposing the conditions, because PG&E will be able to focus

its resources on its highest-priority problems, consistent with the directives of the CPUC. And, indeed, the Insurance Condition would impose harmful restrictions on PG&E's contractors (which are not under probation) without increasing the availability of liability insurance to compensate wildfire victims. Rather than striving to comply with impracticable or impossible conditions while this Court considers reconsideration and the Ninth Circuit weighs any appeal, PG&E should be able to spend its time and energy on what both it and the Court care most about: quickly and effectively addressing risks to public safety.

## CONCLUSION

For the reasons set forth above, PG&E respectfully requests a stay pending reconsideration and appeal.

Dated: May 13, 2020                                Respectfully Submitted,

                                                   JENNER & BLOCK LLP

                                                   By:  /s/ Reid J. Schar
                                                        Reid J. Schar (*pro hac vice*)

                                                   CRAVATH, SWAINE & MOORE LLP

                                                   By:  /s/ Kevin J. Orsini
                                                        Kevin J. Orsini (*pro hac vice*)

                                                   CLARENCE DYER & COHEN LLP

                                                   By:  /s/ Kate Dyer
                                                        Kate Dyer (Bar No. 171891)


                                                   Attorneys for Defendant PACIFIC GAS
                                                   AND ELECTRIC COMPANY