Robert A. Julian (SBN 88469)
Kimberly S. Morris (SBN 249933)
Cecily A. Dumas (SBN 111449)
BAKER & HOSTETLER LLP
Transamerica Pyramid Center
600 Montgomery Street, Suite 3100
San Francisco, CA 94111-2806
Telephone:    415.659.2600
Facsimile:    415.659.2601
Email: rjulian@bakerlaw.com
Email: kmorris@bakerlaw.com
Email: cdumas@bakerlaw.com

Eric E. Sagerman (SBN 155496)
David J. Richardson (SBN 168592)
Lauren T. Attard (SBN 320898)
BAKER & HOSTETLER LLP
11601 Wilshire Blvd., Suite 1400
Los Angeles, CA 90025-0509
Telephone:    310.820.8800
Facsimile:    310.820.8859
Email: esagerman@bakerlaw.com
Email: drichardson@bakerlaw.com
Email: lattard@bakerlaw.com

*Counsel to the Official Committee of Tort Claimants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Defendant, | Case No.  14-cr-00175-WHA<br><br>**FOURTH DECLARATION OF THOMAS SCOTT HYLTON** |

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    I, Thomas Scott Hylton, pursuant to 28 U.S.C. § 1746, declare the following under penalty

2    of perjury:

3    1.    I have been retained by Baker & Hostetler, LLP as an expert witness for the Official

4    Committee of Tort Claimants (the "TCC") in connection with the Pacific Gas & Electric ("PG&E")

5    chapter 11 bankruptcy case (Case No. 19-30088 (DM)) and estimation proceedings (Case No. 19-

6    05257 (JD)). All statements in this Declaration are based upon my personal knowledge developed

7    during the course of my engagement with the TCC.

8    2.    I have 37 years of experience climbing, inspecting, maintaining, and repairing

9    transmission lines. By the time I retired in 2013, I held the position of superintendent managing a

10   department of approximately 200 line workers. I have also instructed countless individuals, both in

11   the classroom and in the field, about safe transmission line practices and procedures. These are the

12   subject areas within my expertise and for which I was hired by the TCC. I never claimed to be an

13   expert in metallurgy or engineering.

14   3.    PG&E's focus on metallurgy is a distraction and beside the point. According to

15   PG&E's own procedures, the company does not want equipment in the condition of the Cresta-Rio

16   Oso Tower 09/81 connection hardware on its transmission towers—that is why it slates them for

17   removal and replacement beginning at 30% material loss. At between 30% and 50% material loss

18   on a C-hook or hanger plate, PG&E's own procedures state that replacement is due within 1 year.

19   At 51% material loss, PG&E's own procedures require immediate replacement. One of the hanger

20   plates removed from the Cresta-Rio Oso Tower was a mere percentage point from requiring

21   immediate replacement at 49%, which should have set off alarm bells, not formed the basis for a

22   defense before this Court.

23   4.    Despite PG&E's company requirements for equipment removal and replacement at

24   different intervals of material loss, it has become clear through this investigation that it is extremely

25   difficult, if not impossible, for anyone to accurately determine how much wear is on either a C-

26   hook or hanger plate when they are joined together and in service on a transmission tower.

27   5.    PG&E's linemen are also not engineers or metallurgists. In filings submitted to this

28   Court, PG&E attempted to excuse the failure of its crewmembers to accurately identify wear on

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  PG&E equipment by pointing to problems caused by light and shadows, and "the general difficulty

2  of assessing the extent of wear on a C-hook and hanger plate without separating the two interlocking

3  pieces to observe any material loss on the contact surfaces." But those excuses only highlight the

4  problems with PG&E's inspection protocols. The "general difficulty" to which PG&E refers should

5  have resulted in added and better inspections.

6       6.     PG&E's personnel underestimated the amount of material loss on the connection

7  hardware on the Cresta Rio Oso Tower 09/81 during two enhanced inspections in 2019 when no

8  material loss was identified.  PG&E's inspectors entirely missed the material loss and PG&E has

9  provided no reasonable explanation for its failure. And, even in January 2020, after I brought the

10 wear issues to their attention, PG&E estimated the loss was as low as 30%.  PG&E's final

11 measurements after removal were 43% and 49% for the two hanger plates.

