JENNER & BLOCK LLP
    Reid J. Schar (*pro hac vice*)
    RSchar@jenner.com
    353 N. Clark Street
    Chicago, IL 60654-3456
Telephone: +1 312 222 9350
Facsimile: +1 312 527 0484

CLARENCE DYER & COHEN LLP
    Kate Dyer (Bar No. 171891)
    kdyer@clarencedyer.com
    899 Ellis Street
    San Francisco, CA 94109-7807
Telephone: +1 415 749 1800
Facsimile: +1 415 749 1694

CRAVATH, SWAINE & MOORE LLP
    Kevin J. Orsini (*pro hac vice*)
    korsini@cravath.com
    825 Eighth Avenue
    New York, NY 10019
Telephone: +1 212 474 1000
Facsimile: +1 212 474 3700

Attorneys for Defendant PACIFIC GAS AND ELECTRIC COMPANY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>         v.<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>                    Defendant. | Case No. 14-CR-00175-WHA<br><br>**REPLY IN SUPPORT OF MOTION FOR LEAVE TO RECONSIDER ORDER MODIFYING CONDITIONS OF PROBATION**<br><br>Judge:  Hon. William Alsup |

**TABLE OF CONTENTS**

**INTRODUCTION**............................................................................................................................1

**ARGUMENT**..................................................................................................................................2

I.    THIS COURT HAS AUTHORITY TO RECONSIDER ITS ORDER AND MUST HOLD A HEARING..................................................................................................2

II.   THE NEW PROBATION CONDITIONS ARE IMPROPER BECAUSE THEY INTERFERE WITH CALIFORNIA'S EXISTING REGULATORY REGIME................3

III.  THE RECORD DOES NOT SUPPORT THE CONDITIONS AS REASONABLY NECESSARY TO SERVE THE GOALS OF PROBATION. ...........................................6

IV.  THE FOURTH DECLARATION OF THOMAS SCOTT HYLTON DOES NOT SUPPORT THE CONDITIONS.....................................................................................8

**CONCLUSION** ...........................................................................................................................11

**INTRODUCTION**

PG&E respectfully submits this reply seeking reconsideration of the probation conditions imposed by the Court's April 29, 2020 Order Modifying Conditions of Probation ("Order").[1]  PG&E shares the Court's desire to protect Californians, but the conditions will not do that.  PG&E's motion presents three primary grounds for reconsideration:  (1) the conditions were imposed without the required notice and hearing; (2) the conditions interfere with California's comprehensive regulatory regime; and (3) the conditions are not reasonably necessary because they are impractical, inefficient, and counterproductive, particularly in light of PG&E's ongoing efforts to comply with the obligations imposed by its regulators.

The Government's brief provides support for all of these grounds.  (*See* Dkt. 1193 ("Gov't Resp.").)  The Government agrees that notice and a hearing are needed to comply with Rule 32.1.  The Government agrees that probation conditions should not interfere with state regulation or otherwise impose impractical or counterproductive obligations.  And, most important, the Government agrees that the conditions are not supported on the record before the Court.  Given the parties' agreement on these key points, PG&E asks the Court to reconsider and vacate the conditions.

The Government suggests that this Court could obtain "input from the CPUC and Cal Fire" to develop a more substantial record for assessing the conditions or to design alternative conditions.  (Gov't Resp. at 2; *see also id.* at 8-9.)  But that proposal only highlights why the conditions should not be imposed.  The CPUC and its specialized Wildfire Safety Division ("WSD") are already overseeing PG&E's 2020 Wildfire Mitigation Plan, including PG&E's programs for vegetation management and transmission line inspections.  As PG&E explained in its Motion to Reconsider, this process has been specifically designed by the California Legislature to allow for essential input from subject-matter experts, the public, consumer advocacy groups,

---

[1] PG&E submits this reply in support of its motion for leave to seek reconsideration.  The government styled its brief as in response to PG&E's underlying motion for reconsideration.  This submission may be considered a reply in support of that motion as well.  PG&E also responds to the unsolicited Fourth Declaration of Thomas Scott Hylton (Dkt. 1194) in this submission.

and other stakeholders, including CAL FIRE. (Dkt. 1187-1 ("Recons. Mot.") at 11-15.) PG&E is already in ongoing discussions with its regulators to help ensure that it complies with the obligations that those regulators have imposed. And this Court has already required, as a probation condition, PG&E's compliance with those regulatory obligations. There is no justification for requiring these state agencies to engage in a separate regulatory and policymaking process overseen by a federal court. PG&E's regulators should be allowed to continue their oversight, and PG&E's compliance should be measured against the agencies' regulatory obligations and policy priorities.

