JENNER & BLOCK LLP
   Reid J. Schar (*pro hac vice*)
   RSchar@jenner.com
   353 N. Clark Street
   Chicago, IL 60654-3456
Telephone: +1 312 222 9350
Facsimile: +1 312 527 0484

CLARENCE DYER & COHEN LLP
   Kate Dyer (Bar No. 171891)
   kdyer@clarencedyer.com
   899 Ellis Street
   San Francisco, CA 94109-7807
Telephone: +1 415 749 1800
Facsimile: +1 415 749 1694

CRAVATH, SWAINE & MOORE LLP
   Kevin J. Orsini (*pro hac vice*)
   korsini@cravath.com
   825 Eighth Avenue
   New York, NY 10019
Telephone: +1 212 474 1000
Facsimile: +1 212 474 3700

Attorneys for Defendant PACIFIC GAS AND ELECTRIC COMPANY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>   v.<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>               Defendant. | Case No. 14-CR-00175-WHA<br><br>**SUPPLEMENTAL EXPERT DECLARATION OF DAVID G. DECAMPLI IN FURTHER SUPPORT OF PG&E'S MOTION TO RECONSIDER ORDER MODIFYING CONDITIONS OF PROBATION**<br><br>Judge: Hon. William Alsup |

I, David G. DeCampli, declare as follows:

1. I previously submitted a declaration in this matter on May 13, 2020. (Dkt. 1187-10, DeCampli Decl.) The opinions expressed in this supplemental declaration are based on my personal knowledge, my experience with transmission and distribution maintenance and asset management practices, (*see id.* ¶¶ 1-8), and my review of certain documents in the record and provided to me by counsel.

2. Pacific Gas and Electric Company ("PG&E") has asked me to opine on opinions expressed by Thomas Scott Hylton in his declaration dated May 20, 2020. (Dkt. 1194, Fourth Hylton Decl.)

3. As an initial matter, and as stated in my prior declaration, I am not aware of any utility whose inspection and maintenance policy would require immediate emergency replacement of C-hooks or hanger plates in the condition of the C-hooks and hanger plates removed from Tower 009/081 on the Cresta-Rio Oso 230 kV Transmission Line. In my view, it would be inappropriate to require emergency replacement of equipment in this condition when weighed against the burdens and inefficiencies associated with obtaining an emergency line clearance (*i.e.*, de-energization of the line to allow for the repair work) and mobilizing the required maintenance crew.

4. I do not agree with Mr. Hylton's "opinion that PG&E has not shown the ability to accurately assess connection hardware while it is present on the line". (Dkt. 1194, Fourth Hylton Decl. ¶ 7.) Since December 2018, PG&E has been employing multiple inspection methods, including climbing and aerial inspections by drone, helicopter or aerial lift, to assess the condition of transmission structures from top to bottom and from multiple vantage points. In practice, PG&E's application of these methods has proven effective in identifying worn cold-end insulator attachment hardware, among other conditions. I have reviewed approximately 40 Priority Code A work orders generated as a result of PG&E's enhanced inspections in 2019 that document PG&E's identification of worn or otherwise defective cold-end insulator attachment hardware. In each case, PG&E's fundamentally enhanced inspections proved capable of

identifying conditions of the type that Mr. Hylton contends PG&E "lacks the ability to accurately assess". Based on maintenance records I have reviewed, I further understand that PG&E's inspections in 2019 generated more than 1,000 lower-priority work orders that call for replacement or repair of cold-end insulator attachment hardware. Mr. Hylton's blanket statement that PG&E lacks "the ability to accurately assess connection hardware while it is present on the line" is contradicted by these multiple past instances in which PG&E has identified wear without disassembly of the components.

5. Mr. Hylton contends that cold-end insulator attachment hardware on PG&E's transmission structures "must be taken down and separated to be properly analyzed". (Dkt. 1194, Hylton Decl. ¶ 7.) In most cases, PG&E would have to de-energize transmission lines to take down and separate cold-end insulator attachment hardware assemblies during its inspections. The work required to separate the hardware during routine inspections would be significantly more labor- and time-intensive. PG&E maintains approximately 1,400 transmission lines spanning approximately 18,000 line miles, many of which are under the control of the California Independent System Operator. To disassemble hundreds of thousands of in-service C-hooks and hanger plates without conducting dangerous, live-line work, PG&E would need to de-energize hundreds of transmission lines. Even if the system operator approved such a disruptive maintenance plan, there are likely insufficient redundancies in the grid to maintain adequate system reliability to customers. In limited circumstances, transmission lines could remain in service during such work through the use of "hot line" techniques, but such methods, when they could be utilized, are extremely labor-intensive and time-consuming—much more so than conducting the work with the transmission line out of service. In either case, PG&E would likely have difficulty maintaining pace with its planned inspections. I am not aware of any electric utility that disassembles all cold-end insulator attachment hardware for routine inspections. In my opinion, Mr. Hylton's suggestion is unworkable.

1  6. Mr. Hylton's suggestion is also unnecessary.  As stated above, PG&E's
2 revised procedures are well designed to identify and replace cold-end insulator attachment
3 hardware before it reaches a degree of wear that presents an immediate threat to public safety.

I declare under the penalty of perjury that the foregoing is true and correct and that I executed this declaration on May 24, 2020, in Eden, Utah.

*[signature]*

David G. DeCampli