Pages 1 - 91

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP, JUDGE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| VS. | ) | No. CR 14-00175 WHA |
| | ) | |
| PACIFIC GAS AND ELECTRIC | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | San Francisco, California |
| _____ | ) | Thursday, May 28, 2020 |

**TRANSCRIPT OF TELECONFERENCE PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:           DAVID L. ANDERSON
                         United States Attorney
                         450 Golden Gate Avenue, 11th Floor
                         San Francisco, California  94102
                   BY:   **NOAH STERN**
                         **HALLIE HOFFMAN**
                         **JEFF SCHENK**
                         **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:           CRAVATH, SWAINE & MOORE LLP
                         825 Eighth Avenue
                         New York, New York  10019-77475
                   BY:   **KEVIN J. ORSINI, ESQ.**

                         CLARENCE, DYER & COHEN LLP
                         899 Ellis Street
                         San Francisco, California  94109
                   BY:   **KATE DYER, ESQ.**

                         JENNER & BLOCK, LLP
                         353 North Clark Street
                         Chicago, Illinois  60654-3456
                   BY:   **REID J. SCHAR, ESQ.**

Reported By:   **BELLE BALL, CSR 8785, CRR, RDR**
               Official Reporter, U.S. District Court

(Appearances continued, next page)

**APPEARANCES, CONTINUED:**


For Tort Claimants Committee:
                         BAKER HOSTETLER
                         600 Montgomery Street
                         Suite 3100
                         San Francisco, California  94111-2806
                   BY:   **KIMBERLY S. MORRIS, ESQ.**

For City of San Bruno:
                         CITY OF SAN BRUNO
                         City Attorney
                         567 El Camino Real
                         San Bruno, California  94066-4247
                   BY:   **MARC L. ZAFFERANO**
                         **CITY ATTORNEY**


For Amici Curiae:
                         AGUIRRE & SEVERSON, LLP
                         501 West Broadway
                         Suite 1050
                         San Diego, California  92101
                   BY:   **MICHAEL  AGUIRRE, ESQ.**
                         **MARIA C. SEVERSON, ESQ.**


Also Present:            **MARK FILIP, FEDERAL MONITOR**
                         **CHARLES KALIL, FEDERAL MONITOR**
                         **CHRIS KEEGAN, FEDERAL MONITOR**
                         **JULIE M. KANE, SR. VICE PRESIDENT, PG&E**
                         **JENNIFER HUTCHINGS, U.S. PROBATION**
                         **LILLAN GROSSBARD**
                         **CHRISTINE HAMMOND, CALIFORNIA PUC**
                         **CHRISTOFER NOLAN, CALIFORNIA PUC**

**Thursday, May 28, 2020**                                            **9:02 a.m.**

### P R O C E E D I N G S

THE CLERK:  Calling Criminal Action 14-175, United States versus Pacific Gas and Electric Company.

Counsel, please state your appearances for the record, beginning with the government.

MR. STERN:  Good morning, Your Honor.  Noah Stern for the United States.  I have with me on the line, appearing by telephone, Hallie Hoffman and Jeff Schenk.

THE COURT:  PG&E, please.

MR. ORSINI:  Good morning, Your Honor.  This is Kevin Orsini from Cravath Swaine & Moore on behalf of PG&E.

MR. SCHAR:  Reid Schar of Jenner & Block on behalf of PG&E.

MS. DYER:  Kate Dyer, Clarence Dyer & Cohen, for PG&E.

THE COURT:  All right.  Any other counsel wish to appear?

MR. AGUIRRE:  Good morning, Your Honor.  This is Michael Aguirre, on behalf of the amici in the case.

MS. SEVERSON:  Good morning, Your Honor.  Maria Severson, also on behalf of amici in this case.

THE COURT:  All right.  Is there anyone else?

MS. HUTCHINGS:  Good morning, Your Honor.  Jennifer Hutchings on behalf of Probation.

MR. ZAFFERANO:  Good morning, Your Honor.  Marc

1    Zafferano for the City of San Bruno.

2           **MR. FILIP:**  Good morning, Your Honor, Mark Filip,

3    Chris Keegan and Charles Kalil on behalf of the monitor team.

4           **MS. HAMMOND:**  Good morning, Your Honor.  This is

5    Christine Hammond from the California Public Utilities

6    Commission.  And we had not intended to make an appearance, as

7    such, but wanted to make ourselves available to answer any

8    questions.

9           **THE COURT:**  All right.  Your name again, please?

10          **MS. HAMMOND:**  Christine Hammond.

11          **THE COURT:**  Excellent.  I appreciate your attendance.

12    Anyone else?

13     (No response)

14          **THE COURT:**  All right.  Ms. Hammond, I have got a

15    question for you right off the bat.

16          And that is AB1054, I believe, established something

17    called the Wild -- I'm sorry, I've lost it now.  Some division

18    called the Wildfire Safety Division.  Is that it?

19          **MS. HAMMOND:**  That's correct, Your Honor

20          **THE COURT:**  Yes.  Is that part of the CPUC?  Or is

21    that a separate agency?

22          **MS. HAMMOND:**  It was created as being within the CPUC,

23    and in 2021 it will move over to the California Resources

24    Agency, which also is an agency in which CalFire is housed.

25          **THE COURT:**  Okay.  And are you connected with the --

```
 1    that division?
 2         MS. HAMMOND:  Yes.  I'm representing the California
 3    Public Utilities Commission.  And that is presently where the
 4    Wildfire Safety Division is housed.
 5         THE COURT:  All right.  Okay.  That helps a lot.  All
 6    right.  So this is -- I need to say to -- there's a lot of
 7    people on the line.  But every time you join in or join out,
 8    there is a beeping noise that disrupts our ability to hear each
 9    other.  So please try not to do that.
10         And I guess all of you should put yourselves on mute so
11    that we won't hear your background noise.  I might do that,
12    myself.
13         (Beeping noise)
14         THE COURT:  See, like, there goes another beep right
15    there.
16         (Beeping noise)
17         THE COURT:  I have to ask everyone to please, please
18    not beep on the line.
19         Anyway -- I've forgotten what I was about to say.  We're
20    here because of a motion to reconsider by PG&E, with respect to
21    conditions of probation.
22         So this is the motion by PG&E, and I would like to give
23    you the opportunity to go first.  So, please go ahead.
24         MR. ORSINI:  Thanks, Your Honor.  This is Kevin Orsini
25    from Cravath, Swaine & Moore.
```

1    Just to make sure we're on the same page at the outset on

2    the procedural issues, Your Honor, so we had filed a motion for

3    leave to file our motion for reconsideration.  But my

4    understanding at this point is that the Court has granted that

5    leave but, of course, has not ruled on the actual

6    reconsideration request.

7    And based on that, we've obviously submitted a series of

8    declarations from both fact witnesses and experts, and it's my

9    understanding those are in the record.  So unless the Court has

10   a different view or proposed approach, I would just proceed

11   right to the argument at this point.

12       **THE COURT:**  Well, I -- I do want to say -- yes.  Your

13   assumption that I am allowing this motion to be reconsidered is

14   correct.  And I don't want you to feel as if you did not get a

15   fair hearing.  But I do feel -- I'll give you just one example.

16   We did have a hearing, I believe it was in February, at

17   which I had proposed certain things in advance.  And you were

18   commenting on those.  For example, one of your responses was

19   that PG&E did not have to -- should not be required to go out

20   and hire additional people to cut the trees because you were --

21   yourself, PG&E, was going to hire what you called

22   pre-inspectors.  And these would be on your own payroll, and

23   in-house.

24   And I then said okay, that's what PG&E wants, and that's

25   not a bad idea.  I'll shift over to that.  And then now, now

1   you flimflam me, and say:  No, we never got enough chance for a

2   hearing.

3       Well, it was your own idea.  So I'm sorry that you feel

4   that you didn't get a hearing, but I want to err on the side of

5   giving you a hearing, and I want to seriously consider all of

6   your objections.  And then I may modify the order, or I may

7   withdraw it, completely.

8       So, so -- but you need to remember that if ever there was

9   a corporation that deserved to go to prison, it's PG&E.  And

10   the number of people it killed in California.  And the judge

11   who's overseeing this probation has got to take the public

12   interest and the safety, the safety of the people of California

13   into account.  I only have five years to do it, and there's

14   three years have been used up.

15       But, PG&E is a recalcitrant criminal.  And I am going to

16   do everything within my power, being fair to you at the same

17   time, everything within the power of the Federal District Court

18   to protect the people of California from further crimes and

19   further destruction by PG&E.

20       All right.  That being said, I'm very interested to hear

21   what you have to say.  And I will sincerely listen to it, and I

22   will consider it.  And give you yet another opportunity to be

23   heard.

24       Please go ahead.

25       **MR. ORSINI:**  Thank you, Your Honor.  Thank you for

1   that, those remarks.  And I'll get to the vegetation-management

2   issues specifically towards the end of my presentation.

3         And let me just start by saying, Your Honor, we, we

4   completely understand the Court's perspective and share the

5   Court's desire to ensure that there are no more wildfires, that

6   there are no more homes destroyed, and God forbid, there are no

7   more lives lost.  And we appreciate the opportunity to engage

8   with all interested parties including the Court on these issues

9   and will continue to do so.

10        So I thought, Your Honor, as I organize my thoughts for

11  the hearing today which we very much appreciate the Court

12  making available to us, particularly under these circumstances,

13  that I would start by addressing the conditions the Court has

14  proposed with respect to PG&E's transmission system, and then I

15  would turn to issues concerning the distribution system which

16  focuses, as Your Honor noted, on vegetation management.

17        And so starting with the transmission inspection program,

18  we have spoken before, Your Honor, about the fact that the

19  inspection program that's in place today is fundamentally

20  different from what was in place before the tragic Camp Fire.

21  And it was completed redesigned from the ground up,

22  specifically as a result of the Camp Fire and the conditions

23  that led to the ignition of that tragic wildfire.

24        And as we've discussed and set forth in the record,

25  Your Honor, the effort that PG&E undertook last year was

1   unprecedented.  It was unlike anything that, to our knowledge,

2   has ever been done in the utility industry.  I don't say that

3   so that we get a pat on the back.  I don't say that so that we

4   get credit for doing this, because I understand the perspective

5   as to what had happened in previous years.  But I think that is

6   a critical piece of the context.  Because what we are dealing

7   with right now and discussing is fundamentally changed from

8   what PG&E had in the past.  And as we set forth in the

9   declarations, and in particular, the declaration of

10  Ms. Hvistendahl who oversees this program, the Wildfire Safety

11  Inspection program that was implemented in 2009 was a

12  risk-based inspection program that focused on those areas in

13  the state that had the highest risks.

14      Your Honor, you and I have talked about these

15  high-fire-threat districts in the past, and the idea that not

16  all portions of PG&E service territory are created equally as

17  it relates to wildfire risk.

18      So what PG&E did in close consultation with its regulators

19  is it focused on those highest risk areas.  And that included

20  the physical inspections, both climbing and aerial, of just

21  about 50,000 transmission structures.  And, and we have

22  tangible evidence that that program has worked to identify

23  problems on PG&E's transmission system.

24      There were in the calendar year 2019, more than 60,000,

25  60,000 conditions of varying levels that were identified for

either repair or replacement.  That includes more than 2,000

work orders related to what we call cold-end insulation

hardware assemblies.  That's -- that's a broader category,

Your Honor, that includes the C-hook and hanger plate type

assemblies that are in the record that we've talked about.

It's also a little bit broader than that.  But over 2,000 work

orders were identified with respect to those types of

components that needed repair and needed replacement.

And, and we submit, Your Honor, that these overwhelming

reports, which far exceed anything that any other utility in

the state found last year, is tangible evidence that the

enhanced inspections are working, and that they're a

fundamental sea change from what PG&E had been doing in the

past.

The program that is in place right now, Your Honor, builds

on that 2019 experience.  It includes specific lessons learned

from the 2019 inspections, including a few I'll talk about in a

moment.  And it was developed based upon additional input from

its outside regulators at the CPUC and a host of outside

experts, as well as the interested public.

And so, Your Honor, we believe, based on the totality of

the record, that there certainly is in evidence that this

approach needs to be scrapped, and there is no evidence to

support the specific conditions proposed by the Court.  And

I'll get to each of those in detail in a little bit.

1          But first, Your Honor, I think it's important to focus on

2     the threshold issue that's presented by these conditions.   And

3     that is one of federalism.   And the concern that we have, that

4     the Court's attempt to impose conditions that would require us

5     to restart our entire design of the inspection program,

6     interferes with the state regulatory process, which very much

7     is within the police power of the state.

8          Now, let me be very clear, Your Honor.   You have already

9     implemented probation conditions that require PG&E to comply

10    with the law, that require PG&E to comply with the CPUC

11    guidance and regulations, and that require us to continue to

12    work with our monitor.   We accept every single one of those,

13    and we welcome those.   And we are not here arguing that the

14    Court is acting outside its bounds by imposing those types of

15    conditions.

16         But what we do think raises significant federalism

17    concerns of the type that the Ninth Circuit addressed in

18    *Lacatos* is the Court's stepping into the role of the regulator

19    to apply specific conditions to how PG&E maintains its system.

20         And in particular, picking up on your colloquy with the

21    CPUC at the beginning, there is absolutely no question,

22    Your Honor, that the State of California is incredibly focused

23    on wildfire risk.   There have been entire new regulatory

24    regimes created to address this fundamental problem in the last

25    two years.   And a big part of that is what was discussed at the

1    outset of this hearing, which is the creation of the Wildfire

2    Safety Division.  As noted by the CPUC, that division is

3    currently part of the CPUC, but in a year or so will move out

4    to be housed in the very same agency that houses CalFire, so we

5    will now have under one division in the state of California

6    those responsible for trying to prevent the fire from ever

7    starting, as well as the heroic people from CalFire who stop

8    the fires once they do start.

