AROCLES AGUILAR, SBN 94753
CHRISTINE JUN HAMMOND, SBN 206768
CHRISTOFER C. NOLAN, SBN 229542
California Public Utilities Commission
505 Van Ness Avenue
San Francisco, CA  94102
Telephone:  (415) 696-7303
Facsimile:  (415) 703-4592
Christofer.Nolan@cpuc.ca.gov

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 14-CR-00175-WHA |
| Plaintiff, | **COMMENTS OF THE CALIFORNIA PUBLIC UTILITIES COMMISSION IN RESPONSE TO MOTION TO RECONSIDER ORDER MODIFYING CONDITIONS OF PROBATION (ECF. Nos. 1187, 1209)** |
| vs. | |
| PACIFIC GAS AND ELECTRIC COMPANY, | |
| Defendant. | |

# TABLE OF CONTENTS

Pages

I.  INTRODUCTION..................................................................................................1

II.  WILDFIRE SAFETY DIVISION ......................................................................2

III.  WILDFIRE MITIGATION PLANS ....................................................................6

IV.  THE CPUC PENALIZED PG&E FOR ITS ROLE IN IGNITING 16 WILDFIRES IN 2017 AND 2018 BY ORDERING MORE THAN $1.9 BILLION IN SAFETY INSPECTIONS, REPAIRS, AND SYSTEM ENHANCEMENT INITIATIVES THAT FOCUS ON IMPROVING VEGETATION MANAGEMENT AND INSPECTIONS ................................................................................................................12

V.  THE CPUC CONTINUES TO USE ALL COMPLIANCE AND ENFORCEMENT TOOLS ...............................................................................14

VI.  DE-ENERGIZATION (PUBLIC SAFETY POWER SHUT-OFFS) WILL CONTINUE TO BE AN IMPORTANT TOOL TO MITIGATE WILDFIRE RISK ...................16

VII.  THE CPUC CREATED A SIX-STEP ESCALATING OVERSIGHT AND ENFORCEMENT PROCESS TO COMPEL IMPROVED SAFETY OUTCOMES 18

VIII.  THE CALIFORNIA LEGISLATURE IS CONSIDERING PROPOSED LEGISLATION TO EMPOWER OPTIONS OF LAST RESORT ....................................................20

IX.  CRITICAL CONSIDERATIONS AS THE COURT CONTEMPLATES MODIFYING CONDITIONS OF PROBATION ........................................................................22

  A.  The Ability of the CPUC to Exercise Its Broad Authority to Regulate PG&E with Maximum Flexibility Optimizes the Shared Goal of Protecting the Safety and Well-Being of Californians........................................................................22

  B.  Proposed Revised Conditions of Probation that Impose Incremental Costs Must Be Understood in a Broader Context........................................................23

X.  CONCLUSION ....................................................................................................24

## TABLE OF AUTHORITIES

**Pages**

**CPUC Decisions**

D.19-05-042 .......................................................................................................16, 22

D.20-05-019 ..............................................................................................12, 13, 14

D.20-05-051 .................................................................................................17

D.20-05-053 ..............................................................................18, 19, 20, 21

**California Public Utilities Code**

§ 326 .........................................................................................................2

§ 326(a)(1) ...............................................................................................3

§ 326(a)(2) ...............................................................................................3

§ 326(a)(3) ...............................................................................................3

§ 326.1(b) .................................................................................................3

§ 713(a)(1) (proposed) .........................................................................21

§ 1825 (proposed) ................................................................................21

§ 3292(b)(1)(C) (proposed) ................................................................19

§ 3401(a)(5) (proposed) .....................................................................20

§ 3401(a)(6) (proposed) .....................................................................21

§ 3420 (proposed) ...............................................................................21

§ 3434(a) (proposed) ..........................................................................21

§ 3434(g) (proposed) ..........................................................................21

§ 8385 et, seq. .......................................................................................4

§ 8386 .....................................................................................................6

§ 8386(c)(1) ..........................................................................................10

§ 8386(c)(22) ..........................................................................................6

§ 8386.1(a)-(g) .....................................................................................10

§ 8386.3(c) ..............................................................................................5

§ 8386.3(c)(2)(A) .................................................................................10

§ 8386.3(c)(2)(B)(i) .............................................................................11

§ 8386.3(c)(2)(B)(i)-(iii) .....................................................................11

§ 8386.3(c)(4) ............................................................................................................11

§ 8386.3(c)(5)(A) ......................................................................................................11

§ 8386.3(c)(2)(B) ......................................................................................................11

§ 8386.3(c)(2)(C) ......................................................................................................11

§ 8389(e) .....................................................................................................................4

§ 8389(g) ...................................................................................................................10

# I.    INTRODUCTION

At the Court's request, the California Public Utilities Commission ("CPUC") hereby offers its comments in response to the Court's May 28, 2020 hearing on Pacific Gas and Electric Company's ("PG&E") Motion to Reconsider Order Modifying Conditions of Probation (ECF. No. 1187).

The CPUC would like to take this opportunity to highlight the recent important steps that the California Legislature and the CPUC have taken to address wildfire prevention and safety, which may in turn address the specific concerns expressed by the Court at the May 28 hearing. When the Court last sought comments from the CPUC in March 2019 (ECF. Nos. 1028, 1033), Senate Bill ("SB") 901 had recently been passed but was largely still being implemented. SB 901 marked a significant step by the legislature to meet California's increasingly destructive wildfire crisis. SB 901 increased the amount in penalties that the CPUC could assess for violations of CPUC orders, laws, and decisions from $50,000 to $100,000 per violation per day; elaborated on the requirement that electric utilities develop specific Wildfire Mitigation Plans to be approved by the CPUC; required the CPUC to enter into a memorandum of understanding with the California Department of Forestry and Fire Protection ("CAL FIRE") to develop consistent approaches and data sharing related to fire prevention, safety, vegetation management, and energy distribution systems; and required the use of approved independent evaluators with experience in assessing the safe operation of electrical infrastructure to assess the utilities' compliance with their new Wildfire Mitigation Plans.

Since the 2018 passage of SB 901, the California Legislature has taken even more aggressive steps to address wildfire safety. As discussed in more detail below, the passage of Assembly Bills ("AB") 111 and AB 1054 have provided the State with substantial new wildfire-related safety and prevention resources and capabilities. Perhaps most significantly for the Court's purposes, AB 111 established the Wildfire Safety Division, a standalone unit currently housed within the CPUC that will move in 2021 to the Office of Energy

Infrastructure Safety, a new arm of the California Natural Resources Agency (which also oversees CAL FIRE). See Cal. Pub. Util. Code § 326. As discussed in greater detail throughout, the continued development and increased scrutiny of utility Wildfire Mitigation Plans by WSD and Commission investigations to ensure compliance with them will be a cornerstone in California's effort to promote utility wildfire prevention and safety.

