Michael J. Aguirre, Esq., SBN 060402
maguirre@amslawyers.com
Maria C. Severson, Esq., SBN 173967
mseverson@amslawyers.com
AGUIRRE & SEVERSON, LLP
501 West Broadway, Suite 1050
San Diego, CA 92101
Telephone: (619) 876-5364
Facsimile: (619) 876-5368

Catherine J. Kissee-Sandoval, SBN 153839
Csandoval@scu.edu
Santa Clara University School of Law
500 El Camino Real
Santa Clara, CA 95053-0421
Telephone: (408) 551-1902
Facsimile: (408) 554-4426

Attorneys for *Amici* Alex Cannara
and Gene A. Nelson

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

                Plaintiff,

    v.

PACIFIC GAS AND ELECTRIC
COMPANY,

              Defendant.

Case No. CR 14-0175 WHA

**AMICUS BRIEF II IN OPPOSITION TO PG&E'S MOTION TO RECONSIDER ORDER MODIFYING CONDITIONS OF PROBATION**

Judge: Hon. William Aslup

*Amici* Alex Cannara and Gene A. Nelson respectfully offer this brief in support of the April 29, 2020 modifications of PG&E's probation conditions (April 29 Order, ECF No. 1186)  The April 29 Order protects public safety consistent with this court's jurisdiction over PG&E's probation. Federal probation oversight does not usurp California Public Utilities Commission (CPUC) jurisdiction, contradict CPUC orders, nor displace CPUC regulation.  Moreover, the CPUC Wildfire Safety Division's oversight of PG&E's Wildfire Safety Mitigation Plans (WMP) does not consider PG&E's recidivist history of felony violations of safety rules and its 84 felony criminal homicides committed in violation of its probation.

I.      **BACKGROUND FOR APRIL 29 ORDER**

Deficiencies in Pacific Gas& Electric (PG&E) vegetation management on its overhead electric distribution lines and defective equipment on its transmission lines have and will cause deadly catastrophic fires unless corrected.  On April 29, 2020, the Court ordered PG&E to retain in-house inspectors to double check its vegetation management, and further, the Court ordered PG&E to itemize and identify the age of its transmission line equipment. PG&E has requested reconsideration of the judge's order and appealed the order to the Ninth Circuit, and resists conducting the activities ordered on April 29, 2020.

There is a substantial record supporting the April 29 Order.  On June 16, 2020, PG&E pled guilty to an 84 count indictment[1] for criminal homicides in connection with the Camp Fire it caused in November 2018.[2]  The Butte County District Attorney issued a "People's Statement of Factual Basis in Support of the Pleas and Sentencing Statement" that provided PG&E recklessly caused the Camp Fire and was guilty of 84 counts of criminal manslaughter in violation of Penal Code §192(b)).  (Docket No. 1220-1)

The California Public Utilities Commission's (CPUC) Safety Enforcement Division (SED) determined PG&E's violations of fire safety rules were associated

---

[1] https://www.google.com/search?client=firefox-b-1-d&q=butte+county+indictment+of+pge
[2] https://www.youtube.com/channel/UCyTCqtrn7O_iTaFYoVIjjoQ/videos

with 16 fires caused by PG&E operations in 2017 and 2018.  (CPUC Decision 20-05-019, pp. 9-13)  PG&E's violations included:

- GO 95 Rule 31.1 – Failure to identify and abate hazardous

- GO 95 Rule 31.1- Inspection Records not maintained

- GO 95 Rule 35 – Vegetation clearance not maintained

- GO 95 Rule 38 – Conductor clearance not maintained

- GO 95 Rule 31.1 – Repair Records not maintained

This Court's April 29 Order is tailored to the circumstances of PG&E's actual criminal record by because it orders PG&E to obtain transmission facility records and take action to address its aging facilities, both of which were predicate facts that led PG&E to commit 84 counts of involuntary manslaughter and 1 count of unlawful fire start in Butte County. Rather than relying on the standard-based rules of California Public Utilities Code § 451 that requires safe, reliable service with adequate facilities at just and reasonable rates, this court's order will both rehabilitate PG&E and foster public safety consistent with the federal criminal code.  Indeed, this Court's April 29 Order addresses a gap in federal and state utility governance that PG&E has exploited to evade record-keeping responsibilities and to continue operating century old equipment without analysis of the safety risks.

It is up to this Court to determine what PG&E's probation conditions should be for its federal crime, not the CPUC. The CPUC's Comments to this Court about the proposed modification of PG&E's probation stated that "PG&E refused to admit that it violated applicable laws, rules and regulations," but that PG&E "does not dispute that its electric facilities played a role in the ignition of all [sixteen] fires for which [the Safety and Enforcement] found violations." *Amici* observe that PG&E's violations of the CPUC's rules, orders, decisions, resolutions, and the California Public Utilities Code were predicate acts to its commission of 84 manslaughter counts and 1 count of unlawfully starting a fire to which PG&E pled guilty.

Lives are at risk in these jurisdictional fissures.  PG&E's appeal of this Court's order and its petition for reconsideration reflect its desire to not conduct the record search

and operational analysis this Court's April 29 Order required. The CPUC has made no parallel order requiring those steps. PG&E would have the Court and the public rely on its professed intent to comply with CPUC safety standards. But as set forth herein, PG&E takes refuses to take responsibility for its actions.

