1

Michael J. Aguirre, Esq., SBN 060402
maguirre@amslawyers.com
2
Maria C. Severson, Esq., SBN 173967
mseverson@amslawyers.com
3
AGUIRRE & SEVERSON, LLP
4
501 West Broadway, Suite 1050
San Diego, CA 92101
5
Telephone:  (619) 876-5364
Facsimile:  (619) 876-5368
6

7
Catherine J. Kissée-Sandovál, Esq. SBN 153839
Csandoval@scu.edu
8
Santa Clara University School of Law
500 El Camino Real
9
Santa Clara, CA 95053-0421
Telephone: (408) 551-1902
10
Facsimile: (408) 554-4426

11

12
Attorneys for *Amici* Alex Cannara
and Gene A. Nelson

13

FILED

Jul 16 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

14

**UNITED STATES DISTRICT COURT**

15

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

16

17
UNITED STATES OF AMERICA,

18
                    Plaintiff,

19
        v.

20
PACIFIC GAS AND ELECTRIC
COMPANY,

21
                    Defendant.

22

23

Case No. CR 14-0175 WHA

**AMICI COMMENTS IN OPPOSITION TO THE PROBATION CONDITIONS SUGGESTED BY PG&E, THE FEDERAL MONITOR, AND THE U.S. DEPT. OF JUSTICE**

Judge: Hon. William Aslup

24
        **I.    Introduction**

25
        *Amici* Alex Cannara and Gene A. Nelson respectfully offer these comments in response to

26
this Court's invitation and order granting any interested party an opportunity to comment on

27
whether, and the extent to which, the joint proposed probation conditions submitted by PG&E, the

28
United States Government, and the Federal Monitor (hereinafter Joint Proposal) should be adopted

1

1   as an order. (ECF 1233) The Joint Proposal[1] "aimed at addressing the Court's Order regarding

2   PG&E's vegetation management and transmission inspection programs." Interested parties, *Amici*

3   Alex Cannara and Gene A. Nelson, residents of the area PG&E serves, respectfully offer this

4   comment in opposition to the joint probation proposal. Further, *Amici* offer recommendations

5   about condition modifications to and extension of PG&E's probation to protect public safety and

6   promote PG&E's rehabilitation from its status as a recalcitrant criminal felon.

7         In June 2020, while on probation supervised by this Court, PG&E pled guilty to 85

8   felonies including 84 counts of involuntary manslaughter (a violation of California Penal Code

9   section 192(b)) and one count of Unlawful Causing a Fire (a violation of California Penal Code

10  section 452) that caused great bodily injury to a firefighter, and burned approximately 18,804

11  structures. "PG&E pleaded guilty to the charges brought by the Butte County District Attorney

12  and agreed that the grand jury investigation established a factual basis for those charges."[2]

13        While on probation for its commission of federal felonies, Counts 1, 2, 5, 6, 7 of the

14  indictment brought in *U.S. v. PG&E* including PG&E's obstruction of the National Transportation

15  Safety Board (NTSB) investigation into the San Bruno Natural Gas Explosion, PG&E's criminal

16  thinking and conduct caused  several major fires that resulted in grievous injuries including the

17  loss of 84 lives, destroyed property and the town of Paradise, California, and harmed the

18  environment. PG&E's conduct ignited several of the 2017 Wine Counties Fire, the 2017 Honey

19  Fire, and the 2018 Camp Fire. PG&E's response to the People's Statement of Fact to support its

20  guilty plea to Butte County (People's Statement or People's Statement of Fact) denied Butte

21  County's allegation that PG&E caused the 2019 Kincade Fire, which remains under investigation.

22  (ECF 1232, p. 36-37)

23       "Since at least 2006, PG&E has recognized bad things, especially fire, happen when

24  equipment failures occur on transmission lines. Everything in the overhead electric transmission

25

26  _____

27  [1] ECF 1227
    [2] ECF 1232, PG&E'S RESPONSE TO PEOPLE'S STATEMENT OF FACTUAL BASIS IN
28  SUPPORT OF THE PLEAS AND SENTENCING STATEMENT, July 1, 2020, p. 1 [hereinafter, *PG&E'S RESPONSE TO PEOPLE'S STATEMENT OF FACTS*]. **

1   system is designed to keep the conductor hanging in the air and away from persons or objects it

2   could harm,"  (ECF 1232, p. 36)  PG&E admitted in response to this Court's order to admit or

3   deny the People's Statement of Fact. PG&E concedes it "was aware of the risk of equipment

4   failure causing conductor failure or 'wire down events'" and "the causal relationship between fire

5   and equipment failure on transmission towers." (ECF 1232, p. 28)   PG&E equally admits it "was

6   also aware that age is but one of a number of factors that influence wear and the overall condition

7   of cold-end hardware and other tower components." (ECF 1232, p. 34)   "Cold-end hardware" is

8   composed of "[c]omponents used to attach the nonconductor end (cold-end) of the insulator to the

9   tower; both the tower and the insulator attachment components are considered cold-end

10  hardware." (ECF 1232, p. 34)

11       Despite PG&E's admissions about the critical importance of all components on an

12  electrical power line system to public safety, the Joint Proposal would limit PG&E's duty to make

13  a "reasonable effort" to search for records to undefined items described as "certain critical

14  transmission tower components in High Fire-Threat Districts, the failure of which may result in an

15  ignition."[8] The Joint Proposal contradicts PG&E's recognition that *everything* in an overhead

16  electric transmission system is designed to be critical  to its safe operation and maintenance.

17  There are no ornaments on an overhead power line. From a bolt to a fastener, a hook, a pole, a

18  conductor, and the myriad parts comprising a power line and the poles and towers supporting the

19  line, each and every component forms a critical network that transmits tens to hundreds of

20  thousands of volts of electricity 24 hours a day.

21       The Joint Proposal unduly narrows the types of records for which PG&E must conduct a

22  "reasonable" search, limits the record search to geographic areas not commensurate with

23  California's recognized fire and safety risk, and allows PG&E to substitute assumptions for

24  records and critical information. The Joint Proposal inappropriately defers to PG&E's judgment

25  and overlooks the dangers of allowing this convicted felon utility to determine what is a

26  _____

27  [8] JOINT SUPPLEMENTAL BRIEF OF PG&E, FEDERAL MONITOR AND UNITED STATES
    GOVERNMENT REGARDING PROPOSED CONDITIONS OF PROBATION, p. 3 [hereinafter
28  *Joint Brief*]. (ECF 1227)

"reasonable" search, which records to search for, which components are critical, and which assumptions to make.

A side-by-side comparison between the conditions in the Order (ECF 1186) and the conditions in the Joint Proposal (ECF 1227) shows the joint proposal falls materially below the standards in Judge Alsup's April 2020 Order modifying PG&E's probation conditions:

**Table I**

**Comparison of Judge Alsup's April 2020 Order Modifying PG&E's Probation and the Joint Proposal**

| Order (ECF 1186) | Joint Proposal (ECF 1227) | What's Missing |
|---|---|---|
| Order: 6.  PG&E shall employ its own cadre of pre- and post inspectors on its own payroll. PG&E shall employ **a sufficient number** of inspectors to manage the outsourced tree-trimming work.\* The pre-inspectors must identify trees and limbs in violation of California clearance laws that require trimming. Post-inspectors must spot-check the work of the contracted tree-trimmers to ensure that no hazard trees or limbs were missed. PG&E shall set clear guidelines on the colors and tags used to indicate hazard trees and limbs. PG&E shall submit a detailed by plan by May 28, 2020, to carry out this requirement. | Vegetation Condition: PG&E shall, by July 1, 2020, staff **an in-house vegetation management inspection manager** to oversee a number of workforce resources who will provide in-field oversight of all stages of the vegetation management process, including the enhanced vegetation management program work, to be deployed throughout PG&E's territory, including High Fire-Threat Districts.\* By the end of September 2020, PG&E will extend offers to 10 in-house field supervisors and/or inspectors, an additional 10 inspectors by the end of November, and the remaining approximately 10 inspectors by the end of January 2021. The inspectors shall conduct in-field oversight of PG&E contractors while the work is being performed, verifying, and correcting any deviation from applicable scopes of work pursuant to PG&E policies and legal requirements. The inspectors shall also oversee pre-inspectors to help ensure | Judge Alsup's order required a "sufficient number of inspectors" vs "31 by 2021" envisioned in the Joint Proposal

PG&E's litigation opposing the modifications to its probation after committing multiple felonies while on probation has delayed the work plan and staffing from the May 28, 2020 date proposed in Judge Alsup's Order to at least 2021.

Judge Alsup's April 2020 order required PG&E to "Identify trees and limbs in violation of California clearance laws that require trimming" vs. the Joint Proposal's suggestion that "work is being performed, verifying and correcting any deviation from applicable scopes of work" |

4

| | | |
|---|---|---|
| | they are clearly marking and designating trees for trimming and removal, and that tree-trimming contractors are appropriately performing their duties. Deviations from applicable scopes of work shall also be accurately recorded and reported to PG&E and the Monitor team to be used for, among other things, ongoing training of PG&E's contract workforce. | The Joint Proposal's suggests that "Deviations shall also be accurately recorded to be used for training of PG&E's contract workforce" as opposed to requiring compliance with applicable laws, rules, standards, and orders. |
| Order: 7. PG&E must keep records identifying the age of every item of equipment on every transmission tower and line. Every part must have a recorded date of installation. If the age of a part is unknown, PG&E must conduct research and estimate the year of installation. | Asset Age Condition: For certain critical transmission tower components in High Fire-Threat Districts, the failure of which may result in an ignition, PG&E shall conduct a reasonable search and, where available, record the age and date of installation of those components. For all other such critical transmission components and where asset age records are not reasonably available, PG&E shall make conservative assumptions of such ages and dates of installation. PG&E shall also implement a program to determine the expected useful life of critical components factoring in field conditions and incorporate that information into its risk-based asset management programs. PG&E shall begin this effort (or supplement any existing or planned initiatives) immediately and provide monthly progress reports to the Monitor team. | Judge Alsup's April 2020 order required PG&E to "PG&E must keep records identifying the age of every item of equipment on every transmission tower and line. Every part must have a recorded date of installation."

The Joint Proposal's suggests "For certain critical transmission tower components in High Fire-Threat Districts, the failure of which may result in an ignition, PG&E shall conduct a reasonable search and, where available, record the age and date of installation of those components."

The Joint Proposal narrows, without justification, the geographic scope and type of records for which PG&E must search, despite PG&E's admission that all components on an |

| | | |
|---|---|---|
| | | overhead electric line are critical to safe operation.

Judge Alsup's April 2020 Order required that if "the age of a part is unknown, PG&E must conduct research and estimate the year of installation."

