JENNER & BLOCK LLP
    Reid J. Schar (*pro hac vice*)
    RSchar@jenner.com
    353 N. Clark Street
    Chicago, IL 60654-3456
Telephone: +1 312 222 9350
Facsimile: +1 312 527 0484

CLARENCE DYER & COHEN LLP
    Kate Dyer (Bar No. 171891)
    kdyer@clarencedyer.com
    899 Ellis Street
    San Francisco, CA 94109-7807
Telephone: +1 415 749 1800
Facsimile: +1 415 749 1694

CRAVATH, SWAINE & MOORE LLP
    Kevin J. Orsini (*pro hac vice*)
    korsini@cravath.com
    825 Eighth Avenue
    New York, NY 10019
Telephone: +1 212 474 1000
Facsimile: +1 212 474 3700

Attorneys for Defendant PACIFIC GAS AND ELECTRIC
COMPANY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>        v.<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>                    Defendant. | Case No. 14-CR-00175-WHA<br><br>**RESPONSE TO REQUEST FOR CLARIFICATION REGARDING JOINT PROPOSED CONDITIONS OF PROBATION**<br><br>Judge:  Hon. William Alsup |

1    Defendant Pacific Gas and Electric Company ("PG&E") respectfully submits this

2  response to the Court's July 21, 2020 Request for Clarification Regarding Joint Proposed

3  Conditions of Probation.  (Dkt. 1239.)  PG&E conferred with the Federal Monitor and the United

4  States Government on this response, and they do not oppose PG&E's submission.

5    **Question 1:**  Do "High Fire-Threat Districts" as used in these conditions include

6    both Tier 1 and Tier 2 High Fire-Threat Districts as defined by the CPUC?

7  **PG&E Response:**

8    The proposed joint conditions use the definition of High Fire-Threat District

9  ("HFTD") developed by the California Public Utilities Commission ("CPUC").  That definition

10  includes Zone 1 Tier 1 High Hazard Zones ("HHZs") and Tier 2 and Tier 3 fire-threat areas.

11  Tier 2 fire-threat areas depict areas where there is an elevated risk (including likelihood and

12  potential impacts on people and property) from utility-associated wildfires.  Tier 3 fire-threat

13  areas depict areas where there is an extreme risk (including likelihood and potential impacts on

14  people and property) from utility-associated wildfires.  Tier 2 and Tier 3 fire-threat areas may

15  overlap with Tier 1 HHZs on the Tree Mortality HHZ Map.  Zone 1 of the HFTD map

16  encompasses the remaining areas of Tier 1 HHZs.  A fuller explanation of the CPUC's definition

17  of HFTD is available on its website at https://www.cpuc.ca.gov/FireThreatMaps/.

18    **Question 2:**  With regard to vegetation inspections and transmission inspections,

19    the Court believes there should be a clear understanding as to how and to whom

20    safety issues are reported.  For example, will safety issues be reported to the

21    CPUC?  The Monitor?  PG&E's Chief Safety Officer?  Please explain how safety

22    concerns are required to be reported under the proposed conditions.

23  **PG&E Response:**

24    PG&E will report periodically to the Federal Monitor and to PG&E's

25  management, including its Senior Vice President of Electric Operations, on any safety issues

26  identified by (i) the in-house vegetation management inspection manager contemplated by the

27  Vegetation Condition; (ii) the in-house field supervisors and/or inspectors conducting in-field

28

1   oversight of PG&E contractors while vegetation management work is being performed, as

2   described in the Vegetation Condition; and (iii) the in-house and/or contract inspectors

3   overseeing field transmission inspections, as contemplated by the Transmission Inspection

4   Program Condition.  The frequency with which PG&E will produce these reports will be

5   mutually agreed between PG&E and the Federal Monitor team after the inspection oversight

6   begins and the parties are able to assess the types and volume of issues being identified by these

7   inspectors.  During that beginning phase of work, PG&E and the Federal Monitor team will be in

8   weekly contact to discuss these matters.

9            Beyond PG&E's periodic reporting to the Federal Monitor and its internal

10   management on safety issues identified by these personnel, PG&E will continue to report to the

11   CPUC and external stakeholders any conditions or incidents that meet the relevant safety threat

12   criteria for self-reporting.

13   *Proposed Asset Age Condition*

14            **Question 3:**  The condition states that "for certain critical transmission tower

15            components in High Fire-Threat Districts . . . PG&E shall conduct a reasonable

16            search . . ."  The parties shall please describe the criteria to be used in determining

17            which components qualify as "certain critical transmission tower components."

