UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>    Defendant. | No. CR 14-0175 WHA<br><br>**REQUEST FOR FOLLOWUP BY PG&E CONCERNING ITS OCTOBER 26 SUBMISSION** |

The Court has read PG&E's submission dated October 26, 2020, and thanks PG&E and its counsel. By **NOVEMBER 18, AT NOON**, PG&E shall please answer in full and forthrightly these followup questions:

1. With respect to PG&E's Large Fire Probability model identification, PG&E's description in Exhibit E states at page 14:

> PG&E's Large Fire Probability (LFP) model identification of areas on both PG&E's distribution and transmission systems with high wind-driven outage probability combined with high probability of a large fire if an ignition were to occur.
>
> - On the distribution system, the Distribution Large Fire Probability Model ($LFP_D$) is a product of PG&E's Outage Producing Wind (OPW) model and FPI models. The $LFP_D$ model provides hourly output at 2km model resolution and highlights locations with concurrence of a high probability for large fires and

       high probability of wind-related outages on PG&E's distribution system.

- On the transmission system, the Transmission Large Fire Probability Model ($LFP_T$) is the product of PG&E's Transmission Operability Assessment (OA) model and FPI models. The $LFP_T$ model provides hourly forecast outputs for each transmission structure. The model highlights locations with both an increased probability for large fires and high probability of wind-related failures on PG&E's transmission system.

Leading up to the Zogg Fire, how close did the Distribution Large Fire Probability model come to assessing specifically the Girvan Distribution Line? Describe all September 2020 assessments made for the smallest area that included the Girvan Line.

    2. What were the specific ratings, scores and weightings considered by the PG&E team, broken out for each distribution line in Shasta County in the September PSPS?

    3. To what extent, if at all, did the Distribution Large Fire Probability model take into account the extent to which vegetation had been cleared or trimmed or not cleared or trimmed in the immediate vicinity of a specific distribution line?

    4. To what extent, if at all, did the Distribution Large Fire Probability model take into account the fire threat tier level through which a specific distribution line ran?

    5. Did the Distribution Large Fire Probability model take into account the difficulty or ease with which residents would be able to evacuate on short notice in the event of a wildfire?

    6. For the smallest region that included the Girvan Line, what were PG&E's ratings and/or assessments in days and hours leading up to the late September PSPS with respect to (see page 14 of Exh. E):

       (a) Fuel moisture;

       (b) Humidity;

       (c) Wind speed;

       (d) Air temperature;

       (e) Land type; and

       (f) Historical fire occurrences.

7. How did those assessments compare specifically to the smallest region that included the de-energized line nearest the Girvan Line?

8. Explain specifically why some lines in Shasta County were de-energized but the Girvan Line in Shasta County was not. How close were any de-energized lines to the Girvan Line and what specifically accounted for the difference?

9. Describe with specificity and step-by-step how the "Distribution Large Fire Probability Model" works, how it weights various factors, and all other factors used and their weights in deciding which lines to de-energize. Is the decision done by algorithm or by subjective assessment? Please attach examples of any worksheets used for Shasta County in the late September PSPS.

10. At page 16 of Exhibit E, PG&E states:

> In light of the meteorological information indicating the potential for catastrophic wildfire and the customer impacts from mitigating that fire risk through de-energization, PG&E considered whether alternatives to de-energizing, such as additional vegetation management and disabling automatic reclosers, could adequately reduce the risk of catastrophic wildfire to obviate the need for de-energization. PG&E determined that these measures alone did not reduce the risk of catastrophic wildfire in areas within the PSPS scope sufficiently to protect public safety.
>
> - PG&E conducted hazard tree mitigation efforts on circuits potentially in PSPS scope in the days leading up to the event and continued up through the day of de-energization.
>
> - PG&E conducted pre-patrols of circuits and equipment in de-energization scope in the days leading up to the time of de-energization.
>
> - The company disabled automatic reclosing in Tier 2/Tier 3 areas.
>
> - PG&E deployed Safety and Infrastructure Protection (SIP) crews for real-time observations and fire response.

With respect to this statement:

(a) What hazard tree mitigation efforts were done on the Girvan Circuit "in the days leading up to the event and continued up through the day of de-energization" Please append all pertinent reports, photographs and documents and name the people who made any such effort.

3

    (b)    What "pre-patrols" were done on the Girvan Circuit within the meaning of your statement in the run-up to the PSPS?

    (c)    Was the Girvan Circuit in Tier 2 or Tier 3 and were any of its automatic reclosers "disabled" within the meaning of your statement?

    (d)    Were any real-time crews deployed along the Girvan Circuit?

11.    At page 23, Exhibit E states:

> PG&E teams met to discuss the models trending weaker in TP8 (Kern county). Leaders decided to abort the TP8 PSPS event as the latest forecasts indicated that no areas exceeded PSPS guidance. By 1142 PDT, all areas de-energized in this event were given the Weather All Clear.

Specifically, please identify by name and position and role each member of the "PG&E Team" and each one of the "Leaders" referenced in this paragraph.

12.    In its PSPS program, has PG&E ever de-energized a distribution line even though it had been cleared of hazard trees and limbs? If so, please give examples and explain why it de-energized lines with no such risk?

13.    Why isn't the PSPS decision made by asking this simple question — Is the line safe to conduct power during high winds? If yes, then PG&E would leave it on. If not, then PG&E would turn it off during the storm. The balancing-of-factors approach that PG&E uses, according to its generalized description, leaves open the possibility that a line will remain powered up even though it's unsafe to do so in a windstorm (due to the presence of hazard trees or threatening limbs not yet fixed by PG&E).

14.    With respect to Exhibit D, the first photograph shows a gray pine uphill from the distribution line looming in the direction of the transmission line. Is this the gray pine that was eventually recovered by CAL FIRE? Is that gray pine still there? Is there specific evidence that this particular gray pine was trimmed or removed prior to the Zogg Fire? Was this tree identified for work by any patrol?

15.    If this is not the tree taken by CAL FIRE, then do we have anywhere a pre-fire photograph of the tree that was taken?

16. At page 8, lines 20–22, PG&E states that "work" was done on ten trees in the area of interest. What, specifically, was that work, tree by tree?

17. Same question for the "work" referenced at page 9, line 13.

18. Please provide all reports by PG&E or CNUC or Wright Tree Service regarding the March to April 2020 patrols and work referenced at page 8. Given that more than 2000 trees were identified for work on the Girvan Circuit, why were only ten trees worked? For the 2019 patrols and work, were additional trees identified for possible work beyond the ten referenced at page 8? Same question for the October 2018 patrol and April 2018 CEMA patrol. (PG&E's answers say that as a result of patrols, work was prescribed for certain trees and then done but this begs the question whether the patrols identified other potential problems for which work was not done.) Please explain why the area of interest was not subject to a separate CEMA patrol in 2019.

19. Please attach in chronological order paper copies of all maps, charts, diagrams, reports, memos, text messages, emails, recordings, or other documents in your possession that refer to the Girvan Line or any PSPS in Shasta County that were consulted or prepared in the period from September 21 to September 30, 2020, in connection with the PSPS. Videos or recordings of Zoom or similar meetings may be provided by thumb drive along with a paper index of the drive's contents.

In your response, please restate the question at the outset of your answer. Please respond under oath.

**IT IS SO ORDERED.**

Dated: October 29, 2020.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE