1

2

3

4

5

6

7 UNITED STATES DISTRICT COURT

8

9 NORTHERN DISTRICT OF CALIFORNIA

10

11 UNITED STATES OF AMERICA,

12         Plaintiff,                     No.  CR 14-00175 WHA

13     v.

14 PACIFIC GAS AND ELECTRIC             **ORDER TO SHOW CAUSE RE**
COMPANY,                             **CONDITIONS OF PROBATION**

15

16         Defendant.

17

18       This order to show cause proposes further conditions of probation to require the convicted

19 utility, in deciding which power lines to de-energize during windstorms, to take into account the

20 extent to which power lines have or have not been cleared of hazardous trees and limbs as

21 required by California law and the Offender's own Wildfire Mitigation Plan (WMP).  This

22 proposal is made to protect the people of California from yet further death and destruction

23 caused by the Offender's continuing failure to operate its power grid safely.

                                  *      *      *

24

25       In September 2010, a high-pressure gas transmission pipeline owned and operated by

26 defendant Pacific Gas and Electric Company exploded in a residential area of San Bruno.  The

27 inferno killed eight, injured 58, and damaged 108 homes, 38 of which were destroyed.  The

28 National Transportation Safety Board (NTSB) immediately investigated and found that PG&E's

United States District Court
Northern District of California

Integrity Management Program was deficient, ineffective, and a probable cause of the San Bruno explosion.  The investigation further revealed that PG&E lacked complete and accurate records for its gas transmission pipelines despite receiving notice of recordkeeping deficiencies through employees, regulatory agencies, and third-party auditors and consultants (PSR ¶¶ 13–19).

In August 2016, a federal jury convicted PG&E on five felony counts of knowingly and willfully violating Natural Gas Pipeline Safety Act safety standards and one felony count of obstructing the NTSB's investigation arising out of the San Bruno explosion.  The felony judgment that followed imposed the largest fine allowed by law and the longest probation allowed by law.  One of several conditions of probation prohibited the Offender from committing another federal, state, or local crime.  It was also required to notify the probation office immediately upon learning of any major civil litigation, criminal prosecution, or administrative proceeding against PG&E, or any investigation or formal inquiry by governmental authorities regarding the organization.  The felony judgment also provided for an independent monitor to oversee safety aspects of PG&E's operations (Dkt. No.s 884, 922).

Then came a stunning chapter in California history.  Since the commencement of the Offender's probation alone, PG&E has ignited 20 or more wildfires in California, killing at least 111 individuals, destroying at least 22,627 structures, and burning half a million acres.  Here follows a summary.

In October 2017, the Wine Country Fires — including the Atlas and Nuns fires — ravaged more than two hundred thousand acres in Northern California.  According to CAL FIRE, PG&E ignited seventeen of the twenty-one major Wine Country wildfires.  The culprit this time was PG&E's electricity grid.  These seventeen fires alone killed 22 people and destroyed 3,256 structures.  Following the Wine Country fires, the Monitor, federal prosecutors, PG&E, and the Court agreed that the Monitor would evaluate PG&E's electricity-distribution operations, including its vegetation-management plan, and equipment-maintenance and inspection programs.  CAL FIRE found that PG&E's violations of Section 4293 of the California Public Resources Code specifically had caused at least three of the Wine Country fires.

United States District Court
Northern District of California

1   All these fires occurred during the wildfire season and during windstorms.  During a

2   windstorm, if a tree or a heavy limb blows onto energized lines, the lines are pushed together,

3   and because they are uninsulated, a bolt of electricity flashes between the conductors. The

4   molten metal blazes to the ground where it lands in the dry grass, igniting a wildfire.  There is

5   nothing wrong with the lines being uninsulated, for they almost always have been.  Precisely

6   because they are uninsulated, in 1929, the California Public Utilities Commission (CPUC)

7   General Order (GO) 95, set forth rules for utilities to ensure that overhead power lines remain

8   free of tree and limb hazards.  Similarly, since 1965, the California Public Resources Code has

9   separately required utilities like PG&E to police their rights of way and remove trees and limbs

10  within a specified clearance.  During the wildfire season, Section 4293 requires utilities to

11  maintain a clearance of specified distances "in all directions between all vegetation and all

12  conductors which are carrying electric current" and to trim or remove hazardous trees or limbs

13  that may contact the line from the side or fall on the line.

