Michael J. Aguirre, Esq., SBN 060402
maguirre@amslawyers.com
Maria C. Severson, Esq., SBN 173967
mseverson@amslawyers.com
AGUIRRE & SEVERSON, LLP
501 West Broadway, Suite 1050
San Diego, CA 92101
Telephone:  (619) 876-5364
Facsimile:  (619) 876-5368

Catherine Janet Kissee-Sandoval
Csandoval@scu.edu
Santa Clara University School of Law
500 El Camino Real
Santa Clara, CA 95053-0421
Telephone:  (408) 551-1902
Facsimile:  (408) 554-4426

Attorneys for *Amici* Alex Cannara
and Gene A. Nelson

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Defendant. | Case No. CR 14 -0175 WHA<br><br>***AMICI* BRIEF IN RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE RE CONDITIONS OF PROBATION [DOCUMENT NO. 1277, 1280]**<br><br>Judge: Hon. William Aslup<br><br>Hearing Date: February 3, 2021<br>Time:  8:00 a,m.<br>Location:  by Zoom (if not in person) |

1

# TABLE OF CONTENTS

2
3
4
5
I.   Improving PG&E's Vegetation Management, and the Information Management, Record-Keeping, and Information Communication Systems that Drive PG&E's Management and Operation, is Critical to Public Safety and Preventing the Offender from Committing Additional Crimes ................................................. 1

6
II.  Amici's Proposed Conditions 13-16 and Summary Analysis .................... 3

7
     Proposed Condition 13 ................................................................ 3

8
     Proposed Condition 14 ................................................................ 4

9
     Proposed Condition 15 ................................................................ 5

10
     Proposed Condition 16 ................................................................ 6

11
12
     A.   The Proposed Probation Conditions, Augmented by Amici's Suggestion, Reasonably Relate to PG&E's Crimes, the Goals of Federal Sentencing, and Do Not Interfere with CPUC Jurisdiction ...................................... 8

13
14
15
     B.   PG&E's Poor Record-Keeping and Information Management Drive its Criminal Conduct including the San Bruno Explosion, the Camp Fire, and other Fires PG&E Ignited While on Criminal Probation ............... 12

16
     C.   PG&E's Corporate Conduct Constructs Risk and Endangers Public Safety ................................................. 14

17
18
     D.   PG&E's Recklessly Poor Information and Record-Keeping Management Institutionalize its Dangerous Operation and Undermine Decision-Making ............... 15

19
20
III. PG&E's Brief Submitted in Response to the OSC is Neither Verified by a PG&E Officer Nor Supported by Cited Evidence ............................................. 18

21
22
23
24
IV.  PG&E's Brief in Response to the OSC Fails to Recognize PG&E's Lack of Effective Operation, and its Proposed Additions to the OSC are not Well-Designed to Protect Public Safety, are Vague, and Create Trap Doors that Undermine the OSC's Goal to Protect Public Safety ................................................. 19

25
26
27
     (A)  PG&E's PSPS Decisionmaking and Operation is Not Effective as PG&E Effectively Admits it Does Not Currently Consider the Status of Vegetation Management and Compliance with Federal and State Law ............................................. 19

28

i

B)   The Scope of PG&E's PSPS Should Consider
Hazardous Vegetation Including that Which
Borders and is Likely to Make Contact
with its Lines and Facilities ...........................................................20

C)   PG&E's Proposal to Limit Condition 11 to
Priority 1 and 2 Vegetation Lacks Sufficient
Information about the Origin of those Priorities,
What Priority Categories are Omitted, and
Analysis of the Likely Public Safety Consequences
of Limiting the Probation Conditions .............................................21

D)   PG&E Should be Required to Immediately
Comply with the Proposed Probation Conditions;
Compliance by July 2021 is Too Late to
Protect Public Safety .....................................................................24

E)   PG&E Effectively Admits that its Poor Information
Management Does Not Currently Support
Consideration of its Vegetation Management in its
PSPS Decision-making, Despite GO 95, Rule 18's
Requirement that Utilities Create an Auditable
Vegetation Management Program ...................................................25

F)   Access Issues Do Not Provide an Escape Hatch
from the Duty to Comply with Federal or State Law
or PG&E's Probation Conditions; PG&E Should
Document Access Issues and take Appropriate
Steps to Resolve Them Promptly.....................................................26

V.   PG&E's Failure to Document, Follow-up, and
Resolve Access Issues Violates its Duty of Safe
Operation and Raises Concern that PG&E's
Conduct Obstructs Justice ...........................................................29

VI.  This Court Should Order PG&E to Use Internet of
Things Devices Such as Chips or QR Codes Instead of
Spray Painting Trees in High Wildfire Danger Zones to
Protect Public Safety ...................................................................30

VII.  Conclusion ............................................................................32

ii

*Amici* Alex Cannara and Gene A. Nelson, pursuant to the Court's Order (Document No. 1280), respectfully submit this *amici curiae* brief in response to the Court's order to show cause (OSC) dated December 29, 2020. (Document No. 1277). Amici discuss several reasons why we believe additional conditions should be added to PG&E's probation to protect public safety, reduce the likelihood of the Offender committing additional crimes, and to promote the Offender's rehabilitation. Amici offer additional conditions to improve PG&E's information and record-keeping management that drives its vegetation management and operational activities and deficiencies, including PG&E's criminally reckless conduct.

**I. Improving PG&E's Vegetation Management, and the Information Management, Record-Keeping, and Information Communication Systems that Drive PG&E's Management and Operation, is Critical to Public Safety and Preventing the Offender from Committing Additional Crimes**

As the Court's OSC notes on pgs. 13-15, by PG&E's own admission, "[v]egetation-caused ignitions are one of the largest drivers of utility-caused wildfires, and the largest driver in HFTD [High Fire-Threat Districts] areas. We estimate that 70 percent of the time, if identified vegetation is not worked, it can cause a power-line failure under high fire threat weather conditions."[1]

PG&E's recklessly irresponsible information and record-keeping management, data operations, and information communication (collectively "Data Operations") undermine the effectiveness of its operations, vegetation management, and the proposed probation conditions. PG&E's *information management and record-keeping failures* are fundamentally *management failures* that predicate fires, explosions, and other hazards. PG&E is (or should be) an information management company, that uses its information and records to manage its physical assets, assess

---

[1] *Pacific Gas and Electric Company Quarterly Report on 2020 Wildfire Mitigation Plan for May to July 2020* (Sept. 9, 2020), at 11.

and report on its practices and asset conditions, and deploy its workforce, hardware, software, and information assets and analysis to ensure safe and reliable operation.

Amici support the Court's proposed probation conditions 11 and 12 to protect the public from further death and destruction and to help rehabilitate the Offender (18 U.S.C. §§ 3553(a)(1), (a)(2)), with an edit to condition 11 proposed by Amici as indicated below in bold:

> 11. In determining which distribution lines in Tier 2 or Tier 3 to de-energize during a PSPS, PG&E must take into account all information in its possession and in the possession of its contractors and subcontractors concerning the extent to which trees and/or limbs bordering those lines remain in violation of Public Resources Code Section 4293, GO 95, **the California Public Utilities Code, the CPUC's Orders, Decisions, or rules,** FERC FAC-003-4, and/or its own wildfire mitigation plan **as approved by the CPUC**.

