UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. CR 14-0175 WHA |
| v. | |
| PACIFIC GAS AND ELECTRIC COMPANY, | **QUESTIONS FOR FOLLOW-UP** |
| Defendant. | |

By **MARCH 3, 2021, AT NOON**, PG&E shall please provide answers to the first six questions. By **MARCH 12, 2021, AT NOON**, PG&E shall please provide the requested answers to the remainder.

1. At the February 3 hearing, counsel for the offender, Attorney Kevin Orsini, stated with respect to the Gray Pine in question:

> [A]s we sit here right now, what we know is there were three different sets of qualified foresters who went out there, who examined the area in their professional judgment, designated a thousand trees in that area to come down. Used the tools that PG&E has in place, that include assessment of lean and species, and made a determination that they were not going to mark that tree for removal.

This led to questions propounded in an order dated February 5, 2021. PG&E's answers now show that Mountain G Enterprises, a PG&E contractor, marked the Gray Pine in question for

work in 2018 but that work was never done.  Attorney Orsini shall please explain (under oath) why he stated the above to the Court without also stating that MGE had marked the Gray Pine for work.  He shall also please state who the third set of "qualified foresters" were that "made a determination that they were not going to mark that tree for removal."  PG&E identified only two "determinations" (although those declarants had no memory of any determination).  Please supply the same information requested before as to the third set of foresters and their "determination."

2. Declarant A states that, after the Carr Fire in July and August 2018, Mountain G Enterprises, Inc., performed post-fire clean-up under contract with PG&E.  During that engagement, MGE marked the Gray Pine in question for work, he believes, but the work was not done.  Provide declarations from every MGE and PG&E personnel who made the 2018 determination to mark the Gray Pine for work and append all records regarding the determination.  Said declarations should detail how and why that determination was made and identify all persons who knew or should have known about it.  Provide declarations from every MGE and PG&E personnel who made the subsequent determination *not* to work the Gray Pine (or to postpone the work).  Those declarations should detail how and why that determination was made and identify all persons who knew or should have known that the Gray Pine had not been worked (or postponed).  Append all MGE and PG&E reports, memos, notes or other communications related to the determination not to do the work.  Provide declarations that explain the "Collector Application" and identify all PG&E personnel who had access to it during the time between the Carr and Zogg Fires.  Please resubmit any prior response(s) describing the Collector Application.  Provide declarations identifying the full extent to which PG&E personnel were aware prior to the Zogg Fire that trees marked for work along the Girvan Line had, in fact, not been worked.

3. Declarant A and Declarant B had zero memory of any "determination not to work" the tree — zero.  All they could say is that, in their opinion now, they "would have" done the right thing, therefore, they surely did the right thing.  Please interview all others who

might have been involved with the viewing of the Gray Pine and supply their declarations and append all relevant documents.

4. Paragraph 22 of Declarant B refers to "a black base from being burned," referring to burn on the Gray Pine in question. This was observed by Declarant B in a photograph in Docket No. 1250-4. Please submit the image viewed by the declarant and circle the "black base from being burned," as referenced by Declarant B.

5. How accurate and reliable are the latitude/longitude data used by PG&E and its contractors. Aren't the data supposed to be precise enough for subsequent crews to find the precise tree to remove? Yet, Declarant A, using that very data, visited the Zogg Road site and could only say, "in my view, the odds are" that the Gray Pine was among the trees marked for work. Is this system accurate enough for crews to locate exactly the right trees noted for removal?

6. Under what circumstances, if any, would General Order 95, Rule 35, or Section 4293 have required that a gray pine in the position of the Gray Pine in question be removed? For example, if it was known that the Gray Pine had been burned badly at the base in a previous fire, that it was leaning more than twenty degrees from vertical on a downhill slope looming over the power lines such that, if it fell downhill, it would fall on the power lines, and that high winds were eventually expected, how much more would be needed before PG&E would be obligated by General Order 95, Rule 35 or Section 4293 to remove it?

7. Regarding the four gray pines at the area of interest (see page 24 of the PG&E response dated December 16, 2020, to federal monitor), produce the following for the period September 2017 to the end of 2020:

   (a) All work orders and/or pre-inspection orders for the four gray pine trees marked for removal and one tree marked for trimming;

   (b) Pictures/videos from the same four gray pines and the immediate surrounding area;

   (c) Name of the person who marked trees and his/her employer;

3

  (d) LiDAR and photosynthesis data for all trees in area of interest, including subject tree; LiDAR data to include software model and system used; and

  (e) Any numbers assigned to the four gray pine trees in area of interest.

8. Produce an organizational chart for persons having authority over vegetation management of the Girvan Circuit as of the date of the period 2017 to and including 2020:

  (a) Organization chart identifying the names, titles, duties and periods when the positions were held for those responsible for vegetation management decisions related to the Girvan Circuit for the period 2017 to 2020; and

  (b) Name, duties, and periods when the position was held for the position of Director of Vegetation Management Execution during the post-Carr Fire restoration effort in 2018.

9. Produce all communications involved in the decisions to reschedule and cancel the 2019 CEMA patrol for the Girvan Circuit.

10. Provide current contact information for Declarants A, B, and C and any other declarants supplied in response to these questions such that probation or other law enforcement officers may contact and interview them.

