1   Michael J. Aguirre, Esq., SBN 060402
    maguirre@amslawyers.com
2   Maria C. Severson, Esq., SBN 173967
    mseverson@amslawyers.com
3   AGUIRRE & SEVERSON, LLP
    501 West Broadway, Suite 1050
4   San Diego, CA 92101
    Telephone:  (619) 876-5364
5   Facsimile:  (619) 876-5368

6   Catherine Janet Kissee-Sandoval, SBN 153839
    Csandoval@scu.edu
7   Santa Clara University School of Law
    500 El Camino Real
8   Santa Clara, CA 95053-0421
    Telephone:  (408) 551-1902
9   Facsimile:  (408) 554-4426

10  Attorneys for *Amici* Alex Cannara
    and Gene A. Nelson

11

12

13                    **UNITED STATES DISTRICT COURT**

14              **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

15

| | |
|---|---|
| 16   UNITED STATES OF AMERICA, | Case No. CR 14 -0175 WHA |
| 17                            Plaintiff, | |
| 18   v. | ***AMICI'S* RESPONSE TO COURT ORDER RE CONDITIONS 10 AND 12** |
| 19   PACIFIC GAS AND ELECTRIC COMPANY, | **[DOCUMENT NO. 1294]** |
| 20                            Defendant. | Judge: Hon. William Aslup |
| 21 | |
| 22 | Hearing Date: March 9, 2021 Time:  8:00 a.m. |
| 23 | Location:  by Zoom (if not in person) |

24

25

26

27

28

# TABLE OF CONTENTS

I.  COMMENTS RE PROPOSED CONDITIONS 11 .....................................1

    A.  PG&E Vegetation Management Conditions
        Should Be Modified to Protect Public Safety
        and Rehabilitate Felon PG&E, Consistent with
        the Goals of Federal Criminal Probation ...........................1

    B.  PG&E's Responses Raise Questions about
        Missing and Inaccurate Data, Supporting the
        Imposition of Additional Probation Conditions...............................4

    C.  PG&E's Dkt. No. 1300-1 Raises Questions
        About Whether the Tree of Concern was
        Identified for Work in 2012, Why Fields Were
        Left Uncompleted, and Highlight the Need for
        Better Information Management Including
        Active Tree Markers ...........................................................9

        1.  The Affidavit by PG&E's Subcontractor
            whose Name is Blacked Out in PG&E
            Dkt. No. 1300-1 Raises Many Issues About
            PG&E's Work Process, Data Integrity, and Follow-up .........9

        2.  PG&E Exhibit 1, Dkt. No. 1300-1 Shows
            A Gray Pine Whose Work Was Not
            Completed *Since 2012* with Many Fields
            Missing, Emphasizing the Imperative of
            Modified Probation Conditions to Protect
            Public Safety and Rehabilitate Felon PG&E.......................12

    D.  Reclosers, Smart Meter Data, and Facilities
        to Section Blackouts.........................................................14

    E.  Exhibit 1 Contains No Description about
        General Order 95, Rule 18 Tiers into Which the
        Trees in Exhibit 1 Fall or Any Relationship between
        Those Trees and PG&E's Priority 1 and 2 Categories ...................20

    F.  This Court Should Order PG&E to Consider Tree
        Species in its Deenergization Decision-Making............................21

    G.  Condition 11 Should Be Modified to Include
        Information PG&E and its Contractors and
        Subcontractors Possess About PG&E's
        Poles and Infrastructure ....................................................22

    H.  PG&E Should Be Required to Consider the
        Information in its Possession, or in the Possession
        of its Contractors or Subcontractors Regarding
        the Analysis and Status of PG&E Facilities
        Including Hardware on Utility Poles, Towers,
        or Associated with Conductors .......................................24

i

II.      Proposed amendments to Section 11.
         Additional modifications proposed by Amici ............................................27

III.     COMMENTS RE PROPOSED CONDITIONS 12 ...................................28

         A.     Comments Regarding Proposed Condition 11...............................28

         B.     Proposed amendments to Section 12 ..............................................28

ii

*Amici* Alex Cannara and Gene A. Nelson, pursuant to the Court's Request (Dkt. No. 1294), respectfully submit the following proposed modifications and/or objections to proposed conditions 11 and 12.

## I. COMMENTS RE PROPOSED CONDITION 11

### A. PG&E Vegetation Management Conditions Should Be Modified to Protect Public Safety and Rehabilitate Felon PG&E, Consistent with the Goals of Federal Criminal Probation

As PG&E admitted at the February 3, 2021, federal criminal probation hearing, the gray pine under investigation as the cause of the 2020 Zogg Fire (tree of concern) was "neither a Priority 1 nor Priority 2 tree" under PG&E's classification.[1] PG&E's attempt to narrow Probation Condition 11 to Priority 1 and Priority 2 trees, without informing the Court that would have excluded the tree of interest in the Zogg fire, disserve justice and the public, and are inconsistent with the compliance and candor due from a felon under federal criminal probation.

In Dkt. No. 1250 p. 15, PG&E stated PG&E stated "as the Court is aware, PG&E has augmented its routine vegetation management work through its Enhanced Vegetation Management ("EVM") program, which from 2019 to the end of this year will subject over 4,000 line miles to enhanced trimming and tree removal… The Girvan Circuit was not among the 4,000 miles subject to EVM in 2019 or this year [2020]."

**Amici recommend this Court order PG&E to submit a statement to the Court and all parties including Amici and the Monitor [hereinafter "all parties"] about whether the Girvan Circuit is in the EVM program in 2021 or has been proposed to be added for 2022.**

---

[1] Transcript Feb. 3, 2021 Hearing, CR 14-00175 WHA, (Dkt. No. 1292, 12:18-19)

1

At the February 3, 2021, probation hearing, PG&E counsel Mr. Orsini referred to the fact that the Girvan Circuit was not located in an EVM area to attempt to limit the proposed probation conditions. Mr. Orsini stated:

> And the fact that it was leaning in, a gray pine, is not itself enough to require us to take the tree out; right? That goes back to the submissions from Cal Fire a year ago. It goes back to the CPUC regulations on our Enhanced Vegetation Management Program, where PG&E was taking out trees simply because of their species. We're not permitted to do that; right? (Dkt. No. 1292, p. 23:2-8)

Mr. Orsini's understanding of the applicable CPUC regulations is both off-base from the applicable rules and standard, and fails to consider the requirements and goals of federal criminal probation. Even when an area is subject to EVM standards, other CPUC rules and standards still apply. CPUC General Order 95, which provides guidelines on maintenance of overhead lines, is a particularization of the California Public Utilities Code which requires safe, reliable service at just and reasonable rates under CA PU Code § 451. PG&E must operate its system in a manner that is safe. Doing so requires PG&E to take steps to protect safety including removing vegetation that poses a danger to lines in high winds or other conditions.

The goals of federal criminal probation are to protect society from the offender's criminal behavior, rehabilitate the offender, and protect the rights of the victims. PG&E is a repeat felon responsible for igniting 20 or more wildfires in California since on probation, killing at least 111 individuals, destroying at least 22,627 structures, and burning half a million acres. (Dkt. No. 1277, p. 2:16-18) This follows its criminal conduct that killed 8 in the San Bruno explosion. PG&E equipment was involved in the deadly 2015 Butte Fire, 2017 Northern California Wildfires and is now under investigation to determine whether its actions caused the death of four people in the 2020 Zogg fire.

As a *recidivist felon responsible for the deaths of at least 111 people while on federal criminal probation*, this Court should not defer to PG&E's promises to perform better or to comply with CPUC rules. Neither is this Court required to defer to the CPUC's civil process under the California Public Utilities Code.

