AROCLES AGUILAR, SBN 94753
CHRISTINE JUN HAMMOND, SBN 206768
CHRISTOFER C. NOLAN, SBN 229542
California Public Utilities Commission
505 Van Ness Avenue
San Francisco, CA  94102
Telephone:  (415) 696-7303
Facsimile:  (415) 703-4592
Christofer.Nolan@cpuc.ca.gov

Attorneys for the California Public Utilities Commission and
Marybel Batjer, Martha Guzman Aceves, Clifford Rechtschaffen,
Genevieve Shiroma, and Darcie Houck in their official capacities as
Commissioners of the California Public Utilities Commission

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 14-cr-00175-WHA |
| Plaintiff, | **CPUC MOTION FOR LEAVE TO FILE AMICUS LETTER** |
| vs. | |
| PACIFIC GAS AND ELECTRIC COMPANY, | Hearing Date: 03/09/2021<br>Time:          8:00 am<br>Courtroom:  12, 19th Floor<br>Judge:        Hon. William H. Alsup |
| Defendant. | |

**CPUC MOTION FOR LEAVE TO FILE AMICUS LETTER**

The California Public Utilities Commission ("CPUC") hereby seeks leave of the Court to file an *Amicus* letter regarding the new proposed terms of probation for defendant Pacific Gas and Electric Company ("PG&E"). Federal courts have inherent authority to entertain Amicus briefs. *In re Bayshore Ford Truck Sales, Inc.*, 471 F.3d 1233, 1249, n.34 (11th Cir. 2006).

The CPUC's proposed letter is attached hereto as **Exhibit 1**.

Respectfully submitted,

By:    /s/      *Christofer C. Nolan*
February 19, 2021
AROCLES AGUILAR
CHRISTINE JUN HAMMOND
CHRISTOFER C. NOLAN

Attorneys for the CALIFORNIA PUBLIC UTILITIES COMMISSION

**CPUC MOTION FOR LEAVE TO FILE AMICUS LETTER**
Case No. 14-CR-00175-WHA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 1

**CPUC MOTION FOR LEAVE TO FILE AMICUS LETTER**

Case No. 14-CR-00175-WHA

STATE OF CALIFORNIA                                                     GAVIN NEWSOM *Governor*

## PUBLIC UTILITIES COMMISSION
505 VAN NESS AVENUE
SAN FRANCISCO, CA  94102-3298



February 19, 2021


**VIA ELECTRONIC MAIL**


Honorable William H. Alsup
United States District Court
Northern District of California
Courtroom 12 - 19th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

  *Re: Proposed Probation Conditions 11 and 12 in Case No. 14-cr-00175-WHA*

Dear Judge Alsup,

The California Public Utilities Commission ("CPUC") understands the Court has solicited party comment on proposed probation conditions 11 and 12 for defendant Pacific Gas and Electric Company ("PG&E") contained in your order of February 4, 2021.  Although not a party to the instant proceeding, the CPUC respectfully offers the Court an update on the CPUC's ongoing public safety power shutoff ("PSPS") proceedings and some critical context to any potential order affecting PG&E's PSPS protocols.

The CPUC agrees that PSPS can be an important and vital tool in preventing and mitigating catastrophic wildfires in California at this time.  After years of collaborating with our emergency, first responder, and state and local government partners, conferring with wildfire mitigation experts, and hearing first-hand accounts from the public directly impacted by PSPS, the CPUC respectfully submits that PSPS is properly understood as a utility's *tool of last resort* for preventing wildfires under extreme weather conditions.  The CPUC does not object to new proposed terms of probation 11 and 12, as modified by PG&E and the Government;[1] however, the February 4 versions of proposed conditions 11 and 12, which add consideration of tree density, may unduly broaden PG&E's PSPS events beyond the scope that has been vetted by safety experts and parties in ongoing CPUC proceedings.

The CPUC has an ongoing proceeding with a purpose to establish guidelines to ensure that utilities – when they must call PSPS events – limit their impact as much as possible and safely execute PSPS.  This rulemaking, discussed further herein, provides an iterative process with

---

[1] See CPUC letter to the Court (February 2, 2021) (ECF 1288).

Hon. William H. Alsup
February 19, 2021
Page 2

robust stakeholder participation that results in updates to CPUC guidelines aimed at minimizing the use and impact of PSPS based on lessons learned from prior wildfire seasons.  Without a thorough vetting of the February 4 versions of the proposed probation conditions, the CPUC is concerned that these changes to PG&E's PSPS protocols may cause more public safety harm than good.

The CPUC believes the most important voices on the safety impacts, risks, and benefits of PSPS are those directly impacted by any utility PSPS event:  the members of the public and utility customers at the center of PSPS outages and their local governments and first responders.  By way of offering the Court a fuller consideration of any modifications to probation conditions that affect PG&E's PSPS actions, the CPUC provides excerpts from parties that have argued:

1. *PSPS Should Only Be an Option of Last Resort*

2. *The IOUs Should Limit the Footprint and Duration of PSPS Events*

3. *Overly Broad PSPS Events Can Transfer the Risk from IOUs to the Public*

4. *Access and Functional Needs, Economically Disadvantaged, and Limited English Proficiency Households Are Disproportionately Impacted and Especially Vulnerable During PSPS Events*

5. *PSPS Events Can Impair, Fatigue, and Even Overwhelm Critical First Responder Capabilities at State and Local Levels*

6. *De-Energized Communications Networks Can Impair Public Safety During Wildfire Conditions, At the Time When They Are Most Needed*

7. *Electricity Is Required to Pump Water for Firefighting and for Potable Water Needs*

8. *Broadening PSPS Might Increase Confusion At a Time When Clarity and Coordination Are Most Critical*

9. *PSPS Alerts Themselves Can Heighten Public Alarm*

The CPUC's rulemaking and adjudicatory proceedings are the central public forum for the parties affected by any changes to PSPS protocols, and local utility customers and representatives, including local emergency and public welfare agencies, have attested that PSPSs themselves can cause unsafe conditions and consequences.  The CPUC here presents some of their comments, many of whose voices may not have reverberated into this Court.  These parties raise important points that inform the CPUC's deliberations.

The CPUC continues to actively consider how to account for and mitigate, to the extent possible, the clear testimony demonstrating that PSPS events can harm the public even as they offer a tool for reducing wildfire risk that in turn benefits the public.  This issue is the highest priority for the CPUC.  The tradeoffs are complicated, but these policy decisions are presently front and center before the CPUC.

