Exhibit 1

COM/MP6/jt2                                        **Date of Issuance  6/4/2019**

Decision 19-05-042   May 30, 2019

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Order Instituting Rulemaking to Examine Electric Utility De-Energization of Power Lines in Dangerous Conditions. | Rulemaking 18-12-005 |

### DECISION ADOPTING DE-ENERGIZATION (PUBLIC SAFETY POWER SHUT-OFF) GUIDELINES (PHASE 1 GUIDELINES)

R.18-12-005  COM/MP6/jt2

## Table of Contents

**Title**                                                                 **Page**

DECISION ADOPTING DE-ENERGIZATION (PUBLIC SAFETY POWER SHUT-OFF) GUIDELINES (PHASE 1 GUIDELINES) .................................................. 1
Summary ........................................................................................................... 2
1. Overview ..................................................................................................... 2
2. Background and Jurisdiction..................................................................... 6
  2.1. Decision 12-04-024 ............................................................................. 7
  2.2. Resolution ESRB-8 ............................................................................. 8
  2.3. Senate Bill 901 .................................................................................... 10
  2.4. R.18-12-005 Purpose and Procedural Background ........................ 11
3. Issues Before the Commission.................................................................. 14
4. Positions of Parties on Scoping Memo and Staff Proposal ................. 16
  4.1. Definitions ............................................................................................ 17
    4.1.1. First Responders/Emergency Responders/Public Safety
           Partners/Local Safety Partners (Issues 2(d) and 2(d)(i)................. 17
      4.1.1.1. Staff Proposal .......................................................... 17
      4.1.1.2. Parties' Positions .................................................... 18
        4.1.1.2.1. Definition of First Responders/Emergency
                   Responders ................................................. 18
        4.1.1.2.2. Water Utilities and Communication Providers ............ 19
        4.1.1.2.3. Public Safety Partners ......................................... 20
    4.1.2. Critical Facilities (Issue 2(c)) .................................................. 21
      4.1.2.1. Staff Proposal .......................................................... 21
      4.1.2.2. Parties' Positions .................................................... 22
    4.1.3. Vulnerable Populations (Populations with Access and
           Functional Needs) (Issues 2(b) and 2(b)(i)).................................... 26
      4.1.3.1. Staff Proposal .......................................................... 26
      4.1.3.2. Parties' Positions .................................................... 27
  4.2. De-Energization Notification and Communication ...................... 32
    4.2.1. Who Should be Notified? (Portions of Issue 2(a)) ........................ 32
      4.2.1.1. Staff Proposal .......................................................... 33
      4.2.1.2. Parties' Positions .................................................... 33
    4.2.2. When and in What Order Should Contact Occur? (Issue 2(a)(i))... 34
      4.2.2.1. Staff Proposal .......................................................... 35
      4.2.2.2. Parties' Positions.................................................... 35

R.18-12-005  COM/MP6/jt2

# Table of Contents (cont.)

**Title**                                                                                   **Page**

    4.2.3.  What Information Should Be Communicated? (Part of Issue 1, Part of Issue 2(a), Part of Issue 2(A)(i), Issue 2(a)(ii), and Part of Issue 2(a)(iii) ................................................................. 38
        4.2.3.1.  Staff Proposal ........................................................ 38
        4.2.3.2.  Parties' Positions .................................................. 40
            4.2.3.2.1.  Issue 1 ....................................................... 40
            4.2.3.2.2.  Issue 2(a) and 2(a)(ii) ........................... 42
            4.2.3.2.3.  Issue 2(a)(i) ........................................... 43
            4.2.3.2.4.  Issue 2(a)(iii) ....................................... 44
    4.2.4.  Who is Responsible for Notification? (Issue 2(a)(iii) ...................... 44
        4.2.4.1.  Staff Proposal ........................................................ 45
        4.2.4.2.  Parties' Positions .................................................. 45
    4.2.5.  What Notification Systems and Notification Methods Should Be Used? (How Should Contact Occur?) (Issue 2(a)(iv), Part of Issue 2(a), Part of Issue 2(a)(i), Part of Issue 2(a)(iii) ..................... 46
        4.2.5.1.  Staff Proposal ........................................................ 47
        4.2.5.2.  Parties' Positions .................................................. 49
  4.2.5.2.1.  Issue 2(a) ......................................................................... 49
  4.2.5.2.2.  Issue 2(a)(i) ..................................................................... 50
  4.2.5.2.3.  Issue 2(a)(iii) and Issue 2(a)(iv) ................................... 51
    4.2.6.  Coordination Between Utilities and First Responders/Local Governments (Issue 3) and Utility Liaisons in Emergency Operation Centers (Issue 3(a)) ............................................................. 52
        4.2.6.1.  Staff Proposal ........................................................ 53
        4.2.6.2.  Parties' Positions .................................................. 53
  4.2.6.2.1.  Issue 3 .............................................................................. 53
  4.2.6.2.2.  Issue 3(a) ......................................................................... 55
  4.3.  Requests to Delay De-Energization (Issue 1(a)) ............................................. 56
  4.4.  Staff Proposal .............................................................................................. 56
  4.5.  Parties' Positions ........................................................................................ 57
  4.6.  De-Energization of Transmission Lines (Issue 6) ......................................... 58
    4.6.1.  Staff Proposal ............................................................................... 58
    4.6.2.  Parties' Positions .......................................................................... 58
  4.7.  Reporting (Issue 4) ..................................................................................... 61
    4.7.1.  Staff Proposal ............................................................................... 62

R.18-12-005  COM/MP6/jt2

# Table of Contents (cont.)

**Title**                                                                 **Page**

4.7.2.  Parties' Positions ................................................................... 62
5.  Adopted De-Energization Guidelines ................................................... 66
5.1.  Adopted Definitions ........................................................................ 71
5.1.1.  First Responder/Emergency Responders.......................... 72
5.1.2.  Public Safety Partners ....................................................... 73
5.1.3.  Critical Facilities/Critical Infrastructure......................... 73
5.1.4.  Vulnerable Populations ..................................................... 77
5.1.5.  How Should Entities Be Identified.................................... 78
5.1.5.1.    Identification of First/Emergency Responders/Public
Safety Partners .................................................. 79
5.1.5.2.    Critical Facilities and Infrastructure ........................ 80
5.1.5.3.    Access and Functional Needs Populations............ 81
5.1.5.4.    All Other Customers .................................................. 83
5.2.  Who Should Receive Notification and in What Order of Priority?........... 83
5.2.1.  Who Should Receive Notice? .............................................. 84
5.2.2.  In What Order of Priority? ................................................. 84
5.3.  How Far in Advance Should Notice Occur? ........................................ 85
5.4.  Who is Responsible for Notification? .................................................. 87
5.5.  What Information Should Be Included in Notifications
(and Outreach)?........................................................................... 90
5.5.1.  Advanced Outreach and Education.................................... 90
5.5.1.1.    Public Safety Partners and Critical Facilities........... 90
5.5.1.2.    All Other Customers .................................................. 92
5.5.2.  Notification Preceding a De-Energization Event............... 94
5.5.2.1.    Public Safety Partners .............................................. 95
5.5.2.2.    All Other Customers .................................................. 96
5.6.  What Methods Should the Electric Investor-Owned Utilities Use to
Communicate a De-Energization Event with the Public? ......................... 97
5.7.  How Should the Electric Investor-Owned Utilities Communicate
and Coordinate with Public Safety Partners Before and During a
De-Energization Event? ...................................................................... 99
5.8.  Coordination with Emergency Response Centers and Incident
Command Systems ........................................................................... 102
5.9.  Requests to Delay De-Energization and to Re-Energize.......................... 104
5.10. De-Energization of Transmission Lines ....................................... 105

R.18-12-005  COM/MP6/jt2

## Table of Contents (cont.)

**Title**                                                          **Page**

5.11. Post-Event Reporting and Lessons Learned ................................................ 106

6. R.18-12-005 Phase 2 ............................................................................................. 109

7. Comments on Proposed Decision ...................................................................... 110

8. Assignment of Proceeding ................................................................................. 115

Findings of Fact ........................................................................................................ 116

Conclusions of Law .................................................................................................. 123

ORDER ........................................................................................................................ 130

Appendix A - De-Energization (Public Safety Power Shut-Off) Guidelines

Appendix B - Preliminary Phase 2 Issues

Appendix C - Glossary of Useful Definitions and Abbreviations

Appendix D – Resolution ESRB-8

Appendix E – San Diego Gas & Electric Company November 11-16, 2018
De-Energization Report

R.18-12-005  COM/MP6/jt2

**DECISION ADOPTING DE-ENERGIZATION (PUBLIC SAFETY POWER
SHUT-OFF) GUIDELINES (PHASE 1 GUIDELINES)**

**Summary**

This decision adopts de-energization (Public Safety Power Shut-off)
communication and notification guidelines for the electric investor-owned
utilities along with updates to the requirements established in Resolution
ESRB-8.  The guidelines adopted in this decision are meant to expand upon those
in Resolution ESRB-8.  Resolution ESRB-8 and the guidelines adopted in this
decision remain in effect unless and until superseded by a subsequent decision.
This decision also presents the overarching de-energization strategy of the
Commission.

The de-energization guidelines adopted in this decision are set forth in
Appendix A.  Appendix B presents a preliminary list of issues to be explored in
Phase 2 of this rulemaking.  Appendix C contains a glossary of terms and
abbreviations used throughout this decision.  Appendix D contains a copy of
Resolution ESRB-8, and Appendix E includes a copy of San Diego Gas &
Electric's November 11-16, 2018 de-energization report, issued on December 4,
2018.

This proceeding remains open.

**1.    Overview**

Over the last decade, California has experienced increased, intense, and
record-breaking wildfires in Northern and Southern California.  These fires have
resulted in devastating loss of life and damage to property and infrastructure.
The California Public Utilities Commission (CPUC or Commission) has been one
of three critical state agencies – along with the California Department of Forestry
and Fire Protection (CAL FIRE) and the California Governor's Office of

R.18-12-005  COM/MP6/jt2

Emergency Services (CalOES) – involved in assessing and addressing the impacts of wildfires.

After several years of drought, changing weather patterns, extreme high heat, ferocious winds, and low humidity, among other factors, the 2018 fire season in California was the most destructive on record.  July 2018 was the hottest month on record in California.[1]  In 2018, more than 8,000 fires burned close to 2 million acres.[2]  These devastating fires resulted in billions of dollars in damage and numerous lives lost.

Electric utility infrastructure has historically been responsible for less than ten percent of reported wildfires;[3]  however, fires attributed to power lines comprise roughly half of the most destructive fires in California history.[4]  With the growing threat of wildfire, utilities will proactively cut power to lines that may fail in certain weather conditions in order to reduce the likelihood that their infrastructure could cause or contribute to a wildfire.  This effort to reduce the risk of fires caused by electric infrastructure by temporarily turning off power to specific areas is called "de-energization" in this proceeding.[5]

The strategy to de-energize builds on new weather tracking and modeling technology that provides localized forecasts during increasingly powerful wind storms, along with statewide fire hazard maps identifying those areas of very

---

[1] National Oceanic and Atmospheric Administration; https://www.noaa.gov/news/july-2018-was-11th-warmest-july-on-record-for-us.

[2] https://www.predictiveservices.nifc.gov/intelligence/2018_statssumm/fires_acres18.pdf.

[3] Cal FIRE; http://www.fire.ca.gov/fire_protection/fire_protection_fire_info_redbooks.

[4] Cal FIRE; http://fire.ca.gov/communications/downloads/fact_sheets/top20_destruction.pdf.

[5] De-energization is also known as a "proactive power shutoff" or "public safety power shutoff (PSPS)".

R.18-12-005  COM/MP6/jt2

flammable dry woody and brush fuels due to years of drought.  These new tools
have been developed, tested, and improved over the course of several years in
the San Diego area by the local electric utility, San Diego Gas & Electric
Company (SDG&E).  Over this period, weather monitoring and wind modeling
have become more precise, and the areas that are proactively shut off from
service have grown smaller and smaller due to more reliable information and
changes to electric infrastructure that allow SDG&E to isolate smaller portions of
their system for de-energization.

  Added to tougher regulations for removing vegetation that can come into
contact with electric power infrastructure, proactively de-energizing power lines
can save lives.  Increasing precision to allow de-energization of smaller areas of
infrastructure is important because, aside from the inconvenience of lost power
for individuals and businesses, public safety services such as street lights and
signals, wells used for pumping water used for firefighting, police and fire
facilities, telecommunications, and home medical devices may also be impacted
or shut down when power is turned off.

  The 2017 and 2018 wildfire season evidenced that the public needs better
information – about fire conditions, about when those conditions occur, and how
the public should prepare – regardless of whether de-energization is performed
proactively or occurs as a result of another emergency.  The focus needs to be
more on the growing danger of fire and how to respond to conditions associated
with wildfire risk, and not just on actions such as de-energization that utilities
take to prevent their infrastructure from contributing to potential fires.  When
there is forewarning of high-fire threat conditions and the potential for ignition

R.18-12-005  COM/MP6/jt2

from utility infrastructure or other sources exists,[6] emergency responders need to expect and be prepared for a potential loss of power.

The Commission's goal must be to ensure the public receives timely notice of proactive de-energization or de-energization resulting from another event. Achieving this goal necessitates shared responsibility among the electric investor-owned utilities, local, and state entities.  Lessons learned from prior disasters throughout the State show that these entities should utilize Standardized Emergency Management System (SEMS).  This will allow the utilities, emergency responders, and local governments to be seamlessly integrated when communicating de-energization notifications.

It is the Commission's vision that notification and communication will come primarily from the utilities with supplemental or secondary notification by local first responders.  To make this possible, the Commission will need to ensure that the utilities integrate as much as possible with local emergency systems and frameworks and treat de-energization in a similar manner as any other emergency that results in loss of power, such as earthquakes, floods or non-utility caused fire events.  The need for shared responsibility between the utilities, public safety partners, and local governments is critical.  Therefore, the utilities should immediately begin working with CalOES to integrate their

---

[6] In contrast to proactive de-energization, unplanned electric grid outages may occur as a result of many unforeseeable events. Examples of such events include vehicle collisions with poles and equipment, animal contact with energized power lines, lighting strikes and other weather that causes damage to equipment, vandalism, arson, and wildfires not caused by utility equipment.  Often, unplanned outages occur during catastrophes, such as floods, severe winds or heat storms and such outages can impact essential services, including 911 and other emergency communications.  Therefore, while this decision adopts advanced notification and education guidelines for proactive de-energization, emergency responders, operators of critical facilities, local governments, and electric customers, especially those in high fire threat districts, should be prepared for power outages that occur without advanced warning.

R.18-12-005  COM/MP6/jt2

warning programs with the agencies and jurisdictions within California that are responsible for ensuring the public is notified effectively before, during, and after emergencies.  To this end, the utilities should align messaging and outreach with the California Statewide Alert and Warning Guidelines recently issued by CalOES.[7]

Finally, critical to making a notification system work for de-energization events is significant investment by the state agencies, local governments, and utilities in a joint effort to educate the public on how to prepare for wildfire season and de-energization events.  These statewide education campaigns should educate the public in advance of de-energization events regarding what is entailed during a de-energization event, what tools are available to the public during these events, what to do in an emergency, how to receive information alerts during a power shutoff, and who the public should expect to hear from and when.  The utilities should also report back to the Commission through its required ESRB-8 filings, as updated by this decision, on what they learn after each de-energization event.

## 2.    Background and Jurisdiction

In the wake of one of the most devastating wildfire seasons in California in history and in response to Senate Bill (SB) 901,[8] the Commission instituted this Order Instituting Rulemaking (OIR) to build on earlier rules on the de-energization of powerlines.[9]  California Public Utilities Code Sections[10]

---

[7]  Incorporated into the record of Rulemaking (R.) 18-12-005 by written ruling on March 28, 2019.

[8]  Stats. 2018, Ch. 626.  SB 901 *available at* https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180SB901.

[9]  R.18-12-005 at 1; SB 901.

R.18-12-005  COM/MP6/jt2

(Pub. Util. Code §§) 451 and 399.2(a) give electric investor-owned utilities (IOUs, electric utilities, or utilities) authority to shut off electric service in order to protect public safety.[11]  However, de-energization can leave communities and essential facilities without power, which brings its own risks and hardships, particularly for vulnerable communities and individuals.[12]  This section outlines current de-energization policies adopted by the Commission and where this OIR fits among current legislative directives and other active wildfire mitigation proceedings pending before the Commission.

### 2.1.   Decision 12-04-024

The Commission adopted de-energization rules and guidelines in Decision (D.) 12-04-024, which established requirements for reasonableness, notification, mitigation and reporting by SDG&E for its de-energization events.[13]  D.12-04-024 reaffirms the Commission's finding in D.09-09-030 that SDG&E has authority under §§ 451 and 399.2(a) to shut off power in order to protect public safety when strong winds exceed the design basis for SDG&E's system.[14]  D.12-04-024 goes a step beyond the 2009 decision, by ordering SDG&E to (1) take all appropriate and feasible steps to provide notice and mitigation to its customers whenever the utility shuts off power pursuant to §§ 451 and 399.2(a), and (2) reporting any de-energization events to the Commission's Safety and Enforcement Division (SED) within 12 hours after SDG&E shuts off power.[15]

---

[10]  Unless otherwise stated, all code section references are to the Public Utilities Code.

[11]  R.18-12-005; Resolution ESRB-8 at 2.

[12]  R.18-12-005 at 2.

[13]  D.12-04-024 at 1.

[14]  *Id*.

[15]  *Id.* at Conclusions of Law 1 and 2.

R.18-12-005  COM/MP6/jt2

While the Commission recognizes the impossible feat of anticipating every
emergency situation resulting in proactive de-energization, the Commission held
that SDG&E should provide as much notice as feasible before shutting off power
so the affected providers of essential services (e.g., hospitals, prisons, public
safety agencies, telecommunications utilities, and water districts) and customers
who are especially vulnerable to power interruptions (e.g., customers who rely
on medical-life support equipment) may implement their own emergency
plans.[16]  Since the adoption of D.12-04-024, Pacific Gas and Electric Company
(PG&E) and Southern California Edison Company (SCE) have exercised their
authority to de-energize power lines pursuant to §§ 451 and 399.2(a), but these
electric utilities were not subject to the reasonableness, notification, mitigation
and reporting requirements ordered in D.12-04-024 for SDG&E.[17]

## 2.2.    Resolution ESRB-8

In 2017, California suffered the most destructive wildfire season on record,
including 5 of the 20 most destructive wildland-urban interface fires in the state's
history.[18]  As a result of these fires, the President of the United States approved a
major disaster declaration and the Governor of California proclaimed a State of
Emergency.  In light of the increased intensity of California wildfires and varying
de-energization guidelines amongst all of California's electric IOUs, the
Commission issued Resolution ESRB-8 on July 16, 2018.  Resolution ESRB-8
extends D.12-04-024's reasonableness, public notification, mitigation and
reporting requirements to all electric IOUs to ensure that public and local

---

[16] *Id.* at 10.

[17] Resolution ESRB-8 at 2.

[18] *Id.*

R.18-12-005  COM/MP6/jt2

officials are prepared for power shut off and aware of the electric IOUs' de-energization policies.[19]  Resolution ESRB-8 goes a step beyond D.12-04-024 by strengthening the reporting and public outreach, notification and mitigation guidelines adopted in 2012.[20]

Resolution ESRB-8 strengthens reporting requirements by directing the electric IOUs to submit a report to the Director of SED within 10 business days after each de-energization event, as well as after high-threat events where the utility provided notifications to local government, agencies, and customers of possible de-energization actions but where de-energization did not occur.[21]  At a minimum, the de-energization report must include:  (1) who the electric utility contacted in the community prior to de-energization and whether the affected areas are classified as Zone 1, Tier 2, or Tier 3 per the definition in General Order 95, Rule 21.2-D[22]; (2) explanation of why notice could not be provided at least 2 hours prior to a de-energization event if such notice was not given; (3) the number of and a summary of the complaints received as a result of the de-energization events, including any claims filed against the utility because of de-energization; (4) a detailed description of the steps the utility used to restore power; and (5) the address and description of each community assistance location during a de-energization event.[23]

---

[19] *Id.* at 5.

[20] *Id.* at 5 to 7.

[21] *Id.* at 5.

[22] Rule 21.1(D) defines High Fire-Threat Districts(s) (HFTD).  Zone 1 is Tier 1 of the latest version of the United States Forest Service and CAL FIRE's joint map of Tree Mortality High Hazard Zones.  Tiers 2 and 3 are designated as such in the Commission's Fire-Threat Map.

[23] Resolution ESRB-8 at 5.

R.18-12-005  COM/MP6/jt2

Resolution ESRB-8 strengthened the public outreach, notification, and mitigation guidelines of D.12-04-024 by directing the IOUs to hold De-Energization Information Workshops with the public within 90 days from the date Resolution ESRB-8 was formally adopted.  Resolution ESRB-8 ordered the IOUs to submit a report to the Director of SED outlining its public outreach, notification and mitigation plan, within 30 days of the effective date the resolution.  Resolution ESRB-8 also orders the IOUs to retain documentation of community meetings and customer notifications for a minimum of one-year after a de-energization event.  Finally, Resolution ESRB-8 requires the IOUs to assist critical facility customers to evaluate their need for backup power and notes that the IOUs may need to provide generators to critical facilities that are not well prepared for a disruption in service.[24]

### 2.3.   Senate Bill 901

On September 21, 2018, the Governor approved SB 901.  Among other things, SB 901 added new provisions to § 8386, requiring all California electric utilities to prepare and submit Wildfire Mitigation Plans (Plans) that describe the utilities' plans to prevent, combat, and respond to wildfires affecting their service territories.[25]  Shortly after, the Commission opened R.18-10-007 as a vehicle for the review and implementation of the electric IOUs' Plans prior to commencement of the 2019 wildfire season.[26]  R.18-10-007 notes that, although

---

[24] *Id.* at 7.

[25] R.18-10-007 at 2.

[26] R.18-10-007 at 2 to 3.

R.18-12-005  COM/MP6/jt2

SB 901 included other Commission-related provisions in addition to the Plans, those provisions would be addressed in other Commission proceedings.[27]

Pertinent to R.18-12-005, § 8386(c)(6) requires the Plans to include protocols for disabling reclosers and de-energizing portions of the electrical distribution system that consider the associated impacts on public safety, including impacts on critical first responders and on health and communication infrastructure.[28]  Furthermore, § 8386(c)(7) requires the Plans to include appropriate and feasible procedures for notifying customers who may be impacted by the de-energizing of electrical lines.  The procedures must consider the need to notify, as a priority, critical first responders, health care facilities and operators of telecommunications infrastructure.

Prior to R.18-10-007, the Commission initiated R.18-03-011 to address emergency disaster relief to California residents affected by a series of devastating wildfires in Northern and Southern California in 2017 and 2018.[29] Cross coordination among all of these rulemakings is necessary to ensure California is prepared for the 2019 and beyond wildfire seasons.

## 2.4.  R.18-12-005 Purpose and Procedural Background

On December 19, 2018, the Commission opened R.18-12-005 to further examine de-energization policies and guidelines adopted in D.12-04-024 and Resolution ESRB-8.[30]  Due to the important role that de-energization can play in

---

[27]  R.18-10-005 at 2, footnote 4.

[28]  R.18-12-005 at 3.

[29]  R.18-03-011 at 1 to 2.

[30]  PG&E, SCE, SDG&E, Liberty Utilities/CalPeco Electric (Liberty), Bear Valley Electric Service, a division of Golden State Water Company (Bear Valley), and Pacific Power, a division of PacifiCorp (PacifiCorp) are listed as respondents to the OIR.

R.18-12-005  COM/MP6/jt2

ensuring public safety during an extreme weather event, as well as the impacts of de-energization on affected populations, the Commission opted to address the implementation and logistics for de-energization of power lines in R.18-12-005,[31] rather than in R.18-10-007.[32]

This proceeding intends to: examine conditions in which proactive and planned de-energization is practiced; develop best practices that ensure an orderly and effective set of criteria for evaluating de-energization programs; ensure the electric utilities coordinate with state and local level first responders, and align their systems with SEMS;[33] mitigate the impact of de-energization on vulnerable populations; examine whether there are ways to reduce the need for de-energization; ensure effective notice to affected stakeholders of possible de-energization and follow-up notice of actual de-energization; and ensure consistency in notice and reporting of de-energization events.[34]

Pursuant to the schedule set in R.18-12-005, staff led the first of two workshops on December 14, 2018 in Santa Rosa, California.  A second staff led workshop took place on January 9, 2019 in Calabasas, California.  On January 25, 2019, the assigned Administrative Law Judge (ALJ) issued a ruling providing guidance to parties on the comments to the rulemaking and canceling the February 6, 2019 prehearing conference (PHC) date to allow adequate time for the Commission and parties to review comments on the rulemaking.

---

[31] R.18-12-005 at 1:  Resolution ESRB-8 will remain in effect during the pendency of this proceeding unless and until the Commission explicitly modifies or rescinds it.

[32] *Id.* at 3.

[33] R.18-12-005 at 2, footnote 2:  SEMS is the system required by Government Code Section 8607(a) for managing emergencies involving multiple jurisdictions and agencies.

[34] *Id.* at 2.

R.18-12-005  COM/MP6/jt2

Subsequently the assigned ALJ scheduled a PHC,[35] which was held on February 19, 2019 in Sacramento, California.[36]

In response to the opening comments and discussion at the PHC, the assigned Commissioner issued a Scoping Memo and Ruling (Scoping Memo) on March 8, 2019.  The Scoping Memo divides this OIR into two phases[37] with the goal of the first phase being completed in advance of the 2019 wildfire season.[38] The first phase of the OIR, which is the subject of the instant decision, focuses on notice and communication issues in order to provide a framework under which the electric utilities may de-energize.[39]

The Scoping Memo attached a Staff Proposal authored by the Commission's SED.  The Staff Proposal provides high-level responses to each of the issues in scope for Phase 1 of this proceeding.  The Scoping Memo directed

---

[35] *See* Administrative Law Judge's Ruling Setting Prehearing Conference (January 31, 2019).

[36] Opening comments and responses to the OIR were filed by:  Small Business Utility Advocates (SBUA); Coalition of California Utility Employees (CUE); California Farm Bureau Federation (Farm Bureau); Sunrun, Inc.; Utility Consumers' Action Network (UCAN); SDG&E; Counties of Napa, Sonoma, Mendocino, and the City of Santa Rosa (*collectively referred to as*, the Joint Local Governments); California Energy Storage Alliance (CESA); PG&E; Direct Access Customer Coalition, Energy Users Forum (DACC/EUF); Protect Our Communities Foundation (POC); SCE; Northern California Power Agency (NCPA); Bear Valley, Liberty, and PacifiCorp (*collectively referred to as*, the California Association of Small and Multijurisdictional Utilities (CASMU); California Water Association (CWA); East Bay Municipal Utility District (EBMUD); Municipal Water District of Orange County (MWDOC); the Commission's Office of the Safety Advocate (OSA); California Municipal Utilities Association (CMUA); the City and County of San Francisco(CCSF); the Public Advocates Office of the California Public Utilities Commission (Public Advocates); The Utility Reform Network (TURN); Local Government Sustainable Energy Coalition (LGSEA); County of San Diego Office of Emergency Services; and Mussey Grade Road Alliance (MGRA).

[37] Scoping Memo at 3:  Phase 2 issues will be set forth in a forthcoming scoping memo.

[38] *Id*.

[39] *Id*.

R.18-12-005  COM/MP6/jt2

parties to respond to the Staff Proposal in comments.[40]  Parties filed comments on March 25, 2019 and reply comments on April 2, 2019.[41]

### 3.   Issues Before the Commission

The Assigned Commissioner's Scoping Memo and Ruling, issued on March 8, 2019, states:  "The goal of the first phase of this proceeding is to ensure that the Commission has adopted de-energization parameters and protocols in anticipation of the upcoming 2019 wildfires season."  Due to an expedited timeline, Phase 1 focuses primarily on notice and communication issues.  Phase 2 will take a more comprehensive look at de-energization practices, including mitigation, additional coordination across agencies, further refinements to findings in Phase 1, re-energization practices, and other matters.  A preliminary list of Phase 2 issues is attached to this decision as Appendix B.

The Phase 1 issues considered in this decision are:

1.  Updates to Resolution ESRB-8;

    a.  What, if any, updates or modifications should be made to Resolution ESRB-8 to ensure that, should de-energization become necessary during the 2019 wildfire season, de-energization is undertaken as efficiently and safely[42] as possible?

---

[40] *Id.* at 5.

[41] The following parties filed Phase 1 comments: SDG&E, California State Association of Counties (CSAC); Rural County Representatives of California (RCRC); William B. Abrams (Abrams); SCE; Farm Bureau; AT&T, CTIA, California Cable & Telecommunications Association (CCTA), Frontier Communications, T-Mobile West LLC dba T-Mobile, Sprint Communications, California Company and the Small LECs, Comcast Phone of California LLC, and Verizon (*collectively,* the Joint Communications Parties); PG&E; NCPA; UCAN; Public Advocates; CMUA; CASMU; California Large Energy Consumers Association (CLECA); TURN; EBMUD; SBUA; DACC/EUF; Joint Local Governments; City of Malibu; Center for Accessible Technology (CforAT); OSA; CCSF; POC; and MGRA.

[42] Parties were requested to provide comment on what constitutes "efficient" and "safe" de-energization.

