Exhibit 2

COM/MBL/gp2                                        **Date of Issuance: 6/5/2020**

Decision 20-05-051  May 28, 2020

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Order Instituting Rulemaking to Examine Electric Utility De-Energization of Power Lines in Dangerous Conditions. | Rulemaking 18-12-005 |

**DECISION ADOPTING PHASE 2 UPDATED AND ADDITIONAL GUIDELINES FOR DE-ENERGIZATION OF ELECTRIC FACILITIES TO MITIGATE WILDFIRE RISK**

R.18-12-005  COM/MBL/gp2

# TABLE OF CONTENTS

**Title**             **Page**

DECISION ADOPTING PHASE 2 UPDATED AND ADDITIONAL GUIDELINES FOR DE-ENERGIZATION OF ELECTRIC FACILITIES TO MITIGATE WILDFIRE RISK ................................................................................2

1.  Background .............................................................................................2

    1.1.  Jurisdiction....................................................................................4

        1.1.1.  D.12-04-024 Adopting Fire Safety Requirements  for SDG&E ..............5

        1.1.2.  Resolution ESRB-8 ...............................................................6

        1.1.3.  Senate Bill 901 .....................................................................8

        1.1.4.  Decision 19-05-042 Phase 1  De-energization Guidelines ......................9

        1.1.5.  Assembly Bill 1054 ..............................................................10

2.  Issues Before the Commission ..............................................................10

3.  COVID-19 Stay-at-Home Order ............................................................11

4.  Additions or Modifications to Existing De-energization Guidelines Adopted in Resolution ESRB-8 and D.19-05-042 to Promote the Public Safety in Advance of the 2020 Wildfire Season ..................................................12

    4.1.  Working Groups and Advisory Boards .......................................12

        4.1.1.  Party Comments on Working Groups  and Advisory Boards .............13

        4.1.2.  Commission Determination on Working Groups  and Advisory Boards ...............................................................16

    4.2.  De-energization Exercises .........................................................18

        4.2.1.  Party Comments on De-energization  Exercises ....................................18

        4.2.2.  Commission Determination on  De-energization Exercises ................20

    4.3.  Who should receive notice? When should notice occur?  How should notice occur?..............................................................21

        4.3.1.  Party Comments on Notice ......................................................23

        4.3.2.  Commission Determination on Notice ....................................27

    4.4.  Community Resource Centers......................................................30

        4.4.1.  Party Comments on Community Resource Centers...........................30

        4.4.2.  Commission Determination on Community  Resource Centers..........35

    4.5.  Restoration of Service Upon Conclusion  of Need for De-energization....38

        4.5.1.  Party Comments on Restoration of Service Upon Conclusion of Need for De-energization...............................................38

R.18-12-005  COM/MBL/gp2

4.5.2.  Commission Determination on Restoration of service upon
conclusion of need for de-energization ....................................................42
4.6.  Transportation resilience......................................................................44
4.6.1.  Party Comments on Transportation Resilience.......................................45
4.6.2.  Commission Determination on  Transportation Resilience................50
4.7.  Medical baseline and access and  functional needs populations ...............52
4.7.1.  Party Comments on Medical Baseline and  Access and Functional
Needs Populations..................................................................................53
4.7.2.  Commission Determination on Medical Baseline  and Access and
Functional Needs Populations .................................................................58
4.8.  Transparency ........................................................................................61
4.8.1.  Party Comments on Transparency........................................................62
4.8.2.  Commission Determination on  Transparency ...................................66
4.9.  Definitions ............................................................................................67
4.9.1.  Party Comments on Modifications of Definitions of Critical Facilities
and Infrastructure ....................................................................................68
4.9.2.  Commission Determination on  Definitions ...........................................69
5.  Adoption of Appendix A .........................................................................69
6.  General Order Regarding Rules for De-energization  of Electric Facilities to
Mitigate Wildfire Risk .....................................................................................69
7.  Comments on Proposed Decision.......................................................................70
8.  Assignment of Proceeding ................................................................................73
ORDER ............................................................................................................92

**Appendix A** – Adopted Phase 2 Guidelines
.

R.18-12-005  COM/MBL/gp2

## DECISION ADOPTING PHASE 2 UPDATED AND ADDITIONAL GUIDELINES FOR DE-ENERGIZATION OF ELECTRIC FACILITIES TO MITIGATE WILDFIRE RISK

**Summary**

This decision adopts additional de-energization guidelines for the electric investor owned utilities.  The guidelines adopted in this decision are meant to expand upon those adopted in Resolution ESRB-8 and Decision (D.)19-05-042. Resolution ESRB-8, the guidelines adopted in D.19-05-042, and the guidelines adopted in this decision remain in effect unless and until superseded by a subsequent decision.

The de-energization guidelines adopted in this decision are set forth in Appendix A.

This proceeding remains open, among other things, to potentially develop a general order that encapsulates and supersedes Resolution ESRB-8, the guidelines adopted in D.19-05-042, and the guidelines adopted in this decision.

## 1.  Background

The California Public Utilities Commission (CPUC or Commission) opened this proceeding via an Order Instituting Rulemaking (OIR) adopted on December 13, 2018 and issued on December 19, 2018. The intent of this proceeding is to examine the rules allowing electric investor-owned utilities (IOU) to de-energize power lines in the case of dangerous conditions that threaten life or property in California.  Through this proceeding, the Commission is undertaking a thorough examination of de-energization processes, also named Public Safety Power Shutoff (PSPS) by various electric utilities, and adopt best practices and a framework for them to ensure orderly and safe de-energization,

R.18-12-005  COM/MBL/gp2

and re-energization, of power lines and to identify the need for review of these practices and framework in future proceedings.

On June 4, 2019, the Commission issued Decision (D.) 19-05-042, the Decision Adopting De-Energization Guidelines (Phase 1 Guidelines).  The Phase 1 Guidelines decision adopted de-energization communication and notification guidelines for the electric IOUs along with updates to the requirements established in Resolution ESRB-8.  The Commission intended the guidelines adopted in that decision to expand upon those in Resolution ESRB-8.  The Phase 1 decision also presents the overarching de-energization strategy of the Commission.

Following the adoption of the Phase 1 Guidelines, the assigned Commissioner issued a Phase 2 Scoping Ruling on August 14, 2019.  The assigned Commissioner then issued an amended Phase 2 Scoping Ruling on December 19, 2019.

On January 30, 2020, the assigned Administrative Law Judge (ALJ) issued a ruling requesting comments on proposed guidelines (Proposed Phase 2 Guidelines) that are in addition to the guidelines in Appendix A of the Phase 1 decision and Resolution ESRB-8.  The topics addressed in the Proposed Phase 2 Guidelines include Working Groups and Advisory Boards, de-energization exercises, who should receive notice, when should notice occur, how should notice occur, community resource centers (CRC), restoration of service upon conclusion of the need for de-energization, transportation resilience, medical baseline and access and functional needs (AFN) populations, transparency, and definitions.

R.18-12-005  COM/MBL/gp2

Comments were received by Association of California Water Agencies (ACWA), California Association of Small & Multi-Jurisdictional Utilities (CASMU), California Community Choice Association (CalCCA), California Large Energy Consumers Association (CLECA), California Municipal Utilities Association (CMUA), California Energy Storage Alliance (CESA), California Manufacturers & Technology Association (CMTA), California Water Association (CWA), Center for Accessible Technology (CforAT), City of San Jose (San Jose), Coalition of California Utility Employees (CUE), East Bay Municipal Utility District (EBMUD), Energy Producers and Users Coalition (EPUC), Joint Communications Parties (CCTA/ AT&T), Joint Local Government (JLG), Joint Water Districts, Local Government Sustainable Energy Coalition (LGSEC), Mussey Grade Road Alliance (MGRA), Northern California Power Agency (NCPA), Pacific Gas and Electric Company Company (PG&E), Protect our Communities (POC), Public Advocates Office (Cal Advocates), Rural County Representatives of California (RCRC), San Diego Gas & Electric Company (SDG&E), Santa Clara County, Small Business Utility Advocates (SBUA), Southern California Edison (SCE), Tesla Inc., The Utility Reform Network (TURN), Utility Consumer's Action Network (UCAN), and William B Abrams (Abrams).

Reply comments were received by CalCCA, CESA, CMTA, CWA, CforAT, San Jose, CUE, EBMUD, CCTA/ AT&T, JLG, LGSEC, PG&E, POC, SDG&E, SBUA, SCE, Tesla Inc., TURN, UCAN, California State Association of Counties, ChargePoint, and Cellco Partnership.

R.18-12-005  COM/MBL/gp2

## 1.1.  Jurisdiction

In the wake of one of the most devastating wildfire seasons in California's history and in response to Senate Bill (SB) 901,[1] the Commission instituted this OIR to build on earlier rules on the de-energization of powerlines.[2]  California Public Utilities Code Sections[3] (Pub. Util. Code §§) 451 and 399.2(a) give electric IOUs authority to de-energize power lines in order to protect public safety.[4] However, de-energization can leave communities and essential facilities without power, which brings its own risks and hardships, particularly for vulnerable communities and individuals.[5]

### 1.1.1.  D.12-04-024 Adopting Fire Safety Requirements for SDG&E

The Commission adopted de-energization rules and guidelines for SDG&E in D.12-04-024, which established requirements for reasonableness, notification, mitigation and reporting by SDG&E for its de-energization events.[6]  D.12-04-024 reaffirms the Commission's finding in D.09-09-030 that SDG&E has authority under §§ 451 and 399.2(a) to shut off power in order to protect public safety when strong winds exceed the design basis for SDG&E's system.[7]  D.12-04-024

---

[1]  Stats. 2018, Ch. 626.  SB 901 available at
https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180SB901.

[2]  R.18-12-005 at 1; SB 901.

[3]  Unless otherwise stated, all code section references are to the Public Utilities Code.

[4]  Rulemaking (R.) 18-12-005; Resolution ESRB-8 at 2.

[5]  R.18-12-005 at 2.

[6]  D.12-04-024 at 1.

[7]  *Id*.

R.18-12-005  COM/MBL/gp2

went a step beyond the 2009 decision, by ordering SDG&E to (1) take all appropriate and feasible steps to provide notice and mitigation to its customers whenever the utility shuts off power pursuant to §§ 451 and 399.2(a), and (2) report any de-energization events to the Commission's Safety and Enforcement Division (SED) within 12 hours after SDG&E shuts off power.[8] While the Commission recognized the impossible feat of anticipating every emergency situation resulting in proactive de-energization, the Commission held that SDG&E should provide as much notice as feasible before shutting off power so the affected providers of essential services (*e.g.*, hospitals, prisons, public safety agencies, communications providers, and water districts) and customers who are especially vulnerable to power interruptions (*e.g.*, customers who rely on medical life support equipment) may implement their own emergency plans.[9] Following the adoption of D.12-04-024 in 2012 and before subsequent Commission action in 2018, PG&E  and SCE exercised their authority to de-energize power lines pursuant to §§ 451 and 399.2(a), however, in that period of time those electric utilities were not subject to the reasonableness, notification, mitigation, and reporting requirements that were ordered in D.12-04-024 for SDG&E..[10]

---

[8]  *Id.* at Conclusions of Law 1 and 2.

[9]  *Id.* at 10.

[10]  Resolution ESRB-8 at 2.

R.18-12-005  COM/MBL/gp2

### 1.1.2.  Resolution ESRB-8

In 2017, California suffered the most destructive wildfire season on record, including 5 of the 20 most destructive wildland urban- interface fires in the state's history.[11]  As a result of these fires, the President of the United States approved a major disaster declaration and the Governor of California proclaimed a State of Emergency.  In light of the increased intensity of California wildfires and varying deenergization guidelines amongst all of California's electric IOUs, the Commission issued Resolution ESRB-8 on July 16, 2018.  Resolution ESRB8 extended the reasonableness, public notification, mitigation and reporting requirements of D.12-04-024 to all electric IOUs to ensure that public and local officials are prepared for power shutoff and aware of the electric IOUs' deenergization policies.[12]  Resolution ESRB-8 went a step beyond D.12-04-024 by strengthening the reporting and public outreach, notification and mitigation guidelines adopted in 2012.[13]

Resolution ESRB-8 strengthened reporting requirements by directing the electric IOUs to submit a report to the Director of SED within 10 business days after each de-energization event, as well as after high-threat events where the utility provided notifications to local government, agencies, and customers of possible de-energization actions but where de-energization did not occur.[14] ESRB-8 required that at a minimum, the de-energization report must include:

---

[11]  *Id.*

[12]  *Id.* at 5.

[13]  *Id.* at 5 to 7.

[14]  *Id.* at 5.

R.18-12-005  COM/MBL/gp2

(1) who the electric IOU contacted in the community prior to de-energization and whether the affected areas are classified as Zone 1, Tier 2, or Tier 3 per the definition in General Order 95, Rule 21.2-D[15];  (2) explanation of why notice could not be provided at least 2 hours prior to a de-energization event if such notice was not given;  (3) the number of and a summary of the complaints received as a result of the de-energization events, including any claims filed against the electric IOU because of de-energization;  (4) a detailed description of the steps the electric IOU used to restore power;  and (5) the address and description of each community assistance location during a de-energization event.[16]

Resolution ESRB-8 strengthened the public outreach, notification, and mitigation guidelines of D.12-04024 by directing the electric IOUs to hold de-energization Information Workshops with the public within 90 days from the date that Resolution ESRB-8 was formally adopted.  Resolution ESRB-8 ordered the electric IOUs to submit a report to the Director of SED outlining their public outreach, notification and mitigation plans, within 30 days of the effective date the resolution.  Resolution ESRB8 also ordered the electric IOUs to retain documentation of community meetings and customer notifications for a minimum of one- year after a -de-energization- event.  Finally, Resolution ESRB-8 required the electric IOUs to assist critical facility customers to evaluate

---

[15]  Rule 21.1(D) defines High Fire-Threat Districts(s) (HFTD).  Zone 1 is Tier 1 of the latest version of the United States Forest Service and CAL FIRE's joint map of Tree Mortality High Hazard Zones.  Tiers 2 and 3 are designated as such in the Commission's Fire-Threat Map.

[16]  Resolution ESRB-8 at 5.

R.18-12-005  COM/MBL/gp2

their need for backup power and noted that the electric IOUs may need to provide generators to critical facilities that are not well prepared for a disruption in service.[17]

### 1.1.3.  Senate Bill 901

On September 21, 2018, the Governor signed SB 901.  Among other things, SB 901 added new provisions to § 8386, requiring all California electric utilities to prepare and submit Wildfire Mitigation Plans (WMP) that describe the electric IOUs' plans to prevent, combat, and respond to wildfires affecting their service territories.[18]  Shortly after, the Commission opened Rulemaking (R.)18-10-007 as a vehicle for the review and implementation of the electric IOUs' WMPs prior to commencement of the 2019 wildfire season.[19]  R.18-10007 notes that, although SB 901 included other Commission related provisions in addition to the WMPs, those provisions would be addressed in other Commission proceedings.[20]

Pertinent to this proceeding, § 8386(c)(6) requires the Plans to include protocols for disabling reclosers and de-energizing portions of the electrical distribution system that consider the associated impacts on public safety, including impacts on critical first responders and on health and communication infrastructure.[21]  Furthermore, § 8386(c)(7) requires the Plans to include appropriate and feasible procedures for notifying customers who may be

---

[17]  *Id.* at 7.

[18]  R.18-10-007 at 2.

[19]  R.18-10-007 at 2 to 3.

[20]  R.18-10-005 at 2, footnote 4.

[21]  R.18-12-005 at 3.

R.18-12-005  COM/MBL/gp2

impacted by the de-energization of electrical lines.  The procedures must consider the need to notify, as a priority, critical first responders, health care facilities and operators of communications infrastructure.

Prior to R.18-10-007, the Commission initiated R.18-03-011 to address emergency disaster relief for California residents affected by a series of devastating wildfires in Northern and Southern California in 2017 and 2018.[22] Cross-coordination among all of these rulemakings is necessary to ensure California is prepared for the 2020 and beyond wildfire seasons.

### 1.1.4.  Decision 19-05-042 Phase 1 De-energization Guidelines

In Phase 1 of this proceeding, the Commission issued D.19-05-042, that developed de-energization communication and notification guidelines for the electric IOUs along with updates to the requirements established in Resolution ESRB-8.  The guidelines adopted in that decision were meant to expand upon those in Resolution ESRB-8.  Resolution ESRB-8 and the guidelines adopted in D.19-05-042 remain in effect unless and until superseded by this or a subsequent decision.  D.19-05-042 also presents the overarching de-energization strategy of the Commission.

### 1.1.5.  Assembly Bill 1054

Assembly Bill (AB) 1054 (Ch. 79, Stats. 2019) (AB 1054) was enacted as an urgency measure to address the dangers and devastation from catastrophic wildfires in California caused by electric utility infrastructure, including the increased costs to ratepayers resulting from electric utilities' exposure to financial

---

[22]  R.18-03-011 at 1 to 2.

R.18-12-005  COM/MBL/gp2

liability. AB 1513 (Ch. 396, Stats. 2019) subsequently modified AB 1054 and a companion bill, AB 111 (Ch. 81, Stats. 2019), was also enacted. AB 1054 left in place the same components of Public Utilities Code § 8386 that required the regulated electrical corporations to address de-energization in their WMPs.

