STATE OF CALIFORNIA                                                    GAVIN NEWSOM *Governor*

## PUBLIC UTILITIES COMMISSION

505 VAN NESS AVENUE
SAN FRANCISCO, CA  94102-3298



February 26, 2021

**VIA ELECTRONIC MAIL**

Honorable William H. Alsup
United States District Court
Northern District of California
Courtroom 12 - 19th Floor
450 Golden Gate Avenue
San Francisco, California 94102

*Re: Proposed Probation Conditions 11 and 12 in Case No. 14-cr-00175-WHA*

Dear Judge Alsup,

The California Public Utilities Commission ("CPUC") thanks the Court for its request for additional input on the Court's proposed eleventh and twelfth conditions of Pacific Gas and Electric Co.'s ("PG&E") probation. The Court has asked the CPUC and the California Governor's Office of Emergency Services ("Cal OES") the following question:

> What specific procedure would you require of PG&E in its
> implementation of the PSPS process that would have prevented the Zogg
> Fire and four deaths resulting therefrom?

As the Court is aware, the CPUC is not only a regulatory body but is also an investigative one. The CPUC is still actively investigating the cause of the September 27, 2020 Zogg Fire, as is the California Department of Forestry and Fire Protection ("CAL FIRE"). Neither agency has released conclusions from their investigations, and analyses conducted pursuant to an ongoing investigation must remain confidential until investigators have had an opportunity to fully conduct their investigation.  This care is necessary so that, if appropriate, formal adjudications, prosecutions, and penalties can be pursued.

The CPUC appreciates the thrust of the Court's inquiry:  what can be done to prevent and mitigate catastrophic wildfires ignited by electric utility equipment?  We know from concluded investigations in ***recent years that wildfires started by PG&E's equipment have been attributed to varying ignition sources***:  failures in PG&E's equipment maintenance, recordkeeping, vegetation management, risk assessments, and spending priorities.  We also know that a profound underlying defect in PG&E's organizational culture of not effectively prioritizing public safety has laid the groundwork for the occurrence of direct ignition sources.

Hon. William H. Alsup
February 26, 2021
Page 2

In turn, ***wildfire prevention and mitigation require the mobilization of a wide multitude of PG&E's tools and resources*** – vegetation management, system hardening, and inspections, with PSPS as an option of last resort – in coordination with local communities and governments, and under the guidelines, regulation, and enforcement authorities of the CPUC, its Wildfire Safety Division, Safety and Enforcement Division, and Safety Policy Division, CAL FIRE, and Cal OES, and other authorities through their public processes.[1]  For example, the CPUC described for the Court the many coordinated efforts of the CPUC, California Legislature, and Governor's Office to hold PG&E accountable and improve public safety in the face of wildfire threats, which include:[2]

- Establishing a new Wildfire Safety Division, which initiated the Field Inspection Program in May 2020 and to date has conducted 2023 physical inspections of PG&E's wildfire mitigation work and demanded more transparency, granularity, accountability, and effectiveness in PG&E's Wildfire Mitigation Plans;[3]
- Requiring completion of a Root Cause Analysis into the 16 wildfires in 2017 and 2018 that PG&E equipment caused that will "identify systemic, programmatic, management, and structural matters that may need to be addressed to reduce such incidents in the future";
- Ordering System Enhancement Initiatives to increase and improve vegetation management capabilities;
- Requiring the appointment of an Independent Safety Monitor that is the functional equivalent of, and will overlap in time with, this Court's Monitor, who will develop recommendations to address compliance issues and enhance safety performance;
- Adopting a six-step Enhanced Oversight and Enforcement Process to tighten regulatory monitoring and compel safety improvements, beginning with ordering corrective action plans and graduating, if appropriate, to the final steps of ordering a Chief Restructuring Officer, appointment of a Receiver, and potential new conditions on or revocation of PG&E's license to operate as a utility in California.

Just yesterday, February 25, 2021, the CPUC issued a draft resolution invoking the Enhanced Oversight and Enforcement Process, and this draft resolution will be presented for a CPUC vote as early as April 15, 2021.  The Triggering Event was PG&E's failure in 2020 to prioritize its completion of Enhanced Vegetation Management work on the highest-risk power lines by instead completing more of its required compliance work on lower-risk lines, demonstrating insufficient progress towards risk-driven investments.[4]  The proposed Resolution directs PG&E to submit to the CPUC a corrective action plan and progress reports every 90 days.

---

[1] See letter to the Court from Mark Ghilarducci, Director of the Governor's Office of Emergency Services (Feb. 26, 2021).
[2] "Comments of the California Public Utilities Commission In Response to Motion to Reconsider Order Modifying Conditions of Probation (ECF Nos. 1187, 1209)" (June 11, 2020) (ECF 1217).
[3] The Wildfire Safety Division will become the Office of Energy Infrastructure Safety in July 2021 when it moves from the CPUC to the California Natural Resources Agency.
[4] A copy of the "[Draft] Resolution M-4852:  Placing Pacific Gas and Electric Company Into Step 1 of the "Enhanced Oversight and Enforcement Process" Adopted in Decision 20-05-053" (mailed Feb. 25, 2021) is attached hereto as Exhibit 1.

Hon. William H. Alsup
February 26, 2021
Page 3

In short, the CPUC continues to engage in a comprehensive, coordinated, and expert- and stakeholder-informed mobilization of wildfire prevention and mitigation efforts.  The CPUC does not disagree with the Court that the state of PG&E's vegetation management could be an appropriate consideration when determining whether to deenergize any distribution line as part of a Public Safety Power Shutoff, but we can go no further at this time, without fully vetting and allowing expert and public comment on the competing considerations.  Through its February 19, 2021 submission to the Court, the CPUC was attempting to advise the Court of the innate hazards that come with large-scale PSPS events and the concern expressed by many participants in CPUC proceedings about the vulnerabilities they face when these events occur.  These CPUC proceedings have placed a focus on improving PG&E's ability to more granularly deploy the PSPS option to avoid unnecessary hardship and unintended safety consequences.  The CPUC respectfully submits that these proceedings are the appropriate venue to resolve these very difficult issues.

