JENNER & BLOCK LLP
    Reid J. Schar (*pro hac vice*)
    RSchar@jenner.com
    353 N. Clark Street
    Chicago, IL 60654-3456
Telephone: +1 312 222 9350
Facsimile: +1 312 527 0484

CLARENCE DYER & COHEN LLP
    Kate Dyer (Bar No. 171891)
    kdyer@clarencedyer.com
    899 Ellis Street
    San Francisco, CA 94109-7807
Telephone: +1 415 749 1800
Facsimile: +1 415 749 1694

CRAVATH, SWAINE & MOORE LLP
    Kevin J. Orsini (*pro hac vice*)
    korsini@cravath.com
    825 Eighth Avenue
    New York, NY 10019
Telephone: +1 212 474 1000
Facsimile: +1 212 474 3700

Attorneys for Defendant PACIFIC GAS AND ELECTRIC COMPANY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　　Plaintiff,<br><br>　　v.<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>　　　　　　　　　Defendant. | Case No. 14-CR-00175-WHA<br><br>**PG&E'S RESPONSE TO ORDER TO SHOW CAUSE WHY FURTHER CONDITIONS OF PROBATION SUGGESTED BY AMICI SHOULD NOT BE IMPOSED**<br><br>Judge: Hon. William Alsup |

1  Defendant Pacific Gas and Electric Company ("PG&E") respectfully submits this response to the Court's February 4, 2021 order to show cause why the conditions of probation relating to PG&E's information management and record-keeping suggested by Amici Alex Cannara and Gene A. Nelson should not be imposed.  (Dkt. 1293.)

PG&E shares the Court's and Amici's desire to design and implement solutions that reduce wildfire risk.  However, there is no evidence in the record that Amici's proposed conditions would further that goal.  Instead, we believe Amici's proposed conditions would distract from, and interfere with, ongoing efforts already being undertaken by PG&E to improve its record-keeping processes and drive down risk under the supervision of PG&E's regulators, the Federal Monitor and the California Governor's Office Operational Observer.

In fact, just last week, the CPUC informed the Court that it issued a draft resolution invoking the Enhanced Oversight and Enforcement Process of PG&E in light of PG&E's implementation of its 2020 enhanced vegetation management ("EVM") program in comparison to risk assessments.  (*See* Dkt. 1320.)  If the CPUC's resolution is adopted by the CPUC, PG&E will be required to submit a corrective action plan and then report to the CPUC on its progress every 90 days.  The CPUC's findings are consistent with concerns raised by the Federal Monitor.  (*See* Dkts. 1247-1, 1284.)  As PG&E previously told the Court, PG&E agrees that in making operational decisions, PG&E must give greater weight to working the riskiest areas first and must do so in a more rigorous, consistent and measurable way, and PG&E has already put in place specific processes to further emphasize risk ranking for EVM scheduling in 2021. (Dkt. 1258.)

Maintaining high-quality records and ensuring the efficient utilization of information to mitigate wildfire risk are among the highest of priorities for PG&E.  PG&E recognizes and acknowledges that its record-keeping in the past has fallen short.  PG&E has been working very hard in recent years to improve its records.  PG&E fully acknowledges its efforts to improve data management are not done, but, contrary to Amici's suggestions, there have been

very concrete improvements made and being made.  PG&E highlights some items of progress below.

*Asset Inspections.*  PG&E's data management regarding its asset inspections has improved over the last two years.  Prior to the Camp Fire, PG&E's records of its inspections of assets consisted of paper records filled out by inspectors during their inspections.  The records were typically exception based and did not include information about which specific components were checked by individual inspectors or the condition of those components.  Because the records were paper based, they carried no "metadata", such as whether the inspector was at the appropriate location.

Today, those asset inspection records in high-fire threat areas are digital and are more auditable and verifiable.  For example, if the Court has a question about an inspection of transmission tower in a high-fire threat area, PG&E can provide the all-digital inspection forms, as well as photographs of the tower (including the physical identification tags affixed to the tower), along with metadata showing the time and location when the inspector or drone took those photographs.  An electronic checklist guides the inspector to assess each of the components targeted by the inspection and check them off, and photos are required to document the condition of numerous components.  The inspection forms make it mandatory to fill certain fields and make extensive use of "drop down" menus to create consistent entries.

