JENNER & BLOCK LLP
Reid J. Schar (*pro hac vice*)
RSchar@jenner.com
353 N. Clark Street
Chicago, IL 60654-3456
Telephone: +1 312 222 9350
Facsimile: +1 312 527 0484

CLARENCE DYER & COHEN LLP
    Kate Dyer (Bar No. 171891)
    kdyer@clarencedyer.com
    899 Ellis Street
    San Francisco, CA 94109-7807
Telephone: +1 415 749 1800
Facsimile: +1 415 749 1694

CRAVATH, SWAINE & MOORE LLP
    Kevin J. Orsini (*pro hac vice*)
    korsini@cravath.com
    825 Eighth Avenue
    New York, NY 10019
Telephone: +1 212 474 1000
Facsimile: +1 212 474 3700

Attorneys for Defendant PACIFIC GAS AND ELECTRIC
COMPANY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 14-CR-00175-WHA |
| Plaintiff, | **RESPONSE TO QUESTIONS FOR FOLLOW-UP** |
| v. | Judge: Hon. William Alsup |
| PACIFIC GAS AND ELECTRIC COMPANY, | |
| Defendant. | |

Defendant Pacific Gas and Electric Company ("PG&E") respectfully submits this response to Questions 7 through 25 contained in the Court's February 18 and 22, 2021 orders. (Dkts. 1307, 1318.)

**Question 7:**

Regarding the four gray pines at the area of interest (see page 24 of the PG&E response dated December 16, 2020, to federal monitor), produce the following for the period September 2017 to the end of 2020:

a) All work orders and/or pre-inspection orders for the four gray pine trees marked for removal and one tree marked for trimming;

b) Pictures/videos from the same four gray pines and the immediate surrounding area;

c) Name of the person who marked trees and his/her employer;

d) LiDAR and photosynthesis data for all trees in area of interest, including subject tree; LiDAR data to include software model and system used; and

e) Any numbers assigned to the four gray pine trees in area of interest.

**PG&E Response:**

PG&E understands this Question as requesting information for all vegetation management work done on the above-mentioned trees between September 2017 and the start of the Zogg Fire on September 27, 2020.

On page 24 of PG&E's December 16, 2020 Response, PG&E referenced four trees marked for removal and one tree marked for trimming in the area of interest by Declarant A from CN Utility Consulting ("CNUC") during his routine vegetation management patrol in October 2018. (*See* Dkt. 1271 at 24 ("Specifically in the area of interest, during the routine patrol that occurred after the Carr Fire in October 2018, the arborist marked four trees for removal and one tree for trimming.  PG&E records indicate that this work was subsequently performed."); *see also* Dkt. 1300-1.)  Based on the records, two of those trees were Gray Pines, another was a Knobcone Pine and two others were Live Oaks.  PG&E is producing as Exhibit A the inspection records for those five trees as generated from PG&E's Vegetation Management Database ("VMD"), as well as the work requests subsequently issued to tree crew contractors.  As explained in its response to Question 25 below, PG&E does not believe that the Gray Pine identified for trimming in October 2018, but not removal, is the Gray Pine of interest.

The numerical identifiers assigned to these trees through the VMD as of Declarant A's 2018 routine vegetation management inspection are below[1]:

| Tree | Tree Record ID | External Tree ID |
|---|---|---|
| Gray Pine (trimmed) | -1082388642 | W122562360N40538678 |
| Gray Pine (removed) | -1082323527 | W122562035N40538680 |
| Knobcone Pine | -1082323526 | W122563538N40539350 |
| Live Oak | -1082323528 | W122562037N40538677 |
| Live Oak | -1082388158 | W122563670N40539322 |

PG&E has previously provided to the Court aerial photographs of the area of interest from July 2019, taken after the removal and trimming work was completed on the trees identified for work during the October 2018 routine patrol. (*See* Dkt. 1250 at 7.) PG&E has not identified other photographs or videos of the trees that were removed or trimmed in the area of interest as a result of the 2018 routine patrol.

In 2019, as part of a program to conduct aerial-based light detection and ranging ("LiDAR") surveys of vegetation near distribution circuits in high-fire threat areas, PG&E conducted LiDAR surveys of the area of interest through a vendor. PG&E understands that, to collect the LiDAR data, the vendor used helicopter-mounted sensor systems called Heliscope 2.5 and, to collect the data, the vendor used proprietary software to attempt to detect what data represents trees and parts thereof, as opposed to PG&E facilities or other objects, and to estimate tree location, height, canopy size and other information. In certain situations, such as when vegetation is dense, the software does not necessarily make accurate estimates, including identifying all vegetation, distinguishing between different tree canopies or accurately estimating where a tree trunk is relative to its top.

---

[1] PG&E notes that Tree Record ID -1082388158, identified as a Live Oak, is identified near where a Valley Oak was identified during the post-Carr Fire restoration work. (*See* Dkt. 1323-8, Exhibit H-7, "Tree Data" tab, row 3101.) The 2018 routine patrol inspection record states: "TREE WAS WORKED FOR FIRE BUT STILL POSSES [sic] A THREAT T [sic] LINES". Although the records identify different species of Oak, it appears possible that these records may refer to the same tree. PG&E's records indicate that the Live Oak identified on the routine patrol was subsequently worked as part of the tree work for the routine patrol. (*See* Exhibits A-1, A-5.)

