JENNER & BLOCK LLP
    Reid J. Schar (*pro hac vice*)
    RSchar@jenner.com
    353 N. Clark Street
    Chicago, IL 60654-3456
Telephone: +1 312 222 9350
Facsimile: +1 312 527 0484

CLARENCE DYER & COHEN LLP
    Kate Dyer (Bar No. 171891)
    kdyer@clarencedyer.com
    899 Ellis Street
    San Francisco, CA 94109-7807
Telephone: +1 415 749 1800
Facsimile: +1 415 749 1694

CRAVATH, SWAINE & MOORE LLP
    Kevin J. Orsini (*pro hac vice*)
    korsini@cravath.com
    825 Eighth Avenue
    New York, NY 10019
Telephone: +1 212 474 1000
Facsimile: +1 212 474 3700

Attorneys for Defendant PACIFIC GAS AND ELECTRIC COMPANY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>    v.<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>                Defendant. | Case No. 14-CR-00175-WHA<br><br>**PG&E'S RESPONSE TO POST-HEARING ADDITIONAL REQUEST FOR RESPONSES**<br><br>Judge: Hon. William Alsup |

Defendant Pacific Gas and Electric Company ("PG&E") respectfully submits this response following the March 23, 2021 hearing and the Court's Post-Hearing Additional Request for Responses (the "Post-Hearing Request") (Dkt. 1364). In Section I, PG&E provides the Court with language for Proposed Conditions 11 and 12, as requested in the Post-Hearing Request. In Section II, PG&E describes its efforts to mitigate the customer and community impacts of PSPS. In Section III, PG&E responds to requests made by the Court during the March 23, 2021 hearing.

**I.  Proposed Conditions 11 and 12 with Consideration of Tree-Overstrike Exposure**

In response to the Court's request for a re-write of Proposed Conditions 11 and 12 that incorporates consideration of tree-overstrike exposure, PG&E respectfully sets forth the following language for Proposed Conditions 11 and 12:

Proposed Condition 11

In determining which distribution lines in Tier 2 or Tier 3 to de-energize during a PSPS, PG&E must take into account all information in its possession and in the possession of its contractors and subcontractors concerning the extent to which trees and/or limbs are at risk of falling on those lines in a windstorm. In determining which distribution lines to de-energize during a PSPS event, PG&E will implement this condition by July 1, 2021, by considering the existence of all outstanding vegetation management work tagged "Priority 1" or "Priority 2" within PG&E's service territory that is subject to potential de-energizations and which is forecast to satisfy PG&E's minimum fire potential conditions. [Subject to the approval of the California Public Utilities Commission, ]PG&E shall also consider the approximate number of trees tall enough to fall on the line by using LiDAR, or other remote sensing and data-capture methods, to approximate the relative amount of tree-overstrike exposure in areas that are subject to potential de-energizations and forecast to satisfy PG&E's minimum fire potential conditions and, in particular, by considering whether the area is in the 70th percentile or greater of tree-overstrike exposure as compared with other areas subject to potential de-energization~~irrespective of the health of the tree and irrespective of whether the tree stands outside or inside prescribed clearances. The latter may be done by simply rating the total approximate number of such tall trees along a line as 'None,' 'Few,' 'Average' or 'Many,' and by treating the 'Many' category as posing a greater risk than the 'Average' category and the 'Average' category as posing a greater risk than the 'Few' category and so on~~.

Proposed Condition 12

> To the extent that such information shows that such trees and limbs present a safety hazard in the event of a windstorm, PG&E must make a specific determination with respect to that distribution line and it must de-energize it unless PG&E finds in writing that there are specific reasons to believe that no safety issue exists. PG&E will implement this condition by July 1, 2021.

Because the state regulator that oversees the administration of PSPS events by California utilities objects to PG&E complying with the Proposed Conditions without first undergoing a state regulatory review, PG&E respectfully submits that the bracketed language above should also be included in the Proposed Conditions. (*See* Dkt. 1354 at 4.) Today, the CPUC directed PG&E to work with CPUC staff to initiate an expedited process for review of PG&E's proposed implementation of Proposed Conditions 11 and 12 prior to the 2021 fire season. In light of this directive, PG&E will be engaging with the CPUC to initiate that process, and PG&E proposes that it keep the Court apprised of how that process proceeds. (*See* Dkt. 1368 at 7-8.)

