Michael J. Aguirre, Esq., SBN 060402
maguirre@amslawyers.com
Maria C. Severson, Esq., SBN 173967
mseverson@amslawyers.com
AGUIRRE & SEVERSON, LLP
501 West Broadway, Suite 1050
San Diego, CA 92101
Telephone: (619) 876-5364

Catherine Janet Kissee-Sandoval, SBN 153839
Csandoval@scu.edu
Santa Clara University School of Law
Director, Center of Insurance Law & Regulation
500 El Camino Real
Santa Clara, CA 95053-0421
Telephone: (408) 551-1902

Attorneys for *Amici* Alex Cannara
and Gene A. Nelson

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 14 -0175 WHA |
| Plaintiff, | |
| v. | ***AMICI'S* REQUEST TO FILE A BRIEF RESPECTFULLY RECOMMENDING THE COURT:** |
| PACIFIC GAS AND ELECTRIC COMPANY, | **(1) ISSUE AN ORDER TO SHOW CAUSE TO DETERMINE WHETHER PG&E COMMITTED CIVIL OR CRIMINAL CONTEMPT OF COURT,** |
| Defendant. | **(2) AS PART OF THE OSC, CONSIDER APPOINTMENT OF A SPECIAL MASTER TO INVESTIGATE AND REPORT WHETHER PG&E ENGAGED IN OBSTRUCTION OF JUSTICE, OR A CONSPIRACY TO OBSTRUCT JUSTICE IN THIS CRIMINAL PROBATION PROCEEDING.** |

*Amici,* Alex Cannara and Gene A. Nelson, respectfully seek leave of the Court to file the *Amicus* brief attached hereto as Exhibit 1. The attached *Amicus* brief respectfully suggests the Court issue an Order to Show Cause (OSC) to determine whether PG&E committed civil or criminal contempt of court by failing to provide documents and analysis responsive to this Court's orders, and instead, submitting responsive analysis to the California Public Utilities Commission (CPUC) in a manner that reflected duplicity toward the CPUC and this Court.

*Amici's* attached brief respectfully recommends this Court appoint a Special Master to investigate, and promptly report to this Court by July 2021, facts relevant to whether PG&E and its employees or agents engaged in obstruction of justice, or in a conspiracy to obstruct justice, through the acts described above that attempted to interfere with this Court's administration of PG&E's federal criminal probation.

As part of the OSC, *Amici* also respectfully recommend the Court  direct PG&E to produce and file publicly in this docket all records of its communication with the CPUC, California Office of Emergency Services (Cal OES), the California Governor's Office, Members, Staffs, or Committees of the California Legislature, and members of the press regarding this Court's probation conditions, including proposed probation conditions since September 2020 and to continue to do so throughout the duration of PG&E's federal criminal probation.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1        Federal courts have inherent authority to entertain Amicus briefs. *In re*

2    *Bayshore Ford Truck Sales, Inc*., 471 F.3d 1233, 1249, n.34 (11th Cir. 2006).

3

4

5                                           Respectfully submitted,

6                                           CATHERINE J. KISSEE-SANDOVAL

7                                           Associate Professor

8                                           Santa Clara University School of Law

9    Dated:  March 29, 2021           */s/Catherine J.K. Sandoval*, Esq.,

10

11

12                                          AGUIRRE & SEVERSON, LLP

13   Dated:  March 29, 2021           */s/Maria C. Severson*

14                                          Maria C. Severson, Esq.,

15                                          Attorneys for *Amici* Petitioners

16                                          Alex Cannara and Gene A. Nelson

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit 1**

**I.    *AMICI* RESPECTFULLY RECOMMENDS THIS COURT ISSUE AN ORDER TO SHOW CAUSE TO DETERMINE WHETHER PG&E COMMITTED CONTEMPT OF COURT OR OTHER FEDERAL OFFENSES, UP TO AND INCLUDING OBSTRUCTION OF JUSTICE, THROUGH ITS CONDUCT REGARDING PROPOSED PROBATION CONDITIONS 11 AND 12.**

*Amici* are deeply concerned that PG&E's conduct in its federal criminal probation, particularly since this Court's Order to Show Cause issued on December 29, 2021 (Dkt. 1294) may have exhibited contempt of court. PG&E withheld from this Court and this docket relevant documents and analysis regarding proposed probation conditions 11 and 12, conditions designed to prevent more PG&E-caused fires that result in death and destruction. During PG&E's criminal probation, PG&E has been found responsible for the deaths of at least 115 people, the last four victims added to PG&E's record when CalFire determined that PG&E caused the September-October 2020 Zogg fire. (Dkt. 1358, Exhibit B, CalFire report finding PG&E caused the Zogg Fire) (Dkt. No. 1277, p. 2)).

Instead of forthrightly providing analysis and documentation responsive to this Court's questions 22 and 24 in Dkt. 1307 and probation conditions 11 and 12, PG&E engaged in a repeated and systematic campaign to unduly influence the CPUC's comments to this Court. PG&E's conduct raises concerns about whether PG&E interfered with the administration of justice in its federal criminal probation.

The midnight document production in response to this Court's Order in Dkt. 1355 revealed PG&E engaged in a sustained and systematic campaign to influence the CPUC's comments about PG&E's probation terms. PG&E's influence campaign targeted at CPUC staff was designed to evade scrutiny by this Court, parties to this proceeding, the Monitor, and *Amici*.

3

PG&E Dkt. 1358 and CPUC Dkt. 1360, filed shortly before midnight on March 22 in response to Dkt. 1355, revealed that PG&E had failed to produce relevant analysis in response to this Court's questions 22 and 24 in Dkt. 1307, PG&E's March 2021 LiDAR study "CPUC Distribution HFTD Lidar Review for Potential Inclusion in PGE Distribution PSPS Criteria 2021-03-08 (003).pdf" [hereinafter "March 2021 LiDAR study"]. PG&E withheld information relevant to the analysis of probation conditions 11 and 12 while influencing the CPUC's comments to this Court.

PG&E's filing in Dkt. 1377 referenced LiDAR analysis in discussing its answer to Dkt. 1307 questions 22 and 24. Yet, PG&E failed to disclose that it had conducted and completed a March 2021 LiDAR study relevant to Dkt. 1307 questions 22 and 24 and probation conditions 11 and 12. Neither did PG&E's response in Dkt. 1377, nor any other filing until its midnight disgorgement of documents on March 22, submit PG&E's March 2021 LiDAR study to this Court and its docket. As the clock approached the stroke of midnight on March 22, PG&E finally revealed that it gave that LiDAR study to the CPUC on March 8 **and met with the CPUC that day** (and perhaps on other occasions) to influence the CPUC's comments about probation conditions 11 and 12.

PG&E's circumvention of this Court's supervision of its federal criminal probation deprived this Court and parties to this proceeding -- including the U.S. Department of Justice (U.S. DOJ), the Monitor appointed to oversee PG&E's compliance with its criminal probation, and *Amici* -- the opportunity to review PG&E's LiDAR study prior to the midnight hours preceding the March 23, 2021 hearing. If *Amici* had been afforded the opportunity to analyze PG&E's Lidar study earlier than in the midnight hour before the March 23 hearing, *Amici* would have pointed out PG&E's flawed methodology.

The CPUC's statements in its March 19 letter (Dkt. 1349, p. 4) about PG&E's LiDAR study raise concerns about whether PG&E communicated to CPUC staff a

1   false interpretation of the results of PG&E's March 2021 LiDAR study. The

2   CPUC's apology to this Court in Dkt. 1359 to correct the overestimate that

3   probation conditions 11 and 12 may cause PSPS to double does not make it clear

4   whether that error resulted from PG&E's comments to the CPUC and its staff, or

5   whether the misinterpretation was due to flawed CPUC staff analysis.

