Michael J. Aguirre, SBN 060402, maguirre@amslawyers.com
Maria C. Severson, Esq., SBN 173967, mseverson@amslawyers.com
**AGUIRRE & SEVERSON, LLP**,
501 West Broadway, Ste. 1050, San Diego, CA 92101 (619) 876-5364

Catherine Janet Kissee-Sandoval, SBN 153839, Csandoval@scu.edu
**Director, Institute for Insurance Law, Santa Clara University School of Law**
500 El Camino Real, Santa Clara, CA 95053-0421 (408) 551-1902

(Attorneys for *Amici* Alex Cannara and Gene A. Nelson)

June 1, 2021

The Honorable William Alsup
United States District Court Judge, USDC for the Northern District of California

> Re: *Amici* Request (1) to File Brief Regarding Proposed Inspection Topics for
> PG&E's Monitor, and (2) to Appear at the June 2, 2021 Status Conference

Dear Honorable Judge Alsup:

*Amici* representing Alex Cannara and Gene Nelson, PG&E customers concerned about PG&E's
poor public safety record, submit this letter to (1) suggest topics this Court should assign
PG&E's Monitor to investigate, and (2) request to appear at the June 2, 2021 PG&E's criminal
probation status conference.

## I.     RECOMMENDATIONS RE THE MONITOR

In Dkt. 1389, this Court ordered PG&E's Monitor to continue walking PG&E's distribution lines
on an unannounced basis to conduct spot checks. The Monitor is required to "vet PG&E's work
done in removing vegetation and hazards from the front lines and in prioritizing the work." (*Id.*
at 1). ***Amici* respectfully suggest this Court order the Monitor to conduct spot checks and
inspections at PG&E's offices and virtual inspections as needed due to the COVID-19
pandemic.** This Court's order directs inspection of PG&E's efforts in "prioritizing the work,"
recognizing that many of PG&E's safety problems are created at PG&E headquarters, not in the
field.

*Amici* respectfully recommend this Court order the Monitor to examine PG&E's management
and oversight of:

> 1) PG&E's vegetation management process to ensure inspection, trimming, and removal
>    crews are dispatched consistent with risk-based priorities, and that inspection
>    determinations (trimming, removal, etc.) are promptly and properly executed;

1

2) PG&E's utility pole inspections and execution of inspection requirements and priorities;

3) PG&E inspection of work conducted, *e.g.*, decommissioning of electric lines, whether transmission or distribution, to ensure that work was done properly and does not create any safety hazards; and

4) PG&E's reliance on visual inspection methods, without consideration of asset age, expected useful life, or spot-checks of conditions associated with metal and component fatigue.

### A. <u>Recommend Monitor Inspection of PG&E Vegetation Management Process</u>

*Amici* respectfully suggest this Court order the Monitor to inspect PG&E's process to ensure that vegetation inspection determinations (trimming, removal, etc.) are timely and fully executed. This examination should review the role of PG&E's data and information systems in its vegetation management process. PG&E admitted to this Court that its databases do not communicate with its vegetation management contractor databases. (Dkt.No. 1323-14, Exhibit N-2, p. 78, lines 1-5).

PG&E relies on Excel spreadsheets sent from subcontractors to PG&E that indicate inspection determinations (trimming, removal, etc.). In the Zogg fire area, for example, PG&E admitted in docket 1337, p.11, that the exhibits PG&E produced in Dkt. 1323-H indicate that PG&E's contractor identified Gray Pine trees for vegetation management work, though that work was never completed.[1] PG&E has produced no evidence of any system used to ensure that those inspection determinations are executed.

As *Amici* pointed out in Dkt. 1333: "PG&E has produced no evidence indicating that its personnel were reviewing the reports of Mountain G or CFVM [the contractors working in the Carr fire area that later became the scene of the Zogg fire] in any detail. Neither has it produced any evidence showing action taken to address missing fields left in records by vegetation management crews such as the lack of "tree worked" timelines or latitude and longitude data." "PG&E took no responsibility for creating systems that would allow PG&E to exercise the supervisory rule incumbent on PG&E as the electric and natural gas service franchisee." *Id.*

To protect public safety, *Amici* respectfully request this Court order the Monitor to examine and conduct inspections regarding PG&E's vegetation management process, including information and supervision management.

