Michael J. Aguirre, SBN 060402, maguirre@amslawyers.com
Maria C. Severson, Esq., SBN 173967, mseverson@amslawyers.com
**AGUIRRE & SEVERSON, LLP**,
501 West Broadway, Ste. 1050, San Diego, CA 92101 (619) 876-5364

Catherine Janet Kissee-Sandoval, SBN 153839, Csandoval@scu.edu
**Director, Institute for Insurance Law, Santa Clara University School of Law**
500 El Camino Real, Santa Clara, CA 95053-0421 (408) 551-1902

(Attorneys for *Amici* Alex Cannara and Gene A. Nelson)

July 2, 2021

The Honorable William Alsup
United States District Court Judge, USDC for the Northern District of California

> *Re: Request to File Brief Regarding Proposed Inspection Topics for PG&E's Monitor Following PG&E's May 7, 2021 Report to the CPUC About Safety Issues Regarding 543,560 Cellon-treated in-service PG&E wood poles and Request to Appear at the August 2, 2021 Status Conference*

Dear Honorable Judge Alsup:

*Amici* Alex Cannara and Gene Nelson, PG&E customers concerned about PG&E's poor public safety record, submit this letter to suggest additional topics this Court should assign PG&E's Monitor to investigate following PG&E's May 7, 2021 report to the California Public Utilities Commission (CPUC) about safety issues regarding 543,560 Cellon-treated in-service PG&E wood poles at risk of failure due to dry rot. (PG&E's May 7, 2021 letter is attached as Exhibit A). *Amici* also request to appear at the August 2, 2021 PG&E's criminal probation status conference.

***PG&E's fleet of Cellon-treated poles at risk of failure pose a high and widespread safety risk, meriting immediate action by this Court and the Monitor to protect public safety***. PG&E's 543,560 Cellon-treated pole represent more than 22% of all PG&E poles.[1] Jaxon van Derbeken's June 25, 2021 story for NBC Bay Area News reports that CPUC records indicate more than 200,000 of PG&E's cellon-treated poles are in High Fire Treat District (HFTD) areas, while more than 300,00 are in urban and suburban areas.[2] Each of these poles is vulnerable to

---

[1] PG&E, Facts about PG&E Pole Management and Maintenance, PG&E Currents (Nov. 8, 2017), https://www.pgecurrents.com/2017/11/08/facts-about-pge-pole-management-and-maintenance/ (reporting that PG&E manages "2.4 million power poles throughout its 70,000 square-mile service area.") [hereinafter *PG&E, Facts about PG&E Pole Management and Maintenance*].

[2] Jaxon Van Derbeken, *PG&E Raises 'Safety Concern' About Half-Million Aging Power Poles*, NBC Bay Area News (June 25, 2021, updated, June 26, 2021 at 12:15 am),

1

dry rot failure or collapse that can ignite a wildfire, electrocute members of the public or PG&E workers, and damage property and the environment. PG&E's unsafe management of its assets, records, inspection methods heighten these public safety risks.

PG&E's May 7, 2021 letter to the CPUC reported that it stopped installing Cellon-treated poles in 1989, but fails to disclose when it discovered problems with Cellon-treated poles. By 2016 there were public reports of Cellon-treated pole failures in Pennsylvania including dry rot that hollowed out poles and could lead to pole collapse, creating safety and reliability problems.[3] (See Exhibit B, pp. 16-17 for photos of PPL Cellon-treated poles including a hollowed-out pole suffering extensive dry rot). PG&E has disclosed no information about when it found out about the dry rot problems with its more than 500,000 cellon-treated poles. Neither has it disclosed when it received indications that its inspection process failed and may have obscured dry rot problems with Cellon-treated poles.

PG&E has yet to submit information to this Court regarding safety issues posed by its Cellon-treated wood poles and its response to their dry rot failure risk. Neither did PG&E disclose whether it informed PG&E's Monitor about this safety issue when it first discovered that its 2015 and 2005 intrusive inspections failed to detect significant internal dry rot in Cellon-treated wood poles. Nor has PG&E made it clear when it discovered that its inspection methods were not detecting, and may have obscured, the significant dry rot that causes Cellon-treated wood poles to weaken from the inside. This substantial dry rot may lead Cellon-treated wood poles to collapse, causing fire and safety dangers.

