JENNER & BLOCK LLP
Reid J. Schar (*pro hac vice*)
RSchar@jenner.com
353 N. Clark Street
Chicago, IL 60654-3456
Telephone: +1 312 222 9350
Facsimile: +1 312 527 0484

CLARENCE DYER & COHEN LLP
Kate Dyer (Bar No. 171891)
kdyer@clarencedyer.com
899 Ellis Street
San Francisco, CA 94109-7807
Telephone: +1 415 749 1800
Facsimile: +1 415 749 1694

CRAVATH, SWAINE & MOORE LLP
Kevin J. Orsini (*pro hac vice*)
korsini@cravath.com
825 Eighth Avenue
New York, NY 10019
Telephone: +1 212 474 1000
Facsimile: +1 212 474 3700

Attorneys for Defendant PACIFIC GAS AND ELECTRIC
COMPANY

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 14-CR-00175-WHA |
| Plaintiff, | **RESPONSE TO FOLLOW-UP QUESTIONS RE DIXIE AND FLY FIRES, QUESTIONS 7 THROUGH 36** |
| v. | |
| PACIFIC GAS AND ELECTRIC COMPANY, | Judge: Hon. William Alsup |
| Defendant. | |

1

2

3

4

          Defendant Pacific Gas and Electric Company ("PG&E") respectfully submits this

response to Questions 7 through 36 contained in the Court's August 17, 2021 order (Dkt. 1417) and

the Court's August 18, 2021 order (Dkt. 1418); the Court's requests for transcripts of certain calls

(Dkt. 1419); and the Court's request for a glossary of abbreviations and acronyms (Dkt. 1420).

5

**Question 7:**

6

7

8

Please provide copies of all reports and memos and emails regarding the site visit on
April 16, 2021, regarding the plan for under-grounding the circuit and all reports and
memos and emails summarizing, describing or referring to the need to do so or the
proposal to do so or the problem leading to such proposals.

9

**PG&E Response:**

10

11

12

          PG&E will deliver to the Court on August 31, 2021 a thumb drive containing

electronic copies of 2,044 documents bearing Bates PGE-DIXIE-NDCAL-0000001 to PGE-DIXIE-

NDCAL-000008582 that PG&E has identified as responsive to this request.[1]

13

14

15

16

17

18

          PG&E has interpreted the request for documents regarding the "plan for under-

grounding the circuit" to refer to the system hardening project for the Bucks Creek 1101 distribution

circuit approved by the Wildfire Risk Governance Steering Committee in January 2021 (the "Bucks

Creek 1101 System Hardening Project").[2]  To respond to the Court's document request in the time

provided by the Court, PG&E has conducted a reasonable search for responsive documents using the

following parameters:

19

20

21

22

          a.  PG&E identified a list of thirteen custodians ("Custodians") likely to have emails

responsive to this question, including individuals involved with the 2021 Wildfire Distribution Risk

Model; individuals involved in the development, presentation, and management of the Bucks Creek

23

24

25

          [1]  PG&E is delivering a significant portion of responsive documents by August 31 and intends
to complete its production to the Court on or before September 3.  PG&E notes that certain
documents being provided to the Court contain personally identifying information and other
confidential information.  PG&E is in the process of identifying this confidential information and
will prepare and deliver a redacted set and file a corresponding administrative motion to seal.

26

27

          [2]  PG&E does not interpret the Court's question as calling for information protected by the
attorney-client privilege or attorney work product protection.

28

1101 System Hardening Project; and individuals who attended the April 16, 2021 site visit related to
the Bucks Creek 1101 System Hardening Project.

PG&E ran the following search terms against the Custodians' emails:  (Buck* W/5
Creek) AND (underground* OR harden* OR visit*).  Each of the Custodians' emails dated between
October 1, 2020 and July 13, 2021 that contained terms that satisfied this search are being reviewed
and, if determined to be responsive to this request, will be produced to the Court.  Where applicable,
PG&E is redacting portions of documents determined to be protected by attorney-client privilege or
to constitute attorney work product.

b.  PG&E has also collected for review and will produce to the Court documents
related to the Bucks Creek 1101 System Hardening Project that are contained in the following
electronic repositories:  PG&E's Electronic Document Routing System ("EDRS"), which is a tool
used to route documents and generate requests for review and approval for projects such as the
Bucks Creek 1101 System Hardening Project, and SAP, a structured database and the system of
record for Plant Maintenance ("PM") Orders for such projects.

**Question 8:**

What indications are there that the Douglas Fir broke and fell onto the Bucks Circuit?

**PG&E Response:**

Although the Douglas Fir was leaning on the line, the stump was still rooted in the
ground on July 18, 2021, as reflected in the photos that PG&E submitted on August 25, 2021.  *See*
Exs. R-1 through R-3, Dkts. 1428-09 through 1428-11.  Photos taken after CAL FIRE cut the tree
off the line show that the bottom portion of the tree had separated from the stump.  *See id.*; *see also*
Exs. S-1 through S-3, Dkts. 1428-13 through 1428-15 (photographs of the bottom portion of the
tree).  CAL FIRE and/or other law enforcement have removed the trunk and stump from the site and
CAL FIRE has declined to provide PG&E with access to or receipts for the evidence that CAL FIRE
collected from the site.

**Question 9:**

What indications are there that the Douglas Fir uprooted and fell onto the Bucks Circuit?

**PG&E Response:**

PG&E has seen no indications that the Douglas Fir seen leaning against the line uprooted. Contrary indications are noted in PG&E's response to question 8, *supra*.

**Question 10:**

Please state all other information on why the Douglas Fir fell.

