Michael J. Aguirre, SBN 060402, maguirre@amslawyers.com
Maria C. Severson, Esq., SBN 173967, mseverson@amslawyers.com
**AGUIRRE & SEVERSON, LLP**,
501 West Broadway, Ste. 1050, San Diego, CA 92101 (619) 876-5364

Catherine Janet Kissee-Sandoval, SBN 153839, Csandoval@scu.edu
**Director, Institute for Insurance Law, Santa Clara University School of Law**
500 El Camino Real, Santa Clara, CA 95053-0421 (408) 551-1902

(Attorneys for *Amici* Alex Cannara and Gene A. Nelson)

September 8, 2021

The Honorable William Alsup
United States District Court Judge, USDC for the Northern District of California

    Re:  *Amici* Request to File Brief Regarding September 13, 2021 Hearing

Dear Honorable Judge Alsup:

    *Amici* representing Alex Cannara and Gene Nelson, PG&E customers concerned about PG&E's poor public safety record, respectfully seek leave to submit this letter to propose: 1) the Court invite PG&E's CEO to the September 13, 2021 hearing; 2) consider making implementation of fast-trip settings for high-priority circuits in High Fire Threat Districts [HFTDs] a condition of PG&E's probation; 3) order PG&E to file information with this Court about its communications with the CPUC including those not subject to the CPUC's ex parte rules; 4) order PG&E to submit a declaration as to whether it had inspected the tree leaning on the wires at the time of the Dixie Fire for dry rot or fungus prior to that fire's ignition and to promptly examine trees tall enough to fall on PG&E powerlines in PG&E's HFTD for evidence of dry rot and tree fungus; and 5) order PG&E to propose and invite The Monitor, The U.S. Department of Justice, and *Amici* to propose other means to mitigate wildfire risk including implementation of

more sensors, cameras, and drones in PG&E HGTDs. Further, *Amici* would appreciate the opportunity to appear and make brief comments, but leave that to the Court's sound discretion.

I.     INTRODUCTION

On January 9, 2019, this Court proposed to stop convicted felon PG&E from causing catastrophic fires by requiring the company to operate only in those areas deemed fire safe.  After PG&E balked, the Court proposed PG&E agree to at least take reasonable steps to shut off electricity in unsafe areas.  Again PG&E resisted. The regulatory agency charged with enforcing safety rules against PG&E did not support the court's remedial efforts.  The Dixie Fire, which may have been ignited on August 14 by PG&E's electric line, is still burning as of this brief's filing. Swift action is appropriate during PG&E's federal criminal probation to protect public safety and promote felon PG&E's rehabilitation.

*Amici* proposes the Court do five things: (1) invite PG&E's Chief Executive Officer to explain the company's justification for operating in areas that have not been shown to be safe; (2) consider making implementation of fast-trip settings for high-priority circuits in High Fire Threat Districts [HFTDs] a condition of PG&E's probation; (3) order PG&E to disclose its communications and those of its lobbyists with the CPUC, including those not subject to CPUC ex parte rules; (4) order PG&E to submit a declaration as to whether it had inspected the tree leaning on the wires at the time of the Dixie Fire for dry rot or fungus prior to that fire's ignition and to promptly examine trees tall enough to fall on PG&E powerlines in PG&E's HFTD for evidence of dry rot and tree fungus; and (5) order PG&E and invite the Monitor, the U.S. Attorney's Office, and *Amici* to submit proposals to this Court to stop PG&E from causing more fires during the duration of PGE&'s

federal criminal probation, protect public safety, and promote felon PG&E's rehabilitation.

