UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. CR 14-00175 WHA |
| v. | |
| PACIFIC GAS AND ELECTRIC COMPANY, | **ORDER FOR FURTHER RESPONSES RE DIXIE FIRE** |
| Defendant. | |

In addition to the questions posed in open court yesterday (which answers are due Friday at noon), PG&E shall please separately answer the following by **SEPTEMBER 24 AT NOON**.

1. PG&E shall describe its policies, practices, and procedures then in place for the circumstances in which it would deenergize a line pending investigation of a fault. It shall also describe the extent to which the decision to do so rests with troublemen versus the dispatch operator versus others. PG&E shall identify, by name and position, all individuals with decision-making power and shall identify by name all specific individuals who actually gave consideration or input as to how to respond to this July 13 incident. For one example, did anyone specifically consider de-energizing any part (or all) of the Bucks Creek 1101 line and, if so, when and how?

2. As a single exhibit, provide all PG&E (and partner, contractor, *etc.*) internal emails, texts, memos, and other documents created on July 13 or 14, 2021, pertaining to the July 13 incident on the Bucks Creek 1101 line, and separately summarize them.

3. PG&E shall submit all documents (including electronically-stored documents) within PG&E's possession or control that summarize, describe, or refer to any PG&E policies, procedures, or protocols that address how PG&E should respond to tags with the following characteristics: (1) in HFTDs; (2) with a fault on the line *or* an outage without a fault; *and* (3) where that outage plausibly could be the result of a fallen/leaning tree or branch contacting the line. Provide the documents as a single exhibit but also summarize them in your response.

4. In the actual event, when switch 941 was turned off on July 13, how did the railroad deal with that loss of power? Why couldn't the same approach have been taken if the switch had been turned off earlier in the day? Did the railroad have backup power at that location? How does the railroad generally deal with PSPS de-energizations?

5. For each channel that was installed in the radio in the Troubleman's truck, state the location of the nearest repeater to the Bucks Creek 1101 line and its frequency pairs. If a channel was simplex (rather than duplex), state the single frequency for that channel as of July 13. What radio frequencies were installed and monitored on July 13 at the Rock Creek Switching Center?

6. What cell phone carrier did the Troubleman use for his work-issued cell phone? How did the Troubleman receive work tags? Via his PG&E-issue cell phone, or a different device? What carrier did that device employ? Did the Troubleman have a personal cell phone with him? If so, what carrier did it use? Did he carry a satellite phone?

7. With respect to the Troubleman's testimony that the radio would not work (except at the single location he indicated on Highway 70) and that the radio call he received while fighting the fire came line of sight and on a single frequency from a truck also in the hills, PG&E shall submit corroboration of all aspects of this testimony and shall separately submit all documents in its possession or control that explain radio reception in the canyon.

8. Submit a declaration of the employee with whom the Troubleman talked by radio from the pole site on July 13. The declaration should state whether the employee was using simplex (*i.e.* no repeater) versus a repeater in communicating with the Troubleman, and his location at the time and the channel used.

9. What was the Fire Index on July 13 for the location of Fuse 17733?

10. The Court is informed that there were no lightning strikes in the area for at least seven days prior to July 13. Please research and provide PG&E's view on this matter.

11. Is PG&E in possession of any information from any source that the Dixie Fire was (or was not) ignited by lightning? If so, state all such information in summary form and separately provide the back up documentation.

12. PG&E's 2021 Wildfire Mitigation Plan Revised (dated June 3, 2021) states at page 621 under the heading "Risk to be mitigated/problem to be solved":

> A high impedance fault like a wire down or tree contact could remain undetected and become an ignition source. In addition, high impedance line to ground faults on distribution circuits are difficult to detect with traditional overcurrent protection.

Explain why and how a "tree contact could remain undetected and become an ignition source." Separately, as a single exhibit, attach all PG&E documents necessary to explain this problem. With respect to high impedance ground faults, to what extent were PG&E's sensors for the Bucks Creek 1101 Circuit set (or not set) to detect such levels of current? Put differently, if a single phase was sending power to ground through the tree in question, was the PG&E equipment then set to detect such an occurrence?

13. Is PG&E in possession of any information from any source that contradicts or supports the scenario that the tree on the line became a ground fault that conducted electricity from the live wire to ground? If so, state all such information in summary form and separately provide the back up.

14. Is PG&E in possession of any information from any source that contradicts or supports the scenario that the tree on the line became a ground fault that conducted electricity

3

from the live wire to ground? If so, state all such information in summary form and separately provide the back up.

15. Is PG&E in possession of any information from any source concerning the extent to which Douglas Firs conduct electricity? If so, state all such information in summary form and separately provide the back up.

16. Is PG&E in possession of any information from any source that would indicate that the fire would have ignited anyway even if Bucks Creek 1101 had been de-energized soon after the Troubleman arrived at Cresta Dam? If so, state all such information in summary form and separately provide the back up.

17. With respect to the declaration previously provided by the Senior Manager of the Distribution Planning Group:

    a. Explain the terms "phase fault," "ground fault," and "sensitive ground fault;"

    b. What was the applicable MTT?

    c. The measurement was less than $4/100^{ths}$ of a second, but how much less?

    d. What is a "phase to phase" fault?

    e. With respect to the phase to phase fault detected by PG&E, what was the maximum amperage detected?

18. With respect to Attachment 1 to the Declaration of the Senior Manager of the Distribution Planning Group filed August 31, 2021:

    a. What is the significance of the alternating pattern of entries (typically 1.2 v. 2.4)?

    b. What, if anything, do the data tell us about a fault to ground possibility? What would the entries have looked like had all been normal?

**IT IS SO ORDERED.**

Dated: September 14, 2021.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

4