JENNER & BLOCK LLP
   Reid J. Schar (*pro hac vice*)
   RSchar@jenner.com
   353 N. Clark Street
   Chicago, IL 60654-3456
Telephone: +1 312 222 9350
Facsimile: +1 312 527 0484

CLARENCE DYER & COHEN LLP
   Kate Dyer (Bar No. 171891)
   kdyer@clarencedyer.com
   899 Ellis Street
   San Francisco, CA 94109-7807
Telephone: +1 415 749 1800
Facsimile: +1 415 749 1694

CRAVATH, SWAINE & MOORE LLP
   Kevin J. Orsini (*pro hac vice*)
   korsini@cravath.com
   825 Eighth Avenue
   New York, NY 10019
Telephone: +1 212 474 1000
Facsimile: +1 212 474 3700

Attorneys for Defendant PACIFIC GAS AND ELECTRIC COMPANY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>   v.<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>               Defendant. | Case No. 14-CR-00175-WHA<br><br>**RESPONSE TO FOURTH FURTHER REQUEST RE DIXIE FIRE**<br><br>Judge: Hon. William Alsup |

Defendant Pacific Gas and Electric Company ("PG&E") respectfully submits this response to the Court's October 28, 2021 Fourth Further Request re Dixie Fire (Dkt. 1499).

**Question 33:**

*Please answer the question fully concerning which phases the railroad used. Even if the railroad was damaged by the fire, presumably enough survived to detect which two phases were used by the railroad. Please send an employee to the site and report back.*

**PG&E Response:**

On Friday, October 29, the day after it received this Court's order, PG&E dispatched an employee to review the entire Bucks Creek 1101 Line via helicopter, including the locations where the railroad connects to the line. For the reasons explained, an identification of phases requires a review of the line from the substation to the connection in question, and not merely an inspection of the connection.

The inspection was unable to identify the phases used by the railroad, for the reasons explained below and in our previous submission. PG&E is working to integrate data from several sources in an effort to provide the Court with a reliable answer and will update the Court as soon as possible.

a. As PG&E reported in its response to Question 25 (Dkt. No. 1497), PG&E's EDGIS database[1] reports that each of the three railroad locations used transformers that are served by just two phases. The employee determined that, at each connection, the railroad ties into the outer conductors on the pole. For each of the three railroad locations, PG&E submits herewith various photographs taken during the aerial inspection, beginning with the transformer serving the railroad site closest to the substation and ending with the transformer at the railroad site furthest from the substation. *See* Exs. QQ, RR and SS.

b. This information from the sites does not provide a basis to determine which two phases served the railroad at each of its three metered sites on the Bucks Creek 1101 Line, for the

---

[1] EDGIS stands for Electric Distribution Geographical Information System.

following reasons:

*First*, the conductors do not bear physical phase labels at any of the railroad transformer locations.

*Second*, the position of the phases on the poles changes multiple times on the Bucks Creek circuit, in order to balance the load (which is typical for a multi-phase line, as noted in PG&E's response to Question 25).  Thus, the identities of the two phases occupying the outer positions at one railroad transformer are not necessarily the same as the phases occupying the outer positions at the other railroad locations.  Between the first and third railroad tie-in, the employee identified two apparent phase transpositions—one between each tie-in. (Photographs of these two transpositions are included in Exhibits WW and XX, noted below).  If there are no other transpositions between the first and third railroad tie-ins, then the phase configuration in this stretch of the circuit would mean that the railroad tied into a different combination of phases at each of its three tie-ins.  Since there are only three possible combinations of phases, this would mean that, at one location, the railroad tied into phases A & B; at another location, phases A & C; and at the remaining location, phases B & C.

From the substation to the end of the line, the PG&E employee identified seven poles where he observed an apparent transposition of the location of the phases, including five locations between the substation and the railroad site furthest from the substation.[2]  For each of these apparent transposition poles, PG&E submits herewith various photographs taken during the aerial inspection, beginning with the apparent transposition pole closest to the substation and ending with the apparent transposition pole furthest from the substation.  *See* Exs. TT through ZZ.

It is possible that on July 13, 2021, there were additional phase transposition points not visible to the PG&E employee during the aerial inspection on October 29.  The employee identified numerous locations where poles and/or wires were down on the ground, and/or poles

---

[2] The PG&E employee began his aerial inspection at the first pole load side and across the river from the substation.

suffered fire damage; PG&E is in the process of determining whether any of this damage to the line impacts the reliability of the identification of phase transpositions. Missing even one transposition would make the entire phase map downstream of that location inaccurate.

