UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>      Plaintiff,<br>   v.<br>PACIFIC GAS AND ELECTRIC COMPANY,<br>      Defendant. | No. CR 15-0175 WHA<br><br>**FIFTH FURTHER REQUEST FOR RESPONSES RE DIXIE FIRE** |

Responses to the following shall be due **NOVEMBER 16 AT NOON**.

36. When the Court asks a question, PG&E should also ask its employees and contractors to learn about a topic or what happened. It is not sufficient to respond that PG&E has "not located any documents" on a topic, as PG&E did, for example, in responding to Question 12 (Dkt. 1479). When the answer helps PG&E, it readily, the Court has observed, supplies declarations and statements. PG&E should do the same regardless of whether the answer helps it. Therefore, PG&E shall go back and answer in full Question 5 (Dkt. No. 1428 — explain exactly what made the Bucks Creek 1101 circuit ranked eleventh most dangerous for equipment risk. Name the equipment, its precise location, what made it risky, and why it was not replaced before July 13, 2021); Question 15 (Dkt. No. 1479); and Question 18 (*ibid.* — the Senior Manager of the Distribution Planning Group should explain: if the data did not confirm or preclude a low-amperage, high-impedance fault, explain the possible interpretations that the data did suggest).

37. At the hearing, the Troubleman testified that he did not have authority to cut power at Switch 941 (a district operator "ha[s] to give me an okay to operate unless it's due to life or limb"). But even a single fuse blowing could cause single-phasing. According to PG&E, "Switchmen are not authorized to open primary devices to isolate trouble without first contacting the Control Center, except if single phasing is present" (Dkt. No. 1479, Exh. LL-1 at 32). Explain the discrepancy between the testimony and PG&E policy. Explain what training the Troubleman did or did not have with respect to PG&E's policy. The Troubleman must explain, under oath, his error in understanding the policy.

38. After learning, at 14:43, that at least one fuse had blown; that the Troubleman would have difficulty and delays reaching the fuse; and that there was limited cell and radio service, what explanation(s) did the NDCC Operator #2 think was causing the outage, or *possibly* causing the outage, such that it was prudent not to cut power? Same question, for the Troubleman (Dkt. No. 1474, Exh. JJ-11). Provide sworn answers.

39. On the Bucks Creek Circuit, where were any fuses other than at Pole 17733 and at the Cresta Dam? If so, did any of them blow on July 13 (and if so when)?

40. On July 13, did PG&E have in place any protocol or procedure for monitoring or examining, in real time, data from the SCADA system/recloser from the Bucks Creek substation to assess for ground faults?

41. On July 13, did PG&E have anywhere in its California system any protocol or procedure for monitoring data from the SCADA system to detect ground faults in real time? If so, please describe it.

42. On July 13, which PG&E employee or contractor were aware that the amps on Phase C had dropped to a steady state of one amp on the Bucks Creek Circuit? (Interview them and advise. Don't limit your answer to "documents.") Did any PG&E employee or contractor see anything in the data or information known about the outage that could indicate ground faults? If so, what? What follow-up did they pursue?

2

43. List all PG&E employees or contractors who had access on July 13 to the amperage data on the Buck Creek 1101 line and state their titles and location of work. With respect to each, state what steps each would have had to do to view the data.

44. On July 13, at the time of the phase-to-phase fault, did any SCADA alarm sound? Was there an "alarm printout?" as referenced in TD-2700P-09 (Dkt. No. 1479, Exh. LL-3 at 5, at §2.4)? If so, did the alarm allow for "prioritizing or categorizing alarms on the alarm printout" (*id*. at 4)?

45. At that time, was there a "change in circuit breaker, line recloser, or switch positions with wav. File alerts," as referenced in TD-2700P-09 (Dkt. No. 1479, Exh. LL-3 at 4)?

46. Did the July 13 phase-to-phase fault, which registered at the recloser (*see* Dkt. No. 1408 at 2) and was recorded in SCADA, involve or qualify as a "change in circuit breaker, line recloser, or switch positions" (*ibid*.)?

47. On July 13, did the industry have any technology for detecting ground faults on a line in real time? If so, please describe. Does PG&E utilize such technology anywhere?

48. Normally, all three phases would have supplied power to the Cresta Dam and tunnel. If only one phase went out (as in its fuse had blown), would the other two phases normally have continued to supply power? If *two* phases, however, went out, would the one phase power the dam or tunnel alone? If you answered "yes" to the first question and "no" to the second question, didn't the fact that no power was being received at the dam and tunnel on July 13 mean that at least two phases were out?

49. Was there a way at the Cresta Dam for the Troubleman to test each incoming phase (for example, against ground) to see whether it was a live wire at the dam? Did he do this?

50. State whether (or not) the following would account for the amperage data patterns described in Dkt. No. 1494, questions 24–27: Cresta Dam and Tunnel used all three phases and the railroad used only A and B, so Phases A and B normally drew more amps. When Phases A and B then blew their fuses at Pole 17733, this left the railroad as the only

3

customer drawing power on A and B, so the currents on A and B were correspondingly reduced. Phase C, by itself, could not alone deliver power to the dam and tunnel (since at least two phases had to be connected to any load). However, instead of showing zero amps, Phase C was showing a steady 1.1 amps. This 1.1 amps was due to a ground fault on Phase C.

51. If the overall risk ranking was 568 out of 3,074 in the Enhanced Vegetation Management Tree Weighted Prioritization List for 2021, why does PGE-DIXIE-NDCAL-000017019 (at 3) appear to describe the "2021 Risk Rank" simply as "11" (Dkt. Nos. 1428 at 9; 1472)?

52. What does "H tag remediation of jobs put on hold . . . Targeted for 12/31/20" mean (Dkt. No. 1472, PGE-DIXIE-NDCAL-000017031 at 1)? What jobs were put on hold and why? Were they related to "the presence of an older and smaller gauge conductor, the presence of splices from prior conductor repairs" (Dkt. No. 1428 at 10)? When was the work completed? Please include a sworn response by the individual named in line nine of document PGE-DIXIE-NDCAL-000017031, and any other knowledgeable individuals.

53. Were any drones in the area of Bucks Creek 1101 line between 7 am and 5 pm on July 13 that could have been used to inspect the line in lieu of the Troubleman waiting to reach the fuses?

54. According to Cal FIRE, the CPUC, and PG&E, "Inspectors should not confuse tree health and tree stability. High-risk trees can appear healthy in that they can have a dense, green canopy," but "tree decline due to certain types of root disease is likely to cause the tree to be structurally unstable." *California Power Line Fire Prevention Field Guide*, 2021-power-line-fire-prevention-field-guide-ada-final_jf_20210125.pdf, at 49. Did PG&E's inspectors examine the Douglas Fir that fell on the Bucks Creek 1101 line for root disease during the routine inspection in November 2020? In the CEMA patrol on January 14, 2021 (Dkt. No.

1416 at 9)? What specifically did the inspector(s) do to inspect for root disease? Append all records and photographs, interview all witnesses, and provide those witness' statements.

**IT IS SO ORDERED.**

Dated: November 3, 2021.



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE