JENNER & BLOCK LLP
    Reid J. Schar (*pro hac vice*)
    RSchar@jenner.com
    353 N. Clark Street
    Chicago, IL 60654-3456
Telephone: +1 312 222 9350
Facsimile: +1 312 527 0484

CLARENCE DYER & COHEN LLP
    Kate Dyer (Bar No. 171891)
    kdyer@clarencedyer.com
    899 Ellis Street
    San Francisco, CA 94109-7807
Telephone: +1 415 749 1800
Facsimile: +1 415 749 1694

CRAVATH, SWAINE & MOORE LLP
    Kevin J. Orsini (*pro hac vice*)
    korsini@cravath.com
    825 Eighth Avenue
    New York, NY 10019
Telephone: +1 212 474 1000
Facsimile: +1 212 474 3700

Attorneys for Defendant PACIFIC GAS AND ELECTRIC COMPANY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>   v.<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>                  Defendant. | Case No. 14-CR-00175-WHA<br><br>**PG&E'S 28-DAY REPORT FOR OCTOBER 15-16, 2021 PSPS EVENT**<br><br>Judge:  Hon. William Alsup |

Defendant Pacific Gas and Electric Company ("PG&E") respectfully submits this 28-day report for the October 15-16, 2021 Public Safety Power Shutoff ("PSPS") event (the "PSPS Event") pursuant to the Court's April 29, 2021 order.  (Dkt. 1386.)

The information provided in this report is based on PG&E records reviewed as of the date of this filing.  The information is preliminary and subject to change and further validation.

*1.  How many circuits were turned off in the PSPS.*

PG&E pre-emptively de-energized 6 distribution circuits as part of the PSPS Event.[1]

*2.  How many of such circuits had limbs and/or trees blown or fallen onto the lines (as determined in the post-storm inspection).*

As part of PG&E's post-event patrols prior to re-energizing distribution circuits, PG&E identifies damage to PG&E's assets that require repair or replacement and classifies those conditions as an instance of "damage".  PG&E's records reflect that, during the post-event patrols of the 6 de-energized distribution circuits, conducted following the PSPS Event, such patrols identified one instance of damage attributable to vegetation.[2]

PG&E's post-event patrols also identify conditions that, in the judgment of the personnel conducting the patrol, might have posed an electrical arcing risk or a risk of ignition had the circuit been energized, even though there was no damage to PG&E equipment necessitating repair, and classifies those conditions as "hazards".  PG&E's records reflect that, during the post-

---

[1] Because PG&E understands the scope of the Court's April 29, 2021 order to be focused on distribution circuits, the information in this report relates only to distribution circuits.  PG&E notes that there were no transmission circuits de-energized related to the October 15-16, 2021 PSPS event. Of the transmission circuits in an HFTD which were not pre-emptively de-energized as part of the PSPS Event, PG&E's records reflect that no outages and no ignitions attributable to vegetation occurred between the start of the PSPS event of 0200 PDT on October 15 and the final weather "all clear" of 1514 PDT on October 16.

[2] PG&E's records reflect that the post-event patrols did not identify any instances of non-vegetation-related damage.

event patrols of the 6 de-energized distribution circuits, conducted following the PSPS Event, such patrols identified zero instances of hazards that were attributable to vegetation.[3]

> 3. How many of such strikes would, in the judgment of PG&E, have started a fire (regardless of size) had the circuit been energized at the time of the strike.

While PG&E is unable to determine whether any of the conditions identified in response to Question 2 would have started a fire, based on PG&E's post-event reporting patrols, PG&E is aware of one vegetation strike that may have posed an electrical arcing risk or a risk of ignition had PG&E not de-energized the circuit as part of the PSPS event.

> 4. How many circuits left energized had limbs and/or trees blown or fallen onto the lines by the storm without causing a fire.

Of the circuits in an HFTD which were not pre-emptively de-energized as part of the PSPS Event, PG&E's ordinary course records reflect zero sustained outages attributable to vegetation on distribution circuits during the time period between the start of the PSPS event of 0200 PDT on October 15 and the final weather "all clear" of 1514 PDT on October 16 that were not associated with an ignition.[4]

> 5. How many circuits left energized with strikes that in fact resulted in fires (regardless of size).

