William B. Abrams
end2endconsulting@gmail.com
1519 Branch Owl Place
Santa Rosa, CA, 95409
Tel: 707 397 5727

*Pro Se Claimant, PG&E Victim, Wildfire Survivor and*

*Party to the United States Bankruptcy Court Proceeding Case No. 19-30088, PG&E Corporation and Pacific Gas and Electric Company*

*Party to California Public Utilities Commission Proceeding I.15-08-019 to Determine whether Pacific Gas and Electric Company and PG&E's Corporation's Organizational Culture and Governance Prioritizes Safety*

*Party to California Public Utilities Commission Proceeding A.20-06-011 which is the Application of Pacific Gas and Electric Company for Approval of Regionalization Proposal*

*Party to California Public Utilities Commission Proceeding R.18-10-007 which is the Order Instituting Rulemaking to Implement Electric Utility Wildfire Mitigation Plans Pursuant to Senate Bill 901*

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br>Defendant. | Case No. CR 14-0175 WHA<br><br>**WILLIAM B. ABRAMS MOTION FOR LEAVE TO FILE AMICUS BRIEF TO STRENGTHEN THE CONDITIONS OF PROBATION FOR PACIFIC GAS AND ELECTRIC CORPORATION**<br><br>Judge: Hon. William Alsup |

## PRELIMINARY STATEMENT

William B. Abrams as a PG&E victim and wildfire survivor respectfully moves this Court for an order permitting *amicus curiae* to intervene in this matter in *Pro Se* for the purpose of filing an Amicus Brief to strengthen the conditions of probation in the above-captioned Amicus Brief to Strengthen the Condition of Probation for Pacific Gas and Electric Corporation ("**Brief to Strengthen Probation Conditions**").  A copy of the proposed amicus brief is attached as Exhibit A, and supporting Declaration of William B. Abrams is attached as Exhibit B.

## INTRODUCTION

As a victim of the 2017 PG&E wildfires and an individual with applicable professional experience with risk mitigation and public safety, I have actively engaged in various judicial, legislative and regulatory proceedings to motivate Pacific Gas and Electric ("**PG&E**") to reorient their company to provide safe and reliable service.  Since my family and I ran through the flames, I have tried to work collaboratively with PG&E, the California Public Utilities Commission ("**CPUC**"), California State Legislators, bankruptcy attorneys and others to ensure no other families need to live through these types of harrowing wildfire experiences at the hands of PG&E.  *Amicus* William B. Abrams, PG&E utility customer and one of a growing number of PG&E wildfire victims, respectfully moves this Court for leave to file an *amicus curiae* brief to file the *Amicus Brief to Strengthen the Condition of Probation for Pacific Gas and Electric Corporation***.**

On April 29, 2020, this Court imposed four probation conditions on PG&E. Under these conditions, PG&E is required to (1) employ a sufficient number of inspectors to manage the outsourced tree-trimming work; (2) keep records identifying the age of every item of equipment on every transmission tower and line; (3) design a new inspection system for assessing every item of equipment on all transmission towers; and (4) require all contractors performing such inspections to carry insurance sufficient to cover losses [Dkt. 1186]  Since that time, PG&E filed an update to their Wildfire Mitigation Plan ("**WMP**") through their "*Notice of PG&E Wildfire Mitigation Plan*

*Update by Pacific Gas and Electric Company*" on March 4, 2021 [Dkt. 1331] with additional comments by the CPUC through the "*Motion of the California Public Utilities Commission and California Department of Forestry and Fire Department for Leave to File Amicus Letter re: 1308 Order to Show Cause, by Arocles Aguilar*" on March 11, 2021 [Dkt. 1335].

As set forth in the attached amicus brief and declaration, both the PG&E wildfire mitigation activities and the CPUC "enhanced oversight" are ineffectual to address the conditions of probation and are insufficient to keep Californians safe from the growing number of PG&E wildfires.  Given the breadth of my engagement in these issues, I have a unique vantage point as (1) an active party within the PG&E US Bankruptcy Proceeding (Case#19-30088), (2) an active party within related proceedings at the California Public Utilities Commission (R.18-10-007, I.15-08-015, I.19-09-016) and (3) an active participant within legislative efforts surrounding the formation and passage of Assembly Bill 1054 (CA State Senate Energy, Utilities and Communications Committee and CA Committee on Utilities and Energy) which among other impacts was the basis of the regulatory response to PG&E's safety failures.  Through my brief, I will demonstrate how the combined efforts of PG&E and their investors have undermined well-intentioned corporate restructuring efforts and redirected funds away from safety enhancements and common-sense reforms to ensure short-term investor gains will continue to be prioritized over the safety and security of California residents. Given these underlying and systemic issues that prevent PG&E from reorganizing their operations to provide safe service, I will also propose remedies to be incorporated as conditions of probation.

