STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

JEFFREY B. SCHENK (CABN 234355)
NOAH STERN (CABN 297476)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    Jeffrey.b.schenk@usdoj.gov
    Noah.stern@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR-14-00175-WHA |
| Plaintiff, | UNITED STATES' RESPONSE TO PG&E'S AND MONITOR'S REPORTS |
| v. | |
| PACIFIC GAS AND ELECTRIC COMPANY, | |
| Defendant. | |

The United States, through Assistant United States Attorneys Jeffrey Schenk and Noah Stern, submits this response to PG&E's Response to Request for a Final Report, Dkt. No. 1519, and the PG&E Independent Monitor Report of November 19, 2021, Dkt. No. 1524-1.

**I.    BACKGROUND**

On September 9, 2010, a natural gas pipeline owned and operated by defendant PG&E ruptured in a residential neighborhood in San Bruno, California, leading to an explosion that killed 8 people, injured 58 others, and damaged 108 homes, 38 of which were completely destroyed. The United States charged PG&E with a number of criminal offenses relating to the explosion and PG&E's obstruction of

the ensuing National Transportation and Safety Board ("NTSB") investigation. On August 9, 2016, after an eight-week jury trial, PG&E was convicted of five counts of knowingly and willfully violating minimum safety standards under the Natural Gas Pipeline Safety Act and one count of obstruction of justice. On January 26, 2017, the Court sentenced PG&E to the maximum fine and maximum term of probation (five years). The Court imposed special terms of probation that required PG&E to, among other things, comply with the terms of an order imposing a Monitorship on PG&E. Dkt. 922 at 3.

The Monitorship order set forth the goal of "prevent[ing] the criminal conduct with respect to gas pipeline transmission safety that gave rise to the Superseding Indictment filed in this matter." *Id.* at 6. It also describes the scope of the Monitor's work, the procedures for the retention of a Monitor, and the Monitor's powers, compensation, and reporting process. *Id.* at 6-18. The order provides for the reporting of certain information to the United States Attorney's Office for the Northern District of California ("USAO"). It also requires that certain disputes between the Monitor and PG&E be brought to the USAO in the first instance for resolution. *Id.* at 9, 11, 13, 15. With respect to recommendations made by the Monitor in connection with its reporting, the order requires PG&E to notify the Monitor and the USAO if PG&E disagrees with any of the Monitor's recommendations. *Id.* at 14-15. If PG&E and the Monitor are unable to reach an agreement, PG&E is required to "promptly consult with the USAO regarding the dispute," after which the Order contemplates the USAO "submit[ting] a written opinion to PG&E and Monitor as to whether PG&E should adopt the Monitor's recommendation or an alternative proposal." *Id.* If the USAO's written opinion does not resolve the dispute, the order allows the parties to bring the issue to the Court for resolution. *Id.* The Monitorship order also provides that the "Monitor shall prepare a final written report for public release setting forth the Monitor's assessment of the monitorship and PG&E's compliance with the goals of the monitorship." *Id.* at 14. The order gives PG&E the option to "file its own final public written report simultaneously with the Monitor's final public written report." *Id.*

In the wake of large wildfires caused by PG&E's equipment, the Court expanded the scope of PG&E's probation conditions and the Monitorship to PG&E's electric operations.

On November 17, 2021, PG&E filed a response to the Court's request for a final report. Dkt.

No. 1519. On November 23, 2021, the Court filed on the public docket the PG&E Independent Monitor Report of November 19, 2021. Dkt. No. 1524-1.

## II. PG&E'S GAS OPERATIONS

According to the Monitor's report, PG&E's reform and improvement of gas operations has "been sustained and substantial." Dkt. No. 1524-1 at 2. With respect to the 15 technical requirements set out in the Monitorship order, the Monitor found that PG&E has completed the requirements subject to completion and has made "substantial progress" with respect to the other requirements. *Id.* at 5. Further, the Monitor reports that PG&E had made "sustained and substantial improvement in Compliance and Ethics." *Id*. at 2.

There do not appear to be any disputes between the Monitor and PG&E with respect to the Monitor's recommendations requiring the USAO's written opinion. The government notes that with respect to PG&E's gas operations, it appears that PG&E has made improvements during the course if its probation that will accrue to the benefit of public safety.

