JENNER & BLOCK LLP
   Reid J. Schar (*pro hac vice*)
   RSchar@jenner.com
   353 N. Clark Street
   Chicago, IL 60654-3456
Telephone: +1 312 222 9350
Facsimile: +1 312 527 0484

CLARENCE DYER & COHEN LLP
   Kate Dyer (Bar No. 171891)
   kdyer@clarencedyer.com
   899 Ellis Street
   San Francisco, CA 94109-7807
Telephone: +1 415 749 1800
Facsimile: +1 415 749 1694

CRAVATH, SWAINE & MOORE LLP
   Kevin J. Orsini (*pro hac vice*)
   korsini@cravath.com
   825 Eighth Avenue
   New York, NY 10019
Telephone: +1 212 474 1000
Facsimile: +1 212 474 3700

Attorneys for Defendant PACIFIC GAS AND ELECTRIC COMPANY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>    v.<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>                Defendant. | Case No. 14-CR-00175-WHA<br><br>**RESPONSE TO REQUEST FOR CRITIQUES**<br><br>Judge:  Hon. William Alsup |

**Preliminary Statement**

PG&E thanks the Federal Monitor for its Report, the actionable feedback it contains and the identification of areas where PG&E can continue to target improvements in its safety work. The Monitor's Report is consistent with the constructive and productive approach he and his team have promoted during the entire monitorship.  With the shared goal of making PG&E a better company, PG&E welcomes the Monitor's observations and opinions.  PG&E has already been working on implementing many of the recommendations in the Monitor's Report, and is carefully evaluating further adjustments in the short and long term based on the Monitor's feedback.

PG&E also appreciates the Monitor's acknowledgment of the substantial progress on safety that 25,000 PG&E employees have been working hard to achieve, including that:

- the Monitor team, after extensive engagement with the leaders of PG&E, "does not doubt the sincerity of the efforts of PG&E leaders" in facing the challenges that remain;
- PG&E has made "real", "significant" and "substantial" progress in improving its Gas Operations and the safety of those operations;
- PG&E's Compliance & Ethics program is "reasonably designed, implemented, and enforced so that the program is generally effective in preventing and detecting criminal conduct", and that "[p]romoting a compliant and ethical culture, particularly, through PG&E's 'Speak Up, Listen Up, Follow Up' initiative, has been an appropriate and central focus for the C&E team throughout the Monitorship";
- while many areas for improvement in PG&E's Electric Operations remain and more progress needs to be made, there is "no doubt that PG&E has improved during the term of the Monitorship in both Gas and Electric Operations and the Company's practices are becoming safer"; and
- among the improvements in Electric Operations has been PG&E's efforts to "continue [] to develop, improve, and automate" its PSPS program, which has averted up to 1,450 ignitions and has "saved lives", and to initiate recently its EPSS program, which based on early indications is "preventing fires".

As PG&E stated in its report to the Court, the Company is pushing hard to stop catastrophic wildfires; the Company is objectively making financial investments in wildfire safety that are unprecedented (over $12 billion in capital expenditures and expenses over the past five years); and the Company's actions have made a major difference in reducing wildfire risk across its service territory.  PG&E believes the Federal Monitor's Report is consistent with those observations.

Below PG&E details its perspectives and additional context on certain of the subjects covered in the Monitor's Report.  And, at the outset, PG&E offers three overarching comments that touch on many of the opinions and observations in the Monitor's Report.

*First*, it is important to emphasize that PG&E's approach to combatting catastrophic wildfires is not a single-line defense, but rather a multi-layered program.  The Monitor's Report addresses PG&E's vegetation management, infrastructure inspections and repairs, system hardening and emergency preparedness separately.  By way of example, the Monitor observes that "PG&E's VM organization has improved work quality since 2019", PG&E Independent Monitor Report of Nov. 19, 2021, ECF No. 1524-1 ("Monitor Report") at 21, and that PG&E recently has self-identified shortcomings and instituted corrections better than it has historically, Monitor Report at 23.   The Monitor also observes that even a 99% VM compliance rate still means, if extrapolated across PG&E's HFTD miles, many hazard trees would still threaten PG&E's lines.  As set forth in PG&E's Final Report to the Court, PG&E acknowledges it has more to do, is committed to continuous improvement in its VM operations and is taking a multitude of steps to build on the progress made to date.

