UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> PACIFIC GAS AND ELECTRIC COMPANY, <br><br> Defendant. | No. CR 14-0175 WHA <br><br> **FINAL COMMENTS OF DISTRICT COURT UPON EXPIRATION OF PG&E'S PROBATION** |

PG&E's five-year term of felony probation will end on January 25, 2022. The Monitor has filed a recent concluding report herein (Dkt. No. 1524 Exh. 1). So has PG&E (Dkt. No. 1519). Each has now critiqued the other (Dkt. Nos. 1538, 1541). Both recount the progress and shortfalls of PG&E's rehabilitation. I commend these filings to PG&E's victims, the public, the press, the regulators, and the Legislature. As the supervising district judge, I now offer this parting observation.

Rehabilitation of a criminal offender remains the paramount goal of probation. During these five years of criminal probation, we have tried hard to rehabilitate PG&E. As the supervising district judge, however, I must acknowledge failure.

While on probation, PG&E has set at least 31 wildfires, burned nearly one and one-half million acres, burned 23,956 structures, and killed 113 Californians. PG&E has pled guilty to 84 manslaughter charges for its ignition of the 2018 Camp Fire in Butte County, is facing five felony and 28 misdemeanor counts arising out of the 2019 Kincade Fire in Sonoma

County (that county's largest wildfire ever), is facing pending involuntary manslaughter charges arising out of the 2020 Zogg Fire in Shasta County, and is facing a civil suit by five counties arising out of the 2021 Dixie Fire (and may face criminal charges as well). The Dixie Fire, the second largest in California history, alone required 1,973 personnel to extinguish. So, in these five years, PG&E has gone on a crime spree and will emerge from probation as a continuing menace to California.

Almost all of the survivors of these fires are still waiting for compensation. Many hundreds who lost their homes endure in travel trailers because they have not yet been compensated. Meanwhile, PG&E management pays itself handsome salaries and bonuses, all paid from revenues collected from customers. This unfairness should tug at our conscience. Out of respect, the names of all those killed in the PG&E explosion in San Bruno, as well as all those killed in wildfires started by PG&E, are set forth in the Monitor's report (at Exhibit 1).

We remain trapped in a tragic era of PG&E wildfires because for decades it neglected its duties concerning hazard-tree removal and vegetation clearance, even though such duties were required by California's Public Resource Code. In time, this neglect led to hazard trees and limbs falling on its distribution lines and sparking wildfires or becoming "ground faults" (wherein the tree remains against a live wire and conducts sufficient electrical power to the earth to overheat and explode in flames). PG&E's backlog of unattended trees and vegetation was staggering at the outset of probation. As probation ends, PG&E remains at least seven years (my estimate) from coming close to being current. During its criminal probation, all or virtually all of the wildfires started by PG&E distribution lines have involved hazard trees.

PG&E has blamed global warming, drought, and bark beetles. It's true that those things made the wildfires worse. But they were reasons to step up compliance rather than slack off. And, those things didn't start those fires. PG&E did that.

PG&E has instituted some important wildfire safety reforms. These include its Public Safety Power Shutoffs, its enhanced vegetation management work, and its Fast Trip Mitigation protocol. Yet, PG&E's swath of devastation persists.

Why?

One systemic cause, in my view, is that for decades, PG&E has been outsourcing to independent contractors its statutory responsibility for finding and removing hazard trees and for maintaining vegetation clearances. A large part of the wildfire problem, as the Monitor has pointed out (Dkt. No. 1524 Exh. 1 at 47), has been sloppy inspection and clearance work (almost exclusively outsourced to independent contractors).

This outsourcing seems to have been done for at least two reasons. One has been to save on salary and benefits, the usual reason companies go from an "employee" model to an "independent contractor" model. A second, more pertinent here, has been to manufacture a strategic defense in wildfire litigation. Time and again, we have heard PG&E blame its outside contractors. When one of them failed to mark a hazard tree for removal and the tree fell on a line to start a fire, PG&E has shrugged that it had contracted with "professional arborists" and relied on them, all as part of an argument that PG&E itself acted prudently. And, when disaster struck, PG&E itself hadn't had all the necessary records — it has had to beg and plead for them from the contractors, to the extent records survived.

But it's worse than that. PG&E has told us at least a dozen times that one major reason it has fallen so far behind on its statutory duty to find and remove hazard trees and encroaching vegetation is that it has scoured the country for outside arborists and that there are no more to be had. But PG&E could hire its own employees and train them as arborists. It could hire and train as many as it needs. PG&E does not have to use the independent contractor model. One condition of probation eventually required PG&E to hire and train its own vegetation inspectors, at least thirty of them. I regret now that more weren't required. So, one systemic obstacle to rehabilitation has been and will remain PG&E's outsourcing model. PG&E should hire on its own payroll and train as many arborists as are needed to fully comply with California's Public Resource Code and to keep records adequate to fix accountability.