12      7.     Due to the repeated failure to identify material wear on its component parts, it is my

13 opinion that PG&E has not shown the ability to accurately assess connection hardware while it is

14 present on the line—therefore, this equipment must be taken down and separated to be properly

15 analyzed.  If it were not for my initial letter and photographs, PG&E would not have identified the

16 Tower 09/81 connector parts for replacement at all.

17      8.      The photographs I took while on the ground in both 2018 and 2019 clearly showed

18 material loss in several C-hooks along the Cresta-Rio Oso Line. While PG&E's inspection

19 protocols do include taking drone photographs from the air, the drone photographs produced to this

20 court by PG&E are not as clear as the photographs I took of the same component parts and lack the

21 level of detail required to view hardware issues on the transmission towers, thereby resulting in

22 inadequate inspections. Cresta-Rio Oso Tower 09/81 is just one tower in PG&E's system but it is

23 within site of the Caribou-Palermo Tower 27/222 that failed and caused the Camp Fire. In my

24 opinion, PG&E's inspection protocols failed to identify an obvious condition that should have led

25 to replacement of the components on the Cresta-Rio Oso line. I am concerned that if they missed

26 this one, how many others have they missed?

27      9.     In its motion, PG&E questioned my reasons for not identifying the hardware issues

28 I observed on the Cresta-Rio Oso 230kV Transmission Line sooner. I first observed the Cresta-Rio

3

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Oso Line in my capacity as an expert witness for a victim of the Camp Fire—I was there to observe an evidence removal from Tower 27/222 on the Caribou-Palermo Line that was the origin point of the Camp Fire. The bottom phase jumper and support arm of Tower 27/222 had already been removed before I arrived on site. I noticed Cresta-Rio Oso Line Tower 09/81 (which was right next to Tower 27/222) appeared to have the same tower configuration as Tower 27/222 and I took several photos for comparison purposes.

10.     I noticed one of the C-hooks on Tower 09/81 had black electrical tape on it. I also noticed from the photographs the C-hooks and/or connecting plates appeared to be significantly worn. At that time, I did not know about the hardware issues that caused the Camp Fire or that a failed C-hook caused the fire.

11.     While I was on site for the evidence removal from Tower 27/222 in 2018, PG&E had several representatives on-site facilitating the inspection. It was inconceivable to me at that time (and now) that PG&E's many, many personnel at the Camp Fire ignition site would not identify, then, **or at any subsequent point until I brought it to PG&E's attention a year later**, the issues presented on Tower 09/81, which were observable to me from ground level. Tower 09/81 appeared to be of a similar vintage, had the same configuration, and was subject to identical weather and environmental influences as Caribou-Palermo Tower 27/222. No one would have more information about this tower than PG&E itself.

12.     When I returned to observe Tower 09/81 a year later, I was completely shocked and horrified to see that PG&E had done nothing about this badly worn equipment in the interim— especially **after it had determined that it was a failed C-hook that caused the Camp Fire and killed 85 people.**

13.     After my second visit to Tower 09/81 in 2019, I immediately informed the TCC's counsel of my observations, and we later decided together that we should inform PG&E and this Court of the issues I found.  Both the TCC and I were concerned about the safety of the Paradise and surrounding communities who had already lost so much should PG&E's equipment fail and ignite another fire.

FOURTH DECLARATION OF THOMAS SCOTT HYLTON - CASE NO.: 14-cr-00175-WHA

1    I declare under penalty of perjury under the laws of the United States of America that the

2  foregoing is true and correct.

3

4  Dated: Sacramento, CA
           May 20, 2020                              Thomas Scott Hylton

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

FOURTH DECLARATION OF THOMAS SCOTT HYLTON - CASE NO.: 14-cr-00175-WHA