The record proves the point. Evidence shows the additional conditions will not promote, and may well hinder, wildfire safety. As PG&E has argued, each condition would impose impractical or impossible obligations or divert substantial resources from more effective initiatives being overseen by PG&E's regulators. No record can support them. As explained at length in PG&E's Motion to Reconsider, the conditions require PG&E to embark on massive, costly and impractical endeavors that are neither risk-based nor supported by expert analysis or industry research, and introduce execution risk into PG&E's operations by displacing or interfering with existing programs that are under review by PG&E's regulators. For all of these reasons, and those provided in PG&E's Motion to Reconsider, the conditions should be vacated.

**ARGUMENT**

**I.   THIS COURT HAS AUTHORITY TO RECONSIDER ITS ORDER AND MUST HOLD A HEARING.**

As the Government recognizes, this Court is authorized to "modify [or] reduce" the conditions of probation "at any time prior to the expiration . . . of the term of probation", 18 U.S.C. § 3563(c), and so has inherent authority to reconsider its Order and vacate the probation conditions, *e.g.*, *United States v. Fazzini*, 414 F.3d 695, 698 (7th Cir. 2005). (*See* Gov't Resp. at 2-3.)[2] As the Government also recognizes, Federal Rule of Criminal Procedure 32.1(c)(1) requires

---

[2] PG&E disagrees with the Government's position that "PG&E's notice of appeal in this case is ineffective." (Gov't Resp. at 3.) PG&E filed a timely protective appeal to ensure it may seek appellate review, if needed, of the Order. (*See* Dkt. 1188.) To the extent this Court's consideration

that "[b]efore modifying the conditions of probation . . . the court must hold a hearing . . . at which the person has the right to counsel and an opportunity to make a statement and present any information in mitigation." (Gov't Resp. at 4 (first and second alterations in original).) PG&E agrees with the Government that the May 28 hearing ordered by the Court would satisfy "[t]he procedural requirements of Rule 32 of the Federal Rules of Criminal Procedure", (*id.* at 1), to the extent that PG&E has notice of any conditions ultimately imposed and a meaningful opportunity to present mitigating evidence at the hearing.[3]

## II. THE NEW PROBATION CONDITIONS ARE IMPROPER BECAUSE THEY INTERFERE WITH CALIFORNIA'S EXISTING REGULATORY REGIME.

PG&E further agrees with the Government that "sentencing courts should be mindful of federalism concerns when imposing probation conditions that implicate areas of state regulation." (Gov't Resp. at 7.) As the Ninth Circuit has explained, "[w]here a state has in place a comprehensive procedure for resolution of the condition probation imposes, it makes good sense to defer to that established procedure." *United States v. Lakatos*, 241 F.3d 690, 695 (9th Cir. 2001) (vacating probation condition and citing relevant authority). The Order violates that rule. As PG&E has explained, California is robustly regulating in the area of wildfire safety. (Recons. Mot. at 12-15.) The new conditions unlawfully impinge on state regulatory authority and are therefore substantively unreasonable.

The Government suggests that the conditions may not interfere with California's regulatory regime. (Gov't Resp. at 8.) But the conditions *inherently* interfere because they require PG&E to make different choices, adopt different priorities, and allocate resources differently from how regulators have approved. Regulation always involves prioritizing based on finite resources.

---

of PG&E's Motion to Reconsider extends the time for seeking appellate review of the Order, PG&E's appeal will ripen upon the resolution of the motion. *See, e.g.*, *Martinez v. Barr*, 941 F.3d 907, 916 (9th Cir. 2019) ("We can assume jurisdiction based on a prematurely filed notice of appeal when 'subsequent events can validate [the] prematurely filed appeal.'" (alteration in original) (citation omitted)). In all events, PG&E will not seek to prosecute its appeal while its reconsideration motion remains pending.

[3] In the event the Court were to propose new conditions, PG&E would request additional time to respond to any such proposal.

(*See, e.g.*, Recons. Mot. at 15 (discussing WSD Draft Resolution recommending PG&E engage in "strategic prioritization of initiatives" to "be most effective with its finite resources" (citation omitted)); *see also* Comments of the California Public Utilities Commission in Response to Order to Show Cause, Dkt. 987 (Jan. 28, 2019) ("CPUC Comments") at 5 ("In public utility regulation, safety, reliability, and consideration of costs and timing are never considered in isolation. A utility's costs of programs such as vegetation management, safety inspections, and asset repair and replacement must be orderly and executed over a schedule of years.").)