9        Governor Newsom has made a series of announcements over

10   the past few months about the resources that are being

11   dedicated to the Wildfire Safety Division.  And he's explained

12   that it will be staffed by at least a hundred people who have

13   specific expertise, and will be devoted full-time to focusing

14   on the question of wildfire prevention and wildfire safety.

15   The division is advised by an independent board of directors.

16   And critically, it engages in data requests directed at all of

17   the investor-owned utilities across the state of California.

18       Just by way of example, as we have gone through the

19   many-month process of preparing our 2020 wildfire mitigation

20   plan, the Wildfire Safety Division provided PG&E, alone, with

21   over 200 data requests seeking specific information about every

22   aspect of the design of our mitigation program.  And while I

23   don't know the specific numbers that went to the two large

24   utilities in the south, they're submitting similar data

25   requests to them.

1        And the key is this allows the Wildfire Safety Division,

2    as empowered by state law, to compare best practices among the

3    utilities, and bring innovation from one to another.   Something

4    we absolutely welcome.   And we had talked at previous hearings

5    about PSPS.   Much of our PSPS program was specifically designed

6    based upon the experiences that were achieved in southern

7    California, who had programs in place before us.

8        And the Wildfire Safety Division is the regulatory body

9    that has the expertise, that has the manpower, and that has the

10   legal mandate to help us all work together to constantly

11   improve our programs.   And that's key.   Continuous improvement.

12   Because I do not stand here and say that this process is done.

13   It is an ongoing regulatory process that will last for as long

14   as the wildfire conditions exist in the state of California.

15       And critically, it is a process that includes the striking

16   of significant balances between how best to focus efforts and

17   most effectively mitigate the risks presented by many different

18   aspects of any utility's electrical system, including PG&E's.

19   It is not one that can be redesigned overnight.   And it's not

20   one that is susceptible to conditions just being bolted onto

21   it, without causing interference with those conditions that

22   already exist.

23       And respectfully, Your Honor, there is no court that could

24   ever hope to replicate that expertise, and critically, resource

25   that's available for this ongoing iterative process.   And so --

1          **THE COURT:**  Let me interrupt you on that, then.

2      If all of that is true, and if the CPUC and the

3  legislature and all the regulators -- they were all in place,

4  all of that was in place when you -- PG&E burned up the wine

5  country with 17 fires, explain to me why that expertise didn't

6  stop the -- and those regulators didn't stop PG&E from burning

7  up the wine country with 17 fires that you started, and killed

8  a lot of people, and burned up a lot of homes.

9      Where was federalism then?  Explain that to me.

10         **MR. ORSINI:**  Yes, Your Honor.  And I appreciate the

11  question.

12      And the answer to that is, Your Honor, much of this did

13  not exist back at that time.  Obviously, the CPUC was in place.

14  But there was no wildfire mitigation plan requirement like

15  there is today.  There was no Wildfire Safety Division like

16  there is today.  There was no ongoing iterative workshopping

17  process with experts and with the public like there is today.

18  All of which was created specifically because of those horrible

19  tragedies that the Court has referenced.  And, and we all know

20  that everyone wishes that those -- those tragic events could

21  have been averted.

22      But what -- what we can represent, Your Honor, and what I

23  think is the critical point as we sit here today, is when we

24  talk about the inspection program that exists now, it is

25  nothing like the inspection program that existed then.  When we

1    talk about the regulatory framework that exists now, it is

2    nothing like the regulatory framework that existed then.  The

3    state has responded, PG&E has responded, to the failures of the

4    past.  And in particular, to the extreme increased risk that

5    we're facing as each year goes on, including this year, when

6    the conditions are susceptible to significant wildfire issues.

7         So Your Honor, in response to that question, I would

8    respectful submit this regulatory regime wasn't in place at the

9    time.  There was a CPUC, there was a PG&E.  But both of those

10   organizations, the focus of those organizations, and the

11   statutory framework today is completely and fundamentally

12   different.

13        And, and as part of that, the wildfire safety plans that

14   we have to now submit, including our 2020 plan, are dozens of

15   pages long, with extensive backup materials that we go through

16   an elongated process with the Wildfire Safety Division to get

17   approved.

18        And just this past month -- it was earlier this month, and

19   it's in one of the materials that we've submitted to the Court,

20   the WSD conditionally approved PG&E's 2020 plan.  But in doing

21   so, it imposed a long list of conditions.

22        There's no question, no question whatsoever, that the

23   Wildfire Safety Division in approving our plan, conditionally,

24   and as it relates to both transmission and vegetation, found

25   issues that they demand we do better on.  And raised questions

1    that they demand we answer.

2        And that shows precisely that the process is working.

3    That they are not just accepting what we say is the right way

4    for PG&E to do this process.  They're taking the input of their

5    experts, they're taking the input of the public, and they're

6    pushing not only PG&E, but all of the utilities across the

7    state, to make these programs better, Your Honor.

8        And, and we submit that as a result of that, at the most

9    fundamental level, that is why, while we do accept conditions

10   that say we have to comply with the monitor, while we welcome

11   conditions that say we have to comply with state law and keep

12   working through this process, we respectfully do not believe

13   that it is either appropriate or beneficial to try to replicate

14   any of that regulatory process in the context of probation

15   hearings.

16       **THE COURT:**  Wait, wait, wait, let me -- I want to

17   challenge you on that.

18       **MR. ORSINI:**  Yes, Your Honor.

19       **THE COURT:**  The conditions that you have already

20   accepted are not only to comply with state law concerning

21   vegetation, but also -- and the monitor, but also to comply

22   with your own wildfire safety plan which you submitted to me a

23   year ago, and which was then accepted by the CPUC.  And that

24   version was what you were required to comply with, and you

25   utterly failed.

1        In the first year, you failed so far behind on your own

2   milestones in your plan, and you are in total violation of that

3   condition of probation.  It is -- you cannot go, run off to the

4   CPUC and say:  Oh, please, excuse us from violating our own

5   plan, because you promised the U.S. District Court you would

6   comply with that version of the plan.

7        Now, having violated your own conditions of probation, now

8   you say to the District Court:  Oh, Judge, oh, Judge, you don't

9   have the authority to do anything about the fact that we

10  violated the conditions of probation; only the CPUC can

11  regulate us.

12       Well, what remedy do I then have, if you continue to

13  violate the conditions of probation?  Don't I have some

14  authority to require PG&E to clean up its act, when you -- when

15  you won't keep your promises as the probationer, as the

16  convicted criminal, and the judge overseeing you -- doesn't

17  that judge have some authority to enforce, by imposing more

18  conditions that are designed to bring you into compliance with

19  the conditions that you have, in fact, accepted?

20       All right.  I'll stop there.  Please answer that question.

21       **MR. ORSINI:**  Yes, thank you, Your Honor.

22       So, a couple of responses on that.  Number one, I

23  completely agree with the Court's statement, which is factually

24  true, that we were ordered as a probation condition to comply

25  with our wildfire safety plan.  And we would be very open and

1   accept a condition that requires us to continue to comply with

2   our wildfire safety plans.  I believe the existing condition

3   may already do that.

4        I disagree with the Court in the statement that we fell

5   completely behind with respect to that safety plan.  There were

6   failures.  There's no question.  There were a number of

7   metrics, a minority of metrics, on which PG&E did not meet its

8   standards.  There were far more where PG&E did meet its

9   standards.  I'm not saying and PG&E certainly does not believe

10  that, you know, batting .750, hitting two thirds of your

11  milestones is sufficient, right?  It's not acceptable to us.

12  It shouldn't be acceptable to anyone.

13       And that is why PG&E is working to address every failure

14  that was exhibited, to meet specific targets of the wildfire

15  safety plan.  Which Your Honor also needs to understand was, in

16  its first place, an incredibly aggressive plan.  Doesn't excuse

17  not meeting the targets, those are targets we took on, but it

18  was an incredibly aggressive plan.  And that's what it need to

19  be.  And PG&E overwhelmingly and the record demonstrates that

20  PG&E overwhelmingly met its targets.

21       With respect to the Court's question about the powers of

22  this Court, respectfully, I do not believe the Court has the

23  authority to impose conditions as a result of those failures or

24  any other that intrude upon and displace the regulatory regime

25  in the state of California, as these proposed regulations do.

1    Again, that's not to say that the Court doesn't have the

2  power to impose conditions that we comply with the law.  The

3  Court certainly has the power to insist the monitor continue to

4  work with us, something we welcome and appreciate, and are

5  working closely with them.

6    But respectfully, Your Honor, no, I do not believe the

7  law, I do not believe principles of federalism, and I do not

8  believe *Lacatos* permits the Court to impose conditions of the

9  type that are presented here in any circumstance, because they

10 interfere with the regulatory regime.

11            **THE COURT:**  Let me interrupt you a second now.

12    Part of the recent order that you object to said at the --

13 near the end, that the Court was flexible, meaning I was

14 flexible, and that you can come back -- you can confer with the

15 CPUC, with the monitor, with your experts; you can come back

16 with a counter-proposal that was designed to get at the same

17 issues that the Court was raising.  And I did that specifically

18 to avoid any contention that I was stepping on the toes of the

19 CPUC, or at least, disregarding what they had to say.

20    Now, why doesn't that give you what you need in terms of

21 flexibility with the CPUC and your experts, to come back with a

22 counter-proposal that explains to the Court an alternative way

23 to achieve the same result?  Why -- what's wrong with that?

24 You completely ignore that part of the order.

25            **MR. ORSINI:**  Thank you, Your Honor.

1        So, so I think in part, Your Honor, that part of the

2    proposal puts a finger on precisely the problem here.  We have,

3    throughout the last year and a half, repeatedly been in

4    situations where the Court is soliciting the input of the CPUC,

5    of CalFire, of having us work together with respect to these

6    plans.  But Your Honor, that is precisely what the state

7    regulatory regime is doing.  The proposal as to how best to

8    mitigate wildfire risk already exists.  It is the proposal that

9    is reflected in PG&E's 2020 wildfire mitigation plan as

10   required by state law.  And, and as now conditionally -- and

11   that's a key word -- conditionally approved, subject to ongoing

12   efforts by the regulators to have the very discussions the

13   Court is focused on.

14       Your Honor, I feel like it is unfortunate that you and I

15   fight on these issues in the context of these hearings, because

16   we have fundamental agreement on one point.  And that

17   fundamental agreement is we cannot afford another wildfire.

18   The state of California cannot afford another wildfire.  We

19   have to do everything we can to stop this from happening.  And

20   that's what we're doing, Your Honor, with the regulators.

21   That's what the wildfire mitigation plan says.

22       And bringing that process in an abbreviated form into the

23   context of a federal probation proceeding just interferes with

24   the ability to focus on it that.

25            THE COURT:  Wait a minute.  Wait, wait.  I just have

1    to interrupt you.

2         You know, after the wine country fires of 2017, I heard

3    the same argument.  I heard the same argument from PG&E.  And

4    -- that this problem was in hand, you were working with the

5    regulators, and:  Please, Judge, let us work with the people

6    who know best and we'll solve this problem.

7         And then a few months later, we had the worst wildfire in

8    California history that burned down half of Butte County and

9    killed 88 people.  That was what happened under that regime.

10        And then you said the same thing, you told me the same

11   thing:  Oh, we're working with the regulators, we have this --

12   we have a wildfire safety plan.  Then what happened?  The

13   Kincade Fire.

14        Now, you haven't owned up to the Kincade Fire yet, but

15   it's quite clear that that jumper cable broke loose and started

16   that fire on the burned mountain tower.  And now you're making

17   the same argument.  This argument is never going to end.

18        You're always going to have a fire; you're always going to

19   be saying:  Oh, the regulators, we're working with the

20   regulators.  And, I don't know.  It rings hollow after a while,

21   this argument about defer to the regulators.  I'm sorry, but I

22   have to say that.

23        **MR. ORSINI:**  Well, Your Honor, with respect to -- with

24   respect to those comments, obviously the 2017 fires involved

25   overwhelmingly, in I think all but one of the significant

1  wildfires of 2017, involved specifically vegetation management

2  issues.  And there was a lot of work done immediately after

3  those fires to enhance the vegetation management work.  And we

4  see the results.  The Court has noted that.  We did not have a

5  single vegetation-caused wildfire last year that resulted in a

6  loss of a life or the loss of a structure.  And we have to keep

7  that streak going.

8       With respect to the 2018 Camp Fire, the cause that we've

9  acknowledged and the primary point was the failure of the

10 C-hook that we've talked about.  And we all wish that that

11 could have been avoided.  And that had been identified through

12 a variety of different mechanisms prior to the fire starting.

13      But it was as a result of the combined effect of those two

14 years of fires that any incremental changes to the system that

15 occurred between 2017 and '18 were discarded as insufficient,

16 and we started with a complete blank piece of paper, both with

17 respect to the regulatory framework, with respect to the

18 legislation, and with respect to PG&E's approach.  And, and

19 what we've done prior to those just does not compare to what

20 was done today.

21      With respect to Kincade, Your Honor, we don't yet know

22 specifically what caused the fire.  We do know, as we have

23 said, that a jumper separated.  What we've seen is, and as the

24 expert declarations set forth, the inspections of that specific

25 tower showed no evidence of an imminent failure of a jumper.

1    And the reality is that no inspection program will ever be

2    perfect, but that doesn't mean we don't strive for perfection.

3    And that is what PG&E is doing, and that's what the regulators

4    are doing.

5         Your Honor, I understand the skepticism.  I understand

6    your skepticism; I understand the skepticism of the public.