Further, while actions responding to SB 901 and AB 1054 have enhanced utility wildfire safety generally, the CPUC has also used its innate authority to place numerous conditions on PG&E at the time the CPUC adopted its decision approving PG&E's bankruptcy plan of reorganization. These conditions include ensuring an ongoing post-probation third-party monitor and subjecting PG&E to a novel and heightened regulatory oversight and enforcement process if PG&E again lapses on wildfire safety, potentially leading to the CPUC revocation of PG&E's license to operate (Certificate of Public Convenience and Necessity). The CPUC hopes its description of the measures undergone legislatively and at the CPUC to curtail the threat of utility infrastructure igniting future catastrophic wildfires since it last addressed the Court will demonstrate that the CPUC shares the Court's goal of eliminating this wildfire threat. The CPUC believes the legislative measures recently enacted and now backed with new CPUC resources and new oversight process specific to PG&E will move California towards this goal while ensuring PG&E provides safe and reliable electric service.

## II.   WILDFIRE SAFETY DIVISION

AB 111 was passed by the California Legislature and signed by the Governor on July 12, 2019, and it established the Wildfire Safety Division ("WSD"), the first state agency tasked exclusively with developing and implementing wildfire safety protocols for electric utilities and their infrastructure. The WSD consults with the California Wildfire Safety Advisory Board, which was established by AB 1054, also in July 2019, and whose seven members are "selected from industry experts, academics, and persons with labor and workforce safety experience or other relevant qualifications and shall represent a cross-section

1    of relevant expertise including, at all times, at least three members experienced in the safe

2    operation, design, and engineering of electrical infrastructure." Cal. Pub. Util. Code

3    § 326.1(b).

4         By statute, the WSD is tasked with numerous duties pertaining to wildfire safety and

5    prevention, including oversight and enforcement of electrical corporations' compliance with

6    wildfire safety pursuant California Public Utilities Code sections 8385 et. seq. See Cal. Pub.

7    Util. Code § 326(a)(1). The WSD is required to periodically consult with the Wildfire Safety

8    Advisory Board to "develop and recommend . . . performance metrics to achieve maximum

9    feasible risk reduction" to develop and evaluate compliance with Wildfire Mitigation Plans.

10   Cal. Pub. Util. Code § 326(a)(2). The WSD is required to "[d]evelop a field audit program for

11   wildfire mitigation plan compliance by each electrical corporation." Cal. Pub. Util. Code

12   § 326(a)(3).

13        The WSD is required to consult with California's Office of Emergency Services in its

14   management and response to utility public safety power shutoff ("PSPS") events to ensure

15   compliance with PSPS program requirements. Cal. Pub. Util. Code § 326(a)(4). The WSD has

16   been authorized to "[r]etain appropriate staff that includes experts in wildfire, weather, climate

17   change, emergency response, and other relevant subject matters." Cal. Pub. Util. Code

18   § 326(a)(6). WSD staff is further obliged to assist in the assessment and analysis of "fire

19   weather data and other atmospheric conditions that could lead to catastrophic wildfires" and

20   to review and provide recommendations on "safety requirements for electrical transmission

21   and distribution infrastructure" to mitigate wildfire risk. Cal. Pub. Util. Code § 326(a)(5), (7).

22   As noted, the WSD and its staff will be transferred to the nascent Office of Energy

23   Infrastructure Safety effective July 1, 2021.

24        The WSD's primary directive is to evaluate and approve or deny electrical

25   corporations' Wildfire Mitigation Plans in accordance with Public Utilities Code section 8385

26   et. seq. to ensure that the utilities are taking effective actions to reduce utility-related wildfire

27   risk. In addition, WSD will actively audit and evaluate utility compliance with Wildfire

28

1   Mitigation Plans, promptly addressing faults, including PSPS protocols, and is responsible for

2   issuing safety certifications to electrical corporations if they have satisfied numerous

3   requirements contained in Public Utilities Code section 8389(e).

4        Within the WSD, there is a Wildfire Mitigation Branch, which is responsible for

5   evaluating Wildfire Mitigation Plans, updating plan guidelines, and assessing progress. The

6   Wildfire Mitigation Branch establishes guidelines, performance metrics, and evaluation

7   criteria for utility Wildfire Mitigation Plans, is responsible for approving, denying, or

8   "conditionally" approving each utility's plan, ensures that Wildfire Mitigation Plans address

9   local community needs and engage the broader public on utility-related wildfire efforts, and

10  works to enhance utility wildfire data capabilities.

11       The WSD's Compliance Branch is responsible for ensuring the utilities are executing

12  their approved plans by investigating highest-risk areas, thus assuring compliance on all

13  elements of Wildfire Mitigation Plan implementation. This branch also ensures utility

14  compliance with vegetation management requirements, manages and executes a field audit

15  program, reviews independent evaluator assessments, and works with compliance assurance

16  contractors to assess compliance.  This Compliance Branch also administers lower-level

17  enforcement penalties related to ongoing Wildfire Mitigation Plan compliance findings, and

18  reviews quarterly advice letters filed by utilities to assess the veracity of their statements.

19       The WSD also collaborates with other divisions within the CPUC to achieve robust

20  enforcement and impose significant penalties when warranted. The CPUC's Safety and

21  Enforcement Division has authority to initiate enforcement actions when WSD identifies

22  significant noncompliance with the provisions of a utility's Wildfire Mitigation Plans and will

23  provide expertise to support the Wildfire Mitigation Plan evaluations. The CPUC's Safety

24  Policy Division, which is responsible for developing safety-related policy generally, also

25  makes recommendations for Wildfire Mitigation Plan evaluations.

26       The WSD began operation on January 1, 2020 to implement its numerous

27  responsibilities.  Field inspections began in May 2020 and since then WSD has completed 538

28

1  inspections of utility infrastructure, despite travel restrictions imposed by the COVID-19

2  pandemic.  All of the initial field investigations were of PG&E's infrastructure and they

3  uncovered 18 defects, including hazard trees within contact range of wires, vegetation contact

4  on guy lines, and extensive woodpecker damage on poles. WSD has notified PG&E of these

5  defects, and PG&E is responsible for resolving them in a timely manner.

6      By the end of 2020 and each year annually, WSD expects to complete more than 2,000

7  inspections of electric infrastructure across the state, with approximately half of those being

8  inspections of PG&E infrastructure. WSD's inspectors perform field verification of Wildfire

9  Mitigation Plan activities reported by electric utilities, independent inspections of utility assets

10  for wildfire ignition hazards, inspections to ensure compliance with the CPUC's General

11  Order 95 vegetation clearance requirements, PSPS-related inspections, and investigations of

12  public complaints related to utility wildfire safety activities. Their work is further substantially

13  augmented by contracts with third-party utility wildfire subject-matter and risk management

14  experts and engineers to conduct electric line inspections, land surveys, worker safety

15  monitoring, document review, and materials testing. Digital inspection technologies such as

16  remote sensing (LiDAR, photogrammetry, and smart sensor) and mobile GIS are used for all

17  Wildfire Mitigation Plan compliance assurance activities.

18      While so far they have been coordinated with utilities, WSD can perform unannounced

19  inspections where the utilities are working if WSD receives specific notice of a potential

20  vegetation management violation or if WSD staff or its contractors find previously

21  unidentified violations while in the field. WSD determines the priority areas for inspection.