The Court's first condition of PG&E's probation terms was a simple but critical one: "(1) While on probation, PG&E shall not commit another Federal, State, or local crime." (ECF No. 919) PG&E committed 85 felonies while on probation in direct violation of this probation condition. This Court has the authority and responsibility to determine whether PG&E violated its criminal probation, to determine whether PG&E's probation conditions should be modified, and to examine whether the length of PG&E's probation should be extended. In so doing, the Court should find PG&E's continuing criminal conduct in violation of its probation warrant this modification and extension of PG&E's probation.

## II.    PG&E REFUSES TO TAKE RESPONSBILITY

PG&E refuses to acknowledge its violations of safety rules has caused catastrophic fires. As stated above, the CPUC's SED investigated 18 fire incidents that occurred over 2017 and 2018, and determined that PG&E was responsible for 16 of these wildfires. (D.20-05-019). (ECF No. 1217, p. 14) These wildfires are, in 2018, the Camp Fire, and in 2017, the Adobe, Atlas, Cascade, Norrbom, Nuns, Oakmont/Pythian, Patrick, Pocket, Point, Potter/Redwood, Sulphur, Youngs, Lobo, and McCourtney Fires. (D.20-05-019). (ECF No. 1217, p. 14)   The CPUC notes "PG&E **refused** to admit that it violated applicable laws, rules and regulations. *Id.* at 15" (D.20-05-019). (ECF No. 1217, p. 14)

On June 16, 2020, after pleading PG&E guilty to 84 counts of criminal homicide in the Camp Fire, PG&E's Chief Executive Officer William  Johnson represented it was PG&E equipment that caused the fire--not PG&E's violations of the fire safety rules.

PG&E refuses to establish an in-house inspection system to keep honest its distribution line vegetation management program.  PG&E refuses to itemize and age the equipment on its transmission lines.  The SED identified vegetation management and

4

transmission equipment failures as the primary causes of the PG&E catastrophic fires in 2017 and 2018.  (D.20-05-019, pp. 9 -13)

Instead, PG&E asks the Court to defer the duty to oversee PG&E's probation to the CPUC 's Wildfire Safety Division (WSD). Rather than require safety inspections to double-check vegetation management on PG&E's distribution lines or catalogue the items and age of transmission equipment likely to fail and cause fires, the WSD "has developed a **model** for evaluating current and projected wildfire risk reduction performance."  The WSD has adopted a gentle approach to regulating convicted murderer PG&E: "It is important to note that this model is not designed to immediately penalize utilities for poor performance, but rather it is an effort by the WSD to work collectively with the utilities it regulates to facilitate improvement by identifying best practices, current strengths and current weaknesses across the utility landscape."[7]

III.    **PG&E HAS SHOWN IT CANNOT BE TRUSTED**

PG&E cannot be trusted.  For example, the Company's duplicity was documented in the Butte County District Attorney's Camp Fire Report (ECF No. 1220-1, pertinent parts provided here):

IX.  INSPECTION AND PATROL OF THE
CARIBOU-PALERMO LINE

Based upon PG&E records and flight records obtained from their contracted helicopter company, the evidence established inspections and patrols of the Caribou-Palermo line **did not comply with the standards set forth in the ETPM[8]** and did not meet the requirements of the law or the regulatory agencies.

Routine inspection and patrol records for the Caribou-Palermo line were obtained back to 2001.

---

[7]  2020 Wildfire Mitigation Plan Final Action Statements and Ratified Resolutions
https://www.cpuc.ca.gov/SB901/

[8] PG&E's Electric Transmission Preventative Maintenance Manual

According to PG&E, **no inspection or patrol records prior to 2001 could be located**.[9] Based upon the inspection and patrol records the evidence established that the Caribou-Palermo line was subjected to "Detailed Ground Inspections" in 2001, 2003, 2005, 2009 and 2014. Based upon the inspection and patrol records the evidence established the Caribou-Palermo line was subjected to "Annual Aerial Patrols" in 2001, 2002, 2004, 2006-2008, 2010-2013, 2015-2018. There is no record of any climbing inspections, detailed ground inspections above 10' or aerial inspections conducted on the Caribou-Big Bend section of the transmission line. All of the inspection and patrol records were reviewed and all of the troublemen/linemen who conducted the inspections and patrols were interviewed. (ECF No. 1220-1 p. 39)

\*\*
However, according to this 2014 report, those missing towers were physically inspected in August 2014, including a previously documented issue on tower 22/188. The previously documented issue on Tower 22/188 was the replacement of the parallel groove connectors identified during the 2009 Detailed Ground Inspection.

6) The lineman assigned to assist with the 2014 Detailed Ground Inspection of the Caribou-Palermo line **was not trained to complete the ground clearance measurements**. According to PG&E policy, clearance measurements must include the measurement, and the date, time and air temperature when the measurement was taken. **Although the report shows the clearance measurements were done** concurrently with the inspection, **the evidence established they were not.**\*\* The result was the dates and times of the clearance measurements documented in his **reports were not accurate**.