The Joint Proposal suggests PG&E should be allowed to use "conservative assumptions" about age and installation dates where it is unable to find records through a "reasonable search."

The Joint Proposal substitutes PG&E's assumption for records and conflates assumptions about only two factors, age and date of installation, with records that would provide information about equipment necessary for safe electrical operation and maintenance. |
| Order: 8. In consultation with the monitor, PG&E shall design a new inspection system for assessing every item of equipment on all transmission towers. Forms shall be precise enough to track what inspectors actually do, such as whether they touch or tug on equipment. Videos must be taken of every inspection. PG&E shall submit plans for its new inspection system to | Transmission Inspection Program Condition: PG&E shall, by the end of 2020, supplement its transmission asset inspections program to include the following measures: (1) hire a crew of in-house and/or contract inspectors, independent from inspectors conducting transmission inspections, to oversee in the field transmission inspections while they are being conducted; (2) going forward, and subject | Judge Alsup's April 2020 Order required "new inspection system for assessing every item of equipment on all transmission towers."

The Joint Proposal suggests PG&E "hire a crew…to oversee in the field inspections transmission" |

| | | |
|---|---|---|
| the undersigned for appr oval by May 28 | to CAISO clearances and/or other external dependencies, revise the material loss threshold for the replacement of cold-end hardware (including Chooks and hanger plates) in High Fire-Threat Districts to create a 90-day replacement requirement for such hardware with an observed material loss approaching 50%; and (3) make the prior two years of inspection reports available to transmission post-inspection review teams starting in 2021, and one year of inspection reports available in 2020. | This Joint Proposal reduces oversight to the inspections to those PG&E decides to conduct, instead of requiring a broad range of new inspections, particularly for aging lines and equipment.<br><br>The Joint Proposal suggests PG&E "make the prior two years of inspection reports available to transmission post-inspection review team" and<br><br>Create a "90-day replacement of equipment with 50% material loss"<br><br>Those inspection reports should be made available to the monitor and the California Public Utilities Commission (CPUC). A material loss threshold of 30-50 percent should be adopted, particularly where PG&E is unable to produce traceable, verifiable records of such equipment.<br><br>Judge Alsup's April 2020 Order required videos of every inspection.<br><br>The Joint Proposal drops the video requirement without explanation. |
| Order: 9. PG&E shall require all contractors performing such inspections to carry insurance sufficient to cover losses suffered by the public should | No compliance | The Joint Proposal, without explanation, drops the requirement in Judge Alsup's Order that all contractors performing such inspections to carry |

| their inspections be deficient and thereby start a wildfire. | | insurance sufficient to cover losses suffered by the public should their inspections be deficient and thereby start a wildfire. |
|---|---|---|
| *Emphasis in bold added by *Amici* | | |

## II.   The Joint Proposal Misses by Miles the Standards, Information, and Conduct Necessary to Protect Public Safety, Properly Train Inspectors, Appropriately Inspect PG&E Assets, Safely Operate and Maintain PG&E's System, and Steps Necessary to Rehabilitate PG&E

*Amici* respectfully urge this Court to reject the Joint Proposal's Asset Age Conditions which would permit PG&E to pick and choose the types of transmission equipment for which PG&E would be required to conduct a "reasonable search" for records. This Court should similarly reject the Joint Proposal's terms that would allow PG&E to use unchecked "conservative assumptions" concerning equipment age and dates of installation rather than providing traceable, verifiable records.

Mere assumptions about the age or installation date of certain equipment are insufficient to protect public safety. Absent critical information about the material out of which a component or piece of equipment is made, its type and size, schematics, and documentation about how equipment such as a C-hook and a hanger plate are supposed to fit together, the mere proffering of records or assumptions estimating age and installation dates are insufficient for safe operation. Neither can PG&E appropriately train its workforce, conduct inspections, or estimate useful life or conditions based on assumptions about equipment age and installation date.

In response to Judge Alsup's April 2020 modification of PG&E's probation conditions (ECF 1186), PG&E admitted it has no records particularly for its older lines.[9] "Given the age of

---

[9] PG&E's MOTION TO RECONSIDER ORDER MODIFYING CONDITIONS OF PROBATION, May 13, 2020, p. 23 [hereinafter, *PG&E Motion for Probation Modification Reconsideration*] (ECF 1187-1)

1   the system, many of the records do not exist," PG&E admitted. (ECF 1187-1, p. 23)  This

2   admission lacks candor because it fails to identify the categories of PG&E's missing records,

3   whether by line, age, type of equipment, or other factors. The Joint Proposal reflects, rather than

4   remedies, these inexcusable record omissions.

5        *Amici* respectfully suggest that in lieu of approving the Joint Proposal, this CCourt should

6   require PG&E to submit a list of electrical lines, categories, ages, or types of equipment for which

7   it has no traceable, verifiable records. Once PG&E submits such a list to this Court and the parties

8   to PG&E's probation proceeding including *Amici*, this Court should give parties the opportunity to

9   comment on the next appropriate steps. If no records exist, this Court should consider directing

10  PG&E to test or replace equipment--a step the NTSB and CPUC required for PG&E's natural gas

11  pipelines for which PG&E could not produce traceable, verifiable records.[10]

12       The Joint Proposal's conditions fail to address this Court's concern that while on criminal

13  probation, "Pacific Gas & Electric Company, though the single largest privately-owned utility in

14  America, cannot safely deliver power to California."(ECF 1186) Allowing PG&E to search for

15  only a few records and employ assumptions instead of records about equipment and its work

16  orders misses by miles the goal of ensuring safe power delivery..

17       PG&E's arguments regarding its training, inspection, budget, and records practices[12]

18  highlight the importance of providing access to the Butte County Grand Jury proceedings to this

19  Court and the parties to this probation proceeding including *Amici*. **On at least 13 occasions in**

20  **response to this Court's order to admit or deny the People's Statement of Facts, PG&E relied on**

21  **its private analysis of material before the Butte County Grand Jury to bolster its response.**[13]

22

23

24  _____

25  [10] *See* CPUC Decision 11-06-017, DECISION DETERMINING MAXIMUM ALLOWABLE
    OPERATING PRESSURE METHODOLOGY AND REQUIRING FILING OF NATURAL GAS

26  TRANSMISSION PIPELINE REPLACEMENT OR TESTING IMPLEMENTATION PLANS,
    (Rulemaking 11-02-019), p. 18, June 9, 2011 [hereinafter *CPUC Decision 11-06-017*].

27  [12] (ECF 1232) *PG&E'S RESPONSE TO PEOPLE'S STATEMENT OF FACTS, supra* note 1,  at 1,
    5, 6-8, 9, 10, 12, 13, 14, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 28, 29, 30, 32, 33, 34, 36.

28  [13] *Id.* at 2, 5, 7, 12,13, 15, 17, 18, 21, 25, 36.

9

AMICUS BRIEF, COMMENTS IN OPPOSITION TO THE PROBATION CONDITIONS
SUGGESTED BY PG&E, THE FEDERAL MONITOR, AND THE U.S. DEPT. OF JUSTICE                CASE NO. CR 14-0175 WHA

1     While repeatedly citing its grand jury testimony to this Court to rebut or admit the People's

2   Statement of Facts, facts material to PG&E's probation, PG&E concurrently filed to seal all Butte

3   County Grand Jury material (See 3rd Appellate District Case No. C092045). PG&E's extensive

4   reliance on its private review of the Butte County Grand Jury transcripts to assess, admit or deny

5   the People's Statement of Facts underscores the importance of access to the Grand Jury materials

6   by this Court and the parties before it in order to assess PG&E's of probation conditions.

7     In *Canarra v. Butte* Case No. 20CV01365, PETITION TO OBTAIN PUBLIC RECORDS

8   UNDER CALIFORNIA CONSTITUTION ARTICLE I, SEC. 3; CALIFORNIA GOVERNMENT

9   CODE § 6259; PENAL CODE § 938.1; AND FIRST AMENDMENT, *Amici* represented by

10   Michael Aguirre and Maria Severson sued Butte County for access to records of the Grand Jury

11   materials and exhibits used to support PG&E's indictment and conviction for 85 felonies

12   committed while PG&E was on probation. Petitioners seek copies of the 6,000 pages of

13   transcripts, 100 witness statements, and 1,600 exhibits the Butte County Grand Jury reviewed.

14   PG&E's response to the People's Statement of Fact highlight the importance of these materials to

15   PG&E's probation. PG&E's response to this Court reveals that PG&E retains access to the Grand

16   Jury materials PG&E has moved to keep secret. PG&E's citation to these materials to discuss

17   matters relevant to its probation highlight both the information asymmetry and unfairness PG&E

18   creates by opposing the release of the Butte County Grand Jury materials. *Amici* respectfully

19   recommend that this Court should order PG&E to provide this Court and all parties in this

20   proceeding including *Amici* access to the Butte County Grand Jury materials in PG&E's

21   possession including all documents, transcripts, materials, and exhibits.

22     *Amici* are also concerned the Joint Proposal's PG&E's vegetation management conditions

23   are not sufficiently specific as to the proposed number of inspectors, scope of their duties, and

24   timetable for staffing the office. The Joint Proposal fails to address the source of funds for this

25   inspection work. *Amici* respectfully recommend this Court clarify that PG&E shareholders should

26   fund the cost of the vegetation management inspectors.

27     The Joint Proposal's recommendations regarding PG&E's Transmission Asset Inspections

28   Program require more specificity about the size of the inspection "crew" PG&E is to hire. The

proposal to create a 90-day replacement requirement for cold-end hardware with an observed material loss approaching 50% underscores the importance of records to support proper training and inspection of equipment condition. *Amici* respectfully recommend that PG&E replace cold-end hardware with an observed material loss of 30 to 50% within 90-days after that condition is observed or as indicated by records of the hardware's useful life and the conditions to which it is exposed.

As discussed below in Section VII, *Amici* respectfully renew the suggestions made in their June 24, 2020 brief (ECF 1228) that this Court order PG&E to work with the monitor to develop a testing and training program to identify and stop PG&E's criminal thinking. *Amici* once again respectfully suggest that this Court order PG&E to file a statement in this proceeding identifying each finding of fact or conclusion of law it admits or denies in CPUC Decision 20-05-019 regarding the CPUC investigation into the 2017 Wine Country Fires and the 2018 Camp Fire. As discussed in *Amici's* June 24, 2020 brief (ECF 1228, p. 13) , *Amici* respectfully suggest that this Court extend PG&E's probation due to its massive violations of its probation conditions and felonies committed while on probation.

*Amici* request the opportunity for additional briefing on what this Court should order to ensure that PGE&'s operation and maintenance funds approved by the CPUC and Federal Energy Regulatory Commission (FERC) are appropriately spent to protect public safety and prevent the commission of additional crimes by PG&E. As discussed in *Amici's* brief (ECF 1228, p. 21), *Amici* respectfully suggest Judge Alsup order the operation and expense budgets approved by the CPUC and FERC be "locked down" to prevent PG&E from shifting those funds to bonuses and other types of expenditures.