18   **PG&E Response:**

19            PG&E will identify critical transmission tower components for purposes of the

20   Asset Age Condition by weighing the relative ignition risks associated with particular types of

21   components.  Those risks are driven primarily by the frequency and consequences of past asset

22   failures.  Priority will be given to component types and categories assessed as higher risk.  The

23   criteria considered include, but are not limited to, (1) historical outage data; (2) PG&E's current

24   Transmission Line Failure Mode and Effects Analysis ("FMEA"), which identifies single points

25   of failure on electric assets that are capable of causing an ignition event; (3) past maintenance

26   work orders for different categories of assets; and (4) subject-matter expertise within PG&E and

27   the broader utility industry.  Sub-components may be grouped into larger component groups as

28

RESPONSE TO REQUEST FOR CLARIFICATION REGARDING
JOINT PROPOSED CONDITIONS OF PROBATION
Case No. 14-CR-00175-WHA

1    appropriate based on how components are installed and replaced (*e.g.*, hanger plate and C-hook

2    assemblies).

3              While PG&E's analysis remains ongoing, applying these criteria, PG&E has

4    already identified insulators, conductors, switches, structures, and hardware assembly (including

5    C-hooks and plates) as specific asset categories or category groups for which it will search and

6    record age or date of installation for purposes of the Asset Age Condition.  PG&E may identify

7    additional asset types, categories and/or groups.  PG&E will update the Federal Monitor on the

8    identification of specific components and/or sub-components that PG&E intends to designate as

9    critical transmission tower components for purposes of this condition, as well as the specific

10   ways PG&E will incorporate the data collected pursuant to this condition into its asset

11   management programs.

12             **Question 4:**  When will PG&E commit to completing recordkeeping as to asset

13             age under this proposed condition?

14   **PG&E Response:**

15             The process for tracking and recording critical asset information (including age)

16   and incorporating it into PG&E's risk-based asset management programs is continuous and

17   ongoing.  The specific program contemplated by the Asset Age Condition would require PG&E

18   to search for and capture information regarding the age and other attributes of certain critical

19   transmission components, as described above.  PG&E is currently in the foundational planning

20   phase of the project and cannot provide a firm date by which the Asset Age Condition will be

21   fully implemented until that foundational process is complete.

22             While this planning phase is underway and until PG&E is in a position to gather

23   and record data on asset age to fulfill the Asset Age Condition, PG&E's asset management

24   decisions will be guided by conservative assumptions that tie the age of a given component to the

25   age or installation date of the larger component, structure or circuit of which it forms a part.  In

26   addition, once PG&E begins to gather data on age and other attributes as part of the project

27   contemplated by the Asset Age Condition, PG&E will incorporate that data into its systems on a

28

1    rolling basis so that it can be leveraged for asset management as it is collected and before the

2    project is complete.

3                    In the foundational planning phase that is now underway, PG&E is working to

4    identify the scope, process, personnel and tools that will best facilitate implementation of the

5    Asset Age Condition.  During this phase, PG&E is applying risk-based criteria to identify the

6    critical transmission tower components for which age and other attributes will be captured;

7    gathering source material; developing templates for documentation of acquired data; developing

8    databases for storage and organization of acquired data; and hiring and training contractors to

9    review, analyze and capture the sought-after information.  Once the planning phase is complete,

10   the program will enter a two- to three-month pilot that will be used to validate data output and

11   quality and streamline processes for efficiency.  PG&E is targeting Q1 2021 for commencement

12   of the pilot project.  Based on the results of the pilot, PG&E will be in a better position to

13   propose a date for completion of the undertaking contemplated by the Asset Age Condition.  To

14   be clear, PG&E will have identified and organized a significant amount of data contemplated by

15   this condition by Q1 2021.  PG&E will provide regular updates to the Federal Monitor on its

16   progress towards fulfilling the Asset Age Condition.

17   *Proposed Transmission Inspection Program Condition*

18                   **Question 5:**  The condition states that PG&E shall "hire a crew of [independent]

19                          in-house and/or contractor inspectors" to oversee transmission inspections.  What

20                          is the minimum number of inspectors required to fulfill this condition?

21   **PG&E Response:**

22                   To implement the Transmission Inspection Program Condition, PG&E intends to

23   hire seven full-time "lead inspectors" to oversee transmission inspections and three seasonal

24   inspectors who will provide support for approximately five months each year.  This staffing level

25   aims to assign one lead inspector for every ten inspectors, which PG&E believes is an

26   appropriate ratio to adequately cover PG&E's service territory and work volume.