14  PG&E, however, failed to comply with these safety directives and began to divert funds

15  from right-of-way maintenance.  It used those funds for, among other things, bigger bonuses,

16  dividends, and political contributions.   Inspections of lines and removal of hazardous limbs and

17  trees got postponed.  The backlog of uncompleted work grew and grew.  In 2017, we paid the

18  price in the Wine Country Fires.  Windstorms blew trees and limbs onto live PG&E wires and

19  sparked the conflagrations.

20  Shortly after the 2017 fires, PG&E, though flush with cash, fled into bankruptcy to

21  minimize its liability for those wildfires.  It also went to the legislature for a relief plan.  In 2018,

22  the California Legislature passed SB 901, which required California's electrical utilities to create

23  WMPs, which they must submit annually to the CPUC.  WMPs detail utilities' safety measures

24  and wildfire prevention efforts.  Pursuant to SB 901, PG&E's WMP would include protocols

25  and programs for de-energization, vegetation management, and facility inspection and

26  maintenance.  The same bill added factors, including climate conditions, which the CPUC could

27  use to determine whether and what portion of a utility's wildfire-related expenses could be

28  passed along to ratepayers.  Soon followed AB 1054, which created an insurance fund for

3

United States District Court
Northern District of California

1   utilities, and which required that electrical utilities submit the annual WMPs to the newly-

2   formed Wildfire Safety Advisory Board for comment.  In addition to the annual submission, it

3   required utilities to comprehensively change their WMPs every three years.

4          In November 2018, the Camp Fire in Butte County, the deadliest wildfire in California

5   history, destroyed the town of Paradise, killed 85, and burned 18,793 structures.  Again, P&E

6   caused the fire.  One cause was the collapse of an ancient, worn-out C-hook hanging from a

7   PG&E transmission tower, and another was a tree blowing onto a PG&E distribution line, all as

8   strong winds swept the region.  In all cases, the high winds, known as Diablo Winds, had been

9   expected, annual events in our autumns.

10         On January 9, 2019, United States Probation Officer Jennifer Hutchings filed a Form 12

11   charging that PG&E violated the conditions of its probation by failing to notify her of a $1.5

12   million settlement entered into with the Butte County District Attorney's Office, whereby Butte

13   County had agreed to forgo criminal prosecution in connection with three even earlier wildfires

14   that CAL FIRE determined had been caused by trees blowing onto PG&E distribution lines.

15   That same day, another order herein directed the parties to show cause why PG&E's conditions

16   of probation should not be modified to, among other things, require PG&E to re-inspect its

17   electrical grid, remove or trim all trees or branches that might contact PG&E's equipment during

18   high-wind events, and to de-energize any part of its electrical grid not yet rated as safe by PG&E

19   for the wind conditions then prevailing.  Hearings followed (Dkt. No.s 960–61).

20         This led to further probation conditions in April 2019 (Dkt. No. 1040):

> 1.  PG&E must fully comply with all applicable laws concerning vegetation management
>     and clearance requirements, including Sections 4292 and 4293 of the California Public
>     Resources Code, CPUC General Order 95, and FERC FAC-003-4.
>
> 2.  PG&E must fully comply with the specific targets and metrics set forth in its wildfire
>     mitigation plan, including with respect to enhanced vegetation management.
>     Compliance with these targets and metrics, however, will not excuse any failure to
>     fully comply with the vegetation laws as required in paragraph 1.
>
> 3.  The Monitor shall assess PG&E's wildfire mitigation and wildfire safety work,
>     including through regular, unannounced inspections of PG&E's vegetation
>     management efforts and equipment inspection, enhancement, and repair efforts.  The
>     inspections will include both inspections of segments of power lines where PG&E has

4

conducted its enhanced vegetation management efforts pursuant to its wildfire mitigation plan, as well as areas where enhanced vegetation management has yet to occur.  The inspections will further include field interviews and questioning of PG&E employees and contractors.

4.  PG&E shall maintain traceable, verifiable, accurate, and complete records of its vegetation management efforts.  PG&E shall report to the Monitor on the first business day of every month on its vegetation management status and progress, and make available for inspection all related records at the Monitor's request.

5.  PG&E shall ensure that sufficient resources, financial and personnel, including contractors and employees, are allocated to achieve the foregoing. If PG&E cannot find enough contractors, then PG&E must hire and train its own crews to trim and remove trees.  To ensure that sufficient financial resources are available for this purpose, PG&E may not issue any dividends until it is in compliance with all applicable vegetation management requirements as set forth above.