> 12. To the extent that such information shows that such trees and limbs present a safety hazard in the event of a windstorm, PG&E must make a specific determination with respect to that distribution line and it must de-energize it unless PG&E finds in writing that there are specific reasons to believe that no safety issue exists.

These conditions appropriately require PG&E to take into account the necessary factor of the status of its vegetation management and compliance with federal and state law. Amici suggest including reference to the California Public Utilities Code, the CPUC's Orders, Decisions, or rules, as compliance factors that should be taken into account in deenergization decisions since General Order (GO) 95 relies on the California Public Utilities Code and does not displace other statutory duties such as the duty to provide safe, reliable service under Cal. Pub. Util. Code § 451. PG&E should be required to consider compliance with its wildfire mitigation plan as approved by the CPUC in deenergization and operational decisions, recognizing that plan does not displace other responsibilities under the Public Utilities Code, Public Resources Code § 4293, and FERC FAC-003-4 requiring vegetation management near transmission lines.

To safely operate as required by Public Utilities Codes §§ 451 and 8386(a), PG&E should have been considering its compliance with state and federal law and the status of its work in its operational decision including power shutoffs. Amici suggests that the court add the following conditions to ensure that complete and accurate information, information systems and management inform those decisions, as well as the status of compliance with federal and state law.

It is vital to public safety that recidivist PG&E improve the integrity and accuracy of information in its and its subcontractors' possession, its information and record-keeping management systems, and communication of that information. Through adoption of Amici's proposed conditions 13-16, below, this Court should ensure that PG&E's poor information and record management do not undermine the information that informs its actions and decision-making about deenergization, planning to avoid the need for power shutoffs, and operational and strategic decisions and conduct.

## II.    Amici's Proposed Conditions 13-16 and Summary Analysis

Amici respectfully suggest that this court add the following conditions to the Offender's probation, numbered for purposes of tracking:

**Proposed Condition 13:**
PG&E shall hire a Chief Data Operations Officer within 90 days with responsibility over a sufficient staff or no fewer than 10 data operations, information management, record-keeping, engineering, and legal professionals with responsibility for reviewing PG&E's information management and record-keeping systems and their relationship to PG&E's operations including vegetation management work and PSPS, and to report to PG&E's CEO, the PG&E Board, the Monitor, parties to this action including amici and this court within 180 days about recommended actions to improve PG&E's information and record-keeping management and the relationship between information management and analysis and action to operate safely. PG&E shall fund and support this position as a long-term corporate strategy to identify and remediate deficiencies in PG&E's information management and record-keeping systems, including those of its contracts and

subcontractors, and better use information and records to trigger and inform safe operation.

**Analysis**: As this Court required in its probation conditions 8 and 10 which required PG&E to hire Vegetation Management and Transmission Inspection Management teams, ordering PG&E to hire a Chief Data Operations Officer and team will ensure that PG&E improves the integrity of its information and record-keeping and communication. This step is necessary to ensure that proposed probation conditions 11 and 12 transmit complete and accurate information about the status of vegetation management and compliance with federal and state law to the PSPS decision-making process.

PG&E needs accurate and complete information including record-keeping to communicate to work teams over time, whether hours, days, weeks, months, years, or decades. PG&E's recklessly poor job with Data Operations drives many of its safety violations and its criminal conduct ranging from the San Bruno natural gas explosion to the many fires its facilities, information, and management failures have ignited. Without Proposed Condition 13, PG&E's recklessly poor information management will undermine compliance with Conditions 11 and 12, other probation conditions, and fuel public safety danger.

**<u>Proposed Condition 14</u>:**
PG&E shall immediately initiate steps to prevent data falsification or omission. This includes, but is not limited to, issuing orders to its employees, contractors, and subcontractors and creating information management and record-keeping systems that prevent: a) the creation of false records such as by "scheduling" inspection or work in the past (a false records that makes it appear that work has been done); b) omission of input of information in data fields; c) omission of sufficient information to identify issues and follow-up needs. PG&E shall report to the Monitor, the Court, parties including Amici, its CEO and Board within 60 days on steps it has initiated to prevent data falsification or omission.

**Analysis**: As the court recognized, PG&E's systems contain false records which fail to trigger appropriate follow-up such as removal of dangerous vegetation. It appears that the schedule of inspections in the past may have contributed to the failure to remove dangerous trees that contributed to the Zogg fire. (OSC, p. 2, 12). PG&E created systems that allow for input of inaccurate and false information such as scheduling inspections in the past, omitting critical data, or not providing sufficient information for follow-up. While businesses across America commonly adopt practices to prevent these errors, PG&E's failure to implement data integrity practices leaves the public at risk. Amicus respectfully suggest this order is necessary to protect public safety, additional offenses while on probation, and to enable the effectiveness of other probation conditions.

**Proposed Condition 15:**

PG&E shall within 90 days propose a plan to the Court, the Monitor, parties including amici, the CEO, and the Board to use sensors, QR codes, or other markets that actively communicate information (collectively, Internet of Things (IoT) devices) to mark trees for removal and track the status of the tree removal process for vegetation management. This proposal shall plan deployment of IoT devices for vegetation management in Tier 2 and 3 High Wildfire Danger zones in lieu of using spray paint or other passive markets no later than 180 days after this order. The information from the IoT device shall be integrated into PGE&'s information management, record-keeping, and work system to track progress from identification of vegetation requiring additional work such as trimming, removal, or monitoring, to the follow-up work, and the consideration of the status of that work in the PSPS process and in PG&E's daily operations.

**Analysis**: As discussed above, PG&E's continued reliance on spray paint to mark trees for removal effective relies on passive graffiti to communicate next steps to tree trimming or removal crews. PG&E's practices are decades out-of-date and fail to take advantage of prudent and widespread technologies farmers, the post office, and many businesses uses to track inventory and improve workflow. Ordering PG&E to propose a plan to adopt IoT devices for vegetation management

5

in Tier 2 and 3 High Wildfire Danger zones in lieu of using spray paint or other passive markets no later than 180 days after this order will protect public safety by informing information management systems and enhancing the ability to track and communicate critical work.  Doing so will protect public safety in a manner no spray paint can.

**Proposed Condition 16:**

PG&E shall immediately initiate consideration of the status of information management based on the records in its possession, including in the possession of its contractors or subcontractors, in PSPS and in daily operation. Within 90 days PG&E shall report to the Monitor, the Court, parties including Amici, its CEO and Board about its steps to improve its information management and record-keeping process to improve information integrity, inform analysis, and inform and enhance daily operation including PSPS.

**Analysis**: PG&E is already required by California law including GO 95 to maintain vegetation management records for at least 10 years and to develop an auditable vegetation management program. Ordering PG&E to report within 90-days about its steps to improve its Data Operations will ensure the integration of accurate data and records into PG&E's decision-making. Doing so will enhance public safety as the public, including Amici, face continued threats from PG&E's operations.