11. Provide copies of *all* guidelines and instructions given by PG&E or its contractors to crews prior to the Zogg Fire regarding the factors to consider in marking trees for removal, including factors regarding species, height, lean, damage to tree, and proximity to powerlines, and including any guidance concerning that part of Section 4293 that states "and trees or portions thereof that are leaning toward the line which may contact the line from the side or may fall on the line shall be felled, cut or trimmed to remove such hazard." Please include whatever guidance Declarants A and B had on this subject.

12. At Docket No. 1012 (filed Feb. 6, 2019), Cal FIRE stated herein that Section 4293 (emphasis added):

> means that a tree, or portion thereof, that is leaning toward the line, must be "felled, cut or trimmed," *regardless of its health*, if it "may contact the line from the side or may fall on the line." *Id*. Section

4293 requires utilities to identify and remove such hazards.

Cal FIRE went on to say that whether a tree or limb is a hazard "depends on the factual circumstances specific to that tree or limb." State under oath the full extent to which PG&E has, since the Cal FIRE filing, disagreed with Cal FIRE's statement that this must be done "regardless of its health."

13. In the summer of 2019, the Monitor observed that PG&E's pre-inspectors were not fully assessing the trunks of trees (page 20 of letter dated July 26, 2019, filed at Docket No. 1089, Aug. 14, 2019). Provide declarations identifying all PG&E personnel who attended the Monitor's presentation on July 17, 2019, and stating what, if any, PG&E did in response to the Monitor's criticism. Please attach all relevant documents. Provide declarations identifying all PG&E personnel who were aware that some pre-inspectors did not walk around the base of leaning trees to inspect them for defects or damage.

14. Name any and all PG&E personnel or contractor personnel who walked around the Gray Pine in question to inspect it between the Carr and Zogg Fires and provide their declarations as to what they did and saw. Please append all relevant documents.

15. Provide all communications from July 23, 2018, to October 13, 2020, regarding vegetation management along the Girvan Line to or from Michael Lewis, Sumeet Singh, Deborah Powell, Ahmad Ababneh, Patrick Hogan, Kevin Dasso, or Barry Anderson.

16. PG&E has stated (on November 18) that the Gray Pine of interest may have been identified for removal (but not removed) during restoration efforts following the Carr Fire in 2018, based "on certain records" recently reviewed by PG&E concerning that restoration work. Please provide copies of those "certain records" and summarize them in a cover sheet.

17. PG&E's counsel, at the February 3, 2021, hearing, responded to the issue raised by *Amici* about backdating the inspection. Counsel stated "there was an error" that was "sort of [an] illogical application of logic by a data entry analyst, who fully expected that . . . what that would do is trigger an alert that said you have to go out now and do an inspection. And, in fact, that's what happened, an inspection was done. Now, ultimately, they didn't do a second one six months later . . . " (Document No. 1292, 56:19–57:10). Please provide the *names* of

the data entry analyst and the information PG&E counsel relied upon when he made that representation to the Court.

18. Has PG&E created and now implemented a system which flags, prevents, or creates an alarm when a person schedules or reschedules an event in the past? Does the alarm flag the change of the record as opposed to flagging that the event (such as an inspection) is overdue?

19. Do PG&E or contractor records indicate the Gray Pine of interest was spray painted to mark it for removal or work? Was any other record or signal created to indicate Gray Pine of interest required subsequent work?

20. According to PG&E's 2021 wildfire mitigation plan, PG&E began using its tree assessment tool ("TAT") in March 2020 as part of its Enhanced Vegetation Management patrols to assess all trees that have the potential to strike its power lines. Are all trees assessed with the TAT documented regardless of the outcome (*i.e.*, is a record of the result of the TAT created even if no work was needed)? Does PG&E currently use (or plan in the near future to use) its TAT during routine vegetation management patrols or CEMA patrols? If the Gray Pine that is suspected to have caused the Zogg Fire still stood, would it have been assessed with the TAT in 2021? If not, can PG&E estimate when it would have been assessed with the TAT?

21. For the 2021 fire season, has PG&E made any changes to the processes it uses to identify dead, diseased, or dying trees with the potential to strike power lines during *routine* vegetation management patrols? For the 2021 fire season, has PG&E made any changes to the substantive standards it uses to determine whether a tree should be worked or removed because it is a dead, diseased, or dying tree, with the potential to strike a power line? If so, identify the changes.

22. Has PG&E analyzed whether there are circumstances in which trees that have the potential to strike power lines should be worked or removed, even though they are healthy and not in violation of minimum clearances required by California Public Resources Code Section 4293, California Public Utilities Commission General Order 95, and Federal Energy

Regulatory Commission FAC-003-4? If so, what conclusions did PG&E reach? Has this issue been the subject of any regulatory process or analysis?

23. Does PG&E, in its view, have the authority to remove potential strike trees other than those that are dead, diseased, dying, or identified by PG&E's TAT as "abate"?

24. Has PG&E analyzed whether all trees that have the potential to strike its power lines should be documented for PSPS purposes (or other purposes) regardless of their health and/or whether they need to be worked? If so, what conclusions did PG&E reach? Has this been the subject of any regulatory process or analysis?

**IT IS SO ORDERED.**

Dated: February 18, 2021.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

7