The CPUC has no jurisdiction to administer or enforce state criminal laws. Neither does the CPUC have any jurisdiction to enforce federal criminal laws. PG&E has been convicted in federal court of violating the National Gas Pipeline Act, in addition to obstruction of justice. It is this federal Court's responsibility to oversee the federal criminal probation for PG&E's crimes, including its repeated violation of its probation conditions, the first of which is to commit no felonies while on probation.

As Amici stated in Dkt. No. 1228 at p.15:11-19:

"In its oversight of PG&E's federal probation, this Court is not required to defer to any judgments of the CPUC or FERC regarding PG&E's criminal conduct and its probation violation. Neither does this Court's federal criminal probation interfere with CPUC jurisdiction under the California Constitution and the California Public Utilities Code, nor FERC's jurisdiction under the Federal Power Act.27 **FERC has NO jurisdiction over electricity safety**, independent of reliability analysis. The CPUC's newly developed Wildfire Mitigation Plan has not ordered a detailed examination of the lack of PG&E record-keeping on transmission infrastructure, nor required detailed analysis and action to address the risks of infrastructure that has outlived its useful life.

Amici suggest amendments to Conditions 11 and 12 below to protect public safety and rehabilitate PG&E throughout its service territory including in high fire-threat areas. Protecting public safety requires compliance with the standards of federal criminal probation, and applicable California and federal law. Probation conditions should not be limited by categories PG&E created without reference to applicable laws and standards such as its "Priority 1 and 2" vegetation management terms.

/ / /

Following the last hearing in this federal criminal probation on February 3, PG&E submitted its proposed Wildfire Mitigation Plan (WMP) for the consideration of the CPUC and its Wildfire Safety Division.[2] It is important to emphasize the likely year-long timeline in which PG&E's February WMP will be evaluated and may, or may not, be approved or subject to conditions. PG&E's proposed WMP, if approved, will likely not go into effective until December 2021 or January 2022 as PG&E's federal criminal probation is scheduled to end.

PG&E's WMP late 2021-2022 proposal poses no bar to the exercise of this Court's jurisdiction and ability to modify PG&E's federal criminal probation conditions. Neither does PG&E's existing WMP pose any limit to this Court's jurisdiction as the CPUC has no jurisdiction to administer federal criminal law. The critical objective in this proceeding is to achieve the goals of federal criminal probation for PG&E, a recidivist felon who has caused the death of *at least 111 people while on federal criminal probation, and more* if PG&E is found responsible for the Zogg fire.

### B. PG&E's Responses Raise Questions about Missing and Inaccurate Data, Supporting the Imposition of Additional Probation Conditions

This Court should require PG&E to provide to this Court and all parties information of the photograph of what appears to be the tree of concern in the Zogg fire, attached as Exhibit D to PG&E's October 26, 2020 filing (Dkt. No. 1250-4), attached to this brief as Exhibit C. That photo, shown on page 11 of this Court's

---

[2] PG&E, PG&E to Deploy New Risk Modeling and Fire Spread Technology to Further Reduce Wildfire Risk, Feb. 5, 2021, https://www.pgecurrents.com/2021/02/05/pge-to-deploy-new-risk-modeling-and-fire-spread-technology-to-further-reduce-wildfire-risk/

December 29, 2020 Order to Show Cause (Dkt. No. 1277), appears to be an aerial photo. In Dkt. No. 1250 p. 15, PG&E stated that it:

> "is submitting to the Court a flash drive containing (1) photographs of the area of interest taken during the April 2019 WSIP inspection of the Girvan Circuit; (2) photographs of the area of interest taken during the LiDAR survey of the Girvan Circuit in July 2019; and (3) hundreds of photographs of the area of interest taken after the Zogg Fire by PG&E's evidence collection vendor in connection with evidence collection operations in October 2020."

PG&E further states that "PG&E is providing the Court with a flash drive that contains 77 photographs of the area of interest taken by air during a Light Detection and Ranging ("LiDAR") survey of the Girvan Circuit in July 2019." (Dkt. No. 1250, p. 7)

**Amici respectfully request this Court order PG&E to publish the photos in the record and make them available to all parties** through electronic means in addition to print outs.

**PG&E should be required to inform the Court and all parties about whether this photo was taken as a still photo or as part of a video.** If the photo was part of a video, or if a video was also taken in that LiDAR survey, **this Court should order PG&E to publish the video and submit it to this Court and all parties.**

If PG&E crews, contractors, or subcontractors also took videos of the area and/or tree of concern between 2012 and the 2020 Zogg fire, this Court should order PG&E to submit those videos to this Court and all parties.

**Amici recommend this Court order PG&E to publish the LiDAR images that show the area of interest and submit them to the Court and all parties.** In addition, PG&E should be ordered to provide the Court and all parties including Amici with the software, licenses, and instructions necessary to view, understand, and analyze the images.

**Amici respectfully recommend** that PG&E be ordered to describe how it uses LiDAR in its vegetation management decisions.[3]

**We recommend this Court order PG&E to describe how, if at all, PG&E uses LiDAR readings in its vegetation management.** Does PG&E compare use LiDAR and ground patrol analysis, and reconcile LiDAR data with vegetation management work records? Does PG&E use LiDAR data to analyze information from ground patrols, analyze, identify, or initiate action on work orders, or initiate new vegetation management work orders? Does PG&E use its LiDAR data in its de-energization (power shutoff) decisions, or in its operational or strategic planning decision-making, and if so how?

**This Court should order PG&E to describe the compass direction in which the photos in Dkt. No. 1250-4 were taken**. Is the Gray Pine of interest shown in more than one of the 3 photos attached as Exhibit 1 in Dkt. No. 1250-4? Do the photos in that Exhibit show views of the Gray Pine of interest flying from the south and returning from the north? If so, PG&E should provide a description of the Gray Pine and area of interest in those photos Amici recommend this Court order PG&E to submit and make available to all parties the images in Dkt. No. 1250 p. 9 of the Girvan circuit near the Zogg mine road area in the order in which they were captured.

In Dkt. No. 1250, p. 7, PG&E states: "The Gray Pine from which CAL FIRE collected sections was located nearest to pole 101457905."

---

[3] See, Leah Wasser, ***The Basics of LiDAR - Light Detection and Ranging - Remote Sensing*, NEON, Oct 7, 2020, https://www.neonscience.org/resources/learning-hub/tutorials/lidar-basics**; Rafa Torro, Vegetation Management for Utilities Using Lidar Data, Sept. 13, 2018, **https://www.gim-international.com/content/article/vegetation-management-for-utilities-using-lidar-data**.

**PG&E should be ordered to explain to this Court and all parties whether and how this correlates with the chart of vegetation management work generated in October 2018 Exhibit 1 of Dkt. No. 1300-1**.

In addition, **PG&E should be ordered to answer the following questions** and make the explanation available to the Court and parties.

- Does the location of the nearest pole inform PG&E's analysis of which is the tree of interest, if any described in Exhibit 1 of Dkt. No. 1300-1?
- Is proximity to the nearest pole used as a marker to locate vegetation of concern?
- Is Zogg Mine Road the end of a circuit or does a lateral or tap line end there?
- If so where does the lateral or tap line end in relation to the Gray Pine of interest?

In the upper fourth of the photograph in Dkt. No. 1250-4, there is a shadow. **PG&E should be ordered to explain to the Court and the parties whether that is the shadow of a helicopter, burn marks from the Carr fire, or other black vegetation on the ground.**

**Amici recommend the Court order PG&E to submit information should ask the *who, when, why, and how* regarding the photo.**

- Who took the photo in Dkt. No. 1250-4? On what date and at what time was it taken? The shadows from the power line indicate it might have been taken in the afternoon between 1:00-2:00 p.m. or in the morning in the 11:00 a.m. hour. PG&E's November 18 submission, Dkt. No. 1265, p. 24, and Dkt. No. 1250, p. 7 mention a July 2019 photograph of the area of interest in the Zogg fire.
- Confirm the date and time on which it was taken. Explain why the photo of the tree of interest was taken and what actions PG&E took because of this photo.