Hon. William H. Alsup
February 19, 2021
Page 3

## U̲PDATE OF CPUC P̲ROCEEDINGS TO I̲MPROVE THE U̲TILITIES' PSPS I̲MPLEMENTATION

While there remains considerable room for improvement as to how all IOUs, including PG&E, conduct their PSPS events, there are numerous inevitable hardships that are embedded in any PSPS event.  There are at present two pending proceedings at the CPUC addressing the best means of carrying out PSPS events for all of the investor-owned utilities ("IOUs") under the CPUC's jurisdiction. These proceedings address among other matters, enforcement and improving guidelines for the safe and judicious use of PSPS. These proceedings reflect the considered judgment of the CPUC about the appropriate criteria and circumstances for instituting PSPS.  In the first proceeding, the CPUC issued ***Rulemaking ("R.") 18-12-005 on December 13, 2018, "Order Instituting Rulemaking to Examine Electric Utility De-Energization of Power Lines in Dangerous Conditions,"*** ("R.18-12-005"), naming all CPUC-regulated electric IOUs as respondents. Notice of the rulemaking and invitations to intervene were widely distributed, including to 14 separate state and civic organizations to enlist their participation.[2]  As a result, there are over 60 parties contributing to this proceeding, including those whose constituents are most impacted by PSPS events. To illustrate the breadth of interests represented in this proceeding, the parties are listed in **Appendix B**.

After receiving input from all the participants in Phase 1 of R.18-12-005, the CPUC issued Decision ("D.") 19-05-042 on June 4, 2019. A true and correct copy is attached hereto as **Exhibit 1**. Appendix A to D.19-05-042 consists of  27 pages of "De-Energization (Public Safety Power Shut Off) Guidelines" that address overarching principles for PSPS events and adopt uniform definitions. The Guidelines also consider the timing and manner of notifications, who should be notified, in what priority, and by whom. They focus on the identification of First/Emergency Responders/Public Safety Partners, critical facilities and infrastructure, and access and functional needs populations. The Guidelines also concern the content of notifications of a PSPS event and the methods IOUs should employ to communicate and coordinate with Emergency Operation Centers and other public safety partners. Finally, the Guidelines also address the issues of post-PSPS event reporting, requests to delay PSPS events, and the de-energization of transmission lines.

Phase 1 of R.18-12-005 dealt primarily with communication, coordination, and post-PSPS reporting. Phase 2 of the proceeding examined the IOUs' handling of PSPS events during the wildfire season of 2019 in light of the Phase 1 Guidelines, and then adopted additional Phase 2 Guidelines addressing Working Groups and Advisory Boards, de-energization exercises, who should receive notice, when should notice occur, how should notice occur, community resource centers, restoration of service upon conclusion of the need for de-energization, transportation resilience, medical baseline and access and functional needs populations, transparency, and definitions. These are contained in the CPUC's June 5, 2020 D.20-05-051, a true and correct copy of which is attached hereto as **Exhibit 2**.

---

[2] Notice of the Rulemaking 18-12-005 was published in the CPUC's Business Meeting Agenda and Daily Calendar, and notice was served on the service lists of nine formal proceedings listed in Appendix A hereto.

Hon. William H. Alsup
February 19, 2021
Page 4

Within R.18-12-005, the CPUC is also considering whether to sanction PG&E for its mishandling of PSPS events in October 2019.  The R.18-12-005 proceeding remains open and PG&E may be subject to penalties for its mishandling of the October 2019 PSPS events.[3]

The second ongoing proceeding at the CPUC to address PSPS events is ***Investigation ("I.") 19-11-013,*** which commenced on November 13, 2019 when the CPUC issued an ***"Order Instituting Investigation on the Commission's Own Motion on the Late 2019 Public Safety Power Shutoff Events."***  The CPUC instituted I.19-11-013 to determine whether California's electric IOUs prioritized safety and complied with the CPUC's regulations, requirements, and PSPS Guidelines with respect to their PSPS events during October and November of 2019.  As in R.18-12-005, there are a large number of participants in the I.19-11-013 proceeding representing numerous constituencies.  The parties are listed in **Appendix C**.

As a result of these two enforcement efforts by the CPUC, the continuous updates to the Guidelines adopted in the rulemaking, and ongoing scrutiny by the CPUC, other elected leaders, and the public means that PG&E and all of California's utilities are showing improvements in its PSPS implementation.  But while there remains considerable room for improvement as to how all IOUs, including PG&E, conduct their PSPS events, customers inevitably face hardships from any PSPS event – even if one is perfectly executed.

In its proceedings, the CPUC has sought to hear from a diverse array of constituents in communities most likely to be affected by prolonged PSPS events. While recognizing the role that PSPS events have to play in wildfire risk mitigation, most participants have argued for fewer, more targeted PSPS events rather than more or broader ones.

### SELECT COMMENTS IN THE CPUC'S RULEMAKING TO EXAMINE ELECTRIC UTILITY DE-ENERGIZATION OF POWER LINES IN DANGEROUS CONDITIONS (R.18-12-005)

The CPUC offers the following select excerpts of stakeholders' filed comments and briefs in R.18-12-005 to assist the Court as it weighs if and how to impose additional probations conditions on PG&E relating to PSPS.[4]  These excerpts are the very voices of those who are, or those who represent those who are, directly affected by PSPS.  The broad cross-section of parties reflects the value of public rulemakings to make difficult policy determinations around the

---

[3] The issue of CPUC penalties against PG&E arose at the Court's February 3, 2021 hearing and has at times been the subject of some confusion in the press. To clarify, in D.20-05-019, the CPUC penalized PG&E $2.137 billion for its role in igniting wildfires in 2017 and 2018, but it suspended $200 million of that amount in fines (less than 10%) because it jeopardized PG&E's bankruptcy reorganization and the amount would have been withdrawn from the Fire Victims Trust, which the CPUC sought to avoid. D.20-05-019 at 47-50; see also ECF 1217 in this case, "Comments of the California Public Utilities Commission In Response to Motion to Reconsider Order Modifying Conditions of Probation (ECF. Nos. 1187, 1209)," at 14-16.