R.18-12-005 COM/MP6/jt2

2. Notification and communication to the public (including vulnerable populations), local governments, critical facilities, and emergency/first responders;

a. What are the best ways to notify the aforementioned parties of a planned de-energization event and when power will be restored in the event of de-energization?

i. How far in advance (and in what order of priority) should the aforementioned parties be notified of an upcoming de-energization event?

ii. What information should be conveyed about an upcoming de-energization event?

iii. Who should be responsible for notifying affected customers/populations? Should the utilities be solely responsible, or should other parties such as local governments have a responsibility in communicating these events?

iv. What systems [or frameworks][43] should be used for notification of customers (for example, the Standardized Emergency Management System[44] framework, reverse 9-1-1, *etc.*)?

b. How should 'vulnerable populations' be defined and identified?

i. Is a list of Medical Baseline customers sufficient, and if not, how should the utilities identify vulnerable populations?

_____

[43] Added to the original scope to improve clarity.

[44] The Commission notes that SEMS is not a notification system. The purpose of SEMS is to "provide effective management of multi-agency and multijurisdictional emergencies in California. By standardizing key elements of the emergency management system, SEMS is intended to: (1) facilitate the flow of information within and between levels of the system, and (2) facilitate coordination among all responding agencies.

Use of SEMS will improve the mobilization, deployment, utilization, tracking, and demobilization of needed mutual aid resources. Use of SEMS will reduce the incidence of poor coordination and communications and reduce resource ordering duplication on multi-agency and multijurisdictional responses." *See* SEMS Guidelines, Page 1 Section I.A.2. "Purpose of SEMS", November 2009.

R.18-12-005  COM/MP6/jt2

    c.  How should critical facilities be defined and identified?

    d.  How should first responders/emergency responders be defined and identified?

        i.  Should water utilities and communication companies be defined as first responders?

3.  What structures and practices should be in place to maximize coordination between utilities and first responders/local governments?

    a.  Should the utilities be required to embed liaison officers (who are empowered to make decisions on behalf of the utility) in emergency operations centers carried out under state and local plans consistent with SEMs?

4.  What information should be provided to the Commission after a de-energization event to show that de-energization was used as a method of last resort and that it followed Commission rules?

5.  What additional provisions or protocols are necessary if de-energization of transmission lines become necessary?

## 4. Positions of Parties on Scoping Memo and Staff Proposal

Attached to the March 8, 2019 Scoping Memo, the Commission's SED introduced its Phase 1 Staff Proposal containing preliminary recommendations on each of the questions contained in the Scoping Memo. Parties provided detailed comments on the Staff Proposal, which are summarized in the following sections.[45] Although this decision does not identify every comment made by each party, the Commission considered the input of all parties in adopting the guidelines herein. Furthermore, comment summaries are presented in a different order to the layout of the Staff Proposal.

_____

[45] Parties provided thorough comments on all issues in this proceeding. Due to the magnitude of information and the compressed timeline of Phase 1, summaries of party comments are not comprehensive. The assigned Commissioner and assigned ALJ did; however, review all comments. The decision contains a representative selection of comments for each section.

R.18-12-005  COM/MP6/jt2

### 4.1.   Definitions

Adopting standardized definitions and customer designations allows the utilities, CalOES (and other state or local government entities), CAL FIRE, local first/emergency responders, local governments, critical facilities, the Commission, customers and all others to operate with a shared understanding and language throughout a de-energization event.  In addition, designation as one of the groups set forth below carries special consideration for notice, both in timing and form (discussed later in this decision,) possible mitigation to lessen the impacts before, during and after a de-energization event and possible prioritization during re-energization.  Mitigation and re-energization will be explored more fully in Phase 2 of this proceeding.

#### 4.1.1.   First Responders/Emergency Responders/Public Safety Partners/Local Safety Partners (Issues 2(d) and 2(d)(i)

The Scoping Memo, in Issue 2(d), asks parties to answer the following question:  How should first responders/emergency responders be defined and identified?  As a follow-up to this initial question, in Issue 2(d)(i), the Scoping Memo solicits feedback on whether water utilities and communication companies should be designated as first responders.  The Staff Proposal mentions the term "public safety partners" throughout but does not include a specific definition for that term.  Party positions on the staff proposal are summarized below.

##### 4.1.1.1.   Staff Proposal

Staff set forth the following proposals:

> The term "first responder" refers to those individuals who in the early stages of an incident are responsible for the protection and preservation of life, property, evidence, and the environment,

- 17 -

R.18-12-005  COM/MP6/jt2

including emergency response providers.  The term "emergency
response providers" includes federal, state, and local governmental
and nongovernmental public safety, fire, law enforcement,
emergency response, emergency medical services providers
(including hospital emergency facilities), and related personnel,
agencies, and authorities.  (*Issue 2(d)*)

Public Utilities Code Section 8386 (c)(6) states that Communications
infrastructure providers should receive priority notification of planned
de-energization events.  For purposes of notification, water and communication
companies should be prioritized; however, this should not include designation as
first responders.  (*Issue 2(d)(i)*).

### 4.1.1.2.   Parties' Positions
### 4.1.1.2.1.   Definition of First Responders/Emergency Responders

Parties broadly supported Staff's proposed definition of first
responders/emergency responders, including CASMU, Public Advocates, CCSF,
SDG&E, EBMUD, PG&E, the Joint Communications Parties, City of Malibu,
CforAT and the Farm Bureau.  CSAC agrees with Staff's definition but suggests
the inclusion of Emergency Medical Associations and public works in this
category.  OSA recommends the inclusion of CalOES and CAL FIRE.  SCE
suggests expanding the definition to include certain electric utility staff, such as
wildfire management personnel and troublemen.  Abrams recommends
expansion to include individual decision makers within the private and
non-profit sectors that manage at-risk infrastructure, e.g. flammable and
combustible material storage facilities.

Other parties recommend that the Commission adopt a different definition
for first/emergency responders.  CWA suggests the following definition:  "fire
departments, first responders, local communities, government, water service

- 18 -

R.18-12-005  COM/MP6/jt2

providers, communications providers, and Community Choice Aggregators (CCAs)."  The Joint Local Governments state that the Staff Proposal is too broad and does not identify the actual agencies that will be contacted first in a de-energization event.  MWDOC recommends use of the definition of "first responder" set forth in the U.S. Department of Homeland Security Presidential Directive HSPD-8.[46]  TURN offers that Merriam-Webster and Federal Emergency Management Agency (FEMA) definitions could be a starting place to define first/emergency responders.  TURN further states that first/emergency responders should include responders that protect the public safety during a prolonged blackout, not just those that respond to accidents or emergencies.

### 4.1.1.2.2.   Water Utilities and Communication Providers

Most parties agree with Staff's recommendation that "for purposes of notification, water and communication companies should be prioritized; however, this should not include designation as first responders"[47] (Farm Bureau, CASMU, CforAT, OSA, Public Advocates, EBMUD, City of Malibu, PG&E, SCE, SDG&E, TURN).  Selected additional comments follow.  The Joint Water Districts[48] and MWDOC recommend that water utilities be designated as first responders, citing in part to HSPD-8.  However, TURN raises the concern that designation of water utilities as first responders by a state agency "may have

---

[46]  As cited in MWDOC opening comments at 6: refers to those…who in the early stages of an incident are responsible for the protection and preservation of life, property, evidence, and the environment, including…emergency management…public works, and other skilled support personnel (such as equipment operators) that provide immediate support services during prevention, response and recovery operations."

[47]  Staff Proposal at 5.

[48]  Valley Center Municipal Water District and Padre Dam Municipal Water District filed opening comments jointly.  MWDOC joined these entities to file reply comments.

R.18-12-005  COM/MP6/jt2

implications beyond the current de-energization proceeding."[49]  CWA, in reply comments, acknowledges TURN's concern and suggests that priority notification of water utilities is more important than a designation as a first responder. RCRC and other parties suggests that telecommunications companies and water utilities should be notified as if they were first responders, but not receive an official designation as such.

Finally, the parties representing water infrastructure emphasize that the lack of water supply can reduce firefighting capabilities, and a lack of adequate water pressure can increase the risk of drinking water contamination.  Electric service is also a vital component to the transport and treatment of wastewater. These parties agree that water infrastructure warrants priority designation for notification.

### 4.1.1.2.3.    Public Safety Partners

CCSF, CWA, and MWDOC, among others, note that the Staff Proposal uses the term "public safety partners" throughout, but does not provide a definition for the term.  CWA (supported by CCSF) asserts that the term "public safety partners" should be defined as "fire departments, first responders, affected local communities, local governments, publicly-owned utilities, communication providers, community choice aggregators, water service providers, and waste utilities."  Several other parties recommend that public safety partners be defined as the collective group of emergency/first responders *and* critical facilities.  PG&E suggests that the terms should be defined as city and county officials (or local officials), CalOES, CAL FIRE and the Commission.

---

[49]  TURN Opening Comments at 10.

R.18-12-005  COM/MP6/jt2

### 4.1.2.   Critical Facilities (Issue 2(c))

In Resolution ESRB-8, the Commission requires that the utilities ensure that operators of critical facilities are aware of any planned de-energization event.  Furthermore, in preparation for a de-energization event, the utilities must assist critical facility customers to evaluate their needs for backup generation and determine whether additional equipment is needed, including providing generators to facilities that are not well prepared for a power shut off.[50] Although Resolution ESRB-8 provides several examples of critical facilities, no comprehensive definition has yet been adopted by the Commission.  Therefore, Issue 2(c) in the Scoping Memo solicits feedback on the following question:  How should critical facilities be defined and identified?

#### 4.1.2.1.   Staff Proposal

Staff set forth the following proposal:

For the purposes of de-energization events, critical facilities should include the following:
- Police Stations
- Fire Stations
- Emergency Operations Centers
- Medical facilities, including hospitals, skilled nursing facilities, nursing homes, blood banks, and health care facilities
- Schools and day care centers
- Public and private utility facilities vital to maintaining or restoring normal services
- Drinking water and wastewater treatment plants
- Communication carrier infrastructure including selective routers, central offices, head ends, cellular switches, remote terminals, and cell sites.

---

[50]  Resolution ESRB-8 at 7.

R.18-12-005  COM/MP6/jt2

### 4.1.2.2.  Parties' Positions

Many parties, including a majority of the utilities, support the list of critical facilities set forth in the Staff Proposal, most with proposed modifications. Selected comments follow.  The Joint Local Governments and CforAT support the Staff Proposal as presented.  CSAC recommends the addition of dialysis centers, surgical centers, hospitals, lock down facilities, pump stations, refineries and chemical production facilities.  CASMU suggests the inclusion of jails and prisons.  OSA recommends the Commission consider adding school districts, universities, colleges, private schools, hospice facilities, airports, prisons and nursing homes.  RCRC recommends the addition of fairgrounds or other local government staging sites, including evacuation centers and shelters, as well as municipal airports.

CCSF concurs with the recommendations of others and offers that navigation communication systems, traffic control and landing and departure facilities for commercial air and sea operations, rail transit systems, petroleum refineries, other industrial facilities dependent on electricity for public safety, publicly-owned utilities (POUs), CCAs, and dialysis centers should be added to the list of critical facilities.  CCSF recommends that the Commission combine the list presented in the Staff Proposal with the list of Essential Customers adopted in D.02-04-060, *Interim Opinion on Interruptible Programs and Curtailment Priorities*.[51]  Abrams supports the inclusion of flammable and combustible material storage facilities.  City of Malibu recommends an expanded list of water infrastructure, discussed more below, as well as the inclusion of city halls or similar city facilities.

---

[51] D.02-04-060, Attachment B, lists Essential Customers.

R.18-12-005  COM/MP6/jt2

The Joint Communication Providers note that SB 901 requires priority notification of communications providers without the requirement they be designated as critical facilities.[52]  TURN recommends that critical facilities should include communications and telecommunications facilities in addition to schools, airports and other transit providers.  TURN notes that, as required by ESRB-8, the IOUs must assist critical facilities to evaluate their needs for backup power and determine whether additional equipment is needed.  Public Advocates recommends that the list of critical facilities be updated by the local utility when new critical infrastructure is established in its operating territory.

CSAC, MWDOC and Public Advocates recommend that the Commission consider the FEMA definition of critical facilities, which is broader than the Staff Proposal.  EPUC offers that the Commission should consider whether a special outreach protocol is necessary for Category N customers.  POC suggests that the list of 110 sites proposed by SDG&E to be prewired to accept portable generators, as discussed in D.09-09-030, is a good starting place to designate critical facilities.

CLECA notes that terms used by the utilities in their Wildfire Mitigation Plans and those presented in the Staff Proposal overlap.  For example, SCE designates "Essential Service Providers,"[53] and PG&E references "critical services" and "critical facilities."[54]  CLECA recommends that the Commission adopt a standard term for critical facilities/essential service providers along with a list of included categories to ensure proper notification of such facilities.  CLECA also requests the inclusion of private industrial facilities necessary to the

---

[52]  Many other parties support inclusion of communication facilities as critical facilities.

[53]  SCE Wildfire Mitigation Plan at 68.

[54]  PG&E Wildfire Mitigation plan at 103-105.

R.18-12-005  COM/MP6/jt2

operation of police, fire and emergency operations centers (e.g. pipeline transportation facilities that supply fuel directly to fire departments or other first responders).  In addition to suggestions offered by others, CLECA recommends inclusion of radio and television broadcasting stations used for broadcasting emergency messages, instructions, and other public information related to electric curtailment.

Many parties suggest that drinking water and wastewater treatment plants do not encompass the scope of critical water infrastructure that should be designated as critical facilities.  CMUA offers the following definition:  "drinking water and wastewater facilities critical to maintain public health and safety standards, such as, treatment plants, pumping stations and other storage facilities."[55]  CWA recommends that critical facilities be defined to include all infrastructure used to pump, divert, transport, store, treat and deliver water.  The Joint Water Districts emphasize the inclusion of, at a minimum, water pumping stations, sewer lift stations, water and wastewater treatment plants, corporate headquarters and operation control facilities.  MWDOC offers a complementary list of water facilities as those already presented, and EBMUD also recommends the inclusion of drinking water pumping distribution plants.  The Farm Bureau notes that many rural users rely primarily on well water that requires electricity for access; therefore, advanced notification of such customers should be considered.

The utilities offer a varied response to the Staff Proposal.  PG&E generally supports the Staff Proposal, noting that the proposal is generally aligned with the

---

[55] CMUA Opening Comments at 6.  In Reply Comments, CLECA disagrees with SCE, arguing that the list of critical facilities should be expansive this year when the risks of de-energization are likely greater than in subsequent years (CLECA Reply Comments at 4).

R.18-12-005  COM/MP6/jt2

list PG&E provides in its Wildfire Mitigation Plan; however, PG&E notes that its list is comprehensive and presents entities in order of priority for re-energization. PG&E disagrees with the suggestions of many parties, arguing that "the Commission [should] avoid broadening the definition in a manner that would be unmanageable or defeat the prioritization purpose."[56]  SCE also agrees with most of the entities listed in the Staff Proposal but notes that it considers entities which provide critical services to the public as essential providers.  For example, SCE notes that shutting off power to schools and daycare facilities does not pose the "same immediate risk to public safety operations as compared to fire and police agencies and other critical infrastructure such as hospitals and nursing homes."[57] CASMU generally supports the Staff Proposal, but encourages engagement with emergency service contacts to further evaluate needs and ensure all critical facilities are included.  Finally, SDG&E argues that the Staff Proposal's list of critical facilities is overly broad.

Regarding how to identify critical facilities, few parties offered specific comments beyond a discussion of broad critical facility categories.  CCSF recommends that each IOU have ultimate responsibility for identifying critical facilities within its service territory.  Prior to the start of the wildfire season, CCSF states that the IOUs should be required to vet their lists of critical facilities with relevant emergency officials (a position supported by CASMU) and the IOUs should be required to update the list on an on-going basis as new information is learned, but no less frequently than annually.

---

[56] PG&E Reply Comments at 6.

[57] SCE Opening Comments at 17.

R.18-12-005  COM/MP6/jt2

### 4.1.3.   Vulnerable Populations (Populations with Access and Functional Needs) (Issues 2(b) and 2(b)(i))

The Commission, in ESRB-8, first identifies the need to communicate with and educate vulnerable populations (although not designated as such in the resolution) including low-income customers, customers with limited English, disabled customers and the elderly.[58]  In the OIR that opened this proceeding, the Commission set a preliminary scope that included the following questions:  "Do notification standards differ for vulnerable populations,"[59] and "how [should the utilities] mitigate the impact of de-energization on vulnerable populations?[60]

Many parties' comments on the OIR stated that, absent a definition of "vulnerable populations," it would be challenging to ascertain appropriate notification standards and mitigation measures.  Therefore, Issue 2(b) of the Scoping Memo asked the following question:  How should 'vulnerable populations' be defined and identified?  Issue 2(b)(i) expanded upon this threshold by seeking feedback on the following question:  Is a list of medical baseline customers sufficient, and if not, how should the utilities identify vulnerable populations?

#### 4.1.3.1.   Staff Proposal

Staff proposed the following definition for vulnerable populations (*Issue 2b*):

> For the purposes of de-energization, "vulnerable populations" should address those individuals who are or have:

---

[58]  Resolution ESRB-8 at 6.

[59]  OIR at 8.

[60]  *Id* at 9.

R.18-12-005  COM/MP6/jt2

- Physical, developmental or intellectual disabilities
- Chronic conditions or injuries
- Limited English proficiency
- Elderly
- Children
- Low income, homeless and/or transportation disadvantaged (i.e., dependent on public transit)
- Pregnant women

Regarding the question of medical baseline customers, Staff proposed the following (*Issue 2(b)(i)*):

> Although medical baseline customers do not represent the breadth and scope of the Access and Functional needs community, the use of this population is the best available proxy prior for the 2019 fire season.  To augment the limitations on this methodology, IOUs should reach out to organizations with the ability to reach out to these communities, including (but not limited to):  local Independent Living Centers, Regional Centers, paratransit providers, and other resource providers.  Additionally, potential augmentation efforts to more fully address methods to identify and alert vulnerable populations should be addressed in Phase 2 of this rulemaking.

### 4.1.3.2.  Parties' Positions

The majority of parties recommended that the definition of vulnerable populations be expansive in nature (Issue 2(b)) and not limited solely to those customers listed under the utilities' various medical baseline programs (Issue 2(b)(i).  Parties offered numerous additional populations and definitions the Commission could consider in its designation of vulnerable populations.  The utilities and several other parties argue that the Staff Proposal's definition is infeasible in practice due to identification and privacy concerns and that the definition should be limited to data that is available to the utilities under its programs and tariffs.

R.18-12-005  COM/MP6/jt2

CSAC, the Joint Local Governments, and City of Malibu generally agree with the Staff Proposal as presented, although the Joint Local Governments are concerned about the feasibility of identifying and providing effective notice to such a large group.  Abrams suggests that the term 'vulnerable populations' be replaced with the term 'disproportionately vulnerable populations,' because all residents are vulnerable to utility ignited wildfires.  UCAN suggests a more expansive definition featuring additional qualifiers, e.g. instead of the term 'elderly,' UCAN suggests replacing it with the following:  "seniors and people living with disabilities to include people living both independently and in dependent care facilities."[61]

CCSF states that the Staff Proposal's list of vulnerable populations addresses the appropriate groups, but recommends that the Commission adopt a more specific definition, such as that set forth in Government Code § 8593.3.[62] Public Advocates cites to CAL FIRE's 2019 Community Wildfire Prevention and Mitigation Report as a possible source for defining vulnerable populations as well as § 745(c)(1), which, in addition to medical baseline customers, includes customers requesting third-party notifications and customers who the Commission has ordered cannot be disconnected from service without a prior in-person visit from a utility representative.  SBUA agrees that vulnerable

---

[61]  UCAN Opening Comments at 7.

[62]  Government Code § 8593.3 provides that cities and counties must update their emergency plans to include service for the 'access and functional needs' population.  The code lists 'access and functional needs' populations as follows: …the "access and functional needs population" consists of individuals who have developmental or intellectual disabilities, physical disabilities, chronic conditions, injuries, limited English proficiency or who are non-English speaking, older adults, children, people living in institutionalized settings, or those who are low income, homeless, or transportation disadvantaged, including, but not limited to, those who are dependent on public transit or those who are pregnant.

R.18-12-005  COM/MP6/jt2

populations should include Medical Baseline customers, but the Commission should also consider using the definition of 'hard to reach' customers as defined in D.18-05-041.[63]

RCRC requests inclusion of communities with only one method of ingress/egress, as these communities are particularly vulnerable during wildfires.  RCRC also cautions against using only CalEnviroScreen to identify disadvantaged communities, as it would eliminate almost all of the most fire prone communities.  TURN suggests that, at a minimum, vulnerable customers should include medical baseline customers and life support customers, customers who certify that they have a serious illness that could become life threatening absent electric service, and customers over 65 years old.  TURN also recommends consideration of households with infants less than 12 months of age, noting that many states also provide protections against disconnections of households with infants.

CASMU asserts that the utilities do not have the data to ascertain whether customers fall under the Staff Proposal's 'vulnerable populations' definition. PG&E suggests that Staff's proposed definition is infeasible because it would require the utility to ascertain socio-economic data that is not legally or practically available to the utility.  SCE suggests that the proposed definition is too broad and would be difficult, if not impossible, to reasonably implement. Adoption of this definition will shift responsibilities on to the IOUs that state law assigns to public sector emergency services.  SDG&E submits that 'vulnerable populations' should be defined as those who are wholly dependent upon electricity for life-sustaining service, for example those designated as "Life

---

[63] *Decision Addressing Energy Efficiency Plans*.

R.18-12-005  COM/MP6/jt2

Support" customers, which are a subset of SDG&E's medical baseline population.  In Reply Comments, PG&E agrees that there is a distinction between those customers who are dependent upon electricity for health care needs and those customers that are generally vulnerable, but notes if the Commission adopts a broad definition, then PG&E supports the suggestion that the utilities partner with the appropriate agencies who could then notify broader categories of "vulnerable populations."

Staff propose that, for the 2019 wildfire season, use of medical baseline customers is the best available proxy for vulnerable populations, with the caveat that the IOUs should increase outreach to community organizations that can contact vulnerable populations as a means of overcoming limitations of the use of the medical baseline program.  This proposal was met with varying responses among parties.  CASMU, PG&E, SCE and SDG&E agree that medical baseline customers are the best available proxy for 2019, although SCE disagrees with the recommendation that the IOUs use additional notification streams to notify communities disproportionately affected by de-energization.  CSAC, CforAT, POC, CCSF, SBUA and others disagree that medical baseline is an appropriate proxy for 2019.  The Joint Governments argue that medical baseline programs are undersubscribed.  SBUA recommends prioritizing residential and small commercial customers residing in disadvantaged communities for the 2019 fire season.

Parties offer many suggestions on how to identify vulnerable populations, both through the utilities' own programs and tariffs and through partnership with local agencies.  CSAC suggests that identification of "medically fragile" vulnerable populations should be handled by both the IOUs and the local Public

R.18-12-005  COM/MP6/jt2

Health Department.[64]  OSA recommends that the utilities identify vulnerable populations in the same way they identify medical baseline customers; the utilities should ask such customers to register with the utility.  TURN supports this approach but recommends that the utilities be required to partner with community-based organizations that work with identified vulnerable populations to facilitate self-certification.

Public Advocates suggests that the utilities immediately update their Medical Baseline lists prior to the start of the 2019 wildfire season.  If possible, the utilities should work with appropriate counties and departments of health and human services to identify eligible customers.  CforAT notes that the utilities can identify and reach low income customers that are enrolled in the utilities' CARE (California Alternate Rates for Energy) and FERA (Family Electric Rate Assistance) programs.  The Joint Local Governments recommend that the utilities must cultivate and maintain ongoing relationships and lines of communication with the agencies that serve its vulnerable populations.  Further, customers could be given a way to self-select to the list of identified vulnerable populations.  Similarly, UCAN notes that incorporating community-based organizations into notification systems builds both alert capacity and post-event effectiveness.  Advanced cooperation is imperative.  NCPA stresses that the Commission must adopt a means of identifying and locating vulnerable populations prior to the development of notification processes.

---

[64]  CSAC Opening Comments at 7.

R.18-12-005  COM/MP6/jt2

### 4.2.   De-Energization Notification and Communication

This decision will focus primarily on notice and communication in the days prior to and after a de-energization event, but the Commission will also adopt preliminary standards for advanced communication and notice (standardized templates, etc.), as well as communication during de-energization when power will be interrupted and also during re-energization. Communication and notice during de-energization and re-energization will be explored more fully in Phase 2.

This decision will answer the following questions:  (1) who should receive notice; (2) who is responsible for providing notice; (3) when should agencies/entities/customers receive notice; (4) what information should be conveyed; (5) what systems and methods should be used to convey that information; and (6) what structures and practices should be in place to maximize coordination between utilities first responders and local governments.

In order to answer the above questions, information from the Staff Proposal (and party comments) are presented in a different order than originally presented in the Staff Proposal.  This discussion section will correspond with this format.

### 4.2.1.   Who Should be Notified? (Portions of Issue 2(a))

Communication with affected customers as well as first responders is critical to ensure that de-energization happens as orderly and safely as possible. Issue 2(a) in the Scoping Memo asked for feedback on the following question: What are the best ways to notify [the public, including vulnerable populations, local governments, critical facilities and emergency/first responders] of a

R.18-12-005  COM/MP6/jt2

planned de-energization event and when power will be restored in the event of de-energization?

### 4.2.1.1.   Staff Proposal

Staff provided the following proposal:

… IOUs will be responsible for contacting local public safety officials in impacted jurisdictions prior to a de-energization event and must utilize all available means to communicate a de-energization event. At a minimum, these contacts should include local and county public safety notification points whose jurisdictions include de-energized areas.  These contacts must include primary 24-hour contact points, secondary contacts, and tertiary contacts.

To ensure the accuracy of these lists, electric IOUs will be required to update these lists annually and conduct a communication exercise prior to fire season to confirm their ability to rapidly disseminate information.  Additionally, all notifications related to de-energization events will be concurrently sent to CalOES, the CPUC and CAL FIRE. These notifications should include anticipated de-energization events, de-energization events, and estimated restoration timelines.

### 4.2.1.2.   Parties' Positions

Parties provided a variety of comments, most generally supportive of the staff proposal, but with proposed modifications.  Many of parties' comments pertain to timing, method and content of notice, which, although included minimally in Issue 2(a), will be discussed in later sections.

CASMU, the Joint Local Governments, CCSF, PG&E, CforAT, and Public Advocates generally support the Staff Proposal.  CSAC recommends the addition of notice to the Emergency Management Agency, the Department of Public Health, and fire service and law enforcement agencies, at a minimum.  EBMUD and the Joint Water Districts recommend that notice be given to water companies.  SBUA recommends that the utilities should notify governmental

R.18-12-005  COM/MP6/jt2

bodies beyond first responders.  CCSF also recommends that notice be sent to relevant adjacent jurisdictions that may be impacted by de-energization.

Farm Bureau recommends that the Commission require a dedicated customer service line for wildfire-related information that is staffed with specifically trained personnel.  CLECA offers that the utilities should be able to receive communications from critical facilities and/or large users in addition to sending messages.  DACC/EUF note the importance of obtaining the correct contact at critical facilities and/or large customers; the billing contact may not be the appropriate contact in the case of de-energization.  Several parties recommend notification of POUs and electric cooperatives that may be impacted by de-energization because of interconnection with the utility's grid.

SCE concurs with the Staff Proposal, but requests that the Commission not require that a specific information technology be used.  Furthermore, SCE suggests that tertiary contacts should not be required because the utilities cannot require that public safety agencies provide a certain number of contacts.  SDG&E supports annually updating its contact list as well as conducting a communication exercise on an annual basis.  SDG&E also states that all affected groups should be notified as soon as practicable or operationally feasible.

### 4.2.2.  When and in What Order Should Contact Occur?  (Issue 2(a)(i))

Advance notice is crucial in order to allow agencies and affected customers time to adequately prepare for and respond to a de-energization event.  The Scoping Memo (Issue 2 (a)(i)) seeks feedback on the following question:  How far in advance (and in what order of priority) should [the public, including vulnerable populations, local governments, critical facilities and emergency/first responders] be notified of an upcoming de-energization event?

- 34 -

R.18-12-005  COM/MP6/jt2

### 4.2.2.1.  Staff Proposal

Staff set forth the following proposal:

Every effort must be made by the IOUs to provide notice of potential de-energization events as early as possible.  At a minimum, notifications to Public Safety officials and critical infrastructure owners/operators should occur when a utility Emergency Operations Center activates (stands-up) in anticipation of a public safety power shutoff (PSPS) Response Protocol taking place, when the PSPS Response Protocol is initiated, when re-energization begins, and when re-energization is completed within a jurisdiction.

Instead of creating a multi-layer notification tiering system, it is recommended that notifications be provided to public safety partners and critical infrastructure partners prior to initial customer notifications; however, the completion of these notifications should not be an impediment to providing notification to impacted populations.  To the extent practical, communities disproportionately impacted by de-energization events should include additional notification streams (up to and including in person notification) in lieu of staggered alerting timelines.

Staff also recommends consistency with the California Alert and Warning Guidelines by using alerts, warnings and notifications.  This proposal will be discussed in Section 4.2.3, below.  In addition, the method of notification, including possible in-person notification for vulnerable populations, is described in Section 4.2.5, below.

### 4.2.2.2.  Parties' Positions

The parties universally agree that advanced notice is imperative and should be afforded whenever possible.  Parties differ on which entities should receive priority notice and how far in advance notice should be given. Comments will focus first on the timing of notification and then on the priority of notification, although some comments overlap.  Farm Bureau and the City of Malibu support the Staff Proposal as written.  CSAC suggests a phased approach

- 35 -

R.18-12-005  COM/MP6/jt2

beginning at seven days before de-energization, then 72 hours, 48 hours, 24 hours, 12 hours, and finally two hours before a de-energization event.  CforAT supports advance notice but cautions that advance notice of de-energization events that ultimately do not occur could cause customer frustration and fatigue as customers take potentially expensive precautions.