## 2.  Issues Before the Commission

The issues identified in the Scoping Ruling to be addressed in Phase 2 of this proceeding are as follows:

1. Updates or changes to existing de-energization guidelines adopted in Resolution ESRB-8 and D.19-05-042 to promote the public safety in advance of the 2020 wildfire season;

2. Proposed guidelines relating to the following topics:

   a. Electric IOU server and website capacity to ensure ability of the broader affected population to access real-time de-energization information during a de-energization event;

   b. Identification of transit corridors and critical transportation infrastructure dependent upon back-up generation during a de-energization event and plans to ensure backup generation is deployed;

   c. Operations and location of Community Resource Centers during de-energization events;

   d. Possible creation of a wildfire safety community Advisory Board for each utility;

   e. De-energization planning exercises in advance of the wildfire season, including electric IOUs and communication services providers;

   f. Communication and notification during a de-energization event when communications services may be disrupted;

- 11 -

R.18-12-005  COM/MBL/gp2

    g.  Assistance to medical baseline customers in the near term to mitigate impact of de-energization events; and

    h.  Plans to better execute identification, communication, and contact with vulnerable populations that may not be considered medical baseline customers.

### 3.  COVID-19 Stay-at-Home Order

On March 19, 2020, the Governor of California signed Executive Order N-33-20 requiring Californians to heed the order of the California State Public Health Officer and the Director of the California Department of Public Health that all individuals living in the State of California stay home or at their place of residence, except as needed to maintain continuity of operation of the federal critical infrastructure sectors, in order to address the public health emergency presented by the COVID-19 disease (stay-at-home order).[23]  The stay-at-home order is indefinite, and as of the date of the issuance of this decision it remains in effect.

The Commission acknowledges that the investor owned electric utilities should make every reasonable attempt to adhere to the guidelines adopted in this decision while complying with direction from public health officials regarding shelter-in-place, social distancing, or other measures that may need to be taken in response to the COVID-19 pandemic.  Additionally, on April 13, 2020, a group of joint intervenors moved in this proceeding for the Commission to issue an emergency order regarding de-energization protocols during the COVID-19 pandemic.  This decision does not address that motion, although the

---

[23]  Executive Order N-33-20. Available at: https://covid19.ca.gov/img/Executive-Order-N-33-20.pdf.  Last accessed March 27, 2020.

R.18-12-005  COM/MBL/gp2

Commission is taking serious consideration of precautions related to the
COVID-19 pandemic.

## 4. Additions or Modifications to Existing De-energization Guidelines Adopted in Resolution ESRB-8 and D.19-05-042 to Promote the Public Safety in Advance of the 2020 Wildfire Season

On January 30, 2020, the assigned ALJ issued a ruling with proposed new
and modified guidelines for Phase 2 of this proceeding.  Parties provided
comments and replies on the proposed new and modified guidelines.  This
section will address the proposed new and modified guidelines and the
comments and reply comments the Commission received.

### 4.1.  Working Groups and Advisory Boards

The assigned ALJ proposed the following guidelines regarding the
creation and establishment of de-energization Working Groups and Advisory
Boards.

> The large electric investor-owned utilities, with the
> participation of small multi-jurisdictional electric utilities,
> community choice aggregators, and communications
> providers, shall convene, at least monthly, regionalized
> Working Groups with tribal and local government entities,
> public safety partners, and representatives of access and
> functional needs and vulnerable communities.  The electric
> investor-owned utilities shall conduct outreach to impacted
> communities to increase their level of participation and to
> plan the coordination for future de-energization events.  The
> purpose of these Working Groups is to ensure there is a
> formal environment to share lessons learned between the
> impacted communities and the electric investor-owned
> utilities.  Additionally, convening these Working Groups
> serves as a mechanism for the CPUC and the local
> communities to validate whether the electric investor-owned
> utilities have successfully implemented lessons learned from

prior de-energization events and alleviate barriers to solutions for future de-energization events.  The electric investor owned utilities must report back to the CPUC on progress on a monthly basis.  The electric investor-owned utilities shall develop their de-energization protocols with feedback from the Working Group.  The protocols should include the provision of Community Resources Centers, communication strategies, information sharing, identification of critical facilities and access and functional needs customers, and contingency plans.

All electric investor-owned utilities must coordinate Advisory Boards which consist of public safety partners, local and tribal government officials, business groups, non-profits, representatives of access and functional needs and vulnerable communities, and academic organizations to advise on best practices for wildfire issues and safety, community preparedness, regional coordination and the use of emerging technologies.  All electric investor-owned utilities shall emulate the approach SDG&E has implemented with its wildfire Advisory Board.

### 4.1.1.  Party Comments on Working Groups and Advisory Boards

Parties commented extensively on recommendations to adopt the Commission's proposed guideline regarding Working Groups and Advisory Boards, in some circumstances suggesting modifications.  The party comments focused on four core areas of issues pertaining to the proposed Working Groups and Advisory Board guidelines: goals and purposes, participation, frequency, and reporting.

#### 4.1.1.1.  Goals and Purposes

PG&E generally supports the proposed guidelines.

R.18-12-005  COM/MBL/gp2

SCE generally supports the intent of the proposed guidelines but requests flexibility in implementing more productive community engagement forums or Working Groups and Advisory Boards.

SDG&E fully supports the use of Working Groups and Advisory Boards to serve as a regular forum to engage in a dialogue with interested stakeholders regarding wildfire safety and de-energization. SDG&E submits that these guidelines are duplicative of existing requirements in place that fulfill these needs and thus should not be imposed, including the progress report required by D.19-05-042 and requirements related to WMP submissions.

UCAN supports the Advisory Boards being broad and expansive in nature to allow for a wide spectrum of input, gathering of data, diverse perspectives, customer/ratepayer feedback, pre-event information, post-operational experiences and, overall, de-energization "lessons learned" and "best practices."

Santa Clara County suggests that the Advisory Board structure and procedures should research and adopt best practices from similar de-energization and wildfire Advisory Boards, such as, SDG&E's Wildfire Advisory Board.

CalCCA notes that the Working Group's goals should include at a minimum:  (a) Regional Response Planning;  (b) Regional Communication Planning,  (c) Regional Mitigation Planning,  (d) Regional Resiliency Planning, and  (e) the development of protocols for activating a de-energization event. Additional goals can be added per consensus of the Working Group based on pressing circumstances.  CalCCA also advocates that the Advisory Boards must

R.18-12-005  COM/MBL/gp2

have broad access to information on the electric IOUs' de-energization related and resiliency-related planning, operations, investments, and expenditures.

### 4.1.1.2.  Participation

CMUA advocates that participation should include the publicly owned utilities (POU).

RCRC supports the inclusion of local governments in the Working Groups and Advisory Boards.

LGSEC supports board representation of participants that should reflect the diverse needs of the individual communities including, low-income, limited English speaking, medical baseline customers, physically disabled, mentally disabled, elderly, and youth.

Cal Advocates notes that Working Groups and Advisory Boards must reflect the existing status of communications service providers as critical facilities and public safety partners.

ACWA notes that as key public safety partners, the public water agencies should be included in the regionalized Working Groups and Advisory Boards. Along a similar note, NCPA indicates that electric POUs and electric cooperatives should be included in the regional Working Groups and Advisory Boards.

### 4.1.1.3.  Frequency

PG&E and SDG&E recommend that the frequency of these Working Groups and Advisory Boards be quarterly. SCE recommends that the Commission revise the guidelines to require the utilities to invite stakeholders to an engagement forum that will meet twice per year for the next three years, or

R.18-12-005  COM/MBL/gp2

provide flexibility to the electric IOU to be able to implement this sort of engagement forum.

CalCCA also suggests that the CPUC should determine the frequency of meetings for each year for the Advisory Boards.  CalCCA recommends that for the 2020 wildfire season, advisory boards should meet every month until the CPUC reduces their meeting frequency.

#### 4.1.1.4.   Reporting

SDG&E raises issues with the reporting from the Working Groups and Advisory Boards occurring on a monthly basis, indicating this reporting is too frequent.

### 4.1.2.   Commission Determination on Working Groups and Advisory Boards

The record generally supports the development of guidelines that require the electric IOUs to hold and maintain de-energization Working Groups and Advisory Boards.  However, the record also supports some modifications to the Working Groups and Advisory Boards guidelines initially proposed in the January 30, 2020 ALJ ruling.

Regarding the goals and the purpose of the regional Working Groups and the Advisory Boards, there is a clear delineation.  The Working Groups are more geared towards local and regional community interactions prior to, during, and after a de-energization event.  The Advisory Boards consider broader system territory-wide de-energization and wildfire issues and provide hands-on, direct advisory capabilities to the electric IOUs related to all aspects of de-energization.

R.18-12-005  COM/MBL/gp2

It is the intent of the Commission to ensure that representation on the Working Groups reflect the individual dynamics and needs of the local communities that are impacted by de-energization events.

The Commission acknowledges that not all public safety partners, local governments, and other entities invited to participate in the Working Groups and Advisory Boards may elect to participate.  Provided the electric IOUs reasonably communicate the invitation and notice of the meetings to the appropriate local entities, it is likely the electric IOU has fulfilled its duty.  It is beyond the control of the electric IOUs regarding whether an entity or group choses to participate.  In the event of sufficient notice and invitation, the electric IOUs should not be held responsible for a third party's decision not to participate.

CMUA, ACWA, and NCPA made reasonable showings, and we agree, that the electric POUs and water service providers should be invited to participate in the Working Groups and Advisory Boards.

The Commission finds that it is reasonable based on the record for the working groups and advisory boards to be held on a quarterly basis. As such, the Commission also finds that it is reasonable for reporting on the working groups and advisory boards to also occur on a quarterly basis.

Some parties like SCE requested that the Commission provide flexibility to the electric IOUs in developing alternatives to the working groups and advisory boards.  The Commission finds that considering the record, this is reasonable provided some conditions are met.  The investor owned electric utilities may submit Tier 3 Advice Letters that propose alternatives to the working group

R.18-12-005  COM/MBL/gp2

and/or advisory board guidelines.  In an Advice Letter, the IOU must clearly lay out its plan for administering an alternative working group and/or advisory board, including the proposed goals and purpose, participation, frequency, reporting, and an explanation for how the alternative proposed is in the public interest.  In resolving the Advice Letter, the Commission will consider whether the proposed alternative to the working group and advisory board guidelines is in the public interest.  The electric IOU must convene the working groups on a quarterly basis, as directed in this decision, until such time that the Commission approves its Tier 3 Advice Letter.

These modifications are reflected in the final guidelines adopted in Appendix A of this decision.

## 4.2.  De-energization Exercises

The assigned ALJ proposed the following guideline regarding de-energization exercises.

> The electric investor-owned utilities shall collaborate with the CPUC, CalFire, CalOES and local emergency response officials to plan annual de-energization exercises throughout the utility service territories in the areas with the highest historical and forecasted risk for de-energization in advance of fire season. The exercises should consider worst case scenarios of de-energization. The exercises shall measure de-energization program performance during a mock event and would include items, not limited to, tests of customer and critical facilities notification and communication systems, tests of backup power resources, switching and sectionalizing devices, remote disabling of reclosers and other smart grid technologies, aerial and ground inspections of lines, functioning of emergency operations centers, and community resource centers. Lessons learned from these exercises should

R.18-12-005  COM/MBL/gp2

be utilized to modify the design and implementation of de-energization program elements.

### 4.2.1.  Party Comments on De-energization Exercises

PG&E supports de-energization exercises and added the comment that after alignment with the CPUC, Cal Fire, California Governor's Office of Emergency Services (CalOES), and local emergency response officials on scope and scale of the de-energization exercise, PG&E plans to utilize the Homeland Security Exercise Evaluation Program to design and implement the exercise.

SDG&E recommended that de-energization exercises should take place in the August/September timeframe to allow for sufficient time to incorporate any lessons learned and regulatory updates prior to fire season.

SCE agrees with the need for de-energization exercises.  It requests that the Commission find that de-energization exercises already being conducted by SCE are sufficient and to not require SCE to modify its current practices as proposed in the Ruling.  SCE notes that out of concern for public safety and the safety of its personnel, it does not de-energize customers as part of exercises or drills, and instead conducts mock drills only. SCE also notes it does not conduct helicopter aerial line inspections as part of its de-energization exercises.  For both aerial inspections and facility de-energizations, SCE relies on lessons learned either from the work required in the ordinary course of business or when events requiring such aerial inspections or de-energizations actually take place.

CalCCA advocates that the IOUs should collaborate with the Commission, CalFire, CalOES, AFN community representatives, local emergency response officials, and all other public safety partners to plan annual de-energization mock

R.18-12-005  COM/MBL/gp2

exercises in their territory where the highest historical risk for de-energization events occur.

CLECA and CMTA make comments that suggest that the CPUC should make clear the these are "mock" exercises and are not actual de-energization events.  An actual de-energization of circuits could pose unnecessary public confusion and unsafe conditions.  An actual outage would also disrupt business activities unnecessarily.  Valuable lessons can be learned from doing mock exercises, and therefore, de-energizing the lines is not necessary.

UCAN advocates that the exercises should adopt "lessons learned "to modify the design and implementation of de-energization program elements.

CforAT recommends that Proposed Guidelines be modified to expressly require all de-energization exercises to include planning for how to respond to people with medical needs who are facing the risk of harm due to an extended outage.

Abrams advocates that the exercises should define "stress test" criteria to understand how the interdependent systems and organizations will be able to interact.

### 4.2.2.  Commission Determination on De-energization Exercises

The record supports the development of guidelines that require the electric IOUs to conduct de-energization exercises in preparation for de-energization events that might occur.  However, the record also supports some modifications to the de-energization exercise guidelines initially proposed in the January 30, 2020 ALJ ruling.

R.18-12-005  COM/MBL/gp2

The record supports modifying the proposed guideline to ensure that the de-energization events or simulations do not necessitate the actual de-energization of circuits nor violate communication systems requirements. Rather, the purpose of these exercises is for them to be table-top simulations. We find that it does not make sense to require the electric IOUs to actually test backup power resources, switching and sectionalizing devices, remote-disabling of reclosers and other smart grid technologies, and conduct aerial and ground inspection of lines. Aspects of these components of the electric IOUs' systems should be present in the table-top simulation, however, operationally the electric IOUs should not be taking action during these exercises that could result in outages for customers.

The record does clearly substantiate that the lessons learned from these exercises should be reported to exercise participants, working groups and advisory boards, and utilized to modify the design and implementation of de-energization program elements.

These modifications are reflected in the final guidelines adopted in Appendix A of this decision.

### 4.3.   Who should receive notice? When should notice occur? How should notice occur?

The assigned ALJ proposed the following guidelines in regards to notification.

The electric investor-owned utilities shall utilize all reasonable channels of communication to all populations potentially affected by a de-energization event.

R.18-12-005  COM/MBL/gp2

The electric investor-owned utilities shall develop communication and notification plans with local authorities that anticipates the disruption of traditional communication channels.

In situations where internet, cellular, or landline-based communication services are limited, the electric investor-owned utilities should leverage, in coordination with the public safety partners, public alert systems, public radio broadcasts, and neighborhood patrols in de-energization event areas.

The electric investor-owned utilities shall ensure there is available bandwidth capacity, either via a cloud service or on-premise, to manage a website that provides the public with access to information about the geographic areas impacted by potential de-energization events and all other critical information to maintain public safety prior to, during, and after a de-energization event.  Given the state-wide, national, and international interest in de-energization events in California, the electric investor owned utilities shall create and maintain an actionable plan that ensures necessary bandwidth is immediately available and consistent up to and through a de-energization event.  The electric investor-owned utilities shall have bandwidth and technological resources available to serve traffic to all peak demand that will occur as a result of a de-energization event.

The electric investor-owned utilities shall consult with the California Department of Technology (CDT) to develop plans with reports to the CPUC that outline steps for meeting future website and server performance requirements necessary for effective and uninterrupted communication to the general public about de-energization events.

The electric investor-owned utilities shall ensure that the public is able to access precise locality information of potential and active de-energization event impacted service points.  The

R.18-12-005  COM/MBL/gp2

electric investor-owned utilities shall make every reasonable attempt available to ensure all false-negative and false-positive communications are eliminated and the public is able to access precise and accurate information regarding the location and duration of potential and active de-energization events and restoration efforts. In the event a false-negative or false-positive communication is made, the electric investor -owned utilities shall promptly and clearly explain why they were incorrect through a communication to the public and on a posting on their public website and de-energization webpage. Furthermore, the electric investor -owned utilities shall explain any false communications in the post event reports by citing the sources of changing data.  Lessons learned should be incorporated in ongoing de-energization communications and notifications to increase their accuracy and effectiveness.

All notifications to customers about potential or active de-energization events shall be communicated with ease of readability and comprehension as a priority.  The electric investor-owned utilities shall proactively reach out to the media and community -organizations to ensure third party use of all messaging and map data including application programming interfaces for the de-energization event is consistent.  The electric investor-owned utilities shall retain and utilize the expertise of emergency situation user interface and user experience professionals to ensure planned and executed communication prior to, during, and following a de-energization event minimizes public confusion.

The electric investor-owned utilities must provide communications carriers with the meter and circuit IDs to be de-energized and reenergized to ensure communication carriers receive actionable notification information that can inform proactive deployment of resources to minimize the impact of the de-energization events on communications infrastructure.

R.18-12-005  COM/MBL/gp2

### 4.3.1.   Party Comments on Notice
#### 4.3.1.1.   Communications/Notification Plan

CalCCA advocates that electric IOUs should provide for the establishment of a secure web data portal for sharing information, including sensitive or confidential information, with local government and emergency management agencies.

JLG indicates that the plans should consider utilizing National Oceanic and Atmospheric Administration (NOAA) and National Weather Service (NWS) radios, which are designed to function during disasters, and instruct customers that radio broadcasts will be made throughout the event.