Sincerely,

/s/      *Christine Jun Hammond*
AROCLES AGUILAR
CHRISTINE JUN HAMMOND
CHRISTOFER NOLAN

Attorneys for the
CALIFORNIA PUBLIC UTILITIES COMMISSION

Exhibit 1

**DRAFT**          Item _____ (Agenda ID # 19236)

PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA

Executive Division                                    Date: April 15, 2021
                                                      Resolution M-4852

# R E S O L U T I O N

**RESOLUTION M-4852: PLACING PACIFIC GAS AND ELECTRIC COMPANY INTO STEP 1 OF THE "ENHANCED OVERSIGHT AND ENFORCEMENT PROCESS" ADOPTED IN DECISION 20-05-053**

## SUMMARY

This Resolution is issued to Pacific Gas and Electric Company (PG&E) in accordance with Commission Decision (D.) 20-05-053, which gave Commission approval of PG&E's bankruptcy plan of reorganization with conditions and modifications. The decision established an Enhanced Oversight and Enforcement Process (EOE Process) allowing the Commission to take additional steps to ensure PG&E is improving its safety performance if specific Triggering Events occur. The steps range from Step 1, which contains enhanced reporting and oversight requirements, to Step 6, involving the potential revocation of PG&E's ability to operate as a California electric utility.

This Resolution invokes Step 1, with regard to PG&E's insufficient progress with risk-driven wildfire mitigation efforts and requires PG&E to submit a Corrective Action Plan within 20 days of the Resolution effective date.

It is appropriate to place PG&E into Step 1 of the EOE Process due to the following Triggering Event:

> PG&E Has Made Insufficient Progress Toward Approved Safety or Risk-Driven Investments Related to Its Electric Business (EOE Process Step 1, Triggering Event A(iii)).

The findings supporting this Triggering Event include the following:

> PG&E is not sufficiently prioritizing its Enhanced Vegetation Management (EVM) based on risk. PG&E ranks its power line circuits by wildfire risk, but the work performed in 2020 demonstrates that PG&E is not making risk-driven investments. PG&E is not doing the majority of EVM work – or even a significant portion of work – on the highest risk lines.

367731890                              1

Resolution M-4852                    **DRAFT**                    April 15, 2021

In 2020, PG&E conducted more work in 2020 on lower risk power lines than high risk lines if one examines the 161 power lines on which PG&E performed EVM.  Less than five percent of the EVM work PG&E completed was on the 20 highest risk power lines according to PG&E's own risk rankings.

The foregoing facts meet the triggering requirements for placing PG&E into Step 1 of the EOE Process, which warrants imposition of a Corrective Action Plan containing enhanced reporting requirements.  No later than 20 days following issuance of this Resolution, PG&E shall submit a Corrective Action Plan containing the material set forth below.  The enhanced reporting requires PG&E to prioritize EVM on power lines that pose the greatest wildfire risk.

PG&E shall serve the Corrective Action Plan on the service lists for Investigation (I.) 19-09-016 (which created the EOE Process) and Rulemaking (R.) 18-10-007 (the Commission's wildfire mitigation proceeding), as well as on the Wildfire Safety Division (WSD) at wildfiresafetydivision@cpuc.ca.gov and the Safety and Enforcement Division at ESRB_ComplianceFilings@cpuc.ca.gov.  PG&E shall also send the Corrective Action Plan to the Commission's Executive Director seeking her approval.

The EOE Process does not supplant existing Commission regulatory or enforcement jurisdiction, and nothing in this Resolution is intended to affect such jurisdiction or limit the Commission's or WSD's authority to pursue other enforcement related to the facts set forth herein.  Further, nothing in this Resolution alters the requirements of D.20-05-019.[1]

**BACKGROUND**

PG&E entered bankruptcy in 2019 following several catastrophic wildfires in its service territory.  In D.20-05-053, the Commission approved a reorganization plan, giving its approval for PG&E to emerge from bankruptcy with specific financial and operational conditions.  To hold PG&E accountable for improving its safety record, including the need to reduce the risk of catastrophic wildfire caused by its infrastructure, the decision instituted a new EOE Process to supplement the Commission's existing enforcement authority.  Appendix A to this Resolution provides the EOE Process adopted in D.20-05-053.

---

[1] *Rehearing denied*, D.20-12-015. The underlying decision adopts, with modifications, a settlement with regard to the *Order Instituting Investigation on the Commission's Own Motion into the Maintenance, Operations and Practices of Pacific Gas and Electric Company (U39E) with Respect to its Electric Facilities; and Order to Show Cause Why the Commission Should not Impose Penalties and/or Other Remedies for the Role PG&E's Electrical Facilities had in Igniting Fires in its Service Territory in 2017.*  The decision and settlement require reporting, root cause analyses of past fires, and other actions related to wildfires in PG&E's territory.

Resolution M-4852                    **DRAFT**                    April 15, 2021

The Commission may invoke the EOE Process if PG&E self-reports, or the Commission becomes aware of, Triggering Events covered by the EOE Process. In this case, PG&E did not self-report problems. Instead, through persistent inquiry, the Commission and WSD have discovered that PG&E did not prioritize EVM in 2020 in a risk-driven manner that would entail performing work on its highest risk power lines first. PG&E has failed to provide the WSD with consistent information about how it assesses power line risk for prioritizing EVM work, but under any of PG&E's risk rankings, PG&E has not made sufficient progress toward risk-driven investments in the area of EVM.

## 1. EOE Process

The EOE Process has six steps, which range from adoption of additional reporting requirements in Step 1 to formal review of PG&E's Certificate of Public Convenience and Necessity (CPCN) in Step 6. D.20-05-053 states that the Commission need not necessarily move PG&E through the steps sequentially. This Resolution relies on findings made, and requirements imposed, by the WSD through its review of PG&E's Wildfire Mitigation Plan (WMP) performance, and places PG&E into Step 1 of the EOE Process.

The EOE Process:

> contains six steps which are triggered by specific events, some of which would rely on Safety and Operational Metrics. The Process includes enhanced reporting requirements and additional monitoring and oversight. The Process also contains provisions for PG&E to cure and permanently exit the Process if it can satisfy specific criteria. If triggered, the Process would occur in coordination with the Commission's existing formal and informal reporting requirements and procedures and would not replace or limit the Commission's regulatory authority including the authority to impose fines and penalties.

> If triggered, the Commission would place PG&E in the appropriate step upon the occurrence of a specified Triggering Event, with appropriate notification by the Commission's Executive Director, or as otherwise provided below. The Commission's Executive Director may move PG&E through the steps of the Process sequentially, or the Commission or its Executive Director may place PG&E in the appropriate step upon the occurrence of a specified Triggering Event. D.20-05-053 at 58.