As the data from these efforts has accumulated, PG&E is seeking to leverage them.  For example, they are being used in PG&E's ongoing efforts to record or estimate the age of certain critical transmission components in high-fire threat areas.  PG&E has also created and is piloting the use of artificial intelligence programs to review and analyze inspection photographs to flag components of potential concern (such as worn c-hooks).

*PSPS*.  The data management advances made when it comes to PSPS are substantial.  PG&E had no PSPS program or infrastructure in 2017.  Now, it has a program that is informed by one of the largest collections of advanced weather stations fielded by a utility

anywhere in the world and is staffed from a new (2018) and upgraded (2019) hub for monitoring wildfire risks and coordinating prevention and response efforts.

The PSPS program uses advanced models to forecast weather across PG&E's service territory and recommend de-energization when weather conditions warrant it. These data management models are being improved over time. For example, the PG&E Operational Mesoscale Modeling System ("POMMS"), which produces weather forecast that serves as a foundation for PG&E's de-energization decisions, initially forecast weather only at a 3-kilometer resolution. But for the 2020 fire season, PG&E implemented a higher resolution 2-kilometer forecast that allowed PG&E to analyze data, forecast weather and implement de-energizations at a more granular level. The new 2-kilometer model was, after significant validation and testing, determined to lead to more accurate weather forecasts, and thus ultimately recommended by two independent groups of external experts and adopted by PG&E.

PG&E also updated its Outage Producing Winds ("OPW"), Utility Fire Potential Index ("Utility FPI") and Distribution Large Fire Probability ("$LFP_D$") models. As part of updating the $LFP_D$ model for 2020, PG&E analyzed the updated $LFP_D$ model against historical weather events, including those present during the most catastrophic and wind-driven fires in PG&E's service territory. The OPW model was updated in 2020 to incorporate into the model outage data from 2019 through February 2020. For 2021, PG&E is currently in the process of changing the Utility FPI model to use an improved, satellite-based fire-occurrence dataset and weather information.

A new website keeping customers informed of PSPS events is cloud-based and scalable, allowing the site to field massive surges in customer visits that crashed PG&E's old website in prior years. Once a scope for de-energization is decided, PG&E's data management systems translate the de-energization scope to the list of customers that need to be notified to prepare safely for the de-energization. Communicating across these distinct systems with the accuracy and speed necessitated by PSPS events was a significant data management challenge, one ultimately and successfully overcome with the help of a third-party's cutting-edge data

4
PG&E'S RESPONSE WHY CONDITIONS PROPOSED BY AMICI SHOULD NOT BE IMPOSED
Case No. 14-CR-00175-WHA

management platform—the Palantir Foundry platform.  Using that platform, this past year PG&E increased its notification rate to customers within the specified time frame to over 99%, an improvement from below 90% in 2019.

*Vegetation Management*.  PG&E has recently detailed for the Court its current data management systems used across its vegetation management programs.  (*See* Dkt. 1271.)

Initiatives are underway to continue to improve those data management systems and records.  These initiatives face unique challenges in the context of VM.  The objects of the work—trees—are very significant (many millions), are frequently located in areas without reliable cell phone coverage, and they are not PG&E's property.  The number of employees and contractors that need to access the various systems at any given time number in the thousands, and each individual tree worker is not necessarily or even typically adept with technology.  The programs that exist have developed at different times over the years, and have relied on differing technology and systems.

PG&E's immediate initiatives include changes relating to its Priority 1 and Priority 2 vegetation tags.  In part based on feedback from the Federal Monitor, PG&E intends to implement by the middle of the year a new application to all of PG&E's VM inspectors and work crews for identifying Priority 1 and Priority 2 work.  PG&E will require all Priority 1 and Priority 2 vegetation tags be entered into this single application.  The result is to enable PG&E to disseminate that information and use it for taking such trees into account during PSPS events as well as to ensure that such trees are timely remediated.