PG&E uses the vendor's Sharper CORE software to review the LiDAR data, as well as to visualize the data points that the software identifies as trees. PG&E is providing to the Court as Exhibit B a ".kmz" file with data associated with the area of interest and certain other portions of the Girvan 1101 12 kV Distribution Circuit ("Girvan Circuit"), extracted from the PG&E ArcGIS database, where LiDAR data is compiled from the vendor's GeoDatabase.[2] Files in the ".kmz" format should be readily viewable in common mapping software such as Google Earth, but PG&E notes that, by exporting the data into a non-proprietary format, certain aspects of data analyzed by Sharper CORE are not available. The extract portrays geographic representations of data that Sharper CORE views as trees, as well as additional data associated with each tree point. For example, each tree point includes estimates of latitude and longitude, tree height, the horizontal offset of a tree point from the nearest line span, the shortest distance from a point on the tree canopy to the nearest wire and whether the tree is tall enough to strike the line if it were to fall.[3]

**Question 8:**

Produce an organizational chart for persons having authority over vegetation management of the Girvan Circuit as of the date of the period 2017 to and including 2020:

    a)  Organization chart identifying the names, titles, duties and periods when the positions were held for those responsible for vegetation management decisions related to the Girvan Circuit for the period 2017 to 2020; and

    b)  Name, duties, and periods when the position was held for the position of Director of Vegetation Management Execution during the post-Carr Fire restoration effort in 2018.

**PG&E Response:**

PG&E is producing at Exhibit C organizational charts that capture the Company's organization for the regional vegetation management office that covers the Girvan Circuit and that

---

[2] Because certain .kmz and Excel files referenced in this filing are not formatted for printing on regular-sized paper, PG&E filed slipsheets in lieu of such files and has provided such files on a thumb drive that PG&E has delivered to the Court.

[3] It is not clear to PG&E what the Court is referring to in terms of "photosynthesis data" to the extent that it is different from LiDAR data.

office's reporting structure within PG&E's vegetation management division as of December 31 of the years 2017, 2018, 2019 and 2020. These organizational charts are produced by PG&E's Human Resources Department in the ordinary course of business and are made available company-wide through PG&E's SharePoint. PG&E has not endeavored to produce other organizational charts that may show, for example, mid-year personnel changes.

PG&E is additionally producing organizational charts identified in emails that were sent to PG&E by Mountain G Enterprises, Inc. ("Mountain G"), a contractor involved in managing post-Carr Fire restoration work, at the outset of the post-Carr Fire restoration effort in late July 2018 as Exhibit C-5.1. These organizational charts appear to identify contractors and PG&E employees involved in the post-Carr Fire restoration effort as of late July 2018.

The position of Director of Vegetation Management Execution was created in July 2019. As a result, there was no Director of Vegetation Management Execution during the post-Carr Fire restoration effort. The vegetation management leadership positions that existed as of year-end 2018, and the persons who held them, are shown in the organizational chart for 2018 produced as Exhibit C-2. At that time, the duties of the Director of Vegetation Management Execution, as the position exists today, were principally the duties of the Director of Compliance Vegetation Management.

**Question 9:**

Produce all communications involved in the decisions to reschedule and cancel the 2019 CEMA patrol for the Girvan Circuit.

**PG&E Response:**

Attached to this submission as Exhibit D and Exhibit E are communications PG&E has identified as involving the decisions to reschedule and close the 2019 CEMA patrol for the portion of the Girvan Circuit that includes the Zogg Mine Road area (the "Zogg Mine Road route")[4]

---

[4] The Zogg Mine Road route refers to the patrol route that includes the portion of the Girvan Circuit that extends north from the intersection of South Fork Road and Archer Road and runs along Zogg Mine Road, as well as branches such as Jenny Bird Lane, Horse Canyon Way and Larry Horse

without a separate CEMA patrol having occurred.  PG&E conducted a search for responsive, nonprivileged documents by identifying eight custodians likely to have potentially responsive documents.  These custodians were individuals who were involved in the review of PG&E's Project Management Database ("PMD") that resulted in the 2019 CEMA patrol along the Zogg Mine Road route being rescheduled on April 4, 2019, as previously described to the Court (*see* Dkt. 1265 at 30-32), and PG&E employees and contractors who were responsible for conducting and overseeing the routine and CEMA patrols along the Zogg Mine Road route in 2019.  PG&E ran the following search terms against these custodians' documents:  Zogg, Girvan and 173686.[5]  Each of the custodians' documents dated between November 16, 2018 and May 31, 2019 that contained one or more of these search terms was reviewed for responsiveness.

After the Court issued its order, PG&E also contacted counsel for CNUC and ACRT Pacific ("ACRT"), the employers of certain of the eight custodians identified above during the relevant time period.  Records identified as responsive to this request by counsel for CNUC are attached to this submission as Exhibit F.  Counsel for ACRT informed PG&E that they had not located any materials responsive to this Question that were not already in PG&E's possession, but that their search for responsive records was ongoing.

In its prior submissions, PG&E described for the Court the circumstances as PG&E understood them surrounding the rescheduling and closure of the 2019 CEMA patrol for the Zogg Mine Road route.  (*See* Dkt. 1250 at 9; Dkt. 1260 at 5-9; Dkt. 1265 at 30-32.)  In collecting and reviewing documents following the Court's February 18, 2021 Order in order to respond to this Question, PG&E identified additional communications in which the PG&E Vegetation Management Program Manager ("VPM") responsible for the portion of PG&E's service territory that includes the

---

Lane.  The Zogg Mine Road route is depicted in index maps being submitted to the Court with this filing and submitted to the Court on November 3, 2020 as Exhibit A-1 to its Supplemental Response to Orders Regarding Zogg Fire. (*See* Dkt. 1260-1.)

[5] 173686 is the unique project ID in PG&E's PMD associated with the 2019 CEMA patrol along the Zogg Mine Road route.

Zogg Mine Road route was asked by CNUC personnel whether it was permissible for the pre-inspector, who was already scheduled to perform the routine patrol along the Zogg Mine Road route, to sign the index map for the CEMA patrol along the same route, and that the PG&E VPM responded that it was permissible to do so.  This correspondence is attached to this submission as Exhibit E.