**II.     Continuing Efforts to Mitigate the Impacts of PSPS Events**

PG&E acknowledges that its execution of PSPS events in 2019 identified areas where it could improve to mitigate the impacts on customers and communities. PG&E implemented a number of improvements in 2020 that resulted in more targeted PSPS events as compared with 2019. PG&E developed and implemented for 2020 a 2 km-resolution weather model which resulted in more precise event boundaries than did the 3 km-resolution model used in 2019. Moreover, PG&E added or automated over 600 sectionalizing devices and line switches to be used to de-energize certain portions of the lines inside the forecast weather event footprint, while leaving other portions outside the weather event energized. PG&E also secured 450 megawatts of temporary generation to support substations and critical customers such as hospitals, water and wastewater plants, emergency response personnel such as fire and police

stations, and telecommunications providers.[1]  Overall, PG&E de-energized 55% fewer customers in 2020 than it would have under similar weather conditions in 2019.

PG&E also reduced, for customers who were de-energized during a 2020 PSPS event, the amount of time that they were without power.  Using the 2 km-resolution weather modeling, PG&E was able to declare weather "all clears" on a more granular level than in 2019, allowing PG&E to begin restoration patrols sooner.  To expedite the rate at which restoration patrols could be conducted, PG&E also analyzed optimal routing methods for such patrols, nearly doubled the number of helicopters dedicated to such patrols, from 35 in 2019 to 65 in 2020, and commissioned two airplanes with specialized equipment that allowed such patrols of transmission lines to occur at night.  Through these efforts, PG&E reduced the aggregate average outage duration after the "all clear" from approximately 17 hours in 2019 to approximately 10 hours in 2020, or a reduction of 41%.

One area identified for improvement following the 2019 PSPS events was PG&E's communications and notifications to customers, including with respect to Medical Baseline customers.  In 2020, PG&E notified over 99% of its Medical Baseline customers who were in the final scope of de-energization prior to the de-energization event, despite the fact that in-event weather shifts altered the de-energization footprints in every 2020 PSPS event.  These notifications were available in over a dozen languages, and included estimated energy-restoration timing.

To notify Medical Baseline customers in advance of an approaching PSPS event in 2020, PG&E sent hourly text messages or made hourly phone calls and, if the customer had not acknowledged receipt, sent personnel to knock on their door and leave a door hanger notifying them of the event if no one answered.  PG&E also shared through its updated and secure PSPS Portal tool lists of Medical Baseline customers with appropriate county and tribal emergency operations agencies.  PG&E also launched a Portable Battery Program for low-

---

[1] PG&E initiated the Energy and Communications Providers Coordination Group in early 2020 to create a forum for communications providers to provide feedback on PG&E's current PSPS implementation protocols and to coordinate engagement before and during PSPS events.

income Medical Baseline customers in Tier 2 and Tier 3 HFTDs and provided over 5,550 batteries under this program by mid-January 2021.

PG&E further sought to improve its outreach to customers who could benefit from the Medical Baseline program, including in response to the COVID-19 pandemic.  PG&E temporarily removed a requirement that applications to join the Medical Baseline program be accompanied by a certification from a medical practitioner, simplified the online application process and partnered with community-based organizations ("CBOs") to drive adoption of the Medical Baseline program.  As of December 1, 2020, enrollment in the Medical Baseline program increased by 26% across PG&E's service territory in 2020.

PG&E also launched a number of other initiatives in 2020 aimed at mitigating PSPS impacts on certain communities.  For example, PG&E and the California Foundation for Independent Living Centers ("CFILC") launched the Disability Disaster Access and Resources Program ("DDARP"), a joint effort to aid elderly or individuals who rely on power for medical or independent living needs.  In addition to providing approximately 1,000 backup portable batteries in addition to those discussed above, the DDARP works through local organizations to provide accessible transportation, lodging, food and gas vouchers, promotion of the Medical Baseline program, and emergency planning and education.  PG&E also sought to initiate mitigating the challenges that PSPS events pose for rural customers who rely on well water powered by electricity by launching the Well-Pump Generator Program, which provides rebates for qualifying customers who purchase backup generators.  For the Access and Functional Needs ("AFN") community, PG&E established formal agreements with 97 partners to provide resources, services and in-language communications before, during and after a PSPS event.  Together with these partners, PG&E provided vulnerable customers, among other things, assessments for backup power support, services like grocery delivery and the delivery of 30,000 food boxes.

PG&E also deployed programs that were aimed at mitigating the effects of PSPS for customers more generally.  For example, PG&E's PSPS websites were updated to manage

enhanced bandwidth during PSPS events so that emergency information was accessible to customers, and to include additional preparedness content.  And during 2020 PSPS events, PG&E activated a total of 245 community resource centers that served approximately 50,000 visitors and were equipped with medical-device charging, mobile battery chargers and bottled water amongst other service offerings.

In a recent survey of customers impacted by PSPS events in 2020, 60% reported that PG&E improved the handling of PSPS events over 2019 and only 10% reported our handling to be worse.  While substantial challenges remain (as reflected in feedback from the community and agencies), PG&E believes substantial progress was made in 2020.  In 2021, PG&E intends to continue building on these efforts.