6       If PG&E was the origin of the false representation of the consequences

7   indicated by its LiDAR study, such conduct would raise dire concerns about

8   whether PG&E engaged in contempt of court or obstruction of justice, or conspiracy

9   to obstruct justice in its federal criminal probation. PG&E's circumvention of this

10  Court and submission of its LiDAR study to the CPUC also raises serious concerns

11  about whether PG&E engaged in contempt of court or engaged in obstruction of

12  justice. While PG&E professed its willingness to abide by probation conditions 11

13  and 12 in its February 19, 2021 filing (Dkt. 1310,  p. 2), PG&E hoped to and did

14  secure its state regulator's opposition to those same probation conditions.

15      PG&E's pattern of concerted action raises grave concerns about whether

16  PG&E and its employees, agents, or representatives committed contempt of court.

17  It appears PG&E attempted to interfere with the administration of justice in its

18  federal criminal probation by attempting to influence witnesses such as the CPUC in

19  its probation outside of the Court's purview and the scrutiny of the other parties,

20  *Amici*, and the public.

21      As part of the requested OSC, *Amici* respectfully suggests this Court engage

22  in fact-finding, or appoint a Special Master to engage in fact-finding and promptly

23  report to this Court by July 2021, to determine if a referral to the U.S. Attorney's

24  Office is appropriate to examine whether PG&E committed obstruction of justice or

25  conspiracy to obstruct justice through its conduct described above.

26      To promote the administration of justice in PG&E's criminal probation, *Amici*

27  respectfully recommend this Court's OSC direct PG&E to publicly file in this

28  federal criminal probation docket on a regular basis all records of PG&E's

5

communications (including that of its employees, officers, agents, or representatives including its lawyers and lobbyists) with state or federal government agencies, legislators, officers, or members of the press regarding PG&E's federal criminal probation or its current or proposed probation conditions throughout the duration of PG&E's federal criminal probation. Such filings should include a brief summary of the content of the communication, the parties to the communication, and any documents exchanged for the communication. This measure is recommended to ensure PG&E is not circumventing this Court's supervision of its federal criminal probation and unduly attempting to persuade other parties, including witnesses in this probation, to influence or interfere with this Court's probation supervision and the administration of justice.

## II. PG&E'S CONDUCT AND ATTEMPT TO INFLUENCE THE CPUC TO OPPOSE THIS COURT'S PROPOSED PROBATION CONDITIONS 11 AND 12 RAISE CONCERNS ABOUT WHETHER PG&E HAS ENGAGED IN CONTEMPT OF COURT OR OTHER OFFENSES

### A. PG&E's Strategy to Oppose Proposed Probation Conditions 11 and 12 Shifted to Inducing the CPUC to Impose those Conditions After PG&E's Feb. 19 filing in Dkt. 1310 Falsely Indicated that PG&E did not Oppose Probation Conditions 11 and 12

Following the 2020 Zogg fire, this Court proposed to modify PG&E's probation to add probation conditions 11 and 12 requiring PG&E to take the status of its vegetation management into account in determining whether to deenergize an area through a PSPS. (See Dkt. 1294 issued December 29, 2021) PG&E tried to limit this condition to trees PG&E categorized as Priority 1 and Priority 2. (Dkt 1279, filed Jan. 20, 2021, p. 4). PG&E sent the CPUC its January 20, 2021 **filing and held a meeting with the CPUC the next day** about proposed probation conditions 11 and 12. (Dkt. 1360-1, p. 2). Neither PG&E nor the CPUC has disclosed the content of those discussions. That meeting was revealed in the

CPUC's document production on March 22 in response to this Court's order in Dkt 1355.

*Amici* in Dkt 1283, p. 24, filed on January 27, 2021, expressed concern that PG&E's proposal to limit probation conditions 11 and 12 to Priority 1 and Priority 2 trees "creates inappropriate escape hatches from the condition and compliance with state and federal law." *Amici* expressed concern that PG&E had failed to offer any public analysis of its proposal, a pattern PG&E repeated in its campaign against probation conditions 11 and 12. Amici observed in Dkt 1283, p. 26:

> Neither has PG&E explained to this Court and the parties which *priority* tier those trees and limbs were classified in, whether priority 1, priority 2, or some other unnamed priority. Without that information, this Court and the parties before it cannot analyze PG&E's proposal to limit mandatory consideration of vegetation management to priority 1 and 2 vegetation as PG&E has not told us what this would omit or informed the Court of its analysis of the consequences of such exclusion.

At the February 3, 2021 hearing, counsel for PG&E admitted its proposed limits of probation conditions 11 and 12 to its Priority 1 and 2 classifications would **not** have covered the tree of concern in the Zogg fire, the tree later determined to be the Zogg fires' cause. (Dkt. 1292, p. 12, lines 18-20; Dkt. 1458-2).

This Court found on February 4, 2021 that PG&E's proposed Priority 1 and Priority 2 limitation "is too restrictive and will not sufficiently protect California from wildfires started by PG&E." (Dkt. 1294, p. 1):

> The limited way in which PG&E seeks to implement Proposed Condition 11 would leave too many risks unaddressed. It would allow PG&E, in determining which distribution lines to de-energize, to ignore the threat of trees tall enough to be blown onto the lines. Indeed, counsel for PG&E admitted that its proposed procedure would not have resulted in consideration of the tall Gray Pine looming over the Girvan Line at (or near) the site of the Zogg Fire or the other tall Gray Pines of concern. (Dkt. 1294, p. 1).

The Court invited all parties and *Amici* to submit comments or objections to the modification to proposed probation conditions 11 and 12 by February 19, with replies due on February 26, to be heard at a hearing via Zoom on March 9, 2021.

On February 19, PG&E stated "PG&E has no objection to the Court's modified Proposed Conditions 11 and 12. PG&E commented that its "operations teams are working to operationalize the implementation of the Proposed Conditions" to more expressly account for "the approximate number of trees tall enough to fall on the line irrespective of the health of the tree and irrespective of whether the tree stands outside or inside prescribed clearances." (Dkt. 1310, p. 2).

PG&E's response in Dkt. 1310, p. 2 for the first time mentioned its intention to use LiDAR to implement probation conditions 11 and 12:

> so, one of the things PG&E intends to leverage is remote sensing capabilities, such as aerial based light detection and ranging ("LiDAR") technology, which uses pulsed laser light to generate digital 3-D object maps. The precise mechanics of how to effectively leverage these capabilities in the time available prior to fire season to fulfill the letter and spirit of the Court's condition is being worked on by PG&E's operations teams.

PG&E's statements that the mechanics of how to leverage its LiDAR capability was "being worked on by PG&E's operations teams," did not hint that it would shortly generate a LiDAR-based study to project the consequences of probation conditions 11 or 12.

PG&E's March 22 midnight document production in response to this Court's order revealed PG&E sought to stoke the CPUC's opposition to probation conditions 11 and 12. PG&E did so, hidden from the view of this Court and the parties to this proceeding including the U.S. DOJ and the Monitor appointed to oversee PG&E's probation, as well as *Amici* representing PG&E customers concerned about PG&E's poor public safety record, Alex Cannara and Gene Nelson. PG&E has not disclosed whether it met with California Office of Emergency

Services (Cal OES) to encourage Cal OES to oppose probation conditions 11 and 12 or whether it shared PG&E's 2021 LiDAR study with Cal OES prior to the March 22 midnight document disgorgement.

PG&E deliberately circumvented this Court's procedure, docket and filing in submitting documents and analysis to the CPUC instead of this Court. PG&E made representations to the CPUC to influence the CPUC's comments to this Court and induce the CPUC's opposition to probation conditions 11 and 12. In so doing, PG&E attempted to appear cooperative while influencing the CPUC, a party this Court invited to appear as *Amici* regarding probation conditions 11 and 12 and steps to prevent fires such as the Zogg fire, to oppose probation conditions 11 and 12. PG&E did so in a clandestine attempt to generate opposition to the proposed probation conditions while preserving its appearance of cooperation before this Court and hiding its analysis from this Court, the public, and other parties.