### B. <u>Recommend Monitor Examination of PG&E Utility Pole Inspection</u>

PG&E's 7 May 2021 letter to the CPUC, a copy of which is attached, **admits that it did not inspect 54,755 poles in 2020** as required by CPUC General Order 165. PG&E's explanation for

---

[1] *See* Dkt. 1323-H, Exhibit H-5.1, "PI" tab at rows 6274 and 6275 (indicating that crews identified two Grey Pines for work in the area where the Zogg fire ignited). *See also* Dkt. 1323, Exhibit H-6.1, "Tree Data" tab at rows 12158 and 12159, and Exhibit H-7, Mountain G "Carr Fire Daily Report," identifying Gray Pines on the "Tree Data" tab at rows 12158 and 12159.

its failure to carry out these required inspections is stunning. PG&E blames its poor internal communications for this failure, skimming over what appears to be lack of any accountability for defiance of PG&E senior management and failure to meet CPUC requirements. PG&E's May 7 CPUC letter stated about the overdue inspections:

> Upon further reflection, and since there was still time to perform the inspections within the required timeframe, the Senior Vice President of Electric Operations directed the inspection organization to complete the enhanced inspections before the end of 2020 and report any missed poles in our annual GO 165 report for 2020, to the extent any were actually late. Despite the intent to inspect the Tier 2 poles in 2020, there was a breakdown in communication. Our 2020 work plan was not updated to include the GO 165 inspections for the 54,755 poles, and most of these poles were not inspected in 2020.

If PG&E's Senior Vice President of Electric Operations directed the inspection organization to complete the required safety inspections for 54,755 poles by the end of 2020, why wasn't this order executed? PG&E offers no explanation except for "breakdown in communication." Where was the breakdown? Was the order given but not executed? Who failed to execute the order and why? Were there any procedural backstops in place to ensure that required inspections were carried out? Was any personnel action (firings, suspensions, disciplines, ineligibility for bonuses) conducted by PG&E in response to this action. This is not simply a "communications" issue, it is a PG&E management failure that leaves people and property at risk.

PG&E's May 7 letter informed the CPUC that its review of the 54,755 missed inspections "identified that we also should have inspected, but did not inspect, 3,296 poles in Tier 3 as required by our 2020 Wildfire Mitigation Plan." Once again, PG&E has failed to execute its priorities, in this case required by PG&E's 2020 Wildfire Mitigation Plan approved by the CPUC.

PG&E's May 7 letter characterizes its failure as a "compliance issue, not a safety issue," citing other less intrusive inspections it conducted. PG&E's characterization is not controlling. Failure to conduct required inspections and work extensively litigated and approved through PG&E's Wildfire Mitigation Plan increases safety risks.

*Amici* respectfully suggest that this Court order the Monitor to examine PG&E's utility pole inspection process, and other required inspection processes. As part of that examination, the Monitor should examine PG&E's management and personnel processes including its bonus and incentive structure. If PG&E ties bonuses to the absence of "safety" problems, does that structure create a perverse incentive to recharacterize issues as *not* a safety problem? Is PG&E appropriately documenting work orders and their execution, and holding people accountable for carrying out work priorities?

### C. Recommend Monitor Inspection of PG&E Work Quality

*Amici* respectfully recommend this Court order the Monitor to examine PG&E's work quality inspection process. Jaxon Van Derbeken of NBC News reported about the Kincade fire:

When PG&E crews went to decommission the line in 2001, Cal Fire found they disconnected the wire from a clamp on the tower that was designed to secure the line and keep it taut in high winds.

Cal Fire said the now loose line was left unsecured for more than a decade and suffered "low cycle fatigue" from twisting and bending in high winds.[2]

The Monitor should be ordered to examine PG&E's process for inspecting its work quality. Disconnecting a live wire from a clamp leaves it vulnerable to low cycle fatigue. This conduct reveals poor PG&E work and inspection quality that fuels safety risks. The Monitor's examination should also evaluate PG&E's decommissioning process. Does PG&E leave decommissioned lines energized and continue to include them in PG&E's rate base as "used and useful?" Was the line that ignited the Kincade fire still in PG&E transmission ratebase? If the line is still energized (as the line that caused the Kincade fire) appears to have been, what process is in place to ensure the line is properly secured? What work does PG&E do to ensure that work is conducted to professional safety standards, consistent with CPUC and Federal Energy Regulatory Commission rules and other applicable standards?

PG&E's failures to inspect its own work are at the root on the San Bruno natural gas explosion. PG&E planted the seeds of that explosion through its use of non-pipeline grade material and inadequate welds when work was conducted on that line in the 1950s.[3] The Monitor's examination of PG&E's work oversight process is critical to protect public safety and prevent substandard work.