PG&E has not disclosed in this federal criminal probation docket that on July 8, 2020, "a Cellon gas-treated pole failed in a customer's backyard in Danville, CA."[4] It is our understanding that a neighbor alerted PG&E about the learning pole before the pole failure incident. PG&E's records should have alerted it to the fact that the leaning pole was a Cellon-treated pole susceptible to internal wood rot. PG&E should have recognized this incident as symptomatic of a widespread issue putting millions of PG&E customers and neighborhoods in PG&E territory at risk of sudden pole failure that could spark electrocution risk, fire, and property damage.

On July 8, 2020, that Cellon-treated pole collapsed and fell onto the homeowner's roof in Danville. The utility pole's collapse led the conductors to snap from the pole and dangle into a

---

https://www.nbcbayarea.com/investigations/pge-raises-safety-concern-about-half-million-aging-power-poles/2579796/

[3] See PPL Asset Management, PPL Electric Utilities (May 23, 2016), https://pjm.com/~/media/committees-groups/task-forces/trpstf/20160523/20160523-item-03-education-module-3-ppl-asset-management.ashx

[4] Letter from Lise Jordan, Sr. Director, Regulatory Compliance and Quality Assurance to Nika Kjensli, Program Manager, ESRB, SED, California Public Utilities Commission, Re: Safety Issue Notification: Cellon-Treated Wood Poles (May 7, 2021), https://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/Electric_Safety_and_Reliability/SSI%20Notification_Cellon%20Poles.pdf [hereinafter *PG&E May 7, 2021 letter re: Cellon-Treated Wood Pole Safety Issues*].

neighbor's swimming pool. By minutes, fatalities were avoided because the neighbor, who had been outside three minutes earlier, was inside when the pole fell and the line made contact with his swimming pool.[5] Through grace, no person was injured.

This near miss could have been a tragedy and is symptomatic of larger safety problems at PG&E. This incident highlights the danger of PG&E's operational theory that relies heavily visual inspection and fails to consider asset records and records about issues such as dry rot risks from Cellon-treated poles. This failure occurred during PG&E's federal criminal probation, yet PG&E has not disclosed in this docket this widespread and substantial safety issue.

Nearly six months after the pole collapse in Danville, PG&E reports that it "initiated an Apparent Cause Evaluation (ACE) in January 2021 and identified two apparent causes: (1) extensive internal dry rot and (2) failure to detect the rot during the previous inspections."[6] PG&E "analyzed Cellon pole inspection records and found that after poles reach approximately 42 years in age, the rate of intrusive inspection rejections increases versus non-Cellon poles, resulting in a greater need for reinforcement or replacement."[7] PG&E stated that approximately "70% of our Cellon-treated poles will be older than 42 years by 2022, and 100% by 2030."[8]

PG&E has not disclosed any information in this docket about the estimated useful life for its Cellon-treated wood poles. PG&E's 2016 General Rate Case (GRC) testimony informed the CPUC that the life of a distribution pole "is generally considered to be on the order of 40 years."[9] The 40-year useful life estimate is consistent with PG&E's testimony in its 2007 GRC General Rate Case[10] wherein PG&E recognized Cellon as a factor limiting a pole's useful life. PG&E's testimony regarding its Depreciation Study for its 2007 GRC stated that "field engineers reported that almost a third of PG&E's poles were treated with cellon in 1960s and are not expected to last more than 10 years from now."[11] PG&E's 2007 testimony pegged the useful life of its Cellon-treated poles as ending by 2017. PG&E has not explained why it continues to rely on Cellon-treated poles past 2017 or the estimated 40-year useful life of wooden poles generally.

PG&E "also identified that the fumigant preservative used to treat inspection holes bored into the poles led to petrification of the wood immediately around the holes. Our procedures currently guide inspectors to re-use previously drilled boreholes to probe test for internal rot and to measure shell thickness. In this case, the petrified boreholes led to a misunderstanding of the

---

[5] Van Derbeken, *supra* note 2.

[6] *PG&E May 7, 2021 letter re: Cellon-Treated Wood Pole Safety Issues*, *supra* note 3.

[7] *Id.*

[8] *Id.* at n. 1.