**PG&E Response:**

At this point, PG&E has not reached a conclusion as to why the tree failed, and to PG&E's knowledge, CAL FIRE has not publicly announced any view on the issue. No PG&E arborist has been granted access to the bottom portion of the tree or the stump, both of which CAL FIRE (or assisting law enforcement) has removed. A PG&E arborist who reviewed the photographs taken on July 26, 2021 of the tree's roots observed that one of eight roots of the tree shows signs of internal rot, but without further inspection has not reached a conclusion, for example, as to why the tree failed or whether there were any visible, external indications. *See* PG&E Arborist Decl. (Ex. Y) ¶ 4. PG&E's investigation is ongoing. PG&E requested access to evidence that CAL FIRE removed but CAL FIRE denied that request.

**Question 11:**

Please state all information and data on local or regional wind gusts or wind conditions at or about the time of power interruptions near the Douglas Fir.

**PG&E Response:**

The line recloser at the Bucks Creek substation for the Bucks Creek 1101 Line recorded momentary current levels on two of the three phases in excess of the Minimum To Trip ("MTT") at 6:48 a.m. Dkt. 1408-02, Recloser Witness 1 Decl. (Ex. B) at 3. Shortly thereafter, power was reported out at the Cresta Dam. Dkt. 1408-05, Custodian 1 Decl. (Ex. E) ¶ 3. PG&E

provides the following information concerning wind conditions near the Douglas Fir at 6:48 a.m.:

On July 13, 2021, the nearest weather station, for which the National Weather Service reports data, to the Douglas Fir's location was weather station PG326, located approximately 5.9 miles from the tree.  Meteorologist Decl. (Ex. Z) ¶ 3.  Weather station PG326 sits at an elevation of approximately 4,249 feet above sea level.  GPS from a photograph of the stump of the Douglas Fir indicates an elevation of approximately 2392 feet above sea level.[3]  At 6:40 a.m. on July 13, 2021, PG326 reported winds of approximately 5 mph, with gusts of approximately 9 mph.  *Id.* ¶ 4.  Ten minutes later, at 6:50 a.m., the same station reported winds of approximately 7 mph, with gusts of approximately 9 mph.  *Id.* The below chart provides the approximate distance from the Douglas Fir, elevation, time, sustained wind speed, gust wind speed, and wind direction for the weather stations within 10 miles of the Douglas Fir's location on July 13, 2021.

| Station | Distance from Douglas Fir | Elevation | Observation 1 | | | | Observation 2 | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Time | Sustained Wind | Wind Gust | Wind Direction | Time | Sustained Wind | Wind Gust | Wind Direction |
| **PG326** | 5.9 miles | 4249' | 6:40 a.m. | 5 mph | 9 mph | 57º | 6:50 a.m. | 7 mph | 9 mph | 55º |
| **PG328** | 7.6 miles | 2785' | 6:40 a.m. | 17 mph | 20 mph | 87º | 6:50 a.m. | 17 mph | 20 mph | 82º |
| **PG468** | 9.5 miles | 2943' | 6:40 a.m. | 10 mph | 16 mph | 9º | 6:50 a.m. | 10 mph | 15 mph | 9º |

**Question 12:**

With respect to the patrols on November 11, 2020, and January 14, 2021, what was identified for work, if anything, within one-quarter mile of the Douglas Fir?

**PG&E Response:**

Below is a table containing information from PG&E's vegetation management records regarding the trees that those records indicate were identified for work in either the November 11, 2020 routine inspection or the January 14, 2021 CEMA aerial inspection and within approximately one quarter mile of the Douglas Fir.  PG&E Arborist Decl. (Ex. Y) ¶ 5.

---

[3] PG&E provided this photo to the Court on August 4, 2021, labeled 2021-07-18_1278.

| Inspection | Species | Height (feet) | DBH[4] (inches) | Type of Work | Date Work Marked Complete |
|---|---|---|---|---|---|
| Nov. 2020 Routine | Douglas Fir | 100 | 38 | Remove | 6/10/21 |
| Nov. 2020 Routine | Cedar | 80 | 75 | Side Trim | 6/11/21 |
| Nov. 2020 Routine | Ponderosa Pine | 80 | 22 | Side Trim | 6/11/21 |

**Question 13:**

With respect to any other patrols or inspection within the last five years, please state all other work, if any, was specified within one-quarter mile of the Douglas Fir.

**PG&E Response:**

Below is a table containing information from PG&E's vegetation management records regarding the trees that those records indicate were identified for work in vegetation management patrols or inspections within the past five years other than those conducted on November 11, 2020 and January 14, 2021 and within approximately one quarter mile of the Douglas Fir.  PG&E Arborist Decl. (Ex. Y) ¶ 5.

| Inspection | Species | Height (feet) | DBH (inches) | Type of Work | Date Work Marked Complete |
|---|---|---|---|---|---|
| Sept. 2018 Routine | Ponderosa Pine | 32 | 12 | Top | 6/18/19 |
| Sept. 2018 Routine | Ponderosa Pine | 100 | 33 | Overhang | 6/18/19 |
| Sept. 2018 Routine | Ponderosa Pine | 30 | 10 | Top | 6/18/19 |
| Sept. 2018 Routine | Ponderosa Pine | 35 | 10 | Side Trim | 6/18/19 |
| Sept. 2018 Routine | Cedar | 26 | 7 | Remove | 10/6/18 |
| Sept. 2018 Routine | Black Oak | 30 | 6 | Remove & Treat Stump | 10/6/18 |
| Sept. 2018 Routine | Ponderosa Pine | 35 | 12 | Top | 10/6/18 |
| Sept. 2018 Routine | Ponderosa Pine | 40 | 13 | Side Trim | 6/18/19 |

---

[4] DBH stands for Diameter at Breast Height.