## II. BACKGROUND

In 2016, a jury convicted Pacific Gas & Electric (PG&E) on six felony counts of knowingly and willfully violating safety standards and obstructing the related investigation arising out of the San Bruno explosion of a PG&E gas pipeline that killed eight and destroyed 38 homes.[1] Upon its August 9, 2016 conviction, PG&E proclaimed: "we are **committed to maintaining our focus on safety.**"[2]

However, since August 9, 2016, PG&E's focus has not been on safety. In October 2017 and November 2018, multiple wildfires started burning across PG&E's service territory in Northern California. These wildfires were unprecedented in size, scope, and destruction.[3] The California Public Utilities Commission's Safety and Enforcement Division (SED) found that PG&E committed over 43 safety violations in connection with 15 of the fires, as follows:

| No.[4] | Incident | Violations Found |
|---|---|---|
| 1 | Adobe Fire | 1. GO 95, Rule 31.1 – Hazardous tree not identified and abated<br>2. GO 95, Rule 31.1 – Records of 2015 CEMA inspection not retained |

---

[1] Case 3:14-cr-00175-WHA Document 961 Filed 01/09/19

[2] https://search.yahoo.com/yhs/search;_ylt=AwrWmn0Q6h5hrGwAjQEPxQt.;_ylc=X1MDMjExN DcwMDU1OQRfcgMyBGZyA3locy10cnAtMDAxBGZyMgNzYi10b3AEZ3ByaWQDanFCXz NHREtRVDJQXzZrTW51V3hYQQRuX3JzbHQDMARuX3N1Z2cDMgRvcmlnaW44Dc2Vhcm NoLnlhaG9vLmNvbQRwb3MDMARwcXN0cgMEcHFzdHJsAzAEcXN0cmwDMzAEcXV1cnk DYXVndXN0JTIwOSUyQyUyMDIwMTYlMkMlMjBwZ2UlMjBzdGF0ZW1lbnQlMjAEdF9z dG1wAzE2Mjk0MTU5NzM-?p=august+9%2C+2016%2C+pge+statement+&fr2=sb-top&hspart=trp&hsimp=yhs-001&type=Y143_F163_201897_102620

[3] https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M336/K236/336236538.pdf p. 3

[4] https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M336/K236/336236538.pdf pp. 9-12

3

| | | |
|---|---|---|
| | | 3. GO 95, Rule 31.1 – Work order completed late |
| 2 | Atlas Fire | 4. GO 95, Rule 31.1 – Failure to identify and abate hazardous Black Oak tree at Atlas 1 site |
| | | 5. GO 95, Rule 31.1 – Failure to identify and perform correctional prune of hazardous Valley Oak codominant branch at Atlas 2 site |
| | | 6. GO 95, Rule 35 – Vegetation clearance not maintained at Atlas 1 site |
| | | 7. GO 95, Rule 35 – Vegetation clearance not maintained at Atlas 2 site |
| | | 8. GO 95, Rule 31.1 – Work order completed late |
| 3 | Cascade Fire | 9. GO 95, Rule 38 – Conductor clearance not maintained |
| 6 [5] | Norrbom Fire | 10. GO 95, Rule 31.1 – Hazardous tree not identified and abated G |
| | | 11. O 95, Rule 35 – Vegetation clearance not maintained |
| 7 | Nuns Fire | 12. GO 95, Rule 35 - Improper prioritization and delay in abating vegetation strain on secondary conductor |
| 8 | Oakmont/Pythian Fire | 13. GO 95, Rule 31.1 – Incomplete patrol prior to reenergizing circuit |
| | | 14. 14. GO 95, Rule 31.1 – Failed to complete work order and reinforce a pole |
| | | 15. GO 95, Rule 31.1 – Completed a work order late |
| 9 | Partrick Fire | 16. GO 95, Rule 31.1 – Hazardous tree not identified and abated |
| | | 17. GO 95, Rule 35 – Vegetation clearance not maintained |
| 10 | Pocket Fire | 18, GO 95, Rule 31.1 – Hazardous tree not identified and abated |
| | | 19. GO 95, Rule 35 – Vegetation clearance not maintained |
| 11 | Point Fire | 20. GO 95, Rule 19 – Evidence disposal |
| 12. | Potter/Redwood Fire | 21. Resolution E-4184 – Second fire located at 9100 Main St., Potter Valley not reported |