As examples of such damage, PG&E submits herewith various photographs taken during the aerial inspection of the damage to the line at four of these locations, between the second railroad site and the railroad site furthest from the substation, beginning with a photograph of the location closest to the second railroad site and ending with the location closest to the third railroad site. *See* Ex. AAA.

During the aerial inspection the PG&E employee also identified several locations downstream of the railroad tie-ins, where the wires had been removed entirely (as part of PG&E's work to make the area safe after the fire, or to preserve evidence). PG&E submits herewith various photographs taken during the aerial inspection showing two of these locations. *See* Ex. BBB.

*Third*, in order to reliably trace the identity of the phases on the line to the RT SCADA data,[3] PG&E must also reliably identify the label (A, B or C) applied by the line recloser to each of those phases when it recorded oscillography and/or reported data to the RT SCADA system. With an energized line, PG&E can readily confirm by electronic means whether the physical label at the substation for each phase and the label applied by the recloser are the same; PG&E is currently confirming whether this can be done reliably for this de-energized line.

As noted above, PG&E is working now to combine multiple sources of information— including the information obtained through the aerial inspection showing where certain transposition occurs, where certain ties-ins occur, and where poles and lines are down or missing, as well as pre-fire imagery collected for other purposes—in an attempt to identify reliably all transpositions and which two phases as labeled by the line recloser were used at each of the railroad locations on July 13, 2021. PG&E will update the Court with the conclusions it is able to reach.

---

[3] RT SCADA is the name of the Supervisory Control and Data Acquisition Application.

**Question 34:**

*On July 13, at 1412, the Chico Troubleman told NDCC Operator #2, "Sounds like you got a little fire up in the canyon" (Dkt. No. 1474, Exh. JJ-16). To what fire and what canyon was the Chico Troubleman referring? Name the source of the information.*

**PG&E Response:**

As PG&E reported in Dkt. 1478, the 14:12 time listed on the call in Dkt. 1474-17 (Ex. JJ-16) is erroneous. The time was incorrectly transcribed by the service that transcribed the calls. PG&E corrected the error on September 23 (Dkt. 1478) and filed with the Court a corrected version of Ex. JJ-16 (Dkt. 1478-1).

PG&E's records reflect that the call in Ex. JJ-16 occurred at 17:18 hours. That time is corroborated by the substance of the call itself: The person described as the Chico Troubleman (who was not involved in responding to the Cresta Dam outage or the Dixie fire) reports that he had just performed an unrelated operation *at 17:15 hours*.

The Chico Troubleman who made the call confirms that the "fire" he mentioned during his 17:18 communication was what subsequently became known as the Dixie Fire and "the canyon" was the Feather River Canyon; he said on the call it "*sounds* like you got a little fire" there because he had either heard, or heard about, the initial radio calls reporting a small fire in the canyon.

**Question 35:**

*Provide the following documents, referenced at:*

*i. Dkt. No. 1479-1 at 12: Attachment 2, "Integrated SCADA Alarm Summary Table."*
*ii. Id. at 73: TD-2700P-11, "Testing and Sectionalizing Distribution Equipment."*
*iii. Id. at 81: Attachment 1, Exhibit B and SCADA Examples.*
*iv. Dkt. No. 1479-3 at 88: Utility Standard TD-2800S, "Distribution SCADA System Operations and Protocol."*

**PG&E Response:**

Attached hereto as Exhibits CCC-1 through CCC-4 are the requested documents.

\* \* \*

With respect to the Court's clarification regarding the requested summary of documents submitted in response to Question 2 in the Court's Order for Further Responses re Dixie Fire (Dkt. 1470), PG&E will provide on November 4, 2021 a summary of the documents previously provided and, going forward, will provide a summary when additional documents, if any, are produced.

Dated:  November 1, 2021

Respectfully Submitted,

JENNER & BLOCK LLP

By:  /s/ Reid J. Schar
     Reid J. Schar (*pro hac vice*)

CRAVATH, SWAINE & MOORE LLP

By:  /s/ Kevin J. Orsini
     Kevin J. Orsini (*pro hac vice*)

CLARENCE DYER & COHEN LLP

By:  /s/ Kate Dyer
     Kate Dyer (Bar No. 171891)

Attorneys for Defendant PACIFIC GAS AND ELECTRIC COMPANY