Of the circuits in an HFTD which were not pre-emptively de-energized as part of the PSPS Event because they were not forecast to meet PG&E's PSPS criteria, PG&E's ordinary course records reflect that no ignitions were attributable to vegetation making contact with an energized distribution circuit during the time period between the start of the PSPS event of 0200 PDT on October 15 and the final weather "all clear" of 1514 PDT on October 16.

---

[3] PG&E's records reflect that the post-event patrols did not identify any non-vegetation-related hazards.

[4] PG&E's response here does not include outages occurring below the distribution level, *i.e.*, on secondary lines or service drops which service as few as one customer. PG&E does not in the usual course identify whether each such outage is attributable to vegetation, as opposed to contact with other foreign objects.

> *The above five categories should each be further broken down by those circuits that were in substantial compliance with section 4293 as well as PG&E's Wildfire Mitigation Plan.*

To maintain compliance with Section 4293 and other regulatory requirements, all of PG&E's distribution circuits in HFTDs are scheduled for routine vegetation management and CEMA patrols (and, as necessary, post-fire restoration patrols). Those patrols generate orders or tags for work that are then worked according to their prescribed timelines, which depend on the priority of tree work identified by the inspector. In Appendix A, PG&E provides the information responsive to Questions 1-5 on a circuit-by-circuit basis, and for each listed circuit, includes the number of vegetation management tags that PG&E's records indicate had been created prior to October 15, 2021 as part of PG&E's routine vegetation management program, CEMA program or post-fire restoration program, and not marked as complete by October 15, 2021.[5]

---

[5] Vegetation work that was outstanding at this time related to other programs, such as EVM, system hardening and reliability patrols, have been excluded from Appendices A and B. Vegetation work called for by those programs is either not aimed at section 4293 compliance or goes beyond what is required for section 4293 compliance.

| | |
|---|---|
| Dated: November 12, 2021 | Respectfully Submitted, |
| | JENNER & BLOCK LLP |
| | By:   /s/ Reid J. Schar |
| |       Reid J. Schar (*pro hac vice*) |
| | CRAVATH, SWAINE & MOORE LLP |
| | By:   /s/ Kevin J. Orsini |
| |       Kevin J. Orsini (*pro hac vice*) |
| | CLARENCE DYER & COHEN LLP |
| | By:   /s/ Kate Dyer |
| |       Kate Dyer (Bar No. 171891) |
| | Attorneys for Defendant PACIFIC GAS AND ELECTRIC COMPANY |

## Appendix A[6]

Distribution Circuits De-Energized as Part of the October 15-16, 2021 PSPS Event

| Circuit | Circuit Miles[7] | Number of Vegetation-Related | | | Number of Outstanding Vegetation Tags | | |
|---|---|---|---|---|---|---|---|
| | | Damages | Hazards | Damages and Hazards with Ignition Potential | Priority 1[8] | Priority 2[9] | Other[10] |
| CAL WATER 1102 | 33 | - | - | - | - | - | - |
| LAMONT 1104 | 62 | - | - | - | - | - | - |
| MAGUNDEN 1108 | 53 | - | - | - | - | - | - |
| SCE TEHACHAPI 1101 | 3 | - | - | - | - | - | - |
| TEJON 1102 | 98 | 1 | - | 1 | - | - | 388 |
| TEJON 1103 | 43 | - | - | - | - | - | 30 |

---

[6] Please refer to the body of this filing for an explanation of the values included herein.

[7] The circuit miles are the total miles for the circuit listed.

[8] Priority 1 tags are used to identify vegetation that is (1) in contact or showing signs of previous contact with a primary conductor; (2) actively failing or at immediate risk of failing and could strike PG&E's facilities; or (3) presenting an immediate risk to PG&E's facilities.

[9] Priority 2 tags are used to identify vegetation that (1) has encroached within the PG&E minimum clearance requirements and is not in contact with a conductor or (2) has an identifiable integrity issue that does not rise to the level of a Priority 1 condition but is likely to strike facilities and may manifest into a risk before the next scheduled inspection.

[10] "Other" includes non-priority tags created as a part of PG&E's routine vegetation management program, CEMA program or post-fire restoration program.

6

PG&E'S 28-DAY REPORT FOR OCTOBER 15-16, 2021 PSPS EVENT
Case No. 14-CR-00175-WHA