As a wildfire survivor and PG&E victim, I have engaged in various proceedings to advance the public interests in having a Northern California investor-owned utility that is not predisposed to safety lapses and ongoing criminal activity.  Through these experiences, I have come to understand and appreciate the financial and regulatory structures that have been insufficient in guiding Pacific Gas and Electric Corporation on a more lawful path.  I respectfully present this *amicus curiae* brief to this court so that I may file the *Amicus Brief to Strengthen the Condition of Probation for Pacific Gas and Electric Corporation***.**

///

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

Federal district courts possess the inherent authority to accept *amicus* briefs. *See In re Bayshore Ford Truck Sales, Inc.*, 471 F.3d 1233, 1249 n.34 (11th Cir. 2006) ("[D]istrict courts possess the inherent authority to appoint 'friends of the court' to assist in their proceedings."); *Jin v. Ministry of State Sec.*, 557 F. Supp. 2d 131, 136 (D.D.C. 2008) The role of an amicus is to assist the court "in cases of general public interest by making suggestions to the court, by providing supplementary assistance to existing counsel, and by insuring a complete and plenary presentation of difficult issues so that the court may reach a proper decision." *Newark Branch, N.A.A.C.P. v Town of Harrison, N.J.,* 940 F. 2d 792, 808 (3d Cir. 1991). Courts permit briefing from an *amicus* when (1) a party is not represented competently; (2) the *amicus* has an interest that may be affected by the decision but does not entitle the *amicus* to intervene; or (3) the *amicus* has unique information or a new perspective that can help the court beyond what the parties can provide. *Ryan v. Commodity Futures Trading Comm'n*, 125 F.3d 1062, 1064 (7th Cir. 1997)

Here, *amicus William B. Abrams* petitions to assist the court with establishing PG&E's conditions of probation given his unique first-hand personal and professional experience on the matters of ensuring public safety within PG&E's service territory.  I have personal and harrowing experiences with PG&E fires and understand the impediments to pursuing collaborative solutions to PG&E's ongoing managerial, financial and operational challenges to improve the safety culture within the utility.  Both my personal experiences and my professional experiences working within legislative, regulatory and bankruptcy proceedings bear on the disposition of PG&E in this case and the degree to which the conditions of probation sought by this court may be successfully implemented.  Unlike other parties that represent specific public interests in this case, I have a breadth of personal and professional engagement that will provide the court with valuable perspective that directly bears on the critical matters related to how future victims of PG&E fires will be treated and the degree to which the public will be able to rely upon this utility to safely operate their electric infrastructure.

Through my engagement within the California State Legislature, I have engaged with utility lobbyists, public advocacy groups, victim lobbyists, utility investors as well as the authors of key legislation including Assembly Bill 1054 which this court may or may not be able to rely upon to

ensure particular matters of oversight regarding the conditions of the PG&E probation. Additionally, through my engagement within the CPUC, I have engaged in various proceedings focused on the safety culture of PG&E (I.15.08-019) and corporate restructuring (I.19-09-016) which included a regionalization proposal (A.20-06-011) and the ongoing development of their Wildfire Mitigation Plans (R.18-10-007).  My participation within these proceedings included collaborative work with many public advocacy organizations (The Utility Reform Network, Mussey Grade Road Alliance, Protect Our Communities, etc.) along with business advocates and those representing the interests of utilities and their investors.  Through these and other proceedings, I submitted hundreds of pages in briefs, motions and testimony along with extensive work cross-examining past and present PG&E executives.  All of this work was designed to advance collaborative solutions that both supported PG&E financials AND furthered safety operations. *Amicus* herein petitions the court to advise, suggest and recommend a complete and plenary presentation of the issues so that the Court may reach a proper decision. Here, it is especially appropriate when there are no attorneys or parties in the probationary proceeding who represent PG&E victims and/or have formally engaged to the extent of *Amicus* across various legislative, judicial and regulatory proceedings relied upon by this court to support the conditions of probation.

Additionally, the Court should permit briefing from *amicus* because the victims within PG&E's territory most affected by its past and future actions are not adequately represented. Given the stock position of the Fire Victim Trust ("**FVT**") holding ~25% of PG&E shares and the fact that *Amicus* owns a residential and business property within PG&E territory, *amicus* has both a safety and financial interest that will be affected by the decision; whether PG&E operates safely has a direct bearing on my personal safety and my financial security. Finally, *amicus* has unique information from engaging across proceedings with many PG&E stakeholders and has a unique perspective that can help the Court beyond what PG&E or other parties have provided.

In closing, *pro se amicus* asks to be heard so that the Court can consider evidence and perspective that PG&E and other parties have not put before the Court.