## III. PG&E'S ELECTRIC OPERATIONS

In its report, PG&E describes its effort to mitigate wildfire risks stemming from its equipment, including the capital expenditures it has made in support of such efforts. Dkt. No. 1519 at 8-38. PG&E repeatedly acknowledges "there is more work to do" in addressing these risks. *Id.* at 3, 7, 34, 42. PG&E's report, however, does not describe in detail where the Company believes it is currently falling short, what specifically it plans to do to address those shortfalls, what level of wildfire risk from its equipment (if any) it believes is acceptable, how much capital it is able or willing to use in support of these efforts, or how it has decided to allocate capital between mitigation strategies.

The Monitor details its view with respect to errors and shortcomings in PG&E's wildfire mitigation work, which it describes overall as "obviously . . . inadequate," Dkt. 1524-1 at 2, including:

- "[T]he Company needs to continue to try to overcome worker skepticism, particularly among longer-tenured employees, that the Company does not want to hear bad news and will retaliate for it, and that PG&E admonitions to 'Speak Up' are not sincere." *Id.*[1]

---

[1] The Monitor later says that it "believes PG&E is committed to and making meaningful strides

- "[S]ome core [Wildfire Mitigation Plan ("WMP")] targets . . . have been *decreasing* year over year . . . including in PG&E's Enhanced Vegetation Management ("EVM") program. . . . [T]he Company would be well served to take a more aggressive approach to wildfire mitigation than it has in the past to stop wildfires today . . . ." *Id.* at 19.

- PG&E did not address "the highest risk work sooner rather than later" until the fall of 2020. *Id.* at 20.

- "So far in 2021, the Monitor team inspected 199.75 miles of EVM work. Out of 32,269 trees inspected in 2021, the Monitor team identified 77 hazard trees, 24 radial clearance issues, and 53 overhang issues. That is, 99.5% of strike trees have been compliant with EVM scope in 2021." *Id.* at 23.

- "Thus far in 2021, out of 23,025 trees inspected [that underwent routine vegetation management work], the Monitor team identified 268 hazard trees and 55 radial clearance issues. That is, 98.6% of trees have been in compliance with the Routine VM scope in 2021." *Id*. at 23.

- "While PG&E's improvement from 2019 to 2021 on EVM is encouraging, these results are currently inadequate because they still allow very substantial wildfire risks even in EVM-worked areas. . . . Moreover, extrapolating the Monitor team's inspection statistics across PG&E's full [high fire-threat district ("HFTD")] service territory suggests that approximately 60,000 trees were missed by PG&E in 2021, even after Enhanced and Routine vegetation management work." *Id.* at 23-24.

- If the pace of EVM work continues, PG&E "will need more than 10 years to complete EVM work on the HFTDs. Given the threat of wildfires in California, and the existence of a more effective EVM program, the Monitor team respectfully believes that PG&E should not limit its EVM targets to 1,800 miles per year out of the 25,500 HFTD miles." *Id.* at 25-26.

---

toward effecting culture change" with respect to this issue. *Id.* at 15.

- "When launching its enhanced inspection program, PG&E undertook an unprecedented amount of work, inspecting all of its approximately 685,000 distribution poles, 50,000 transmission structures, and 200 substations in HFTDs in a calendar year. That 2019 effort led to an unprecedented number of orders (673,968) for remediation work ("tags"). There are over 500,000 tags from 2019 to present that remain unresolved to date." *Id.* at 29.

- "[I]n no year has PG&E met all of the inspection commitments in its WMP." *Id.* at 30.

- "In 2021, the Monitor team conducted an in-field review of 1,628 distribution structures in HFTDs that had been inspected by PG&E. Approximately 27% of the structures had potential exceptions related to field conditions, for a total of 583 missed field issues by PG&E inspectors across 435 structures. Approximately 31% of the structures had potential exceptions relating to recordkeeping, for a total of 642 potential exceptions by PG&E inspectors across 507 structures." *Id.* at 31.

- "In 2021, the Monitor team inspected 304 electric transmission structures via PG&E aerial photography records. Approximately 47% of the steel structures inspected had potential exceptions, for a total of 160 missed issues across 88 structures. Approximately 53% of the wood structures also had potential exceptions, for a total of 136 missed issues across 76 structures." *Id.* at 33.