And still, PG&E is *not* relying solely on vegetation management to prevent wildfires caused by vegetation.  Short of clearcutting the millions of trees that surround PG&E's lines (which PG&E is not permitted to do), PG&E cannot feasibly cut away all risk posed by those trees, particularly using a process that necessarily relies on subjective human judgment applied across millions of trees.  That is why PG&E relies on multiple lines of defense.

Every circuit in PG&E's HFTD service territory is subjected to both a routine and a "mid-cycle" patrol every year, as well as work verification starting this year.  PG&E does not stop

there in addressing VM risk.  As the Court is aware, PG&E is subjecting its highest risk miles to EVM, which removes far more than the trees that are considered "hazard trees" under state law.  PG&E is also engaging in system hardening, such as undergrounding sections of circuits or installing covered conductor, to limit the risk of ignitions even if a tree falls into its lines.  PG&E also employs PSPS in high-fire threat areas, which *by itself* reduces dramatically the risk of a catastrophic wildfire from PG&E's equipment by de-energizing at the specific times and places where conditions are ripe for devastating fires.  PG&E will also be employing EPSS in high-fire threat areas going forward, a program that this past year demonstrated the capability to reduce ignitions when trees hit the lines, regardless of adverse wind conditions.

The same is true for equipment inspections, where again the Monitor recognized the improvements PG&E has made from prior practices (including the high proficiency of PG&E's enhanced inspections in identifying higher priority problems) but where the Monitor also identified areas in which PG&E's quality and consistency can improve, which are in accord with PG&E's ongoing efforts to enhance its equipment inspections.  As with vegetation management, PG&E has made and continues to implement numerous improvements to increase the quality of its asset inspections, which were detailed in PG&E's Final Report.  Moreover, the multiple layers of defense that apply to combatting ignitions from vegetation contact—system hardening, PSPS, EPSS—also apply to preventing ignitions from equipment failures.

*Second,* the Monitor's Report suggests increasing the volume and pace of essentially *all* of PG&E's wildfire mitigation efforts—including more EVM, more system hardening, faster repairs of low-priority equipment and numerous other initiatives.  PG&E agrees with the Federal Monitor's perspective that when it comes to wildfire mitigation, the company should be always looking to do more.  That is precisely why PG&E is investing about six times more this year on wildfire-related capital and expenses than it did in 2017—nearly $4 billion in 2021.  PG&E must also balance the reality that it is one company, with access to finite qualified people, resources, and managerial focus to devote to the entire array of wildfire mitigation programs it is undertaking.  And more volume is not always the best answer.  For example, as explained below, PG&E will complete

approximately the same number of EVM miles in 2021 as it did in 2020, yet it will reduce far more risk by focusing on the highest ranked lines.  The challenge for PG&E and its regulators is to weigh and determine how best to allocate these unprecedented, significant, but ultimately limited resources amongst the numerous risk-reducing initiatives.  PG&E, in consultation with its regulators, is focused on allocating available resources on a risk-prioritized basis, and PG&E appreciates the Monitor's recognition that "[p]erhaps one of the largest and most important improvements [the Monitor team] saw during the Monitorship was the amount of resources and leadership brought to bear on the Company's risk-based planning and prioritization of wildfire mitigation work", Monitor Report at 19.