A second systemic problem is the conflict between PG&E's oft-advertised concern for safety versus its deep-rooted obsession for keeping power flowing. Two examples illustrate.

When probation started in 2017, PG&E had no Public Safety Power Shutoff program of any kind. After the Wine Country Fires in 2017, seventeen of which were caused by PG&E when the Diablo winds blew hazard trees and limbs (some of which should have been but had not been removed) onto its lines, the Court proposed to require PG&E, in advance of future windstorms, to deenergize any lines known to be at risk due to unremoved hazard trees and limbs. PG&E resisted this proposal mightily. Among other objections, PG&E reminded us that its customers depended on electrical power. Reluctantly, the Court didn't order such a program but still urged it. Then, in a turnabout, PG&E on its own adopted such a program, which has become known as its Public Safety Power Shutoff (PSPS) program. The highwater mark of its PSPS program came in its first year (2019), when, despite severe windstorms that year, not a single fire was caused by any PG&E distribution line. Lines at risk had been deenergized as the storms drew near. PG&E photographs taken in the immediate aftermath of the windstorms showed hundreds of downed trees and limbs collapsed upon the deenergized power lines. Had those lines been energized, many fires would have been started.

So, as the 2019 wildfire season ended, it seemed as if PG&E had found a *modus vivendi* to save lives, homes, farms, and forests, at least with respect to its distribution lines, until the hazard tree backlog could be worked through. (The massive Kincaid Fire that year was started by a PG&E *transmission* line, not a *distribution* line.)

Numerous complaints, however, arose about loss of power during PSPS outages. In response, we later learned, PG&E watered down its criteria for which lines to deenergize in advance of windstorms, so as to leave power running in more circuits than before. Then followed the Zogg Fire in 2020 in which four lives were lost and 204 structures destroyed in Shasta County due to a hazard tree falling on a distribution line during a windstorm. In short, PG&E compromised a safety protocol, the PSPS, in order to keep more meters turning. It wound up getting neither (since the fire destroyed the power lines anyway).

The catastrophic damage being so severe, it is inconceivable to the Court that any line should remain energized in a windstorm when it has not been faithfully and fully cleared of hazard trees and limbs. Yet, PG&E's revised criteria allowed just that.

1     PG&E wants us to believe that this systemic conflict is unavoidable and inherent in the
2   delivery of power.  But the whole point of California's Public Safety Resource Code is to
3   allow distribution lines to operate in windstorms by removing the hazards.  If PG&E were in
4   full compliance with California's Public Resource Code with respect to hazard tree removal
5   and vegetation clearance maintenance, then the need for any PSPS would be vastly reduced,
6   and almost all meters could continue to turn in safety.  But PG&E was somehow allowed, for
7   decades, to postpone more and more hazard tree and limb clearance.  It is nowhere near full
8   compliance.  So, there remains a systemic conflict between keeping the meters turning versus
9   doing so safely.

10    Another example of the ingrained culture to keep the meters turning is the recent 2021
11  Dixie Fire.  That fire broke out along the Feather River and became the second-largest wildfire
12  in California history.  It all started at dawn on July 13 when PG&E learned that two customers,
13  the Cresta Dam and the nearby CalTrans Tunnel on Route 70, served by PG&E's Bucks Creek
14  1101 Circuit, had lost all power.  That distribution line was only ten miles long and served only
15  three customers, the two who'd already lost power and some railroad signals along the tracks
16  beside the river.  It took over five hours for anyone from PG&E to arrive at the dam and
17  tunnel, then over four more hours to reach the source of trouble on the power line.  True, once
18  PG&E was late to begin with, some of the further delay was not PG&E's fault.  (Work on a
19  county bridge began at nine or nine-thirty that morning.)  But, most fundamentally, given that
20  it was taking so long for PG&E to track down the problem, why didn't PG&E, if safety was
21  really its top priority, simply deenergize the circuit until the trouble could be determined?

22    Hour upon hour went by with PG&E knowing that it was plausible (i) that one or two of
23  fuses on the three phases — but not all three fuses — had blown, cutting power to the dam and
24  tunnel, (ii) that a possible cause was that a tree had collapsed somewhere upon the power line,
25  a common enough occurrence, and (iii) that the tree had become a "ground fault," wherein the
26  tree would conduct power from a live wire to the ground, gradually overheating and eventually
27  bursting into flames.  Put differently, for hour after hour, PG&E could not rule out the

possibility of a ground fault since it knew power was still being fed into the circuit. In the face of this danger, wasn't the safe course to turn off the power until the trouble could be traced?

True, there were non-threatening possibilities for the outage. It was plausible, for example, that a bird with long wings might have touched two of the three conductors and blown their fuses (in the course of being electrocuted). And, it's true that any such scenario would have posed little risk of fire. And, from down below at the dam and highway, no smoke could yet be seen. But a ground fault remained a plausible danger. Yes, in the run of cases, turning off power would have inconvenienced all customers on the line. But, here, only one other customer was still receiving power, and that customer (the railroad) had battery backup. So no customer would have been inconvenienced by turning off the power in the circuit. If safety was really its number-one priority, why didn't PG&E turn off the power at the source, the substation, or at Turnoff Switch 941, once it knew it could not track down the problem quickly?