When a probation order requires spending those resources in different ways and for different priorities than what state regulation has directed or approved, it necessarily interferes with that state regulation. In the words of the Ninth Circuit, such an order constitutes impermissible "federal intervention into a 'traditional area of state concern'". *Lakatos*, 241 F.3d at 695 (citation omitted).[4] Moreover, some of the conditions expressly require PG&E to depart from what California regulators have directed. For example, the conditions require PG&E to "design a new inspection system for assessing *every* item of equipment on *all* transmission towers", (Order at 11-12 (emphases added)), and to embark on a massive and costly effort to identify the age of *every* component in its transmission system that would yield little benefit, (*id.*). But the CPUC has instructed PG&E to "*target the highest risk elements*" so that PG&E can "be most effective with its finite resources". (Recons. Mot. at 15 (emphasis added) (citation omitted).)

---

[4] At times, the Government's brief seems to suggest that probation conditions must "directly conflict with . . . state regulations" to raise federalism concerns. (Gov't Resp. at 8.) But as noted above, the proper inquiry is whether a condition constitutes "federal intervention into a 'traditional area of state concern'", not whether there is direct conflict, a standard that is not supported by the case law. *Lakatos*, 241 F.3d at 695 (citation omitted). Thus, courts have struck down conditions that, for instance, revoked a prisoner's driver's license under his state's vehicle code, *United States v. Snyder*, 852 F.2d 471, 474 (9th Cir. 1988), required a probationer to resign from the state bar, *United States v. Pastore*, 537 F.2d 675, 683 (2d Cir. 1976), *superseded by statute on other grounds as recognized by United States v. Singh*, 390 F.3d 168 (2d Cir. 2004), or revoked a probationer's state-issued pharmacy license, *United States v. Sterber*, 846 F.2d 842, 844 (2d Cir. 1988), *superseded by statute on other grounds*, *Singh*, 390 F.3d 168. None of these cases involved direct conflict with state law. Rather, they rejected probation conditions that, as here, "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of" a state regulatory regime. *Cf. Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015) (citation omitted).

PG&E cannot meet that state mandate if it must focus on "every" piece of equipment in its grid, regardless of risk.

The Government states that the Court has directed PG&E to meet and confer with the CPUC, and suggests that together they could propose an approach to implementation that would "achieve the essence" of the Court's conditions. (Order at 12; *see* Gov't Resp. at 8 n.2.) The Government also proposes that the Court seek input from the CPUC and CAL FIRE to develop a more substantial record concerning the conditions. (Gov't Resp. at 2, 8-9.) PG&E is already in ongoing dialogue with the CPUC and CAL FIRE regarding how best to mitigate wildfire risk, and has had extensive interactions with the Federal Monitor aimed at reviewing and improving PG&E's processes.[5] These discussions should properly focus on California's assessment of how best to reduce wildfire risk, not on how to manage the implementation of conditions imposed by this Court outside the regulatory process.

Indeed, the Court's directive to work with the CPUC to propose an implementation plan only exacerbates the problem of interference and would do nothing to address the fundamental problem with the conditions—namely, that they did not grow out of the CPUC's regulatory processes for evaluating and approving utility programs for vegetation management and asset inspections. California's regulatory agencies are charged under state law with setting regulatory policies and priorities, are accountable to the people of California, and are empowered with the fact-finding tools and expertise to discharge these duties. Requiring them to serve as advisors to a federal court, or to develop an implementation plan to satisfy a federal court's regulatory goals, makes the federal court, not California, the ultimate arbiter of California regulatory policy that is

---

[5] The Government's brief endorses the suggestion in the Order that PG&E work with the Federal Monitor "to devise ways to carry out the new conditions", (Gov't Resp. at 2, 8), and further recommends soliciting opinions on the conditions from experts hired by the Monitor, (*id.* at 2, 9). However, PG&E has already been engaging with the Federal Monitor to improve its processes, including by providing the Monitor with "unfettered access to PG&E employees, contractors and records to facilitate the Monitor's parallel review and analysis" of PG&E's implementation of its Enhanced Vegetation Management program. (Resp. to Order re July 26 Report and Setting Hr'g, Dkt. 1091 (Sept. 3, 2019).)

of utmost concern to state residents.  That is not only improper "federal intervention" into an area of state concern, *Lakatos*, 241 F.3d at 695, but also an improper commandeering of the state regulatory agency to implement what amounts to a court-imposed federal regulatory policy.  *Printz v. United States*, 521 U.S. 898, 925 (1997) ("[T]he Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs.").[6]  The Government does not point to, and PG&E has not found, any precedent for a court to use its criminal probation authority to interfere with a comprehensive state regulatory scheme.