7    And we should not and do not ask that the Court simply accept

8    PG&E's word for it.  But federal law and Ninth Circuit

9    precedent does require that these ongoing concerns be addressed

10   under the police power of the state.  And that's where they are

11   being addressed, Your Honor.  And we believe that it's critical

12   that the Court defer to that process.

13        Now, I would like at this point, Your Honor, if I may, to

14   turn to some of the specifics and -- and some of the specifics

15   with respect to the conditions.

16        As I noted earlier, Your Honor, we fundamentally believe

17   that the evidence of all of the issues that have been found,

18   whatever that might say about the past, establishes that what's

19   being done today is working.  And we talked about Kincade.

20        The other thing that Your Honor and I have spent a lot of

21   time talking about and a lot of paper's been dedicated to are

22   the assemblies, the C-hook and hanger plates on the Cresta-Rio

23   Oso line.  Um, on that tower that was adjacent to the

24   Caribou-Palermo line where the tragic Camp Fire started.

25        And let me say right at the outset and acknowledge right

at the outset that ultimately when PG&E went back and

reinspected that tower with the benefit of the photographs

provided by the TCC, PG&E made the determination that the

condition of those hanger plates warranted what we call an

E tag.  And therefore, replacement within a year.  We

ultimately did it much faster than that; we did it within two

months.  And we absolutely wish that that condition had been

noted the first time the inspection was done.  It was not.

And so the question then is, since we acknowledge that key

factual predicate, the question then is:  Does that one

incident, does that one example suggest that the entire

inspection program needs to start over, and that it's not

working?

And respectfully, Your Honor, it does not.  There was no

imminent safety risk presented by that hook.  Period, full

stop.

Dr. James's analysis is unrefuted.  And it shows that we

exceeded the CPUC's safety factor by 40-some-odd times.  Right,

the CPUC safety factor that the Court has cited to me in the

past requires a load factor of 1.33.  Even the worst one of

these assemblies had a load factor of 50 to 60 times.  There

was absolutely no imminent risk of failure.  So there was no

public safety risk here.

And the reality, Your Honor, is that those same assemblies

had, at a minimum, 15 more years before they approached the

1    critical safety factor, and potentially as long as a hundred

2    years.  But that tower would have been inspected multiple times

3    before we ever got close to that safety factor.

4        And that's why the program is designed to have repeated

5    inspections and more frequently repeated inspections in those

6    areas that are most susceptible to wildfires.

7        Now, the next question that I would ask me is:  Well,

8    that's fine, but what are you doing to make sure you don't miss

9    it the first time again?

10       And the answer there is, as set forth in the declarations,

11   we have done a lot of work, PG&E has done a lot of work to

12   improve the quality of the photos that are being taken during

13   these inspections, and to improve the guidance that is being

14   provided to those who are doing the inspections.  We're

15   learning from these lessons.  And, and that's what we need to

16   do.  But again, this was not an imminent safety risk.

17       And respectfully Your Honor, one example across the entire

18   system when we found 60,000 issues that needed correction just

19   doesn't provide a record to throw the whole inspection program

20   out.

21       And then, focusing on the particular conditions that the

22   Court has proposed, which I break in to, I think, four basic

23   categories, the first is videotaping.

24       Your Honor, as we set forth in the declarations, that is

25   not something that's done by any utility, to our knowledge.

1    It's not something that any of the experts believe would be of

2    any use.   It's something that would give lower-quality

3    inspection materials than the high-resolution photos that are

4    currently being taken.

5         And ultimately, I think part of what might have been

6    motivating the Court's concern with this condition, although

7    you will obviously correct me if I'm wrong, was the concern

8    about potential records falsification.   Or a lack of clarity as

9    to whether or not inspections were actually completed.

10        And as we set forth in our declarations and in the expert

11   analysis, Your Honor, we do have very significant controls in

12   place already on that front.   The company is moving as quickly

13   as it can to all digital-based inspection programs and forms.

14        The photographs that are required, some of which we have

15   provided as an example in the submissions, include metadata.

16   They require -- they require specific shots to be taken of the

17   tower leg with the tower numbers.   There's GPS location data on

18   the photographs.   So we already have a robust system in place

19   through the photography to help address any concern that may

20   exist about whether or not the inspection actually occurred.

21   But there's no evidence, Your Honor, simply none, that would

22   suggest that videotaping would add any value.

23        Related to that, there's the Court's suggestion that there

24   might be pulling or tugging on the components.   And I think

25   that might be -- in part have been motivated by the Court's

comments and concerns related to the Kincade jumper that
separated.

But the reality is, Your Honor, again, as set forth in the
uncontested declarations of both the experts and the fact
witnesses, is -- you can't do that.  You certainly can't do it
while energized, without using Faraday suits, which presents an
incredible safety risk to those line workers up there actually
doing this work.

**THE COURT:**  Wait a second.  Wait, wait.  You're being
very unfair here.

I said if there was going to be any pulling or tugging on
it, of course it would have to be de-energized.  There's no way
you could do that with the power.  It would have to be a
completely de-energized line.

But here's the problem.  When you submitted all of those
-- that -- it's always a needle-in-a-haystack problem with you.
You send me box after box after box, and there will be one
document somewhere in there that's relevant.  We try to find
it, anyway.

But, the problem is this.  You -- when we actually read
your reports, and read what the inspectors put down on the
paper, as recently as the Kincade Fire, after all these
regulators did their job, as recently as all that, you cannot
reconstruct from those reports whether they actually got up
there on a de-energized line and tried to tug on the line, or

1   tried to see if it was loose in some respect.  You have no way

2   of knowing, no way of knowing what those inspectors actually

3   did.  You even try to hide the names of the inspectors from me

4   so that we can't call them into court to ask them that

5   question.

6       It's impossible to go behind your inspection regime

7   because it is designed to conceal what really happened and what

8   really was tested, so that you can then say -- it's a courtroom

9   prop.  You say:  Judge, look, the inspections all said

10  everything was fine.  We did our job.  No inspection system is

11  perfect.

12      I've heard you say that like a broken record, 42 times.

13  Well, I'm sorry, but you need some way to know what these

14  inspectors did.  And how complete a job they did.  And the idea

15  of the video was to have that record, a moment-by-moment

16  reconstruction in addition to all those other things that you

17  are doing, that would -- so that you could look at that and

18  say:  Okay, yeah, they de-energized the line.  Yeah, in this

19  particular case, they did get up there and tug on it to see if

20  it was tight.

21      But I'm not saying that you -- I'm not saying -- I have

22  never said and it's unfair for you to suggest that I said that

23  you should send a worker up there to be electrocuted by

24  touching a live wire.  That's ridiculous.  I never would make

25  such a suggestion.  I know better than that.  I know enough

1    about power lines that that would be instant death.

2        Please, don't -- don't try to impugn the integrity of the

3    Court in that way.

4        Next point.

5        **MR. ORSINI:**  Your Honor, I in no way was trying to

6    impugn the Court's integrity.  And my very next point was going

7    to be on de-energizing.

8        So Your Honor, I was laying out the two different

9    approaches that are available to do something like this.  One

10   would be energized which, as we both agree, would be very

11   dangerous.  The other would be, as the Court noted,

12   de-energizing.  But that's neither feasible nor productive.

13       To de-energize consistently enough to do a

14   tugging-and-pulling inspection on all of the transmission lines

15   would cause massive reliability problems in the state of

16   California, would require close coordination with the

17   California ISO, and impose an enormous burden on them, all of

18   which would not yield any benefit.

19       Your Honor, the forms do not indicate whether anyone

20   tugged or pulled on the equipment, because we know they didn't.

21   Because they are not instructed or permitted to.  Because,

22   again, you can't do it when it's live.  You would have to

23   de-energize, which we don't.  And, and as the evidence

24   establishes, doing so would not actually provide any useful

25   information in nearly all instances.

1          As the experts explained, these components are incredibly

2     large, incredibly heavy, under incredible tension.  And having

3     someone climb the tower and give them a tug or a pull does not

4     go anywhere towards simulating the types of conditions that

5     they would face in a failure event.

6          So --

7               **THE COURT:**  Wait, wait, wait.  Wait.  I didn't say you

8     had to climb and de-energize every line.  I never suggested

9     that.  It is a -- you, yourself, told me that you de-energized

10    that line in Butte County.  That it was completely dead.  You

11    de-energized that in order to -- in part, I guess, to do

12    inspections.

13         Now, I know you can de-energize a line if you feel it's

14    necessary.  But what I don't want you doing is coming back and

15    saying later: Oh, Judge, look at the inspection reports;

16    everything, everything was fine.

17         So, how -- tell me, counsel, assume for the sake of

18    argument that I'm correct -- and I'm -- I believe to a moral

19    certainty that I am correct -- that your jumper cable on the

20    Kincade tower is what caused that fire, and it broke loose in

21    the windstorm.

22         Explain to me how you would fix the inspection system so

23    that that would not happen again.  And if you can't explain

24    that, how do we know it's not going happen on other jumper

25    cables on PG&E lines?

1      Please, how would you fix the -- how is PG&E going to fix,

2  fix it so that that inspection system catches it the next time?

3      **MR. ORSINI:**  Your Honor, unfortunately I can't answer

4  that question, because we don't yet know precisely what the

5  failure mechanism was of that jumper.  So without having a full

6  reconstruction as to why it failed, we're not able to actually

7  determine whether or not there's a specific issue that we could

8  be looking for.

9      The --

10      **THE COURT:**  Wait, wait.  Think about how ridiculous

11  that is.

12      Here it is, almost a year after that failure, a year after

13  -- and it's your equipment, it's PG&E's equipment.  And you,

14  working with the regulators that you say have it all under

15  control, you don't even know what went wrong.

16      **MR. ORSINI:**  Your Honor --

17      **THE COURT:**  That is an insult to the people of the

18  state of California who rely on PG&E to be safe -- and that's

19  what you keep telling us -- but in fact, you can't even tell us

20  what went wrong on your own line that caused the fire.

21      **MR. ORSINI:**   And Your Honor, if I could continue,

22  part of the reason why we don't know precisely what happened is

23  because there is an ongoing investigation with respect to that

24  incident.  And as is completely typical in any type of

25  investigation of this nature, that evidence is preserved by the

State.  It's not a criticism of them.  Not in the least.  But
it's just a fact.  That's point number one.

     Point number two, what I can tell you is that PG&E,
without having full knowledge right now of what may have caused
that separation, does have additional inspection tools that it
is using in order to try to identify hidden defects, such as
they are.

     And one of those is infrared imaging, which, based upon
certain load factors, can help identify whether or not there
may be a hidden defect.  That is being deployed, and it's being
deployed broadly.

     We are also looking for circumstances that may involve
jumpers, to have them more closely examined to see if there's
anything else we can identify that could cause a separation, in
the event of a high-wind occurrence.

     So, so Your Honor, I understand the frustration with
respect to not knowing precisely what happened.  We are -- we
are moving forward with inspection programs that were enhanced,
to try to identify as many of these types of issues as we
possibly can.

          **THE COURT:**  All right.  I interrupted you.  You were
-- you are still on transmission.  The point-by-point critique
of the things that I had suggested that you put into your
revised inspection program, all subject to a -- I was all
willing to listen to a flexible revision of that, after you

consulted with the CPUC.  But this is fine; I want to continue
to hear your objections.

Go ahead.

**MR. ORSINI:**  Yes, thank you, Your Honor.

So with respect to the asset age condition, again, the
record overwhelmingly demonstrates that it's neither useful nor
feasible.  Asset age is not the primary motivator or even one
of the key motivators of the maintenance of these systems.

This is a condition-based inspection program.  It's
looking at the specific condition that exists.  That is the
industry standard.  It's exactly what's done by all other
utilities in the state of California.

And as we've submitted, there is no record of any utility
in the United States that would capture this level of granular
information, because at the end of the day, it is only loosely
correlated to the asset-management decisions.

Age can be a very poor indicator of condition.  It could
lead to decisions that are made that are not the most efficient
and risk-adjusted decisions, in terms of what to inspect and
what to replace.

You know, PG&E does track age at the line level, as a
general matter, and that does provide some information for
asset-management purposes.  And also would permit, for example,
an assessment of, you know, this line is X years old, but it's
in a very dry inland area, and therefore, unlikely subject to

corrosion versus Y line which traverses the Bay area, and

therefore is younger, but far more subject to corrosion.  So at

the very macro level of line vintage, that type of information

is generally known and is tracked.

     But to get into the specific age of the hundreds of

thousands and millions of components across the entire

transmission system would not meaningfully impact any

asset-management decisions.  And, candidly, would not even be

feasible.

          **THE COURT:**  Let's stop you for a second.

          **MR. ORSINI:**  Sure.

          **THE COURT:**  On that line up there that wound up

burning down half of Butte County, you've seen the photographs

of the hanger plate and you've seen the photographs of the

C-hook that was more than halfway worn through from swaying in

the wind, and you're telling me that it would have done zero

good to know the age of those components.

          **MR. ORSINI:**  Well, I'm telling you, first of all, that

we don't know the age of those components.  I know that for a

fact.

     Second of all, it would not have, in the context of a

well-designed condition-based inspection program.  Right?  And

that's what we have today.

     I'm not defending, Your Honor, the program that was in

place that failed to catch those conditions in Butte.  I can't,

and I won't.  What I can say is with the program we have now,
just stepping back, it was based upon, in particular, what's
called an FMEA, a failure mode effect analysis.

     So what PG&E did with various outside experts is there are
obviously a lot of different configurations, there are a lot of
different assets and components to these lines.  And not all
are equal in terms of both their wildfire risk and their
likelihood of wear or corrosion.  And so an analysis was done
of those components that are most likely to exhibit significant
deterioration over time.  And that is what's targeted as part
of the inspections.  That was updated for the year 2020.

     And the way it was updated was by looking at those 60,000
conditions that came down in 2019, and analyzing, based upon
that data:  Okay, what are we seeing in trends?  What does it
look like is occurring on the system, now that we have really
enhanced these inspections?