22      AB 1054 also requires each utility to engage a qualified independent evaluator with

23  experience in assessing the safe operation of electrical infrastructure starting in 2021. Cal.

24  Pub. Util. Code § 8386.3(c). The independent evaluator "shall consult with, and operate under

25  the direction of, the Wildfire Safety Division," and is tasked with reviewing, assessing, and

26  issuing a report each July on an electrical corporation's compliance with its Wildfire

27  Mitigation Plan, including whether an electrical corporation failed to fund any activities

28

1    included in its Wildfire Mitigation Plan. Id. The independent evaluator is intended to observe

2    and report without interference from its assigned utility and will provide more data points for

3    WSD's evaluation of a utility's compliance, identification of failures, and correction of

4    deficiencies.

5         WSD's January 1, 2020 commencement ushers in new resources and capabilities for

6    the state and CPUC's management of wildfire risks through a new, proactive branch of

7    California government that is dedicated to preventing and mitigating damage from utility-

8    sparked wildfires. The CPUC shares the Court's concerns over catastrophic wildfires and

9    takes its new legislative mandates seriously.   The CPUC is rapidly working to institute

10   permanent wildfire safeguards through risk-based plans, conditions to approvals of plans,

11   metrics to assess implementation, compliance monitoring, and announced and unannounced

12   field inspections – all backed by the investigatory and penalty powers of the CPUC – in order

13   to reduce the threat of catastrophic wildfire. The WSD is a primary manifestation of

14   California's effort.

15              **III.   WILDFIRE MITIGATION PLANS**

16        SB 901 refined the process of requiring the utilities to devise Wildfire Mitigation Plans

17   ("WMPs") and subsequent legislation has added breadth to the requirements and provided for

18   greater penalties for non-compliance with the plans. Cal. Pub. Util. Code § 8386, 8386.1. By

19   establishing the WSD, California now has dedicated personnel and resources to develop more

20   robust plans and ensure their compliance.

21        The statutory requisites that must be included in current WMPs are in Public Utilities

22   Code section 8386(c). There are 22 separate categories of information and analysis, with

23   additional subparts, required of utility's WMP. Id. However, the WSD retains the latitude to

24   require the submission of "[a]ny other information that the Wildfire Safety Division may

25   require." Cal. Pub. Util. Code § 8386(c)(22). The CPUC and WSD have been working to

26   produce more elaborate and detailed WMPs with quantifiable metrics and staggered and

27   increasing penalties for non-compliance.

28

1    After WMP requirements were amplified by SB 901, the CPUC opened a proceeding

2  entitled "Order Instituting Rulemaking to Implement Electric Utility Wildfire Mitigation

3  Plans Pursuant to Senate Bill 901 (2018)," also known as R.18-10-007. On December 16,

4  2019, the Administrative Law Judge for R.18-10-007 issued a ruling that recognized that AB

5  111 and AB 1054 transferred oversight over WMPs from that CPUC proceeding to WSD on

6  January 1, 2020. The ruling also introduced and attached new templates and evaluative

7  materials to be submitted by the utilities in their WMPs. See Declaration of Christofer C.

8  Nolan ("Nolan Decl."), **Exh. 1**. The new materials included (1) WMP Guidelines, (2) a Utility

9  Wildfire Mitigation Maturity Model to assess utility capabilities in reducing wildfire risk and

10  corresponding maturity levels, (3) a Utility Survey to collect information relevant to the Utility

11  Wildfire Mitigation Maturity Model, (4) WMP Metrics to evaluate each utility's wildfire

12  mitigation approach, progress, and results, and (5) a Supplemental Data Request, which

13  outlined a broader set of data that the CPUC requested from utilities and would formalize in

14  requirements in the 2021 WMP process. Id. at pp. 3-7.

15    On February 7, 2020, the electric utilities, including PG&E, submitted their 2020

16  WMPs for consideration by WSD.[1] PG&E's WMP is nearly 500 pages, not including its

17  numerous attachments, and is housed on PG&E's website at

18  https://www.pge.com/en_US/safety/emergency-preparedness/natural-

19  disaster/wildfires/wildfire-mitigation-plan.page?WT.mc_id=Vanity_wildfiremitigationplan

20    Shortly after electrical corporations filed their WMPs, the WSD held two sets of all-

21  day workshops over four days, on February 18, 19, 24 and 25, 2020.  The February 18-19,

22  2020 informational workshops called for the electrical corporations to present details on their

23  WMPs to stakeholders and the public, and for stakeholders to ask questions, raise concerns,

24  and otherwise comment on the WMPs' contents.  The February 24-25, 2020 technical

25  workshops focused more in depth on key provisions of the WMPs:  vegetation management,

26

27  ───────────────

[1] PG&E submitted an updated version of its 2020 WMP on February 28, 2020.

28

system hardening, risk-spend efficiency, emerging technology, and reduction of the scale and scope of Public Safety Power Shutoff ("PSPS") events.  Again, stakeholder and public input was offered.

Stakeholders were also allowed to submit comments on the WMPs, to which the electrical corporation replied.  Stakeholders and members of the public commented on the WMPs on April 7, 2020, and the electrical corporations responded to those comments on April 16, 2020. Various stakeholders submitted comments to WSD on the 2020 WMPs. Organizations and entities that submitted comments included: California Environmental Justice Alliance, East Bay Municipal Utility District, Energy Producers and Users Coalition, Green Power Institute, Joint Local Governments, Mussey Grade Road Alliance, Orange County Fire Authority, Perimeter Solutions, Protect Our Communities Foundation, Public Advocates Office, Santa Clara County, and The Utility Reform Network.  In addition, a significant number of members of the public submitted input focusing mostly on PG&E's 2019 PSPS actions, vegetation management programs, and other issues.

On May 7, 2020, after consultation with the Wildfire Safety Advisory Board and CAL FIRE and evaluation of the WMPs, WSD issued several proposed Resolutions related to the WMPs for public comment. Draft Guidance Resolution WSD-002 provides an overview of the framework used by WSD in 2020 for WMP submissions, including the 2020 WMP Guidelines, Utility Wildfire Mitigation Maturity Model, data standardization efforts, and performance metrics. Nolan Decl., **Exh. 2**. Resolution WSD-002 further discusses common deficiencies found across the electrical corporations' WMPs and the WSD's plans to bring WMPs into compliance with the 2020 WMP Guidelines. Finally, Resolution WSD-002 provides a discussion of the post-WMP reporting requirements, introduces the 2021 WMP evaluation process, includes updates to the 2021 WMP Guidelines, and addresses the WSD transition to the California Natural Resources Agency in July 2021.