On June 26, 2018, a PG&E work order requiring climbing inspections of all Caribou-Palermo line structures was issued by a PG&E Tower Department supervisor. The supervisor was interviewed. The supervisor **could not provide any reason or rationale for the work order.** Specifically, the supervisor stated that the work order was requested by someone else **and his job was simply to compile the information into a template report and forward the template report** to the appropriate work group. (ECF No. 1220-1 p. 46)

PG&E was unable to provide any further information. "PG&E's inspection records do not identify the factors that led to the selection of the Caribou Palermo 115 kV Transmission Line as one of the lines selected for climbing inspections as part of this effort. PG&E understands that the age of lines was a factor that was considered in their selection." (ECF No. 1220-1 p. 46)

---

[9] All bold in these passages are emphasis added.

Beginning in September 2018 climbing crews from the PG&E Tower Department climbed and inspected 80 towers on the Caribou-Palermo line. The vast majority of the towers climbed and inspected were on the Palermo-Big Bend section of the Caribou-Palermo line. "PG&E understands that the reason these approximately 80 towers were selected first and the order in which they were inspected was determined by the Tower Department based on various considerations, including weather conditions and crew availability." (ECF No. 1220-1 p. 46)

All of the towers climbed in September and October 2018 were subjected to WSIP enhanced inspection starting in December 2018. The WSIP enhanced inspections documented problems and defects on numerous towers that were not discovered/detected/documented during the September 2018 climbing inspections. (ECF No. 1220-1 p. 46)

The fact that **PG&E has no explanation for how or why or by whom the decision to conduct climbing inspections was made is disturbing but not unusual.** Numerous decisions and policies were investigated. As to many decisions and policies, **PG&E was unable to provide any documentation as to who made the decision, how the decision was made and upon what the decision was based**. This inability to determine who made decisions and upon what those decisions were based**, frustrated efforts** to identify individuals potentially personally liable for policies that lead to the conditions which caused the Camp Fire. (ECF No. 1220-1 p. 46)

PG&E agents are now trying to keep secret the names of these PG&E employees who were part of the Butte County Grand Jury Proceeding. (See 3rd Appellate District Case No. C092045).

IV.  **WILDFIRE SAFETY DIVISION INSUFFICIENT FOR A RECIDIVIST CRIMINAL**

At the May 28, 2020 probation modification hearing, this Court discussed the run-around it gets from PG&E when it exercises its authority to hold its probationer accountable. (Reporter's Transcript (RT) 72:4-5) The Court stated: "There are two sets of problems. One is -- concerns the distribution lines. The other concerns the transmission lines." (RT 68:21-23) The Court identified related issues:

"Well, the – so the issue is potential communications and misdirection because PG&E is outsourcing all of this work and does not have in-house any of the people who

AMICUS BRIEF II IN OPPOSITION TO PG&E'S MOTION TO RECONSIDER
ORDER MODIFYING CONDITIONS OF PROBATION                                    CASE NO. CR 14-0175 WHA

are doing the pre-inspections, nor, for that matter, the post-inspections, to designate what work needs to be done to be in compliance with state law, and for that matter, the wildfire mitigation plans." (RT 68:6-11)

The Court elaborated: "One set of problems concerns the quality of the vegetation management, and the tree-cutting and tree-trimming, that's what it comes down to. And I guess also the hardening, that's a separate problem. Okay. So that's one set of problems related to distribution." (RT 70:25-71:4)

The Court addressed the "second set of problems relates to transmission lines," and "at least two instances now, the Kincaide as well as the Butte County, where massive fires have started." (RT 71:5-6, 8-9) "PG&E trots out the inspection reports; the inspection reports say everything was checked. But they're in such vagueness that it is impossible to go behind it and find out what really happened." (RT 71:10-14)

It is in this context that the Court asked the CPUC and others present, including Amici: "How do we fix that inspection so that it has a better chance – not a perfect chance, but a better chance – of finding the things that are about to go wrong, so we avoid another catastrophic fire from the transmission lines?" (RT 71:19-23) The CPUC stated, "I'm not sure that we would say, ourselves, everything is under control…we're not getting ahead of the problem. We are trying to get ahead of the problem now." (RT 73:21-22; 74:1-2)

This Court directed an answer to the questions: "How can we solve the two problems that I've put on the table, and instead of making a long list of excuses, explain to me what specifically is different you're doing now or will do that will solve those problems." (RT 87:24 – 88:2)

PG&E and the CPUC ask the Court to have blind faith in the Wildfire Safety Division. But Amici's investigation reveals the CPUC has outsourced those responsibilities, just as PG&E has failingly outsourced its inspection and vegetation management. The CPUC represents the "WSD's primary directive is to evaluate and approve or deny electrical corporations" Wildfire Mitigation Plans in accordance with Public Utilities Code section 8385 et. seq. to ensure that the utilities are taking effective

actions to reduce utility-related wildfire risk." (ECF No. 1217, p. 8)

However, in papers the CPUC filed with the California Department of General Services on or before September 12, 2019, the CPUC admitted the "CPUC needs to develop a strategy for utility Wildfire Mitigation Plans that includes specific goals, actions and performance measures. There are currently no policies or standards that establish criteria for an adequate utility Wildfire Mitigation Plan." The CPUC admitted the "CPUC does not have staff to develop a Wildfire Mitigation Plan evaluation framework and is therefore requiring a contractor to provide policy consultants to assist with this process." [11] In fact, the Wildfire Safety Division has contracted out the function of reviewing PG&E's Wildfire Mitigation Plans.[12]

The WSD rationalizes it gentle treatment of PGE: "it is in the best interest of the utilities, ratepayers and other key stakeholders to take this **collaborative**, growth-oriented approach." The WSD acknowledges "certain utilities are currently on the low end of the range for various categories of performance" However, the "WSD is hopeful that providing clear review and evaluation of performance, including identifying such weaknesses, will help drive change in the utilities, allowing all regulated electric utilities in California to improve wildfire risk reduction performance."[13] In other words, as far as safety enforcement, it is business as usual at the CPUC, and the people of California are not safely rely on "hope."