### III.   The Vegetation Conditions in the Joint Proposal are Insufficient to Protect Public Safety and Prevent Fire Ignition and Spread in the Upcoming Wildfire Seasons

#### A.  Joint Proposal's Vegetation Conditions Are Not Sufficiently Specific

Judge Alsup's April 2020 order imposed additional probation conditions regarding PG&E's vegetation management to "protect the public from further death and destruction resulting

from PG&E-caused wildfires, and to promote the rehabilitation of PG&E, among other goals of 18 U.S.C. §§ 3553(a)(1) and (a)(2)." That order required:

> 6. PG&E shall employ its own cadre of pre- and post inspectors on its own payroll. PG&E shall employ a sufficient number of inspectors to manage the outsourced tree-trimming work. The pre-inspectors must identify trees and limbs in violation of California clearance laws that require trimming. Post-inspectors must spot-check the work of the contracted tree-trimmers to ensure that no hazard trees or limbs were missed. PG&E shall set clear guidelines on the colors and tags used to indicate hazard trees and limbs. PG&E shall submit a detailed by plan by May 28, 2020, to carry out this requirement. (ECF 1186)

The Joint Proposal is insufficient to achieve the public safety or rehabilitation goals of Judge Alsup's April 2020 order. It delays the accomplishment of safety oversight until 2021, a date well into wildfire season, multiplying the risks facing Californians.

The delay caused by PG&E's opposition to Judge Alsup's April 2020 probation modification order leaves PG&E customers vulnerable to the twin mortal threats of PG&E's criminal conduct and the COVID-19 pandemic. Dr. Robert Redfield, director of the US Centers for Disease Control and Prevention, anticipates that the fall and the winter of 2020 and 2021 are probably going to be "one of the most difficult times that we experienced in American public health."[14] Californians face the frightening confluence of power outages, increased wildfire risks due to PG&E's criminal conduct and thinking, and the most challenging time in America's public health history.

Joint Proposal's Vegetation Conditions suggests "PG&E shall, by July 1, 2020, staff an in-house vegetation management inspection manager to oversee a number of workforce resources who will provide in-field oversight of all stages of the vegetation management process, including the enhanced vegetation management program work, to be deployed throughout PG&E's territory, including High Fire-Threat Districts." This proposal is not specific as to the size of or qualifications for the staff for the "in-house vegetation management inspection manager." If PG&E does not support this position with sufficient resources, the inspection manager cannot

---

[14] Amanda Watts, *CDC director offers bleak public health outlook for fall and winter*, CNN NEWS, July 14, 2020, https://www.cnn.com/world/live-news/coronavirus-pandemic-07-14-20-intl/h_0a1e9579c6acb8adc5a8cd454f221d59.

1   effectively carry out the mission of providing in-field oversight of all stages of vegetation

2   management throughout PG&E's territory.

3        The Joint Proposal specifies that "By the end of September 2020, PG&E will extend offers

4   to 10 in-house field supervisors and/or inspectors, an additional 10 inspectors by the end of

5   November, and the remaining approximately 10 inspectors by the end of January 2021." It is

6   unclear if this cadre is to compose the total staff for the vegetation management inspection team

7   the Joint Proposal envisions. The Joint Proposal only requires that PG&E extend offers, but fails

8   to require PG&E successfully recruit, train, or retain supervisors or inspectors for any time period.

9        The Joint Proposal drops the requirement in Judge Alsup's April 2020 Order that "PG&E

10  shall employ a sufficient number of inspectors to manage the outsourced tree-trimming work."

11  The Joint Proposal offers no explanation for whether the staffing level it envisions is sufficient to

12  protect public safety. *Amici* recommend that the sufficiency standard in Judge Alsup's April 2020

13  order be applied to the staffing of PG&E's vegetation inspection teams. Specific numbers should

14  be applied to the hiring timetables to ensure accomplishment of this important oversight role.

15       The Joint Proposal provides:

16       The inspectors shall conduct in-field oversight of PG&E contractors while the work
         is being performed, verifying and correcting any deviation from applicable scopes
17       of work pursuant to PG&E policies and legal requirements. The inspectors shall
         also oversee pre-inspectors to help ensure they are clearly marking and designating
18       trees for trimming and removal, and that tree-trimming contractors are
         appropriately performing their duties. Deviations from applicable scopes of work
19       shall also be accurately recorded and reported to PG&E and the Monitor team to be
         used for, among other things, ongoing training of PG&E's contract workforce.
20       (ECF 1227, note 7, at 3)

21

22       The Joint Proposal is not sufficiently specific about the scope of the inspection team's

23  work. As Judge Alsup's Order required, a specification should be added that "Post-inspectors must

24  spot-check the work of the contracted tree-trimmers to ensure that no hazard trees or limbs were

25  missed."

26       The elongated offer schedule contemplated in the Joint Proposal and PG&E's opposition to

27  Judge Alsup's April 2020 Order will likely result in many inspector positions not being filled prior

28  to the Fall/Winter 2020-2021 wildfire season. The Joint Proposal neither sets goals for the number

13

of inspections to be done nor does it set any calibration markers such as a percentage of PG&E vegetation management jobs to be overseen by the inspectors. *Amici* recommend the vegetation management provisions be made more specific regarding the number of inspectors to be employed by PG&E and the scope and goals of their work.

*Amici* suggest that deviations from the applicable scope of work be reported to the CPUC and the monitor, in addition to being used to train PG&E's contract workforce. *Amici* recommend that inspections records be used to identify vegetation management issues and trends such as trees most highly associated with causing a fire.

**B.  The Vegetation Conditions Must Clarify that PG&E Shareholders Will Bear the Costs of these Measures**

The Joint Proposal does not specifically require PG&E shareholders to pay for this work. Without specifying the source of payment, PG&E seeks to use CPUC or FERC ratepayer funds or Wildfire Safety Funds to cover this work through rates.

Judge Alsup's April 29, 2020 Order stated that the pre- and post-vegetation management inspection team shall be employed on PG&E's "own payroll," a provision which prohibits PG&E from contracting out this rule. This Court should clarify its intention that PG&E shareholders must fund these activities.

**IV.  The Joint Proposal's Asset Age Conditions Do Not Adequately Protect Safety, Safeguard Against Wildfire Risk, or Prevent PG&E's Reckless Criminal Behavior**

**A.  The People's Statement of Facts and PG&E's Admissions Underscore the Importance of Producing Traceable, Verifiable Records**

The Joint Proposal's Asset Age Conditions would allow PG&E to substitute "conservative assumptions" regarding equipment age and dates of installation for records. Assumptions would be permitted where PG&E's "reasonable search" for documentation about undefined types of equipment does not yield actual records. This proposal is inadequate to ensure that PG&E finds and replaces dangerous equipment such as the worn C-hook that caused the Camp Fire. Neither would this proposal support proper training, inspection, and maintenance of PG&E equipment.

14

In response to Judge Alsup's Order for PG&E to admit or deny the People's Statement of Facts, PG&E admitted it "should have found and replaced the worn C-hook that broke and caused the catastrophic fire."(ECF 1232, note 1, at 1) The Butte County's People's Statement found that "Investigators determined a "C hook" that linked an insulator string connected to the jumper conductor to the transposition arm of the tower failed, allowing the energized jumper conductor to make contact with the steel tower structure," a finding PG&E does not contest.(ECF 1232, p. 4)

The Joint Proposal suggests this Court should not require PG&E to provide records that include information or good faith analysis of equipment composition including its metallurgy or material. The Joint Proposal equally fails to address the interaction of equipment with other parts of the system including pieces connected to each other. Nor does it address gaps created by PG&E's failure to retain records of conducted work. Maintenance or replacement work on some components of a line can affect other components as indicated by the interaction between a conductor and a C-hook identified by the FBI Metallurgy Lab for the Butte County case against PG&E.[18]

### B. The Joint Proposal Envisions a Shift from the Records Judge Alsup's April 2020 Order Required to A Limited Search for Records or Assumption about Age and Installation Date for a Narrower Range of Equipment and Regions

Judge Alsup's April 29, 2020 Order imposed probation conditions designed to address PG&E's ongoing record keeping failures which contribute to its safety failures and criminal conduct. As a further condition of probation, Judge Alsup ordered that "PG&E must keep records sufficient to identify when a piece of equipment is in danger of failing, and must require inspections that truly assess the state of equipment." "In addition to the conditions of probation already in effect, the Court impose[d] the following new conditions:

> 7. PG&E must keep records identifying the age of every item of equipment on every transmission tower and line. Every part must have a recorded date of installation. If the age of a part is unknown, PG&E must conduct research and estimate the year of installation." (ECF 1186, p. 11)

---

[18] (ECG 1220-1, note 17 at 30)

In response to this order, PG&E filed a motion for reconsideration of the additional probation conditions and appealed to the Ninth Circuit. In contrast to Judge Alsup's order, the Joint Proposal narrows the geographic regions subject to additional probation requirements, limits the categories of transmission equipment for which PG&E must conduct a "reasonable search" for records, and allows PG&E to substitute assumptions about age and year of installation for records that would yield a range of important and necessary information.

Judge Alsup's amended probation condition required PG&E to keep records identifying the age of "every item of equipment on every transmission tower and line. Every part must have a recorded date of installation." The Joint Proposal twists this requirement to allow assumptions instead of records. It would allow PG&E to make assumptions only about age and installation date without addressing other information that records would have produced. Records ordered by Judge Alsup would have provided more information than merely the age and installation date of an item. Records would describe the item, provide information about the material from which it is composed, detail its size, weight, type, limitations, useful life, warranties, and other factors critical to electrical system operation and maintenance.

The Joint Proposal ignores the directive in Judge Alsup's April 2020 order that "PG&E must keep records sufficient to identify when a piece of equipment is in danger of failing and must require inspections that truly assess the state of equipment." That aim cannot be achieved by searching for a narrow range of records in limited regions and by substituting assumptions about age and installation in place of full equipment records.

**C. The Joint Proposal's Limited Application to Undefined Critical Transmission Tower Components is Inconsistent with PG&E's Admission of the Importance of All Overhead Transmission Line Components to Public Safety**

The Joint Proposal applies its limited requirements only to "certain critical transmission tower components in High Fire-Threat Districts, the failure of which may result in an ignition." (ECF 1227, note 7, at 3) This proposal is unclear as to whether it applies to both Tier 1 and 2 High Fire-Threat Districts as defined by the CPUC. It fails to address areas within the Tree Mortality

Task Force Zones defined by the CPUC.[21] It also fails to address historically high or persistent wind zones that may not be in a High Fire-Threat area, but nonetheless impact the risk of equipment failure. High winds or sustained winds may induce metal on metal rub and create dangerous conditions including conductor splice failures or wear on fasteners, hardware, and other equipment that can ignite fires.