27

28

**Question 6:**  The condition also states that PG&E shall "revise the material loss threshold for the replacement of cold-end hardware (including C-hooks and hanger plates) in High Fire-Threat Districts to create a 90-day replacement requirement for such hardware with an observed material loss approaching 50%." The Court is concerned that the "approaching 50%" criterion is not conservative enough under all circumstances, such as when high winds buffet power lines and thus add considerable additional stress over and above the stress present during calm conditions.  The Court is therefore concerned that PG&E will blame the conditions of probation for its failure to replace worn C-hooks and hanger plates (among other things).  Please explain how the parties arrived at the "approaching 50%" criterion and why it is a distinct improvement over existing requirements. How does this "approaching 50%" square with CPUC requirements?

**PG&E Response:**

The 90-day replacement requirement described in the Transmission Inspection Program Condition recognizes that PG&E's current inspections repair methodology treats all material loss in the 30 to 50 percent range the same; that is, within that range, all cold-end hardware is to be replaced within 6 or 12 months depending on location in a Tier 3 or Tier 2 HFTD area.  Accordingly, the new 90-day replacement standard (at least half the time of the prior standard) in the proposed term of probation will require PG&E's post-inspection review teams to scrutinize more closely any cold-end hardware with an observed material loss in the 30 to 50 percent range, and to expedite such hardware for replacement as necessary based on the results of that individualized risk assessment, including consideration of unique environmental conditions (like high winds) or other relevant factors.  As noted in prior submissions, PG&E's existing standards require immediate replacement of cold-end hardware with observed material loss exceeding 50 percent.

The new 90-day replacement requirement provides a mechanism for PG&E's post-inspection review teams to accelerate replacement of moderately worn hardware if

conditions require, which PG&E anticipates will occur more frequently at the upper end of the 30 to 50 percent range, hence the "approaching 50 percent" language.  Rather than prescribing a specific material loss threshold between 30 and 50 percent to trigger the 90-day replacement (*e.g.*, 40 percent), the language in the proposed condition of "approaching 50 percent" also recognizes that human visual inspections inherently lack that level of precision.  For clarity, even where an inspector flags material loss on a C-hook for the post-inspection review team to assign a repair because the inspector believed there was 30 percent wear, the post-inspection review team under this new standard will be forced to more closely scrutinize the issue and, even if the loss appears to be in the 30 to 40 percent range, may still assign a 90-day replacement based on its individualized assessment.  In addition, the 90-day replacement requirement will significantly reduce the time between identification of moderately worn cold-end hardware and replacement (by three months or nine months, depending on location of the equipment in a Tier 3 or Tier 2 HFTD area).  In sum, this proposal is aimed at providing individualized treatment to cold-end hardware with loss in the 30 to 50 percent range, while providing a means to expedite repairs in at least half the time of the prior standards.

As explained in PG&E's prior submissions, PG&E believes based on engineering analyses that its existing thresholds for replacement of worn cold-end hardware require replacement well before such hardware reaches a safety factor at which replacement or reinforcement is required by CPUC General Order 95.  The 90-day replacement requirement similarly meets CPUC requirements as it directs replacement of such equipment sooner than is required by PG&E's existing standards, which already meet CPUC requirements as specified in General Order 95.

RESPONSE TO REQUEST FOR CLARIFICATION REGARDING
JOINT PROPOSED CONDITIONS OF PROBATION
Case No. 14-CR-00175-WHA

1    Dated:  July 28, 2020                              Respectfully Submitted,

2                                                       JENNER & BLOCK LLP

3

4                                                       By:   /s/ Reid J. Schar
5                                                             Reid J. Schar (*pro hac vice*)

6                                                       CRAVATH, SWAINE & MOORE LLP

7

8                                                       By:   /s/ Kevin J. Orsini
9                                                             Kevin J. Orsini (*pro hac vice*)

10

11                                                      CLARENCE DYER & COHEN LLP

12

13                                                      By:   /s/ Kate Dyer
                                                              Kate Dyer (Bar No. 171891)

14

15                                                      Attorneys for Defendant PACIFIC GAS
                                                        AND ELECTRIC COMPANY
16

17

18

19

20

21

22

23

24

25

26

27

28

RESPONSE TO REQUEST FOR CLARIFICATION REGARDING
JOINT PROPOSED CONDITIONS OF PROBATION
Case No. 14-CR-00175-WHA