At the sentencing hearing on May 7, 2019, PG&E board members and officers were ordered to visit San Bruno, the site of the gas explosion, and Butte County, the site of the deadly Camp Fire, to bring home the devastation that PG&E had wrought.  PG&E was also required to create a committee within the Board of Directors to scrutinize PG&E's fidelity to the WMP and its conditions of probation.  These conditions became the following (Dkt. No.s 1061, 1027, 1071):

6.  By no later than July 15, 2019, the PG&E Board of Directors, PG&E's Chief Executive Officer and certain other PG&E senior executive leaders, the Monitor, and Probation shall visit Paradise and San Bruno to gain a firsthand understanding of the harm inflicted on those communities and meet with victims and other stakeholders, such as fire-fighting personnel and/or city officials.

7.  A committee of the PG&E Board of Directors shall assume responsibility for tracking progress against PG&E's Wildfire Safety Improvement Plan, as approved by the California Public Utilities Commission, and the new terms of probation imposed on April 3 regarding wildfire safety.  The committee is to report in writing to the Board at least quarterly, and also present orally to the Board at least quarterly, PG&E's progress in meeting the terms of the approved Wildfire Safety Improvement Plan and the April 3 terms of probation and, to the extent there are shortfalls, how PG&E will address the shortfalls.

In June 2019, the Court, the Monitor, PG&E's board of directors, its officers, and Probation Officer Hutchings all went to Paradise, Ground Zero of the Camp Fire.  They learned from first responders and survivors of the Camp Fire about the devastation that wrecked the

county and killed so many, all because of PG&E's safety failures.  The same group visited the San Bruno pipeline explosion site in July to see and hear the full story of that crime.

In Butte County, PG&E would eventually admit responsibility for 84 deaths in the Camp Fire and would plead guilty in June 2020.  *See* THE NEW YORK TIMES, "PG&E Pleads Guilty to 84 Counts of Manslaughter in Camp Fire" (June 16, 2020).  It also would agree to pay $13.5 billion to the victim's compensation fund, a $4.5 million dollar fine, and $500,000 to cover the costs of the prosecution.

This Court urged, but ultimately did not require, PG&E to temporarily de-energize any power line unsafe to operate during dry-season windstorms.  PG&E protested the idea at the time and resisted any proposed order to engage in such temporary de-energizations.  During the 2019 fire season, however, PG&E voluntarily implemented eight power shutoffs, which came to be known as Public Safety Power Shutoffs (PSPSs).  No major wildfire, in fact, came from a PG&E distribution line failure in 2019.  This represented an important safety development.  Most significantly, during the entire wildfire season in 2019, no lives were lost from wildfires started by PG&E.  This stood in stark contrast to preceding years.  Troublesome and aggravating as those power shutoffs certainly were, that paled in comparison to the death and destruction caused in the preceding years.  Photos of downed trees draped over de-energized distribution lines in the wake of the windstorms demonstrate what might have occurred had the power been left on and the massive extent to which PG&E has failed to maintain the required clearances.  During 2019, PG&E conducted eight PSPSs.  PG&E found that 334 trees or limbs fell on distribution lines during just four PSPSs in October.  Of these fallen trees, PG&E estimated that 234 would have caused arcing (in which electricity would have flown to the closest conducting surface, such as the dry, grass-covered earth).  Here are four photographs from the October 26 or 29 PSPSs illustrating the point (Dkt. No.s 1110, 1119, 1132):

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California



**A blown-over tree and broken conductors in Sonoma County.**



**A tree blown onto conductors in Alameda County.**

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**A tree blown onto conductors in unincorporated Napa County.**



**A tree blown onto conductors in unincorporated Lake County.**

1    Public Safety Power Shutoff Oct. 26–Nov. 1, 2019 Report to the CPUC, Appx. C, Figs. 1, 5, 6,

2    7.

3          Although no distribution line ignited a wildfire in 2019, a PG&E transmission line did fail

4    and cause a major wildfire, the Kincade Fire in Sonoma County.  A transmission tower at the

5    intersection of Kincade and Burned Mountain Roads saw a jumper cable break loose during a

6    windstorm, contact the metal tower, and short out, tossing electrical sparks onto the dry wind-

7    blown grass.  It burned through over 77 thousand acres and destroyed 374 structures, but,

8    mercifully, killed no one.  CAL FIRE blamed PG&E.  *See* SAN JOSE MERCURY NEWS,

9    "PG&E Power Lines Caused Kincade Fire in Sonoma County" (July 16, 2020).