Northern California experienced a high wind event on January 19, 2021 during which PG&E shutoff power to thousands of Californians.[2] PG&E reported that it detected windspeeds of up to 100 miles per hour in some locations in its service territory.[3] With atmospheric rivers anticipated in Northern California and other conditions, it is likely PG&E customers and residents sharing the air basin

---

[2] PG&E, *PG&E Crews Out in Force Making Repairs After Offshore Windstorm Sweeps Through State, Causing Wind Hazards and Related Outages*, PG&E CURRENTS, Jan. 19, 2021, https://www.pgecurrents.com/2021/01/19/pge-crews-out-in-force-making-repairs-after-offshore-windstorm-sweeps-through-state-causing-wind-hazards-and-related-outages/.
[3] *Id.*

with PG&E territory will face more high wind events in the coming years. It is imperative that this Court order PG&E to improve and report on its Data Operations to enhance the management of its system, including PSPS planning, avoidance, execution, daily and strategic planning, to protect life, limb, and property.  Doing so will rehabilitate the Offender and reduce the likelihood of more criminal offenses including felonies while and after PG&E is on probation, accomplishing the goals of the federal sentencing guidelines and federal probation.

Amici's proposed conditions are necessary and appropriate to ensure that complete and accurate information is considered in deenergization and operational decisions --  critical to both the millions of PG&E customers and those impacted by foul and dangerous air quality when PG&E's criminal mismanagement ignites a wildfire or causes an explosion.

Poor information and record management institutionalizes reckless behavior that enables criminal recklessness and endangers public safety. It creates information blindness, inaccuracy, uncertainty, and undermines operational integrity. Work is wasted because it is not properly tracked for appropriate followup. Lack of information management obscures reasons for failures, e.g. what types of access issues are alleged, how can those access issues be resolved.

PG&E has *designed* a system that depends on the transmission of knowledge and information from one set of workers to another, often separated by significant time periods.  A different crew inspects and identifies trees to be removed than the crew which brings chainsaws to remove the trees. Thus, accurate recording and transmission of information and tracking of that handoff process is critical to make sure a tree identified as posing a danger to a line and the  community is timely removed.

PG&E's current information system is a reckless design that allows its users to schedule an inspection in the past (which results in no inspection conducted in the future) (*See e.g.* OSC, p. 2, 12) or to skip critical fields, thus fueling violations of

7

law, i.e., Pub. Resources Code § 4293, Pub. Util. Code §§ 451, 8386(a), CPUC General Order 95, and federal law, FERC FAC-003-4. California Public Utilities Code § 8386(a) requires that "[e]ach electrical corporation shall construct, maintain, and operate its electrical lines and equipment in a manner that will minimize the risk of catastrophic wildfire posed by those electrical lines and equipment."

As discussed below, the Court's proposed conditions in the OSC and Amici's proposals are imperative to protect public safety and mitigate the potential for additional offenses while the convicted felon corporation remains on probation. Amici respectfully recommend this Court reject PG&E's proposed additions to the OSC.

### A. The Proposed Probation Conditions, Augmented by Amici's Suggestion, Reasonably Relate to PG&E's Crimes, the Goals of Federal Sentencing, and Do Not Interfere with CPUC Jurisdiction

PG&E's data management failures are a thread that run through its criminal activity that led to the San Bruno explosion in 2010 and to many of the fires PG&E's management of its natural gas and electric lines ignited. PG&E's reckless data management fuels its vegetation management failures and its failure to properly track and follow through with its own work and asset conditions necessary for safe operation. Including provisions in the OSC to improve PG&E's information management practices will provide the data necessary to prevent PG&E from putting the public in danger through its reckless management.

The facts constituting PG&E's record of reckless operations belie its objections to the OSC's Proposed Conditions. PG&E argues there is no reasonable relation between its original offenses (violations of the National Pipeline Safety Act and Obstruction of Justice) and the Proposed Conditions relating to its electric

distribution businesses.[4] PG&E contends without explanation that the Probation Conditions interfere with California's authority to regulate PSPS events.[5] It also argues that the Proposed Conditions are not reasonably necessary to accomplish the purposes of the sentencing.[6] Each of these objections ignores the relationship between PG&E's poor information management and record-keeping and its criminal conduct.

The proposed conditions bear a reasonable relationship to PG&E's original offenses because PG&E's poor information management, record-keeping, and operational management led to the San Bruno natural gas explosion. PG&E compounded its offenses of the National Pipeline Safety Act by obstructing the NTSB's investigation, and was convicted of obstruction of justice.

In the nearly fifty years between the installation of sub-standard materials that ruptured in the 2010 San Bruno natural gas explosion, and in the decade following that explosion, PG&E failed to properly maintain its records or to manage information critical to its gas and electric operations, and failed to link accurate information (including information about PG&E's own work and assets) to appropriate action.

As a result of its faulty data operations, PG&E failed to conduct appropriate work, and missed work it earlier identified as important, such as failing to remove trees marked as a danger to powerlines, an omission that appears to have contributed to the deadly 2020 Zogg Fire. The proposed conditions that PG&E consider the status of vegetation management in power shutoffs, informed by better information and record management, will prevent the types of offenses which led to the death of

---

[4] PG&E, Comments, OSC, January 20 2020, note 2 (citing *United States v. Lorenzini*, 71 F.3d 1489, 1493 (9th Cir. 1995).

[5] *Id.* (citing *see United States v. Lakatos*, 241 F.3d 690, 695 (9th Cir. 2001)).

[6] *Id.* (citing *see United States v. Lorenzini*, 71 F.3d 1489, 1493, 1492 (9th Cir. 1995) (*See also, e.g.*, Dkt. 1195 at 3-6; Dkt. 1187 at 12-17; Dkt. 976 at 13-50.)

9

eight people in San Bruno, 84 people in Butte County, and illegal fire(s) committed while on probation. CalFire, Shasta County, and Sonoma County are investigating whether PG&E was responsible for other fires ignited during PG&E's probation including the Kincade and Zogg Fires.

PG&E's argument that the Proposed Conditions are not reasonably necessary to accomplish the purposes of the sentencing, citing *U.S. v. Lorenzini*, 71 F.3d 1489, 1493 (9th Cir. 1995), are without merit as it ignores the goals of the federal sentencing guidelines and federal criminal probation. In *Lorenzini*, the Ninth Circuit rejected a probation condition requiring the defendant to repay his court-appointed attorneys fees following defendant's bank fraud conviction. The Ninth Circuit determined that condition was not reasonably related "to the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," 18 U.S.C. § 3553(a)(2)(A).

In contrast here, requiring PG&E to take the status of information about its vegetation management into account in its power shutoffs and operation, and Amici's proposals to improve PG&E's Data Operations, reflect the seriousness of PG&E's misconduct including its violations of federal and state law,  obstruction of justice, and multiple offenses while on probation that resulted in at least 84 deaths. Requiring PG&E to consider its own information and improve its information management and data operations are a just condition of its punishment and should be part of PG&E's normal operations to protect public safety and ensure compliance with the law. Sadly, PG&E's record demonstrates the imperative of the Court ordering these measures to protect public safety, deter PG&E from committing more felonies while on probation, and rehabilitate PG&E.

While on probation, PG&E's poor information and operational management and lack of follow-up of its own work caused PG&E to fail to cut down trees identified for removal for over two years – the suspected cause in igniting the 2020 Zogg fire per the CalFire investigation.