7

- PG&E Dkt. No. 1250, p. 7 states that the photos attached to that submission including the photo showing the Gray Pine of interest incorporated into the Order to Show Cause of December 29, 2020, p. 11, were taken by air as part of a LiDAR survey. Amici respectfully recommend that this Court order PG&E to state why the photo taken and by whom? What was its purpose?

- Was this photograph taken using a digital mechanism such as a digital camera or digital video? If so, this Court should order PG&E to provide this Court and all parties with the metadata and links to the original file from which this photograph was derived. Additionally, this Court should order PG&E to provide data about the information collected by whoever took that photo.

- PG&E should be required to describe the process that followed from the photo of the tree of concern: Who reviewed the photo taken in July 2019 and for what purpose? What did PG&E do with that photo to inform its vegetation management or operations? How is the taking of photos such as the July 2019 photo related to the work entered by vegetation management personnel? How are work orders generated in response to photos such as this, or from aerial or ground patrols?

PG&E subcontractor A, whose name is blacked out in PG&E DKt. No. 1300-1, p. 3, states in paragraph 13: "When I began working for CNUC, I also was given a binder containing PG&E vegetation management policies and procedures, as well as other company procedures, that I reviewed and have kept with me at all times while performing pre-inspection work."

**Amici respectfully recommends this Court order PG&E to produce the binder containing PG&E's vegetation management policies and procedures, as well as those other company procedures mentioned by this subcontractor, to this Court and all parties.**

1

2
3
4

**C.      PG&E's Dkt. No. 1300-1 Raises Questions About Whether the Tree of Concern was Identified for Work in 2012, Why Fields Were Left Uncompleted, and Highlight the Need for Better Information Management Including Active Tree Markers**

5
6
7

**1.     The Affidavit by PG&E's Subcontractor whose Name is Blacked Out in PG&E Dkt. No. 1300-1 Raises Many Issues About PG&E's Work Process, Data Integrity, and Follow-up**

8

The Affidavit by PG&E's Subcontractor whose Name is Blacked Out in

9

PG&E Dkt. No. 1300-1, p. 4 states in paragraph 21:

10
11
12
13
14
15

> I do not specifically remember inspecting the Gray Pine identified by the Court. Based on my review of inspection records I generated in the course of the October 2018 routine patrol of Route 50, however, I know that I would have been inspecting the portion of the Girvan Circuit that included the Gray Pine on October 12, 2018. A copy of the relevant record generated on October 12, 2018, is attached hereto as Exhibit 1. Based on my review of these records, I believe I would have inspected the Gray Pine on approximately October 12, 2018.

16

That affiant states on PG&E Dkt. No. 1300-1, p. 5, paragraph 31: "I believe

17

that the record attached as Exhibit 1 to this declaration is the report I would have

18

generated through Getac on the date I inspected the portion of Route 50 that

19

includes the Gray Pine. The report does not mention or refer to the Gray Pine."

20

Paragraph 30 mentions PG&E's Getac system. A screen shot of PG&E Dkt. No.

21

1300-1 Exhibit 1 is attached hereto as Exhibit A to Amici's brief.

22

The affiant states on PG&E Dkt. No. 1300-1, p. 5, paragraph 33: "When

23

conducting routine patrols, it was not my practice to submit notes or reports

24

concerning healthy trees that did not require work. Based on the absence of any

25

work orders, notes, or reports concerning the Gray Pine, I believe that at the time I

26

would have inspected it in October 2018, I did not expect it to pose a threat to the

27

power line in the next year." In paragraph 34 affiant states: "My review of Exhibit D

28

to Dkt. No. No. 1250-4 is consistent with this. In this picture, as discussed above,

9

the Gray Pine appears to be a healthy tree that was in compliance with all vegetation management standards governing its proximity to the power lines."

The affiant states on PG&E Dkt. No. 1300-1, p. 6, paragraph 37: "Having reviewed the photograph at Dkt. No. No. 1250-4, I do not regard the lean of the Gray Pine as indicative of a threat to the power line likely to arise in the subsequent year. Based on my experience, I know that before the Zogg Fire there were countless healthy trees along Route 50 that exhibit a similar or more drastic lean toward power lines that would be affected by a fall." The fact that there are other leaning trees menacing the line does not explain affiant A's analysis of the photo from Dkt. No. 1250-4. Given the height and type of the tree as a Gray Pine with a shallow root system, the affiant does not provide any explanation of his or her assessment based on a photograph of the tree of concern.

Nor does affiant describe whether his analysis of the data in Exhibit 1 affected the analysis of that Tree 5 described as a Gray Pine. Tree 5's data entry indicates that tree was marked for work on June 5, 2012. No explanation is offered as to why no work was done on that tree between 2012 and the Zogg fire in 2020. Nor does the affiant explain what follow up affiant completed regarding Tree 5, particularly since it was marked as last inspected in 2012. In addition, data is missing information for most data fields, and it lacks latitude and longitude coordinates, and a work completion date.

The 2012 date on which Tree 5 was marked should have drawn PG&E's urgent attention. Neither PG&E nor affiant explain why follow-up was apparently *not* completed regarding this tree since 2012 or what systems were used to flag vegetation compliance years out of date.

Affiant explains in PG&E Dkt. No. 1300-1, p. 7, paragraph 44:

"After the Zogg Fire, I was hired by MGE [Mountain G Enterprises] to go to Zogg Mine Road in November 2020 to review trees in the area around the Gray Pine…. MGE retained me to investigate and determine

10

whether any trees that fell on the power lines near the location where CAL FIRE was conducting its investigation of the Zogg Fire were trees that had been marked for work but not ultimately worked. I was hired by MGE due to my familiarity with this area."

PG&E does not explain whether any conflict of interest was created by its Contractor, MGE, hiring the person who believes he inspected the area of interest in 2018 to inspect the same area after the 2020 Zogg fire. Affiant A was essentially hired by PG&E's contractor MGE to inspect his or her own past work for PG&E with a previous PG&E contractor, CNU.

At PG&E Dkt. No. 1300-1, p. 7, paragraph 44 and 48 affiant states that the tree of concern may be among those that affiant identified through inspection of the Zogg fire area in November 2020 while retained by MGE:

"MGE provided me with the location data from the Collector Application for trees it had marked for work during the post-Carr Fire work." (paragraph 44).

"While at the site of CAL FIRE's investigation, I observed that the tree that CALFIRE cut down was an R2, meaning a diameter at breast height ("DBH') of at least twelve and less than 24 inches, and the other tree- which had fallen on the line-was an R3, meaning a DBH of at least 24 and less than 36 inches. The location of these two trees appeared to me consistent with the coordinates for trees that had been marked for work during the post-Carr Fire cleanup work that ultimately had not been worked. Therefore, in my view, the odds are that the Gray Pine was among the trees marked for work, although I cannot be certain of that. (paragraph 48).

Affiant does not reconcile this analysis affiant conducted in November 2020. PG&E and affiant A should be ordered to explain in more detail the analysis of Exhibit 1 to Dkt. No. 1300-1, and the affiant's analysis of the photograph of the tree of concern.