[4] The choice of these select excerpts should not be misinterpreted as the CPUC's final determinations, nor for the weight the CPUC has placed on certain comments during its deliberative process.  Moreover, as excerpted, these comments are properly best understood in relation to the complete pleading and fuller context in which they were filed.

Hon. William H. Alsup
February 19, 2021
Page 5

inevitable complications caused by PSPS, as weighted against its value as a tool "of last resort" for preventing wildfires under extreme weather conditions.

### 1. *PSPS Should Only Be an Option of Last Resort*

At a recent CPUC meeting on SCE's execution of 2020 PSPS Events (January 26, 2021), both Thom Porter, Fire Chief and Director of CAL FIRE, and Mark Ghilarducci, Director of the California Governor's Office of Emergency Services ("Cal OES") within the Office of Governor Gavin Newsom, stressed that PSPS was always meant to be an option of last resort, not first resort. Parties agree.

> [Rural County Representatives of California ("RCRC")] member counties have suffered the lion's share of destruction caused by catastrophic wildfires over the past decade and experienced most of the state's Public Safety Power Shutoff (PSPS) events. We do not underestimate the risk of wildfire danger and appreciate the role that expertly-informed, tailored PSPS events play in avoiding catastrophic wildfires. At the same time, the awesome power to deenergize individuals and communities cannot be taken lightly and must always be used as a last resort. [] PSPS events are not mere inconveniences for many Californians. Rural areas are populated by a greater number of elderly persons, many of whom may rely on medical devices to sustain vital health care needs or have sensitivities to extreme heat. (RCRC Comments on the Safety and Enforcement Division's ("SED") Report (Dec. 2, 2020) at 2-3.)

> Finally, throughout the course of this proceeding, [the Center for Accessible Technology ("CforAT")] has repeatedly raised concerns that PG&E has not adequately honored the Commission's directive that de-energization can only be used as a measure of last resort, and has not considered the risks and harms of de-energization in balancing whether shutting off power will support public safety overall. (CforAT Opening Brief on Order to Show Cause ("OSC") Phase (Oct. 30, 2020) at 4-5.)

> … the appropriate admonition is that PSPS events can have serious consequences for PG&E's customers and shutting off the power should therefore be a carefully considered, finely calibrated, and well-coordinated last resort. (Comments of the County of Mendocino, the County of Napa, and the County of Sonoma on R.18-12-005 (Feb. 8, 2019) at 2.)

Hon. William H. Alsup
February 19, 2021
Page 6

As intervenors who have been involved in studying the issues surrounding proactive power shut-off since 2007, we are deeply concerned that in the light of the death, destruction, and ruin of the 2017 and 2018 fires there will be a push on the part of utilities, the Commission, politicians, and even the courts to resort to de-energization as a panacea for the power line fire problem. As we have stated in our previous filings on this issue, while shutoff is an important tool in the tool box it is also a dangerous one that may cause real harm and increased risk and not mere inconvenience. It is therefore essential that its use be quantitatively balanced against the risk reduction associated with preventing power line fires. We've argued for this approach from the beginning, consistently raising the need for a cost/benefit or risk/benefit analysis to determine shut-off criteria.  (Comments of Mussey Grade Road Alliance on R.18-12-005 (Feb. 8, 2019) at 6.)

## 2. *The IOUs Should Limit the Footprint and Duration of PSPS Events*

Given the substantial public health, safety, and environmental impacts related to deenergization, utilities must carefully evaluate the risks involved and strive to harden infrastructure and increase system resiliency to reduce the size, duration, and frequency of future PSPS events. (RCRC Comments on SED Report (Dec. 2, 2020) at 3.)

[Rural County Representatives of California] believes that new annual reports can paint a better picture of the utility's progress in reducing the size, scope, and frequency of PSPS events and mitigating their impacts. […] Based on that information, utilities should describe steps they will take to reduce the risk of deenergizing those circuits (including through system hardening, sectionalization, or deployment of microgrids), an estimated time to complete those projects, and explain how they are building local resiliency and mitigating effects in impacted communities in the interim."  (RCRC comments on SED Report (Dec. 2, 2020) at 6.)

Lastly, in addition to considering how to reduce the frequency of deenergization events, this proceeding should include consideration of how utilities can reduce the footprint/size of their de-energization events and deenergize more "surgically" to minimize impact.  (California Association of Small and Multi-Jurisdictional

Hon. William H. Alsup
February 19, 2021
Page 7

Utilities Comments on R.18-12-005 (Feb. 8, 2019) at 5.)

Yes. The Commission should restrict its authorization for de-energization to facilities located in areas that are most at risk of catastrophic wildfires, e.g. Tier 2 and 3 fire-threat areas. (East Bay Municipal Utility District Comments on R.18-12-005 (Feb. 8, 2019) at 4.)

Given the very real consequences that de-energization has on ratepayers, communities and businesses, the utility approach to de-energization should be thoughtful and planned rather than subject to seat-of-the pants discretion. In light of the potential for huge wildfire liabilities, utilities may not sufficiently value the adverse consequences and over-rely on de-energization as a means to limit the utility's future liabilities. (The Utility Reform Network Comments on R.18-12-005 (Feb. 8, 2019) at 3. )

Cal Advocates performed a superb analysis of affected customers inside of and outside of High Fire Threat Districts, and found that up to 53% of de-energized customers were outside of HFTDs during some 2019 shutoff events. (Mussey Grade Road Alliance Comments on SED Report (Dec. 2, 2020) at 10.)

3. *Overly Broad PSPS Events Can Transfer the Risk from IOUs to the Public and Local Governments and Their Emergency Services*

The Commission should make it clear that it is unacceptable for utilities to encourage customers to contact 9-1-1 for non-emergency issues to mitigate the impacts of PSPS events. As the Joint Local Governments note, "SCE's plan to have customers call 911 for nonmedical emergency issues related to a de-energization event was a problem for local governments, and also likely burdened those customers with significant expenses." Similarly, PG&E's Wildfire Mitigation Plan suggests using first responders to provide medical transportation of access and functional needs individuals to community resource centers. (Rural County Representatives of California Comments on SED Report (Dec. 2, 2020) at 10.)