The Joint Governments support the Staff Proposal but note that communication with local governments, public safety and CalOES is most critical.  Public Advocates supports a generally structured and prioritized notification system.  CLECA supports the Staff Proposal, pending the definition of critical facilities, and suggests extending any communication exercises to critical facilities.  EPUC recommends an upfront notification system to customers based on their relative risk of de-energization.  EPUC offers a relative risk categorization system, such as red/yellow/green.  CMUA offers that the Commission should either clarify that the utility must always activate an Emergency Operations Center before a de-energization event or else designate some other point in time prior to de-energization that the utilities should use, to the extent feasible, to provide notice.

OSA suggests there should be five tiers of notification:  Priority 1 (first responders) one-to-seven days in advance; Priority 2 (local government) two-to-six days in advance; Priority 3 (Critical Facilities) three-to-five days in advance; Priority 4 (medical baseline) four days in advance; Priority 5 (general public) two days in advance.  The Joint Communication Parties recommend, in addition to those in the Staff Proposal, an additional notice two-to-four hours in advance of de-energization.  TURN suggests that first responders, water and telecommunications providers receive between 96 and 48-hours advance notice,

R.18-12-005  COM/MP6/jt2

local governments 24 to 48 hours, and the general public 24 to 48 hours- notice.
Final notice should occur 24 hours before de-energization.

CCSF recommends that the Commission adopt specific notification
timelines and recommends a 72-hour notice.  Abrams emphasizes the importance
of advance notification so that affected entities are prepared when a
de-energization event is called.  POC recommends that all customers in Tier 3
HTFD affirmatively sign an advisory notice at least one month in advance of fire
season, inclusive of information regarding where to go during a de-energization
event.  DACC/EUF recommend that the Commission requires at least a 12-hour
advance notice of re-energization.

CASMU supports the Staff Proposal as written.  PG&E agrees with the
Staff Proposal, noting that prioritization of alerts, warnings and notifications
should not create any impediment to notification of the entire population.  SCE
agrees that the notification of public safety agencies and customers should
generally occur two days in advance of de-energization.  SDG&E states that it
attempts to notify the public, local governments, critical facilities and
emergency/first responders at least 48 hours in advance of a de-energization
event.  SDG&E prioritizes public safety partners, especially first/emergency
responders, because these groups are best positioned to respond to emergencies.
If concurrent notification does not occur, notification should next be made to
local governments because the public is likely to turn to them for information
and because local governments can initiate emergency response protocols.  Next
should be critical facilities such as hospitals, water and telecommunication
providers, followed by the general public.

R.18-12-005  COM/MP6/jt2

### 4.2.3.   What Information Should Be Communicated?  (Part of Issue 1, Part of Issue 2(a), Part of Issue 2(A)(i), Issue 2(a)(ii), and Part of Issue 2(a)(iii))

Public Safety Partners and affected customers will require accurate and up-to-date information for each de-energization event.  Furthermore, different entities will require different information.  For example, first/emergency responders will require a different type of information than residential customers since they must prepare for the public safety impacts of de-energization.  Staff discussed the type of information that should be included in de-energization notifications and communications to both Public Safety Partners and customers in various portions of the Staff Proposal.  This section brings those proposals together under one heading and presents a summary of party comments on the topic.

#### 4.2.3.1.   Staff Proposal

Staff offered the following proposals:

1. In order to facilitate situational awareness across public safety partners throughout California, IOUs must clearly articulate their threshold for strong wind events, as well as the conditions (humidity, fuel dryness, temperature) that define "an extreme hazard" to allow public safety partners to conduct parallel planning for potential de-energization events.  Additionally, IOUs will be responsible for publishing a Geographic Information System Representational State Transfer Service (GIS REST) service articulating the geographic boundaries of the areas subject to de-energization to public safety partners concurrent with their notifications of de-energization events (*Issue 1*).

2. [All] notifications related to de-energization events will be concurrently sent to the CalOES the CPUC, and CAL FIRE.  These notifications should include anticipated de-energization

R.18-12-005  COM/MP6/jt2

events, de-energization events, and estimated restoration timelines.  (*Issue 2a*).

3. Additionally, to be consistent with the California Alert and Warning Guidelines, the following definitions will be utilized to discuss de-energization communications (*Issue 2(a)(i)*):

    a. Alert - A communication intended to draw the attention of recipients to some previously unexpected or unknown condition or event.
    b. Warning – A communication that encourages recipients to take immediate protective actions appropriate to some emergent hazard or threat.
    c. Notification – A communication intended to inform recipients of a condition or event for which contingency plans are in place.

4. In order to ensure shared situational awareness, IOUs will need to provide public safety partners with the following information: total customer outages within a jurisdiction's boundaries, total number of impacted medical baseline customers within a jurisdiction's boundaries, the event triggering the de-energization, and the estimated length of the de-energization event.  IOUs will be responsible for publishing a GIS REST service articulating the geographic boundaries of the areas subject to de-energization to public safety partners concurrent with their notifications of de-energization events.  (*Issue 2(a)(ii)*).

5. IOUs should pre-script messages templates in advance in a format that allows public safety agencies to use their official public alerting channels to amplify the message if they choose to do so.  Consistent with existing best practices articulated in the California Alert and Warning Guidelines, warning messages should answer five (5) key recipient questions (*Issue 2(a)(iii)*:

    a. Why are we at risk?
    b. Do you really mean me?  (Does this affect my location or situation?)
    c. How long do I have to act?

R.18-12-005  COM/MP6/jt2

    d.  What should I do?

    e.  Who says so?

### 4.2.3.2.  Parties' Positions

### 4.2.3.2.1.  Issue 1

Many parties supported Staff's proposal in Issue 1, with proposed modifications.  For example, the Joint Local Governments, CCSF, Public Advocates, DACC/EUF,  PG&E, SCE, SDG&E and the Joint Communication Parties generally support the provision of de-energization event boundaries to Public Safety Partners.  Several parties, such as CCSF, request that more detailed information be provided, including affected circuits, real-time weather data and fire threat mapping.  DACC/EUF recommend that notifications be precise as to what facilities are to be de-energized so that back-up generation can be activated. The Joint Communication Providers recommend that communication providers receive the same information as Public Safety Partners.

PG&E suggests that utility GIS were designed for utility information needs and therefore presents information that is not formatted for use by public safety agencies.  SCE recommends against the requirement to share GIS REST files, instead stating that the information can be published to their website for far less cost.  SCE also agrees with other parties that information such as outage boundaries, circuits impacted by shut-off, the number of customers per circuit, and the number of critical care customers per circuit should be shared with Public Safety Partners.  SDG&E generally supports sharing information with Public Safety Partners but believes that the Staff Proposal requires more exploration and expansion.  Furthermore, SDG&E does not believe that Resolution ESRB-8 requires modification, noting that SDG&E has received

R.18-12-005  COM/MP6/jt2

positive feedback from local jurisdictions on their notification and communication efforts.  CASMU supports the Staff Proposal as written.

Regarding the setting of thresholds for strong wind events and defining the conditions that constitute an "extreme hazard," parties provided varying comments.  MWDOC, Abrams, the Joint Local Governments, NCPA and CCSF agree that the utilities should have clearly articulated thresholds and conditions. Abrams supports standardization of thresholds across the utilities.  Both CCSF and NCPA notes that setting thresholds and standards should not be construed as automatically triggering a de-energization event; rather, such information helps Public Safety Partners with their own planning efforts.

The Joint Communication Parties suggest that defined standards are not as important as receiving clear and advance information in real time from the utilities.  TURN, on the other hand, supports the adoption of thresholds and standards, noting that the utilities "are required to provide an essential public service, and they should not have unbounded discretion over when the essential public service should be suspended."[65]  TURN states that the utilities should have narrow discretion, but defined thresholds must be met before the utility can exercise that discretion.  To do otherwise would mean that the Commission cannot determine whether a particular instance of de-energization was necessary to protect the public safety, as required by ESRB-8.

SDG&E states that it does not utilize thresholds or define "extreme hazards," but it agrees with the sentiment of the Staff Proposal.  SDG&E notes that it already shares information with the public, but the decision to de-energize requires utility operating experience in order to analyze all inputs.  PG&E asserts

---

[65] TURN Reply Comments at 2.

R.18-12-005  COM/MP6/jt2

that it already has set and articulated the parameters it uses to determine if
de-energization is necessary.  SCE opposes the adoption of thresholds because
the determination to de-energize is complex and subject to change based on
real-time conditions.

### 4.2.3.2.2.    Issue 2(a) and 2(a)(ii)

This section will summarize party comments pertaining to relevant
portions of Issue 2(a) and Issue 2(a)(ii).  The staff proposals on these two issues
overlap significantly.  Comments pertaining to GIS REST services are
summarized above.

CLECA and CforAT support the Staff Proposal, particularly information
regarding the anticipated length of the de-energization event.  CSAC suggests
inclusion of the following information:  (1) the reason for the proposed outage or
event triggering the de-energization; (2) trigger points for outage; (3) area of
proposed outage; (4) anticipated length of outage; (5) number of residents
affected; (6) estimated de-energization start time and date; (7) restoration date
and time; and (8) estimated time to re-energize the grid.  The Joint Local
Governments believe that weather data, fire threat assessments, maps of the
circuits and transmission lines potentially affected, information regarding
segmentation of those circuits for targeted de-energization, and the status of
notifications to vulnerable populations should be communicated to local
governments and the public.  MWDOC adds that information regarding
protocols for engagement during the event, including appropriate contacts and a
reliable communication briefing timeline should be required.

EBMUD notes that water agencies also need circuit level information and
an understanding of whether water facilities can remain online by employing
sectionalization or other technologies for separating loads within a circuit.

R.18-12-005  COM/MP6/jt2

EBMUD also requests re-energization estimates.  The Joint Water Agencies generally agree with EBMUD's comments.  RCRC and CCSF suggest that notice includes information regarding total number of impacted medical baseline or other medically vulnerable customers and critical facilities.  POC recommends that, in order to develop messaging, the utilities should be required to hold a lessons-learned workshop focusing on the reports from previous de-energization events.  TURN recommends that exact location information at a granular level be provided.  Abrams focuses mostly on advanced education and notes that information should be provided about safe use of generators, traffic safety when traffic signals may be impacted, information regarding where to obtain information, and who to contact during a de-energization event.

PG&E and CASMU generally agree with the Staff Proposal regarding information to be conveyed.  SCE suggests that, based on its experience, public safety agencies are most concerned about the impacts of de-energization, rather than information on what triggered the event.  SCE disagrees with providing the number of medical baseline customers, noting that it should focus on Critical Care customers, those customers that require critical life support equipment at their home.  SCE and SDG&E are concerned that providing an estimated duration for de-energization may be misleading and counterproductive since conditions can change rapidly.

### 4.2.3.2.3.    Issue 2(a)(i)

Few parties provided comment on the use of the definitions included in the California Alert and Warning Guidelines Plan for notification (alert, warning, notification).  As noted elsewhere, EPUC recommends the use of tiered notification using color coding, such as red/yellow/green to signify a customer's risk of de-energization.  SBUA recommends the following definitions:  (1) Alerts:

R.18-12-005  COM/MP6/jt2

communicating that conditions in the coming days may result in de-energization. Alerts may continue for several days without other action; (2) Watches: announcing that potentially dangerous conditions are emerging and encouraging customers to begin preparations; (3) Warnings: predicting that the utility expects to de-energize; and (4) Notifications: reporting actual de-energization.  SDG&E supports using consistent definitions but suggests that determining the appropriate definitions may require collaboration through workshops in order to achieve state-wide uniformity.  SDG&E suggests this topic be deferred to Phase 2.

### 4.2.3.2.4.    Issue 2(a)(iii)

No party filed comments disagreeing with the proposal that messages should be consistent with the existing best practices articulated in the California Alert and Warning Guidelines, which include answering the five questions set forth in the Staff Proposal.  Presumably parties that concurred with the Staff Proposal as written (SDG&E, CASMU, PG&E, SCE, CLECA, POC, RCRC, Public Advocates, EPUC, Joint Communication Parties, Joint Water Agencies, MWDOC TURN, and others) also agreed with the use of the California Alert and Warning Guidelines best practices for notice.

### 4.2.4.   Who is Responsible for Notification? (Issue 2(a)(iii))

The Scoping Memo, in Issue 2(a)(iii) asks the following question:  Who should be responsible for notifying affected customers/populations?  Should the utilities be solely responsible, or should other parties, such as local governments, have a responsibility in communicating these events and notifying affected customers/populations?  If not, who should be responsible for notification?

R.18-12-005  COM/MP6/jt2

### 4.2.4.1.   Staff Proposal

Staff sets forth the following proposal:

The IOUs should retain the responsibility for notifying impacted jurisdictions of de-energization events…

The Staff Proposal offers additional language pertaining to the method and content of messaging.  This proposal is discussed in Section 4.2.5.

### 4.2.4.2.   Parties' Positions

The parties universally agreed that the utilities should be primarily responsible for notification of affected customers.  As the entity that is responsible for calling the de-energization event and the entity that holds contact information for its own customers, parties feel that the utility should take the primary leadership role in providing notice to customers.  However, many parties recognize that the utilities may have limitations in identifying certain customer groups, such as vulnerable populations, and therefore recommend partnering with various agencies and organizations to more effectively disseminate information.

For example, Farm Bureau and CforAT recommend coordination with safety agencies, City of Malibu recommends coordination with local governments, and CSAC recommends that notification language be provided to the local Office of Emergency Services to send out via the emergency notification system.  CSAC also recommends that the utilities develop a Memorandum of Understanding with local governments in order to coordinate notification.  UCAN recommends collaboration with local public safety partners because such agencies have an "accurate and timely understanding of potential adverse

R.18-12-005  COM/MP6/jt2

impacts of notification"[66] and can ensure that notifications will be distributed to vulnerable populations.  The Joint Local Governments support the utility as the lead for notice but assert that the utility must partner with local health departments, medical service providers, nursing facilities and other social service organizations that serve vulnerable populations that are likely not enrolled in medical baseline.

PG&E concurs with the Staff Proposal and agrees to share notification templates with public safety agencies in advance so that the agencies can leverage their own public alert systems to supplement PG&E's notifications, if they choose to do so.  SDG&E agrees that the utility should retain responsibility for notification and remains concerned with the proposed expansion of vulnerable populations.  SCE and CASMU agree with the Staff Proposal.

### 4.2.5.  What Notification Systems and Notification Methods Should Be Used?  (How Should Contact Occur?)  (Issue 2(a)(iv), Part of Issue 2(a), Part of Issue 2(a)(i), Part of Issue 2(a)(iii))

In order to provide notification and to communicate effectively with affected customers and public safety partners, the utilities will have to use many communication systems.  Furthermore, the utilities, in order to collaborate effectively with first/emergency responders and local governments, will need to employ messaging structures that coordinate with the systems used by such entities and agencies.  The Scoping Memo asks the following main questions: What systems should be used for notification of customers (e.g. reverse 9-1-1),

---

[66] UCAN Opening Comments at 5.

R.18-12-005  COM/MP6/jt2

and what are the best ways to notify [entities] of a planned de-energization event and when power will be restored in the event of de-energization?

The Staff Proposal, in various places, discusses the frameworks for providing notice, such as SEMS, the systems that can be used to send out notifications, and the various types of communications that should be used (e.g. social media, telephone, in person notification).  This section brings the staff proposals together under one heading and presents a summary of party comments on the topic.

### 4.2.5.1.   Staff Proposal

Staff set forth the following proposals:

1. Consistent with the principles of the Standardized Emergency Response System (SEMS), (emphasis added) IOUs will be responsible for contacting local public safety officials in impacted jurisdictions prior to a de-energization event and must utilize all available means to communicate a de-energization event (emphasis added) (*Issue 2(a)*).

2. To the extent practical, communities disproportionally impacted by de-energization should include additional notification streams (up to and including in person notification) in lieu of staggered alerting timelines…Additionally, to be consistent with the California Alert and Warning Guidelines, the following definitions will be utilized to discuss de-energization communications (*Issue 2(a)(i)*):

   - Alert - A communication intended to draw the attention of recipients to some previously unexpected or unknown condition or event.
   - Warning – A communication that encourages recipients to take immediate protective actions appropriate to some emergent hazard or threat.
   - Notification – A communication intended to inform recipients of a condition or event for which contingency plans are in place.

R.18-12-005  COM/MP6/jt2

3.  [T]he California Alert and Warning Guidelines state that
    (*Issue 2(a)(iii)*):

    "People rarely act on a single warning message alone.  To be
    effective, warnings should be delivered in various formats via
    various media, both to increase reliability of warning delivery
    and to provide a sense of corroboration that will encourage
    recipients to take protective actions"

    In order to ensure time sensitive notifications are sent to
    populations potentially impacted by de-energization events,
    IOUs should pre-script messages templates in advance in a
    format that allows public safety agencies to use their official
    public alerting channels to amplify the message if they choose to
    do so.  Consistent with existing best practices articulated in the
    California Alert and Warning Guidelines, warning messages
    should answer five (5) key recipient questions:  a. Why are we at
    risk; b. Do you really mean me? (Does this affect my location or
    situation?); c. How long do I have to act; d. What should I do; and
    e. Who says so?

4.  In order to be effective, warnings should be delivered in multiple
    formats across several media channels, both to increase the
    potential a message successfully reaches an impacted population
    and to provide a sense of corroboration that will encourage
    individuals to take protective actions.  These customer
    notifications should include, but are not limited to, telephonic
    notification, text message notification, social media advisories,
    emails, and messages to agencies that service disadvantaged
    communities within an impacted area to allow them to amplify
    any pertinent warnings.  Although mandating public safety
    partners provide notifications to impacted jurisdictions in
    advance of a de-energization event is outside the scope of this
    proceeding, IOUs should develop messages that allow public
    safety partners to utilize their official notification tools at their
    discretion (Issue 2(a)(iv)).

R.18-12-005  COM/MP6/jt2

### 4.2.5.2.  Parties' Positions

### 4.2.5.2.1.  Issue 2(a)

Many of the comments relating to Issue 2(a) have been discussed elsewhere.  This section will focus primarily on comments regarding methods of communication; however, some of the comments will be necessarily duplicative of earlier sections.  As noted earlier, many parties agree with the Staff Proposal as written.  OSA recommends that all available communication channels be used to give notice and that notice must be given in multiple languages.  Public Advocates agrees with OSA but recommends that the Commission adopt a standard notification timeline across utilities so that customers understand de-energization processes even if they move across service territories.  Public Advocates also notes that first responders should receive maps and detailed information about de-energization as soon as they become available.  De-energization without notice should be kept to a minimum and should receive heightened scrutiny by the Commission.

City of Malibu agrees with the Staff Proposal but highlights that during a de-energization event, internet and phone services may not be available.  The utilities must take all necessary steps to communicate effectively, which may include door-to-door knocking or other efforts.  TURN clarifies that attempted notifications may not be sufficient, especially for vulnerable populations.  Positive or affirmative notification must be employed for such customers.  The Commission should also direct the utilities to establish or re-establish local offices in areas most likely to experience de-energization.  Finally, TURN notes, messages should be actionable and should educate and motivate audiences to act on what they have learned, use common language and terminology and should be generic and flexible.  Both Abrams and SBUA emphasize coordinated

R.18-12-005  COM/MP6/jt2

education campaigns in advance of wildfire season.  Abrams suggests that
surveys must be used to determine the effectiveness of education campaigns.
Numerous parties support using all available communication channels including
broadcast media, cellular text messaging, door-to-door notice (if warranted)
electronic mail communications, radio, and phone calls.

PG&E supports establishing "clear and consistent notification processes
that include advanced notification and more targeted customer outreach."[67]
PG&E commits to working closely with first responders, critical facilities and
others to establish clear lines of communication and established protocols.
SDG&E notes that communication and coordination is important, but it cannot
supersede or delay actual de-energization, which may occur rapidly if the need
arises.

### 4.2.5.2.2.    Issue 2(a)(i)

Most of the provisions of Issue 2(a)(i) were discussed earlier, including the
use of the California Alert and Warning Guidelines definitions of alert, warning
and notification.  Most parties support the Staff Proposal and were either
affirmative or silent on the use of the California Alert and Warning Guidelines
definitions.  SBUA provided other suggested definitions, discussed earlier, and
EPUC recommended a color-coded system of green/yellow/red to denote
de-energization risk for specific areas/populations.  As noted earlier, TURN
supports in-person notification for customers disproportionally impacted by
de-energization and notes the importance of remembering that customers will be
without power during de-energization and re-energization, thus limiting
communication streams.  CforAT, like TURN, supports the notion of positive

---

[67]  PG&E Reply Comments at 2.

contacts or affirmative contacts for vulnerable populations.  CforAT recommends that the utilities report on the number of positive contacts and requests that the utilities provide an explanation of why positive contacts were not made, if that occurs.  Utility comments are summarized in the previous section and elsewhere in this decision.

### 4.2.5.2.3.    Issue 2(a)(iii) and Issue 2(a)(iv)

Starting with the almost universally agreed upon understanding stated in the California Alert and Warning Guidelines that people rarely act on a single warning message alone (Issue 2(a)(iii)), the bulk of party comments focus on the methods and systems that should be used to contact affected entities in the case of a power shut-off.  Comments also focus on differences between communication with affected customers and Public Safety Partners.

City of Malibu and CLECA support the Staff Proposal as written.  CSAC asserts that warnings must be disseminated through as many formats and channels as possible, including partnering with local OES and broadcast media. The Joint Communication Parties recommend that messaging be sent via phone, text or email.  The Joint Water Agencies recommend the use of radio and television broadcasts.  RCRC emphasizes that rural communities have insufficient broadband connectivity and as such, broadband cannot be relied upon as a primary source of information for such entities.  TURN agrees that wireless emergency alerts (WEA) or other local government systems could assist with notification.  UCAN recommends that the utilities should select communication methods and technologies that are most effective for each jurisdiction's demographic, cultural and geographical area.  Public Advocates recommends that "off-network" communication methods be used, such as in-person visits to medical baseline customers or the opening of physical

R.18-12-005  COM/MP6/jt2

information centers."  CforAT notes that the ability to send messages via multiple channels will be impacted by loss of power.

The Joint Local Governments support using the SEMS framework as the first line of communication between the utility and first responders.  Once the utility has provided notice and relevant information, the local governments can use their own notification systems (e.g. Nixle, Nextdoor, Reverse 9-1-1) to amplify the message.  The Joint Local Governments, as well as other parties, note that there should be a 24-hour hotline that remains active throughout the event. MWDOC also supports the use of the SEMS framework, but reminds the Commission that SEMS is not a notification system.  CCSF recommends that coordination with critical facilities occur through the California Utilities Emergency Association.[68]

PG&E agrees with the Staff Proposal that warnings should be delivered through various channels including Interactive Voice Response (IVR), text, e-mail, social media, and mass media.  PG&E agrees to share notification templates in advance with public safety agencies so that public alerting channels can be used to supplement PG&E's notifications.  CASMU and SCE support the Staff Proposal as presented.

### 4.2.6.  Coordination Between Utilities and First Responders/Local Governments (Issue 3) and Utility Liaisons in Emergency Operation Centers (Issue 3(a))

Safe and effective de-energization relies in large part on the ability of the utilities, first/emergency responders and local jurisdictions/governments to

---

[68] The California Utilities Emergency Association "serves as a point of contact for critical infrastructure utilities and [CalOES] and other Government Agencies before, during and after an event."

R.18-12-005  COM/MP6/jt2

coordinate responses, including messaging, as seamlessly as possible.  The Scoping Memo sought feedback from parties on the following questions: (1) What structures and practices should be in place to maximize coordination between utilities and first responders/local governments (*Issue 3*); and (2) Should the utilities be required to embed representatives (who are empowered to make decisions on behalf of the utility) in emergency response team operations centers carried out under state and local plans consistent with SEMS?  (*Issue 3(a)*)

### 4.2.6.1.  Staff Proposal

Staff offered the following proposals:

In order to ensure situational awareness in a format compatible with state-of-the-art public safety systems, IOUs should provide geospatial REST services in a format that can be readily accessed and that provides a near real time overview.  Additionally, IOUs should provide Shapefiles/KMZ files to public safety partners and critical infrastructure providers that geospatially represent historic de-energization boundaries and any available probabilistic models of de-energization events.  (*Issue 3*)

Yes; in order to ensure that public safety partners are able to address the full range of impacts that may stem from a de-energization event, IOUs who have initiated a de-energization plan should assign a liaison officer to the Emergency Operations Center (EOC) that has been activated to respond to a de-energization event.  These liaison officers must be enabled to provide rapid and accurate information from the IOUs and should be in frequent communication with an IOU's operational center.  *(Issue 3(a))*

### 4.2.6.2.  Parties' Positions

### 4.2.6.2.1.  Issue 3

Staff's proposal regarding the provision of GIS REST services has been presented elsewhere in this decision.  This section will focus on party comments pertaining to the provision of historic de-energization boundaries and probabilistic models to Public Safety Partners.  In addition, parties provided

R.18-12-005  COM/MP6/jt2

comments on the general principles of utility/first responder/local government coordination.

Several parties support the Staff Proposal as articulated, including CLECA, CWA, EBMUD, City of Malibu, POC, RCRC and CCSF.  OSA recommends using SEMS[69] for managing responses to multi-agency and multijurisdictional emergencies in California as the appropriate governing framework for de-energization.  Public Advocates also recommends aligning the utilities' coordination practices with SEMS (or at least using SEMS to inform their coordination practices).  CforAT agrees with the Staff Proposal but notes that the proposal requires additional coordination, including consideration of allocation of resources between utilities and local government agencies.

CSAC and CMUA recommend, as does CASMU below, that the utilities be required to provide pre-scripted message language to local OES for use in the Emergency Notification System as well as in all social media.  This messaging should be used to augment the utilities' communications, and a Memorandum of Understanding should be developed between parties.  Abrams asserts that structures and practices for coordination should be developed from a very specific set of protocols with associated communication tools and templates. MWDOC recommends that all provisions of data and messaging be delivered to water utilities in addition to first responders/local governments.  The Joint Water Districts suggest that there should be increased electric utility/water utility coordination and documentation for critical water/wastewater facilities.

SDG&E supports information sharing and collaboration with Public Safety Partners, but suggests that more specificity, clarity and guidance is needed

---

[69]  Government Code § 8607(a).

R.18-12-005  COM/MP6/jt2

regarding the provision of shapefiles.  CASMU supports the Staff Proposal but recommends that the utilities should pre-script message templates in advance in a format that allows public safety agencies to use their official alert channels to amplify the utility message, if they choose to do so.  PG&E states that without additional detail on probabilistic models, PG&E cannot endorse Staff's recommendation.

### 4.2.6.2.2.    Issue 3(a)

Most parties that responded to Issue 3(a) support the notion of embedding a utility liaison with decision-making authority in the local jurisdictional emergency operation centers (EOCs), including the Joint Local Governments, OSA, TURN and Abrams.  CMUA suggests that this issue is out of scope because it is more appropriately addressed in R.15-06-009.[70]  The Joint Local Governments, in response to the concerns articulated by the utilities below, recommend that the utility embed a liaison officer in the County EOC if and when it is activated.  In the alternative, if the utility is able to hold twice-daily conference calls between its EOC Incident Commander and local governments, that may be sufficient to "address the previous shortcomings in PG&E's communications— assuming that the conference calls provide timely and accurate information and a direct line to PG&E's decision-makers."[71]

PG&E disagrees with the Staff Proposal noting that, depending on the scope of the event, or if there are multiple emergencies occurring, PG&E could

---

[70] Order Instituting Rulemaking Regarding Policies, Procedures and Rules for Regulation of Physical Security for the Electric Supply Facilities of Electrical Corporations Consistent with Public Utilities Code Section 364 and to Establish Standards for Disaster and Emergency Preparedness Plans for Electrical Corporations and Regulated Water Companies Pursuant to Public Utilities Code Section 768.6.

[71] Joint Local Governments Reply Comments at 4.

R.18-12-005  COM/MP6/jt2

face challenges with embedding liaisons.  Furthermore, PG&E asserts that embedding liaisons with decision-making authority in multiple locations would defeat the purpose of having an Incident Command Structure (ICS).[72]  PG&E proposes that it assign a full-time liaison that CalOES can call when local EOCs are activated in order to get the most up-to-date information from the Chief of Staff in PG&E's EOC.  SDG&E also disagrees with the proposal to embed liaisons in local EOCs noting that it would strain limited resources and violate both Incident Command Systems and emergency management principles, which discourage self-deployment.  SDG&E notes that it has designated seats in its EOC for both County and CalOES representatives.

### 4.3.   Requests to Delay De-Energization (Issue 1(a))

In Issue 1 of the Scoping Memo asks for feedback on the following question:  what, if any, updates or modifications should be made to Resolution ESRB-8 to ensure that, should de-energization become necessary during the 2019 wildfire season, de-energization is undertaken as efficiently and safely as possible?  Staff set forth three main recommendations, the first two of which are discussed in earlier sections (thresholds for strong wind events and conditions for "an extreme hazard" as well as the provision of GIS REST service articulating the boundaries of the areas subject to de-energization).  Staff also sets forth a recommendation to allow requests to delay de-energization.  This section discusses Staff's recommendation as well as party comments on this matter.

### 4.4.   Staff Proposal

Staff offers the following proposal:

---

[72]  ICS is a management system designed to enable effective and efficient domestic incident management by integrating a combination of facilities, equipment, personnel, procedures, and communications operating within a common organizational structure.

R.18-12-005  COM/MP6/jt2

> IOUs should ensure their de-energization plans provide the means
> for pre-designated first responders with statutory responsibility for
> impacted jurisdictions to request a temporary delay in
> de-energization events in exigent circumstances.