Santa Clara County asserts the electric IOUs should coordinate with each local government entity to designate a point of contact for submission of post-event de-energization reports and surveys.  Further, the electric IOUs should develop and implement a real time de-energization outage and re-energization platform, including a circuit map, that provides emergency managers with up-to-date information about the areas and circuits within their jurisdictions that will be or are impacted by de-energization.

CalCCA and CLECA note that electric IOUs should provide communication carriers with the meter and circuit identifications (ID) to be de-energized and re-energized to ensure carriers have the information needed to maintain communication networks.

#### 4.3.1.2.   Website

CalCCA indicated that the guidelines should require electric IOUs to have adequate bandwidth and technical resources in place to ensure their

R.18-12-005  COM/MBL/gp2

de-energization web portals for local government agencies, Public Safety Partners, and the general public remain operational and are updated in real time.

CforAT notes that any website devoted to providing information about a de-energization event must be accessible in accordance with Americans with Disability (ADA) web accessibility standards.

CalCCA and Abrams advocate that outage map information must be made available by address look up and be updated at least hourly from 48-hours prior to a de-energization event to 48-hours after re-energization.

### 4.3.1.3.  Notification Protocols

PG&E indicated it generally supports the proposed guidelines on this topic but recommends the requirement related to false positives, circumstances where it alerts customers that power will be shutoff but ultimately does not shutoff, be deleted.

SDG&E submits that it would be confusing to consumers to require the electric IOUs to clearly explain errors in notification through additional communications and near real-time posting on the public website or de-energization webpage.  Instead, efforts are better served by ensuring that the de-energization webpage is up-to-date with the most accurate information.

Cal Advocates indicated that the electric IOUs must convey geographical information systems (GIS) formatted de-energization boundary information with affected meter and circuit ID information with their initial 48-72 hour advance de-energization notifications to all public safety partners, including communications service providers.

R.18-12-005  COM/MBL/gp2

Santa Clara County contends that the electric IOUs should conduct a widespread outreach program to update the phone numbers and contact information of all utility customers.

CLECA supports the idea that notifications "be communicated with ease of readability and comprehension as a priority." CLECA also supports the proposed guideline that communications carriers be provided "meter and circuit IDs to be de-energized and re-energized to ensure communications carriers receive actionable notification information."

CMTA suggests modified Guidelines that specify that manufacturing and industrial facilities must be included as "populations potentially affected by a de-energization event" that require notification of de-energization events that anticipate "the disruption of traditional communication channels."  CMTA indicates that manufacturing and industrial facilities need to be able to "access precise locality information of potential and active de-energization event impacted service points."

CWA advocates that the electric IOUs should be required to provide water service providers with the meter and circuit IDs to be de-energized and re-energized.  CWA contends that water service providers need to have sufficient information regarding the electrical transmission and distribution system to make at least an initial designation of where to send personnel and procure back-up electricity generation to guard against the interruption of water service.

CCTA/AT&T advocates that notifications be consistent, clear, accurate, and actionable.

R.18-12-005  COM/MBL/gp2

NCPA advocates that the information shared in notifications must be meaningful, and to that end, the guidelines should be further modified to clarify that the electric IOU is to provide information to critical facilities, like affected POUs, that is commensurate with the sophistication of the customers, as well as timely and accurate.  NCPA suggests that the electric IOUs should be required to notify local government entities of the individuals, particularly medical baseline customers, who the utilities were unable to contact.

TURN asserts the electric IOUs should provide in-language notifications for de-energization events in areas where there are populations for whom English is not a native or dominant language, leverage ethnic language news media outlets, and carry out in-language notification coordination with the public safety partners, public alert systems, public radio broadcasts, and neighborhood patrols. Further TURN asserts that agencies responsible for receiving and routing 9-1-1 calls, including Public Safety Answering Points within the state's 9-1-1- network, need to be included as part of the term "9-1-1- emergency service" and treated as a "critical facility"; these personnel may not always be directly part of a police or fire agency or fall under the current definitions

Abrams indicates that the electric IOUs should be required to notify each customer by phone or telephone relay services (TTY) instead of relying on customers to access utilities' websites or having to opt-in to phone notifications. Abrams additionally advocates for a set target of "at least 90% customer awareness" as a standard for de-energization events with "at least 24-hour notice" prior to power shutoff.

R.18-12-005  COM/MBL/gp2

CforAT provides rationale that de-energization notification materials must include accessible formats across all media platforms to make them accessible for people with disabilities and limited English speakers. Additionally, electric IOUs, local governments, and community centers should collaborate to identify such populations in their regions.

### 4.3.1.4.   Notification Media

CforAT asserts that it is not appropriate to expect volunteer organizations like neighborhood patrols and ham radio operators to fill gaps left by communications services and IOUs.

RCRC advocates that multi-channel communications are essential, especially because a significant portion of the state's population does not have access to the internet, including some of the state's most vulnerable residents that live in underserved and unserved broadband regions.

Santa Clara County contends that the electric IOUs should notify each customer by phone instead of relying on customers to access utilities' websites in order to opt-in to phone notifications. Further, the electric IOUs should hold live telephone calls with each local government point of contact prior to, during, and following each de-energization event.

San Jose contends that electric IOUs should coordinate with public safety partners, public alert systems, public radio broadcasts, and neighborhood patrols in de-energization event areas where internet, cellular, or landline-based communication services are limited.

R.18-12-005  COM/MBL/gp2

### 4.3.2.   Commission Determination on Notice

The record supports the development of additional guidelines regarding the notification requirements that apply to the electric IOUs. However, the record also supports some modifications to the notification requirements initially proposed in the January 30, 2020 ALJ ruling.

The record supports developing a guideline that indicates the electric IOUs shall utilize all reasonable channels of communication that will reach all populations potentially impacted by a de-energization event.

The record also supports a requirement for the electric IOUs to have communications plans. In developing communications plans, the electric IOUs must include CalOES, county and local governments, independent living centers, and representatives of people and communities with access and functional needs.

The Commission finds it reasonable that the electric IOUs consider alternative forms of in-language communications to reach the public when the conventional channels of communication are overloaded or are not functioning. At this time, the Commission does not find it necessary to mandate that the electric IOUs coordinate with neighborhood patrols, although there certainly may be value in this type of coordination.

The record supports a guideline that requires the electric IOUs to secure sufficient bandwidth capacity to manage a website that provides the public, including public safety partners, with access to necessary information about the status of the de-energization events. With knowledge about the bandwidth utilization of the de-energization events in the recent years, the record supports

R.18-12-005  COM/MBL/gp2

requiring that the electric IOUs have sufficient bandwidth and technological resources available to serve the peak demand of website traffic that will occur as a result of a de-energization event.

  As a part of these guidelines, the Commission finds it reasonable that electric IOUs shall consult with the California Department of Technology (CDT) to develop plans with reports to the CPUC that outline steps for meeting future website and server performance requirements necessary for effective and uninterrupted communication to the general public about de-energization events.

  The record certainly supports the guideline indicating that the electric IOUs shall ensure that the public is able to access precise locality information of potential and active de-energization event impacted service points. However, the Commission finds that parties like PG&E make a reasonable showing that it is not feasible to require that "in the event of a false negative or false positive communication," that the electric IOUs must promptly and clearly explain why they were incorrect in the communication with some sort of posting on their website. We acknowledge that the electric IOUs are typically managing dynamic environments while conducting a de-energization event, and at this time it is unreasonable to layer on this additional requirement.

  The Commission recognizes that clarity of communication is a major issue that the electric IOUs must perfect in the implementation of de-energization events. The electric IOUs shall ensure their communication with the public regarding de-energization events is easy to read and comprehend. And further, the electric IOUs shall retain the expertise of emergency situation user interface

R.18-12-005  COM/MBL/gp2

and user experience professionals to ensure planned and executed communication prior to, during, and following a de-energization event minimizes public confusion.

With support from the communications interveners, it is reasonable to adopt the guideline that electric IOUs shall provide communications carriers with the meter and circuit IDs to be de-energized and re-energized to ensure communication carriers receive actionable notification information that can inform proactive deployment of resources to minimize the impact of the de-energization events on communications infrastructure.

These modifications are reflected in the final guidelines adopted in Appendix A of this decision.

### 4.4.  Community Resource Centers

The assigned ALJ proposed the following guideline regarding community resource centers (CRC)

> The electric investor-owned utilities, through collaboration with relevant stakeholders, shall design, test and execute on a plan 60 days after issuance of the Phase 2 final decision based on local demographic and survey data for meeting a variety of safety needs for vulnerable populations through the provision of community resource centers (CRCs). The plan should include a protocol for siting and accessibility of CRC locations, operations and a determination of the resource needs to best serve the community members who visit. This plan shall be created with consultation from the regional local government Working Groups and the wildfire Advisory Boards. When feasible, CRCs should be set up in areas known to the public, such as recreational centers and public office. Impacted customers should not be required to drive more than 30 minutes to a CRC and CRCs shall be operable 24 hours a day during an active de-energization event (provided there is no curfew

R.18-12-005  COM/MBL/gp2

in effect). Electric investor-owned utilities may staff the CRCs with onsite security during 24-hour operation.

### 4.4.1.   Party Comments on Community Resource Centers

The party comments ranged widely on issues pertaining to CRCs, from advocacy that there should be limited implementation to indications that there should be a substantial expansion of the centers.

### 4.4.1.1.   Facilities and Operations

The IOUs provided comments that share reservations about the extent to which the Commission is proposing to expand the availability of CRCs.

For instance, PG&E requested that the Commission remove the reference that the CRCs be located no more than a 30-minute drive from impacted customers and that the CRCs be open 24 hours per day during active de-energization events.

SCE requested that there be an exemption to the 30-minute rule in instances where it is not reasonable for this requirement to be met. SCE also indicated that it does not believe that CRCs should be operable 24 hours per day during an active de-energization event. SCE also advocates that customers would be much better served if CRC daytime support functions can be leveraged to complement existing emergency shelter infrastructure provided by government and non-governmental based organizations and community based organizations, instead of supplanting or interfering with that infrastructure. SCE indicated that its CRC siting strategy is based on a forecast of high priority areas identified after considering the likelihood of de-energization events, grid-hardening activities, special needs customers including those identified in its systems as Medical

R.18-12-005  COM/MBL/gp2

Baseline and Critical Care, and those in Disadvantaged Communities. SCE notes it also has deployed mobile community crew vehicles to serve remote areas.

Cal Advocates comments that CRC plans should: identify the categories of stakeholders that should be consulted during the development of the CRC plan; define the specific vulnerable populations that the CRC Plan should cover; explain the purpose of the CRC plan, including the key issues that the CRC plan should address; and require the utilities to report on how well the plan was implemented during a de-energization event and whether any lessons learned were identified.

SDG&E notes that operating a CRC 24 hours per day during activation would result in increased safety risk to employees, volunteers, and the public. SDG&E further asserts that because de-energization events are not automatically defined as emergency situations by most governments, 8:00 AM to 6:00 PM is reasonable.

While CASMU is fully supportive of establishing CRCs, CASMU is concerned that the proposed timeline to "design, test and execute" within 60 days could be overly aggressive. CASMU recommends a six-month timeline be utilized. CASMU notes that the Proposed Guidelines are unclear regarding how CRCs shall be funded. CASMU comments that costs to develop CRCs could have a significant impact on smaller utilities like the CASMU members. CASMU notes that these costs should be fully considered before the Proposed Guidelines are adopted.

JLG advocates that the electric IOUs must work with local governments, state Advisory Boards, and AFN representatives to ensure that CRCs are

R.18-12-005  COM/MBL/gp2

designed and deployed to meet the needs of vulnerable customers.  JLG comments that the CRCs must provide charging resources for medical equipment, not just small electronic devices.

LGSEC suggests that the Commission direct the electric IOUs to work with local governments for CRC planning.

CforAT commented that the proposed guidelines be revised to include requirements for CRCs to function as emergency shelters, including providing food, hygiene facilities, and power to support use of any required medical devices, as well as communication devices. CforAT also comments that while the proposed guidelines require that customers should not be required to drive more than 30 minutes to get to a CRC, this does not take into account the needs of people without a private car who must have access to assistance in reaching a CRC.

San Jose notes that the "30-minutes to a CRC" guideline makes no reference to AFN populations and their transportation needs.  San Jose notes the electric IOUs should also consult with AFN populations on where the locations of CRCs could best serve them.

TURN suggests that CRCs must also be accessible within a one-hour trip via public transportation. TURN also noted that accommodations such as mobile charging stations in areas where public transportation is not available should also be deployed by IOUs to ensure that vulnerable customers without access to transportation can also have access to the electricity they need. TURN indicated the IOUs and communication companies should use CRCs to provide charging equipment and access to WiFi for displaced individuals. TURN further asserts

R.18-12-005  COM/MBL/gp2

that voluntary efforts are not reliable and cannot be incorporated into the planning for these de-energization events.

### 4.4.1.2.  Governance and Planning

SCE indicated it considers site requirements such as compliance with the ADA, access to bathrooms, and the ability to charge personal mobile devices. SCE also indicated it is collaborating with community-based organizations who support customers with access and functional needs

CalCCA notes that the CRC proposal should be modified to more accurately reflect the authority and responsibilities of local governments and the IOUs in responding to emergencies and establishing CRCs. CalCCA also notes that proposal should be modified to require that the electric IOUs defer to local governments' CRC-related decisions unless the local government explicitly elects not to exercise this function and allows the electric IOUs to take responsibility for CRC planning.

CforAT supports the recommendation of the Joint Local Governments that utilities work with local governments, state Advisory Boards, and AFN representatives to create an adequate system for designing and operating CRCs. CforAT also indicates that while CRCs should be located within a reasonable distance of impacted communities so that people can easily access them by car, IOUs need to have strategies to identify and provide transportation for those people who do not have their own means of transportation.

RCRC indicates that plans should also consider adequacy with respect to the services provided, number of facilities, convenience of facilities, and hours of operation.  RCRC advocates that the CRCs should provide far more than just

R.18-12-005  COM/MBL/gp2

light refreshments and phone charging capabilities. RCRC also indicated that local government should be free to site and operate one or more CRC within its own jurisdiction.

San Jose notes that the electric IOUs should coordinate with local governments on the locations of CRC in the community, but cities should be among the local governments consulted.

Santa Clara County advocated that CRCs should be:  1) located in libraries as well as recreational centers and public offices; and 2) accessible by public transit. Santa Clara County also indicated that the electric IOUs should bear the costs of operating and supplying the CRCs with resources, including backup generation.

SBUA commented that the Commission should require the electric IOUs to formally consider potential locations for resiliency zones in light of both existing opportunities, such as available solar power sources on municipal buildings and schools, and locations in particular need for reliable power, such as dense neighborhoods, small business districts, hospitals, vulnerable communities, elderly facilities and areas hit by multiple de-energization events in the previous year.

Tesla commented that the Commission should create a pathway for private sector and other non-utility entities to be designated as CRCs, specifically, direct the utilities to establish criteria or a process that can be used by interested entities to be considered for designation as a CRC.

TURN notes that CRCs should be established in close coordination with local healthcare providers and local public health departments. TURN also

R.18-12-005  COM/MBL/gp2

comments that CRCs should be funded by taxpayer dollars and not ratepayer dollars.

Abrams notes that the Commission should ensure that whatever standards are set by the "consultation from regional local government Working Groups and the wildfire Advisory Boards" that these are able to be monitored and verified by the commission without reliance on public complaints as the basis for understanding if standards were met.

### 4.4.2.   Commission Determination on Community Resource Centers

The record generally supports the development of additional guidelines regarding CRCs. However, the record also supports some modifications to the CRC requirements initially proposed in the January 30, 2020 ALJ ruling.

The record supports the creation of a guideline that requires that the electric IOUs, with collaboration with relevant stakeholders, develop their own CRC plans. A reasonable timeframe to require the development of this plan is 60 days after the issuance of this decision.

De-energization events impact large swaths of the population in the impacted areas, and how one individual is impacted can be significantly different from how another proximately close individual is impacted based on specific needs. Because of this, it is reasonable to require that the siting and conditions to accommodate accessibility for CRC locations are developed with input from the impacted communities. In this, the record supports modifications to the proposed guidelines that ensure the electric IOUs are consulting regional and local governments, de-energization Advisory Board participants, public safety partners, representatives of people and communities with access and

R.18-12-005  COM/MBL/gp2

functional needs, tribal representatives, senior citizen groups, business owners,

community resource organizations, public health and healthcare providers, and

wildfire Advisory Board members.

The electric IOUs in many circumstances raised concern with the proposed

requirement that CRCs be cited no more than a 30-minute drive from any

impacted customer.  The Commission agrees that this hard limitation could

cause the electric IOUs to be required to open CRCs in locations that provide low

value to the impacted communities.  However, the record does support a

guideline that ensures that the siting of the CRCs is interspersed throughout the

impacted areas and are accessible to the communities that need CRC availability

in locations that provide at least two egress routes.  The record supports

developing a guideline that ensures that the CRCs are set up in fixed facility

locations that can be quickly opened when needed.  And further, the record

supports a guideline that indicates that the locations should be in areas known to

the public, such as recreational centers, public offices, schools, and libraries.

CRC locations should be ADA accessible to meet the needs of

people/communities with access and functional needs, medical baseline, and

other vulnerable utility customers.