Resolution M-4852                    **DRAFT**                    April 15, 2021

## 2. Step 1

This Resolution places PG&E into Step 1 of the EOE Process, which provides that if PG&E's conduct meets any of the Triggering Events listed below, a Corrective Action Plan is required.  Specifically, this Resolution invokes Step 1 Section A(iii).

### STEP 1: Enhanced Reporting

A. Triggering Events

    i. PG&E fails to obtain an approved wildfire mitigation plan or fails in any material respect to comply with its regulatory reporting requirements;

    ii. PG&E fails to comply with, or has shown insufficient progress toward, any of the metrics (i) set forth in its approved wildfire mitigation plan including Public Safety Power Shutoffs (PSPS) protocols, (ii) resulting from its on-going safety culture assessment, (iii) contained within the approved Safety and Operational Metrics, or (iv) related to other specified safety performance goals;

    iii. PG&E demonstrates insufficient progress toward approved safety or risk-driven investments related to the electric and gas business; or

    iv. PG&E (or PG&E Corporation) fails in any material respect to comply with the Commission's requirements and conditions for approval of its emergence from bankruptcy.

B. Actions During Step 1

PG&E will submit a Corrective Action Plan to the Executive Director within twenty days of a Commission Order placing PG&E into Step 1.

    i. The Corrective Action Plan shall be designed to correct or prevent a recurrence of the Step 1 Triggering Event, or otherwise mitigate an ongoing safety risk or impact, as soon as practicable and include an attestation stating that it has been approved by the Chief Risk Officer (CRO).

    ii. The Corrective Action Plan, including any timeframes set forth therein for the correction of the Triggering Events or mitigation of any ongoing safety risk or impact, shall be approved by the Commission or the Executive Director.

    iii. Commission staff will monitor PG&E's compliance with its Corrective Action Plan based on, among other things, existing or enhanced reporting.

    iv. The CRO, the Safety and Nuclear Oversight (SNO) Subcommittee, and the boards of directors shall provide reporting to the Commission as directed.

  C. Performance that Results in Exit from Step 1

    i. PG&E shall exit from Step 1 of the Process upon issuance of a Commission Resolution finding that PG&E has met the conditions of its Corrective Action Plan within the required timeframe.

    ii. The Commission, by Resolution, will move PG&E to Step 2 if it fails to adequately meet the conditions of its Corrective Action Plan within the required timeframe. PG&E may remain in Step 1 if it demonstrates sufficient progress toward meeting the conditions of its Corrective Action Plan and additional time appears needed to successfully address the Triggering Event(s).

## **DISCUSSION**

PG&E should be placed in Step 1 of the EOE Process based on Triggering Event A(iii) above.  PG&E failed to prioritize its limited vegetation management resources in 2020 on working the highest risk power lines for EVM, thereby "demonstrat[ing] insufficient progress toward approved safety or risk-driven investments related to the electric … business."

To remedy this failure, PG&E's Corrective Action Plan must explain in detail how it will both perform risk modeling and use the results of risk modeling to ensure the highest risk power lines are prioritized for vegetation management under its EVM program in 2021 before working lower risk lines.  It must report changes to its risk modeling and output proactively.  It must report accurately to the Commission the location where it intends to engage in EVM and demonstrate that it is prioritizing high risk power lines for EVM work.

Resolution M-4852 **DRAFT** April 15, 2021

The facts supporting invocation of Triggering Event in Step 1 Section A(iii) appear below.

### 1.   Failure to Target Highest Risk Power Lines for EVM

The WSD's Action Statement and Commission's Resolution approving PG&E's 2020 WMP required PG&E to demonstrate that it was using a system of risk prioritization in all of its wildfire mitigation work.[2] This direction included a requirement that PG&E use risk assessment to determine where to target its EVM work.

Over the course of 2020 and early 2021, PG&E provided the WSD with three different lists ranking its power lines by risk (with item 1 being the highest-risk circuit or feeder). Each risk ranking differed from the others in material respects. Notwithstanding these differences in approach to identifying high risk power lines, under each risk ranking list, less than five percent of the EVM work PG&E completed in 2020 was done to the 20 highest-risk power lines. This failure to appropriately prioritize and execute EVM on its highest-risk power lines is a Triggering Event under Step 1, Section A(iii), because PG&E has demonstrated insufficient progress toward approved safety or risk-driven investments related to its electric business.

As detailed in WSD's recently published Audit Report on PG&E's Implementation of Enhanced Vegetation Management Program in 2020 (EVM Audit),[3] PG&E furnished WSD with three risk rankings dated September 2020, December 2020, and January 2021. If one tallies the total percentages worked under either the September 2020 or January 2021 risk rankings, the work completed as a percentage of the total was at most 4.9 percent, as shown in Table 1 below:

---

[2] *See, e.g.,* Resolution WSD-003 at 24-25 & Appendix A, Conditions PGE-5 and PGE-18; Resolution WSD-002 at 21 & Appendix A, Conditions Guidance-1 and Guidance-3; and WSD June 11, 2020 Action Statement on PG&E's WMP at 3-5.

[3] The EVM Audit is available at the following link: https://www.cpuc.ca.gov/uploadedFiles/CPUCWebsite/Content/About_Us/Organization/Divisions/WSD/2021.02.08.EVMAudit.pdf. Its contents are incorporated as if set forth herein. In response to the EVM Audit, PG&E has stated the January 2021 risk ranking is not a "model" but that characterization does not alter the basic conclusion of this Resolution.