The company's most modern VM platform is the digital one used for EVM, which relies on a digital iOS-based app and the digital, in-app Tree Assessment Tool, which record information in a database.  The apps have certain mandatory fields that cannot be left blank and make extensive use of "drop down" menus to create consistent entries, and they track who makes changes to records and when.  In standing up that platform, PG&E faced numerous challenges, including as users interacted with an unfamiliar platform, which PG&E has been addressing with refinements to the programs.  As the Federal Monitor has noted, significant work

remains to be done, but improvement has occurred.  PG&E's goal in the mid-term is to transition all tree removal and trimming work into a similar, consolidated platform, one that leverages the learnings and iterations from standing up the digitized system for EVM.

*   *   *

Amici's proposed conditions are not informed by the wide-ranging work that is currently going on within PG&E.  PG&E's efforts have benefited from the detailed involvement and concrete suggestions of the Federal Monitor and the Operational Observer, but Amici do not offer that type of feedback.  Instead, Amici ask the Court to impose requirements that would bog down and distract from existing efforts by requiring finite time and attention to be devoted to procedural and bureaucratic steps, rather than ongoing efforts to drive down risk.

PG&E further explains why the specific conditions proposed by Amici should not be imposed, in addition to the reasons set forth above.

**Proposed Condition 13:**

PG&E shall hire a Chief Data Operations Officer within 90 days with responsibility over a sufficient staff or no fewer than 10 data operations, information management, record-keeping, engineering, and legal professionals with responsibility for reviewing PG&E's information management and record-keeping systems and their relationship to PG&E's operations including vegetation management work and PSPS, and to report to PG&E's CEO, the PG&E Board, the Monitor, parties to this action including Amici and this court within 180 days about recommended actions to improve PG&E's information and record-keeping management and the relationship between information management and analysis and action to operate safely.  PG&E shall fund and support this position as a long-term corporate strategy to identify and remediate deficiencies in PG&E's information management and record-keeping systems, including those of its contracts and subcontractors, and better use information and records to trigger and inform safe operation.

**PG&E Response:**

As PG&E indicated during the February 3, 2021 hearing, the information management and record-keeping issues that Amici raise fall under the purview of the company's Chief Risk Officer ("CRO"), who already reports directly to the CEO and the Board.  PG&E views data integrity as a fundamental risk issue, which is why prioritization of the relevant initiatives to advance information management are overseen by the CRO.  Amici have not worked with PG&E's CRO.  The Federal Monitor, which has, reported to the Court that "if you

were objectively coming in to pick someone to put into a space to handle profound issues, he would be a strong candidate". (Feb. 3, 2021 Hr. Tr. 47:8-9.)

Appointing a Chief Data Operations Officer and assigning an arbitrary number of direct reports to him or her, as Proposed Condition 13 requires, will not result in better data management during the term of PG&E's probation.  Amici have put forward no evidence that their proposal would improve any aspect of PG&E's operations, or that it would provide any greater assurance that PG&E would not violate state law.  Ordering these conditions would instead undercut ongoing efforts to improve PG&E's data management and record-keeping, and add additional layers of hierarchy.  The condition would require PG&E to hire a new executive to take over functions already being executed by existing teams, and would cause delay and disruption in PG&E's ongoing efforts as a search is conducted and an applicant is recruited, brought up to speed on existing conditions, and brought up to speed on feedback received to date from internal and external experts.

**Proposed Condition 14:**

PG&E shall immediately initiate steps to prevent data falsification or omission.  This includes, but is not limited to, issuing orders to its employees, contractors, and subcontractors and creating information management and record-keeping systems that prevent: a) the creation of false records such as by "scheduling" inspection or work in the past (a false records that makes it appear that work has been done); b) omission of input of information in data fields; c) omission of sufficient information to identify issues and follow-up needs.  PG&E shall report to the Monitor, the Court, parties including Amici, its CEO and Board within 60 days on steps it has initiated to prevent data falsification or omission.

**PG&E Response:**

PG&E has already initiated many steps to prevent data falsification and omission.  For example, after PG&E identified to the Court an instance where a contractor had prepared a false record—and PG&E had barred that contractor from working on any PG&E projects going forward—the Court suggested that PG&E stress to its contractors the seriousness of safely doing PG&E's work.  (Sept. 17, 2019 Hr. Tr. 31:13-32:8.)  PG&E subsequently did just that, issuing additional notices to its contractors emphasizing the importance of accurate record-keeping.