> **Question 10:**
>
> Provide current contact information for Declarants A, B, and C and any other declarants supplied in response to these questions such that probation or other law enforcement officers may contact and interview them.

**PG&E Response:**

Contact information for the declarants who PG&E understands are not represented by counsel is attached as Exhibit G, which PG&E is filing under seal.[6]  PG&E is providing below contact information for counsel who PG&E understands represents certain declarants.

| Declarant | Contact Information |
|---|---|
| Declarant D | Law Office of Nick Zinkin<br>Nick Zinkin, nzinkin@nz-law.com<br>5 E River Park Place West, Suite 204<br>Fresno, CA 93720<br>Telephone: (559) 225-2200 x 109 |
| Declarant E | Ramsey & Ehrlich LLP<br>Miles Ehrlich, miles@ramsey-ehrlich.com<br>803 Hearst Avenue<br>Berkeley, CA 94710<br>Telephone: (510) 548-3600<br>Fax: (510) 291-3060 |
| Declarants G and H | The Sherron Law Firm, PC<br>Claudine Sherron, claudine@sherron-law.com<br>1101 Standiford Avenue, Suite B1 |

---

[6] Declarants A, B and C submitted declarations in connection with PG&E's February 12, 2021 Response to Request for Further Responses.  (Dkt. 1300.)  In addition to counsel for PG&E, the declarants who submitted declarations in response to the Court's February 18, 2021 Questions for Follow-Up include the CFVM QC inspector who marked the two Identified Gray Pines in August 2018 (Declarant D); the PG&E VM Manager (Declarant E); the PG&E Director of Vegetation Management Execution (Declarant F); and the two pre-inspectors who conducted a second patrol of the area of interest in September 2018 (Declarants G and H).

1
2
3
4
5
6

Modesto, CA 95350
Telephone: (209) 427-2200
Fax: (209) 250-0377

Bonnie J. Anderson, Inc.
Bonnie J. Anderson, bonnie@bjalaw.com
909 15th Street, Suite 7
Modesto, CA 95354
Telephone: (209) 509-4640
Fax: (209) 846-9394

7

8    **Question 11:**

9
10   Provide copies of *all* guidelines and instructions given by PG&E or its contractors to
     crews prior to the Zogg Fire regarding the factors to consider in marking trees for
     removal, including factors regarding species, height, lean, damage to tree, and
11   proximity to powerlines, and including any guidance concerning that part of
     Section 4293 that states "and trees or portions thereof that are leaning toward the line
12   which may contact the line from the side or may fall on the line shall be felled, cut or
     trimmed to remove such hazard."  Please include whatever guidance Declarants A
13   and B had on this subject.

14   **PG&E Response:**

15         Question 11, and numerous questions that follow below, reference PG&E

16   "powerlines".  PG&E understands the Court to be asking in these questions, based on the context of

17   the Court's questions, about PG&E's distribution powerlines, which are managed separately from its

18   transmission lines, and has answered accordingly.

19         PG&E is producing at Exhibit H copies of formal Electric Operations Vegetation

20   Management ("VM") guidance documents related to patrols of PG&E's distribution facilities in

21   effect as of the five years preceding September 27, 2020 and through September 27, 2020, as

22   published in PG&E's Technical Information Library ("TIL") and Electric Document Management

23   Archive ("EDMA").  This document set also includes related procedures, bulletins, and standards, in

24   effect as of the five years preceding September 27, 2020 and through September 27, 2020.  These

25   policies were accessible to PG&E contractors performing vegetation management patrols.  PG&E is

26   also producing at Exhibit I a current example of what CNUC foresters keep in their trucks while

27

28

doing patrols, which was provided by counsel for CNUC to PG&E.[7]  It is not a copy of what Declarant A or B would have had with them while performing the patrols described in their declarations.  As explained by counsel for CNUC to PG&E, the binders are regularly updated as new guidance issues from PG&E and it is not possible to recreate with certainty the binders as they existed during those patrols.

PG&E has also endeavored to identify other responsive documents concerning post-wildfire response work by inquiring with PG&E personnel responsible for vegetation management whether they are aware of any procedures relating to the post-wildfire response work and by running searches on documents collected regarding the post-Carr Fire response work.  Documents relating to post-wildfire response work identified as part of these inquiries are being produced at Exhibit J.

PG&E expects that additional records responsive to the Court's request exist, including in informal communications, guidance or other training materials.  PG&E has not been able to collect, review and produce all such documents in the time available to respond to the Court's questions.  Prior to the Zogg Fire, the area of interest was not subject to Enhanced Vegetation Management ("EVM"), and PG&E's response does not include guidelines and instructions relating to PG&E's EVM program.

**Question 12:**

At Docket No. 1012 (filed Feb. 6, 2019), Cal FIRE stated herein that Section 4293 (emphasis added):

> means that a tree, or portion thereof, that is leaning toward the line, must be "felled, cut or trimmed," regardless of its health, if it "may contact the line from the side or may fall on the line."  *Id.*
> Section 4293 requires utilities to identify and remove such hazards.

Cal FIRE went on to say that whether a tree or limb is a hazard "depends on the factual circumstances specific to that tree or limb." State under oath the full extent to

---

[7] PG&E has included in Exhibit I the binder provided by CNUC counsel.  PG&E noticed that there was a scanning error, requested a corrected copy of Exhibit I and will file a corrected copy of Exhibit I after PG&E receives such copy.

1    which PG&E has, since the Cal FIRE filing, disagreed with Cal FIRE's statement that
2    this must be done "regardless of its health."