**III.     Requests from the March 23, 2021 Hearing**

During the March 23, 2021 hearing, the Court requested that PG&E follow-up with additional information on three topics.

*First*, the Court asked PG&E for certain additional information regarding PG&E's presentation to the CPUC regarding PSPS.  (*See* Dkt. 1358-1 at 5-9.)

PG&E is producing as Exhibit A an extension of that presentation that includes, for 2019, the estimated impact that PG&E's tree-overstrike and Priority 1 and Priority 2 proposals may have had in expanding the scope of PSPS events under the models PG&E had in place in 2020, as well as compared with the historical 2019 events themselves.  PG&E reiterates that the figures included in the chart are approximations that are based on several assumptions, but PG&E believes that they are directionally representative of the impact that these differences in PSPS protocols could have had if applied in 2019.  In particular, PG&E notes that the projected impact of considering Priority 1 and Priority 2 trees is likely larger than it would have been had PG&E contemporaneously implemented this proposal, including because, as described during the March 23 hearing, if PG&E implements this proposal, it expects to mitigate some or all relevant outstanding Priority 1 and Priority 2 trees within the forecast adverse weather footprint in the lead-up to a potential PSPS event.

In the time period allotted by the Court for responding to these requests and in light of other analyses PG&E is conducting in preparation for fire season, PG&E was unable to prepare a similar analysis for 2020 or to add the impact of Priority 1 and Priority 2 trees to the 2010 through 2019 analysis, but PG&E will continue to work on such analyses if requested by the Court.  While PG&E will work to promptly provide any further analyses needed, PG&E respectfully notes that the meteorology team that would prepare these analyses would need to manage such requests against pending work needed to meet operational and Wildlife Mitigation Plan commitments.

*Second*, the Court inquired about a post-Carr Fire restoration database maintained by PG&E contractor Mountain G. Enterprises, Inc. ("MGE").  The Court asked PG&E to confirm "[w]hether or not [MGE's] database exists in the exact same form today as it did back then [in 2018]", to confirm "that database [is] still intact" and to inform MGE that the Court considers the database "evidence that should be preserved".

After the hearing, PG&E followed-up with MGE.  PG&E is producing that correspondence as Exhibit B.  As shown in that correspondence, MGE relayed to PG&E that MGE had provided PG&E "with all Carr Fire Collector and ArcGIS data" and that MGE would "continue to preserve all Carr Fire related records currently in its possession and control".

*Third*, the Court asked PG&E to explain how PG&E calculates the distance between the Gray Pine of interest and the property that belonged, as of the post-Carr Fire restoration effort, to the individual referred to in Question 3 of the Court's March 22, 2021 Request for Information at Tomorrow's Hearing.  (Dkt. 1356.)

PG&E used the County of Shasta Geographic Information System's online "Shasta County Map Viewer" to calculate the distance from the nearest point of what PG&E understands to be the subject property's intersection with Zogg Mine Road to the location of the PG&E pole closest to the Gray Pine of interest, the GPS coordinates of which are 40.5389094944, -122.562904435, as recorded in PG&E's database. PG&E understands that the Shasta County Map Viewer displays property boundaries, including those of a property that

1   public records indicate belonged to the individual in question during the post-Carr Fire
2   restoration effort.  PG&E utilized the measurement tool available in the Shasta County Map
3   Viewer to measure the distance in yards between the two points, which calculated a distance of
4   522 yards.

5          A screenshot of the Shasta County Map Viewer, taken on March 29, 2021 in
6   connection with preparing this response as an image illustrative of the process described above,
7   is being provided as Exhibit C.

8          During the March 23 hearing, PG&E referenced records provided to the Court
9   that suggest that the individual in question appears to have been threatening to brandish her
10  firearm in areas beyond her property boundaries.  (*See* Ex. J-6 to Dkt. 1323-10 at 30 (stating that
11  the individual "had blacked out at least one of her neighbor's trees and told the PIs that no tree
12  crew would touch the tree she blacked out.  Furthermore, she would brandish her firearm again if
13  she saw someone cutting the tree").)

Dated: March 29, 2021

Respectfully Submitted,

JENNER & BLOCK LLP

By: /s/ Reid J. Schar
Reid J. Schar (*pro hac vice*)

CRAVATH, SWAINE & MOORE LLP

By: /s/ Kevin J. Orsini
Kevin J. Orsini (*pro hac vice*)

CLARENCE DYER & COHEN LLP

By: /s/ Kate Dyer
Kate Dyer (Bar No. 171891)

Attorneys for Defendant PACIFIC GAS AND ELECTRIC COMPANY