### B. PG&E Circumvented this Court's Order in Dkt. 1307 to Answer Questions about PG&E's Analysis of Trees Tall Enough to Strike Its Lines While Inducing the CPUC's Opposition to Probation Conditions 11 and 12

In Dkt. 1307, this Court on February 18 asked PG&E Questions 22 and 24 regarding whether PG&E had analyzed if healthy trees had the potential to strike PG&E's power lines and whether such trees should be documented for PSPS or for other purposes. PG&E's answer to that question was also due to this Court on March 12, 2021.

In Dkt. 1337, PG&E on March 12, 2021 filed its response to this Court's questions 7-25 propounded in Dkt. 1307. PG&E's answer to those questions omitted any reference to the "LiDAR" study PG&E gave to CPUC staff on March 8, 2021. (*See* Dkt. 1337 at 2-4, 16, 19; cf. Dkt. 1360-1, Exhibit 4, p. 17).

/ / /

**Question 22** in Dkt. 1307 asked:

> Has PG&E analyzed whether there are circumstances in which trees that have the potential to strike power lines should be worked or removed, even though they are healthy and not in violation of minimum clearances required by California Public Resources Code Section 4293, California Public Utilities Commission General Order 95, and Federal Energy Regulatory Commission FAC-003-4? If so, what conclusions did PG&E reach? Has this issue been the subject of any regulatory process or analysis?

PG&E Responded in Dkt. 1337, pgs. 17-19:

> Yes, PG&E has analyzed whether there are circumstances in which trees that have the potential to strike its distribution lines should be worked or removed, even though they are healthy and not in violation of minimum clearances required by California Public Resources Code Section 4293, California Public Utilities Commission General Order 95, and Federal Energy Regulatory Commission FAC-003-4.

> As noted above, the EVM program was originally designed to identify for removal all potential strike trees from the top 10 risk species, as determined by PG&E analyses of the tree species that were responsible for causing vegetation-related ignitions. In reviewing five years of data, PG&E identified 10 species of trees—Black Oak, Gray Pine, Tanoak, Coast Live Oak, Live Oak, Ponderosa Pine, Eucalyptus/Blue Gum, Douglas Fir, Valley Oak and Monterey Pine—that were responsible for nearly 75 percent of incidents in Tier 2 and Tier 3 HFTDs. As part of the original EVM scope, PG&E intended to go beyond what is required by state law to abate trees from these 10 species that were tall enough to strike distribution lines, had a clear path to strike, and exhibited leaning or weighting toward the line.

> As the Court is aware, the EVM program is analyzed as part of the regulatory processes surrounding PG&E's annual Wildfire Mitigation Plans. During the review process for PG&E's 2019 Wildfire Mitigation Plan ("WMP"), "some parties asserted that PG&E's EVM may target significantly more trees than necessary, given the consequences of widespread tree removal."

10

AMICI'S REQUEST TO FILE A BRIEF RESPECTFULLY RECOMMENDING    CASE NO. CR 14-0175 WHA
THE COURT ISSUE AN ORDER TO SHOW CAUSE

For example, trees provide support for other trees, reduce carbon, and provide other important ecological benefits which may be lost due to aggressive tree removal." *See* CPUC's May 30, 2019 Decision on PG&E's 2019 WMP Pursuant to Senate Bill 901 ("2019 WMP Decision"). The 2019 WMP Decision stated "PG&E should only remove healthy trees if the utility has evidence that those trees pose a risk to utility electric facilities under wildfire ignition conditions, based on the opinion of a certified arborist." (*Id.* at 24.)

In response to the CPUC's direction in the 2019 WMP Decision, PG&E developed its TAT. The tool was developed by a team of ISA Certified Utility Arborists and is informed by PG&E data regarding regional vegetation-caused contact with PG&E's overhead electric distribution lines. As described above, that tool is now used by pre-inspectors on every tree within the scope of EVM that has the potential to strike PG&E's distribution lines if it were to fall. Among other things, any tree with strike potential that is determined to lean more than 25 degrees is designated for abatement, regardless of the health or tree species. This risk-mitigation measure goes well beyond the requirements of, *inter alia*, section 4293.

Based on PG&E data regarding regional vegetation-caused outages and ignitions, PG&E also recently evaluated whether certain species should be targeted on an accelerated basis around distribution lines in high-fire threat areas on a "bright-line" basis, regardless of their health, as an additional step. That resulted in the new proposal set forth in PG&E's March 4, 2021 submission to the Court regarding Gray Pines and Tanoaks in particular regions. (Dkt. 1330.) This proposal was based on PG&E data that showed that these particular species may present higher risk of falling into the line in these particular regions. This proposal has not yet been subject to any regulatory process, but CAL FIRE and the CPUC have stated to the Court that their position is that it should not be implemented as a probation condition at this time. (*See* Dkt. 1335.)

Previous PG&E vegetation management programs have sought to abate vegetation beyond what is required by state law, including the Fuel Reduction program, the Accelerated Wildfire Risk Reduction Program, and the Public Safety & Reliability program, and would have been underpinned by analyses, including analyses of ignition or outage data. Other analyses may have also been conducted in the

11

1
2
3

> past that would be responsive to the Court's Question. To provide more information on such potential analyses, PG&E would need additional time to investigate and respond.

4
5

Despite answering "Yes" to question 22, PG&E did **not** submit its March 2021 Lidar study to this Court (*See* Dkt. 1337 at 17-18).

6
7
8
9
10
11
12
13
14

PG&E's analysis in Dkt. 1337 at 17-18 seems to rest on the analysis later revealed to this Court to be based on PG&E's March 2021 LiDAR study. Yet, PG&E did not disclose the existence of its March 2021 LiDAR study or produce it, though it was directly responsive to this Court's questions about PG&E's analysis. Neither did PG&E update its response in Dkt. 1310 which referred to PG&E's intention to leverage LiDAR data to inform the Court that it had develop a LiDAR-based analysis of probation conditions 11 and 12 as applied to years 2010-2019. Nor did PG&E disclose that it had provided its March 2021 LiDAR study to the CPUC on March 8, four days before its answer was due on March 12.

15
16
17
18
19
20
21
22

PG&E's March 2021 LiDAR study discusses PG&E's analysis indicating there are "7.3 million trees detected through LiDAR in PG&E's HFTD distribution corridors, of which 5.3 million trees could strike the line (Fall-in) (Docket 1358-1, p. 7). This analysis is directly relevant to question 22 in Dkt. 1307 regarding PG&E's analysis of "whether there are circumstances in which trees that have the potential to strike its distribution lines should be worked or removed, even though they are healthy." Yet, PG&E's response in Dkt. 1337 at 17-19 fails to mention its LiDAR study or that it had shared and discussed that study with the CPUC.

23
24
25
26
27

In response to Dkt. 1307, question 22, which asked "(h)as this issue been the subject of any regulatory process or analysis?", PG&E stated "(t)his proposal has not yet been subject to any regulatory process, but CAL FIRE and the CPUC have stated to the Court that their position is that it should not be implemented as a probation condition at this time. (*See* Dkt. 1335.)"

28

/ / /

PG&E's response did not disclose that it had provided its March 2021 Lidar study to CPUC staff and held meetings with CPUC staff to discuss this analysis. Neither did PG&E disclose whether it had represented to the CPUC that PSPS might double if probation conditions 11 and 12 were adopted.