### D.   Recommend the Monitor Review PG&E's Reliance on Visual Inspections in lieu of Asset Records, Information about Asset Useful Life, or Inspections to Determine Internal Wear of Components

*Amici* respectfully recommend this Court order the Monitor to inspect PG&E's reliance on visual inspection methods in lieu of examining asset age, expected useful life, or conducting intrusive inspections capable of detecting internal wear such as metal fatigue. In Dkt. 1313 *Amici* highlighted the danger of PG&E's reliance on visual inspection and claim that its process was "industry standard" as insufficient to protect public safety. Dkt. 1313 notes:

---

[2] Jaxon Van Derbeken, *Kincade Fire Tied to PG&E Failure to Decommission an Unneeded High-Voltage Line*, NBC BAY AREA, Oct. 22, 2020, Updated, Oct. 23, 2020 at 9:09 am, https://www.nbcbayarea.com/news/local/kincade-fire-tied-to-pge-failure-to-decommission-an-unneeded-high-voltage-line/2384828/.

[3] National Transportation Safety Board (NTSB), Pacific Gas and Electric Company Natural Gas Transmission Pipeline Rupture and Fire, Executive Summary, Aug. 30, 2011, https://www.ntsb.gov/investigations/AccidentReports/Pages/PAR1101.aspx ("The National Transportation Safety Board determines that the probable cause of the accident was the Pacific Gas and Electric Company's (PG&E) (1) inadequate quality assurance and quality control in 1956 during its Line 132 relocation project, which allowed the installation of a substandard and poorly welded pipe section with a visible seam weld flaw that, over time grew to a critical size, causing the pipeline to rupture during a pressure increase stemming from poorly planned electrical work at the Milpitas Terminal; and (2) inadequate pipeline integrity management program, which failed to detect and repair or remove the defective pipe section.")

On page 33 of the May 28, 2020 hearing Mr. Orsini stated at lines 7-11:

> Asset age is not the primary motivator or even one of the key motivators
> of the maintenance of these systems. This is a condition-based
> inspection program. It's looking at the specific condition that exists.
> That is the industry standard.

[Amici observed in its brief] Whether or not maintenance and operation based on condition inspection, with no regard to asset age is or is not the industry standard, is not the relevant question. Rather, the issue is whether PG&E's operation and maintenance comply with applicable law including CA PU Codes 451, 8386(a), Public Resources Code Section 4293, GO 95, FERC FAC-003-4, and the conditions of PG&E's probation.

PG&E has a metallurgical laboratory that can conduct more detailed inspections than visual inspections. As discussed in the story by Brandon Rittiman of ABC:

> PG&E's metallurgical laboratory "discovered "severe wear" on steel parts holding
> up a 72-year-old power line in the East Bay Area. An internal report from PG&E's
> own materials lab neglected the risk of those parts cracking and concluded that they
> had as many as 28 years of "remaining life," even though PG&E's own
> maintenance policies said they did not. The lab report provides a window into what
> prosecutors call PG&E's "run to failure" policy of delaying maintenance on power
> line parts until they break.[4]

These discoveries were made through PG&E's metallurgical laboratory using equipment to find evidence of cracking or "fretting" detectable by examining cross-section of internal portions or material. *Amici* recommend the monitor examine PG&E's use of its metallurgical laboratory. "Engineers in the materials lab were under pressure to "sell" their services to supervisors around the company, Bantz said. When PG&E's power grid managers wanted to see years of remaining life, that's what the lab gave them," Rittiman reported.[5]

The Monitor's examination should evaluate PG&E's standards and process for using its metallurgical laboratory, the communications that appear to pressure the lab to find a remaining useful life in equipment, and the process for follow-up from the lab's recommendations. Professor Catherine Sandoval commented in Mr. Rittiman's story that it "is not the responsibility of some guy [in a PG&E lab] to convince another boss to send them work. It is PG&E's responsibility as the corporation that owns those assets to maintain those assets."[6] The Monitor

---

[4] Brandon Rittiman, *ABC10 Investigation: PG&E knew old power line parts had 'severe wear' months before deadly Camp Fire*, ABC10, Feb. 16, 2021, updated Feb. 17, 2021, https://www.abc10.com/article/news/local/wildfire/run-to-failure-what-pge-knew-and-when/103-e4654585-1036-47bb-9078-137893ac242d.

[5] *Id.*
[6] *Id.*

should examine the process by which the lab solicits jobs to be sent to it and examine the lifecycle of lab projects to PG&E follow-up, to better manage PG&E's assets and protect public safety.

## II.     REQUEST TO APPEAR AT THE 2 JUNE 2021 STATUS CONFERENCE

*Amici* respectfully request to appear at the June 2 Status Conference at 2:00 p.m. to briefly discuss these recommendations for the Court's orders to PG&E's Monitors and to provide additional briefing, if any, as requested by the Court.

Respectfully submitted,

/s/ *Catherine Sandoval*, Director, Institute for Insurance Law, SCU Law

/s/ *Michael J. Aguirre, /s/ Maria C. Severson*
Attorneys for *Amici*, Alex Cannara and Gene Nelson