[9] *2017 General Rate Case Phase II Updated And Amended Prepared Testimony*, PACIFIC GAS AND ELECTRIC COMPANY 5-11 (2016), https://drpwg.org/wp-content/uploads/2017/07/PGE-09-v1_GRC-2017-PhII_Test_PGE_20161202_396470.pdf

[10] 10-4-10-5, https://www.bing.com/search?q=PG%26E+2007+general+rate+case+depreciation+study+&qs=n&form=QBRE&sp=-1&pq=pg%26e+2007+general+rate+case+depreciation+study+&sc=2-47&sk=&cvid=FE70F26977F14E68A6C157D0B504BB22

[11] *Id.* at 10-4.

actual shell thickness and hindered the detection of internal dry rot."[12] It appears that PG&E's inspection methods obscured the analysis of the extent of internal rot.

PG&E failed to disclose whether any of its inspectors raised this issue during their work or made notes about their tests and treatment of Cellon-treated poles. Acoustic hammer tests should have alerted PG&E that dry rot was hollowing out the inside of Cellon-treated poles and creating a widespread safety risk. PG&E's 2007 GRC testimony about dry-rot risk from Cellon-treated poles should have led it to look for evidence of this growing problem in its inspections of those poles. PG&E has produced no evidence about whether it made its inspectors aware of the heightened risks for cellon-treated poles or how it followed-up on this safety risk.

PG&E put ONE WORD about cellon in its 2021 Wildfire Mitigation Plan (WMP), listing cellon as a pole failure risk factor:

> Poles identified for remediation each year by the various inspection programs are scheduled for replacement. Replacements are prioritized using a risk-based approach. Specifically, poles replacements are prioritized based on probability of consequence and probability of failure. Probability of consequence takes into account HFTD and circuit density (count of customers). Probability of failure takes into account some pole factors, such as age, class (class 5 poles are smallest) and treatment (cellon).[13]

This ONE word about cellon fails to disclose PG&E's knowledge about the level of risk posed by cellon treated poles or that more than 200,000 are located in HFTD. Neither does PG&E's June 3 update to its 2021 WMP make any reference to its May 7, 2021 letter to the CPUC disclosing 543,560 cellon-treated poles at risk of failure. Nor does its WMP disclose that PG&E's investigation of the Cellon-treated pole collapse in Danville revealed that its inspection methods were missing and likely masking the extent of dry rot and failure risk for those poles.

PG&E's poor management of its more than 543,560 cellon-treated poles at risk of failure merit more than one word buried deep in its 2021 WMP. A review of CPUC GRC decisions after 2007 found no mention of cellon,[14] likely because PG&E did not raise this issue in its GRC

---

[12] *PG&E May 7, 2021 letter re: Cellon-Treated Wood Pole Safety Issues*, *supra* note 3, p. 1.
[13] Pacific Gas and Electric Company, 2021 Wildfire Mitigation Plan, Revised (Rulemaking 18-10-007) p. 534 (JUNE 3, 2021), https://www.pge.com/pge_global/common/pdfs/safety/emergency-preparedness/natural-disaster/wildfires/wildfire-mitigation-plan/2021-Wildfire-Safety-Plan-Revised-060321.pdf
[14] *See*, CPUC Decision 07-03-044, Decision 07-03-044 March 15, 2007 (March 15, 2007); CPUC Decision 11-05-018 DECISION ON PACIFIC GAS AND ELECTRIC COMPANY TEST YEAR 2011 GENERAL RATE INCREASE REQUEST (May 5, 2011); CPUC Decision 14-08-032, DECISION AUTHORIZING PACIFIC GAS AND ELECTRIC COMPANY'S GENERAL RATE CASE REVENUE REQUIREMENT FOR 2014-2016 (Aug. 14, 2014); CPUC, Decision 17-05-013, DECISION AUTHORIZING PACIFIC GAS AND ELECTRIC COMPANY'S GENERAL RATE CASE REVENUE REQUIREMENT FOR 2017-2019 (May 11, 2017).

application and filings. If the Office of Energy Infrastructure Safety (OEIS) at the California Natural Resources Agency (the successor to the CPUC's Wildfire Safety Division as of July 1, 2021), approves PG&E's WMP, ratepayers may bear the cost of replacement of cellon-treated poles in PG&E territory as PG&E did not limit its pole remediation plan to HFTD.