RESPONSE TO FOLLOW-UP QUESTIONS RE DIXIE AND FLY FIRES QUESTIONS 7 - 36
Case No. 14-CR-00175-WHA

| Inspection | Species | Height (feet) | DBH (inches) | Type of Work | Date Work Marked Complete |
|---|---|---|---|---|---|
| Sept. 2018 Routine | Ponderosa Pine | 45 | 14 | Side Trim | 6/18/19 |
| Sept. 2018 Routine | Live Oak | 32 | 18 | Slope Trim | 6/18/19 |
| Sept. 2018 Routine | Live Oak | 16 | 3 | Brush Trim | 6/18/19 |
| Sept. 2018 Routine | Cedar | 80 | 75 | Overhang | 6/18/19 |
| Sept. 2018 Routine | Douglas Fir | 30 | 7 | Remove | 6/18/19 |
| Sept. 2018 Routine | Douglas Fir | 26 | 7 | Remove | 6/18/19 |
| Sept. 2018 Routine | Douglas Fir | 100 | 38 | Remove | 6/18/19 |
| Sept. 2018 Routine | Black Oak | 45 | 16 | Slope Trim | 6/14/19 |
| Sept. 2018 Routine | Douglas Fir | 80 | 22 | Side Trim | 6/14/19 |
| Sept. 2018 Routine | Alder | 38 | 14 | Top | 6/14/19 |
| June 2019 Tag[5] | Douglas Fir | 90 | 29 | Remove | 6/26/19 |

**Question 14:**

Turning to the Fly Fire, what indications are there that the White Fir broke and fell onto the Gasner Circuit?

**PG&E Response:**

PG&E has seen no indications that the trunk of the White Fir broke before being observed laying on the Gansner 1101 Circuit.[6]  Contrary indications are noted in PG&E's response to question 15, *infra*.

---

[5] PG&E's records indicate that this tree was identified for work because of an electric corrective ("EC") tag rather than a routine patrol or inspection.

[6] The terms "White Fir", "Gansner 1101 Circuit" and "Collection Area" used in this submission have the definitions ascribed in PG&E's August 16, 2021 submission.  Dkt. 1416.

**Question 15:**

What indications are there that the White Fir uprooted and fell into the Gasner Circuit?

**PG&E Response:**

A PG&E arborist was part of the team of PG&E personnel that assisted the United States Forest Service ("USFS") in the August 2 and 4 site visits, which included collecting portions of the White Fir. PG&E Arborist Decl. (Ex. Y) ¶¶ 1, 2. That arborist is of the opinion that the photographs PG&E submitted in connection with its August 16, 2021 filing appear to show that the White Fir uprooted and fell into the line. *Id.* ¶ 3. Specifically, the arborist believes that the photographs appear to depict the White Fir's trunk in what appears to be one, non-broken piece still attached to what appears to be the White Fir's root ball or a portion of it. *Id.*

**Question 16:**

Please state all other information on why the White Fir failed and fell.

**PG&E Response:**

The information currently available to PG&E regarding the White Fir's failure is based on visual observation of the Collection Area and the White Fir. As part of PG&E's August 16, 2021 filing, PG&E submitted to the Court on a thumb drive the photographs that PG&E took as it assisted the USFS in moving and collecting evidence on July 25, August 2 and August 4, which include photograph of the Collection Area and White Fir. *See* Dkt. 1416 at 4. Appendix A identifies the pictures on the thumb drive that, based on a review for this filing, contain images of the White Fir.

As noted above, a PG&E arborist is of the opinion that the White Fir appears to have uprooted. PG&E Arborist Decl. (Ex. Y) ¶ 3. At this point, PG&E has not reached a conclusion as to why the White Fir failed in this manner, nor have investigators announced any conclusions. Upon observing the exposed root ball of the tree following its uprooting, the PG&E arborist observed what

looked to him like signs of rot in the root ball, which may have contributed to the tree's uprooting.  *Id.*[7]

**Question 17:**

Please state all information and data about local or regional wind gusts and wind conditions at about the time of the Fly Fire ignition.

**PG&E Response:**

At about the time of the Fly Fire's ignition, the nearest weather station to the recorded location of the White Fir that reports wind data to the National Weather Service was QYRC1, which is part of the USFS's Remote Automatic Weather Station network, and is located approximately 2.5 miles from the recorded location of the White Fir.  Meteorologist Decl. (Ex. Z) ¶ 2.  That weather station reported winds of 4 mph with gusts to 16 mph at 4:15 p.m. and winds of 3 mph with gusts to 17 mph at 5:15 p.m.  *Id.*  The below chart provides the approximate distance from the White Fir, elevation, observation time, sustained wind speed, gust wind speed, and wind direction for the weather stations within 10 miles of the Collection Area that record and report wind speeds to the National Weather Service.  PG&E has included below data from the July 22, 2021 observations, from each such weather station, immediately preceding or concurrently with the approximate time when PG&E's line recloser first detected a fault at 4:50 p.m., as well as the first observation after that time.

| Station | Distance from White Fir | Elevation | Observation 1 | | | | Observation 2 | | | |
|---------|------------------------|-----------|------|-----------------|-----------|-----------------|-----------|-----------------|-----------|-----------------|
| | | | Time | Sustained Wind | Wind Gust | Wind Direction | Time | Sustained Wind | Wind Gust | Wind Direction |
| QYRC1 | 2.5 miles | 3652' | 4:15 p.m. | 4 mph | 16 mph | 188° | 5:15 p.m. | 3 mph | 17 mph | 237° |
| CHAC1 | 2.8 miles | 4478' | 4:47 p.m. | 14 mph | 31 mph | 221° | --[8] | -- | -- | -- |
| C3FRC | 4.0 miles | 3452' | 4:50 p.m. | 3 mph | 5 mph | 211° | 4:52 p.m. | 7 mph | 10 mph | 199° |
| PG315 | 4.1 miles | 3443' | 4:50 p.m. | 6 mph | 21 mph | 281° | 5:00 p.m. | 7 mph | 16 mph | 278° |

[7] *See also* photos that PG&E provided to the Court on August 16, 2021, labeled IMG_6189.JPG, IMG_6195.JPG and IMG_6199.JPG.  Dkt. 1416 at 4.