---

[5] SED did not fine violations for the fires listed as 4 and 5,

4

| | | |
|---|---|---|
| | | 22. GO 95, Rule 31.1 – Repair records not maintained 23. GO 95, Rule 31.1 – Records of 2016 CEMA inspection not maintained |
| 13 | Sulphur Fire | 24. GO 95, Rule 19 – Evidence disposal<br>25. GO 95, Rule 31.1 – Records of 2016 CEMA inspection not maintained |
| 15.[6] | Youngs Fire | 26. GO 95, Rule 31.1 – Hazardous tree not identified and abated<br>27. GO 95, Rule 35 – Vegetation clearance not maintained |
| 16 | Lobo Fire | 28. GO 95, Rule 31.1 – Hazardous tree with open cavity not identified and abated<br>29. GO 95, Rule 31.1 – Failure to identify unsafe condition that left the subject tree exposed to high winds<br>30. GO 95, Rule 31.1 – Records of 2014 CEMA inspection not maintained<br>31. GO 95, Rule 35 – Vegetation clearance not maintained |
| 17 | McCourtney Fire | 32. GO 95, Rule 31.1 – Failure to identify and remove a hazardous tree<br>33. GO 95, Rule 35 – Vegetation clearance not maintained |
| 18. | Camp Fire | 34. GO 95, Rule 44.3 – Failure to replace or reinforce the C-hook on Tower :27/222 (Incident Tower) before its safety factor was reduced to less than two-thirds of the safety factor specified in Rule 44.1, Table 4, which is a violation of Rule 44.3.<br>35. GO 95, Rule 31.1 – Failure to maintain the C-hook supporting the transposition jumper on the Incident Tower :27/222 for its intended use and regard being given to the conditions under which it was to be operated.<br>36. GO 95, Rule 31.2 – Failure to inspect Incident Tower thoroughly and failure to detect an immediate Safety Hazard or Priority A condition on the incident C-hook. |

---

[6] SED found no violations for Fire 14.

37. GO 165, Section IV – PG&E failed to follow its procedures by failing to document the factors and reasons that led to the delay in the repair work on the Incident Tower.
38. GO 165, Section IV – Failure to conduct detailed climbing inspections when conditions to trigger climbing inspections were evident as specified by internal procedures. Wear on the original working eyes that remained on the Incident Tower is an indication of a known condition with potential to recur on the added hanger plates with working eyes, which should have triggered detailed climbing inspection to examine the added hanger plates.
39. GO 95, Rule 31.1 –The condition of the C-hook (material loss > 50%) supporting the transposition jumper on Tower :24/199 demonstrates that PG&E did not maintain the tower for its intended use.
40. GO 95, Rule 31.2 – Failure to inspect Tower :24/199 thoroughly and failure to detect an immediate Safety Hazard or Priority A Condition on the C-hook.
41. GO 165, Section IV – C-hook on Tower :24/199 had material loss of over 50%. PG&E failed to detect and correct the Priority A condition as specified in PG&E's procedures.
42. GO 95, Rule 18 – PG&E assigned an incorrect priority for an immediate Safety Hazard (disconnected insulator hold-down anchor on Tower :27/221).
43. GO 165, Section IV – PG&E failed to follow its procedures by using an outdated inspection form during the detailed climbing inspections that PG&E conducted from September 19 to November 5, 2018. – PG&E failed to report the reportable incident on the Big Bend 1101 12kV Distribution Circuit in a timely manner.
44. CA Pub. Util. Code § 451 – Failure to maintain an effective inspection and maintenance program to identify and correct hazardous conditions on its

|  |  | transmission lines in order to furnish and maintain service and facilities, as are necessary to promote the safety and health of its patrons and the public. |
|---|---|---|

PG&E's safety violations during its federal criminal probation killed over 100 and destroyed over 17,000 homes and structures.  On January 9, 2019, this Court noted that "CAL FIRE has determined that PG&E caused eighteen wildfires in 2017, twelve of which CAL FIRE referred for possible criminal prosecution. (CAL FIRE continues its investigation into the more recent Camp Fire in Butte County in which 86 people lost their lives.)"[7] Butte County District Attorney Mike Ramsey ultimately prosecuted PG&E for 84 felony counts of manslaughter. "Guilty you honor," admitted PG&E CEO Bill Johnson, as pictures of each of the 84 people PG&E's Camp Fire killed were shown on a screen in the Butte County Superior Court on June 16, 2020.[8]