Dated:  November 11, 2021

Respectfully submitted,
/s/ William B. Abrams
William B. Abrams
Pro Se Amicus Petitioner

# EXHIBIT A

William B. Abrams
end2endconsulting@gmail.com
1519 Branch Owl Place
Santa Rosa, CA, 95409
Tel: 707 397 5727

*Pro Se Claimant, PG&E Victim, Wildfire Survivor and*

*Party to the United States Bankruptcy Court Proceeding Case No. 19-30088, PG&E Corporation and Pacific Gas and Electric Company*

*Party to California Public Utilities Commission Proceeding I.15-08-019 to Determine whether Pacific Gas and Electric Company and PG&E's Corporation's Organizational Culture and Governance Prioritizes Safety*

*Party to California Public Utilities Commission Proceeding A.20-06-011 which is the Application of Pacific Gas and Electric Company for Approval of Regionalization Proposal*

*Party to California Public Utilities Commission Proceeding R.18-10-007 which is the Order Instituting Rulemaking to Implement Electric Utility Wildfire Mitigation Plans Pursuant to Senate Bill 901*

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Defendant. | Case No. CR 14-0175 WHA<br><br>**AMICUS BRIEF TO STRENGTHEN THE CONDITIONS OF PROBATION FOR PACIFIC GAS AND ELECTRIC CORPORATION**<br><br><br>Judge: Hon. William Alsup |

I. **THE REGULATORY FRAMEWORK AND LEGISLATED "ENHANCED OVERSIGHT" ARE MISALIGNED AND INEFFECTUALLY POSITIONED TO SUPPORT THE PG&E CONDITIONS OF PROBATION**

We have seen ongoing criminal activities and probation violations including those filed with the court on November 10, 2021 [Dkt. 1513]. These activities demonstrate the importance of the court's pointed questions regarding the causes of recent wildfires (Kincade, Zogg, Fly, Dixie, etc.) as well as PG&E's related wildfire mitigation-related activities (vegetation management, grid hardening, maintenance activities, etc.). Unfortunately, these questions have been inadequately addressed by PG&E for the purposes of ensuring the conditions of probation.[1] Moreover, the efforts within the California Public Utilities Commission ("**CPUC**") to review and approve the PG&E Wildfire Mitigation Plan ("**WMP**") and provide "enhanced oversight" in light of these recent fires has also been ineffectual given the recent investor influences on California Assembly Bill 1054 ("**AB1054**") legislation. Evidence of this dysfunction can be seen within the recent CPUC voting meeting approving the PG&E WMP. Initially, this decision was delayed as both the CPUC and the newly formed Office of Energy Infrastructure Safety ("**OEIS**") tried to figure out who was responsible for plan oversight. Following this delay and at the next CPUC voting meeting on October 21, 2021, Commissioner Houck stated that *"Now that Energy Safety is a separate department, we're finding that it's not always clear how the joint and overlapping roles and responsibilities set out in the Public Utilities Code for Energy Safety and the Commission will be implemented through what are now separate entities…"* and that they may need *"legislative support to clarify any ambiguities as to each agency and its responsibility."* Commissioner Guzman Aceves followed these comments and noted that *"If we don't have the discretion which I'm not sure I fully agree with then where is the discretion?"* and went onto say *"they* [PG&E WMP] *are a bit stagnate… especially given some of the orders and responses they have to do in order to comply with Judge Alsup and in that I was disappointed to not see the fast trip component included in the revisions… I believe that needs to be incorporated into the plan… So, I just want to reiterate what Commissioner Houck has said and the need to have greater statutory clarification of how we are going to work with this obviously adaptive nature of a plan."*[2]

---

[1] See Case No. 14-CR-00177-WHA [Dkt. 1407, 1415, 1417, 1418, 1419, 1420, 1470, 1477, 1492, 1495, 1499]

[2] See CPUC Voting Meeting, October 21, 2021, http://www.adminmonitor.com/ca/cpuc/voting_meeting/20211021/

So, the huge problem here regarding oversight of the conditions of probation is that the legislation this court currently relies upon is designed to be ambiguous and with little teeth to hold PG&E to account.  As President Batjer indicated within that same meeting, AB1054 mandates that they *"must ratify."*[3]  Further substantiating these valid concerns by the Commissioners, I received the following response in an email from OEIS when inquiring about the process for public engagement and collaboration around these issues:

> *"Simply put, at the moment we do not have any resources to help Intervenors. Management is aware that this is an important issue and they will be considering the issue in the coming months and attempt to address it."*

Yes, the CPUC and the OEIS are making honest attempts to hold PG&E accountable and to provide "enhanced oversight" in line with the conditions of probation but simply do not have the legislated authority, human resources or tools to do so given the design of AB1054 and other legislation that has the primary purpose of protecting investor interests.  Therefore, it will be important for the conditions of probation to not rely upon regulatory oversight bodies and instead require independent structural changes within PG&E corporation that are foundational to ensuring the conditions of probation that have been ordered by this court.