- "PG&E lacks a clear execution plan to address the increasing backlog [of unresolved transmission and distribution tags] in a timely way and has been constrained by available budget and resources in its ability to do so. Furthermore, conditions that are meant to be addressed within six months per PG&E guidance could sit unmitigated for several years." *Id.* at 35.

- A broken "cross arm was first identified in connection with an August 19, 2019 patrol . . . but [the repair] was never completed. . . . On June 16, 2021, there was an ignition, which PG&E's Preliminary Ignition Investigation Report ("PIIR") attributed to 'a rotten and decayed secondary, wooden cross arm failing . . . .' As of the date of the PIIR, there

were 1290 open notifications on the same circuit associated with common ignition drivers, of which 886 were past due and 256 were due within six months." *Id.* at 36.

- "PG&E does not maintain traceable, verifiable, accurate, and complete records of its electric infrastructure." *Id.* at 37.

- "The trend of reducing system hardening mileage targets over the past couple of years does not comport with the Company's position that system hardening is the most effective wildfire mitigation measure. . . . [T]he Monitor team would have expected to see these targets increase, not decrease, given the increasing threat of wildfires. PG&E's reasoning for decreasing the targets in 2020 from the original forecast—that the original forecasts were ambitious to begin with—is unsatisfactory, given that these were PG&E's own proposed goals. Had the Company planned and allocated sufficient resources, it could have made more progress." *Id.* at 41.

- "[W]ithout including the fire rebuild miles in the total system hardening miles—including those in the footprint of the Camp Fire in Butte County—PG&E would not have satisfied its annual system hardening WMP target for 2019 or 2020." *Id.* at 44.

- "[D]uring multiple 2019, 2020, and 2021 PSPS events, PG&E failed to notify all account holders at impacted service points in advance of deenergization—including critical facilities and members of PG&E's medical baseline program." *Id.* at 45.

- "PG&E's contract workforce has experienced high turnover in the past several years. For example, there has been a different group of contractors involved in electric equipment inspections each year since PG&E implemented its WMP. Similarly, the vegetation management contractor workforce regularly turns over. . . . With the high turnover, there is little opportunity to instill necessary cultural values into that workforce, including a "safety first" mentality . . . ." *Id.* at 47.

As an initial matter, it does not appear that there are any disputes between the Monitor and PG&E at this time that require the USAO's written opinion. PG&E appears to be evaluating certain recommendations made by the Monitor and, under the Monitorship order, PG&E has 30 days to notify

1 the USAO and Monitor that it does not agree with recommendations.

2 Assuming the factual accuracy of both reports, PG&E's report does not appear to provide a clear-eyed self-assessment of the Company's progress, challenges, and plans. PG&E undoubtedly should emphasize the work it has done to decrease wildfire risk—much of which the Monitor also acknowledges—but by failing to place a similar emphasis and share details about shortcomings and plans for improvement, the public and regulators are deprived of the opportunity to assess whether PG&E is truly on the right path (at the right speed) or whether the Monitor is correct that "regulatory changes, or experiments with new approaches, may yield better results." *Id.* at 50.

For example, despite the fact that PG&E is performing more work verification on vegetation management works streams, in the Monitor's view (as documented by photographs, *see id.* at Ex. 6) PG&E has continued to miss a number of hazard trees. The public and regulators would likely benefit from PG&E's self-assessment on issues such as these, including whether it agrees with the Monitor regarding the error rate, what it believes drives the error rate (e.g., inattentive inspectors, not enough time allowed for inspection, or judgment calls), and whether it believes it is possible to improve on the error rate.

///

UNITED STATES' RESPONSE TO
PG&E'S AND MONITOR'S REPORTS            7
CR-14-00175-WHA

The Monitor's report also suggests that several of PG&E's work streams that reduce wildfire risk are moving at a slow pace, including enhanced vegetation management work in high fire-threat districts, completing remediation work already identified by inspections (including past-due remediation work), and system hardening.  The speed at which such work streams progress would appear to be primarily resource-driven, but PG&E's report does not analyze in any detail its resource constraints, what it would need to move these work streams along more quickly, and why it is not doing so.  The government believes that this type of information may be useful to the public in assessing whether PG&E should be trusted to continue its work or whether some greater legal and/or political intervention is warranted.

DATED:       December 16, 2021                          Respectfully submitted,

STEPHANIE M. HINDS
Acting United States Attorney


           /s/
JEFFREY B. SCHENK
NOAH STERN
Assistant United States Attorneys