*Third*, PG&E appreciates and fully agrees with the Monitor's repeated recognition that it is "important for PG&E to have real stability in the coming years in each aspect of its leadership", Monitor Report at 46, and that "[n]o organization can sustain long-term progress" with substantial turnover, *id.* at 17.  The Monitor catalogues the repeated turnover in PG&E's leadership, including five Chief Executives and four heads of Electric Operations, and there has also been significant turnover in the mid-level management of the Company and among PG&E's contractors.  As detailed in PG&E's Final Report, the Company has recently brought in leaders from operationally excellent and safe utilities across the country.  PG&E's leadership believes in making PG&E a company that helps underpin California's success by delivering safe, reliable, affordable, and clean energy, and is committed to staying until the job is done.  Of course, to a large extent, the stability of PG&E's ranks depends on PG&E's stakeholders as much as PG&E itself.  The vilification and criminalization of good-faith operational judgments and mistakes—despite (as the Monitor recognizes) sincere efforts and substantial progress on PG&E's part—fosters fear and cynicism that PG&E is actively trying to stave off, is profoundly destabilizing to PG&E's leaders, employees, and contractors, and is fundamentally counterproductive to the shared goal of promoting safety.

**PG&E's Comments on Selected Portions of the Monitor's Report[1]**

1. **Compliance and Ethics**

> *"It is imperative that PG&E work assiduously to earn the trust of its workforce, who (especially among longer-serving PG&E personnel) often doubt whether their managers and supervisors actually want to hear bad news."* Monitor Report at 15.

PG&E agrees that fostering trust among its employees and encouraging them to speak up and raise issues and bad news is imperative, and appreciates the Monitor's recognition of the Company's efforts and progress in promoting a safe and ethical culture. As the Monitor observed, "the Monitor team believes PG&E is committed to and making meaningful strides toward effecting culture change". Monitor Report at 15.

The Monitor Report detailed one of the efforts PG&E has undertaken to promote a compliant and ethical culture—PG&E's Ethics Council. *Id.* Other examples of the type of steps that PG&E is taking to promote the right culture are PG&E's Corrective Action Program, or CAP, and its Eagle Eye Certificates and Speak Up Awards.

PG&E's CAP program provides all PG&E employees with a simple and accessible way to report and track equipment and safety issues, ineffective and inefficient work processes and procedures, and provide suggestions on how to improve PG&E generally. Every issue is reviewed and evaluated by members of the CAP Review Team who help address the concern. Through the CAP program, PG&E is able to analyze submissions proactively and identify and respond to known or developing issues. Just in 2021, PG&E employees will submit over 20,000 issues through CAP, providing tangible evidence that employees widely feel comfortable raising issues that require corrective action.

---

[1] Because issues discussed in the Monitor Report interrelate and overlap, PG&E has identified representative portions of the Monitor's Report to comment on, as opposed to commenting on similar passages. PG&E has also sought to avoid repeating information previously set forth in PG&E's Final Report.

To encourage further this kind of feedback, PG&E brings its employees and contractors together to celebrate those who "speak up":

- PG&E's Eagle Eye Certificates are given to employees and contractors for going above and beyond in raising an issue or coming up with a resolution.
- Speak Up awards are presented by Compliance & Ethics to recognize employees who raise concerns, including through CAP.

To illustrate, just last week, PG&E held an all-employees meeting, led by the Company's CEO, to celebrate this year's Speak Up Award nominees and winners (also known as "Speak Up Champions").  By showing videos to the assembled employees that highlight the issues flagged by Speak Up Champions and publicly celebrating and awarding these acts (winners can designate a $1,500 donation by the PG&E Corporation Foundation to the charity of their choice), PG&E believes these ceremonies help demonstrate that identifying and reporting "bad news" is not only okay, but expected and commendable.  For example, one award was given this year to the anonymous employee who reported to the Company's Ethics & Compliance Helpline that the Company was out of compliance with required electric asset inspections, which led PG&E to self-report the issue to the CPUC and develop an expedited plan to address the inspections.  PG&E's self-report prompted a $2.5M penalty from the CPUC.  In addition to conferring an award for reporting this issue, Company leaders took time during the ceremony to specifically call out and thank this employee, stating:  "To the anonymous winner, thank you for Speaking Up.  Your voice has made a difference.  You have made us a better company. . . Raising this issue and self-reporting it was the right thing to do. . . This person's courage helped us make it right and make it safe, and we're very grateful to that coworker."

2. **Vegetation Management**

> *"PG&E should clarify what it meant by the phrase 'stood up' at page 24. (Possibly, it was an editing error.)"* Request for Critiques at 2.