The true reason, I'm convinced after studying PG&E for five years, is that PG&E simply preferred to leave the power on (and the meters turning) until there was actual knowledge of an actual fire or at least of an imminent fire danger. For example, if PG&E had seen that a tree was leaning against the lines, it would've treated it as an imminent fire danger and cut the power. But PG&E, from the dam and highway, could not see all of the line or any of the line where the problem lay. In practice, that preference for power on had often proven out. But sometimes such outages had led to wildfires. Its own Wildfire Mitigation Plan had explicitly recognized the fire risk posed by ground faults. *See* 2021 Wildfire Mitigation Plan, § 7.3.3.9.1, updated June 3, 2021.

All of this was occurring in a High Fire Threat District well into the wildfire season on a circuit already rated by PG&E itself as quite dangerous in terms of wildfire risk. So, even if a harmless scenario had been more likely, the consequences of error should have been weighed. The risk of a catastrophic wildfire, even when discounted by a reduced likelihood of such an event, should have urged extreme caution, all the more so in a case where no inconvenience to customers could have flowed from erring on the side of safety.

6

But PG&E continued feeding power into the circuit.

Here's what the evidence now shows happened in the Dixie Fire. In fact, a tall tree in a remote location had fallen on the power line, a three-phase circuit. Two of three conductors evidently shorted against each other in the crash and blew their two fuses. But the third phase — the one with the unblown fuse — remained energized upstream from the fuses, meaning energized where the tree had fallen. With the tree leaning against an energized line, the tree became a ground fault. Over several hours, the large tree, though a poor electrical conductor, as are all trees, conducted enough power to ground, as will all trees, to overheat and to burst into flames. After the flames eventually broke out and while the burn area was only 600 to 800 square feet, PG&E finally arrived at the scene at 4:40 p.m., but it was too late — the Dixie Fire was underway. The first thing PG&E did, upon arrival, was to cut the power in the third phase (by tripping the third fuse). Had power been shut off hours earlier from the source or Turnoff Switch 941, the tree would have stopped overheating and the fire would never have occurred. (A separate question is whether PG&E should have inspected and found the hazard tree and removed it before it could fall on the line. When the full report by Cal Fire is made public, we will learn the answer.)

Even as the Dixie Fire was raging, PG&E announced a new safeguard called "Fast Trip Mitigation" for its High Fire Threat Districts. With the turn of a knob, PG&E adjusted the settings on its reclosers to shut off power more quickly (and more often) when its monitors show a disturbance on the lines in High Fire Threat Districts. This would have prevented the Dixie Fire. This was a clear step in the right direction, but, if safety had indeed been the top priority all along, why wasn't this safeguard in place before the fire? The reason is in the ingrained culture to keep the meters turning. Why does it take catastrophic conflagrations to force safer standards out of PG&E?

Other systemic problems are identified by the Monitor.

This statement will end by noting PG&E's stubborn refusal to take responsibility for its actions. On the afternoon that the Dixie Fire started, the PG&E Troubleman radioed to his dispatcher that a tree had fallen on the power line and started a fire. He said it twice (Dkt.

7

Nos. 1444-8, 1444-10). He saw it firsthand. By the time of our evidentiary hearing nine weeks later, however, he refused to stand by his firsthand statements to the dispatcher that the tree had started the fire. Instead, he testified that maybe it had been started by lightning. The weather records for the region, however, showed clear skies for at least a week before the fire. Cal Fire has since confirmed that it *was* the tree that fell on the power line and caused the fire, not lightning. This type of evasion has occurred time and again over the last five years.

In probation, with a goal of rehabilitation in mind, we always prefer that criminal offenders learn to accept responsibility for their actions. Sadly, during all five years of probation, PG&E has refused to accept responsibility for its actions until convenient to its cause or until it is forced to do so.

After these five years, as matters have gone from bad to worse, I have come to fear that PG&E should be divided into at least two separate utilities — one to serve the High Fire Threat Districts and one (or more) to serve the rest. Less sprawling utilities would be easier to train and to instill practices and procedures that truly put safety first. And, outsourcing should be outlawed or restricted.

A fair number of victims and amici have asked that probation be extended. The closest authority on point seems to hold that probation may not be extended beyond the statutory maximum of five years, although part of the predicate for that holding has since been eviscerated. Nevertheless, in the absence of a motion by the United States Attorney to extend probation, the Court will not do so on its own.

As PG&E emerges from probation, the Court wishes it well and hopes for its safe success, as it does for all probationers. But the systematic problems summarized in these parting observations and by the Monitor will endure and must be set right.

The Court will retain jurisdiction for the limited purpose of unsealing, as warranted, material in the file for the benefit of the public or others.

Dated: January 19, 2022.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

8