Ultimately, the Government states that it "is not in a position to address the feasibility of implementing the conditions, the likelihood of their success, or PG&E's arguments against them."  (Gov't Resp. at 9.)  Neither is a federal court.  Unlike the CPUC, courts lack expertise in the areas that the conditions seek to regulate.  Imposition of the conditions would interfere with or supplant the standards developed by expert agencies.  As explained in the next section, that is particularly problematic where, as here, the Court's conditions would not advance, and may well frustrate, the goal of preventing wildfires.

### III. THE RECORD DOES NOT SUPPORT THE CONDITIONS AS REASONABLY NECESSARY TO SERVE THE GOALS OF PROBATION.

The Government's brief repeatedly states that the record does not provide a basis for the Government to support the specific probation conditions imposed by the Court.  (*See* Gov't Resp. at 2, 9 ("[O]n this record, the United States is not in a position to address whether the new conditions ordered by the Court can be feasibly implemented, will protect the public, and are consistent with regulations imposed on PG&E by the California Public Utilities Commission

---

[6] As the CPUC has itself observed in these proceedings, there are also sound prudential reasons for abstaining from federal intervention in this area.  In commenting on the Court's January 9, 2019 Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified (Dkt. 961), the CPUC explained that "because the CPUC's regulation of electric utilities is so comprehensive, the regulation of California's electrical utilities, and by extension the de-energization of an electrical system, must be done in an orderly, deliberate, and unified manner." (CPUC Comments at 6.)  The CPUC noted that "[t]his is particularly true where wildfires are a statewide challenge."  (*Id.*)  Regulating utilities' wildfire safety programs in a probation proceeding, no matter how developed or extensive the record may be, is *not* an orderly, deliberate and unified manner of regulation.

('CPUC') and other regulators"; "[O]n this record, the United States is not in a position to address the feasibility of implementing the conditions, the likelihood of their success, or PG&E's arguments against them"; "[T]he record is comparably thin on evidence to show that the *specific conditions* ordered by the Court are reasonably necessary to improve PG&E's inspections and thereby protect the public." (emphasis in original)).)

The Government is correct. As explained in detail in PG&E's Motion to Reconsider and multiple supporting declarations, there are no facts in the record warranting imposition of the requirements for PG&E to "employ its own cadre of pre- and post-inspectors" (the "Hiring Condition"), (Order at 8); to "design a new inspection system for assessing every item of equipment on all transmission towers" (the "Inspection Condition"), (*id.* at 11); to identify the "age of every item of equipment on every transmission tower and line" (the "Age Identification Condition"), (*id.*); or to use only inspection contractors that "carry insurance sufficient to cover losses suffered by the public should their inspections be deficient and thereby start a wildfire" (the "Insurance Condition"), (*id.* at 12). The conditions therefore violate the rule that a "discretionary [probation] condition must be reasonably related to one or more of the[] goals" of sentencing laid out in 18 U.S.C. § 3553(a)(1)-(2), "and must involve only such deprivations of liberty or property as are *reasonably necessary* to accomplish the purposes of sentencing." *United States v. Lorenzini*, 71 F.3d 1489, 1492 (9th Cir. 1995) (emphasis added). The Order's new conditions are not "reasonably necessary to a proper sentencing objective" and are unsupported by the record. *Id.* at 1494. They cannot be sustained.

Indeed, the record is not only devoid of facts to support the conditions, but affirmatively establishes that they may well *undermine* PG&E's safety efforts. *First*, the Hiring Condition would force PG&E to divert its attention from critical ongoing vegetation management work to develop, from scratch, a new pre-inspection division within PG&E employing 600 people, together with the systems, processes, controls and policies that are currently overseen by highly specialized contractors. (Recons. Mot. at 16.) It would also interfere with a new model being deployed by PG&E this July that has been designed to increase contractor accountability by