     And that is further refining the focus of the inspectors
on the condition.  And so ultimately, Your Honor, it comes down
the condition; it comes down to that inspection.  And knowing
the precise age of every single assembly on the transmission
system will not meaningfully change the assessment on a
condition-by-condition basis.

     And as I said, it's just simply not possible.  The records
going back that far do not exist.  No utility tracks records
like that.  And the amount of effort and energy and distraction

 1   that would be spent trying to come up with approximations of

 2   that data which does not exist would not, at the end of the

 3   day, yield reliable enough information to inform

 4   asset-management decisions, even if that level of granularity

 5   did.  As I said, there are higher-level pieces of asset age

 6   that are part of the overall analysis, as related to the

 7   line-level age.  And those are taken into account.

 8        But we do not believe that there's any records to support

 9   the idea that getting into that level, given the infeasibility

10   for each of the components, would do anything to enhance the

11   safety of the system.

12        And then the final point, Your Honor, I'll make with

13   respect to the transmission line conditions is the insurance

14   condition.  My remarks here are short because it's simply

15   impossible.  The insurance market does not exist that would

16   provide that level of wildfire coverage.

17        That is a big part of the reason that the State of

18   California created the wildfire fund.  To make sure that there

19   is a backstop in the event of another catastrophic wildfire

20   that exceeds not only the insurance available to a utility and

21   its contractors, but also that utility's ability to pay.

22   Stated differently, to avoid another bankruptcy like we're

23   currently in.

24        So the insurance condition, if it were possible, that

25   would be ideal.  But it's simply not possible.

1           **THE COURT:**  Well, I think you're overstating what the

2     insureds' condition was.  Do the -- do these contractors carry

3     insurance now?  And if so, what is the typical amount that they

4     carry for -- if they were to do their job poorly?

5           **MR. ORSINI:**  The contractors do carry insurance,

6     Your Honor.  It varies by contractor.  My understanding is some

7     of them may have an ability to obtain no more than a few tens

8     of millions of dollars worth of insurance.  Other of the

9     larger, more national contractors may often have insurance

10    towers that exceed 100-, $200 million.  But those would be

11    towers that I anecdotally understand would cover all of the

12    lines of work that they're in.

13          The problem is the insurance market for wildfire liability

14    coverage in the state of California just doesn't really exist

15    anymore.  That's a little bit of an overstatement.  It is

16    incredibly tight.

17          We set forth in the declarations the difficulty PG&E has

18    had in getting insurance, itself.  I know firsthand from

19    working to resolve the wildfire claims in the bankruptcy and in

20    the state-court proceedings before that, that when you look

21    back at -- when you look back at what the company had in terms

22    of a wildfire liability tower prior to the North Bay fires, it

23    was close to a billion dollars.  It was still a little over

24    $1 billion when the Camp Fire occurred for that policy year.

25    Now we're down in the 4- to $5 million range.

1        And to get that level of insurance, even for PG&E, is

2   premiums that get close to 60 to 80 percent at times of the

3   actual insurance coverage, even if the insurers will write it.

4        And what we've heard from the contractors, as reflected in

5   the materials we filed, is the general description of the

6   levels of coverage that I gave a few moments ago were for prior

7   years, and it's not even clear whether or not they'll be able

8   to obtain that type of insurance going forward.

9             THE COURT:  Let me ask you a history question here.

10            MR. ORSINI:  Yes, Your Honor.

11            THE COURT:  Have any of the contractors through their

12   insurance, or with or without insurance, paid into compensate

13   victims of the various fires?

14            MR. ORSINI:  So with respect to the Butte Fire -- not

15   the Camp Fire, Your Honor, but the Butte County Fire of 2015,

16   PG&E did pursue claims against a couple of its

17   vegetation-management contractors, and there were amounts paid

18   by those contractors into the recoveries that went to the

19   wildfire victims.

20        For the more recent fires, part of the settlement that we

21   reached with the tort claimants committee and the victims that

22   they voted in favor of and is subject to confirmation right

23   now, and it's actually a big part of the negotiation from the

24   perspective of the TCC, was assigning to those -- to the trust

25   that's being created for the benefit of the wildfire victims,

1  the claims that PG&E would otherwise have to seek such

2  recoveries against any of PG&E's contractors that may bear some

3  responsibility for the '17 and '18 fires.

4       So I have every expectation, given how hard the TCC has

5  fought for those claims, that they will be pursued.  They're

6  already seeking discovery in furtherance of those claims in the

7  bankruptcy.  And that's where that stands, Your Honor.

8            THE COURT:  All right.  So you've now gotten through

9  all of your points on the transmission lines.  I think you

10 wanted to also now turn to the distribution lines and the

11 vegetation problem.

12           MR. ORSINI:  Yes, Your Honor, thank you.

13      And, and here, again, I think there is common ground

14 between PG&E and the Court.  We have acknowledged repeatedly

15 that vegetation contact on distribution lines is one of the

16 biggest wildfire risks in the PG&E service territory.

17      (Music played over audio system)

18           THE COURT:  Somebody, someone -- Theresa, are we still

19 connected?

20           MR. ORSINI:  I can hear you, Your Honor.

21           THE CLERK:  Yes, we are, Judge.

22           THE COURT:  What was that music?

23           THE CLERK:  I'm not quite sure where that was coming

24 from.

25           MR. STERN:  Your Honor, this is Noah Stern from the

1  government.  I've had that happen before on a call.  I think

2  somebody put us on hold.  And sometimes the hold -- there's

3  hold music that gets played.

4       So, if you could instruct everybody not to put us on hold.

5       **THE COURT:**  Yes.  I so instruct everyone.  Try to keep

6  the noise down, so we can hear everyone.

7       Okay.  We're going to turn now to the vegetation.  Please

8  go ahead.

9       **MR. ORSINI:**  Yes, thank you, Your Honor.

10      The point I was making when we had a soundtrack was that

11  the company obviously agrees that vegetation strike on

12  distribution lines is one of the biggest areas of risk.  And

13  that's why the company has done a lot, which we've talked to

14  you about, in terms of expanding the work it does on that

15  front.

16      And, and in particular, in these high-fire threat

17  districts, each mile of distribution lines gets at least two

18  different work flows, and in some instances three, that can

19  result up to 12 different vegetation management work cycles in

20  a given calendar year.  And that's a combination of the routine

21  work, the FEMA work, and the enhanced vegetation management.

22      You know, again, I'm focused on what we're doing today,

23  not what happened before the 2017 fires.  But what happened --

24  what's happening today, and as confirmed by the testimony we

25  submitted of Mr. Goodfellow, a vegetation management expert

1   with more than 40 years of experience, PG&E's process is at the

2   forefront of the industry.  Which is where it need to be.

3   Right?  Industry standard is one thing.  California industry

4   standard is another.  And PG&E continues to push forward as

5   much as it can.  And, and there's no question that the

6   vegetation management efforts are improving significantly.

7        As the Court noted, there were no vegetation-caused fires

8   that destroyed a single home in PG&E's territory in 2019.

9             THE COURT:  Well, wait, wait, wait, wait.  That is

10  true.  But tell everyone why that is true.

11            MR. ORSINI:  Well, Your Honor, part of that is true

12  because of the enhanced vegetation management work we are

13  doing.  Another part of that, which I was going to get to, is

14  the PSPS.  The de-energization.  Which, again, we have very

15  common ground on that one, Your Honor.  We believe

16  de-energization is a critical part of what PG&E has to do to

17  avoid wildfire risk.

18        Where we depart on that issue, Your Honor, is --

19            THE COURT:  Wait, wait.  One second.  I'm sorry,

20  counsel.  Someone is talking on the line and it's -- they're

21  not muting, and we're hearing your conversation, and it's

22  interrupting us.  So please mute your line if you are not

23  speaking to the Court.

24        Well, while I have the floor, I'll just say this.  I think

25  the number was in -- was about 300.  I've forgotten the exact

1   number now.  During the PSPSs, I asked you to go back and to

2   determine how many trees and limbs fell on the line, the

3   distribution lines, and that were de-energized.

4        And of course, you know that, because the whole point of

5   de-energizing is to be able to check the lines before you

6   reenergize them to see if they're safe to -- and it turned out

7   there were a fantastic number of trees and limbs had fallen

8   that would have resulted in wildfires, had you not done the

9   PSPS.

10       So on the one hand, I salute you, I give you credit for

11  the PSPS.  That is a step forward, despite the fact that it is

12  a huge inconvenience, that nevertheless is better -- a lesser

13  evil than -- lesser evil.

14       However, please don't leave the impression, as I think you

15  were about to, that the vegetation program is under control.

16  It is not.  That is why you -- you are so far behind on it.  So

17  far behind, many, many years behind on it, that you have to

18  resort to the PSPS to avoid those trees from starting

19  wildfires.

20       So I think, I think your spin on this is not quite

21  correct.  I think your spin on this is that everything is fine.

22  It's not everything is fine.  There are a lot of trees and

23  limbs out there that present real and present and clear dangers

24  to the safety of the people of California.

25       Okay.  I'm sorry for the interruption, but I had to say

1    that.  Go ahead.

2         **MR. ORSINI:**  And I'll address that directly,

3    Your Honor.  First of all, I do not assert that everything is

4    perfect.  You know, far from it.

5         But I don't, respectfully, agree with the Court's

6    statement that the incidence of trees striking lines during

7    PSPS is somehow indicative of a fundamental flaw in the

8    company's system, or that we are so many years behind where we

9    need to be.  We are not.  The record does not support the

10   conclusion that PG&E is years away from compliance.

11        PG&E --

12        **THE COURT:**  Wait, wait, wait.  Wait, wait.  I know you

13   have terminated Bill Johnson.  But about nine months ago, he

14   was on television when he was still the CEO, and he said it

15   would be a decade -- a decade -- before the company would be

16   caught up on its vegetation management.  And, and looking at

17   the numbers that you have supplied to me, I believe that's

18   pretty close to accurate, as to how far behind you are on your

19   backlog.

20        Now, God bless you, I would be thrilled if you could come

21   into compliance in one or two years.  But I don't -- I believe

22   it's more likely to be eight or ten years than it is to be one

23   or two.

24        Do you disagree with that?

25        **MR. ORSINI:**  I do, Your Honor.  I do disagree with

that.  Because what Mr. Johnson was saying -- and we've
addressed this previously -- is that it would be ten years
before we might be able to stop PSPS.  But that's not because
of a backlog in vegetation management.  That's because of other
things that we need to do to bring the system up to the place
where we can target de-energization, where we can harden the
system, where we can do enhanced vegetation management that
goes far beyond any regulatory clearance requirements.  The
enhanced vegetation management work that's clearing ground to
sky, that's clearing a much wider corridor than the regulations
actually require, Your Honor.

    I do fundamentally disagree with the idea that the record
supports that PSPS is the result of some multi-year backlog
that's in place at PG&E.  That's just simply not true,
Your Honor.

    PSPS, on top of that -- and the point I was going to make
next is healthy green trees fail.  Trees that no vegetation
management program in the world would take down fail.  And, and
that's what our experts have explained.  And that was a big
part of the reason identified by the CPUC as to why PG&E and
the other utilities need de-energization programs.  Because
even the best utility vegetation management program in the
world -- and I'm not suggesting that's PG&E's, but even the
best in the world, whoever it is, will not be able to stop all
tree strikes.  It's fundamentally and physically impossible.

1    PG&E worked last year over 1.3 million trees.  For an

2    expanded vegetation management, which will take eight to ten

3    years to get done, they exceeded -- by just a tiny bit, but

4    they met and exceeded the line mile target they had set in the

5    2019 wildfire plan.

6    So yes, it will take years to do all of that enhanced

7    vegetation management.  But that's not years to clear a

8    backlog.  That's years to do enhanced work that's being

9    designed to address the increased challenge of wildfires and

10   the increased risk because of the confluence of the dry seasons

11   and the high winds.

12   And Your Honor, on that point as well, there were -- what

13   the record does support in terms of missed trees, there were a

14   number that the monitor reported which we welcome and

15   appreciated.  Overwhelmingly, those were trees that were part

16   of the enhanced vegetation management program.  With a few

17   exceptions, they were not compliance issues.  Right?  So that

18   doesn't support the idea that we are fundamentally out of

19   compliance with the state regulations.

20   There were hiccups with the EVM program because no one had

21   ever done it before.  And there were needs to go back and

22   retrain a lot of the workers because they had to think about

23   the approach very differently than you typically would from a

24   compliance perspective, and that was part of the process.  We

25   didn't pilot it, we just did it.  Because we needed to get

1    started right away.  But, again, that's not a compliance issue.

2        So I understand the Court's perspective, and I've heard

3    the Court's perspective.  But respectfully, we fundamentally

4    disagree on the idea that there -- that what we are seeing with

5    PSPS or otherwise is in any way related to some backlog of

6    years and years worth of work that will take a decade to

7    complete.  Because respectfully, Your Honor, it's just not

8    true.

9        Now, turning directly to the specific condition -- and --

10   and I heard Your Honor's description at the outset that we've

11   sort of flimflammed you here.  And that was certainly not our

12   intention, and I don't believe we have done so.

13       What we explained in our prior filings was that we were

14   running a pilot program to potentially bring a small number of

15   pre-inspectors in house.  That pilot program is still ongoing.

16   We also are running a number of programs to bring some work

17   verification, which is another way of saying post-inspection,

18   in-house.

19           **UNIDENTIFIED MAN:**  What?  What's that?

20       **MR. ORSINI:**  Sorry.  Was that the Court?  Or was that

21   someone else?

22           **THE COURT:**  It must be someone else.  I can hear you.