On the same day, May 7, 2020, the WSD released for public comment an Action Statement and Draft Resolution WSD-003, which specifically addresses PG&E's proposed

1   2020 WMP. Nolan Decl., **Exh. 3**. As described in the Action Statement, WSD evaluated 2020

2   WMPs considering the following factors: (1) Completeness: whether the WMP is complete

3   and comprehensively responds to the WMP requirements; (2) Technical feasibility and

4   effectiveness: whether initiatives proposed in the WMP are technically feasible and are

5   effective in addressing the risks that exist in the utility's territory; (3) Resource use efficiency:

6   whether initiatives are an efficient use of utility resources; and (4) Forward looking growth:

7   whether the utility is targeting maturity growth. Id., Action Statement at p. 3.

8       The Action Statement summarizes key findings and deficiencies related to PG&E's

9   proposed WMP, but a fuller assessment is contained in the body of Draft Resolution WSD-

10  003 itself. Overall, WSD identified 29 deficiencies in PG&E's proposed WMP, and WSD-

11  003 places 29 conditions on PG&E with which it must comply in order for the WMP to be

12  deemed approved by the CPUC.[2] WSD has classified the deficiencies as Class A, B, or C.

13  Class A deficiencies are considered most serious, and PG&E is required to develop a Remedial

14  Compliance Plan to resolve the deficiency and submit it to the WSD within 45 days of CPUC

15  ratification of WSD-003. Id., WSD-003 at p.4. Class B deficiencies are of medium concern

16  and require PG&E to provide missing data or update its progress in its quarterly report, while

17  Class C deficiencies require PG&E to submit additional detail and information or otherwise

18  come into compliance in its 2021 annual WMP update. Id.

19      The 29 deficiencies identified by WSD are most exhaustively discussed in the body of

20  WSD-003, but WSD-003 also includes an Appendix A with a table that presents the 29

21  deficiencies and attendant conditions for more accessible review. Nolan Decl., **Exh. 4,** pp.

22  A1-A25. The 29 deficiencies and conditions cover programmatic, vegetation management,

23  infrastructure, inspection, and data analysis concerns.

24

25

26  _____

27  [2] The CPUC voted to approve Resolutions WSD-002 and WSD-003 on June 11, 2020, the
    same date this briefing is due.

28

1    If PG&E fails to cure the deficiencies and comply with the WMP and its 29 conditions,

2    recently enacted sections of the Public Utilities Code provide WSD and the CPUC with

3    mechanisms to incentivize PG&E. Monetary penalties can be levied against utilities that fail

4    to substantially comply with their WMPs, based on a number of factors, including: (a) the

5    nature, severity, and whether noncompliance with the plan resulted in harm; (b) whether the

6    utility had complied with its WMP in prior years; (c) whether the utility self-reported the

7    circumstances constituting noncompliance; (d) whether the utility implemented corrective

8    actions with respect to the noncompliance; (e) whether the utility knew or should have known

9    of the noncompliance; (f) whether the utility had previously engaged in conduct of a similar

10   nature that caused significant property damage or injury; and (g) any other factors established

11   by the CPUC in a rulemaking proceeding. Cal. Pub. Util. Code § 8386.1(a)-(g).

12   Moreover, if WSD determines that PG&E (or any other utility) is not in compliance

13   with its WMP, it can recommend that the CPUC, through its Safety and Enforcement Division,

14   "pursue an enforcement action against the electrical corporation for noncompliance with its

15   approved plan." Cal. Pub. Util. Code § 8389(g).

16   WSD is tasked with overseeing PG&E's compliance with its 2020 WMP. To that end,

17   PG&E must submit to WSD an annual report addressing its compliance with its previous

18   year's WMP.[3] Cal. Pub. Util. Code § 8386.3(c)(1). As noted earlier, before March 1, 2021,

19   and again prior to March 1 in succeeding years, WSD, in consultation with CAL FIRE, "shall

20   make available a list of qualified independent evaluators with experience in assessing the safe

21   operation of electrical infrastructure."[4] Cal. Pub. Util. Code § 8386.3(c)(2)(A). PG&E must

22   engage an independent evaluator from this list, who operates under the direction of WSD and

23   must issue a report by July 1 of each year on the state of PG&E's compliance with its WMP

24   _____

25   [3] The compliance period for PG&E's 2019 WMP ends on June 31, 2020, and PG&E's

26   compliance report for its 2019 WMP is due by the end of September 2020.

27   [4] WSD Compliance Branch staff has coordinated with CAL FIRE on this requirement and

28   expects to have a list of evaluators ready before the end of 2020, before the March 2021 statutory deadline.

and whether it "failed to fund any activities included in its plan." Cal. Pub. Util. Code § 8386.3(c)(2)(B)(i). Although not binding, WSD uses the information obtained and assessment by the independent evaluator to carry out its obligations to ensure PG&E is operating safely. Cal. Pub. Util. Code § 8386.3(c)(2)(B)(ii)-(iii). WSD is required to complete its compliance review of a utility's WMP within 18 months of the utility's submittal of its compliance report. Cal. Pub. Util. Code § 8386.3(c)(4).

A utility is further required to notify WSD within one month "after it completes a substantial portion of the vegetation management requirements" in its WMP, at which point WSD promptly audits the work performed by the utility. Cal. Pub. Util. Code § 8386.3(c)(5)(A). "The audit shall specify any failure of the electrical corporation to fully comply with the vegetation management requirements" in the WMP, and the utility is then given a reasonable amount of time to cure the identified deficiencies.[5] Id.

WSD is permitted to retain its own independent evaluator to perform the above vegetation management audit.[6] Cal. Pub. Util. Code § 8386.3(c)(5)(B). Within a year from the end of the time that the utility was given to cure the deficiencies found in the vegetation management audit, the independent evaluator must issue a publicly available report "describing any failure of the electrical corporation to substantially comply with the substantial portion of the vegetation management requirements in the electrical corporation's wildfire mitigation plan." Cal. Pub. Util. Code § 8386.3(c)(5)(C).

---

[5] WSD has begun receiving reports from PG&E for 2019 WMP compliance and are coordinating with the utility so that WSD can verify the results, and inspections by WSD are underway.

[6] WSD has retained the services of 4Leaf, Inc., a multi-discipline engineering firm, to act as its "Compliance Assurance Contractor" in fulfilling this role, and the company is already in the field performing inspections on WMP work.