The WSD approved PG&E's Wildfire Mitigation Plan for 2020, despite finding over 29 material deficiencies, as shown below. The WSD categorized the deficiencies into three classes: (1) Class A – aspects of the WMP are lacking or flawed; (2) Class B – insufficient detail or justification provided in WMP; (3) Class C – gaps in baseline or

---

[11] https://publicrecords.cpuc.ca.gov/requests/19-606
[12] https://www.cpuc.ca.gov/uploadedFiles/CPUCWebsite/Content/About_Us/Organization/Divisions/WSD/Report_WildfireMitigationStrategy_WSD_DRAFT_vF.pdf
[13] 2020 Wildfire Mitigation Plan Final Action Statements and Ratified Resolutions https://www.cpuc.ca.gov/SB901/

historical data, as required in 2020 WMP Guidelines:

**Class A Deficiencies  (4)**

- PGE-1 PG&E groups initiatives into programs and does not provide granular initiative detail. Class A Deficiency
- PGE-8 Annual risk ranking is quickly out of date Class A Deficiency
- PGE-15 It is unclear how PG&E classifies findings at the appropriate level. Class A Deficiency
- PGE-25 Lack of details in PG&E's WMP on how to address personnel shortages. Class A Deficiency

**Class B Deficiencies  (20)**

- PGE-2 Equipment failure. Class B Deficiency
- PGE-5 PG&E provides little discussion of how it uses the results of relative risk scoring method. Class B Deficiency
- PGE-6 Discrepancy between ignition reduction projections Class B Deficiency
- GE-7 It is not clear if PG&E's line risk scoring sufficiently incorporates all risks that cause ignition and PSPS Class B Deficiency
- PGE-9 How PG&E weighs egress as a risk factor. Class B Deficiency
- PGE-10 PG&E lacks sufficient weather station coverage Class B Deficiency PGE-11 Including additional relevant Class B Deficiency
- PGE-12 PG&E's fuse replacement program planned to take 7 years. Class B Deficiency
- Page 13 PG&E does not explain how the factors limiting microgrid deployment will impact its microgrid plans. Class B Deficiency
- PGE-14 Level 3 findings. Class B Deficiency In accordance with GO 95, Rule 18, to determine the priority level classification of an inspection finding, a utility must differentiate the potential severity of the risk to safety or reliability, classified as high (i.e., Level 1), moderate (i.e., Level 2) or low (i.e., Level 3). As shown in Appendix B, Figure 2.1a, PG&E's increased inspection efforts in 2019 generated a huge spike in Level 3 findings which it has 60 months or longer to address. Considering that this determination of risk level is made at the discretion of utilities and directly corresponds to the amount of time allowed to address the risk, the lack of parity with SCE and SDG&E in the number of Level 3 findings gives the WSD concern that PG&E may be using the Level 3 category to avoid fixing problems quickly. In notes to Table 7 of its WMP, PG&E indicates it currently utilizes two models to calculate ignition risk, with a third developed in 2019, all of which produce outputs in

10

potential structures damaged or acreage burned should an ignition occur. However, it seems as though PG&E is currently prioritizing utilizing these models to enhance and support its PSPS implementation over grid hardening, asset inspections and vegetation management decision-making. While it is encouraging that PG&E is utilizing its meteorology resources to develop models and analyses to support short term initiatives such as PSPS, these resources must be equally leveraged for long-term planning and management of its grid.

- • PGE-17 Effectiveness of inspections using infrared technology. Class B Deficiency
- • PGE-18 PG&E does not describe in detail how its hazard tree analysis focuses on at-risk trees. Class B Deficiency
- • PGE-19 Low pass rate on EVM QA Class B Deficiency PG&E's is falling far short of meeting its stated 92 percent pass rate in EVM inspections, leading to a large volume of re-work and repetitive QA testing that consumes limited resources and lengthens the time required to complete EVM initiatives.
- • PGE-20 PG&E is redistributing resources to focus more on transmission clearances. Class B Deficiency
- • PGE-21 PG&E fails to describe why additional programs for transmission clearances are necessary. Class B Deficiency
- • PGE-23 Vegetation waste and fuel management processes unclear.
- • Class B Deficiency
- • PGE-24 Improving prioritization. Class B Deficiency
- • PGE-27 Public safety partner coordination. Class B Deficiency
- • PGE-28 Lack of justification and detail for PG&E's self-assessed stakeholder engagement capabilities. Class B Deficiency I
- • PGE-29 Cooperation and sharing of best practices. Class B Deficiency

## Class C Deficencies  (5)

- • PGE-3 High incidence of conductor failure. Class C Deficiency
- • PGE-4 Capacitor bank failure. Class C Deficiency
- • PGE-16 PG&E's record keeping is deficient. Class C Deficiency
- • Page 22 Some of PG&E's vegetation management inspectors may lack proper certification Class C Deficiency
- • PGE-26 Effectiveness of increased vegetation clearances. Class C Deficiency