The CPUC's Safety and Enforcement Division (SED) found that "higher sustained winds are more likely to cause motion in non-tensioned lines and hardware, such as jumpers."[22] The CPUC used the National Renewable Energy Laboratory Wind Resource database to analyze wind patterns that affected the Caribou-Palermo line where the Camp Fire ignited. The "Caribou-Palermo North [line] experiences elevated incident winds on average, more than three times the average taken across all towers on all comparison lines."[23] Layering data about wear on cold-end hardware such as C-hooks  with wind data, the CPUC found that "[m]any of the Caribou-Palermo North towers that exhibit high-priority cold-end hardware/wear tags are exposed to elevated wind conditions."[24]

The CPUC found that "age of the lines, the flexibility and configuration of hardware connections, the relative amount of friction at hardware connection points, conductor tension, and interactions between the natural structure/line frequency and the forcing frequency of the wind" are additional risk factors that contribute to sustained cyclic conductor motion.[25] The CPUC determined that "wind conditions alone are not sufficient to describe the primary cause of damage in each tower" on the Caribou-Palermo line, and that other factors influencing damage "likely include differences in age of the structures, maintenance history, and tower/component design."[26]

---

[21] CPUC, High Fire Map, https://ia.cpuc.ca.gov/firemap/ (last visited July 13, 2020).
[22] CPUC, Appendix A, SED Incident Investigation Report for 2018 Camp Fire with Attachments (I. 19-06-015), CAMP-0598, p. 48.
[23] *Id.*
[24] *Id.*
[25] *Id.* at CAMP-0606, p. 56.
[26] *Id.* at CAMP-0610, p. 60.

17

The CPUC found that the "relatively high rate of wear-related high-priority tags observed on Caribou-Palermo after the Camp Fire suggests damage that has accumulated over years."[27] The CPUC analyzed the nature and frequency of PG&E repairs on the Caribou-Palermo line, including records of inspections, replacements, and corrective tags. [28] The CPUC found that factors such as "design (link connectors and a relatively large number of non-tensioned insulated conductors), long-duration exposure to higher winds, age, and historical inspection methodologies likely all contributed to these cold-end hardware wear issues."[29] Records or assumptions about age and date of installation alone do not provide necessary insight into how maintenance can interact with equipment condition and wear.

The Joint Proposal fails to demonstrate how critical components would be identified. Neither does it propose any process by which the basis for this categorization will be disclosed. Does the Joint Proposal acknowledge a C hook and a fastener as a critical component? PG&E's Wildfire Safety Mitigation plan adopted a "run to condition" approach for insulators and other "cold-end hardware" such as C hooks. PG&E admitted that failure of a C-hook caused the catastrophic Camp Fire. For the Kincade Fire a public revelation about why the jumper cable came loose has yet to materialize. Jumper cables are attached to insulators. Did the jumper cable come loose due to a fastener or equipment problem? Is such hardware within the category of "critical components" undefined by the Joint Proposal? The Joint Proposal fails to acknowledge these critical questions.

The Joint Proposal's focus on asset records or assumptions for only "certain critical transmission tower components in High Fire-Threat Districts, the failure of which may result in an ignition" leaves PG&E with great and dangerous discretion to determine which components fall in its category. PG&E's deficient safety record and repeated criminal conduct warn against reliance on PG&E's discretion and judgement to determine the scope and type of records for which it should search. Moreover, this proposal ignores PG&E's admission that *everything* on an overhead

---

[27] *Id.* at CAMP-0612, p. 62.
[28] *Id.*
[29] *Id.* at CAMP-0626, p. 76.

1    transmission system is critical. [30] PG&E's admission underscores the need for PG&E to search for

2    all records of every component of its transmission system.

3
4         **D.  The Joint Proposal's Suggestion to Allow PG&E to Use Conservative**
             **Assumptions of Ages and Installation Dates in Lieu of Records Does Not Provide a**
5            **Method to Disclose or Contest Those Assumptions and their Basis**

6         The Joint Proposal suggests PG&E should be allowed to use "conservative assumptions"

7    about age and installation dates where it is unable to find records through a "reasonable search"

8    for the undefined "critical components."[31] As part of the CPUC's investigation into the San Bruno

9    natural gas pipeline explosion, the CPUC in 2011 rejected PG&E's proposal to use "engineering

10   assumptions" in lieu of pressure testing natural gas pipelines where it was unable to produce

11   traceable, verifiable records of its natural gas pipeline system.[32] The CPUC's investigation into the

12   San Bruno natural gas explosion revealed PG&E's poor recordkeeping. PG&E's ongoing record-

13   keeping deficiencies contributed to the deaths and injuries in the Camp Fire and to other fires.

14   PG&E's record-keeping failures fuel the need to modify PG&E's probation conditions.  In 2011,

15   PG&E admitted that particularly for its older natural gas pipelines, it would be unable to locate

16   specific records of every component in the pipeline as the NTSB required.[33] "Given the age of the

17   [electrical] system, many of the records do not exist," PG&E conceded, seven years after it made a

18   similar admission about the gaps in its natural gas pipeline records.[34]

19        The Joint Proposal neither requires PG&E to disclose the basis for its "conservative

20   assumptions" nor does it provide any process or opportunity to challenge those assumptions. Nor

21   does the Joint Proposal erect any boundaries that would cabin PG&E's assumptions about

22   equipment age or installation date. PG&E has not been forthright in admitting whether it lacks

23   records for classes of equipment or by age. Does the age marker for PG&E's deficient record-

24   keeping date to the 1950s-1970s as it did for its natural gas pipeline? Does PG&E lack records for

25

26   [30] ECF 1232, note 1, at 36.
     [31] ECF 1227, *Joint Brief, supra* note 7, at 3.
27   [32] *CPUC Decision 11-06-017*, *supra* note 9, at 18.
     [33] *Id.* at 12.
28   [34] ECF 1187-1, *PG&E Motion for Probation Modification Reconsideration*, *supra* note 8, at 23.

1   its lines constructed or acquired prior to 1950 or 1930? PG&E's ongoing operation of lines and

2   equipment in excess of 50, 75, or 100 years old does not excuse PG&E's failure to maintain

3   records for that equipment. Neither do PG&E's failure to retain or obtain older records justify the

4   assumption that PG&E can safely operate and train its workers and inspection teams with

5   assumptions about age and installation dates in lieu of traceable, verifiable records.

### E. PG&E's Record Retention Policies Do Not Excuse its Failure to Retain Records or Duty to Provide Safe, Reliable Service with Adequate Facilities

8       PG&E's May 13, 2020, MOTION TO RECONSIDER ORDER MODIFYING

9   CONDITIONS OF PROBATION buried on page 23 its admission that many records do not exist

10  for its transmission and distribution system.[35] PG&E attempts to excuse this failure by stating

11  "Given the age of the system, many of the records do not exist."[36] PG&E contends that

12  "[a]pplicable document retention periods have long since elapsed for PG&E lines that entered into

13  service in the early to mid-1900s."[37] PG&E cites the Ly Declaration ¶10 to bolster its specious

14  argument that PG&E's records retention policies excuse its failure to retain records.

15      The People's Statement in support of PG&E's plea to 85 felonies found that "[d]espite the

16  fact that PG&E has owned the Caribou-Big Bend portion of the Caribou-Palermo line since 1930,

17  the evidence established PG&E did not catalogue or replace the original conductors, insulators or

18  attachment hardware on many of the towers in the original Caribou-Big Bend section of the

19  transmission line."[38] Additionally, "PG&E admits that, at the time of the Camp Fire, structures on

20  the section of the Caribou-Palermo Line from the Caribou Powerhouse to the Big Bend Switching

21  Station (the "Caribou-Big Bend section") had components of original vintage."[39]

---

[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] ECF 1232, *PG&E'S RESPONSE TO PEOPLE'S STATEMENT OF FACTS supra* note 1, at 2 (responding to People's Statement, pg. 16 (noting that a "conductor" is known as a power line or wire. Hot end attachment hardware attaches the insulators to the conductor. Cold end attachment hardware attaches the insulators to the tower/structure/pole.))
[39] *Id.* at 2.

"As to statements to the effect that PG&E did not 'catalogue' components before the Camp Fire, PG&E clarifies that it identified splices on the Caribou-Palermo Line conductor and recorded changes in conductor size and type in various locations."[40] PG&E's records regarding changes to the conductors in the decade preceding the Camp Fire do not negate its admission that it failed to catalogue or replace non-conductor equipment including C-hooks. PG&E's record and knowledge gap are evidence of its refusal to admit that "the transposition arms, C hooks, insulator strings and jumper conductor, were original components in service since 1921," or that the "insulator string hanging from the C hook that broke on November 8, 2018 was an original 1921 insulator."[41] PG&E based its denial of these facts on its record-keeping failures by stating how "available records and evidence are not conclusive as to their date of installation."[42]

The People of Butte County found the C hook responsible for the Camp Fire appeared to be in service since 1921.[43] The CPUC found that C hook was consistent with drawings from 1912.[44] The People of Butte County found that the absence of many PG&E records contributed to training and inspection failures that led to the deaths of 84 people in Paradise, California--injuries and lost lives that PG&E does not contest.[45]

PG&E's records retention policies do not excuse PG&E's duty to provide safe, reliable service with adequate facilities at just and reasonable rates under California Public Utilities Code § 451. "Every public utility shall furnish and maintain such adequate, efficient, just, and reasonable

---

[40] Id.
[41] Id.
[42] Id.
[43] Id. at 17.
[44] CPUC I.19-06-015, Decision Different, Attach. A (paragraphs 110-111 "PG&E identified original Great Western Power drawings for the construction of Great Western Power Line Number Three (a portion of which is now the line referred to as the Caribou-Palermo line) and the records show that certain components on the line may be original vintage. An example of Great Western Power documents that appear to be associated with Great Western Power Line Number Three is a drawing of a "Suspension Hook" dated "10-11-12." The C-hook that broke on Tower :27/222 on the Caribou-Palermo 115 kV Transmission Line (the "incident hook") bears
 similarities to a C-hook manufactured by Ohio Brass, as determined by design Drawings.")
[45] ECF 1232, *PG&E'S RESPONSE TO PEOPLE'S STATEMENT OF FACTS supra* note 1, at 2.

21

service, instrumentalities, equipment, and facilities, including telephone facilities, as defined in Section 54.1 of the Civil Code, as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public."[46] No CPUC rule, order, decision, or provision of the California Public Utilities Code or provision of federal law allows PG&E to "grandfather" facilities for which it failed to retain records from PG&E's duties to provide safe and reliable service.