10          To patrol and clear its right of ways, PG&E has in this century outsourced all

11   responsibility, both as to inspections to identify hazardous trees and limbs and as to cutting

12   them.  Since the Wine Country Fires, PG&E has ramped up its outsourcing.  As of April 2020, it

13   had under contract over 1,000 "pre-inspectors" to flag trees that violated clearance requirements

14   and roughly 5,000 tree-trimmers to follow behind to remove them.  This clearing work,

15   however, has been sloppy and missed dangerous conditions entirely.  The Court asked the

16   Monitor to perform unannounced spot checks on outsourced work and the Monitor reported

17   numerous shortfalls (and continues to do so).  When called to account, PG&E routinely shrugs

18   and says it didn't know of the substandard work done by the outsourcees.

19          The problem was that PG&E needed at least some inspectors on its own management team

20   to oversee the quality (or not) of the outsourced work.  Put differently, PG&E needed its own

21   inspectors to do what the Monitor had been doing.  This led the Court to impose, in April 2020,

22   additional terms of probation regarding inspections and to require PG&E to hire and train its

23   own inspectors so as to better manage quality control over its contractors.   They were as follows

24   (Dkt. No. 1243):

25        8.   Vegetation Condition:  PG&E shall, by September 1, 2020, staff an in-house vegetation
26             management inspection manager to oversee a number of workforce resources who will
               provide in-field oversight of all stages of the vegetation management process, including
27             the enhanced vegetation management program work, to be deployed throughout
               PG&E's territory, including High Fire-Threat Districts (HFTDs).  By the end of
28             September 2020, PG&E will extend offers to 10 in-house field supervisors and/or

United States District Court
Northern District of California

inspectors, an additional 10 inspectors by the end of November, and the remaining approximately 10 inspectors by the end of January 2021. The inspectors shall conduct in-field oversight of PG&E contractors while the work is being performed, verifying and correcting any deviation from applicable scopes of work pursuant to PG&E policies and legal requirements. The inspectors shall also oversee pre-inspectors to help ensure they are clearly marking and designating trees for trimming and removal, and that tree-trimming contractors are appropriately performing their duties. Deviations from applicable scopes of work shall also be accurately recorded and reported to PG&E and the Monitor team to be used for, among other things, ongoing training of PG&E's contract workforce.

9. Asset Age Condition: For certain critical transmission tower components in High Fire-Threat Districts, the failure of which may result in an ignition, PG&E shall conduct a reasonable search and, where available, record the age and date of installation of those components. For all other such critical transmission components and where asset-age records are not reasonably available, PG&E shall make conservative assumptions of such ages and dates of installation. PG&E shall also implement a program to determine the expected useful life of critical components factoring in field conditions and incorporate that information into its risk-based asset management programs. PG&E shall begin this effort (or supplement any existing or planned initiatives) immediately and provide monthly progress reports to the Monitor team.

10. Transmission Inspection Program Condition: PG&E shall, by the end of 2020, supplement its transmission-asset inspections program to include the following measures: (1) hire a crew of in-house and/or contract inspectors, independent from inspectors conducting transmission inspections, to oversee in the field transmission inspections while they are being conducted; (2) going forward, and subject to CAISO clearances and/or other external dependencies, revise the material loss threshold for the replacement of cold-end hardware (including C-hooks and hanger plates) in HFTDs to create a 90-day replacement requirement for such hardware with an observed material loss approaching 50%; and (3) make the prior two years of inspection reports available to transmission post-inspection review teams starting in 2021, and one year of inspection reports available in 2020.

These conditions were worked out by the Monitor and eventually stipulated to by the Offender.

Unlike 2019, when no PG&E distribution lines caused any major wildfires, thanks to the PSPS, 2020 saw a return to distribution-line disaster. On September 27, 2020, during a windstorm, a fire ignited in the area of Zogg Mine Road and Jenny Bird Lane in Shasta County (Zogg Fire). The Zogg Fire killed four: Alaina Michelle Rowe and her eight-year-old daughter died when flames overtook their pickup truck, Karin King also died trying to escape in her vehicle, and Kevin Vossen succumbed to burns. It also destroyed 204 structures.