10

PG&E did not shut off the power in the Zogg fire area, despite urgent tree removal tasks pending  for years in that area. People's lives depend on this Court to require improvements in PG&E's information management to mitigate the likelihood that PG&E will commit more criminal offenses and harm public safety. Thus, the probation conditions accomplish the purposes of federal sentencing and probation.

Neither do the proposed conditions interfere with the CPUC's jurisdiction. PG&E's citation to *U.S. v. Lakatos* does not support its argument that the Probation Conditions interfere with California's authority to regulate PSPS events. The Ninth Circuit in *Lakatos* held that "[e]nforcement of the district court's condition that Lakatos pay his entire child support debt in twenty-nine months would clearly nullify the effect of the preexisting child support order issued by the California Superior Court."[7] The proposed order does not nullify or contradict any order of the CPUC, neither does it interfere with the CPUC's jurisdiction over PG&E.

The CPUC's 2020 deenergization decision does not include in its guidelines a requirement that utilities consider the status of vegetation management or improve its information management, record-keeping, or information transmission, as a factor in power shutoff decision-making or its operations.  CPUC D. 20-05-051 issued on May 28, 2020, required that utilities provide information on their websites regarding "de-energization mitigation efforts" including "asset and vegetation management, sectionalizing, switching, system hardening, and backup power projects they are undertaking to reduce the need for or scope of de-energization events, progress on implementing de-energization mitigation efforts to date, and

---

[7] U.S. v. Lakatos, 241 F.3d 690, 695 (9th Cir. 2001).

11

planned dates of completion."[8] Similarly, the CPUC's 2019 decision on deenergization policies listed as a finding of fact:

> Educating public safety partners and the public about the characteristics and factors that the utility considers in determining whether to de-energize, such as high temperatures, high wind speeds, dry vegetation, and low humidity, enables public safety partners and the public to conduct parallel planning and preparation.[9]

Neither CPUC decision on deenergization requires PG&E to consider the factors in the OSC, the status of its vegetation management, nor additional factors Amici propose below. Thus, *Lakatos* is inapposite as this Court's OSC does not undermine any CPUC order, nor conflict with any CPUC decision, nor limit the CPUC's jurisdiction.

The CPUC has not addressed whether vegetation management should be taken into account in deciding where to initiate a PSPS. Neither has the CPUC ordered PG&E to systematically improve its information management and to link those approvals to its PSPS decision-making. The CPUC remains free to analyze these issues and adopt appropriate orders in its future rulemakings. The proposed probation conditions, augmented by Amici's proposals, fill an immediate safety gap the CPUC has not yet addressed.

### B. PG&E's Poor Record-Keeping and Information Management Drive its Criminal Conduct including the San Bruno Explosion, the Camp Fire, and other Fires PG&E Ignited While on Criminal Probation

PG&E's practices such as its lack of recordkeeping and data integrity resulted in its employees, contractors, and subcontractors failing to maintain records, skipping

---

[8] CPUC Decision 20-05-051, DECISION ADOPTING PHASE 2 UPDATED AND ADDITIONAL GUIDELINES FOR DE-ENERGIZATION OF ELECTRIC FACILITIES TO MITIGATE WILDFIRE RISK (Rulemaking 18-12-005), Findings of Fact 56, May 28, 2020.
[9] CPUC Decision 19-05-042, DECISION ADOPTING DE-ENERGIZATION (PUBLIC SAFETY POWER SHUT-OFF) GUIDELINES (PHASE 1 GUIDELINES) (Rulemaking 18-12-005), Findings of Fact 31, May 30, 2019.

12

data input into information fields, poor design of record management systems, and allowing the "scheduling" of inspections in the past. (*See e.g.* OSC, p. 2, 12). Data management techniques commonly practiced for widely available Apps do not allow users to skip input of critical information (such as a zip code or location), or to book appointments in the past (such as a plane flight or hotel reservation). Despite PG&E's operational experience spanning more than a century, substantial personnel, capitalization, and assets, orders of this Court and the CPUC, PG&E has not managed its data integrity process and personnel to prevent even the most basic data errors and mismanagement that fuel its reckless criminal conduct.

As the Court's OSC points out, "[s]ince the commencement of the Offender's probation alone, PG&E has ignited 20 or more wildfires in California, killing at least 111 individuals, destroying at least 22,627 structures, and burning half a million acres." (OSC p. 2). PG&E is under investigation for whether its operations caused the Zogg fire which took the lives of four people, including a mother and her 8-year-old daughter who unsuccessfully tried to escape the massive fire. The Zogg Fire killed these people while PG&E was under investigation for its role in the Kincade fire which caused widespread property destruction and polluted the air with particulates that compromise lung health. This Court should require conditions that address PG&E's reckless Data Operations which endanger and take life, damage property, undercut its data vegetation management, and undermine safe operation as required by federal and state law.

PG&E's practice of using spray paint to mark trees to be trimmed or removed compounds the danger of relying on incomplete or inaccurate data entry and information management methods.[10] *Amici* respectfully recommends this Court's proposed probation conditions be modified to include orders to improve the

---

[10] RESPONSE TO REQUEST FOR FOLLOW UP BY PG&E CONCERNING ITS OCTOBER 26 SUBMISSION, p. 23, Case No. 14-CR-00175-WHA, November 18, 2020.

information created, maintained, and used at PG&E to inform decision-making about work deployment, vegetation management, electric and gas operation, safety and reliability conditions and issues, and power shutoffs.

## C. PG&E's Corporate Conduct Constructs Risk and Endangers Public Safety

PG&E as a corporate entity, created and maintained a plethora of poor information management and record-keeping systems, that thwarted its ability to track its own work and transmit knowledge between workers, managers, contractors, and subcontractors about what to do. PG&E's actions impair its vegetation management and decision-making about its operations including power shutoffs. This is not a case where a single employee created a poor information management or vegetation management system.

At issue in PG&E criminal probation is not merely the collective knowledge available at PG&E, known to its employees, contractors, or subcontractors. Rather, at issue is PG&E's creation and maintenance of information and record management systems so recklessly poor that they undermine individual and collective knowledge and endanger public safety in violation of California and federal law.

"[E]nsuring that corporations have adequate procedures for generating and transmitting information through appropriate channels to personnel who can respond when problems are uncovered" supports "effective corporate compliance."[11] Corporations such as PG&E serve as knowledge-keepers and knowledge-transmitters. Consistent with the longevity of its operational function and assets, PG&E must maintain information and knowledge and transmit that information from one group of workers to another over the course of hours, days, or decades.

---

[11] Mihailis E. Diamantis, *Functional Corporate Knowledge*, 61 Wm. & Mary L. Rev. 319, 326 (2019).

14

PG&E constructed systems such as its vegetation management that rely on corporate knowledge keeping and transmission. One set of workers identifies trees to be trimmed or removed, and another set of workers brings the tools and chain saws to trim or remove the trees, hours, days, months, or years later. The smooth and prompt function of this process depends on maintenance of accurate information and knowledge systems and timely transmission of correct information.

The CPUC issued billions in penalties against PG&E for record-keeping failures. Those failures were at the heart of the San Bruno criminal conviction (in addition to PG&E's obstruction of justice). The poor record- keeping and information management systems PG&E created, maintains, or ignores, has fueled explosions, fire, death, and destruction. This must stop.