/ / /

/ / /

/ / /

**2. PG&E Exhibit 1, Dkt. No. 1300-1 Shows A Gray Pine Whose Work Was Not Completed _Since 2012_ with Many Fields Missing, Emphasizing the Imperative of Modified Probation Conditions to Protect Public Safety and Rehabilitate Felon PG&E**

PG&E Exhibit 1 Dkt. No. 1300-1 underscores the urgency of modifying PG&E's probation conditions, including the modifications Amici propose herein, and support Amici's proposed probation conditions 13-16. Exhibit 1 contains an inspection date of 10/12/2018 9:24:39 AM, marked as (preload). It reports CNU as the inspector company, though the inspector's name is blacked out.

Dkt. No. 1300-1, Exhibit 1 reports three Gray Pine trees in the Zogg fire area. Tree No. 2 at latitude/longitude 40.53868, -122.562035 is listed with an external tree identification (listed by PG&E as External TreeID) of: W122562035N40538680. Tree No. 2 is marked in the inspection report as @ P59; DEAD, UP HILL. Affiant described the Gray Pine in the photo in Dkt. No. 1250-4 as healthy. This indicates the tree of interest is not likely Tree No. 2 described in Exhibit 1 as P59; DEAD, UP HILL if the tree of interest is that portrayed on page 11 in the December 29 Order to Show Cause. This Court should order PG&E to explain what @ P59 or P59 means, as that term is repeated for each tree entry in Dkt. No. 1300-1, Exhibit 1.

**This Court should require PG&E to verify the date of the photograph of the Gray Pine in Dkt. No. 1250-4 that PG&E has previously described as taken in July 2019.**

**This Court should order PG&E to verify whether the photo in Dkt. No. 1250-4 describes the same areas and trees described in Exhibit 1.**

Exhibit 1 reports a Gray Pine as Tree No. 4 at latitude/longitude 40.538678, -122.56236 and an External TreeID of: W122562360N40538678, listed as 85 inches high is marked in the inspection report as .3S/W/OF P59; REMOVE DEAD LIMB. Affiant described the Gray Pine in the photo in Dkt. No. 1250-4 as healthy. Tree No. 4 is listed as having a DBH of 24. Affiant stated at PG&E Dkt. No. 1300-1, p. 7,

12

paragraph 48 that the tree of interest appeared to have a DBH of 24 "and the other tree-which had fallen on the line-was an R3, meaning a DBH of at least 24 and less than 36 inches." The work completion date for Tree 4 is listed in Exhibit 1 as 2/15/2019, indicating that this inspection dated 10/12/2018 was setting work completion dates in the future.

**This Court should order PG&E to verify whether Tree 4 is the tree of interest.**

**This Court should also order PG&E to state whether the work ordered for External TreeID of: W122562360N40538678 was timely completed by 2/15/2019.**

**This Court should order PG&E to verify and report to this Court, and to all parties about whether Tree 4 is the tree in the photograph of the Gray Pine in Dkt. No. 1250-4**.

Exhibit 1 reports a Gray Pine as Tree No. 5 with NO latitude/longitude filled in, NO External TreeID, listed as 80 inches high, with a comment: .3 & .4S/W/O P59.

**This Court should order PG&E to explain in detail the meaning of the comment 3 & .4S/W/O P59. Tree No. 5 states as priority "No Trim," a term this Court should order PG&E to explain.** Clearance is described for Tree No. 5 as 0. For other trees on Exhibit 1 where clearance is listed clearance as 99 for Tree 4, the Gray Pine described as dead, and 15 for the Gray Pine listed as Tree 4.  All three Gray Pines are listed under the proximity category as "inside." This Court should order PG&E to explain what "inside" means and what its clearance numbers mean.

Exhibit 1 reports that the inspection date for the Gray Pine listed as Tree No. 5 was 6/25/2012. Yet, Tree No. 5 contains NO entry under Completed by and under Invoice states *Not Worked.* PG&E's Exhibit 1 for Tree No. 5 states the last edit was 10/12/2018 9:24:37 AM by: [name redacted]. The affidavit in PG&E Dkt. No. 1300-1 does not explain why the inspector did not make any entries, initiate any work, or

13

offer any explanation as to why no follow-up was done for Tree No. 5 identified in the inspection date IN 2012.

**This Court should order PG&E to verify whether Tree No. 5 is the tree of interest.**

**This Court should also order PG&E to explain why the data fields were skipped for Tree no. 5, and why no action was apparently taken on Tree No. 5 (according to Exhibit 1) since the inspection date IN 2012.**

**This Court should order PG&E to answer the questions about Tree No. 5 listed above.**

PG&E represented in PG&E Dkt. No. 1265, p. 22, lines 12-14 that "PG&E currently believes the Gray Pine of interest may have been identified for removal (but not removed) during restoration efforts following the Carr Fire in 2018, based on certain records recently reviewed by PG&E concerning that restoration work."

**This Court should order PG&E to explain the factual basis for that belief.**

**This Court should order PG&E to explain whether Exhibit 1 informs its belief about the Gray Pine of interest and identify which Tree in Exhibit 1 appears to reflect the Gray Pine of interest.**

**This Court should order PG&E to reconcile its statement in PG&E Dkt. No. 1300-1, p. 22, lines 12-14 with PG&E Dkt. No. 1265.**

### D. Reclosers, Smart Meter Data, and Facilities to Section Blackouts

The location of the Zogg fire start and the tree of interest are important to the assessment of the modification of PG&E's criminal probation conditions. PG&E stated in Dkt. No. 1250 p. 2:

> According to CAL FIRE's website, the Zogg Fire began on September 27, 2020 at 4:03 p.m. in the area of Zogg Mine Road and Jenny Bird Lane, north of Igo in Shasta County. The properties on Zogg Mine Road

14

are served by a distribution circuit, the Girvan 1101 12 kV Distribution Circuit ("Girvan Circuit").

PG&E states that following the Zogg fire, CalFire analyzed evidence near the Zogg fire marked by "three spans—between pole 103320099 and pole 101457898—[which PG&E] referred to [] as the "area of interest." (Dkt. No. 1250 p. 6.) PGE describes the SmartMeter data that may indicate the commencement of the Zogg fire as voltage fluctuated, consistent with a tree hitting a conductor, Dkt. No. 1250 p. 2:

> According to data currently available to PG&E, at approximately 2:40 p.m., a SmartMeter recording power usage at a property on Zogg Mine Road near the intersection of Zogg Mine Road and Jenny Bird Lane reported a drop in voltage to a level below that required for its continued operation (known as a "last gasp" event).

A "last gap" event indicates a SmartMeter is going offline, an indicator that something is wrong.

PG&E reported that during the same minute as the last gasp event near the intersection of Zogg Mine Road and Jenny Bird Lane where the Zogg fire started, the reclosers on downstream lines did not deenergize power to the area near Zogg Mine Road and Jenny Bird Lane. In Dkt. No. 1250 p. 2-3 PG&E states:

> Also at approximately 2:40 p.m., a Line Recloser on the Girvan Circuit, LR 323094, reported a temporary reduction of voltage on the line. LR 323094 is the line recloser physically closest to the intersection of Zogg Mine Road and Jenny Bird Lane, but does not protect the branch of the Girvan Circuit (known as a "tap line") that supplies the area near that intersection. Attached as Exhibit A is a map showing the location of LR 323094, the intersection of Zogg Mine Road and Jenny Bird Lane, and the other protective devices on the Girvan Circuit that are referenced in this response.

**Amici respectfully recommend that this Court should order PG&E to specify how far the nearest reclosers were to the area of interest near the intersection of Zogg Mine Road and Jenny Bird Lane.** Dkt. No. 1250-1, Exhibit A, shows a map that flags the area of interest, marks the intersection of Zogg Mine

Road and Jenny Bird Lane, and pins the location for reclosers LR 1330 and LR323094. No recloser is identified on what appears in the map to be Zogg Mine Road. Both reclosers pinned on the map appear to be on a major road on the Girvan Circuit. PG&E admitted in Dkt. No. 1250 p. 2-3 that no recloser protects the intersection of Zogg Mine Road and Jenny Bird Lane. This Court should order PG&E to explain how much of the area of Zogg Mine Road, if any, recloser LR323094 would protect.