Hon. William H. Alsup
February 19, 2021
Page 8

While advanced notifications for medically sensitive residents are
absolutely necessary, notifications alone fail to protect those
individuals from adverse PSPS-related impacts. Much of the
existing focus has been on notification and urging medically
sensitive residents to have a plan in place in case their power is
shut off during a PSPS event. This "hands-off" approach
inappropriately places unnecessary burdens on customers who
often lack the resources to adequately prepare for losing electricity,
particularly those customers who depend on electric-powered
medical equipment. We acknowledge the role that the Self-
Generation Incentive Program may play in helping to mitigate
these risks for some customers; however, those resources are
quickly being exhausted. []  We note (and greatly appreciate) that
the utilities have already made great strides in contracting with
community-based organizations to provide goods and services to
at-risk individuals to mitigate PSPS impacts. Less clear is whether
those organizations can fully satisfy customer demand before the
allocated resources are exhausted. While utilities are tapping into a
large network of organizations, it is not clear if any communities
remain unserved by that network or if individuals have fallen
through the cracks and been unable to obtain mitigation assistance.
(Rural County Representatives of California Comments on SED
Report (Dec. 2, 2020) at 10.)

In particular, the guidelines must be modified to ensure that
deenergization is only used after the IOUs conduct a clear
evaluation of the public safety risks of such a shut off (including
the risks to the most vulnerable populations, and including the
increased risks that come with a series of shutoffs affecting the
same communities), and those risks are determined to be lower
than the risks of keeping the power on, so that public safety overall
supports the need to turn off the power.  (Center for Accessible
Technology Comments on SED Report (Dec. 2, 2020) at 2.)

"[T]he key, underlying issue behind the authorization of grid de-
energization is the belief that such power shutoffs can be used to
advance public safety.… it remains unclear whether this is the
case. CforAT continues to recommend that the Commission should
directly consider the question of whether PSPS events actually
improve overall public safety. The SED Report confirms that the
IOUs only considered the risk of wildfire caused by utility

Hon. William H. Alsup
February 19, 2021
Page 9

facilities, without meaningfully or adequately documenting any effort to calculate or consider the risk to public safety from turning the power off. Nor did the IOUs or the Commission consider at any time the cumulative effects of multiple shutoffs on a community, or on the most vulnerable member of the communities that were subject to multiple events.  [] Finally, CforAT notes our continued concern about the way that de-energization shifts costs and responsibilities from the IOUs to individual customers and local governments. As discussed in our comments on the OII, a decision to turn off the power lowers risks for the IOU, while placing substantial burdens on other individuals and entities to respond and compensate. The SED Report acknowledges the utility's failure to consider risks to the public from deenergization, but it does not address the burden-shifting that has been a hallmark of the process. Both of these fundamental issues must be given consideration by the Commission in determining how to move forward.  (Center for Accessible Technology Comments on SED Report (Dec. 2, 2020) at 2-3.)

[C]omments of the Acton Town Council describe news reports providing examples of a purported generator fire that caused the "Thief" fire, destroying a home, and alleging that the destructive "Tick" fire was started by outdoor food preparation during a PSPS event. []  Every intervenor, including the Alliance, raised the lack of consideration of customer harm (safety and economic) as a major issue that needs to be addressed. As MGRA stated in its Report Comments: "As we have mentioned other filings, IOUs actually have a counter-incentive to identify the full impacts, risks, and harm caused by de-energization, because by doing so they could potentially find damages for which they could be held liable…" (Mussey Grade Road Alliance Comments on SED Report (Dec. 2, 2020) at 5.)

Customer harm from shutoff is not quantified and included in utility determinations for power shutoff. As MGRA noted in its previous comments in this docket: "Deenergization is a powerful but dangerous tool, and using it properly requires a rigorous and quantitative balancing of its harms and benefits in order to achieve the greatest public good. The utilities have little incentive to perform this analysis, since they directly benefit from the liability reduction they achieve by removing power line ignitions, and are

Hon. William H. Alsup
February 19, 2021
Page 10

unlikely to be held accountable for the often indirect harm caused by power shutoff. The Commission, therefore, must develop explicit guidelines for utility behavior regarding shutoff, and must lead the effort to determine the optimal balance between the intertwined mandates of safety and reliability. (Mussey Grade Road Alliance Comments on SED Report (Dec. 2, 2020) at 3-4.)

This threshold issue calls into question whether any of the chaotic events in the fall of 2019 were justified in the first instance. PG&E has continually asserted that its power shutoff events advance public safety by reducing the risk of wildfire ignition sparked by utility facilities. In reducing this specific wildfire risk, however, power shutoffs undeniably create other risks to public safety, and PG&E has never adequately considered whether public safety overall is advanced or reduced by utility created extended power outages. [] In its recounting of the events of Fall, 2019 and following, PG&E continues to try to contextualize the power shutoff events as necessary, though it has not ever engaged in adequate efforts to actively consider the risks associated with extended outages as compared to the risks of keeping the power on, and to focus on how it makes projections of fire risk. But there can be no dispute that PG&E had not given adequate consideration to the impact of its outages when it turned off the power repeatedly in the fall of 2019, resulting in chaos, harm, and costs to customers and communities that were impacted repeatedly. (Center for Accessible Technology Opening Brief on OSC Phase (Oct. 30, 2020) at 5.)

[At] the California Public Utilities Commission (CPUC or Commission) workshops on PSPS policies held on December 14, 2018 and January 9, 2019 as part of this proceeding …. The Commission heard extensive comments from local government Office of Emergency Services officials on best practices, coordination, planning, communication, notification and outage implementation issues highlighting the successes and challenges currently faced both prior to and following implementation of the new statewide PSPS policy. These participants have emphasized numerous ways in which planned, voluntary outages have strained existing local government and community emergency preparedness and response resources. (Local Government Sustainable Energy Coalition Comments on R.18-12-005 (Feb. 8, 2019) at 2.)

Hon. William H. Alsup
February 19, 2021
Page 11

> Under low and moderate wind conditions, there are 100 times
> more fires from causes other than power lines than fires are from
> power lines. Therefore even a small degradation in the ability of
> the public to deal with fires – the ability to report fires, the ability
> to respond to fires, to receive emergency information and
> broadcasts, to evacuate and to navigate through traffic – could
> have significant impacts on peoples' safety and well-being."
> (Mussey Grade Road Alliance Comments on R.18-12-005 (Feb. 8,
> 2019) at 4 n.8.)