### 4.5.  Parties' Positions

CLECA generally supports the Staff Proposal as written.  Public Advocates
recommends that the Commission make clear who qualifies to be a
pre-designated first responder and determine who has ultimate authority to
implement de-energization.  Furthermore, the Commission, should it allow
requests to delay de-energization for emergency circumstances, must clarify
which emergency takes precedence and how long a delay can last before a
decision to de-energize must be reached.  Finally, Public Advocates asserts that
the Commission must clearly define "exigent circumstances."  MWDOC agrees
that further clarification is necessary to determine who is a "pre-designated first
responder with statutory responsibility…"  MWDOC also notes that, after a
de-energization occurs, there must be a protocol for rapid re-energization if an
emergency occurs, e.g. if a non-utility wildfire occurs and water is needed from a
de-energized water provider to fight the fire.

The Joint Local Governments and PG&E express concern about the
allowance of a delay noting that once a utility has decided to de-energize, a delay
could put communities at risk.  The Joint Local Governments note that it is not
clear that a situation would arise where the utility would decide to de-energize
and then delay that decision because other circumstances outweigh the risk of a
wildfire caused by utility equipment.  SDG&E suggests that first responders with
a statutory responsibility for an affected jurisdiction should be able to request a
temporary delay, but the Staff Proposal as written is concerning and the issue of

R.18-12-005  COM/MP6/jt2

liability if a delay is granted must be addressed.  SCE recommends that this issue be explored more fully in Phase 2.

### 4.6.   De-Energization of Transmission Lines (Issue 6)

To date, de-energization has focused primarily on the distribution system; however, there may be times when it becomes necessary for an electric utility to consider de-energization of a transmission line.  De-energization of transmission lines will likely have more far-reaching and cascading impacts than distribution-level de-energization.  As such, the Scoping Memo asked the following question:  What additional provisions or protocols are necessary if de-energization of transmission lines becomes necessary?

#### 4.6.1.   Staff Proposal

Staff set forth the following proposal:

As opposed to providing provisions or protocols that differ based on impacted infrastructure (transmission versus distribution), it is recommend that the IOUs shape their protocols based on the impacts to populations across impacted jurisdictions.  In the case of transmission line de-energization events, this may require additional coordination with CalOES's State Operations Center.

#### 4.6.2.   Parties' Positions

TURN, Public Advocates, EBMUD, the Joint Local Governments, SDG&E and DACC/EUF generally agreed with the Staff Proposal that notice and communication methods and de-energization protocols should be based on the type, number, and location of customers that may be affected.[73]  Some parties note, however, that transmission level de-energization requires a different assessment of impact as well as different notification and coordination efforts

---

[73] TURN-specific language, Opening Comments at 12.

R.18-12-005  COM/MP6/jt2

because of the types of customers that may be affected by a transmission-level outage.

For example, parties noted that the following entities could be significantly affected or brought entirely offline if the utility employs transmission-level de-energization:  large generators (NCPA); POUs and electric cooperatives that interconnect to the IOU-grid (OSA, NCPA); facilities that interconnect at the transmission level (CCSF); and customers that live in distant jurisdictions that may not live in high fire-threat districts (CCSF, Joint Local Governments). However, as noted by Farm Bureau and SDG&E, the transmission system has some level of built-in redundancies such that resultant outages to customers could be less likely.  CSAC notes that the scale and scope of response of a transmission-level de-energization should reflect the scope of the events.

Many parties, such as Public Advocates, CLECA, SCE, CCSF, CMUA, PG&E, SDG&E, NCPA, EPUC, DACC/EUF, and OSA noted that communication and coordination with additional entities is warranted because the impacts of a transmission-level de-energization could be more extensive.  Parties note that communication with the CAISO, CalOES's State Operations Center, the reliability coordinator for the Western Electricity Coordination Council and other transmission owners will be likely.  OSA, CLECA, EPUC and CCSF note that de-energization of transmission lines could violate North American Electric Corporation (NERC) Reliability Standards and there may be Federal Energy Regulatory Commission (FERC) jurisdictional tariff issues that must be considered.  CAISO, in reply comments, notes that they do not own or operate transmission lines; de-energization decisions rely entirely on the transmission owners.  However, notice to CAISO is necessary to allow for CAISO to ensure grid reliability.

R.18-12-005  COM/MP6/jt2

SCE and PG&E discuss a bit about their risk-based decision-making process to assess wildfire risk of individual transmission lines, and SCE discusses its risk-based decision-making process for transmission-line de-energization.  CLECA states that PG&E's risk-based process to assess wildfire risk of individual transmission lines requires more clarity.  CASMU notes that both Bear Valley Electric Service and Liberty CalPeco have limited or no transmission lines in their service territories.  PacifiCorp is geographically diverse, and its customers are geographically dispersed; therefore, PacifiCorp supports the Staff Proposal's focus on impacts to populations.

CSAC argues if a wildfire exists, de-energization should not be permitted, and re-energization should be required.  Similarly, MWDOC requests that the Commission explore what happens if a line is de-energized and a wildfire occurs which could require the need for power.  Similarly, MWDOC requests that the Commission explore what happens if a line is de-energized and a wildfire occurs which could require the need for power.  City of Malibu notes that water utilities may require generators, and that water utilities must be able to ensure that water needs can be met for firefighting activities.  Presumably, CSAC, MWDOC and City of Malibu's comments apply to both distribution-level and transmission-level de-energization events.

Finally, NCAP argues that the Commission must provide "clear direction and clarification regarding the 'power lines' subject to the rules and protocols being addressed [in Phase 1]."[74]  NCAP notes that the scope and impact of de-energization can vary significantly depending on whether a distribution or transmission line is being de-energized and how the lines are defined.  As an

---

[74] NCAP Opening Comments at 2.

R.18-12-005  COM/MP6/jt2

example, NCPA notes that if the distinction between transmission and distribution lines is based on a 100kV bulk electric system threshold, POUs and electric cooperatives that interconnect on a 60kV line could be seen as distribution level customers, which presumably could impact notice to and coordination with non-IOU customers.

### 4.7.   Reporting (Issue 4)

Resolution ESRB-8 expands the reporting requirements adopted in D.12-04-024 following a de-energization event to all the utilities and adopts additional strengthened requirements.  Currently, the electric utilities are required to submit a report to the Director of Commission's Safety and Enforcement Division within ten business days after a de-energization event, as well as after high-threat events where the utility provided notifications to local government, agencies, and customers of possible de-energization though no de-energization occurred.[75]  The reports must include a variety of information, for example (but not limited to), a list of all factors considered in the decision to shut off power, the time, place and duration of the de-energization event, the number of affected customers, any wind-related damage to overhead power-line facilities, a description of the notice to customers and any other mitigation measures provided the utility, the local community representative contacted, an explanation if the utility is not able to provide at least two hours of notice prior to a de-energization event, complaints receive by the utility, etc.

The Scoping Memo solicits party feedback on the following question: What information should be provided to the Commission after a de-energization

---

[75]  Resolution ESRB-8 at 5.

R.18-12-005  COM/MP6/jt2

event to show that de-energization was used as a method of last resort and that [de-energization] was in compliance with Commission rules?

### 4.7.1.   Staff Proposal

Staff provided the following proposal:

In the reporting required by ESRB-8 following power restoration, the IOUs should provide information including, but not limited to, an event timeline, decision criteria leading to a de-energization (including an evaluation of alternative actions), all notifications and timing, impacted area, and lessons learned.  In addition, the IOUs should explain how the public benefit of the de-energization event outweighed any potential public safety risks.

### 4.7.2.   Parties' Positions

There was consensus among parties that after-the-fact reporting was critical to ascertain the reasonableness of a de-energization event and to facilitate learning for future de-energization events.  Many parties stated that de-energization reports should be made public,[76] and first/emergency responders, involved government organizations and others should be allowed to submit their own comments and/or feedback on the de-energization (or anticipated de-energization) event.  Comments below are presented first with recommended additional reporting requirements followed by comments regarding party input on reports and report timing and review.

CLECA recommends that, in addition to the reporting requirements set forth in ESRB-8 and the Staff Proposal, the utilities should describe all mitigation measures used to prevent utility-caused wildfire employed in advance of de-energization (for the de-energized area).  Public Advocates requests that the utilities demonstrate how the public benefit of de-energization outweighed any

---

[76] The Joint Communications Parties suggest that confidential information in the report should be made available to interested parties upon execution of a nondisclosure agreement.

R.18-12-005  COM/MP6/jt2

potential public safety risks as well as presenting full evaluations of alternatives considered that justify de-energization as the best solution.  City of Malibu recommends that the utilities present an analysis of whether the utilities could have reduced the size of the affected area and/or the duration of the de-energization event while still protecting public safety.  Many parties suggest that the utilities provide a detailed accounting of how the utilities arrived at the decision to de-energize, including a discussion of alternatives (generally, CSAC, Public Advocates, the Joint Local Governments, CCSF, the Joint Communication Parties, SDG&E and CforAT).  City of Malibu requests that the utilities include information on requested delays or modifications from local government and whether the utility agreed to the delay (and if not, an explanation of why).  OSA recommends that the number of impacted customers include information on critical facilities and medical baseline customers (how many were impacted and for how long).

RCRC requests that the utilities be required to show what actions were taken to strategically sectionalize areas of risk in order to minimize impacts on utility customers.  RCRC also recommends that the utilities present all information and communications with local government agencies to the Commission for review.  TURN and CforAT suggest that the utilities provide a report of all known incidents of harm as a result of de-energization.  TURN, MGRA and CforAT request that the utilities present information about all wire down or other equipment failures that occurred during de-energization that could have caused ignition both inside and outside of a de-energized area.  MGRA suggests that vegetation contact should be included.

Regarding input from affected parties and timing/review of de-energization reports, EBMUD, the Joint Local Governments, CCSF, CASMU

R.18-12-005  COM/MP6/jt2

and others recommend that the Commission require the utilities to solicit input from all affected critical facilities, public safety partners, local governments and citizens regarding the effectiveness of notification, communications, lessons learned and recommendations for improvement, if any.  The Joint Communication Parties, TURN and CASMU suggest that the water and telecommunication companies should also provide feedback.  SDG&E recommends that, if the utilities are to be held to the ten-day deadline for submitting de-energization reports, comments from stakeholders should be submitted to SED after the utility files the report.

Parties recommended that, in addition to de-energization reports being public, they should be subject to a 30-day comment period, posted on the Commission's Daily Calendar and on the utilities' websites.  CCSF recommends that the Commission's Safety and Enforcement Division should be required to analyze the utilities' reports and related comments and publish an independent evaluation of each de-energization event.  The Joint Communication Parties assert that the Commissions should rule on the reasonableness of each de-energization event; SED should issue a draft resolution for review by the full Commission.  In making a determination of reasonableness, Abrams offers that the Commission should review utility actions for results.  For example, Abrams argues utility notifications alone should not be a measure of reasonableness; rather, the Commission must evaluate whether the communications were effective.  Abrams also suggests that utility de-energization events be measured against other actions taken to reduce risk, showing that de-energization is a measure of last resort.  Public Advocates recommends that the Commission adopt a standard reporting template in Phase 2.  MGRA concurs noting that

R.18-12-005  COM/MP6/jt2

SDG&E's November 16, 2018 report introduced a format for reporting that should be replicated across utilities.

MGRA notes that, to date, the Commission's SED has only reviewed one power shut-off report.  Furthermore, MGRA suggests that the Commission should review a utility's decision to de-energize based upon risk of utility infrastructure being a source of wildfire ignition; wildfire risk in and of itself should not be considered adequate justification for a de-energization event. MGRA emphasizes that a determination of reasonableness must rely upon a finding that de-energization increased public safety; liability is not a justifiable reason to de-energize.  Finally, MGRA asserts that reports must provide clear and actionable information that can be used to formulate future de-energization protocols and requirements.

PG&E, SCE and SDG&E generally comment that the existing requirements in Resolution ESRB-8 adequately meet the intent of the Staff Proposal and provide sufficient information regarding the timing of key events leading to de-energization and restoration.  CASMU, as noted above, generally supports the staff proposal and supports input from stakeholders affected by and involved with de-energization.  PG&E recommends that the Commission consider the issue of weighing public benefit against public safety risks in Phase 2.  SCE offers that, in addition to the ESRB-8 reporting requirements, it will provide information about protective measures taken before a de-energization event, including:  (1) using modified field work procedures for field crews working in high fire risk areas during times of elevated fire danger; (2) blocking reclosers; (3) enabling fast curve relay settings; and (4) sending personnel to the field to monitor actual conditions near electrical lines.  SCE will also describe how the "facts on the ground coincided with the risk of ignition in conditions that could

- 65 -

R.18-12-005  COM/MP6/jt2

lead to a catastrophic wildfire such that de-energization to prevent a catastrophic outcome was warranted."[77]

## 5.   Adopted De-Energization Guidelines

The Commission adopts the guidelines set forth in this decision in order to promote safe, effective and consistent de-energization of powerlines across the service territories of the electric utilities under the Commission's jurisdiction. The guidelines adopted herein are in addition to the guidelines adopted in Resolution ESRB-8,[78] and the utilities must adhere their de-energization plans to both Resolution ESRB-8 and this decision.  The guidelines in Resolution ESRB-8 and this decision will remain in effect unless and until superseded by a subsequent decision.  It is expected that the utilities will make every effort to implement these guidelines in advance of the 2019 wildfire season; however, the Commission recognizes that some of these guidelines will take additional time to fully deploy.  As such, the utilities are required to submit two reports to the Director of the SED detailing progress towards implementation of the guidelines adopted herein.  The electric utilities must also serve copies of progress reports on the service list of this proceeding and post the reports on their websites.  The first progress report is due three months after issuance of this decision, and the second is due nine months after issuance of this decision.  The Commission's SED may request additional progress reports after these initial reports.

As noted in the Scoping Memo, due to regional variability in topography, weather, and other factors, there is no one-size-fits-all approach for utility

---

[77] SCE Opening Comments at 21.

[78] In the event that a guideline adopted in this decision conflicts with a guideline in ESRB-8, the guidelines adopted herein govern.

R.18-12-005  COM/MP6/jt2

de-energization.  Further, each of the utilities has varying experience with de-energization and must serve diverse territories ranging significantly in size. Therefore, the Commission understands that the utilities must be afforded some flexibility in developing and deploying their de-energization programs. However, it is the intention of the Commission that, by adopting these and future guidelines, utilities, first responders and local jurisdictions will all operate under a cohesive framework using consistent language.  This endeavor will ensure that citizens within the utilities' service territories understand and know how to respond to de-energization events, no matter where they may live.

The 2017 and 2018 wildfire seasons evidenced that better warnings and communication are needed – about fire conditions, when those conditions occur, and how the public should prepare – whether de-energization is proactive or not.  The focus needs to be more on the growing danger and how generally to respond, and not just when utilities act to prevent potential hazards from their infrastructure.  The Commission will need to ensure that the utilities integrate as much as possible with local emergency systems and frameworks and treat de-energization in a similar manner as any other emergency that results in loss of power, such as earthquakes, floods or non-utility caused fire events.  The need for shared responsibility between the utilities, public safety partners, and local governments is critical; however, for now, the electric utilities are ultimately responsible and accountable for de-energization communication and notification.

A critical part of making a notification system work for de-energization events is a coordinated and up-front effort to educate the public on how to prepare for wildfire season and de-energization events.  These statewide education campaigns should educate the public in advance of de-energization events regarding what is entailed during a de-energization event, what tools are

R.18-12-005  COM/MP6/jt2

available to the public during these events, what to do in an emergency, how they may receive information alerts during a power shutoff, and who the public should expect to hear from and when.

A key component to developing an effective and cohesive de-energization program is to report on de-energization experiences and lessons learned. Therefore, the utilities must report back to the Commission through its required ESRB-8 filings, as updated by this decision, on what occurred in advance of and during each proactive de-energization event.  In addition, beginning in 2020, the utilities are required to submit with their annual Wildfire Mitigation Plans reports on lessons learned through the de-energization process.

De-energization has far reaching and significant impacts on affected communities.  As such, although de-energization is a valuable tool to promote the public safety, it must be deployed by the utilities as a measure of last resort, and the utilities should continue to strengthen their infrastructure to minimize the need for and size of de-energization events.  Under no circumstances may the utilities employ de-energization solely as a means of reducing their own liability risk from utility-infrastructure wildfire ignitions, and the utilities must be able to justify why de-energization was deployed over other possible measures or actions.

The guidelines adopted below focus primarily on issues of notice and communication in advance of a de-energization event.  The Commission adopts high-level guidelines for communication during the de-energization event itself and during re-energization; however, these issues, among others, will be more fully explored in Phase 2 of this rulemaking.  A comprehensive list of the guidelines adopted in this decision is set forth in Appendix A.  Appendix B contains a preliminary list of issues to be explored in Phase 2.  Appendix C

R.18-12-005  COM/MP6/jt2

provides a glossary of definitions and acronyms used in this decision.
Appendix D contains a copy of Resolution ESRB-8, and Appendix E includes a
copy of SDG&E's November 16, 2018 de-energization report.

In addition to the specific guidelines set forth below, the Commission
adopts the following overarching de-energization guidelines:

- The purpose of proactive de-energization is to promote public
  safety by decreasing the risk of utility-infrastructure as a source
  of wildfire ignitions.

- The electric investor-owned utilities must deploy de-energization
  as a measure of last resort and must justify why de-energization
  was deployed over other possible measures or actions.

- Customers should understand the purpose of proactive
  de-energization, the electric investor-owned utilities' process for
  initiating it, how to manage safely through a de-energization
  event, and the impacts if deployed.  To accomplish this, the
  electric investor-owned utilities must:

  o develop and use a common nomenclature that integrates with
    existing state and local emergency response communication
    messaging and outreach, including the California Statewide
    Alert and Warning Guidelines.

  o develop notification and communication protocols and
    systems that reach customers no matter where the customer is
    located and deliver messaging in an understandable manner.

  o communicate to customers in different languages and in a
    way that addresses different access and functional needs
    using multiple modes/channels of communication.

- Deploying de-energization requires a coordinated effort across
  multiple state and local jurisdictions and agencies.  Coordination
  in preparation for de-energization is a shared responsibility
  between the electric investor-owned utilities, public safety
  partners, and local governments; however, the electric utilities
  are ultimately responsible and accountable for the safe
  deployment of de-energization.  The electric investor-owned

- 69 -

R.18-12-005  COM/MP6/jt2

utilities must work with the CalOES to integrate their warning programs with the agencies and jurisdictions within California that have a role in ensuring that the public is notified before, during, and after emergencies.

- The electric investor-owned utilities, emergency responders, and local governments need to be seamlessly integrated when communicating de-energization notifications, with the goal that local governments provide supplemental or secondary notifications in the near future.  For now, the utilities retain ultimate responsibility for notification and communication throughout a de-energization event.

- The consequences of de-energization should be treated in a similar manner as any other emergency that may result in loss of power, such as earthquakes, floods or non-utility caused fire events.  The electric investor-owned utilities must avoid development of duplicative or contradictory messaging and notification systems to those already deployed by first responders.

- The electric investor-owned utilities must coordinate with CalOES and the CAL FIRE to engage in a statewide public education and outreach campaign.  The campaign must effectively communicate in English, Spanish, Chinese (including Cantonese, Mandarin and other Chinese languages), Tagalog and Vietnamese as well as Korean and Russian where those languages are prevalent within the utilities' service territories.[79] The campaign must convey, in advance of wildfire season, the immediate and increasing risk of catastrophic wildfires and how to prepare for them, the impacts of de-energization, how the public can prepare for and respond to a de-energization event, what resources are available to the public during these events, what to do in an emergency, how to receive information alerts

---

[79]  This requirement is consistent with the guidance set forth in SB 901.  The Commission takes Official Notice, Pursuant to Rule 13.9 of the Commission's Rules of Practice and Procedure, that United States Census data shows that the top three primary languages used in California other than English and Spanish are Chinese (including Cantonese, Mandarin and other Chinese languages), Tagalog, and Vietnamese.

R.18-12-005  COM/MP6/jt2

during a power shutoff, and who the public should expect to hear from and when.

- The electric investor-owned utilities must report on lessons learned from each de-energization event, including instances when de-energization protocols are initiated, but de-energization does not occur, in order to further refine de-energization practices.  In addition, the utilities must work together to share information and develop best practices across California.

- The electric investor-owned utilities must work together to share information and advice in order to create effective and safe de-energization programs at each utility and to ensure that utilities are sharing consistent information with public safety partners.

### 5.1.   Adopted Definitions

Adopting standardized definitions and customer designations allows the utilities, CalOES (and other state or local government entities), CAL FIRE, local first/emergency responders, local governments, critical facilities, the Commission, customers and all others to operate with a shared understanding and language throughout a de-energization event, including re-energization.  In addition, designation as one of the groups set forth below may carry special consideration for notice, both in timing and form (discussed later in this decision,) possible mitigation before, during and after a de-energization event and possible prioritization during re-energization (mitigation and re-energization will be explored more fully in Phase 2 of this proceeding).

The Commission adopts the definitions set forth below for first/emergency responders, critical facilities, public safety partners, and vulnerable populations.  The Commission recognizes the adopted definitions as an interim step towards the standardization of language across agencies and anticipates that the adopted definitions will evolve over time.  The Phase 1

R.18-12-005  COM/MP6/jt2

record also pointed to the need to adopt and standardize other terms in the
context of de-energization, such as 'extreme wildfire risk' and 'transmission
versus distribution.'  The Commission will explore additional refinement of
definitions in Phase 2 of this proceeding, and the Commission is actively
partnering with CalOES and CAL FIRE to move towards a standard lexicon.  The
definitions adopted herein will remain in effect unless or until updated by the
Commission in a subsequent decision.

### 5.1.1.  First Responders/Emergency Responders

The Commission adopts the following definition for first/emergency
responders:

> The term 'first responder/emergency responder' refers to those
> individuals who, in the early stages of an incident, are responsible
> for the protection and preservation of life, property, evidence, and
> the environment, including emergency response providers.  The
> term 'emergency response providers' includes federal, state, and
> local governmental and nongovernmental public safety, fire, law
> enforcement, emergency response, emergency medical services
> providers (including hospital emergency facilities), and related
> personnel, agencies and authorities.

This definition was widely supported by parties and is an appropriate
definition that can be used and understood by all agencies and entities, such as
CalOES, CAL FIRE, the Commission, local governments and other affected
customers and stakeholders.  The definition included in the Staff Proposal is
rooted in existing definitions adopted by FEMA,[80] which comports with the
Commission's goal to standardize and harmonize nomenclature across federal,
state and local agencies and to fit de-energization practices within existing

---

[80]  The proposed definition is cited to both (White House, HSPD 8, 2003) and (Homeland
Security Act of 2002, Public Law No. 107-296, section 2, 116.)

R.18-12-005  COM/MP6/jt2

emergency response frameworks.  The adopted definition does not designate water utilities and communication companies as first/emergency responders, instead designating them as critical facilities and public safety partners that must receive priority notification.  Identification of specific first/emergency responders within each jurisdiction will be discussed in subsequent sections.

### 5.1.2.  Public Safety Partners

The Staff Proposal uses the term 'public safety partners' throughout but does not offer a definition for the term.  The Commission finds value in the use of the term and views Public Safety Partners as those entities for whom advanced notice is critical to preserve the public safety during a de-energization event, including during re-energization.  The Commission adopts the following definition:

> The term 'public safety partners' refers to first/emergency responders at the local, state and federal level, water, wastewater and communication service providers, community choice aggregators (CCAs), affected publicly-owned utilities (POUs)/electrical cooperatives, the Commission, CalOES and CAL FIRE.  Public safety partners will receive priority notification of a de-energization event, as discussed in subsequent sections.

### 5.1.3.  Critical Facilities/Critical Infrastructure

As noted earlier in this decision, Resolution ESRB-8 notes that operators of critical facilities and critical infrastructure must be aware of any planned de-energization event.  Furthermore, the utilities must assist critical facility and infrastructure customers to evaluate their needs for backup generation and determine if additional equipment is needed, potentially including utility-provided generators for facilities that are not well prepared for a power

R.18-12-005  COM/MP6/jt2

shut-off.[81]  The Staff Proposal set forth a list of potential critical facilities and critical infrastructure, but did not offer a standard definition for the term. Parties, in comments, mostly responded to the list presented in the Staff Proposal, but few offered an overarching definition.  Many parties pointed out overlaps with utility terms such as SCE's 'essential providers,' which SCE lists as those entities that provide a critical service to the public.[82]

The purpose of adopting a standard definition for the term 'critical facilities' and 'critical infrastructure' is to promote coordination between the utilities, local government agencies, first/emergency responders and such facilities that are essential to the public safety.[83]  The goal, as noted in ESRB-8, of identifying these facilities and infrastructure is to provide adequate notice before a de-energization event but, equally as important, to assist those facilities to maximize resiliency during de-energization and re-energization by implementing advanced planning.

At this point, the Commission lacks sufficient record and experience with de-energization across the utilities to adopt an overarching definition for critical facilities and critical infrastructure.  Parties offered a number of possible expansions and changes to the list; however, the impact of these additions is not yet fully understood.  However, it is the Commission's goal to move towards a standardized definition across all utilities.  It is also unclear from the record whether it is prudent to adopt a specific list of facilities at this time and require the use of that list across all utilities, exclusive of all other facilities.  Therefore,

---

[81]  Resolution ESRB-8 at 7.

[82]  SCE does not include daycares and schools in its list of 'essential providers.'

[83]  At this point, there is disagreement on what facilities are essential to the public safety.

R.18-12-005  COM/MP6/jt2

the Commission adopts the following interim definition and list of critical facilities and critical infrastructure but notes that this list is not meant to be exhaustive or restrictive.  The Commission may examine this definition further in Phase 2 of this proceeding or subsequent proceedings.  Identification of these facilities and infrastructure will be discussed in a subsequent section.

> The term 'critical facilities' and 'critical infrastructure' refers to facilities and infrastructure that are essential to the public safety and that require additional assistance and advance planning to ensure resiliency during de-energization events.  The Commission adopts an interim list of 'critical facilities' and 'critical infrastructure' but notes that the utilities, in their Wildfire Management Plans (WMP), often list additional or differing facilities than those adopted here.  The Commission strives to move towards a standardized definition and designation of critical facilities and critical infrastructure on a going forward basis, and the definition adopted here should not be construed as restrictive.  The utilities must use the standard terms 'critical facilities' and 'critical infrastructure' (together critical customers) on a going forward basis in their de-energization procedures and WMPs.  Utilities should partner with local government and public safety partners in high fire risk areas to develop a list of critical facilities and critical infrastructure in those areas, and the utilities should be prepared to partner with the Commission to adopt a comprehensive list of types of critical facilities and critical infrastructure in the future.

The Commission adopts the following interim list of critical facilities/infrastructure based upon the Department of Homeland Security's Critical Infrastructure Sectors:[84]

- Emergency Services Sector
    - Police Stations
    - Fire Station

---

[84] *See* https://www.dhs.gov/cisa/critical-infrastructure-sectors at 21.

R.18-12-005  COM/MP6/jt2

- o Emergency Operations Centers

- Government Facilities Sector

  - o Schools

  - o Jails and prisons

- Healthcare and Public Health Sector

  - o Public Health Departments

  - o Medical facilities, including hospitals, skilled nursing facilities, nursing homes, blood banks, health care facilities, dialysis centers and hospice facilities[85]

- Energy Sector

  - o Public and private utility facilities vital to maintaining or restoring normal service, including, but not limited to, interconnected publicly-owned utilities and electric cooperatives

- Water and Wastewater Systems Sector

  - o Facilities associated with the provision of drinking water or processing of wastewater including facilities used to pump, divert, transport, store, treat and deliver water or wastewater

- Communications Sector

  - o Communication carrier infrastructure including selective routers, central offices, head ends, cellular switches, remote terminals and cellular sites

- Chemical Sector

  - o Facilities associated with the provision of manufacturing, maintaining, or distributing hazardous materials and chemicals.[86]

---

[85] Excluding doctor offices and other non-essential medical facilities.

[86] Including Category N-Customers as defined in D.01-06-085.

R.18-12-005  COM/MP6/jt2

### 5.1.4.  Vulnerable Populations (Access and Functional Needs Populations)

De-energization can have disproportionate impacts on certain populations. As discussed below, the Commission adopts a definition that comports with that used by CalOES and will henceforth refer to vulnerable populations as populations with access and functional needs (AFN populations).  The purpose of identifying AFN populations is to ensure that such populations, as with critical facilities, receive the education and notification they need to maximize resiliency during a de-energization event.  Parties provided a variety of comments on the suggested definition in the Staff Proposal ranging from greatly expanding the list to reducing the list solely to those who are wholly dependent upon electricity for life-sustaining service, e.g. SDG&E's Life Support customers. Parties are generally concerned about two main issues:  (1) the ability to identify and locate customers that are designated as AFN and (2) the burden and potentially diminishing returns of notifying an expansive list of customers, especially if door-to-door notification becomes necessary.

The Commission, at this juncture, takes a broad approach to defining AFN populations with the goal of identifying and notifying AFN populations and mitigating against the impacts of de-energization on these populations.  This will include up-front education of AFN populations in advance of wildfire season such that these customers can be prepared to address the unique impacts of de-energization.  The Commission recognizes that the utilities cannot adequately identify all AFN populations at this time; identification will be explored in the next section.  However, the Commission expects the utilities to partner with local and state agencies to develop a plan with the goal of identifying and notifying AFN populations on a going forward basis.  As with critical facilities and critical

R.18-12-005  COM/MP6/jt2

infrastructure, the Commission wishes to adopt a standardized definition across all utilities but recognizes that this definition will need to be further refined as the utilities, the Commission and other public safety partners gain experience with proactive de-energization.