Regarding hours of operation for CRCs, parties both supported 24-hour

operation during de-energization events while also providing valid rationales for

why 24-hour operation is not prudent.  We understand that there are concerns

for employee safety during late-night operations, and further it is not the intent

of the Commission for these CRCs to function as shelters during de-energization

events.  However, shuttering the CRCs at 6 PM, as some parties suggested, is too

R.18-12-005  COM/MBL/gp2

early, especially for community members who are coming home from work in the evening.  Considering this, we determine that the appropriate hours of operation shall be 8:00 a.m. to 10:00 p.m. during de-energization events.  While these are the minimum operating hours, if a local government would like to run a CRC later than 10:00 p.m., it should have the opportunity to do so.  The only caveat, as included in the guidelines by indicating "with actual hours of operation to be determined by the local government," is the circumstance where the CRC is located in a government controlled building that is mandated to close earlier than 10:00 p.m.  In this circumstance, it is reasonable for the CRC to have a closing time that matches with the mandated closure of the government building.

One caveat, as included in the guidelines by indicating "with actual hours of operation to be determined by the local government," is the circumstance where the CRC is located in a government controlled building that is mandated to close earlier than 10:00p.m.  In this circumstance, it is reasonable for the CRC to not operate until 10:00 p.m. and rather have a closing time that matches with the mandated closure of the government building.

Additionally, the record supports an indication of what minimum essentials the CRCs should provide, including charging stations, cellular network services, water, chairs, de-energization event information representatives, and restrooms.

These modifications are reflected in the final guidelines adopted in Appendix A of this decision.

R.18-12-005  COM/MBL/gp2

### 4.5.   Restoration of Service Upon Conclusion of Need for De-energization

The assigned ALJ proposed the following guidelines regarding the restoration of service upon conclusions of the need for de-energization.

> The electric investor-owned utilities shall ensure that power service to impacted service points is restored as soon as possible and no longer than 24 hours following the conclusion of conditions that necessitate a de-energization event.

> Within one hour of an electric investor-owned utility knowing it will re-energize a line, it shall inform the public safety partners first and immediately thereafter the general public. If unintended circumstances are encountered within this timeframe that prevent a safe re-energization, then the electric investor-owned utility shall promptly notify the relevant stakeholders and affected population and provided an updated re-energization timeframe.

#### 4.5.1.   Party Comments on Restoration of Service Upon Conclusion of Need for De-energization

PG&E notes that the requirements in the proposed guidelines may not be possible to implement.  PG&E indicated it is focused on ensuring customers' power is restored as quickly and safely as possible, with a goal to restore service to 98 percent of impacted customers within 12 daylight hours of the "weather all-clear" declaration. PG&E provides the input that the proposed guidelines' 24-hour re-energization requirement may not be possible in situations where damage to lines occurs that requires significant time to repair.  PG&E requests the requirements portion of the proposed guidelines be deleted in its entirety.

SDG&E advocates that restricting customer restorations to 24 hours after the circuit "concludes conditions that necessitate a de-energization event," may not be feasible under certain conditions.  SG&E indicates that it is not

R.18-12-005  COM/MBL/gp2

appropriate from a safety perspective to set a strict requirement that power restoration be no longer than 24 hours.  SDG&E requests the Commission to remove the requirement that restoration take no longer than 24 hours.  SDG&E takes the stance that the most important factor is to make sure restoration occurs when it is safe to do so.

SCE advocates that the commission should not base the 24-hour requirement solely on the conclusion of conditions that necessitated de-energization, and instead, should consider the time required for all necessary steps for a safe re-energization.  SCE advocates that the commission should require SCE to re-energize within 24 hours from the conclusion of the event or when safe to do so, with the proviso that SCE would be required to provide evidence of the conditions and concerns that delayed de-energization beyond the 24-hour deadline in its ESRB-8 reports.

CalCCA indicates its position that the electric IOUs should be required to provide detailed information in their post-event reports listing all service points that took longer than 24-hours to re-energize.

CforAT supports the proposed guidelines for service restoration within 24 hours of the conclusion of conditions supporting the de-energization event and the requirements for notice in advance of restoration of power.

San Jose takes the position that de-energization should not last longer than 24 hours following the conclusion of conditions that necessitate a de-energization event.

CUE shares its position on power restoration, indicating that restoration of service within 24 hours should not be a requirement for all facilities all the time

R.18-12-005  COM/MBL/gp2

because:  1) safe restoration must be prioritized over quick restoration and electric IOUs should not be forced to choose between violating a Commission requirement and risking public or worker safety; 2) setting a hard deadline may fail to account for the varying circumstance of each PSPS event, for example if there are substantial increases in the number of microgrids, there will be a corresponding increase in the complexity of restoring service;  3) electric utilities must inspect all interconnecting switches to be sure they are set in the proper position;  4) a 24-hour period is misleading since electric IOUs would actually have significantly less than 24 hours to restore power because safety patrols work during daylight only;  and 5) re-energization deadlines should not apply to areas with damaged facilities.

NCPA notes that electric IOU plans and processes for restoration of power must include clearly defined prioritization protocols.  NCPA indicates further that the de-energization guidelines should be revised to require that the processes and practices used for re-energization be formally developed into protocols that can be followed in the future and must be coordinated with generation operations from impacted entities.

POC advocates that the guidelines should specify that service will be restored following the same protocol established by Bear Valley Electric for return of service because Bear Valley has a clear, transparent, and prompt criteria for a return-of-service following a de-energization event.

Cal Advocates indicates that the Commission should require the utilities to include in their post-event de-energization reports whether and how they complied with the requirement to restore power as soon as possible and no

R.18-12-005  COM/MBL/gp2

longer than 24 hours following the conclusion of conditions that necessitate a de-energization event.

RCRC supports accelerating service restoration beyond a 24-hour limit. RCRC requests consistency with D.00-05-002, which is requires service restoration within an average of 12 hours after major storms.

Santa Clara County also requests that the Commission consider decreasing the time to power restoration from 24 hours to 12 hours, consistent with the Commission's requirement to restore power within 12 hours on average following a major storm.

### 4.5.1.1.  Notice of Restoration

PG&E requests that the requirement for a one-hour notice of power restoration be removed from the adopted guidelines.  It is concerned that the timing of information would likely be incorrect given how PG&E operationalizes restoration.

SDG&E notes that a one hour estimated restoration of power notifications would not be accurate due to many factors.  SDG&E advocates that its process for notifying its public safety partners and impacted communities at the start of patrol of de-energized circuits and updating them with expected restoration times creates more reasonable customer and partner expectations with which they can make tactical decisions.

SCE provided the position that it is working on determining how it would be possible to provide estimated ranges for the restoration of power on its website.  SCE indicated that while customers want to know how soon their

R.18-12-005  COM/MBL/gp2

power will be restored, SCE does not want to provide erroneous or misleading information.

CMTA agrees that utilities must restore power and notify the public that power is being restored as soon as possible following the end of a de-energization event. CMTA notes that manufacturing and industrial facilities require as much advanced notice of re-energization as possible; like the utilities, manufacturing and industrial facilities must first verify their equipment and processes can be re-activated safely and properly once the power has been restored.

CLECA suggests that the one-hour timeframe to notify re-energization be extended to two hours, to ensure adequate notice prior to re-energization of complex industrial sites.

CCTA/AT&T argues that public safety partners must include communications service providers.  These joint comments contend that the Commission should incorporate their proposals into revised requirements to ensure that public safety partners are provided actionable re-energization information beyond the single one-hour advance notice, as follows:

- A notice captioned "IOU Re-energization Initiation Notice" provided immediately before re-energization begins.

- A notice captioned "IOU Hour Re-energization Notice" provided when the IOU begins to "walk a circuit" for re-energization.

- A notice captioned "IOU Re-energization Completion Notice."

JLG notes that public safety partners must ensure that their facilities are ready for re-energization.

R.18-12-005  COM/MBL/gp2

RCRC takes the position that there should be advance notice of when the service will be restored and prompt notice to local officials when restoration occurs.

### 4.5.2.  Commission Determination on Restoration of service upon conclusion of need for de-energization

The record supports the development of additional guidelines regarding the restoration of service upon conclusion of the need for de-energization. However, the record also supports some modifications to the restoration of service upon conclusion of the need for de-energization requirements initially proposed in the January 30, 2020 ALJ ruling.

It is firmly the intent of the Commission that the IOUs do everything possible to restore service to customers within 24 hours after the termination of a de-energization event.  The Commission understands that there may be hazardous conditions that necessitate further inspection and repair to the power lines prior to the restoration of service. In the event that the electric IOU is not able to restore service to a customer or group of customers within 24 hours after the termination of a de-energization event, the electric IOU must explain why it was not able to timely restore service in its post de-energization event reporting to the Commission.  The Commission expects that this would only be an exception to the normal practice.  The Commission will watch the metric of restoration time closely, and the Commission may open an investigation if there are data present that support that the electric IOUs are routinely restoring service longer than 24 hours after the termination of de-energization events.

Regarding notification of restoration of service, there is a balance here in that the electric IOUs communicate the difficulty of providing a one-hour

R.18-12-005  COM/MBL/gp2

estimate of restoration while parties like CMTA and CLECA indicate that notice is imperative for the safe restoration of energization of their large equipment. For this reason, we are adding the language that the notification must go out to provide one-hour of notice of restoration "to the extent possible."

The record further supports that the electric IOUs should notice not only public safety partners of power restoration but also the operators of critical facilities and critical infrastructure and then, immediately after, impacted utility customers.

Given the issues regarding re-energization that parties like CMTA and CLECA shared, it is prudent to include in the guidelines that "if unintended circumstances are encountered within this timeframe that prevent a safe re-energization, the electric investor-owned utility shall promptly notify the relevant stakeholders and affected population and provide an updated re-energization timeframe."

These modifications are reflected in the final guidelines adopted in Appendix A of this decision.

### 4.6.  Transportation resilience

The assigned ALJ proposed the following guidelines regarding transportation resilience.

> The electric investor-owned utilities shall implement a transportation resiliency taskforce with local, tribal, Federal and State government agencies, and other private and public sector parties to develop a needs assessment and resilience plan in advance of fire season that would identify and describe transportation infrastructure and corridors throughout California in need of back up generation. The

electric investor-owned utilities shall prioritize providing necessary resources to transportation infrastructure that is geographically located in areas most likely to experience de-energization events.

At a minimum, the transportation resiliency needs assessment (TRNA) should consider, but not be limited to the following transportation modes and the corridors and facilities within them:

- Ground – tunnels, bridges, highways, traffic lights and streetlights (in heavy vehicular corridors, i.e. arterials and higher capacity roadways), publicly accessible fueling and charging stations;

- Rail – freight and passenger rail (both heavy and light) facilities;

- Aviation – airports, air traffic control systems, helicopter ports, air force facilities; and

- Maritime – ports, terminals, ferries, freighters, and naval and coastguard facilities.

California is committed to the deployment of electric vehicles. By the 2021 wildfire season, each electric investor-owned utility shall develop and execute a plan to ensure that mobile and deployable electric vehicle fast charging is available and priority access is granted to customers, including those serving AFN populations, potentially impacted by de-energization events, especially along major transportation corridors.  The electric investor-owned utilities shall design a plan to assess where additional Level 3 charging stations are needed (*e.g.* near major transportation corridors), and where portable battery energy storage and/or fossil generation can be sited to power them.  The electric investor-owned utilities' public websites and mobile apps shall communicate the location, number, and accessibility of all Level 3 charging stations and publicly available Level 2 charging stations in proximity to areas potentially impacted by de-energization

R.18-12-005  COM/MBL/gp2

events prior to and during potential or active de-energization
events.

### 4.6.1.   Party Comments on Transportation Resilience
#### 4.6.1.1.   Transportation Resiliency Taskforce

SCE puts forth the position that implementation of an effective
transportation resiliency taskforce is a multi-stakeholder undertaking that is
much better organized by government authorities, such as the California
Department of Transportation (CalTrans).  SCE notes that transportation
infrastructure and corridor planning are beyond the role of any IOU, and the
IOUs could not guarantee effective engagement from the necessary stakeholders
but, should a task force be created and lead the development of a Transportation
Resiliency Needs Assessment, SCE will participate to help identify the need for
back-up generation.

SDG&E supports the transportation resiliency taskforce guideline.  SDG&E
does not have any tunnels, bridges, ports, or rail that have been impacted by
de-energization events.  SDG&E indicated it believes that creating the taskforce
described in the Proposed Guidelines would be the most effective solution.  By
including regional transportation partners, such as Caltrans, San Diego
Metropolitan Transit System, California Highway Patrol, and San Diego
Association of Governments within SDG&E's regionalized taskforce, SDG&E
indicated it can efficiently address transportation concerns with other regional
partners.

CalCCA recommends that the Commission amend the guideline to require
that provision of resources to transportation infrastructure be prioritized in
accordance with the recommendations of the local, state, federal, and tribal

R.18-12-005  COM/MBL/gp2

governments along with other stakeholders.  CalCCA requests that the community choice aggregators (CCA) be allowed to be a collaborative partner in these transportation resiliency efforts.

CESA supports the formation of a transportation resiliency taskforce. CESA Recommends that the taskforce be empowered to identify the best resiliency solution that could be deployed.

CMTA agrees each utility should implement a "transportation resiliency taskforce" to help develop transportation resiliency plans.

CforAT supports the development of a transportation resilience taskforce but is skeptical that such a taskforce can be convened, a needs assessment conducted, and a plan developed and implemented in advance of the 2020 wildfire season.

JLG advocates that the utilities should implement a transportation resiliency taskforce to identify transportation infrastructure and corridors throughout the state that need backup generation.

LGSEC recommends the commission include traffic signals and public transportation within the ground transportation category to ensure that electric bus operations are fully accessible during wildfire and de-energization events.

NCPA advocates that electric POUs and electric cooperatives should be included in discussions regarding transportation resilience.

RCRC notes that the transportation sector should be included in the definition of critical infrastructure during de-energization events.  RCRC advocates that decision-makers should understand that there is a significant

R.18-12-005  COM/MBL/gp2

portion of the population that has mobility challenges and may need additional transportation accommodations during a de-energization event.

Santa Clara County supports the creation of a transportation resiliency taskforce and creation of a plan to ensure that electric vehicle charging stations remain available during de-energization events.

SBUA supports the creation of a transportation taskforce and further supports the Commission addressing communications resilience.

### 4.6.1.2.  Electric Vehicle Charging

PG&E recommends that the guidelines on electric vehicle (EV) charging be deleted.

SDG&E supports the proposal for deployable EV charging infrastructure but outlines a very lengthy process it would choose to undertake to get to the deployment of the assets.  SDG&E indicated that additional CPUC approvals would be necessary to deploy actual infrastructure for this purpose.  SDG&E suggests that it would take 3-4 months to put together a detailed de-energization EV charging plan with solutions and costs for the custom equipment that would be required, another 3-4 months to draft a stand-alone CPUC application for the de-energization EV charging plan (to obtain approval and funding), 9-12 months to receive CPUC approval on the application as a fast tracked project, and 12-14 months after approval to roll out and implement the de-energization EV charging solutions specified by the plan (a total of 27 – 34 months).

SCE asserts that transportation resilience developments should be managed through the Transportation Electrification Framework under R.18-12-006, not the subject OIR focused on de-energization guidelines.  SCE

R.18-12-005  COM/MBL/gp2

indicated it is unaware of issues with EV charging availability during any de-energization events in its service territory.

ChargePoint comments that in order to avoid unintended consequences and ensure alignment with other public and private investment, the deployment of infrastructure or communications to support EV charging should be addressed in the R.18-12-006 (Order Instituting Rulemaking to Continue the Development of Rates and Infrastructure for Vehicle Electrification.), not this proceeding. Chargepoint asserts that coordination between the IOUs and network service providers is the most effective and least costly approach to ensuring that EV drivers have access to information in the event of an anticipated or ongoing to de-energization event.

CalCCA recommends that electric IOUs should incorporate information from DrivetheArc.com, which has charging stations located along Interstate 80 and transects Tier 2 and Tier 3 fire areas and many locations in the Bay Area.

CforAT advocates that the Commission must provide equal attention and support to meet the needs of people without any form of personal transportation, a much larger group than those with access to electric cars, and a group that is much more likely to include otherwise vulnerable individuals.

San Jose recommends the electric IOUs consult paratransit services to understand their de-energization needs in serving the AFN population.

JLG advocates that the proposed requirement that the utilities develop and execute a plan to provide electric vehicle fast charging by the 2021 fire season should be adopted.

R.18-12-005  COM/MBL/gp2

POC advocates that all critical facilities, not just EV charging stations, should be equipped with solar and battery storage to ensure they can fulfill their function in a safe and reliable manner during de-energization events.

TURN notes its position that transportation resiliency would be more appropriately discussed as part of the Transportation Electrification Framework currently being developed in R.18-12-006 instead of part of this proceeding.

Tesla advocates that the Commission should ensure that efforts to improve the resiliency of EV charging include working with existing charging network providers to enhance the resiliency of their existing and planned facilities.  Tesla indicates that the utilities should instead be directed to engage with companies like Tesla, amongst others, to explore how utility can best support transportation efforts to enhance the resiliency of their networks rather than pursuing a completely independent and potentially duplicative effort.  Tesla supports the revised guidelines that recognize the importance of mitigating the impacts of de-energization events on EV drivers specifically, particularly given the criticality of EV adoption to achieving the state's greenhouse gas reduction goals. Tesla asserts that concerns regarding the incremental ratepayer costs associated with the deployment of resiliency solutions for EV charging can be addressed by leveraging self-generation incentive program (SGIP) funds.  Tesla comments that on the issue of EV charging network resiliency in the face of de-energization events, it is more appropriate for consideration as part of the Transportation Electrification Framework development initiative in R.18-12-006.  Tesla indicated it believes it is reasonable and appropriate to take up the issue of enhancing the resiliency of EV charging solutions in this proceeding as well because the

R.18-12-005  COM/MBL/gp2

transportation electrification framework will likely not get adopted until the fourth quarter of 2020 and the electric IOUs will likely not file transportation electrification plans until 2021 at earliest.