Resolution M-4852 **DRAFT** April 15, 2021

**Table 1 - Work Completed on Top 20 Circuits as Proportion of Total EVM Work Completed (September 2020 and January 2021 Rankings)**

| | Miles of Work Completed, as of January 3 2021 | Work completed as % of total |
|---|---|---|
| Top 20 circuits, September risk rankings | 59.19 | 3.2% |
| Top 20 circuits, January risk rankings | 91.72 | 4.9% |
| All circuits | 1877.94 | |

Table 2 shows the risk rankings of PG&E's power line circuits:

**Table 2 - Risk Rankings from PG&E (September 2020, December 2020, January 2021) Sorted by January 2021 Rankings; Highest Risk is #1**

| Circuit | Risk score rank | | |
|---|---|---|---|
| | September | December | January |
| PUEBLO 2103 | 107 | 1 | 1 |
| APPLE HILL 2102 | 276 | 2 | 2 |
| PINE GROVE 1102 | 90 | 3 | 3 |
| MOLINO 1102 | 10 | 4 | 4 |
| EL DORADO PH 2101 | 8 | 5 | 5 |
| SILVERADO 2104 | 86 | 6 | 6 |
| HICKS 2101 | 540 | 7 | 7 |
| RINCON 1101 | 57 | 8 | 8 |
| PLACERVILLE 2106 | 103 | 9 | 9 |
| CASTRO VALLEY 1104 | 575 | 10 | 10 |
| SANTA ROSA A 1111 | 235 | 11 | 11 |
| WYANDOTTE 1103 | 112 | 12 | 12 |
| DUNBAR 1101 | 174 | 13 | 13 |
| STELLING 1110 | 295 | 14 | 14 |
| PUEBLO 2102 | 34 | 15 | 15 |
| STANISLAUS 1702 | 4 | 16 | 16 |
| SAN RAFAEL 1108 | 266 | 17 | 17 |
| BRUNSWICK 1106 | 13 | 18 | 18 |
| WOODSIDE 1104 | 332 | 19 | 19 |
| CASTRO VALLEY 1106 | 190 | 20 | 20 |
| ... | | | |
| HIGGINS 1110 | 302 | 500 | 430 |
| PERRY 1101 | 121 | 805 | 591 |
| RESERVATION ROAD 1101 | 81 | 952 | 635 |

While PG&E's changing approach to its risk ranking made it more challenging for WSD to evaluate PG&E's EVM work, under all three risk rankings, PG&E has made insufficient progress toward risk-driven investments in its EVM program.  Simply put, PG&E failed to risk-prioritize its EVM work on the ground, as is apparent from an

Resolution M-4852                    **DRAFT**                        April 15, 2021

analysis of the EVM work performed under any of the results.[4]  This failure is demonstrated in the following tables and figures and summary, which are based on WSD's EVM Audit.

PG&E states it completed 1,800 miles of EVM work in 2020 on 161 circuits.  As shown in Table 3, using the September risk ranking, fewer than 60 miles of EVM work was completed on the top 20 highest risk lines.  As shown in Table 4, using the January risk ranking, fewer than 92 miles of the 1,800 miles of EVM work was completed on the top 20 highest risk circuits.

**Table 3 - Miles of Completed Work, Top 20 Highest Risk Circuits (September 2020)**

| Circuit | Risk score rank | | Miles of Completed Work, as of January 3, 2021 |
|---|---|---|---|
| | September | January | |
| MIWUK 1701 | 1 | 63 | 0.66 |
| WOODACRE 1101 | 2 | 180 | 7.85 |
| MONTE RIO 1113 | 3 | 44 | 0.65 |
| STANISLAUS 1702 | 4 | 16 | 3.60 |
| ORO FINO 1102 | 5 | 42 | 0.57 |
| MIWUK 1702 | 6 | 57 | 1.56 |
| WOODSIDE 1101 | 7 | 171 | 6.98 |
| EL DORADO PH 2101 | 8 | 5 | 4.51 |
| MIDDLETOWN 1101 | 9 | 66 | 19.68 |
| MOLINO 1102 | 10 | 4 | 0.14 |
| ORO FINO 1101 | 11 | 25 | 1.32 |
| BRUNSWICK 1105 | 12 | 23 | 1.43 |
| BRUNSWICK 1106 | 13 | 18 | 7.30 |
| FITCH MOUNTAIN 1113 | 14 | 39 | 1.90 |
| MONTE RIO 1112 | 15 | 164 | 0.18 |
| SALT SPRINGS 2102 | 16 | 62 | 0.00 |
| BRUNSWICK 1103 | 17 | 33 | 0.87 |
| WEST POINT 1101 | 18 | 72 | 0.00 |
| CHALLENGE 1102 | 19 | 148 | 0.00 |
| FORESTHILL 1101 | 20 | 51 | 0.00 |
| | | *Total:* | 59.19 |

---

[4] The December 2020 and January 2021 Risk Rankings are similar for the highest risk circuits; accordingly, like the EVM Audit this Resolution uses the September 2020 and January 2021 lists.

367731890                                  8

Resolution M-4852 **DRAFT** April 15, 2021

**Table 4 - Miles of Completed Work, Top 20 Highest Risk Circuits (January 2021)**

| Circuit | Risk score rank | | Miles of Completed Work, as of January 3, 2021 |
|---|---|---|---|
| | September | January | |
| PUEBLO 2103 | 107 | 1 | 0.87 |
| APPLE HILL 2102 | 276 | 2 | 28.93 |
| PINE GROVE 1102 | 90 | 3 | 0.45 |
| MOLINO 1102 | 10 | 4 | 0.14 |
| EL DORADO PH 2101 | 8 | 5 | 4.51 |
| SILVERADO 2104 | 86 | 6 | 38.89 |
| HICKS 2101 | 540 | 7 | 0.00 |
| RINCON 1101 | 57 | 8 | 0.00 |
| PLACERVILLE 2106 | 103 | 9 | 0.00 |
| CASTRO VALLEY 1104 | 575 | 10 | 0.00 |
| SANTA ROSA A 1111 | 235 | 11 | 0.60 |
| WYANDOTTE 1103 | 112 | 12 | 0.00 |
| DUNBAR 1101 | 174 | 13 | 2.04 |
| STELLING 1110 | 295 | 14 | 0.00 |
| PUEBLO 2102 | 34 | 15 | 4.41 |
| STANISLAUS 1702 | 4 | 16 | 3.60 |
| SAN RAFAEL 1108 | 266 | 17 | 0.00 |
| BRUNSWICK 1106 | 13 | 18 | 7.30 |
| WOODSIDE 1104 | 332 | 19 | 0.00 |
| CASTRO VALLEY 1106 | 190 | 20 | 0.00 |
| | | **Total:** | 91.72 |

Seen another way, based on either PG&E's September 2020 or January 2021 risk rankings, as of January 3, 2021, PG&E's own reports show that a significant portion of the total miles for the 20 highest risk circuits remains unworked. This fact is demonstrated in Figures 1 and 2:

**Figure 1 - Miles Completed and Unworked Miles, Top 20 Circuits (September 2020)**



Resolution M-4852 **DRAFT** April 15, 2021

**Figure 2 - Miles Completed and Unworked Miles, Top 20 Circuits (January 2021)**



Further, looking at the full set of 161 circuits on which PG&E performed any EVM work in 2020, the highest percentage of this work was completed on the lowest-risk circuits. Figures 3 and 4 below illustrate the percentage of miles worked (in the green bars) on all 161 circuits, showing the September risk rankings in Figure 3 and the January risk rankings in Figure 4:

**Figure 3 - Miles Completed and Unworked Miles**
**161 Circuits with Work Performed in 2020, September Risk Rankings**



Resolution M-4852                     **DRAFT**                     April 15, 2021

**Figure 4 - Miles Completed and Unworked Miles**
**161 Circuits with Work Performed in 2020, January Risk Rankings**



The examination in Figures 3 and 4 of the full set of 161 circuits on which PG&E performed EVM work in 2020 shows that the low-risk circuits received the greatest focus. This result is the opposite of the desired result and contrary to the expectations in the EOE Process that PG&E would demonstrate progress toward approved safety or risk-driven investments or else be placed into Step 1 of the EOE process.

By failing to prioritize EVM on the circuits PG&E itself identified as highest risk and allocating resources instead to conducting EVM on lower-risk circuits, in 2020 PG&E made insufficient progress toward approved safety or risk-driven investments.

### 2.    Consequences of Step 1 – Corrective Action Plan

Step 1 triggers a requirement for PG&E to submit a Corrective Action Plan for approval by the Commission's Executive Director. The Commission may move PG&E to another Step if it fails to adequately meet the conditions of its Corrective Action Plan within a required timeframe. If PG&E complies with the Corrective Action Plan requirements, it may exit Step 1. The Commission will inform PG&E whether PG&E has complied with the Step 1 conditions and may exit Step 1 via a Resolution. The Commission will issue a new Resolution in the event PG&E is required to move to another step of Enhanced Oversight and Enforcement.

PG&E's Corrective Action Plan must explain how it will model the highest risk power lines and demonstrate that PG&E is prioritizing the highest risk lines in its EVM program. PG&E must also report accurately to the Commission where it is performing work and keep the Commission apprised of changes in its plans or the risk model(s) used to inform those plans. PG&E's Corrective Action Plan is due no later than 20 days following issuance of this Resolution.

Resolution M-4852                **DRAFT**                April 15, 2021

### 3.    Corrective Action Plan for Triggering Event A(iii)

PG&E shall submit its Corrective Action Plan for approval by the Commission's Executive Director.  The Corrective Action Plan for Step 1 Section A(iii) shall consist of reporting starting on day 20 and every 90 days thereafter (until the Commission issues a Resolution or other communication ceasing the required reporting) as follows:

1.  A description of the circumstances that contributed to PG&E's failure to adequately prioritize the highest risk lines, as described in this Resolution and the WSD's EVM Audit, in its EVM in 2020;

2.  A description of its risk model(s) for determining where to target EVM in the next 90 days;

3.  A detailed list of the EVM projects for the 12 months following the reporting date;

4.  A description of how the list in item 3 above ensures PG&E is prioritizing the power lines with highest risk first;

5.  An explanation of any planned EVM work does not target the power lines with highest risk first;

6.  Any changes to its risk model occurring over the prior 90 days or planned for the subsequent 90 days;

7.  A description of the circumstances that contributed to PG&E management's inconsistent reporting on the details of its risk modeling and risk ranking lists;

8.  Verification by a senior officer of PG&E that the risk model it is using to prioritize EVM is as set forth in its report;

9.  Verification by a senior officer of PG&E that it will target EVM to the highest risk power lines first, as shown by its risk model or other ranking, in the next 90 days for EVM;

10. Verification by a senior officer of PG&E that it targeted EVM to the highest risk power lines first, as shown by its risk model or other ranking, in the prior 90 days;

11. Verification by a senior officer of PG&E that the company has communicated information in items 3, 4 and 9 above to personnel of PG&E's EVM programs and that such personnel is aware of where to target EVM in the subsequent 90 days.

12. A proposed timeline for ending the required reporting, with a detailed explanation of why the proposal ensures PG&E is in compliance with the requirement that it prioritize high risk circuits in

its EVM work.  The timeline shall include milestone goals for June 1, 2021, September 1. 2021, and December 31, 2021.  These goals shall include a targeted percentage of high risk power line circuits to be completed by those dates.

13. A description of how the Corrective Action Plan proposed in response to this Resolution will complement and not undermine PG&E's compliance activities ordered in D.20-05-019.[5]

PG&E shall coordinate with Commission Staff on the formatting of its reporting for its Corrective Action plan to ensure the information provided is clearly discernable and demonstrates whether PG&E has made progress over the prior 90 days. At all times, the Commission retains the authority to exercise all powers within its jurisdiction regardless of PG&E's position in Step 1 of the EOE Process.

## **CONCLUSION**

PG&E's conduct set forth herein justifies its placement into Step 1 of the EOE Process established in D.20-05-053.  Consequently, PG&E is required to serve a Corrective Action Plan, as described herein, no later than 20 days following issuance of this Resolution for approval by the Commission's Executive Director, and a progress report on the Corrective Action Plan every 90 days thereafter.  If PG&E demonstrates that it is prioritizing high risk lines for EVM to the Commission's satisfaction, it may be removed from the EOE process by Resolution.  If it fails to satisfy the Step 1 requirements, it may be placed in Step 2 or such other Step as the Commission may direct.  The Commission will issue a new Resolution specifying the consequences of such a failure by PG&E.

Nothing in this Resolution precludes the Commission from placing PG&E into another Step of the EOE Process if warranted.

---

5 D.20-05-019 adopted a settlement agreement among PG&E, the Safety and Enforcement Division and other parties which required several actions by PG&E with regard to its vegetation management, including 1) a Tree Crew Training and Certificate Program; 2) a Pre-Inspector Training and Certificate Program; 3) a Vegetation Management Oversight Pilot; 4) Semi-Annual Wildfire Mitigation Meetings among PG&E and local government planning, public works, emergency services, and fire leadership to exchange feedback and information regarding ongoing wildfire safety activities; 5) Independent Wildfire Safety Audits; 6) Quarterly Reports on Electric Maintenance Work; 7) Fuel Reduction Funding; 8) Local Government Vegetation Management Data Sharing: and 9) a PG&E shareholder-funded Independent Study of PG&E's Distribution and Transmission System.