Similarly, PG&E's Employee Code of Conduct states that each and every employee is required to conduct himself or herself "in an honest and ethical manner in

accordance with our Culture, and comply with all laws, rules and regulations, and PG&E's policies, standards and procedures".[1]  The Code of Conduct emphasizes that "[d]ata management is a business-driven, enterprise-wide, shared responsibility" and that PG&E employees are "all responsible for managing PG&E records and information to verify they are complete, accurate, reliable, secure and available".  Employees are required to complete training on the Code of Conduct annually, and any violations of the Code of Conduct may lead to discipline or termination.

Further, as described above, PG&E has been working steadily over the past number of years to move records from paper-based systems toward all-digital systems that are more auditable and verifiable.

For example, PG&E has high-quality PSPS records and has used them to provide answers to detailed questions that the Court has posed about PSPS events in 2020 and to provide a voluminous amount of underlying data.  For asset inspections, as discussed above, the records are now all digital in high-fire threat areas and fundamentally improved from the records PG&E has generated in the past.  And PG&E has described to the Court, PG&E's steps to improve its VM record-keeping.  For example, PG&E implemented three updates to the Collector application for EVM in May 2019, September 2019 and March 2020.  These updates included incorporating drop-down menus in information fields to ensure standard terminology, requiring certain fields to be completed prior to submitting a record, preventing users from editing vegetation points and conductor segments that already passed work verification and requiring users operate the app on an iOS product (*i.e.*, an iPhone or iPad) for added stability.

With respect to the rescheduling of the 2019 CEMA patrol of the Zogg Mine Road area of Girvan 1101 on April 4, 2019 to Q1 2019 (February 15), which PG&E described in its November 18, 2020 submission to the Court, PG&E disagrees with the characterization that a "false record" was created.  (Dkt. 1265 at 30-32.)  This April 4 re-scheduling change made the

---

[1] PG&E's current Employee Code of Conduct is accessible here:  https://www.pgecorp.com/aboutus/pdfs/PGE-Employee-Code-of-Conduct-External-021721.pdf.

CEMA patrol register as overdue in PG&E's Project Management Database ("PMD") but was not marked as complete. In any event, PG&E has taken steps to increase the level of controls in the PMD by, among other things, limiting the number of individuals with access to alter the planned completion date of a patrol.

PG&E has also described how this year it is hiring approximately 200 additional work verification personnel to expand 100% work verification to routine VM and CEMA patrols in high-fire threat areas, in addition to EVM, to increase work quality, including by identifying any needed work not recorded by the primary inspector.

**Proposed Condition 15:**

PG&E shall within 90 days propose a plan to the Court, the Monitor, parties including Amici, the CEO, and the Board to use sensors, QR codes, or other markets that actively communicate information (collectively, Internet of Things (IoT) devices) to mark trees for removal and track the status of the tree removal process for vegetation management. This proposal shall plan deployment of IoT devices for vegetation management in Tier 2 and 3 High Wildfire Danger zones in lieu of using spray paint or other passive markets no later than 180 days after this order. The information from the IoT device shall be integrated into PGE&'s information management, record-keeping, and work system to track progress from identification of vegetation requiring additional work such as trimming, removal, or monitoring, to the follow-up work, and the consideration of the status of that work in the PSPS process and in PG&E's daily operations.

**PG&E Response:**

As detailed above, PG&E has dedicated a significant amount of resources to initiatives that seek to improve its VM and PSPS work processes. And PG&E has embraced new technology, including drones to capture high-definition imagery, advanced modeling to simulate fire risk, state-of-the-art software from Palantir and ground-based LiDAR to check conductor clearances. But Amici's proposed requirement that PG&E within 180 days use an undefined and unspecified Internet of Things ("IoT") device to mark trees identified for work is not grounded in experience nor feasible in the timeline set forth in the Proposed Condition.