3  **PG&E Response:**

4    In response to the Court's Question, a declaration is attached as Exhibit K.

5    **Question 13:**

6    In the summer of 2019, the Monitor observed that PG&E's pre-inspectors were not
     fully assessing the trunks of trees (page 20 of letter dated July 26, 2019, filed at
7    Docket No. 1089, Aug. 14, 2019).  Provide declarations identifying all PG&E
8    personnel who attended the Monitor's presentation on July 17, 2019, and stating
     what, if any, PG&E did in response to the Monitor's criticism.  Please attach all
9    relevant documents.  Provide declarations identifying all PG&E personnel who were
     aware that some pre-inspectors did not walk around the base of leaning trees to
10   inspect them for defects or damage.

11  **PG&E Response:**

12    In response to the Court's Question, a declaration is attached as Exhibit L.

13    **Question 14:**

14    Name any and all PG&E personnel or contractor personnel who walked around the
      Gray Pine in question to inspect it between the Carr and Zogg Fires and provide their
15    declarations as to what they did and saw.  Please append all relevant documents.

16  **PG&E Response:**

17    PG&E refers the Court to its February 12, 2021 submission (Dkt. 1300) and its

18  responses to Questions 2, 3 and 4 in its March 3, 2021 submission (Dkt. 1323 at 2-5, 8-10; *see also*

19  Dkt. 1323-2; Dkt. 1323-5; Dkt. 1323-6; Dkt. 1323-7).

20    **Question 15:**

21    Provide all communications from July 23, 2018, to October 13, 2020, regarding
22    vegetation management along the Girvan Line to or from Michael Lewis, Sumeet
      Singh, Deborah Powell, Ahmad Ababneh, Patrick Hogan, Kevin Dasso, or Barry
23    Anderson.

24  **PG&E Response:**

25    Attached to this submission as Exhibit M are communications PG&E has identified as

26  being responsive to this Question.  PG&E conducted a search for responsive, nonprivileged

27

28

RESPONSE TO QUESTIONS FOR FOLLOW-UP
Case No. 14-CR-00175-WHA

1   documents by running the following search terms against the documents of the custodians identified

2   by the Court:  "Zogg" and "Girvan".  Each of the custodians' documents dated between July 23,

3   2018 and October 13, 2020 that contained one or both of these search terms was reviewed for

4   responsiveness.

5            **Question 16:**

6            PG&E has stated (on November 18) that the Gray Pine of interest may have been
identified for removal (but not removed) during restoration efforts following the Carr

7            Fire in 2018, based "on certain records" recently reviewed by PG&E concerning that
restoration work. Please provide copies of those "certain records" and summarize

8            them in a cover sheet.

9   **PG&E Response:**

10           PG&E refers to its March 3, 2021 submission (Dkt. 1323), including Exhibit H of that

11  submission, which attaches records responsive to the Court's request.  Exhibit H of the March 3

12  submission includes records generated by the CFVM QC inspector regarding his determination to

13  identify the two Gray Pines, including emails about his inspection results, a work order dated August

14  25, 2018 that lists the two Identified Gray Pines, and versions of a document titled "Carr Fire Daily

15  Report", which PG&E understands to contain data from Mountain G's ArcGIS database, including

16  data concerning the two Identified Gray Pines.  (*See, e.g.*, Dkt. 1323-8, Exhibit H-7, "Tree Data" tab,

17  rows 12158, 12159.)

18           **Question 17:**

19           PG&E's counsel, at the February 3, 2021, hearing, responded to the issue raised by
*Amici* about backdating the inspection.  Counsel stated "there was an error" that was

20           "sort of [an] illogical application of logic by a data entry analyst, who fully expected
that . . . what that would do is trigger an alert that said you have to go out now and do

21           an inspection.  And, in fact, that's what happened, an inspection was done.  Now,
ultimately, they didn't do a second one six months later . . . "  (Document No. 1292,

22           56:19–57:10).  Please provide the *names* of the data entry analyst and the information

23           PG&E counsel relied upon when he made that representation to the Court.

24   **PG&E Response:**

25           PG&E counsel's comments during the February 3, 2021 hearing quoted by the Court

26  were referring to the April 4, 2019 scheduling change made to the 2019 CEMA patrol along the

27

28

Zogg Mine Road route (the "April 4 Scheduling Change"). PG&E detailed its understanding of the April 4 Scheduling Change and the subsequent patrol history along the Zogg Mine Road route in submissions to the Court that were submitted prior to the hearing. (*See* Dkt. 1250 at 9; Dkt. 1260 at 3; Dkt. 1265 at 27, 29; Dkt. 1300 at 3.)

The name of the database management specialist who PG&E understands coordinated the PMD Review and the name of the database management specialist who made the April 4 Scheduling Change are being filed under seal as Exhibit N to this submission.

In addition to interviews of those database management specialists conducted by PG&E's counsel team, PG&E's understanding of the April 4 Scheduling Change as set forth in Dkt. 1265 at 30-32 was informed by the documents and records that are attached to this submission at Exhibit D and Exhibit O. Among those documents, PG&E highlights Exhibit D-19 through Exhibit D-29, which are weekly reports generated after the April 4 Scheduling Change from PMD, the database used to track completion of patrols and tree-trimming work for PG&E's routine and CEMA vegetation management programs. These reports show that the April 4 Scheduling Change made the 2019 CEMA patrol along the Zogg Mine Road route appear as "overdue", but PMD showed that this patrol had not yet occurred. As also shown in these reports, PMD has data fields for the "planned" dates of a patrol, the "forecasted" dates of a patrol, and the "actual" dates of a patrol, which are populated once the patrol begins and ends. The April 4 Scheduling Change resulted in the "planned" and "forecasted" dates for the 2019 CEMA patrol along the Zogg Mine Road route being set to dates that had already passed, but the fields for the "actual" dates of the project were not affected by the April 4 Scheduling Change.