PG&E failed to disclose it had submitted responsive analysis regarding question 22 to its state regulator, as part of a regulatory process or analysis. If that document was not submitted to CPUC staff as part of a regulatory process or analysis, this raises substantial questions about PG&E's motives. Did PG&E submit its March 2021 LiDAR study to the CPUC to influence the CPUC's opinion about PG&E's probation conditions? Did PG&E attempt to dupe the CPUC into repeating what may be PG&E's misrepresentation of what that document stated, misleading the CPUC and this Court and interfering with justice?

Whatever PG&E's motives, PG&E knew or should have known that its March 2021 LiDAR study was responsive to this Court's questions. PG&E's Dkt. 1354 filed on the afternoon of March 22 indicates that PG&E recognized the importance of its March 2021 LiDAR study to the development of its probation conditions. Yet, PG&E failed to disclose this important analysis of trees tall enough to strike its lines with this Court. In so doing, PG&E confounded this Court's analysis, and attempted to sidestep the administration of justice in PG&E's federal criminal probation.

On March 22, in Dkt. 1354, PG&E mentioned it had provided documentation to its state regulator regarding PG&E's analysis of probation conditions 11 and 12. PG&E stated that following the CPUC's February 19, 2021 filing indicating concern about outages that may result if probation conditions 11 and 12 were adopted, PG&E communicated with the CPUC and shared documents regarding PG&E's analysis, documents it did not produce in Dkt. 1354 or until ordered to do so just before midnight on March 22:

/ / /

After that [Feb. 19] filing by PG&E's regulator, and as part of PG&E's process of analyzing and setting fire-risk thresholds to determine when conditions warrant de-energization as part of Proposed Conditions 11 and 12, PG&E shared with the CPUC the fire risk thresholds that it has been considering to address the issue of tall trees in proximity to PG&E's lines. As PG&E explained to the CPUC, it developed those thresholds specifically to ensure that—if they had been in place in September 2020—PG&E would have de-energized the Girvan Circuit in the area of interest on the day the Zogg Fire ignited. PG&E also explained to the CPUC, as it has previously stated to the Court, that these new thresholds, if adopted, will lead to significant additional de-energizations.

Nonetheless, PG&E once again failed to file in this docket its March 2021 LiDAR study it sent to, and discussed with, the CPUC on March 8th. PG&E avoided naming its March 2021 LiDAR study or stating that it had developed and shared a LiDAR-informed analysis as anticipated by Dkt. 1310. Instead, PG&E referred to sharing "with the CPUC the fire risk thresholds that it has been considering to address the issue of tall trees in proximity to PG&E's lines." PG&E's attempts to dance around the document it had shared with the CPUC, but not with this Court, came to a crashing end when the party was over by midnight on March 22 and PG&E finally produced its "fire risk thresholds," the March 2021 LiDAR study.

PG&E's March 22 response in Dkt. 1354 stressed that it shared documents with the CPUC, its "regulator." PG&E effectively admitted thereby that its March 2021 LiDAR study was subject to a regulatory process or analysis. PG&E's admission indicates PG&E knew its March 2021 LiDAR study was responsive to this Court's question 22 in Dkt. 1307, and to consideration of probation conditions 11 and 12. Yet, PG&E did not publicly disclose its March 2021 LiDAR study until ordered by this Court to produce documents before midnight of March 22, 2021 reflecting its communications with the CPUC as indicated by Dkt. 1349 filed by the CPUC on March 19.

A similar lack of responsiveness and candor is reflected in PG&E's response in Dkt. 1337 (at 19-20) to Question 24 in Dkt. 1307:

> Has PG&E analyzed whether all trees that have the potential to strike its power lines should be documented for PSPS purposes (or other purposes) regardless of their health and/or whether they need to be worked? If so, what conclusions did PG&E reach? Has this been the subject of any regulatory process or analysis?

PG&E responded in Dkt.1337:

> Yes, PG&E has analyzed whether all trees that have the potential to strike its distribution lines should be documented for PSPS purposes (or other purposes) regardless of their health and/or whether they need to be worked. PG&E has been recently working on implementing the Court's Proposed Conditions 11 and 12 to more expressly account in PSPS scoping for "the approximate number of trees tall enough to fall on the line irrespective of the health of the tree and irrespective of whether the tree stands outside or inside prescribed clearances". To do so, one of the things PG&E intends to leverage is remote sensing capabilities, including LiDAR technology, which uses pulsed laser light to generate digital 3-D object maps. PG&E's current intent is to use the tree detection algorithm described above to provide estimates of the number of trees with the potential to strike PG&E's lines, without regard to the health characteristics of the tree or whether it needs to be worked. As discussed above, the detections are not necessarily accurate at the individual tree level, and trees are living, dynamic organisms. But the algorithm can be used to generate relative estimates of the distribution line's potential tree-strike exposure, which can then in turn be used to scope distribution circuits with high vegetation exposure for potential de-energization. This specific proposal is still being developed and has not yet been the subject of a regulatory process.
>
> Further, as discussed elsewhere in this submission, for purposes of EVM, PG&E's current program scope calls for inspectors to assess every tree with strike potential with the TAT that is on the inspector's smartphone or tablet, which creates a digital record. The EVM program as a whole has been the subject of the regulatory processes surrounding PG&E's Wildfire Mitigation Plans.

Further, one PG&E employee queried about the Court's Question recalled informal consideration in or around 2018 of whether to document trees that were not identified for abatement during PG&E's annual routine vegetation management patrols. The employee also recalled that PG&E inquired with two other major California utility companies as to whether they documented trees during routine patrols that did not require abatement. The employee recalled that PG&E learned through this "benchmarking" that those utilities did not document such trees. The employee recalled that the employees considering this proposal did not conclude that the proposal merited more formal analysis.

To identify other potential examples of when PG&E employees may have performed analysis responsive to the Court's Question in the past, PG&E would need additional time to investigate and respond.

Once the CPUC and PG&E produced PG&E's March 2021 LiDAR study in response to this Court's order on March 22, 2021, it became clear that PG&E's response to Question 24 is likely built on that document as it appears to draw directly from it. Yet, PG&E neither referred to nor produced that study until ordered to disgorge its communications with the CPUC referred to in Dkt. 1349.

PG&E's statement in Dkt. 1337, p. 19, in response to question 24 that it "has been recently working on implementing the Court's Proposed Conditions 11 and 12 to more expressly account in PSPS scoping for "the approximate number of trees tall enough to fall on the line irrespective of the health of the tree and irrespective of whether the tree stands outside or inside prescribed clearances"" seems to refer directly to its work reflected in its March 2021 LiDAR study. Yet, PG&E failed to disclose the existence of that document, its underlying analysis, or that it had shared that document with the CPUC on March 8.

Dkt. 1337, p. 19 states that PG&E was preparing to implement the Court's Proposed Conditions 11 and 12 by leveraging its "remote sensing capabilities, including LiDAR technology, which uses pulsed laser light to generate digital 3-D

16

object maps." That response appears to be based on PG&E's unnamed March 2021 LiDAR study. Yet, PG&E evaded identifying that study or that it had shared that document days earlier with the CPUC.

As discussed below, PG&E's failure to produce this responsive document on March 12 deprived this Court, and parties to this criminal probation proceeding including *Amici*, the opportunity to analyze PG&E's methodology, assumptions, and conclusions prior to the March 23 hearing. Had PG&E produced such analysis on March 12, *Amici* would have carefully scrutinized PG&E's document and sought leave to file comments with this Court early the following week to prevent misapprehensions based on PG&E's model—a model which inappropriately uses years 2010-2019. The opportunity to file comments analyzing PG&E's March 2021 LiDAR study early in the week of March 15 may have prevented the CPUC from filing comments on March 19 repeating what may have been PG&E's misrepresentation that probation conditions 11 and 12 would double PSPS. (See Dkt. 1349, p. 5). PG&E's March 2021 LiDAR study does not support that inaccurate characterization.