As indicated by PG&E's GRC for its revenue requirement for 2017-2019, more than $7.5 billion is at issue from PG&E's proposed rate shift through its ONE word about Cellon in its 2021 WMP. In response to PG&E's forecast for pole replacement for PG&E's 2017-2019 GRC revenue requirement, CUE (Coalition of California Utility Employees) recommended that PG&E should replace 9,400 more poles per year than PG&E forecast, at a capital cost of $130.09 million per year.[15] That is a replacement cost of $13,829 per pole. Multiplied by 543,560 cellon-treated poles at risk of failure results in a capital cost of $7,517,319,148 for replacement of those poles. PG&E GRC Applications often result in a settlement that shifts some costs to shareholders, as noted in CPUC Decision 17-05-013 regarding PG&E's utility pole spending. That Settlement Agreement provided "PG&E will spend an additional $4 million for 2018 and an additional $6 million for 2019 for the accelerated retirement of higher risk poles, absorbing the cost of the increased pole replacement activity in the settled 2018 and 2019 post-test year revenue requirements."[16] PG&E should not mask a widespread safety problem affecting more than 22% of its poles and $7.5 billion in needed capital investment without more analysis and disclosure of PG&E's role in the deterioration of its Cellon-treated poles.

OEIS should examine PG&E's cellon-treated pole issue in more detail before approving PG&E's 2021 WMP. The CPUC should analyze whether PG&E has been forthcoming with the CPUC about its Cellon-treated pole management, inspection method, and failure risk problems. *Amici* offer several suggestions below for this Court's consideration regarding PG&E's Cellon-treated pole failure risk and its lack of candor with this Court.

The extent and scope of Cellon-treated pole dry rot failure risk raises concerns that PG&E's pole loading calculations are incorrect. Many poles are jointly owned by PG&E and a telecommunications company, primarily AT&T or Frontier.[17] Under federal and state law, many telecommunications companies and certain Internet providers have rights to access utility poles. To ensure poles are not overloaded and remain safe, "(d)uring a pole's service life, pole loading calculations are performed when load is added to a pole, or if a suspected overload condition is observed during inspection. Pole loading calculations are performed in O-Calc software during design phase to ensure poles are sized correctly to satisfy GO 95 requirements."[18]

---

[15] CPUC, Decision 17-05-013, *supra* note 15, at 60, § 4.1.3.3.
[16] *Id*.
[17] *PG&E, Facts about PG&E Pole Management and Maintenance*, supra note 1 ("Many of the poles are jointly owned between PG&E and other companies, such as AT&T. Joint owners are members of the Northern California Joint Pole Association.  Any added load to joint poles must meet the strength requirements set forth by California Public Utilities Commission (CPUC) General Order (GO) 95.")

[18] PG&E Response to the Wildfire Safety Division's (WSD) Revision Notice for PG&E's 2021 Wildfire Mitigation Plan Update (Revision Notice) p. 699 (June 3, 2021),

Pole loading calculations are used to determine whether equipment can safely attach to a utility pole without measures to strengthen the pole or building a new pole. If PG&E's pole loading calculations did not account for dry rot affecting Cellon-treated poles and the failures of PG&E's inspection methods,[19] those poles could be overloaded based on incorrect pole loading calculations.[20] Such errors may increase the risk of pole failure, property destruction, electric, communications, cable, and Internet service outages, and public safety risks.

Throughout the pleading and oral arguments about the proposed conditions for PG&E's criminal probation, PG&E remained silent about the public safety risks posed by its more than 500,000 Cellon-treated poles, more than 200,000 of which are located in high wildfire danger areas. In July 2020, this Court was considering PG&E's petition for rehearing about proposed probation conditions regarding PG&E's vegetation management, transmission asset age information gathering, and transmission inspection program. On August 7, 2020, this Court issued Dkt. No. 1243, adopting probation conditions addressing those three topics. PG&E failed to disclose the Cellon-treated pole incident that occurred the previous month in Danville, or its knowledge of safety risks due to dry rot in such poles. Following the 2020 Zogg fire, this Court considered and adopted conditions on April 29, 2021 in Dkt. 1386 regarding proposed probation conditions 11 and 12 and requiring PG&E to report to the Court regarding its public safety power shutoffs and whether there were leaning trees over lines involved in the PSPS. PG&E's failure to promptly disclose serious and widespread public safety threats associated with its poor management of cellon-treated poles reflects its deficient safety behavior. PG&E continues to hide problems, rather than being forthright with this Court, regulators, the public, and investors about safety risks created by PG&E conduct.