[8] CHAC1 does not appear to have recorded weather observations on July 22, 2021 after 4:47 p.m.

| Station | Distance from White Fir | Elevation | Observation 1 | | | | Observation 2 | | | |
|---------|------------------------|-----------|------|-----------------|-----------|----------------|------|-----------------|-----------|----------------|
| | | | Time | Sustained Wind | Wind Gust | Wind Direction | Time | Sustained Wind | Wind Gust | Wind Direction |
| PG292 | 5.3 miles | 2787' | 4:50 p.m. | 7 mph | 17 mph | 291º | 5:00 p.m. | 8 mph | 18 mph | 284º |
| PG311 | 7.0 miles | 3793' | 4:50 p.m. | 10 mph | 22 mph | 223º | 5:00 p.m. | 11 mph | 21 mph | 223º |
| PG310 | 8.8 miles | 3521' | 4:50 p.m. | 7 mph | 15 mph | 190º | 5:00 p.m. | 8 mph | 17 mph | 223º |
| PG746 | 9.2 miles | 6174' | 4:50 p.m. | 10 mph | 19 mph | 271º | 5:00 p.m. | 7 mph | 13 mph | 263º |

PG&E notes that the Collection Area has an elevation of approximately 3287 feet and that the CHAC1 station is located at an elevation approximately 1191 feet higher than the Collection Area and stands on the ridge of a large hill.  Meteorologist Decl. (Ex. Z) ¶ 7.

**Question 18:**

Please provide photos of the White Fir after it fell onto the Gasner Circuit sufficient to show (i) whether it broke versus uprooted; (ii) the extent to which the tree burned; and (iii) whether the White Fir had disease or death (if any).

**PG&E Response:**

PG&E refers the Court to the pictures it provided on a thumb drive to the Court with its August 16, 2021 filing, which contains the photographs that PG&E took as it assisted the USFS in moving and collecting evidence on July 25, August 2, and August 4.  *See* Dkt. 1416 at 4.  As noted above, Appendix A identifies the pictures on the thumb drive that, based on a review for this filing, contain images of the White Fir.

**Question 19:**

What actual evidence indicates that the Fly Fire was started by a spot fire from the Dixie Fire?

**PG&E Response:**

PG&E's August 16, 2021 filing quoted the Butte County District Attorney, as reflected in an interview reported by the media, as the basis for its statement that "certain investigators are investigating whether there was 'a tree into a line, and then a fire started, or a fire started which put the tree into the line after a fire had started—presumably from the Dixie Fire

spotting over'". Dkt. 1416 at 2 (footnote omitted). PG&E does not know what evidence, if any, has been collected by the investigators that bear on whether the Dixie Fire spotted over.

**Question 20:**

Another thing that does not add up is that the line disruption was recorded at 6:48 a.m. on July 13 but, ten hours later, when the troubleman saw the fire (After 4:40 p.m.), the fire was only 600 or 800 square feet in size. If the fire had begun at or about when the disruption occurred, the fire would have grown many times larger and faster than that. What accounts for this delay?

**PG&E Response:**

PG&E's investigation into how and when the Dixie Fire initially started is ongoing. PG&E agrees that the size of the fire when the troubleman observed it after 4:40 p.m., Dkt. 1408-01, Dixie Troubleman Decl. (Ex. A) ¶ 12, and the lack of any other known indications of a fire before then, suggest that the fire had not been burning long at that time.

PG&E is aware of no evidence that the fire started at 6:48 a.m., when (a) the line recloser at the Bucks Creek substation for the Bucks Creek 1101 Line recorded momentary current levels on two of the three phases in excess of the Minimum To Trip and (b) the fuses on those phases apparently opened and shut off power downstream of those locations. *See* Dkt. 1408 at 2; Dkt. 1408-02, Recloser Witness 1 Decl. (Ex. B); Dkt. 1408-03, Recloser Witness 2 Decl. (Ex. C); Dkt. 1408-04, Recloser Witness 3 Decl. (Ex. D). According to logs and records, between 8:52 a.m. and 9:04 a.m., a roving operator who reported to and inspected Cresta Dam reported power out, but did not report any indication of a fire. *See* Dkt. 1408-06, Custodian Decl. 1 ¶ 3, Attach. 1 (Ex. E-1). The troubleman arrived at Cresta Dam at approximately 12:30 p.m., and when he looked up the Bucks Creek 1101 Line with his binoculars, he saw that a fuse had apparently opened, but did not see any smoke or indication of a fire. *See* Dkt. 1408-01, Dixie Troubleman Decl. (Ex. A) ¶¶ 6-7. PG&E is not aware of any reports of a fire in the area prior to the troubleman's radio calls at approximately 5:00 p.m.