To "reduce to zero the number of wildfires caused by PG&E in the 2019 Wildfire Season," considering PG&E's history of falsification of inspection reports, this Court on January 9, 2019 proposed to order PG&E management to "re-inspect all of its electrical grid and remove or trim all trees that could fall onto its power line." [9] Further, the proposed order provided: **"At all times during the 2019 Wildfire Season (and thereafter), PG&E may supply electricity only through those parts of its electrical grid it has determined to be safe under the wind conditions then prevailing."[10]  (emphasis added)**

PG&E, supported by the CPUC, resisted this Court's proposed January 9, 2019 order.   PG&E told the Court PG&E did not "have the ability to raise" [the] "$75 billion to $150 billion" PG&E estimated it would take to comply.[11] On

---

[7] Case 3:14-cr-00175-WHA Document 961 Filed 01/09/19
[8] http://www.buttecounty.net/districtattorney/Pressrelease
[9] Case 3:14-cr-00175-WHA Document 961 Filed 01/09/19 3-4.
[10] Case 3:14-cr-00175-WHA Document 961 Filed 01/09/19 Page 3 of 4
[11] Case 3:14-cr-00175-WHA Document 976 Filed 01/23/19 Page 9 of 60

January 28, 2019, the CPUC confronted this Court with the claim that the January 9th order would likely "conflict with and frustrate the extensive federal statutory and state Constitutional and statutory regulatory scheme under which the CPUC regulates PG&E."[12] The CPUC protested: "The proposed order would also likely conflict with state law requiring public utilities to provide both safe and reliable electric service, *without compromising either policy.*"[13] The CPUC insisted on business as usual: "The CPUC submits that the most appropriate response plan for insuring the safety of California before, during, and after the 2019 Wildfire Season is to avoid conflicting with the CPUC's ongoing exercise of exclusive jurisdiction to regulate the safe and reliable operation of the electric system at just and reasonable rates. The Court should accordingly allow the CPUC's investigations, rulemakings, and other regulatory processes to continue, and to **refrain from implementing the proposed order**." [14]

Simultaneously, PG&E tried to attribute its fires to climate change. After PG&E's 2017 wildfires, PG&E CEO Geisha Williams claimed in a January 18, 2018, news release "financial exposure to climate risks that California energy companies are now facing in the wake of 2017's devastating wildfires."[15]  In its January 23, 2019, response to the January 9 order, the CPUC repeated PG&E's mantra that catastrophic fires were "caused in significant part by climate change."[16] PG&E spent over $944,430.31[17] to lobby the CPUC in 2019 to 2020.

---

[12] Case 3:14-cr-00175-WHA Document 987 Filed 01/28/19 Page 5 of 150
[13] Case 3:14-cr-00175-WHA Document 961 Filed 01/09/19 Page 3 of 4
[14] Case 3:14-cr-00175-WHA Document 987 Filed 01/28/19 Page 6 of 150
[15] https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20180131_pge_ceo_geisha_williams_highlights_californias_clean_energy_progress_and_key_challenge_for_the_future
[16] Case 3:14-cr-00175-WHA Document 987 Filed 01/28/19 Page 4 of 150
[17] https://cal-access.sos.ca.gov/Lobbying/Employers/Detail.aspx?id=1146888&session=2019&view=activity

On January 25, 2019, PG&E used those who had influence to block the January 9th Order. They asserted "the Court's proposed conditions" are "impractical to the point of impossible and costly to the point of impossible."[18] Within in a month, on February 19, 2019, PG&E worked with a lobbyist to organize a meeting with the Governor's Legal Affairs Secretary and the Senior Energy Advisor to discuss the Governor's "60 Day Action Plan."