## II.   PG&E FINANCIAL STRUCTURES AND INVESTOR INCENTIVES MUST BE REALIGNED TO SUPPORT THE CONDITIONS OF PROBATION

The court has correctly noted that PG&E has a history of diverting financial resources away from infrastructure safety and reliability to ensure a greater return for institutional utility investors. Due to this reality, we have seen calls for municipalization of the grid from the City of San Francisco, the City of San Jose and many others along with a "Golden State Energy" proposal which has been pushed away with AB1054 and the six strikes "enhanced oversight."[4]  Most recently we have seen increasing calls for a public takeover of PG&E including from Congressman Ro Khanna.  In response to the corporate misallocation of investments away from safety efforts to instead head towards PG&E investor pockets, Rep. Ro Khanna stated earlier this month:

---

[3] See CPUC Voting Meeting, October 21, 2021, http://www.adminmonitor.com/ca/cpuc/voting_meeting/20211021/
[4] See California Senate Bill No. 350,
https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201920200SB350

> *"When is enough, enough. We know PG&E has under invested in safety. We know that*
> *PG&E has not prioritized ratepayers. We now know that PG&E prioritized private investors*
> *at the expense of victims of the fires."[5]*

Of course, it is not up to this court to take a side regarding this public-owned vs. investor-owned debate.  However, it is important for the court to understand how legislative and regulatory efforts have been designed to guard the interests of investors and to keep the PG&E structural status quo.

As a wildfire survivor and victim of the PG&E fires, I put forward many motions within the bankruptcy proceeding to advance the interests of safety.  I even put forward motions to ensure safety professionals within PG&E would be available to testify regarding the lack of safety-orientation through the bankruptcy process.[6]  However, PG&E as well as parties representing institutional investors and victims felt that safety-oriented witnesses would just get in the way of ensuring the division of dollars and an expedited plan confirmation.  Within the bankruptcy courtroom, there was an overreliance on the California Wildfire Fund as a substitute for needed safety-oriented structural changes within PG&E.  Parties understood that there was no need to restructure PG&E towards providing safe and lawful operations as soon as the financial safety net for investors was put into place through the AB1054 legislative fix.  This was true to such an extent that Hon. Judge Montali made the following comments within his order confirming the PG&E plan:

> *"Mr. Abrams' desire for a better PG&E, for a better environment and a better Northern*
> *California, safe from wildfires, while aspirational and well-intended, is not something the*
> *Bankruptcy Code or this court can deliver."[7]*

The fact is that core parties to the bankruptcy proceeding (Ad Hoc Group of Bondholders, Ad Hoc Committee of Unsecured Noteholders, many shareholder groups, etc.) engaged in powerful influence campaigns to ensure that their financial interests were protected at the expense of public safety and regardless of further PG&E criminal activity.  Within the bankruptcy proceeding, I provided detailed evidence of how PG&E investors financed all sides of the AB1054 legislation including but not limited to funding key victim attorneys to ensure their financial benefits.[8]  Despite

---

[5] See KQED Interview, November 3, 2021, https://omny.fm/shows/kqed-segmented-audio/congressmember-ro-khanna-wants-a-public-takeover-o
[6] See Case# 19-30088(DM), [Dkt. 7500] "Amended Witness and Exhibit List of William B. Abrams"
[7] See Case# 19-30088-DM [Dkt. 8001], (pgs. 14-15)
[8] See Case #19-30088, [Dkt. 6799], April 20, 2020, William B. Abrams Motion to Designate Improperly Solicited Votes

the court's denial of my motion, later reporting confirmed that a key victim attorney received ~$400M in financing from PG&E investors. This funding in turn helped finance the Up From the Ashes Coalition which was the primary organization responsible for pushing the AB1054 legislation into law.[9]  What is important for the court to note with this example is the extent to which hedge funds and other investor interests are driven at the expense of safety and the victims of PG&E fires.  It is only in recent months that we have seen the extent to which hedge funds have benefited from the victim stock position that was forced upon them by the conflicts of interest surrounding the PG&E reorganization decision-making.[10]

**Again, these are not issues for this court to remedy but I am highlighting them within this brief so it is clear to this court that investor interests must be better aligned with public safety interests through the conditions of probation if other safety-oriented conditions are going to be correctly prioritized by PG&E.**  We cannot expect that by probation conditions such as trimming trees or other downstream wildfire mitigation tactics that PG&E operations will head in a direction aligned with ethical and law-abiding conduct that is counter to the interests of their investors.  If the court considers the testimony of Julie Kane, Chief Ethics and Compliance Officer within the March 2, 2020 CPUC hearings it will be clear that ethical operations are deprioritized when compared to investor benefits.  Within that hearing, I asked Ms. Kane if she felt there was an ethical obligation to notify customers if the company learned that due to PG&E infrastructure deficiencies there was a 10% chance their home and community would be burned down within the next year.  Her answer was direct and frightening to victims of the PG&E fires.  She responded "*I don't think I would have that expectation.*"[11]

It is clear that if the conditions of probation do not address the underlying financial and operational structures within PG&E, the ethics of the corporation will not support a lawful orientation.  There are specific ways PG&E may choose to implement financial mechanisms and structures including through special debt classifications, the implementation of joint ventures and/or