PG&E clarifies that the cited phrase "stood up" meant that the program was built out in 2021.

> *"PG&E's scopes of work in both Routine VM and EVM could be improved to ensure that vegetation risks are better mitigated. First, PG&E limits radial clearance trimming to trees capable of growing within the minimum clearance distance within one year and limits Routine VM hazard tree removals to trees that could fail within one year. A more conservative approach would help ensure that risks are mitigated before they materialize, while further reducing potential error in what is oftentimes a difficult, subjective determination."* Monitor Report at 25.

PG&E agrees with the Monitor that VM work involves oftentimes difficult, subjective determinations and being conservative helps reduce potential error. This is in part why PG&E has been making the investments detailed in its Final Report to increase the quality of its VM determinations. S*ee* PG&E's Response to Request for a Final Report (Nov. 17, 2021), ECF No. 1519 ("PG&E's Final Report") at 24-26.[2]

PG&E clarifies that if a tree is identified as one that will grow into the minimum clearance distance within one year, PG&E seeks to prescribe a clearance sufficient to obtain 2-3 years of clearance, and in the EVM program most of the work consists of the entire tree being removed. PG&E also clarifies that, if an inspector determines that a tree poses a hazard to the line, then the inspector is required to identify the tree for work on an appropriate priority.

---

[2] As discussed in PG&E's Final Report, PG&E seeks to move to 360-degree assessments of hazard trees in high-fire threat areas during routine patrols, but this unprecedented step requires numerous operational considerations that PG&E is working through. PG&E has determined that further work on developing an implementation strategy is necessary and that work will proceed into 2022, which will subsequently inform the scaled deployment approach.

> *"PG&E's EVM work—which goes above and beyond the minimum compliance requirements of Routine VM—is being performed slowly, that is, on* less than 10% *of the HFTD annually . . . The Company stated in 2019 that it expected to perform at least 2,450 miles of EVM work per year, with the goal of finishing EVM on all HFTD circuits by the end of 2026. But PG&E's annual targets decreased in 2020 and 2021 to 1,800 miles (and were approved at those levels by the CPUC)."* Monitor Report at 25.

The Monitor is correct that PG&E completed approximately 1,800 miles of EVM in 2020 and targeted approximately the same number of miles in 2021. In 2021, PG&E has already exceeded this 1,800 mile target and has reduced significantly more risk than last year. This year's work reflected shifts to align work with the Company's revised and improved risk models and to rigorously target the highest risk miles. Thus, while the number of miles completed as part of EVM between 2020 and 2021 is similar, the number of trees worked has increased significantly from approximately 167,000 trees in 2020 to over 325,000 trees year to date, *an increase of approximately 95%.* In 2021, the EVM program alone will require an investment by PG&E of over $600 million, demonstrating the massive resources PG&E is committing to reduce wildfire risk.

> *"From the beginning of the Monitor team's review of VM work, we have identified significant recordkeeping issues. . . . [PG&E's] goal must be to have a system where self-correction (without an external force) is routine."* Monitor Report at 27-28.

PG&E agrees with the Monitor that it should continue to prioritize improvement in VM recordkeeping, including systems of self-correction. While more needs to be done in this area, there has been significant improvement over the past few years. PG&E has successfully undertaken numerous initiatives (several of which have been previously detailed for the Court), and it is continuously working to improve these issues. One example of the work PG&E is doing is PG&E's recent implementation of the EVM Veg Point Data Error Checking Process in February 2021. As data flows from the Collector App to PG&E's reporting database, data error checks now execute for each vegetation point to ensure conflicting and missing values are flagged as "data errors". All

vegetation points with data errors are captured in a report to allow pre-inspectors to perform data cleanup.  A segment with one or more vegetation points that contain data errors will not be sent for work verification until all vegetation points for that segment are error-free.  This process helps resolve conflicting or missing data fields.