assigning each contractor responsibility for both pre-inspection and tree-trimming work on specific circuit miles. (*Id.* at 16-17.) *Second*, the Inspection Condition would force PG&E to displace an existing program that has proven effective in identifying thousands of high-risk conditions on transmission lines in favor of an undefined alternative that would include unnecessary or dangerous elements, such as capturing video of inspections and tugging on tower components. (*Id.* at 18-21.) *Third*, the Age Identification Condition would require PG&E to reallocate finite resources from ongoing risk-informed safety work to support an unfocused inquiry into "the age of every item of equipment on every transmission tower and line", (Order at 11), even though the value of this massive exercise would be insignificant, (Recons. Mot. at 21-22.) *Fourth*, the Insurance Condition prohibits PG&E from engaging inspection contractors unless they can meet an impossible requirement to carry billions of dollars in wildfire liability insurance, and would thus deprive PG&E of their critical services on the eve of fire season. (*Id.* at 24-25.)

While the Government acknowledges that the developed record does not support the Court's specific conditions, (Gov't Resp. at 2, 9), it nonetheless states that "the record is replete with facts to support more restrictive probation conditions with respect to PG&E's inspections", (*id.* at 9). But the Government does not cite to anything in the record to support this contention about PG&E's inspection program, which is being overseen by PG&E's regulators and has been described by qualified experts as exceeding industry standards. (Recons Mot. at 19-20.) Those regulators are best situated to determine how PG&E should conduct inspections, and nothing justifies using the probation power to interfere with that orderly regulatory process.

**IV.    THE FOURTH DECLARATION OF THOMAS SCOTT HYLTON DOES NOT SUPPORT THE CONDITIONS.**

On May 21, Mr. Thomas Scott Hylton filed an unsolicited fourth declaration relating to equipment on PG&E's Cresta-Rio Oso 230 kV Transmission Line ("Cresta-Rio Oso Line"). Mr. Hylton's latest declaration does not provide any support for the Court's conditions and further illustrates why regulatory policy should be determined by the expert agencies rather than through the probation process.

Most importantly, Mr. Hylton does not endeavor to evaluate the Court's probation

conditions or opine that they will help (as opposed to hurt) PG&E's efforts to reduce wildfire risk. But Mr. Hylton does continue to insinuate, without any evidence, that the C-hooks and hanger plates removed from Tower 009/081 posed an imminent threat to public safety. He claims that the degree of wear on the equipment "should have set off alarm bells", (Dkt. 1194 ("Fourth Hylton Decl.") ¶ 3), but provides no support for that risk assessment and, in fact, appears to have abandoned his previous assertion that "equipment that measures between 30-50% material loss, especially on both the C-Hook and associated hanger plate, should *in all instances* be slated for immediate replacement, not replacement within 6-12 months", (Dkt. 1185, Ex. A, Third Hylton Decl. ¶ 5) (emphasis added). Mr. Hylton's abandonment of that unsupported position is unsurprising in light of Dr. Brad James' expert metallurgical analysis, which found that the C-hook and hanger plate assemblies removed from Tower 009/081 could support 57 to 60 times their actual loads in service and would not have reached the level of wear at which replacement is required under CPUC regulations for anywhere from 15 to 100 years. (Dkt. 1187-12, James Decl. ¶¶ 6-14.) Nowhere in his fourth declaration does Mr. Hylton attempt to challenge Dr. James' conclusions as to the remaining life of the equipment. Instead, Mr. Hylton simply dismisses Dr. James' "focus on metallurgy" as a "distraction" and "beside the point". (Fourth Hylton Decl. ¶ 3.) But the remaining life of a component is precisely what determines whether it poses an imminent risk to public safety. (Supplemental Expert Declaration of Brad James, Ph.D., P.E. in Further Support of PG&E's Motion to Reconsider Order Modifying Conditions of Probation (May 23, 2020) ("Supp. James Decl.") ¶ 2.)

    Mr. Hylton also contends that PG&E has "repeated[ly] fail[ed] to identify material wear on its component parts" and "has not shown the ability to accurately assess connection hardware while it is present on the line". (Fourth Hylton Decl. ¶ 7.) Here again, Mr. Hylton's claims do not withstand scrutiny.[7] As explained in the supplemental expert declaration of David

---

[7] It also bears noting that Mr. Hylton's claims regarding the observability of C-hook wear are internally inconsistent. On the one hand, Mr. Hylton claims that "it has become clear through this investigation that it is extremely difficult, if not impossible, for anyone to accurately determine how much wear is on either a C-hook or hanger plate when they are joined together and in service