23       **MR. ORSINI:**  Okay.  Thank you, Your Honor.  I just

24   wanted to make sure I wasn't talking over you.

25       That work is ongoing; those pilot programs are ongoing.

1    But, but we have not and never have intended to bring the

2    entire pre-inspector work force internal to PG&E.  And for all

3    of the reasons we've set forth in the papers, all of the

4    reasons that we've set forth in the declarations, we do not

5    believe that that is advisable.

6         You know, I understand from our various interactions over

7    the past year or so, Your Honor, that the Court has concerns

8    about the use of outsourced contractors.  The fact is that is

9    what is done by every utility in this state, and that is

10   industry standard throughout the country.  There are good

11   reasons for that.  They are the experts on doing this work.  We

12   are not.  They have the manpower to spin up and spin down and

13   have flexibility to deploy resources that we don't.

14        And bringing 600 to 1,000 pre-inspectors in house to PG&E,

15   I don't believe, Your Honor, there's any evidence that would

16   actually improve safety or compliance.  Right, in part, because

17   it would just be the same people.  There's a limited work force

18   of trained inspectors.  And so if we had to hire them to wear

19   PG&E uniforms, we would just be taking the same people who

20   currently exist, and moving them into PG&E, but now we would

21   have to build on top of that an entire infrastructure to manage

22   a new 1,000-person work force.  And that would -- it would cost

23   a lot of money.  But far more important than the money, it

24   would be a distraction for the vegetation management leaders

25   from what they need to be focused on, which is their expertise

1    in trying to improve the accountability of the contractors that

2    are doing the work.  And that, I think, is one of the most

3    important points here on this condition, Your Honor.

4         Again, a common ground here is we believe one of the most

5    important things PG&E has to do is improve the accountability

6    of the contractors who are doing the vegetation management

7    work.  And that is a big motivation behind the new defined

8    scope program that PG&E has developed over the last few months,

9    and is in the process of rolling out.

10        And just to give a little bit more detail on that,

11   historically, for PG&E's basic regulatory-compliance tree work,

12   there would be one contract company that would do the

13   inspection, and a separate contract company that actually went

14   in and did the tree cutting.  And we've seen instances where a

15   post-inspection will find something that was missed, as part of

16   the quality control and quality assessment work that PG&E has

17   done.

18        And there were at least some instances in which you would

19   see some finger pointing.  The pre-inspector saying:  Oh, we

20   marked it but they didn't work it.  The tree contractor saying:

21   Oh, we didn't see a marking there so they missed it, and we do

22   what we are told to do.

23        A big part of defined scope is solving that problem.  And

24   the way it does that is by placing in the hands of a single

25   contractor the work flow for a defined set of circuit miles.

1    That way, there is no ambiguity whatsoever with respect to who

2    is responsible, in the event that some tree is missed.

3        And PG&E, as they roll this out, is adding another level

4    of quality control because what they're going to do is they're

5    going to add on top of their existing quality control and

6    quality assessment audits, another level of work verification

7    where they will go through with a mix of in-house and contract

8    personnel -- obviously not contractors from the contractor who

9    works that segment -- and do some post-work verification, and

10   see how good a job that contractor did on the line miles that

11   they are responsible for.

12       And that will allow for immediate accountability; it will

13   allow for retraining.  It will allow for, in the worst-case

14   scenario, you know, a very clear record that this contractor's

15   just not up to snuff, and they have to go.

16       And so that's a process that is under way that as

17   Mr. DeCampli, an individual with decades of experience in this

18   industry know, has been used to great effect elsewhere.  And

19   it's something that we're designing specifically to get to, I

20   think, some of the very same concerns the Court has articulated

21   about accountability and effectiveness of the work that's being

22   done.  And it's something that we can't do and also comply with

23   the Court's condition.

24       And so respectfully, Your Honor, I think the evidence

25   establishes that there is really no support for the idea that

1  bringing the whole pre-inspector cadre into PG&E will have any

2  material benefit to public safety or compliance.  And, and the

3  evidence establishes that that's not something that's remotely

4  done within the industry.  But more significantly, that we're

5  working to address the same types of concerns through another

6  program that's already under way, and that would be disrupted

7  if we had to comply with the condition.

8          **THE COURT:**  All right.  I never said that you had to

9  bring every single pre-inspector into -- I said you had to

10  bring in a sufficient number to manage the problem.

11         And you already have your own pre-inspection program on

12  your own payroll.  And that could be expanded some so that you

13  could do at least some of the work, and have a firsthand

14  knowledge of what is going on out there in the field.  Because

15  apparently, from what you're saying, you have no one competent

16  within the four corners of PG&E to go out in the field and to

17  spot the trees that need to be cut.  Yet, it's your

18  responsibility under the state law to do that.  And, and yet

19  you have nobody on your payroll who is competent to do that.

20         In the old days, I know you did.  Back in the nineties, I

21  believe you had people on the payroll who did exactly that.

22  But you decided to outsource.  That's what you did, outsource.

23  You outsourced it.

24         And to your point that there's -- that you would just be

25  hiring the same people, well, in part, that may be true.  But

1   on the other hand, you can train people.  Do what the Army

2   does.  You train people to do the job, that don't have any

3   prior experience, yet they're trainable, and so you can train

4   your own work force.

5        So, I don't know; you're not convincing me.  You,

6   yourself, told me this at the hearing in February that you --

7   or whenever we were considering another different idea:  Oh,

8   Judge, look, we're bringing the pre-inspectors into PG&E.  We

9   have our own program.  We're going to be trying this out.

10       Well, I thought:  Okay, that's a pretty good idea.  Let's

11  go with that, instead.

12       Well, now you're backing off of that and saying it's a

13  disaster.  I was flimflammed by you, counsel.  So, you -- you

14  did it.  You did it.  You weren't -- you're trying to wiggle

15  off your own statements to me now.

16           **MR. ORSINI:**  Your Honor, if I may --

17           **THE COURT:**  And I never said bring in 1,000 people.

18  That's ridiculous.  Where in the order does it say:  Bring in a

19  thousand people?  It didn't say that.

20           **MR. ORSINI:**  Well, Your Honor, a couple things, if I

21  may respond to that.

22       So we interpreted your order as requiring us to in-house

23  the pre-inspectors.  When it says we shall employ our own cadre

24  of pre-inspectors that will be a sufficient number to support

25  the work being done by the tree trimmers, that is how we

1    interpreted the language.  If that's not how the Court intended

2    the language, I appreciate that clarification.

3         **THE COURT:**  Well, didn't I also say that you can come

4    -- I said specifically:  Please get together with your experts,

5    please get together with the monitor and with the CPUC, and you

6    come back with a counter-proposal that -- and I used the word

7    "flexible."  But, something that will address this problem that

8    I'm trying to get at.

9         And listen.  You're not fooling me.  Those pictures that

10   PG&E sent to me by court order after each PSPS, they were in

11   the hundreds.  Hundreds of trees that fell on the distribution

12   lines in those windstorms.  And, and, those trees should have

13   been cut.  Those trees should have been cut or trimmed.  And

14   yes, some of them maybe you couldn't have told that they were a

15   danger, but others you definitely could have.  And you didn't

16   do that.

17        So the problem is still very real.  The problem of trying

18   to find those trees and -- is a very real problem.  And you are

19   falling behind on that.  You're not -- so there is a backlog.

20        Please don't tell me there is no backlog.  There is a

21   backlog.  And it's going to take eight to ten years for you to

22   dig your way out from under the backlog that PG&E created by

23   paying dividends and executive bonuses instead of cutting the

24   trees when they -- that's what happened here.

25        All right.  But I -- all right.  I'll let you say --

```
 1   because I made a little speech there, I'll let you go ahead and
 2   respond.
 3            MR. ORSINI:  Thank you, Your Honor.
 4        So, so again, what we said back in February was we were
 5   running a pilot program.  We didn't say we were bringing
 6   everybody in-house.  I have not stated, Your Honor, that
 7   there's no one within PG&E that has this ability.  There are.
 8        As I just said a few moments ago, we are doing some of the
 9   work verification and some of the quality assurance work
10   internal to PG&E with PG&E personnel.  We interpreted the
11   Court's condition to suggest that we had to bring all the
12   inspectors in-house.  If that's not what the Court meant and
13   the Court has now clarified that, we appreciate that.
14        I still do not believe the condition is appropriate.  We
15   are working with the regulators to continually develop the
16   program and I think a statement that we have to employ a
17   sufficient number is vague, and will not permit us to continue
18   to develop the program, and be flexible in the way that we need
19   to be.
20            THE COURT:  Tell me, how many people do you have in
21   the program now, and what do they actually do?
22            MR. ORSINI:  I do not have those numbers available to
23   me as I stand here right now, Your Honor.
24            THE COURT:  Do you have even a rough idea?
25            MR. ORSINI:  I understand that there are -- well, I
```

```
 1    don't, Your Honor.  I don't want to give a number that is
 2    inaccurate.
 3              THE COURT:  All right.
 4         MR. ORSINI:  As I said, the pilot program is under
 5    way.  But Your Honor, I have to -- and maybe we'll just have to
 6    disagree on this, but I have to again strenuously object to the
 7    characterization that any of this is the result of an eight- to
 8    ten-year backlog.  The record just does not support that,
 9    Your Honor.  There is no evidence that there is an eight to
10    ten-year backlog that we are still working through.
11         What we identified in terms of compliance issues that were
12    a carryover from last year were 22,000 trees, out of
13    1.3 million that had been worked.  Of those 22,000 trees, there
14    are only 3,000 left.  The overwhelming majority of which are
15    neither imminent hazards, nor trees that we can just go out and
16    just cut down, because there are permitting and third-party
17    issues associated with them that we are working through.
18         So the backlog from last year in terms of trees that are
19    even arguably out of compliance is 22,000.  And those are being
20    addressed and worked down.  There's not an eight to ten-year
21    problem here.
22              THE COURT:  All right.  Even if it's one year, that's
23    too much.
24         MR. ORSINI:  Your Honor, respectfully --
25              THE COURT:  No, wait a minute.  Whenever PG&E burns
```

1   down another town, or burns down another neighborhood, people

2   ought to drag out your comments, and say:  Oh, a one-year

3   backlog is 22,000 trees.  Oh, that's nothing, we are addressing

4   them.

5       That's, that's the present participle tense, that's like

6   saying "The check is in the mail."  You shouldn't have even one

7   tree in the backlog.  How did you even get up to 22,000, to

8   begin with?  Well, it's because you weren't doing your job.

9   You weren't doing your job.  You weren't complying with state

10  law.  So you are very good at making excuses, but you are not

11  good at complying with state law.

12      **MR. ORSINI:**  And if I may, just in closing Your Honor,

13  I understand the perspective.  We are in substantial

14  compliance, overwhelmingly.

15      The 22,000 trees -- you know, a calendar year is not

16  really relevant to the biology of a tree or when it's going to

17  present a safety risk.  And as we explained, many of these

18  trees were trees that were identified late in the year.  And

19  that are being worked in the ordinary course.

20      So, so, I understand the Court's perspective.  I

21  respectfully disagree with it.

22      But I just want to close by noting again, Your Honor, that

23  we do agree fully with the general propositions articulated by

24  the Court that we cannot rest on the current program, and PG&E

25  is not resting on the current program.  Our regulators are not

1    letting us rest on the current program.  They have presented a

2    host of conditions and criticisms of what we put forward.  And

3    we look forward to continuing to work with them to address

4    those issues.

5              THE COURT:  All right.  I -- I would like to give the

6    government an opportunity to speak, and then if time permits I

7    will let the amici speak.  And I definitely want to hear from

8    the CPUC as well.  So let's hear from the U.S. Attorney.

9              MR. STERN:  Thank Your Honor.  This is Noah Stern for

10   the United States.  Just a quick housekeeping matter before I

11   start.

12      I don't believe Your Honor made findings about the

13   appropriateness of a telephonic hearing and whether PG&E waived

14   its right to an in-person hearing.  I think that might be

15   appropriate.

16             THE COURT:  All right.  Well, does PG&E waive your

17   right to an in-person hearing?

18             MR. ORSINI:  This is Kevin Orsini.  We do, Your Honor.

19   We are satisfied with this telephonic hearing, and appreciate

20   the Court's indulgence.

21             THE COURT:  Thank you for that.

22      And the finding is that because of the pandemic, COVID-19,

23   we have to proceed by telephone because there's too many people

24   interested in this and -- and the courtroom would be too full.

25   I hope that within a few weeks we will be able to have some

1    proceedings on the criminal side, and in the court.  But we are

2    at a distinct handicap because of the COVID-19.

3        So thank you for that waiver.  And I now make that

4    finding.

5        Okay.  Go ahead, Mr. Stern.

6        MR. STERN:  Thank you, Your Honor.

7        So just to summarize the government's position here, we

8    agree that you can impose enlarged conditions on PG&E.

9    However, we do think that those conditions should take into

10   consideration the state regulation.  And we also think that

11   those conditions should take into consideration the new

12   inspection programs that PG&E asserts that it is running this

13   year.  And we think that it makes sense to supplement the

14   record to further develop it with respect to those issues, and

15   to support whatever specific conditions the Court ends up

16   ordering.

17       I would also note that the government thinks that

18   Your Honor's suggestion that PG&E could submit a plan that

19   would accomplish, I guess, the essence of the new conditions

20   seems to be a very reasonable suggestion.  And listening to

21   Mr. Orsini's discussion with the Court, the government thinks

22   that it may be that if PG&E had submitted a plan or submitted

23   what it had already been intending on doing, that it's possible

24   that that may have satisfied many of the Court's concerns.

25       So, just, now I'll talk a little bit more about those

1    things.  I want to be very clear that the government shares the

2    Court's interest in imposing probation conditions on PG&E to

3    protect the public.  And the Court has very broad discretion in

4    developing and imposing conditions of probation, and it can

5    modify or enlarge those conditions without any change in

6    circumstances.