1

2

3

**IV.    THE CPUC PENALIZED PG&E FOR ITS ROLE IN IGNITING 16 WILDFIRES IN 2017 AND 2018 BY ORDERING MORE THAN $1.9 BILLION IN SAFETY INSPECTIONS, REPAIRS, AND SYSTEM ENHANCEMENT INITIATIVES THAT FOCUS ON IMPROVING VEGETATION MANAGEMENT AND INSPECTIONS**

4

5

6

7

8

9

10

11

12

13

14

On May 7, 2020, the CPUC resolved its investigation into the role of PG&E's electric facilities in igniting fires in 2017 and 2018.  Using its enforcement authority as another tool to mitigate wildfire risk, the CPUC adopted proactive and remedial measures that echo some of the same functions for which the Court focused concerns.  The CPUC ordered PG&E's shareholders to pay $1.823 billion to inspect, repair and replace aged or unsafe equipment, enhanced oversight of pre-inspection and tree work performed, enlarge the pool of certified tree trimming crews, and enlarge the pool of certified pre-inspectors. See CPUC Decision 20-05-019, "Decision Approving Proposed Settlement Agreement with Modifications" (issued May 8, 2020).[7]  PG&E is required to report quarterly on electric maintenance work performed under this penalty to the CPUC's Safety and Enforcement Division and report on "near hit" potential fire incidents.  Id. at 56-58.

15

16

17

18

19

20

21

22

23

The bulk of this penalty will be dedicated to safety inspections and facilities repairs and replacement.  Critical to its effectiveness, the CPUC also ordered PG&E to fund Root Cause Analyses for each of the 16 wildfires in 2017 and 2018 that PG&E is responsible for causing.  Id. at 52-56.  The Root Cause Analyses should "identify systemic, programmatic, management, and structural matters that may need to be addressed to reduce such incidents in the future."  Id. at 53, quoting Settlement Agreement attached as Appendix A of the decision. The scope of the Root Cause Analysis would look into the technical causes of the wildfire, but it would not be limited there.  It must also "be scoped with sufficient depth and breadth to ensure that any physical, procedural, operational, management, and organizational elements

24

25

26

27

28

---

[7] The CPUC's decision adopting the settlement as modified can be downloaded from https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M337/K051/337051250.PDF.  The settlement (unmodified) is Appendix A to the decision and can be downloaded from https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M337/K051/337051249.pdf.

1    that may have contributed to the fires' ignition come to the surface." Id. at 55.  Any consultant

2    hired to perform the Root Cause Analysis would work under the direction of the CPUC's

3    Safety Policy Division and Safety and Enforcement Division, not under PG&E's direction.

4    Id. at 54-55.

5         The CPUC also ordered PG&E shareholders to pay $114 million for multiple System

6    Enhancement Initiatives.[8]  System Enhancement Initiatives will fund and implement over the

7    next five years a Vegetation Management Oversight Pilot program, a Pre-Inspector Training

8    and Certificate program, a Tree Crew Training and Certificate program, and other safety

9    initiatives.   These enumerated initiatives will supplement PG&E Enhanced Vegetation

10   Management that is part of its Wildfire Safety Plan, or WMP.  The Vegetation Management

11   Oversight Pilot program is intended to improve the quality of the work of PG&E's pre-

12   inspections and tree crews.  See Joint Motion for Approval of Settlement Agreement (Public)

13   (Dec. 17, 2019) at 16-18 (the CPUC Decision 20-05-019 did not modify the substance of these

14   Safety Enhancement Initiatives, only increased the budget).[9]   The Tree Crew Training and

15   Certificate program and Pre-Inspector Training and Certificate program will establish training

16   programs to increase the pool of qualified candidates to perform tree crew and pre-inspection

17   work for PG&E.  Id.

18        System Enhancement Initiatives will themselves be subject to a wildfire safety audit

19   performed by a Safety Evaluator.   This audit will cover PG&E's policies, procedures,

20   practices, and compliance with the shareholder-funded Safety Enhancement Initiatives and

21   financial data related to PG&E's Wildfire Safety Plans, with particular focus on PG&E's

22   overhead distribution and transmission maintenance program.  Id. at 58-59, 73-74.

23        The CPUC believes that this penalty costing PG&E's shareholders over $1.9 billion –

24   with its focus on electric distribution and transmission inspections, repairs, and replacements,

25   _____

26   [8] The Root Cause Analyses, quarterly reporting on electric maintenance work, and "near hit"
     reporting are also among the System Enhancement Initiatives.

27   [9] https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M322/K232/322232178.PDF.

28

1   studies and improvements to vegetation management practices, and efforts to increase the

2   numbers of trained and certified tree trimming professionals and pre-inspectors – will resonate

3   with the Court's expressions of profound concern in these areas that have proven deficient in

4   PG&E's performance record.

5   **V.      THE CPUC CONTINUES TO USE ALL COMPLIANCE AND
           ENFORCEMENT TOOLS**

6

7           Investigations and imposition of fines and other penalties remains an ongoing tool of

8   the CPUC to compel PG&E's compliance with electric utility safety standards.  When the

9   CPUC issued D.20-05-019 resolving the investigation into PG&E's responsibility in 18

10  wildfires in 2017 and 2018, as just discussed, it imposed on PG&E a package of penalties and

11  fines exceeding $2.1 billion, with a permanent suspension of the $200 million fine portion of

12  the total penalty.  This was done so that monies in the Fire Victims Trust in bankruptcy do not

13  compete with fines that PG&E would have to pay, had the CPUC not suspended the fine.  See

14  CPUC Decision 20-05-019 at 81-82.  Fines would have to be paid to the State's General Fund,

15  rather than directed to immediate wildfire mitigation investments.  Id. at 19 n.19.  In deciding

16  to direct PG&E shareholders to pay over $1.9 billion in improvements, the CPUC decided

17  that focus must remain on ameliorative remedies on a going forward basis, to achieve the

18  optimal safety benefits for Californians.

19          By way of background on the investigation, the CPUC's Safety and Enforcement

20  division investigated 18 fire incidents that occurred over 2017 and 2018, and determined that

21  PG&E was responsible for 16 of these wildfires.  These wildfires are, in 2018, the Camp Fire,

22  and in 2017, the Adobe, Atlas, Cascade, Norrbom, Nuns, Oakmont/Pythian, Patrick, Pocket,

23  Point, Potter/Redwood, Sulphur, Youngs, Lobo, and McCourtney Fires.  PG&E refused to

24  admit that it violated applicable laws, rules and regulations.  Id. at 15.   At the same time,

25  PG&E "does not dispute that its electric facilities played a role in the ignition of all fifteen

26  fires for which [the Safety and Enforcement] found violations." Id. at 14.

27          The CPUC's Safety and Enforcement Division then entered into settlement

28  discussions – there were more than ten parties in the formal investigation proceeding – and

1    reached a settlement with PG&E, the CPUC's Office of Safety Advocate, and the Coalition

2    of California Utility Employees.   The initially proffered settlement would have imposed

3    penalties of $1.625 billion in the form of "disallowances" plus $50 million in the form of

4    System Enhancement Initiatives.   "Disallowances" refers to PG&E's shareholders being

5    disallowed from recovering expenditures from ratepayers that it would otherwise be allowed

6    to recover.