**Deficiency** Of all PG&E ignitions on its distribution system, 37% were caused by equipment failures over the last five years with the largest driver being

conductor failures at 19% of total PG&E ignitions (or 53% of all equipment failure driven ignitions). Based on normalized data, this rate is almost 50% higher than other large electrical corporations and has a significant impact since PG&E has by far the most overhead conductor miles.[15]

Instead of requiring PG&E to identify and replace its defective equipment likely to cause future fires, the WSD limited the correction to PG&E in its next quarterly report explaining why its "equipment failure rate is so high compared to other large electrical corporations" and addressing "whether its prior maintenance history is causing higher rates of equipment failure." The WSD required PG&E to include "all places where a court ** found fault with PG&E's historical equipment maintenance, either with regard to individual assets or its maintenance policies as a whole."[16]

The WSD also found a PG&E Class C deficiency, "PG&E has approximately 50% more conductor failure ignitions as a percentage of total ignitions, nearly 2.5 times the number of "conductor failure" driven ignitions per overhead circuit mile compared to peer utilities. Since PG&E has the most overhead circuit miles and thus conductors compared to peer utilities, the high rate of conductor failure poses a serious risk."[17] Again, the WSD corrective was limited to PG&E presenting in 2021 "a study or analysis showing the root causes of conductor failures on its grid." The WSD required PG&E to list the "specific locations and assets that are most likely to experience conductor failure."[18]

The WSD found another Class deficiency involving PG&E's capacitor bank failures: "PG&E capacitor bank failures on its distribution system cause 500% higher rates of ignition compared to other large electrical corporations."[19] The WSD corrective was limited: "In its 2021 WMP update, PG&E shall list and describe mitigation measures

---

[15] https://www.cpuc.ca.gov/SB901/
[16] https://www.cpuc.ca.gov/SB901/
[17] https://www.cpuc.ca.gov/SB901/
[18] https://www.cpuc.ca.gov/SB901/
[19] https://www.cpuc.ca.gov/SB901/

that it is undertaking to reduce the likelihood of a capacitor bank ignition."[20]  This pattern

of the WSD identifying material deficiencies in PG&E's but then providing gentle

conditions of corrections continued in a 20 -page table.[21]

In summary, the WSD gently requests future explanations and promises from

PG&E; it does not ask PG&E to redress the problems. Thus, this Court's modified

conditions are critical if lives are to be saved in the upcoming fire seasons.

## V.  MODIFICATION OF PG&E'S PROBATION FOR ITS FEDERAL CRIME AND VIOLATION OF PROBATION IS NOT LIMITED BY CPUC JURISDICTION

PG&E committed mass and shocking crimes, 85 felonies including 84 counts of

Involuntary Manslaughter, while on federal probation for its conviction for multiple willful

violations that killed eight people. The Court's first condition of PG&E's probation terms

was a simple but critical one: "(1) While on probation, PG&E shall not commit another

Federal, State, or local crime." (ECF No. 919)  PG&E committed 85 felonies while on

probation in direct violation of its first condition of probation. PG&E's commission of

mass manslaughter and its unlawful ignition of a fire while on federal probation, as well as

its conduct that led to other fires and violated California law, support modification of

PG&E's probation. *Amici* respectfully suggests that PG&E's continuing criminal conduct

in violation of its probation warrant this Court's consideration of extending PG&E's

probation.

PG&E on June 16, 2020 pled guilty in Butte County, California to 84 individual

counts of Involuntary Manslaughter (a violation of California Penal Code section

192(b)). This plea was entered following an indictment that named each of the persons

killed in the Camp Fire by PG&E's criminal negligence. PG&E also pled guilty to one

count of Unlawfully Causing a Fire (a violation of California Penal Code section 452)

which includes three special allegations for PG&E's causing great bodily injury to a

---

[20] https://www.cpuc.ca.gov/SB901/
[21] https://www.cpuc.ca.gov/SB901/

firefighter; causing great bodily injury to more than one surviving victim; and causing multiple structures to burn.

CPUC Decision 20-05-019 alleged and found on May 8, 2020 that PG&E violated several California statutes in the California Public Utilities Code (CA PU Code), CPUC rules orders, decisions and resolutions in connection with the Wine Country Fires in 2017 and the Camp Fire in 2018.[22] The CPUC's Comments to this Court about the proposed modification of PG&E's probation stated that "PG&E refused to admit that it violated applicable laws, rules and regulations," but that PG&E "does not dispute that its electric facilities played a role in the ignition of all fifteen fires for which [the Safety and Enforcement] found violations." (ECF No. 1217, pp. 14-15) *Amici* observe that PG&E's violations of the CPUC's rules, orders, decisions, resolutions, and the California Public utilities code were predicate acts to its commission of 84 counts of involuntary manslaughter and 1 count of unlawfully starting a fire PG&E pled to in Butte County.

*Amici* respectfully suggest that this Court order PG&E to file a statement with this Court identifying each finding of fact or conclusion of law it admits or denies in CPUC Decision 20-05-019. Such an order would develop a factual predicate for probation modification or extension. That order would supplement the factual basis for probation oversight that will arise from this Court's order for PG&E to file a public statement with this Court identifying each statement the truth of which PG&E denies, and if so, the reason for the denial of the facts in the final summary report from the Butte County District Attorney entitled "People's Statement of Factual Basis in Support of the Pleas and Sentencing Statement." This Court ordered that "All other statements therein shall be deemed admitted." (ECF No. 1220)

/ / /

/ / /

---

[22] CPUC, Decision 20-05-019, Decision Approving Proposed Settlement Agreement with Modifications, Investigation 19-06-015, p. 52 (issued May 8, 2020).