California Public Utilities Code Section 8386(a) (adopted in 2016) requires that "[e]ach electrical corporation shall construct, maintain, and operate its electrical lines and equipment in a manner that will minimize the risk of catastrophic wildfire posed by those electrical lines and equipment." Record-keeping and knowledge of the components of electrical lines and equipment are critical to meeting the duties imposed by Section 8366(a) and to preventing catastrophic wildfire. PG&E's record retention policies and the Joint Proposal suggesting substitution of assumptions for records do not supplant PG&E's legal duties to provide safe service and minimize the risk of catastrophic wildfire under California law.

### F. PG&E's Citation to the Butte County Grand Jury Material to Defend its Training and Inspection Practice Underscore the Importance of Access to the Grand Jury Records and Information about Equipment Material, Fit, and Work Records

PG&E pleaded guilty to the charges brought by the Butte County District Attorney and agreed that the Grand Jury investigation established a factual basis for those charges.[47] PG&E admits that it should have found and replaced the worn C-hook that broke and caused the catastrophic fire.[48] PG&E relies on its analysis of Grand Jury material, documents it has sought to seal, to contest many of the statements in the People's Statement of Facts used to support PG&E's indictment, guilty plea, and conviction.

PG&E states based on "review of the grand jury transcript, PG&E disagrees with the following paraphrase of the testimony of the Senior Director of Transmission Asset Management:

---

[46] CA PU Code 451.
[47] ECF 1232. *PG&E'S RESPONSE TO PEOPLE'S STATEMENT OF FACTS supra* note 1, at 1.
[48] *Id.* at 1.

1
2
3

"Specifically he conceded that because nobody was looking for wear on cold end attachment hardware and therefor, no notifications/tags were being generated for replacement of cold end attachment hardware there were, as of November 8, 2018, no projects in the foreseeable future for the replacement of cold end attachment hardware.[49]

4
5

PG&E also disagrees with the People's Statement that:

6
7
8
9
10
11

"[A]lthough there were no specific plans to replace cold end attachment hardware the Senior Director of Transmission Asset Management asserted that plans were being made to perform preventative maintenance on the Caribou-Palermo line. According to the Senior Director of Transmission Asset Management, the NERC Project included non-NERC required preventative maintenance on the Caribou-Palermo line. When confronted with the Project Scope document for the NERC Project the Senior Director of Transmission Asset Management was unable to identify any non-required work. According to the Senior Director of Transmission Asset Management the non-required preventative maintenance was not included in the Project Scope document but that plans were being made to perform the preventative                                                    maintenance."[50]

12
13
14

PG&E does not explain the basis for its disagreement or cite to specific sections of the Grand Jury testimony it relies upon to support its assessment.

15
16
17

The *People's Statement of Factual Basis* found that the "lack of specific training and records was especially significant for troublemen inspecting the Caribou-Palermo line" that was the source of the Camp Fire.[51] In support of PG&E's indictment and plea The People stated that

18
19
20
21

PG&E "troublemen themselves unanimously denied having received any formal training on conducting inspections and patrols and assessing wear. The troublemen also denied being provided with any records (for example tower schematics) specific to the transmission lines being inspected."[52]

22
23
24

"PG&E denies statements to the effect that troublemen did not "receiv[e] any formal training[,]" that there was a "lack of specific training and records[,]" and that training concerning inspections was "limited to filling out reporting forms and notifications" and "informal

25

26
27
28

[49] *Id.* at 25 (citing People's Statement of Facts at 66).
[50] *Id.* (citing People's Statement of Facts at 66).
[51] ECF 1220-1. PEOPLE'S STATEMENT OF FACTUAL BASIS IN SUPPORT OF THE PLEAS AND SENTENCING STATEMENT, *supra* note 17, at 30.
[52] *Id.*

1    mentoring."[53] PG&E argues that the "[n]otion that troublemen in general, and the troublemen who

2    inspected the Caribou-Palermo Line in particular, received no 'formal training on how to perform

3    an inspection or patrol', is contradicted by PG&E training records and testimony elicited during

4    the grand jury proceedings."[54]

5         Butte County's Grand Jury investigation and review in support of PG&E's conviction

6    found that the "hanger holes, according to the original schematics, were 1 1/8" in diameter and the

7    C hooks were 15/16" thick at the contact point. On other Feather River Canyon [where the

8    Caribou-Palermo line is located] transmission lines the C hooks were the same size but the hanger

9    holes were significantly larger."[55] "The evidence established that the Troublemen's lack of

10   knowledge of the different sized hanger holes contributed greatly to the failure of PG&E to

11   recognize the degree of wear on the C hook on Tower 27/222," the People of Butte County

12   found.[56]

13        PG&E disagrees with what it characterizes as "the unsupported statement that

14   troublemen's lack of knowledge of size differences in working eyes "contributed greatly" to the

15   failure to identify and replace the C-hook on Tower :27/222."[57] The "working eyes" would be

16   seen in the hanger holes on which a C-hook swings to support the insulator that attaches to other

17   components to keep the electrical lines aloft and away from the steel tower or other components

18   that could cause a fire. PG&E fails to explain the basis for its disagreement.

19        PG&E also denies the following statements in the People's Statement of Facts relevant to

20   inspection, training and maintenance of the Caribou-Palermo line that contributed to the Camp

21   Fire:

22        "The evidence established that, despite the lofty goals of the originators of the
         troubleman position, and the designation of QCR by PG&E, by 2007 the
23       inspections and patrols of the Caribou-Palermo line were being conducted by
         inexperienced, untrained and unqualified troublemen. Both of the Detailed Ground
24       Inspections (2009 and 2014) and seven of the ten Annual Air Patrols on the Caribou

25

26   [53] ECF 1232, *PG&E'S RESPONSE TO PEOPLE'S STATEMENT OF FACTS supra* note 1, at 6.
     [54] ECF 1232, *Id.* at 7.
27   [55] *Id.*
     [56] *Id.*
28   [57] *Id.* at 30.

                                                    24

Palermo were completed by troubleman [sic] who had little or no prior transmission experience, and no formal training on performing inspections and patrols. This is contrary to the third Revision of the ETPM which requires that the 'QCRs must be thoroughly familiar with all of the facilities, equipment, safety rules and procedures associated with the facilities and equipment.' . . . . The majority of the troubleman [sic] sent to inspect and patrol the Caribou-Palermo line had no idea what the C hooks and hanger holes were supposed to look like. Because of their lack of knowledge, experience, and training, the troubleman [sic] could not have been expected to identify the wear. The overwhelming evidence clearly established that troublemen and linemen inspecting and patrolling the Caribou-Palermo line did not meet the standards established in the ETPM."[58]

PG&E states its "records confirm that the troublemen who patrolled and inspected the Caribou-Palermo Line had received formal training in inspections."[59] PG&E's denial does not explain whether argues that the training and records it supplied to troublemen demonstrate that PG&E provided its staff with reliable information and records that describe how the hanger and C-hook should interact in the working eyes. Neither does PG&E argue against the causal importance of the interaction between the hanger and the C-hook, including their rub and fit, to the Camp Fire.

PG&E states it "does not have sufficient information to admit or deny that a PG&E troubleman who worked in the Feather River Canyon between 1987 and 1995 "established the Caribou-Palermo line was considered a 'Class B Circuit'" and, as a result, was "required to be patrolled three times each year."[60] PG&E states it "has not identified any documents from that period that support the troubleman's assessment of the Caribou-Palermo Line as a Class B Circuit or otherwise permit a determination that the line was so classified."[61]

PG&E admits that it does not have sufficient information to admit or deny the accuracy of the following statement relevant to transmission hardware, inspection, operation and maintenance:

"Former PG&E Transmission Line Supervisors from 1987 noted the checklist inclusion of 'worn hardware' was a result of a 1987 PG&E Laboratory Test Report documenting a worn C hook and hanger hole from a Bay Area transmission tower. Photos of the worn C hooks and holes were distributed to troublemen in all of the PG&E regions for training purposes, and inspection of C hooks and hanger holes

---

[58] *Id.* at 7-8.
[59] *Id.* at 8.
[60] *Id.* at 4.
[61] *Id.*

1      was made a specific priority during inspections/ patrol."[62]

2          PG&E states it "does not appear that any documents corroborating this testimony were

3   presented to the grand jury" and PG&E argues it "cannot independently verify the accuracy of the

4   statement given the passage of time."[63] PG&E's admissions do not excuse its record-keeping and

5   maintenance failures for aging lines and equipment it continues to operate.

6          PG&E denies that "[t]here is no record of any climbing inspections . . . conducted on the

7   Caribou-Big Bend section of the [Caribou-Palermo 115 kV] transmission line."[64] PG&E states its

8   "records produced to the grand jury indicate that more than 30 of the 80 Caribou-Palermo towers

9   subject to climbing inspections before the Camp Fire were on the Caribou-Big Bend section of the

10  line. Moreover, in March 2010, PG&E personnel conducted climbing inspections of the 10 towers

11  identified for relocation, all of which are on the Caribou-Big Bend section."[65] PG&E represents

12  that "[a]t least five infrared patrols were conducted after the Rock Fire in September 2008,

13  including one that occurred less than three weeks after the Rock Fire" and that it "produced to the

14  Grand Jury an October 6, 2008 Electric Event Report concerning the Rock Fire."[66]

15         PG&E admits that, "in October 2016, a contractor aloft Tower 11/99 nearly lost his footing

16  when a corroded J-hook broke" which "was used to connect flat bracing to the tower leg."[67]

17  "PG&E denies that it had a "practice" of not inspecting equipment on similar towers after an

18  equipment failure."[68] PG&E states its "records show that PG&E investigated the incident and sent

19  an alert to employees advising them to exercise caution when working on or near towers fitted

20  with J-hook hardware and to take "[s]pecial care to inspect the condition of the hardware prior to

21  applying force.""[69]

22

23  _____

24  [62] Id.
25  [63] Id. at 5.
    [64] Id. at 13 (citing People's Statement of Facts at 39).
26  [65] Id.
    [66] Id. at 12.
27  [67] Id. at 13.
    [68] Id. (citing People's Statement of Facts at 38).
28  [69] Id.