As of this moment, CAL FIRE has not blamed the Zogg Fire on PG&E, but there are clear signs that PG&E bears responsibility. On October 9, PG&E disclosed that CAL FIRE had taken possession of PG&E equipment as part of an ongoing investigation into the origins of the Zogg Fire. CAL FIRE also seized portions of a gray pine in connection with its investigation. The gray pine had been looming over a section of distribution line (the area of interest) along PG&E's Girvan Circuit. On October 12, an order herein requested that PG&E explain its role in the ignition of the Zogg Fire, including whether inspections of the Girvan Circuit had previously identified trees for trimming or removal and the status of that work.



**The gray pine looming over the Girvan Circuit prior to the Zogg Fire (Dkt. No. 1250-4).**

According to PG&E's response, when the Zogg Fire erupted during the windstorm, a PG&E SmartMeter and a line recloser serving the area of interest reported drops in voltage and other activity from approximately 2:40 p.m. to 3:06 p.m., when a line recloser deenergized that portion of the Girvan Circuit. NOAA's geostationary weather satellite detected a fire in the area at 2:46 p.m. PG&E reports that CAL FIRE confiscated, among other things, several shattered

United States District Court
Northern District of California

1   and at least one burned piece of distribution-line infrastructure from the area of interest (Dkt.

2   No. 1250 at 4–5, 7).

3       Although other distribution lines in Shasta County were de-energized during the

4   windstorm, PG&E had left the Girvan Line fully energized.

5       PG&E admits that it had failed to perform work on trees that had been designated for

6   removal or trimming in the area of interest.  Specifically, in August 2018, a subcontractor

7   identified "for removal two Gray Pine trees that have a location consistent with the location of

8   the Gray Pine from which CAL FIRE appears to have collected sections after the Zogg Fire."

9   PG&E acknowledges that these gray pines, along with others identified, "may not have been

10  worked despite being identified for work by the" California Forestry and Vegetation

11  Management Quality Control "inspector."  PG&E also admits that the area of interest had not

12  received a separate Catastrophic Event Memorandum Account (CEMA) patrol in 2019, as was

13  required.  PG&E's CEMA patrols involve visual inspections for dead and dying trees in the

14  highest-risk portions of its distribution lines.  They supplement PG&E's standard vegetation

15  management inspections.  In April 2019, a PG&E database contractor (yet another outsource)

16  logged into the inspection scheduling system and changed the scheduled start date for the

17  CEMA patrol, which had been scheduled to occur in November 2019.  The individual reset the

18  inspection for *February* 2019, a date that had already passed.  Consequently, the CEMA patrol

19  of the area of interest ultimately did not take place (Dkt. No. 1265 at 24, 31, 32).

20      Shasta and Tehama Counties have recently sued PG&E in state court, and the Shasta

21  County District Attorney's office is investigating criminal charges against the utility.  *See* SAN

22  FRANCISCO CHRONICLE, "Shasta, Tehama Counties Sue PG&E, Alleging Negligence Led

23  to Zogg Fire" (Dec. 10, 2020); *see also* REDDING RECORD SEARCHLIGHT, "More than 150

24  in Shasta County Join to Sue PG&E over Zogg Fire" (Dec. 16, 2020).  Additionally, PG&E

25  reported to the Securities and Exchange Commission in mid-December 2020 that it expects to be

26  liable for $275 million or more in damages to victims of the fire (Dkt. No. 1270-1).

27      Since some of the distribution lines in Shasta County were shut off during that windstorm

28  but the Girvan Line was somehow left on, the Court asked PG&E to explain its PSPS decision-

12

1    making process.  The responses led to more follow-up questions.  *The Court was surprised to*

2    *learn PG&E did not and does not consider the extent to which distribution lines have been*

3    *cleared of hazardous trees and limbs in designating lines for a PSPS* (Dkt. No.s 1265, 1271).