This Court has the power to order PG&E to improve its record keeping and information management systems to ensure that its knowledge-keeper failures do not result in more corporate crimes during and following its criminal probation. A large part of what this means is ensuring that corporations have adequate procedures for generating and transmitting information through appropriate channels to personnel who can respond when problems are uncovered.

Neither PG&E, nor its contractors or subcontracts can act on information it doesn't keep and accurately transmit. If the court does not order PG&E to better organize its information and ensure information accuracy, any order to act on the information about the status of vegetation management is meaningless to decision-making about power shutoffs or operation.

### D. PG&E's Recklessly Poor Information and Record-Keeping Management Institutionalize its Dangerous Operation and Undermine Decision-Making

PG&E's reckless information management appears to have contributed to the Zogg fire as the tree marked for removal two years earlier was never removed, no

inspection occurred before the 2020 fire season, and a tree hitting the line is being investigated as the cause of the fire that led to the death of two people.

This Court has a duty and opportunity to make sure that PG&E's poor information management is not a corporate institutional strategy to keep knowledge from being readily available, thwarting efforts to hold the corporation accountable for its criminal and civil conduct. PG&E's failures to improve its system reflect its ongoing criminal thinking and reckless behavior that continues to pose a danger to public safety.

This Court has the jurisdiction and duty to impose probation conditions that help protect community safety and reform the offender. The Court may consider, but need not determine at this juncture, PG&E's motivation to maintain its recklessly poor information management and record-keeping systems. Jurisdictions considering criminal cases against PG&E for the Kincade and Zogg fires, as well as the CPUC, are advised to probe PG&E's motivations and information management conduct. Federal and state authorities can also consider whether PG&E's reckless information management systems that allow for entry of false and misleading information obstruct justice by violating prior court orders.

This Court's OSC expresses concern about PG&E's deficient and at times erroneous record-keeping as identified by the Monitor:

> [T]here "continue to be gaps in PG&E's recordkeeping" of inspections and vegetation work, in violation of PG&E's WMP and fourth condition of probation. While acknowledging improvements since 2019, the Monitor still found troubling errors. For example, within PG&E's records, "approximately 8,200 trees" displayed risk "scores indicating" they should be removed, but were nonetheless "marked in the internal system as *not* requiring tree work." The Monitor also reports, "PG&E's maps for EVM work are still not accurate and complete." Some maps omitted entire segments of circuits. In one case, the Monitor even found a radial clearance violation on the real-life segment of the circuit that was missing from the map; but for the

16

1

2

Monitor's inspection, this radial clearance violation would remain today (*id*. at 11–13 (emphasis added)).[12]

3

4

5

6

7

8

9

Marking trees needing removal as "*not* requiring tree work" creates a false record that prevents subsequent crews from being dispatched to remove or trim the tree. False, or even poor, record-keeping and information management systems institutionalize and digitize danger. Records PG&E still keeps in analog form (where it has records) are not integrated with digital records to enable complete and accurate information to inform prudent action. PG&E's criminally reckless information, record-keeping management and information communications systems that allow such false entries turn trees into deadly weapons near uninsulated powerlines and aging facilities.

10

11

12

13

14

15

16

17

Ordering PG&E to improve its information management systems relevant to its PSPS will help protect the public from death and destruction of property while PG&E is on probation. It will help track vegetation management related failures such as those at issues in the Zogg fire, and failure to complete and track PG&E's work at issue in the Kincade fire. In both cases, PG&E did not deenergize lines, although awareness of information about work not done or improperly done should have informed those deenergization decisions and initiated immediate work to correct the gap.

18

19

20

21

22

23

Cal Fire reportedly blamed "the Kincade Fire – the largest in Sonoma County history – on PG&E's failure to properly decommission a high voltage line that had once fed power to a shuttered geothermal plant, according to the findings of its final report obtained by NBC Bay Area."[13] "The company's failure to fully and properly decommission the line, either by deenergizing or removing it, Cal Fire concluded, was the root cause of the fire."[14] "Cal Fire went as far as recommending that PG&E

24

25

26

27

28

[12] OSC, p. 15.

[13] Jaxon van Derbeken, *Kincade Fire Tied to PG&E Failure to Decommission an Unneeded High-Voltage Line – NBC Bay Area*, NBC Bay Area, Oct. 23, 2020, https://www.nbcbayarea.com/news/local/kincade-fire-tied-to-pge-failure-to-decommission-an-unneeded-high-voltage-line/2384828/.

[14] *Id*.

17

be charged criminally with multiple felony counts for recklessly causing the fire, which started one year ago."[15] Professor and former CPUC Commissioner Catherine Sandoval said "the Kincade fire a year later is yet another product of the company failing to track problems and deal with them preventatively. "It's not just sloppy, it's wrong," she said. "The question becomes in legal terms, is it actually criminally negligent?  Is it actually reckless?'"[16]

Poor design of PG&E information management systems allowed conduct that undermines public safety such as skipping important field, not having information fields for critical components such as C-hooks, and scheduling inspections in the past (*See e.g.* OSC, p. 2, 12). Questions remain about whether such conduct was criminal recklessness that led to the 2019 Kincade fire, the 2020 Zogg fire, and the 2018 Camp Fire for which PG&E pled to the commission of 86 deadly felonies.

Improving PG&E's information management systems, data integrity, Data Operations, and communication of its information will improve PG&E's daily work including its decision-making about deenergization. It will enhance visibility into problems that need to be fixed and work that is due or overdue, improving operation and reducing the need for deenergization that disrupts lives and livelihoods for the millions of Californians that have been subjected to frequent PG&E power shutoffs.

### III.    PG&E's Brief Submitted in Response to the OSC is Neither Verified by a PG&E Officer Nor Supported by Cited Evidence

When PG&E pled guilty to 84 felony charges relating to its fire killing 84 people in Butte County, its President stood up in Court and affirmed the plea to each count. Yet here, when responding to this Court's OSC, brings forth no words of its officers and instead, only the argument of legal counsel as to what it is allegedly doing. By

---

[15] *Id.*
[16] *Id.; Professor Sandoval is also one of Amici counsel, here.*

18

this conduct, PG&E demonstrates its failed "tone at the top" and lack of commitment to changing its conduct to promote safety. Any unsupported claim of conduct by PG&E's counsel should be ignored.

**IV.    PG&E's Brief in Response to the OSC Fails to Recognize PG&E's Lack of Effective Operation, and its Proposed Additions to the OSC are not Well-Designed to Protect Public Safety, are Vague, and Create Trap Doors that Undermine the OSC's Goal to Protect Public Safety**

**(A) PG&E's PSPS Decisionmaking and Operation is Not Effective as PG&E Effectively Admits it Does Not Currently Consider the Status of Vegetation Management and Compliance with Federal and State Law**

PG&E contends in its OSC Response Brief (p. 2) that it has developed a "sophisticated and demonstrably effective program" for deenergizations, its "Public Safety Power Shutoff (PSPS) program:

> PG&E first developed its PSPS program in response to the October 2017 North Bay Wildfires. (Dkt. 976 at 29.) Through large expenditures and the efforts of many PG&E employees, PG&E has evolved it into a sophisticated and demonstrably effective program that includes, among many other things, advanced models and analytics developed alongside third-party experts and informed by deep datasets, a wildfire safety operations center, one thousand weather stations and over three hundred high-definition cameras, a multitude of new switches and sectionalizers, and training for the hundreds of employees that execute PSPS events.