**Amici respectfully recommend this Court order PG&E to inform the Court and all parties about whether it has installed or operates any recloser that protects the branch of the Girvan Circuit (known as a "tap line") that supplies the area near the intersection of Zogg Mine Road and Jenny Bird Lane**.

**PG&E should also be required to state under oath *why* it decided not to install a recloser that protects that tap line.**

**PG&E should also state whether it has submitted any proposals in its WMP to install reclosers on Zogg Mine Road including reclosers to protect the mountainous area near Jenny Bird Lane that features dirt roads, tight switchbacks, and limited escape routes.**

During the minute before nearby fire watch cameras detected the Zogg fire, PG&E describes how other reclosers near Zogg Mine Road and Jenny Bird Lane experienced brief events. PG&E did not set up those reclosers to trigger line deenergize for events of the duration described below. Dkt. No. 1250 p. 3 states:

> At approximately 2:41 p.m., two other Line Reclosers (LR 1330 and LR 1636) recorded current levels in excess of their Minimum To Trip ("MTT") that were not long enough in duration to open the Line Reclosers and de-energize the line. LR 1330 and LR 1636, which are upstream and to the southeast of the intersection of Zogg Mine Road and Jenny Bird Lane,serve as the protective devices for line segments that supply power to that area. LR 1636 is the protective device nearest the Girvan Circuit's power source, and LR 1330 is a protective device

16

further downstream. MTT is a threshold setting on line reclosers. Exceeding the MTT thresholdfor a prescribed amount of time will cause a line recloser to open or "trip", resulting in de-energization of the line it protects. The prescribed amount of time will vary depending on, among other factors, the level of current recorded, with the prescribed time being shorter for higher current.

**This Court should ask PG&E if and how it has adjusted MTT thresholds, implementation of deenergization events, and operational and strategic decisions in response to short MTT events that reflect a voltage event in a nearby line segment that may be experiencing a fire or similar event.**

It appears from the maps of the Girvan distribution circuit PG&E submitted in 1250-1 that the tap line ends at Jenny Bird Lane. A Google Earth Search for Jenny Bird lane reveals that it is an area where the foothills climb into the mountains, characterized by dirt roads.[4] PG&E describes the Girvan circuit in Dkt. No. 1250 p. 7 as located in a forested and elevated area. PG&E states: "The Girvan Circuit, including the portion that runs through the area of interest, is located in forested terrain, as shown in Exhibit C, and traverses an elevated (Tier 2) fire-threat area on the California Public Utility Commission's ("CPUC") Fire Threat Map."

In the event of a fire, residents of Jenny Bird Lane would not be able to escape by driving north into the mountains as it appears the dirt road ends on Jenny Bird Lane. The roads are winding switchbacks in this area. The Court should order PG&E to explain how its analysis of the escape routes, road types (dirt roads, switch backs, etc.), terrain, and other geographic factors affects its decision-making about

---

[4] Google Earth (search for Jenny Bird Lane, Redding): https://earth.google.com/web/search/Jenny+Bird+Lane,+Redding,+CA/@40.5402284,-122.566005,528.90145227a,779.81270375d,35y,0h,0t,0r/data=CigiJgokCSm0-0SwSERAEVYHFekPRURAGT3JKfpXol7AIXhvIbr_pV7A (last visited Feb. 18, 2021).

where to place reclosers. PG&E should also be ordered to explain to the Court and all parties why it did not place a recloser to govern the tap line on Jenny Bird Lane.

**This Court should direct PG&E to explain whether its algorithms used to inform its power shutoff decisions and other operations consider recloser the location.** Is the absence of a recloser for a circuit, line, or tap line considered in power shutoff decisions? Is the absence of a recloser for a circuit, line, or tap line considered in deciding where to install additional reclosers or facilities to segment lines in a power shutoff?

**Amici suggest the Court:**

- Add to condition 11 the order for PG&E to consider whether reclosers are installed and operational for the circuits, lines, and tap lines in an area to make decisions about power shutoffs and other operational and strategic decisions. Direct PG&E to explain the geographical breadth of a power outage in the area of Jenny Bird Lane if one were ordered. What types of facilities help to constrain the geographical scope of a power shutoff?

- Direct PG&E to explain whether and on what basis it asserts that a windspeed monitor in the flatlands of Igo accurately predicts the winds in foothills and mountainous areas such as Jenny Bird Lane. What is the factual basis for PG&E's prediction that the Igo wind monitor would accurately predict the wind in the area of Jenny Bird Lane?[5]

---

[5] *See*, Brandon Rittiman, *Investigation: PG&E made shutoff decisions on 'junk science,'* ABC10, Feb. 2, 2021, https://www.abc10.com/article/news/investigations/investigation-pge-shutoff-decisions-zogg-fire/103-273163f6-c0f6-4404-b36b-9053b2980d3d (discussing PG&E's nearest wind monitor to the Zogg fire was located in the flat area of Igo in contrast to the foothills and mountains of Jenny Bird Lane).

1   PG&E describes a nearby University of Nevada Reno wildfire alert camera
2   capturing what appears to be the start of the Zogg fire, though it provides
3   insufficient detail. Dkt. No. 1250 p. 54 states:

4       Also at approximately 2:42 p.m., smoke that may be associated with
        the ZoggFire appears to become visible in footage recorded by a
5       firewatch camera operated by the University of Nevada Reno and
6       located approximately three miles east of the intersection of Zogg Mine
        Road and Jenny Bird Lane Alert Wildfire, Shasta Modoc.
7

8       Information about several wildfire alert camera operated by the University of
9   Nevada Reno is available at Alertwildfire.org.[6]

10      **This Court should order:**
11      -   PG&E to specify *which* wildfire camera captured what appears to be the
12          start of the Zogg fire.
13      -   PG&E to  describe if and how it uses wildfire alert cameras in
14          deenergization, operational, or strategic decision-making.
15      -   PG&E to  describe how it uses information about wildfires to adjust its
16          vegetation management, information management, operational, or strategic
17          actions and processes.
18      -   PG&E to explain whether it built this distribution line or acquire it from
19          someone else?
20      -   PG&E to explain why this line was built including the tap to Jenny Bird
21          Lane.
22   / / /
23   / / /
24   / / /
25   / / /
26
27
28   [6]AlertWildfire.org http://www.alertwildfire.org/shastamodoc/index.html?v=7a7f1c0
     (last visited Feb. 18, 2021).

19

**E.**     **Exhibit 1 Contains No Description about General Order 95, Rule 18 Tiers into Which the Trees in Exhibit 1 Fall or Any Relationship between Those Trees and PG&E's Priority 1 and 2 Categories**

PG&E fails to explain in what category the trees listed in Exhibit 1 fall under CPUC General Order 95, Rule 18's Tiers. Neither does PG&E explain in which categories the Trees in Exhibit 1 fall under PG&E's Priority 1 and 2 Categories. Counsel for PG&E, Mr. Orsini, stated that the tree of interest was neither a Priority 1 nor a Priority 2 tree.[7] Neither has PG&E explained how its Priority 1 and Priority comport or conflict with the governing rules in CPUC General Order 95, Rule 18 or with CA PU Codes 451, 8386(a), Public Resources Code Section 4293, GO 95, FERC FAC-003-4.