### 4. Access and Functional Needs, Economically Disadvantaged, and Limited English Proficiency Households Are Disproportionately Impacted and Especially Vulnerable During PSPS Events

> Ever since the concept of deliberate de-energization of electrical
> facilities was first proposed by SDG&E following wildfires in
> 2007 (which were, at the time, the most destructive in California's
> history), advocates for utility customers with disabilities have been
> raising concerns about the harms that would come to pass for
> vulnerable customers if they were to be subjected to a prolonged
> power outage. […]  The risks identified back in 2009 included: •
> Loss of communications at customer premises; • Public safety
> impacts from degraded communications services (including
> inability to access 911 emergency services and inability for first
> responders to communicate with each other or the public); • Loss
> of access to new and information; • Direct and indirect risks of
> harm to customers with disabilities, including those who rely on
> devices powered by electricity as well as those who rely on
> medication that must be refrigerated, those who rely on specialized
> communications equipment, and those who need to maintain their
> environment within a narrow temperature range for their health.
> Direct risks are based on loss of critical medical support, and
> indirect risks include inability to communicate with caregivers and
> assistants and or inability to afford the costs of purchasing
> provisions to mitigate the risk of extended power outages; […] •
> Adverse impacts on water supplies and sewer service including
> potential impacts on the ability to fight wildfires that may ignite; •
> Externalized costs to prepare for and endure outages, as customers
> purchase items ranging from extra batteries and flashlights to
> portable generators and fuel in order to prepare for outages, and
> replace spoiled foods and medicines in the aftermath of an outage;

Hon. William H. Alsup
February 19, 2021
Page 12

• Harm to low-income customers who cannot absorb the
externalized costs; • Public safety risks, including use of generators
by people wo are not well trained (during times of high fire risk),
disrupted traffic and street lights, increased difficulty in conducting
orderly evacuations, diversion of public safety personnel from
other important activity; and • Loss of economic activity.  [ ]  This
failure to prepare for a well-identified set of risks and harms,
including failure to adequately identify and plan for
communications with AFN customers, and PG&E's focus on
shutting off the power alone, without considering the impacts of
the resulting outages, was not reasonable.  [ ]  While the
improvements over the course of 2019 (and into 2020) have been
real, within the formal record of this proceeding, PG&E has failed
to adequately respond to the specific issues raised by CforAT.
(Center for Accessible Technology Opening Brief on OSC Phase
(Oct. 30, 2020) at 6-8, 11, 12.)

[T]hose who live in rural areas where income levels are often
much lower than the statewide median household income. []
While we acknowledge that the utilities are making substantial
investments to harden their infrastructure and increase resiliency,
hundreds of thousands of Californians still had their power shut off
during one or more PSPS event this year. Those events coincided
with extreme heat and poor local air quality.  Rural County
Representatives of California Comments on SED Report (Dec. 2,
2020) at 5.)

The Counties' understanding is that PG&E used its list of
customers that signed up for Medical Baseline service, and that, in
some circumstances, the "customer" is actually a meter, not a
person. Using the Medical Baseline registry is problematic because
that program is significantly under-enrolled. The requirement that
customers self-register presents a barrier to entry for people who
have limited English language capabilities, cognitive issues or
severe physical impairments, sensory disabilities, medication or
other substance impairment, and psychosocial instability. In the
midst of the winter 2018 PSPS events, Napa County learned that
PG&E's Medical Baseline registry led PG&E to believe there were
146 medically vulnerable residents in the County; the County's
own In Home Support Services records identified over 900
medically vulnerable residents. Napa County also learned that
some of the "customers" PG&E identified were actually meters

Hon. William H. Alsup
February 19, 2021
Page 13

associated with master-metered mobile home parks or multitenant
buildings. (Comments of the County of Mendocino, County of
Napa, and County of Sonoma (Feb. 8, 2019) at 7.)

As described in response to Issue 3, above, one of the primary
impacts to vulnerable populations of shutting the power off is that
critical medical equipment, or medications that require
refrigeration, can be adversely affected. Patients who have left
ventricular assist devices, ventilators, oxygen concentrators,
electric wheelchairs, home IV infusion devices, home dialysis,
tube feeding pumps, suction pumps, and electric beds are
particularly impacted by loss of electricity. Shutting off the power
can also harm individuals and communities in remote areas,
particularly if communications towers lose power and deprive
these residents of phone service. Whether populations are
medically vulnerable or vulnerable due to remote location, the
most crucial elements of de-energizationare effective notice of a
potential PSPS event and protocols to address the needs of these
residents if and when the power goes out. (Comments of the
County of Mendocino, County of Napa, and County of Sonoma
(Feb. 8, 2019) at 14.)

While de-energizing power lines might reduce the potential for a
wildfire caused by utility equipment, a de-energization event has
enormous consequences on utility customers, especially the most
vulnerable communities. Utility customers on Medical Baseline
rates rely on utility service to operate life support equipment and
maintain appropriate temperatures in their homes. These customers
will be put in peril if not properly notified of and protected in a
deenergization event. Vulnerable customers, however, are not
limited to those enrolled in the Medical Baseline program. Some
customers, not otherwise eligible for Medical Baseline, may
require refrigeration for medicines or may be homebound and
reliant on paratransit for transportation. Low-income customers
can lose valuable wages if their workplaces are impacted or if
schools are closed, necessitating a lost day of work for childcare
purposes. Related, some children may lose out on the only meals
they can depend on if schools are cancelled. In some isolated
communities, loss of electric service could result in the loss of
other necessary services, including water pumping and
communications. (Opening Comments of The Utility Reform
Network (Feb. 8, 2019) at 2.)

Hon. William H. Alsup
February 19, 2021
Page 14

Other vulnerable populations may not be eligible for Medical
Baseline programs but may have limited mobility (elderly,
otherwise incapacitated). They may have difficulty relocating in
the event of a de-energization and could be left in harm's way
without access to communications if a wildfire occurs regardless of
the de-energization. Low-income customers face different
challenges. A de-energization could take away multiple days of
wages from a worker dependent on those wages for survival.
Closure of schools create child care challenges and may mean that
a child misses out on the few meals she can depend on each week.
Limited English Proficiency communities may be unaware that the
utility can rely on de-energization as a tool and without proper
outreach be caught off-guard by a de-energization event. Non-
citizen populations may be fearful or mistrusting of certain
communications, particularly those from the government given
deportation fears or other negative experiences.  (Opening
Comments of The Utility Reform Network (Feb. 8, 2019) at 9.)