In keeping with the Commission's desire to integrate as fully as possible with existing emergency management frameworks and structures, the Commission adopts the following definition:

> The term 'access and functional needs populations' refers to those populations with access and functional needs as set forth in Government Code § 8593.3.  Government Code § 8593.3 lists 'access and functional needs populations as follows: …the 'access and functional needs population' consists of individuals who have developmental or intellectual disabilities, physical disabilities, chronic conditions, injuries, limited English proficiency or who are non-English speaking, older adults, children, people living in institutionalized settings, or those who are low income, homeless, or transportation disadvantaged, including, but not limited to, those who are dependent on public transit or those who are pregnant.

### 5.1.5.   How Should Entities Be Identified?

Identification of public safety partners, critical facilities and AFN populations in advance of wildfire season is essential to ensure that de-energization occurs as safely and effectively as possible.  As noted by the Joint Local Governments, the definition of first/emergency responders adopted herein does not identify the actual agencies that will be contacted first in a de-energization event.  Furthermore, as discussed by many parties, including the utilities, identification of AFN populations goes beyond customer information held by the utility.  The Commission recognizes that identification of first/emergency responders, critical facilities/critical infrastructure contacts and AFN populations will be an ongoing process that will not be fully complete in

R.18-12-005  COM/MP6/jt2

advance of the 2019 wildfire season.  However, the utility, in partnership with state and local public safety partners, should continue to identify appropriate points of contacts for all listed populations.[87]  The utility should prioritize identification in Tier 2 and 3 fire threat areas followed by adjacent jurisdictions that may be impacted in the event of de-energization.  The Commission adopts the following guidelines:

### 5.1.5.1.  Identification of First/Emergency Responders/Public Safety Partners

- The electric investor-owned utilities must work with local and county officials to identify appropriate emergency/first responder points of contact.  This may include local government points of contact for jurisdictions that share first responder resources.  The electric investor-owned utilities must identify 24-hour contact points and must identify secondary contacts at a minimum and tertiary contacts if possible.  The electric investor-owned utilities must also identify primary and secondary means of communication for each contact.

- The electric investor-owned utilities must provide utility personnel 24-hour points of contact, including secondary and tertiary contacts to affected local jurisdictions/first responders.

- The electric investor-owned utilities must identify clear points of contact for all other public safety partners, including affected CCAs, POUs/electric cooperatives, water and communications providers.  The electric investor-owned utilities must have 24-hour contacts with secondary contacts at a minimum and tertiary contacts if possible.  The electric investor-owned utilities must also have clear points of contact at the Commission, CalOES and CAL FIRE.

---

[87]  The Commission recognizes that the utilities will not be able to identify specific AFN points of contact beyond those customers enrolled in existing utility programs such as medical baseline programs.

R.18-12-005  COM/MP6/jt2

- To ensure accuracy of contacts, the electric investor-owned utilities are required to update lists annually at least two months in advance of the start of the wildfire season and conduct communication exercises prior to wildfire season to confirm their ability to rapidly disseminate information.  The electric investor-owned utilities should work with points of contact to encourage proactive updating of information in the event of a change, beyond the annual update required of the utilities.

### 5.1.5.2.   Critical Facilities and Infrastructure

- The electric investor-owned utilities must, in addition to developing their own list of critical facilities and infrastructure based on the adopted definition, work in coordination with first/emergency responders and local governments to identify critical facilities within the electric investor-owned utilities' service territories.  The electric investor-owned utilities must identify 24-hour points of contact and, at a minimum, secondary points of contact.  The electric investor-owned utilities must work together with the operators of critical facilities and infrastructure to identify preferred points of contact (the billing contact may not be the appropriate de-energization contact) and preferred methods of communication.

- To ensure accuracy of contacts, the electric investor-owned utilities are required to update critical facility and infrastructure lists annually at least two months in advance of the start of wildfire season.  The electric investor-owned utilities should work with points of contact to encourage proactive updating of information throughout the year in the event of a change, beyond the annual update required of the utilities.  The electric investor-owned utilities should prioritize identification of appropriate contacts for critical facilities and infrastructure located within Tier 3 and 2 HFTDs, followed by adjacent jurisdictions that may be impacted in the event of de-energization.

- The electric investor-owned utilities must, pursuant to Resolution ESRB-8, and in advance of the wildfire season, proactively partner with critical facility and critical infrastructure representatives to assess the ability of the critical facility to

R.18-12-005 COM/MP6/jt2

maintain operations during de-energization events of varying lengths. The electric investor-owned utilities must help critical facility and critical infrastructure representatives assess the need for backup generation and determine whether additional equipment is needed, including providing generators to facilities that are not well prepared for a power shut off.[88] Advance education of representatives and preparation of critical facilities and infrastructure is imperative to ensure that public safety is preserved during a de-energization event.

### 5.1.5.3.  Access and Functional Needs Populations

Most parties support an expanded definition of AFN populations; however, the utilities express concerns about their ability to identify such populations, including privacy concerns. The Commission understands and appreciates this concern; however, it is important for AFN populations to be identified in order to ensure that these customers are able to prepare for de-energization in a way that fits their needs. For example, it is essential that those customers dependent upon life-sustaining medical equipment that requires electricity[89]are identified so that the utilities and public safety partners can assist those customers in developing a de-energization action plan. It is the goal of the Commission that a means of identifying other AFN populations is developed; however, the Commission recognizes that the utilities will be unable to identify and notice all AFN populations and must rely upon local and state jurisdictions to assist in this effort. This will be an ongoing endeavor, and the Commission will explore identification of and notification methods to AFN populations more fully in Phase 2. Accordingly, the Commission adopts the following guidelines:

---

[88]  Responsibility for the cost of back-up generation will be explored in Phase 2.

[89]  These customers are noted differently in each utility's tariffs but are generally included under the utilities' medical baseline programs.

R.18-12-005  COM/MP6/jt2

- The electric investor-owned utilities must make a diligent effort to identify AFN populations within their customer base. The electric investor-owned utilities should review available information including, but not limited to, customers on medical baseline tariffs, CARE and FERA tariffs and customers that require in person notification in advance of service disconnection.[90]  In advance of the 2019 wildfire season, the electric investor-owned utilities should seek to identify and expand registration under their medical baseline tariffs.

- In the spirit of shared responsibility, the electric investor-owned utilities should endeavor to partner with local governments and agencies to encourage identification of AFN populations through those agencies.  Recognizing privacy concerns, the Commission does not require the electric investor-owned utilities to develop a comprehensive contact list of AFN customers nor to share individual customer information with local jurisdictions; rather, the Commission encourages that, through local agency partnerships, the electric investor-owned utilities and local jurisdictions can together provide up front education and outreach before and communication during a de-energization event in formats appropriate to individual AFN populations. The electric investor-owned utilities must also develop a plan for expanding identification of AFN customers beyond those customers enrolled in existing utility programs in the event that local agency partnerships are unavailable to assist.  The Commission acknowledges that identification of all AFN customers is a goal that may not be fully achievable even with assistance of local jurisdictions; however, the utilities must take all reasonable steps within the boundaries of the law towards that goal in order to protect the safety of AFN populations.

- The electric investor-owned utilities must update contact information for medical baseline customers and provide an opportunity for such customers to select alternative means of

---

[90] *See* D.12-03-054.

R.18-12-005  COM/MP6/jt2

contact beyond their preferred means of contact from the utility
for billing and other information.

### 5.1.5.4.   All Other Customers

The utility and public safety partners will need to communicate with all

customers within the boundaries of a de-energized area (and potentially adjacent

jurisdictions) in advance of a de-energization event.  The Commission adopts the

following guidelines:

> The electric investor-owned utilities must ensure that customer
> contacts are up-to-date.  The Commission recognizes that electric
> investor-owned utility customer points of contact are necessarily
> limited, for example a landlord-controlled account will not provide a
> method of contact for tenants.  The electric investor-owned utilities
> must work with local jurisdictions to leverage all means of
> identifying and communicating with all people within a
> de-energized area, including people who may be visiting the area or
> not directly listed on utility accounts.  The Commission expects that
> this will be an iterative process developed over time.

### 5.2.   Who Should Receive Notification and in What Order of Priority?

Communication of a de-energization event, no matter the cause, is crucial

to ensure that the event happens in as safe orderly a manner as possible.  There

are two main forms of communication:  (1) education and public outreach in

advance of wildfire season to ensure that procedures and processes are in place

with public safety partners and that customers are aware of de-energization and

know how to prepare; and (2) notice and communication of a potential,

imminent or a suddenly occurring de-energization event.  This section will focus

primarily on the second form of communication; education and outreach are

already occurring and will be discussed further below in this decision.

R.18-12-005  COM/MP6/jt2

### 5.2.1.   Who Should Receive Notice?

Depending on the size of the de-energized area and the utilities' ability to segment their grid, de-energization can have a significant impact on a large group of people spread across diverse topographies.  It is imperative that all stakeholders potentially impacted by a de-energization event receive notification as far in advance as possible, without causing undue confusion.  The Commission adopts the following guidelines:

> Recognizing that there may be times when advance notice is not possible due to emergency conditions beyond the electric investor-owned utilities' control, the electric investor-owned utilities must, whenever possible, provide advance notification to all populations potentially affected by a de-energization event.  This includes, but is not limited to, public safety partners, critical facilities and critical infrastructure, AFN populations, and jurisdictions that are not at threat of a utility-caused wildfire but may lose power as a result of de-energization elsewhere on the system.

### 5.2.2.   In What Order of Priority?

Understandably, all affected entities wish to receive notification of an impending de-energization event as far in advance as possible.  As noted by SDG&E, the utilities should strive to provide notice with enough time for affected populations to respond effectively, which may include concurrent notification to all affected populations.  The Commission finds, however, that whenever possible priority notice should be given to a select group of stakeholders, followed by all other affected populations.  Priority notice provides that those who will respond to ensure public safety are sufficiently noticed and adequately prepared.  Accordingly, the Commission adopts the following guidelines:

R.18-12-005  COM/MP6/jt2

> Consistent with the principles of the SEMS, whenever possible,
> priority notification should occur to the following entities, at a
> minimum:[91]  public safety partners, as defined herein, and adjacent
> local jurisdictions that may lose power as a result of de-energization.
> Notice to all other affected populations, including AFN populations,
> may occur after the utility has given priority notice; however, AFN
> populations may require additional notification streams.  This
> guideline is not meant to be restrictive; utilities may provide priority
> notification to a broader subset of customers, e.g. certain critical
> facilities, to promote public safety.

The Commission acknowledges that many parties recommended that the
Commission require advanced notification of critical facilities and AFN
populations.  As discussed elsewhere in this decision, public outreach and
education events in advance of wildfire season are critical to ensure that such
populations are prepared and know how to respond in the event of
de-energization.  The Commission and the utilities, based upon their statements
in comments, wish to provide advance notification whenever possible to all
populations; however, it is imperative that priority notification be given to those
who will be called on to respond to preserve the public safety.

### 5.3.   How Far in Advance Should Notice Occur?

The Commission recognizes that all stakeholders desire as much time as
possible to prepare for a de-energization event.  However, there is a balance that
must be struck.  Notification too far in advance risks causing confusion and/or
ambivalence, especially if the utility ultimately decides not to de-energize.  The
Commission also appreciates that there may be times when de-energization must

---

[91]  The Commission's adopted definition of public safety partners does not include critical
facilities and infrastructure beyond water utilities and communication providers.  The utility
may, in partnership with first/emergency responders and/or local government entities,
identify other critical facilities that should receive priority notice.  This guideline is intended to
set a floor, not a ceiling for priority notification.

R.18-12-005  COM/MP6/jt2

occur with little to no notification in order to respond to an emergency situation, to avoid the risk of a utility-caused wildfire, or because de-energization occurs due to an unforeseen circumstance outside of the control of the utility, such as a natural disaster or non-utility ignited wildfire.  Finally, as discussed in the general guidelines and Section 5.4, below, the Commission expects the utilities to endeavor to work with local jurisdictions, CalOES and CAL FIRE to develop a coordinated notification effort that leverages existing emergency notification channels and protocols.

The utilities stated generally that they would provide advanced notice whenever possible, with SDG&E noting that it strives to provide 24-48 hours advanced notice.  The Commission is persuaded by parties that it is valuable to adopt a specific notification timeline; however, the utilities must be afforded flexibility to adjust the timeline based upon situational awareness and real-time events that may be out of the utilities' control.  The Commission adopts the following guidelines:

> Every effort must be made by the electric investor-owned utilities to provide notice of potential de-energization as early as the electric investor-owned utilities reasonably believe de-energization is likely. At a minimum, notification to public safety partners must occur when a utility activates its Emergency Operations Center (EOC) in anticipation of a de-energization event or whenever a utility determines that de-energization is likely to occur, whichever happens first.  In addition, the electric investor-owned utilities must provide notice when a decision to de-energize is made, at the beginning of a de-energization event, when re-energization begins and when re-energization is complete.  Electric investor-owned utilities should, whenever possible, adhere to the following minimum notification timeline:

R.18-12-005  COM/MP6/jt2

- 48-72 hours in advance of anticipated de-energization: notification of public safety partners[92]/priority notification entities

- 24-48 hours in advance of anticipated de-energization: notification of all other affected customers

- 1-4 hours in advance of anticipated de-energization, if possible: notification of all affected customers[93]

- When de-energization is initiated: notification of all affected customers[94]

- Immediately before re-energization begins: notification of all affected customers[95]

- When re-energization is complete: notification of all affected customers

## 5.4.  Who is Responsible for Notification?

Parties to this proceeding universally agreed that the utility, as the entity calling the de-energization event, should be ultimately responsible for notification of all stakeholders.  The Commission, however, also seeks to ensure that the utilities integrate as much as possible with local emergency systems and frameworks and treat de-energization in a similar manner as any other emergency that results in loss of power, such as earthquakes, floods or

---

[92]  Consistent with Resolution ESRB-8, the electric investor-owned utilities must provide notice to the Commission's SED Director.

[93]  The Commission appreciates that it may not be possible at this juncture to know exactly when a de-energization will occur and to provide this level of advanced notification.  However, the electric investor-owned utilities should strive to communicate that de-energization is imminent.

[94]  In advance of wildfire season, the electric investor-owned utilities must develop a plan for communicating with public safety partners during a de-energization event, recognizing that many communication channels may be affected by the loss of power.

[95]  Similarly, communication may be affected by the loss of power.

R.18-12-005  COM/MP6/jt2

non-utility caused fire events.  It is the Commission's vision that notice and communication will primarily come from utilities but with close coordination with local first responders, whenever possible, based upon pre-designed templates and scripts developed by the utilities in coordination with relevant state and local agencies.  The Commission supports this approach so that there is cohesive treatment and communication across all emergency events and in recognition that citizens should have consistent experience during de-energization events regardless of their utility provider.

The concept of shared responsibility between the utilities, public safety partners and affected customers is critical; however, for now, the utilities are ultimately accountable for each de-energization event.  Affected customers should be afforded advanced notification whenever possible; however, with advanced education and outreach, customers should be prepared well in advance of a de-energization event or any other event that results in the loss of power, such as a non-utility caused wildfire resulting in power loss, to meet their own safety needs.  For AFN populations, this includes, to the extent possible, partnering with community-based organizations and other entities to develop plans in advance to ensure that needs can be met in the event of a power loss.  The utilities should work with public safety partners and community-based organizations to develop outreach and education materials and plans for AFN populations to prepare for de-energization well in advance of any particular event.

There are public safety implications that must be explored, especially as utilities harden and sectionalize their grid, resulting in more granular de-energization events.  Furthermore, local jurisdictions incur costs when they engage in notification and public safety efforts during de-energization, and it is

R.18-12-005  COM/MP6/jt2

unclear who should bear the burden of those costs at this time.  The Commission also does not have enough of a record to determine at this point if the electric utility or a CCA (or both) should provide notification in jurisdictions where a customer is served by both a CCA and the utility.  Finally, the SEMS framework, aside from setting a bottom-up approach to emergency events, acts as a framework for allocating resources across jurisdictions.  The utilities are not a governmental agency, and at this juncture, state agencies cannot allocate utility resources in the event of de-energization.  The Commission will explore these issues in Phase 2.

Taking the above into account, the Commission adopts the following guidelines for the 2019 wildfire season, recognizing that these guidelines will necessarily evolve over time:

> The electric investor-owned utilities, as the entity with the most knowledge of and jurisdiction to call a de-energization event and subsequent re-energization, retain ultimate responsibility for development of the communication strategy and notification in advance of, during and after a de-energization event.  However, the electric investor-owned utilities should immediately begin working with CalOES and local governments to develop notification programs such that, wherever possible, the utilities' notification processes integrate into the SEMS framework, with the goal that local governments provide supplemental or secondary notification in the near future based upon pre-designed templates and scripts developed by the utilities in coordination with relevant state and local agencies.  Supplemental notification does not supplant the utilities' responsibility to provide notification to all customers

> The utilities must work with the goal of integrating into and leveraging existing outreach and notification systems wherever possible, rather than creating duplicative and potentially conflicting systems to those employed by local jurisdictions/emergency/first responders.

R.18-12-005  COM/MP6/jt2

### 5.5.    What Information Should Be Included in Notifications (and Outreach)?

There are two primary timeframes for notification that must occur prior to de-energization, and each has differing information that must be conveyed.  The first form of notice comes in advance of wildfire season and includes information that must be shared with public safety partners, critical facilities and the public (advanced outreach and education).  The second form of notice occurs in the days and hours preceding a specific de-energization event.

### 5.5.1.   Advanced Outreach and Education

The utilities must work to build relationships with public safety partners, critical facilities, community-based organizations (preferably in partnership with public safety partners) and the public, including AFN populations, in order to ensure that all are as prepared as possible to face a de-energization event if and when it occurs.  Accordingly, the Commission adopts the below advanced education and outreach guidelines.

#### 5.5.1.1.   Public Safety Partners and Critical Facilities

The utilities must develop partnerships with public safety partners at the local and state level to enable these agencies and entities to sufficiently prepare for de-energization events.  The Commission finds that the utilities should share information as broadly and comprehensively as possible to allow public safety partners to conduct parallel planning in advance of the 2019 and subsequent wildfire seasons.  For this reason, the Commission is unconvinced by some of the utilities' arguments that thresholds cannot be developed or communicated for strong wind events and extreme hazard conditions (humidity thresholds, fuel dryness, extreme temperatures).

R.18-12-005  COM/MP6/jt2

The Commission recognizes that there are a number of factors, including on-the-ground utility employee assessments, that go into calling a de-energization event, and the Commission understands that, at this time, there is some degree of discretion that is necessary.  The Commission further recognizes that different utilities are in different places in their development of de-energization programs.  However, requiring each utility to share the particular characteristics and thresholds, which likely vary across terrain, that trigger the utility to *consider* de-energization, enables public safety partners, critical facilities and the general public to plan accordingly.  Therefore, the Commission requires, as set forth below, that the utilities begin to develop and make available information characteristics and thresholds that the utility uses in considering whether to de-energize.  The Commission does not require that the utilities develop standardized thresholds across the state.  Finally, the Commission requires that the utilities work with critical facilities and public safety partners to ensure that these entities have the information and ability to communicate they need to respond effectively during a de-energization event. This may include, but is not limited to, sharing information about the number of medical baseline customers in a particular jurisdiction, circuits affected, and de-energization boundaries to the extent possible, as well as providing operational coordination with public safety partners.

The Commission adopts the following guidelines:

- With the goal of having a common understanding of situational awareness among public safety partners throughout California, each electric investor-owned utility must clearly articulate thresholds for strong wind events as well as the conditions that define "an extreme fire hazard" (humidity, fuel dryness, temperature) that the electric investor-owned utility evaluates in considering whether to de-energize.  This information may vary

R.18-12-005  COM/MP6/jt2

for different jurisdictions and topographies; however, the information must be provided to and be readily available to public safety partners and the public.[96]  The electric investor-owned utilities are afforded discretion to evaluate real-time and on-the-ground information in determining whether to de-energize; adoption of thresholds is not determinative of de-energization.

- To aid in preparation, the electric investor-owned utilities must provide, if requested, relevant GIS data, including identification of critical facilities, circuits, and number of medical baseline customers, to local jurisdictions in advance of wildfire season.  In addition, the utilities must provide, if requested, operational coordination with public safety partners to ensure such partners have not only the information but also the coordination with the utilities necessary to prepare for de-energization.

### 5.5.1.2.   All Other Customers

Although de-energization is a proactive shutting off of power, any emergency, including a non-utility-infrastructure caused wildfire, can cause a prolonged loss of power.  The Commission, therefore, requires that the utilities work with public safety partners, including CAL FIRE and CalOES, to develop outreach and educational materials to make citizens aware of how to prepare for a prolonged loss of power in advance of the 2019 wildfire season.[97]  The Commission will not adopt specific language or requirements at this juncture; however, the Commission requires that the outreach and education efforts be a comprehensive and cohesive multi-agency outreach effort that is coordinated with local entities.

---

[96]  For example, on the utility's website.

[97]  The utilities have already begun to partner with Cal FIRE and CalOES to develop and disseminate such materials.  See, for example, https://prepareforpowerdown.com/

R.18-12-005  COM/MP6/jt2

Finally, the utilities must partner with public safety partners to develop scripted de-energization templates that can be used by public safety partners during a de-energization event.  This should include a standardized set of definitions that must be used across all utilities and public safety partners.  The utilities should, whenever possible, use the best practices, procedures, and protocols outlined in the California Alert and Warning Guidelines to harmonize with existing emergency notifications.

Accordingly, the Commission adopts the following guidelines:

- In advance of the 2019 wildfire season, the electric investor-owned utilities, jointly, must immediately oversee development and execution of a statewide Public Safety Power Shut-off education campaign, developed in partnership with CalOES and CAL FIRE, that provides education tailored to the needs of stakeholders, including AFN populations, in order to make citizens aware of how to prepare for and obtain information during a prolonged loss of power, including as a result of de-energization.  Education and outreach must use best practices outlined in the California Alert and Warning Guidelines to maximize understanding.  The electric investor-owned utilities, in coordination with the above-named agencies, must measure effectiveness of education and outreach efforts and adjust efforts accordingly.

- The electric investor-owned utilities must partner with local and state public safety partners to develop scripted de-energization templates that can be used by public safety partners leading up to, during, and after a de-energization event.  In order to allow jurisdictions with public alerting authority to send timely and appropriate messages to populations potentially impacted by a de-energization event, the utilities must develop Common Alerting Protocol compliant messages and protocols for use by the designated alert authorities.  Whether local jurisdictions choose to utilize their Public Alert and Warning system to notify the public of a de-energization event is at their discretion.  The electric investor-owned utilities must also work with state public

R.18-12-005  COM/MP6/jt2

safety partners (CalOES, CAL FIRE) to develop definitions to use for communications and a standardized nomenclature based on existing emergency frameworks.

### 5.5.2. Notification Preceding a De-Energization Event

Equally important as advanced outreach and education is notification to potentially affected entities preceding a de-energization according to the timelines discussed earlier in this decision.  Public safety partners will require specific information including the boundaries of the de-energization event, circuits to be de-energized, information regarding customers within the de-energization boundaries (number of medical baseline customers, etc.,) the estimated start date and time of de-energization, estimated length of the de-energization event and estimated restoration timelines.

The Commission is not persuaded by some of the utilities' arguments that it is inappropriate to provide an estimated length of de-energization.  While it is impossible to know the exact length of a de-energization event in advance, it is likely that by evaluating advanced weather forecasting and "extreme hazard" thresholds, the utility can develop an estimated length of outage.  The utilities must convey this information to public safety partners but may caveat the information as an estimate that is subject to change as conditions evolve in real-time.  The utilities must also convey this information to all affected customers but may present it in estimated timeframes, e.g. 2-7 days.

Finally, the utilities must provide all situational awareness information possible to public safety partners, including GIS situational awareness information.  The goal is for the utilities to provide GIS REST services; however, the Commission understands this may not be possible in advance of the 2019 wildfire season.  Nevertheless, accurate and timely geospatial information that

R.18-12-005  COM/MP6/jt2

can be rapidly integrated into public safety partners' existing geospatial awareness tools is critical in facilitating decision-making at the state and local level.  The Commission rejects SCE's suggestion that agencies can manually download information from a public website.  To require this would necessitate that an additional series of steps be taken in a time-constrained environment, increasing the potential for errors.  The Commission does support, however, the inclusion of de-energization boundary maps on the utilities de-energization websites that are accessible to the public.

### 5.5.2.1.  Public Safety Partners

The Commission adopts the following guidelines for information to be communicated with public safety partners in the days and hours preceding a de-energization event:

- The electric investor-owned utilities must convey to public safety partners at the time of first notification preceding a de-energization event information regarding the upcoming de-energization, including estimated start time of the event, estimated duration of the event, and estimated time to full restoration.  The electric investor-owned utilities must use the previously established contact channels developed in advance of the 2019 wildfire season and should strive to provide contact according to the timeframes adopted in these guidelines.  The electric investor-owned utilities must provide the number of medical baseline customers in the impacted area to first/emergency responders and/or local jurisdictions.

- For the 2019 wildfire season, the electric investor-owned utilities must, at the time of first notification preceding a de-energization event, make available a GIS shapefile via a secure data transfer process depicting the most accurate and specific information possible regarding the boundaries of the area subject to de-energization to all public safety partners whose jurisdictions or service areas will be impacted by the de-energization event, including adjacent jurisdictions or service areas that could lose

R.18-12-005  COM/MP6/jt2

power as a result of de-energization in a high fire threat district (HFTD).  Going forward, the electric investor-owned utilities must work to provide a secure data transfer of the de-energization boundary in GIS REST format (or other agreed upon format that is rapidly consumable by existing geospatial and situational awareness tools) and must also show affected circuits and any other information that is requested by public safety partners and can reasonably be provided by the utility. The utilities must work towards being able to provide real-time data to public safety partners.

### 5.5.2.2.   All Other Customers

The Commission adopts the following guidelines for information to be communicated with all other customers in the days and hours preceding a de-energization event:

- The electric investor-owned utilities must work with local public safety partners to communicate with all other customers that a de-energization event is possible, the estimated start date and time of the de-energization event, the estimated length of the de-energization event, which may be communicated as a range, and the estimated time to power restoration, which again, may be communicated as a range.  Communications should state when the customer can next expect communication about the de-energization event.  Communication, consistent with best practices articulated in the California Alert and Warning Guidelines, must answer five key recipient questions:  (1) Who is the source of the warning; (2) What is the threat; (3) Does this affect my location; (4) What should I do; and (5) What is the expected duration of the event? Communications must also point customers towards education and outreach materials disseminated in advance of the 2019 wildfire season.

- The electric investor-owned utilities must provide up-to-date information, including a depiction of the boundary of the de-energization event, on their websites' homepage and a dedicated PSPS webpage regarding the de-energization event. The electric investor-owned utilities, in partnership with local

R.18-12-005  COM/MP6/jt2

public safety partners, must establish and communicate a
24-hour means of contact that customers may use to ask
questions and/or seek information.

### 5.6. What Methods Should the Electric Investor-Owned Utilities Use to Communicate a De-Energization Event with the Public?

The Statewide Alert and Warning Guidelines (Guidelines) provide

guidance and expectations for jurisdictions throughout California to ensure that

all available tools are used to alert and warn members of the public about

emergencies.  The Guidelines state that "it is an inherent responsibility of local

government organizations to keep the public informed about natural,

human-caused, and technological disasters," and that "a highly effective alert

and warning program will use as many delivery methods as possible."[98]

Although the Guidelines do not explicitly address de-energization and do not

adopt notification and communication methods when there is a loss of power,

the Guidelines create a strategy for notice to residents by local jurisdictions.  The

utilities must partner with local and state public safety partners to develop

notification strategies that comport with the Guidelines for all customer groups,

recognizing that the utilities retain responsibility to ensure notification of

affected public safety partners, critical facilities and infrastructure and

customers.

De-energization should be communicated by all available means

including, but not limited to, media and broadcast television, social media,

phone calls, texts, and in person visits, and multiple methods of communication

should be employed.  In addition, notifications must be communicated in

---

[98]  Section 11.3.4 Multi-Modal /Multi-Platform Systems, 2019 Statewide Alert & Warning
Guidelines.

R.18-12-005  COM/MP6/jt2

English, Spanish, Chinese (including Cantonese, Mandarin and other Chinese languages), Tagalog and Vietnamese as well as Korean and Russian where those languages are prevalent within the utilities' service territories.  Communication methods must consider the geographic and cultural demographics of affected areas, e.g. some rural areas lack access to broadband services.  The utilities, in partnership with local and state public safety partners, must develop notification strategies for AFN populations up to and including in person notification.  The Commission will not adopt a list at this juncture of populations requiring in-person notification; however, consideration should be given to medical baseline customers and customers requiring advanced notice in the event of power service disconnection.[99]  The utilities should strive to develop a coordinated positive/affirmative notification strategy with public safety partners for pre-designated AFN populations.  Pre-designated AFN populations should be determined in coordination with public safety partners, whenever possible.  Finally, the utilities, in coordination with public safety partners, must develop a strategy for how communication can occur, if possible, with affected customers once de-energization has begun and during re-energization.  Loss of power will likely impact many communication channels.  This issue will be explored further in Phase 2.