### 4.6.2.  Commission Determination on Transportation Resilience

The record supports the development of additional guidelines regarding transportation resilience.  The record also supports expanding this section to address communications and water system resilience, among other modifications beyond the proposed guidelines in the January 30, 2020 ALJ ruling.

Regarding resilience, there are services critical to California that rely on power to function, including transportation, communications, and water system infrastructure.  Interveners like SBUA provided sufficient justification that critical communication infrastructure should be included, and ACWA also provided comments in other sections of the record that indicate that critical water infrastructure needs to be addressed.  For this reason, the adopted guidelines do not enumerate specific transportation infrastructure that must be addressed.  However, the adopted guideline regarding resiliency indicates that the IOUs need to work with the appropriate governing authorities to identify critical transportation, water, and communications infrastructure.  The electric IOUs must work with those governing bodies to provide backup generation to ensure critical infrastructure is not taken offline during a de-energization event.

Regarding EV charging, it is critical that EV owners are not left stranded during de-energization events.  For this reason, we adopt the guideline that by the 2021 wildfire season, each electric investor-owned utility shall implement pilot projects to investigate the feasibility of mobile and deployable EV Level 3

R.18-12-005  COM/MBL/gp2

fast charging.  This may not be an off-the-shelf solution, and the electric IOUs may need to employ the resources of engineering design firms to develop a solution that will allow the deployment of mobile fast chargers.

Further, there are circumstances where existing charging infrastructure may be provided supportive resources by the electric IOUs to remain functioning during times of de-energization.  For this reason, we adopt the guideline that the electric IOUs shall design a plan, in coordination with charging network providers, to reinforce networks and key charging locations with backup generation.

To ensure that the public has clear information about where these supported EV chargers are located during the de energization events, we adopt the guideline that the electric IOUs shall coordinate with EV network information providers to communicate  (on both the utility public websites and mobile apps), to the extent possible, the location, number, and accessibility of all Level 3 charging stations and publicly available Level 2 charging stations in proximity to areas potentially impacted by de-energization events prior to and during potential or active de-energization events.

We disagree with SDG&E's assertion that the implementation of the EV guideline would necessitate 3-4 months of time to draft a standalone CPUC application for the deployment of EV charging infrastructure followed by 9--12 months to receive approval. Commission approval is not necessary for the electric IOUs to deploy this infrastructure.  Rather, Commission approval is necessary for SDG&E to recover the costs of these expenditures in rates. SDG&E's implication is that it would necessitate a Commission prudency

R.18-12-005  COM/MBL/gp2

determination on its deployable EV infrastructure expenditure before making the investment.  SDG&E and the other electric IOUs may seek an ex post prudency determination and recovery of the costs involved for the procurement and deployment of this infrastructure in the next general rate case.

### 4.7.  Medical baseline and access and functional needs populations

The assigned ALJ proposed the following guidelines regarding medical baseline and access and functional needs populations.

> The electric investor-owned utilities shall work in collaboration with public safety partners, local governments, and access and functional needs customer advocates to conduct a needs assessment (in conjunction with the Working Groups and advisor boards).  The needs assessment shall identify current and unsubscribed medical baseline customers, what if any assistance is needed for these people during de-energization events, and an evacuation plan for these populations that specifies transportation and health care resources that can be provided to them.  The electric investor-owned utilities shall provide a plan to the Commission by May 1, 2020 and thereafter by January 31 of each following year regarding its planned efforts to address access and functional needs customers during de-energization events.  The electric investor-owned utilities shall provide the Commission with monthly updates regarding the progress towards meeting the established plans and impact of the efforts to address this population during de-energization events.

> The electric investor-owned utilities shall work in collaboration with local government partners, access and functional needs advocates and service providers to obtain data needed to identify access and functional needs populations and utilize various remote and in person

R.18-12-005  COM/MBL/gp2

channels of communication.  The utilities and partner
organizations should prioritize their efforts for identification,
contact and communication with the disabled, elderly,
pregnant women, children, and those with severe injuries or
chronic conditions.

### 4.7.1.  Party Comments on Medical Baseline and Access and Functional Needs Populations

PG&E supports the proposed guidelines on this topic but recommends submitting quarterly updates, rather than monthly.  PG&E does not support the expanded collection of medically sensitive customer data from external parties due to the Health Insurance Portability and Accountability Act.  PG&E supports continuing to assess the needs of Medical Baseline and AFN customers.  PG&E indicated it supports driving improvements in the Medical Baseline Program by conducting research to identify opportunities to drive program awareness and make the enrollment process easier.  PG&E notes that expanding the universe of customers who are eligible or required to receive an in-person visit during a de-energization event risks diverting resources from other safety-related work or overcommitting limited resources to the point that the most vulnerable Medical Baseline customers may not receive timely door knocks.  PG&E requests the Commission modify the protocols to authorize and require disclosure of confidential customer information to Local Governments and Tribes before, during and after de-energization events without requiring non-disclosure or confidentiality agreements.

SDG&E disagrees with including "an evacuation plan for these populations that specifies transportation and health care resources that can be provided to them" in a needs assessment on AFN communities.  SDG&E

R.18-12-005  COM/MBL/gp2

indicated it is the responsibility of the County offices of emergency services (OES) and city first responders to develop, prepare, and implement evacuation plans. SDG&E lacks the expertise but will continue to work closely with the County OES and local partner organizations to identify and reach out to the AFN population.  SDG&E also commented that monthly reporting is not the best practice and instead recommends progress reporting be after each relevant advisory council meetings, which would be at least twice a year, if not quarterly.

SCE advocated that the responsibility should not lie with the electric IOUs to ensure that evacuation plans are maintained and communicated to customers affected by disasters.  According to SCE, it is more efficient, reliable, and effective for local emergency management agencies that hold this responsibility to be the single source for communicating this information to customers.

CalCCA advocates that the Commission should adopt aggressive mandatory targets for the identification and enrollment of all unenrolled medical baseline eligible customers, and closely monitor electric IOU progress towards those targets.  CalCCA suggests the Commission amend its guideline proposal to specifically require the inclusion of CCAs in the development of the assessment/plan.  CalCCA indicated it believes that there is an immediate and pressing need for the IOUs to identify all AFN individuals and populations in their service territories and take comprehensive steps to protect them from harm during de-energization events.

CforAT provided input indicating that the medical baseline population is not and will never be co-extensive with the universe of medically vulnerable

R.18-12-005  COM/MBL/gp2

people who are at risk of harm due to an extended power outage.  CforAT notes
that the limitations to the use of medical baseline include:

- The medical baseline is a rate program intended to provide discount on electricity to customers who usage is driven by medical consumption.

- The eligibility criteria are set by statute.  The process of enrolling requires certification by a medical professional (a substantial hurdle to people who are uninsured).

- The medical baseline program is only available to people who are direct customers of an IOU.

CforAT advocates that the Commission should specifically identify the
appropriate channels to reach the impacted communities and require the utilities
to use all of the resources within their own databases to create lists of customers
who may need support during power shutoffs.  These lists could include:

- Customers who have self-identified as meeting the criteria that allow them to be entitled to an in-person visit prior to disconnection for nonpayment.

- Customers who receive bills or other utility information in a non-standard format.

- Customers who have self-identified as having a person with a disability in the household in communication with any utility representative.

San Jose suggests that the electric IOUs should engage with local partners
that support AFN populations, such as Silicon Valley Independent Living
Center.  San Jose also recommends that the Guidelines should clarify that AFN
populations include not only "the disabled, elderly, pregnant women, children,
and those with severe injuries or chronic conditions" but also those with limited
English proficiency and those who do not have reliable access to transportation.

R.18-12-005  COM/MBL/gp2

JLG provided comments indicating that there should be monthly and annual reporting requirements regarding progress on outreach and impact to medical baseline and AFN populations. JLG suggests the electric IOUs develop a robust information-sharing process to identify existing resources and agencies in a particular area. JLG also suggests the utilities should work with durable medical equipment providers to increase awareness of medical baseline program.

NCPA notes that all utilities should continue to work with their community members and organizations and deploy all available means to ensure that the most vulnerable members of their communities are identified.

POC indicates that equipping medical baseline, access and functional needs populations with solar and batteries should be prioritized and implemented as soon as possible.  POC advocates that the commission should prioritize the provision of SGIP incentives to medical baseline and AFN populations located in high fire threat areas subject to de-energization events.

Cal Advocates provides comments indicating that the Commission should provide examples of the proposed channels of communications and notification streams the utilities should consider using when contacting AFN and medical baseline customers.  Cal Advocates further suggests that the Commission should require the utilities to conduct an evaluation of their priority notifications procedures with respect to AFN and medical baseline customers.

RCRC comments that the Commission should direct the electric IOUs to conduct a survey of their customers (including those who reside in dwellings served by a master meter) to determine what assistance is needed by whom

R.18-12-005  COM/MBL/gp2

during a de-energization event.  The electric IOUs tailoring the "needs assessment" to "current and unsubscribed medical baseline customers" is flawed, RCRC comments, because:  1) the existing medical baseline programs are under-subscribed and under-representative of the larger universe of AFN individuals for whom utilities should mitigate de-energization impacts;  2) the medical baseline programs do not extend to residents who live in dwellings served by a master meter;  3) and medical baseline programs may be under-subscribed due to burdens associated with enrolling in the program, including certification by a medical professional.  RCRC recommended increased efforts to expand enrollment in medical baseline and identify and mitigate impacts of AFN individuals who have similar needs.  RCRC indicated that the electric IOUs should not require counties to sign non-disclosure agreements (NDAs) in order for local government to obtain information about medical baseline and other sensitive customers, even when that information is sought in advance of a de-energization event to improve local planning efforts.

Santa Clara County indicated that the needs assessment should identify not only medical baseline customers, but all access and functional needs populations.  Electric IOUs should provide backup power to facilities serving individuals with access and functional needs in High Fire Threat areas.  Further the utilities should install solar-powered microgrids with battery storage in critical facilities, such as fire and police stations and hospitals, that are located in High Fire Threat areas.  Santa Clara County also indicated the utilities should provide transportation for access and functional needs populations, upon request, to the community resource centers.  Santa Clara County advocated that

R.18-12-005  COM/MBL/gp2

utilities should provide refueling resources dedicated to critical infrastructure in High Fire Threat areas, such as critical facilities, cell towers, and repeater sites.

TURN commented that the electric IOUs should be required to increase enrollment of medical baseline customers by:  1) creating an AFN registry administered by a third-party to identify customers who are not eligible for the medical baseline program;  2) increasing enrollment of medical baseline to at least 80% of eligible customers;  and 3) supplementing the list of medical baseline customers with other lists of vulnerable customers used by public health and safety partners, such as the Health and Human Services Empower Program.

UCAN supports requirements of due dates for various plans and reports that address AFN customer needs.  The reports should include a non-utility perspective if not an outright AFN alternative update/report.  UCAN indicated that the guidelines must address any restrictions that impose burdensome requirements that limit the sharing of information among pertinent agencies. UCAN also commented that the guidelines should expand the means by which AFN populations are identified.

Abrams also commented that substitute accommodations like increased TTY or help-lines might need to be established and can be mapped to specific process and decision points on use case diagrams.

### 4.7.2.  Commission Determination on Medical Baseline and Access and Functional Needs Populations

The record generally supports the refinement of guidelines protective of medical baseline customers and people with access and functional needs.  This includes a requirement for the IOUs to identify, above and beyond the medical baseline customer population, households that self-identify to receive an in-

R.18-12-005  COM/MBL/gp2

person visit prior to disconnection for nonpayment or receive utility communications in a non-standard format or self-identify as having a person with a disability in the household.  CforAT supports a requirement for the IOUs to provide support for these vulnerable customers during a de-energization event. The record also supports expanding this section to support the appropriate sharing of information to promote the health and safety of this population, among other modifications beyond the proposed guideline in the January 30, 2020 ALJ ruling.

The record supports continuing efforts to collaborate with public safety partners, local governments, and representatives of people and communities with access and functional needs, in order to identify any needed assistance in relation to de-energization events.  Having appropriate plans in place increases the effectiveness of these efforts.  Thus, the electric IOUs shall provide their plans to the Commission by June 1, 2020, and thereafter by January 31 of each following year, regarding the planned efforts to address people/communities with access and functional needs during de-energization events.  PG&E's recommendation for quarterly, rather than monthly updates, is reasonable and shall be adopted.

On the record before us, we must also balance the benefits of sharing customer information while respecting privacy.  Originally, we expected electric IOUs to enter into NDAs in order to be able to ensure that information sharing could occur without unduly impacting confidentiality.  The parties, however, make clear that it is not always practicable to enter into NDAs with relevant authorities.  PG&E now suggests that we modify the information sharing

R.18-12-005  COM/MBL/gp2

provision to allow electric IOUs to disclose medical baseline critical facility customer information with local and tribal governments without NDAs or other enforceable confidentiality commitments.  PG&E recommends that the disclosure of this information would occur broadly before, during and after de-energization events, upon the request of the local and tribal governments.

While sharing such information, without being delayed by confidentiality requirements, may expedite the implementation of protective measures, it risks intruding upon the privacy rights of affected customers.  In Resolution L-598 the Commission balanced these concerns by requiring disclosure of medical baseline information, on a confidential basis, for the sole purpose of protecting the safety and welfare of those customers.[24]  The resolution did not require NDAs, but its terms allowed for the sharing of critical information with the electric IOUs being required to acknowledge the potential confidentiality of the information.

The record supports continuing the "confidential basis" limitation from Resolution L-598.  As a practical matter, in response to an October 8 letter from the Commission (which was later incorporated into Resolution L-598), PG&E indicates that it was able to make available confidential medical baseline and critical facility customer data, subject only to a condition that recipients without NDAs protect the data as confidential.  While this does not guarantee confidential treatment in the same manner as an NDA, such designations are protective of privacy interests.  To the extent that local and tribal governments receive Public Records Act requests that seek confidential medical baseline

---

[24]  Res. L-598 at 6, Ordering Paragraphs (OP) 1 and 2.

R.18-12-005  COM/MBL/gp2

and/or critical facility customer information, requiring the utility to specifically mark such customer information as confidential should assist those entities in appropriately responding to such requests.  To provide further clarity, electric IOUs may also state that the information is being provided pursuant to a CPUC Order.

The record includes some discussion of privacy protections and other applicable laws relevant to the confidentiality of customer information.  However, we decline to opine on the contours or requirements of such laws.  It is the responsibility of the electric IOUs to determine which specific information should be marked as confidential, and any other actions that they must take to comply with applicable law.  We also do not seek to alter the responsibility of any local or tribal governments to appropriately respond to Public Records Act requests.

Concerns about confidentiality can still be addressed through NDAs.  The record shows that many relevant NDAs have already been signed.  In order to protect privacy interests, the adopted medical baseline and access and functional needs populations guidelines adopted in Appendix A do not abrogate any relevant NDAs that electric IOUs have already signed.  Moreover, to the extent that entering into NDAs with local and tribal governments is a practicable means to allow for information sharing with appropriate privacy protections, it is encouraged.  We note that there may also be other specific situations amenable to NDAs, such as PG&E's footnoted suggestion that it would seek NDAs and

R.18-12-005  COM/MBL/gp2

consent regarding the location of certain privately owned critical facilities.[25]  We do not discourage entering into such NDAs.

Rather than providing that disclosures would occur "before, during and after" de-energization events as suggested by PG&E, we clarify that such disclosure would occur "in relation to de-energization events."  It is not our intention for the sharing of such customer information to occur outside of the de-energization context, or for reasons other than protecting the health and safety of customers.

These modifications are reflected in the final guidelines adopted in Appendix A of this decision.

### 4.8.  Transparency

The assigned ALJ proposed the following guidelines regarding transparency.

> During any potential or active de-energization event the electric investor-owned utilities must provide on its website a thorough and detailed indication of the quantitative and qualitative factors it considered in calling, sustaining, or curtailing each de-energization event (including information regarding why the de-energization event was a last resort option) and a specification of what factors must be present for the de-energization event to be concluded.

> Year-round, and including during any potential or active de-energization event, the electric investor-owned utilities must include comprehensive information that is available on their websites regarding de-energization mitigation efforts including asset and vegetation management, sectionalizing,

---

[25]  PG&E Comments at 24, n. 10.

R.18-12-005  COM/MBL/gp2

switching, system hardening, and backup power projects they
are undertaking to reduce the need for or scope of
de-energization events, progress on implementing
de-energization mitigation efforts to date, and planned dates
of completion.  The utilities shall provide information that is
in alignment with publicly available information issued in the
de-energization related proceedings (*i.e.* de-energization order
instituting an investigation, Wildfire Mitigation Plan and
Microgrid proceedings).

The electric investor-owned utilities shall file and serve
de-energization roadmaps with the Commission on an annual
basis, beginning April 15, 2020, that explain and provide
specification regarding their short, medium, and long term
plans for reducing the impact and need of de-energization
events to mitigate wildfire risk.  The electric investor-owned
utilities shall make the de-energization roadmaps available on
their public websites.  The utilities shall provide roadmap
information that is in alignment with publicly available
information issued in the de-energization related proceedings
(*i.e.* de-energization order instituting an investigation,
Wildfire Mitigation Plan and Microgrid proceedings).

### 4.8.1.   Party Comments on Transparency

PG&E supports providing information regarding its de-energization

mitigation plans and progress towards implementing those plans on its website

for stakeholders to be able to track progress.  PG&E recommends that updates

and progress reporting on its plan be made through the Wildfire Mitigation Plan

proceeding and filings.