Resolution M-4852                    **DRAFT**                    April 15, 2021

## **COMMENTS**

Public Utilities Code Section 311(g)(1) provides that this Resolution must be served on all parties and subject to at least 30 days public review and comment prior to a vote of the Commission.  This Resolution is being served on the service lists for I.19-09-016 (which created the EOE Process) and R.18-10-007 (a formal Commission wildfire-related proceeding).

## **FINDINGS**

1. PG&E is not sufficiently prioritizing its Enhanced Vegetation Management (EVM) based on risk.

2. PG&E's progress on the highest risk power lines in 2020 is set forth herein in Tables 1-4 and Figures 1-4, as well as the EVM Audit.

3. PG&E's failure to prioritize EVM on the highest risk power lines is a Triggering Event under Step 1 Section A(iii) of the EOE Process in D.20-05-053, which applies Step 1 if PG&E fails to make progress toward approved safety or risk-driven investments related to the electric business.

4. As a consequence of PG&E being in Step 1, PG&E is required by D.20-05-053 and this Resolution to submit a Corrective Action Plan.  The Corrective Action Plan shall address the issues contained in this Resolution and be served as directed herein no later than 20 days following issuance of this Resolution, with follow-up reporting every 90 days thereafter.

5. The Commission will notify PG&E whether it meets or fails to meet the requirements of the Corrective Action Plan ordered in this Resolution.  If it meets the requirements, the Commission will determine by Resolution that PG&E may exit Step 1.

6. If the Commission determines that PG&E has failed to satisfy the Corrective Action Plan, it may place PG&E in Step 2 or other relevant Step set forth in D.20-05-053. The Commission will issue a new Resolution specifying the consequences of such a failure by PG&E.

## **THEREFORE, IT IS ORDERED that:**

1. Pacific Gas and Electric Company is in Step 1 of the Commission's Enhanced Oversight and Enforcement Process adopted in Decision 20-05-053.

2. Pacific Gas and Electric Company shall serve in Investigation 19-09-016 (the proceeding resulting in Decision 20-05-053), Rulemaking 18-10-007 (a formal wildfire-related proceeding), and serve on the Wildfire Safety Division at wildfiresafetydivision@cpuc.ca.gov, and on the Safety and Enforcement Division at

367731890                              14

Resolution M-4852                     **DRAFT**                     April 15, 2021

ESRB_ComplianceFilings@cpuc.ca.gov, on the Commission's Executive Director, and/or any other proceeding service lists or persons requested by the Commission or its staff, a Corrective Action Plan as described herein. The Corrective Action Plan shall be served no later than 20 days following issuance of this Resolution. The Corrective Action Plan shall request approval by the Commission's Executive Director.

3. Every 90 days following service of the Corrective Action Plan described above, Pacific Gas and Electric Company shall serve in the same proceedings, and on the same email addresses as in ordering paragraph 2, a report updating the information required in the Corrective Action Plan until such time as the Commission issues a Resolution or other communication ceasing such required reporting.

4. In its Corrective Action Plan, Pacific Gas and Electric Company shall propose a timeline for the cessation of reporting required in this Resolution, with justification of the proposal.

5. Upon Pacific Gas and Electric Company's demonstration that it is prioritizing high risk lines for Enhanced Vegetation Management to the Commission's satisfaction and meeting all of the Step 1 conditions imposed by this Resolution, the Commission will issue a Resolution allowing Pacific Gas and Electric Company to exit Step 1.

6. If Pacific Gas and Electric Company fails to demonstrate that it is prioritizing high risk lines for Enhanced Vegetation Management to the Commission's satisfaction and meeting all of the Step 1 conditions, the Commission may place Pacific Gas and Electric Company in Step 2 or other relevant Step set forth in Decision 20-05-053. If the Commission determines such action is appropriate, it will issue a new Resolution.

7. Nothing in this Resolution limits the Commission's authority to place Pacific Gas and Electric Company into any Step set forth in Decision 20-05-053's Enhanced Oversight and Enforcement process at any time.

8. Nothing in this Resolution limits the Commission's authority to take actions to ensure safe and reliable gas and electric service, enforce its own orders or California law and regulation, or take any other steps to ensure Pacific Gas and Electric Company's system is designed, operated and maintained to mitigate catastrophic wildfire.

This Resolution is effective today.

367731890                                 15

Resolution M-4852                     **DRAFT**                        April 15, 2021


I certify that the foregoing Resolution was duly introduced, passed and adopted at a conference of the Public Utilities Commission of the State of California held on April 15, 2021, the following Commissioners voting favorably thereon:


_____
                                        Rachel Peterson
                                        Executive Director

I.19-09-016  ALJ/PVA/avs

# APPENDIX A

# ENHANCED OVERSIGHT AND
# ENFORCEMENT PROCESS

I.19-09-016  ALJ/PVA/avs

## Appendix A
### Enhanced Oversight and Enforcement Process

The Commission adopts an Enhanced Oversight and Enforcement Process (Process) designed to provide a clear roadmap for how the Commission will closely monitor PG&E's performance in delivering safe, reliable, affordable, clean energy.

The Process contains six steps which are triggered by specific events, some of which would rely on Safety and Operational Metrics. The Process includes enhanced reporting requirements and additional monitoring and oversight. The Process also contains provisions for PG&E to cure and permanently exit the Process if it can satisfy specific criteria. If PG&E is placed into the Process, actions taken would occur in coordination with the Commission's existing formal and informal reporting requirements and procedures. The Process does not replace or limit the Commission's regulatory authority, including the authority to issue Orders to Show Cause and Orders Instituting Investigations and to impose fines and penalties.

Except as otherwise provided below, a Commission Resolution would place PG&E in the appropriate step based upon the occurrence of a specified triggering event. PG&E shall report the occurrence of a triggering event to the Commission's Executive Director no later than five business day after the date on which any member of senior management of PG&E becomes aware of the occurrence of a triggering event.[25]  PG&E should presumptively move through the steps of the Process sequentially but the Commission may place PG&E in the appropriate step upon the occurrence of a specified triggering event.

## 1.  Enhanced Reporting

### STEP 1: Enhanced Reporting

A. Triggering Events

    i.    PG&E fails to obtain an approved wildfire mitigation plan or fails in any material respect to comply with its regulatory reporting requirements;

    ii.   PG&E fails to comply with, or has shown insufficient progress toward, any

---

[25] Applicable to triggering events that are not based upon a Commission determination.