While Amici assert that PG&E's use of spray paint to identify trees for removal is "decades out-of-date", Amici fail to point to one major utility that affixes IoT devices to trees scheduled for work as a general practice, nor is PG&E aware of one. More to the point, however, Amici's implication that spray painting is PG&E's sole means of identifying trees for removal is wrong. Subsequent work crews are provided with locational information to get in the

1  vicinity of the subject tree, and then spray paint and descriptors about the tree—such as its
2  species, height and width—identify the specific tree at issue.  This is a method that is used
3  widely in vegetation management in the industry.  PG&E contracts with several national or
4  regional vegetation management companies for its work crews and PG&E understands that these
5  are the same general practices that they use for other utilities.
6  　　　　　Rather than continue using industry-standard approaches, Amici mandate that
7  "IoT devices" be deployed for vegetation management in Tier 2 and 3 High Wildfire Danger
8  zones in lieu of using spray paint or other passive markers within 180 days.  This mandate is
9  ill-advised.  It would require a diversion of finite attention and resources to rush to meet this
10  mandate, one that is informed by no expert analysis and that fails to take into account realities on
11  the ground, such as the fact that large swaths of PG&E's service territory in high-fire threat areas
12  lack reliable data connectivity, all when there is no evidence that the current industry-standard
13  approach is not working.
14  　　　　　Amici offers no evidence that their vague solution is more effective than spray
15  paint at confirming, in combination with other descriptors, the specific tree at issue once a tree
16  crew arrives in the vicinity of the tree, or that a barcode is more likely to be seen by tree crews
17  than bright-colored spray paint.  To be clear, as part of PG&E's ongoing operational efforts,
18  PG&E has considered the use of new technologies (such as barcodes) on trees that are identified
19  for work and will continue to do so, independent of Amici's proposals.  But PG&E is not aware
20  of an existing application used by another major utility that could be readily adopted by PG&E.
21  The applications are therefore untested and the value is unproven in the context of vegetation
22  management.  PG&E would need to build the requisite program, infrastructure and training from
23  the ground up.  In order to meet the timelines set by Amici, PG&E would need to rush to validate
24  an untested product, then roll it out despite very limited time to conduct sufficient training,
25  optimization and testing, let alone integrate it into PG&E's existing databases.  The result is
26  likely to be errors by employees and contractors, ones that could have serious unintended
27  consequences.
28

PG&E'S RESPONSE WHY CONDITIONS PROPOSED BY AMICI SHOULD NOT BE IMPOSED
Case No. 14-CR-00175-WHA

PG&E has identified and implemented, and will continue to identify and implement, ways to utilize more technology in its operations. But Amici's mandate is not the right approach.

**Proposed Condition 16:**

PG&E shall immediately initiate consideration of the status of information management based on the records in its possession, including in the possession of its contractors or subcontractors, in PSPS and in daily operation. Within 90 days PG&E shall report to the Monitor, the Court, parties including Amici, its CEO and Board about its steps to improve its information management and recordkeeping process to improve information integrity, inform analysis, and inform and enhance daily operation including PSPS.

**PG&E Response:**

As the examples in this submission demonstrate, PG&E already considers information management and how to improve it in conjunction with its regulators, the Federal Monitor and other parties. Additional reports—beyond the ones regularly provided to the Federal Monitor—would only serve to divert and distract the team members who are working to reduce risk from their ongoing work.

*   *   *

PG&E is working to improve its information management and record-keeping practices for its wildfire prevention efforts. Amici's vague Proposed Conditions would hinder rather than advance these goals.[2] They should not be adopted.

---

[2] The Proposed Conditions are objectionable for several other reasons detailed in past filings. (*See, e.g.*, Dkt. 1279 at 3 n.2; Dkt. 1195 at 3-6; Dkt. 1187 at 12-17; Dkt. 976 at 13-50.) PG&E reserves all rights relating to such arguments.

Dated: March 3, 2021

Respectfully Submitted,

JENNER & BLOCK LLP

By: /s/ Reid J. Schar
Reid J. Schar (*pro hac vice*)

CRAVATH, SWAINE & MOORE LLP

By: /s/ Kevin J. Orsini
Kevin J. Orsini (*pro hac vice*)

CLARENCE DYER & COHEN LLP

By: /s/ Kate Dyer
Kate Dyer (Bar No. 171891)

Attorneys for Defendant PACIFIC GAS AND ELECTRIC COMPANY