**Question 18:**

Has PG&E created and now implemented a system which flags, prevents, or creates an alarm when a person schedules or reschedules an event in the past? Does the alarm flag the change of the record as opposed to flagging that the event (such as an inspection) is overdue?

1    **PG&E Response:**

2              As discussed above, as a result of the April 4 Scheduling Change made in PMD, the

3    2019 CEMA patrol along the Zogg Mine Road route appeared in PMD as overdue and not yet

4    completed.

5              PG&E's PMD did not at that time, nor does it now, flag, prevent or create an alarm

6    when a person updates or attempts to update one of its data fields that relates to a specific date with a

7    date that is in the past.  PMD does generate change logs that track when changes to data fields are

8    made and by whom they are made.  PG&E notes that certain fields that refer to dates are intended to

9    be populated with dates in the past.  In particular, the data fields reflecting the dates when

10   inspections begin and end are designed to be updated with dates in the past because those dates are

11   put into PMD by database management specialists only after inspectors or tree crews confirm work

12   has begun and/or been completed.

13             As stated in its prior submission to the Court in response to Amici's proposed

14   modified conditions of probation, PG&E has taken steps to increase the level of controls in PMD by,

15   among other things, limiting the number of individuals with access to alter the "planned" completion

16   date of a patrol.  (Dkt. 1322 at 9.)  PG&E's vegetation management team has also recently begun

17   conducting a number of monthly audits of PMD to identify potential discrepancies, including

18   identifying "forecasted" patrol dates that are inconsistent with "actual" patrol dates, identifying any

19   routine and CEMA projects where the "forecasted" or "actual" patrol dates are within four months or

20   greater than eight months apart from one another, and identifying any CEMA patrols with no tree-

21   trimming work prescribed where the comments fail to affirmatively indicate that the patrol was

22   performed.

23             **Question 19:**

24             Do PG&E or contractor records indicate the Gray Pine of interest was spray painted
          to mark it for removal or work?  Was any other record or signal created to indicate
25        Gray Pine of interest required subsequent work?

26

27

28

1    **PG&E Response:**

2              For the reasons stated in PG&E's prior submissions, PG&E does not know for a fact

3    whether the Gray Pine of interest was marked for removal.  PG&E refers to its response to

4    Question 6 in its December 16, 2020 submission to the Court regarding whether PG&E or

5    CAL FIRE have observed any spray paint on the Gray Pine of interest following the Zogg Fire.

6    (Dkt. 1271 at 19.)

7              The two Identified Gray Pines with locations near the Gray Pine of interest were

8    identified by Declarant B, whose declaration is attached to PG&E's March 3, 2021 Response to

9    Questions for Follow-Up.  (Dkt. 1323-2 ¶¶ 8-9.)  In his declaration, Declarant B explained that his

10   practice for identifying a tree was to place a flag around the tree and spray paint on the tree.

11   (*Id.* ¶ 6.)

12             **Question 20:**

13             According to PG&E's 2021 wildfire mitigation plan, PG&E began using its tree
14   assessment tool ("TAT") in March 2020 as part of its Enhanced Vegetation
     Management patrols to assess all trees that have the potential to strike its power lines.
15   Are all trees assessed with the TAT documented regardless of the outcome (*i.e.*, is a
     record of the result of the TAT created even if no work was needed)?  Does PG&E
16   currently use (or plan in the near future to use) its TAT during routine vegetation
     management patrols or CEMA patrols?  If the Gray Pine that is suspected to have
17   caused the Zogg Fire still stood, would it have been assessed with the TAT in 2021?
     If not, can PG&E estimate when it would have been assessed with the TAT?
18

19   **PG&E Response:**

20             PG&E began using the TAT in March 2020 as part of its EVM program to assess all

21   trees with the potential to strike in-scope distribution lines.  A pre-inspector conducting EVM work

22   is required to use the TAT for all trees that could strike the relevant distribution line, and the result

23   of the assessment is documented regardless of whether the conclusion is that the tree should be

24   abated.  Part of the purpose of the TAT is to identify trees that present elevated risk, regardless of

25   whether state law requires PG&E to remove the tree.

26

27

28

1  Pre-inspectors conducting routine vegetation management and CEMA patrols are not

2  required to use the TAT during such patrols, and PG&E does not currently have plans to require

3  such use in the near future.

4  If the Gray Pine that is suspected to have caused the Zogg Fire still stood, PG&E does

5  not expect an assessment of it using TAT would be required in 2021 because that portion of the

6  Girvan Circuit is not expected to be in EVM scope in 2021.  Because the eligibility of a given line

7  segment for EVM is determined on a year-by-year basis based on the most up-to-date risk model,

8  PG&E does not currently have a reliable estimate for when PG&E would subject the Zogg Mine

9  Road area to EVM.  PG&E notes that it recently made a proposal to the Court regarding PSPS that,

10  if adopted, PG&E anticipates would lead to the de-energization of the Girvan Circuit if the fire

11  conditions that prevailed in the run-up to the Zogg Fire were to occur in 2021.  (Dkt. 1310.)

12  **Question 21:**

13  For the 2021 fire season, has PG&E made any changes to the processes it uses to
   identify dead, diseased, or dying trees with the potential to strike power lines during

14  *routine* vegetation management patrols?  For the 2021 fire season, has PG&E made

15  any changes to the substantive standards it uses to determine whether a tree should be
   worked or removed because it is a dead, diseased, or dying tree, with the potential to

16  strike a power line?  If so, identify the changes.