Between the February 3 and the March 23, 2021 hearings in this matter, PG&E produced thousands of pages of documents. Yet, PG&E did not produce the one document it effectively admitted in Dkt. 1354 it had given to the CPUC. It appears PG&E gave this analysis to the CPUC on March 8, 2021 to influence the CPUC's comments about probation conditions 11 and 12 and deter this Court from adopting those proposals.

PG&E's conduct willfully circumvented this Court's criminal probation, feigning willingness to comply with probation conditions 11 and 12 while inducing the CPUC to oppose those proposals. PG&E's evasion of this Court's docket supervising PG&E's probation deprived this Court and parties in this proceeding including the US DOJ, the Monitor, and *Amici* from analyzing PG&E's methodology, assumptions, or analysis in its LiDAR study prior to the hours just

17

1   after midnight on March 22, two weeks after PG&E gave that document to the

2   CPUC.  It appears that PG&E's conduct attempted, and perhaps completed,

3   deliberate interference with the administration of justice before this Court.

4

5   **C. PG&E Injected Poison into The Administration of Justice in Its Federal**

6   **Criminal Probation, Circumventing This Court's Orders and Selectively**
    **Submitting Information to CPUC Staff in A Manner PG&E Knew**

7   **Would Minimize Public Scrutiny.**

8   PG&E injected poison into the administration of its federal criminal probation

9   by circumventing this Court's orders and selectively submitting information to

10  CPUC staff in a manner that PG&E knew would minimize public scrutiny of its

11  efforts.  PG&E's communications with CPUC staff do not trigger the CPUC's *ex*

12  *parte* notice requirements.[1] Neither PG&E's request for a meeting with CPUC staff

13  nor its submission of documents to CPUC staff triggered a requirement under CPUC

14  Rules of Practice and Procedure for the issuance of a notice of an *ex parte* meeting.

15  PG&E knew that by submitting documentation to staff in this matter, it would not

16  have to issue a public notice that would have alerted this Court, parties to this

17  proceeding, and participants including *Amici*, or parties in CPUC proceedings, to

18  PG&E's meetings with CPUC staff designed to influence PG&E's federal criminal

19  probation. Nor did PG&E file its March 2021 LiDAR study in any docket for CPUC

20  proceedings, though its analysis might be relevant to several CPUC proceedings.

21  PG&E's submissions in Dkt. 1337 and 1354 attempt to falsely portray itself

22  as willing to cooperate with the proposed modification of its probation conditions.

23

24  _____

25
26  [1] See CPUC Rules of Practice and Procedure, effective April 1, 2018, Rule 8, ex
    parte requirements for meetings with decision-makers,
27  https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M209/K618/209618807.P
    DF; CPUC Ex Parte Communications,
28  https://www.cpuc.ca.gov/exparte_communications/ (last visited March 28, 2021).

18

Meanwhile, PG&E was attempting to manipulate its state regulator into expressing concerns about the effect of proposed probation conditions 11 and 12.

As indicated by the documents PG&E and the CPUC produced on March 22 just before midnight, PG&E began pursuing CPUC staff on March 1st seeking a meeting to discuss probation conditions 11 and 12. According to Dkt. 1360, Exhibit 2, PG&E sent an email request to CPUC staff on March 1st asking for a meeting to discuss probation conditions 11 and 12. PG&E and CPUC staff met on March 8. As indicated by Dkt. 1360, Exhibit 4, prior to that meeting PG&E sent to CPUC staff a document entitled "CPUC Distribution HFTD Lidar Review for Potential Inclusion in PGE Distribution PSPS Criteria 2021-03-08 (003).pdf," PG&E's March 2021 Lidar study.

A hearing in PG&E's criminal probation case was initially set for March 9, 2021. That hearing was later rescheduled to March 11, then consolidated with the hearing on March 23, 2021. PG&E appears to have been anxious to meet with CPUC staff prior to the March 9 hearing to discuss PG&E's analysis of High Fire Threat Districts (HFTD) and influence the CPUC's opinion about and comment to the Court regarding probation conditions 11 and 12. The criminal probation hearing was postponed until March 23, 2021, providing more time for communications from PG&E to the CPUC.

PG&E met with the CPUC on March 8, 2021 (as indicated by Dkt. 1360, Exhibit 5 thanking CPUC staff for meeting with PG&E "on Monday" referring to March 8, 2021). For that meeting, PG&E gave the CPUC PG&E's March 2021 Lidar study relevant to PG&E's analysis of the potential effects of proposed probation conditions 11 and 12 if applied to the decade between 2010 and 2019.

Throughout this process, it appears the CPUC was PG&E's target. The CPUC's March 19 letter raises concerns that PG&E may have fed the CPUC misleading information regarding the impact of the proposal to require PG&E to consider the status of its vegetation management in making decisions about PSPS.

1    Indeed, the CPUC may find it prudent to consider whether PG&E committed a Rule

2    1 violation based on PG&E's representations to the CPUC about the potential PSPS

3    increase if probation conditions 11 and 12 were adopted.

4         PG&E should have also disclosed to the CPUC that the March 2021 Lidar

5    study was relevant to this Court's questions. There is no indication PG&E informed

6    the CPUC that it had not produced that document in PG&E's federal criminal

7    probation proceeding, though the document was responsive to this Courts proposed

8    criminal probation conditions and questions 22 and 24 from Dkt. 1307.

9         On March 8, and perhaps on other occasions, PG&E met with CPUC staff and

10   conveyed the 2021 Lidar study.  PG&E did not produce that document to this Court

11   on March 12, though it was responsive to this Court's order directing PG&E to

12   answer questions 22 and 24.

13        PG&E's communications with the CPUC appear to have induced the CPUC

14   to state that PSPS would double if probation conditions 11 and 12 were imposed. In

15   Dkt. 1349, p. 4, the CPUC on March 19, 2021, the CPUC stated that based on its

16   conversations with PG&E, the CPUC was concerned that PSPS may double if

17   probation conditions 11 and 12 were adopted. The CPUC stated:

18         In summary, the potential doubling of Public Safety Power Shutoff
19         ("PSPS") events in PG&E's service territory under these modified
           Proposed Conditions could translate into a corresponding or even
20         greater increase in the public safety perils flowing directly from the use
           of PSPS. (*Id.*).
21

22   The CPUC's concern that probation conditions 11 and 12 would result in "doubling"

23   PSPS appears to derive from PG&E's representations to the CPUC.

24        The CPUC's comments on March 19, in Dkt. 1349, mention communications

25   between the CPUC and PG&E:

26         In the course of recent communications between PG&E and CPUC
27         staff, CPUC staff asked PG&E to assess how its plan for implementing
           the modified Proposed Condition Nos. 11 and 12 would affect the size,
28         scope, and frequency of PSPS events in its service territory. PG&E

                                              20

1
2
3
4
5

provided CPUC staff with estimates, based on historic weather data
from 2010 – 2019. PG&E's estimates show that, had PG&E conducted
PSPS over that time period,1 adding the revised Probation Conditions
Nos. 11 and 12 as triggers to execute a PSPS event would have more
than doubled the total number of PSPS events conducted in PG&E's
service territory.

6
7
8
9
10
11

Neither the CPUC nor PG&E have clarified who was responsible for the

interpretation that PSPS would double in PG&E's service territory if probation

conditions 11 and 12 were adopted. *Amici* respectfully recommend this Court order

PG&E (and request the CPUC) to produce documentation, and if appropriate,

provide testimony to a Special Master appointed by this Court, to determine the

source of this mischaracterization.