The PG&E's Cellon-treated pole safety issues are symptomatic of patterns of safety-compromising behavior: 1) PG&E's failure to recognize problems with its inspection methods; 2) PG&E's failure to recognize asset or inspection issues as widespread problems and practice of treating incidents as singular events, rather than symptomatic of problematic patterns; 3) PG&E's practice of keeping assets in service beyond their anticipated useful life (running to and past failure), and; 4) PG&E's safety and corporate culture that fails to promptly disclose and respond to problems. These problems reflect the root causes of PG&E's criminal conduct that led to its federal conviction for violations of the Natural Gas Pipeline Safety Act, obstruction of justice, and its plea to and conviction for 84 counts of involuntary manslaughter and one count of unlawful fire start associated with the 2018 Camp Fire.

As a convicted felon, the first condition of PG&E's probation, is to comply with federal and state laws. The CPUC has not yet made a determination about whether PG&E's conduct

---

https://www.pge.com/pge_global/common/pdfs/safety/emergency-preparedness/natural-disaster/wildfires/wildfire-mitigation-plan/2021-Wildfire-Safety-Plan-Revised-060321.pdf

[19] *PG&E May 7, 2021 letter re: Cellon-Treated Wood Pole Safety Issues*, supra note 3, p. 1.

[20] *PG&E*, *Facts about PG&E Pole Management and Maintenance*, supra note 1 ("When a pole is tested [per GO 1650 and found not to meet minimum requirements, a process is followed that may include performing pole loading calculations and/or repairing, reinforcing, or replacing the pole as necessary.")

regarding its Cellon-treated pole inspection methods, failure risks, and lack of prior disclosure violated state law. The breadth, extent, risk, and likely lengthy duration of these issues raise concerns about whether PG&E violated state laws and has put public safety at risk during its federal criminal probation.

PG&E's conduct lacks candor and contrition appropriate to a convicted felon on federal criminal probation. PG&E's failure to promptly disclose the Cellon-treated pole safety problem to this Court while on federal criminal probation reflects PG&E's lack of attentiveness to public safety obligations that apply to every utility and to the conditions of its probations.

**Recommendations:**

1. ***Amici* recommend this Court order PG&E to report *all* of its safety issues to this Court within thirty days of the Court's order**. *That report should include everything PG&E asserts to be a "compliance issue," not a safety issue, as its May 7 letter to the CPUC contended about its failure to inspect more than 54,755 utility poles in accordance with the standards of CPUC General Order 165 (GO 165).[21] PG&E's mention of GO 165 inspections as integral to its wood pole safety inspection process in its 2020 Wildfire Mitigation Plan belies PG&E's attempt to characterized its failure to conduct such inspections for more than 54,755 as a "compliance issue," not a safety issue.[22] PG&E itself had previously recognized GO 165 inspections as critical to public safety.[23] **Amici***

---

[21] Letter from Deborah Powell Vice President, Asset & Risk Management, PG&E to May 7, 2021 Caroline Thomas Jacobs, Director Wildfire Safety Division, California Public Utilities Commission and Leslie Palmer, Director Safety and Enforcement Division, California Public Utilities Commission, https://www.pge.com/pge_global/common/pdfs/safety/emergency-preparedness/natural-disaster/wildfires/wildfire-mitigation-plan/GO-165-Inspection-Self-Report.pdf

[22] PACIFIC GAS AND ELECTRIC COMPANY, 2020 WILDFIRE MITIGATION PLAN REPORT UPDATED (CPUC RULEMAKING 18-10-007) p. 5-119 (Feb. 28, 2020), https://www.pge.com/pge_global/common/pdfs/safety/emergency-preparedness/natural-disaster/wildfires/wildfire-mitigation-plan/2020-Wildfire-Safety-Plan.pdf ("5.3.3.6 Distribution Pole Replacement and Reinforcement, Including with Composite Poles PG&E has an extensive condition monitoring program for wood poles in accordance with requirements of GO 165. PG&E conducts annual patrols in urban areas and biannual patrols in rural areas, visually looking for damaged poles and other defects on the distribution overhead system. PG&E performs a detailed inspection every 5 years to look for external damage or deterioration, as well as an intrusive inspection approximately every 10 years to identify internal or below ground decay that may be present in the pole.")

[23] *PG&E, Facts about PG&E Pole Management and Maintenance*, supra note 1 ("CPUC GO 165 requires that each pole is intrusively tested at a minimum of every 20 years; however, instead, for the vast majority of our poles, this test is performed about every 10 years. To perform this test, PG&E digs down about 20 inches to expose part of the pole to conduct a

    **respectfully recommend this Court order PG&E to come clean and publicly report *everything* it suspects to be a safety issue, or a wobbler, or a "non-compliance" issue where PG&E is failing to comply with applicable federal or state law including CPUC rules, orders, and decisions**. This order is necessary to protect public safety as neither this Court nor the public, nor the parties can rely on PG&E to be forthcoming about its conduct that is creating safety risk, even when PG&E remains on federal criminal probation.