PG&E understands, but has not been able to confirm, that CAL FIRE (or assisting law enforcement) has taken evidence—the trunk, stump, and parts of the top of the tree, as well as

1    PG&E equipment—that might bear on the question of precisely what transpired (and over what

2    period of time) to start an ignition.  PG&E has requested access to the PG&E equipment that CAL

3    FIRE collected from the area, as well as receipts for the equipment CAL FIRE removed; CAL FIRE

4    has denied those requests.

5            **Question 21:**

6            What time did the troubleman, evidently using his binoculars, first see the blown fuse
        hanging down?  Where exactly was he?

7

8    **PG&E Response:**

9            Shortly after he arrived at the Cresta Dam, the troubleman, using his binoculars to

10   visually inspect the Bucks Creek 1101 Circuit, first saw what appeared to be a fuse hanging down

11   from a pole on the circuit, which is the ordinary indication that such a fuse had operated and opened

12   the line.  *See* Dkt. 1408-01, Dixie Troubleman Decl. (Ex. A) ¶ 7.

13          The time of this observation is estimated between approximately 12:20 and 12:40

14   p.m., based on the troubleman's recollection and the GPS tracking data showing his time and

15   location, as reflected in one of the maps submitted on August 25, 2021.  *See id.* ¶¶ 6-7; Dkt. 1428-24

16   (Ex. X-2); Dkt. 1428-25 (Ex. X-3); Troubleman Decl. (Ex. AA) ¶ 4.  When the troubleman looked

17   up the line with his binoculars, he was standing next to a pole near Cresta Dam, as indicated on

18   another one of the maps submitted on August 25, 2021, in what is known as the Grizzly Dome

19   Tunnel.  Dkt. 1428-23 (Ex. X-1); Troubleman Decl. (Ex. AA) ¶ 4.

20          **Question 22:**

21          No one saw any fire at all until after the troubleman arrived at the site.  What, if
        anything, did the troubleman do upon his arrival at the site that might have
22       accidentally caused the fire?

23   **PG&E Response:**

24          PG&E is not aware of anything the troubleman did at the site that would have caused

25   the fire, which he observed was a couple hundred feet away and down the hillside from the road

26   where he parked and operated his bucket truck.  Upon arriving at the road near the pole with Fuse

27

28

17733, the troubleman parked his truck; once he exited, he smelled smoke but initially assumed it was coming from the Sugar Fire. *See* Dkt. 1408-01, Dixie Troubleman Decl. (Ex. A) ¶ 12. He observed at that time that two of the three fuses had opened, and he got into the bucket of his truck to go up towards the fuses. *Id.* As he ascended in the bucket, before he reached the fuses, he could see a fire down the hillside and a tree on the line, as previously described. *Id.* The troubleman took no other actions between the time he arrived at Fuse 17733 and the time he saw the fire. Troubleman Decl. (Ex. AA) ¶ 5. PG&E has no reason to believe any of these actions should have resulted in a fire, consistent with the Troubleman's observation that the fire was already burning. As noted below, *after* he saw the fire, he opened the fuse on third conductor. Dkt. 1408-01, Dixie Troubleman Decl. (Ex. A) ¶¶ 12-13.

**Question 23:**

What other sources of ignition were in the area? Could the blown fuse itself have sparked the fire? What evidence or observations would so indicate?

**PG&E Response:**

The troubleman did not observe anything he perceived to be another source of ignition near the 600 to 800 square foot fire and the base of the Douglas Fir. *See* Troubleman Decl. (Ex. AA) ¶ 6.

The troubleman did not observe anything that would lead him to believe the fuses had sparked the fire. *See* Troubleman Decl. (Ex. AA) ¶ 6. The troubleman did not observe any fire or signs of fire near the pole, which he recalls was surrounded by decomposed granite without any obvious sources of ignition. *Id.* The troubleman's observations appear consistent with the subsequent photographs, which show no apparent signs of fire damage beneath the fuses or near the bottom of the pole on which the fuses were installed. *See* Ex. GG (photos of bottom of pole taken on July 18, 2021).[9]

---

[9] PG&E provided these photos to the Court on August 4, 2021, labeled 2021-07-18_0048.JPG and 2021-07-18_0913.JPG.

1    In addition, the absence of any indication of a fire until late in the afternoon suggests
2    that the fire began hours after the fuses operated.  *See* Response to Question 20, *supra*.

3    The fuses that were installed on the pole *can* malfunction and cause ignition, but
4    PG&E is not aware of evidence indicating the fuses here malfunctioned.  Based on PG&E records,
5    including a photograph from a May 13, 2021 overhead inspection, PG&E believes the fuses are
6    SMU-20 power fuses manufactured by S&C Electric Company with PT63 Polymer cutouts.  *See*
7    Recloser Witness 1 Decl. (Ex. CC) ¶¶ 6-7.  Such fuses are classified as exempt from Public
8    Resources Code section 4292.  *See* Fuse Decl. (Ex. BB) ¶ 3.

9    These fuses have been the subject of a previous PG&E bulletin and recent review,
10   based on ignitions resulting from water intrusion into the fuse, which caused the fuse to remain
11   closed with the fault continuing until the fuse becomes overheated, resulting in ignition.  *See* Fuse
12   Decl. (Ex. BB) ¶¶ 4-5.  Here, by contrast, the recloser data shows that the fault event involving
13   current exceeding Minimum To Trip levels at approximately 6:48 a.m. lasted only some 4/100ths of
14   a second, which is consistent with the fuses operating as they are designed to do.  Recloser Witness 1
15   Decl. (Ex. CC) ¶ 8; *see also* Dkt. 1408-02, Recloser Witness 1 Decl. (Ex. B) at 3:8-13 (last two
16   paras.); *see also generally id.* (entire declaration); Dkt. 1408-03, Recloser Witness 2 Decl. (Ex. C);
17   Dkt. 1408-04 Recloser Witness 3 Decl. (Ex. D).  The recloser data show no subsequent fault events
18   that could cause a malfunctioning fuse to overheat and ignite.  *See id.*; Recloser Witness 1 Decl. (Ex.
19   CC) ¶¶ 4-5 & Attach. 1.