The Governor pushed into enactment AB 1054 -- a law that materially reduced PG&E's liability to victims of PG&E fires.[19] AB 1054 allows PG&E to tap into a state Wildfire Safety insurance fund, and limits PG&E's obligation to replenish the fund to "Twenty percent of the electrical corporation's total transmission and distribution equity rate."[20]  It allowed PG&E easy access to a CPUC "safety certificate"[21] that granted PG&E a presumption of prudence to defeat any fire cost recoveries:  "If the electrical corporation has received a valid safety certification for the time period in which the covered wildfire ignited, an electrical corporation's conduct **shall be deemed to have been reasonable**."[22] (emphasis added)

Joining PG&E in the push to enact AB 1054 into law was the Governor's long-term friend and lobbyist, Jason Kinney of Axiom Advisors.  As lobbyist for PG&E's Official Committee of Unsecured Creditors (OCUC),[23]  Kinney "expended significant time and resources meeting with legislators, staff, and

---

[18] Case 3:14-cr-00175-WHA Document 983 Filed 01/25/19 Page 6 of 10
[19] February 14. 2021, Governor of California Terms of Engagement with O'Melveny & Meyers
[20] AB 1054 Section Chapter 3 Operation of Fund Section 3292(i)
[21] SEC. 21. Section 8389
[22] AB 1054 SEC 6 Section 451.1(c)
[23] The 9 members of the Committee are as follows: the BOKF, N.A, Deutsche Bank, NextEra Energy, Inc, Roebbelen Contracting, Inc. The Davey Tree Expert Company, G4S Secure Solutions, International Brotherhood of Electrical Workers, Pension Benefit Guaranty Corporation, and Mizuho Ban, See, March 20, 2019, Amended Appointment of the Official Committee.

stakeholders to discuss various wildfire issues including A.B.1054."[24] During the PG&E bankruptcy proceedings, "Axiom attended numerous hearings and met periodically with the Governor's office to discuss wildfire policy issues and these chapter 11 cases. Each of these activities developed Axiom's understanding of legislative and stakeholder dynamics for presentation to the Committee."[25]

PG&E used its influence and the influence of others to enact AB 1054 which (1) provided funding from innocent ratepayers for the uninsured liabilities its fires cause; (2) provided a presumption of reasonableness if it could obtain a "safety certificate" from the CPUC, using a process that makes the certificate without substance and without safety measures that will actually prevent fires.

With the moral hazard created by AB 1054's funding mechanism now in place, and the lack of incentive for PG&E to ensure safe operations, it is left to this Court to impose its full authority to protect public safety and order measures to promote felon PG&E's rehabilitation under PG&E's federal criminal probation.

### III. PG&E'S UNSAFE OPERATIONS CAUSING MORE FIRES

#### A. 2019 Kincade Fire

PG&E continued to cause more fires in 2019, 2020 and 2021. For example, on October 23, 2019, CAL FIRE determined PG&E facilities caused the Kincade Fire. On April 6, 2020, the Sonoma County District Attorney filed criminal charges against PG&E for its role in causing the 2019 Kincade Fire. The criminal complaint charges PG&E with 5 felonies and 28 misdemeanors, including unlawfully causing a fire that resulted in great bodily injury, unlawfully causing a fire that resulted in the burning of inhabited structures, and unlawfully causing a

---

[24] Second Interim Application of Axiom Advisors as Government Affairs Consultant for the Official Committee of Unsecured Creditors, for Allowance and Payment of Compensation p. 8
[25] Final Fee Application of Axiom Advisors p. 8.

fire that resulted in the burning of forest land, as well as various air pollution crimes.[26]

### B.     2020 Zogg Fire

On September 27, 2000, at 4:03 PM, the Zogg fire started when a pine tree met PG&E electrical lines located north of Igo in Shasta County.[27] PG&E's Zogg fire burned over 56,000 acres in two counties (Shasta and Tehama) and killed four (4), including a mother and child trapped in their car as they tried to escape.[28]