---

[9] See KQED, "Sharks are Circling Again: With Wildfires Come Lawyers, and Previous Survivors Have a Warning, September 8, 2021, https://www.kqed.org/news/11887723/sharks-are-circling-again-with-wildfires-come-lawyers-and-previous-survivors-have-a-warning
[10] See KQED, "Hedge Funds Cash Out Billions in PG&E Stock. Fire Survivors Suffer and Wait", October 11, 2021, https://www.kqed.org/news/11891626/hedge-funds-cash-out-billions-in-pge-stock-fire-survivors-suffer-and-wait
[11] See CPUC Proceeding I.19-09016 Hearing, March 2, 2020 (Mark 1:40), https://www.adminmonitor.com/ca/cpuc/hearing/20200302/

the establishment of mutual assistance agreements.  It should be incumbent upon PG&E to demonstrate how they will restructure and address their systemic issues that to date have inhibited their ability to adhere to other regulated conditions of probation central to public safety.  Of course, implementing some of these financial structures would mean a longer-term investment horizon for some hedge funds that have relied on short-term yield for too long and have enough power and influence to bend systems and regulatory processes to their short-term financial advantage at the expense of public safety.  The court must recognize these power dynamics and require PG&E to take the necessary steps to restructure in a way that ensures investments are oriented to support the conditions of probation.  Without these types of systemic and structural changes to the financials, the operational safeguards put forward as conditions of probation will be rendered ineffectual.

### III.   THE PG&E WILDFIRE MITIGATION PLAN MUST BE REALIGNED TO SUPPORT THE CONDITIONS OF PROBATION

Pacific Gas and Electric Corporation has effectively lowered the bar for the approval of their Wildfire Mitigation Plans ("**WMP**", "**WMPs**") by the California Public Utilities Commission ("**CPUC**") when compared to pre-bankruptcy standards through the financial influence campaign which I previously outlined.  These legislated steps backward to ensuring safety included (1) substituting an annually required WMP to a three-year plan; (2) implementing a "reasonableness" standard that must be proven by intervenors like me if PG&E is to be held to account for future wildfires; and (3) sidelining prior advancements to align investor return and ratepayer reimbursement with safety performance metrics (performance-based regulation).  All of these investor-favorable concessions were euphemistically tied to "enhanced oversight" and can be traced to the undue influence of investors on the legislative and bankruptcy processes.  That said, what I want to highlight for the court is that this WMP and the associated wildfire mitigation tactics should not be relied upon as a pathway to orient PG&E towards becoming a law-abiding investor-owned utility.  In an effort to support the court's charge with establishing strong conditions of probation, I will propose prudent remedies to address the clear deficiencies within the PG&E WMP.

**First, it is important to point out one of the most obvious and glaring deficiency of the PG&E Wildfire Mitigation Plan is that it simply does not specify the causes that led to past fires.**  This fact in many ways makes it impossible for PG&E to accurately identify effective wildfire mitigation tactics or strategies that will allow the company to avoid causing future fires and

related criminally negligent activities.  As an example, the plan does not state that a C-hook, factor X and/or decision Y led to the Camp Fire and has been addressed with the following mitigations. Similarly, the plan does not state that a flexible jumper, slag factor X and/or decision Y led to the Kincade Fire, Zogg Fire, Fly Fire, Dixie Fire or any fire.  We need to understand these X and Y factors to ensure strong conditions of probations and they must be directly mapped within their Wildfire Mitigation Plan.  PG&E's strained efforts to avoid accountability for any aspects of past fires within their WMP has led them to prioritize financial liability avoidance over pragmatic wildfire mitigation tactics even within this document which is meant to be the central strategic document for PG&E's wildfire mitigation activities.  This head-in-the-sand strategic approach has the unfortunate consequence of making future catastrophic wildfires more likely.  Indeed, PG&E has to a large extent disassociated the causes of past fires from their mitigation strategies as seen from this statement by a PG&E Senior Manager in a recent CPUC workshop:

> *"Also, as you said with regards to the Kincade Fire... the particular piece of equipment that was suspected of being part of this was a jumper cable and that particular piece of analysis is NOT discussed in our Wildfire Mitigation Plan because our transmission wildfire risk model is currently in development... with regards to our planning models as far as transmission wildfire risk assessment, we are still building that process in there. So, we got a ways to go in that and is one of the things we are working on in 2021. Unfortunately, we are struggling with data on that... but we are making progress."[12]*

Another vehicle conveniently leveraged in pursuit of their financial risk avoidance tactics within the PG&E WMP and within this court is the term "black swan."[13]  This turn of phrase is misused and misappropriated by PG&E to describe lapses in judgement, negligence and generally to deflect from their responsibilities and culpabilities.  As an example, Aaron Johnson, Vice President Wildfire Safety Public Engagement, used this term to explain why the factors that led to the Kincade Fire were not found within their wildfire mitigation plans by stating:

> *"We understand at a high-level that our equipment was responsible for that fire... So, we looked at what are the criteria... that was a very healthy piece of equipment that had been inspected multiple times, there were high definition cameras and nothing was identified.*

---

[12] See 2021 WMP Updates Technical Workshop, February 22, 2021, Comments by Paul McGregor, Director EO Risk Management & Analytics (see admin monitor mark 2:00) http://www.adminmonitor.com/ca/cpuc/workshop/20210222/
[13] See "Response to Request for Follow Up by PG&E," Case No. 14-CR-00177-WHA, filed 11/18/2020