3. **Electric Infrastructure Inspections and Remediation Work**

> *"[W]e understand PG&E may be considering to reduce the frequency of Tier 3 inspections—the riskiest areas—which we would not support in the near-term."  Monitor Report at 29.*

PG&E appreciates the Monitor's concern over reducing the frequency of its Tier 3 asset inspections and responds that the Company currently has no plans to do so.  In drafting its 2022 WMP, PG&E's Wildfire Risk Governance Committee (WRGC) was presented with various proposals for its consideration, including a proposal that involved reducing the inspection frequency for some Tier 3 assets based on a risk-informed approach that included factors other than HFTD tier.  The WRGC rejected the proposal to change the inspection frequency of Tier 3 HFTD assets in 2022, and PG&E will continue conducting these inspections annually.

> *"PG&E would benefit from additional planning, resource, recordkeeping improvements, and procedural enhancements to ensure it meets all external and internal inspection commitments going forward." Monitor Report at 30.*

PG&E is taking several steps to improve its asset inspection programs, including by addressing recordkeeping issues that the Monitor has identified.  In addition to the steps discussed in PG&E's Final Report at 26-35, PG&E has implemented a change in the timing of its inspection planning activities involving System Inspections and Asset Management teams so that those activities begin earlier.  PG&E has also implemented controls and controls testing to ensure alignment between its internal inspection commitments and the inspection work plan.  As part of these controls, PG&E has established a monthly process to review changes to PG&E's asset registry and compare it against

1  the inspections work plan to identify any assets that need to be included into the current year work
2  plan.  And PG&E has engaged in efforts to improve its asset registry, which include:  reducing the
3  backlog of aged-construction As-Builts, correcting asset registry maps, addressing structure record
4  synchronization issues and completing LiDAR data review to update data on structures in wildfire
5  areas.  Additionally, PG&E created a Project Management Office to intake, prioritize and manage
6  data quality and governance issues, with a focus on System Inspections.  PG&E has also developed
7  additional tools that will further enhance the quality of its inspections, including the System
8  Inspection Readiness Tool, which identifies data-related issues that can prevent poles from being
9  integrated into inspection plans.

> *"Despite ongoing prioritization and remediation efforts, PG&E lacks a clear execution plan to address the increasing backlog [of pending, unresolved electric infrastructure-related tags] in a timely way and has been constrained by available budget and resources in its ability to do so."*  Monitor Report at 35.

PG&E's inspections are effectively catching high-priority issues, and the Company prioritizes the repair of higher-risk conditions.  While PG&E believes its prioritization of repair tags by risk is necessary to mitigate the risk of catastrophic wildfires in its service area, PG&E recognizes that it has a backlog of lower priority repair tags and is committed to reducing that backlog in a way that best deploys the limited pool of qualified personnel in a risk-informed manner.  For example, PG&E is evaluating opportunities where it can combine lower priority tag work with on-going work nearby.  Seizing these opportunities will allow PG&E to address its lower priority tags while continuing to allocate the necessary resources to timely complete remediation work that presents higher wildfire risk.  And, consistent with its multi-layered wildfire mitigation approach, PG&E considers pending equipment repair tags when scoping PSPS events.

> "PG&E should incorporate more experiential field training into the curriculum and further utilize testing both during and at the end of [asset inspection] trainings to ensure comprehension and retention of information." Monitor Report at 35.

PG&E is working to incorporate the Monitor's recommendations on training for system inspections. PG&E is updating its training content based on feedback and learnings from 2021 and is developing additional knowledge assessments and testing that it plans to incorporate in its training programs in 2022. PG&E's System Inspections and Quality Team also continues to develop both desk and field work verification processes for 2022 inspections, which will include feedback regarding the quality and completeness of inspections.

> "PG&E estimates it could take years to verify the accuracy of all structure location data and for its records to accurately reflect the existence of all electric assets in its service territory. The Monitor team suggests that greater resources be dedicated to [asset location] efforts moving forward as PG&E over the past several years has not devoted an appropriate level of attention and resources to these issues." Monitor Report at 38.