9

DeCampli, the enhanced inspections PG&E introduced after the Camp Fire have resulted in the identification and replacement of C-hooks and hanger plates exceeding the wear threshold for a Priority Code A condition—including C-hooks on other towers on the Cresta-Rio Oso Line. (Supplemental Expert Declaration of David G. DeCampli in Further Support of PG&E's Motion to Reconsider Order Modifying Conditions of Probation (May 24, 2020) ("Supp. DeCampli Decl.") ¶ 4.) PG&E's enhanced inspections in 2019 also generated over 1,000 work orders relating to conditions on C-hooks or other cold-end insulator attachment hardware, including wear. (*Id.*) These tangible inspection results contradict any notion that the observation of worn equipment on one tower demonstrates a "repeated failure to identify material wear on its component parts", (Fourth Hylton Decl. ¶ 7), or a lack of "ability to accurately assess connection hardware", (*id.*).

Mr. Hylton's proposed solution appears to be that "this equipment must be taken down and separated to be properly analyzed". (*Id.* ¶ 7.) Putting aside that PG&E's enhanced inspections have identified worn C-hooks and hanger plates *without* disassembly of the components, Mr. Hylton's suggestion is unworkable. As Mr. DeCampli explains, to take apart the hundreds of thousands of pieces of attachment hardware in its system during routine inspections, PG&E would need to conduct extremely labor- and time-intensive "hot line" work, or else de-energize its nearly 1,400 transmission lines for unsustainably long periods of time. (Supp. DeCampli Decl. ¶ 5.) De-energization of transmission lines on such a scale would require approval from the California Independent System Operator and likely disrupt the flow of power to millions of customers throughout the Western Interconnection. (*Id.*) In either case, it would be difficult for PG&E to keep pace with its planned inspections. (*Id.*)

Finally, Mr. Hylton attributes his 14-month delay in reporting his observations to PG&E to the fact that he "did not know" at the time he photographed Tower 009/081 in December 2018 "about the hardware issues that caused the Camp Fire or that a failed C-hook caused the fire", and further claims that his observation of the same equipment on Tower 009/081 in December

---

on a transmission tower". (*Id.* ¶ 4.) Yet, just four paragraphs later, he asserts that "PG&E's inspection protocols failed to identify an *obvious* condition that should have led to replacement of the components on the Cresta-Rio Oso line." (*Id.* ¶ 8 (emphasis added).)

2019 compelled him to "immediately inform[] the TCC's counsel of [his] observations". (Fourth Hylton Decl. ¶¶ 10, 13.)  But, as the timestamps on the photographs taken by Mr. Hylton show, Mr. Hylton observed the equipment on Tower 009/081 for a second time on December 9, 2019. (Ex. A at 3 (Jan. 17, 2020 Ltr. from T.S. Hylton to K. Kleber) (referencing Mr. Hylton's "last visit . . . on December 9, 2019"), 7-8 (December 9, 2019 photographs).)  On January 17, 2020—more than a month after his December 9 visit—Mr. Hylton wrote to counsel for the TCC to inform them of his observations. (*Id.* at 4-5.)  It was not until nearly two weeks later, on January 30, 2020, that counsel for the TCC first raised the issue of the Cresta-Rio Oso equipment with PG&E. (*Id.* at 1-2 (Jan. 30, 2020 Ltr. from K. Morris to K. Orsini).)  In other words, after the December 9, 2019 visit that Mr. Hylton claims left him "completely shocked and horrified to see that PG&E had done nothing about this badly worn equipment in the interim", (Fourth Hylton Decl. ¶ 12), it took Mr. Hylton and the TCC *almost two months* to raise the issue with PG&E.

## CONCLUSION

PG&E respectfully requests that this Court reconsider the Order and vacate its conditions.  PG&E also asks that the Court continue its stay pending reconsideration and any appeal.

| | |
|---|---|
| Dated:  May 25, 2020 | Respectfully Submitted, |
| | JENNER & BLOCK LLP |
| | By:  /s/ Reid J. Schar  <br>      Reid J. Schar (*pro hac vice*) |
| | CRAVATH, SWAINE & MOORE LLP |
| | By:  /s/ Kevin J. Orsini  <br>      Kevin J. Orsini (*pro hac vice*) |
| | CLARENCE DYER & COHEN LLP |
| | By:  /s/ Kate Dyer  <br>      Kate Dyer (Bar No. 171891) |
| | Attorneys for Defendant PACIFIC GAS AND ELECTRIC COMPANY |