7         Here, there's certainly been a change in circumstances,

8    and the Court's order cites to numerous facts that support

9    enlarged conditions with respect to PG&E's inspection programs.

10   The Court pointed out in its order that with respect to

11   distribution lines, the federal monitor identified numerous

12   dangerous conditions that were missed by PG&E's contractors.

13        And with respect to transmission lines, the Court cited to

14   substantial evidence that inspections missed dangerous

15   conditions.  That includes inspections on the transmission

16   tower that was one of the causes of the Camp Fire which led to

17   PG&E recently pleading guilty to 84 counts of manslaughter.

18        The government disagrees with PG&E's federalism arguments.

19   PG&E appears to be arguing that the conditions are unlawful

20   because they inherently interfere with the state regulatory

21   scheme.  That argument, taken to its logical conclusion, I

22   think would bar a court from ever imposing a substantive

23   probation condition on a regulated company.

24        And it's not clear why PG&E's arguments wouldn't apply

25   equally to probation conditions that are already in place, from

1    the imposition of the federal monitor itself, to the condition

2    the Court ordered this last fall that required PG&E to provide

3    a $3 million fund for San Bruno to use for wildfire -- a

4    wildfire mitigation project.  Each of those conditions relate

5    to PG&E's use of finite resources.  But PG&E did not argue that

6    they were clearly unlawful because they infringed on the CPUC's

7    prioritization of those resources.

8        The cases that PG&E cites also do not support its broad

9    arguments.  Rather, they just support the proposition that

10   conditions that implicate federalism concerns are more closely

11   scrutinized by appellate courts.

12       For that reason, and because PG&E has argued here that the

13   conditions would essentially -- I think Mr. Orsini said would

14   displace the CPUC's regulations, the government believes that

15   it's appropriate for the Court to solicit the input of the

16   CPUC.  This would be consistent with the recommendation in the

17   sentencing guidelines that the Court do that.  And it may also

18   inform whether the conditions interfere with or undermine the

19   regulatory scheme, and if so, to what degree.  This input would

20   also be relevant to the next issue, which is whether the

21   conditions are reasonably necessary to protect the public.

22       And on this issue, the government's view is that the Court

23   should supplement the record about the feasibility and the

24   likely effectiveness of the specific conditions ordered.

25       There's a lot in the record supporting the imposition of

new conditions, generally.  But a lot of this also may not

account for the new programs that PG&E is implementing.  And

the vast majority of the record relating to how the specific

conditions would work was submitted by PG&E in opposition to

those conditions.  I think PG&E submitted around eleven

declarations from its employees and experts with its motion,

who state, as Mr. Orsini has detailed in the hearing today,

that some of the conditions might not be feasible or may confer

no safety benefits.

          And then, they also highlight the changes that PG&E's

already making.  These are very complex issues.  And the United

States isn't in a position to dispute the expert evidence that

PG&E has offered with respect to the specific conditions.  And

so for those reasons, the government is suggesting that the

Court supplement the record with additional evidence.

          One of the ways the Court could do that is it could ask

the federal monitor to obtain opinions from its experts about

the feasibility and effectiveness of the conditions.  I think,

as everyone's aware, the monitor has been working closely with

PG&E on its inspection processes.  These experts may be

well-positioned to opine on whether the new conditions are

reasonably necessary, in light of the changes that PG&E is

already making.  The Court could also invite other PG&E

stakeholders to submit their views.

          This additional information might support the specific

conditions that the Court has already ordered.  It could

support different conditions, or none at all.  But I think the

Court will be in a better position to support its ruling on a

more full record.

So for all of those reasons, the government's position is

that the Court should for now, extend the stay of the

conditions that it ordered, and seek to supplement the record.

**THE COURT:**  Okay.  Thank you, Mr. Stern.

Let me hear from Ms. Hammond for a moment.

Ms. Hammond, how up to speed are you on the proceedings

that have gone on in our court over here?  I know you are

attending as a courtesy to the Court, so I don't want to

presume that you are up to speed on everything, but maybe you

are.  So I would like to give you a chance to say your piece.

Go ahead.

**MS. HAMMOND:**  Sure.  Thank you, Your Honor.

The CPUC is not a party to this proceeding.  We don't

receive courtesy copies of any filings.  It's up to us to try

to keep up and monitor whatever is docketed.  So we are trying

to keep up with what's being filed.

There has been a flurry of activity in California at the

state level and the legislature, here at the CPUC, and I would

like to update the Court on some of the recent activities and

actions and orders, since the CPUC last spoke to the Court.

But I do want to start off with saying that we do find

ourselves in this unusual position of weighing in on a criminal

probation overseen by this United States District Court.  It is

very important to the CPUC that the Court and the Commission

don't find themselves in a jurisdictional dispute as a result

of PG&E's filings.

　　We are primarily concerned with the revised conditions of

probation, if any, that could be at odds with the utility

regulators' comprehensive jurisdiction over PG&E.  And with any

revised conditions of probation that could have unintended

consequences that we may not even be aware of or can

anticipate, that would be detrimental to the public health and

safety.  But the CPUC is willing to help supplement its 2019

filings, and give you this update on what the State has been

doing for the Court's record.

　　There's about seven or eight items.  I will quickly go

through that list.  Your Honor may be aware of many of the

things that have happened.  Of course, last year's passage of

AB1054, and the creation of the Wildfire Safety Division, about

which Your Honor has already asked.

　　There are now 2020 wildfire mitigation plans that are teed

up for approval with conditions.  And those conditions are

recommended by the Wildfire Safety Division, because that

division identified tremendous deficiencies in PG&E's filings.

　　The Wildfire Safety Division is like a division, a

looking-over-the-shoulder set of eyes and regulator like we've

1   never had before.  What has proven to be effective 20 years ago

2   that showed weaknesses and then showed failures more recently

3   is now being addressed through AB1054, and increased

4   regulation.  And that is driven primarily through the Wildfire

5   Safety Division.

6       They're pretty much just getting up and running.  They

7   started inspections two and a half weeks ago.  In two and a

8   half weeks, they have conducted, I think, something like 50

9   inspections already.  Looking over the shoulder of PG&E's work.

10      Their focus is on system hardening, it's what we refer to

11  as improving the assets; the PSPS events; and enhanced

12  vegetation management.  And this is going to be a tremendous

13  and robust organization.

14      The third thing that I wanted to update you on are just

15  ongoing audits, citations and investigations.  Those are tools

16  that have long been at the CPUC's disposal, and we have been

17  using them.  Most recently last month, in the issuing of a

18  final order in the investigation into the 2017 and 2018

19  wildfires that PG&E was responsible for.  Although PG&E did not

20  admit fault or violations in that proceeding, it was a

21  settlement that was adopted, with modifications.  And it

22  resulted in a fine -- a penalty, total penalty of about -- over

23  $2.1 billion.

24      Now, there has been some discussion by amici about a fine

25  being suspended.  That does not diminish the fact that PG&E

```
1    will be paying for $2.1 billion of penalties.  And there is a
2    larger reason behind the suspension of the fine.  And that has
3    to do with not drawing down funds for the victims compensation
4    fund that is being addressed in Bankruptcy Court.  So, I don't
5    know if Your Honor was aware of that, but there is a final
6    decision that was voted out last month.
7         Your Honor, this morning, the CPUC is holding a business
8    meeting to consider a proposed decision approving -- a decision
9    on resolving PG&E's bankruptcy plan that the CPUC has to
10   approve.  And it is imposing a number of conditions on PG&E to
11   improve the safety performance.  And there is a plan of
12   enhanced enforcement.  And it is a six-step process.  It
13   progressively demands greater performance and compliance by
14   PG&E.
15        Ultimately, there is a path, if PG&E continues to fail on
16   the safety front, for the CPUC to impose the ultimate option,
17   as identified in the decision.  And that is to revoke their
18   license.  But that's not one of the first things that the
19   Commission would consider.  It's very important from the
20   Commission's perspective that power continues to be delivered.
21   That is a core safety consideration.  It has to be delivered
22   safely.  It has to be delivered affordably.  But it has to be
23   delivered.  And not delivering power is not an option.  And
24   that's something that the CPUC did stress last year to the
25   Court.
```

1      There is an additional proposed legislative action.

2   There's a Senate Bill 350, that's proposed in the legislature.

3   And that is supposed to dovetail with an option of the CPUC

4   asking for a receiver to step in, should we ever reach that

5   point.  But the goal in the immediate future and in the near

6   future is to do more, do it better, do it faster.  And to

7   continue to have power delivered safely.

8         THE COURT:  Can I ask you a question on that?

9      Are you -- of course I think everyone would agree, we need

10   to keep the power going.  But are you saying that you're going

11   to stop the PSPS process?

12         MS. HAMMOND:  Not at all.  Not at all.  In fact,

13   there's a decision that's also pending a vote today that is

14   supposed to improve the PSPS process.  There is also an

15   investigation into how PG&E handled their PSPS events last

16   year.  And it's all designed to improve, to narrow, to broaden

17   where necessary, um, just to continue to improve the PSPS.  But

18   in no way is PSPS off the table.  In fact, it's only going to

19   be improved.  We hope.

20         THE COURT:  Okay.  Good.  Please continue.

21         MS. HAMMOND:  Sure.

22      I just want to talk a little bit about the discussion that

23   amici raised about PG&E -- the emphasis on PG&E's financial

24   stability.  And none of the considerations that we talk

25   about -- financial stability, safety, enhanced vegetation

management -- can be considered in isolation.

Financial stability is necessary to continue to have operating, (inaudible) expense, working capital.  The system has to continue to keep operating.

Part of AB1054, part of the wildfire investigation settlement, part of the wildfire mitigation plans, part of the CPUC's ongoing regulation of PG&E, involves continued expenditures to harden the system, to make improvements.  And that all requires money.

Now, Your Honor, we all know we're in this COVID-19 pandemic.  And many, many Californians are finding that they can't pay their bills, including the utility bills.  And one of the (inaudible) the CPUC has done is instructed utilities not to disconnect customers because they can't pay as a result of the pandemic.

Now, that's cutting into the revenues of each of the utilities, and the ability to continue to make safety improvements and to comply with the wildfire mitigation plans. I say this only to emphasize that no one mitigation measure, conditions of probation, or any isolated CPUC action or order can be viewed in isolation.

If I may, Your Honor, I just wanted to say a couple more things.  The wildfire mitigation plans that are teed up to be approved with conditions represent an attempt to improve the wildfire mitigation plans.  We're learning, we're improving,

1    we're demanding better.  And we -- we want to be better.  And

2    we -- we and the State expect us to be better.

3        But the conditions can't be immutable.  We will continue

4    to learn more information.  We may identify new high-risk

5    situations that we are not aware of now, and attention may need

6    to shift in that direction, just as we're triaging.

7        And so the concern that the CPUC has is that the revised

8    conditions of probation may hamper the ability to pivot as

9    necessary.  And then address any given issue in the appropriate

10   order.

11       And I finally want to say that the CPUC has open

12   proceedings, they're open to the public.  There's noticing

13   requirements.  On PG&E's 2020 wildfire mitigation plan there

14   were, I think, something like 13 formally submitted comments

15   and wildfire mitigation plans, maybe mod-  -- not modified, but

16   conditioned in response to some of the comments.

17       It's not just any one party's particular interests that

18   the CPUC would take into consideration.  There is constantly a

19   balancing of interests between differently situated customers,

20   differently situated members of the public.  And in all

21   circumstances, safety is the priority.

22       But the nature of public utility regulation does demand

23   hearing from the different voices at the table.  And, and, and

24   there is a particular emphasis on hearing from communities that

25   usually don't have a voice.  They don't have the financial

1    resources.  Disadvantaged community (inaudible).  And that's a

2    part of the process that unfortunately is not near in this

3    criminal probation.  And it's not to be expected to.  CPUC is

4    the home for that public process.  It's for public input.

5            I think I'll stop there.  I'm happy to answer any more

6    questions.

7                 **THE COURT:**  Thank you.  I appreciate that.  That was

8    good information for the Court to learn.

9            Ms. Hammond, I'm going ask you a question whether or not

10   you would be willing to submit a brief or statement to the

11   Court.

12           Let me just tell you what -- somebody is making noise on

13   the -- on the line.  It sounds like ripping paper off or

14   something.

15           Please, here is what these two new conditions are trying

16   to get at.  And what I'm going ultimately to ask you is:  Okay,

17   do you agree that these are problems?  And even if they are

18   problems, maybe you already have a solution to them that I

19   don't know about yet, and that I should just defer to the CPUC.

20           So I -- that would be grand if you did, in fact, have a

21   solution.  But there are two sets of problems.  One is --

22   concerns the distribution lines.  The other concerns the

23   transmission lines.

24           On the distribution lines, which is the lower ones, of

25   course, the ones where -- that are down -- where the trees can

1    fall on them, the problem is the trees do fall on them.  And

2    then they -- because they're uninsulated.  And there's nothing

3    wrong with being uninsulated, but when they fall on the lines

4    they spark, they -- in the dry summers, the spark falls to the

5    grass, catches the grass on fire, and immediately we have a

6    grass fire.  I don't have to explain that to you.  I know you

7    understand that.  And the whole purpose of the public utilities

8    code, the Public Resources Code, was to have enough clearance

9    from the trees that that wouldn't happen.

10       Well, there's a backlog.  We disagreed a moment ago about

11   how big the backlog is and how many years it accumulated, but

12   you can just look at the record.  The 2017 fire was started by

13   trees falling on the lines.  The Butte County Fire, the

14   Camp Fire, one of the (inaudible) causes were the same thing.

15   The other one was a transmission line.

16       I, myself, drive around through the chaparral region of

17   the state of California, and I can -- on any given day I could

18   bring back a dozen photographs of the PG&E lines that are

19   running through, right through trees.  They're not -- they're

20   not in compliance with the state law.  Anyone could send you

21   those.