7        The CPUC chose to adopt a settlement with modifications prompted by the Assigned

8    Commissioner overseeing the investigation proceeding, that would increase the disallowances

9    from $1.625 billion to $1.823 billion, in recognition of the "questionable" likelihood that

10   PG&E would have been allowed to recover some of the expenditures from ratepayers (e.g.,

11   the Catastrophic Expense Memorandum Account costs).   Id. at 39.   The Commission also

12   voted to order that certain tax deductions that might be derived from PG&E's shareholder-

13   funded expenditures should flow to ratepayers.   Id. at 40-47.

14       The CPUC felt strongly about imposing a $200 fine on PG&E because "[f]ines convey

15   the strongest societal opprobrium for wrongdoing and are thus the most potent tool for

16   purposes of penalizing and deterring unlawful conduct.   Id. at 48.   However, because there

17   was a risk of drawing down funds set aside to pay fire victims' bankruptcy claims, the CPUC

18   chose not to risk drawing funds away from fire victims and instead permanently suspended

19   the fine.   Id. at 47-50.

20       As discussed in the section above, the Commission also more than doubled the penalty

21   amounts for the System Enhancement Initiatives and other corrective actions (discussed

22   above) from $50 million to $114 million.   Id. at 51-59.

23       With the fine, the total penalties exceeded $2.1 billion.   With the fine permanently

24   suspended, the penalties for which PG&E is responsible totals $1.937 billion.[10]

25   _____

26   [10] CPUC counsel represented to the Court at the May 28 hearing that the total penalty with
     the suspended fine exceeds $2.1 billion.   (ECF No. 1212, Transcript, at 63-64).   The CPUC

27

28

1

**VI.    DE-ENERGIZATION (PUBLIC SAFETY POWER SHUT-OFFS) WILL
CONTINUE TO BE AN IMPORTANT TOOL TO MITIGATE
WILDFIRE RISK**

2

3    De-energization is a tool used to mitigate the risk of wildfires caused by utility

4    electrical equipment, but de-energization itself can have direct and sometimes acute or even

5    fatal impacts on utility customers.  Last fall, PG&E implemented a number of PSPS events

6    that resulted in power shut off to more than 700,000 customer accounts, affecting over two

7    million Californians.   PG&E's PSPS implementation in 2019 presents many, many

8    opportunities to improve.  Despite this, de-energization remains a critical option-of-last-resort

9    to mitigate the risk of wildfires and is one of the tools on which the CPUC and the very broad

10   cross-section of partners and stakeholders have been focusing efforts to refine this past year.

11   As the CPUC detailed for the Court last year, the CPUC established PSPS standards

12   and guidelines for SDG&E in 2012.  See CPUC Resolution ESRB-8, Exhibit 4 of CPUC

13   Comments In Response to OSC (ECF No. 987), at 1.  By 2018, those standards and guidelines

14   extended to all electric utilities.  Id.  As the CPUC and utilities continually gain more

15   experience with PSPS events, the critical importance of effective coordination with local

16   communities, first responders, and medical baseline and access and functional needs ("AFN")

17   populations, and of effective advance notification to customers, has never diminished.  See id.

18   at 4-7.

19   Soon after it last addressed the Court in 2019, the CPUC issued its "Decision Adopting

20   De-Energization (Public Safety Power Shut-Off) Guidelines (Phase 1 Guidelines)," D.19-05-

21   042 (issued June 4, 2019),[11] setting forth the Commission's overall de-energization strategy,

22   in Rulemaking 18-12-005, the CPUC's Rulemaking to Examine Electric Utility De-

23

24

25

26   hereby corrects that statement that the total penalty for which PG&E shareholders will be
responsible, after the $200 million fine is permanently suspended, is $1.937 billion.

27   [11] https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M296/K598/296598822.PDF.

28

Energization of Power Lines in Dangerous Conditions.[12]  Notably, the Phase 1 Guidelines focused on and improved the key two functions.  First, it improved guidance on communication and notification of PSPS events and re-energization of lines.  CPUC Decision 19-05-042 at 32-51.  Second, the Phase 1 Guidelines focused on "[i]ncreasing precision to allow de-energization of smaller areas of infrastructure" to minimize the potential for other harmful consequences, such as the impairment of public emergency and safety services.  Id. at 4.

Earlier this month, the Commission adopted a decision in Phase 2 of the Rulemaking, providing additional guidelines on coordination and communication in advance of the 2020 wildfire season.[13]  The Commission's emphasis was on increasing outreach through working groups and advisory groups to refine de-energization protocols and collectively establish best practices.  Id. at 13-19.  Outreach was directed toward tribal and local governments, public safety partners, and representatives of access and functional needs and vulnerable communities; business communities and non-profits and academic experts. Id. at 13-14.  The Commission also instructed de-energization table-top exercises and simulations with the CPUC, CAL FIRE, CalOES, communications providers, representatives from medical baseline and AFN populations, and other public safety partners, in areas with the highest historical and forecasted probability of PSPS events.  Id. at 22, 80-81, and 91.  Other concrete aides to improve PG&E's PSPS events include establishing community resource centers and meeting the needs of AFN and other vulnerable populations.  Id. at 32-40.

---

[12] The Commission previously informed the Court of the Phase 1 Scoping Memo by the CPUC's Comments In Response to Second Order to Show Cause (ECF No. 1033).  The CPUC informed the Court that at least 61 parties were participating.  The first phase of the rulemaking was intended "to ensure that the Commission has adopted de-energization parameters and protocols in anticipation of the upcoming 2019 wildfire season.

[13] Decision Adopting Phase 2 Updated and Additional Guidelines for De-Energization of Electric Facilities to Mitigate Wildfire Risk, D.20-05-051 (issued June 5, 2020). https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M339/K524/339524880.PDF.

1    Enhancements to the CPUC's de-energization policy involve planning for backup

2   generation, CPUC D.20-05-051 at 54, 55, 61, backup battery systems for customer-sited

3   generation, see https://www.cpuc.ca.gov/PSPSFAQ/, and increased backup power for remote

4   cell towers.  The CPUC may also expand the use of microgrids to improve wildfire resiliency.

5   The Commission is today considering a vote to approve an expedited process to interconnect

6   microgrids to prepare for the 2020 wildfire season.  See Rulemaking 19-09-009, "Proposed

7   Decision Adopting Short-Term Actions to Accelerate the Deployment of Microgrids and

8   Related Resiliency Solutions."[14]

9    The CPUC does not ignore that PG&E's PSPS implementation in 2019 may have led

10  to PG&E's violating laws, regulations, or orders, and the CPUC is pursuing compliance and

11  enforcement actions as appropriate.[15]  However, given the immediate and direct impact to

12  customers and the public of either well-executed or poorly executed PSPS events, the CPUC

13  remains committed to helping PG&E and the utilities competently and judiciously exercise

14  the important tool-of-last-resort, PSPS events.