1  This Court has the authority and responsibility to determine whether PG&E has
2  violated its criminal probation, to determine whether PG&E's probation conditions
3  should be modified, and to examine whether the length of PG&E's probation should be
4  extended. The CPUC found in its decision approving PG&E's exit from bankruptcy that
5  based on the record before the Commission "and with the conditions and modifications
6  imposed by this order including the adopted ACR proposals, we find no indication that
7  the plan of reorganization and resulting governance structure as approved by the
8  Commission is inconsistent with the requirements of PG&E's criminal probation."[25]  In
9  making this decision the CPUC observed that "PG&E seems reluctant to take ownership
10 of its own safety history and acknowledge its failings." (ECF No. 1217, p. 17)

11    In its oversight of PG&E's federal probation, this Court is not required to defer to
12 any judgments of the CPUC or FERC regarding PG&E's criminal conduct and its
13 probation violation. Neither does this Court's federal criminal probation interfere with
14 CPUC jurisdiction under the California Constitution and the California Public Utilities
15 Code, nor FERC's jurisdiction under the Federal Power Act.[27] **FERC has NO jurisdiction**
16 **over electricity safety**, independent of reliability analysis. The CPUC's newly developed
17 Wildfire Mitigation Plan has not ordered a detailed examination of the lack of PG&E
18 record-keeping on transmission infrastructure, nor required detailed analysis and action to
19 address the risks of infrastructure that has outlived its useful life.

20    PG&E has displayed a pattern of failing to admit responsibility for violating laws
21 as well as CPUC rules, orders, resolutions, and decisions. PG&E failed to admit before
22 Butte County the facts that supported its conviction but did not contest those facts. *Amici*
23 support Judge Alsup's order to request PG&E to admit or deny the facts in the Butte

---

[25] CPUC, DECISION APPROVING REORGANIZATION PLAN, Decision 20-05-053, Investigation 19-09-016, p. 71 (May 28, 2020).
[27] The Federal Power Act, 16 U.S.C. §§ 791 *et seq*., provides the Federal Energy Regulatory Commission (FERC) with jurisdiction over electricity reliability (16 U.S.C. § 824o) and just and reasonable rates (16 U.S.C. § 824d).

County report. *Amici* respectfully suggests that this Court order PG&E to admit or deny the findings of fact and conclusions of law in CPUC Decision 20-05-053 regarding the violations of CPUC rules, orders, decisions, resolutions, and the California Public Utilities Code in connection with the Wine Country and Camp Fires. PG&E's violations formed the factual and legal predicate for PG&E's criminal conduct that led to the death of 84 people and the catastrophic destruction fueled by the Camp Fire.

To address the roots of PG&E's *criminal thinking* that fuels its pattern of criminal conduct, *Amici* respectfully suggests that this Court order PG&E to implement testing and training to recognize and end criminal thinking pervading PG&E. Such an order is an outgrowth of the probation condition requiring ethics training at PG&E.[28] Ordering testing and training to recognize and end criminal thinking acknowledges that criminal thinking undermines ethics and public safety. Testing and training to identify and stop criminal thinking would address the roots of PG&E's repeated crimes, enhance respect for law, and protect the safety of all Californians affected by PG&E's pattern of criminal conduct.

1. **Amici Respectfully Suggest that this Court Order Testing and Training to Identify and End PG&E's *Criminal Thinking* that Fuels its Criminal Conduct**

Amici respectfully suggests that PG&E has failed to implement an effective ethics program as required by the third condition of its probation. PG&E's probation required that within "six months of the date of the Judgment, PG&E shall develop and submit to the court an effective compliance and ethics program consistent with §8B2.1 (Effective Compliance and Ethics Program)."[29] As a repeat offender, PG&E's pattern of criminal

---

[28] *See e.g.* United States Court, Post Conviction Risk Assessment (PCRA), https://www.uscourts.gov/services-forms/probation-and-pretrial-services/supervision/post-conviction-risk-assessment (last visited June 14, 2020) (discussing the tests administered to federal convicts to identify patterns of criminal thinking and requiring training through courses to recognize and end criminal thinking that leads to criminal behavior).

[29] United States v. PG&E, Criminal Minutes, Case No.: 14-cr-00175-TEH-1, Jan. 26, 2017; U.S. Dept. of Justice, PG&E Ordered To Develop Compliance And Ethics Program As Part Of Its Sentence For Engaging In Criminal Conduct, Jan. 26, 2017

16

conduct led to 84 deaths and a plea to 85 felonies during its federal criminal probation. PG&E's conduct reveals its *criminal thinking* that fuels its criminal conduct and obstructs rehabilitation under its probation.

Amici respectfully suggest that this Court order PG&E to work with the monitor appointed in this proceeding to administer tests of criminal thinking patterns to its Board of Directors, Officers, Executives and Managers, and all personnel responsible for safety activities including record-keeping, inspection, vegetation management, and maintenance. This Court should order PG&E to coordinate with the monitor in this probation to develop and administer tests and courses within six months of its June 16, 2020 plea to 85 felonies while under probation. Such an order would create a means to identify and break PG&E's pattern of criminal thinking that drives its criminal conduct.