PG&E stated that it "does not have sufficient information to admit or deny the following statements:

> "One former troubleman admitted he did not like flying the Feather River Canyon transmission lines and, whenever possible, assigned an available lineman to complete the routine air patrols. According to the former troubleman, after the lineman completed the air patrol the troubleman would use the lineman's notes to complete the patrol report and submit the report as if the former troubleman had personally completed the patrol." Based on review of the grand jury transcripts, PG&E cannot identify the paraphrased testimony of the former troubleman in question. Absent further investigation and without details sufficient to identify the records at issue, PG&E cannot admit or deny the accuracy of the former troubleman's account.[70]

PG&E states it "does not have sufficient information to admit or deny that a "recently retired troubleman" who conducted aerial patrols "was only confirming the structures and components were 'standing upright.'"[71] PG&E contends that "[b]ased on review of the grand jury transcripts, PG&E cannot identify the paraphrased testimony."[72]

Based on its review of the Butte County Grand Jury transcript, "PG&E denies the accuracy of the following paraphrase of the testimony of a former Maintenance & Construction engineer:

> "When asked about these emails, the former M&C Engineer denied he was instructed to find ways to capitalize the money already spent and asserted that he was lying in the emails in order to get necessary work done quickly. As to the 2013 and 2014 emails, he stated the recipient of the emails, the Transmission Line Supervisor at Table Mountain Headquarters, distrusted engineers, so he lied and put blame on Asset Management in order to avoid argument. When asked about the 2016 email, which was directed to an engineer in Asset Management, the former M&C Engineer replied that the Sr. Director of Transmission Asset Management was not involved in the project and he invoked the name of the Sr. Director of Transmission Asset Management to speed up the process. This person is the same former M&C Engineer who wrote the original AA and the approved AA and now claims that his description of the condition of the relevant Caribou-Palermo line structures and conductor was unsupported and exaggerated for the purpose of securing funding for the project."[73]

---

[70] *Id.* at 15.
[71] *Id.*
[72] *Id.*
[73] *Id.* at 21 (citing People's Statement of Facts at 57).

27

1    PG&E's denial emphasizes the importance of access to the Grand Jury transcripts for the

2    parties before this Court and the need for this Court to monitor and put restraints on PG&E's use

3    of the maintenance and operation budgets approved by FERC and the CPUC.

4        PG&E's denials are in large part based on its analysis of Grand Jury material that PG&E

5    seeks to keep secret. While relying on the Grand Jury material more than 13 times before this

6    Court, PG&E is actively pursuing litigation to keep the Butte County Grand Jury material

7    confidential. This Court should not consider or give weight to PG&E's statements based on the

8    Butte County Grand Jury material until the Court and the parties to PG&E's probation including

9    *Amici* have an opportunity to review and comment on the relevance of that material to PG&E's

10   probation.

11   **G. PG&E's Response to the Butte County Statement of Facts and Analysis of the
     Butte County Grand Jury Materials Highlight the Danger of Allowing PG&E to
12   Assume only Equipment Age and Date of Installation in Lieu of Records**

13

14       PG&E states before the Camp Fire, "C-hook wear was not a commonly reported failure

15   mode and failures of C-hooks in the field were relatively rare."[74] PG&E contends that "Before the

16   Camp Fire, PG&E administered training to troublemen through a combination of on-the-job

17   learning and formal educational modules that included exemplar photographs of conditions to be

18   identified and reported."[75] PG&E does not state that those "exemplar photographs" included

19   photos of the C-hooks and their fit to hanger plates or insulator cables. PG&E's contestation of

20   facts regarding its Troubleman Training and inspection process underscores the importance of

21   requiring records of PG&E's equipment. Such records are essential to developing training and

22   inspection processes informed by information about how equipment should wear and the

23   interaction of equipment with other components and environmental factors such as wind.

24       PG&E denies that "even if the troublemen had looked at the C hooks and hanger holes,

25   without knowledge as to their respective sizes, the troublemen would not have been able to assess

26

27   _____

28   [74] *Id.* at 6.
     [75] *Id.* at 6-7.

1   wear," and contends "[t]hat statement lacks a basis in the evidence."[76] PG&E does not specify

2   what type of evidence is missing to support this conclusion. Neither does PG&E's denial negate

3   the importance of documentation regarding the size of equipment and the interaction between

4   components including their fit. PG&E acknowledges the importance of information and training

5   about the interaction of components through its admission that "[a]ccording to the email string a

6   PG&E Engineer correctly surmised that this wear was 'probably caused by years of rubbing

7   between the c-hook and the plate.'"[77]

8          The Joint Proposal's Asset Age Conditions suggest that PG&E could assume equipment

9   age and dates of installation where it cannot find records based on a reasonable search. This

10  proposal would not provide information about different sized hanger holes and the relative fit

11  between C-hooks and hanger holes, information vital to inspectors and maintenance. Inspectors

12  need equipment specifications (including schematics and drawings of how equipment should be

13  connected) to identify when the installed equipment falls outside of safe conditions.  PG&E

14  represents to this Court that it is "overhauling its inspection process[.]"[78] Two-dimensional

15  assumptions about age and installation dates in lieu of records are a deficient basis for inspection,

16  training, or safety.

17          **H. Information on Equipment, Material, Size, Type, Fit between Components,
            and Work is Necessary to Protect Public Safety**

18

19          The Joint Proposal would not require PG&E to find or state reliable information about the

20  material from which equipment is made. Is equipment such as a C-hook made of brass, an alloy,

21  or another metal? This information is critical to evaluating the equipment's condition. Equipment

22  made out of brass, an alloy of copper and zinc, may wear differently than equipment made from

23  copper. Metal on metal friction and fatigue will vary based on the composition of the metal and be

24

25

26

27  [76] *Id.* at 16 (citing ECF 1220-1, PEOPLE'S STATEMENT OF FACTUAL BASIS IN SUPPORT
    OF THE PLEAS AND SENTENCING STATEMENT, July 1, 2020, p. 44, n. 89.)

    [77] *Id.* at 35.

28  [78] ECF 1232, *PG&E'S RESPONSE TO PEOPLE'S STATEMENT OF FACTS supra* note 1, at 1.

29

1  affected by conditions such as wind and load. Lack of information on equipment composition

2  leaves inspectors to guess and may lead to inconsistent and faulty analysis.

3       The FBI's Metallurgy Unit analysis of the C hooks, transposition arms, and hanger plate

4  holes from Towers 27/222 (where the Camp Fire originated) and 24/199 (a tower inspected

5  following the Camp Fire) detected wear on the C hooks and hanger holes. The FBI found different

6  materials used for C hooks, corresponding with varying levels of hardness, to connect insulator

7  arrays on the Caribou-Palermo line.[79] The People's Statement reported that the "broken left phase

8  C hook from Tower 27/222 and the most worn right phase C hook from Tower 24/199 were

9  determined to be malleable cast iron. The least worn C hooks from Towers 27/222 and 24/199

10  were determined to be forged, plain carbon steel."[80]

11       The FBI tested for hardness the "broken C hook from Tower 27/222, the most worn hook

12  from Tower 24/199."[81] The FBI's testing "determined there was a significant difference in

13  hardness between the most worn malleable cast iron hooks, and the least worn forged plain carbon

14  steel hook."[82] The FBI also examined the "transposition arms and the bolted on hanger brackets"

15  and found they were "made of galvanized plain carbon steel."[83]

16       The FBI's metallurgist "determined that as a result of rotational body on body wear, the

17  edge of the hanger holes had cut a channel into the C hooks and the C hooks had worn away the

18  bottom of the hanger holes elongating the holes."[84] The FBI Metallurgist observed "the channeling

19  of the right phase C hook from Tower 24/199 showed a distinct change in angle" and testified that

20  it "could have been caused by shortening of the jumper conductor which changed the position and

21  angle of the insulator string attached to the C hook."[85]

22

23

_____

24  [79] ECF 1220-1. PEOPLE'S STATEMENT OF FACTUAL BASIS IN SUPPORT OF THE PLEAS

25  AND SENTENCING STATEMENT, *supra* note 17, at 30.
   [80] *Id.*

26  [81] *Id.*
   [82] *Id.*

27  [83] *Id.*
   [84] *Id.* at 15.

28  [85] *Id.*

30

1    PG&E admitted that "C-hooks and hanger plates removed from Towers :27/222, :20/160,

2    :24/199 and :35/281 were worn."[86] Similarly, "PG&E admits that it does not have records of work

3    done on the jumper conductor on Tower :24/199 to 'shorten[ it] and splice[ it] together using a

4    parallel groove connector', (SOFB at 19), and PG&E therefore lacks sufficient information to

5    admit or deny that any such work was done."[87]

6    PG&E also admitted "that hanger brackets were added to the transposition runner arms of

7    Towers :27/222 and :24/199 and that it is reasonable to infer they were added to address wear

8    observed on the original hanger plates."[88] "PG&E acknowledges that whoever did this work likely

9    would have been aware of material loss on the original hanger plates. PG&E admits that it was

10   unable to locate any records of when, why and by whom the hanger brackets were installed."[89]

11   PG&E's admissions underscore the importance of retaining records about material, wear, and

12   work done on transmission and distribution lines. Such information is necessary to understand

13   equipment condition and the interaction of each component with others in the system.

14   The People's Statement found that when the C hook on Tower 27/222 failed, it caused the

15   insulator string connected to the jumper conductor to make contact with the steel tower structure.[90]

16   "The ensuing electrical arcing between the jumper conductor and steel tower structure caused the

17   aluminum strands of the conductor to melt as well as a portion of the steel tower structure."[91]

18   "Aluminum melts at approximately 1200 degrees Fahrenheit, steel melts at approximately 2700

19   degrees Fahrenheit. The electrical engineer estimated the temperature of the electrical arc between

20   the conductor and the steel structure between 5,000- and 10,000-degrees Fahrenheit."[92] The

21   relative melting points of metals and the interaction highlight the importance of knowing more

22   than age and date of installation to protect public safety.

---

[86] ECF 1232, *PG&E'S RESPONSE TO PEOPLE'S STATEMENT OF FACTS supra* note 1, at 3.
[87] *Id.*
[88] *Id.* at 8.
[89] *Id.*
[90] ECF 1220-1, *supra* note 17, at 4.
[91] *Id.*
[92] *Id.*

1    PG&E admits that the "[g]reatest risk of failure in transmission conductors is thought to be

2    with the oldest steel reinforced conductors," an assessment based on the 2010 Quanta Report[93]

3    "Steel reinforced conductor has a solid steel core to increase the strength of the conductor. The

4    conductor on Tower 27/222 was steel reinforced," the People's Statement of Facts explained.[94]

5    PG&E's admission recognizes the importance of reliable information about the material that

6    composes equipment including conductors and all parts of a transmission and distribution system,

7    as the material affects safety and risk of failure.

8        The CPUC's Camp Fire investigation found that "[c]onductor type and size may influence

9    the susceptibility of a line to motion that could affect cold-end hardware."[95] The CPUC's Safety

10   and Enforcement Division (SED) explained:

11       [C]onductors with greater diameter (greater cross-sectional area) and/or reduced
         weight are more susceptible to vibration and galloping. Susceptibility to wind-
12       induced conductor motion increases with conductor diameter and decreases with
         conductor weight. Therefore, differences in conductor type could result in one line
13       experiencing conductor motion under a given set of environmental conditions
         (wind, precipitation, temperature, etc.), while a parallel line in the same location
14       and environmental conditions may not.[96]

15       The CPUC's analysis indicates that information about asset age and date of installation

16   would be insufficient to provide guidance about equipment size and type that affects performance

17   during weather conditions such as wind that may increase fire risk. The FBI Metallurgical Lab's

18   analysis illustrates that information about the composition of equipment including the metals and

19   materials from which equipment is critical to predicting equipment's useful life and analyzing

20   wear including metal on metal, body on body wear.