4         The Zogg Fire illustrates this point.  Shortly before September 27, as the northern counties

5    braced for the windstorm, PG&E initiated a PSPS analysis and ultimately de-energized several

6    circuits in that region, beginning on the 27th, in anticipation of high winds and dangerous

7    conditions.  PG&E proceeded in two steps.  Initially, variables including weather, fuel humidity,

8    terrain, and forecasted wind speeds (among others) fed an algorithm, which rated regions by risk

9    of catastrophic wildfire.  In other words, the algorithm was supposed to predict the areas facing

10   an unacceptable risk of catastrophic wildfire and nominate those areas (and those areas alone)

11   for de-energizing.  Significantly, however, its inputs did not (and still do not) consider

12   compliance (or not) with clearance mandates.  As a result, the algorithm ignored the main

13   problem and ignored the entire extent to which any line had or had not been cleared.

14        Next, PG&E's meteorology team and other decision makers examined each of those

15   nominated regions and decided whether to de-energize the overhead electrical wires that traverse

16   them.  As part of this second-stage analysis, once a line was designated for a PSPS, PG&E went

17   out to try to find and remove hazardous trees in order to possibly "adequately reduce the risk of

18   catastrophic wildfire" and subtract the line from the PSPS.  (Of course, very little time remained

19   to do this.)  But, to repeat, in nominating the lines for a PSPS in the first place, PG&E ignored

20   (and still ignores) the extent of risk from hazardous trees and limbs.  This meant (and still

21   means) that a distribution line beset by hazardous trees and limbs would not be nominated

22   unless, by luck, the other criteria happened to indicate sufficient risk (Dkt. No.s 1265, 1271,

23   1250-5 at 16).

24        It is most confounding that PG&E, in deciding which distribution lines to de-energize in a

25   PSPS, ignored (and still ignores) the number-one cause of wildfires ignited by PG&E:

26   hazardous trees and limbs that should have, by law, been removed but which still loom as threats

27   in windstorms.  There can be no debate about the dangers of dead, dying, and untrimmed trees

28   near live distribution lines.  By PG&E's own admission,

United States District Court
Northern District of California

13

1

2

3

4

> [v]egetation-caused ignitions are one of the largest drivers of utility-caused wildfires, and the largest driver in HFTD areas.  We estimate that 70 percent of the time, if identified vegetation is not worked, it can cause a power-line failure under high fire threat weather conditions.

5

6

*Pacific Gas and Electric Company Quarterly Report on 2020 Wildfire Mitigation Plan for May to July 2020* (Sept. 9, 2020), at 11.

7     So, here we are again, concerned with the most serious life and death question arising out

8    of PG&E's continuing safety violations of California law in its failure to remove dangerous trees

9    and limbs from its distribution lines.  This problem is often referred to as "vegetation

10    management."  But that term vastly understates and marginalizes its true severity.  It's not a

11    matter of landscaping or gardening.  It's a matter of life and death.

12     PG&E's recent responses, and a December 2020 letter from the Monitor, illuminate gaps

13    in PG&E's compliance with California law, recordkeeping, and compliance with various terms

14    of its probation.  (The Monitor letter is appended hereto as Exhibit 1.)

15     *First*, PG&E continues to be in violation of Section 4293 because it has failed to remove

16    all trees and limbs within the required clearances.  PG&E admits this (Dec. Monitor Ltr. at 8,

17    10).

18     *Second*, in 2020, PG&E continued to allow trees to threaten distribution lines in violation

19    of California law.  PG&E found 157 "Level 1" trees (posing imminent threats to distribution

20    lines), between January and April 2020.  PG&E violated GO 95 by failing to ameliorate these

21    hazardous trees within 24 hours.  Then there are the trees that PG&'s work failed to address.  On

22    lines certified "compliant," PG&E's internal reviews found 432 trees that failed.  The Monitor's

23    independent, and smaller-scope review found an additional 153 dangerous tree conditions (*id*. at

24    8, 10, Exh. G).

25     Within California's HFTDs, as well, the Monitor found that PG&E's work regularly

26    "missed trees."  HFTDs denote areas of the power grid that carry a heightened risk of severe

27    wildfires.  The HFTDs include three separate risk tiers, in order from least to most dangerous:

28    Tier 1 refers to the "high hazard" areas on the U.S. Forest Service-CAL FIRE tree-mortality

United States District Court
Northern District of California

14

map, Tier 2 refers to areas with an "elevated risk" of utility-caused wildfires, and Tier 3 refers to areas with an "extreme risk" of utility-caused wildfires.  In its WMP, PG&E has adopted more stringent internal standards for trimming and removing trees within the HFTDs.  These standards are referred to as Enhanced Vegetation Management (EVM) "scope."  The Monitor found more exceptions to the EVM scope per mile than it had between September and December of 2019.  Alarmingly, these exceptions included more trees overhanging distribution lines and trees that posed a strike risk, per mile, than the Monitor found from September to December 2019.  The Monitor did report that, in 2020, PG&E completed over 1,800 miles of EVM inspections and tree work in HFTDs and that "non-conformance with the EVM scope is more the exception than the norm."  Yet PG&E's work continued to overlook potentially deadly trees (*id*. at 2–3, 5–6).