Sadly, PG&E's management of its electric and gas operations -- including its deenergization decision-making process and operation -- is neither sophisticated nor demonstrably effective. PG&E's failure to professionally and prudently manage information about its work and records of the facilities and assets PG&E installed or purchased, continues to fuel danger. Amici's proposed probation conditions 13-16 will improve PG&E's decision-making and operational capability to protect public safety and mitigate the likelihood of future PG&E felonies while on probation.

19

**B) The Scope of PG&E's PSPS Should Consider Hazardous Vegetation Including that Which Borders and is Likely to Make Contact with its Lines and Facilities**

PG&E effectively admits that it is behind in vegetation management when it states in its OSC Brief that the "Proposed Conditions will increase the scope of PG&E's PSPS events because they add a new trigger for de-energizing lines." (p. 2) PG&E's opposition to factors 11 and 12 raises more questions than they answer.

This is an example of where the lack of an affidavit from any PG&E officer or employee in support of PG&E's brief leaves this Court and the parties with insufficient information to assess PG&E's arguments:

- Does PG&E admit that it does not at present consider the status of vegetation management work in deciding which circuits and communities should endure a PSPS or in planning work to mitigate the need for PSPS?

- Does PG&E admit that it is so behind in its vegetation management work that having to consider this factor would enlarge power shutoffs? How large is the footprint likely to endure more PSPS?

The status of vegetation management should be a factor in considering PSPS, as well as in daily operations and plans to forestall the need for more power shutoffs. Particularly where PG&E and its contractors or subcontractors have identified trees for trimming or removal, but the required work has yet to be performed, or where inspections and patrols have not been able to evaluate the current conditions, considering the status of vegetation management is crucial to well-planned operation and deenergization decision-making. Accurate and complete information supports by Amici's proposed conditions 13-16 will foster decision-making that protects public safety and complies with federal and state law.

20

Regarding the scope of vegetation management considered in PSPS decision-making, PG&E's OSC Brief states on p. 4:

> In expanding the scope of PSPS for the 2021 fire season to account for hazard trees *outside* the footprint determined by the existing PSPS models, PG&E will need to identify those categories of trees or limbs that are subject to pending work that will be taken into account.

Proposed condition 11 would require PG&E to consider the status of vegetation management for "trees and/or limbs bordering those lines" including violations of federal and state law. PG&E does not explain why trees bordering those lines are "*outside* the footprint determined by the existing PSPS models." This provides another example of where an affidavit from a PG&E officer, under the penalty of perjury, would have better informed the court as to the facts underlying these assertions. PG&E should be taking into account hazardous trees and vegetation including those likely to make contact with the line, whether through growth or as windblown hazard due to the type of vegetation (such as a eucalyptus tree whose oily bark tends to peel off).

**C) PG&E's Proposal to Limit Condition 11 to Priority 1 and 2 Vegetation Lacks Sufficient Information about the Origin of those Priorities, What Priority Categories are Omitted, and Analysis of the Likely Public Safety Consequences of Limiting the Probation Conditions**

PG&E's additional proposed language on pg. 4 of its OSC Brief intends to limit the applicability of Condition 11, but does so in a way that creates inappropriate escape hatches from the condition and compliance with state and federal law. PG&E states that its proposal on pg. 4 of its OSC Brief:

> "[]is intended to prescribe with specificity the categories of trees and limbs that fit this definition so that the Court, the public and PG&E personnel have a clear and common understanding that the additional PSPS blackouts likely to result from the Proposed Conditions will be based on the presence of trees or limbs that present an elevated safety

21

risk   substantially   above   that   posed   by   healthy   trees."

PG&E should be considering trees or limbs that pose an elevated safety risk its failure to take appropriate steps to remove hazard trees. PG&E's attempts to limit this consideration are vague, fail to define which types of hazards would be excluded by its proposals, and create an escape hatch from the conditions; its approach is inconsistent with the intent to protect public safety and rehabilitate the offender. Additionally, PG&E's proposals to exclude vegetation management where there was an "access issue" are inconsistent with the goals of its federal criminal probation and California law under the Cal Pub. Util. Code and GO 95.

PG&E proposes on pg. 4 of its OSC Brief to limit condition 11 to vegetation it classifies at Priority 1 or 2, but fails to identify the origins of those classifications or include analysis of what those classifications would exclude. PG&E proposes:

> In determining which distribution lines to de-energize during a PSPS event, PG&E will implement this condition by July 1, 2021 by considering the existence of all outstanding vegetation management work tagged "Priority 1" or "Priority 2" within PG&E's service territory that is subject to potential de-energizations.[17]

Amici respectfully suggest this Court require PG&E to provide this Court and the public, including Amici, more information about its "priority 1 and 2"vegetation management categories, including information about whether there are other applicable classifications, the origins of the classifications, and analysis of excluding other classifications from the probation condition order.

PG&E states on pg. 5 of its OSC brief that it:

> "uses two tags—Priority 1 and Priority 2—for priority work where trained vegetation inspectors identify trees or limbs that currently present elevated risk and must be worked on an expedited basis. Inspectors use Priority 1 tags for vegetation (i) in contact or showing signs of previous contact with a primary conductor; (ii) actively failing

---

[17] PG&E OSC Brief, p. 4.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

or at immediate risk of failing and which could strike PG&E's facilities; or (iii) presenting an immediate risk to PG&E's facilities. Inspectors use Priority 2 tags for vegetation that does not rise to the level of Priority 1 vegetation, but has encroached within the PG&E minimum clearance requirements or has an identifiable potential safety issue requiring expedited work."

PG&E offered no description for other priority vegetation categories. Neither did it explain where these priorities come from. Neither CPUC General Order 95 nor its deenergization orders, D.1905042 and D.20-05-051, Rulemaking 18-12-005 contain these classifications.

PG&E's arguments fail to state in which priority tier it classified the grey pine tree under investigation in the Zogg fire. (See OSC p. 11 for a photo of the grey pine tree under investigation as a cause of the Zogg fire). The OSC state on pg. 6 that "PG&E found that 334 trees or limbs fell on distribution lines during just four PSPSs in October. Of these fallen trees, PG&E estimated that 234 would have caused arcing (in which electricity would have flown to the closest conducting surface, such as the dry, grass-covered earth)."  However, PG&E has yet to publicly release information about those 334 trees and limbs or its analysis of *why* they fell on distribution lines in the October 2019 windstorms.

Neither has PG&E explained to this Court and the parties which *priority* tier those trees and limbs were classified in, whether priority 1, priority 2, or some other unnamed priority. Without that information, this Court and the parties before it cannot analyze PG&E's proposal to limit mandatory consideration of vegetation management to priority 1 and 2 vegetation as PG&E has not told us what this would omit or informed the Court of its analysis of the consequences of such exclusion.