PG&E admitted that there is no Priority 3 and that "if a tree is identified for work and it does not fall within a Priority 1 or Priority 2, it's something that would need to be worked in the ordinary course."[8] PG&E fails to explain how this comports with CPUC General Order 95, Rule 18 and the tiers listed therein which set forth guidelines including work timelines. CPUC General Order 95, Rule 18, CA PU Codes 451, 8386(a), Public Resources Code Section 4293, GO 95, FERC FAC-003-4 are among the controlling rules and standards for vegetation management work. The categories PG&E created, Priority 1 or Priority 2, do not set the relevant rule or standard. Neither has PG&E explained how its priorities match to the applicable rules or standards.

Since PG&E's Priority 1 and Priority 2 would not have identified the tree of interest and are not consistent with the applicable rules and standards, **Amici urge that it is important to include reference to the applicable rules in standards in**

---

[7] Transcript of Hearing, No. CR 14-00175 WHA, Feb. 3, 2021, P. 12, Lines 18-19; P. 13, Lines 18-22.

[8] *Id.* at 20, lines 9-13.

1  **PG&E Probation Condition 11.** Modifications to Probation Condition 11 to

2  address these concerns are described below in section II.

3

4  **F.      This Court Should Order PG&E to Consider Tree Species in its
         De-energization Decision-Making**

5

6      As part of its consideration of the status of vegetation management in power

7  shutoffs and PG&E's operation, **this Court should order PG&E to consider tree**

8  **species and the type of vegetation that may contact its lines or facilities**. SDG&E

9  considers tree species in its Wildfire Mitigation Plan and has targeted certain types

10 of trees for inspection including eucalyptus, oak, sycamore, and pine.[9] Trees such as

11 eucalyptus have oily bark that peels and may become airborne during high winds.

12     **This Court should order PG&E to analyze the types of trees and**

13 **vegetation that have come into contact with its lines during the past five years**.

14 PG&E should be ordered to analyze factors including tree type, tree condition (*e.g.*

15 diseased, infected, or dying) associated with conductor or other facility contact. This

16 Court should order PG&E to submit that analysis to this Court and all parties by

17 May 2021 and consider that analysis in its implementation of probation conditions

18 11 and 12 by July 1, 2021. This Court should order PG&E to consider the types of

19 trees near its lines as a factor in its evaluation of the status of its vegetation

20 management in making decisions about its operation including power shutoffs.

21     In addition, **Amici recommend this Court order PG&E to consider the**

22 **status of its pole inspection and management, and its analysis of asset or facility**

23 **condition into account in its operational decisions including power shutoffs, as**

24 **well as in strategic planning.**

25  _____

26 [9] SDG&E, Wildfire Mitigation Plan, Sept. 17, 2019, p. 11,

27 https://www.cpuc.ca.gov/uploadedFiles/CPUCWebsite/Content/News_Room/News
   Updates/2019/SDGE%20Wildfire%20Plan%20Update%20at%20the%20CPUC%20

28 9.17.19%20R1.pdf.

**G.**   **Condition 11 Should Be Modified to Include Information PG&E and its Contractors and Subcontractors Possess About PG&E's Poles and Infrastructure**:

Probation Condition 11 addresses information about vegetation management in the possession of PG&E and its contractors or subcontractors. Amici respectfully recommend Condition 11 be amended to require PG&E to consider information in its possession, including that of its contractors and subcontractors, about the status of utility poles including the status of pole inspections. Two stories by Jaxon van Derbeken, with NBC NEWS BAY AREA, raise concerns that PG&E repeatedly and falsely reported to the CPUC that it had timely completed more than 41,000 pole inspections, when in fact it was dramatically behind and more of the inspections not completed were in high wildfire danger areas.[10]

Mr. van Derbeken reported on February 12, 2021 that PG&E "has informed state regulators that it failed to test and treat more than 6,000 of its electric distribution power poles – including about 2,000 in high fire threat areas – despite regulatory reports asserting that all of its poles had been inspected as required by state law." Additionally, that story states PG&E reported it "surveyed most of the 41,000 poles – including more than 12,500 in high-fire-threat areas [it had previously reported as not inspected]– and found that most had, in fact, either been

--------------------------------

[10] Jaxon van Derbeken, *PG&E Admits Missing 'Critical' Pole Checks in Fire Risk Areas*, NBC BAY AREA NEWS, Feb. 12, 2021, https://www.nbcbayarea.com/investigations/pge-admits-missing-critical-pole-checks-in-fire-risk-areas/2467051/ [hereinafter, *van Derbeken, Feb. 12, 2021*]; Jaxon van Derbeken, *PG&E Scrambles to Check 41,000 Power Poles Lacking Key Records*, NBC BAY AREA NEWS, Dec. 15, 2020 (quoting Professor Sandoval regarding PG&E's misrepresentation to the FCC about its inspection more than 41,000 utility poles), https://www.nbcbayarea.com/investigations/pge-scrambles-to-check-41000-power-poles-lacking-key-records/2424389/. [hereinafter, *van Derbeken, Dec. 15, 2021*].

inspected – required at least once every 20 years -- or did not qualify for inspection. Some 6,212 poles, however, were not inspected -- despite PG&E telling regulators it had inspected all its poles as required in several annual regulatory filings."[11] PG&E belatedly discovered it falsely reported to the CPUC that it had completed pole inspections, a failure found through an audit.[12]

NBC Bay Area reports that "PG&E told regulators in November it intended to account for what led it to falsely report all inspections had been performed. But CPUC regulators say the company has not submitted that promised explanation to date and they are reviewing the company's submissions so far, and may take further action, if deemed necessary."[13] After the audit, "PG&E informed the CPUC that work has now been completed on 5,081 of those 6,212 poles, with the remaining to be completed by mid- to late-2021."[14]

PG&E has yet to explain why it made reports to the CPUC which did not comport with actual inspection work done. The CPUC will analyze and address issues of false made reports to the CPUC, addressing the issue under its Rules of Practice and Procedure. The CPUC's potential sanction of PG&E for false reporting or non-compliance with pole safety conditions may take a year to eighteen months or more to address once the CPUC initiates a formal proceeding on this matter. The CPUC has not yet issued any order to PG&E about its pole inspection process, compliance, or data management.

**Amici respectfully recommend this Court adopt probation modifications to address PG&E's conduct that undermines public safety during its probation and to rehabilitate the felon PG&E.** PG&E's false reports regarding its pole inspections, its delayed inspections, and record-keeping failures associated with that

---

[11] *van Derbeken, Feb. 12, 2021, supra note 10.*
[12] *van Derbeken, Dec. 15, 2020, supra note 10.*
[13] *van Derbeken**, Feb. 12, 2021**, supra note 10.*
[14] *Id.*

inspection program each undermine public safety and underscore the need for probation modification conditions to rehabilitate PG&E.

**Amici recommend that this Court order PG&E to analyze and consider the status of its inspections of poles and other facilities in its operations including its power shutoff decisions.** PG&E should consider whether inspections have been completed in an area, and whether there has been a lengthy period since an inspection. In addition, PG&E should consider whether work is outstanding regarding poles or facilities in an area making deenergization or other operational decisions about an area. PG&E should also consider this information in its daily operations and strategic planning.

**H.   PG&E Should Be Required to Consider the Information in its Possession, or in the Possession of its Contractors or Subcontractors Regarding the Analysis and Status of PG&E Facilities Including Hardware on Utility Poles, Towers, or Associated with Conductors**

The report by Brandon Rittiman with ABC10, dated February 17, 2021, sheds light on PG&E's knowledge of substantial deterioration in its hanger plates to which C-hooks attach at least six months before the 2018 Camp Fire. PG&E's Applied Technology Services Lab studied and reported on substantial hangar plate wear. Hangar plates are used on utility towers to attach C-hooks, which in turn attach to insulator assemblies, and hold energized conductors away from metal utility towers. The Applied Technology Services Lab reports and shows photographs of hanger plate holes that should have been round but were instead keyhole shaped. This distorted shape and excessive wear results from decades of metal-on-metal friction as the C-hook hung on the hanger plate and swayed in the wind. The report also raises concern about cracking inside the metal plate, a condition that would not be apparent from visual inspections on which PG&E appears to primarily rely.