5.  *PSPS Events Can Impair, Fatigue, and Even Overwhelm Critical First Responder
    Capabilities*

As a foundational issue, [Rural County Representatives of
California] strongly disputes the way the SED Report dismisses the
need for utilities to minimize PSPS related impacts because "the
Commission should also recognize that resources are also provided
by local jurisdictions." Local government personnel and resources
are already strained as a result of COVID-19, reduced revenues,
wildfire disaster response and recovery, and having to mitigate
PSPS impacts on their own facilities and operations. We agree
with the City of San Jose and believe it is inappropriate to presume
that the utilities should be relieved of any obligations to mitigate
PSPS impacts simply because local governments have stepped in
to protect the health and safety of their residents amidst the void
created by those utilities.  (Rural County Representatives of
California Comments on SED Report (Dec. 2, 2020) at 4.)

Effective communication with local governments, critical facilities,
and emergency responders is crucial to ensure that basic
infrastructure and safety services are not adversely affected.
Shutting off electricity affects the Counties' critical infrastructure,

Hon. William H. Alsup
February 19, 2021
Page 15

such as radio tower communications, water and fuel pumps, hospitals, and camera networks. De-energization also impacts resources and communication channels for first responders, tactical situational awareness, and the Counties' ability to effectively communicate with residents through alert and warning systems. Effective communication about the duration of a de-energization event is also necessary. The length of a PSPS event will almost always exceed the battery backup capabilities of cell towers and generators, which increases public safety risks for both residents and first responders.  (Comments of County of Mendocino, County of Napa, and County of Sonoma (Feb. 8, 2019) at 6.)

Finally, the Counties note that the costs to local governments for public safety response during PSPS events is heavily impacted by the level of uncertainty from PG&E. Local governments incur significant costs for staff overtime and disruption of operations beginning in the early stages of a PSPS notification and continuing for the duration of the event. This can include increased staffing for emergency management, public communications, dispatch, fire, law enforcement, and emergency operations centers. If PG&E continues to overstate or misstate the areas that will be impacted, if PG&E is unable to provide accurate information about the situation in real-time, and if PG&E is unable to communicate effectively with local governments, local emergency and public safety resources will be expended unnecessarily. If PSPS events are to become a regular event for PG&E, public safety capabilities will be stretched thin and will negatively impact local jurisdictions' budgets and resources, which will create the need for financial assistance or austerity measures.  (Comments of County of Mendocino, County of Napa, and County of Sonoma (Feb. 8, 2019) at 10.)

The key focus in developing de-energization guidelines will be on finding a good approach for balancing the public safety risk of wildfire with public safety risks of de-energization (which may include wildfire risk, since de-energizing circuits serving water pumping facilities could affect firefighting capabilities during and after the de-energization event).  (EBMUD, 2/8/19)

Hon. William H. Alsup
February 19, 2021
Page 16

### 6. *De-Energized Communications Networks Can Impair Public Safety During Wildfire Conditions, At the Time When They Are Most Needed*

There are a substantial number of Californians living in rural areas that either have no access to wireless service or where reception to wireless service is poor. As a result of landline provider migration away from resilient copper line telephone systems, many residents in these communities must have electricity in order to use the phone system – even to reach 9-1-1 or access emergency services. Often located in rugged terrain, many of these communities are also at increased wildfire risk. These are some of the communities in greatest need of reliable electricity (especially during the weather conditions that trigger PSPS events) because of an increased risk of wildfire. Residents in high fire risk zones need access to information about any fires that break out and any shelter-in-place or evacuation orders that may be issued by the local emergency manager. Conversely, residents also need to have the ability to quickly report wildfires to emergency responders because timely response to wildfire is often the key to effective management and containment.  (Rural County Representatives of California Comments on SED Report (Dec. 2, 2020) at 11-12.)

The essential use of cell phones in communications about events related to wildfires is well-known. Our rural constituents are concerned that the cellphone communication infrastructure could be unnecessarily compromised during a deenergization event. Power outages for those who depend on cellphone and internet service for communication create significant issues for ensuring information is adequately conveyed.  (Comments of the California Farm Bureau Federation on R.18-12-005 (Feb. 7, 2019) at 2.)

During disasters, communications providers play a key role delivering emergency messages, assisting in the communications between first responders and allowing families to remain in contact. TURN's Comments in this Rulemaking acknowledge the reliance of utility customers, particularly more vulnerable populations, on communications that could be lost in a de-energization event.  (Comments of The Utility Reform Network Supporting Joint Administrative Law Judge Ruling (Feb. 19, 2019) at 1.)

Hon. William H. Alsup
February 19, 2021
Page 17

Emergency services are compromised in a de-energization event.
As noted above, de-energization may limit access to
communications services. If communication services are down, the
utility and other emergency providers will have difficulty
contacting impacted communities, especially given the reliance of
many customers on mobile communications. De-energization will
cause the loss of traffic signals, creating gridlock and limiting the
ability of a community to evacuate in an emergency scenario.
Increased accidents and traffic control requirements will divert
emergency resources from managing a potential wildfire event.
(Opening Comments of The Utility Reform Network (Feb. 8,
2019) at 3.)

### 7. *Electricity Is Required to Pump Water for Firefighting and for Potable Water Needs*

Water utilities provide water to first responders for fire protection
and suppression, as well as essential drinking water service.
(Comments of California Water Association on R.18-12-005 (Feb.
8, 2019) at 1.)

Even with adequate advance notice, de-energization of electric
lines will present serious challenges for the safe operation of water
treatment facilities and pumping of water to meet fire flow
requirements, water quality and customer needs.  (Comments of
California Water Association on R.18-12-005 (Feb. 8, 2019) at 2.)