The Commission adopts the following guidelines:

- The California Alert and Warning Guidelines states that "people rarely act on a single warning message alone.  To be effective, warnings should be delivered in various formats via various media, both to increase reliability of warning delivery and to provide a sense of corroboration that will encourage recipients to take protective actions." The electric investor-owned utilities

---

[99] *See* D.12-03-054

R.18-12-005  COM/MP6/jt2

must develop notification strategies for all customer groups affected by de-energization.  The electric investor-owned utilities must partner with local and state public safety partners, whenever possible, to develop notification strategies.  In order to be effective, notifications should be delivered in multiple formats across several media channels, both to increase the potential a message successfully reaches an impacted population and to provide a sense of corroboration that will encourage individuals to take protective actions.  Customer notifications should include, but are not limited to, telephonic notification, text message notification, social media advisories, emails, and messages to agencies that service disadvantaged communities within an impacted area to allow them to amplify any pertinent warnings. Communication methods must consider the geographic and cultural demographics of affected areas, e.g. some rural areas lack access to broadband services.  Communications must be delivered in English, Spanish, Chinese (including Cantonese, Mandarin and other Chinese languages), Tagalog and Vietnamese as well as Korean and Russian where those languages are prevalent within the utilities' service territories.

- The electric investor-owned utilities must develop a strategy for how communication will occur with affected customers once de-energization has begun and during re-energization, recognizing that communication channels may be restricted due to the loss of power.  The electric investor-owned utilities should develop this strategy in coordination with public safety partners.

### 5.7.  How Should the Electric Investor-Owned Utilities Communicate and Coordinate with Public Safety Partners Before and During a De-Energization Event?

There are two layers of notification and communication that must be addressed by the utilities and public safety partners, both of which require coordination.  The first is how (under what principles and frameworks) should notification of and communication with public safety partners occur, and the second is how should public safety partners and utilities communicate with

R.18-12-005  COM/MP6/jt2

affected customers.  As noted elsewhere, the Commission intends that public safety partners and the utilities work together to address de-energization as they would any other emergency event, despite the utilities having the jurisdictional authority to call a de-energization event.

The Commission supports a framework where the utility embeds in and utilizes existing emergency preparedness and response frameworks, rather than developing redundant or contrary platforms.  SEMS is a structure for coordination between the government and local emergency response organizations.  It provides and facilitates the flow of emergency information and resources within and between the organizational levels of on-the-ground responders, local government, operational areas, regions and state management. Although the utilities are not government agencies, and state management cannot allocate resources from the utilities, the utilities should, consistent with the principles of SEMS, follow the notification practices included therein, which means that the utilities will be responsible for contacting local public safety officials in impacted jurisdictions, through pre-designated channels prior to and during a de-energization event.  The utility must ensure that an impending de-energization event is communicated to local and state officials.  The utilities must work with public safety partners to disseminate all information in formats and through processes that are used by public safety partners during other emergencies, including developing messaging aligned with the best practices outlined in the California Alert and Warning Guidelines.

The Commission adopts the following guidelines:

R.18-12-005  COM/MP6/jt2

- Consistent with SEMS,[100] the electric investor-owned utilities will be responsible for contacting local public safety officials in impacted jurisdictions prior to and during a de-energization event.  The electric investor-owned utilities must communicate an impending de-energization event to local and state officials.  The electric investor-owned utilities must work with public safety partners to disseminate all information in formats and through processes that are used by public safety partners during other emergencies, including developing notification messaging consistent with the California Alert and Warning Guidelines.  The electric investor-owned utilities must partner with local and state public safety partners to develop notification strategies for all customer groups that comport with the best practices articulated in the California Statewide Alert and Warning Guidelines.

- In advance of the 2019 wildfire season, the electric investor-owned utilities must continue to partner with local jurisdictions, CalOES and CAL FIRE to develop a comprehensive, coordinated and cohesive notification framework including, but not limited to, the electric investor-owned utilities providing notification to public safety partners and public safety partners, to the extent they are willing and able, providing secondary or supplemental notification to the general public.  Electric investor-owned utilities retain responsibility to ensure notification of affected customers.

- The electric investor-owned utilities, in partnership with local and state public safety partners, must develop notification strategies for AFN populations up to and including in-person notification.  The electric investor-owned utilities should strive to develop a coordinated positive/affirmative notification strategy with public safety partners for pre-designated AFN populations.  Pre-designated AFN populations should be determined in coordination with public safety partners, whenever possible, but

---

[100]  PacifiCorp, as a utility that operates across state lines, requests that it operate consistent with NIMS.  This is allowable; however, if a provision of NIMS conflicts with SEMS, PacifiCorp must follow the provisions mandated in SEMS.

R.18-12-005  COM/MP6/jt2

should include customers on medical baseline tariffs that are dependent upon electricity for the provision of life-sustaining services.

### 5.8. Coordination with Emergency Response Centers and Incident Command Systems

A safe and effective de-energization event relies in large part on the ability of the utilities and public safety partners to coordinate responses as seamlessly as possible.  Although not yet declared emergencies by the State of California, de-energization should be treated as any other emergency that results in a prolonged loss of power.  Accordingly, the utilities must avoid developing duplicative and separate response structures and instead seek to integrate into and coordinate with already existing structures and emergency response practices.

The Commission rejects the utilities' arguments that embedding liaisons in local EOCs would be overly burdensome; however, the Commission does appreciate the utilities' concerns about dilution of resources and the possibility of inconsistent decision-making with a dispersed structure.  The Commission addresses this issue in the guidelines set forth below.  The Commission does agree that, consistent with the principles of the Incident Command System, utilities should not *proactively* embed a liaison unless requested by the local jurisdiction.  In fact, if de-energization is not considered an emergency by a local jurisdiction, it is likely that the jurisdiction will not form its own EOC; therefore, it would be futile to require the utility to embed in a non-existent EOC.  At this juncture, the utility does form its own EOC; thus, the utility must hold seats in its EOC for local jurisdictional emergency representatives and invite those representatives to sit on its EOC.

R.18-12-005  COM/MP6/jt2

On a going forward basis, the Commission envisions that de-energization will be treated as any other incident/emergency.  The utilities should coordinate with CalOES, CAL FIRE and local jurisdictions to determine the most appropriate formation and staffing of EOCs in the case of utility called de-energization.  Finally, it is imperative that the utilities and public safety partners have a communication strategy for when power is turned-off; loss of power may impact many standard forms of communication such as cellular and internet services.

The Commission adopts the following guidelines:

- If requested by the local jurisdiction, the electric investor-owned utilities must embed a liaison officer at the local or county EOC. When requested, the utility must embed a liaison officer at the State Operations Center for the purpose of assessing and integrating wildfire threat data for decision-making.  The liaison officers must be empowered to provide rapid and accurate information from the utilities.  To ensure consistency of response across jurisdictions, the electric investor-owned utilities should have a designated lead with decision-making authority located at the utility's EOC with whom embedded liaisons can communicate in real-time to obtain the most up-to-date information. This requirement does not preclude the utilities from developing a centralized communication structure that is amenable to both the utility and local jurisdictions to provide real-time coordination and situation awareness.

- Currently, the electric investor-owned utilities form an EOC during each de-energization event.  The electric investor-owned utilities must invite representatives from CalOES, water infrastructure providers, and communication service providers. In the alternative, the utilities may develop a mutually agreeable communications structure with water infrastructure providers and communication service providers in lieu of holding seats in its EOC.

R.18-12-005  COM/MP6/jt2

### 5.9.   Requests to Delay De-Energization and to Re-Energize

In the Staff Proposal, Staff suggests that utilities should ensure that their de-energization plans allow for pre-designated first responders with statutory responsibility for impacted jurisdictions to request a temporary delay in de-energization events in exigent circumstances.  Party comments make clear that this issue requires further exploration, and the Commission lacks sufficient record to define the terms "pre-designated first responders with statutory responsibility for impacted jurisdictions," "exigent circumstances" and "temporary delay" (i.e. length of delay that can be requested).  Noting the concerns of MWDOC and others about the possibility of de-energization amplifying another emergency event,[101] the Commission adopts the following interim guidelines:

- The electric investor-owned utilities should continue to address requests for a de-energization delay on a case-by-case basis.  The electric investor-owned utilities must only respond to de-energization delay requests from public safety partners.  The electric investor-owned utilities retain ultimate authority to grant a delay and responsibility to determine how a delay in de-energization impacts public safety.

- The electric investor-owned utilities must work with public safety partners in advance of the wildfire season to develop preliminary plans for addressing emergency situations that may arise during de-energization, such as a non-utility caused wildfire that occurs in a de-energized area that necessitates the use of water for firefighting purposes.  Although not a request to delay de-energization, such a situation could result in the public safety being better served by utility lines being re-energized.

---

[101]  MWDOC points to the loss of water pressure during a wildfire that can impact the ability of fire fighters to fight wildfires.

R.18-12-005  COM/MP6/jt2

### 5.10.  De-Energization of Transmission Lines

De-energization of transmission lines will have different and not yet fully understood impacts as compared to de-energization of distribution lines.  For example, de-energization of transmission lines may have impacts on POUs, adjacent jurisdictions and entities such as airports that are often interconnected at the transmission level.  Furthermore, some of the small and multi-jurisdictional utilities do not operate any transmission lines and/or are geographically disbursed.

Based upon the record before the Commission, de-energization of transmission lines requires further exploration in Phase 2 including, but not limited to, voltage designation for delineation of distribution versus transmission level de-energization, impacts on small and multi-jurisdictional utilities, notification required for transmission level de-energization (type and timing), and other matters.  As noted by CAISO, the utility, as the transmission line operator, retains authority to de-energize transmission lines.  The Commission adopts the following interim guidelines for de-energization of transmission lines:

- The electric investor-owned utilities must design interim protocols for the de-energization of transmission lines based upon the impacts to populations across affected jurisdictions including, but not limited to, POUs/electric cooperatives, adjacent jurisdictions and small/multi-jurisdictional utilities and critical facilities interconnected at the transmission level. The utility must solicit input from stakeholders in developing these protocols, and the utilities shall serve the interim protocols on the service list of R.18-12-005 within three months of issuance of this decision.

- In the event of transmission line de-energization, additional coordination may be required with CalOES, CAL FIRE, local jurisdictional public safety partners and the California Independent System Operator (CAISO).  The electric

investor-owned utilities must also provide notice to the CAISO of transmission-level de-energization as far in advance as possible. The electric investor-owned utilities must comply with Federal Energy Regulatory Commission (FERC) and North American Electric Reliability Corporation (NERC) reliability standards.

- While the Commission explores development of transmission level notification and communication guidelines, the utilities must employ all relevant notification and communication guidelines adopted herein, in addition to those in Resolution ESRB-8, to the de-energization of transmission lines.

### 5.11.  Post-Event Reporting and Lessons Learned

Resolution ESRB-8 expands the reporting requirements adopted in D.12-04-024 following a de-energization event to all the utilities and adopts additional strengthened reporting requirements.  Currently, the electric utilities are required to submit a report to the Director of the Commission's SED within ten business days after a de-energization event, as well as after high-threat events where the utility provided notifications to local government, agencies, and customers of possible de-energization though no de-energization occurred.[102]

The Commission views post-event reporting as a means of facilitating learning and improvement across utilities, state and local public safety agencies and local jurisdictions.  Therefore, it is imperative that the utilities provide detailed and accurate information to the Commission and that the Commission review each de-energization event for reasonableness.  As with other elements of de-energization, reporting will be an iterative process that will be further developed with time.  For example, in Phase 2, the Commission will explore whether to adopt additional reporting requirements and whether to review and

---

[102]  Resolution ESRB-8 at 5.

approve the reasonableness of de-energization events through a formal Commission proceeding.  The guidelines adopted below are meant to compliment the requirements in Resolution ESRB-8.  Where the guidelines adopted herein conflict with those in Resolution ESRB-8, the guidelines in this decision govern.

- In addition to submitting a report to the Director of the Commission's Safety and Enforcement Division (SED) within 10 business days of power restoration, electric investor-owned utilities must serve their de-energization report on the service lists of this proceeding and Rulemaking (R.) 18-10-007 or their successor proceedings.  Service should include a link to the report on the utility's website and contact information to submit comments to the Director of SED.  The electric investor-owned utilities must actively contact public safety partners involved in the de-energization event to encourage them to provide feedback. The electric investor-owned utilities must also send a copy of the report to the lead local/county public safety agency for the de-energization event.

- Within 15 days of the electric investor-owned utility serving its post-event report, affected stakeholders, including public safety partners, critical facilities and local residents may serve comments on the electric investor-owned utility's post-event report in order to inform SED's reasonableness review. Comments must be sent to the following address: Safety and Enforcement Division Director, California Public Utilities Commission, 505 Van Ness Avenue, San Francisco, California, 94102. In addition, comments should be served on the service list of R.18-12-005 or its successor proceeding.

- In addition to the reporting requirements in Resolution ESRB-8, the electric investor-owned utilities must provide the following information:

  1) Decision criteria leading to de-energization, including an evaluation of alternatives to de-energization that were considered and mitigation measures used to decrease the risk of utility-caused wildfire in the de-energized area;

R.18-12-005  COM/MP6/jt2

2) A copy of all notifications, the timing of notifications, the methods of notifications and who made the notifications (the utility or local public safety partners);

3) If the utility fails to provide advanced notification or notification according to the minimum timelines set forth in these Guidelines, an explanation of the circumstances that resulted in such failure.

4) A description and evaluation of engagement with local and state public safety partners in providing advanced education and outreach and notification during the de-energization event;

5) For those customers where positive or affirmative notification was attempted, an accounting of the customers (which tariff and/or AFN population designation), the number of notification attempts made, the timing of attempts, who made the notification attempt (utility or public safety partner) and the number of customers for whom positive notification was achieved.

6) A description of how sectionalization, i.e. separating loads within a circuit, was considered and implemented and the extent to which it impacted the size and scope of the de-energization event;

7) An explanation of how the utility determined that the benefit of de-energization outweighed potential public safety risks;

8) The timeline for power restoration (re-energization,) in addition to the steps taken to restore power as required in Resolution ESRB-8.

9) Lessons learned from the de-energization event; and

10) Any recommended updates to the guidelines adopted in Resolution ESRB-8 and this decision.

- The electric investor-owned utilities should refer to SDG&E's November 11-16, 2018 de-energization report, issued on December 4, 2018 (Appendix E) as a starting place for a reporting

R.18-12-005  COM/MP6/jt2

format until the Commission provides further guidance on a standard report template.

- In addition to de-energization reports, the electric investor-owned utilities are required to submit reports on de-energization lessons learned concurrent with their 2020 Wildfire Mitigation Plans and thereafter, including an evaluation of utility/public safety partnerships.  The reports must include a copy of all educational campaigns and outreach made in advance of the wildfire season and an evaluation of their effectiveness. The Commission may consider these reports in other proceedings; however, existing or successor Wildfire Mitigation Plan proceedings are the appropriate place to file these reports at this time.

- The Commission's SED should develop a post-de-energization event reporting template. The template, at a minimum, should include the information requested herein; however, SED has the discretion to request additional information. SED should solicit input from stakeholders on the development of the template. The template should be adopted by the Commission via Tier 3 advice letter.

- The Commission's SED should develop a template for the lessons learned report in advance of the 2020 Wildfire Mitigation Plan submission date. SED should hold workshops to solicit input and facilitate cross-utility and cross-stakeholder learning to inform the development of the reports. The template should be adopted by the Commission via Tier 3 advice letter.

- The Commission's SED will continue to review electric investor-owned utility's de-energization reports pursuant to Resolution ESRB-8.  The Commission will consider development of reasonableness criteria in Phase 2.

## 6.   R.18-12-005 Phase 2

This Phase 1 decision primarily addresses notification and communication prior to a de-energization event as well as updates to Resolution ESRB-8.  The Commission adopts the guidelines in this decision in order to move the needle

- 109 -

R.18-12-005  COM/MP6/jt2

towards a comprehensive, cohesive and well-executed de-energization policy that is easily understood by customers and public safety partners alike.  Due to the proximity to the 2019 wildfire season, the Commission necessarily issued this decision under a tight timeline.

De-energization is a rapidly evolving tool that is being developed by many of the utilities in real-time as conditions in California change in unprecedented ways.  Much work remains to be done among all partners.  The Commission will further examine some of the findings in this decision as well as many other topics related to de-energization in Phase 2 of this rulemaking.  A preliminary list of Phase 2 issues is set forth in Appendix B to this decision.  This list is not meant to be comprehensive; the Commission may consider additional issues not listed in Appendix B.  A final Phase 2 scope will be adopted in a subsequent scoping memo.

## 7.   Comments on Proposed Decision

The proposed decision of Commissioner Picker in this matter was mailed to the parties in accordance with Section 311 of the Public Utilities Code and comments were allowed under Rule 14.3 of the Commission's Rules of Practice and Procedure.  The following parties filed and served opening comments on May 16, 2019: Abrams; CSAC; City of Malibu; NCPA; CMUA; TURN; the Joint Water Districts; DACC/EUF; EBMUD; EPUC; POC; Public Advocates;  MGRA; NCPA; CWA; CforAT; Western States Petroleum Association; Agricultural Energy Consumers Association; the Joint Communication Parties; CLECA; CESA; the Joint Local Governments; Farm Bureau; PG&E; SDG&E; SCE; and, PacifiCorp. The following parties filed and served reply comments on May 21, 2019: CSAC; CMUA; DACC/EUF; City of Malibu; MGRA; TURN; EBMUD;

R.18-12-005  COM/MP6/jt2

EPUC; POC; CWA; CforAT; CCSF; the Joint Local Governments; PG&E; SCE; SDG&E; and, PacifiCorp.

In addition to modifications to the decision to improve clarity and correct typographical errors, the Commission makes the following modifications based upon party comments:

- A new ordering paragraph is added requiring that the electric investor-owned utilities submit two progress reports detailing progress towards implementation of the guidelines set forth in Appendix A to the Director of the SED. The progress reports must be served on the service list of Rulemaking 18-12-005 and posted to the utilities' websites.  The first progress report is due three months after issuance of this decision; the second progress report is due nine months after issuance of this decision. The Commission's Safety and Enforcement Division may request additional progress reports after the initial two reports.

- The Commission adds a new Appendix D containing Resolution ESRB-8 and a new Appendix E containing SDG&E's November 11-16, 2018 de-energization report, submitted on December 4, 2019.

- The introduction is adjusted to better reflect that the purpose of de-energization is to protect the public safety from the risk of wildfire caused by utility infrastructure. In addition, citation sources have been updated.

- The overarching guidelines are updated as follows:

  o Addition of requirement for electric investor-owned utilities to justify why de-energization was deployed over other possible measures;

  o Addition of the goal that customers should know how to manage safely through a de-energization event;

  o Clarifying language that electric investor-owned utilities are ultimately responsible and accountable for the safe deployment of de-energization;

R.18-12-005  COM/MP6/jt2

- o Clarification that, for now, the electric investor-owned utilities retain ultimate responsibility for notification and communication throughout a de-energization event;

- o Clarification that the statewide education campaign must be conducted in English, Spanish, Chinese (including Cantonese, Mandarin and other Chinese languages), Tagalog and Vietnamese as well as Korean and Russian where those languages are prevalent within the utilities' service territories.

- The 'Adopted Definitions' guidelines are updated as follows:

  - o Clarification that a de-energization event includes the power restoration (re-energization) process;

  - o Inclusion of wastewater service providers in the definition of "public safety partners:"

  - o Critical Facilities/Infrastructure definition is updated to remove licensed daycare centers, add public health departments and wastewater service providers and clarify that the chemical sector includes Category N customers.

- The "How Should Entities be Identified" guidelines are updated as follows:

  - o Electric investor-owned utilities must ensure that emergency/first responder and critical facility contacts are updated at least two months in advance of the start of wildfire season;

  - o Additional clarification is provided regarding the identification of AFN populations;

  - o The requirement for the electric investor-owned utilities to develop a means for customers to self-identify as a member of an AFN population is removed. The Commission will explore this further in Phase 2;

  - o The electric investor-owned utilities must consider how to provide notice to people impacted within a de-energized area but who may not be listed on a utility account.

R.18-12-005  COM/MP6/jt2

- The 'Who Should Receive Notice and in What Order of Priority' guidelines are updated as follows:

  o  Additional clarification is provided to note that electric investor-owned utilities may provide priority notice to entities beyond those listed in the guidelines.

- The 'How Far in Advance Should Notice Occur' guidelines are updated to provide clarity around which customers should receive notice under each notice time period.

- The 'What Information Should be Included in Notifications and Outreach' guidelines are updated as follows:

  o  The electric investor-owned utilities are required to provide operational coordination with public safety partners, if requested, in order to facilitate de-energization preparation;

  o  The guidelines are clarified to state that certain information must be provided to public safety partners at the time of first notification preceding a de-energization event;

  o  The electric investor-owned utilities must provide a depiction of the boundary of the area to be de-energized on their website homepage and a dedicated PSPS webpage.

- The 'What Methods Should the Electric Investor-Owned Utilities Use to Communicate a De-energization Event with the Public' guidelines are modified to clarify that communications must be delivered in English, Spanish, Chinese (including Cantonese, Mandarin and other Chinese languages), Tagalog and Vietnamese as well as Korean and Russian where those languages are prevalent within the utilities' service territories.

- The 'How Should the Electric Investor-Owned Utilities Communicate and Coordinate with Public Safety Partners Before and During a De-Energization Event' guidelines are modified to clarify that medical baseline customers that are dependent upon electricity for the provision of life-sustaining services should receive positive or affirmative notification, up to and including in person notification.

R.18-12-005  COM/MP6/jt2

- The 'Coordination with Emergency Response Centers and Incident Command Systems' guidelines are modified as follows:

  o The requirement for the electric-investor owned utility to embed a liaison in a local or county EOC, if requested, is modified to clarify that this requirement does not preclude the utilities from developing a centralized communication structure that is amenable to both the utility and local jurisdictions to provide real-time coordination and situation awareness;

  o The electric investor-owned utilities are permitted to develop a mutually agreeable communications structure with water infrastructure providers and communication service providers in lieu of holdings seats for these providers in the utilities' EOCs.

- The 'De-Energization of Transmission Lines' guidelines are modified as follows:

  o The electric investor-owned utilities are required to develop their interim transmission de-energization protocols with the input of stakeholders, and interim protocols must be served on the service list of R.18-12-005 within three months of issuance of this decision;

  o The electric investor-owned utilities must employ all notification and communication guidelines adopted in this decision and Resolution ESRB-8 to the de-energization of transmission lines while the Commission explores this issue more fully in Phase 2.

- The 'Post-Event Reporting and Lessons Learned' guidelines are modified as follows:

  o Post de-energization reports must be submitted within 10 business days of power restoration;

  o The electric investor-owned utilities must explain the circumstances that led to a failure to provide advanced notification of a de-energization event, if advanced notification does not occur.

○ The electric investor-owned utilities must provide a description of the customers that received affirmative or positive notification;

○ The electric investor-owned utilities must report on the timeline for power restoration (re-energization) in addition to the steps taken to restore power as required in Resolution ESRB-8;

○ The electric investor-owned utilities must submit individual reports on lessons learned concurrent with their 2020 Wildfire Mitigation Plans and annually thereafter;

○ The Commission's SED should develop a post de-energization event reporting template;

○ The Commission's SED should develop a template for the lessons-learned reports in advance of the 2020 Wildfire Mitigation Plan submission date.

The Commission also modified Appendix B to provide for greater clarity on Phase 2 issues; however, a final determination of Phase 2 issues will be conveyed in the Phase 2 Scoping Memo.  The Commission rejects MGRA's assertion that the Commission committed legal error by not including in the Phase 1 or preliminary Phase 2 scope certain issues that were set forth in the Preliminary Scoping Memo to the OIR.  The Preliminary Scoping Memo is meant to present the Commission's initial thinking on the scope of the proceeding. Pursuant to Pub. Util. Code § 1701.1(c), "the assigned commissioner shall prepare an issue by order or ruling a scoping memo that describes the issues to be considered…"  Issuance of the Phase 1 Scoping Memo and the upcoming Phase 2 Scoping Memo meet the requirements of § 1701.1(c).

## 8.   Assignment of Proceeding

Michael Picker is the assigned Commissioner and Melissa K. Semcer is the assigned Administrative Law Judge in this proceeding.

R.18-12-005  COM/MP6/jt2

**Findings of Fact**

1.  The 2018 wildfire season in California was the most destructive on record.

2.  Electric utility infrastructure can be an ignition source for wildfires.

3.  De-energization is the proactive shut-off of power to power lines that may fail in certain weather conditions in order to reduce the likelihood that utility infrastructure can cause or contribute to a wildfire.  It is a measure that can be used after the electric investor-owned utility has exhausted all other means to protect against the risk of wildfire ignitions as a result of utility infrastructure.

4.  Utilities are responsible and accountable for the safe de-energization of power lines and all de-energization notification and communication.

5.  Regional variability in topography, weather, and on-the-ground utility employee assessments impact de-energization decisions.

6.  The electric investor-owned utilities serve diverse territories ranging significantly in size and topography.

7.  The electric investor-owned utilities have varying experience with de-energization.

8.  De-energization can have disproportionate impacts on certain populations.

9.  Adopting standardized definitions and customer designations allows the electric investor-owned utilities, CalOES, CAL FIRE, other state and local government agencies, critical facilities and infrastructure, public safety partners, the Commission, and the public to operate with a shared understanding and language throughout a de-energization event and during subsequent re-energization.

10.  The purpose of identifying critical facilities and critical infrastructure is to provide adequate notice to these facilities and infrastructure prior to a

R.18-12-005  COM/MP6/jt2

de-energization event and to assist these facilities and infrastructure to maximize resiliency during de-energization and re-energization.

11.   The purpose of identifying AFN populations is to ensure that such populations receive the education and notification they need to maximize resiliency during a de-energization event and subsequent re-energization.

12.   Advanced identification of primary, secondary, and if possible tertiary 24-hour points of contact for public safety partners and primary and secondary 24-hour points of contact for critical facilities and critical infrastructure, updated annually at least two months prior to the start of wildfire season, is essential to ensure a safe and effective de-energization event, including re-energization.

13.   The electric investor-owned utilities cannot identify all AFN populations within their service territories at this time. Identification of AFN populations may require the assistance of local and state jurisdictions and social service agencies.

14.   It is essential to identify customers dependent upon life-sustaining medical equipment that requires electricity so that the electric investor-owned utilities and public safety partners can assist those customers in advance of and during a de-energization and re-energization event.

15.   Customer account contacts may not adequately capture all users of electricity within the utilities' service territories or all people that may be impacted within a de-energized area.

16.   Advance notice of a de-energization event allows public safety partners, critical facilities and critical infrastructure, AFN populations and utility customers time to prepare for and respond to a de-energization event.

17.   Accurate and timely communication with and notification to first responders/emergency responders, state and local government entities, public

R.18-12-005  COM/MP6/jt2

safety partners, critical facilities and affected customers within the boundaries of a de-energization event is critical to ensure safe and orderly de-energization.

18.   Coordinated responses, including messaging, among electric investor-owned utilities, first responders and emergency responders, public safety partners and state and local jurisdictions/governments is necessary to protect the public safety during a de-energization event and subsequent re-energization.

19.   There are two forms of advanced de-energization notification and communication:  (1) education and public outreach in advance of wildfire season to ensure that procedures and processes are in place with public safety partners and that customers are aware of de-energization and know how to prepare; and (2) notice and communication of a potential, imminent, or a suddenly occurring de-energization event.

20.   Notification of imminent re-energization helps protect the public safety.

21.   Priority notification of public safety partners and adjacent jurisdictions that may be impacted by a de-energization event enables those with public safety responsibilities to be adequately prepared.

22.   There may be times when advanced notification of a de-energization event is not possible.

23.   Adopting an advanced notification timeline, while affording the electric investor-owned utilities flexibility to adjust the timeline based upon situational awareness and real-time events, allows public safety partners, critical facilities and critical infrastructure, and affected customers time to prepare for and respond to an imminent de-energization event.

24.   It is difficult to predict in advance the duration or extent of a de-energization event.

R.18-12-005  COM/MP6/jt2

25.   The electric investor-owned utilities, as the entities with the most knowledge of and jurisdiction to call a de-energization event and subsequent re-energization, are best situated to provide notification in advance of and during a de-energization event and subsequent re-energization.

26.   Local jurisdictions are responsible for notification and communication related to other emergency events that result in a loss of power, such as wildfires.

27.   Consequences of de-energization and subsequent re-energization should be treated in a similar manner as any other emergency that results in a loss of power.

28.   Integrating into and leveraging existing state and local emergency outreach and notification guidelines and systems, such as the California Alert and Warning Guidelines, and developing pre-scripted templates and messages that are Common Alerting Protocol compliant enables a cohesive notification effort and allows local jurisdictions the ability to provide secondary or supplemental notification and outreach.

29.   Public outreach and education in advance of wildfire season are critical components to ensure that AFN populations are prepared and know how to respond to a de-energization event or any emergency event that may result in a loss of power.

30.   A statewide education campaign will allow citizens to prepare for and obtain information during a prolonged loss of power.

31.   Educating public safety partners and the public about the characteristics and factors that the utility considers in determining whether to de-energize, such as high temperatures, high wind speeds, dry vegetation, and low humidity, enables public safety partners and the public to conduct parallel planning and preparation.

R.18-12-005  COM/MP6/jt2

32.   Informing public safety partners of the geographic boundaries of a de-energization event, the circuits to be de-energized, information regarding customers within the de-energization boundaries (e.g. medical baseline customers and critical facilities/infrastructure), the estimated start date and time of the de-energization event, the estimated length of the de-energization event and the estimated restoration time, will facilitate a coordinated response to these events and enhance public safety.

33.   Requiring the electric investor-owned utilities to provide operational coordination with public safety partners, if requested, enables public safety partners to prepare for de-energization.

34.   Accurate and timely geospatial information that can be rapidly integrated into public safety partners' existing geospatial tools is critical in facilitating decision-making at the state and local levels.