SDG&E comments that it does not support the proposed transparency

guidelines.  It believes decision to de-energize circuits is made in real-time, it is

not practical to simultaneously or even contemporaneously post the factors on

R.18-12-005  COM/MBL/gp2

the website.  It also does not believe that requiring electric IOUs to file de-energization roadmaps on an annual basis is necessary.

SCE provides comments that it believes the Commission needs to develop a better record after stakeholder discussions regarding how much information should be posted, how often, in what format, to what granularity, and how to prevent public misunderstanding and mistrust if the outcomes vary from what was indicated on the websites.  It also believes the Commission should give utilities until June 30, 2020, to submit the requested roadmaps.  To avoid unnecessary duplication of materials, SCE additionally requests that the roadmaps be limited in scope to a succinct summary of the ongoing mitigation efforts and developments in the de-energization proceedings.

CMTA advocates that utility customers must be able to inquire, monitor and ask questions about the electric IOUs' current and anticipated activities to reduce the number and scope of de-energization events, especially since utility customers are both directly impacted by the electric IOUs' de-energization events and are responsible for funding the work needed to reduce and eliminate de-energization events in the future.

CforAT comments that the Commission should require an express consideration of the risks of shutting off power (including financial costs as well as short-term and long-term risks of harm) to be balanced against the risks of keeping the power on (namely, the risk that utility equipment will ignite a wildfire).

R.18-12-005  COM/MBL/gp2

San Jose notes that it appreciates that the proposed guidelines requiring the electric IOUs to provide on their websites information about the factors it considered in calling, sustaining, or curtailing each de-energization event.

EBMUD comments that the investor owned electric utilities must provide public safety partners access to the electric IOUs' real time system information through a dedicated portal or other method that is consistent with maintaining cybersecurity, system reliability, and customer privacy.

JLG suggests that the proposed utility de-energization roadmaps, if adopted, should provide public safety partners and the public with information that will inform local and individual resiliency planning, which will help reduce de-energization impacts.

MGRA shares concerns about the compliance of the electric IOUs with these transparency guidelines.  MGRA also notes that achieving the Commission's goal of transparency during potential and active de-energization events will require specifying exactly what 'qualitative' factors the Commission expects to see on a de-energization support website and how these factors should be best 'quantified,' and SED should provide immediate feedback related to each incident indicating potential improvements in the utility website to achieve additional transparency.

NCPA notes that the guidelines should be modified to require the electric IOUs to provide the data by location and region, and to provide the level of detail and specificity that is commensurate with the needs of a utility.

POC supports the development by the electric IOUs of short, medium- and long-term plans for reducing the impact and need for de-energization events to

R.18-12-005  COM/MBL/gp2

mitigate wildfire risk.  POC comments that roadmaps must be developed through evidentiary process with active engagement by the Commission and not simply submitted by the electric IOUs to the Commission on an annual basis.

Cal Advocates recommends that the Commission provide more detail on the information that the utilities must report on their websites, using examples. Cal Advocates also comments that the Commission should require the utilities to explicitly cross-reference any information contained within the post-event de-energization reports and lessons learned reports with filings that have been made under the wildfire mitigation plan and de-energization related proceedings.

RCRC advocates that the guidelines should require that the electric IOUs provide additional information on the specific efforts that a utility is taking to mitigate de-energization related impacts on medical baseline and AFN populations and critical facilities and infrastructure.

Santa Clara advocates that the guidelines should require the electric IOUs to provide analysis of the likelihood of de-energization to each county and city in the days leading up to any de-energization event.

SBUA comments that data from de-energization events in 2018 and 2019 should allow some estimation of de-energization-driven risks, but such risk data does not appear to be part of the reporting.

TURN notes that electric IOUs should have the burden of proof to demonstrate that the scope of each de-energization event was as narrowly tailored as possible

R.18-12-005  COM/MBL/gp2

Abrams notes that the Commission should not over-rely on transparency as a substitute for comprehensive regulatory monitoring.  Abrams also comments that the Commission should ensure we are no longer reliant upon electric IOU transparency and subjective assertions as poor substitutes for active monitoring.

### 4.8.2.  Commission Determination on Transparency

There is support in the record for the Commission to develop guidelines regarding transparency during de-energization events that are triggered in an effort to mitigate wildfire risk.  There is some opposition by the electric IOUs, and we consider this opposition in developing guidelines that are able to be operationalized.

It is imperative that the IOUs are able to provide insight into the reasoning behind the calling of every de-energization event.  In the proposed guidelines, the requirement was for the electric IOUs to provide information on its websites regarding the quantitative and qualitative factors it considered in calling, sustaining, or curtailing each de-energization event (including information regarding why the de-energization event was a last resort option) and a specification of what conditions must be present for the de-energization event to be concluded.  We believe that this information is critical from a transparency standpoint, however after considering the input of parties, it is more appropriate for the electric IOUs to provide this information in their post event reports.

It is important for the electric IOUs to provide transparency on their respective websites in an effort to ensure that the public is able to understand what efforts are underway to reduce the need to rely de-energization events as a

R.18-12-005  COM/MBL/gp2

way of mitigating wildfire risk.  For this reason, the guidelines require that the electric IOUs post on their websites comprehensive information regarding de-energization mitigation efforts including asset and vegetation management, sectionalizing, switching, system hardening, and backup power  projects that they are undertaking to reduce the need for or scope of de-energization events, progress on  implementing de-energization mitigation efforts to date, and planned dates of completion.  The electric IOUs absolutely should not solely provide a link to their WMPs to describe these efforts. Instead, the electric IOUs should provide a customer friendly portal that easily explains the work it is undertaking to mitigate the need for de-energization events, the progress it has made, and the expected completion date of each component of its mitigation strategy.  This information should be easily accessible on the electric IOUs' websites during active de-energization events, and there should be links on their Web pages to facilitate customer accessing to relevant information.

The record supports the requirement for the electric IOUs to develop and include in their 2021 WMPs, as well as provide publicly, short, medium, and long-term actions the utilities will take to reduce the impact of and need for de-energization events to mitigate wildfire risk.  To provide transparency to the public, the adopted guidelines indicate that the proposed actions should be made available and easily accessible on each utility's respective public website.

### 4.9.  Definitions

The assigned ALJ proposed the following definitions for critical facilities and infrastructure as part of its guideline proposal.

R.18-12-005  COM/MBL/gp2

9-1-1 emergency services must be included in the definition of critical facilities to ensure 9-1-1 emergency services receive priority notification and any additional assistance necessary to ensure resiliency during de-energization events.

The transportation sector should be included in the list of critical facilities and infrastructure to ensure transportation resilience is a priority during de-energization events. This definition includes facilities associated with automobile, rail, aviation and maritime transportation for civilian and military purposes.

### 4.9.1.  Party Comments on Modifications of Definitions of Critical Facilities and Infrastructure

PG&E, CalCCA, CforAT, and JLG support the expansion of the definition of Critical Facilities and Infrastructure to include 9-1-1 call centers and the transportation sector.

CLECA, CESA, and NCPA support inclusion of transportation sector in the list of critical facilities.

EPUC recommends that the Commission include the full production chain of transportation fuels, including production field operations, refining and distribution of the refined product as part of the critical facilities definition.

CCTA and AT&T recommend that the inclusion of public safety answering points is appropriate in the definition of "critical facilities."

SDG&E indicates that the definition of critical facilities is overly broad and should be narrowed and aligned with definitions used by other state agencies to bring focus to immediate life-sustaining and public safety facilities.  SDG&E supports including 9-1-1 emergency services sites in the definition of critical facilities.  SDG&E does not recommend using or including broad terms such as

R.18-12-005  COM/MBL/gp2

"transportation" into the critical facilities definition.  SDG&E recommends that transportation infrastructure be assessed on a case by case basis to see if they warrant inclusion.

Tesla suggests that the Commission find that Level 3 charging sites with two or more charging ports, and that are located in either Tier 2 or 3 High Fire Threat Districts or that have been subject to de-energization, are critical facilities/infrastructure.

### 4.9.2.  Commission Determination on Definitions

The Commission adopts the inclusion of transportation infrastructure and 9-1-1 emergency services into the definitions of critical facilities and infrastructure, beyond the definitions adopted in Appendix A of D.19-05-042. We take the recommendation of CCTA/AT&T that we refer to 9-1-1 emergency services as public safety answering points.

These modifications are reflected in the final guidelines adopted in Appendix A of this decision.

## 5.  Adoption of Appendix A

On January 30, 2020, the assigned ALJ issued a ruling seeking comment on proposed additional and modified de-energization guidelines in addition to Appendix A of the De-energization Phase 1 Decision (D.19-05-042) and Resolution ESRB-8.

This decision is adopting an Appendix A that includes the proposed guidelines with modifications based on the record developed in this proceeding. However, the guidelines developed in previous Commission decisions and

R.18-12-005  COM/MBL/gp2

resolutions continue to apply unless specifically superseded or modified in this decision.

## 6. General Order Regarding Rules for De-energization of Electric Facilities to Mitigate Wildfire Risk

The Commission acknowledges that there are multiple authorities, including multiple Commission decisions and resolutions, that provide guidelines and directives to the electric IOUs regarding de-energization events that are initiated to mitigate the risk of catastrophic wildfires.

The Commission will leave this rulemaking open to pursue a third phase that will develop a general order that will codify the guidelines and directives contained in this decision and previous authorities.  The purpose of developing this general order will be to have one primary authority that provides guidelines and/or directives to the electric IOUs regarding de-energization events that are initiated to mitigate the risk of catastrophic wildfires.

Other issues may also be taken up in the third phase of this proceeding, including issues already scoped into Phases 1 and 2 that have not fully been addressed by the Commission.

The Commission may also take a wholistic review of the reporting requirements that have been developed for de-energization events in the third phase of this proceeding. Future requirements may include annual reports to the Commission on de-energization event impact, planning, mitigation, and lessons learned.

## 7. Comments on Proposed Decision

The proposed decision in this matter was mailed to the parties in accordance with Section 311 of the Public Utilities Code and comments were

R.18-12-005  COM/MBL/gp2

allowed under Rule 14.3 of the CPUC's Rules of Practice and Procedure. Comments were filed on May 18, 2020 by EPUC, CUE, CESA, POC, Joint Water Districts, NCPA, JLG, CWA, CCTA/AT&T, MGRA, CforAT, California State Association of Counties (CSAC), SDG&E, TURN, PG&E, UCAN, CLECA, CASMU, City of Riverside, Cal Advocates, Tesla Inc., CalCCA, ChargePoint, EBMUD, SCE, and SBUA. Reply comments were filed on May 26, 2020 by MGRA, UCAN, CSAC, POC, JLG, PG&E, Cellco Partnership, Cal Advocates, CforAT, SCE, TURN, SDG&E, EBMUD, City and County of San Francisco, CalCCA, CCTA/AT&T, CUE, and SBUA.

Numerous parties, including TURN, included in their comments that there should be an initial cost cap set for the EV charging pilot projects, with TURN's recommendation being a limit of $4 million per project, consistent with the Commission's Ruling for Priority Review Projects, with a maximum of $10 million per IOU. We agree with this comment and adopt it in the final decision.

Comments, like those from EPUC, indicate that the Commission should still keep in consideration unresolved issues from the first two phases of this proceeding in future phases of this proceeding. In response, we are indicating in section 6 of this decision that the Commission may give further consideration to Phase 1 and 2 issues that were not fully addressed by the Commission.

In response to comments by PG&E, SCE, SDG&E, and JWA, we clarify in Guideline F that the investor-owned utilities are not responsible for providing or procuring the backup generation for critical infrastructure, and instead will be available for governing bodies of these facilities, whether they be private or

R.18-12-005  COM/MBL/gp2

public entities, to consult on the procurement and deployment of backup generation solutions.

CUE and some of the investor-owned utility parties commented that the requirement for power to be restored within 24 hours of the completion of a de-energization event could lead to a scenario where unsafe actions are taken to restore power service too quickly. However, the Commission already addressed this in the body and adopted guideline. "Electric service shall be restored only after facilities have been inspected and the utility has determined that service can be restored safely.  For any circuits that require more than 24 hours to restore, the utility shall explain why it was unable to restore each circuit within this timeframe in its post event report." The Commission acknowledges that power may not be safely restored within 24 hours, and thus the Commission allowed for these exceptions but directs that an explanation be provided to the Commission. For this reason, we will add the clarification that power must be restored within 24 hours of the end of the de-energizaiton event unless it is unsafe to do so.

In response to the comments of the JLG, we clarify that the CRCs should be able to provide charging services that are capable of powering medical devices.

In response to comments by CforAT, we clarify that section C of Appendix A will include the language regarding clarity of notification to include the following language. "Whenever reasonably possible, communications shall be in the language preferred by the customer. Alternative communication formats

R.18-12-005  COM/MBL/gp2

should be made available for people with disabilities who may not be able to use standard forms of communication. "

In response to PG&E's comments, we include the indication that public transportation shall be included in the list of critical transportation infrastructure.

Some parties, like Cal Advocates, provided suggestions for modifications to reporting requirements that would include additional reports beyond those already prescribed and adopted in this decision. For this reason, we are going to signal that we may take a wholistic review of the de-energization reporting requirements in the third phase of this proceeding.

## 8.  Assignment of Proceeding

Marybel Batjer is the assigned Commissioner and Brian Stevens is the assigned Administrative Law Judge in this proceeding.

## Findings of Fact

1.  Wildfires in California in recent years have been destructive.

2.  Electric utility infrastructure can be an ignition source for wildfires.

3.  The electric IOUs are responsible and accountable for the safe de-energization of power lines and all de-energization notification and communication.

4.  Regional variability in topography, weather, and on-the-ground utility employee assessments impact de-energization decisions.

5.  The electric IOUs serve diverse territories ranging significantly in size and topography.

6.  The electric IOUs have varying experience with de-energization.

R.18-12-005  COM/MBL/gp2

7.  De-energization has disproportionate impacts on certain populations.

8.  Regionalized de-energization Working Groups led by the large electric IOUs that include small multi-jurisdictional electric utilities, community choice aggregators, electric POUs, communications and water service providers, CPUC staff, tribal and local government entities, public safety partners, and representatives of people/communities with access and functional needs and vulnerable communities that convene at least quarterly can help better inform the electric IOUs regarding how to plan and execute de-energization protocols.

9.  If the electric IOUs conduct outreach to potential de-energization Working Group participants, it is likely that there will be increased community participation which may result in better informed planning for de-energization protocols.

10.  The large electric IOUs convening de-energization Working Groups serves as a mechanism for the Commission and the local communities to validate whether the electric IOUs have successfully implemented lessons learned from prior de-energization events and alleviated barriers to solutions for future de-energization event issues.

11.  If the large electric IOUs report back to the Commission on a quarterly basis of the activities of the Working Groups, the Commission can have insight into the impact of the Working Groups.

12.  If the electric IOUs coordinate service territory-wide Advisory Boards that consist of public safety partners, communications and water service providers, local and tribal government officials, business groups, non-profits, representatives of people/communities with access and functional needs and

R.18-12-005  COM/MBL/gp2

vulnerable communities, and academic organizations, they can leverage critical advice on best practices for de-energization issues and safety, community preparedness, regional coordination and the use of emerging technologies to better plan for de-energization events.

13.   SDG&E administers a wildfire Advisory Board that provides valuable input into the utility's planning for de-energization events, and this activity could be emulated by other electric IOUs in California.

14.   The electric IOUs might have proposals for alternatives to the Working Group and Advisory Board guidelines that are more in the public interest than the Working Group and Advisory Board guidelines prescribe.

15.   If the electric IOUs coordinate with the CPUC, CalFire, CalOES, communications providers, representatives of people/communities with access and functional needs, and other public safety partners to plan de-energization mock exercises throughout the utility service territories in the areas with the highest historical and forecasted risk for de-energization in advance of fire season, it is likely the electric IOUs will be more prepared for actual de-energization events.

16.   Simulation exercises of de-energization events that disrupt electric service or violate any communication requirements could be harmful to the public.

17.   De-energization simulations and exercises that consider worst case scenarios can help the electric IOUs be more prepared for extreme situations that may arise during actual de-energization events.

18.   De-energization tabletop exercises that measure de-energization program performance during a mock event and that include, to the extent possible, tests of

R.18-12-005  COM/MBL/gp2

customer and critical facilities notification and communication systems, functioning of emergency operations centers, notification protocols, and community resource center operations can help codify lessons learned from these exercises that can be reported to exercise participants, reported to Working Groups and Advisory Boards, and utilized to modify the design and implementation of de-energization program elements.

19.   It is necessary for the electric IOUs to utilize all reasonable channels of communication to all populations potentially affected by a de-energization event to minimize public confusion and detrimental impact from de-energization events, including the execution of in-language communication and in formats accessible by disabled individuals.

20.   If the electric IOUs develop communication and notification plans jointly with CalOES, county and local governments, independent living centers, and representatives of people/communities with access and functional needs that anticipate the disruption of traditional communication channels, this action will reduce public confusion and detrimental impact from de-energization events.

21.   In situations where internet, cellular, or landline-based communication services are limited, the electric IOUs can leverage, in coordination with the public safety partners, public alert systems and public radio broadcasts in de-energization event areas to minimize public confusion and detrimental impact from de-energization events.

22.   Simulation exercises of de-energization events that disrupt electric service or violate any communication requirements are harmful to the public.

R.18-12-005  COM/MBL/gp2

23.   The electric IOUs can ensure there is available bandwidth capacity, either via a cloud service or on-premise, to manage a website that provides the public safety partners and the general public with access to information about the geographic areas impacted by potential de-energization events and all other critical information to maintain public safety prior to, during, and after a de-energization event.  This would minimize public confusion and detrimental impact from de-energization events.