1

of the metrics (i) set forth in its approved wildfire mitigation plan including Public Safety Power Shutoffs (PSPS) protocols, (ii) resulting from its on-going safety culture assessment, (iii) contained within the approved Safety and Operational Metrics, or (iv) related to other specified safety performance goals;

   iii. PG&E demonstrates insufficient progress toward approved safety or risk-driven investments related to the electric and gas business; or

   iv. PG&E (or PG&E Corporation) fails in any material respect to comply with the Commission's requirements and conditions for approval of its emergence from bankruptcy.

B. Actions During Step 1

PG&E will submit a Corrective Action Plan to the Executive Director within twenty days of a Commission Order placing PG&E into Step 1.

   i. The Corrective Action Plan shall be designed to correct or prevent a recurrence of the Step 1 triggering event, or otherwise mitigate an ongoing safety risk or impact, as soon as practicable and include an attestation stating that it has been approved by the Chief Risk Officer (CRO).

   ii. The Corrective Action Plan, including any timeframes set forth therein for the correction of the triggering events or mitigation of any ongoing safety risk or impact, shall be approved by the Commission or the Executive Director.

   iii. Commission staff will monitor PG&E's compliance with its Corrective Action Plan based on, among other things, existing or enhanced reporting.

   iv. The CRO, the Safety and Nuclear Oversight (SNO) Subcommittee, and the boards of directors shall provide reporting to the Commission as directed.

C. Performance that Results in Exit from Step 1

   i. PG&E shall exit from Step 1 of the Process upon issuance of a Commission Resolution finding that PG&E has met the conditions of its Corrective Action Plan within the required timeframe.

   ii. The Commission, by Resolution, will move PG&E to Step 2 if it fails to adequately meet the conditions of its Corrective Action Plan within the required timeframe. PG&E may remain in Step 1 if it demonstrates sufficient progress toward meeting the conditions of its Corrective Action Plan and additional time appears needed to successfully address the

I.19-09-016  ALJ/PVA/avs

triggering event(s).

## Step 2: Commission Oversight of Management and Operations

A.  Triggering Events

i.   PG&E fails to adequately meet the conditions of its Corrective Action Plan within the required timeframe as provided in Step 1, Section C (ii) above;

ii.  A gas or electric incident occurs that results in the destruction of 1,000 or more dwellings or commercial structures and appears to have resulted from PG&E's failure to follow Commission rules or orders or prudent management practices;

iii. PG&E fails to comply with electric reliability performance metrics, including standards to be developed for intentional de-energization events (i.e., PSPS) and any that may be contained within the approved Safety and Operational Metrics; or

iv.  PG&E fails to report to the Commission a systemic electric or gas safety issue.

B.  Actions During Step 2

i.   PG&E will submit a Corrective Action Plan, or updated Corrective Action Plan, to the Executive Director within twenty days of a Commission Order placing PG&E into Step 2.

ii.  The Corrective Action Plan shall be designed to correct or prevent a recurrence of the Step 2 triggering event, or otherwise mitigate an ongoing safety risk or impact, as soon as practicable and shall include an attestation stating that it has been approved by the CRO and the SNO Subcommittee.

iii. The Corrective Action Plan, including any timeframes set forth therein for the correction or prevention of the Step 2 triggering events or mitigation of any ongoing safety risk or impact, shall be approved by the Commission or the Executive Director.

iv.  Commission staff will monitor PG&E's compliance with its Corrective Action Plan based on, among other activities, increased inspections, quarterly reports, and, to the extent applicable, spot auditing of General Rate Case, Wildfire Expense Memorandum Account, Catastrophic Events Memorandum Account, or Pipeline Safety Enhancement Plans accounts in

3

I.19-09-016  ALJ/PVA/avs

> which approved investments in wildfire mitigation, electric or gas safety are auditable.

> v.  A representative of the SNO Subcommittee and the CRO shall appear quarterly before the Commission to report progress on the Corrective Action Plan and provide additional reporting as directed.

C.  Performance that Results in Exit from Step 2

> i.  PG&E shall exit from Step 2 upon issuance of a Commission Resolution finding that the company has met the conditions of its Step 2 Corrective Action Plan within the required timeframe. The Commission may move PG&E back to Step 1 of the Process rather than exit the process if it determines that PG&E has made sufficient progress in meeting its Step 2 Corrective Action Plan but continued enhanced reporting is needed.

> ii.  The Commission, by Resolution, will move PG&E to Step 3 if PG&E fails to adequately meet the conditions of its Corrective Action Plan and additional time in Step 2 is not likely to result in the effective implementation of its Corrective Action Plan.

## 2.  Enhanced Enforcement

Steps 3 through 6 of the Process implement increasing levels of operational oversight upon occurrence of certain triggering events.

### Step 3: Appointment of Independent Third-Party Monitor

A.  Triggering Events

> i.  PG&E fails to adequately meet the conditions of its Corrective Action Plan within the required timeframe, as provided in Step 2, Section C (ii); or

> ii.  PG&E fails to obtain or maintain its safety certificate as provided in AB 1054.

B.  Actions During Step 3

> i.  The Commission's Executive Director may appoint an independent third- party monitor (Monitor), or expand the authority of any Independent Safety Monitor previously appointed by the Commission, to oversee PG&E's operations and to work with senior management to develop and implement a Corrective Action Plan with reasonable timeframes to address the triggering event(s) as soon as practicable.

I.19-09-016  ALJ/PVA/avs

    ii.    The Monitor will provide active, external oversight of PG&E's implementation of its Corrective Action Plan.

    iii.    The Monitor will have the authority to hire third-party safety and utility operations experts to assist it with its oversight obligations.

    iv.    PG&E's senior management must work jointly with the Monitor to develop and implement a Corrective Action Plan including reasonable timeframes (which timeframes shall be acceptable to the Commission). The Corrective Action Plan shall be certified by the Monitor.

    v.    PG&E may request the Monitor to modify the Corrective Action Plan but must otherwise implement the plan as approved by the Monitor.

    vi.    The Monitor will provide quarterly reports to the Commission and to PG&E's board of directors on the progress towards implementing the Corrective Action Plan.

    vii.    The CRO and SNO Subcommittee will provide reporting to the Commission as required during this Step.