17  **PG&E Response:**

18  PG&E has made several changes to the processes it uses to identify dead, dying or

19  diseased trees with the potential to strike distribution lines during routine vegetation management

20  patrols for the 2021 fire season.  As detailed in PG&E's prior filings, PG&E is hiring approximately

21  200 additional work verification personnel to subject routine VM patrols in HFTD areas to 100%

22  work verification.  (Dkt. 1322 at 9.)  Work verification will, among other things, help identify

23  needed work not recorded by the primary inspector, such as the removal of hazard trees.  (*Id.*)  This

24  year, PG&E has also stood up its Vegetation Management Inspector ("VMI") Program, as it has

25  previously committed to the Court.  In addition to PG&E-employed supervisors and management,

26  PG&E intends to have 95 VMIs (including 30 employed by PG&E) in the field by the end of 2021.

27

28

(Dkt. 1310 at 3.)  A maigotn area of focus for the VMIs will include spending time accompanying routine vegetation management inspectors in the field during their patrols, providing in-the-field coaching and oversight of their work.  Over time, PG&E expects that this significant investment in coaching routine inspectors will result in higher-quality, more consistent routine vegetation management patrols.

In addition, PG&E will roll out during the course of 2021 the use of vehicle-based LiDAR technology as yet a further check on the quality of its routine vegetation management patrols.  (Dkt. 1310 at 4.)  Specifically, vehicle-based LiDAR scans following a routine inspection and its associated tree work will help objectively confirm in areas accessible by road that the required clearance around the conductors has been achieved.  Following pilot testing in 2019 and 2020, PG&E is in the process of hiring a contractor to use this technology more broadly in 2021 across HFTD areas that are accessible by road.

These recent improvements—200 additional work verification inspectors to provide 100% work verification; 95 new VMI program inspectors that will provide in-field coaching of inspectors; and ground-based LiDAR scanning—represent the focus on continual improvement designed to increase the quality of PG&E's routine vegetation management patrols.  (Dkt. 1310 at 4.)

For the 2021 fire season, PG&E has not made any changes to the substantive standards it uses to determine whether a tree should be worked or removed because it is a dead, diseased or dying tree, with the potential to strike a power line.[8]  PG&E notes that in its March 4, 2021 submission, PG&E stated that it has no objection to the Court's proposed condition requiring PG&E to confirm to its vegetation management personnel that healthy trees may be hazard trees and to ensure that its vegetation management personnel are provided with and instructed to follow the guidance available from CAL FIRE for applying section 4293.  (Dkt. 1330 at 2.)

---

[8] PG&E notes that in August 2020, PG&E created a reference document relating to assessing Redwood, Live Oak, Tanoak and Douglas Fir trees with wildfire damage, which is attached as Exhibit J-7.

**Question 22:**

Has PG&E analyzed whether there are circumstances in which trees that have the potential to strike power lines should be worked or removed, even though they are healthy and not in violation of minimum clearances required by California Public Resources Code Section 4293, California Public Utilities Commission General Order 95, and Federal Energy Regulatory Commission FAC-003-4?  If so, what conclusions did PG&E reach?  Has this issue been the subject of any regulatory process or analysis?

**PG&E Response:**

Yes, PG&E has analyzed whether there are circumstances in which trees that have the potential to strike its distribution lines should be worked or removed, even though they are healthy and not in violation of minimum clearances required by California Public Resources Code Section 4293, California Public Utilities Commission General Order 95, and Federal Energy Regulatory Commission FAC-003-4.

As noted above, the EVM program was originally designed to identify for removal all potential strike trees from the top 10 risk species, as determined by PG&E analyses of the tree species that were responsible for causing vegetation-related ignitions.  In reviewing five years of data, PG&E identified 10 species of trees—Black Oak, Gray Pine, Tanoak, Coast Live Oak, Live Oak, Ponderosa Pine, Eucalyptus/Blue Gum, Douglas Fir, Valley Oak and Monterey Pine—that were responsible for nearly 75 percent of incidents in Tier 2 and Tier 3 HFTDs.  As part of the original EVM scope, PG&E intended to go beyond what is required by state law to abate trees from these 10 species that were tall enough to strike distribution lines, had a clear path to strike, and exhibited leaning or weighting toward the line.

As the Court is aware, the EVM program is analyzed as part of the regulatory processes surrounding PG&E's annual Wildfire Mitigation Plans.  During the review process for PG&E's 2019 Wildfire Mitigation Plan ("WMP"), "some parties asserted that PG&E's EVM may target significantly more trees than necessary, given the consequences of widespread tree removal. For example, trees provide support for other trees, reduce carbon, and provide other important

1   ecological benefits which may be lost due to aggressive tree removal."  *See* CPUC's May 30, 2019

2   Decision on PG&E's 2019 WMP Pursuant to Senate Bill 901 ("2019 WMP Decision").  The 2019

3   WMP Decision stated "PG&E should only remove healthy trees if the utility has evidence that those

4   trees pose a risk to utility electric facilities under wildfire ignition conditions, based on the opinion

5   of a certified arborist."  (*Id.* at 24.)

6           In response to the CPUC's direction in the 2019 WMP Decision, PG&E developed its

7   TAT.  The tool was developed by a team of ISA Certified Utility Arborists and is informed by

8   PG&E data regarding regional vegetation-caused contact with PG&E's overhead electric distribution

9   lines.  As described above, that tool is now used by pre-inspectors on every tree within the scope of

10   EVM that has the potential to strike PG&E's distribution lines if it were to fall.  Among other things,

11   any tree with strike potential that is determined to lean more than 25 degrees is designated for

12   abatement, regardless of the health or tree species.  This risk-mitigation measure goes well beyond

13   the requirements of, *inter alia*, section 4293.

14           Based on PG&E data regarding regional vegetation-caused outages and ignitions,

15   PG&E also recently evaluated whether certain species should be targeted on an accelerated basis

16   around distribution lines in high-fire threat areas on a "bright-line" basis, regardless of their health,

17   as an additional step.  That resulted in the new proposal set forth in PG&E's March 4, 2021

18   submission to the Court regarding Gray Pines and Tanoaks in particular regions.  (Dkt. 1330.)  This

19   proposal was based on PG&E data that showed that these particular species may present higher risk

20   of falling into the line in these particular regions.  This proposal has not yet been subject to any

21   regulatory process, but CAL FIRE and the CPUC have stated to the Court that their position is that it

22   should not be implemented as a probation condition at this time.  (*See* Dkt. 1335.)