12
13
14
15
16
17

The only document the CPUC or PG&E produced regarding CPUC staff

questions asking about PG&E's assessment of "how its plan for implementing the

modified Proposed Condition Nos. 11 and 12 would affect the size, scope, and

frequency of PSPS events in its service territory" is Dkt. No. 1360, Exhibit H (at

39). In that March 18, 2021, email, a CPUC staff member asks PG&E Senior

Director, Regulator Relations, Meredith Allen:

18
19
20
21

Meredith, can you clarify for me what is reflected in the "PSPS Total
Events 10 Year" – is that the average of the total number of events in
each county in PG&E territory over the 10-year period? (It's not an
average annual number of events correct?) Trying to understand the
difference between slides 4 and 5.

22
23
24

Neither the CPUC nor PG&E have produced any other documents regarding

questions from CPUC staff to PG&E about the size, scope, and frequency of PSPS

events in its service territory relevant to proposed probation conditions 11 and 12.

25
26
27
28

On the morning of the March 23, 2021 hearing, in Dkt. 1359 the CPUC

submitted a letter apologizing to this Court for the overstatement that proposed

probation conditions 11 and 12 would have resulted in a potential doubling of PSPS.

The CPUC explained that PG&E's 2021 LiDAR study indicated a potential

doubling of PSPS only in certain counties where PG&E documented a high number of trees tall enough to strike its lines:

> The CPUC sincerely apologizes for its overstatement that Pacific Gas and Electric Company's ("PG&E") estimates of customer impacts flowing from its envisioned implementation of modified Proposed Conditions 11 and 12 would result in a "potential doubling of Public Safety Power Shutoff ("PSPS") events in PG&E's service territory." ECF 1349 at 4 of 7; see also ECF 1349 at 5 of 7 ("… would have more than doubled the total number of PSPS events conducted in PG&E's service territory."). The CPUC wishes to correct this error and present the Court with more precise and correct statements as soon as it realized these inappropriately unqualified statements.
>
> The correct characterization of PG&E's estimates of customer impacts as a result of implementing modified Proposed Conditions 11 and 12 is that it would have resulted in a potential doubling of PSPS events in some of the counties in PG&E's service territory.

The CPUC's correction does not explain whether PG&E was the source of the asserted doubling of PSPS. In Dkt. 1349, p. 7, the CPUC appears to attribute the characterization that probation conditions 11 and 12 would double PSPS to PG&E. *Amici* respectfully recommend that this Court's OSC regarding whether PG&E engaged in contempt of court or committed other federal offenses including obstruction of justice investigate and determine the source of that misrepresentation.

### D. PG&E's Circumvention of This Court Influenced the Public Dialogue about Proposed Probation Conditions 11 and 12 and Interfered with the Administration of Justice in PG&E's Federal Criminal Probation

The CPUC's comment expressing concern about the potential expansion of PSPS as a result of probation conditions 11 and 12 based on PG&E's then undisclosed analysis was promptly reported in the press.  On March 19, Courthouse News reported:

> "The California Public Utilities Commission also raised concerns about the proposed conditions in a letter Friday, noting that a requirement to

factor in tree density "may unduly broaden PG&E's [public safety power shutoff] events beyond the scope that has been vetted by safety experts and parties in ongoing CPUC proceedings."[2]

On the morning of March 23, prior to this Court's probation modification hearing, KQED's California Report stated that the California Public Utilities "Commission oppose also Alsup's proposal. They argue it will dramatically increase the number in size of future blackouts and pose new risks to public safety."[3]

PG&E succeeded in achieving public repetition of the story it may have provided to the CPUC that PSPS would double if probation conditions 11 and 12 were adopted. At the same time, PG&E deprived this Court, parties, *Amici*, and the public the opportunity to engage in meaningful analysis of the basis for those statements which were misaligned with PG&E's 2021 LiDAR study. That study was based on a flawed methodology that comment from the parties would have sooner revealed.

The harm in this federal criminal probation is clear: PG&E's failure to produce this analysis relevant to its probation conditions, and to the Court's direct questions to PG&E, prevented the parties in this matter from analyzing PG&E's assertions prior to midnight before the hearing. The CPUC's limited description on Friday, March 19, 2021 of the analysis PG&E provided to the CPUC, without disclosure of the underlying document, provided an insufficient basis for analysis of the methodological flaws underlying the assumption PG&E perpetrated.

On March 22, 2021, in Dkt. 1366, *Amici* filed a request to file a brief, p. 6 of which asks this Court to order PG&E to provide the basis for the analysis the CPUC

_____

[2] Nicolas Iovino, *California Officials Oppose PG&E Mandates That Could Expand Blackouts*, Courthouse News Service, Feb. 19, 2021, https://www.courthousenews.com/california-officials-oppose-pge-mandates-that-could-expand-blackouts//
[3] KQED, California Report, March 23, 2021, https://archive.org/details/KQED_88_5_FM_20210323_100000?start=10464&q=increase+power+shutoffs+public+utilities+

23

cited on March 19. In that filing, *Amici* states "***Amici respectfully recommend this Court order PG&E to provide any basis for that analysis under oath in a manner publicly available through this docket.***" (*Id.*, emphasis in the original).

*Amici*'s March 22 filing asked about the causes of the asserted "doubling" of PSPS:

> This [the CPUC's March 19] recounting of PG&E's statement to the CPUC omits any analysis of the underlying cause of such an increase.
>
> • Is PG&E's record-keeping and information management so deficient that PG&E would double PSPS if it took the status of vegetation management into account because it is unable to ascertain the status of its vegetation management compliance?
>
> • Is PG&E's vegetation management so poor that PSPS would double if PG&E took compliance with federal and state vegetation management rules into account?
>
> • Is there another cause or violation(s) of state or federal law that would drive this asserted doubling in PSPS if the status of PG&E's vegetation management were considered?
>
> • What are the barriers to PG&E's compliance with its vegetation management obligations that would reduce the increase from considering this factor?

*Amici* emphasized the imperative of receiving evidence regarding the asserted causes of PSPS increases, rather than merely stating anticipated potential consequences:

> Focus on the *outcome* of consideration of PG&E's vegetation management on PSPS as contemplated by probation conditions 11 and 12 overlooks PG&E's *conduct* that it believes would *cause* that outcome. It is imperative to public safety and to rehabilitation of PG&E that PG&E disclose the basis for its analysis under oath, and subject that analysis to public scrutiny in this federal criminal probation.

PG&E failed to timely produce its March 2020 Lidar study and disclose that it had given the document to the CPUC on March 8. PG&E failed to disclose its representations to the CPUC and the basis for the CPUC's March 19 letter that

stated PSPS would double if probation conditions 11 and 12 were adopted. PG&E's conduct interfered with this Court's administration of justice. PG&E effectively denied this Court, the United States Department of Justice, the Federal Monitor, *Amici* representing PG&E customers Canarra and Nelson—who are concerned about PG&E's poor safety record—and other *Amici,* the opportunity to timely analyze and comment on the basis for PG&E's representations to the CPUC and asserted increase in PSPS.

### III. PG&E'S CONDUCT RAISES CONCERNS ABOUT WHETHER PG&E ENGAGED IN A PATTERN OF CONTEMPT OF COURT OR OTHER OFFENSES INCLUDING OBSTRUCTION OF JUSTICE

PG&E's deliberate and knowing attempts to circumvent this Court interfere with the administration of justice in PG&E's federal criminal probation. PG&E needed only produce its March 2021 Lidar study on March 12 as an Exhibit to explain its analysis in response to questions 22 and 24. PG&E had an opportunity every day to file that study after it prepared that analysis. PG&E should have filed that study when PG&E gave it to the CPUC on March 8, 2021. PG&E should have filed that study as an exhibit to its response to questions 22 and 24 filed on March 12, 2021. PG&E should have filed that analysis on the afternoon of March 22, 2021 when it emphasized the importance of the "fire risk thresholds" PG&E had provided to the CPUC. Despite filing thousands of pages of documents between March 8-22, 2021, did not produce the *one* document it sent to the CPUC to persuade the CPUC to oppose probation conditions 11 and 12 and repeat PG&E's representations about the effect of those probation conditions.