2. ***Amici* recommend this Court should order PG&E to publicly disclose whether the information it provided for pole loading calculations for the 543,560 Cellon-treated poles accounted for the dry rot that leads to hollowing out of such poles.** If PG&E did not disclose the dry rot conditions developing in Cellon-treated poles, the risk of pole failure may be increased by other equipment attached to the poles, based on incorrect information and pole loading calculations by PG&E.

3. *Amici* are informed that PG&E marked as confidential its May 2021 report to the CPUC about Cellon-treated poles. ***Amici* respectfully recommend that this Court order PG&E to publicly disclose its reports to the CPUC and to the OEIS about the cellon-treated pole issue by filing that information in its criminal probation docket.** The Court should scrutinize any request from PG&E for confidentiality of those documents and limit confidential treatment to personnel and customer names and identifying information.

4. ***Amici* recommend this Court require PG&E to publicly disclose documents in this proceeding to all parties including *Amici* regarding Cellon-treated pole safety issues**. For example, were there any written communications, records, or notations from inspectors that mentioned the petrification of the wood immediately around the inspection drill holes? What was the response to those communications? Were there other PG&E Cellon-treated pole failures prior to the Danville failure in July 2020? When did PG&E learn about the dry rot issue with Cellon-treated poles? What did PG&E do in response to that information? Did PG&E disclose the Cellon-treated pole safety issue to the CPUC prior to its May 7, 2021 letter? Did PG&E disclose the Cellon-treated pole safety issue to PG&E's Monitor prior to its May 7, 2021 letter, and if so, did the Monitor disclose that issue to this Court or the parties through a public letter or report?

5. ***Amici* recommend this Court order PG&E to produce any photographs that show hollowed-out or compromised Cellon-treated poles. Amici also recommend this Court should order PG&E to, in coordination with the**

---

detailed visual inspection of the pole. Holes are bored and wood probed to evaluate the integrity of the wood. A preservative is also applied to extend the life of the pole.")

      **Monitor, remove representative samples of Cellon-treated poles it believes may be compromised by interior dry rot**. This Court should order PG&E to coordinate with the Monitor to take photographs of the pole's interior and engage in other appropriate tests approved by the Monitor to determine pole integrity and recommend next steps to protect public safety.

6. *Amici* **recommend this Court order the Monitor to review PG&E's Cellon-treated pole safety issues and issue a report no later than November 2021 regarding PG&E's apparent failure to promptly recognize and take action regarding problems with PG&E's Cellon-treated poles.** The Monitor should examine PG&E's practice of keeping assets in service beyond their anticipated useful life, and its apparent failure to examine asset records including inspection records in determining when to replace assets instead of running to and past failure. The Monitor should review PG&E's inspection methods that led to the petrification of wood around the bore holes, and PG&E's response to those inspection issues. The Monitor should also examine PG&E safety and corporate culture that failed to promptly disclose and respond to issues that create risks to the public.

7. **If the Monitor finds immediate safety concerns with PG&E's Cellon-treated poles, the Court should order the Monitor to file a letter in this docket recommending prompt steps to protect public safety**. The CPUC's investigation of these issues may take six to twelve months or more. The Monitor need not wait for the CPUC to take action to protect public safety. The Monitor should continue its work to achieve the goals of federal criminal probation by protecting public safety while the felon is on probation. As a corporate felon on probation, PG&E is actively conducting its business. PG&E's belated disclosure and failure to recognize its widespread and growing safety issues—such as the risks posed by its more than 500,000 cellon-treated poles—underscore the need for active monitoring and orders of this Court to protect public safety from PG&E's conduct.

///

///

///

      *Amici* respectfully request to appear at the August 2 status conference at 2:00 to participate in the discussion of the status of PG&E's criminal probation supervision. *Amici* would be happy to discuss these recommendations for the Court's orders to PG&E's monitors and to provide additional briefing as requested by the Court.

      Respectfully submitted,

/s/ *Catherine Sandoval*
/s/ *Michael J. Aguirre*
*/s/ Maria C. Severson*
Attorneys for *Amici*, Alex Cannara and Gene Nelson