20   PG&E's investigation into the causes of the fire, and its pre-existing, independent
21   review of the fuses, is ongoing.

22   **Question 24:**

23   Your July 28 submission states that the troubleman went to the pole to replace the
     blown fuse, but is vague as to whether he did, in fact, replace it. Did the troubleman
24   replace the blown fuse or try to, even temporarily? If he did, wouldn't that have
     allowed power to flow in that line (since the circuit was reported as otherwise having
25   a "good load") and pose a risk of arcing where the tree pushed the lines together?

26

27   **PG&E Response:**

28

PG&E had not intended to be vague with respect to the troubleman's actions.  The troubleman did not replace or try to replace the open fuses.  Troubleman Decl. (Ex. AA) ¶ 7.  After he observed through his binoculars what appeared to be a hanging (i.e., open) fuse, the troubleman drove to the fuse's location to identify any problem and, potentially, depending on what he observed when he reached the fuses, replace any open fuses with new fuses he carries in his truck.  *See id.*  After arriving at the site of the fuses and seeing that two fuses had operated (which would open or de-energize the phases that the fuses were on), he ascended in his bucket and looked down the line to see if something on the line caused the outage.  *See id.*  As he was ascending in his bucket, the troubleman observed the tree on the line and the fire; so he decided not to replace the blown fuses.  *Id.*  Instead, he quickly opened the fuse on the third phase—the fuse that had not operated earlier— which de-energized the third phase; he did not replace or touch the blown fuses.  *Id.*; *see also* Dkt. 1408-01, Dixie Troubleman Decl. (Ex. A) ¶ 13.

**Question 25:**

Precisely when in the sequence did the troubleman see the tree on the line? Wasn't it dangerous to replace the blown fuse while the tree was still leaning on the line (and the circuit still had a "good load")? Did he inspect the line (and the leaning tree) before working on the fuses?

**PG&E Response:**

The troubleman observed the tree leaning on the line as he was ascending in the bucket of his truck toward the fuses when he was approximately 5 to 10 feet from the bucket's cradle.  Dkt. 1408-01, Dixie Troubleman Decl. (Ex. A) ¶ 12; Troubleman Decl. (Ex. AA) ¶ 8.  The troubleman did not replace the blown fuses.  *Id*. ¶ 7.  Rather, to prevent "single phasing," which can cause damage to equipment, the troubleman opened the third fuse.  Dkt. 1408-01, Dixie Troubleman Decl. (Ex. A) ¶¶ 12-13.  Before opening the third fuse, he visually inspected the line and did not see any breaks in the line or damage to other equipment.  *Id.* ¶ 12; Troubleman Decl. (Ex. AA) ¶ 9.

When the troubleman observed the tree on the line, it appeared to him to be green at the top where it leaned against the line, and he did not see any smoke or indications of fire coming

from the top part of the tree that was touching the line; because of the fire, he did not take time to otherwise inspect the tree. Troubleman Decl. (Ex. AA) ¶ 9. He lowered his bucket in order to report and fight the fire. *Id.* ¶ 8.

**Question 26:**

Did the troubleman hear any arcing on the line?

**PG&E Response:**

The troubleman did not hear (or see) any arcing on the line. Troubleman Decl. (Ex. AA) ¶ 10.

**Question 27:**

When the troubleman replaced the blown fuse (if he did), how did it react upon being installed? Blow again? Did it emit a smell? Crackle? All fuses from the site should be preserved as evidence.

**PG&E Response:**

The troubleman did not remove, replace, or touch the two fuses that had operated. Troubleman Decl. (Ex. AA) ¶ 11. He opened the third fuse for safety reasons and did not remove that fuse either. *Id.*

The three fuses the troubleman left at the site are not in PG&E's possession. They were not present on July 18, 2021 when PG&E was first permitted to access the site after the fire.[10] PG&E has requested access to the PG&E equipment that CAL FIRE collected from the area, as well as receipts for the equipment CAL FIRE removed; CAL FIRE has denied those requests.

**Question 28:**

Identify by pole number the pole that corresponded with fuse 17733. From the blown fuse, how far away was the tree in question and how far away was the oval-shaped fire? Couldn't the downed tree be seen from the ground standing by the pole?

**PG&E Response:**

---

[10] PG&E provided photos to the Court on August 4, 2021, including those labeled 2021-07-18_0041 and 2021-07-18_0042, that show that the fuses were not in the fuse cutouts when PG&E's representatives reached the site that day.

Fuse 17733 corresponds in PG&E's records with the pole with SAP number 100403908.  Dkt. 1428-23 (Ex. X-1).  The tree and fire were approximately two-thirds of the way to the next pole, Dkt. 1408-01, Dixie Troubleman Decl. (Ex. A) ¶ 12, downhill, with the fire in an oval shape that appeared to be progressing uphill.  Troubleman Decl. (Ex. AA) ¶ 13.  The troubleman estimates that the tree leaning on the line was 180 to 200 feet away from the fuses, and the edge of the fire nearest to the pole with the fuses was 120 feet away when he first saw it.  *Id.* ¶¶ 12-13.  The near edge of the fire was not at the right of way, and the far edge was roughly 25 yards from the right of way.  Dkt. 1408-01, Dixie Troubleman Decl. (Ex. A) ¶ 12.  The approximate location of the oval fire is indicated in a map attached to PG&E's August 25, 2021 submission.  Dkt. 1428-23 (Ex. X-1).