### C.     2021 Dixie Fire

PG&E's operation of a power line is suspected to have caused the Dixie fire in Butte County on July 13, 2021. PG&E said in a report filed with state utility regulators late Sunday night July 18 that Cal Fire is investigating the company's equipment as the possible cause of a wildland blaze that's in Butte County. [29] As of the date of this filing, the Dixie Fire has raged for over 57 days, burning more than 919,300 acres in 5 Northern California counties, destroying over 1282 structures. [30] PG&E personnel did not act in time to stop the Dixie Fire from igniting.  PG&E personnel did not consider a power outage it had detected in the area early on July 13 to be a high-priority issue (See PG&E 1444, p. 18, lines 15-19).  PG&E's CEO blames the delay in reaching the site of the Dixie Fire on the worker's difficulty accessing the remote location where a tree had fallen on a power line and apparently ignited the blaze that turned into the Dixie Fire.[31]

---

[26] https://sonomacounty.ca.gov/DA/Press-Releases/Criminal-Charges-Filed-Against-PGandE-Related-to-the-Kincade-Fire
[27] https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20210322_pge_responds_to_cal_fires_announcement_about_2020_zogg_fire_in_shasta_county
[28] https://www.fire.ca.gov/incidents/2020/9/27/zogg-fire/
[29] https://www.documentcloud.org/documents/21011766-071821
[30] https://www.fire.ca.gov/incidents/2021/7/14/dixie-fire/#incident-contacts
[31] https://www.kqed.org/news/11881837/why-it-took-pge-9-5-hours-to-get-to-the-scene-where-dixie-fire-started

PG&E Docket 1444, p. 4, states that a "PG&E arborist who reviewed the photographs taken on July 26, 2021 of the tree's roots observed that one of eight roots of the tree shows signs of internal rot, but without further inspection has not reached a conclusion, for example, as to why the tree failed or whether there were any visible, external indications." *Amici* recommends this Court order PG&E to submit a declaration as to whether it had inspected the tree leaning on the wires at the time of the Dixie Fire for dry rot or fungus prior to that fire's ignition. With respect, *Amici* recommend this Court consider ordering PG&E to examine trees tall enough to fall on PG&E powerlines in PG&E's HFTD for evidence of dry rot and tree fungus.

PG&E responded by announcing that in the future, it will "target responding to any fault or outage on its electric system in these high fire risk areas within 60 minutes or less." [32] PG&E has not yet been subjected to any orders directing it to operate in this manner during this or any future wildfire season. Additional measures are merited through PG&E's federal criminal probation to protect public safety and rehabilitate felon PG&E.

## IV.   *AMICI'S* ADDITIONAL PROPOSALS

### A. Require PG&E to supply electricity only through those parts of its electrical grid it has determined to be safe.[33]

This Court's January 9, 2019, proposed order requiring PG&E to only operate through those parts of its electrical gride PG&E had determined to be safe was a sound and compelling requirement.  PG&E is insisting that it be allowed to

---

[32] https://investor.pgecorp.com/news-events/press-releases/press-release-details/2021/PGE-Outlines-Additional-Safety-Measures-It-Is-Deploying-to-Help-with-Historic-Drought-Impacts-and-Growing-Wildfire-Risk-in-California/default.aspx
[33] Case 3:14-cr-00175-WHA Document 961 Filed 01/09/19 Page 3 of 4

knowingly operate through parts of its electrical grid PG&E knows to be unsafe. *Amici* respectfully urge the Court to require PG&E's CEO to come before the Court and explain why PG&E should be allowed to operate those parts of its electrical grid that PG&E management knows or should know with reasonable diligence to be unsafe.

### B. Require PG&E to disclose its communications with the CPUC

The CPUC has taken PG&E's side in blocking the Court's effort to require PG&E to stop violating safety rules, thus causing more fires. Within weeks of the Court's January 9th order requiring PG&E to operate only in areas it certified, the CPUC said "NO!" [34] At the related hearing of January 30, 2019, the Court asked the CPUC representative (Attorney Christine Hammond): "So, please, help us. Help us solve this problem."[35]