> *However, the fire conditions on the ground were quite extreme during that time, so we adopted something in our transmission protocols, called **black swan criteria**.[14]*

Keep in mind that this "black swan" is referenced ~20 times within the PG&E WMP but not used in this way by any other California Investor-Owned Utility ("**IOU**").  This term and its application to risk modeling was developed by Nassim Nicholas Taleb but is mischaracterized and misappropriated across the PG&E WMP and throughout their filings within this court as somehow a catch all phrase for the causes of recent fires.[15]  This term has been used by PG&E to explain away failures associated with the Kincade Fire, Zogg Fire and other fires across their territory. It is used so often that it would seem that there is a bevy of black swans (wedge if in flight) plaguing PG&E risk modeling and it was just their bad luck that these instances were hoisted upon them.  If we are amenable to this characterization by PG&E regarding these events, it will be important to note a warning Nassim Nicholas Taleb also states in reference to black swan events:

> *"Some business bets in which one wins big but infrequently, yet loses small but frequently, are worth making if others are suckers for them and if you have the personal and intellectual stamina."[16]*

We can either concede to this "black swan" liability scapegoat or require that PG&E actually maps their operational, managerial and infrastructure failures from past wildfires to specific mitigation activities within their WMP.  The alternative is to believe the false assumptions that rusted C-hooks, jumper cables, misuse of wind sensor data, leaving abandoned infrastructure energized, poor de-energization decision making and a host of other utility ailments are all just unfortunate, rare and unavoidable occurrences that cannot be accounted for in risk mitigation efforts.  Yes, the PG&E failures related to the Kincade Fire, Zogg Fire, Dixie Fire and other fires are common white swans and deserve to be directly addressed within the WMP as a condition of probation. We cannot wait on CAL Fire reports or Federal Monitors proving incidents were the fault of PG&E before we ingrain learnings from past failures into these risk mitigation efforts.  Similarly, we can't wait for these failures to be deemed statistically significant enough by PG&E to warrant inclusion in their WMP.  **If a failure contributed to or directly caused a catastrophic**

---

[14] See 2021 Wildfire Mitigation Plan Updates Technical Workshop, February 23, 2021 (admin monitor mark 5:11) http://www.adminmonitor.com/ca/cpuc/workshop/20210223/
[15] See Response to Request for Follow Up by PG&E, Case No. 14-CR-00177-WHA, filed 11/18/2020
[16] The Black Swan: The Impact of the Highly Probable, Nassim Nicholas Taleb, Random House Pub., April, 2007

**wildfire, that should be enough of a reason for the court to ensure it is addressed within their Wildfire Mitigation Plan as a condition of probation.**

Another area where the court must insist upon demonstrated course correction from PG&E as a condition of probation is regarding the manner in which they model risk. As we look at the back and forth regarding the Dixie Fire, much of what PG&E has focused upon is the tree in question and whether or not they should have understood the risk and mitigated the risk (i.e. cut the tree down). This question although important is looking through the wrong lens when it comes to risk modeling within complex systems. This linear risk modeling that looks at whether risk factor A (leaning tree) caused catastrophic outcome B (Dixie Fire) is too simplistic and represents a wrong-headed attempt to apply linear risk analysis to a complex risk profile with compound risk factors.

This linear-risk analysis has unfortunately been the go-to approach of PG&E and has led to poor decision making and risk management. As an example, PG&E has indicated that the primary reason that they did not de-energize the transmission line which was a significant cause of the Kincade Fire is that they wrongly assessed that transmission lines present a low and unexpected probability of wildfire risk (i.e. black swan). It is this same negligent miscalculation that has led them to not incorporate these same risks (jumper cable failures, mismatched de-energization protocols, etc.) into their 2021 WMP given that they are deemed "low probability events." However, this infrastructure DOES pose a much higher risk when in close proximity of other assets. Jumper wire and clearances or spaces are determined by considering the sag length of the jumper wire so as to create distance between the tower or arms. The swinging movement of the jumper wire or the movements of the power transmission line itself can dramatically increase the interdependent risks of these component parts on the transmission line. Therefore, it is desirable to have the jumper in a more rigid state where conditions are likely to cause more swinging (exp. high wind events). Further compounding these risks is the catenary angle of the conductor and the insulated string which may cause extreme temperature variations and movements such as sleet-jumping and galloping. If these compound risks were considered by PG&E then perhaps they would have not drawn the wrong-headed linear conclusion that transmission lines are low risk. Instead, they may have identified those transmission lines that are more exposed to wind and measured the rigidity of jumper configurations.