PG&E has implemented initiatives to accelerate the improvement of its electric infrastructure records and its asset location data, including asset registry improvements and efforts to reduce backlogs in its asset location verification. Those steps have already significantly reduced backlogs and will continue improving after probation ends. For example, since 2020, PG&E has reduced the backlog of aged construction As-Builts that have not been processed in the asset registry by 83%. Between 2019 and August 2021, PG&E completed over 130,000 asset registry map corrections. Since May 2021, PG&E has completed several near-term, risk-prioritized activities in which the Company:

- investigated and resolved 93,000 structure record synchronization issues;
- identified and corrected approximately 3,500 potentially misassigned customer-to-transformer relationships;

12
RESPONSE TO REQUEST FOR CRITIQUES
Case No. 14-CR-00175-WHA

- enhanced the accuracy of its parcel mapping to improve communications with customers regarding PSPS events and unplanned outages;
- synchronized data on its transmission assets across its various software platforms to enable a more accurate and effective use of that data in PSPS scoping and operations; and
- updated the physical sequencing of transmission lines and support structures to provide critical input to PSPS planning and operations.

PG&E has also completed LiDAR data review and updated data on structures in wildfire areas. In Q1 2022, PG&E will initiate the physical installation of pole number tags on additional distribution structures using risk-informed prioritization. PG&E plans to continue its asset location efforts into 2022 and beyond.

4. **System Hardening Program**[3]

> *"PG&E did not specify a timeframe by which it expects to complete the undergrounding of 10,000 miles, but indicated an intention to harden up to 1,000 miles per year as part of the program. As of October 20, 2021, PG&E expects to underground approximately 66 miles in 2021 and a total of 327 miles from 2021-2023. Notably, there is substantial skepticism among PG&E field personnel that PG&E can feasibly underground more than 500 miles per year using current technology and hardening methodologies."* Monitor Report at 42.

PG&E is not surprised that there is skepticism about the feasibility of undergrounding 10,000 miles of electric lines—this is a highly ambitious, unprecedented goal for a utility. And PG&E is mindful that system hardening efforts involve operationally intensive work. PG&E Final Report at 35. Nonetheless, PG&E is focused on pursuing this bold goal of dramatically increasing the pace of system hardening. PG&E is currently on track to underground 650 miles by the end of 2023, with 325 miles, or 50% of that target, already scoped, readied for construction or currently

---

[3] On page 7 of PG&E's Final Report (Dkt. 1519), PG&E incorrectly stated two numbers related to system hardening. PG&E incorrectly stated that its system hardening mileage in 2019 was 171.6 miles. The correct number is 171.16 miles. PG&E also incorrectly stated that its system hardening mileage in 2020 was 324.1 miles. The correct number is 342 miles.

under construction, and intends to increase the number of miles undergrounded year over year. This undergrounding work is in addition to the substantial amount of other system hardening work conducted on overhead lines. For example, in 2022 PG&E is targeting 470 miles of overall hardening (including undergrounding), which is an approximately 250% increase from 2021. To achieve the goal of ramping up to undergrounding 1,000 miles per year over time, PG&E has gathered information from 24 industry-leading engineering and construction firms. The Company is working with ARPA-E, an extension of the Department of Energy, to research and test potential technological innovations and is also working with product and software companies to further support its undergrounding efforts. PG&E meets monthly with a dedicated Undergrounding Advisory Group (comprised of representatives from academia, environmental groups and federal agencies) to share information and receive feedback from key stakeholders, and also meets regularly with other utilities to share information, lessons learned and other details related to their undergrounding work.

> *"Notably, without including the fire rebuild miles in the total system hardening miles—including those in the footprint of the Camp Fire in Butte County—PG&E would not have satisfied its annual system hardening WMP target for 2019 or 2020." Monitor Report at 44.*

The Monitor is correct that PG&E counted fire rebuild miles toward its annual system hardening WMP targets in 2019 and 2020 and that those miles were necessary to satisfy those targets. To be clear, however, PG&E was on track to complete its WMP targets for 2019 and 2020, even if the fire rebuilds had not occurred. PG&E had adequate work and resources available to complete its WMP system hardening targets before the fire rebuilds occurred and, absent fire associated rebuild in 2019 and 2020, the planned system hardening work would have continued to completion.