22       Now, I want to say, I have seen many PG&E contractors out

23   there cutting the limbs.  And, good for them.  Because PG&E has

24   been trying to address the backlog.  So, I am not saying

25   they're not doing that.  But, but, then we come to -- I sent

out the monitor to spot-check the work.  And to use a simple

phrase, the work that was being done was crappy.  C-R-A-P-P-Y.

The monitor found numerous examples where the work was not done

properly.  So we reported that to PG&E, and then PG&E goes back

and tries to address that problem.

        Well, the -- so the issue is potential miscommunications

and misdirection because PG&E is outsourcing all of this work

and does not have in-house any of the people who are doing the

pre-inspections, nor, for that matter, the post-inspections, to

designate what work needs to be done to be in compliance with

state law, and for that matter, the wildfire mitigation plan.

        And so then the contractors are supposed to do the work,

and then somebody double-checks to make sure that that work was

done.  I am firmly of the -- I am firmly of the view that the

quality of the work that is being done now, even though it is

in -- it is vastly ramped up over what it was a year ago, the

quality of the work is not good.  And there are too many

mistakes, and we need a way to check it in advance.

        By that, I mean that someone skilled goes in there from

PG&E and says "Cut this tree, cut that tree, trim that tree."

And you have a consistent flagging system with color-coded

flagging and a GPS system.  But the system that PG&E has in

place now are not working.  And it's not just that there's an

occasional error; there are a lot of errors.  And the monitor

found those errors.  So that's one set of problems.  One set of

1    problems concerns the quality of the vegetation management, and

2    the tree-cutting and tree-trimming, that's what it comes down

3    to.  And I guess also the hardening, that's a separate problem.

4    Okay.  So that's one set of problems related to distribution.

5         The second set of problems relates to transmission lines

6    which are way above the treetops.  There's no tree problem

7    there.  But there is a problem with the towers.  And there seem

8    to be at least two instances now, the Kincade as well as the

9    Butte County, where massive fires have started.  And when you

10   try to get -- go behind it, we have the same scenario.  PG&E

11   trots out the inspection reports; the inspection reports say

12   everything was checked.  But they're in such vagueness that it

13   is impossible to go behind it and find out what really

14   happened.

15        And PG&E keeps saying:  Nothing is perfect, we did our

16   job, PG&E -- Look.  The report said everything was fine.  But

17   we know something is wrong.  We know that they're not spotting

18   all the things that need to be fixed.

19        So the second major point is:  How do we fix that

20   inspection system so that it has a better chance -- not a

21   perfect chance, but a better chance -- of finding the things

22   that are about to go wrong, so that we avoid another

23   catastrophic fire from the transmission lines?

24        So that one is:  How do we fix the inspection process and

25   the inspection reporting process and hold people accountable

1    for -- if they didn't do the inspection right, then they're

2    accountable.   So we can pinpoint what went wrong, so we'll know

3    next time that's -- to avoid that problem.

4        It's a run-around now.   At least, at least I get the

5    run-around in court.   I don't know what the PUC gets.   But when

6    these things happen, the lawyers are highly paid, and they're

7    beautifully trained, and they do a great job, but it's a

8    run-around.   The same thing:   Nothing is perfect, Judge; we had

9    inspections reports; the inspections reports said everything

10   was fine; it's impossible to do what you want to do, Judge.   So

11   we never have a suggestion to improve the thing.

12       Anyway, I'm getting off, myself, on a broken record.

13   Here's what I want you to do.   How would you fix -- how does

14   the PUC propose to fix these things?   Or maybe you think they

15   don't need to be fixed.   Or they're already fixed.   But there's

16   -- these are the two problems.   One is -- I'll just summarize

17   them in one sentence each.

18       On the distribution lines, it's the quality of the work

19   that is being done now is not good enough.   There are too many

20   errors.   And how do we fix that?   I thought we could fix it by

21   expanding the program that PG&E told me it already had in

22   place, which was pre-inspection.   Okay.   If you don't like

23   that, what would you do?   Or maybe you think it's -- it's okay

24   now.

25       The second one is transmission lines, and the inspection

1    process, and how do we -- how do we strengthen that to find the

2    mistakes before they happen, and to impose accountability when

3    they do happen?

4        So it's not -- to me, if the PUC came back to me and said

5    "Judge, these are -- these problems are under control and

6    here's how we are going control it and here's how -- the

7    conditions, you know, the Wildfire Safety Division has imposed,

8    they specifically addressed these problems and give those a

9    chance," I probably would go along with that.  I would go along

10   with that.  But all I ever hear from PG&E is a broken record

11   saying -- they never have a single positive comment.  All they

12   do is -- is the same broken record.

13       But if the PUC were to say "You think you've got this

14   under control, Judge, and you don't need to do this," I'd very

15   likely defer to your judgment on this.  But it's got to be

16   something concrete that I can understand.  And yeah, that looks

17   pretty good.  I'm glad that the PUC is -- so, would you be

18   willing to send me a brief on that subject?

19       Please.  Go ahead.

20       **MS. HAMMOND:**  Um, yes.  We are willing to help the

21   Court understand what the State is doing.  I'm not sure that we

22   would say, ourselves, everything is under control.  There is a

23   tremendous and concerted effort to get safety, get the state

24   safe.  And we are trying to get ahead of the problem.  The

25   tools that traditionally have been at our disposal like

1    penalties and fines, it is not -- we're not getting ahead of

2    the problem.  We are trying to get ahead of the problem now.

3        And there aren't necessarily specific actions that the

4    CPUC may want to put forward, but we are willing to help the

5    Court understand exactly what we're doing.  And understand --

6    help the Court understand the tools that the State has at its

7    disposal and is considering in the event that we don't see

8    improved safety.

9        **THE COURT:**  Well, I appreciate that.  In addition, I

10   invite to you explain to me why -- and it may be true, but to

11   explain to me why any additional conditions even in the

12   ballpark of what I'm suggesting would somehow hamper the CPUC

13   in doing its job.  I don't want to hamper the CPUC.  So if that

14   -- I want you to help me on that point, too.

15       Well, okay.  How long do you need to do that brief?

16       **MS. HAMMOND:**  Is two weeks acceptable to the Court?

17       **THE COURT:**  Two weeks will be fine.  And I appreciate

18   it because I -- we're very close to the -- the next wildfire

19   season is less than a month away.  So, yes, two weeks will be

20   fine.  I appreciate that.

21       **MS. HAMMOND:**  Thank Your Honor.  And we, too, are

22   feeling that urgency.

23       I misspoke about the number of inspections that have

24   already been conducted by the Wildfire Safety Division in its

25   two and a half weeks in.  It's -- they've actually conducted

1    200 field inspections.

2         THE COURT:  That's good.  I wrote down 50, but the

3    200, that's even better.  Yeah.  Good for the inspectors.

4         MS. HAMMOND:  And they're slated to have a total of

5    about 1,500 this year.

6         THE COURT:  And the inspections are of work that's

7    already been done?  Or of work that is about to be -- what are

8    they inspecting?

9         MS. HAMMOND:  I believe it's work that's being

10   conducted as it -- as the improvements are being done.  But I'm

11   happy to make that clarification.

12        THE COURT:  Okay.  Here, it would be good to know, is

13   that inspecting the -- the hardening of the system?  Is it

14   inspecting vegetation management?  And that would be very

15   useful for me as well as the public.  I hope you can make this

16   a public document so that the public will get the benefit of

17   it.

18      All right.  So thank you for that.  Okay.  Can I -- do you

19   have anything more, Ms. Hammond, to say?  Or I'll move on to

20   the amici.

21        MS. HAMMOND:  Not at the moment.  Your Honor probably

22   remembers that amici did try to have the Cannara case referred

23   to Your Honor, and Your Honor considered that request and

24   declined it.  These are active litigants in a case that is

25   before Judge Donato.  And I just wanted to make that statement.

1      Thank Your Honor.

2          **THE COURT:**  Yeah, I think I remember that, but I --

3   all right.

4      So, now, the amici doesn't get as much time --

5          **UNIDENTIFIED WOMAN:**  Do you guys have rubbing alcohol?

6          **THE COURT:**  What was that about rubbing alcohol?

7          **MR. WILKINS:**  That was my mother.  I apologize for

8   that, Judge Alsup.  This is Antwan Wilkins.  That was my mom.

9          **THE COURT:**  I can't give you much time because you

10  submitted a big brief.  But I'll give you two minutes to weigh

11  in.  Go ahead.

12         **MR. WILKINS:**  Okay, um -- I'm here on behalf of --

13         **UNIDENTIFIED MAN:**  Excuse me, that is not the amici,

14  Your Honor, speaking there.

15         **THE COURT:**  Who is it that was speaking?

16         **MR. WILKINS:**  This is Antwan Wilkins.  I'm calling on

17  behalf of David Rizk, my lawyer.

18         **MR. RIZK:**  Your Honor, this is David Rizk.  Sorry.

19  We're on the next case.

20      Antwan, can you please mute your phone?  This is another

21  case.  Thank you.

22         **MR. WILKINS:**  Okay, I'll mute it.  I apologize.

23         **THE COURT:**  All right.  I have another case I've got

24  to go to.  I'm sorry, counsel.

25      But amici, give us your name, and then you have --

1          **MR. AGUIRRE:**   Your Honor, my name is Michael Aguirre.

2    And I have been litigating these wildfire issues since 2009

3    with PG&E.

4          Your Honor, you're not being told a big part of the

5    puzzle.  And PG&E is not putting their cards on the table.

6    Behind the scenes, PG&E is heavily influencing the Public

7    Utilities Commission.

8          This is something PG&E said back in August of 2016

9    (As read):

10              "While we are very much focused on the future, we

11              will never forget the lessons of the past.  We have

12              made unprecedented progress in the nearly six years

13              since the tragic San Bruno accident, and we are

14              committed to maintaining our focus on safety."

15          PG&E is not focused on safety.  They are focused on how to

16    pay for the fires.  Your Honor's rulings has been focused on

17    how to stop the fires.  And I think it's imperative -- I'd ask

18    Your Honor -- I know you said I could only have two minutes.

19    But I think it's very imperative that Your Honor understand

20    that the reason that the insurance companies are not writing

21    insurance for PG&E is because they have absolutely no faith in

22    PG&E's program for preventing future fires.

23          1054 did away with the most important prudence rule, the

24    most important safety rule we had, which is that the utilities

25    could only recover if they proved that they were prudent in

1   connection with the fire.  That's gone now, and that's been

2   replaced, at the behest of PG&E, with a presumption that they

3   acted prudently.

4        So for example, with the Camp Fire, if the Camp Fire were

5   to have happened after July of 2015, then PG&E would have been

6   given a presumption that they acted reasonably, and they could

7   recover for their uninsured costs.

8        The other part of 1054 is they imposed on the utility

9   customers a $13 1/2 billion charge, without any kind of

10  fairness in terms of any hearing, to make the utility customers

11  pay in the future.  PG&E doesn't even believe that it's going

12  to cause -- or not cause fires in the future.

13       PG&E has something that they have developed called the

14  Fire Prediction Index, where they have taken all the various

15  factors, and they have shared that secretly with the Governor's

16  staff in connection with 1054.

17       Your Honor, I would urge Your Honor to allow us to file

18  some additional papers to tell Your Honor what else you might

19  want to ask for.  Number one, the disclosure of all PG&E's

20  communications to the PUC via the Governor's office, so you

21  could understand how PG&E is, in fact, influencing the CPUC.

22       The CPUC, in its August 23rd approval where they issued

23  the fire safety certificate to PG&E, they said -- the PUC said

24  explicitly that they recognize what Your Honor was doing, and

25  that they were going to follow the direction of Your Honor.

1    And that's what the executive director said in the August 23rd

2    letter.   PG&E -- PG&E is not committed to stopping the fires.

3    And when you listen to them carefully, they make excuse after

4    excuse.

5        The reason that your idea of having an in-house inspector

6    makes sense is because that creates a corporate memory.   That

7    creates internal records that they can't hide or dispose of

8    through their independent contractors.

9        They need to have a core of people trained to do this on

10   an everyday basis.   If anything, they need to expand the number

11   of inspectors so that they can main- -- their inspectors should

12   have a catalog of all of their high-fire-danger area

13   vegetation-management issues as well as the transmission

14   issues.   They should have a catalog of that.   There should be

15   people assigned to specific areas of the state in order to

16   avoid that.

17       But what PG&E is doing now is if they -- if they cause

18   another fire in 2020 or 2021, that -- the full cost of that

19   fire will automatically be paid by utility customers.   They are

20   already being forced to pay $13 1/2 billion into this wildfire

21   fund.

22       And if you just step back for a second, and you look at

23   what Your Honor started in January of 2019, every step along

24   the way, PG&E has brought the CPUC in to act as their defender.

25       There was -- the investigation that the staff -- and the

1    staff of the CPUC, in my experience, does have integrity and

2    can be relied upon, but the -- the Department of Safety

3    Enforcement, they did conduct an investigation of PG&E's

4    activities in 2017 and 2018.  They found that they caused 14

5    fires.  They committed 44 violations of General Order 95.  And

6    in doing so, they did not penalize them.

7         The idea that -- they said:  Oh, we're going to disallow.

8    Well, they disallowed what was never allowed, to begin with.

9    There was no penalty imposed.

10        And with regard to -- with regard to the investigation,

11   itself, I would recommend that Your Honor ask the safety

12   enforcement division personnel that actually conducted that

13   investigation, have them come before Your Honor, put them on

14   the witness stand, and give Your Honor a chance and maybe amici

15   a chance to examine them so you can find out what's really

16   happening.