15  **VII.   THE CPUC CREATED A SIX-STEP ESCALATING OVERSIGHT
          AND ENFORCEMENT PROCESS TO COMPEL IMPROVED SAFETY
16        OUTCOMES**

17    On May 28, the CPUC approved PG&E's plan of reorganization.  CPUC Decision 20-

18  05-053 (issued June 1, 2020).[16]  The CPUC exacted changes to PG&E's Reorganization Plan

---

[14] https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M335/K511/335511328.PDF.

[15] See "Assigned Commissioner and Assigned Administrative Law Judge's Ruling Setting the Scope and Schedule of the Order to Show Cause Against Pacific Gas and Electric Company for Violations Related to the Implementation of the Public Safety Power Shutoffs in October 2019" (issued Dec. 23, 2019) regarding PG&E's handling of October 2019 PSPS events, alleging failures of communications portals and notification systems. https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M322/K703/322703988.PDF.  In addition, CPUC Investigation 19-11-013 is a formal adjudicatory investigation proceeding into whether PG&E and other utilities prioritized safety and complied with state laws and regulations on the 2019 PSPS events. https://apps.cpuc.ca.gov/apex/f?p=401:56:0::NO:RP,57,RIR:P5_PROCEEDING_SELECT:I1911013.

[16] https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M338/K816/338816365.PDF.

1    that ties a significant portion of executive compensation to PG&E's safety performance,

2    among other structural and incentive changes, and sets out a six-step Enhanced Oversight and

3    Enforcement Process to compel PG&E's positive reform, at the ultimate risk of PG&E losing

4    its license to operate as a public utility.

5        The CPUC must approve PG&E's plan of reorganization in accordance with AB

6    1054's mandates, before PG&E could participate in the Wildfire Fund and have the ability to

7    access funds and quickly pay compensation to wildfire victims.  See Cal. Pub. Util.  Code

8    § 3292(b)(1)(C).  The CPUC determined that PG&E's Plan of Reorganization as modified by

9    its final decision *is not inconsistent with the requirements of PG&E's criminal probation* as

10   of May.  CPUC Decision 20-05-053 at 71.  If the Court does entertain modified conditions of

11   probation that could conflict with the Reorganization Plan and other CPUC considerations,

12   such changes could affect the CPUC's approval of the Plan and PG&E's ability to exit

13   bankruptcy and participate in the Wildfire Fund, and thus to pay wildfire victims.

14       In so reviewing PG&E's Reorganization Plan, the Commission was required to ensure

15   immediate and lasting changes in PG&E's governance and safety record, "*in light of PG&E's*

16   *safety history*."  Id. at 18-19 (emphasis added).  This was not an easy undertaking, as the

17   Commission stated:

18           It is understandable that PG&E may want to shift the focus
             away from the history of its recent safety performance - which
19           has ranged from dismal to abysmal - and instead seek to draw
             attention to its remedial efforts. At the same time, however,
20           this is a cause for concern, as PG&E seems reluctant to take
             ownership of its own safety history and acknowledge its
21           failings. PG&E's safety history is, however, well documented
             elsewhere, including Commission decisions and other parties'
22           testimony and pleadings.
23

24   Id. at 17.  Upon receiving a draft of PG&E's Plan of Reorganization, the Assigned

25   Commissioner was compelled to add refinements and details on such matters as:

26       •   A changed board, holding company, and governance structure, where
             the Board is largely independent, not presenting conflicts of interest
27           with investment funds, Decision, pp. 30-34, and presenting significant

28

safety expertise related to wildfire safety, wildfire prevention, and/or wildfire mitigation.

- The appointment of an Independent Safety monitor that is the functional equivalent of this Court's Monitor, to develop recommendations to address compliance issues and enhance safety performance.

- Restructuring the company by creating local operating regions, where each region will have its own risk officer and safety officer.[17]

Most importantly for public safety, the Assigned Commissioner introduced and the Commission adopted a novel, detailed six-step Enhanced Oversight and Enforcement Process for the CPUC to closely monitor PG&E's safety performance going forward.   CPUC Decision.20-05-053 at 57-70, 122, and Appendix A.[18]   It contains six steps of increasing oversight and enforcement, where progression to the next step is "triggered" by certain events or failures with respect to Safety and Operational Metrics.  Id. at 58 and Appendix A.  PG&E will be given opportunities to make improvements and reverse forward movement on the six-step Process.  If PG&E continues to set off "triggers" and its safety performance continues poorly, however, the Enhanced Oversight and Enforcement Process can "lead to the Commission placing conditions on or revoking PG&E's certificate of public convenience and necessity (CPCN)."  Id. at p. 57.  The Enhanced Oversight and Enforcement Process invited significant comment in part because the CPUC has never before explicitly advanced a process for revoking a large utility's license to operate.  See Id. at 60-61, 68.

## VIII.   THE CALIFORNIA LEGISLATURE IS CONSIDERING PROPOSED LEGISLATION TO EMPOWER OPTIONS OF LAST RESORT

Proposed legislation in the California Legislature sets a path for a receiver or the State to take operational control or ownership of PG&E, which the bill's authors present as paths

---

[17] See Assigned Commissioner's Ruling and Proposals [to modify PG&E's Reorganization Plan] (issued Feb. 18, 2020). https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M327/K303/327303409.PDF.

[18] Appendix A of CPUC Decision 20-05-053 is included in the link to the decision provided above, and the CPUC provides a copy of the CPUC-adopted Enhanced Oversight and Enforcement Process as Nolan Decl., **Exh. 6**.

1   of last resort should PG&E fail to successfully emerge from bankruptcy or under the six-step

2   Enhanced Oversight and Enforcement Process.  "It is the intent of the Legislature that Golden

3   State Energy act pursuant to this division only in the event that a transformed utility does not

4   emerge from the bankruptcy or the transformed utility fails to meet its duty to provide safe,

5   reliable, and affordable energy services."  Cal. Pub. Util. Code § 3401(a)(5) (proposed).  The

6   Court may find this informative as to how the state may codify additional tools to hold PG&E

7   accountable for its safety performance.[19]

8           Insofar as it is relevant to this brief, SB 350 enables the CPUC, if it determines that a

9   receiver is warranted to operate PG&E, to petition a superior court to appoint a receiver. Cal.

10  Pub. Util. Code § 1825 (proposed).

11          SB 350 would also empower the Governor to establish Golden State Energy as a new

12  non-profit public benefit corporation to own, control, operate, and manage the electric and gas

13  services of PG&E. Cal. Pub. Util. Code § 3420(a) (proposed). Golden State Energy would be

14  subject to the regulatory authority of the CPUC to set rates, implement policies pertaining to

15  safety, wildfire mitigation, climate change mitigation and adaptation, public purpose

16  programs, and any other requirements except as otherwise provided by statute.  (Cal. Pub. Util

17  Code §§ 3401(a)(6), 3434(g) (proposed).

18          Thus, SB 350 dovetails with the sixth step in the Enhanced Oversight and Enforcement

19  Process that the CPUC required as a condition of approval of PG&E's Plan of Reorganization.

20  SB 350 provides that, if the CPUC determines, pursuant to the processes or procedures

21  adopted in D.20-05-053 from the pending bankruptcy investigation proceeding I.19-09-016,

22  that PG&E's Certificate of Public Convenience and Necessity should be revoked, Cal. Pub.