As this Court stated in its proposed modification of the conditions of PG&E's probation in April 2020:

> A fundamental concern in this criminal probation remains the fact that Pacific Gas & Electric Company, though the single largest privately-owned utility in America, cannot safely deliver power to California. This failure is upon us because for years, in order to enlarge dividends, bonuses, and political contributions, PG&E cheated on maintenance of its grid — to the point that the grid became unsafe to operate during our annual high winds, so unsafe that the grid itself failed and ignited many catastrophic wildfires. In the past three years alone, PG&E wildfires killed at least 108 and burned 22,049 structures. It will take years, now, for PG&E to catch up on maintenance so that the grid can safely supply power at all times. The conditions of probation herein have been aimed at requiring PG&E to do so. It's evident, however, that more is necessary.

Ordering testing and training to recognize and end criminal thinking pervading PG&E would address the safety objectives of this criminal probation.

---

https://www.justice.gov/usao-ndca/pr/pge-ordered-develop-compliance-and-ethics-program-part-its-sentence-engaging-criminal.

Were an individual convicted for the crime of obstructing the NTSB's investigation and violating the PSA, the court could have ordered that defendant to take a federal Post Conviction Risk Assessment of their criminal thinking when sentenced in 2017.[30] That convict would have received training years ago to recognize and break patterns of criminal thinking.

Corporations cannot be put in jail for their crimes and may pay fines not commensurate with their crimes. PG&E was sentenced in Butte County Superior Court on June 18 and ordered "to pay the maximum penalty of nearly $4 million for its role in the deaths of 84 people in the devastating Camp Fire of 2018."[31] Amici respectfully suggest that this Court use its power to order tests and training to root out criminal thinking that leads PG&E to engage in a repeated pattern of criminal conduct.

The eight major patterns of criminal thinking recognized by U.S. Courts in criminal conviction, probation, and parole matters are: Mollification, Cutoff, Entitlement, Power Orientation, Sentimentality, Superoptimism, Cognitive Indolence, and Discontinuity.[32] PG&E's criminal thinking is evident in its failure to recognize the dangers of operating a century old C-hook to hold up components that support electric lines that transmit tens to hundreds of thousands of volts of electricity per second.

---

[30] United States Court, Post Conviction Risk Assessment (PCRA), https://www.uscourts.gov/services-forms/probation-and-pretrial-services/supervision/post-conviction-risk-assessment (last visited June 14, 2020).

[31] *PG&E sentenced to max $4M penalty for criminal convictions in Camp Fire*, DANVILLE-SAN RAMON NEWS, June 18, 2020, https://danvillesanramon.com/news/2020/06/18/pge-sentenced-to-max-4m-penalty-for-criminal-convictions-in-camp-fire.

[32] Emma Palmer, Clive Hollin, *The use of the Psychological Inventory of Criminal Thinking Styles with English young offenders*, 9, Legal and Criminological Psychology, 253, 257, The British Psychological Society (2004) (describing eight major patterns of criminal thinking identified by Walters); Glen D. Walters, *The Psychological Inventory of Criminal Thinking Styles (PICTS): A Review and Meta-Analysis*, 3 Assessment (Sept. 9, 2002), 278-91, doi: 10.1177/1073191102009003007, https://pubmed.ncbi.nlm.nih.gov/12216785/.

18

1   PG&E stipulated to the fact the C-hook responsible for the Camp Fire was consistent

2   with the manufacturer's 1912 design.[33]

3          The belief that operating in this manner is safe is consistent with Cognitive

4   Indolence, poor critical reasoning and overreliance on cognitive shortcuts in dealing

5   with social problems,[34] in this case health and safety. PG&E's failure to admit that it

6   violated CPUC rules may reflect its sense of Entitlement and Power Orientation. Such

7   conduct reflects Mollification, the tendency to externalize blame for the consequences

8   of criminal offenses, and to offer rationalizations and excuses for committing crimes.[35]

9          It is beyond the capacity of *Amici* to determine the elements of criminal thinking

10  PG&E continues to embrace and percolate through its culture and conduct. It is within

11  the capacity of this Court's criminal probation jurisdiction to order testing and training

12  for PG&E to identify, examine, and end criminal thinking that leads to criminal

13  conduct.

14         The CPUC's investigation into PG&E's Safety Culture initiated in 2015, Order

15  Instituting Investigation 15-08-019, has not addressed PG&E's criminal thinking.

16  PG&E's plea to 85 felonies committed while on probation underscores the urgent need

17  for training to recognize and break PG&E's criminal thinking patterns that undermine

18  ethical behavior and endanger public safety.

19         If PG&E fails again and the CPUC initiates steps to terminate PG&E's licenses,

20  California will still need someone to operate transmission lines to wheel power to

21  agencies that will provide energy to local customers.  (ECF No. 2017, p. 17) We need

22  an inventory of PG&E assets, including its transmission assets, regardless of their age.

23  Examination of PG&E's records, or the lack thereof, and its practices such as relying on

24  visual inspection without regard to equipment age, exposure, and function, are key to

25

26  _____

27  [33] CPUC, I.19-06-015 COM/DECISION DIFFERENT, App A. Stipulated Facts 109-111.
    [34] Palmer and Hollin, supra note [X, at 257.
28  [35] Palmer and Hollin, supra note [X, at 257.

protecting safety now and in the future.