21       Records about PG&E work including line changes, replacement, or shortening are also

22   critical to analyzing the interaction of such work with transmission or distribution towers and

23   equipment. The Joint Proposal's suggestion that PG&E should be allowed to make conservative

24

25   _____

26   [93] ECF 1232 *supra* note 1, at 35 (citing 12201-1, *supra* note 17, at 85-86).
     [94] ECF 1220-1, *supra* note 17, at 86.
27   [95] CPUC, Appendix A, SED Incident Investigation Report for 2018 Camp Fire with Attachments
     (I. 19-06-015), CAMP-0595, p. 45.
28   [96] *Id.*

1   assumptions about only equipment age and installation date would be insufficient to train

2   inspectors to detect wear and conditions that require proactive replacement. Neither would this

3   proposal support training, inspection, and analysis of equipment or evaluation of PG&E's

4   compliance with safety standards.

5   **I. The Joint Proposal Would Support "Run to Failure"**

6   PG&E denies the conclusion of the People of Butte County "based on isolated uses of the

7   phrases "run to failure' and 'run to maintenance[,]' that "PG&E was employing a run to failure

8   strategy on the entirety of the Caribou-Big Bend section of the Caribou-Palermo line."[97]"

9   Additionally, "PG&E denies any implication in the Statement of Factual Basis that it intentionally

10  allowed C-hooks or hanger plates to remain in place on transmission towers until those

11  components broke or otherwise failed."[98]

12  PG&E's Wildfire Safety Mitigation Plan stated that it adopts a "run to condition" policy

13  for "assets with lower risk of catastrophic wildfire (including cross arms, insulators, voltage

14  regulation, protective equipment, transformers and switching equipment).[99] PG&E states it

15  employs a "Proactive replacement" approach for assets it describes as posing "a high risk of

16  catastrophic wildfire if they fail (conductor, pole, and fuses and surge arresters that cause sparks

17  and potential ignition)."[100]

18  PG&E's "run to condition" policy risks running to failure and fire danger. Cold-end

19  hardware such as C-hooks that failed during the Camp Fire, may be included in the categories of

20  equipment PG&E will allow to "run to condition" without full documentation of what that

21  condition should be. The jumper cable and its fasteners implicated during the Kincade Fire, may

22  also fall within the class of equipment PG&E would allow to "run to condition" regardless of age,

23  useful life, exposure to wind, sway, population or evacuation risks.

24  

25  [97] ECF 1232, *supra* note 1, at 24 (citing ECF 1220-1, *supra* note 17, at 67).

26  [98] *Id.*

27  [99] CPUC, Wildfire Safety Division Action Statement on Pacific Gas and Electric Company's 2020 Wildfire Mitigation Plan, p. 37, June 11, 2020, https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M340/K895/340895473.PDF.

28  [100] *Id.*

33

The Joint Proposal would not yield sufficient information to prevent a run to failure strategy. PG&E's proposal to "run to condition" depends on PG&E, all of its workers, inspectors, contractors, and its regulators including the CPUC, FERC, the monitor, the DOJ, and this Court understanding what the "condition" is that requires action.

V.      **Transmission Inspection Program Condition**

        A. **Joint Proposal Regarding PG&E's Transmission Asset Inspections Program**

The Joint Proposal recommends that PG&E shall, by the end of 2020, supplement its transmission asset inspections program to include the following measures:

(1) hire a crew of in-house and/or contract inspectors, independent from inspectors conducting transmission inspections, to oversee in the field transmission inspections while they are being conducted;

(2) going forward, and subject to CAISO clearances and/or other external dependencies, revise the material loss threshold for the replacement of cold-end hardware (including C hooks and hanger plates) in High Fire-Threat Districts to create a 90-day replacement requirement for such hardware with an observed material loss approaching 50%; and

(3) make the prior two years of inspection reports available to transmission post-inspection review teams starting in 2021, and one year of inspection reports available in 2020.

Regarding Joint Proposal 1, more specificity is needed regarding the size of the "crew" PG&E is to hire. More clarity is needed as to who has authority when there is a conflict between the inspector overseers and the inspectors. An in-house inspector oversight crew with access to PG&E's supervisory chain and Board of Directors would create the best opportunity for accountability in the inspection process and resolution of any conflicts.

/ / /

/ / /

/ / /

/ / /

/ / /

1

2

3

**B.  The Proposal for a 90-day Replacement Schedule for Cold-end Hardware with an Observed Material Loss Approaching 50% Underscores the Need To Have Adequate Records Including Information about Material Composition and Should be Adjusted to Requirement 90-day Replacement at 30-50% Observed Material Loss**

4

5

6

7

8

9

10

11

12

13

14

Regarding Joint Proposal 2, the proposal to create a 90-day replacement requirement for cold-end hardware with an observed material loss approaching 50% underscores the need to have adequate records that include information about the material from which equipment is made. "In order to judge material loss a troubleman would have to know what a component looked like at 100%."[101] The People's Statement of Fact observed in support of PG&E's conviction in Butte County that lack of access to records inhibited PG&E's training and its inspection. The absence of such records contributed to PG&E's failure to recognize the dangerously degraded condition of several C hooks and equipment on the Caribou Palermo line. Inspectors also need schematics, drawings, and records about how components such as the C hook and a hanger plate interact so they can better discern material loss. Records of conductor lines, their material, and conditions such as wind can also help to anticipate and recognize factors that accelerate material loss.

15

16

17

18

19

20

Regarding the proposed 50% observed material loss threshold, PG&E's MOTION TO RECONSIDER ORDER MODIFYING CONDITIONS OF PROBATION states "engineering and metallurgical expertise is required to assess with accuracy the remaining life of the equipment on Tower 009/081."[102] PG&E's argument concedes the necessity to have "engineering and metallurgical expertise" which is informed by records including knowledge about materials and metals for the relevant components.

21

22

23

24

25

26

PG&E's December 19, 2019 RESPONSE TO FOLLOW-UP QUESTIONS RE CPUC REPORT ON CAMP FIRE, FURTHER QUESTIONS TO BE ANSWERED BY PG&E BY DECEMBER 19 AND SUPPLEMENTAL QUESTION 6a cited its Electric Transmission Preventive Maintenance ("ETPM") Manual in effect at the time of the Camp Fire to support its assessment that a "material loss of between 30% and 50% on insulators and steel structures,

27

28

[101] ECF 1220-1, *supra* note 17, at 31.
[102] ECF 1187-1, May 13, 2020, p. 8 (citing ECF 1186, p. 11).

35

1    including C-hooks, is a condition that should be assigned Priority Code E. Such conditions must

2    be addressed within 12 months."[103] ETPM provides that for insulators identified as "Worn 30 -

3    50% material loss," PG&E would classify and assign Priority Code E, thus requiring the condition

4    to be addressed within 12 months.[104]

5         The Joint Proposal contemplates a 90-day replacement requirement for cold-end hardware

6    with an observed material loss approaching 50% but does not shift the timeline for such hardware

7    in the 30% to high 40% wear range.  Neither does it define what threshold is "approaching 50%."

8    A worn condition of 30% or low to mid 40% may merit replacement sooner than 12 months,

9    particularly when wind, interaction with other components, and materials used are analyzed. To

10   protect public safety and proactively avoid failure, *Amici* suggest that PG&E be required to

11   replace worn insulator hardware when there is an observed material loss of 30-50%.

12        *Amici* are concerned about the Joint Proposal's suggestion to limit the accelerated

13   replacement rate to unspecified High Fire-Threat Districts. This proposal remains ambiguous as to

14   whether it includes both Tier 1 and Tier 2 High Fire-Threat Districts. The CPUC has also defined

15   Tree Mortality Task Force Zones which pose ignition threats due to the high number of dying

16   trees in the region.[105]  The 90-day replacement timeline should apply to Tree Mortality Task Force

17   Zones and Tier 1 and Tier 2 High Fire-Threat Districts for all insulators and cold-end hardware

18   observed at 30-50% wear.  As discussed above, making such an assessment accurately requires

19   records, training, and information about the components such as the metallurgy, the interaction of

20   components that results in wear, information about conductors, wind, and other information. This

21   Court must ensure that PG&E is required to produce accurate records to support assessments of

22   wear, inspection, and safe operation.

23   / / /

24

25   [103] PG&E, RESPONSE TO FOLLOW-UP QUESTIONS RE CPUC REPORT ON CAMP FIRE,

26   FURTHER QUESTIONS TO BE ANSWERED BY PG&E BY DECEMBER 19 AND
     SUPPLEMENTAL QUESTION 6a, Case No. 14-CR-00175-WHA, p. 3, December 19, 2019.

27   [104] PG&E, Electric Transmission Preventive Maintenance ("ETPM") Manual, p. 28, Nov. 20,
     2018.

28   [105] CPUC, High Fire Map, https://ia.cpuc.ca.gov/firemap/ (last visited July 13, 2020).

36

**C. Proposal to Make the Prior Two Years of Inspection Reports Available to Transmission Post-Inspection Review Teams Starting In 2021, And One Year Of Inspection Reports Available in 2020**

*Amici* are concerned that the time frame for inspection reports to be provided to Transmission Post-Inspection Review Teams fails to provide the review teams with enough records; the timeline is also not fast enough. One year of inspection records provided in 2020 to review teams is inadequate to assess details and trends relevant to transmission inspection. Two years of such records by 2021 also leaves inspectors with a thin folder, particularly for lines operated for 50, 75, or 100 years or more. Five years should be the minimum available to inspectors on a daily basis. *Amici* suggest that the inspectors be given the ability to access older records within 48 hours of such a request.

**VI.    *Amici* Respectfully Recommend That This Court Order PG&E to Work with the Monitor to Develop Training to Identify and Stop its Criminal Thinking**

"PG&E admits that facts presented to the grand jury provide a sufficient factual basis for PG&E's guilty plea."[106] Despite PG&E's belated contestations of some of the facts in the People's Statement of Facts, PG&E admits there is a sufficient factual basis to support each element of the 85 felony charges of which PG&E was convicted during its probation.[107] PG&E's criminal conduct, its ongoing evasions, and its proposal to replace records and facts regarding its transmission and distribution network with assumptions about age and installation date underscore the urgent need for this Court to order PG&E to identify and stop its criminal thinking through development of appropriate training with PG&E's federal monitor.