*Third*, there "continue to be gaps in PG&E's recordkeeping" of inspections and vegetation work, in violation of PG&E's WMP and fourth condition of probation.  While acknowledging improvements since 2019, the Monitor still found troubling errors.  For example, within PG&E's records, "approximately 8,200 trees" displayed risk "scores indicating" they should be removed, but were nonetheless "marked in the internal system as *not* requiring tree work."  The Monitor also reports, "PG&E's maps for EVM work are still not accurate and complete."  Some maps omitted entire segments of circuits.  In one case, the Monitor even found a radial clearance violation on the real-life segment of the circuit that was missing from the map; but for the Monitor's inspection, this radial clearance violation would remain today (*id*. at 11–13 (emphasis added)).

*Fourth*, PG&E has reported to the CPUC that it will fall short of fulfilling its WMP in 2020.  PG&E's WMP incorporated multiple goals, of which PG&E anticipates it will fail to meet three.  One deals with post-PSPS power restoration to customers, but two involve improvements to its SmartMeters to better detect service transformer failures and voltage drops that indicate downed distribution wires.  Both of the latter aim to help prevent wildfires, but PG&E is not projected to meet those WMP commitments (*id*. at 6–7).

15

*Fifth*, the Monitor emphasized that in 2019 and 2020, PG&E failed to use risk models as "the predominant input . . . in PG&E's [EVM] work planning and execution for 2019 and 2020." This choice by PG&E defies belief. The Monitor called on PG&E "to give greater weight to working the riskiest areas first" with respect to hazardous trees (a goal, it acknowledges, that PG&E seems poised to improve upon in 2021) (*id*. at 2).

This order recognizes that PSPS events, necessary because PG&E has failed to clear hazardous trees and limbs, cause huge disruptions for the public. Businesses suffer and residents who use medical devices go without electricity. Still, in October of last year, PG&E's then-CEO and President Bill Johnson stated that PSPS events could continue for up to 10 years, since it will take that long for the Offender to bring its lines into compliance and thus eliminate the need for PSPS events during windstorms. *See* KQED, "The PG&E Public Safety Power Shutoffs Could Continue for 10 Years, Says CEO" (Oct. 18, 2019). The PSPS is the lesser evil and will remain essential until PG&E finally comes into full compliance with respect to removing hazardous trees and limbs and honoring the required clearances.

PG&E is therefore ordered to show cause why the below proposed conditions of probation should not be added as conditions reasonably necessary to protect the public from further death and destruction and to help rehabilitate the Offender (18 U.S.C. §§ 3553(a)(1), (a)(2)):

> 11. In determining which distribution lines in Tier 2 or Tier 3 to de-energize during a PSPS, PG&E must take into account all information in its possession and in the possession of its contractors and subcontractors concerning the extent to which trees and/or limbs bordering those lines remain in violation of Public Resources Code Section 4293, GO 95, FERC FAC-003-4, and/or its own wildfire mitigation plan.

> 12. To the extent that such information shows that such trees and limbs present a safety hazard in the event of a windstorm, PG&E must make a specific determination with respect to that distribution line and it must de-energize it unless PG&E finds in writing that there are specific reasons to believe that no safety issue exists.

PG&E may continue with its two-step process so long as it also follows the new conditions herein.

A few weeks ago, a prior question to PG&E raised the general proposal in this order and PG&E replied. This order now poses a specific version of that question. Rather than treat the

16

earlier answer as PG&E's response, this order gives the Offender a fresh opportunity to show cause.

PG&E is ordered to show cause why the above further conditions of probation should not be added.  Its response shall be due **JANUARY 20, 2021, AT NOON**.  The government shall please submit its brief by **JANUARY 25, 2021, AT NOON**.  A hearing shall be held on **FEBRUARY 3, 2021, AT 8 A.M.** by Zoom (if not in person).

**IT IS SO ORDERED.**

Dated:  December 29, 2020.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
Northern District of California

17