PG&E fails to explain what its timeline is for other priority categories when it states on p. 5 of its OSC Brief that "PG&E's policy calls for all Priority 1 trees to be worked within 24 hours. PG&E's policy calls for Priority 2 trees to be addressed within 30 days, absent access issues." Neither does PG&E explain its process or

timeline for resolving access issues. CPUC General Order 95 Rule 18 recognizes that access issues can reasonably extend the deadline for addressing vegetation management issues, but this does not create an indefinite timeline. Neither does it absolve PG&E of its duty to operate safely under CA PU Codes 451 and 8386(a), Public Resources Code Section 4293, GO 95, FERC FAC-003-4.

**D) PG&E Should be Required to Immediately Comply with the Proposed Probation Conditions; Compliance by July 2021 is Too Late to Protect Public Safety**

PG&E proposes a more than six-month delay in the timeline to comply with the Court's proposed probation conditions, requesting a July 1 start date through its additions in bold to condition 12:

> Proposed Condition 12: To the extent that such information shows that such trees and limbs present a safety hazard in the event of a windstorm, PG&E must make a specific determination with respect to that distribution line and it must de-energize it unless PG&E finds in writing that there are specific reasons to believe that no safety issue exists. **PG&E will implement this condition by July 1, 2021 by developing a methodology to de-energizeline segments in areas subject to potential de-energizations thathave outstanding Priority 1 or Priority 2 vegetation management work when forecast conditions are above specified fire-risk thresholds, absent a documented determination that de-energization is not warranted. (OSC Brief, p. 6)**

PG&E's proposed delay endangers public safety for too long. PG&E is currently required by CPUC General Order 95, Rule 18 to maintain records and an auditable maintenance program for their facilities.

Amici recommend this Court order PG&E to comply with Condition 12 immediately, or that PG&E provide a declaration as to why it cannot do so immediately, despite the Court's previous orders and requirements of the CPUC including General Order 95.

24

Likewise, PG&E's proposed three-month timeline to report to the Court and monitor on its PSPS thresholds that account for the status of its vegetation management is unacceptable and dangerous:

> Because these thresholds will serve as an additional trigger for de-energizations of residences and businesses, the precise mechanics of calculating and setting those thresholds will be based on expert analyses over the coming months. Given the potential public safety risks posed by larger de-energizations, these analyses will need to consider how many customers may lose power in potential events and how long they may remain without power. PG&E will share those finalized thresholds and the methods for implementing them with the Court and the Monitor in the next three months.

Amici respectfully recommend this Court order PG&E to report to the Court, the Monitor, and parties (including Amici) within three months about its improvements to its information management system to improve vegetation management and information relevant to daily operation, including PSPS. Amici also respectfully recommend this Court order PG&E to report in that 3-month period its hiring a Data Operations executive and team that reports to the CEO and to the Monitor and Board.

### E) PG&E Effectively Admits that its Poor Information Management Does Not Currently Support Consideration of its Vegetation Management in its PSPS Decision-making, Despite GO 95, Rule 18's Requirement that Utilities Create an Auditable Vegetation Management Program

PG&E tacitly admits that its poor information management does not currently support consideration of its vegetation management in its PSPS and operational decision-making:

> While PG&E's current infrastructure does not provide a means by which outstanding Priority 1 and Priority 2 trees are readily incorporated into the PSPS-scoping process, PG&E will build the systems and tools needed to streamline the availability of Priority 1 and Priority 2 tree data to the team that is scoping PSPS events in a manner that can be integrated with the

1    meteorological and other tools used to scope PSPS events. (OSC Brief, p. 6)

2    CPUC General Order 95, Rule 18(2)(a) requires that all companies subject to

3    the rule "shall establish an auditable maintenance program for their facilities and

4    lines." PG&E fails to explain why that auditable maintenance program and records

5    required for compliance with GO 95 and other CPUC rules are not already readily

6    available to PG&E teams making decisions about PSPS events, work to prevent

7    PSPS events, and for daily operation and strategic decision-making.

8    Proposed probation conditions 11 and 12, supplemented by Amici's proposed

9    conditions 13-16, will ensure that PG&E takes its vegetation management status into

10   account, rather than leaving it to PG&E's indefinite timeline to build systems and

11   tools to integrate vegetation management into PSPS. Proposed conditions 11-12 and

12   Amicis's proposed conditions 13-16 are appropriate to establish a timeline to

13   improve information and record management and communication of information to

14   PG&E decision-making and work teams, so that work is appropriately and timely

15   done to protect public safety from this recidivist felon, PG&E. PG&E should report

16   to this Court, the monitor, the parties to this proceeding, the CPUC, and the public

17   on its success in meeting the timeline under GO 95 and any priority categories, and

18   in resolving access issues.

19       **F) Access Issues Do Not Provide an Escape Hatch from the Duty to Comply
          with Federal or State Law or PG&E's Probation Conditions; PG&E
20        Should Document Access Issues and take Appropriate Steps to Resolve
          Them Promptly**
21

22

23   PG&E's brief implies that access issues should create an escape hatch from

24   compliance with the proposed probation conditions.  PG&E's OSC Brief, p. 5, states

25   "PG&E's policies will call for non-priority trees in high fire threat areas with strike

26   potential that are flagged for removal because they show signs of mortality to be

27   addressed within six months, absent access issues."  Its brief fails to provide any

28   information about what PG&E is doing to resolve access issues, or to recognize that

26

1  access issues do not absolve it of the duty to comply with its probation conditions or
2  federal or state law.

3      Clearing a hazardous tree needs to be treated as seriously as dealing with any
4  deadly hazard. The person brandishing a gun poses an unlawful risk of death and
5  PG&E should provide appropriate information so law enforcement authorities can
6  appropriately deal with that threat. A tree too close to the line or vegetation that
7  threatens contact with a line or utility facilities also poses a deadly threat that needs
8  to be eliminated appropriately and swiftly

9      PG&E's November 18, 2020 "RESPONSE TO REQUEST FOR FOLLOW
10  UP PG&E CONCERNING ITS OCTOBER 26 SUBMISSION" described an
11  incident it might categorize as an "access" issue, but its OSC Brief fails to explain
12  whether this is the type of incident that PG&E argues should create an effective
13  exemption from complying with the probation condition. PG&E's states:

14      PG&E is aware that work in the Zogg Mine Road area was interrupted
15      in October 2018 due to interactions with a resident of Zogg Mine Road,
       who believed that PG&E crews were cutting trees unnecessarily and
16      had previously brandished a firearm to tree crews attempting to work
17      in the area and was threatening to do so again. PG&E is also aware
       based on its records that inquiries were subsequently made in October
18      2018 about attempting to secure help from law enforcement to stand by
19      and protect tree crews against the resident that had brandished a
       firearm. Among other things, PG&E is investigating what role, if any,
20      that work interruption played in the two Gray Pines apparently not
21      having been worked.[18]

22  This incident happened nearly two years before the Zogg fire. PG&E failed to
23  explain and document whether it attempted to secure law enforcement help to
24  protect tree crews doing work, or any other efforts to use the civil process or

25

26

27
_____

28  [18] PG&E, RESPONSE TO REQUEST FOR FOLLOW UP PG&E CONCERNING ITS
    OCTOBER 26 SUBMISSION, Case No. 14-CR-00175-WHA, p. 25, November 18, 2020.

coordinate with law enforcement to complete necessary work.  It cannot claim "access issues" as a means to avoid the work so critical to public safety.