/ / /

24

PG&E's Applied Technology Services Lab report raises grave concerns about what PG&E knew prior to the Camp Fire, and its actions or inaction to detect, prevent, or address similar conditions.[15] Mr. Rittiman's report for ABC10 underscores that PG&E's poor information management drives its safety problems. PG&E has issued no report that indicates any follow-up, inspection work, or additional analysis performance resulting from the report of PG&E's metallurgical analysis that showed substantial hanger plate deterioration. Mr. Rittiman's story contains an update that states PG&E submitted a redacted version of the report by PG&E's Applied Technology Services Lab to this Court.

PG&E's Applied Technology Services Lab report and Mr. Rittiman's February 17, 2021 story raise serious concerns about whether PG&E's inspections of conditions are properly and promptly assessing the true status of its assets. Metallurgical analysis provides more information than visual inspection. When metallurgical analysis is combined with information about parts including asset age, more information can be assessed to ensure safe operation.

**This Court should order PG&E to report on the actions it has taken to conduct additional examinations of hangar plates and other facilities or assets in response to the Applied Technology Services Lab's report or any other analysis of the condition of PG&E's assets.**

**Amici respectfully suggest this Court order PG&E to consider any information in its possession, and that of its contractors or subcontractors, about the status or wear of any of its assets or facilities.**

---

[15] Brandon Rittiman, *ABC 10 Investigation: PG&E knew old power line parts had 'severe wear' months before deadly Camp Fire*, ABC10, Feb. 17, 2021, https://www.abc10.com/article/news/local/wildfire/run-to-failure-what-pge-knew-and-when/103-e4654585-1036-47bb-9078-137893ac242d. [hereinafter *Rittiman, Feb. 17, 2021*].

At the May 28, 2020 hearing in this federal criminal probation, Mr. Orsini said for PG&E that PG&E's inspection program was primarily based on asset condition. He made this argument attempting to rebuff the imposition of probation conditions that would require PG&E to consider asset age. On page 33 of the May 28, 2020 hearing Mr. Orsini stated at lines 7-11:

> Asset age is not the primary motivator or even one of the key motivators of the maintenance of these systems. This is a condition-based inspection program. It's looking at the specific condition that exists. That is the industry standard.

Whether or not maintenance and operation based on condition inspection, with no regard to asset age is or is not the industry standard, is not the relevant question. Rather, the issue is whether PG&E's operation and maintenance comply with applicable law including CA PU Codes 451, 8386(a), Public Resources Code Section 4293, GO 95, FERC FAC-003-4, and the conditions of PG&E's probation.

**Amici further propose adding language to condition 11 that requires PG&E to consider information in its possession, and in the possession of its contractors or subcontractors, regarding the status or analysis of PG&E facilities or equipment, and in PG&E operations including deenergization decisions.** If PG&E is aware that substantial hanger plate wear, for example, has been found on samples of plates from its towers, PG&E should consider that information and the status of repair or replacement in its operational decisions including deenergization. PG&E should also consider that information in its strategic and risk planning.  Amici respectfully suggest amendments to Proposed Condition 11 to address this safety issue.

/ / /

/ / /

/ / /

/ / /

## II. PROPOSED AMENDMENTS TO SECTION 11, ADDITIONAL MODIFICATIONS PROPOSED BY AMICI:

To achieve the goals of federal criminal probation and address the issues raised above, Amici proposed the following additional modifications to condition 11 as highlighted in italics.

*Proposed Condition 11*: In determining which distribution lines in Tier 2 or Tier 3 to de-energize during a PSPS, PG&E must take into account all information in its possession and in the possession of its contractors and subcontractors concerning the extent to which trees and/or limbs are at risk of falling on those lines in a windstorm. In determining which distribution lines to de-energize during a PSPS event, PG&E will implement this condition by July 1, 2021, by considering the existence of all outstanding vegetation management work tagged "Priority 1" or "Priority 2" *and work that would be classified under CPUC General Order 95, Rule 18 as Level 1 or Level 2 that require correction within 12 months*, as well as compliance with CA PU Codes 451, 8386(a), Public Resources Code Section 4293, GO 95, FERC FAC-003-4, within PG&E's service territory that is subject to potential de-energizations. PG&E shall also consider the approximate number of trees tall enough to fall on the line irrespective of the health of the tree and irrespective of whether the tree stands outside or inside prescribed clearances. The latter may be done by simply rating the total approximate number of such tall trees along a line as "None," "Few," "Average" or "Many," and by treating the "Many" category as posing a greater risk than the "Average" category and the "Average" category as posing a greater risk than the "Few" category and so on. *PG&E shall also consider tree species and vegetation that may contact its lines or facilities by conducting an analysis of the types of trees and vegetation that have commonly contacted its lines or facilities (for example, transformers) during the past five years, analyzing factors including tree type, tree condition (e.g. diseased, infected, or dying). PG&E shall submit that analysis to the Monitor, the DOJ, and all parties to this proceeding including Amici by May 2021 and consider that analysis in its implementation of this condition of probation by July 1, 2021. PG&E shall also consider whether reclosers are installed and operational for circuits, lines, and tap lines to make decisions about power shutoffs and other operational and strategic decisions.*

/ / /

*PG&E shall also consider the status of its inspection compliance including its inspection of utility poles. [consider status of PG&E information regarding facilities and infrastructure vegetation may contact]. The status of pole inspections and information in its possession regarding the status and risks of facilities including, but not limited to, facilities that may be affected by contact with vegetation or wind such as cold end hardware including hanger plates, C-hooks, and assemblies, transformers, conductors, and other assets, shall be considered in PG&E operations including deenergization decisions.*

## III.   COMMENTS RE PROPOSED CONDITIONS 12

### A. **Comments Regarding Proposed Condition 12**

Consideration of the additional factors listed below in deenergization and operational decisions will ensure the implementation of Condition 11, protect public safety, and rehabilitate recidivist felon, PG&E.

### B. **Proposed amendments to Section 12:**

*Proposed Condition 12:* To the extent that such information shows that such trees and limbs present a safety hazard in the event of a windstorm, PG&E must make a specific determination with respect to that distribution line and it must de-energize it unless PG&E finds in writing that there are specific reasons to believe that no safety issue exists.

*Where PG&E has inspection or compliance gaps or has information about contact risks from vegetation, it shall consider that information in its deenergization decision-making process. PG&E shall also consider the status of its pole inspections in areas under consideration for deenergization, and its analysis of the risks and status of facilities and its information management systems and tracking for compliance in its deenergization decisions. PG&E shall make a written report to the public, monitor, this Court, and to all parties to this proceeding including Amici, about its findings on compliance with inspection requirements and its analysis of the conditions of its facilities and information management systems as applied to its deenergization decisions within thirty days of a deenergization event, and work to*

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*improve its compliance and information management to reduce the need to resort to denergization to protect public safety.* PG&E will implement this condition by July 1, 2021.