Water storage at higher elevations is limited. If water utilities are
not given time to prepare, de-energization of pumping stations will
eventually lead to a loss of water supply, which could affect
firefighting capabilities and water pressure. When potable water
distribution systems have inadequate pressure, the likelihood of
drinking water contamination goes up dramatically. Disinfection of
water facilities after a depressurization due to loss of electricity
could deprive local residents of potable water for days.  (East Bay
Municipal Utility District Comments on R.18-12-005 (Feb. 8,
2019) at 2.  )

Hon. William H. Alsup
February 19, 2021
Page 18

> As critical infrastructure and first response agencies (per the
> Standardized Emergency Management System (SEMS) and
> Homeland Security Presidential Directive (HSPD-8), Water
> Utilities relies on energy to provide clean drinking water to the
> public and water for fire suppression. Water and wastewater
> utilities are one of the largest consumers of energy in California,
> and the provision of water and wastewater services supports the
> energy production and transmission process.  []  As wildfires
> increasingly become a more significant threat to our state, our
> infrastructure and our residents, MWDOC understands and
> recognizes the need for investor owned utilities (IOUs) to be able
> to de-energize their systems to protect public safety.  It is the very
> same conditions that initiate de-energization that is a cause of
> concern for Water Utilities.  It is these same conditions in which
> electric reliability is needed most by Water Utilities to ensure
> services. With appropriate notification and coordination, however,
> Water Utilities can continue to provide drinking water, wastewater
> collections, and water for fire suppression even during a de-
> energization event.  (Comments of Municipal Water District of
> Orange County (Feb. 8, 2019) at 2.)

**8.** ***Broadening PSPS Might Increase Confusion At a Time When Clarity and
Coordination Are Most Critical***

> In 2019, PG&E attempted to inform local governments every time
> a new weather update impacted the outage footprint, which led to
> significant confusion for the local governments because the outage
> area was constantly changing. In 2020, PG&E adopted an outage
> update schedule closer to that used by CalFire, an agency that also
> oversees emergencies with constantly changing boundaries. It is
> important that the utilities inform local governments of changes to
> the scope of de-energization events, but the Commission should
> not adopt a strict requirement that every change in scope be
> reported within one hour. That requirement would create a
> constantly moving target that would stymie local response efforts
> instead of helping them.  (Comments of the Counties of Kern,
> Marin, Mendocino, Napa, Nevada, San Luis Obispo, Santa
> Barbara, and Sonoma, and the City of Santa Rosa on SED Report
> (Dec. 2, 2020) at 5.)

Hon. William H. Alsup
February 19, 2021
Page 19

When the public learns of an emergency or natural disaster that may affect them, they often contact their local government Office of Emergency Services (OES), fire department, police department, elected officials, and other local officials for information. During the October 9 de-energization event, Santa Rosa received multiple telephone calls on a variety of nonemergency numbers, as well as a large number of emails and social media postings from residents asking for information and expressing frustration and anger about the power shutoff. Marin County received similar calls from confused and frustrated residents to its Public Safety Answer Points, 911 call centers, EOC, and its emergency managers. Nevada County experienced higher than usual call volumes to its 2-1-1 telephone line, its Office of Emergency Services, its Sheriff's Department main dispatch line, and all six of its fire districts from customers looking for information about the de-energization event. The City of San José also became the default source of information for its residents who could not obtain information from PG&E's website or outage notifications; the City's residents were so eager for information that the City created a 12-person public information team and City staff provided language translation services. The information shortages created by PG&E's website meltdown were exacerbated by the buffered outage maps, which overstated the boundaries of the de-energized area, and the fact that PG&E had not mastered its process for providing lists of impacted customers and critical facilities to local governments. Nevada County's and Santa Rosa's efforts to provide information to their residents were also complicated by the fact that the news media often received information about the de-energization before local emergency management or the media had different information than the local government, and it was not clear which entities had the most accurate information.  (Opening Brief of the Counties of Kern, Marin, Mendocino, Napa, Nevada, San Luis Obispo, Santa Barbara, and Sonoma, and the City of Santa Rosa on OSC (Nov. 2, 2020) at 11-12.)

9. *PSPS Alerts Themselves Can Heighten Public Alarm*

Sonoma County observed that, during the October 15,2019 event, PG&E's public information regarding de-energization unnecessarily alarmed residents outside the PSPS area. PG&E's

Hon. William H. Alsup
February 19, 2021
Page 20

map of the shutdown areas was misleading and caused notable
concern and confusion because the map was not specific enough
about the areas in which PG&E planned to shut off the power.
(Comments of County of Mendocino, County of Napa, and County
of Sonoma (Feb. 8, 2019) at 9.)

At the most basic level, PG&E's shutoffs created such chaos and
fear that the inherent public safety harms of any shutoff were
substantially magnified. On this basis, there is no way for PG&E to
claim that its actions resulted in a net benefit to public safety.
(Center for Accessible Technology Opening Brief on OSC (Nov.
17, 2020) at 4.)

But any responsible public utility would understand that de-
energization can have chaotic and devastating consequences to its
customers and that the Commission expected IOUs to help
mitigate these risks.  (City of San Jose Rely Brief on OSC (Nov.
17, 2020) at 3.)

### CONCLUSION

The CPUC thanks the Court for its consideration of the foregoing.

Sincerely,


/s/      *Christine Jun Hammond*
AROCLES AGUILAR
CHRISTINE JUN HAMMOND
CHRISTOFER NOLAN
Attorneys for the CALIFORNIA PUBLIC
UTILITIES COMMISSION

## APPENDIX A

Notice of the CPUC's "Order Instituting Rulemaking to Examine Electric Utility De-Energization of Power Lines in Dangerous Conditions" (R.18-12-005) was served on the service lists of the following CPUC proceedings:

1. Rulemaking 18-10-007, Order Instituting Rulemaking Implement Electric Utility Wildfire Mitigation Plans Pursuant to Senate Bill 901 (2018);
2. Rulemaking 18-03-011, Order Instituting Rulemaking regarding Emergency Disaster Relief Program;
3. Rulemaking 15-05-006, Order Instituting Rulemaking to Develop and Adopt Fire Threat Maps and Fire Safety Regulations;
4. Rulemaking 15-06-009, Order Instituting Rulemaking Regarding Policies, Procedures and Rules for Regulation of Physical Security for the Electric Supply Facilities of Electrical Corporations Consistent with Public Utilities Code Section 364 and to Establish Standards for Disaster and Emergency Preparedness Plans for Electrical Corporations and Regulated Water Companies Pursuant to Public Utilities Code Section 768.6;
5. Application 15-09-010, Application of San Diego Gas & Electric Company for Authorization to Recover Costs Related to the 2007 Southern California Wildfires Recorded in the Wildfire Expense Memorandum Account (WEMA);
6. Application 17-07-011, Application of Pacific Gas and Electric Company for Authority to Establish the Wildfire Expense Memorandum Account;
7. Application 18-04-001, Application of Southern California Edison Company to Establish the Wildfire Expense Memorandum Account;
8. Application 18-09-002, Application of Southern California Edison Company for Approval of Its Grid Safety and Resiliency Program; and
9. Application 08-12-021, Application of San Diego Gas & Electric Company for Review of its Proactive De Energization Measures and Approval of Proposed Tariff Revisions.