35.   Providing customers with information regarding the timing and estimated duration of a de-energization event in a format consistent with the best practices articulated in the California Alert and Warning Guidelines enables customers to better prepare for these events. In addition, providing customers access to the boundaries of the de-energized area allows them to understand the scope of the de-energization event.

36.   The California Alert and Warning Guidelines provide guidance and expectations for jurisdictions throughout California on the tools to use to alert the public to dangerous conditions and warn of emergencies.

37.   Whether local jurisdictions choose to utilize their Pubic Alert and Warning systems to notify the public of a de-energization event is at their discretion.

R.18-12-005  COM/MP6/jt2

38.   Establishing a 24-hour point of customer contact with the electric investor-owned utilities enables customers to have their de-energization questions answered.

39.   To be effective, notifications should be delivered in multiple formats via various media, and in English, Spanish, Chinese (including Cantonese, Mandarin and other Chinese languages), Tagalog and Vietnamese as well as Korean and Russian where those languages are prevalent within the utilities' service territories in order to increase reliability of warning delivery and to provide a sense of corroboration that will encourage recipients to take protective actions.

40.   Some rural areas may lack access to broadband services.

41.   During a de-energization event, customers may not have access to communication channels that rely upon electricity, such as broadband services, cellular services, etc.

42.   SEMS is a structure for coordination between government and local emergency response organizations. It provides and facilitates the flow of emergency information and resources within and between the organizational levels of on-the-ground responders, local government, operational areas, regions and state management.

43.   Advanced provision of GIS data to local jurisdictions, including the location of non-confidential critical facilities and infrastructure, circuit maps and number of medical baseline customers, will facilitate preparation for future de-energization events.

44.   The Incident Command System governs formation and staffing of EOCs.

45.   It is possible that a local jurisdiction will not form an EOC for a de-energization event; however, the electric investor-owned utilities will always form an EOC.

R.18-12-005  COM/MP6/jt2

46.   Requests to delay de-energization currently occur on an ad-hoc basis. Further development of the record is required to adopt standardized de-energization delay parameters.

47.   De-energization could exacerbate another subsequent emergency, e.g. if a wildfire ignites in a de-energized area and water infrastructure lacks electricity to provide adequate water services for fire suppression.

48.   To date, de-energization has occurred primarily on the distribution system; transmission-level de-energization may become necessary in the future.

49.   De-energization of transmission lines may have different and not yet fully understood impacts as compared to de-energization of distribution lines.

50.   De-energization of transmission lines will require coordination with CAISO, CalOES and CAL FIRE as well as compliance with FERC and NERC reliability standards.

51.   De-energization of transmission lines will require similar notification and outreach efforts as de-energization of distribution lines; however, additional notifications may be needed for downstream communities outside of the target de-energization area.

52.   Post-de-energization reporting provides transparent information on the de-energization event and facilitates learning by the utilities, public safety partners and the Commission.

53.   Wide service of post de-energization event reports will ensure that impacted public safety partners are provided an opportunity to offer feedback on the de-energization event.

54.   SED currently reviews post de-energization reports.

55.   Adoption of standardized post de-energization report templates and lessons-learned templates will enable comparison and learning across utilities.

R.18-12-005  COM/MP6/jt2

56.   Adopting the Guidelines in Appendix A furthers the ability of the electric investor-owned utilities, first and emergency responders and public safety partners to operate under a cohesive framework using consistent language.

57.   Submission of status reports will enable the Commission and other public safety partners and all customers to understand the efforts being undertaken by the electric investor-owned utilities to implement the Guidelines set forth in Appendix A.

**Conclusions of Law**

1.   Pursuant to Pub. Util. Code §§ 451 and 399.2(a), the electric investor-owned utilities have the authority to shut-off electric service in order to protect the public safety.

2.   D.12-04-024 adopted reasonableness, public notification, mitigation and reporting requirements for SDG&E in the event that SDG&E initiated de-energization.

3.   Resolution ESRB-8 extends the reasonableness, public notification, mitigation and reporting requirements of D.12-04-024 to all electric investor-owned utilities and strengthens reporting, public outreach, notification and mitigation guidelines.

4.   It is reasonable to afford the electric investor-owned utilities flexibility in developing and deploying de-energization programs while requiring the use of standardized definitions and nomenclature and requiring operation under a cohesive framework.

5.   It is reasonable to adopt a definition for first responders/emergency responders that is rooted in definitions adopted by FEMA.

R.18-12-005  COM/MP6/jt2

6.  It is reasonable to adopt a definition for public safety partners in order to designate entities for whom advanced notice of a de-energization event, including re-energization, is critical to preserve the public safety.

7.  It is reasonable to adopt a definition for critical facilities and critical infrastructure aligned with the Department of Homeland Security's Critical Infrastructure Sectors.

8.  It is reasonable to adopt the definition for AFN populations set forth in Government Code § 8593.3.

9.  It is reasonable to adopt definitions for first responders/emergency responders, public safety partners, critical facilities/infrastructure and AFN populations set forth in the Guidelines in Appendix A.

10.  It is reasonable to require the electric investor-owned utilities to identify and maintain accurate 24-hour points of contact for public safety partners and critical facilities/infrastructure, updated annually two months in advance of wildfire season.

11.  It is reasonable to require the electric investor-owned utilities to update and expand outreach for enrollment in their Medical Baseline programs and to partner with local governments and social service agencies to identify AFN populations as well as to require the electric investor-owned utilities to take all reasonable steps within the boundaries of the law to identify AFN populations even absent assistance from local governments and social service agencies.

12.  It is reasonable to require priority notification of a de-energization event to public safety partners and adjacent jurisdictions that may lose power as a result of de-energization.

13.  The guidelines in Appendix A satisfy the requirements of Pub. Util. Code § 8386(c)(7).

R.18-12-005  COM/MP6/jt2

14.   It is reasonable to require the electric investor-owned utilities, whenever possible, to provide advanced notification of de-energization events according to the timeline set forth in the Guidelines in Appendix A.

15.   It is reasonable for the electric investor-owned utilities to, for now, retain responsibility and accountability for notification and communication of a de-energization event and subsequent re-energization and to retain responsibility and accountability for the safe deployment of de-energization and subsequent re-energization.

16.   It is reasonable to require the utilities to integrate into and leverage existing local and state emergency notification systems and for the electric investor-owned utilities to coordinate with public safety partners to provide notification.

17.   It is reasonable to require the electric investor-owned utilities to provide to local governments, public safety partners, and the public information on the thresholds for strong wind events and conditions that define an "extreme fire hazard" that the utility evaluates in considering whether to de-energize.

18.   Official Notice is taken, pursuant to Rule 13.9 of the Commission's Rules of Practice and Procedure, that United States census data shows that the top three primary languages used in California other than English and Spanish are Chinese (including Cantonese, Mandarin, and other Chinese languages), Tagalog and Vietnamese.

19.   It is reasonable to require the electric investor-owned utilities to partner with CalOES and CAL FIRE to develop a statewide education campaign that provides education tailored to the needs of customers, including AFN populations, in English, Spanish, Chinese (including Cantonese, Mandarin and other Chinese languages), Tagalog and Vietnamese as well as Korean and

R.18-12-005  COM/MP6/jt2

Russian where those languages are prevalent within the utilities' service
territories.

20.  It is reasonable to require the electric investor-owned utilities to provide
public safety partners with the boundaries of a de-energization event, circuits to
be de-energized, information regarding customers within the de-energization
boundaries (e.g. medical baseline customers), the estimated start date and time of
the de-energization event, estimated length of the de-energization event and
estimated restoration times, which includes the re-energization start date and
time and completion timeframe.

21.  It is reasonable to require the electric investor-owned utilities to provide
geographic information to public safety partners as set forth in Appendix A.

22.  It is reasonable to require the electric investor-owned utilities to partner
with local public safety partners to communicate to impacted customers that a
de-energization event is possible, the estimated start date and time of the
de-energization event, the estimated length of the de-energization event, the
geographic boundaries of the de-energization event, and the estimated time to
power restoration. Estimates should be updated as necessary.

23.  The electric-owned utilities should partner with state and local public
safety partners to develop notification strategies that comport with the California
Alert and Warning Guidelines.

24.  It is reasonable to require the electric investor-owned utilities, in
collaboration with state and local public safety agencies, to deliver notifications
to all customer groups in multiple formats and through multiple media channels
including, but not limited to, telephonic notification, text message notification,
social media advisories, emails and messages to agencies that serve
disadvantaged communities within an impacted area.  Notifications should be

R.18-12-005  COM/MP6/jt2

prepared in English, Spanish, Chinese (including Cantonese, Mandarin and other Chinese languages), Tagalog and Vietnamese as well as Korean and Russian where those languages are prevalent within the utilities' service territories.

25.   It is reasonable to require the electric investor-owned utilities to develop notification strategies that consider the geographic and cultural demographics of affected areas.

26.   The investor-owned utilities, in partnership with local and state public safety partners, should develop notification strategies for AFN populations up to and including in-person notification. The utilities should work with local and state government agencies and public safety partners to determine a strategy for in-person notification when needed.

27.   It is reasonable to require the electric investor-owned utilities, in coordination with public safety partners, to develop a communication strategy once de-energization has begun when access to some communication channels may be restricted due to the loss of power.

28.   Even though the electric investor-owned utilities are not government agencies, it is reasonable for the utilities to coordinate with local and state agencies consistent with SEMS.

29.   It is reasonable to require the electric investor-owned utilities to provide, if requested by local jurisdictions, relevant GIS data for that jurisdiction including identification of critical facilities, circuits and number of medical baseline customers in advance of wildfire season.

30.   The electric investor-owned utilities should embed a liaison that is empowered to provide rapid and accurate information regarding the de-energization event in local EOCs and at the state Operations Center, if requested.

R.18-12-005  COM/MP6/jt2

31.   The electric investor-owned utilities should designate an EOC liaison lead with decision-making authority to coordinate communication with embedded liaisons.

32.   When an electric investor-owned utility forms an EOC, it must hold a space for and invite representatives from CalOES, water infrastructure providers, and communication providers.

33.   It is reasonable to permit the electric investor-owned utilities to develop a centralized communication structure that is amenable to both the utility and local jurisdictions to provide real-time coordination and situation awareness.

34.   It is reasonable to allow the utilities to develop a mutually agreeable communications structure with water infrastructure providers and communication service providers in lieu of holding seats in the utilities' EOCs.

35.   It is reasonable to require electric investor-owned utilities to only respond to requests to delay de-energization from public safety partners.  The electric investor-owned utilities should retain ultimate authority to grant or deny a delay and responsibility to determine how a delay will impact the public safety.

36.   It is reasonable to require the electric investor-owned utilities to work with public safety partners in advance of wildfire season to develop preliminary plans for addressing emergency situations that may arise concurrent with de-energization, such as ignition of a wildfire, where re-energization of energized lines may provide greater public safety benefits.

37.   In the event of a transmission-level de-energization, it is reasonable to require the electric investor-owned utilities to provide notice to and coordinate with the CAISO, CalOES and CAL FIRE. The utilities should comply with FERC and NERC reliability standards.

38.   It is reasonable to require the electric investor-owned utilities to develop interim protocols for the de-energization of transmission lines and to serve the interim protocols on the service list of R.18-12-005 within three months of issuance of this decision.

39.   It is reasonable to require the electric investor-owned utilities to the apply the notification and communication guidelines adopted in the Guidelines in Appendix A to the de-energization of transmission lines.

40.   It is reasonable to require the electric investor-owned utilities to submit post-de-energization reports according to the parameters set forth in Appendix A.

41.   SED should develop a post-de-energization event reporting template. The template, at a minimum, should include the information requested in the Guidelines in Appendix A; however, SED has the discretion to request additional information. SED should solicit input from stakeholders on the development of the template. The template should be adopted by the Commission via Tier 3 advice letter.

42.   SED should develop a template for the lessons learned report in advance of the 2020 Wildfire Mitigation Plan due date. SED should hold workshops to solicit input and facilitate cross-utility and cross-stakeholder learning to inform the development of the reports. The template should be adopted by the Commission via Tier 3 advice letter.

43.   SED should assist the Commission, in Phase 2 of this proceeding, to develop reasonableness guidelines for assessing de-energization events.

R.18-12-005  COM/MP6/jt2

44.  R.18-12-005 should remain open to address additional issues in Phase 2.

# O R D E R

**IT IS ORDERED** that:

1.  Pacific Gas and Electric Company, San Diego Gas & Electric Company, Southern California Edison Company, Bear Valley Electric Service, a division of Golden State Water Company, Liberty Utilities (CalPeco Electric) LLC and PacifiCorp d.b.a. Pacific Power must follow the guidelines set forth in Appendix A to this decision.  These guidelines, along with the guidelines adopted in Resolution ESRB-8 will remain in effect unless and until they are superseded by another Commission decision or resolution.

2.  Pacific Gas and Electric Company, San Diego Gas & Electric Company, Southern California Edison Company, Bear Valley Electric Service, a division of Golden State Water Company, Liberty Utilities (CalPeco Electric) LLC and PacifiCorp d.b.a. Pacific Power must continue to follow the guidelines adopted in Resolution ESRB-8 unless superseded by the guidelines adopted in this decision.

3.  Pacific Gas and Electric Company, San Diego Gas & Electric Company, Southern California Edison Company, Bear Valley Electric Service, a division of Golden State Water Company, Liberty Utilities (CalPeco Electric) LLC and PacifiCorp d.b.a. Pacific Power must make every effort to implement the guidelines set forth in Appendix A in advance of the 2019 wildfire season; however, some of the guidelines will necessarily take additional time to fully deploy. Pacific Gas and Electric Company, San Diego Gas & Electric Company, Southern California Edison Company, Bear Valley Electric Service, a division of Golden State Water Company, Liberty Utilities (CalPeco Electric) LLC and

R.18-12-005  COM/MP6/jt2

PacifiCorp d.b.a. Pacific Power must submit two progress reports detailing progress towards implementation of the guidelines set forth in Appendix A to the Director of the California Public Utilities Commission's Safety and Enforcement Division. Pacific Gas and Electric Company, San Diego Gas & Electric Company, Southern California Edison Company, Bear Valley Electric Service, a division of Golden State Water Company, Liberty Utilities (CalPeco Electric) LLC and PacifiCorp d.b.a. Pacific Power must serve the progress reports on the service list of Rulemaking 18-12-005 and post the reports to their websites. The first progress report is due three months after issuance of this decision; the second progress report is due nine months after issuance of this decision. The Commission's Safety and Enforcement Division may request additional progress reports after the initial two ordered herein.

4.   Rulemaking 18-12-005 remains open.

This order is effective today.

Dated May 30, 2019, at San Francisco, California.

MICHAEL PICKER
President
LIANE M. RANDOLPH
MARTHA GUZMAN ACEVES
CLIFFORD RECHTSCHAFFEN
GENEVIEVE SHIROMA
Commissioners

R.18-12-005  COM/MP6/jt2

# Appendix A

R.18-12-005  COM/MP6/jt2

## APPENDIX A
## DE-ENERGIZATION (PUBLIC SAFETY POWER SHUT-OFF) GUIDELINES

**Overarching Guidelines**

- The purpose of proactive de-energization is to promote public safety by decreasing the risk of utility-infrastructure as a source of wildfire ignitions.

- The electric investor-owned utilities must deploy de-energization as a measure of last resort and must justify why de-energization was deployed over other possible measures or actions.

- Customers should understand the purpose of proactive de-energization, the electric investor-owned utilities' process for initiating it, how to manage safely through a de-energization event, and the impacts if deployed.  To accomplish this, the electric investor-owned utilities must:

    o develop and use a common nomenclature that integrates with existing state and local emergency response communication messaging and outreach and is aligned the California Alert and Warning Guidelines.

    o develop notification and communication protocols and systems that reach customers no matter where the customer is located and deliver messaging in an understandable manner.

    o communicate to customers in different languages and in a way that addresses different access and functional needs using multiple modes/channels of communication.

A1

R.18-12-005  COM/MP6/jt2

- Deploying de-energization requires a coordinated effort across multiple state and local jurisdictions and agencies. Coordination in preparation for de-energization is a shared responsibility between the electric investor-owned utilities, public safety partners, and local governments; however, the electric utilities are ultimately responsible and accountable for the safe deployment of de-energization.  The electric investor-owned utilities must work with the California Governor's Office of Emergency Services to integrate their warning programs with the agencies and jurisdictions within California that have a role in ensuring that the public is notified before, during, and after emergencies.

- The electric investor-owned utilities, emergency responders, and local governments need to be seamlessly integrated when communicating de-energization notifications, with the goal that local governments provide supplemental or secondary notifications in the near future given the primary or initial notification to the public provided by utilities. For now, the utilities retain ultimate responsibility for notification and communication throughout a de-energization event.

- Consequences of de-energization should be treated in a similar manner as any other emergency that may result in loss of power, such as earthquakes, floods or non-utility caused fire events. The electric investor-owned utilities must avoid development of duplicative or contradictory messaging and notification systems to those already deployed by first responders.

- The electric investor-owned utilities must coordinate with California Governor's Office of Emergency Services and the California Department of Forestry and

R.18-12-005  COM/MP6/jt2

Fire Protection to engage in a statewide public
education and outreach campaign.  The campaign must
effectively communicate in English, Spanish, Chinese
(including Cantonese, Mandarin and other Chinese
languages), Tagalog and Vietnamese as well as Korean
and Russian where those languages are prevalent
within the utilities' service territories. The campaign
must convey, in advance of wildfire season, the
immediate and increasing risk of catastrophic wildfires
and how to prepare for them, the impacts of
de-energization, how the public can prepare for and
respond to a de-energization event, what resources are
available to the public during these events, what to do
in an emergency, how to receive information alerts
during a power shutoff, and who the public should
expect to hear from and when.

- The electric investor-owned utilities must report on
  lessons learned from each de-energization event,
  including instances when de-energization protocols are
  initiated, but de-energization does not occur, in order to
  further refine de-energization practices. In addition, the
  utilities must work together to share information and
  develop best practices across California.

- The electric investor-owned utilities must work together
  to share information and advice in order to create
  effective and safe de-energization programs at each
  utility and to ensure that utilities are sharing consistent
  information with public safety partners.

## Adopted Definitions

- The term 'first responder/emergency responder' refers
  to those individuals who, in the early stages of an
  incident, are responsible for the protection and
  preservation of life, property, evidence, and the
  environment, including emergency response providers.

R.18-12-005  COM/MP6/jt2

The term 'emergency response providers' includes federal, state, and local governmental and nongovernmental public safety, fire, law enforcement, emergency response, emergency medical services providers (including hospital emergency facilities), and related personnel, agencies and authorities.

- The term 'public safety partners' refers to first/emergency responders at the local, state and federal level, water, wastewater and communication service providers, affected community choice aggregators and publicly-owned utilities/electrical cooperatives, the Commission, the California Governor's Office of Emergency Services and the California Department of Forestry and Fire Protection Public safety partners will receive priority notification of a de-energization event, as discussed in subsequent sections.

- The term 'critical facilities' and 'critical infrastructure' refers to facilities and infrastructure that are essential to the public safety and that require additional assistance and advance planning to ensure resiliency during de-energization events.  The Commission adopts an interim list of 'critical facilities' and 'critical infrastructure' but notes that the electric investor-owned utilities, in their Wildfire Management Plans, often list additional or differing facilities than those adopted here.  The Commission strives to move towards a standardized definition and designation of 'critical facilities' and 'critical infrastructure' on a going forward basis, and the definition adopted here should not be construed as restrictive.  The utilities must use the standard term 'critical facilities' or 'critical infrastructure' on a going forward basis in their de-energization procedures and Wildfire Management Plans.  The electric investor-owned utilities should

R.18-12-005  COM/MP6/jt2

partner with local government and public safety partners in high fire risk areas to develop a list of critical facilities and critical infrastructure in those areas, and the utilities should be prepared to partner with the Commission to adopt a comprehensive list of types of critical facilities and critical infrastructure in the future.

The Commission adopts the following interim list of critical facilities and critical infrastructure, as aligned with Department of Homeland Security's Critical Infrastructure Sectors:[1]

- Emergency Services Sector
  - Police Stations
  - Fire Stations
  - Emergency Operations Centers
- Government Facilities Sector
  - Schools
  - Jails and prisons
- Healthcare and Public Health Sector
  - Public Health Departments
  - Medical facilities, including hospitals, skilled nursing facilities, nursing homes, blood banks, health care facilities, dialysis centers and hospice facilities[2]
- Energy Sector

___

[1] *See* https://www.dhs.gov/cisa/critical-infrastructure-sectors at 21.
[2] Excluding doctor offices and other non-essential medical facilities.

A5

R.18-12-005  COM/MP6/jt2

- Public and private utility facilities vital to maintaining or restoring normal service, including, but not limited to, interconnected publicly-owned utilities and electric cooperatives

  - Water and Wastewater Systems Sector

    - Facilities associated with the provision of drinking water or processing of wastewater including facilities used to pump, divert, transport, store, treat and deliver water or wastewater

  - Communications Sector

    - Communication carrier infrastructure including selective routers, central offices, head ends, cellular switches, remote terminals and cellular sites

  - Chemical Sector

    - Facilities associated with the provision of manufacturing, maintaining, or distributing hazardous materials and chemicals.

- The term 'access and functional needs populations' refers to those populations with access and functional needs as set forth in Government Code § 8593.3. Government Code § 8593.3 list 'access and functional needs populations as follows: …the 'access and functional needs population' consists of individuals who have developmental or intellectual disabilities, physical disabilities, chronic conditions, injuries, limited English proficiency or who are non-English speaking, older adults, children, people living in institutionalized settings, or those who are low income, homeless, or transportation disadvantaged, including, but not

A6

R.18-12-005  COM/MP6/jt2

> limited to, those who are dependent on public transit or
> those who are pregnant.

**Who Should Receive Notice and When Should Notice Occur?**

### *Notification and Priority*

- Recognizing that there may be times when advance notice is not possible due to emergency conditions beyond the electric investor-owned utilities' control, the electric investor-owned utilities must, whenever possible, provide advance notification to all populations potentially affected by a de-energization event. This includes, but is not limited to, public safety partners, critical facilities and infrastructure, access and functional populations, and jurisdictions that are not at threat of a utility-caused wildfire but may lose power as a result of de-energization elsewhere on the system.

- Consistent with the principles of the State Emergency Management System, whenever possible, priority notification should occur to the following entities, at a minimum:[3]  public safety partners, as defined herein, and adjacent local jurisdictions that may lose power as a result of de-energization.  Notice to all other affected populations, including access and functional needs populations, may occur after the utility has given priority notice; however, access and functional needs populations may require additional notification streams.  This guideline is not meant to be restrictive; utilities may provide priority notification to a broader subset of customers, e.g. certain critical facilities, to promote public safety.

---

[3]  The Commission's adopted definition of public safety partners does not include critical facilities and infrastructure beyond water utilities and communication providers.  The utility may, in partnership with first/emergency responders and/or local government entities, identify other critical facilities that should receive priority notice.  This guideline is intended to set a floor, not a ceiling for priority notification.

A7

R.18-12-005  COM/MP6/jt2

### *Timing of Notification*

- Every effort must be made by the electric investor-owned utilities to provide notice of potential de-energization as early as the electric investor-owned utilities reasonably believe de-energization is likely.  At a minimum, notification to public safety partners must occur when a utility activates its Emergency Operations Center in anticipation of a de-energization event or whenever a utility determines that de-energization is likely to occur, whichever happens first.  In addition, the electric investor-owned utilities must provide notice when a decision to de-energize is made, at the beginning of a de-energization event, when re-energization begins and when re-energization is complete. The electric investor-owned utilities should, whenever possible, adhere to the following minimum notification timeline:

  o 48-72 hours in advance of anticipated de-energization: notification of public safety partners[4]/priority notification entities

  o 24-48 hours in advance of anticipated de-energization: notification of all other affected customers/populations

  o 1-4 hours in advance of anticipated de-energization, if possible: notification of all affected customers/populations[5]

---

[4] Consistent with Resolution ESRB-8, the electric investor-owned utilities must provide notice to the Commission's Director of the Safety and Enforcement Division.

[5]  The Commission appreciates that it may not be possible at this juncture to know exactly when a de-energization will occur and to provide this level of advanced notification.  However, the electric investor-owned utilities should strive to communicate that de-energization is imminent.

R.18-12-005  COM/MP6/jt2

      o  When de-energization is initiated: notification of all affected customers/populations[6]

      o  Immediately before re-energization begins: notification of all affected customers/populations[7]

      o  When re-energization is complete: notification of all affected customers/populations

**Who Should Be Responsible for Notification?**

- The electric investor-owned utilities, as the entity with the most knowledge of and jurisdiction to call a de-energization event and subsequent re-energization, retain ultimate responsibility for development of the communication strategy and notification in advance of, during and after a de-energization event. However, the electric investor-owned utilities should immediately begin working with the California Governor's Office of Emergency Services and local governments to develop their notification programs such that, wherever possible, the utilities' notification processes integrate into the Standardized Emergency Management System Framework, with the goal that local governments provide supplemental or secondary notification in the near future based upon pre-designed templates and scripts developed by the utilities in coordination with relevant state and local agencies. Supplemental notification does not supplant the electric investor-owned utilities' responsibility to provide notification to all customers.

---

[6]  The electric investor-owned utilities must develop methods of communicating with public safety partners recognizing that communication channels may be affected by the loss of power.

[7]  Similarly, communication may be affected by the loss of power.

R.18-12-005  COM/MP6/jt2

- The utilities must work with the goal of integrating into and leveraging existing outreach and notification systems wherever possible, rather than creating duplicative and potentially conflicting systems to those employed by local jurisdictions/emergency/first responders.

**How Should Different Customer Groups Be Identified?**

*First/Emergency Responders/Public Safety Partners*

- The electric investor-owned utilities must work with local and county officials to identify appropriate emergency/first responder points of contact.  This may include local government points of contact for jurisdictions that share first responder resources.  The electric investor-owned utilities must identify 24-hour contact points and must identify secondary contacts at a minimum and tertiary contacts if possible.  The electric investor-owned utilities must also identify primary and secondary means of communication for each contact.

- The electric investor-owned utilities must provide utility personnel 24-hour points of contact, including secondary and tertiary contacts to affected local jurisdictions/first responders.

- The electric investor-owned utilities must identify clear points of contact for all other public safety partners, including affected community choice aggregators, publicly owned utilities/electric cooperatives, water and communications providers.  The electric investor-owned utilities must have 24-hour contacts with secondary contacts at a minimum and tertiary contacts if possible.  The electric investor-owned utilities must also have clear points of contact at the Commission, the California Governor's Office of

R.18-12-005  COM/MP6/jt2

Emergency Services and the California Department of Forestry and Fire Protection.

- To ensure accuracy of contacts, the electric investor-owned utilities are required to update lists annually at least two months in advance of the start of the wildfire season and conduct communication exercises prior to wildfire season to confirm their ability to rapidly disseminate information. The electric investor-owned utilities should work with points of contact to encourage proactive updating of information in the event of a change, beyond the annual update required of the utilities.

### *Critical Facilities and Infrastructure*

- The electric investor-owned utilities must, in addition to developing their own list of critical facilities and critical infrastructure based on the adopted definition, work in coordination with first/emergency responders and local governments to identify critical facilities within the electric investor-owned utilities' service territories. The electric investor-owned utilities must identify 24-hour points of contact and, at a minimum, secondary points of contact. The electric investor-owned utilities must work together with operators of critical facilities and critical infrastructure to identify preferred points of contact (the billing contact may not be the appropriate de-energization contact) and preferred methods of communication.

- To ensure accuracy of contacts, the electric investor-owned utilities are required to update critical facility and critical infrastructure lists annually at least two months in advance of the start of wildfire season. The electric investor-owned utilities should work with points of contact to encourage proactive updating of information throughout the year in the event of a

A11

R.18-12-005 COM/MP6/jt2

change, beyond the annual update required of the utilities. The electric investor-owned utilities should prioritize identification of appropriate contacts for critical facilities and infrastructure located within Tier 3 and 2 high fire threat districts, followed by adjacent jurisdictions that may be impacted in the event of de-energization.

- The electric investor-owned utilities, pursuant to Resolution ESRB-8 and in advance of the wildfire season, must proactively partner with critical facility and critical infrastructure representatives to assess the ability of each critical facility to maintain operations during de-energization events of varying lengths. The electric investor-owned utilities must help critical facility and critical infrastructure representatives assess the need for backup generation and determine whether additional equipment is needed, including providing generators to facilities or infrastructure that are not well prepared for a power shut off. Advance education of representatives and preparation of critical facilities and infrastructure is imperative to ensure that public safety is preserved during a de-energization event.

### *Access and Functional Needs Populations*

- The electric investor-owned utilities must make a diligent effort to identify access and functional needs populations within their customer base. The electric investor-owned utilities should review available information including, but not limited to, customers on medical baseline, California Alternative Rate for Energy Program and Family Electric Assistance Program tariffs and customers that require in person notification in advance of service disconnection.[8]  In advance of the

---

[8] See D.12-03-054.

A12

R.18-12-005  COM/MP6/jt2

2019 wildfire season, the electric investor-owned utilities should seek to identify and expand registration under their medical baseline tariffs.

- In the spirit of shared responsibility, the electric investor-owned utilities should endeavor to partner with local governments and agencies to encourage identification of access and functional needs populations through those agencies.  Recognizing privacy concerns, the Commission does not require the electric investor-owned utilities to develop a comprehensive contact list of access and functional needs customers nor to share individual customer information with local jurisdictions; rather, the Commission encourages that, through local agency partnerships, the electric investor-owned utilities and local jurisdictions can together provide up front education and outreach before and communication during a de-energization event in formats appropriate to individual access and functional needs populations. The electric investor-owned utilities must also develop a plan for expanding identification of access and functional needs customers beyond those customers enrolled in existing utility programs in the event that local agency partnerships are unavailable to assist. The Commission acknowledges that identification of all access and functional needs customers is a goal that may not be fully achievable even with assistance of local jurisdictions; however, the utilities must take all reasonable steps within the boundaries of the law towards that goal in order to protect the safety of access and functional needs populations.