24.   The electric IOUs can create and maintain actionable plans that ensure necessary bandwidth is immediately available and consistent up to and through a de-energization event.  With the assistance of these plans, electric IOUs can ensure that bandwidth and technological resources are available to serve peak website demand that will occur as a result of a de-energization event.  This will help minimize public confusion and detrimental impact from de-energization events.

25.   Consultation with the California Department of Technology would assist the electric IOUs in ensuring that website performance is adequate to support effective and uninterrupted communication to the general public about de-energization events.

26.   The electric IOUs could ensure that the public is able to access precise locality information of potential and active de-energization event impacted service points, and this will enhance public safety.

27.   False negative and false positive communications about potential de-energization events do not enhance public safety and may degrade public confidence in de-energization-related communications from utilities.

R.18-12-005  COM/MBL/gp2

28.  Ensuring precise and accurate information regarding the location and duration of potential and active de-energization events and restoration efforts enhances public safety and transparency.

29.  The electric IOUs could explain any false communications in the post event reports by citing the sources of changing data, and lessons learned could be incorporated in ongoing de-energization communications and notifications to increase their accuracy and effectiveness.  This would enhance transparency and allow the electric IOUs to incorporate lessons learned to increase the accuracy and effectiveness of future de-energization related communications.

30.  All notifications to customers regarding potential or active de-energization events could be communicated with ease of readability and comprehension as a priority to ensure that public confusion is minimized during de-energization events.

31.  Electric IOUs proactively reaching out to the media and community-based organizations to ensure third party awareness and access to all messaging and map data, including application programming interfaces for de-energization events, would facilitate broad distribution of public safety information regarding the de-energization event to serve the public interest.

32.  Consultation with emergency situation user interface and user experience professionals and application of their recommendations by the electric IOUs prior to, during, and following de-energization events should help to minimize public confusion about de-energization events.

33.  Providing communications carriers with the meter and circuit IDs that will be de-energized and re-energized will ensure that carriers receive actionable

R.18-12-005  COM/MBL/gp2

information that can inform proactive deployment of resources to minimize the impact of the de-energization events on communications infrastructure.

34.   The electric IOUs, through collaboration with relevant stakeholders, can finalize a CRC plan, 60 days after issuance of the Phase 2 final decision, based on local demographic data for meeting a variety of safety needs for vulnerable populations to ensure there is transparence and adequate planning for the serving of this necessary public safety function.

35.   A CRC plan that includes siting and accessibility of CRC locations, CRC operations and a determination of the resource needs to best serve the community members who visit would be beneficial in ensuring there is transparency and effective execution of CRCs.  Such a plan that is created with consultation from regional local government, de-energization Advisory Boards, public safety partners, representatives of people/communities with access and functional needs, tribal representatives, senior citizen groups, business owners, community resource organizations, and public health and healthcare providers would be developed with broad input from impacted and knowledgeable contingents.

36.   CRCs that are set up in fixed facility locations that can be quickly opened when needed; in areas known to the public such as recreational centers, public offices, schools, and libraries; and are ADA (Americans with Disabilities Act) accessible to meet the needs of people/communities with access and functional needs, medical baseline, and other vulnerable utility customers will better serve the public need by being accessible and accommodating of unique individual circumstances.

R.18-12-005  COM/MBL/gp2

37.   CRCs that, at a minimum, provide charging stations, cellular network services, water, chairs, de-energization information representatives, and restrooms will serve many of the basic needs individuals have during de-energization events.

38.   CRCs that operate from at least 8:00 a.m. to 10:00 p.m. during an active de-energization event, with actual hours of operation to be determined by the local government will serve the necessary hours for public access while limiting risk to employee harm from being open in the late hours of the evening and early hours of the morning.

39.   Restoration of electric service to impacted service points as soon as possible and within 24 hours from the termination of a de-energization event serves the public interest by minimizing the impact and duration of de-energization events unless there are conditions present that would make it unsafe to restore power service within 24 hours from the termination of a de-energization event.

40.   Electric service could be safely restored only after facilities have been inspected and the utility has determined that service can be restored safely.

41.   For any circuits that require more than 24 hours to restore, the utility could explain why it was unable to restore each circuit within this timeframe in its post event report, in turn being held accountable for lengthy restoration times and providing the Commission insight into how many restoration events extend more than 24 hours beyond the end of a de-energization event.

42.   To the extent possible, within one hour of an electric investor-owned utility knowing it will re-energize a line, and immediately after the line is

R.18-12-005  COM/MBL/gp2

re-energized, each electric utility should inform public safety partners and operators of affected critical facilities and critical infrastructure of re-energization.  If unintended circumstances are encountered within this timeframe that prevent a safe re-energization, the electric investor-owned utility could promptly notify the relevant stakeholders and affected population and provide an updated re-energization timeframe.

43.   If the electric IOUs coordinate with local, tribal, Federal and State government agencies, and other private and public sector parties to identify transportation, communications, and water system infrastructure throughout its service territory in need of back up generation, and the electric investor-owned utility provides consultative assistance with the procurement and deployment of backup generation to these facilities, there will be less severe detrimental impact on essential services needed by Californians during de-energization events.

44.   By the 2021 wildfire season, if each electric IOU develops pilot projects to investigate the feasibility of mobile and deployable electric vehicle Level 3 fast charging, this will help ensure that Californians that rely on electric vehicle transportation are not unable to charge their vehicles during de-energization events.

45.   A reasonable initial cost cap for the EV charging projects is that each pilot project shall be limited to $4 million, with a maximum of $10 million per investor-owned utility.

46.  The electric IOUs could design a plan in coordination with charging network providers to reinforce networks and key charging locations with backup

R.18-12-005  COM/MBL/gp2

generation and provide information to impacted customers regarding where they could charge their electric vehicles.

47.   If the electric IOUs' public websites and mobile apps communicate, to the extent possible, the location, number, and accessibility of all Level 3 charging stations and publicly available Level 2 charging stations in proximity to areas potentially impacted by de-energization events prior to and during potential or active de-energization events, this will allow for better coordination among EV owners to obtain electric vehicle charging during a de-energization event.

48.   Each electric IOU could identify, above and beyond those in the medical baseline population,  households that self-identify to receive an in-person visit prior to disconnection for nonpayment, receive utility communications in a non-standard format, or self-identify as having a person with a disability in the household, to provide support for those with medical needs during a de-energization event.

49.   The electric IOUs could work in collaboration with public safety partners, local governments, and representatives of people/communities with access and functional needs to identify assistance (including evacuation plans) required by current and potentially eligible medical baseline customers during de-energization events to assist with mitigating any harmful impact from a de-energization event.

50.   Each electric IOUs could provide a plan to the Commission by June 1, 2020 and thereafter by January 31 of each following year regarding its planned efforts to address people/communities with access and functional needs

R.18-12-005  COM/MBL/gp2

during de-energization events to help provide insight to the Commission regarding progress and implementation success.

51. The electric IOUs providing quarterly updates to the Commission regarding their progress towards meeting the established plans and impact of the efforts to address the access and functional needs population during de-energization events will help the Commission understand where future gaps in addressing this population during de-energization events exist.

52. The electric IOUs providing medical baseline and critical facility customer information to local and tribal governments before, during and after de-energization events upon request by those governments and tribes, on a confidential basis and for the sole purpose of protecting the safety and welfare of those customers, is in the public interest.

53. Before communicating potentially confidential medical or personal information to local or tribal governments, electric IOUs could determine which specific information should be marked as confidential and could take any other actions necessary to comply with applicable privacy laws to protect necessary privacy.

54. Where practical, electric IOUs could enter into NDAs with local and tribal governments to allow for information sharing with appropriate privacy protections.

55. Each electric IOUs submitting to the Commission post event reports that include a thorough and detailed description of the quantitative and qualitative factors it considered in calling, sustaining, or curtailing each de-energization event (including information regarding why the de-energization event was a last

R.18-12-005  COM/MBL/gp2

resort option) and a specification of what conditions it determined must be present for the de-energization event to be concluded will help the Commission better understand the decision making processes the electric IOUs execute regarding calling de-energization events.

56.  Year-round, and including during any potential or active de-energization event, the electric IOUs could include comprehensive information on their websites regarding de-energization mitigation efforts.  This includes asset and vegetation management, sectionalizing, switching, system hardening, and backup power projects they are undertaking to reduce the need for or scope of de-energization events, progress on implementing de-energization mitigation efforts to date, and planned dates of completion.  This will help impacted and potentially impacted customers understand whether there is work in progress towards eliminating the need for de-energization events.

57.  Beginning in 2021, the electric IOUs including in their respective Wildfire Mitigation Plans specific short, medium, and long term actions the utility will take to reduce the impact of and need for de-energization events to mitigate wildfire risk will provide necessary insight to the Commission.

58.  9-1-1 emergency services and other public safety answering points are critical facilities that are necessary to ensure public safety.

59.  The transportation sector facilities are critical facilities that are necessary to ensure public safety.

**Conclusions of Law**

1.  Regionalized de-energization Working Groups led by the large electric IOUs that include small and multi-jurisdictional electric utilities, community

R.18-12-005  COM/MBL/gp2

choice aggregators, electric POUs, communications and water service providers, CPUC staff, tribal and local government entities, public safety partners, and representatives of people/communities with access and functional needs and vulnerable communities that convene at least quarterly can help better inform the electric IOUs regarding how plan and execute de-energization protocols.

2.   The electric IOUs should conduct outreach to potential de-energization Working Group participants.

3.   The large electric IOUs should convene de-energization Working Groups as a mechanism for the Commission and the local communities to validate whether the electric IOUs have successfully implemented lessons learned from prior de-energization events and alleviate barriers to solutions for future de-energization events.

4.   The large electric IOUs should report back to the Commission on a quarterly basis on the activities of the Working Groups.

5.   The electric IOUs should coordinate service territory-wide Advisory Boards that consist of public safety partners, communications and water service providers, local and tribal government officials, business groups, non-profits, representatives of people/communities with access and functional needs and vulnerable communities, and academic organizations.

6.   SDG&E should continue to administer a wildfire Advisory Board that provides valuable input into the utility's planning for de-energization events and this activity should be emulated by other electric IOUs in California.

7.   The electric IOUs should have the opportunity to submit proposals to the Commission for alternatives to the Working Group and Advisory Board

R.18-12-005  COM/MBL/gp2

guidelines that are more in the public interest than the Working Group and Advisory Board guidelines prescribe.

8.   The electric IOUs should coordinate with the CPUC, CalFire, CalOES, communications providers, representatives of people/communities with access and functional needs, and other public safety partners to plan de-energization mock exercises throughout the utility service territories in the areas with the highest historical and forecasted risk for de-energization in advance of fire season.

9.   The electric IOUs should implement de-energization simulations and exercises that consider worst case scenarios to enhance preparation for extreme situations that may arise during actual de-energization events.

10.   De-energization tabletop exercises that measure de-energization program performance during a mock event and that include, to the extent possible, tests of customer and critical facilities notification and communication systems, functioning of emergency operations centers, notification protocols, and community resource centers can help identify lessons learned that can be reported to exercise participants, Working Groups and Advisory Boards, and utilized to modify the design and implementation of de-energization program elements and should be implemented.

11.   The electric IOUs should utilize all reasonable channels of communication to all populations potentially affected by a de-energization event to minimize public confusion and detrimental impact from de-energization events.

12.   The electric IOUs should develop communication and notification plans jointly with CalOES, county and local governments, independent living centers,

R.18-12-005  COM/MBL/gp2

and representatives of people/communities with access and functional needs that anticipate the disruption of traditional communication channels.

13.   In situations where internet, cellular, or landline-based communication services are limited, the electric IOUs should leverage, in coordination with the public safety partners, public alert systems, and public radio broadcasts in de-energization event areas to minimize public confusion and detrimental impact from de-energization events.

14.   The electric IOUs should ensure there is available bandwidth capacity, either via a cloud service or on-premise, to manage a website that provides the public safety partners and the general public with access to information about the geographic areas impacted by potential de-energization events and all other critical information to maintain public safety prior to, during, and after a de-energization event to minimize public confusion and detrimental impact from de-energization events.

15.   The electric IOUs should create and maintain an actionable plan that ensures necessary bandwidth is immediately available and consistent up to and through a de-energization event, and the electric IOUs should have bandwidth and technological resources available to serve traffic to all peak demand that will occur as a result of a de-energization event.  This will help minimize public confusion and detrimental impact from de-energization events.

16.   The electric IOUs should consult with the California Department of Technology to develop plans with reports to the CPUC that outline steps for meeting future website and server performance requirements necessary for

R.18-12-005  COM/MBL/gp2

effective and uninterrupted communication to the general public about de-energization events.

17.   The electric IOUs should ensure that the public is able to access precise locality information of potential and active de-energization event impacted service points.

18.   Whenever reasonably possible, the electric IOUs should communicate in the language preferred by the customer. Alternative communication formats should be made available for people with disabilities who may not be able to use standard forms of communication.

19.   The electric IOUs should make every reasonable attempt available to avoid false-negative and false-positive communications and ensure the public is able to access precise and accurate information regarding the location and duration of potential and active de-energization events and restoration efforts.

20.   The electric IOUs should explain any false communications in the post event reports by citing the sources of changing data, and lessons learned should be incorporated in ongoing de-energization communications and notifications to increase their accuracy and effectiveness.

21.   All notifications to customers regarding potential or active de-energization events should be communicated with ease of readability and comprehension as a priority to ensure that public confusion is minimized during de-energization events.

22.   The electric IOUs should proactively reach out to the media and community-based organizations to ensure third party use of all messaging and map data including application programming interfaces for the de-energization

R.18-12-005  COM/MBL/gp2

event is consistent, public safety information regarding the de-energization event will be more publicly dispersed and will serve the public interest.

23.   The electric IOUs should retain and utilize the expertise of emergency situation user interface and user experience professionals to help ensure planned and executed communication prior to, during, and following de-energization events minimize public confusion.

24.   The electric IOUs should provide communications carriers with the meter and circuit IDs that will be de-energized and re-energized, to ensure that communication carriers receive actionable notification information that can inform proactive deployment of resources to minimize the impact of the de-energization events on communications infrastructure.

25.   The electric IOUs, through collaboration with relevant stakeholders, should finalize a CRC plan, 60 days after issuance of the Phase 2 final decision, based on local demographic data for meeting a variety of safety needs for vulnerable populations.

26.   A CRC plan should include siting and accessibility of CRC locations, operations and a determination of the resource needs to best serve the community members who visit.  This plan should be created with consultation from regional local government, de-energization Advisory Boards, public safety partners, representatives of people/communities with access and functional needs, tribal representatives, senior citizen groups, business owners, community resource organizations, public health and healthcare providers, and wildfire Advisory Boards.

R.18-12-005  COM/MBL/gp2

27.   CRCs should be set up in fixed facility locations that can be quickly opened when needed.  These locations should be in areas known to the public, such as recreational centers, public offices, schools, and libraries.  CRC locations should be ADA (Americans with Disabilities Act) accessible to meet the needs of people/communities with access and functional needs, medical baseline, and other vulnerable utility customers.

28.   CRCs should, at a minimum, provide charging stations, cellular network services, water, chairs, de-energization information representatives, and restrooms.  CRCs should be operable at least 8:00 a.m. to 10:00 p.m. during an active de-energization event with actual hours of operation to be determined by the local government.

29.   The electric IOUs should ensure that electric service to impacted service points is restored as soon as possible and within 24 hours from the termination of the de-energization event.  Electric service should be restored only after facilities have been inspected and the utility has determined that service can be restored safely.  For any circuits that require more than 24 hours to restore, the utility should explain why it was unable to restore each circuit within this timeframe in its post event report.

30.   To the extent possible, within one hour of an electric investor-owned utility knowing it will re-energize a line, it should inform public safety partners and operators of critical facilities and critical infrastructure first, and immediately thereafter, the impacted utility customers. If unintended circumstances are encountered within this timeframe that prevent a safe re-energization, the electric investor-owned utility should promptly notify the

R.18-12-005  COM/MBL/gp2

relevant stakeholders and affected population and provide an updated re-energization timeframe.

31.   The electric IOUs should coordinate with local, tribal, Federal and State government agencies, and other private and public sector parties to identify transportation, communications, and water system infrastructure throughout its service territory in need of back up generation.  The electric IOUs should prioritize infrastructure located in areas prone to de-energization events.

32.   By the 2021 wildfire season, each electric investor-owned utility should implement pilot projects to investigate the feasibility of mobile and deployable electric vehicle Level 3 fast charging.

33.   The electric IOUs should design a plan in coordination with charging network providers to reinforce networks and key charging locations with backup generation.

34.   The electric IOUs' public websites and mobile apps should communicate, to the extent possible, the location, number, and accessibility of all Level 3 charging stations and publicly available Level 2 charging stations in proximity to areas potentially impacted by de-energization events prior to and during potential or active de-energization events.

35.   The electric IOUs should identify, above and beyond those in the medical baseline population, households that self-identify to receive an in-person visit prior to disconnection for nonpayment, or receive utility communications in a non-standard format, or self-identify as having a person with a disability in the household, to help provide support for those with medical needs during a de-energization event.

R.18-12-005  COM/MBL/gp2

36.   The electric IOUs should work in collaboration with public safety partners, local governments, and representatives of people/communities with access and functional needs to identify assistance (including evacuation plans) required by current and potentially eligible medical baseline customers during de-energization events.  The electric IOUs should provide a plan to the Commission by June 1, 2020 and thereafter by January 31 of each following year regarding its planned efforts to address people/communities with access and functional needs during de-energization events.  The electric IOUs should provide the Commission with quarterly updates regarding the progress towards meeting the established plans and impact of the efforts to address this population during de-energization events.