C.  Performance that Results in Exit from Step 3

    i.    PG&E shall exit from Step 3 upon issuance of a Commission Resolution finding that PG&E has met the conditions of its Step 3 Corrective Action Plan within the required timeframe. The Commission may determine that PG&E must remain in Step 1 or 2 for additional time after it confirms that PG&E has exited Step 3.

    ii.    The Commission, by Resolution, will move PG&E to Step 4 if any of the following occurs:

        a.    PG&E fails to implement the Corrective Action Plan within the timeframes required by the Monitor or the Commission's Executive Director.

        b.    The Commission determines that additional enforcement is necessary because of PG&E's systemic non-compliance or poor performance with its Safety and Operational Metrics over an extended period.

## Step 4: Appointment of a Chief Restructuring Officer

A.  Triggering Events

    i.    PG&E fails to adequately meet the conditions of its Corrective Action Plan within the required timeframe and additional time in Step 3 is not

I.19-09-016  ALJ/PVA/avs

likely to result in the effective implementation of its Corrective Action Plan, as provided in Step 3, Section C (ii)(a);

  ii.  Additional enforcement is necessary because of PG&E's systemic non-compliance or poor performance with its Safety and Operational Metrics over an extended period;

  iii.  The Commission determines through an Order to Show Cause, Order Instituting Investigation, or other appropriate process, that PG&E repeatedly violated its regulatory requirements, committed gross negligence, or committed a serious violation of the law, such that such conduct in the aggregate represents a threat to public health and safety;

  iv.  PG&E causes an electric or gas safety incident that results in the destruction of 1,000 or more dwellings or commercial structures and the Commission determines through an Order to Show Cause, Order Instituting Investigation, or other appropriate process, that such event results from the willful misconduct or repeated and serious violations of Commission rules, orders or regulatory requirements;

  v.  The Commission determines through an Order to Show Cause, Order Instituting Investigation, or other appropriate process that additional enforcement is necessary because the wildfire fund administrator has made a determination following a covered wildfire that PG&E is ineligible for the cap on reimbursement because its actions or inactions that resulted in a covered wildfire constituted conscious or willful disregard of the rights and safety of others; or

  vi.  PG&E failed to obtain or maintain its safety certificate as provided in AB 1054 for a period of three consecutive years.

B.  Actions During Step 4

  i.  The Commission will require that PG&E retain a chief restructuring officer from a list of qualified candidates identified by a third-party. The chief restructuring officer will have full management responsibility for developing and directing PG&E to implement the Corrective Action Plan with reasonable timeframes to address the triggering event(s) as soon as practicable.

  ii.  The chief restructuring officer will have the authority of an executive officer of PG&E and will report to the SNO Committee on all safety issues.

I.19-09-016  ALJ/PVA/avs

    iii.    PG&E's senior management must work jointly with the chief restructuring officer to develop and implement a Corrective Action Plan including reasonable timeframes (which timeframes shall be acceptable to the Commission).

    iv.    The chief restructuring officer will have all corporate authority that can be delegated to an officer under the California Corporations Code in order to ensure that PG&E can meet its Corrective Action Plan.

    v.    The Corrective Action Plan must be certified by the chief restructuring officer.

    vi.    PG&E must otherwise implement the Corrective Action Plan as certified by the chief restructuring officer.

    vii.    The chief restructuring officer will provide quarterly reports to the Commission and to PG&E's board of directors on the progress towards implementing the Corrective Action Plan.

    viii.    The Chief Restructuring Officer will remain in place during Steps 5 and 6, if triggered.

C.  Performance that Results in Exit from Step 4

    i.    PG&E shall exit from Step 4 upon issuance of a Commission Resolution finding that it met the conditions of its Step 4 Corrective Action Plan within the required timeframe. The Commission may determine that PG&E must remain in Steps 1, 2, or 3 for additional time after PG&E has exited Step 4.

    ii.    The Commission by Resolution will move PG&E to Step 5 if the Commission finds that PG&E failed to implement the Corrective Action Plan within the timeframes required by the chief restructuring officer or the Commission.

    iii.    PG&E may remain in Step 4 if the Commission determines that additional time appears needed to successfully address the triggering event(s).

I.19-09-016  ALJ/PVA/avs

### Step 5: Appointment of a Receiver

A.  Triggering Events

    i.    PG&E fails to implement its Step 4 Corrective Action Plan within the required timeframes, as provided in Step 4, Section C (ii).

B.  Process

    i.    The Commission will pursue the receivership remedy subject to then applicable law of the state of California. If PG&E becomes the subject of a subsequent chapter 11 case, PG&E will agree not to dispute the Commission's or state of California's authority to file a motion for the appointment of a chapter 11 trustee.

    ii.    The receiver, if appointed by the Superior Court, would be empowered to control and operate PG&E's business units in the public interest but not dispose of the operations, assets, business or PG&E stock.

C.  Performance that Results in Exit from Step 5

    i.    If the Commission by Resolution determines that PG&E has corrected all of the Step 5 triggering events and has remained in material compliance with Safety and Operational Metrics for a period of 18 months, the Commission may request termination of any receivership.

    ii.    At any time while the receiver is in place and to the extent permitted by then applicable law, the Commission can initiate a Step 6 enforcement action if a Step 6 triggering event has occurred.

    iii.    In the event that the Commission seeks, but is not successful in obtaining a receiver, or if the Step 5 triggering event occurs and California law does not allow for the appointment of a receiver, the Commission would determine whether PG&E shall remain in Step 4 or advance to Step 6.

### Step 6: Review of CPCN

A.  Triggering Events

    i.    A receiver appointed as set forth above has determined that continuation of Receiver Oversight will not result in restoration of safe and reliable service; provided that such receiver shall have been a place for a period of at least nine (9) months before making such a determination;

    ii.    A court of applicable jurisdiction has denied the Commission's request for a receiver made as set forth above or the Step 5 triggering event has occurred

8

I.19-09-016  ALJ/PVA/avs

and California law does not provide for the appointment of a receiver; or

iii.   PG&E fails adequately to address the Step 5 triggering event within 18 months of imposition of Step 5 and the Commission determines that additional time in Step 5 is unlikely to result in corrective action.

B.  Process

i.   The Commission will undertake this process subject to then applicable law of the state of California.

ii.   The CPUC will issue an Order to Show Cause or Order Instituting Investigation to initiate Step 6

iii.   As a result of the Order to Show Cause, the CPUC may place conditions on PG&E's CPCN or revoke PG&E's CPCN.

**(END OF APPENDIX A)**