23           Previous PG&E vegetation management programs have sought to abate vegetation

24   beyond what is required by state law, including the Fuel Reduction program, the Accelerated

25   Wildfire Risk Reduction Program, and the Public Safety & Reliability program, and would have

26   been underpinned by analyses, including analyses of ignition or outage data.  Other analyses may

27   have also been conducted in the past that would be responsive to the Court's Question.  To provide

28

1   more information on such potential analyses, PG&E would need additional time to investigate and

2   respond.

3                    **Question 23:**

4                    Does PG&E, in its view, have the authority to remove potential strike trees other than

5                    those that are dead, diseased, dying, or identified by PG&E's TAT as "abate"?

6   **PG&E Response:**

7                    In PG&E's view, it is required to remove a potential strike tree that it concludes is a

8   hazard under state law even if that tree is not dead, diseased, dying or identified by PG&E's TAT as

9   "abate".

10                   **Question 24:**

11                   Has PG&E analyzed whether all trees that have the potential to strike its power lines

12                   should be documented for PSPS purposes (or other purposes) regardless of their

13                   health and/or whether they need to be worked? If so, what conclusions did PG&E

                     reach? Has this been the subject of any regulatory process or analysis?

14  **PG&E Response:**

15                   Yes, PG&E has analyzed whether all trees that have the potential to strike its

16  distribution lines should be documented for PSPS purposes (or other purposes) regardless of their

17  health and/or whether they need to be worked.  PG&E has been recently working on implementing

18  the Court's Proposed Conditions 11 and 12 to more expressly account in PSPS scoping for "the

19  approximate number of trees tall enough to fall on the line irrespective of the health of the tree and

20  irrespective of whether the tree stands outside or inside prescribed clearances".  To do so, one of the

21  things PG&E intends to leverage is remote sensing capabilities, including LiDAR technology, which

22  uses pulsed laser light to generate digital 3-D object maps.  PG&E's current intent is to use the tree

23  detection algorithm described above to provide estimates of the number of trees with the potential to

24  strike PG&E's lines, without regard to the health characteristics of the tree or whether it needs to be

25  worked.  As discussed above, the detections are not necessarily accurate at the individual tree level,

26  and trees are living, dynamic organisms.  But the algorithm can be used to generate relative

27

28

RESPONSE TO QUESTIONS FOR FOLLOW-UP
Case No. 14-CR-00175-WHA

estimates of the distribution line's potential tree-strike exposure, which can then in turn be used to scope distribution circuits with high vegetation exposure for potential de-energization.  This specific proposal is still being developed and has not yet been the subject of a regulatory process.

Further, as discussed elsewhere in this submission, for purposes of EVM, PG&E's current program scope calls for inspectors to assess every tree with strike potential with the TAT that is on the inspector's smartphone or tablet, which creates a digital record.  The EVM program as a whole has been the subject of the regulatory processes surrounding PG&E's Wildfire Mitigation Plans.

Further, one PG&E employee queried about the Court's Question recalled informal consideration in or around 2018 of whether to document trees that were not identified for abatement during PG&E's annual routine vegetation management patrols.  The employee also recalled that PG&E inquired with two other major California utility companies as to whether they documented trees during routine patrols that did not require abatement.  The employee recalled that PG&E learned through this "benchmarking" that those utilities did not document such trees.  The employee recalled that the employees considering this proposal did not conclude that the proposal merited more formal analysis.

To identify other potential examples of when PG&E employees may have performed analysis responsive to the Court's Question in the past, PG&E would need additional time to investigate and respond.

**Question 25:**

In PG&E's response at Dkt. No. 1300-1, Exhibit 1, the forester attaches a report from the October 2018 routine inspection of the "area of interest."  PG&E shall please translate the meaning of the codes used in the fields of this report (including the contents of Comments, Notification, Work Request, and Trim Type fields, *e.g.* ".3 & .4S/W/O P59").  It shall also state if, when the "WC Date" field is updated, that entry causes a change to the "Last Edit" field.  Is Tree Number 5 the Gray Pine of interest? Is Tree Number 4?  Was Tree 5 inspected on June 25, 2012?  If so, provide all information and records of that inspection.

1  **PG&E Response:**

2           PG&E does not believe that either Tree Number 4 or Tree Number 5 refers to the

3  Gray Pine of interest because, based on the tree location comments provided at Dkt. 1300-1,

4  Exhibit 1, Tree Numbers 4 and 5 are identified as being approximately one-half span to the east of

5  the location of the Gray Pine of interest.

6           Based on a review of its records, PG&E understands that Tree Number 5 was

7  inspected on June 25, 2012, but was not listed for work.  The 2012 VMD inspection record

8  containing Tree Number 5, attached as Exhibit P-1, shows the "Priority" field for Tree Number 5 as

9  "No Trim" and the "Notification" field as "Inventory", indicating that no tree work was prescribed

10  by the pre-inspector.[9]  Further, the 2012 work request for Tree Number 5, attached as Exhibit P-2,

11  shows Tree Number 5 listed as a "Reference Tree" and does not show it invoiced for work.[10]

12           PG&E is providing below its understanding of the descriptions of the fields and codes

13  used in the inspection record extracted from PG&E's VMD and appended by Declarant A as

14  Exhibit 1 to his declaration submitted with PG&E's February 12 filing.  (Dkt. 1300-1.)  These

15  descriptions are derived based on input from a subject matter expert at PG&E.  The changes to the

16  "WC Date" do not cause the "Last Edit" field to change, as "WC Date" information is populated

17  from a separate repository and does not reflect an "edit" to the inspection record.