This was a deliberate pattern of conduct carried out apparently by several people at PG&E and perhaps, by people retained by PG&E. This series of actions raises questions about what PG&E's lawyers knew in their filings of March 12 and March 22.

25

AMICI'S REQUEST TO FILE A BRIEF RESPECTFULLY RECOMMENDING                    CASE NO. CR 14-0175 WHA
THE COURT ISSUE AN ORDER TO SHOW CAUSE

Did PG&E's lawyers know about PG&E's meetings with the CPUC and its submission of the March 2021 Lidar study to the CPUC on March 8? Some of PG&E's regulatory attorneys set up the March 8 meeting and may have attended that meeting with the CPUC. Were PG&E's counsel who filed its March 12 answer to this Court's question 22 and 24 aware of PG&E's 2021 LiDAR study and the March 8 meeting with the CPUC?

PG&E's March 22 filing in PG&E Dkt. No. 1354 (at 3) emphasizes to the Court that "PG&E shared with the CPUC the fire risk thresholds that it has been considering to address the issue of tall trees in proximity to PG&E's lines." Yet, the lawyers who signed PG&E Dkt. No. 1354 did not disclose the basis for the analysis they referenced, nor the prior submission of that document to the CPUC.

Neither did the lawyers who filed the March 12 answer to the questions of this Court mention the "Distribution HFTD Lidar" document PG&E provided to the CPUC on March 8. The answer to question 24 so closely touches on the analysis in that document that it suggests the lawyers who filed the March 12 answer to this Court's questions may have been aware of that document. This pattern raises troubling questions about the role of PG&E, PG&E personnel and agents including its legal counsel. It appears PG&E and its agents engaged in a pattern of conduct designed to keep the March 2021 Lidar study out of the view of this Court, the US DOJ, the Monitor, *Amici*, and the public, while attempting to persuade the CPUC to oppose probation conditions 11 and 12.

PG&E has recognized that the corporation and the people who engaged in this pattern of conduct may have deliberately attempted to interfere with this Court's administration of PG&E's federal criminal probation.

*Amici* are concerned about how long PG&E has been engaging in this pattern and about its previous communications with the CPUC, Cal OES, and others including any potential communications with the California Governor's Office or the California Legislature or the press that may have attempted to interfere with the

26

administration of PG&E's criminal probation by providing information to those entities not disclosed in its federal criminal probation.

Were recidivist felon PG&E a person rather than a corporation, PG&E would remain incarcerated, unable to reach or communicate with a wide range of officials, to persuade those officials in weighing in against probation conditions. PG&E, a recidivist convicted felon, does not wear an orange jumpsuit as do those convicted *in persona*. Yet, PG&E stands before this Court and the public as a convicted felon. Sadly, PG&E's conduct does not reflect the respect for justice and its federal criminal probation due from a federal convict.

Apparently anxious to avoid additional probation conditions, PG&E visited and communicated with some officials including CPUC staff about its federal criminal probation. PG&E's March 2021 LiDAR study and conversations with CPUC staff induced the CPUC to file a letter with misstatements about the potential consequences of probation conditions 11 and 12. PG&E could have communicated its March 2021 LiDAR study to this Court no later than March 12, 2021, and forthrightly made its legal arguments about the analysis of that study. Instead, PG&E appears to have chosen to have subverted justice, this time before the federal criminal court.

Apart from this criminal proceeding, PG&E's Senior Executives and Board of Directors should examine whether PG&E staff and representatives attempted to circumvent this Court's administration of federal criminal probation. PG&E should determine whether the action of its executives, employees and representatives was consistent with PG&E's guidelines and standards.

/ / /

/ / /

/ / /

/ / /

/ / /

**A. PG&E's Pattern of Evasion Indicates that PG&E May Have Committed Civil or Criminal Contempt of Court, or Other Federal Offenses Including Obstruction of Justice, Meriting Briefing in Response to an Order to Show Cause about this Matter.**

As *Amici* stated at the March 23, 2021 hearing, *Amici* are concerned that PG&E's conduct may constitute contempt of court. Contempt of court is defined as any act which is calculated to embarrass, hinder, or obstruct a court in the administration of justice, or which is calculated to lessen the authority or dignity of a court.[4] The power to punish acts of contempt is inherent in all courts.[5] *Amici* recommend the court examine whether PG&E's pattern of conduct regarding the proposed probation conditions reflects civil or criminal contempt of court.

Federal statute 18 U.S.C. § 401, grants the federal courts broad powers to punish acts of criminal contempt. This general federal contempt statute states:

> A court of the United States shall have the power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as –
>
> (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
>
> (2) Misbehavior of any of its officers in their official transactions;
>
> (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

---

[4] Joel M. Androphy and Keith A. Byers, *Federal Contempt of Court*, Berg & Androphy, https://www.bafirm.com/publication/federal-contempt-of-court/, (last visited, March 25, 2021) (citing Black's Law Dictionary 288 (5th ed. 1979)).

[5] *Id.* (citing Chambers v. NASCO, Inc., 501 U.S. 32 (1991); accord Roadway Express, Inc. v. Piper, 447 U.S. 752, 764 (1980); Green v. United States, 356 U.S. 165 (1958); Gompers v. Buck's Stove & Range Co., 221 U.S. 418 (1911); United States v. Shipp, 203 U.S. 563 (1906); In re Terry, 128 U.S. 289 (1888); Ex parte Robinson, 86 U.S. (19 Wall.) 505 (1873); Anderson v. Dunn, 19 U.S. (6 Wheat) 204 (1821).

To establish a criminal violation of § 401(l), the following four elements must be established beyond a reasonable doubt:

> (1) misbehavior,
>
> (2) in or near the presence of the court,
>
> (3) with criminal intent,
>
> (4) that resulted in an obstruction of the administration of justice.[6]

*Amici* recommend additional briefing about whether PG&E may have committed civil or criminal contempt of Court.

Any attempt to rebuff such an Order to Show cause by proffering an excuse such as PG&E's failure to realize the responsiveness and relevance of its study to this federal criminal probation proceeding is belied by its response in Dkt. 1377 which seems to be based on PG&E's analysis in that document. PG&E's brief filed on March 22 in Dkt. 1354, p. 4 emphasizes the importance of that study to analysis of probation conditions 11 and 12 without naming that study or disclosing that PG&E had provided it two weeks early to the CPUC. Briefs in response to the OSC and fact-finding by this Court will illuminate whether PG&E committed contempt of court and underscore the respect due to this Court and federal criminal probation.

*Amici* also recommend this Court order PG&E to disgorge information about other communications it may have had with officials regarding its probation conditions. This Court has the latitude to determine the timeframe for that inquiry, whether dating from the Zogg fire, from the 2017 Wine County fires, or throughout PG&E's federal criminal probation.

---

[6] *Id.* (citing *American Airlines, Inc. v. Allied Pilots Ass'n*, 968 F.2d 523,531 (5th Cir. 1992). Except in summary proceedings involving direct criminal contempts where the judge has personally witnessed the commission of the act in question, all other criminal contempts must be proved beyond a reasonable doubt. *See Bagwell*, 114 S.Ct. at 2557).

As part of its Order to Show Cause about whether PG&E should be held in contempt of Court, *Amici* also recommend this Court consider appointing a Special Master to analyze and report to this court by July 2021 to determine whether facts exist to support this court's referral to the U.S. Attorney's Office for Obstruction of Justice and Conspiracy to Obstruct Justice. Review of the facts regarding PG&E's attempt to circumvent and undermine this Court's administration of PG&E's federal criminal probation raises serious questions about whether PG&E obstructed justice or conspired to obstruct justice.