The troubleman did not stand by the base of the pole before seeing the tree, as the pole was downhill from the road where he parked his truck.  Troubleman Decl. (Ex. AA) ¶ 14.  He did stand by the base of the pole that held the fuses after he attempted to fight the fire when he placed a tag with the notation TMOL ("Tag Man On Line") on the pole for safety reasons.  *Id.*  He does not recall whether the tree leaning on the line could be seen from the ground by the pole.  *Id.*

Before he ascended in his bucket, standing near his truck on the road, the troubleman did not see the leaning tree, given his location and the grade of the hill.  *Id.*  He does not know whether the tree could have been seen from that location.  *Id.*

**Question 29:**

How close to the distribution line and downed tree was the oval-shaped fire when the troubleman first saw it, and what relationship did it have to them?

**PG&E Response:**

When the troubleman first saw the fire, it was on the ground, near the base of the tree leaning against the line.  Dkt. 1428-01, Troubleman Decl. (Ex. A) ¶ 12.  The top of the tree was not on fire, and the fire was not under the distribution line.  Troubleman Decl. (Ex. AA) ¶¶ 9, 15.  Rather, the edge of the fire closest to him was not at the right of way, and the edge farthest from him was roughly 25 yards from the right of way.  Dkt. 1428-01, Dixie Troubleman Decl. (Ex. A) ¶ 12.

He did not see any evidence that the fire had burned into the right of way.  Troubleman Decl. (Ex.

AA) ¶ 15.  The approximate location of the fire is indicated on the map provided with PG&E's

submission on August 25, 2021.  Dkt. 1428-23 (Ex. X-1).

**Question 30:**

Did the PG&E sensors record any surge or return of power, even momentarily, on any of the lines in question on July 13 other than the 6:48 a.m. event? If so, set forth the details of any return of power or surges, regardless of how brief.

**PG&E Response:**

Except for the 6:48 a.m., July 13, 2021 event, the line recloser at the Bucks Creek

substation for the Bucks Creek 1101 Line did not record any current in excess of the Minimum To

Trip on any of the three phases that day, either before or after the 6:48 a.m. event.  *See* Dkt. 1408-02,

Recloser Witness 1 Decl. (Ex. B) at 3:8-13 (last para.); *see also generally id.* (entire declaration);

Dkt. 1408-03, Recloser Witness 2 Decl. (Ex. C.); Dkt. 1408-04 Recloser Witness 3 Decl. (Ex. D).

The current levels recorded in PG&E's Process Information ("PI") Historian database for July 13,

2021 are provided with this submission.  Recloser Witness 1 Decl. (Ex. CC) ¶¶ 4-5 & Attach. 1.

PG&E has two users on the Bucks Creek 1101 Line located load-side and

downstream from Fuse 17733; namely, PG&E's Cresta Dam facility and the nearby Caltrans tunnel.

The Rock Creek Switching Center did not receive any indication from PG&E's SCADA system of a

restoration of power to the Cresta Dam facility subsequent to the 6:48 a.m. event.  Custodian 1 Decl.

(Ex. DD) ¶ 3; *see also* Dkt. 1408-05 & -06.  PG&E has seen no indication in the data recovered from

the meter at the Caltrans tunnel that power was restored, but PG&E is still analyzing that data to

determine whether it sheds any light on the events.[11]

**Question 31:**

When the troubleman was fighting the fire, to what extent, by his observation, had the

---

[11] The meter appears not to have been in communication with PG&E's system, and therefore was not time synched.  Determining what data relates to July 13, 2021 will therefore require analysis.

1    flames gotten into the brush, into the trees, versus remaining in the grass?

2    **PG&E Response:**

3             When the troubleman began fighting the fire, he observed it on the ground, which the

4    troubleman recalls as containing pine needles, but not grass.  Troubleman Decl. (Ex. AA) ¶ 16.

5    While fighting the fire, the troubleman observed the fire spread up into some small, green live oak

6    trees that he estimates were 15 to 20 feet tall.  *Id.*; *see* Dkt. 1428-01, Dixie Troubleman Decl. (Ex.

7    A) ¶ 13.  He does not recall a lot of wind at the time and did not observe the fire spreading to the

8    canopy of any of the tall mature trees in the area.  Troubleman Decl. (Ex. AA) ¶ 16.

9             **Question 32:**

10            Was there any burned area other than the oval-shaped fire that the troubleman saw?
11            For example, was there any burned area leading from under the tree on the line to the
             area then actively burning, indicating a path of fire?

12   **PG&E Response:**

13            As explained above, the fire was still burning at the base of the tree when the

14   troubleman first saw it.  Dkt. 1428-03, Troubleman Decl. ¶ 3.  The troubleman did not observe a line

15   of fire from under the line where the tree was touching the line to where the fire was then actively

16   burning, nor did he observe any burned area or other indication of a line of fire from the fuse pole to

17   the oval shaped fire area.  Troubleman Decl. (Ex. AA) ¶ 17.

18            **Question 33:**

19            What were the wind conditions at the site in question during that day?

20   **PG&E Response:**

21            The nearest PG&E weather station to the incident location was weather station

22   PG326, located approximately 5.89 miles away.  Meteorologist Decl. (Ex. Z) ¶ 3.   PG326 sits at an

23   elevation of approximately 4,249 feet above sea level.  *Id.* ¶ 6.  During the day on July 13, 2021,

24   PG326 reported winds speeds between approximately 3 mph and 15 mph, with gusts between

25   approximately 15 mph and 20 mph.  *Id.* ¶ 4.