Documents recently published in the media show the CPUC came to the January 30, 2019, with a script designed to lead the Court away from holding PG&E accountable. [36] The script featured 5 themes[37] for the CPUC representative to chose from to present to the Court. Theme 1 was for the representative to tell the Court, "any decision on wildfire mitigation is based on input from first responders, local communities, and CAL FIRE, Cal OES, and other state and local agencies." At the January 30 hearing, the CPUC representative told the Court: "What's really important, and it's required by statute and it's based on our experience, is that when there have been wildfires and catastrophic wildfires, the input from first responders and the local communities is really critical to tailoring the needs that are local to each of those local jurisdictions and it is -- Cal Fire is

---

[34] Case 3:14-cr-00175-WHA Document 987 Filed 01/28/19 Pa
[35] Document 999 p. 78.
[36] https://twitter.com/BrandonRittiman/status/1428790149471637504
[37] https://twitter.com/BrandonRittiman/status/1428790149471637504

critical. ** We also need to hear from the county fire departments and the local fire departments, the local police, and all –"

After listening to the CPUC representative, the Court asked a key question:

**THE COURT:** Let me ask you this question, though. How did it happen that so many fires occurred under your regulation? You know, 2017 in one month all those fires, and they were under your supervision and it happened, and then Butte County happened under your supervision. So I know it's a tough -- it sounds harsh, but that's what the people of California deserve to know. How did that happen? [38]

The CPUC representative then resorted to theme number three -- the "confidential information" response: "**Theme #3- If the Judge Asks About Confidential Information Pertinent to a Pending Investigation** That information is the subject of a pending investigation. Like other investigators such as police detectives, we have to keep certain information confidential so as not to jeopardize the investigation or the ability to penalize, if penalties are warranted."

The CPUC representative did not miss a beat in resorting to Theme #3: "Your Honor, that is a very difficult question. I have to say that those fires, at least the 2017 and 2018 fires, are still under investigation. So out of respect for preserving those investigations and the possibility of an investigation and penalties, I'm not able to speak to that."

The CPUC representative then returned to Theme Number 1: "As the court is well aware, California is facing a wildfire crisis of previously unseen proportions. The factors are: Climate change, years of drought, and increased wildland-urban interface."  The representative told the court, the "challenges with the utilities, with the climate, with the urban wildland interface, a number of

---

[38] On March 22, 2019, the CPUC argued against the Court's proposed order requiring PG&E to achieve "full compliance with PG&E's amended WMP" [because it] has not been approved by the CPUC."

factors that are converging. These are factors that continue to evolve over time."[39] On March 19, 2021, the CPUC filed Comments in opposition to the modified Proposed Conditions 11 and 12 falsely claiming they would result in a "potential doubling of Public Safety Power Shutoff ("PSPS") events in PG&E's service territory." (ECF No. 1349) The CPUC subsequently admitted its filing misrepresented the magnitude of anticipated PSPS. (ECF No. 1359)

*Amici* respectfully requests PG&E be required to disclose its communications with regulators at the CPUC directly and through any of its lobbyists concerning this Court's proposals or jurisdiction. This should include disclosure to this Court of any meeting by PG&E and its representatives with CPUC staff who are not subject to the CPUC's ex parte reporting requirements, providing a summary of the meeting topic, attendees, date, discussion points, and any handouts.

On April 21, 2021, the CPUC raised before the Court its "concerns that probation conditions might conflict with the CPUC's ongoing exercise of jurisdiction to regulate the safe and reliable operation of regulated utilities' electric systems, based on broad considerations heard in public proceedings.[40] *Amici* respectfully observe that this Court's jurisdiction over PG&E's federal criminal probation is independent of CPUC jurisdiction. *Amici* recommend this Court order PG&E to undertake prompt measures to prevent wildfires, consistent with this Court's duty under federal criminal probation to protect public safety and promote the rehabilitation of felon PG&E.

PG&E CEO Patti Pope's August 27, 2021 letter to the CPUC in response to CPUC President Batjer's letter expressing concern about PG&E's pattern of self-

---

[39] Document 999 p. 81.
[40] Case 3:14-cr-00175-WHA Document 1380 Filed 04/20/21 Page 4 of 6

reported failures, represented that PG&E would take several steps to mitigate wildfire risk. Ms. Pope's letter stated:

> For example, we are addressing high-priority vegetation issues that may pose a safety risk and conducting aerial safety patrols on these circuits beyond our established inspection protocols, and implementing fast-trip settings for high-priority circuits in HFTDs [High Fire Threat Districts], which will quickly turn off the flow of power if a fault occurs (for example, if a foreign object contacts an energized line).