The transmission lines that have less rigid jumper configurations in higher wind conditions might be moved up on the priority list when the de- energization decisions were made on October 23, 2019 leading to the largest wildfire in Sonoma County history. In addition to these types of mitigations for the asset risks, there are operational and process specific mitigations that could and should have occurred. As an example, the practice of cutting the jumper wire in the field might be substituted with a process that determines the jumper arrangement (including wire size) at the manufacturing facility where more precise and consistent tensions and tolerances can be assured. Of course, all of this type of analysis is not for the court to determine. However, it is an imperative of the court to ensure that PG&E demonstrates how they intend to apply appropriate compound risk modeling and analysis to their infrastructure and associated operational processes. **The court must demand that PG&E risk modeling incorporate this type of compound risk analysis as a condition of probation.**

Also, noticeably missing from the PG&E WMP is any mention or integration with the Community Wildfire Protection Plans ("**CWPPs**") that stretch across California at the local-level. This is a key integration point that must be remedied as a condition of probation. Not only is this integration not present within their plan, it was clear at a recent Sonoma/Marin Community Meeting hosted by PG&E to address community concerns that key wildfire-focused executives within PG&E are largely not even aware of these key wildfire mitigation plans. Mark Quinlan, Vice President of Wildfire Mitigation Operations and Execution stated the following within this webinar on October 20, 2021:

"*I am not familiar with Community Wildfire Protection Plans*"[17]

To be clear, these CWPPs are the primary strategy documents for vegetation management and other wildfire mitigation practices across Northern California. PG&E will never be able to effectively mitigate wildfire risks if key wildfire-focused executives like Mr. Quinlan are so out of touch with the communities where they operate that they remain unfamiliar with these key locally-driven documents that stretch across their territory. More importantly, PG&E will not be able to successfully implement their conditions of probation, if they continue to operate in such a vacuum. This court cannot reasonably expect that PG&E will be able to effectively manage vegetation

---

[17] See "Community Wildfire Safety Program: Marin and Sonoma County Webinar, October 20, 2021, (Mark 1:17) https://www.youtube.com/watch?v=bxvrFSGrPJ4

("enhanced" or otherwise) within their territory if they are not even aware of the local strategy documents that govern vegetation management and other wildfire mitigation activities across Northern California communities. **PG&E must be required to integrate their wildfire mitigation strategies and their WMP specifically with local CWPPs as a condition of probation.**

The last point I will touch upon is PG&E's reluctance to measure and report on risk factors across their infrastructure in a transparent manner. It is true that they have started to report on "Risk Spend Efficiency" through the CPUC and touted their new focus on "Lean Management" without defining any Lean metrics. Simply stated, these poor-substitutes for real risk management and reporting are not sufficient for supporting the conditions of probation outlined by this court. The Public Utilities Commission might be able to rely upon these types of measures for IOUs that do not have such an extensive criminal history, but we must insist on more specific measures of risk and risk mitigation to be reported publicly by PG&E if we are to have greater transparency and accountability. Specifically, the court should require PG&E to assign Risk Reduction Ratios ("**RR**") and/or Relative Risk Reduction Ratios ("**RRR**") for each and every mitigation tactic. For too long, PG&E has been able to substitute reporting on risk reduction with activity metrics focused on the quantity of work (line miles underground, number of trees trimmed, etc.) rather than the quality of work and quantified reduction of risk for each action.

Through applying this type of specific measurement of risk reduction to all of the tactics required as conditions of probation and those required by the CPUC, a scorecard should then be produced as a condition of probation. This will then enable the court and the public to understand the progress PG&E is making on reducing risk and adhering to their conditions of probation. Through this type of reporting approach, performance outcomes should then be tied to the financial mechanisms I described in earlier sections to ensure the types of financial incentives necessary to drive accountability are mandated by this court and enforced through the CPUC. Consider the following public-facing scorecard as an example of the type of accountability and transparency that should be required for PG&E to produce monthly as a condition of probation:

*Example: Wildfire Risk Scorecard*

## IV.  SUMMARY OF RECOMMENDATIONS TO STRENGTHEN THE CONDITIONS OF PROBATION

PG&E has violated the terms of their probation time and time again through committing at least 85 more felonies.  As a wildfire survivor from the PG&E Fires in 2017, it grieves me to see the most recent criminal charges and probation violations referenced within Docket No. 1513 and filed on November 10, 2021.  We cannot allow PG&E to continue on the current criminal path and this court must reimpose stronger conditions of probation that consider the recent recidivistic actions of PG&E.  The court must take into account the systemic structural issues of the corporation and the undue financial influences of their investors that enable and/or encourage PG&E to continue on their criminal path.  The conditions of probation must require PG&E to address the underlying financial structures as well as the strategic and operational issues that are foundational impediments to pursuing a path aligned with strong corporate ethics.