But when a wildfire occurs and rebuild is necessary, all available resources, including those who had been focused on planned system hardening projects, are rightly pulled off their current projects to support the restoration of PG&E's customers through the immediate fire rebuild activities. Rebuilding fire-damaged HFTD areas to system hardening standards during fire rebuild is

far more efficient than rebuilding to prior construction standards (*e.g.*, uncovered overhead conductors) and then later coming back and rebuilding those same areas to a hardened standard. It also mitigates substantial risk. Fire rebuild areas are, by experience, areas subject to wildfire risk, and fire may change the fuel profile and the near-term wildfire risk assessment for the affected area. After a fire, the more limited tree coverage may no longer restrain the light flashy fuels from growing, which can lead to taller, drier fuels that raise the risk profile. All of this supports the prudency of deploying available resources to rebuild fire-damaged areas to PG&E's hardened standard while restoring service to customers.

> *"PG&E should attempt to work with governmental agencies to expedite permitting for traditional system hardening projects, not just those involving areas damaged by fires." Monitor Report at 43.*

PG&E wholeheartedly agrees that expedited permitting by governmental agencies of system hardening projects is a good thing. To that end, PG&E works regularly with governmental agencies to try to facilitate expedited permitting. For the last several years, PG&E has worked with federal and state agencies to develop programmatic playbooks for permitting on federal and state lands, including programmatic agreements with the Bureau of Land Management, California State Parks, National Park Service and the U.S. Forest Service. Even with these permits or playbooks in place, PG&E often is still required to obtain location-specific permits for system hardening work because it is more intensive and performed on a larger scale than some of these programmatic permits can cover. In those cases, PG&E works closely with the relevant governmental agencies but still remains subject to the traditional agency permitting process. Permitting is one of the areas in which PG&E fully supports the Monitor's call for state regulators to be open minded about "whether reforms are possible in state regulations and oversight policies". Monitor Report at 50.

5. **Wildfire Emergency Preparedness and Response**

> *"[D]uring multiple 2019, 2020, and 2021 PSPS events, PG&E failed to notify all account holders at impacted service points in advance of deenergization—including critical facilities and members of PG&E's*

> *medical baseline program. The Monitor team recognizes that it may not be possible to notify every single customer, but PG&E must continue improving its notification success rates." Monitor Report at 45.*

PG&E agrees with the Monitor that notice of PSPS events to affected customers, including medical baseline (MBL) customers and critical facilities, is very important.  The Monitor is correct that PG&E has not achieved 100% notification of all account holders, and that it may not be possible to successfully notify every single customer on every occasion: a small number of customers have not provided contact information (despite multiple attempts from PG&E to acquire that contact information), and changes in the scope of a de-energization based on shifting weather may necessitate de-energization without sufficient time to notify customers.  Nevertheless, PG&E has put in place a program that makes extensive efforts to notify customers and seeks to continuously improve its processes for notification.

PG&E uses multiple different communication channels to notify customers before an event, including:

- direct-to-customer notifications sent via phone, text and email;
- social media, including Facebook, Instagram, Twitter and NextDoor;
- information provided on the PG&E website;
- call-center support;
- media engagement; and
- collaboration with public safety partners and community-based organizations.

*MBL Customers.*  During PSPS events, all impacted customers receive automated calls, texts and emails at specified intervals.  MBL customers also receive additional calls and texts at hourly intervals until the customer confirms receipt of the automated notifications by either answering the phone, responding to the text or opening the email.  If confirmation is not received, a PG&E representative physically goes out to the customer's home to notify the customer (referred to as the "doorbell ring" process) while hourly notification retries continue.  If the customer does not answer, the representative leaves a door hanger at the home to indicate PG&E had visited. At times,

16
RESPONSE TO REQUEST FOR CRITIQUES
Case No. 14-CR-00175-WHA

PG&E may make Live Agent phone calls in parallel to the automated notifications and doorbell rings, as an additional attempt to reach the customer prior to and/or after de-energization.  PG&E also shares MBL customer lists with appropriate county, city and tribal agencies via its secure PSPS Portal.