17        The staff wants to do the right thing.  And the staff is

18   developing the capability.  But what I hear from the staff is

19   they're very, very upset about the fact that the CPUC, which is

20   supposed to be an independent investigative commission, that

21   function is now going to be transferred over so it'll be

22   directly under the Governor.  So the PG&E, with its lobbyists,

23   goes to see the Governor.

24        They had -- PG&E had 15 secret meetings with the

25   Governor's office between January and July of 2019, where they

1   put together the plan to do away with the prudence standard and

2   to impose the $13 1/2 billion penalty.

3         So I'm a former Assistant U.S. Attorney.   And I'm going to

4   close here, Your Honor, but I'm a former Assistant U.S.

5   Attorney in the Organized Crime/Fraud Section in the U.S.

6   Attorney's office in San Diego.   And as I was listening to the

7   counsel for this convicted felon that has killed over a hundred

8   people make excuses, I was just thinking:   What would Judge

9   Enright, Bill Enright, have done, if he were to listen to

10  somebody on probation like this make those kinds of excuses?

11  Let me tell you, he would have done exactly what Your Honor is

12  doing.

13        There is no room for laxity.   Your Honor is being given --

14  I would say false information, certainly misleading

15  information, by PG&E.   I'm disappointed that the U.S.

16  Attorney's office has not been more vigilant -- and I don't

17  mean to put them down, but they should be more vigilant and

18  more aggressive in getting a focus on -- there's going to be

19  people that are going to be dead in a year.   Dead in two years.

20  And I'm just wondering what they would think if they come back

21  and they listen to this discussion today and wonder why

22  Your Honor is not sticking with what you've done, which was

23  designed to protect them.

24        So I have much more to say, Your Honor, but I know about

25  each one of your -- every single one of your conditions should

1   absolutely be put into effect, and the CPUC should adopt them.

2   Because they will get at the heart of the problem.

3          Final comment.  Your Honor wants to stop the fires.  PG&E

4   wants to figure out a way to pay for the fires.  That is the

5   dichotomy.  And that cannot allow to stand.  PG&E cannot use

6   its political muscle to go to the Governor's office, the

7   Legislature, get its way with them while they're delaying you,

8   because all they want to do is get past the probationary

9   period.  It's just a stall action.  Stall it out, stall it out.

10         Even, Your Honor, when you asked Ms. Hammond if she would

11  come forward with your very reasonable request and have the

12  staff of the Safety and Enforcement Division explain how you

13  might get to those two specific conditions, the distribution

14  and the quality issues, how you might get there, there's no

15  reason why they can't come in and have their staff come in and

16  work with Your Honor, work with amici, work with the various

17  parties to come up with a plan.  But that's not the goal.

18  That's not what PG&E has told them to do.

19         And Your Honor, I would just -- I want to just say how

20  much we admire Your Honor, and hope that Your Honor will keep

21  the pressure on, and not allow this misinformation to mislead

22  you.

23              **THE COURT:**  Thank you.  I have a -- something you

24  said, I need to go back to Ms. Hammond.

25         Ms. Hammond, are you still there?

1          **MS. HAMMOND:**  I am, Your Honor.

2          **THE COURT:**  All right.  Just clarify for me and the

3  public on this point.

4      Earlier you had said that the Commission had imposed a

5  $2.1 billion -- you called it a penalty.

6          **MS. HAMMOND:**  Yes.

7          **THE COURT:**  And then you also referred to a fine.  But

8  now Mr. Aguirre was saying that the Commission suspended

9  everything.

10     So is that 2.1 billion actually going to be paid by PG&E,

11  that penalty?  Or has that been suspended?

12         **MS. HAMMOND:**  It's $2.1 billion in disallowances.  So

13  they are required to (inaudible) shareholders pay for any sort

14  of repairs, replacements as a consequence of the fires, and any

15  sort of upgrades that are necessary to improve safety.  It will

16  not be paid for by ratepayers.  It will be paid for by

17  shareholders.  And that is --

18         **UNIDENTIFIED MAN:**  That -- I'm sorry.  Excuse me.

19         **MS. HAMMOND:**  Yeah.  And that is the penalty.

20     There was also talk about the use of the different

21  penalizing tools available to the Commission.  It could be in

22  the form of disallowances.  And fines are another option.

23  Fines are paid for by shareholders.  And they go to the general

24  fund.

25     And so a decision was made to focus the punitive effect

1   towards making improvements to the system, rather than money

2   going to the general fund.

3           **MR. AGUIRRE:**  But Your Honor, they're disallowing what

4   was never allowed.  That's total sophistry.  There's no

5   specific order that says that -- or agreement on the part of

6   PG&E that they're going to make $2 billion worth of

7   improvements, safety improvements.  And therefore, they're

8   going to have to pay that, themselves.  That's all just left up

9   in space.  It's -- it's pure sophistry.  They're disallowing

10  what was never allowed to begin with.  So PG&E never had the

11  obligation to pay anything, to begin with.

12          And the one thing that the Administrative Law Judge

13  ordered was a $200 million fine.  $200 million fine.  The only

14  -- the ALJ for the CPUC said they should at least be ordered to

15  pay $200 million.  And that was permanently suspended, ten days

16  ago.

17          There is no interest on the part of the CPUC to do

18  anything other than to carry out the will of PG&E.  It's what

19  Justice Ginsburg calls a "captured agency."  And Your Honor,

20  that's what you are dealing with.

21          And if you would allow us -- you know, we've literally

22  been litigating on these issues since 2009.  We've gone up to

23  the Supreme Court, we've gone to the California Supreme Court,

24  prevailed in both courts, when PG&E tried to undo the

25  prudent-person standard in the courts.

1    And when they failed to do that, they went to the

2    Governor's office.  They had 14 secret meetings with the

3    Governor.  They introduced 1054.  They introduced 1054 on

4    July 12th, and it was passed in a week.  No meaningful

5    hearings.  Then it went over to the CPUC.  No evidentiary

6    hearing.  No impartial tribunal, no cross-examination.  They

7    simply enforced it.  And they had the gall to claim that that

8    was going to save utility customers money.  A $13 1/2 billion

9    charge, $900 million for the next 15 years, with no hearing.

10   And that's what the focus has been.

11       And I think -- so, Your Honor, I mean, this -- if you are

12   being lied to, if the CPUC is not playing straight with you,

13   and you're thinking that you can trust them to regulate PG&E,

14   you can't.  And all they're going to do -- you're going to lose

15   your authority over this case in a couple of years.  Once they

16   get past that, it's back to business as usual.

17       And I -- I respect the very able counsel for PG&E, who has

18   a very difficult case, did an excellent job of confusing the

19   issues, as an able advocate.  But I will tell Your Honor right

20   now, if anything, I would come back and say this.  Have the

21   Safety and Enforcement Division personnel who oversaw the

22   investigation into the 2017 and 2018 fires, have them come in

23   and make their presentation, and ask DA Ramsey to share his

24   investigative materials, who's done a fantastic job, have him

25   share his grand jury information about what he found about what

```
1    P&E did and didn't do in connection with the Camp Fire, and
2    then make your decision about whether PG&E should be held in
3    contempt of the court.
4         And I think until PG&E officers, until PG&E major
5    officials are personally held accountable, we're not going to
6    stop these fires.  And if we don't stop the fires, we're going
7    to have many more deaths in the future, Your Honor.  Many more
8    deaths.
9         Mr. Ramsey told me the story of a mother and a grandmother
10   and a child, and they were on the phone as the fire was closing
11   in on them in Paradise.  And they were -- they were, you know,
12   beseeching someone to come and help them as their lives just
13   faded away and they were burned to death.  And that's not --
14   that will happen again.
15        Even the Governor said, even the Governor said, in
16   connection with the -- in connection with, you know, whether
17   PG&E was at fault or what their attitudes were, this is what
18   the Governor said (As read):
19             "For decades, PG&E failed to prioritize public
20             safety.  Their lack of safety investments left PG&E
21             and nearly half of California with an anticipated
22             electrical system that is vulnerable to weather
23             events and not able -- not at all prepared for the
24             more extreme weather associated with climate change
25             that has been predicted for the past several
```

```
 1              decades."
 2         That's coming from the Governor, who is one of their
 3    closest allies.
 4         So again, Your Honor, I think that they have managed to
 5    confuse the record.  I've gone back and I've read every single
 6    one of your orders to show cause --
 7              THE COURT:  Mr. Aguirre.
 8              MR. AGUIRRE:  Yes, Your Honor.
 9              THE COURT:  I'm giving you an Academy Award, because
10    you have the great gift, when you come to the end of a sentence
11    you immediately start a new sentence --
12              MR. AGUIRRE:  Okay, I'll stop.
13              THE COURT:  I can't get a word in edgewise.
14              MR. AGUIRRE:  All right.  I'll stop, Your Honor.
15    Sorry.
16              THE COURT:  I've given you 20 minutes, instead of two
17    minutes.  I'm not diminishing the seriousness of what you're
18    saying.  But I am -- I have to bring it to a close.
19              MR. AGUIRRE:  Very well.
20              THE COURT:  All right.  The CPUC in two weeks will
21    give me their brief.
22         I am asking -- not just asking, ordering PG&E to give me a
23    brief in two weeks that addresses the same subject.  And that
24    is:  How can we solve the two problems that I've put on the
25    table, and instead of making a long list of excuses, explain to
```

1    me what specifically is different that you're doing now or will

2    do that will solve those problems.

3        And I'm asking the U.S. Attorney to give me a brief in two

4    weeks.  And the monitor to give me a brief in two weeks.  And

5    Mr. Aguirre, you can submit a brief in two weeks.

6        I want to put a page limit of 25 pages on each brief, with

7    the exception of the CPUC.  If you want to add to it, you can.

8    But for everybody else, I think, you have submitted so much

9    already that the 25 pages will be enough.  And I will -- I look

10   forward to reading all of that in two weeks.

11       We will very likely have another hearing.  Maybe not; I

12   don't know.  I'll have to see, read the briefs.  In the

13   meantime, the stay of the conditions will -- will remain in

14   effect, because I want to be fair to PG&E.  I want to consider

15   all of the -- these points and I -- I respect PG&E's right to

16   due process.

17       So --

18           **MR. FILIP:**  Your Honor, Your Honor, this is Mark

19   Filip.  Could I make one suggestion for your consideration,

20   sir?

21           **THE COURT:**  Yes.  Please, go ahead.

22           **MR. FILIP:**  My fear is  you're going to get 125 pages

23   of briefs passing in the night.  And to me, the greatest

24   positive of this effort that you have initiated is that it's

25   been focused on practical things that hopefully will save

1    people's lives.

2         We can all talk about federalism and jurisdiction and all

3    this and that.  But at the margins of a very broad spectrum, it

4    might be relevant, but on the practical issues, probably

5    doesn't matter at all.

6         And if there were a way to say we'll make the briefs due

7    in three weeks, but you directed the parties to confer with

8    each other during that extra week to try to come up with

9    pragmatic, actual concrete things to address these situations,

10   I think -- you know, if people want to fight, they can fight,

11   and they can appeal and all this and that.  But if they do want

12   to get to practical compromises and solutions, there's a lot of

13   room here to try to make progress.

14        And obviously it's up to you.  Whatever schedule you set,

15   we'll abide by.  But I think if you asked the parties to confer

16   with each other to try to come up with -- you know, even if it

17   were PG&E and the government and the monitor team, if -- if the

18   three of us conferred, I -- I think it would give a better

19   chance of having maybe some consensus proposals, as opposed to

20   just people making lawyers' points.

21             **THE COURT:**  Well, I -- will the CPUC meet and confer

22   and will PG&E meet and confer and will the U.S. Attorney meet

23   and confer?

24        If you're willing -- now, Mr. Aguirre, I'm leaving you out

25   of this piece because you're an amicus.  So I'm not going to

1   let you get in there and insist on being part of these

2   meetings.

3        But will you other four meet and confer?

4            **MS. HAMMOND:**  Your Honor, this is the CPUC.

5        I just have to emphasize this unusual position that we

6   find ourselves in.  We're not a party to this proceeding.  This

7   is a criminal probation.

8        At the same time, I do want to emphasize, as Your Honor

9   did note before that, the bankruptcy investigation proposed

10  decision does have -- appoints an independent monitor that

11  performs a function akin to the federal monitor.

12       And I think at the very least, that the Wildfire Safety

13  Division and the federal monitor and our Safety and Enforcement

14  Division can be talking.  I think they might already be talking

15  and conferring with each other.

16           **UNIDENTIFIED MAN:**  We have.

17           **MS. HAMMOND:**  Yes.  And --

18       (Audio connection dropped momentarily)

19           **THE COURT:**  ...CPUC brief, I'd like to get that in two

20  weeks because you're not part of the meet-and-confer.  But the

21  other three of you, PG&E and the U.S. Attorney and the monitor,

22  you all meet and confer, see if you can reach some practical

23  agreements.  And then, your brief is individually due in three

24  weeks.

25       And Mr. Aguirre, I'll let you file a brief as well, but

1   you don't get to be in on the meet-and-confer.  And your brief

2   is due in three weeks as well, too.

3          **MR. AGUIRRE:**  Thank you very much, Your Honor.  We

4   appreciate the opportunity to participate.

5          **THE COURT:**  All right.  I'm sorry; we've been going

6   two and a half hours.  I'm sure my court reporter needs a

7   break.  So I'm going to call the hearing to an end for now and

8   we will -- Theresa, I know we are overdue on the 11:00

9   calendar, so I'm going to hang up and call in in five minutes.

10          All right.  So long, everyone.  Bye-bye.

11          (Proceedings concluded)

**<u>CERTIFICATE OF REPORTER</u>**

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*Belle Ball*

_____
/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Saturday, May 30, 2020