23  Util. Code § 713(a)(1) (proposed), then Golden State Energy would be authorized to issue

24

25

26  _____

27  [19] Senate Bill 350 was introduced by Senator Hill and principally co-authored by Senators
    Dodd and McGuire and Assembly Member Holden.  As of June 10, it appears to be moving

28  quickly through the Legislature.

1  debt to facilitate the acquisition and to commence an eminent domain action. Cal. Pub. Util.

2  Code § 3434(a) (proposed).

3  **IX.   CRITICAL CONSIDERATIONS AS THE COURT CONTEMPLATES
           MODIFYING CONDITIONS OF PROBATION**

4

5       The CPUC submits that it is vitally important that the Court embrace the following

   considerations if or before making further modifications to conditions of PG&E's probation.

6

7       **A.   The Ability of the CPUC to Exercise Its Broad Authority
                to Regulate PG&E with Maximum Flexibility Optimizes
                the Shared Goal of Protecting the Safety and Well-Being of
                Californians**

8

9       As PG&E's regulator, the CPUC must fulfill its constitutional and statutory duties,

10  and in the course of doing so needs to maintain flexibility in its regulatory oversight.  Such

11  flexibility allows the CPUC to order improvements upon receiving new data, Root Cause

12  Analyses, and lessons learned that it has ordered through the decisions discussed herein, to

13  take advantage of new technologies, and to refine rules and standards to enhance wildfire

14  prevention while minimizing unnecessary impacts to public health, safety, and well-being.

15  Regulatory history bears out the need for this flexibility.  The CPUC's Phase 1 Guidelines for

16  PSPS events, for example, "builds on new weather tracking and modeling technology … along

17  with statewide fire hazard maps."  CPUC Decision 19-05-042 at 3.  These tools were

18  "developed, tested, and improved over the course of several years" in San Diego Gas &

19  Electric Company's ("SDG&E") territory after SDG&E's equipment contributed to the

20  historically devastating wildfires in 2007.  Id. at 4.  "Over this period, weather monitoring and

21  wind modeling have become more precise, and the areas that are proactively shut off from

22  service have grown smaller and smaller due to more reliable information and changes to

23  electric infrastructure that allow SDG&E to isolate smaller portions of their system for de-

24  energization."  Id.

25       In addition, the COVID-19 pandemic introduces new and complex logistical, safety,

26  and economic constraints and trade-offs regarding the use of PSPS as a wildfire mitigation

27  tool.  The CPUC, together with CAL FIRE and CalOES, have clearly expressed to PG&E and

28

1    other utilities its expectation that all essential wildfire mitigation work continue to be

2    prioritized even during the COVID-19 pandemic, and that "we cannot afford to lose any

3    progress in our widescale efforts to mitigate the wildfire threats that loom on California's

4    horizon."   See Letter to PG&E Re: "Essential Wildfire and Public Safety Power Shutoff

5    Mitigation Work" (dated March 27, 2020), Nolan Decl., **Exh. 5**.   The CPUC must continue to

6    evaluate and update its guidelines for when and how the electric utilities may call PSPS events,

7    how utilities can safely deploy resources in communities during PSPS events, and to monitor

8    compliance with all requirements and notifications.   The same flexibility might be required

9    for other wildfire mitigation activities, such as the Wildfire Safety Division's field inspections.

10   Accordingly, any condition of probation in a federal criminal court order that impedes this

11   flexibility would squander precious time and resources that must be laser-focused on wildfire

12   mitigation.

13          **B.      Proposed Revised Conditions of Probation that Impose**
                      **Incremental Costs Must Be Understood in a Broader**
14                    **Context.**

15          The Court has ordered (and temporarily suspended) new conditions of probation that

16   would have imposed operational costs on PG&E.   The prospect of these incremental costs

17   must be viewed in the broader context of the CPUC's regulation of wildfire mitigation efforts.

18   The CPUC estimates that PG&E alone will spend $9.54 Billion within the next three years to

19   comply with its Wildfire Mitigation Plans and other CPUC orders detailed herein, on

20   inspections, vegetation management, system hardening and corrective actions, and other

21   wildfire mitigation expenditures .   A significant portion of these expenditures will be borne

22   by PG&E's shareholders as part of the CPUC's $1.9 billion penalty in connections with

23   PG&E's role in starting the 2017 and 2018 wildfires.   More importantly, ,however,is that

24   ratepayers will bear already substantial costs to support the Wildfire Mitigation Plans and

25   should not be shouldered with additional costs absent a public proceeding at the CPUC testing

26   the efficacy and practicability of the proposed undertaking.   The CPUC is keenly sensitive

27   about additional expenditures that this Court may order that could directly impact ratepayers.

28

1    Rates can only be reasonable if they cost-effectively support the safe and reliable provision of

2    utility services.   At the present time, during this COVID-19 public health emergency and

3    widespread economic hardship on households and businesses, rate affordability is of utmost

4    importance.   The CPUC, for example, has had to order utilities not to disconnect customers

5    for failure to pay bills as a result of the present State of Emergency the Governor declared due

6    to COVID-19.[20]   As both a rate and safety regulator of PG&E, the CPUC must always balance

7    the operational needs of the utility and the public's health and safety and right to safe, reliable,

8    *and affordable* utility service.   The CPUC's comprehensive regulation – only partially

9    demonstrated with just a handful of the Commission orders and actions discussed in this brief

10   –is balancing those needs.

11        Derailment of PG&E's focus on the CPUC's integrated plans to mitigate wildfires,

12   and tension that PG&E might face if having to choose between a federal court order and the

13   CPUC's orders, would ill serve public safety and impose additional costs on ratepayers

14   without a public vetting.   The health, safety, and well-being of Californians will be best served

15   if the CPUC is permitted the flexibility to exercise its broad ratemaking, health and safety

16   authority with wide discretion on wildfire mitigation.

17   **X.      CONCLUSION**

18        The CPUC respectfully submits these comments to assist the Court in its ongoing

19   probation of PG&E.

20

21

22

23

24

25

26

27   ---

28   [20] See file:///C:/Users/cjh/AppData/Local/Temp/329673725.PDF.

1   June 11, 2020                                    Respectfully submitted,

2                                                    AROCLES AGUILAR
3                                                    CHRISTINE JUN HAMMOND
                                                     CHRISTOFER C. NOLAN
4
                                    By:     /s/      *Christofer C. Nolan*
5                                                    Christofer C. Nolan

6                                                    Attorneys for the CALIFORNIA PUBLIC
7                                                    UTILITIES COMMISSION

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28