**2. The Butte County DA's Report Raises Concerns about Misrepresentations as Operation and Maintenance Expenses are Mischaracterized as "Funded by the Company"**

*Amici* are concerned about the incorrect characterization of inspection expenses as "funded by the company," in the Butte County DA's report on p. 49, as inspection expenses are funded through the CPUC's General rate case and then passed through to customers in rates. The Butte County DA's report finds that PG&E's skimming on inspections, improper and uninformed inspections, and lack of records contributed to the felonies PG&E committed that led to the Camp Fire. The report states:

> The evidence established PG&E electrical transmission expenditures were divided into two budget categories: 1) capital and 2) expense. The capital budget for the electric transmission division of PG&E was funded through customer rates which were determined by FERC "rate cases." The expense budget was funded by the company. Any money spent on the expense budget potentially reduced the amount of profit of the company. In general, inspection, patrol and maintenance of electrical transmission assets were paid from the expense budget.[37]

If PG&E's representations to Butte County's Grand Jury led to the statement that the "expense budget was funded by the company," such a material mischaracterization would raise questions about whether PG&E committed perjury before the Butte County Grand Jury. This Court should ordered PG&E to admit or deny whether its statements led to the Butte County Report's characterization of the source of funding for transmission facility inspections.[38] If PG&E admits those facts, *Amici* respectfully suggests that the Butte County DA's office consider whether PG&E committed perjury before the Butte County Grand Jury.

---

[37] Butte County District Attorney, THE CAMP FIRE PUBLIC REPORT A SUMMARY OF THE CAMP FIRE INVESTIGATION, June 16, 2020, p. 48 [hereinafter *Butte County DA Camp Fire Report*] (citations omitted).
[38] *Cf.*, ORDER TO ADMIT OR DENY BUTTE COUNTY REPORT, No. CR 14-0175 WHA, June 17, 2020.

20

1    This Court should order PG&E to clarify whether it alleges that the expense budget

2    that funds inspections, as well as record-keeping and vegetation management is "funded by

3    the company," or funded through the CPUC General Rate Case (GRC) or a FERC case.

4    The CPUC makes a distinction between activities funded by shareholders such as the

5    compensation of PG&E's CEO, expenses that would be "funded by the company," as

6    compared to expenses funded by ratepayers that "pass through" PG&E to cover approved

7    expenses. In May 2017 the CPUC approved PG&E's GRC in Decision 17-05-013 "to

8    determine PG&E's gas and electric system revenue requirements necessary for the utility

9    to recover the capital investments and annual operations and maintenance expenses at the

10   core of the utilities operations."[39]

11       *Amici* requests the opportunity for additional briefing on what this Court should

12   order to ensure that operation and maintenance funds approved by the CPUC are

13   appropriately spent to protect public safety and prevent the commission of additional

14   crimes by PG&E. *Amici* respectfully suggest that Judge Alsup order that PG&E be

15   required to "lock down" the expense budget approved in the CPUC current and pending

16   General Rate case and Wildfire Safety Plan. Such a lock down is appropriate to ensure that

17   PG&E is not incentivized or allowed to divert to PG&E profits any "savings" from

18   spending less than budgeted.

19       Further, the monitor in this probation case should be directed to conduct the audits

20   and activities necessary to ensure that PG&E's expense and operations budget are not

21   diverted to profits, particularly for record-keeping, inspection, vegetation management,

22   and maintenance activities.

23   / / /

24

---

25   [39] CPUC, DECISION AUTHORIZING PACIFIC GAS AND ELECTRIC COMPANY'S

26   GENERAL RATE CASE REVENUE REQUIREMENT FOR 2017-2019, Decision 17-05-013, Application 15-09-001, p. 1 (May 11, 2017) (approving a settlement of PG&E's GRC

27   application); *Id.* at Appx. A, Results of Operations Summary of Adopted Increase Over Authorized 2016 General Rate Case (reporting transmission expenses approved in the GRC

28   settlement).

1    Such an order will help this Court craft an appropriate order on probation conditions

2   regarding PG&E's bonus and compensation policies, issues raised in this Court's April 29,

3   2020 order.[40]

4

5                                            Respectfully submitted,

6                                            AGUIRRE & SEVERSON, LLP

7

8   Dated:  June 24, 2020            /s/Michael J. Aguirre
                                     Michael J. Aguirre, Esq.
9                                     /s/Maria C. Severson
10                                    Maria C. Severson, Esq.
                                     Attorneys for *Amici* Petitioners
11                                   Alex Cannara and Gene A.Nelson

12

13                                           CATHERINE J. KISSEE-SANDOVAL,

14  Dated:  June 24, 2020             /s/ Catherine Janet Kissee-Sandoval
15                                   Co-counsel for *Amici* Alex Cannara
                                     and Gene A. Nelson
16

17

18

19

20

21

22

23

24

25

26  [40] ORDER MODIFYING CONDITIONS OF PROBATION, No. CR 14-0175 WHA, April
    29, 2020, p. 12-13 ("executive bonuses should be tied to safety management. Mid- and
27  senior level executives at PG&E should be paid out on their yearly bonuses *on the*
    *condition that* PG&E met all of its wildfire abatement targets in the annual Wildfire Safety
28  Plan.")