*Amici* respectfully suggest this Court order PG&E to work with the monitor to adopt testing and training to recognize and end criminal thinking that pervades PG&E's corporate culture. Such an order is an appropriate next step in probation condition requiring ethics training at PG&E.  Sadly, that ethics training did not eliminate PG&E's criminal thinking that supported its

---

[106] ECF 1232, *supra* note 1, at 36.
[107] *Id.*

reckless criminal conduct. Ordering testing and training to recognize and end criminal thinking

protects the public from further death and destruction resulting from PG&E-caused wildfires, and

promotes PG&E's rehabilitation consistent with the goals of 18 U.S.C. §§ 3553(a)(1) and (a)(2).

Butte County found that PG&E's conduct met the elements of Unlawfully Causing a Fire to a

Structure/Forest land (Pen Code § 452(c)), a conclusion PG&E did not contest:

      a. PG&E set fire to, or burned, or caused the burning of a structure or forest land or

      property;

      b. PG&E did so **recklessly**;

      c. The fire burned an inhabited structure or the fire caused great bodily injury to another

      person.

The definition of Recklessly for a corporation charged with Unlawfully Causing a Fire to a

Structure/Forest land (Pen Code § 452(c)) requires showing that:

      a. It is aware that its actions present a substantial and unjustifiable risk of causing a fire.

      b. It ignores that risk

      c. Ignoring the risk is a gross deviation from what a reasonable person would have done in

      the same situation.

For Involuntary Manslaughter (Pen. Code §192(b)) the legal elements require that:

      a. PG&E had a legal duty to the decedents

      b. PG&E failed to perform that legal duty;

      c. PG&E's failure was **criminally negligent**;

      d. PG&E's failure caused the death of decedents

The Definition of Criminal Negligence for Involuntary Manslaughter under California Law

requires:

      a. Criminal negligence involves more than ordinary carelessness, inattention, or mistake in

      judgment. A corporation acts with criminal negligence when:

      i. It acts in a reckless way that creates a high risk of death or great bodily injury;

      ii. A reasonable person would have known that acting in that way would create such a risk.

1    PG&E "does not dispute the recitation of elements of offenses" that supported its Butte

2    County conviction and plea.[108] Neither does PG&E contest that it had a legal duty that supports

3    these counts, specifically the duty for safe, reliable service with adequate facilities under CA PU

4    Code 451.[109] PG&E also has a legal duty under CA PU Code 8386, which requires that "Each

5    electrical corporation shall construct, maintain, and operate its electrical lines and equipment in a

6    manner that will minimize the risk of catastrophic wildfire posed by those electrical lines and

7    equipment."

8        PG&E's probation required that within "six months of the date of the Judgment, PG&E

9    shall develop and submit to the Court an effective compliance and ethics program consistent with

10   §8B2.1 (Effective Compliance and Ethics Program)."[110] Criminal thinking that leads to criminal

11   conduct undermines ethics, public safety, and the rehabilitation of the convicted party under

12   probation.

13       PG&E's crimes are not mere torts where PG&E's negligence resulted in harm. PG&E has

14   been convicted of multiple felonies including obstruction of an NTSB investigation, and 85

15   felonies that resulted in the death of 84 people and injured a firefighter in the Camp Fire.

16   Recklessness is an element of both Involuntary Manslaughter and Unlawfully Starting a Fire.

17   These crimes require an element of intent represented in awareness of the risk that certain conduct

18   would unlawfully start a fire, or criminal negligence that a reasonable person would have known

19   would create such a risk of involuntary manslaughter.

20       To address the roots of PG&E's repeated crimes and failures, *Amici* respectfully

21   recommend this Court order PG&E to work with the monitor to develop training to identify and

22   stop its criminal thinking. Such an order will enhance respect for law and protect the safety of all

23   Californians affected by PG&E's pattern of criminal conduct.

24   _____

25   [108] ECF 1232. *PG&E'S RESPONSE TO PEOPLE'S STATEMENT OF FACTS supra* note 1, at 34.
26   [109] *Id.* at 35.

27   [110] United States v. PG&E, Criminal Minutes, Case No.: 14-cr-00175-TEH-1, Jan. 26, 2017; U.S.
     Dept. of Justice, PG&E Ordered To Develop Compliance And Ethics Program As Part Of Its
     Sentence For Engaging In Criminal Conduct, Jan. 26, 2017, https://www.justice.gov/usao-
28   ndca/pr/pge-ordered-develop-compliance-and-ethics-program-part-its-sentence-engaging-criminal.

39

1    Were an individual convicted for the same crime of obstructing the NTSB's investigation

2  and violating probation, the Court could have ordered that defendant to take a federal Post

3  Conviction Risk Assessment of their criminal thinking, when sentenced in 2017.[111] That convict

4  would have received training years ago to recognize and break patterns of criminal thinking. Butte

5  County reported that the "inability to determine who made decisions and upon what those

6  decisions were based, frustrated efforts to identify individuals potentially personally liable for

7  policies that lead to the conditions which caused the Camp Fire."[112] PG&E contends that it

8  cooperated with the Butte County Grand Jury investigation and provided documentation.[113]

9  PG&E's defense does not address the fact that its corporate conduct led to decisions by both

10  individuals and the corporation that led to the death of 84 people in Butte County and injured a

11  firefighter due to PG&E's unlawful fire start.

12    Bold steps must be taken to identify and stop PG&E's criminal thinking that fuels its

13  criminal conduct. *Amici* respectfully urge this Court to order testing and training to identify and

14  stop criminal thinking at PG&E as an extension of the ethics training this Court required.

15   **VII.   Summary of Recommendations by *Amici* Regarding the Modification of
              PG&E's Probation Conditions Following PG&E's Commission of
16            84 Counts of Involuntary Manslaughter, One County of Unlawful Fire Start,
              and Causing other Fires While on Federal Probation**
17

18    *Amici* respectfully suggest that in lieu of approving the Joint Proposal, this Court should

19  require PG&E to submit a list of electrical lines, categories, ages, or types of equipment for which

20  it has no traceable, verifiable records. Once PG&E submits such a list to this Court and the parties

21  to PG&E's probation proceeding including *Amici*, this Court should give parties the opportunity to

22  comment on the next appropriate steps. If no records exist, this Court should consider directing

23  PG&E to test or replace equipment--a step the NTSB and CPUC required for PG&E's natural gas

24

25  _____

26  [111] United States Court, Post Conviction Risk Assessment (PCRA),
    https://www.uscourts.gov/services-forms/probation-and-pretrial-services/supervision/post-
27  conviction-risk-assessment (last visited June 14, 2020).
    [112] ECF 1220-1, *supra* note 17, at 46-47.
28  [113] ECF 1232, *PG&E'S RESPONSE TO PEOPLE'S STATEMENT OF FACTS supra* note 1, at 17-
    18.

1   pipelines for which PG&E could not produce traceable, verifiable records.[114]

2          PG&E's citation to the Butte County Grand Jury materials 13 times in its response to the

3   People's Statement of Fact underscores the importance of this Court and the parties before it

4   including *Amici* having access to those materials which PG&E has sought to seal. *Amici*

5   respectfully recommend that this Court order PG&E to provide access to the Butte County Grand

6   Jury materials in its possession including all materials and exhibits to this Court and all parties in

7   this proceeding including *Amici*. With respect, *Amici* recommend this Court not consider or give

8   weight to PG&E's statements based on the Butte County Grand Jury material until the Court and

9   the parties to PG&E's probation including *Amici* have an opportunity to review and comment on

10  the relevance of that material to PG&E's probation.

11         As discussed in *Amici's* brief (ECF 1228, pp. 15-16), *Amici* respectfully suggest that this

12  Court order PG&E to file a statement with this Court identifying each finding of fact or conclusion

13  of law it admits or denies in CPUC Decision 20-05-019 regarding the CPUC investigation into the

14  2017 Wine Country Fires and the 2018 Camp Fire. Such an order would develop a factual

15  predicate for probation modification or extension. PG&E's denial of many portions of the

16  People's Statement of Facts, its admission of some of those facts, and its admission that there were

17  sufficient facts to supports PG&E's guilty plea highlights the need to understand the facts behind

18  PG&E's criminal conduct. This factual predicate would be critical to modifying PG&E's criminal

19  probation terms.

20         As discussed in *Amici's* brief filed (ECF 1228, p. 13), *Amici* respectfully suggest this Court

21  extend PG&E's probation due to its massive violations of its probation conditions and felonies

22  committed while on probation. When evaluating whether to extend or revoke probation sentence, a

23  federal Court stands empowered to modify, reduce, or enlarge the conditions of probation at any

24  time prior to the expiration or termination of the term of probation, as allowed under the Federal

25  Rules of Criminal Procedure. 18 USCS § 3563(c). The law requires that as an explicit condition of

26  a probation sentence for a felony, a misdemeanor, or an infraction federal Courts must proscribe a

27  _____

28  [114] *See CPUC Decision 11-06-017*, *supra* note 9, at 18.

1  defendant from committing another *federal*, state, or local crime during the term of probation. 18

2  USCS § 3563. PG&E's commission of 85 felonies while on probation resulted in the deaths of 84

3  people in the Camp Fire and seriously injured a firefighter. PG&E's colossal violation of its

4  probation cries for an extension of its probation term to stop its criminal thinking and conduct.

5        *Amici* request the opportunity for additional briefing on what this Court should order to

6  ensure that operation and maintenance funds approved by the CPUC and FERC are appropriately

7  spent to protect public safety and prevent the commission of additional crimes by PG&E. As

8  discussed in *Amici's* brief (ECF 1228, p. 21), *Amici* respectfully suggest that Judge Alsup order

9  that the operation and expense budgets approved by the CPUC and FERC be "locked down" to

10  prevent PG&E from shifting those funds to bonuses and other types of expenditures. A budget

11  lock down is appropriate to ensure that PG&E is not incentivized or allowed to divert to PG&E

12  profits any "savings" from spending less than budgeted.  *Amici* respectfully suggest that this Court

13  require the monitor in this probation case to conduct the audits and activities necessary to ensure

14  that PG&E's expense and operations budget are not diverted to profits, particularly for record-

15  keeping, inspection, vegetation management, and maintenance activities.

16                    Respectfully submitted,

17                    AGUIRRE & SEVERSON, LLP

18  Dated: July 16, 2020        */s/Michael J. Aguirre*
19                    Michael J. Aguirre, Esq.
                    */s/Maria C. Severson*
20                    Maria C. Severson, Esq.
                    Attorneys for *Amici* Petitioners
21                    Alex Cannara and Gene A. Nelson

22                    CATHERINE J. KISSEE-SANDOVAL,
23  Dated: July 16, 2020        */s/ Catherine Janet Kissée-Sandovál*
                    Co-counsel for *Amici* Alex Cannara and Gene A. Nelson

24

25

26

27

28