Amici's proposed conditions 13-16 will promote better information management to track alleged "access" issues and deal with them in a timely manner. Without such a requirement, its allegations about access are a mere excuse to put the removal on an indefinite schedule or on the "never" schedule.

This Court should reject PG&E's proposal on p. 5 of its OSC brief to deem access issues as an escape hatch from the probation conditions. PG&E proposed "policy PG&E is in the process of implementing for the 2021 fire season, trees identified as dying will be removed within six months, **absent access issues**." (*Id.* at 5). PG&E's proposal is inconsistent with California law and common sense. General Order 95, Rule 18 does not allow access issues to create an exemption from compliance with that order or from PG&E's safety responsibilities. It only allows a reasonable extension of the time for compliance with the rules, where appropriate.

General Order 95, Rule 18(a)(2)(b) states, in pertinent part:

Correction times may be extended under reasonable circumstances, such as:
·     Third party refusal
·     Customer issue
·     No access
·     Permits required
·     System emergencies (e.g. fires, severe weather conditions)

GO 95, Rule 18 only allows for extension of time under reasonable circumstances to comply with the Order's rules. It does not excuse vegetation management duties. PG&E is required to initiate procedures to obtain access including where appropriate, requesting the assistance of local law enforcement or using civil process to obtain access if letters and inquiries are unsuccessful.

Allegations about access issues should not excuse failure to remove trees within 30 days, but instead should trigger appropriate escalation and support procedure so that removal is promptly accomplished, not years later. PG&E's poor

28

record-keeping about access issues thwart the follow-up to resolve those issues. Lack of follow-up within a reasonable time both fuels danger and reflects PG&E's non-compliance with this court's orders and California and federal law.

## V. PG&E's Failure to Document, Follow-up, and Resolve Access Issues Violates its Duty of Safe Operation and Raises Concern that PG&E's Conduct Obstructs Justice

PG&E's probation conditions modified on April 2019 required, among other things, that PG&E:

> 1.     PG&E must fully comply with all applicable laws concerning vegetation management and clearance requirements, including Sections 4292 and 4293 of the California Public Resources Code, CPUC General Order 95, and FERC FAC-003-4.[19]
> ***
> 4. PG&E shall maintain traceable, verifiable, accurate, and complete records of its vegetation management efforts. PG&E shall report to the Monitor on the first business day of every month on its vegetation management status and progress, and make available for inspection all related records at the Monitor's request.

Additional conditions were added per the Offender's Stipulation with the Monitor and the U.S. DOJ to require: (Condition 8) an in-house vegetation management inspection manager to oversee a number of workforce resources; (Condition 9) a reasonable search for information about transmission asset age and, where available, for PG&E to record the age and date of installation of those components; and (Condition 10) a Transmission Inspection Program.

PG&E's responses in its brief and answer to the question about the Zogg fire raise concerns about whether PG&E has fully complied with its probation

---

[19] Dkt. No. 1040, April 2019. OSC p. 4.

conditions. PG&E's apparent failure to take steps necessary to track and execute removal of a tree identified as hazardous, its years long delay in such removal as indicated by the facts relevant to the Zogg fire, raise questions about whether PG&E's conduct obstructs justice. By not maintaining adequate records of its work and allowing false information to be input such as scheduling inspections in the past (*See* OSC pp. 2, 12, and PG&E Nov. 2018 brief, p. 18), PG&E's conduct obstructs justice by making it exceedingly difficult for federal or state authorities or PG&E to monitor compliance with federal and state law.

PGE&'s lack of records about access issues and its follow-up to resolve them also frustrate analysis about steps needed to promote access. With more information, the CPUC could order PG&E to conduct public relations campaigns and coordinate with state and local government and law enforcement to educate the public about access needs. This information can identify the need for clarity about when permits are required for vegetation removal, and underscore the need to ensure that removal is done properly, for example that PG&E does not cause erosion or other problems in the course of vegetation inspection and removal.

VI.   **This Court Should Order PG&E to Use Internet of Things Devices Such as Chips or QR Codes Instead of Spray Painting Trees in High Wildfire Danger Zones to Protect Public Safety**

PG&E's current practice of spray-painting trees to tag them for trimming or removal (PG&E Nov. 18 Brief, p. 23) has left crews to guess in some instances about which tree to remove, particularly as spray paint color fades over time or people paint over the spray paint.

This Court should require PG&E to initiate modern systems such as using sensors or QR codes linked to information management systems to provide the tree's geolocation and information about the tree including tracking its removal timeline. Businesses from Amazon to the post office use QR codes to track packages

30

and mail ballots.[20]  Farmers are increasing embedding sensors in the soil to measure moisture, humidity, and other factors.[21]

PG&E remains stuck in the 1980s with its spray paint cans, graffitiing trees with these very important symbols that signify work to be done.  Yet, time, rain, more spray paint, vegetation overgrowth and other factors can obscure these signs. Subsequent trimming and removal work may be missed and crews left to guess about which vegetation to trim or remove.  Use of sensors, QR codes, and other IoT devices can create geolocation and identification tags that will better track and identify work to be done and protect public safety.

The Zogg fire highlights the faults with PG&E's spray paint method. When much better methods are commonly used for tracking workflow in the twenty-first century, it does not reflect prudent management for PG&E to continue to rely on spray paint cans to avoid potentially deadly contact between a tree and a live electric wires or facilities.

Amici respectfully recommend this Court consider condition 15 to bring PG&E's work to modern standards to avert ongoing safety hazards and improve the tracking of work to be done near PG&E's lines. Approving Amici's proposed order will promote information integrity, work tracking, and communication to better inform decisions about deenergization, work to prevent the need for power shutoffs, daily, and strategic operation.

---

[20] United States Post Office, Office of the Inspector General, Package Delivery Scanning-Nationwide, Oct. 27, 2017, https://www.uspsoig.gov/document/package-delivery-scanning-%E2%80%95-nationwide; Amazon, Interactive: Unpack your Label,  Interactive: Unpack your label, https://www.aboutamazon.com/news/interactive-unpack-your-label (last visited Jan. 23, 2021).

[21] Sanjeev Verma, *How IoT Soil Condition Monitoring Is Empowering Farmers*, IoT FOR ALL, Nov. 6, 2019, https://www.iotforall.com/soil-moisture-monitoring.

## VII.   Conclusion

In closing, *Amici* respectfully request consideration and entry into the record of this brief responding to the OSC. We ask to be heard at the hearing on this matter so that the Court can consider facts and a perspective otherwise absent from the record before this Court. We appreciate the Court's consideration of Amici's arguments and suggestions respectfully submitted to protect public safety, compliance with federal and state law, and to promote PG&E's rehabilitation to better serve Californians and all affected by PG&E's conduct.

Respectfully submitted,

CATHERINE J. KISSEE-SANDOVAL
Associate Professor
Santa Clara University School of Law

Dated:  January 27, 2021        */s/Catherine J.K. Sandoval*, Esq.,


AGUIRRE & SEVERSON, LLP

Dated:  January 27, 2021         */s/Maria C. Severson*
Maria C. Severson, Esq.,
Attorneys for *Amici* Petitioners
Alex Cannara and Gene A.Nelson