Respectfully submitted,

CATHERINE J. KISSEE-SANDOVAL
Associate Professor
Santa Clara University School of Law

Dated:  February 19, 2021        */s/Catherine J.K. Sandoval*, Esq.,


AGUIRRE & SEVERSON, LLP

Dated:  February 19, 2021         */s/Maria C. Severson*
Maria C. Severson, Esq.,
Attorneys for *Amici* Petitioners
Alex Cannara and Gene A. Nelson

Case 3:14-cr-00175-WHA   Document 1313   Filed 02/19/21   Page 33 of 35

**Amici, Exhibit A**

Screen Shot
of PG&E Exhibit 1 of
PG&E Document 1300-1

Case 3:14-cr-00175-WHA   Document 1300-1   Filed 02/12/21   Page 11 of 19

| Cust.Inf. | MAP | History |

**Inspection Record Detail**

| | | | | City: | County: | Directions: | | Inspector / Company: |
|---|---|---|---|---|---|---|---|---|
| | | | | IGO | SH | S/ON PLACER--W/ON SOUTH FORK RD--N/ON ZOGG MINE, N/OF LARRY HORSE LN | | - CNU |

| Division: | Circuit: (0103401101) | SSD #: | SSD Rte #: | Routing #: | (none): | Area: | SRA | Alerts: |
|---|---|---|---|---|---|---|---|---|
| North Valley | GIRVAN 1101 | 4855 | 50 | 1370 | | P-25 | Yes | AX  NF  PI |

| Insp Date / Time: (preload) | Tag Type: | Tag Number: | Line Name: | | Pole Num: | Quad Map: | Removal #: | Customer Name/Phone: |
|---|---|---|---|---|---|---|---|---|
| 10/12/2018 9:24:39 AM | | | | | | | 3872742 | |

**Comment:**
P58 TP ON DRWY @ 1ST DRWY ENT PAST 8455 ADD FLGD GT P59 1S/W OF P58 TP ABOVE ZOGG MINE RD CUST WANTS TO KNOW WHO IS ON PROPERTY MUST CALL TO HAVE GT OPENED

| Audit | Last Edit: 10/12/2018 12:12:01 PM by

| Tree Number | Tree Species: | Crew: | Priority: | TGR: | Owned By: | Height | DBH | Clearance | Prox: | Cycle: | Qty: | Trim Type: | Account: | Wire Conditions: | Insp Date: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Live Oak | CA | Routine | No | Private | 45 | 9 | | Inside | FS-R1A-Trt | | FS-R1A-Trt | FID | | 10/12/2018 AM |
| | **Comment:** @ P59; DEAD+ROT, UP HILL | | | | | | | | | **Work Request:** CINV1001518 | | **WC Date:** 2/15/2019 | **WC Qty:** 1 | **WC Trim:** FID | **Completed By:** | **Invoice:** XX (104) |
| | **Lat/Long:** 40.538677, -122.562037  Google Map! | | | | | | | | | **External TreeID:** W12256203?N40538677 | | | | | Audit | | **Last Edit:** 10/12/2018 by |
| | **Rx Comment:** | | | | | | | | | | | | | | |

| Tree Number | Tree Species: | Crew: | Priority: | TGR: | Owned By: | Height | DBH | Clearance | Prox: | Cycle: | Qty: | Trim Type: | Account: | Wire Conditions: | Insp Date: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Gray Pine | CA | Routine | No | Private | 45 | 8 | 99 | Inside | FP-Rmv1 A | | M | FIB | | 10/12/2018 9:15:33 AM |
| | **Comment:** @ P59; DEAD, UP HILL | | | | | | | | | **Work Request:** CINV1001518 | | **WC Date:** 2/15/2019 | **WC Qty:** 1 | **WC Trim:** FIB | ted By: | **Invoice:** XX (104) |
| | **Lat/Long:** 40.53868, -122.562035  Google Map! | | | | | | | | | **External TreeID:** W12256203?N40538680 | | | | | Audit | | **Last Edit:** 10/12/2018 by |
| | **Rx Comment:** | | | | | | | | | | | | | | |

| Tree Number | Tree Species: | Crew: | Priority: | TGR: | Owned By: | Height | DBH | Clearance | Prox: | Cycle: | Qty: | Trim Type: | Account: | Wire Conditions: | Insp Date: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | Live Oak | CA | Routine | No | Private | 25 | 14 | 16 | Inside | Rm | | Slope | SL | | 11/2/2017 PM |
| | **Comment:** 1S/W OF P59 | | | | | | | | | **Work Request:** SHNV1024545 | | **WC Date:** 12/20/2017 | **WC Qty:** 1 | **WC Trim:** SL | Completed By: | **Invoice:** TR (104) |
| | **Lat/Long:** 40.538212, -122.561195  Google Map! | | | | | | | | | **External TreeID:** W12256219?N40538212 | | | | | Audit | | **Last Edit:** 10/12/2018 9:24:38 AM by |
| | **Rx Comment:** | | | | | | | | | | | | | | |

| Tree Number | Tree Species: | Crew: | Priority: | TGR: | Owned By: | Height | DBH | Clearance | Prox: | Cycle: | Qty: | Trim Type: | Account: | Wire Conditions: | Insp Date: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4 | Gray Pine | CA | Routine | No | Private | 85 | 24 | | Inside | Rm | | FP-Ov A | FOA | | 10/12/2018 9:15:33 AM |
| | **Comment:** 3S/W OF P59; REMOVE DEAD LIMB | | | | | | | | | **Work Request:** CINV1001518 | | **WC Date:** 2/15/2019 | **WC Qty:** 1 | **WC Trim:** FOA | ted By: | **Invoice:** XX (104) |
| | **Lat/Long:** 40.538678, -122.56236  Google Map! | | | | | | | | | **External TreeID:** W12256236?N40538678 | | | | | Audit | | **Last Edit:** 10/12/2018 by |
| | **Rx Comment:** | | | | | | | | | | | | | | |

| Tree Number | Tree Species: | Crew: | Priority: | TGR: | Owned By: | Height | DBH | Clearance | Prox: | Cycle: | Qty: | Trim Type: | Account: | Wire Conditions: | Insp Date: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | Gray Pine | CA | No Trim | No | Private | 80 | 23 | 0 | Inside | Rm | | Side | M | | 6/25/2012 PM |
| | **Comment:** 3 & 4S/W/O P59 | | | | | | | | | **Work Request:** | | **WC Date:** | **WC Qty:** | **WC Trim:** | **Completed By:** | **Invoice:** Not Worked |
| | **Lat/Long:** | | | | | | | | | **External TreeID:** | | | | | Audit | | **Last Edit:** 10/12/2018 9:24:37 AM by |
| | **Rx Comment:** | | | | | | | | | | | | | | |

| Tree Number | Tree Species: | Crew: | Priority: | TGR: | Owned By: | Height | DBH | Clearance | Prox: | Cycle: | Qty: | Trim Type: | Account: | Wire Conditions: | Insp Date: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6 | Live Oak | CA | Routine | No | Private | 40 | 13 | 12 | Inside | Rm | | Side | M | | 6/25/2012 PM |
| | **Comment:** 9S/W/O P59 | | | | | | | | | **Work Request:** SHNV1018602 | | **WC Date:** 8/7/2012 | **WC Qty:** 1 | **WC Trim:** SD | ed By: | **Invoice:** TR (104) |
| | **Lat/Long:** | | | | | | | | | **External TreeID:** | | | | | Audit | | **Last Edit:** 10/12/2018 9:24:37 AM by |

**Amici, Exhibit B**

Photograph of PG&E Hangar Plate Wear Documented in PG&E's Applied Technology Services Lab Reported as reported by Brandon Rittiman, *ABC 10 Investigation: PG&E knew old power line parts had 'severe wear' months before deadly Camp Fire*, ABC10, Feb. 17, 2021, https://www.abc10.com/article/news/local/wildfire/run-to-failure-what-pge-knew-and-when/103-e4654585-1036-47bb-9078-137893ac242d. [hereinafter *Rittiman, Feb. 17, 2021*].

 

**Amici Exhibit C**

Photograph of Gray Pine,
Tree of Interest
(Dkt. No. 1250-4).