Notice of R.18-12-005 was also served on:

1. State Board of Forestry and Fire Protection (CAL FIRE);
2. California Energy Commission;
3. State Air Resources Control Board;
4. California Governor's Office of Emergency Services;
5. California Department of Fish and Wildlife;
6. California Infrastructure and Economic Development Bank;
7. California Office of Planning and Research;
8. California Department of Parks and Recreation;
9. California State Association of Counties;
10. League of California Cities;
11. California Native American Heritage Commission;
12. California Municipal Utilities Association;
13. California State Sheriffs' Association; and
14. California Fire Chiefs' Association.

**APPENDIX B**

**Respondents** to the CPUC's "Order Instituting Rulemaking to Examine Electric Utility De-Energization of Power Lines in Dangerous Conditions" (R.18-12-005) are:

1. Pacific Gas and Electric Company;
2. Southern California Edison Company;
3. San Diego Gas & Electric Company;
4. Liberty Utilities/CalPeco Electric;
5. Bear Valley Electric Service; and
6. Pacific Power, a division of PacifiCorp.

**Parties** in R.18-12-005, the Rulemaking to Examine Electric Utility De-Energization of Power Lines in Dangerous Conditions, are:

1. Small Business Utility Advocates;
2. Coalition of California Utility Employees;
3. California Farm Bureau Federation;
4. Sunrun, Inc.;
5. Utility Consumers' Action Network;
6. Counties of Napa, Sonoma, Mendocino, Nevada, Marin, Kern, San Luis Obispo, Santa Clara, and Santa Barbara;
7. City of Santa Rosa;
8. California Energy Storage Alliance;
9. Direct Access Customer Coalition;
10. Energy Users Forum;
11. Protect Our Communities Foundation;
12. Northern California Power Agency;
13. California Association of Small and Multijurisdictional Utilities;
14. California Water Association;
15. East Bay Municipal Utility District;
16. Municipal Water District of Orange County;
17. The CPUC's Office of the Safety Advocate;
18. California Municipal Utilities Association;
19. City and County of San Francisco;
20. The Public Advocates Office of the California Public Utilities Commission;
21. The Utility Reform Network;
22. Local Government Sustainable Energy Coalition;
23. County of San Diego Office of Emergency Services;
24. Mussey Grade Road Alliance;
25. The Energy Producers and Users Coalition;
26. William B. Abrams;
27. NextEra Energy Transmission West, LLC;
28. Center for Accessible Technology;

29. California State Association of Counties;
30. Rural County Representatives of California;
31. The Acton Town Council;
32. Western States Petroleum Association;
33. Valley Center Municipal Water District;
34. Padre Dam Municipal Water District;
35. Agricultural Energy Consumers Association;
36. City of Malibu;
37. Pacific Bell Telephone Company, d/b/a AT&T California; AT&T Mobility and AT&T Corp.;
    Frontier; Cal-Ore Telephone Co.; Ducor Telephone Company; Hornitos Telephone Company;
    The Siskiyou Telephone Company; Volcano Telephone Company; Winterhaven Telephone
    Company; Pinnacles Telephone Co.; Foresthill Telephone Co.; Kerman Telephone Co.; Sierra
    Telephone Company, Inc.; Happy Valley Telephone Company; Calaveras Telephone Company;
    The Ponderosa Telephone Co.; Santa Barbara Cellular Systems, Ltd.; CTIA; T-Mobile Mobile
    West LLC; Consolidated Communications of California Company; Sprint; Cellco Partnership
    d/b/a Verizon Wireless; California Cable & Telecommunications Association; Comcast Phone of
    California, LLC;
38. National Fuel Cell Research Center;
39. California Independent System Operator Corporation;
40. City of San Jose;
41. Jane E. Terjung and William E. Naylor;
42. Tesla, Inc.;
43. Contra Costa Water District;
44. Pioneer Community Energy;
45. Monterey Bay Community Power Authority;
46. Disability Rights Education & Defense Fund;
47. Bay Area Municipal Transmission Group;
48. Clean Power Alliance of Southern California;
49. Los Angeles County Department of Public Health;
50. City of Lafayette;
51. Redwood Coast Energy Authority;
52. City of Riverside;
53. ChargePoint, Inc.;
54. Local Government Sustainable Energy Coalition;
55. California Manufacturers & Technology Association;
56. Association of California Water Agencies;
57. Center for Independent Living;
58. East Bay Community Energy; Peninsula Clean Energy; and Marin Clean Energy.

# APPENDIX C

**Respondents** to the CPUC's "Order Instituting Investigation on the Commission's Own Motion on the Late 2019 Public Safety Power Shutoff Events (I.19-11-013) are:

1. Pacific Gas and Electric Company;
2. Southern California Edison Company;
3. San Diego Gas & Electric Company;
4. Liberty Utilities/CalPeco Electric;
5. Bear Valley Electric Service; and
6. Pacific Power, a division of PacifiCorp.

**Parties** in I.19-11-013, Investigation on the Commission's Own Motion on the Late 2019 Public Safety Power Shutoff Events, are:

1. Counties of Napa, San Luis Obispo, Kern, Sonoma, Santa Barbara, Marin, Nevada, Santa Clara, and Mendocino;
2. City of Santa Rosa;
3. Center for Accessible Technology;
4. Western States Petroleum Association;
5. Mussey Grade Road Alliance;
6. The Acton Town Council;
7. City Of Riverside;
8. California Large Energy Consumers Association;
9. City and County of San Francisco;
10. California State Association of Counties;
11. Utility Consumers' Action Network;
12. The Utility Reform Network;
13. California Community Choice Association;
14. Coalition of California Utility Employees;
15. City of San Jose;
16. The Public Advocates Office of the California Public Utilities Commission;
17. Whisker Labs;
18. Small Business Utility Advocates;
19. Energy Producers and Users Coalition;
20. AT&T Mobility, California Cable and Telecommunications Association, AT&T California;
21. Marin Clean Energy, Sonoma Clean Power Authority, Pioneer Community Energy, Central Coast Community Energy, Peninsula Clean Energy Authority, California Choice Energy Authority; and
22. Protect Our Communities Foundation.