- The electric investor-owned utilities must update contact information for medical baseline customers and provide an opportunity for such customers to select alternative means of contact beyond their preferred

A13

R.18-12-005  COM/MP6/jt2

means of contact from the utility for billing and other information.

### All Other Customers

- The electric investor-owned utilities must ensure that customer contacts are up-to-date.  The Commission recognizes that electric investor-owned utility customer points of contact are necessarily limited, for example a landlord-controlled account will not provide a method of contact for tenants.  The electric investor-owned utilities must work with local jurisdictions to leverage all means of identifying and communicating with all people within a de-energized area, including people who may be visiting the area or not directly listed on utility accounts.  The Commission expects that this will be an iterative process developed over time.

## What Information Should be Included in Notifications in Advance of and Directly Preceding a De-Energization Event?

### Advanced Outreach and Education

- With the goal of having a common understanding of situational awareness among public safety partners throughout California, each electric investor-owned utility must clearly articulate thresholds for strong wind events as well as the conditions that define "an extreme fire hazard" (humidity, fuel dryness, temperature) that the electric investor-owned utility evaluates in considering whether to de-energize.  This information may vary for different jurisdictions and topographies; however, the information must be provided to and be readily available to public safety partners and the public.[9]  The electric investor-owned utilities are

---

[9] For example, on the utility's website.

A14

R.18-12-005  COM/MP6/jt2

afforded discretion to evaluate real-time and on-the-ground information in determining whether to de-energize; adoption of thresholds is not determinative of de-energization.

- To aid in preparation, the electric investor-owned utilities must provide, if requested, relevant geographic information system data, including identification of critical facilities, circuits, and number of medical baseline customers, to local jurisdictions in advance of wildfire season. In addition, the utilities must provide, if requested, operational coordination with public safety partners to ensure such partners have not only the information but also the coordination with the utilities necessary to prepare for de-energization.

- In advance of the 2019 wildfire season, the electric investor-owned utilities, jointly, must immediately oversee development and execution of a statewide Public Safety Power Shut-off education campaign, developed in partnership with the California Governor's Office of Emergency Services and the California Department of Forestry and Fire Protection, that provides education tailored to the needs of stakeholders, including access and functional needs populations, in order to make citizens aware of how to prepare for and obtain information during a prolonged loss of power, including as a result of de-energization. Education and outreach must use best practices outlined in the California Alert and Warning Guidelines to maximize understanding.  The electric investor-owned utilities, in coordination with the above-named agencies, must measure effectiveness of education and outreach efforts and adjust efforts accordingly.

- The electric investor-owned utilities must work with local and state public safety partners to develop scripted de-energization templates that can be used by public safety partners leading up to, during, and after a de-energization event. In order to allow jurisdictions

with public alerting authority to send timely and
appropriate messages to populations potentially
impacted by a de-energization event, the utilities must
develop Common Alerting Protocol compliant
messages and protocols for use by the designated alert
authorities. Whether local jurisdictions choose to utilize
their Public Alert and Warning system to notify the
public of a de-energization event is at their discretion.
The electric investor-owned utilities must also work
with state public safety partners (California Governor's
Office of Emergency Services, California Department of
Forestry and Fire Protection to develop definitions to
use for communications and a standardized
nomenclature based on existing emergency
frameworks.

### Notification Preceding a De-Energization Event

- The electric investor-owned utilities must convey to
public safety partners at the time of first notification
preceding a de-energization event information
regarding the upcoming de-energization, including
estimated start time of the event, estimated duration of
the event, and estimated time to full restoration. The
electric investor-owned utilities must use the previously
established contact channels developed in advance of
the 2019 wildfire season and should strive to provide
contact according to the timeframes adopted in these
guidelines. The electric investor-owned utilities must
provide the number of medical baseline customers in
the impacted area to first/emergency responders
and/or local jurisdictions.

- For the 2019 wildfire season, the electric investor-owned
utilities must, at the time of first notification preceding a
de-energization event, make available a Geographic
Information System shapefile via a secure data transfer

A16

R.18-12-005  COM/MP6/jt2

process depicting the most accurate and specific information possible regarding the boundaries of the area subject to de-energization to all public safety partners whose jurisdictions or service areas will be impacted by the de-energization event, including adjacent jurisdictions or service areas that could lose power as a result of de-energization in a high fire threat district.  Going forward, the electric investor-owned utilities must work to provide a secure data transfer of the de-energization boundary in Geographic Information System Representational State Transfer Service format (or other agreed upon format that is rapidly consumable by existing geospatial and situational awareness tools) and must also show affected circuits and any other information that is requested by public safety partners and can reasonably be provided by the utility. The utilities must work towards being able to provide real-time data to public safety partners.

- The electric investor-owned utilities must partner with local public safety partners to communicate with all other customers that a de-energization event is possible, the estimated start date and time of the de-energization event, the estimated length of the de-energization event, which may be communicated as a range, and the estimated time to power restoration, which again, may be communicated as a range. Communications should state when the customer can next expect communication about the de-energization event. Communication, consistent with best practices articulated in the California Alert and Warning Guidelines must answer five key recipient questions: (1) Who is the source of the warning; (2) What is the threat; (3) Does this affect my location; (4) What should I do; and (5) What is the expected duration of the event.

R.18-12-005  COM/MP6/jt2

Communications must also point customers towards education and outreach materials disseminated in advance of the 2019 wildfire season.

- The electric investor-owned utilities must provide up-to-date information, including a depiction of the boundary of the de-energization event, on their websites' homepage and a dedicated Public Safety Power Shut-off webpage regarding the de-energization event.  The electric investor-owned utilities, in partnership with local public safety partners, must establish and communicate a 24-hour means of contact that customers may use to ask questions and/or seek information.

**What Methods Should the Electric Investor-Owned Utilities Use to Communicate a De-Energization Event with the Public?**

- The California Alert and Warning Guidelines state that "people rarely act on a single warning message alone. To be effective, warnings should be delivered in various formats via various media, both to increase reliability of warning delivery and to provide a sense of corroboration that will encourage recipients to take protective actions." The electric investor-owned utilities must develop notification strategies for all customer groups affected by de-energization, and the electric investor-owned utilities must partner with local and state public safety partners, whenever possible, to develop notification strategies.. In order to be effective, notifications should be delivered in multiple formats across several media channels, both to increase the potential a message successfully reaches an impacted population and to provide a sense of corroboration that will encourage individuals to take protective actions. Customer notifications should include, but are not limited to, telephonic notification, text message

R.18-12-005  COM/MP6/jt2

notification, social media advisories, emails, and messages to agencies that service disadvantaged communities within an impacted area to allow them to amplify any pertinent warnings. Communication methods must consider the geographic and cultural demographics of affected areas, e.g. some rural areas lack access to broadband services. Communications must also be delivered in English, Spanish, Chinese (including Cantonese, Mandarin and other Chinese languages), Tagalog and Vietnamese as well as Korean and Russian where those languages are prevalent within the utilities' service territories.

- The electric investor-owned utilities must develop a strategy for how communication will occur with affected customers once de-energization has begun and during re-energization, recognizing that communication channels may be restricted due to the loss of power. The electric investor-owned utilities should develop this strategy in coordination with public safety partners.

## How Should the Electric Investor-Owned Utilities Communicate and Coordinate with Public Safety Partners Before and During a De-Energization Event?

- Consistent with the State Emergency Management System,[10] the electric investor-owned utilities will be responsible for contacting local public safety officials in impacted jurisdictions prior to and during a de-energization event.  The electric investor-owned utilities must communicate an impending de-energization event to local and state officials.  The

---

[10] PacifiCorp, as a utility that operates across state lines, requests that it operate consistent with NIMS.  This is allowable; however, if a provision of NIMS conflicts with SEMS, PacifiCorp must follow the provisions mandated in SEMS.

R.18-12-005  COM/MP6/jt2

electric investor-owned utilities must work with public safety partners to disseminate all information in formats and through processes that are used by public safety partners during other emergencies, including developing notification messaging consistent with the California Public Alert and Warning System. The electric investor-owned utilities must partner with local and state public safety partners to develop notification strategies for all customer groups that comport with the best practices articulated in the California Statewide Alert and Warning Guidelines.

- In advance of the 2019 wildfire season, the electric investor-owned utilities must continue to partner with local jurisdictions, the California Governor's Office of Emergency Services and the California Department of Forestry and Fire Protection to develop a comprehensive, coordinated and cohesive notification framework including, but not limited to, the electric investor-owned utilities providing notification to public safety partners and public safety partners, to the extent they are willing and able, providing secondary or supplemental notification to the general public. Electric investor-owned utilities retain responsibility to ensure notification of affected customers.

- The electric investor-owned utilities, in partnership with local and state public safety partners, must develop notification strategies for access and functional needs populations up to and including in-person notification. The electric investor-owned utilities should strive to develop a coordinated positive/affirmative notification strategy with public safety partners for pre-designated access and functional needs populations. Pre-designated access and functional needs populations should be determined in coordination with public safety partners, whenever possible, but should include customers on medical

R.18-12-005  COM/MP6/jt2

baseline tariffs that are dependent upon electricity for the provision of life-sustaining services.

### Coordination with Emergency Operation Centers and Incident Command Systems

- If requested by the local jurisdiction, the electric investor-owned utilities must embed a liaison officer at the local emergency operation center.  When requested, the utility must also embed a liaison officer at the State Operations Center for the purpose of assessing and integrating wildfire threat data for decision-making. The liaison officers must be empowered to provide rapid and accurate information from the utilities.  To ensure consistency of response across jurisdictions, the electric investor-owned utilities should have a designated lead with decision-making authority located at the utility's emergency operations center with whom embedded liaisons can communicate in real-time to obtain the most up-to-date information.  This requirement does not preclude the utilities from developing a centralized communication structure that is amenable to both the utility and local jurisdictions to provide real-time coordination and situation awareness.

- Currently, the electric investor-owned utilities form an emergency operation center during each de-energization event.  The electric investor-owned utilities must invite representatives from the California Office of Emergency Services, water infrastructure providers, and communication service providers.  In the alternative, the utilities may develop a mutually agreeable communications structure with water infrastructure providers and communication service providers in lieu of holding seats in its emergency operations center.

R.18-12-005  COM/MP6/jt2

**What Information Should be Included in Post-Event Reporting?**

- In addition to submitting a report to the Director of the Commission's Safety and Enforcement Division within 10 business days of power restoration, electric investor-owned utilities must serve their de-energization report on the service lists of this proceeding and Rulemaking 18-10-007 or their successor proceedings.  Service should include a link to the report on the utility's website and contact information to submit comments to the Director of the Safety and Enforcement Division.  The electric investor-owned utilities must actively contact public safety partners involved in the de-energization event to encourage them to provide feedback.  The electric investor-owned utilities must also send a copy of the report to the lead local/county public safety agency for the de-energization event.

- Within 15 days of the electric investor-owned utility serving its post-event report, affected stakeholders, including public safety partners, critical facilities and local residents may serve comments on the electric investor-owned utility's post-event report in order to inform SED's reasonableness review.  Comments must be submitted to the following address: Safety and Enforcement Division Director, California Public Utilities Commission, 505 Van Ness Avenue, San Francisco, California, 94102.  In addition, comments should be served on the service list of Rulemaking 18-12-005 or its successor proceeding.

- In addition to the reporting requirements in Resolution ESRB-8, the electric investor-owned utilities must provide the following information:

    1) Decision criteria leading to de-energization, including an evaluation of alternatives to

A22

R.18-12-005  COM/MP6/jt2

de-energization that were considered and mitigation measures used to decrease the risk of utility-caused wildfire in the de-energized area;

2) A copy of all notifications, the timing of notifications, the methods of notifications and who made the notifications (the utility or local public safety partners);

3) If the utility fails to provide advanced notification or notification according to the minimum timelines set forth in these Guidelines, an explanation of the circumstances that resulted in such failure;

4) A description and evaluation of engagement with local and state public safety partners in providing advanced education and outreach and notification during the de-energization event;

5) For those customers where positive or affirmative notification was attempted, an accounting of the customers (which tariff and/or access and functional needs population designation), the number of notification attempts made, the timing of attempts, who made the notification attempt (utility or public safety partner) and the number of customers for whom positive notification was achieved;

6) A description of how sectionalization, i.e. separating loads within a circuit, was considered and implemented and the extent to which it impacted the size and scope of the de-energization event;

R.18-12-005  COM/MP6/jt2

> 7) An explanation of how the utility determined that the benefit of de-energization outweighed potential public safety risks;
>
> 8) The timeline for power restoration (re-energization,) in addition to the steps taken to restore power as required in Resolution ESRB-8;
>
> 9) Lessons learned from the de-energization event; and
>
> 10) Any recommended updates to the guidelines adopted in Resolution ESRB-8 and this decision.

- The electric investor-owned utilities should refer to San Diego Gas & Electric Company's November 11-16, 2018 de-energization report, issued on December 4, 2018, as starting a place for reporting format until the Commission provides further guidance on a standard report template.

- In addition to de-energization reports, the electric investor-owned utilities are required to submit reports on de-energization lessons learned concurrent with their 2020 Wildfire Mitigation Plans, and thereafter, including an evaluation of utility/public safety partnerships. The reports must include a copy of all educational campaigns and outreach made in advance of the wildfire season and an evaluation of their effectiveness. The Commission may consider these reports in other proceedings; however, existing or successor Wildfire Mitigation Plan proceedings are the appropriate place to file these reports at this time.

- The Commission's Safety and Enforcement Division should develop a post-de-energization event reporting template. The

R.18-12-005  COM/MP6/jt2

template, at a minimum, should include the information requested herein; however, Safety and Enforcement Division has the discretion to request additional information.  Safety and Enforcement Division should solicit input from stakeholders on the development of the template.  The template should be adopted by the Commission via Tier 3 advice letter.

- The Commission's Safety and Enforcement Division should develop a template for the lessons learned report in advance of the 2020 Wildfire Mitigation Plan submission date.  Safety and Enforcement Division should hold workshops to solicit input and facilitate cross-utility and cross-stakeholder learning to inform the development of the reports.  The template should be adopted by the Commission via Tier 3 advice letter.

  - The Commission's Safety and Enforcement Division will continue to review the electric investor-owned utilities reports pursuant to Resolution ESRB-8.  The Commission will consider development of reasonableness criteria in Phase 2 of this rulemaking.

**Requests to Delay De-Energization and to Re-Energize**

- The electric investor-owned utilities should continue to address requests for a de-energization delay on a case-by-case basis.  The electric investor-owned utilities must only respond to de-energization delay requests from public safety partners.  The electric investor-owned utilities retain ultimate authority to grant a delay and responsibility to determine how a delay in de-energization impacts public safety.

- The electric investor-owned utilities must work with public safety partners in advance of the wildfire season to develop preliminary plans for addressing emergency situations that may arise during de-energization, such

A25

R.18-12-005  COM/MP6/jt2

as a non-utility caused wildfire that occurs in a de-energized area that necessitates the use of water for firefighting purposes.  Although not a request to delay de-energization, such a situation could result in the public safety being better served by utility lines being re-energized.

**De-Energization of Transmission Lines**

- The electric investor-owned utilities must design interim protocols for the de-energization of transmission lines based upon the impacts to populations across affected jurisdictions including, but not limited to, publicly-owned utilities/electric cooperatives, adjacent jurisdictions and small/multi-jurisdictional utilities and critical facilities interconnected at the transmission level. The utility must solicit input from stakeholders in developing these protocols, and the utilities shall serve the interim protocols on the service list of Rulemaking 18-12-005 within three months of issuance of this decision.

- In the event of transmission line de-energization, additional coordination may be required with the California Governor's Office of Emergency Services, the California Department of Forestry and Fire Protection, local jurisdictional public safety partners and the California Independent System Operator.  The electric investor-owned utilities must also provide notice to the California Independent System Operator of transmission-level de-energization as far in advance as possible.  The electric investor-owned utilities must comply with Federal Energy Regulatory Commission and North American Electric Reliability Corporation reliability standards.

- While the Commission explores development of transmission level notification and communication guidelines, the utilities

R.18-12-005  COM/MP6/jt2

must employ all relevant notification and communication guidelines adopted herein, in addition to those in Resolution ESRB-8, to the de-energization of transmission lines.

(End of Appendix A)

R.18-12-005  COM/MP6/jt2

# Appendix B

R.18-12-005  COM/MP6/jt2

**Appendix B**
**Preliminary Phase 2 Issues**

1. The following list is a summary of the issues proposed for Phase 2 of R.18-12-005, *Order Instituting Rulemaking to Examine Electric Utility De-Energization of Power Lines in Dangerous Conditions*.  This list is non-exhaustive and will be addressed further in a subsequent scoping memo opening Phase 2.  Analysis and refinement of definitions and utilization of standard lexicon, including but not limited to:

   a. Critical Facilities

      i. Possible addition of transportation sector and Department of Defense facilities?

   b. AFN populations

   c. Medical baseline

   d. Transmission and distribution lines

2. Evaluate and consider refinement of notification and communication guidelines, including education and outreach, to the public (including AFN populations) and public safety partners and critical facilities/infrastructure.

   a. Guidelines for communication and notification if local jurisdiction does not participate in de-energization event.

3. Consider additional or refined processes for reasonableness review, communication protocols, mitigation measures and reporting requirements established in ESRB-8 and this decision.

4. Create comprehensive documentation of all de-energization protocols and guidelines.

5. Overarching de-energization issues

R.18-12-005  COM/MP6/jt2

    a.  Evaluate the use of proactive de-energization and the extent to which it is being used as a method of last resort

    b.  Analysis of de-energization criteria and thresholds

        i.  Evaluate wildfire conditions and consider whether thresholds (e.g. wind speeds, weather conditions, vegetation dryness conditions, etc.) should be defined across utilities and whether to do so would promote the public safety.

        ii.  Consider whether "extreme wildfire conditions" can be defined and whether such a definition would promote the public safety.

    c.  Consider methods to develop more robust contact information for AFN populations and other priority populations, while still maintaining privacy and legal protections.

    d.  Consider how de-energization should be evaluated as a strategy against other measures, such as vegetation management, grid hardening, etc.?

6.  De-energization of transmission lines

    a.  Facilities, such as airports and large industrial facilities, may be connected at the transmission level and be impacted differently than in the case of distribution outages.

    b.  Consider coordination with public safety partners, CAISO, FERC, and NERC, as well as compliance with requirements from these entities.

    c.  Evaluate transmission de-energization impacts and consider how to mitigate and prepare for those impacts.

R.18-12-005  COM/MP6/jt2

Consider how to partner with POUs, electric cooperatives and potentially affected adjacent jurisdictions to prepare for and notice transmission level de-energization events.

7. Communication and Notification

   a. Impact of de-energization on methods for communications with the public.

      i. Communication to all levels (public, AFN populations, first responders, critical facilities, etc.) during a de-energization event?  How will the utility communicate information if communication services (broadband, text, VOIP) are down?

   b. Standardization of protocols and messaging across utilities to avoid confusion and increase understanding by customers and public safety partners.

   c. Where CCA territories exist, who should be responsible and accountable for notification, education and communication- the electric investor-owned utility, the CCA, or both?

   d. How should non-residents in the area be notified?

8. Public Education on how to prepare for wildfire season and de-energization events

   a. Practices needed by the utilities and other state partners to educate the public on de-energization and re-energization events, including what is entailed during a de-energization event, what tools are available to the public during these events, what to do in an emergency and how to receive information alerts during a power shutoff, and who the public should expect to hear from and when.

B3

R.18-12-005  COM/MP6/jt2

    b.  How to prepare for wildfire season, including potential de-energization.

    c.  Metrics to gauge whether public education and outreach efforts are effective.

9.  Mitigation Measures

    a.  Consider developing criteria on deployment of cooling centers and charging stations.

    b.  Evaluate deployment of other power sources to critical facilities and possibly AFN populations.

       i.  ESRB-8 requirement to provide back-up generation
      ii.  Evaluation of back-up generation options.
     iii.  Effectiveness of back-up generation for multi-day de-energization events.

    c.  Consideration of cost responsibility for de-energization impacts/losses.

10. Re-energization

    a.  Speed at which power is reinstated and timing of re-energization.

    b.  Conditions for re-energization.

    c.  Communications during a re-energization event.

    d.  Safety concerns associated with re-energization.

11. Other Issues

    a.  How to address increased localized emissions and carbon dioxide emissions from the use of generators as a result of de-energization/ environmental impact of backup generation usage.

    b.  Billing issues.

    c.  Requests to delay de-energization.

(End of Appendix B)

R.18-12-005  COM/MP6/jt2

# Appendix C

R.18-12-005  COM/MP6/jt2

## APPENDIX C:  Glossary of Useful Definitions and Abbreviations

| A. | Application |
| --- | --- |
| AFN | Access and functional needs populations: consists of individuals who have developmental or intellectual disabilities, physical disabilities, chronic conditions, injuries, limited English proficiency or who are non-English speaking, older adults, children, people living in institutionalized settings, or those who are low income, homeless, or transportation disadvantaged, including, but not limited to, those who are dependent on public transit or those who are pregnant |
| Alert | A communication intended to redirect the attention of recipients to some previously unexpected or unknown circumstance or event |
| AT&T | AT&T Mobility Wireless Operations Holdings, Inc., Pacific Bell Telephone Company, and AT&T Corp. |
| Abrams | William B. Abrams |
| ALJ | Administrative Law Judge |
| AR | automatic reclosers |
| Bear Valley or BVES | Bear Valley Electric Service, a division of Golden State Water Company |
| CAP | Common Alerting Protocol- a standardized digital message format for interoperable communication of public alerts and warnings; the core technology of the California Alert and Warning Guidelines |
| CCA | Community Choice Aggregators |
| California Alert and Warning Guidelines | An integrated, interoperable statewide system-of-systems for public alerting and warning by local jurisdictions and state agencies in California |
| CAISO | California  Independent System Operator |

R.18-12-005  COM/MP6/jt2

| CAL FIRE | California Department of Forestry and Fire Protection |
|---|---|
| CalEnviroScreen | An online tool developed by California Environmental Protection Agency's Office of Environmental Health Hazard Assessment for mapping California communities that are most affected by many sources of pollution. |
| CalOES | California Office of Emergency Services |
| CARE | California Alternate Rates for Energy |
| CASMU | California Association of Small and Multijurisdictional Utilities - Bear Valley, Liberty, and PacifiCorp |
| CCSF | The City and County of San Francisco |
| CCTA | California Cable and Telecommunications Association |
| CESA | California Energy Storage Alliance |
| CforAT | Center for Accessible Technology |
| CLECA | California Large Energy Consumers Association |
| CMUA | California Municipal Utilities Association |
| CPUC or Commission | California Public Utilities Commission or Commission |
| Critical Facilities | Facilities that are essential to the public safety and that require additional assistance and advance planning to ensure resiliency during de-energization events.  The terms 'critical facilities' and 'critical infrastructure' can be used synonymously.  Police Stations; Fire Stations; Emergency Operations Centers; Medical facilities including hospitals, skilled nursing facilities, nursing homes, blood banks, health care facilities, dialysis centers and hospice facilities; Schools and licensed daycare centers; Public and private utility facilities vital to maintaining or restoring normal service, including, but not limited to, interconnected publicly-owned utilities and electric cooperatives; Facilities associated with the provision of drinking water including facilities used to pump, divert, transport, store, treat and deliver water; Communication carrier infrastructure including selective routers, central offices, head ends, cellular switches, remote terminals and cellular sites (or their functional equivalents); Jails and prisons |

R.18-12-005  COM/MP6/jt2

| CSAC | California State Association of Counties |
|---|---|
| CTIA | Represents the United States wireless communications industry and companies throughout the mobile ecosystem |
| CUE | Coalition of California Utility Employees |
| CUEA | California Utilities Emergency Association |
| CWA | California Water Association |
| D. | Decision |
| DACC/EUF | Direct Access Customer Coalition, Energy Users Forum |
| De-Energization | Process by which utilities turn off electricity, usually to reduce the risk of utility-infrastructure wildfire ignitions; can be also be used during other emergencies. |
| EBMUD | East Bay Municipal Utility District |
| Emergency Response Providers | Includes federal, state, and local governmental and nongovernmental public safety, fire, law enforcement, emergency response, emergency medical services providers (including hospital emergency facilities), and related personnel, agencies and authorities |
| EOC | Emergency Operations Center |
| EPUC | Energy Producers and Users Coalition |
| ESRB-8 | Commission Resolution that sets out utility de-energization procedures |
| Farm Bureau | California Farm Bureau Federation |
| FEMA | Federal Emergency Management Agency |
| FERA | Family Electric Rate Assistance Program |
| FERC | Federal Energy Regulatory Commission |

R.18-12-005  COM/MP6/jt2

| | |
|---|---|
| First/Emergency Responder | Individuals who, in the early stages of an incident, are responsible for the protection and preservation of life, property, evidence, and the environment, including emergency response providers.  The term "emergency response providers" includes federal, state, and local governmental and nongovernmental public safety, fire, law enforcement, emergency response, emergency medical services providers (including hospital emergency facilities), and related personnel, agencies and authorities. |
| GIS | Geographic Information  System |
| GIS REST | Geographic Information System Representational State Transfer Service |
| GO | General Order |
| HFTD | High Fire Threat District- areas where utility infrastructure and operations will be subject to stricter fire-safety regulations |
| HHZ | High Hazard Zones |
| HSPD-8 | U.S. Department of Homeland Security Presidential Directive Number 8 |
| I. | Investigation |
| ICS | Incident Command System- a management system designed to enable effective and efficient domestic incident management by integrating a combination of facilities, equipment, personnel, procedures, and communications operating within a common organizational structure. |
| IOUs or Utilities | Investor-Owned Utilities |
| IVR | Interactive Voice Response |
| Joint Communications Parties | Frontier Communications, T-Mobile West LLC dba T-Mobile, Sprint Communications, California Company and the Small LECs, Comcast Phone of California LLC, and Verizon |
| Joint Local Governments | Counties of Napa, Sonoma, Mendocino, and the City of Santa Rosa |
| The Joint Water Districts | Municipal Water District of Orange County (MWDOC), Valley Center Municipal Water District (VCMWD), and Padre Dam Municipal Water District (PDMWD) |

R.18-12-005  COM/MP6/jt2

| | |
|---|---|
| Liberty CalPeco | Liberty Utilities (CALPECO Electric) LLC |
| LGSEA | Local Government Sustainable Energy Coalition |
| Malibu | The County of Los Angeles, City of Malibu |
| Medical Baseline | Customers who are eligible for Medical Baseline tariffs receive an additional allotment of electricity and/or gas per month.  The tariffs are designed to assist residential customers who have special energy needs due to qualifying medical conditions.  There are differences among medical baseline tariffs across the utilities. |
| Mendocino | The County of Mendocino |
| MGRA | Mussey Grade Road Alliance or Mussey Grade |
| MWDOC | Municipal Water District of Orange County |
| Napa | The County of Napa |
| NCPA | Northern California Power Agency |
| NERC | North American Electric Reliability Corporation |
| NIMS | National Incident Management System |
| Notification | A communication intended to inform recipients of an unscheduled event for which contingency plans are in place. |
| OES | Office of Emergency Services |
| OIR | Order Instituting Rulemaking |
| OSA | The Commission's Office of Safety Advocates |
| PacifiCorp | Pacific Power, a division of PacifiCorp |
| PG&E | Pacific Gas and Electric Company |
| PHC | Prehearing Conference |
| POC | Protect Our Communities |
| POU | Publicly Owned Utility |
| PSPS | Public Safety Power Shut-Off or De-Energization |
| Public Advocates | The Public Advocates Office of the California Public Utilities Commission |

R.18-12-005  COM/MP6/jt2

| Public Safety Partners | First responders at the local, state and federal level, water and communication providers, CCAs, affected POUs/electrical cooperatives, the Commission, CalOES and CAL FIRE.  Public safety partners will receive priority notification of a de-energization event. |
|---|---|
| Pub. Util. Code | Public Utilities Code |
| R. | Rulemaking |
| RCRC | Rural County Representatives of California |
| Reclosers | Apparatus that allows an energy line to re-energize |
| Reverse 911 | A public alert system most frequently used by safety organizations to alert individuals and businesses to the risk of danger by sending a recorded voice message to landline telephones and registered cellphones within a defined geographical area. |
| Santa Rosa | The City of Santa Rosa |
| SB 901 | Senate Bill 901 |
| SBUA | Small Business Utility Advocates |
| SCE | Southern California Edison Company |
| SDG&E | San Diego Gas & Electric Company |
| SED | Commission's Safety and Enforcement Division |
| SEMS | Standardized Emergency Management System- the system required by Government Code §8607 (a) for managing response to multi-agency and multi-jurisdiction emergencies in California.  SEMS provides for a multiple level emergency response organization and is intended to structure and facilitate the flow of emergency information and resources within and between the organizational levels. |
| Shapefiles/KMZ | Computer file extensions used by GIS software. |
| Sonoma | County of Sonoma |
| T-Mobile | T-Mobile West LLC dba T-Mobile |
| TURN | The Utility Reform Network |
| UCAN | Utility Consumers' Action Network |

R.18-12-005  COM/MP6/jt2

| | |
|---|---|
| | |
| Warning | A communication encouraging recipients to take immediate protective action in response to some emergent hazard or threat |
| WEA | Wireless Emergency Alerts - emergency messages sent by authorized government alerting authorities through a mobile carrier. |
| WMP or Plan | Wildfire Mitigation Plan |

(End of Appendix C)

C7