37.   The electric IOUs should provide medical baseline and critical facility customer information to local and tribal governments before, during and after de-energization events upon request by those governments and tribes, on a confidential basis and for the sole purpose of protecting the safety and welfare of those customers.  The electric IOUs should notify those local and tribal governments of any specific information that is potentially confidential.  The electric IOUs should state that the information is being provided pursuant to a CPUC Order.

38.   It should be the responsibility of the electric IOUs to determine which specific information should be marked as confidential, and to take any other actions needed to comply with applicable law.

R.18-12-005  COM/MBL/gp2

39.   Electric IOUs should enter into NDAs with local and tribal governments when possible to allow for information sharing with appropriate privacy protections.

40.   The electric IOUs' post event reports should include a thorough and detailed description of the quantitative and qualitative factors it considered in calling, sustaining, or curtailing each de-energization event (including information regarding why the de-energization event was a last resort option) and a specification of what factors must be present for the de-energization event to be concluded.

41.   Year-round, and including during any potential or active de-energization event, the electric IOUs should include comprehensive information that is available on their websites regarding de-energization mitigation efforts including asset and vegetation management, sectionalizing, switching, system hardening, and backup power projects they are undertaking to reduce the need for or scope of de-energization events, progress on  implementing de-energization mitigation efforts to date, and planned dates of completion.

42.   Beginning in 2021, the electric IOUs should include in their respective Wildfire Mitigation Plans specific short, medium, and long-term actions each utility will take to reduce the impact of and need for de-energization events to mitigate wildfire risk.  The electric IOUs shall make this information available and easily accessible on their public websites.

43.   9-1-1 emergency services and other public safety answering points should be included in the definition of critical facilities to ensure public safety answering

R.18-12-005  COM/MBL/gp2

points receive priority notification and any additional assistance necessary to ensure resiliency during de-energization events.

44.   The transportation sector should be included in the list of critical facilities and infrastructure to ensure transportation resilience is a priority during de-energization events.  This definition includes facilities associated with automobile, rail, aviation and maritime transportation for civilian and military purposes.

## O R D E R

**IT IS ORDERED** that:

1.   Pacific Gas and Electric Company, San Diego Gas & Electric Company, Southern California Edison Company, Bear Valley Electric Service, a division of Golden State Water Company, Liberty Utilities (CalPeco Electric) LLC and PacifiCorp d.b.a. Pacific Power shall follow the guidelines set forth in Appendix A to this decision.  These guidelines, along with the guidelines adopted in Resolution ESRB-8 and Decision 19-05-042, will remain in effect unless and until they are superseded by another Commission decision or resolution.

2.   Pacific Gas and Electric Company, San Diego Gas & Electric Company, Southern California Edison Company, Bear Valley Electric Service, a division of Golden State Water Company, Liberty Utilities (CalPeco Electric) LLC and PacifiCorp d.b.a. Pacific Power shall continue to follow the guidelines adopted in Resolution ESRB-8 and Decision 19-05-042 unless superseded by the guidelines adopted in this decision

3.   Pacific Gas and Electric Company, San Diego Gas & Electric Company, Southern California Edison Company, Bear Valley Electric Service, a division of

R.18-12-005  COM/MBL/gp2

Golden State Water Company, Liberty Utilities (CalPeco Electric) LLC and PacifiCorp d.b.a. Pacific Power shall make every effort to implement the guidelines set forth in Appendix A in advance of the 2020 wildfire season; however, some of the guidelines will necessarily take additional time to fully deploy.

4.    Pacific Gas and Electric Company, San Diego Gas & Electric Company, Southern California Edison Company, Bear Valley Electric Service, a division of Golden State Water Company, Liberty Utilities (CalPeco Electric) LLC and PacifiCorp d.b.a. Pacific Power shall submit two progress reports detailing progress towards implementation of the guidelines set forth in Appendix A to the Director of the California Public Utilities Commission's Safety and Enforcement Division. Pacific Gas and Electric Company, San Diego Gas & Electric Company, Southern California Edison Company, Bear Valley Electric Service, a division of Golden State Water Company, Liberty Utilities (CalPeco Electric) LLC and PacifiCorp d.b.a. Pacific Power must serve the progress reports on the service list of Rulemaking 18-12-005 and post the reports to their websites. The first progress report is due two months after issuance of this decision; the second progress report is due six months after issuance of this decision. The Commission's Safety and Enforcement Division may request additional progress reports after the initial two ordered herein.

5.    Rulemaking 18-12-005 remains open.

This order is effective today.

Dated May 28, 2020, at San Francisco, California.

R.18-12-005  COM/MBL/gp2

MARYBEL BATJER
                    President
LIANE M. RANDOLPH
MARTHA GUZMAN ACEVES
CLIFFORD RECHTSCHAFFEN
GENEVIEVE SHIROMA
                        Commissioners

R.18-12-005  COM/MBL/gp2

# APPENDIX A

R.18-12-005  COM/MBL/gp2

**Appendix A**

**ADOPTED PHASE 2 GUIDELINES IN ADDITION TO APPENDIX A OF
DECISION 19-05-042 AND RESOLUTION ESRB-8**

**(a)     Working Groups and Advisory Boards**

The large electric investor-owned utilities shall convene, at least quarterly, regionalized working groups. The opportunity for participation in these working groups shall include and be extended to small multi-jurisdictional electric utilities, community choice aggregators, publicly owned electric utilities, communications and water service providers, CPUC staff, tribal and local government entities, public safety partners, and representatives of people/communities with access and functional needs and vulnerable communities. The purpose of these working groups is to ensure there is a formal environment to share lessons learned between the impacted communities and the electric investor-owned utilities. The large electric investor-owned utilities shall refine their de-energization protocols using feedback from the working groups. As a component of this, the large electric investor-owned utilities shall conduct outreach to impacted communities to plan the coordination for future de-energization events. Components of the de-energization protocols that should be addressed by the working groups include the provision of Community Resource Centers, communication strategies, information sharing, identification of critical facilities, strategies for supporting people/communities with access and functional needs, and contingency plans. The large electric investor owned utilities shall report back to the CPUC on progress on a quarterly basis. CPUC participation and the quarterly reporting shall serve as a mechanism for the CPUC to validate whether the electric investor-owned utilities have successfully implemented lessons learned from prior de-energization events to refine the process for future de-energization events.

R.18-12-005  COM/MBL/gp2

Each electric investor owned utility shall establish advisory boards that provide hands-on, direct advisory functions regarding all aspects of de-energization. These service territory-wide advisory boards should consist of public safety partners, communications and water service providers, local and tribal government officials, business groups, non-profits, representatives of people/communities with access and functional needs and vulnerable communities, and academic organizations. The result of the convening of the advisory boards shall be to develop best practices for de-energization issues and safety, community preparedness, regional coordination and the optimal use of existing and emerging technologies. The electric investor-owned utilities shall emulate the approach SDG&E has implemented with its wildfire advisory board.

The electric investor-owned utilities may seek approval from the Commission to administer alternatives to the working group or advisory board structures outlined in these guidelines through a Tier 3 advice letter submitted to the Commission. The advice letter must include a detailed explanation of the plan for administering the alternative working group or advisory board function and must include a clear explanation for why the proposed alternative is in the public interest.

### (b)    De-energization Exercises

The electric investor-owned utilities shall coordinate with the CPUC, CalFire, CalOES, communications providers, representatives of people/communities with access and functional needs, and other public safety partners to plan de-energization simulation exercises throughout the utility service territories in the areas with the highest historical and forecasted risk for de-energization in advance of fire season. These simulation exercises should not disrupt electric service nor violate any communication requirements and should consider worst case scenarios of de-energization. These tabletop exercises shall measure de-energization program performance during a simulation event and should include, to the extent possible, tests of customer and critical facilities notification and

R.18-12-005  COM/MBL/gp2

communication systems, functioning of emergency operations centers, notification protocols, and community resource centers. Lessons learned from these exercises shall be reported to exercise participants, Working Groups and Advisory Boards, and utilized to refine the design and implementation of de-energization program elements.

**(c)   Who Should Receive Notice, When Should Notice Occur, and How Should Notice Occur?**

The electric investor-owned utilities shall utilize all reasonable channels of communication to all populations potentially affected by a de-energization event.

The electric investor-owned utilities shall develop communication and notification plans jointly with CalOES, county and local governments, independent living centers, and representatives of people/communities with access and functional needs.  The plans shall anticipate the disruption of traditional communication channels and provide contingency alternatives.

In situations where internet, cellular, or landline-based communication services are limited, the electric investor-owned utilities shall coordinate with public safety partners to use in-language public alert systems and public radio broadcasts in de-energization impacted areas.

Each electric investor-owned utility shall ensure there is sufficient bandwidth capacity, either via a cloud service or on-premise, to manage a website that provides public safety partners and the general public with access to information about the geographic areas impacted by potential and active de-energization events and all other critical information to maintain public safety prior to, during, and after a de-energization event. Each electric investor-owned utility shall create and maintain an actionable plan that ensures necessary bandwidth is immediately available and consistent up to and through a de-energization event. Each electric

R.18-12-005  COM/MBL/gp2

investor-owned utility shall have bandwidth and technological resources available to serve all peak demand that may occur as a result of a de-energization event.

Each electric investor-owned utility shall consult with the California Department of Technology (CDT) to develop a plan (submitted to the CPUC) that outlines steps for meeting future website and server performance requirements necessary for effective and uninterrupted communication to the general public regarding de-energization events.

Each electric investor-owned utility shall ensure that the public is able to access precise locality information of potential and active de-energization event impacted service points. Each electric investor-owned utility shall make every reasonable effort to avoid false-negative and false-positive communications. Additionally, each electric investor-owned utility shall make every reasonable effort to ensure the public is able to access precise and accurate information regarding the location and duration of potential and active de-energization events and restoration efforts. Each electric investor-owned utility shall enumerate and explain the cause of any false communications in its post event reports by citing the sources of changing data. Lessons learned should be incorporated in ongoing de-energization communications and notifications to increase their accuracy and effectiveness.

All notifications to customers regarding potential or active de-energization events shall be communicated with ease of readability and comprehension as a priority. Each electric investor-owned utility shall proactively reach out to media and community-based organizations to ensure consistent awareness of and availability to third-parties of all messaging and map data, including application programming interfaces, that is used for de-energization events. The electric investor-owned utilities shall retain and utilize the expertise of emergency situation user interface and user experience professionals to ensure planned and

R.18-12-005  COM/MBL/gp2

executed communication prior to, during, and following a de-energization event minimizes public confusion. Whenever reasonably possible, communications shall be in the language preferred by the customer. Alternative communication formats should be made available for people with disabilities who may not be able to use standard forms of communication.

Each electric investor-owned utility shall provide communications carriers with meter and circuit IDs to be de-energized and re-energized in advance of taking action to ensure communication carriers receive actionable notification information that can inform proactive deployment of resources to minimize the impact of the de-energization events on communications infrastructure.

**(d)    Community Resource Centers**

Each electric investor-owned utility, through collaboration with relevant stakeholders in its service territory, shall finalize a community resource center (CRC) plan, 60 days after issuance of the Phase 2 final decision, based on local demographic data for meeting a variety of safety needs for access and functional needs and vulnerable populations.

The CRC plan shall include siting and accessibility of CRC locations and a determination of the resources needed to best serve the community members who visit. This plan shall be created with consultation from regional local government, Advisory Boards, public safety partners, representatives of people/communities with access and functional needs, tribal representatives, senior citizen groups, business owners, community resource organizations, and public health and healthcare providers.

Where feasible, CRCs should be set up in fixed facility locations that can be quickly opened when needed and provide at least two egress

R.18-12-005  COM/MBL/gp2

routes.  These locations should be in areas known to the public, such as recreational centers, public offices, schools, and libraries.  CRC locations shall be ADA (Americans with Disabilities Act) accessible to meet the needs of people/communities with access and functional needs and medical baseline customers. CRC locations shall comply with social distancing or other public health protocols that are in place.

CRCs should, at a minimum, provide device charging stations that are capable of powering medical devices, cellular network services, water, chairs, PSPS information representatives, and restrooms.  CRCs shall be operable at least 8 AM-10 PM during an active de-energization event, with actual hours of operation to be determined by the local government in cases in which early closure of a facility is required due to inability to access a facility until 10 PM.

**(e)    Restoration of power service upon conclusion of public safety need for de-energization**

Each electric investor-owned utility shall ensure that electric service to impacted service points is restored as soon as possible and within 24 hours from the termination of the de-energization event, unless it is unsafe to do so. Electric service shall be restored only after facilities have been inspected and the utility has determined that service can be restored safely.  For any circuits that require more than 24 hours to restore, the utility shall explain why it was unable to restore each circuit within this timeframe in its post event report.

To the extent possible, within one hour of an electric investor-owned utility knowing it will re-energize a line, it shall inform public safety partners and operators of critical facilities and critical infrastructure first, and immediately thereafter, the impacted utility customers. If unintended circumstances are encountered within this timeframe that prevent a safe

R.18-12-005  COM/MBL/gp2

re-energization, the electric investor-owned utility shall promptly notify the relevant stakeholders and affected population and provide an updated re-energization timeframe.

### (f)    Transportation, Communications, and Water System Resilience

Each electric investor-owned utility shall coordinate with local, tribal, Federal and State government agencies, and other private and public sector parties to identify transportation, communications, and water system infrastructure throughout its service territory in need of back-up generation. Each electric investor-owned utility shall prioritize infrastructure located in areas prone to de-energization events. The electric investor-owned utilities shall work with those governing bodies of the critical infrastructure to provide consultative assistance regarding backup generation to ensure critical infrastructure is not brought offline during a de-energization event.

By the 2021 wildfire season, each electric investor-owned utility shall implement pilot projects to investigate the feasibility of mobile and deployable electric vehicle (EV) Level 3 fast charging for areas affected by de-energization events. Each pilot project shall be limited to $4 million, with a maximum of $10 million per investor-owned utility.

The electric investor-owned utilities shall each design a plan, 60 days after issuance of the Phase 2 final decision, in coordination with EV charging network providers, to reinforce EV charging networks and key charging locations with backup generation.

Each electric investor-owned utility shall coordinate with EV network information providers to communicate (on both the utility website and mobile apps), to the extent possible, current location, number, and accessibility of all Level 3 and Level 2 charging stations  in proximity

R.18-12-005  COM/MBL/gp2

to areas potentially impacted by de-energization events prior to and during potential or active de-energization events.

### (g)  Medical Baseline and Access and Functional Needs Populations

Each electric investor-owned utility shall identify, above and beyond those in the medical baseline population, households that self-identify to receive an in-person visit prior to disconnection for nonpayment or receive utility communications in a non-standard format or self-identify as having a person with a disability in the household, to help provide support for those with medical needs during a de-energization event.  Each electric investor-owned utility shall work in collaboration with public safety partners, local governments, and representatives of people/communities with access and functional needs to identify assistance (including evacuation plans) required by current and potentially eligible medical baseline customers during de-energization events.  Each electric investor-owned utility shall provide a plan to the Commission by June 1, 2020 and thereafter by January 31 of each following year regarding its planned efforts to address people/communities with access and functional needs during de-energization events. The electric investor-owned utilities shall provide the Commission with quarterly updates regarding the progress towards meeting the established plans and the impact of its efforts to address this population during de-energization events.

In relation to de-energization events, each electric investor-owned utility shall provide medical baseline and critical facility customer information to local and tribal governments, upon request by those governments and tribes, on a confidential basis and for the sole purpose of protecting the safety and welfare of those customers.  The electric investor-owned utility providing the information shall notify those local and tribal governments of any specific information that is confidential.  The electric

R.18-12-005  COM/MBL/gp2

investor-owned utilities may state that the information is being provided pursuant to a CPUC Order.

**(h)     Transparency**

Each electric investor-owned utility shall report on all potential or active de-energization events in its post event reports.  These reports shall include a thorough and detailed description of the quantitative and qualitative factors it considered in calling, sustaining, or curtailing each de-energization event (including information regarding why the de-energization event was a last resort option) and a specification of the factors that led to the conclusion of the de-energization event.

Each electric investor-owned utility website shall provide, on a year-round basis, organized, clear, and comprehensive information regarding its efforts to reduce the need for or scope of de-energization events, including, asset and vegetation management, sectionalizing, switching, system hardening, backup power projects, progress on de-energization mitigation efforts, and planned dates of completion. The electric investor-owned utilities should not solely provide a link to their wildfire mitigation plans to provide such information. Instead, the electric IOUs should provide a customer friendly portal that easily explains the work it is undertaking to mitigate the need for de-energization events, the progress it has made, and the expected completion of each component of its mitigation strategy. This information should be easily accessible on the electric investor-owned utilities' websites during active de-energization events, and there should be links to specific information available for the customers accessing their webpages.

Beginning in 2021, each electric investor-owned utility Wildfire Mitigation Plan shall include specific short, medium, and long-term actions the utility will take to reduce the impact of and need for de-energization events to mitigate wildfire risk. Each electric investor-owned

R.18-12-005  COM/MBL/gp2

utility shall make this information available and easily accessible on its public website.

**(i)   Definitions**

Public safety answering points are to be included in the definition of critical facilities to ensure 9-1-1 emergency services receive priority notification and any additional assistance necessary to ensure resiliency during de-energization events.

The transportation sector shall be included in the list of critical facilities and infrastructure to ensure transportation resilience is a priority during de-energization events. The definition of transportation facilities and infrastructure for this purpose includes facilities associated with automobile, rail, aviation, major public transportation, and maritime transportation for civilian and military purposes.

**(End of Appendix A)**