18

19

20

21

22

23

24

─────────────────

25           [9] Tree Number 5 is listed as Tree Number 4 in the 2012 inspection record.  PG&E understands
that the sort order of a tree within a VMD inspection record can change over time based on the

26  addition or subtraction of new trees.

27           [10] Tree Number 5 is listed on row 189 of the work request.

28

| Inspection Record Fields | |
|---|---|
| **Field** | **Description** |
| Address | Address where inspection occurred. |
| City | City where inspection occurred. |
| County | County where inspection occurred. |
| Directions | Directions to address. |
| Division | Name of PG&E VM division. |
| Circuit | Name of circuit. |
| SSD # | Number of the nearest source side device. |
| SSD Rte # | Source side device inspection route number. |
| Routing # | Routing number. |
| Area | Area number. |
| SRA | Indicates whether the inspection occurred in a State Responsibility Area. |
| Alerts | Safety and customer-related notifications for work crew: <ul><li>AX:  Access;</li><li>NF:  Notify first; and</li><li>PI:  Pre-inspector notify first.</li></ul> |
| Insp Date/Time | Date and time of inspection of location. |
| Quad Map | Quad Map (Plat Map) number. |
| Removal # | Removal form number (form documents customer's permission for tree crew to perform tree work). |
| Comment | Comments left by pre-inspector. |
| Customer Name/Phone | The name and/or phone number of the customer. |
| Audit | Hyperlink to log showing history of data changes to location record. |
| Last Edit | Last time location record edited. |

| Tree Record Fields | |
|---|---|
| **Field** | **Description** |
| Tree Species | Species of the tree. |
| Crew | Type of crew recommended by pre-inspector. <ul><li>CA:  Climb crew, dump truck with tools, tree chipper.</li></ul> |
| Priority | Indicates priority of assigned tree work. <ul><li>Routine:  Can be completed during routine cycle.</li><li>No Trim:  No work required.</li></ul> |
| TGR | Whether Tree Growth Regulator used. |
| Owned By | Owner of land where tree is located. <ul><li>Private:  Tree is on private land.</li></ul> |
| Height | Height of the tree, in feet. |
| DBH | Diameter of tree trunk at breast height, in inches. |
| Clearance | Clearance between tree and conductor required at time of trim, in feet. |
| Prox | Proximity, *i.e.*, whether tree work is inside or outside 10 feet from the conductors: |

| Tree Record Fields | |
|---|---|
| **Field** | **Description** |
| | • Inside:  Tree work is within 10 feet of conductors; and<br>• Outside:  Tree work is more than 10 feet from conductors. |
| Cycle | Work cycle for the tree:<br>• Rtn (Routine):  Inspection was conducted for routine vegetation management program (annual cycle). |
| Qty | Quantity of trees for tree record. |
| Trim Type | Type of tree work prescribed by pre-inspector:<br>• FS-R1A+Trt:  Facility Protect Removal R1 (Class A) – Treat;<br>• FP-Rmv1 A:  Facility Protect Removal R1 (Class A) – No Treat;<br>• Slope:  Prune in a slope pattern;<br>• FP-Ov. A:  Facility Protect Overhang (prune overhanging branches) (Class A); and<br>• Side:  Prune side branches. |
| Account | Account or activity type:<br>• M:  Maintenance (*i.e.*, routine annual maintenance). |
| Insp Date | Records last time pre-inspector manually saved results of inspection. Field includes inspector LAN ID. |
| Comment | Comments on location or condition of tree or work required:<br>• S:  Spans, measured in tenths of a span (*e.g.*, .3S is "three-tenths of a span");<br>• W/O:  "West of"; and<br>• P:  Pole number (*e.g.*, P59 is "Pole 59"). |
| Notification | Indicates whether prescribed tree work can proceed:<br>• OK:  Indicates no issues interfering with completion of work. |
| Work Request | Work request ID number. |
| WC Date | Date when work crew worked the tree. |
| WC Qty | Number of trees worked by work crew. |
| WC Trim | Trim code for work done by work crew:<br>• F1D:  Facility Protect Removal R1 (Class B) – Treat;<br>• F1B:  Facility Protect Removal R1 (Class B) – No Treat;<br>• SL:  Prune in a slope pattern;<br>• FOA:  Facility Protect Overhang (prune overhanging branches) (Class A); and<br>• SD:  Prune side branches. |
| Completed By | Name of crew foreman or tree crew company who completed tree work. |
| Invoice | Status of invoice:<br>• XX (104):  Nonbillable through PG&E's automated billing system; Invoiced successfully; and<br>• TR (104):  Tree trim work invoiced successfully. |
| Lat/Long | Latitude and longitude coordinates of tree. |
| External Tree ID | Additional location ID. |

| Tree Record Fields | |
|---|---|
| **Field** | **Description** |
| Audit | Hyperlink to log showing history of data changes to tree record. |
| Last Edit | Last time tree record edited. |

1   Dated:  March 12, 2021                          Respectfully Submitted,

2                                                   JENNER & BLOCK LLP

3

4                                                   By:  ___/s/ Reid J. Schar_____
                                                        Reid J. Schar (*pro hac vice*)
5

6                                                   CRAVATH, SWAINE & MOORE LLP

7
                                                    By:  ___/s/ Kevin J. Orsini_____
8                                                        Kevin J. Orsini (*pro hac vice*)

9                                                   CLARENCE DYER & COHEN LLP

10

11                                                  By:  ___/s/ Kate Dyer_____
                                                        Kate Dyer (Bar No. 171891)
12

13                                                  Attorneys for Defendant PACIFIC GAS AND
                                                    ELECTRIC COMPANY
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28