18 USC 1503 prohibits obstruction of justice in pending federal court proceedings. 18 USC 1503(a) states:

> Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States magistrate judge or other committing magistrate, in the discharge of his duty…or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subsection.

The elements of a prima facie case of obstruction of justice are: (1) the existence of a judicial proceeding; (2) knowledge or notice of the pending proceeding; (3) acting corruptly with the intent of influencing, obstructing, or impeding the proceeding in the due administration of justice: and (4) the action had the natural and probable effect of interfering with the due administration of justice."[7] This statute may apply to pending criminal proceedings such as PG&E's federal criminal probation.

In addition, this Court should consider whether PG&E engaged in witness tampering in its federal criminal probation in violation of 18 U.S. Code § 1512.

---

[7] *United States v. Sussman*, 709 F.3d 155, 168 (3d Cir. 2013) ("Under 18 U.S.C. §1503(a); *United States v. Thomas*, 612 F.3d 1107, 1128-129 (9th Cir. 2010).

18 U.S. Code § 1512 prohibits tampering with a witness:

> (b)Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—
>
> (1) influence, delay, or prevent the testimony of any person in an official proceeding;
>
> (2) cause or induce any person to—
>
> (A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;
>
> (B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;
>
> (C) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or
>
> (D) be absent from an official proceeding to which such person has been summoned by legal process; or
>
> (3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation supervised release, parole, or release pending judicial proceedings;
>
> shall be fined under this title or imprisoned not more than 20 years, or both.

"The term "corruptly" in the phrase "corruptly persuades" as it appears in subsection 1512(b) has been found to refer to the manner of persuasion, the motive for persuasion, and the manner of obstruction."[8]

---

[8] Charles Doyle, *Obstruction of Justice: An Overview of Some of the Federal Statutes That Prohibit Interference with Judicial, Executive, or Legislative Activities*, Congressional Research Service, at 11 (April 17, 2014), https://fas.org/sgp/crs/misc/RL34303.pdf (citing, for example, *United States v. LaShay*, 417 F.3d 715, 718 (7th Cir. 2005)("corrupt persuasion occurs where a defendant tells a potential witness a false story as if the story were true, intending that the witness believe the story and testify to it")(very much like the offenses elsewhere in subsection 1512(b) of "knowingly ... engag[ing] in misconduct toward another person" with obstructive intent); United States v. Gotti, 459 F.3d 296, 343 (2d Cir. 2006)("This Circuit has defined 'corrupt persuasion' as persuasion that is 'motivated by an improper purpose.' *United States v. Thompson*, 76 F.3d 442, 452 (2d Cir. 1996); *United States v. Baldridge*, 559 F.3d 1126, 1143 (10th Cir. 2009)

31

1    Although often applied at trial, this statute may be applicable in federal

2  criminal probation where the convicted felon attempts to interfere with the

3  administration of justice by providing misrepresentations to a party such as the

4  CPUC whose opinion the Court invited Dkt. 1317:

5         The key question that the Court has for the CPUC and the California

6         Governor's Office of Emergency Management is:

7         What specific procedure would you require of PG&E in its implementation of

8         the PSPS process that would have prevented the Zogg Fire and four deaths

9         resulting therefrom?

10        Be aware that PG&E and the United States have both said that the proposal

11        made by them would not have prevented the Zogg Fire.

12  The CPUC responded in 1320 on February 26, 2021:

13        The CPUC does not disagree with the Court that the state of PG&E's
      vegetation management could be an appropriate consideration when
14        determining whether to deenergize any distribution line as part of a
      Public Safety Power Shutoff, but we can go no further at this time,
15        without fully vetting and allowing expert and public comment on the
16        competing considerations. Through its February 19, 2021 submission
      to the Court, the CPUC was attempting to advise the Court of the innate
17        hazards that come with large-scale PSPS events and the concern
      expressed by many participants in CPUC proceedings about the
18        vulnerabilities they face when these events occur.
19

20  This response and the CPUC's February 19, 2021, filing by the CPUC also respond

21  to probation conditions 11 and 12.

22        With deep concern and respect, *Amici* recommend this Court's Order to Show

23  Causes examine whether PG&E's conduct is tantamount to witness tampering in

24  PG&E's federal criminal probation. *Amici* recommend this Court issue an Order to

25

26  ("[T]he 'corruptly persuades' element requires the government to prove a
27  defendant's action was done voluntarily and intentionally to bring about false or
   misleading testimony or to prevent testimony with the hope or expectation of some
28  benefit to the defendant or another person")).

Show Cause and/or appoint a Special Master to determine if the facts support a referral to the U.S. Attorney's Office to determine whether PG&E obstructed justice or engaged in a conspiracy to obstruct justice or engaged in criminal contempt of court through its conduct in federal criminal probation.

PG&E was convicted in 2017 of obstructing justice in the NTSB's investigation. PG&E's five-year federal criminal probation was imposed to protect public safety and rehabilitate the offender following its conviction for obstruction of justice and violations of the National Gas Pipeline Safety Act.  PG&E's conduct raises serious questions about whether PG&E committed contempt of court and potentially obstruction of justice and conspiracy to obstruct justice in its federal criminal probation.

Rehabilitation of the offender has apparently not been achieved during PG&E's probation as PG&E continues its evasive behavior that interferes with administration of justice. PG&E's criminal thinking continues to drive its criminal conduct. As a result, at least 115 lives have been lost due to PG&E's conduct during its federal criminal probation (111 referred to in Dkt. No. 1277, p. 2, with the addition of four more who died in the 2020 Zogg fire).

PG&E's disrespect for this Court and its federal criminal probation are evident in PG&E's attempts to evade this Courts questions and jurisdiction. PG&E did not engage in forthright legal argument. Instead, PG&E deliberately evaded this Court through its campaign to induce the CPUC to oppose proposed probation conditions 11 and 12 designed to safeguard lives and rehabilitate PG&E. *Amici*, representing PG&E customers Nelson and Canara who are concerned about PG&E's recklessly poor safety record, are dismayed that more than four years into PG&E's federal criminal probation, PG&E continues to attempt to dodge and evade this Court and PG&E responsibilities to the public and to the administration of justice.

/ / /

/ / /

## IV. CONCLUSION

For the reasons discussed above, *Amici* respectfully recommend that this Court: 1) issue an order to show cause to determine whether PG&E committed civil or criminal contempt of court; 2) appoint a Special Master to investigate and promptly report to this court by July 2021 facts relevant whether this court should refer PG&E and/or some of its officers, employees, or agents to the U.S. Attorney's Office to investigate whether PG&E engaged in obstruction of justice, a conspiracy to obstruct justice, or criminal contempt of court; and; 3) as part of its OSC on contempt of court, direct PG&E to publicly file in this docket all records of its communication with the CPUC, Cal OES, the California Governor's Office, California legislature members, staff, or committees, and members of the press regarding this Court's probation conditions, and order PG&E to file publicly in this docket records and summaries of any such communications regarding PG&E's federal criminal probation for the duration of its probation term.

*Amici* offers these suggestions to safeguard the integrity of the administration of justice in PG&E's criminal probation, to protect public safety, and rehabilitate PG&E, consistent with the goals of federal criminal probation. Amici respectfully appreciates the Court's consideration of these weighty matters.

CATHERINE J. KISSEE-SANDOVAL
Associate Professor
Santa Clara University School of Law

Dated:  March 29, 2021          */s/Catherine J.K. Sandoval*, Esq.,
                                AGUIRRE & SEVERSON, LLP

Dated:  March 29, 2021          */s/Maria C. Severson*
                                Maria C. Severson, Esq.,
                                Attorneys for *Amici* Petitioners
                                Alex Cannara and Gene A. Nelson

34