26

27

28

RESPONSE TO FOLLOW-UP QUESTIONS RE DIXIE AND FLY FIRES QUESTIONS 7 - 36
Case No. 14-CR-00175-WHA

1

2

3

The below chart provides the approximate distance from the Douglas Fir, elevation, sustained wind speed, and gust wind speed for the weather stations within 10 miles of the Douglas Fir's location on July 13, 2021.

| Station | Distance from Douglas Fir | Elevation | Sustained Wind | Wind Gust |
|---------|---------------------------|-----------|----------------|-----------|
| PG326 | 5.9 miles | 4249' | 3-17 mph | 5-30 mph |
| PG328 | 7.6 miles | 2785' | 0-17 mph | 0-24 mph |
| PG468 | 9.5 miles | 2943' | 0-8 mph | 0-19 mph |

**Question 34:**

Provide a sketch map of the site, approximately to scale, that shows the relevant span(s), the poles (with identification numbers), the blown fuse, the downed tree, the oval-shaped fire of about 600 to 800 square feet, the road, and any other item of relevance. Show true north. Show approximate distances, such as the length of the span.

**PG&E Response:**

PG&E refers to the map PG&E provided to the Court on August 25, 2021 as Exhibit X-1 (Dkt. 1428-23), which contains the information requested.

**Question 35:**

Provide all recordings, statements, emails, and reports by the troubleman or anyone else setting forth his recollection that have not already been provided.

**PG&E Response:**

PG&E is providing the non-privileged records that PG&E identified as responsive to this question, including five audio recordings (provided on a thumb drive) and one record from PG&E's Integrated Logging Information System ("ILIS") (Ex. EE).[12]  Four of the recordings are calls made by the troubleman late in the evening of July 13, 2021.  One recording is a call made by another employee that day around 7:25 p.m.

**Question 36:**

---

[12] As noted with respect to Question 7, *supra*, PG&E does not interpret the Court's question as calling for information protected by the attorney-client privilege or attorney work product protection.

Finally, at what date and time did the drone interfere with the Dixie Fire suppression efforts?

**PG&E Response:**

According to media reports, a drone is reported to have interfered with the Dixie Fire suppression efforts at approximately 7:45 p.m. on July 13, 2021.  As set forth in PG&E's August 25, 2021 submission, this is consistent with the observations of a PG&E employee who heard a report of a drone come over a CAL FIRE radio the evening of July 13, 2021.  Dkt. 1428-02, PSS Decl. ¶ 3.

### Requests for Transcripts (Dkt. 1419):

PG&E shall provide the Court with transcripts of any 911 calls and transcripts of any calls to Cal FIRE reporting the Dixie Fire made by the troubleman, his supervisor, and any other PG&E employee. Additionally, PG&E shall provide transcripts of radio calls that the troubleman made (reporting the fire) to the dispatch centers at Rocklin and Chico, to his supervisor, to Cal FIRE, and to any other emergency responder. It shall also produce the transcripts of radio calls made to the troubleman by his supervisor, as well as any other party, in response to the initial notification about the Dixie Fire. If transcripts are not possible, then produce summaries.

**PG&E Response:**

Attached hereto as Exhibits FF-1 through FF-4 are transcripts of responsive calls, transcribed from audio recordings in PG&E's possession.

\* \* \*

Attached hereto as Exhibit HH is the glossary requested by the Court in Dkt. 1420.

Dated:  August 31, 2021

Respectfully Submitted,

JENNER & BLOCK LLP

By:    /s/ Reid J. Schar
Reid J. Schar (*pro hac vice*)

CRAVATH, SWAINE & MOORE LLP

By:    /s/ Kevin J. Orsini
Kevin J. Orsini (*pro hac vice*)

1

2

CLARENCE DYER & COHEN LLP

3

4

By:    /s/ Kate Dyer                     
          Kate Dyer (Bar No. 171891)

5

6

Attorneys for Defendant PACIFIC GAS AND
ELECTRIC COMPANY

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RESPONSE TO FOLLOW-UP QUESTIONS RE DIXIE AND FLY FIRES QUESTIONS 7 - 36
Case No. 14-CR-00175-WHA

1

## **Appendix A**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

| IMG_1598-1599 |
| IMG_3379 |
| IMG_3474-3495 |
| IMG_3497-3498 |
| IMG_3500-3501 |
| IMG_3504-3509 |
| IMG_3511-3512 |
| IMG_3514-3516 |
| IMG_3521-3525 |
| IMG_3527-3530 |
| IMG_3535-3536 |
| IMG_3544 |
| IMG_3549 |
| IMG_3551 |
| IMG_3668-3671 |
| IMG_6113-6121 |
| IMG_6123-6131 |
| IMG_6135 |
| IMG_6138-6312 |
| IMG_6317-6395 |
| IMG_6419-6420 |
| IMG_6580-6582 |
| IMG_6738-7038 |
| IMG_7040-7063 |
| IMG_7065-7075 |
| IMG_7079-7084 |
| IMG_7087-7093 |
| IMG_7116-7127 |
| IMG_7139-7140 |
| IMG_7149-7160 |
| IMG_7162-7170 |
| IMG_7173-7174 |
| IMG_7177-7180 |
| IMG_7182-7385 |
| IMG_7388-7432 |
| IMG_7683-7684 |

24

25

26

27

28

RESPONSE TO FOLLOW-UP QUESTIONS RE DIXIE AND FLY FIRES QUESTIONS 7 - 36
Case No. 14-CR-00175-WHA