*Amici* respectfully recommend this Court make fast-trip settings for high-priority circuits in PG&E's HFTDs a condition of PG&E's probation to ensure prompt enforceability of PG&E's promise. We also recommend that this Court order PG&E to communicate with customers and public safety officials including local and tribal governments in those areas, about the anticipated consequences of those fast-trip settings and power outages that may result from detection of a fault which results in a fast trip, and PG&E's steps to protect public safety in the event of such a fault.

*Amici* also respectfully recommend this Court order PG&E and invite the Monitor, the U.S. Attorney's Office, and Amici to promptly submit proposals to this Court about additional steps this Court should order to prevent PG&E-caused wildfires. Amici respectfully suggests this Court consider ordering PG&E to install during PG&E's probation sensors and more cameras in HFTDs to detect and communicate about objects such as trees or tree limbs hitting electric lines (conductors) and to detect the beginning of a fire.[41] This Court should also consider ordering PG&E to increase its fleet of drones that can be dispatched in response to

---

[41] See e.g., Stephen Ornes, *Trees power this alarm system for remote forest fires*, Science News for Students, October 16, 2020 at 6:30 am, https://www.sciencenewsforstudents.org/article/trees-power-this-alarm-system-for-remote-forest-fires; Firewatch Australia, https://firewatchaustralia.com/the-firewatch-system/.

a fault-trip setting or sensor signal to identify and communicate regarding the source of the fault and help promptly dispatch appropriate resources to prevent fire ignition or spread.

## V. CONCLUSION

On January 9, 2019, this Court proposed to make the convicted felon PG&E stop causing catastrophic fires by requiring the company to operate only in those areas deemed fire safe. After PG&E balked, the Court proposed PG&E agree to at least take reasonable steps to shut off electricity in unsafe areas. Again PG&E resisted. The regulatory agency charged with enforcing safety rules against PG&E did not support the court's remedial efforts. To protect public safety and promote felon PG&E's rehabilitation *Amici* respectfully proposes the Court:

(1) Invite PG&E's Chief Executive Officer to explain the company's justification for operating in areas that have not been shown to be safe;

(2) Make fast-trip settings for high-priority circuits in PG&E's HFTDs a condition of PG&E's probation. Require PG&E to communicate with customers and public safety officials including local and tribal governments in HFTD areas, about the anticipated consequences of those fast-trip settings, power outages that may result from detection of a fault which results in a fast trip, and PG&E's steps to protect public safety in the event of such a fault.

(3) Order PG&E to submit a declaration as to whether it had inspected the tree leaning on the wires at the time of the Dixie Fire for dry rot or fungus prior to that fire's ignition. Order PG&E to promptly examine trees tall enough to fall on PG&E powerlines in PG&E's HFTD for evidence of dry rot and tree fungus.

(4) Order PG&E to disclose its communications with regulators at the CPUC directly and through any of its lobbyists concerning this Court's proposals or jurisdiction. This should include disclosure to this Court of any meeting by PG&E and its representatives with CPUC staff who are not subject to the

CPUC's ex parte reporting requirements, providing a summary of the meeting topic, attendees, date, discussion points, and any meeting handouts.

(5) Order PG&E, and invite the Monitor, the U.S. Attorney's Office, and *Amici* to promptly submit proposals to this Court about additional steps this Court should order to prevent PG&E-caused wildfires. Suggestions may include, but should not be limited to, installing and expanding use of sensors, cameras, and drones in HFTDs to identify and communicate about faults, wildfire threats, and fire ignitions.

Respectfully submitted,

*/s/ Michael J. Aguirre, /s/ Maria C. Severson*
Aguirre & Severson, LLP

*/s/ Catherine Sandoval*, Director, Institute for Insurance Law, SCU Law

Attorneys for *Amici*,
Alex Cannara and Gene Nelson