Dated:  November 11, 2021

Respectfully submitted,
/s/ William B. Abrams
William B. Abrams

Pro Se Amicus Petitioner

# EXHIBIT B

William B. Abrams
end2endconsulting@gmail.com
1519 Branch Owl Place
Santa Rosa, CA, 95409
Tel: 707 397 5727

*Pro Se Claimant, PG&E Victim, Wildfire Survivor and*

*Party to the United States Bankruptcy Court Proceeding Case No. 19-30088, PG&E Corporation and Pacific Gas and Electric Company*

*Party to California Public Utilities Commission Proceeding I.15-08-019 to Determine whether Pacific Gas and Electric Company and PG&E's Corporation's Organizational Culture and Governance Prioritizes Safety*

*Party to California Public Utilities Commission Proceeding A.20-06-011 which is the Application of Pacific Gas and Electric Company for Approval of Regionalization Proposal*

*Party to California Public Utilities Commission Proceeding R.18-10-007 which is the Order Instituting Rulemaking to Implement Electric Utility Wildfire Mitigation Plans Pursuant to Senate Bill 901*

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br>Defendant. | Case No. CR 14-0175 WHA<br><br>**DECLARATION OF WILLIAM B. ABRAMS IN SUPPORT OF AMICUS BRIEF TO STRENGTHEN THE CONDITIONS OF PROBATION FOR PACIFIC GAS AND ELECTRIC CORPORATION**<br><br><br>Judge: Hon. William Alsup |

I, William B. Abrams, declare that if called as a witness in this case, I would and could testify under oath based on my personal knowledge to the following facts as true and correct.

1.  I am wildfire survivor who lost his home and ran from the PG&E Wildfires of October 8, 2017.  My family and I narrowly escaped the flames and I have personal experiences directly related to the matters before this court.  Since the fires in 2017, I have experienced additional evacuations from the 2019 Kincade Fire and 2020 Glass Fire that struck Sonoma County.

2.  I have engaged in local recovery and resiliency efforts since the fires of 2017 and am intimately familiar with the personal, financial and safety-oriented struggles within my community and other communities ravaged by an increasing number of PG&E wildfires. I organized community rebuilding efforts after the fires and worked collaboratively to support Sonoma County efforts given my diverse professional background within private and public organizations and exposure to public safety systems.

3.  I have engaged as a party to ~10 wildfire and electric utility related proceedings at the California Public Utilities Commission since the wildfires of 2017 to collaborate and work on energy and infrastructure related issues.  Through these experiences, I have worked alongside other ratepayer and public advocates including but not limited to The Utility Reform Network (TURN), Mussey Grade Road Alliance (MGRA), Protect Our Communities (POC), Small Business Utility Advocates (SBUA) to find common ground and support investor owned utilities on a path to provide safe and reliable service.  I have done my best within these proceedings to be representative of utility fire victims and provide a voice within proceedings based upon my personal experiences escaping the PG&E fires and my professional experiences working on related issues in adjacent industries.  My filed motions, briefs and other regulatory documents can be found on the Commission's website and include the following proceedings:[18]

    - **R.18-10-007** – *Order Instituting Rulemaking to Implement Electric Utility Wildfire Mitigation Plans Pursuant to Senate Bill 901*

---

[18] See California Public Utilities Commission Docket, https://apps.cpuc.ca.gov/apex/f?p=401:1:0

- **R.18-12-005** – *Order Instituting Rulemaking to Examine Electric Utility De-Energization Of Power Lines in Dangerous Conditions*

- **R.19-01-006** – *Order Instituting Rulemaking to Implement Public Utilities Code Section 451.2 Regarding Criteria and Methodology for Wildfire Cost Recovery Pursuant to Senate Bill 901*

- **I.19-09-006** – *Order Instituting Investigation of the Commission's Own Motion to Consider the Ratemaking and Other Implications of a Proposed Plan for Resolution of Voluntary Case filed by Pacific Gas and Electric Company, pursuant to Chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court, Norther District of California, San Francisco Division, In re Pacific Gas and Electric Corporation and Pacific Gas and Electric Company, Case No. 19-30088*

- **I.15-08-019** – *Order Instituting Investigation on the Commission's Own Motion to Determine Whether Pacific Gas and Electric Company and PG&E Corporation's Organizational Culture and Governance Prioritize Safety.*

4. I have actively engaged as a Pro Se Party to the PG&E Bankruptcy Proceeding (Case#19-30088) to advocate for victim interests and to promote the safety-orientation of PG&E. My positions taken within the case are readily available on the US Bankruptcy Court Docket and include over 10 motions and related arguments.[19] Through this proceeding, I have engaged with parties that have interests on all sides of the PG&E bankruptcy case in the hopes of finding common ground and to balance the financial and safety aspects of the reorganization.

5. Since the PG&E wildfires of 2017, I have actively engaged in statewide advocacy work related to wildfires, climate, public safety and utilities. Through this work, I have testified before the California Senate Energy, Utilities and Communications Committee, the California Assembly Committee on Utilities and Energy and other California legislative committees. I have actively worked with legislators and their staff on key wildfire and utility related legislation including attempts to amend AB1054. Through this work, I engaged with Union Representatives, Utility Representatives, Utility Investors, PG&E Victims, Ratepayer Advocates and others to advance public interests in clean energy, utility safety and climate change adaptation.

---

[19] See US Bankruptcy Court, Case No. 19-30088(DM), https://restructuring.primeclerk.com/pge/Home-DocketInfo

I declare under penalty of perjury of the laws of the United States and State of California that the foregoing is true and correct.

Executed this November 11, 2021 in Santa Rosa, California.

/s/ William B. Abrams

William B. Abrams

Pro Se Amicus Petitioner