*Critical facilities*.  Critical facilities receive the following notifications and support from PG&E during a PSPS event:  (1) notification in advance of customers for preparedness efforts; (2) maps of potentially impacted areas in advance of customer notifications; and (3) a dedicated single point of contact to communicate frequently via live calls for situational awareness updates and operational support.  Before a PSPS event, PG&E sends automated notifications to potentially impacted critical facilities and asks them to confirm receipt of the notifications.  If these critical facilities do not confirm receipt of the automated notification, PG&E representatives from local Emergency Operations Centers, Customer Relationship Managers or the Critical Infrastructure Lead in PG&E's Emergency Operations Center make direct calls to the critical facility contacts to notify them of the potential PSPS event.  When PG&E's Emergency Operations Center is activated for a PSPS event, a single point of contact at PG&E provides timely updates with event scope and status and answers individual questions for facilities that are both a critical facility and public safety partner.  During PSPS events, PG&E also leverages a dedicated team to support critical facilities and other business customers by conducting direct outreach, providing event updates and answering individualized questions for these customers.  Additionally, PG&E also provides back-up generators to certain critical facilities.

Over time, PG&E has taken numerous steps to improve its customer notifications.  For example, PG&E now utilizes software company Palantir's state-of-the-art Foundry technology to communicate across distinct systems and translate the geographic scope of de-energization to the list of specific customers to notify.  PG&E is the first major U.S. utility to utilize Palantir's Foundry software.

> *"While PG&E now offers many services to impacted customers during deenergization, including Customer Resource Centers, 55% of customers recently surveyed by PG&E indicated that they were unsure or unaware of the resources PG&E provides during PSPS events to customers with disabilities or other medical and acute needs. For these critical services to be useful, customers must know about them."*
> *Monitor Report at 45.*

The Monitor is correct that PG&E offers many services to impacted customers during de-energizations. For example, during a PSPS, PG&E opens Community Resource Centers where residents can access resources in a safe location. Each center offers an ADA-accessible restroom and hand-washing station, basic medical equipment charging, device charging, Wi-Fi and other amenities. For customers with disabilities or other medical and acute needs, PG&E offers additional resources. These include food replacements and stipends, portable batteries, accessible transportation and hotel accommodations.

PG&E intends to keep promoting the availability of the resources it has made available for customers through direct mail, radio advertisements and social media. PG&E notifications of PSPS events include a link to pge.com/pspsupdates, a consolidated webpage dedicated to event updates including a direct link to view support resources for customers living with a disability and/or requiring accessibility, financial or language support. Customers are also informed that PG&E has partnerships to provide translations, food, transportation and backup power resources.

PG&E also promotes available PSPS resources in its customer outreach materials throughout the season, including customer webinars, as well as press releases, and it reviews them during live press conferences as applicable during PSPS events. In August 2021, for example, PG&E sent a letter to customers most likely to be impacted by PSPS highlighting available resources to assist with the hardships created by PSPS. The letter included a multi-page list of all Disability Disaster Access and Resource Centers, Food Banks and Meals on Wheels organizations by county that PG&E has partnered with to offer resources to affected customers.

Recently, in the second half of 2021, PG&E executed an agreement with California 211 to help promote resources available to mitigate the impacts of a PSPS event. This newly

executed agreement is expected to continue promotion of available PSPS resources in 2022 and beyond.

**Conclusion**

PG&E is thankful for the feedback it has received from the Monitor and the Court throughout the probation period. PG&E has made substantial progress in making its system safer and will continue making progress in the weeks, months and years ahead.

Dated:  December 16, 2021

Respectfully Submitted,

JENNER & BLOCK LLP

By:  /s/ Reid J. Schar
     Reid J. Schar (*pro hac vice*)

CRAVATH, SWAINE & MOORE LLP

By:  /s/ Kevin J. Orsini
     Kevin J. Orsini (*pro hac vice*)

CLARENCE DYER & COHEN LLP

By:  /s/ Kate Dyer
     Kate Dyer (Bar No. 171891)

Attorneys for Defendant PACIFIC GAS AND ELECTRIC COMPANY